**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KALOMA CARDWELL,**<br><br>                              Plaintiff,<br><br>**v.**<br><br>**DAVIS POLK & WARDWELL LLP, Thomas Reid,**<br>**John Bick, William Chudd, Sophia Hudson, Harold**<br>**Birnbaum, Daniel Brass, and Brian Wolfe,**<br><br>                              Defendants. | CA No. _____<br><br><br>**VERIFIED COMPLAINT**<br>**WITH JURY DEMAND** |

"Our popular history of the [civil rights] movement largely sidesteps how and by whom racial inequality was perpetuated and maintained. Without understanding how and why a system of racial injustice was propelled not only by people who were yelling but by people who were silent, not just by violence but by state bureaucracy, and by refusing to grapple with the various interests and benefits this system accrued for many and the fears people harbored of standing up against it, we miss a key lesson from this history." - Jeanne Theoharis ("A More Beautiful and Terrible History")

"[Law firms] congratulate themselves for going the extra mile to recruit African-Americans while waiting for them to implode." - Vivia Chen ("Time to Call It Racism?")

*   *   *

Plaintiff, Kaloma Cardwell ("Plaintiff"), a former associate of the Firm (defined below), by counsel, for his complaint against Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), Thomas Reid, John Bick, William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, and Brian Wolfe (each person together with the Firm, the "Defendants"), for racial discrimination and retaliation, and alleges, upon actual knowledge as to his own acts, and upon information and belief as to all other matters, as follows:

## SUMMARY OF CLAIMS

1.      Plaintiff was an associate at the Firm from September 2014 through August 2018. During this period, Plaintiff was subjected to discriminatory treatment by, among other things, Defendants' conduct of: (i) ignoring Plaintiff's complaints of racially based disparate treatment; (ii) limiting Plaintiff's professional development and opportunities by assigning Plaintiff to fewer deals and assignments; and (iii) effectively ceasing communication with Plaintiff and thereby depriving him of all billable work (e.g., from 100+ billable hours a month to effectively zero billable hours for four consecutive months) and mentorship opportunities.

2.      When Plaintiff complained of this conduct, Defendants retaliated against him by: (i) threatening his employment and career; (ii) falsifying Plaintiff's performance reviews and other inter-office communications in order to distort the quality of Plaintiff's job performance and justify his firing; and, ultimately, (iii) terminating Plaintiff's employment.

3.      Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against Davis Polk on August 3, 2017 ("Plaintiff's August 2017 EEOC Filing").  On August 6, 2019 the EEOC issued a Right to Sue letter.

## PARTIES

### Plaintiff

4.      Plaintiff is an African American/Black ("Black") male who at all relevant times was an employee of Davis Polk. Plaintiff worked as a summer associate at the Firm in the Summer of 2012 and as an associate at the Firm from September 2014 through August 2018. During his time at the Firm, Plaintiff worked in three corporate departments (also known as

"practice groups"): Credit, Capital Markets, and Mergers & Acquisitions ("M&A"). He worked

as a member of the Firm's M&A group from April 2016 through August 2018. Plaintiff was the

only Black male (and just one of four Black associates) hired in (and a part of) Davis Polk's

2014 associate class of over 120 associates. Plaintiff worked in Davis Polk's New York office at

450 Lexington Avenue, New York, NY 10017. Plaintiff is a resident of New York, New York.

5.      Plaintiff was a "1L Leadership Council on Legal Diversity (LCLD) Scholar" in

2012 and is a life member of the NAACP, the National Bar Association, the Metropolitan Black

Bar Association ("MBBA"), the National Association of Black Journalists, and the African

American Intellectual History Society. Plaintiff is also a former co-chair of the MBBA's Civil

Rights Committee and a former member of both the New York City Bar Association's ("New

York City Bar") Civil Rights Committee and its Diversity Pipeline Initiatives Committee.

Plaintiff advised certain authors of the New York City Bar's 2016 Law Firm Diversity

Benchmarking Report and served on the steering committee for the New York City Bar's

inaugural Associate Leadership Institute.

**Defendants**

6.      The Firm is a limited liability partnership formed pursuant to the laws of the state

of New York, headquartered in New York City at 450 Lexington Avenue, New York, NY 10017,

and was, at all relevant times hereto, Plaintiff's employer. Davis Polk is a global law firm with

offices in ten cities across the world. Upon information and belief, in 2019, Davis Polk had

approximately 157 partners, 105 counsel, 632 associates, and 125 summer associates. According

to *Chambers Associate*, a widely trusted and respected legal publication, approximately 87% of

Davis Polk's partners are White, 81% of Davis Polk's partners are men, and less than 1% of

Davis Polk's partners are Black.

7.     Defendant Thomas Reid ("Reid") was, at all relevant times, a Corporate Partner, Chair, and Managing Partner of Davis Polk, and a member of the Firm's three-person Management Committee.

8.     Defendant John Bick ("Bick") was, at all relevant times, a Corporate/M&A Partner at Davis Polk. He was the head of Davis Polk's global corporate practice and a member of the Firm's three-person Management Committee from 2011 through April 2019. Mr. Bick was the head of Davis Polk's M&A group during Plaintiff's employment at the Firm.

9.     Defendant Sophia Hudson ("Hudson") was, at all relevant times, a Corporate Partner at Davis Polk.

10.    Defendant William Chudd ("Chudd") was, at all relevant times, a Corporate/M&A partner at Davis Polk.

11.    Defendant Harold Birnbaum ("Birnbaum") was, at all relevant times, a Corporate/M&A Partner at Davis Polk and served as a M&A staffing partner at various times during Plaintiff's tenure at Davis Polk.

12.    Defendant Daniel Brass ("Brass") was, at all relevant times, a Corporate/M&A associate or Partner at Davis Polk and served as a M&A staffing partner at various times during Plaintiff's tenure at Davis Polk.

13.    Defendant Brian Wolfe ("Wolfe") was, at all relevant times, a Corporate/M&A Partner at Davis Polk and served as a M&A staffing partner at various times during Plaintiff's tenure at Davis Polk.

## JURISDICTION AND VENUE

14.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C §§ 1331 and

1343(a)(4), 29 U.S.C. §§ 621 et seq.; and the supplemental jurisdiction of this Court over state

and city claims is invoked under 28 U.S.C. § 1367(a).

15.     Plaintiff has exhausted his administrative remedies and on August 8, 2019

received a Right to Sue letter from the EEOC.

16.     Venue is proper within this District since the unlawful actions complained of

herein all occurred within this District.

## RELEVANT BACKGROUND

*The Firm*

17.     Davis Polk first began to evaluate Plaintiff's abilities and motivation in the

Summer/Fall of 2012. At the time, Plaintiff was a law student, and Davis Polk was interviewing

law students for the purposes of evaluating and hiring law students—first as interns (also known

as "summer associates") for the Summer of 2013 and then as full-time associates for its 2014

associate class. During the recruitment process, the Firm portrayed itself as it does on its website,

and touted the following:

- **The Firm**: "For more than 165 years, Davis Polk has ranked among the premier
  law firms with practices that are world class across the board."

- **Pro Bono**: "Pro bono work is a core responsibility of Davis Polk. We are
  committed to serving the public good and providing legal services to those who
  cannot otherwise obtain legal representation."

- **Diversity and Inclusion**: "Davis Polk is a firm of well-rounded people who bring a wide range of perspectives and backgrounds to our work, resulting in a strong and inclusive culture, and more innovative solutions for our clients."

- **Alumni**: "Our alumni are a tremendous source of strength for the firm and are our best brand ambassadors. We have a dynamic alumni network of over 3,000 lawyers who live and work in over 51 countries worldwide across all sectors of business, government, law and academia."

- **History**: "We have worked on many of the most significant business and legal developments of the past 170 years…."

The quotations above are the very first sentences that appear on each of Davis Polk's "Who We Are" sub-sections.

18.      Davis Polk's self-described reputation and values, as noted above, are somewhat consistent with how Davis Polk is perceived by the larger legal and business community. It is not uncommon for Davis Polk to be ranked among the "top five" law firms in the world in multiple practice group or law firm categories. For example, in 2013, an international law publication noted that Davis Polk won "Americas law firm of the year at the annual IFLR Americas awards ceremony…becoming the first to win the coveted award two years in a row."

***Plaintiff – Among the Top Recruits in The Country***

19.      Plaintiff attended UC Berkeley School of Law ("Berkeley Law").  During the three years that Plaintiff attended Berkeley Law, Berkeley Law was ranked in the "top 10" of U.S. law schools.

20.      Prior to law school, as an undergraduate student-athlete at Lehigh University ("Lehigh"), Plaintiff was an exceptional student and recognized leader in his community. At

Lehigh, Plaintiff received numerous undergraduate honors and awards and was recognized as follows:

- Awarded the **Bosey Reiter Leadership Cup**, an annual award where the criteria are defined chiefly in terms of moral character and "a just regard for the rights of others, together with the unflinching determination to succeed, no matter what obstacles and barriers have to be beaten down";

- Awarded **Scholar-Athlete of the Year**, which is the Lehigh football program's highest honor and is given to the student-athlete who best combines success in both academics and athletics;

- Awarded the **Class of 1904 award**, which is awarded based on character, scholarship, qualifications indicating promise of future leadership, and extracurricular activities;

- Nominated and a finalist for the **Senior Male Leadership award**, which is the top athletic department leadership award for a graduating male athlete who best represents the Lehigh traditions of leadership, character, athleticism, scholarship, service, sportsmanship, a team attitude and passion for sports;

- Awarded the **Contribution to Student Life award**, an award that recognizes Lehigh seniors who have significantly contributed to the improvement and quality of student life during their years at Lehigh;

- Awarded Lehigh's **Office of Multicultural Affairs "MVP" award** as a junior and senior; and

- Voted **Captain** of Lehigh's Division 1-AA football team in both his junior and senior years, becoming one of a handful of two-time football captains in the program's 100-plus-year history.

21.     Plaintiff's exceptional academic and professional record continued after undergrad and through law school. In 2011, Plaintiff was one of about 78 students selected from about 750 applicants to participate in the highly competitive Sponsors for Educational Opportunity ("SEO") Corporate Law Internship Program ("SEO Program"). As noted on their website, the SEO Program starts the Summer before law school and gives "accepted law students a paid internship at a top law firm, immersive mentorship and networking, and law school prep and training." SEO's website also notes that "for 30 years, SEO…has served as a pipeline linking talented pre-law students of color to elite global law firms."

22.     As a pre-law student in the SEO Program, Plaintiff interned in the Summer of 2011 at Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"), an international law firm that is headquartered in New York City and that employed, at the time, about 600 attorneys. At the conclusion of Plaintiff's internship at Fried Frank, and prior to starting law school in the Fall of 2011, Fried Frank evaluated Plaintiff's performance and ultimately asked Plaintiff to return the following Summer to join their 2012 summer associate law class.

23.     In addition to the SEO Program, Berkeley Law also assessed Plaintiff's abilities and motivation prior to his matriculation to law school in the Fall of 2011. In the Spring of 2011, Berkeley Law selected Plaintiff to receive a *Berkeley Law Dean's Fellowship* ("Berkeley Law Dean's Fellowship"). At the time, Berkeley Law informed Plaintiff that "*this prestigious award, based on your strong record of achievement and professional promise, is provided to only a few entering students each year. The purpose of the Dean's Fellowship is to support students*

*showing outstanding leadership experience, significant potential for success, and innovation in their approach to seeking the nexus between law, policy, and justice. In other words, Dean's Fellows are law students that we believe will bring new vision to the study of the law, and will strive to transform that vision into action.*"

24.     Plaintiff's merit-based Berkeley Law Dean's Fellowship provided a total of $75,000 of support and was in addition to any need-based grant. Ultimately, Berkeley Law offered Plaintiff an additional $30,000 in merit-based scholarships to discourage Plaintiff from accepting similar scholarships that other top-ranked law schools had offered Plaintiff in the Spring of 2011.

25.     Though some Black law students are characterized as benefiting from affirmative action, at the time that Berkeley Law evaluated Plaintiff's law school application, Berkeley Law was legally prohibited from using race-based affirmative action in their admission and evaluation process. Plaintiff, along with just a handful of students, was awarded the above competitive, merit-based scholarship awards out of the 300-plus students who joined Berkeley Law in the Fall of 2011.

26.     Plaintiff continued to demonstrate a distinguished record of academic achievement and commitment to service and justice as a Berkeley Law student. By the time Plaintiff interviewed with Davis Polk in the Summer/Fall of 2012, Plaintiff was:

- the Co-President of Berkeley Law's Black Law Student Association;

- an editor and member of *The Berkeley Journal of African-American Law & Policy*;

- a mock trial team member of Berkeley Law's prestigious and highly selective "Board of Advocates";

- honored as 1 of 8 out of 40 participants to win an individual "Outstanding Attorney" award in a Berkeley Law school-wide trial advocacy competition;

- recognized as a 1L Leadership Council on Legal Diversity (LCLD) Scholar; and

- a volunteer teacher to incarcerated youths in California's prison system.

27.     Between the time that Plaintiff interviewed with Davis Polk in 2012 and graduated from Berkeley Law in May 2014, Plaintiff had deepened his record of accomplishment and commitment to service and justice, as evidenced by the fact that Plaintiff:

- worked as a research assistant to john a. powell, the director of the Haas Institute for a Fair and Inclusive Society and the holder of the Robert D. Haas Chancellor's Chair in Equity and Inclusion;

- finished as a semi-finalist in the American Association for Justice (AAJ) National Student Trial Advocacy Competition;

- finished in the Top 10% (High Honors) and Top 40% (Honors) in several law classes that included both corporate courses and civil rights courses; and

- received one of the highest grades in his legal ethics and professional responsibility course due to an essay that Plaintiff authored, which was entitled "An Opportune Time to Engage Inclusion, Democracy, and...Race."

***The Firm Recruits Plaintiff – They Know He's Black***

28.     In the Fall semester of 2012, Plaintiff participated in his law school's on-campus interviewing process. Davis Polk was one of several law firms that interviewed Plaintiff in the Fall semester of 2012.

29.     On or about August 6, 2012, Davis Polk interviewed Plaintiff. During this interview, Plaintiff was interviewed by [DAVIS POLK PARTNER #7][1], a Davis Polk Partner.[2] In connection with the interview, [DAVIS POLK PARTNER #7] and the Firm received Plaintiff's transcript, resume, and writing sample.

30.     On or about August 8, 2012, after reviewing Plaintiff's academic and professional record, Davis Polk invited Plaintiff to participate in a second round of interviews at their New York City headquarters ("Plaintiff's Fall 2012 Second Round Davis Polk Interview"). Plaintiff accepted Davis Polk's invitation and interviewed with the Firm shortly after.

31.     During Plaintiff's Fall 2012 Second Round Davis Polk Interview, the Firm's interviewers made it clear that they viewed Plaintiff's dedication to racial inclusiveness positively. Relatedly, during Plaintiff's Fall 2012 Second Round Davis Polk Interview, a Davis Polk partner explicitly told Plaintiff that Plaintiff was the type of candidate who would essentially have the country's best law firms competing to hire him, saying something to the effect of, "You're clearly very talented. Someone like you will be able to pick virtually any law firm he wants. Can you tell me why—out of all of the firms you could work at—you're interested in possibly working at Davis Polk?"

32.     On or about August 22, 2012, Davis Polk offered Plaintiff a spot in their 2013 summer associate class.

33.     On or about August 28, 2012, Plaintiff accepted the Firm's offer to join their 2013 summer associate class on the condition that Plaintiff be allowed to split and work part of the 2013 Summer at another global law firm that was interested in hiring Plaintiff.

---

[1] This Complaint uses bracket placeholders to make certain Davis Polk attorneys' and staff persons' identities/names anonymous. Such persons' names may be specified in an amended complaint or subsequent filing.
[2] All descriptions and references to Davis Polk attorneys and staff refer to such persons and their status or title at the Firm at the time the applicable events or interactions occurred.

34.     Throughout the Summer of 2013, Davis Polk repeatedly hinted that Plaintiff would receive a job offer to join the Firm upon graduation. Knowing that Plaintiff had other options, Davis Polk directly and indirectly checked-in with Plaintiff throughout the Summer to assess which firm Plaintiff believed might be a better fit for his short and long-term legal career and aspirations.

35.     In the Summer of 2013, Davis Polk had between 125 and 140 partners and just one Black partner.

36.     Thus, when asked about his prospects, Plaintiff pointed to the numbers, the Firm's 165-year history, and expressed concerns.

37.     On multiple occasions in the Summer of 2013, Plaintiff informed Davis Polk that his prior law school and interning experiences, among other experiences, helped him understand that appropriate staffing, feedback, training, and mentorship are critical to junior associates' skills, development, and future career opportunities. Within those same interactions, Plaintiff clearly communicated that these dynamics were even more critical for Black junior associates who work at law firms that have very few Black partners.

38.     Davis Polk attempted to address Plaintiff's priorities and concerns by explaining to Plaintiff that though the Firm had struggled in the past to recruit and retain Black law students and associates, the Firm had recently implemented and would continue to implement policies and practices that would allow the Firm to monitor Black associates' experiences and assignments to ensure Black associates would not "fall through the cracks" or receive fewer or worse opportunities and training than their White and/or White male peers.

39.     Within the ongoing dialogue between Plaintiff and Davis Polk about challenges unique to or associated with Black associates, Davis Polk described a series of deliberate steps

they relied upon to address such challenges, including tracking how Black associates were staffed, the types of assignments Black associates received, how many billable hours Black associates were billing, the quality of the deals and cases that Black associates worked on, and communicating relevant discrepancies and concerns with Black associates.

40.     Also during the recruitment phase, Davis Polk attempted to address Plaintiff's priorities and concerns by explaining to Plaintiff that Davis Polk would assign Black associates mentors and work with Black associates if Black associates appeared to be or actually were behind their peers in terms of billable hours or quality of work. At the time, Davis Polk made it clear to Plaintiff that Davis Polk believed and understood that there were a number of law firm dynamics (i) that were unrelated to Black associates' work ethic or abilities and (ii) that could cause Black associates to have fewer hours and less quality work assignments than their law firm peers.

41.     Additionally, Davis Polk explained to Plaintiff that because Davis Polk hires Black law students who are considered among the best in the country, the Firm would try to prevent Black junior associates from thinking that they should leave Davis Polk early in their careers for other seemingly better career opportunities.

42.     On multiple occasions in the Summer of 2013, Davis Polk attempted to recruit Plaintiff by informing Plaintiff that the Firm wanted Plaintiff and other Davis Polk minorities to use their knowledge and experiences on race-related issues to (i) strengthen the Firm's commitment to racial justice and diversity and inclusion issues and (ii) take an active role in recruiting additional Black and non-White law students and lawyers.

43.     Defendants made no secret of the fact that they considered Plaintiff's dedication to racial inclusiveness an additional benefit to his already robust qualifications. Plaintiff was

assured that Davis Polk would be an environment in which his social advocacy would be valued and that they envisioned him taking an active role in recruiting additional minority associates.

44.     From the time Plaintiff first interviewed with Davis Polk, Plaintiff remained committed to racial inclusion and racial justice as a law student. During that time span, Plaintiff co-authored and/or contributed to the following Supreme Court briefs and articles:

- Co-authored "Homeownership, Wealth, and the Production of Racialized Space" along with john a. powell (published by both the *Harvard Joint Center for Housing Studies* and the *Brookings Institution Press* in the book "Homeownership Built to Last: Balancing Access, Affordability, and Risk after the Housing Crisis");

- Assisted with underlying research used in an amicus Supreme Court brief of housing scholars in support of the respondent in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) (a Supreme Court case that concluded that disparate-impact claims are cognizable under the Fair Housing Act);

- Assisted with an amicus Supreme Court brief of housing scholars in support of respondents in *Township of Mount Holly, N.J.* v. *Mt. Holly Gardens Citizens in Action Inc.*, 133 S. Ct. 2824 (2013);

- Assisted with an article entitled "Fisher v. Texas: The Limits of Exhaustion and the Future of Race-Conscious University Admissions" by john a. powell;

- Assisted with an article entitled "America's Struggle with Integration: The Continued Struggle for Its Soul" by john a. powell;

- Assisted with an article entitled "Affirmative Action: Where Do We Go From Here?" by john a. powell; and

- Assisted with an article entitled "What Constitutes a Racial Classification? Equal Protection Doctrine Scrutinized" by Stephen Menendian.

45.     At the conclusion of Plaintiff's Summer 2013 summer associate internships, Plaintiff received job offers from several of the world's best law firms. Based in part on Davis Polk's strategic, persistent, and partially tailored recruitment of Plaintiff, Plaintiff accepted the Firm's full-time associate offer on or about October 4, 2013.

46.     Plaintiff graduated from Berkeley Law School in May 2014 and commenced working at Davis Polk as an associate on September 15, 2014.

## STATEMENT OF FACTS

**i. Being ignored, no problem. Being left out, no problem. Complain to the boss, problem.**

47.     As early as April 2014, Davis Polk had been notified of and accepted as fact that it had a problem with bias and unconscious bias at the Firm. Upon information and belief, Jerry Kang—a scholar on the nexus between race, implicit bias, and the law and the current Vice Chancellor for Equity, Diversity and Inclusion at The University of California, Los Angeles (UCLA)—gave a presentation in April 2014 at Davis Polk that focused on how bias functions in law firms.

48.     Consistent with the Firm's recruitment of Plaintiff—as well as the Firm's ongoing conversation about bias, diversity, and inclusion—Plaintiff was encouraged to join Davis Polk's "Black Attorney Group" (or BAG as it is commonly called) and provide feedback to the Firm with respect to these and related diversity and inclusion topics.

49.     On March 6, 2015, Davis Polk's "DPWomen Affinity Group" hosted and facilitated a firm-wide discussion—which Mr. Reid and Plaintiff attended and participated in for the entirety of the program—on women and discrimination in the workplace. As detailed in four essays that served as the basis of the discussion (i.e., the *New York Times* series, "Women at Work" by Adam Gran and Sheryl Sandberg), Mr. Reid and other participants explicitly talked about, among other things, (i) how senior attorneys and partners at Davis Polk continue to favor men over equally qualified women in performance evaluations; (ii) how Davis Polk senior associates and partners disproportionately ask women to handle secretarial and less substantive aspects of cases and deals; (iii) how women reasonably choose to "speak up" less, in part, because women are often unfairly and disproportionately punished when they do speak up; and (iv) how Davis Polk disproportionately asks women associates to recruit and mentor women associates and help with diversity initiatives, and how such time commitments and contributions to the Firm are often uncompensated and effectively penalized in performance reviews.

50.     Davis Polk's program explicitly discussed an article entitled, "When Talking About Bias Backfires," which noted that "new research suggests that if people are not careful, making people aware of bias can backfire, leading them to discriminate more rather than less."

51.     Plaintiff experienced a series of discriminatory interactions that mirrored those analyzed at Davis Polk's March 6, 2015 DPWomen Affinity Group discussion.

52.     For example, in an email sent to [Davis Polk's Director] on May 8, 2015, Plaintiff flagged a discriminatory "inter-office," personally-experienced pattern with [Davis Polk's Director], a Davis Polk Executive Director who worked closely with the Firm's management

committee and various other partner committees on policy formulation in the areas of personnel, associate development, and firm management.[3]

53.     Plaintiff's email noted that interpersonal trainings that highlight the value of associates speaking to unfamiliar faces and creating a welcoming environment would benefit everyone. Specifically, Plaintiff's email described situations where Davis Polk attorneys were not making eye contact with or speaking to summer associates and junior associates of color in meetings.

54.     This incident is the first time that Plaintiff actively flagged personally experienced and observed discrimination and actively sought help from Defendants.

55.     In response, [Davis Polk's Director] minimized the issue to the "social awkwardness" of attorneys, said that "unfortunately that happens to everyone," recognized that Plaintiff was possibly describing interactions that he had, and ultimately shifted the burden to Plaintiff by telling Plaintiff, "Hopefully if this happened to you, you showed them how to live in polite society(!) and introduced yourself."

56.     Based on the wording of the email and context, [Davis Polk's Director] recognized that Plaintiff was indeed or possibly describing racial interactions that "happened to [Plaintiff]." [Davis Polk's Director] knew or should have known Plaintiff was cautiously describing personally experienced interactions, in part, because of the nature in which Black Davis Polk associates typically reached out to [Davis Polk's Director]. [Davis Polk's Director] was experienced enough—and had participated in enough bias-related trainings and

---

[3] Davis Polk has described [Davis Polk's Director] as "one of the leaders of the Firm's diversity and inclusion efforts," a description that was consistent with the fact that [Davis Polk's Director] often participated in formal and informal conversations about racial dynamics at Davis Polk. Among the Firm's Black associates in particular, many Black Davis Polk attorneys viewed [Davis Polk's Director] as Davis Polk's most senior and influential executive director, as it was widely understood within the Firm that the Firm's management committee, and Mr. Reid in particular, utilized [Davis Polk's Director] to routinely monitor and address Black associates' experiences, grievances, and requests.

conversations at the Firm—to know that there are many reasons why a Black associate, let alone a first-year Black associate, might not be more explicit about bias and discrimination in an email. Further, [Davis Polk's Director]'s response was wholly disconnected from Plaintiff's raised concern for an additional reason: the wording of Plaintiff's email made it clear that Plaintiff was not describing something that "happens to everyone." [Davis Polk's Director] never inquired about or brought the incident up again with Plaintiff.

57.     [Davis Polk's Director]'s response was inconsistent with how [Davis Polk's Director] would have responded if Plaintiff were a woman who had similarly hinted that men at the Firm were not speaking or making eye contact with her and other women.

58.     While [Davis Polk's Director]'s excuse—that is, some attorneys lack manners—and dismissal of Plaintiff's complaint can seem reasonable in isolation, Defendants' conduct toward Plaintiff continued to escalate.

59.     In 2015, Plaintiff suffered through a series of discriminatory interactions that were motivated by his race and resulted in exclusion from opportunities that are vital to a young attorney's professional development and career.

60.     While Plaintiff was working in Davis Polk's M&A group, on multiple occasions, Plaintiff was left off email communications and meeting invitations (i) that were circulated to all attorneys working on the deal and/or (ii) that should have included Plaintiff.

61.     On one occasion, Plaintiff became aware of this type of disparate treatment when Plaintiff spontaneously walked into the office of a White M&A associate (of Plaintiff's same class year), who was working on the same deal as Plaintiff. On this occasion, Plaintiff noticed the associate was invited to and listening in on a conference call with high-level clients and senior attorneys for the exclusive purpose of listening and learning. On this occasion, the

associate explained that she was only on the call for the purposes of listening. The associate apologized that Plaintiff was not informed about the conference call and made it clear that she did not understand why Plaintiff didn't receive in email/invitation to join the call. As a result of this experience, Plaintiff asked the associate to forward all emails or meeting invitations to Plaintiff if she thought Plaintiff was excluded when he should have been included. Without hesitation, the associate agreed and, for the rest of 2015, periodically forwarded emails to Plaintiff that Plaintiff should have received from White senior M&A associates.

62.     In September 2015, Plaintiff became a second-year associate.

63.     In September 2015, the Firm's Black Attorney Group was having conversations with the Firm about how Davis Polk could improve its diversity and inclusion practices and outcomes. In preparation for a meeting between the Firm's Black associates and the Firm's Diversity Committee, the Firm's Black Attorney Group sent the Firm's Diversity Committee the following questions and statements, which were prepared for the purpose of discussing them with both the Firm's Diversity Committee and Mr. Reid in separate meetings:

    a.   "*How can we strengthen the relationship between the Diversity Committee and the affinity groups? What are some of the Diversity Committee's action items for this recruiting season/next year?*"

    b.   "*I would be interested in hearing about the diversity consultant that the firm is considering bringing in to talk to the partners.*"

    c.   "*What is the Diversity Committee's opinion as to where the biggest need is with respect to diversity at the firm (i.e., recruiting, retention, something else)?*"

d. "*Do you have a sense what our peer firms are doing with respect to diversity initiatives?*"

e. "*How can we further engage non-diverse lawyers in the discussion about diversity at the firm?*"

64.    In September 2015, the Firm's Diversity Committee and the Firm's Black Attorney Group met to discuss the questions above and other issues related to diversity and inclusion. Partners serving on the Firm's Diversity Committee, and the Firm's Director of Associate Development, attended the meeting. Many Black Davis Polk attorneys were also in attendance. During this meeting, Plaintiff participated in a conversation about the general issue of Black Davis Polk attorneys being excluded from staffing-related opportunities at the Firm and was careful not to mention any information that could be connected to any specific attorneys at the Firm. After Plaintiff flagged the issue before the aforementioned partners and Director of Associate Development, he was directly asked whether he had personally experienced exclusion and bias related to his race at the Firm. Plaintiff answered affirmatively. In the verbal exchange that followed, Plaintiff explicitly stated that he wasn't just talking about the *feeling* of being excluded, but rather that the type of exclusion he referred to was and is harmful to his and other Black associates' professional development and careers because the disparate treatment relates to fewer and different staffing-related opportunities.

65.    This incident is the second time that Plaintiff actively flagged personally experienced and observed discrimination and actively sought help from Defendants.

66.    Neither the Director of Associate Development nor any of Davis Polk's partners in attendance followed-up with Plaintiff about his comments or his (or others') experience.

67.     On or about December 1, 2015, Mr. Reid was a featured speaker at an hour and a half long New York City Bar event. The event mainly focused on what leaders in the legal profession can do to improve attorneys' happiness and development.  Most of the event's discussion was about diversity and included what appeared to be over 100 audience members in attendance. Plaintiff and a senior Black associate were in attendance, a fact that Mr. Reid voluntarily highlighted for the entire audience by explicitly naming Plaintiff and the senior Black associate by name and by referring to both as (or in substantially the same terms as) "two of Davis Polk's rising/shining stars." Upon information and belief, Ms. Hudson and [Davis Polk's Director] were also in attendance. Here's how *Bloomberg BNA*, a source for business and legal information, summarized the event and Mr. Reid's involvement in an article entitled "Law Firms Lose Talent In-House Because of Diversity, GC says":

> "*At one point, a plaintiffs attorney in the audience, Jeanne Christensen of Wigdor [i.e., one of the leading employment-discrimination law firms in the country], posed a question to Reid, asking how his law firm **supports diverse and female attorneys so they can climb the ranks***.

> *Reid acknowledged that 'the statistics are not impressive at all, clearly,' but said he makes a point to look at firm diversity in meetings with practice leaders three times a year as they 'talk about **how work at the firm is getting allocated**.'*

> *'**That's the foundation**,' said Reid. 'And on top of that we have a formalized mentoring program. It doesn't match up people who are alike.'*

> *He said that at the end of the day, achieving diversity 'comes from an*
> *attitude of (leaders) caring and a desire to be engaged in everyone's*
> *career.' Reid added that firm leaders need to be 'connected' with their*
> *younger attorneys....*" (emphasis added).

68.     At the conclusion of the event, Mr. Reid approached the senior Black associate and Plaintiff and invited them to dinner. The dinner was ultimately scheduled for January 21, 2016.

69.     Both the senior Black associate and Plaintiff realized that the dinner would be a good opportunity to ensure that Mr. Reid was informed about their individual (as well as other Black associates') goals and concerns. Both the senior Black associate and Plaintiff understood how rare it was for associates, especially Black Davis Polk associates, to have a few uninterrupted hours of conversation with the Managing Partner of Davis Polk.

70.     On January 21, 2016, Mr. Reid, the senior Black associate, and Plaintiff had dinner together at a restaurant. During dinner, the conversation naturally transitioned to a discussion about diversity and inclusion issues at Davis Polk. The senior Black associate and Plaintiff spent a significant amount of time educating Mr. Reid on how they and other Black associates at Davis Polk had experienced interpersonal and institutional discrimination at the Firm.

71.     This incident is the third time that Plaintiff actively flagged personally experienced discrimination and actively sought help from Defendants.

72.     Plaintiff had responsibly escalated his complaints from an [Executive Director], then to Davis Polk's Diversity Committee (which included partners and the Firm's senior

management), and finally to Davis Polk's Managing Partner, the person with the ultimate

authority and obligation to investigate Plaintiff's claims.

73.     Mr. Reid responded, in part, by stating that there are a significant number of

Davis Polk partners who hold seemingly contradictory views on bias at the Firm. That is,

according to Defendant Reid's remarks, many Davis Polk partners (i) believe that existing

research confirms Black and other minority attorney groups experience bias in the workplace and

at Davis Polk while they also (ii) believe that they themselves are fair and would never act with

bias against attorneys from those groups. In other words, in conversations with Mr. Reid, Davis

Polk's partners apparently and conveniently maintained that race-related biased interactions and

decisions exist—just not with themselves or any Davis Polk partners they work with. Mr. Reid

expressed frustration about the difficulty of getting Davis Polk partners to accept objective and

reasonable evidence related to racial bias and minority attorneys.

74.     Notwithstanding Mr. Reid's statements, however, nothing changed at the Firm.

Despite receiving real-time compliments from associates and partners, things started to change

for Plaintiff.

75.     Notwithstanding the disparate treatment that he faced, Plaintiff continued to excel.

**ii. Plaintiff is complaining about racism. Kindly show him the way out.**

76.     Instead of conducting meaningful inquiries into the discriminatory activity

highlighted by Plaintiff, Defendants began a year-long process to create a pretextual record and

conspire to deprive Plaintiff of work, distort assessments related to the quality of Plaintiff's work

product, and obstruct his professional advancement in hopes that he would voluntarily leave the

Firm.

*From "No Basis" to Review to Deceptive Reviews and No Deals.*

77.     According to a written performance review[4] that appears to have been retroactively created after Plaintiff engaged litigation, Mr. Chudd purportedly stated in 2015 that he had "**limited**" contact with Plaintiff. More importantly, Mr. Chudd provided the following answers to the following questions in the same review:

    a.  Question: "Overall, do you feel like this lawyer is performing materially behind, with or ahead of the lawyer's class"?

        i.  Answer: "No Basis"

    b.  Question: "Potential for growth and versatility"?

        i.  Answer: "No basis"

    c.  Question: "Ability to analyze legal issues"?

        i.  Answer: "No basis"

    d.  Question: "Knowledge of relevant substantive law"?

        i.  Answer: "No basis"

    e.  Question: "Understanding of accounting issues and ability to work with quantitative concepts"?

        i.  Answer: "No basis"

    f.  Question: "Understanding of the overall business context (including the relationship between the business problems and legal issues presented)"?

        i.  Answer: "No basis"

    g.  Question: "Presentation skills"?

---

[4] As will be further explained in this Complaint and legal action, at no point during Plaintiff's time at Davis Polk did the Firm allow Plaintiff to see or review his performance reviews. Every reference to Plaintiff's written performance reviews in this Complaint relates to documentation that Plaintiff only became aware of after Plaintiff engaged in litigation with Davis Polk and after the EEOC or Davis Polk shared documents that were a part of the Firm's EEOC response.

          i.   Answer: "No basis"

h.   Question: "Negotiation skills"?

          i.   Answer: "No basis"

i.   Question: "Working hard"?

          i.   Answer: "No basis"

j.   Question: "Being thorough, well organized and efficient"?

          i.   Answer: "No basis"

k.   Question: "Deal management skills"?

          i.   Answer: "No basis"

l.   Question: "Ability to handle multiple matters simultaneously"?

          i.   Answer: "No basis"

m.   Question: "Willingness to volunteer and pitch-in wherever necessary (take on new work, review standard forms, help with recruiting, etc.)"?

          i.   Answer: "No basis"

n.   Question: "Self-confidence/maturity"?

          i.   Answer: "No basis"

o.   Question: "Judgment and common sense"?

          i.   Answer: "No basis"

p.   Question: "Delegation, management, training and supervision of junior lawyers"?

          i.   Answer: "No basis"

q.   Question: "Standing with peers, junior lawyers and staff"?

          i.   Answer: "No basis"

    r.  Question: "Client management skills (including responsiveness to client

       needs)"?

         i.  Answer: "No basis"

    s.  Question: "Focus on client development (including being proactive in

       developing relationships with individuals at the client and in identifying

       business opportunities and effectiveness in business pitches)"

         i.  Answer: "No basis"

***First Face-to-Face "Performance Review."***

78.    In December 2015, Mr. Chudd gave Plaintiff his first annual face-to-face review at the Firm. The 2015 annual review lasted a few minutes, as Mr. Chudd briefly gave positive feedback and then briefly gave two suggestions. For the first suggestion, Mr. Chudd told Plaintiff to "work on better setting expectations regarding how long it will take to do something." The second suggestion was a bit more cryptic and went something along the lines of "Don't spend too much time thinking about the bigger picture."

79.    In response to Mr. Chudd's first suggestion, Plaintiff responded during the face-to-face review by briefly mentioning that he was a bit surprised by the feedback and that it didn't match his habits or any feedback that had been communicated directly to him. Plaintiff acknowledged that he would work on better setting expectations and, at the end of the meeting, explicitly asked Mr. Chudd if he had any advice on how to get supervising attorneys to provide real-time feedback so that he could better account for attorneys' personal preferences. Mr. Chudd acknowledged that it could be difficult to get such feedback and encouraged Plaintiff to continue trying.

80.     Plaintiff did not directly question Mr. Chudd's second suggestion during the interview.

81.     After the meeting, Plaintiff immediately discussed his face-to-face review with a few Davis Polk associates. In those conversations, Plaintiff stated that he was a bit frustrated with the vague, unsupported reference to setting expectations and was confused and uncomfortable about the second point. Both Plaintiff and the Davis Polk associates with whom he spoke with noted that Mr. Chudd's suggestion to not "spend too much time thinking about the bigger picture" was odd and inconsistent with how senior attorneys typically want junior associates to spend more time trying to figure out the bigger picture on deals and cases. Both Plaintiff and the referenced Davis Polk associates discussed whether Mr. Chudd would or had made a similar comment to White junior associates.

82.     Upon information and belief, sometime between February 2016 and June 2016, a senior non-White associate overheard a Davis Polk capital markets attorney refer to Plaintiff in racially biased terms. Upon information and belief, the capital markets attorney's comments were made to or in the presence of Mr. Reid. Upon information and belief, the senior non-White associate heard the comment as well and was so taken aback that such associate immediately told Mr. Reid something along the lines of, "If Plaintiff were a White associate, we both know that you would let Plaintiff know about this incident." Upon information and belief, Mr. Reid acknowledged and understood the senior non-White associate's concern and told such associate that he would personally follow-up with Plaintiff. Upon information and belief, the senior non-White associate emailed Mr. Reid the next day and reminded him to follow-up with Plaintiff. Upon information and belief, Mr. Reid responded to that email and again promised to personally

follow-up with Plaintiff. Neither Mr. Reid nor any Davis Polk partner or staff member has ever mentioned this incident to Plaintiff.

### Second Odd and Untimely Face-to-Face "Performance Review."

83.     On June 14, 2016, a non-White junior M&A associate sent Plaintiff feedback on a memo that she and Plaintiff were working on for (and had submitted to) Mr. Bick. In that email, the associate stated: "*Thank you for all the detailed feedback and the wonderful tips! Wow, it looks quite impressive with your section added! (I saw that you made some edits for my portion in this final version—thank you for catching them all, and I promise I will work harder to identify these edits next time so that you don't have to spend so much time correcting my portion.) I look forward to the next phase of this project! Thanks so much, [Plaintiff]!*" (emphasis added).

84.     On June 30, 2016, Mr. Bick sent Plaintiff an email that stated, "Let me know when you have a spare moment to discuss another research assignment re: [REDACTED]." "The research assignment" in Mr. Bick's email referred to the same matter that involved the memo referenced in the prior paragraph.

85.     When Plaintiff got to Mr. Bick's office, Mr. Bick spent just a few minutes describing the additional research assignment and then abruptly pulled out and opened a folder while stating, "*I know you asked for feedback, so I figured I'd take a few minutes to go through your reviews.*" Plaintiff immediately became concerned, as Plaintiff hadn't requested a performance review or non-real time feedback from anyone at the Firm and because, at this stage in Plaintiff's career, Plaintiff had no knowledge that anyone at Davis Polk had received this type of unannounced face-to-face "review."

86.     As noted above and in Mr. Bick's own email, Plaintiff came to Mr. Bick's office

because Mr. Bick wanted to "discuss another research assignment." Unlike Plaintiff's official

prior face-to-face reviews, Plaintiff never received an email calendar invite or any type of

advanced notice from Mr. Bick or anyone else that such a "review" would take place.

87.     Consistent with Plaintiff's real-time concerns that Mr. Bick was conducting a

sham face-to-face review, Mr. Bick made critiques regarding Plaintiff's performance that were

inconsistent with Plaintiff's experience and the positive feedback he had received up to that

point.

88.     Immediately after the meeting, Plaintiff contacted a senior Davis Polk associate

and informed that associate that Mr. Bick just conducted a surprise face-to-face review and

opened the discussion with a blatant lie (i.e., that Mr. Bick was giving the face-to-face review in

response to a request by Plaintiff).

89.     Plaintiff also highlighted to the senior Davis Polk associate that the substance of

Mr. Bick's remarks also concerned Plaintiff and communicated the following summary of the

June 30, 2016 unannounced face-to-face review to the senior Davis Polk associate: Mr. Bick

stated during the face-to-face review that, "*It's been noted on a few occasions that you have a

pattern of missing deadlines*." Plaintiff responded to Mr. Bick during the meeting by saying

"*That feedback is extremely surprising. I'm sitting here wracking my brain and I'm struggling to

think of any deadlines that I've missed, and I can't think of any. I haven't missed any deadlines.

Can you provide examples of 'deadlines' that I missed?*"

90.     Mr. Bick's response only created more concern, as Mr. Bick responded with a

reply that is deeply inconsistent with the typical written and spoken precision practiced by Mr.

Bick and other Davis Polk M&A partners, as well as the amount of pre-planning that Davis Polk

M&A partners typically engage in prior to giving an associate a face-to-face review. Mr. Bick replied: "Well, don't think of it as deadlines" and proceeded to discuss general timing critiques that where phrased so vaguely that no associate would have been able to assess, verify, or dispute.

91.     Plaintiff informed Mr. Bick that Mr. Bick's feedback was inconsistent with his interactions at work and that such feedback had never been communicated orally or in writing to Plaintiff prior to their conversation. Plaintiff requested additional information, including to be provided with any specific examples that served as the basis of such critiques, but Mr. Bick was unable to provide Plaintiff with any specific examples.

92.     Plaintiff thought Mr. Bick's inability to provide examples was alarming, as Mr. Bick had critiqued Plaintiff while pretending to be holding and reading performance reviews that were supposedly submitted and a part of Plaintiff's file. Plaintiff asked Mr. Bick if he could go back to the reviewers and try to learn what the reviewers could possibly be referring to. Mr. Bick indicated that he would but never followed up with Plaintiff or subsequently provided Plaintiff with any specific examples.

93.     After the unannounced face-to-face review, as noted above, Plaintiff immediately spoke with a senior Davis Polk associate and described the face-to-face review as it appears in this Complaint. The senior Davis Polk associate was immediately and similarly concerned and upset (i) that a partner or group of partners at Davis Polk made the conscious decision to not give Plaintiff feedback informally but through a process that could become a part of his official record, (ii) that no one from Davis Polk provided any advance notice about the face-to-face review, and (iii) that it was highly unlikely that Mr. Bick, a Davis Polk partner with vast leadership experience at the Firm, coincidentally or carelessly used the words "missed

deadlines." Mr. Bick's immediate retraction of the words "missed deadlines," when questioned, fueled further suspicion with the senior Davis Polk associate, as it is commonly known among Davis Polk associates that Davis Polk partners meet before giving associates face-to-face reviews to discuss what should be said during an associate's face-to-face review and how such feedback should be communicated.

94.     After Mr. Bick met with Plaintiff on June 30, 2016 under the false pretenses of assigning Plaintiff "another research assignment," Mr. Bick did not respond to Plaintiff's follow-up emails regarding the assignment itself. On July 19, 2016, Plaintiff emailed Mr. Bick a 15-page research memo that Mr. Bick had requested on June 30, 2016. Mr. Bick never responded to Plaintiff's email.

95.     On July 26, 2016, Plaintiff sent another follow-up email to Mr. Bick about the 15-page memo. Once again, Mr. Bick never replied to Plaintiff's email and never mentioned the "assignment" to Plaintiff again. During the same time period, Mr. Bick, whose office was just two doors down the hall from Plaintiff's, would often walk by Plaintiff in the hallways without any physical or verbal acknowledgment that Plaintiff was also in the hallways. Mr. Bick did not email Plaintiff *any* emails (i.e., where Plaintiff was listed in the "to" or "cc" line in the email) between July 15, 2016 and May 3, 2017—a time period that spans roughly 307 days.

### The Face-To-Face Reviews are Contradicted by the Facts.

96.     Davis Polk and other law firms utilize and rely on written performance reviews ("performance reviews") in order to assess and document the quality of attorneys' work product, principal matters worked on, strength and weaknesses, improvements, special recognitions earned (i.e., other contributions to the firm), and development priorities for the next year, among

other things.  Davis Polk and other law firms also use performance reviews to document and track feedback that applies to and/or is given to associates.

97.     On an annual basis, at Davis Polk, the process for creating and collecting performance reviews is done through a formal, systematic process that involves the Firm asking associates and partners to complete and submit review forms for the applicable (and more junior) reviewee. After senior attorneys submit their completed reviews for an associate and the Firm compiles such reviews, a partner "reviewer" eventually has a face-to-face meeting with the relevant associate and discusses the submitted performance reviews with such associate. Such face-to-face reviews ("face-to-face review") usually occur at the end of the year. Ultimately, the partner reviewer summarizes in a written "Summary Review" (that such partner submits to the Firm) (i) the key conclusions found in the submitted performance reviews and (ii) the key discussion points that were a part of the applicable face-to-face review.

98.     Reviewing attorneys, associates who are being reviewed, and the partner reviewers all understand that performance reviews can, and often do, "make-or-break" attorneys' careers. For that reason (among others), the Firm gives both reviewing attorneys and associates who are being reviewed advance notice and a meaningful amount of time to either (i) submit performance reviews or (ii) prepare for their face-to-face review with their partner reviewer.

99.     Davis Polk uses performance reviews as the official (i.e., authoritative) and permanent record for assessing attorneys and determining whether and to what degree attorneys should have a future at the Firm.

100.    In a performance review that was submitted by a White senior Corporate associate in March 2015, an associate noted that he had "**extensive**" contact with Plaintiff and that the difficulty of Plaintiff's assignment was "**complex**." To the question, "Do you feel this lawyer is

performing materially behind, with or ahead of lawyer's class?" The reviewer answered "**with**."
The reviewer also noted that Plaintiff is "a **hard worker** and tries to please. He is **proactive** in offering help. He makes himself available." (emphasis added).

101.     In a performance review that was submitted by a non-White senior Corporate associate in March 2015, an associate noted he had "**extensive**" contact with Plaintiff and that the difficulty of Plaintiff's assignment was "**complex**." To the question, "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class?" The reviewer answered "**with**." The reviewer also noted that Plaintiff is "**able to understand issues and deal with the mechanics of a complex closing**. He's very easygoing and easy to work with." (emphasis added).

102.     In a "interim [performance] review" that [DAVIS POLK PARTNER #6], a Davis Polk Corporate Partner, submitted in May 2015, [DAVIS POLK PARTNER #6] was asked to provide comments related to the "substance of [the] evaluation (including reviewee's performance compared to expectations for a lawyer of the same seniority)." To that question prompt, [DAVIS POLK PARTNER #6] wrote: "**Generally positive – organized, high quality work, good attention to detail, hard worker**." (emphasis added).

103.     In a performance review that was submitted by a White senior M&A associate in September 2015, an associate noted that she had "moderate" contact with Plaintiff and that the difficulty of Plaintiff's assignment was "routine." To the question, "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class?" The reviewer answered "**with**." The reviewer also stated, "I appreciate that [Plaintiff] **wants to learn and be involved** in the deal he [sic] very quickly volunteers to join calls and take on work." (emphasis added).

104.     In a performance review that was submitted by a non-White senior Corporate associate in November 2015, an associate noted that he had "**extensive**" contact with Plaintiff and that the difficulty of Plaintiff's assignment was "routine." To the question, "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class?" The reviewer answered "**with**." The reviewer also noted that Plaintiff is "**hardworking** and **always willing to help**. He did a good job with the schedules and other diligence matters on the deal." (emphasis added).

105.     Regarding documentation related to Plaintiff's performance reviews in 2016, Mr. Reid, Ms. Hudson, Mr. Bick, and Davis Polk knowingly created and later submitted to the EEOC negative conclusions about Plaintiff's work that did not fully or accurately capture the context, nature, and substance of Plaintiff's work product or the real-time assessments of attorneys who worked with Plaintiff. Plaintiff has contemporaneous documentation that makes it plain that Defendants submitted false statements and characterizations to the EEOC. [5]

106.     Moreover, the documentation that Davis Polk attributed to Ms. Hudson and that supposedly describes the quality of Plaintiff's work product during Plaintiff's rotation in the Firm's Capital Markets group in 2015 and 2016 is directly contradicted by meetings and conversations that Plaintiff had with Capital Markets partners, as well as Ms. Hudson's own real-time statements to Plaintiff.

107.     Out of roughly 200+ emails—spanning from October 28, 2015 through March 21, 2016—that involved Plaintiff and Ms. Hudson during Plaintiff's rotation in the Firm's Capital Markets group—the most direct and negative feedback that Ms. Hudson provided to Plaintiff

---

[5] On April 27, 2018, Plaintiff filed a supplemental charge of discrimination against Davis Polk, describing that Davis Polk's retaliatory decision to terminate Plaintiff's employment was connected to performance evaluations that were contrary to real-time feedback that Plaintiff had received. Upon information and belief, Ms. Hudson's last day as a partner at Davis Polk was in July or August 2018.

related to Plaintiff incorrectly using the word "I" instead of "me" in an internal email (i.e., an email that was not sent to any of the Firm's contacts or otherwise impact the Firm's clients). The relevant exchange occurred on December 17, 2015 and was as follows:

Plaintiff's email to Ms. Hudson:

"*Hi Sophia, Attached, please find the following drafts (each clean and marked against the respective early tender documents): [REDACTED LIST OF DOCUMENTS]. Please let me know if you have any comments.*

*Also, before [the senior capital markets associate on the deal] heads off on vacation this weekend, is there a time tomorrow that you'll be available to meet with [White senior associate] and I?*"

Ms. Hudson's immediate and entire response to the email above:

"*[Plaintiff], No one likes to be corrected on grammar, but it's something partners and sophisticated clients notice a lot so I hope you'll take my advice in the right spirit. Please be careful using I/me. 'Me' is the appropriate pronoun to use below as it is being used as an object of the preposition 'with.' Best, Sophia*"

108.    After Plaintiff's and Ms. Hudson's matters concluded and they stopped working together at the end of 2015/beginning of 2016, Ms. Hudson had virtually no communications with Plaintiff, let alone any communications with Plaintiff about Plaintiff's work product. Once Plaintiff and Ms. Hudson stopped working together, Ms. Hudson did, however, subsequently reach out to Plaintiff to ask Plaintiff if he could recommend a Black restaurant that is in Harlem, New York City. Plaintiff obliged.

109.    Not only did communications stop with Mr. Bick, Ms. Hudson, and other Davis Polk partners, but Defendants found ways to keep Plaintiff off deals.

*After The Sham Reviews, Plaintiff's Assignments Go From Bad To None.*

110.    Both while Davis Polk was recruiting Plaintiff and when Plaintiff was a junior associate, Davis Polk routinely communicated to Plaintiff and other Firm associates that the Firm designed its current procedures related to staffing attorneys in an effort to minimize and eliminate the racial bias flagged by Plaintiff, the Firm's Asian/South Asian/Middle Eastern group, and the diversity and inclusion consultants hired by the Firm. To that end, Davis Polk's policies discouraged partners and senior attorneys—especially when it came to deals and high-profile cases—from bypassing staffing coordinators and using informal channels to staff junior associates. Davis Polk understood, knew, and warned the Firm's associates and partners that such practices had been shown to disproportionately discriminate against and disadvantage women and non-White attorneys at law firms.

111.    During the period in which Plaintiff was permanently assigned to Davis Polk's M&A group (i.e., April 2016 - August 2018), Davis Polk's policies and procedures around staffing were as follows: each week, associates completed a "weekly capacity form," indicating their availability, the type of matters such associate was working on (e.g., names of team members, expected number of hours one expected to work on that matter that week), upcoming vacations, and additional comments/requests, among other things. A staff person then compiled associates' weekly capacity forms into a single chart and sent it (i) to the M&A junior associate assignment coordinator (who used the chart as a guide to staff first- and second-year M&A associates) and (ii) to the two most junior M&A partners (who used the chart as a guide to staff third-year and more senior associates). When the Firm's M&A partners or associates had M&A staffing needs, the requesting attorney sent an email to the applicable coordinator based on the seniority level needed. It was not uncommon for staffing coordinators to ask an associate prior to

staffing that associate, "Have you worked on 'x' yet or worked with this person already?" Because the two most junior M&A partners served as M&A staffing coordinators and did not have complete, independent control over staffing, the junior M&A staffing partners were often in constant communication with Mr. Bick and other, more senior M&A partners about how third-year and more senior associates should be staffed to meet Firm needs (and policies) and partners' preferences. For similar reasons, the junior associate assignment coordinators did not have complete, independent control over staffing.

112.    [Davis Polk Junior Staffing Coordinator #1] was responsible for staffing Plaintiff (and other second-year M&A associates) from April 2016 through the beginning of September 2016. When [Davis Polk Junior Staffing Coordinator #1] was unavailable (e.g., on vacation), either [Davis Polk Junior Staffing Coordinator #2], a staffing coordinator for junior corporate associates who was a member of the Firm's staff (i.e., not a partner or associate), or [Davis Polk Junior Staffing Coordinator #3], an Associate Development Manager who was a member of the Firm's staff (i.e., not a partner or associate), would typically staff junior associates until [Davis Polk Junior Staffing Coordinator #1] returned.

113.    Relevant to Plaintiff's claims is not just how the Firm staffed Plaintiff but also what deals and matters the Firm allowed Plaintiff to work on. In corporate law and among partners and associates at Davis Polk, the difference between (i) M&A "deals" and "transactions" and (ii) M&A "work," "matters," "tasks," "projects," "research, "document review," or "assignments" is both widely understood and significant. "Deals" influence heavily tracked and publicized M&A rankings, M&A fees, legal awards and prestige, associates' partnership and lateral prospects, and clients' and potential clients' perceptions of attorneys' and firms' sophistication and ability to handle complex matters. As such, within the Firm's M&A

group and across the Firm and legal profession, Davis Polk routinely (A) discussed during

Plaintiff's tenure at Davis Polk and continues to discuss its M&A deal rankings (for the

applicable time period), (B) highlighted during Plaintiff's tenure and continues to highlight

"deals and cases" on its homepage (among other places), and (C) emphasized during Plaintiff's

tenure and continues to emphasize rankings in its "Who We Are" section on the Firm's website

(e.g., "For more than 165 years, Davis Polk has **ranked** among the premier law firms with

practices that are world class across the board)." (emphasis added).

114.    Around the time that (i) Mr. Bick conducted a sham review of Plaintiff and (ii)

both a non-White senior associate and Davis Polk's Asian/South Asian/Middle Eastern group

had asked Mr. Reid to take specific actions to interrupt, prevent, or eliminate race-related bias

and disparate treatment at the Firm, Plaintiff began to notice an overall pattern where he was

assigned to fewer deals (which are central to the revenue of the Firm, the M&A practice group,

and the reputation of associates) than the White third-year associates in his practice group.

115.    Instead, and as compared to the White M&A associates at the Firm, Plaintiff was

assigned to more (i) research-related assignments (which are only tangential to the Firm's M&A

business and core revenue streams), (ii) assignments that did not require Plaintiff's or his Davis

Polk peers' level of experience, and (iii) assignments that involved temporarily assisting in the

middle or end of a matter (which, if staffed repeatedly on such matters, makes it difficult for an

attorney to get the type of experiences that are expected or required of mid-level and senior

associates).

116.    As a second-year associate, on May 25, 2016, [Davis Polk Junior Staffing

Coordinator #1] staffed Plaintiff on a *project* that did not require a second-year associate's legal

experience. [Davis Polk Junior Staffing Coordinator #1] staffed Plaintiff on the project after the

requesting M&A attorney, a White senior M&A associate, emailed the following to [Davis Polk Junior Staffing Coordinator #1]: "*[Davis Polk Junior Staffing Coordinator #1], is there a second year or good [**first-year**] to help me with the [REDACTED] project? ([A non-White associate] is too busy. I think) It will take a day's work, but **not big [sic] ongoing commitment**. Fine to be someone with vacation coming up.*" (emphasis added).

117.   On June 8, 2016, as previously described, [Davis Polk Junior Staffing Coordinator #1] staffed Plaintiff on a "business research" assignment for Mr. Bick.

118.   On June 28, 2016, [Davis Polk Junior Staffing Coordinator #2] emailed Plaintiff and asked him to reach out to a White senior M&A associate to assist M&A partner Gar Bason on a non-deal assignment. The email stated, "*Can you please reach out to [the senior M&A associate] to assist [*the associate*] with a [Directors & Officers] review assignment for Gar and [REDACTED]. She said it's not a rush but should be completed in the next week or two. It is the **review** of indemnity **agreements**, so probably would take 20-30 hours*." (emphasis added). Plaintiff agreed and was staffed on the assignment.

119.   On June 30, 2016, [Davis Polk Junior Staffing Coordinator #2] asked Plaintiff (and Plaintiff agreed) to help a senior M&A associate on a PowerPoint presentation. The associate's staffing request for this assignment stated, "*I need a **first** or second year to help me update the statistic in the attached as soon as possible.*" (emphasis added). At the time, the associate indicated to Plaintiff that the associate was surprised that they were once again working together.

120.   On June 30, 2016, as noted above, Mr. Bick staffed Plaintiff on an additional research assignment. Mr. Bick's email to Plaintiff stated: "Let me know when you have a spare moment to discuss **another research assignment** re [REDACTED]. (emphasis added).

121.    Contrary to how the Firm was staffing Plaintiff, each week from about July 2016 through May 2017, Plaintiff included in his weekly capacity form an additional request to work with five specific partners who frequently ran M&A deals: Mr. Reid, Mr. Birnbaum, and M&A partners [DAVIS POLK PARTNER #3], [DAVIS POLK PARTNER #4], and [DAVIS POLK PARTNER #5]. Although Plaintiff's request was in line with the Firm's normal and preferred staffing protocols, most of Plaintiff's assignments, to his and other associates' confusion, continued to be either non-deals or with the same handful of senior associates with whom Plaintiff was already working or had already worked with.

122.    On July 8, 2016, Plaintiff was staffed on a simple matter with a non-White senior M&A associate. The associate's staffing request to [Davis Polk Junior Staffing Coordinator #1] stated: "*Hi* [Davis Polk Junior Staffing Coordinator #1]*, Now that [REDACTED] is away on secondment, would it be possible to have another second year help me with the corporate governance matters for [REDACTED]? The only immediate task is a **simple matter** for Monday, otherwise **10% is enough** until towards the end of the year.*" (emphasis added). The associate's reference to "10% is enough" meant that the senior associate estimated that the assigned associate would only use about 10% of their total weekly capacity on the matter. Notably, if an associate's capacity is full of similarly small matters (i.e., as measured by the estimated or actual capacity required), such associate will not have enough capacity to work on a M&A deal, which can often require an associate to have an available capacity around 40-100%.

123.    On July 13, 2016, Plaintiff was staffed on a non-deal matter involving a White woman senior M&A associate. At the time, the senior associate had informed Plaintiff that she had a discussion with either the supervising partner on the matter or her M&A partner advisor to discuss her concern that this matter was (i) not a deal, (ii) not the type of matter clients typically

hire the Firm's M&A group to work on, (iii) unlikely to help her develop critical and desired deal experience, and (iv) potentially the type to become too cumbersome and ultimately soak up her capacity such that she'd be effectively prevented from having enough capacity to work on deals.

124.     On July 19, 2016, as referenced above, Plaintiff sent an email to Mr. Bick, stating, "*John, As discussed, please find attached a draft summary of the financial arrangement between [REDACTED] and [REDACTED]. Please let me know if you have any questions or comments. Happy to discuss.*" Mr. Bick never responded to Plaintiff's email.

125.     On July 20, 2016, [Davis Polk Junior Staffing Coordinator #3] reached out to Plaintiff and staffed Plaintiff on a small project that would only require a handful of sporadic hours. [Davis Polk Junior Staffing Coordinator #3]'s email stated: "*Hi [Plaintiff], Darren Schweiger needs some help with a **small project** for a joint venture. It will be a **handful of hours** between today and Wednesday, then more **sporadic** after that. Can you please help out with this?*" (emphasis added).

126.     On July 22, 2016, after many months, Plaintiff was finally staffed on an M&A deal. As instructed by [Davis Polk Junior Staffing Coordinator #1], on July 22, 2016, Plaintiff reached out to Mr. Brass, a White then-senior M&A associate and current M&A Davis Polk partner. Plaintiff's email exchange with Mr. Brass went as follows:

- **Plaintiff to Mr. Brass** (2:39 p.m.): "*Hi Daniel, I'll be assisting you on the [REDACTED] deal. When your schedule permits, please let me know when you'd like to discuss.*"

- **Mr. Brass's Response** (2:41 p.m.): "*Thanks.* [The senior associate] *will reach out to you [sic]*"

- **Plaintiff's Response** (2:46 p.m.): "*Thanks, Daniel.*"

- **Mr. Brass's Response** (5:38 p.m.): "*I think you stand down for now!*"

- **Plaintiff's Response** (5:42 p.m.): "*Thanks, Daniel. Will do. Any sense if and when the status of the deal could change?*"

- **Mr. Brass's Response** (5:43 p.m.): "*I think we are ok for the near future.*"

- **Plaintiff's Response** (5:44 p.m.): "*Understood.*"

127.    Mr. Brass's abrupt removal of Plaintiff from the M&A deal was done in secret and without the permission of the deal's staffing coordinator. Typically, Davis Polk senior associates explain to junior associates how the status or nature of a deal has changed and how the change impacts the junior associates previously discussed role on the deal. Mr. Brass's discriminatory actions were willful and blatant.

128.    On July 22, 2016, at 6:04 p.m., Plaintiff emailed the above email conversation to [Davis Polk Junior Staffing Coordinator #1], alerting her to Mr. Brass's unauthorized, disparate treatment of Plaintiff. [Davis Polk Junior Staffing Coordinator #1] did not provide an explanation for Mr. Brass's behavior and merely acknowledged receipt of Plaintiff's email.

129.    On July 26, 2016, as referenced above, Plaintiff sent a follow-up email to Mr. Bick (that included the July 19, 2016 email to Mr. Bick), stating, "*Hi John, Just a quick follow-up on the below. Happy to discuss if you have any questions or comments.*" Mr. Bick never responded to Plaintiff.

130.    On August 4, 2016, [Davis Polk Junior Staffing Coordinator #1] asked Plaintiff if Plaintiff could temporarily "cover" for a first-year associate who was going on vacation for two weeks. Plaintiff agreed and the first-year associate replaced Plaintiff once she returned from vacation.

131.    Also, on August 4, 2016, Plaintiff followed-up with [Davis Polk Junior Staffing Coordinator #1] to try to understand why Mr. Brass removed Plaintiff from the deal on July 22, 2016. Plaintiff asked [Davis Polk Junior Staffing Coordinator #1] the following: "*Separately, and in light of the email that I forwarded to you on the 22nd, has* **anyone** *made a decision to limit my involvement to certain types of deals and matters?*" (emphasis added).

132.    This incident is the fourth time that Plaintiff flagged personally experienced discrimination and actively sought help from Defendants.

133.    Rather than email Plaintiff back, [Davis Polk Junior Staffing Coordinator #1] called Plaintiff and passionately told him, "*Not at all. I'm not sure what happened on that deal [with Mr. Brass] and haven't talked to anyone since. Do you know what happened?*" After Plaintiff responded that he had no clue why he was removed and never received any explanation, [Davis Polk Junior Staffing Coordinator #1] remarked that Mr. Brass's behavior was "weird."

134.    Despite a Davis Polk staffing coordinator's insistence that Plaintiff staffing was not in any way limited to certain types of deals and matters, as a result of how the Firm did and didn't staff Plaintiff during 2016, Plaintiff was often underutilized and underdeveloped. For more than five successive weeks in mid-2016, Plaintiff indicated on his weekly capacity form that he had a capacity of greater than 50% (i.e., more than half of his hours were available for new assignments).

135.    On August 16, 2016, Plaintiff was staffed on an M&A deal with a senior M&A associate and [DAVIS POLK PARTNER #2], which was essentially the first and last M&A deal that Plaintiff was staffed on in 2016 ("Plaintiff's Last 2016 Deal").

136.    On August 18, 2016, per a White senior M&A associate's instruction, Plaintiff emailed M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis and cc'd the senior

associate. In connection with the June 28, 2016 assignment that Plaintiff was staffed on, Plaintiff sent the M&A partners Plaintiff's draft of an indemnification agreement for their review and edits. Plaintiff's email stated: "*All, A few weeks back, [REDACTED] asked us to take a look at their current indemnification agreement and summary of indemnification policy as part of a general corporate housekeeping review. We reviewed the indemnification agreement against [Davis Polk's] standard form and other resources/precedents we found. Generally, we thought that the agreement was in good shape and only had a few suggestions. Attached please find our comments to the indemnification agreement and policy summary. Also attached for your reference is [REDACTED] main indemnification policy. We are happy to discuss.*" Neither Arthur Golden, Gar Bason Jr., nor Michael Davis responded to Plaintiff's email or otherwise communicated with Plaintiff.

137.    On September 7, 2016, per the senior associate's instruction, Plaintiff emailed M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis again with a follow-up reminder regarding Plaintiff's email. The email stated, "*All, Quick follow-up regarding our review of [REDACTED] indemnification agreement and indemnification policy. Please let us know if we can be of any further assistance or if you have any questions or comments.*" Again, neither Arthur Golden, Gar Bason Jr., nor Michael Davis responded to Plaintiff's email or otherwise communicated with Plaintiff.

138.    Instead, and even though it was clear from the email that Plaintiff was the primary reviewer and editor of the documents, Arthur Golden chose to separately reach out to the White senior associate and exclusively discuss with the senior associate his edits to the documents.

139.    On September 9, 2016, per the same White senior associate's instruction, Plaintiff emailed Gar Bason Jr. a third time and cc'd Arthur Golden and the senior associate. The email

stated, "*Gar, Attached, please find revised drafts that reflect Arthur's comments…. Please let us know if you have any further comments.*" Gar Bason Jr. never responded to Plaintiff's email.

140.    At the time, the White senior M&A associate expressed confusion to Plaintiff as to why none of Davis Polk's M&A partners ever responded to Plaintiff's emails. At no point during the matter, did of any of Davis Polk's partners ever respond to Plaintiff's email or verbally communicate with Plaintiff.

141.    Arthur Golden's, Gar Bason Jr.'s, and Michael Davis's lack of communication with Plaintiff cannot be explained by the quality of Plaintiff's work on the assignment. In an email dated August 15, 2016, the White senior M&A associate provided the following feedback to Plaintiff regarding the relevant indemnification assignment: "*I'm so sorry it took me forever to review this. **Very good work** on it. Attached please find my comments/thoughts. Some items I thought we could [revert back to the original language as opposed to using your edits] just to minimize changes. Please let me know if it would be helpful to discuss.*" (emphasis added).

142.    On September 8, 2016, within days of Plaintiff becoming a third-year associate, [Davis Polk Junior Staffing Coordinator #2] asked Plaintiff if he could and would accept being staffed on a potentially lengthy non-M&A matter (i) that did not involve Plaintiff working directly with any Davis Polk partners (from any practice group) or M&A associates, or require Plaintiff's (or his peers') level of experience and (ii) that would have further stalled Plaintiff's development as a soon-to-be mid-level M&A attorney who would be evaluated within the Firm as an M&A attorney. Specifically, in [Davis Polk Junior Staffing Coordinator #2]'s initial email and inquiry, [Davis Polk Junior Staffing Coordinator #2] asked Plaintiff if Plaintiff could assist with a list of tasks, including "one-off tasks," that are widely understood within Davis Polk and

corporate law to be tasks that are routinely assigned to first-year (and possibly second-year) associates.

143.    What is more, [Davis Polk Junior Staffing Coordinator #2]'s initial email and inquiry made it clear that Plaintiff was not being staffed as part of a larger plan to develop Plaintiff as an attorney but because "[the Firm's] credit juniors [were] over capacity and [the Firm had] a few juniors going on vacation." For these reasons and others, and because [Davis Polk Junior Staffing Coordinator #2] merely asked Plaintiff about his interest and capacity to work on the non-M&A matter (as opposed to instructing Plaintiff to work on the non-M&A matter), Plaintiff asked if they could briefly meet to discuss [Davis Polk Junior Staffing Coordinator #2]'s inquiry. [Davis Polk Junior Staffing Coordinator #2] and Plaintiff met shortly thereafter.

144.    In their meeting, Plaintiff briefly described his assignment history and told [Davis Polk Junior Staffing Coordinator #2] something that is substantially similar to the following:

> "*I'm more than happy to work on anything you or anyone else would like me to, but I wanted to share two concerns that I have. **As a Black associate, I'm concerned** about the **general pattern** that exists across the legal profession and **within Davis Polk**. That is, it's typically the case that when Black associates are fourth-, fifth-, and sixth-year associates, White associates often have—for reasons that have nothing to do with merit or work ethic—a resume with more experience and better quality work than Black associates of the same year. Because those are my concerns, I am trying to get as much work in M&A as possible and work with as many M&A attorneys and partners as possible. The reality is that a potentially lengthy credit assignment, which we know expected-to-be short credit assignments can unavoidably become virtually year-long assignments in the Firm's*

*Credit group, will pull me away from opportunities to learn and work with M&A attorneys.*" (emphasis added).

145.    This incident is the fifth time that Plaintiff flagged personally experienced and observed discrimination and actively sought help from Defendants.

146.    Plaintiff expressly noted that he didn't want his career and trajectory to become a part of the pattern described above. During the conversation, Plaintiff also explicitly told [Davis Polk Junior Staffing Coordinator #2] that he'd be happy to work on any assignment that the Firm wanted him to work on, including the non-M&A assignment she initially inquired about, as long as she and the Firm could ensure that the staffing was not a part of the pattern of discrimination described above. After hearing Plaintiff's above statements, and after Plaintiff pointed to specific and documented staffing patterns involving non-White Firm associates, [Davis Polk Junior Staffing Coordinator #2] told Plaintiff and that she would not staff him on the non-M&A matter. [Davis Polk Junior Staffing Coordinator #2] added: "*You clearly have thought about this a lot more than I have.*" Plaintiff then explained again that, if the Firm had a plan to prevent the previously described discrimination-related pattern, he'd be happy to work any assignment the Firm wanted him to, including the non-M&A assignment. [Davis Polk Junior Staffing Coordinator #2] again responded by saying she wouldn't staff Plaintiff on the non-M&A assignment. Following their conversation, [Davis Polk Junior Staffing Coordinator #2] did not arrange or coordinate any new assignments for Plaintiff and did not have any subsequent conversations with Plaintiff about the concerns he shared with her. [Davis Polk Junior Staffing Coordinator #2] did not staff Plaintiff because, at the very least, she was not confident that Plaintiff's staffing did not involve discrimination. Throughout the entire meeting, and in every

conversation since, [Davis Polk Junior Staffing Coordinator #2]'s and Plaintiff's conversation was cordial, professional, and non-confrontational.[6]

147.   In September 2016, Plaintiff became a third-year associate.

148.   On September 29, 2016, and after Plaintiff had billed almost 235 hours for the month, Davis Polk removed Plaintiff from Plaintiff's Last 2016 Deal. The Firm removed Plaintiff from the deal with the following email, which was sent by the senior associate on the deal: "*[Plaintiff], Since you have been tied up with the [REDACTED] restructuring, we have asked [REDACTED/a second-year associate] to fill in for you through signing on [REDACTED]. Please let us know when you free up. I hope things get more manageable soon.*"

149.   The "restructuring" matter that the associate referred to in his email was the same matter that a senior M&A associate had flagged for a M&A partner when she was staffed on it and had described as (i) not a deal, (ii) not the type of matter the Firm's M&A group typically works on, (iii) unlikely to help her develop critical and desired M&A/deal experience, and (iv) the type to become too cumbersome and potentially consume so much of her capacity that she'd effectively be prevented from having enough capacity to work on a deal. The Firm did not staff Plaintiff on another M&A deal over the next eight months.

150.   After Plaintiff was permanently assigned to Davis Polk's M&A group in April 2016, (i) Davis Polk did not staff Plaintiff on deals at the same rate as his White peers, (ii) a White senior Davis Polk attorney violated the Firm's staffing policies and practices and removed Plaintiff from a deal, and (iii) the Firm conveniently used Plaintiff's non-deal assignments as a justification to remove Plaintiff from Plaintiff's Last 2016 Deal.

---

[6] On August 3, 2017, Davis Polk received the substance of the above description of Plaintiff's conversation with [Davis Polk Junior Staffing Coordinator #2] in Plaintiff's August 2017 EEOC Filing. Upon information and belief, [Davis Polk Junior Staffing Coordinator #2]'s last day as an employee of Davis Polk was August 18, 2017.

*Coincidence? Of course not.*

151.    According to [Davis Polk Junior Staffing Coordinator #1] and Davis Polk's policy at the time, Mr. Birnbaum and Mr. Wolfe (i.e., the two most junior M&A partners at the time) replaced [Davis Polk Junior Staffing Coordinator #1] and became responsible for staffing Plaintiff and all other third-year and more senior associates. As early as September 2016, and possibly earlier, Mr. Birnbaum and Mr. Wolfe received and reviewed Plaintiff's (and other M&A associates in Plaintiff's class) weekly capacity forms, which noted which matters he and other associates were working on and how many hours they had available to take on additional work. Moreover, Davis Polk had computer programs that tracked how many billable hours associates had and hadn't billed, among other data related to staffing.

152.    Mr. Birnbaum and Mr. Wolfe did not staff Plaintiff on *any* matters in 2016. Mr. Birnbaum and Mr. Wolfe did not attempt to discuss, or have any conversations, with Plaintiff about why they and the Firm decided not to assign Plaintiff to any new matters. Even though Plaintiff routinely (e.g., once a month) had one-on-one interactions with Mr. Birnbaum (in Mr. Birnbaum's office), Mr. Birnbaum never mentioned or addressed Plaintiff's unusually low hours, or anything related to the quality of Plaintiff's work product.

153.    Defendants' discriminatory actions and refusal to staff Plaintiff on deals in a manner that was consistent with White Davis Polk associates of the same year were intentional and blatant.

154.    In the case of Mr. Birnbaum, Mr. Birnbaum went about 443 days (i.e., from about June 14, 2016 to August 31, 2017) without sending Plaintiff a single email (i.e., notwithstanding group emails to practice groups and other listservs (e.g., emails to "All Lawyers")).

155.     In the case of Mr. Wolfe, Mr. Wolfe went over 628 days (i.e., from about April 13, 2016 to the beginning of 2018) without sending Plaintiff a single email (i.e., notwithstanding group emails to practice groups and other listservs).

156.     Mr. Bick, then the head of the Firm's M&A practice group, similarly ignored and isolated Plaintiff. Mr. Bick went about 292 days (i.e., from about July 15, 2016 to May 3, 2017) without sending Plaintiff a single email (i.e., notwithstanding group emails to practice groups and other listservs (e.g., to "All Lawyers")). As a result of the coordinated efforts of Mr. Bick, Mr. Birnbaum, Mr. Wolfe, among others, and the Firm, Plaintiff experienced, at various times, both unusually low billable hours and drastic drops in billable hours. Plaintiff's number of hours billed in the second half of 2016 and beginning of 2017, as determined by the billable hours that Plaintiff submitted and the Firm tracked and accepted without any disagreement or questioning of Plaintiff, were as follows:

| Plaintiff's Billable Hours | |
| --- | --- |
| **Month** | **# of Hours Billed** |
| May 2016<br><br>(note: Plaintiff was on vacation for two-weeks during this month) | 101.1 |
| June 2016<br><br>(note: Plaintiff had traveled for his swearing-ceremony during this month) | 99.7 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | 234.7 |
| October 2016 | 113 |
| November 2016 | 69 |
| December 2016 | 14.1 |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.8 |

157.    It is clear from the chart above (and the underlying time sheets) that there is a stark difference between the months where [Davis Polk Junior Staffing Coordinator #1] (or, in the event of her absence, her non-Firm partner replacement) was significantly involved in staffing Plaintiff and the months where Mr. Bick, Mr. Birnbaum, and Mr. Wolfe had exclusive and primary control over staffing Plaintiff. Virtually every billable hour noted in the chart above (and the underlying time sheets) relates to a staffing assignment that Plaintiff received from a non-Davis Polk partner.

158.    As previously noted, when asked on December 1, 2015 "how [Mr. Reid's] law firm supports diverse and female attorneys so they can climb the ranks," Mr. Reid explicitly

answered that "the foundation" of such support involved Mr. Reid meeting with "practice leaders three times a year as they 'talk about work at the firm is getting allocated.'" When it came to Plaintiff, Mr. Reid and the leaders of the Firm's M&A group did indeed discuss how work should be allocated to Plaintiff. The evidence indicates that Plaintiff didn't merely slip through so-called cracks in Davis Polk's staffing system; rather, Defendants repeatedly dug a hole that would be almost impossible for Plaintiff to climb out of.

159.    Defendants' decision to not fully or properly staff Plaintiff and to increasingly stop communicating with Plaintiff during the second half of 2016 cannot be reasonably explained by Plaintiff's performance.

### Plaintiff is respected in and out of the Firm.

160.    On October 7, 2016, a Davis Polk associate from a non-M&A group sent the following email to Plaintiff: *"Was just at drinks with a classmate of mine, he was RAVING about how wonderful you are to work with, etc etc [sic] etc."* (emphasis in original email). The non-M&A associate was referring to a White junior M&A associate who was working on the restructuring deal (as noted above) with a senior M&A associate and Plaintiff.

161.    It is notable that the same institutions and individuals that Davis Polk viewed as the authority with respect to a variety of assessments and trainings related to measuring and improving law firms, lawyers' development, and diversity and inclusion outcomes, are the same institutions and individuals that objectively viewed Plaintiff as having exceptional judgment and competencies related to lawyering, law firms, and the legal profession.

162.    In October 2016, a senior director of Diversity and Inclusion at the New York City Bar recruited Plaintiff to join the New York City Bar's Civil Rights Committee. Plaintiff subsequently joined. A few months later, that same director, a person with a widely recognized

expertise related to working with legal employers (including Davis Polk) to foster more diverse and inclusive work environments, recruited Plaintiff to serve on the planning committee for the New York City Bar's inaugural Associate Leadership Institute, an American Bar Association award-winning series of high-level development trainings for mid-level and senior corporate law associates. Plaintiff was recruited to help design curriculum and training modules for the program's participants—i.e., over 100 law firm associates from 47 law firms within the first two years of the program's operation. Plaintiff served on the planning committee and helped recommend, evaluate, and select participants from the program's applicant pool, the curriculum, and instructors for the training sessions.

163.    Not only did members of Davis Polk's leadership reach out to Plaintiff at the time to hear Plaintiff's assessment of the quality of the New York City Bar's Associate Leadership Institute, Davis Polk subsequently and successfully worked to get two of its highest performing and most respected senior non-White associates to apply and be accepted into the associate leadership program that Plaintiff helped design. Since the associate leadership program's inception, every year, Davis Polk has sent at least two of its highest performing senior non-White attorneys to participate in the program.

164.    On October 31, 2016, in a communication to a third-party, a senior Black associate of the Firm and recipient of some of the Firm's highest honors and praise, described Plaintiff in the following way: "*I first became aware of [Plaintiff] in the fall of 2014 through the Black Affinity Group (BAG), a support network and networking outlet for black attorneys at the law firm where he and I work, Davis Polk & Wardwell LLP. As I have found to be the case for others who come to know [Plaintiff], before I met him, I knew his name and of his ability to connect people to actionable ideas. In BAG, he exhibits leadership among more senior attorneys*

*and partners and quite frequently is deferred to once he has given his input….[O]ur many conversations…have led me to see [Plaintiff] as one of the few people in an office of over 700 people who is my go-to person for key decision points, whether I'm considering navigating the politics of potential partnership consideration or troubleshooting ways to get better to ensure the success of our diverse peers.*"

165.    On December 5, 2016, a senior Black associate voluntarily emailed the Black Attorney Group's listserv and stated: "All, [o]ne of our own has been featured in the [Metropolitan's Black Bar Association's] newsletter below. Congratulations, [Plaintiff]." The senior Black associate was drawing attention to the fact that the Metropolitan Black Bar Association (i.e., New York City's largest Black Bar Association) had featured Plaintiff in its "MBBA Leadership Spotlight."

166.    Also, in the Winter of 2016, a senior Black associate, then one of the Firm's most senior Black associates and a member of the Black Attorney Group's Steering Committee (which served as a leadership sub-committee for the Black Attorney Group and a liaison between the Firm's leadership and the Black attorneys at the Firm), began to recruit Plaintiff to join and serve on the steering committee. The senior Black associate recruited Plaintiff instead of and over a handful of eligible Black Davis Polk associates who were more senior than Plaintiff. Plaintiff officially joined the Black Attorney Group's Steering Committee in December 2016 and at the time was the most junior Black Davis Polk associate on the committee.

167.    Throughout Plaintiff's time at the Firm, the Firm's recruiting department routinely praised Plaintiff for his effort and impact and frequently asked Plaintiff to attend or assist with various recruiting and interviewing events. According to the performance review documentation the Firm submitted to the EEOC, Plaintiff's 2015 annual Summary Review stated

that Plaintiff "went **above and beyond** in regarding [sic] to recruiting and the summer program." (emphasis added). Similarly, according to the performance review documentation the Firm submitted to the EEOC, Plaintiff's 2016 annual Summary Review noted that Plaintiff received a "commendation" for his pro bono/recruiting efforts.

### *Still no work.*

168.    Defendants' treatment and termination of Plaintiff's employment is directly at odds with assessments that Plaintiff received from departments and associates that Defendants could not easily manipulate or distort.

169.    Regarding the same months and years that Davis Polk associates, the Firm's non-Partner leadership, and countless others across the legal profession were increasingly praising, recognizing, and consulting Plaintiff for his ability to evaluate, navigate, and shape Davis Polk and other legal institutions, Davis Polk retroactively argued to the EEOC that the abrupt changes to Plaintiff's staffing and evaluation were because Davis Polk partners repeatedly and legitimately reached a radically opposite conclusion about Plaintiff and his competency.

170.    Defendants' actions during the second half of 2016 cannot be reasonably explained as anything other than discriminatory conduct.

171.    In addition to not staffing Plaintiff on any deals and matters, virtually all of Davis Polk's M&A partners isolated and ignored Plaintiff.

172.    Week after week, for months, Davis Polk M&A partners walked by Plaintiff while knowing that they were not going to staff Plaintiff on any assignments—while knowing that at a law firm like Davis Polk, it is virtually impossible for an associate to go throughout his or her day without encountering multiple lawyers and colleagues who would ask, "So, what are

you working on?" "Working on anything interesting?" "Have things been pretty busy for you or the group?"

173.    Week after week, for months, Davis Polk partners isolated Plaintiff with the knowledge that otherwise routine daily interactions—such as constantly being asked what type of legal matters one is working on—would become a form of harassment and humiliation that almost always leads to isolated associates feeling like they have no other choice but to so-called voluntarily leave their law firms. During this period, Plaintiff similarly experienced a constant barrage of direct and indirect forms of harassment and humiliation.

### Third Face-to-Face "Performance Review."

174.    On December 20, 2016, [DAVIS POLK PARTNER #2] met with Plaintiff and gave Plaintiff his December 2016 annual face-to-face review. Defendants' treatment of Plaintiff in the second half of 2016 was not acknowledged or explained to Plaintiff in his December 2016 annual face-to-face review. Similar to Mr. Bick's decision in June 2016 to give Plaintiff a face-to-face "review" without advanced notice, [DAVIS POLK PARTNER #2] simply called Plaintiff without any notice on December 20, 2016 and asked Plaintiff if he had a few minutes to have his annual face-to-face review. Plaintiff met with [DAVIS POLK PARTNER #2] immediately after their phone conversation. Like Plaintiff's June 2016 face-to-face review, at no point during the conversation did [DAVIS POLK PARTNER #2] state or suggest that Plaintiff's performance or quality of work was inferior to the associates in his class.[7]

---

[7] Notably, it is standard practice for Davis Polk to uniformly document associates' poor performance (particularly, performance issues that would have warranted giving an associate a message that it was time for him or her to look for another job) and any issued warnings. Davis Polk failed to do so with Plaintiff—over more than three years— because Plaintiff did not have a record of poor performance and did not make any mistakes that could be reasonably interpreted as being fundamentally different than the type made by a typical Davis Polk associate of his seniority.

175.    During Plaintiff's December 2016 annual face-to-face review with [DAVIS POLK PARTNER #2], [DAVIS POLK PARTNER #2] gave Plaintiff criticisms that were inconsistent with the real-time feedback Plaintiff had received during the year. When Plaintiff explained that [DAVIS POLK PARTNER #2]'s feedback was inconsistent with his experiences and communications, he asked [DAVIS POLK PARTNER #2] for specific examples related to the criticisms. [DAVIS POLK PARTNER #2] struggled to identify specific examples and ultimately gave Plaintiff one example of a single drafting mistake (i.e., the misspelling of an entity's name that was spelled similar to another entity referenced in the applicable documents) from Plaintiff's Last 2016 Deal, which Plaintiff was staffed on in August 16, 2016 and involved months were Plaintiff had billed almost 235 hours.

176.    When Plaintiff asked [DAVIS POLK PARTNER #2] if he was aware of any other mistakes or could provide any other examples related to [DAVIS POLK PARTNER #2]'s criticisms, [DAVIS POLK PARTNER #2] said that he didn't have any other examples at that moment. Despite Plaintiff's request at the time, [DAVIS POLK PARTNER #2] never followed-up with Plaintiff to provide additional examples.

177.    After the December 2016 face-to-face review, Plaintiff's workload continued to be almost completely nonexistent:

| Plaintiff's Billable Hours | |
|---|---|
| Month | # of Hours Billed |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.8 |

**iii. Efforts to push Plaintiff out not successful. Defendants step it up.**

178.   Under the assumption that the Firm's pro bono leaders might be more committed to reducing racial bias, on December 5, 2016, Plaintiff sent an email to [DAVIS POLK PARTNER #1] regarding a Firm Client with a terrible reputation. That did not go well.

179.   On December 5, 2016, Plaintiff emailed [DAVIS POLK PARTNER #1], the supervising partner on a criminal justice pro bono matter that Plaintiff was previously staffed on, the following email:

> "*Hi [DAVIS POLK PARTNER #1],*
>
> *Hope this email finds you well. In light of the Presidential election, the conditions that contributed to its outcome and what is happening in our country, I wanted to briefly follow-up on our memo to [REDACTED].*
>
> *As a reminder, our initial memo detailed how blacks were being disproportionately and unfairly harmed by certain [prison-related] industries and companies. I'm hoping we can discuss what can be done to distance ourselves from [REDACTED] and ultimately end the firm's relationship with [REDACTED].*
>
> *I'm not sure what that internal process would or could look like, or whether the firm has ever distanced itself from certain clients in the past, but I'd be interested in hearing what you think could or should be done. I look forward to hearing from you. Regards, [Plaintiff]*"

180.   The memo that Plaintiff referred to in the email referenced above used publicly available information to research and detail several civil rights and human rights violations that disproportionately impact Blacks, Latinos, Muslims, and immigrants. On this pro bono matter,

[DAVIS POLK PARTNER #1] and the Firm had authorized the removal of one of the memo's topics/sections due to what they claimed was the possibility of a private for-profit prison and immigrant detention company being "negatively impacted" ("Potentially Negatively Impacted Private Prison Company") by the memo. The removed/topic section did not mention or name any companies, let alone the name of the Potentially Negatively Impacted Private Prison.

181.   [DAVIS POLK PARTNER #1] replied to Plaintiff's email and noted that he "did not know what relationship, if any, the firm still ha[d] with" the Potentially Negatively Impacted Private Prison Company. In his reply, [DAVIS POLK PARTNER #1] also indicated that he thought it might make sense for [DAVIS POLK PARTNER #1] to "flag for the management committee the concern about this type of client."

182.   After Plaintiff's inquiry with [DAVIS POLK PARTNER #1] about a racially harmful Davis Polk client and related discrimination, *Defendants did not staff Plaintiff on any billable assignments for the next four months (i.e., from December 2016 through April 2017)*. As noted in the charts above, from January 2017 through March 2017, Plaintiff billed a total of only 5.9 hours, a number that is jarring on its own and even more when one considers how busy Davis Polk's M&A group was during this period.

183.   To this point, Plaintiff observed that other members of his practice group remained continuously staffed on assignments thereby allowing them to generate billable hours, further develop as attorneys, and continue to build relationships with attorneys and professionals in and outside of the Firm. As stately previously, Plaintiff was the only Black male in his class of over 120 associates.

184.   The decline in Plaintiff's billable hours is noteworthy considering the Firm's perennial emphasis on the billable hour as the measuring stick by which one escalates the rungs

of partnership. Surely it is unfathomable to think that one of a handful of Black associates could bill such few hours and go unnoticed for months at a time.

185.    As early as January 2017, and for the next couple of months, Plaintiff had indicated on his weekly capacity form that he had 100% availability to take on new assignments. As noted earlier, the weekly capacity form is regularly reviewed and relied upon to make staffing decisions.  It is not possible that Plaintiff's availability to take on deals and assignments was merely overlooked for four to six months.  Defendants' decision to cease assigning work to Plaintiff was made intentionally, with malice or reckless disregard, and was motivated in whole or in part by Plaintiff's race.

186.    After Plaintiff raised a racial complaint on December 5, 2016, it took the following number of days for the following Davis Polk partners to send Plaintiff an email of any kind (notwithstanding group emails to practice groups and other listservs (e.g., to "All Lawyers")):

   a.    Mr. Bick, an M&A partner, went the next **148** days without emailing Plaintiff (i.e., from about December 6, 2016 - May 3, 2017);

   b.    Louis Goldberg, an M&A partner, went the next **148** days without emailing Plaintiff (i.e., from about December 6, 2016 - May 3, 2017);

   c.    Phillip Mills, an M&A partner, went the next **190** days without emailing Plaintiff (i.e., from about December 6, 2016 - June 14, 2017);

   d.    Lee Hochbaum, an M&A partner, went the next **225** days without emailing Plaintiff (i.e., from about December 6, 2016 - July 19, 2017);

e.  Mr. Birnbaum—except for a February 24, 2017 email to Plaintiff that instructed Plaintiff where he could pick up his paycheck—went the next **268** days without emailing Plaintiff (i.e., from about December 6, 2016 - August 31, 2017);

f.  John Amorosi, an M&A partner, went the next **276** days without emailing Plaintiff (i.e., from about December 6, 2016 - September 8, 2017);

g.  Michael Davis, an M&A partner, went the next **276** days without emailing Plaintiff (i.e., from about December 6, 2016 - September 8, 2017);

h.  Leonard Kreynin, an M&A partner, went the next **320** days without emailing Plaintiff (i.e., from about December 6, 2016 - October 22, 2017);

i.  Oliver Smith, an M&A partner, went the next **374** days without emailing Plaintiff (i.e., from about December 6, 2016 - December 15, 2017); and

j.  Mr. Chudd, Mr. Wolfe, Gar Bason Jr., Joe Rinaldi, John Butler, William Aaronson, and William Taylor—all M&A partners—did not send Plaintiff a single email in all of 2017 (which means that, from December 6, 2016 -January 1, 2018, these M&A partners went about **391** days without sending Plaintiff any emails).

187.   At all relevant times, all of Davis Polk's M&A partners were White men.

188.   The lack of written communication from Davis Polk's M&A partners was not mitigated through face-to-face or phone conversations between such persons and Plaintiff, as such conversations were similarly and virtually non-existent. Relatedly, the lack of communication noted in this Complaint was not because Davis Polk's M&A partners were vastly outnumbered by Davis Polk's M&A associates, as Davis Polk's M&A group had approximately

one M&A partner in the Firm's New York office for every two M&A associates in its New York office.

*Plaintiff Gains New "Career Advisors." They Don't Talk to Plaintiff Either.*

189.    On January 20, 2017, [Davis Polk Junior Staffing Coordinator #2] emailed Plaintiff (with Mr. Bick and John Butler cc'd) informing Plaintiff that Mr. Bick and John Butler had recently become Plaintiff's "Career Advisors" through the Firm's corporate department's Career Advisor program.

190.    This pairing allowed Mr. Bick and the other defendants to create a roadblock between Plaintiff and Davis Polk partners who otherwise would have mentored and trained Plaintiff to succeed at Davis Polk and in the legal profession.

191.    According to the Firm's description of the program at the time, advisors (i) "will be strongly encouraged to work with their advisees to foster **direct involvement with skill building**," (ii) "are encouraged to include their advisees on pitches, client service team discussions, and general conversations about the firm's business goals," and (iii) are "expected to maintain a dialogue with his or her advisees **for the duration of the associate's time at the firm**." (emphasis added).

192.    Such communications and internal programs, among others, recognize that there is a causal relationship between partners having "direct involvement" with junior associates and (i) associates' development in the areas of "skill building," (ii) "pitches" that enable attorneys to become familiar with and ultimately obtain high-paying and sophisticated clients, and (iii) "client service"—all things that impact an associate's financial/professional trajectory and partnership prospects within Davis Polk and the broader legal profession.

193.    From January 20, 2017 (i.e., the day the Firm assigned Plaintiff "Career Advisors") to August 10, 2018 (i.e., Plaintiff's last day at the Firm), in direct violation of its own career advisor policy and practices, Plaintiff did not receive any communications from Mr. Bick or John Butler about either the Career Advisor program, their role as "advisors," or anything related to Plaintiff's long-term career.

194.    Mr. Bick's (among other defendants') actions in connection with Plaintiff's lack of interactions in the Firm's Career Advisors program is consistent with and reflects such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Plaintiff and Plaintiff's rights.

195.    Notably, the Firm described the Career Advisor program at the time by stating, "We believe the addition of advisory relationships will further ensure that Davis Polk's associates develop and succeed in a manner that continues to distinguish the firm." To the contrary, Defendants' abrupt and complete isolation of Plaintiff, as well as their decision to restrict Plaintiff's "Career Advisors" to some of the ring leaders driving Plaintiff's isolation, worked to ensure Plaintiff would not develop or succeed not just at Davis Polk, but within the legal profession. As if such actions weren't enough, even after becoming Plaintiff's "Career Advisor," Mr. Bick, as he had done in the past, would routinely walk by Plaintiff in the hallway without speaking or even acknowledging Plaintiff's presence. Plaintiff observed that Mr. Bick did not ignore Plaintiff's White colleagues in this way.

***Plaintiff is Completely Isolated.***

196.    Some evidence suggests that Defendants kept Davis Polk's diversity and inclusion leadership completely in the dark of Defendants' discriminatory treatment of Plaintiff. It is inconceivable that Plaintiff's performance was both (i) so poor over an extended period of time

that it triggered Plaintiff receiving no billable work for months and eventually termination and (ii) somehow not poor enough to trigger a member of Davis Polk's Diversity Committee to reach out to Plaintiff to discuss Plaintiff's performance and work product, let alone work with Plaintiff to implement a remediation plan over an extended period of time.

197.    The following is a list of Davis Polk partners and staff persons who, at the time, were a part of Davis Polk's official (and unofficial) Diversity Committee. The list below also shows the number of days (leading up to January 1, 2018) that passed before Plaintiff received an email from each person listed below (i.e., notwithstanding group emails sent by such persons to practice groups and other listservs (e.g., to "All Lawyers," to the Black Attorneys Group's listserv)):

  a.  Kyoko Takahashi Lin, a Corporate Partner, went about **458** days without sending Plaintiff any emails (i.e., from about September 30, 2016 - January 1, 2018).

  b.  [Davis Polk's Director] went about **593** days without sending Plaintiff any emails (i.e., from about May 18, 2016 - January 1, 2018.

  c.  Monica Holland, a Corporate Partner who also served as the Chair of the Diversity Committee, went about **584** days without sending Plaintiff any emails (i.e., from about May 27, 2016 - January 1, 2018).

  d.  Maurice Blanco, a Corporate Partner who also served as the Firm's hiring partner, went about **584** days without sending Plaintiff any emails (i.e., from about May 27, 2016 - January 1, 2018).

  e.  James McClammy, Davis Polk's only Black partner at the time, went about **613** days without sending Plaintiff any emails (i.e., from about April 28, 2016

- January 1, 2018, except for an October 30, 2017 email that was sent to confirm whether Plaintiff would be attending an affinity group meeting).

    f.   Byron Rooney, a Corporate Partner, went about **670** days without sending Plaintiff any emails (i.e., from about March 2, 2016 - January 1, 2018).

    g.   Sartaj Gill, a Corporate Partner, went about **730** days without sending Plaintiff any emails (i.e., he did not email Plaintiff at any point in 2016 or 2017).

    h.   Elliot Moskowitz, a Litigation Partner, went about **730** days without sending Plaintiff any emails (i.e., he did not email Plaintiff at any point in 2016 or 2017).

198.    Notably, Mr. Reid went about **711** days without sending Plaintiff any emails (i.e., from about January 21, 2016 - January 1, 2018). The lack of written communication from partners and staff persons who, at the time, were a part of Davis Polk's official (and unofficial) Diversity Committee was not mitigated through face-to-face or phone conversations between such persons and Plaintiff, as such conversations were similarly and virtually non-existent. After almost a full year of constant disparate treatment, Defendants decided that they had to go beyond merely waiting for Plaintiff and his career "to implode." Instead, Defendants attempted to permanently collapse and cripple Plaintiff's career themselves.

199.    Davis Polk did not staff Plaintiff on any matters in December 2016.

200.    Davis Polk did not staff Plaintiff on any matters in January 2017.

201.    Davis Polk did not staff Plaintiff on any matters in February 2017.

202.    Davis Polk did not staff Plaintiff on any matters in March 2017.

203.    Defendants' intentional decision not to staff Plaintiff on any matters from December 2016 through March 2017 was motivated, in whole or in part, by Plaintiff's race.

204.    In a March 3, 2017 email to [DAVIS POLK PRO BONO LEADER], a leader of the Firm's pro bono department, Plaintiff again raised the issue of the Firm's relationship with a private for-profit prison and immigrant detention company whose policies and practices disproportionately discriminated against and dehumanized Blacks and other racial minorities.[8]

205.    At [DAVIS POLK PRO BONO LEADER]'s request and arrangement, Plaintiff later met with her and Mr. Reid on March 9, 2017. During their meeting, Mr. Reid gave Plaintiff a verbal commitment that the Firm would no longer represent the private prison and immigrant detention client.

---

[8] Plaintiff's email to [DAVIS POLK PRO BONO LEADER] stated:

"*In light of your and the firm's recent efforts to address Trump's Muslim ban (and his immigration and policing policies more broadly), I wanted to loop you into the email conversations below. As you'll read, [DAVIS POLK PARTNER #1]'s comments suggest that he did not have a conversation with the management committee at the time the conflict first became known and that he hadn't discussed it with them prior to the communications below. Considering [DAVIS POLK PARTNER #1]'s public track record with [REDACTED] and other related efforts, I was disappointed to not receive confirmation that he or someone else had attempted to resolve the conflict, as I understand occasionally is attempted when billable work is at issue.*

*Based on [DAVIS POLK PARTNER #1]'s response, I can only assume that [DAVIS POLK PARTNER #1] and I reached different conclusions about the nature of the firm's conflict of interest, as well as the scale and scope of the racial and moral dimensions that are bound in the links between (i) race and U.S. incarceration and (ii) Trump's (and his administration's) recent actions and U.S. incarceration. To this point, and I'm happy to say more later, I think both the conflict noted below and current political realities bear a striking resemblance to [Davis Polk's] history with Brown v. Board of Education, a case that led then present-day thinkers and legal communities to conclude that the government's position and actions would inevitably create and maintain racial hierarchies and dehumanizing practices.*

*Certainly, and in addition to the findings in the (attached) memo, many have recently concluded that a number of groups—blacks, Latinos, Muslims, immigrants, LGBTQ and trans folks, among others—have been experiencing harms that in many ways go beyond separate and supposedly equal treatment. (Relatedly, see "Sessions Indicates Justice Department Will Stop Monitoring Troubled Police Agencies" and Sessions: "US to continue use of privately run prisons.")*

*It is my hope that my comments above will provide additional context and guidance on what could and should be done regarding [Davis Polk's] relationship with [REDACTED]. Obviously, there's much that could be said and that must be considered. Please let me know if you're available next week to discuss the above and below.*

*I'd greatly appreciate hearing what you think could be done to ensure that [Davis Polk] isn't simultaneously assisting (i) clients that are being targeted by racist and xenophobic policies and practices and (ii) clients that are incarcerating them.*"

206.    At the conclusion of the March 9, 2017 meeting—and without any prior discussion related to Plaintiff's workload, assignment history, or quality of work—Mr. Reid voluntarily acknowledged and conceded that Plaintiff's prior and current workloads were low, that they were low for reasons that were "not [Plaintiff's] fault," and that the staffing issue needed to be "fixed." Mr. Reid made such statements in the presence of [DAVIS POLK PRO BONO LEADER].

207.    Almost two weeks went by and Plaintiff still had not been assigned to or staffed on any matters.

208.    On March 21, 2017, Plaintiff emailed a written request to the Firm's Director of Associate Development and asked if Plaintiff could review his personnel "file and all the performance reviews that [he] had received to date." The Director of Associate Development declined Plaintiff's request and informed Plaintiff that once she received his request, she decided to arrange a meeting between Plaintiff, Mr. Reid, and [DAVIS POLK PARTNER #2]. Because Plaintiff did not have any conversations with the Director of Associate Development about his recent conversations with Mr. Reid, and did not ask the Director of Associate Development to arrange any meetings, Plaintiff emailed the following second request to the Director of Associate Development:

"*[I]n light of the fact that you informed me that I'll be meeting with [Mr. Reid, [DAVIS POLK PARTNER #2], and [Davis Polk Junior Staffing Coordinator #1]—I'd like to repeat my request to review my file and all of the reviews to date. At the moment, I'll be the only person in the meeting who hasn't had a chance to review my file and I think the conversation will be much more productive if I have that opportunity and can start the meeting with a shared understanding as the other participants. Can you follow-up with*

*[Mr. Reid] and let me know if you'll be able to satisfy my second request? Regards,*

*[Plaintiff]"*

209.    Plaintiff's request was once again rejected. At no point during any of Plaintiffs face-to-face reviews—i.e., his May 2015 face-to-face review, his December 2015 annual face-to-face review, his unannounced June 2016 face-to-face review, or his December 2016 annual face-to-face review—was Plaintiff allowed to review any of the documents associated with Plaintiff's performance reviews (e.g., performance reviews or Summary Reviews submitted by Davis Polk's attorneys).

210.    After receiving Plaintiff's second request on March 21, 2017, the Director of Associate Development, Mr. Reid, and Davis Polk did not offer Plaintiff the option to review a redacted version of his performance reviews, which, at the least, would have provided a layer of anonymity for the reviewers. The Director of Associate Development, Mr. Reid, and Davis Polk also did not offer Plaintiff the option of viewing his performance reviews on the condition that he would be prohibited from (i) taking the performance reviews out of a Firm-designated reviewing room or (ii) making copies. Instead, the Director of Associate Development, Mr. Reid, and Davis Polk categorically denied Plaintiff's requests to review his personnel file and performance reviews and arranged a meeting with the Firm's Managing Partner and [DAVIS POLK PARTNER #2].

211.    The Director of Associate Development scheduled Plaintiff's meeting with Mr. Reid and [DAVIS POLK PARTNER #2] for March 29, 2017. According to the documentation that Davis Polk provided to the EEOC, [DAVIS POLK PARTNER #2] did not submit his Summary Review of Plaintiff's December 2016 annual face-to-face review to the Firm's records department until March 28, 2017—a date that is almost 100 *days* after [DAVIS POLK

PARTNER #2] met and gave Plaintiff his face-to-face review on December 20, 2016 and just *one day* before Plaintiff met with Mr. Reid and [DAVIS POLK PARTNER #2].

### *One Final Warning: Let the Past be the Past, Or Else.*

212. On March 29, 2017, Plaintiff met with Mr. Reid and [DAVIS POLK PARTNER #2]. Mr. Reid began the meeting by attributing Plaintiff's low utilization and lack of work assignments to himself (i.e., Mr. Reid) and the Firm and stated that he and the Firm had "dropped the ball" and made mistakes. Mr. Reid stated that Plaintiff should let the past be the past and focus on things going forward. Without using any aggressive or threatening body language or verbal tones, Plaintiff responded by asking Mr. Reid to explain how multiple assignment coordinators and partners "dropped the ball," over the last five or six months, all at the same time. Mr. Reid responded by saying that it wouldn't be helpful to discuss the past. Plaintiff responded by asking Mr. Reid and [DAVIS POLK PARTNER #2] if they thought it was unreasonable for Plaintiff to want to know who "dropped the ball" and how they "dropped the ball." Mr. Reid responded by telling Plaintiff again that the Firm simply wasn't going to answer those questions. Plaintiff asked Mr. Reid if Mr. Reid could arrange a meeting with Mr. Bick so that Mr. Bick could help Plaintiff understand how the Firm and the M&A partners "dropped the ball" and how it was possible that Mr. Bick didn't know that Plaintiff wasn't receiving any assignments. Mr. Reid responded by saying that he and the Firm weren't going to allow Plaintiff and Mr. Bick to discuss the past. Mr. Reid also told Plaintiff "it's not like your career has been destroyed."

213. During the meeting, Plaintiff noted that he was uncomfortable with the Firm's performance review process and noted that racial biases can influence performance evaluations.

214.     This incident is the sixth time that Plaintiff flagged personally experienced and observed discrimination and actively sought help from Defendants.

215.     Plaintiff reminded Mr. Reid that the diversity and inclusion consultants that the Firm brought in had also noted the Firm's performance reviews were likely to reflect racial biases. Mr. Reid told Plaintiff that if Plaintiff "let the past be the past," the Firm would be prepared to offer Plaintiff unprecedented opportunities "unlike anything that ha[d] ever been done." Plaintiff explained to Mr. Reid it would be difficult to have confidence in a plan going forward because Mr. Reid and the Firm were refusing to (i) tell Plaintiff how the "ball was dropped" over the last six months and who "dropped the ball," (ii) arrange a meeting with Plaintiff and Mr. Bick, the head of M&A, to discuss what went wrong, or (iii) allow Plaintiff to review his performance reviews.

**iv. Explicit Threats to Plaintiff's Career to Halt Racial Complaints and Protect Defendants**

216.     Mr. Reid told Plaintiff that if Plaintiff did not simply drop whatever mistakes the Firm made in the past and move forward, Plaintiff would be "out of the game" and "off the field." The meeting ended shortly after Mr. Reid made such threats to Plaintiff and with Mr. Reid emphatically insisting that Plaintiff take a few days, or as much time as Plaintiff needed, to think things over. Plaintiff responded by informing Mr. Reid that Plaintiff wasn't sure what he was supposed to think over. Plaintiff then explained that he had never rejected any assignments or been a distraction to anyone at the Firm. Critically, both Mr. Reid and [DAVIS POLK PARTNER #2] accepted, without objection, Plaintiff's description of when and how Plaintiff accepted assignments.[9] Plaintiff then explained that if the Firm assigns him work, Plaintiff will do the work and conduct himself with the same professionalism that he had always displayed at

---

[9] According to comments made by Mr. Reid and [DAVIS POLK PARTNER #2] during the meeting, Plaintiff's performance reviews described Plaintiff as engaged, hardworking, and enthusiastic.

the Firm. Mr. Reid ended the meeting by repeating his statement that Plaintiff should take some time and just think about things, noting that they could have a follow-up conversation in a few days.

217.    Mr. Reid's message that if Plaintiff did not "drop" his inquiries into "whatever mistakes the Firm made in the past and move forward, [he] would be 'out of the game' and 'off the field'" is clear in its intent to halt Plaintiff's complaints and reasonable search for answers. Mr. Reid's message was *per se* retaliation, as it was delivered to chill and halt Plaintiff's protected activity.

218.    Mr. Reid's (among other defendants') actions in connection with Plaintiff's March 29, 2017 meeting are consistent with and reflects such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Plaintiff and Plaintiff's rights.

219.    At no point during Plaintiff's March 29, 2017 meeting did Mr. Reid or [DAVIS POLK PARTNER #2] state or suggest that Plaintiff's quality of work was a reason, let alone the reason, why the Firm stopped staffing Plaintiff on deals or giving him assignments. At no point during Plaintiff's March 29, 2017 meeting did Mr. Reid or [DAVIS POLK PARTNER #2] state or suggest that Plaintiff's performance reviews indicated that he was "behind" his peers or that his performance was inferior to his peers at Davis Polk.

220.    Immediately after the meeting, as [DAVIS POLK PARTNER #2] and Plaintiff were walking back to their offices, [DAVIS POLK PARTNER #2] told Plaintiff that he had no idea Plaintiff wasn't receiving any assignments. [DAVIS POLK PARTNER #2] told Plaintiff that had he known that Plaintiff wasn't being assigned work, that [DAVIS POLK PARTNER #2] would have made sure Plaintiff was staffed on his matters.

221.     Two days later, on March 31, 2017, Plaintiff emailed Mr. Reid and accepted Mr. Reid's offer to "take as much time as [Plaintiff] need[ed]" to regroup: Plaintiff requested to use his unused vacation time, which totaled four weeks. Mr. Reid approved the request the same day.

222.     Plaintiff returned to the Firm on May 2, 2017. When Plaintiff returned, the Firm did not have a concrete plan in place (or communicate such plan) to staff Plaintiff on deals or address the issues discussed in the March 29, 2017 meeting with Mr. Reid.

223.     Mr. Bick and Plaintiff met on May 2, 2017. Instead of telling Plaintiff that Plaintiff would be staffed in a manner that was consistent with his peers, Mr. Bick told Plaintiff that he was going to "walk the halls and talk to partners to see what tasks [Plaintiff] could be staffed on." Despite being Plaintiff's so-called "Career Advisor," and despite the gross gaps that M&A partners had created in Plaintiff's billable hours and resume, Mr. Bick also told Plaintiff that no one at the Firm was going to "actively monitor" Plaintiff's hours. For the reasons noted in this Complaint, Mr. Bick's statement is evidence of discriminatory and retaliatory treatment, as law firms and their practice group leaders do not usually tell associates that they will not actively monitor associates' hours. Such a practice, especially in the case of Mr. Bick and Plaintiff, Mr. Bick's Firm-assigned mentee, would undermine the basic incentive structure of a profitable, sustainable, non-discriminatory law firm and practice group.

224.     At no point during Plaintiff's May 2, 2017 meeting with Mr. Bick did Mr. Bick state or suggest that Plaintiff's prior work performance was inferior to his peers or below the Firm's standards. At no point during Plaintiff's May 2, 2017 meeting with Mr. Bick did Mr. Bick state or suggest that Plaintiff's prior assignment history was related to Plaintiff's prior performance.

225.    About fifty-five days after Mr. Reid first acknowledged that Plaintiff's workload needed to be "fixed," the Firm, on May 3, 2017, finally staffed Plaintiff on his first assignment. The Firm staffed Plaintiff on a legal research memo that could have been completed by a law student summer associate (i.e., a non-lawyer) who had little substantive corporate experience or knowledge. [DAVIS POLK PARTNER #3], an M&A partner, was the partner who oversaw the legal research memo. At the time, [DAVIS POLK PARTNER #3] told Plaintiff that the assignment was not particularly time sensitive and that he did not need to see a first draft of the memo for another two or three weeks.

226.    On or about May 19, 2017, Mr. Bick informed Plaintiff that the Firm was not going to staff Plaintiff on another assignment until the legal research assignment was completed. Plaintiff informed Mr. Bick that the memo was not an assignment that required 100% of his capacity and that [DAVIS POLK PARTNER #3] set a deadline for the next stage of the draft that was still a few days away. Plaintiff also told Mr. Bick, "*You do understand that this is the first time anyone has told me that I wouldn't receive another assignment until this first one was finished? And that since no one is ever staffed on a one-on-one basis, I had no way of knowing that until this conversation?*" Mr. Bick's immediate response was, "*Well, I'm sorry you didn't ask the right questions.*"

227.    Mr. Bick's (among other defendants') actions in connection with Plaintiff's May 19, 2017 meeting are consistent with and reflects such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Plaintiff and Plaintiff's rights.

228.    All of Plaintiff's billable hours in May 2017 related to the legal research memo.

229.    On May 22, 2017, just a few days after meeting with Mr. Bick, Plaintiff informed [DAVIS POLK PARTNER #3] that he was feeling ill and that his sickness was caused by

experiences that he was having at the Firm. Plaintiff's email to [DAVIS POLK PARTNER #3] stated the following:

> "*[DAVIS POLK PARTNER #3] [a]pologies for my delay in checking-in with you. Quite some time ago, you shared a story about your [family member].... Though I'm sure you had your own way of processing that experience, it appeared to me that the experience involved unnecessary insults and a feeling that made you sick to your stomach.*
>
> *Last week, I thought about that story as I thought more about my own story and experience here at [Davis Polk] (in addition to other similarly situated workers at [Davis Polk]), and I became ill. Though I'm still feeling and navigating the effects, I expect to return to the office tomorrow. Upon my return, I will complete the write-up as discussed and asap. I think that it will be in final form within 1 or 2 quick turnarounds. Regards, [Plaintiff]*"

230.    In response to Plaintiff's email, [DAVIS POLK PARTNER #3] scheduled a May 23, 2017 meeting for himself, [Davis Polk's Director], and Plaintiff. The three of them met on May 23, 2017.

231.    During the meeting on May 23, 2017, [DAVIS POLK PARTNER #3] told Plaintiff that [DAVIS POLK PARTNER #3] didn't know that Plaintiff had requested to work with him on Plaintiff's weekly work capacity form. [DAVIS POLK PARTNER #3] also told Plaintiff that [DAVIS POLK PARTNER #3] didn't know the degree to which Plaintiff was currently staffed on other projects or hadn't previously been staffed on other projects. Regarding the legal research assignment, [DAVIS POLK PARTNER #3] told Plaintiff "this isn't a test" to see if Plaintiff should be staffed on more or different types of assignments.

232.     During the meeting on May 23, 2017, and like [DAVIS POLK PARTNER #3], [Davis Polk's Director] claimed that she wasn't fully aware of how Plaintiff had been previously staffed and that Mr. Reid and Mr. Bick hadn't yet brought her up to speed. Plaintiff told [Davis Polk's Director] that, without any reasonable justification, the people responsible for staffing him did not staff Plaintiff on any assignments.

233.     This incident is the seventh time that Plaintiff actively flagged personally experienced and observed discrimination and actively sought help from Defendants.

234.     [Davis Polk's Director] asked Plaintiff who were the persons who were primarily responsible for staffing him. Plaintiff told [Davis Polk's Director] that Mr. Reid, Mr. Bick, Mr. Birnbaum, and Mr. Wolfe were responsible for staffing Plaintiff. Plaintiff asked [Davis Polk's Director] to talk to those individuals, to investigate his staffing history and experience at the Firm, and to assess whether Plaintiff's experience was in anyway normal. [Davis Polk's Director] suggested that she would reach out to some or all the partners that Plaintiff mentioned. [Davis Polk's Director] never followed-up with Plaintiff or had a subsequent conversation with Plaintiff about his staffing history, performance, or experience at Davis Polk.

***Plaintiff Continues to Demand Equal Treatment and Files an EEOC Complaint.***

235.     On May 24, 2017, Davis Polk received notice that Plaintiff had engaged Outten & Golden LLP as his legal counsel. It was not until Plaintiff's counsel informed Davis Polk of that fact (i.e., that Plaintiff had engaged counsel) did the Firm assign Plaintiff to his first M&A deal in over eight months.

236.     After effectively experiencing radio silence with Davis Polk's M&A attorneys for months—beginning at the end of March 2017 and continuing throughout the rest of the year— Plaintiff's experience at the Firm continued to be marked by a series of interactions where Davis

Polk partners treated Plaintiff as if they were strategically trying to frustrate him or get him to assume blame for things that were not incorrect, his fault, or under his control.

237.    On June 21, 2017, Plaintiff informed the Firm, in an email, that he had experienced some health complications as a result of the Firm's treatment of Plaintiff.

238.    On August 3, 2017, Plaintiff filed Plaintiff's August 2017 EEOC Filing and noted, among other things, that "the Firm has discriminated against [Plaintiff] because of [Plaintiff's] race and has retaliated against [Plaintiff] because [Plaintiff has] actively raised awareness and concerns regarding issues of racial bias and disparate outcomes."

239.    On December 5, 2017, Davis Polk filed an Answer and Position Statement with the EEOC in response to Plaintiff's August 2017 EEOC Filing ("Davis Polk's EEOC Answer and Position Statement"). Davis Polk's EEOC Answer and Position Statement detailed and confirmed additional discrimination and retaliation against Plaintiff, as their response included a number of intentionally false mischaracterizations that was triggered by Plaintiff's August 2017 EEOC Filing.

### *The Final, Strategic, Face-to-Face "Performance Review."*

240.    After Davis Polk received notice that the EEOC granted Plaintiff an extension (i.e., to January 10, 2018) to file a rebuttal to Davis Polk's EEOC Answer and Position Statement, Davis Polk strategically rescheduled and pushed back Plaintiff's annual face-to-face review to January 11, 2018.  On January 11, 2018, just one day after Plaintiff's attorneys submitted on his behalf a written rebuttal to Davis Polk's EEOC Answer and Position Statement, [DAVIS POLK PARTNER #3], an M&A partner, and [DAVIS POLK PARTNER #4], an M&A, conducted Plaintiff's annual face-to-face review and gave Plaintiff a negative performance evaluation.

241.    Both the Firm's conspicuous rescheduling of Plaintiff's January meeting and the related performance review are consistent with and reflects Defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Plaintiff and Plaintiff's rights.

242.    Davis Polk's negative performance evaluation was contrary to real-time feedback Davis Polk partners, including [DAVIS POLK PARTNER #3], had given Plaintiff during the periods covered in the annual face-to-face review (covering work done in 2017). In the face-to-face review, [DAVIS POLK PARTNER #3] and [DAVIS POLK PARTNER #4] told Plaintiff that staffing him would be "challenging."

243.    During the face-to-face review, Plaintiff explicitly asked [DAVIS POLK PARTNER #3] and [DAVIS POLK PARTNER #4] if they could provide Plaintiff with any examples where Plaintiff received, either in real-time or prior to the face-to-face review, any of the criticisms about his work performance that [DAVIS POLK PARTNER #3] and [DAVIS POLK PARTNER #4] had communicated during the face-to-face review. Plaintiff also asked if [DAVIS POLK PARTNER #3] and [DAVIS POLK PARTNER #4] could provide any examples that show that someone at the Firm had communicated to Plaintiff that the quality of his work was poor or that Plaintiff was behind in his class. On both questions, [DAVIS POLK PARTNER #3] and [DAVIS POLK PARTNER #4] failed to provide Plaintiff with any examples.

244.    Plaintiff stated during the face-to-face review that, prior to the review and while working on the discussed assignments, Plaintiff never explicitly or implicitly received the type of negative feedback that he was receiving during the face-to-face review. Plaintiff explained during the face-to-face review that it was a theme of his career and other Black attorneys at Davis Polk that Davis Polk attorneys would say one thing while working with him and other

Black attorneys and then say another thing in his and other Black attorneys' performance reviews.

245.    This incident is the eighth time that Plaintiff actively flagged personally experienced and observed discrimination and actively sought help from Defendants.

246.    Plaintiff explained that he and other Black attorneys at the Firm had flagged this discrepancy multiple times throughout his career and that he hoped [DAVIS POLK PARTNER #3] and [DAVIS POLK PARTNER #4] understood why such a discrepancy had led him to ask for specific examples where such negative feedback was indeed communicated to Plaintiff prior to the face-to-face review.

**v. Defendants Terminate Plaintiff**

247.    Between the meeting on January 11, 1018 and February 8, 2018, Davis Polk did not staff Plaintiff on any matters.

248.    On February 8, 2018, Plaintiff met with two M&A Davis Polk partners to discuss the Firm's purported inability to staff Plaintiff. During the meeting, the M&A partners informed Plaintiff that Davis Polk would be terminating Plaintiff's employment. The M&A partners explained that Mr. Bick, certain M&A partners, including Mr. Brass and other M&A staffing partners, and "someone on the management committee" collectively decided to terminate Plaintiff's employment.

249.    In the course of this conversation, one of the M&A partners stated that Plaintiff's departure was "not a good situation" and that what was happening to Plaintiff at Davis Polk was not good for Plaintiff.  The same M&A partner stated: "*We have a thousand percent confidence in your integrity…There's no issue with your integrity or behavior.*"

250.     Later in the conversation, the same M&A partner added: "*We don't feel good about this. Okay? I wish this had been a much better experience and that it wasn't ending this way. [...] That's my personal view. You probably are very unhappy. [...] If I were you, I would be furious and unhappy and bitter. [...] You may highly resent any number of us, including me.*"

251.     Less than a year after Mr. Reid threatened that Plaintiff would be "out the game" and "off the field," and about six months after Plaintiff filed Plaintiff's August 2017 EEOC Filing, two Davis Polk M&A partners told Plaintiff Davis Polk was terminating Plaintiff's employment. Defendants' discriminatory actions in connection with Plaintiff's February 8, 2018 meeting and related termination are consistent with and reflects Defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Plaintiff and Plaintiff's rights.

252.     On April 27, 2018, Plaintiff filed a supplemental charge of discrimination against Davis Polk and noted (i) that Davis Polk continued to discriminate and retaliate against Plaintiff and (ii) that Davis Polk's treatment of Plaintiff was consistent with its treatment of other Black attorneys and workers who have worked or currently worked at Davis Polk.

253.     Plaintiff's final date of employment at the Firm was August 10, 2018.

254.     As a direct result of the discrimination and retaliation described in this Complaint, Plaintiff has suffered (and continues to suffer) damages, including, but not limited to, substantial economic losses, lost professional opportunities and career prospects, humiliation, impairment to his name and reputation, embarrassment, emotional and physical distress, and mental anguish.

255.     Defendants are not incompetent or inexperienced. Defendants, some of whom have 20-plus-years of legal experience, are elite strategists and practitioners. Individually and collectively, Defendants have achieved world class status for their ability to create and

coordinate rules, legal teams, and documentation across a variety of complex human, legal, and institutional relationships.

256.    To this point, it is common for M&A attorneys, as well as partners on firms' management committees, to be viewed as the "quarterbacks" of the world's most complex legal deals and institutions.

257.    The facts reveal that, between 2015 and 2018, Defendants quarterbacked and permitted a playbook that marginalized, discriminated against, and retaliated against Plaintiff, the only Black male associate in Davis Polk's 2014 associate class.

258.    In whole or in part because of Plaintiff's race, Davis Polk and the other defendants committed themselves to in an illegal "game" until Plaintiff was "off the field."

## COUNT ONE

### Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964

259.    Plaintiff re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

260.    By the acts and practices detailed in this Complaint, Defendants discriminated against Plaintiff on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").

261.    As a result of Defendants' discriminatory acts and practices, Plaintiff has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

262.    Defendants intentionally discriminated against Plaintiff with malice or reckless indifference to Plaintiff's rights thereby entitling Plaintiff to punitive damages.

## COUNT TWO

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964

263.     Plaintiff re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

264.     By the acts and practices described in this Complaint, Defendants retaliated against Plaintiff in the conditions of his employment for his opposition to unlawful employment practices in violation of Title VII.

265.     As a result of Defendants' retaliatory acts and practices, Plaintiff suffered and continues to suffer harm and substantial economic losses, including but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

266.     Defendants retaliated against Plaintiff with malice or reckless indifference to Plaintiff's rights thereby entitling Plaintiff to punitive damages.

## COUNT THREE

### Racial Discrimination in Violation of the New York State Human Rights Law § 296(1)(a)

267.     Plaintiff re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

268.     By the acts and practices described in this Complaint, Defendants discriminated against Plaintiff on the basis of his race in violation of the New York State Human Rights Law § 296(1)(a).

269.     As a result of Defendants' discriminatory acts and practices, Plaintiff suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary,

bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

270.     Defendants' discriminatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Plaintiff and Plaintiff's rights thereby entitling Plaintiff to punitive damages.

## COUNT FOUR

**Retaliation in Violation of the New York State Human Rights Law § 296(1)(e)**

271.     Plaintiff re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

272.     By the acts and practices described in this Complaint, Defendants retaliated against Plaintiff for his opposition to unlawful discriminatory practices in violation of New York State Human Rights Law § 296(1)(e).

273.     As a result of Defendants' retaliatory acts and practices, Plaintiff suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

274.     Defendants' retaliatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Plaintiff and Plaintiff's rights thereby entitling Plaintiff to punitive damages.

## COUNT FIVE

**Harassment in Violation of the New York State Human Rights Law § 296(1)(h)**

275.     Plaintiff re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

276.     By the acts and practices described in this Complaint, Defendants harassed Plaintiff for his opposition to unlawful discriminatory practices in violation of New York State Human Rights Law § 296(1)(h).

277.     As a result of Defendants' harassment, Plaintiff suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

278.     Defendants' harassment was willful, wantonly negligent or reckless, amounting to a conscious disregard of Plaintiff and Plaintiff's rights thereby entitling Plaintiff to punitive damages.

### COUNT SIX

### Racial Discrimination in Violation of the New York City Administrative Code § 8-107(1)(a)

279.     Plaintiff re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

280.     By the acts and practices described in this Complaint, Defendants discriminated against Plaintiff in the conditions of his employment on the basis of his race in violation of the New York City Administrative Code § 8-107(1)(a).

281.     As a result of Defendants' discriminatory acts and practices, Plaintiff suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

282.    Defendants' discriminatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Plaintiff and Plaintiff's rights thereby entitling Plaintiff to punitive damages.

### COUNT SEVEN

**Retaliation in Violation of the New York City Administrative Code § 8-107(7)**

283.    Plaintiff re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

284.    By the acts and practices described in this Complaint, Defendants retaliated against Plaintiff in the conditions of his employment for opposing unlawful discriminatory practices in violation of New York City Administrative Code § 8-107(7).

285.    As a result of Defendants' retaliatory acts and practices, Plaintiff suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

### **PRAYER FOR RELIEF**

286.    **WHEREFORE**, Plaintiff respectfully requests that this Court enter a Judgment in favor of Plaintiff against Defendants, providing for the following relief:

    a.    Declaring that the acts and practices complained of herein are unlawful and violate Title VII, New York State Human Rights Law §§ 296(1)(a), 296(1)(e), and 296(1)(h), and the New York City Administrative Code §§ 8-107(1)(a) and 8-107(7);

    b.    Directing Defendants to pay compensatory damages for back and front pay, bonuses and other monetary benefits to which Plaintiff is entitled;

c.  Directing Defendants to pay compensatory damages for reputational damage, emotional harm, psychological harm and any physical impairments resulting from Defendants' acts and practices;

d.  Directing Defendants to pay punitive damages for engaging in discriminatory acts or practices with malice or reckless indifference to Plaintiff's rights;

e.  Directing Defendants to pay punitive damages for their willful, wantonly negligent or reckless disregard of Plaintiff's rights;

f.  Directing Defendants to pay punitive damages to the extent allowable by law, including Title VII, New York State Human Rights Law §§ 296(1)(a), 296(1)(e), and 296(1)(h), and New York City Administrative Code §§ 8-107(1)(a) and 8-107(7);

g.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

h.  Pre-judgment and post-judgment interest, as provided by law; and

i.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## **DEMAND FOR JURY TRIAL**

287.  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: New York, New York
        November 4, 2019

By: David Jeffries, Esq.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-601-2770
Djeffries@Jeffrieslaw.nyc

Martin E. Restituyo, Esq.
Law Offices of Martin Restituyo, P.C.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-729-7900
Fax: 212-729-7490
restituyo@restituyolaw.com

*Attorneys for Plaintiff*

## **VERIFICATION**

KALOMA CARDWELL being duly sworn, deposes and says:

I am the plaintiff in this action and as such I am fully familiar with the facts alleged herein. I have read the foregoing Verified Complaint and know the contents thereof. The same are true to my knowledge, except as to those matters to be alleged upon information and belief, and as to those matters I believe then to be true.

By: Kaloma Cardwell

Sworn before me this
04 day of November 2019

Notary Public.

MOHAMMED N HOSSAIN
NOTARY PUBLIC, STATE OF NEW YORK
01H06356839
QUALIFIED IN QUEENS COUNTY
COMMISSION EXPIRES APRIL 10, 20___