**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KALOMA CARDWELL,** | |
| Plaintiff, | CA No. _____ |
| **v.** | |
| **DAVIS POLK & WARDWELL LLP, Thomas Reid, John Bick, William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John Butler,** | **AMENDED VERIFIED COMPLAINT WITH JURY DEMAND** |
| Defendants. | |

"*Racism is being weaponized by elites against all of us…. That's racism for profit…. I want to be very clear about this. I'm not saying this because it's tactically convenient [or because] it's a powerful political message. I'm saying this because I think it is analytically true…. The impetus for it—the profit of it, the fuel of it—is dollars.*" - Ian Haney López

"*In the coming days, each of us, every one of us, Democrat and Republican, will face a choice about whether to begin this trial in search of truth or in service of the...desire to cover it up…. Let every [one of us] reflect on that choice, and let history weigh on every one of our shoulders.*" - Chuck Schumer, U.S. Senator, on January 16, 2020, the day the third impeachment trial in U.S. history officially began

\*   \*   \*

Plaintiff, Kaloma Cardwell ("Cardwell"), a former associate of Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), by counsel, for his complaint against the Firm, Thomas Reid, John Bick, William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John Butler (the "Individual Defendants" and, together with Davis Polk, the "Defendants"), for racial discrimination and retaliation, among other unlawful acts, and alleges, upon actual knowledge as to his own acts, and upon information and belief as to all other matters, as follows:

## SUMMARY OF CLAIMS

1.      Mr. Cardwell was an associate at the Firm from September 2014 through August 2018.  During this period, Mr. Cardwell was subjected to discriminatory treatment by, among other things, Defendants' conduct of: (i) disparate treatment of Mr. Cardwell compared to similarly situated non-Black associates; (ii) ignoring Mr. Cardwell's complaints of racially based disparate treatment; (iii) rigging workplace systems, including limiting Mr. Cardwell's professional development and opportunities by assigning Mr. Cardwell to fewer deals and assignments; (iv) unlawfully weaponizing and changing their conclusions about performance-related reviews, reviewers, and processes; and (v) effectively ceasing communication with Mr. Cardwell and thereby depriving him of mentorship opportunities and all billable work (e.g., going from a range of 100-235 billable hours a month to effectively zero billable hours for four consecutive months).

2.      When Mr. Cardwell complained of this conduct, Defendants, among other things, retaliated against him by: (i) threatening his employment and career; (ii) rigging workplace systems, including falsifying Mr. Cardwell's performance reviews and other inter-office communications in order to distort the quality of Mr. Cardwell's job performance and justify his

firing; (iii) unlawfully weaponizing and changing its conclusions about performance-related reviews, reviewers, and processes; and, ultimately, (iv) terminating Mr. Cardwell's employment.

3.      Mr. Cardwell filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against Davis Polk on August 3, 2017 ("Mr. Cardwell's August 2017 EEOC Filing").  On August 6, 2019 the EEOC issued a Right to Sue letter. On November 4, 2019, Mr. Cardwell filed a lawsuit in federal court in accordance with the Right to Sue letter.

## PARTIES

### Mr. Cardwell

4.      Mr. Cardwell is an African American/Black ("Black") male who at all relevant times was an employee of Davis Polk. Mr. Cardwell worked as a summer associate at the Firm in the summer of 2012 and as an associate at the Firm from September 2014 through August 2018. During his time at the Firm, Mr. Cardwell worked in three corporate departments (also known as "practice groups"): Credit (via a six-month rotation), Capital Markets (via a six-month rotation), and Mergers & Acquisitions ("M&A") (via a six-month rotation and later as an assigned member). He worked as an assigned member of the Firm's M&A group from April 2016 through August 2018. Mr. Cardwell was the only Black male (and just one of four Black associates) hired to join Davis Polk's 2014 associate class of over 120 associates. Mr. Cardwell worked in Davis Polk's New York office at 450 Lexington Avenue, New York, NY 10017. Mr. Cardwell is a resident of New York, New York.

5.      Mr. Cardwell was a "1L Leadership Council on Legal Diversity (LCLD) Scholar" in 2012 and is a life member of the NAACP, the National Bar Association, the Metropolitan Black Bar Association ("MBBA"), the National Association of Black Journalists, and the

African American Intellectual History Society. Mr. Cardwell is also a former co-chair of the

MBBA's Civil Rights Committee and a former member of both the New York City Bar

Association's ("New York City Bar") Civil Rights Committee and its Diversity Pipeline

Initiatives Committee. Mr. Cardwell advised certain authors of the New York City Bar's 2016

Law Firm Diversity Benchmarking Report and served on the steering committee for the New

York City Bar's inaugural Associate Leadership Institute.

**Defendants**

6.      The Firm is a limited liability partnership formed pursuant to the laws of the state

of New York, headquartered in New York City at 450 Lexington Avenue, New York, NY 10017,

and was, at all relevant times hereto, Mr. Cardwell's employer. Davis Polk is a global law firm

with offices in ten cities across the world. Upon information and belief, in 2019, Davis Polk had

approximately 157 partners, 105 counsel, 632 associates, and 125 summer associates. According

to *Chambers Associate*, a widely trusted and respected legal publication, approximately 87% of

Davis Polk's partners are White, 81% of Davis Polk's partners are men, and less than 1% of

Davis Polk's partners are Black. Davis Polk represents some of the largest companies in the

world, including, and as listed on the Firm's website, Comcast, JPMorgan Chase, Baker Hughes,

and General Electric.

7.      Defendant Thomas Reid ("Reid") was, at all relevant times, a Corporate Partner,

Chair, and Managing Partner of Davis Polk, and a member of the Firm's three-person

Management Committee.

8.      Defendant John Bick ("Bick") was, at all relevant times, a Corporate/M&A

Partner at Davis Polk. He was the head of Davis Polk's global corporate practice and a member

of the Firm's three-person Management Committee from 2011 through April 2019. Mr. Bick was the head of Davis Polk's M&A group during Mr. Cardwell's employment at the Firm.

9.     Defendant Sophia Hudson ("Hudson") was, at all relevant times, a Corporate Partner at Davis Polk.

10.     Defendant William Chudd ("Chudd") was, at all relevant times, a Corporate/M&A partner at Davis Polk.

11.     Defendant Harold Birnbaum ("Birnbaum") was, at all relevant times, a Corporate/M&A Partner at Davis Polk and served as a M&A staffing partner at various times during Mr. Cardwell's tenure at Davis Polk. Specifically, Mr. Birnbaum was elected partner in July 2016.

12.     Defendant Daniel Brass ("Brass") was, at all relevant times, a Corporate/M&A associate or Partner at Davis Polk and served as a M&A staffing partner at various times during Mr. Cardwell's tenure at Davis Polk. Specifically, Mr. Brass was elected partner in July 2017.

13.     Defendant Brian Wolfe ("Wolfe") was, at all relevant times, a Corporate/M&A Partner at Davis Polk and served as a M&A staffing partner at various times during Mr. Cardwell's tenure at Davis Polk. Specifically, Mr. Wolfe was elected partner in July 2015.

14.     Defendant John Butler ("Butler") was, at all relevant times, a Corporate/M&A partner at Davis Polk.

## JURISDICTION AND VENUE

15.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C §§ 1331 and 1343(a)(4), 29 U.S.C. §§ 621 et seq.; and the supplemental jurisdiction of this Court over state and city claims is invoked under 28 U.S.C. § 1367(a).

16.     Mr. Cardwell has exhausted his administrative remedies and on August 6, 2019

received a Right to Sue letter from the EEOC. According to letters dated November 27, 2019,

December 11, 2019, and February 7, 2020, the New York State Division of Human Rights

("NYSDHR") issued a Dismissal for Administrative Convenience, noting in its final letter to the

parties' counsels that the NYSDHR "declines to reopen the matter."

17.     Venue is proper within this District since the unlawful actions complained of

herein all occurred within this District.

## RELEVANT BACKGROUND

### *The Firm*

18.     Davis Polk first began to evaluate Mr. Cardwell's abilities and motivation in the

Summer/Fall of 2012. At the time, Mr. Cardwell was a law student, and Davis Polk was

interviewing law students for the purposes of evaluating and hiring law students—first as interns

(also known as "summer associates") for the Summer of 2013 and then as full-time associates for

its 2014 associate class. During the recruitment process, the Firm portrayed itself as it does on its

website, and touted the following:

- **The Firm**: "For more than 165 years, Davis Polk has ranked among the premier
  law firms with practices that are world class across the board."

- **Pro Bono**: "Pro bono work is a core responsibility of Davis Polk. We are
  committed to serving the public good and providing legal services to those who
  cannot otherwise obtain legal representation."

- **Diversity and Inclusion**: "Davis Polk is a firm of well-rounded people who bring
  a wide range of perspectives and backgrounds to our work, resulting in a strong
  and inclusive culture, and more innovative solutions for our clients."

- **Alumni**: "Our alumni are a tremendous source of strength for the firm and are our best brand ambassadors. We have a dynamic alumni network of over 3,000 lawyers who live and work in over 51 countries worldwide across all sectors of business, government, law and academia."

- **History**: "We have worked on many of the most significant business and legal developments of the past 170 years…."

The quotations above are the very first sentences that appear on each of Davis Polk's "Who We Are" sub-sections.

19. Davis Polk's self-described reputation and values, as noted above, are somewhat consistent with how Davis Polk is perceived by the larger legal and business community. It is not uncommon for Davis Polk to be ranked among the "top five" law firms in the world in multiple practice group or law firm categories. For example, in 2013, an international law publication noted that Davis Polk won "Americas law firm of the year at the annual IFLR Americas awards ceremony…becoming the first to win the coveted award two years in a row."

***Mr. Cardwell – Among the Top Recruits in The Country***

20. Mr. Cardwell attended UC Berkeley School of Law ("Berkeley Law").  During the three years that Mr. Cardwell attended Berkeley Law, Berkeley Law was ranked in the "top 10" of U.S. law schools.

21. Prior to law school, as an undergraduate student-athlete at Lehigh University ("Lehigh"), Mr. Cardwell was an exceptional student and recognized leader in his community. At Lehigh, Mr. Cardwell received numerous undergraduate honors and awards and was recognized as follows:

- Awarded the **Bosey Reiter Leadership Cup**, an annual award where the criteria are defined chiefly in terms of moral character and "a just regard for the rights of others, together with the unflinching determination to succeed, no matter what obstacles and barriers have to be beaten down";

- Awarded **Scholar-Athlete of the Year**, which is the Lehigh football program's highest honor and is given to the student-athlete who best combines success in both academics and athletics;

- Awarded the **Class of 1904 award**, which is awarded based on character, scholarship, qualifications indicating promise of future leadership, and extracurricular activities;

- Nominated and a finalist for the **Senior Male Leadership award**, which is the top athletic department leadership award for a graduating male athlete who best represents the Lehigh traditions of leadership, character, athleticism, scholarship, service, sportsmanship, a team attitude and passion for sports;

- Awarded the **Contribution to Student Life award**, an award that recognizes Lehigh seniors who have significantly contributed to the improvement and quality of student life during their years at Lehigh;

- Awarded Lehigh's **Office of Multicultural Affairs "MVP" award** as a junior and senior; and

- Voted **Captain** of Lehigh's Division 1-AA football team in both his junior and senior years, becoming one of a handful of two-time football captains in the program's 100-plus-year history.

22.    Mr. Cardwell's exceptional academic and professional record continued after undergrad and through law school. In 2011, Mr. Cardwell was one of about 78 students selected from about 750 applicants to participate in the highly competitive Sponsors for Educational Opportunity ("SEO") Corporate Law Internship Program ("SEO Program"). As noted on their website, the SEO Program starts the Summer before law school and gives "accepted law students a paid internship at a top law firm, immersive mentorship and networking, and law school prep and training." SEO's website also notes that "for 30 years, SEO…has served as a pipeline linking talented pre-law students of color to elite global law firms."

23.    As a pre-law student in the SEO Program, Mr. Cardwell interned in the Summer of 2011 at Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"), an international law firm that is headquartered in New York City and that employed, at the time, about 600 attorneys. At the conclusion of Mr. Cardwell's internship at Fried Frank, and prior to starting law school in the Fall of 2011, Fried Frank evaluated Mr. Cardwell's performance and ultimately asked Mr. Cardwell to return the following Summer to join their 2012 summer associate law class.

24.    In addition to the SEO Program, Berkeley Law also assessed Mr. Cardwell's abilities and motivation prior to his matriculation to law school in the Fall of 2011. In the Spring of 2011, Berkeley Law selected Mr. Cardwell to receive a *Berkeley Law Dean's Fellowship* ("Berkeley Law Dean's Fellowship"). At the time, Berkeley Law informed Mr. Cardwell that "*this prestigious award, based on your strong record of achievement and professional promise, is provided to only a few entering students each year. The purpose of the Dean's Fellowship is to support students showing outstanding leadership experience, significant potential for success, and innovation in their approach to seeking the nexus between law, policy, and justice. In other*

*words, Dean's Fellows are law students that we believe will bring new vision to the study of the law, and will strive to transform that vision into action.*"

25.     Mr. Cardwell's merit-based Berkeley Law Dean's Fellowship provided a total of $75,000 of support and was in addition to any need-based grant. Ultimately, Berkeley Law offered Mr. Cardwell an additional $30,000 in merit-based scholarships to discourage Mr. Cardwell from accepting similar scholarships that other top-ranked law schools had offered Mr. Cardwell in the Spring of 2011.

26.     Though some Black law students are characterized as benefiting from affirmative action, at the time that Berkeley Law evaluated Mr. Cardwell's law school application, Berkeley Law was legally prohibited from using race-based affirmative action in their admission and evaluation process. Mr. Cardwell, along with just a handful of students, was awarded the above competitive, merit-based scholarship awards out of the 300-plus students who joined Berkeley Law in the Fall of 2011.

27.     Mr. Cardwell continued to demonstrate a distinguished record of academic achievement and commitment to service and justice as a Berkeley Law student. By the time Mr. Cardwell interviewed with Davis Polk in the Summer/Fall of 2012, Mr. Cardwell was:

- the Co-President of Berkeley Law's Black Law Student Association;

- an editor and member of *The Berkeley Journal of African-American Law & Policy*;

- a mock trial team member of Berkeley Law's prestigious and highly selective "Board of Advocates";

- honored as 1 of 8 out of 40 participants to win an individual "Outstanding Attorney" award in a Berkeley Law school-wide trial advocacy competition;

- recognized as a 1L Leadership Council on Legal Diversity (LCLD) Scholar; and

- a volunteer teacher to incarcerated youths in California's prison system.

28.　　Between the time that Mr. Cardwell interviewed with Davis Polk in 2012 and graduated from Berkeley Law in May 2014, Mr. Cardwell had deepened his record of accomplishment and commitment to service and justice, as evidenced by the fact that Mr. Cardwell:

- worked as a research assistant to john a. powell, the director of the Othering and Belonging Institute (formerly the Haas Institute for a Fair and Inclusive Society) and the holder of the Robert D. Haas Chancellor's Chair in Equity and Inclusion;

- finished as a semi-finalist in the American Association for Justice (AAJ) National Student Trial Advocacy Competition;

- finished in the Top 10% (High Honors) and Top 40% (Honors) in several law classes that included both corporate courses and civil rights courses; and

- received one of the highest grades in his legal ethics and professional responsibility course due to an essay that Mr. Cardwell authored, which was entitled "An Opportune Time to Engage Inclusion, Democracy, and...Race."

***The Firm Recruits Mr. Cardwell – They Know He's Black***

29.　　In the Fall semester of 2012, Mr. Cardwell participated in his law school's on-campus interviewing process. Davis Polk was one of several law firms that interviewed Mr. Cardwell in the Fall semester of 2012.

30.     On or about August 6, 2012, Davis Polk interviewed Mr. Cardwell. During this interview, Mr. Cardwell was interviewed by a Davis Polk Partner.[1] In connection with the interview, the Firm received Mr. Cardwell's transcript, resume, and writing sample.

31.     On or about August 8, 2012, after reviewing Mr. Cardwell's academic and professional record, Davis Polk invited Mr. Cardwell to participate in a second round of interviews at their New York City headquarters ("Mr. Cardwell's Fall 2012 Second Round Davis Polk Interview"). Mr. Cardwell accepted Davis Polk's invitation and interviewed with the Firm shortly after.

32.     During Mr. Cardwell's Fall 2012 Second Round Davis Polk Interview, the Firm's interviewers made it clear that they viewed Mr. Cardwell's dedication to racial inclusion positively. Relatedly, during Mr. Cardwell's Fall 2012 Second Round Davis Polk Interview, Davis Polk partner Maurice Blanco explicitly told Mr. Cardwell that Mr. Cardwell was the type of candidate who would essentially have the country's best law firms competing to hire him, saying something to the effect of, "You're clearly very talented. Someone like you will be able to pick virtually any law firm he wants. Can you tell me why—out of all of the firms you could work at—you're interested in possibly working at Davis Polk?"

33.     On or about August 22, 2012, Davis Polk offered Mr. Cardwell a spot in their 2013 summer associate class.

34.     On or about August 28, 2012, Mr. Cardwell accepted the Firm's offer to join their 2013 summer associate class on the condition that Mr. Cardwell be allowed to split and work part of the 2013 Summer at another global law firm that was interested in hiring Mr. Cardwell.

---

[1] All descriptions and references to Davis Polk attorneys and staff refer to such persons and their status or title at the Firm at the time the applicable events or interactions occurred.

35.     Throughout the Summer of 2013, Davis Polk repeatedly hinted that Mr. Cardwell would receive a job offer to join the Firm upon graduation. Knowing that Mr. Cardwell had other options, Davis Polk directly and indirectly checked-in with Mr. Cardwell throughout the Summer to assess which firm Mr. Cardwell believed might be a better fit for his short and long-term legal career and aspirations.

36.     In the Summer of 2013, Davis Polk had between 125 and 140 partners and just one Black partner.

37.     Thus, when asked about his prospects, Mr. Cardwell pointed to the numbers, the Firm's 165-year history, and expressed concerns.

38.     On multiple occasions in the Summer of 2013, Mr. Cardwell informed Davis Polk that his prior law school and interning experiences, among other experiences, helped him understand that appropriate staffing, feedback, training, and mentorship are critical to junior associates' skills, development, and future career opportunities. Within those same interactions, Mr. Cardwell communicated that these dynamics were even more critical for Black junior associates who work at law firms that have very few Black partners.

39.     Davis Polk attempted to address Mr. Cardwell's priorities and concerns by explaining to Mr. Cardwell that though the Firm had struggled in the past to recruit and retain Black law students and associates, the Firm had recently implemented and would continue to implement policies and practices that would allow the Firm to monitor Black associates' experiences and assignments to ensure Black associates would not "fall through the cracks" or receive fewer or worse opportunities and training than their non-Black and/or non-Black male peers.

40.     As part of the ongoing dialogue between Mr. Cardwell and Davis Polk about challenges unique to or associated with Black associates, Davis Polk described a series of deliberate steps they relied upon to address such challenges, including tracking how Black associates were staffed, the types of assignments Black associates received, how many billable hours Black associates were billing, the quality of the deals and cases that Black associates worked on, and communicating with Black associates in real-time any relevant discrepancies and concerns.

41.     Also during the recruitment phase, Davis Polk attempted to address Mr. Cardwell's priorities and concerns by explaining to Mr. Cardwell that Davis Polk would assign Black associates mentors and work with Black associates if Black associates appeared to be or actually were behind their peers in terms of billable hours or quality of work. At the time, Davis Polk made it clear to Mr. Cardwell that Davis Polk believed and understood that there were a number of law firm dynamics (i) that were unrelated to Black associates' work ethic or abilities and (ii) that could cause Black associates to have fewer hours and less quality work assignments than their law firm peers.

42.     Additionally, Davis Polk explained to Mr. Cardwell that because Davis Polk hires Black law students who are considered among the best in the country, the Firm would try to prevent Black junior associates from thinking that they should leave Davis Polk early in their careers for other seemingly better career opportunities.

43.     On multiple occasions in the Summer of 2013, Davis Polk attempted to recruit Mr. Cardwell by informing Mr. Cardwell that the Firm wanted Mr. Cardwell and other Davis Polk minorities to use their knowledge and experiences on race-related issues to (i) strengthen

the Firm's commitment to racial justice and diversity and inclusion issues and (ii) take an active role in recruiting additional Black and non-White law students and lawyers.

44.     Davis Polk and various partners made no secret of the fact that they considered Mr. Cardwell's dedication to racial inclusion an additional benefit to his already robust qualifications. Mr. Cardwell was assured that Davis Polk would be an environment in which his social advocacy would be valued and that they envisioned him taking an active role in recruiting additional minority associates.

45.     From the time Mr. Cardwell first interviewed with Davis Polk, Mr. Cardwell remained committed to racial inclusion and racial justice as a law student. During that time span, Mr. Cardwell co-authored and/or contributed to the following Supreme Court briefs and articles:

- Co-authored "Homeownership, Wealth, and the Production of Racialized Space" along with john a. powell (published by both the *Harvard Joint Center for Housing Studies* and the *Brookings Institution Press* in the book "Homeownership Built to Last: Balancing Access, Affordability, and Risk after the Housing Crisis");

- Assisted with underlying research used in an amicus Supreme Court brief of housing scholars in support of the respondent in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) (a Supreme Court case that concluded that disparate-impact claims are cognizable under the Fair Housing Act);

- Assisted with an amicus Supreme Court brief of housing scholars in support of respondents in *Township of Mount Holly, N.J.* v. *Mt. Holly Gardens Citizens in Action Inc.*, 133 S. Ct. 2824 (2013);

- Assisted with an article entitled "Fisher v. Texas: The Limits of Exhaustion and the Future of Race-Conscious University Admissions" by john a. powell;

- Assisted with an article entitled "America's Struggle with Integration: The Continued Struggle for Its Soul" by john a. powell;

- Assisted with an article entitled "Affirmative Action: Where Do We Go From Here?" by john a. powell; and

- Assisted with an article entitled "What Constitutes a Racial Classification? Equal Protection Doctrine Scrutinized" by Stephen Menendian.

46.     At the conclusion of Mr. Cardwell's Summer 2013 summer associate internships, Mr. Cardwell received job offers from several of the world's best law firms. Based in part on Davis Polk's strategic, persistent, and partially tailored recruitment of Mr. Cardwell, Mr. Cardwell accepted the Firm's full-time associate offer on or about October 4, 2013.

47.     Mr. Cardwell graduated from Berkeley Law School in May 2014 and commenced working at Davis Polk as an associate on September 15, 2014.

## STATEMENT OF FACTS

**i. Being ignored, no problem. Being left out, no problem. Complain to the boss, problem.**

48.     As early as April 2014, Davis Polk had been notified of and accepted as fact that it had or likely had a problem with bias and unconscious bias at the Firm, that such bias often or likely impacted Black associates' retention rates at Davis Polk, and that such bias often or likely created discriminatory assessments for Davis Polk's Black associates.

49.     Part of the Firm's response involved inviting Jerry Kang—a scholar on the nexus between race, implicit bias, and the law and the current Vice Chancellor for Equity, Diversity and Inclusion at The University of California, Los Angeles (UCLA)—to give a presentation at

the Firm focused on how bias functions in law firms. Mr. Kang presented at Davis Polk in April 2014.

50.     The Firm's problem with bias and Black associates was further highlighted in a June 2014 *American Lawyer* publication, wherein Davis Polk was publicly criticized for its poor track record with promoting its Black lawyers. One article gave Davis Polk a chance to explain their track record and noted that "Davis Polk managing partner Thomas Reid says that his firm recruits aggressively for top black law graduates, only to see them leave the firm a few years later for government or in-house positions."[2]

51.     Consistent with the Firm's recruitment of Mr. Cardwell—as well as the Firm's ongoing conversation about bias, diversity, and inclusion—Mr. Cardwell was encouraged to join Davis Polk's "Black Attorney Group" (or BAG as it is commonly called) and provide feedback to the Firm with respect to these and related diversity and inclusion topics.

52.     On March 6, 2015, Davis Polk's "DPWomen Affinity Group" hosted a firm-wide discussion—which Mr. Reid and Mr. Cardwell attended and participated in—on women and discrimination in the workplace. As detailed in four essays that served as the basis of the discussion (i.e., the *New York Times* series, "Women at Work" by Adam Gran and Sheryl Sandberg), Mr. Reid and other participants explicitly talked about, among other things, (i) how senior attorneys and partners at Davis Polk continue to favor men over equally qualified women in performance evaluations; (ii) how Davis Polk senior associates and partners disproportionately ask women to handle secretarial and less substantive aspects of cases and deals; (iii) how women reasonably choose to "speak up" less, in part, because women are often unfairly and disproportionately punished when they do speak up; and (iv) how Davis Polk disproportionately

---

[2] See Julie Triedman, *Big Law is Losing The Race*, THE AMERICAN LAWYER (June 2014), available at https://www.americanlawyer-digital.com/americanlawyer-ipauth/201406ip?pg=46#pg46.

asks women associates to recruit and mentor women associates and help with diversity initiatives, and how such time commitments and contributions to the Firm are often uncompensated and effectively penalized in performance reviews.

53.    Davis Polk's program explicitly discussed an article entitled, "When Talking About Bias Backfires," which noted that "new research suggests that if people are not careful, making people aware of bias can backfire, leading them to discriminate more rather than less."

54.    Mr. Cardwell experienced a series of discriminatory interactions that mirrored those analyzed at Davis Polk's March 6, 2015 DPWomen Affinity Group discussion.

55.    For example, in an email sent to an Executive Director at Davis Polk ("Davis Polk's Executive Director") on May 8, 2015, Mr. Cardwell flagged a discriminatory "inter-office," personally-experienced pattern to Davis Polk's Executive Director, a director who worked closely with the Firm's management committee and various other partner committees on policy formulation in the areas of personnel, associate development, and firm management.

56.    Mr. Cardwell's email noted that interpersonal trainings that highlight the value of associates speaking to unfamiliar faces and creating a welcoming environment would benefit everyone. Specifically, Mr. Cardwell's email described situations where Davis Polk attorneys were not making eye contact with or speaking to summer associates and junior associates of color in meetings.

57.    This May 8, 2015 incident is the first time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.[3]

---

[3] According to the Firm's "Lawyers Handbook," which serves as the Firm's official resource that describes the Firm's policies and procedures, "The Firm strongly recommends the prompt reporting of all perceived incidents of discriminatory behavior or harassment on the basis of…race, color…or any other basis prohibited by federal, state

58.     In response, Davis Polk's Executive Director minimized the issue to the "social awkwardness" of attorneys, said that "unfortunately that happens to everyone," recognized that Mr. Cardwell was possibly describing interactions that he had, and ultimately shifted the burden to Mr. Cardwell by telling him,  "Hopefully if this happened to you, you showed them how to live in polite society(!) and introduced yourself."

59.     Based on the wording of the email and context, Davis Polk's Executive Director recognized that Mr. Cardwell was indeed or possibly describing racial interactions that "happened to [Mr. Cardwell]." Davis Polk's Executive Director knew or should have known Mr. Cardwell was cautiously describing personally experienced interactions, in part, because of the nature in which Black Davis Polk associates typically reached out to Davis Polk's Executive Director. Davis Polk's Executive Director was experienced enough—and had participated in enough bias-related trainings and conversations at the Firm—to know that there are many reasons why a Black associate, let alone a first-year Black associate, might not be more explicit about bias and discrimination in an email. Further, Davis Polk's Executive Director's response was wholly disconnected from Mr. Cardwell's raised concern for an additional reason: the wording of Mr. Cardwell's email made it clear that Mr. Cardwell was not describing something that "happens to everyone." Davis Polk's Executive Director never inquired about or brought the incident up again with Mr. Cardwell.

60.     Davis Polk's Executive Director's response was inconsistent with how Davis Polk's Executive Director would have responded if Mr. Cardwell were a woman who had

---

or local law, regardless of the offender's identity or position. Lawyers who believe they have been subjected to such prohibited conduct or who believe that they have witnessed such prohibited conduct or any other behavior should discuss their concerns immediately with[] [Davis Polk's Executive Director]….the practice group coordinator or head of their office…or any member of the Firm's Management Committee…. The Firm recognizes…that it is not necessary for an individual to talk directly to an offender if that individual feels uncomfortable doing so."

similarly hinted that men at the Firm were not speaking or making eye contact with her and other women.

61.     While Davis Polk's Executive Director's excuse—that is, some attorneys lack manners—and dismissal of Mr. Cardwell's complaint can seem reasonable in isolation, Defendants' conduct toward Mr. Cardwell continued to escalate.

62.     Throughout his employment at the Firm, Mr. Cardwell suffered through a series of discriminatory interactions that were motivated by his race and resulted in exclusion from opportunities that are vital to a young attorney's professional development and career.

63.     While Mr. Cardwell was working in Davis Polk's M&A group, on multiple occasions, Mr. Cardwell was left off email communications and meeting invitations (i) that were circulated to all attorneys working on the same deal or (ii) that should have included Mr. Cardwell.

64.     On one occasion, Mr. Cardwell became aware of this type of disparate treatment when he spontaneously walked into the office of a White M&A associate (of Mr. Cardwell's same class year) who was working on the same deal as Mr. Cardwell. Mr. Cardwell noticed the associate was invited to and listening in on a conference call with high-level clients and senior attorneys for the exclusive purpose of listening and learning. The associate explained that she was only on the call for the purposes of listening. The associate apologized that Mr. Cardwell was not informed about the conference call and made it clear that she did not understand why Mr. Cardwell didn't receive an email or invitation to join the call. As a result of this experience, Mr. Cardwell asked the associate to forward all emails or meeting invitations to Mr. Cardwell if she thought Mr. Cardwell was excluded when he should have been included. Without hesitation,

the associate agreed and, for the rest of 2015, periodically forwarded emails to Mr. Cardwell that

Mr. Cardwell should have received from White senior M&A associates.

65.     In September 2015, Mr. Cardwell became a second-year associate.

66.     In September 2015, the Firm's Black Attorney Group was having conversations

with the Firm about how Davis Polk could improve its diversity and inclusion practices and

outcomes. In preparation for a meeting between the Firm's Black associates and the Firm's

Diversity Committee, the Firm's Black Attorney Group sent the Firm's Diversity Committee the

following questions and statements, which were prepared for the purpose of discussing them

with both the Firm's Diversity Committee and Mr. Reid in separate meetings:

a.    "*How can we strengthen the relationship between the Diversity Committee
      and the affinity groups? What are some of the Diversity Committee's action
      items for this recruiting season/next year?*"

b.    "*I would be interested in hearing about the diversity consultant that the firm is
      considering bringing in to talk to the partners.*"

c.    "*What is the Diversity Committee's opinion as to where the biggest need is
      with respect to diversity at the firm (i.e., recruiting, retention, something
      else)?*"

d.    "*Do you have a sense what our peer firms are doing with respect to diversity
      initiatives?*"

e.    "*How can we further engage non-diverse lawyers in the discussion about
      diversity at the firm?*"

67.     In September 2015, the Firm's Diversity Committee and the Firm's Black

Attorney Group met to discuss the questions above and other issues related to diversity and

inclusion. Partners serving on the Firm's Diversity Committee, and the Firm's Director of Associate Development ("Davis Polk's Director of Associate Development"), attended the meeting. Many Black Davis Polk attorneys were also in attendance. During this meeting, Mr. Cardwell participated in a conversation about the general issue of Black Davis Polk attorneys being excluded from staffing-related opportunities at the Firm and was careful not to mention any information that could be connected to any specific attorneys at the Firm. After Mr. Cardwell flagged the issue before the aforementioned partners and Davis Polk's Director of Associate Development, Mr. Cardwell was directly asked whether he had personally experienced exclusion and disparate treatment related to his race at the Firm (which is evidence that the Firm's leaders understood Mr. Cardwell had made a discrimination complaint). Mr. Cardwell answered affirmatively and unequivocally. In the verbal exchange that followed, Mr. Cardwell explicitly stated that he wasn't just talking about the feeling of being excluded, but rather that the type of exclusion and disparate treatment he referred to was and is harmful to his and other Black associates' professional development and careers because the disparate treatment relates to fewer and different staffing-related opportunities.

68.     This September 2015 incident was the second time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

69.     Neither the Director of Associate Development nor any of Davis Polk's partners in attendance followed-up with Mr. Cardwell about his comments or his (or others') experience.

70.     On or about December 1, 2015, Mr. Reid was a featured speaker at an hour and a half long New York City Bar event. The event mainly focused on what leaders in the legal profession can do to improve attorneys' happiness and development.  Most of the event's

discussion was about diversity and included what appeared to be over 100 audience members in

attendance. Mr. Cardwell and a senior Black associate were in attendance, a fact that Mr. Reid

highlighted for the entire audience by introducing Mr. Cardwell and the senior Black associate

by name and referring to both as two of Davis Polk's rising/shining stars. Upon information and

belief, Ms. Hudson and Davis Polk's Executive Director were also in attendance. Here's how

*Bloomberg BNA*, a source for business and legal information, summarized the event and Mr.

Reid's involvement in an article entitled "Law Firms Lose Talent In-House Because of Diversity,

GC says":

> "*At one point, a plaintiffs attorney in the audience, Jeanne Christensen of*
>
> *Wigdor [i.e., one of the leading employment-discrimination law firms in*
>
> *the country], posed a question to Reid, asking how his law firm **supports***
>
> ***diverse and female attorneys so they can climb the ranks**.*
>
> *Reid acknowledged that 'the statistics are not impressive at all, clearly,'*
>
> *but said he makes a point to look at firm diversity in meetings with*
>
> *practice leaders three times a year as they 'talk about **how work at the***
>
> ***firm is getting allocated**.'*
>
> *'**That's the foundation**,' said Reid. 'And on top of that we have a*
>
> *formalized mentoring program. It doesn't match up people who are alike.'*
>
> *He said that at the end of the day, achieving diversity 'comes from an*
>
> *attitude of (leaders) caring and a desire to be engaged in everyone's*

*career.' Reid added that firm leaders need to be 'connected' with their*

*younger attorneys….*" (emphasis added).

71.     In other words, Davis Polk's "foundation" for ensuring that Black associates (among others) climbed the ranks at Davis Polk involved Firm-created and monitored mechanisms that the Firm's leaders used to prevent and mitigate bias in work allocation, mentorship, decisions related to assessing how and why certain non-White associates are progressing and advancing relative to their class's peers, and partners' engagement with junior attorneys.

72.     At the conclusion of the event, Mr. Reid approached the senior Black associate and Mr. Cardwell and invited them to dinner. The dinner was ultimately scheduled for January 21, 2016.

73.     Both the senior Black associate and Mr. Cardwell realized that the dinner would be a good opportunity to ensure that Mr. Reid was informed about their individual (as well as other Black associates') goals and concerns. Both the senior Black associate and Mr. Cardwell understood how rare it was for associates, especially Black Davis Polk associates, to have a few uninterrupted hours of conversation with the Managing Partner of Davis Polk.

74.     On January 21, 2016, Mr. Reid, the senior Black associate, and Mr. Cardwell had dinner together at a restaurant. During dinner, Mr. Reid indicated that he had, as a matter of habit, reviewed the senior Black associate's and Mr. Cardwell's file and performance reviews prior to their meeting over dinner. The conversation naturally transitioned to two related discussion points, namely (i) the other associate's and Mr. Cardwell's performance at the Firm and (ii) the Firm's diversity and inclusion issues.

75.     On the first discussion point, Mr. Reid made it clear that he was familiar with Mr. Cardwell's evaluations and the M&A group's conclusions about Mr. Cardwell's performance. Mr. Reid gave Mr. Cardwell *a verbatim description* of the same conclusion that Mr. Chudd had communicated to Mr. Cardwell in December 2015, telling Mr. Cardwell to "do a better job of setting people's expectations for how long it will take to do something."[4] Based on the frankness of the entire conversation, there is no doubt that Mr. Reid would have told Mr. Cardwell that Mr. Cardwell was behind in his class or performing below the Firm's standards and expectations if either Mr. Cardwell's reviews indicated such a thing or if the M&A group's leaders had reached such conclusions at the time. Both Mr. Cardwell and the other associate in attendance left the meeting having no doubt that, based on Mr. Reid's assessment of and conclusions about how Mr. Cardwell was performing at the Firm, that Mr. Cardwell was not only qualified to be a Davis Polk associate, but that Mr. Cardwell was performing satisfactorily according to the Firm's and M&A group's typical standards and expectations.

76.     On the second discussion point, Mr. Cardwell spent a significant amount of time educating Mr. Reid on how he had experienced interpersonal and institutional discrimination at the Firm.

77.     Mr. Cardwell spoke at length about implicit bias both conceptually and in relation to the race-based discrimination he himself had experienced during his time at the Firm. During the conversation Mr. Cardwell also inquired about how the Firm insulated assessments and conclusions about performance reviews from the effects of bias and whether there were mechanisms in place to ensure that feedback was reviewed between the reviewing attorney and the associate who received it.

---

[4] Mr. Reid's advice for the senior associate? "Be more confident."

78.     In response to such questions about written reviews and whether anyone was reviewing them for accuracy and potential bias, Mr. Reid mentioned two noteworthy Firm-wide interventions and remedies. The first was that he and the Firm were waiting to evaluate a certain diversity and inclusion consultant before "moving forward with a plan."

79.     The second Firm-wide bias-mitigation mechanism related to the Firm and practice group leaders having a process for accounting for various patterns and inconsistencies that appear in reviewing attorneys' written reviews, and that such leaders understand they must evaluate and communicate conclusions about the substance of written reviews to reviewee attorneys with certain bias-related patterns analyzed and removed from final, Firm- and practice group-accepted assessments and conclusions. In other words, Mr. Reid acknowledged that the Firm and practice group leaders do not automatically accept every assessment or criticism of an associate as accurate, free of bias, or the Firm's (or applicable practice group's) determination or conclusion about such associate's overall performance or contribution.

80.     Regarding issues of bias, Mr. Reid also explained there are a significant number of Davis Polk partners who hold seemingly contradictory views at the Firm. That is, according to Mr. Reid's remarks, many Davis Polk partners (i) believe that existing research confirms Black and other minority attorney groups experience bias in the workplace and at Davis Polk while they also (ii) believe that they themselves are fair and would never act with bias against attorneys from those groups. In other words, according to Mr. Reid, Davis Polk's partners apparently and conveniently maintained that race-related biased interactions and decisions exist—just not with

themselves or any Davis Polk partners they work with.  By this statement Defendant Reid

directly acknowledged the prevalence of implicit bias within the Firm.[5]

81.     This January 21, 2016 incident was the third time that Mr. Cardwell actively

flagged personally experienced discrimination and actively sought help from Davis Polk and

persons with sufficient authority to address it.

82.     Mr. Cardwell had responsibly escalated his complaints from Davis Polk's

Executive Director, then to Davis Polk's Diversity Committee (which included partners and the

Firm's senior management), and finally to Davis Polk's Managing Partner, Mr. Reid, the person

with the ultimate authority and obligation to investigate Mr. Cardwell's claims. Notwithstanding

Mr. Reid's empathetic statements, nothing improved. To the contrary, following the dinner with

Mr. Reid, things changed for Mr. Cardwell in a distinctively negative manner.

**ii. Mr. Cardwell is complaining about racism. Kindly show him the way out.**

83.     Instead of conducting meaningful inquiries into the discriminatory activity

highlighted by Mr. Cardwell, Defendants began, at various stages, a year-long process to deprive

Mr. Cardwell of work, distort assessments and conclusions related to the quality of Mr.

Cardwell's performance, and obstruct his professional advancement in hopes that he would

voluntarily leave the Firm.

   *From "No Basis" to Review to Deceptive Reviews and No Deals.*

---

[5] Mr. Reid's admissions were consistent with the fact that Mr. Reid and the Firm's other leaders and partners were aware that credible research had confirmed that even when supervising attorneys in law firms review and rate the same exact hypothetical memo, supervising attorneys often rate the memo "higher" when the supervising attorney knows or believes the memo was written by a White attorney (in comparison to a Black attorney). For example, according to one widely discussed study, the supervising attorney reviewed and rated the same memo an average of 3.2/5.0 for a hypothetical "African American Thomas Meyer" and a 4.1/50 for a hypothetical "Caucasian Thomas Meyer." In the same study, the "qualitative comments on memos"—despite the memos being exactly the same—"were also more positive" for the study's "Caucasian Thomas Meyer" than the study's "African American Thomas Meyer." See Dr. Arin N. Reeves, *Written in Black & White: Exploring Confirmation Bias in Racialized Perceptions of Writing Skills*, Nextions (April 2014), available at https://nextions.com/portfolio-posts/written-in-black-and-white-yellow-paper-series/.

84.     According to a written performance review[6,7] that appears to have been retroactively created after Mr. Cardwell engaged litigation, Mr. Chudd purportedly stated in September 2015 that he had "**limited**" contact with Mr. Cardwell, while providing the following answers to the following questions in the same review:

    a.  Question: "Overall, do you feel like this lawyer is performing materially behind, with or ahead of the lawyer's class"?

        i.  Answer: "No Basis"

    b.  Question: "Potential for growth and versatility"?

        i.  Answer: "No basis"

    c.  Question: "Ability to analyze legal issues"?

        i.  Answer: "No basis"

    d.  Question: "Knowledge of relevant substantive law"?

        i.  Answer: "No basis"

    e.  Question: "Understanding of accounting issues and ability to work with quantitative concepts"?

        i.  Answer: "No basis"

    f.  Question: "Understanding of the overall business context (including the relationship between the business problems and legal issues presented)"?

        i.  Answer: "No basis"

    g.  Question: "Presentation skills"?

---

[6] As will be further explained in this Complaint and legal action, at no point during Mr. Cardwell's time at Davis Polk did the Firm allow Mr. Cardwell to see or review the written performance reviews that attorneys had completed and submitted to the Firm. Every reference to Mr. Cardwell's written performance reviews in this Complaint relates to documentation that Mr. Cardwell only became aware of after Mr. Cardwell engaged in litigation with Davis Polk and after the NYSDHR or Davis Polk shared documents that were a part of the Firm's NYSDHR response.

[7] The reviews that Davis Polk submitted have material inconsistencies and untruths described in them, such reviews often note the wrong date that the applicable face-to-face review occurred on.

    i.   Answer: "No basis"

h.   Question: "Negotiation skills"?

    i.   Answer: "No basis"

i.   Question: "Working hard"?

    i.   Answer: "No basis"

j.   Question: "Being thorough, well organized and efficient"?

    i.   Answer: "No basis"

k.   Question: "Deal management skills"?

    i.   Answer: "No basis"

l.   Question: "Ability to handle multiple matters simultaneously"?

    i.   Answer: "No basis"

m.   Question: "Willingness to volunteer and pitch-in wherever necessary (take on new work, review standard forms, help with recruiting, etc.)"?

    i.   Answer: "No basis"

n.   Question: "Self-confidence/maturity"?

    i.   Answer: "No basis"

o.   Question: "Judgment and common sense"?

    i.   Answer: "No basis"

p.   Question: "Delegation, management, training and supervision of junior lawyers"?

    i.   Answer: "No basis"

q.   Question: "Standing with peers, junior lawyers and staff"?

    i.   Answer: "No basis"

r.  Question: "Client management skills (including responsiveness to client

needs)"?

i.  Answer: "No basis"

s.  Question: "Focus on client development (including being proactive in

developing relationships with individuals at the client and in identifying

business opportunities and effectiveness in business pitches)"

i.  Answer: "No basis"

85.  Here, Mr. Chudd's September 2015 performance review is evidence of the fact

that Mr. Chudd went out of his way to not document positive conclusions about Mr. Cardwell's

performance and interactions at the Firm. Mr. Chudd's "no basis" responses were at odds with (i)

Mr. Chudd's interactions with Mr. Cardwell at the time; (ii) the 20-plus years of legal experience

that gave Mr. Chudd the ability to answer some if not all of the questions above; (iii) how Mr.

Chudd and other Firm partners typically complete and reach conclusions about performance

reviews; and (iv) what should have been an honest and unbiased effort to properly document

feedback for a recent law-school-graduate-turned-attorney.

86.  On the other hand, in Mr. Chudd's purported September 2015 performance

review, Mr. Chudd went out of his way to suggest that the Firm should consider an unofficial

assessment of an associate that Mr. Chudd knew or should have known was connected to the

racial complaints Mr. Cardwell made to the Firm's Diversity Committee. Stated differently, Mr.

Reid, Mr. Bick, Mr. Chudd, and Davis Polk weaponized Mr. Chudd's performance reviews,

making Mr. Chudd's reviews one of the first "plays" in Defendants' dishonest and discriminatory "playbook."[8]

87.     As further explained below,[9] even if Mr. Chudd's review was not retroactively created after Mr. Cardwell raised racial complaints or engaged in litigation against Defendants, the pretextual nature of Defendants' attempts to unlawfully weaponize Mr. Chudd's reviews is made apparent when one considers that Davis Polk and Mr. Chudd shifted their conclusions about Mr. Chudd's review in response to Mr. Cardwell's racial complaints and the possibility of litigation.

### *First Annual Face-to-Face Performance Review.*

88.     In December 2015, Mr. Chudd gave Mr. Cardwell his first annual face-to-face review[10] at the Firm. The 2015 annual review lasted a few minutes, as Mr. Chudd briefly gave positive feedback and then briefly gave two suggestions. For the first suggestion, Mr. Chudd told Mr. Cardwell to "work on better setting expectations regarding how long it will take to do something." The second suggestion was a bit more cryptic and went something along the lines of, "Don't spend too much time thinking about the bigger picture."

89.     In response to Mr. Chudd's first suggestion, Mr. Cardwell responded during the face-to-face review by mentioning that he was a bit surprised by the feedback because it didn't match his habits or any feedback that had been communicated directly to him. Mr. Cardwell,

---

[8] For additional context, Davis Polk attempted to retroactively leverage Mr. Chudd's "no basis" review to essentially argue in Davis Polk's NYSDHR Answer and Position Statement that Mr. Cardwell lacked positive performance-related assessments early in his career.

[9] Note the chart in this Complaint that compares statements made by Davis Polk and certain defendants—statements and conclusions that Defendants made before and after Mr. Cardwell raised racial complaints and commenced litigation.

[10] This Complaint generally describes written performance reviews that the applicable reviewing attorneys completed and submitted to the Firm as a "written performance review" or "performance review." Meetings in which an associate met face-to-face with a partner to discuss the written performance reviews that were collected for such an associate are generally described in this Complaint as "face-to-face reviews."

however, indicated that he was open to constructive feedback and would work on better setting expectations for three primary reasons. First, based on his experiences and interactions at Davis Polk, Mr. Cardwell knew that such feedback was not uncommon for partners and senior associates to communicate to junior or mid-level Davis Polk associates. Second, Mr. Cardwell appropriately understood that the process of transitioning from law student to lawyer involved various learning processes and that such transitions and evolutions normally occur over a series of years and experiences. And third, Mr. Cardwell knew that the Firm knew that it routinely asked or expected Mr. Cardwell to commit to other Firm-related obligations that created additional time constraints and responsibilities for Mr. Cardwell, namely those related to recruiting (non-White law students) and the Firm's summer program.

90. At the end of the meeting, Mr. Cardwell asked Mr. Chudd if he had any advice on how to get supervising attorneys to provide real-time feedback so that he could better account for attorneys' personal preferences. Mr. Cardwell asked about real-time feedback in his very first annual face-to-face review, in part, because Mr. Cardwell had already experienced certain bias-related interactions that he believed might impact his assessments and written performance reviews and because it quickly became apparent to Mr. Cardwell that the December 2015 face-to-face review was going to be like the first face-to-face review and not last very long. Mr. Chudd remarked something along the lines of, "The face-to-face reviews aren't that extensive at this stage because there often isn't that much to tell junior associates within their first couple of years at the Firm."

91.     Mr. Chudd also acknowledged that it could be difficult to get real-time feedback from senior attorneys and encouraged Mr. Cardwell to continue trying to get such feedback.[11]

92.     Mr. Cardwell did not question Mr. Chudd's second suggestion during the interview.

93.     Ultimately, Mr. Chudd had made it clear with both his comments and tone during the review that Mr. Cardwell was not only qualified to be a Davis Polk associate, but that Mr. Cardwell was performing satisfactorily according to the Firm's and M&A group's typical standards and expectations. Further, at no point during the meeting did Mr. Chudd state or suggest that Mr. Cardwell was under any kind of performance-related probation period or that the Firm or M&A group was going to or was contemplating giving Mr. Cardwell another review in six months to further assess his standing or performance.

94.     Mr. Cardwell had a habit of discussing his meetings and interactions with Davis Polk partners, including his face-to-face reviews, with both Davis Polk associates and non-Firm associates shortly after such meetings and interactions. Accordingly, after his meeting with Mr. Chudd, Mr. Cardwell immediately discussed his face-to-face review with a few Davis Polk associates. In those conversations, Mr. Cardwell stated that he was a bit frustrated with the vague, unsupported reference to setting expectations and was confused and uncomfortable about the second point. Both Mr. Cardwell and the Davis Polk associates with whom he spoke with noted that Mr. Chudd's suggestion to not "spend too much time thinking about the bigger picture" was odd and inconsistent with how senior attorneys typically want junior associates to spend more time trying to figure out the bigger picture on deals and cases. Mr. Cardwell and the

---

[11] Both Mr. Cardwell's comments and questions and Mr. Chudd's responses made it clear that both of Mr. Cardwell and Mr. Chudd understood that there was a meaningful difference between real-time feedback and a face-to-face review and that Mr. Cardwell was seeking the former.

referenced Davis Polk associates discussed whether Mr. Chudd would have or ever had made a similar comment to White junior associates.

95.      Upon information and belief, sometime between February 2016 and June 2016, a senior non-White associate overheard a Davis Polk capital markets attorney refer to Mr. Cardwell in racially biased way. Upon information and belief, the capital markets attorney's comments were made to or in the presence of Mr. Reid. Upon information and belief, the senior non-White associate heard the comment as well and was so taken aback that such associate immediately told Mr. Reid something along the lines of, "If Mr. Cardwell were a White associate, we both know that you would let Mr. Cardwell know about this incident." Upon information and belief, Mr. Reid acknowledged and understood the senior non-White associate's concern and told such associate that he would personally follow-up with Mr. Cardwell. Upon information and belief, the senior non-White associate emailed Mr. Reid the next day and reminded him to follow-up with Mr. Cardwell. Upon information and belief, Mr. Reid responded to that email and again promised to personally follow-up with Mr. Cardwell. Neither Mr. Reid nor any Davis Polk partner or staff member has ever mentioned this incident to Mr. Cardwell.

### *A Sham Review Designed to Evade Firm Policies and the Law.*

96.      On June 14, 2016, a non-White junior M&A associate sent Mr. Cardwell feedback on a memo that she and Mr. Cardwell were working on for (and had submitted to) Mr. Bick. In that email, the associate stated: "*Thank you for all the detailed feedback and the wonderful tips! Wow, **it looks quite impressive with your section added**! (I saw that you made some edits for my portion in this final version—thank you for catching them all, and I promise I will work harder to identify these edits next time so that you don't have to spend so much time*

*correcting my portion.) I look forward to the next phase of this project! Thanks so much, [Mr. Cardwell]!*" (emphasis added).

97.     On June 30, 2016, Mr. Bick sent Mr. Cardwell an email that stated, "Let me know when you have a spare moment to discuss another research assignment re: [REDACTED]." "The research assignment" in Mr. Bick's email referred to the same matter that involved the memo referenced in the prior paragraph.

98.     When Mr. Cardwell arrived at Mr. Bick's office, Mr. Bick spent just a few minutes describing the additional research assignment and then abruptly pulled out and opened a folder while stating, "*I know you asked for feedback, so I figured I'd take a few minutes to go through your reviews.*"

99.     Mr. Cardwell immediately became concerned because he had not requested a performance review or non-real time feedback from anyone at the Firm and because, at this stage in Mr. Cardwell's career, Mr. Cardwell had no knowledge that anyone at Davis Polk received this type of unannounced, mid-year face-to-face "review."

100.     Moreover, as noted above and is evident from Mr. Bick's own email, Mr. Cardwell went to Mr. Bick's office because Mr. Bick claimed he wanted to "discuss another research assignment." Unlike Mr. Cardwell's official prior face-to-face reviews,[12] Mr. Cardwell never received an email calendar invite or any type of advanced notice from Mr. Bick or anyone else that such a "review" would or could take place.[13]  Mr. Bick departed from the Firm's normal

---

[12] As a technical matter, Mr. Cardwell's first face-to-face review occurred in May 2015, as Davis Polk conducts an "interim review" for all first-year associates during their first six months at the Firm.

[13] Tellingly, and in an attempt to mask his discriminatory intent and actions and the unusual nature of Mr. Bick giving Mr. Cardwell the face-to-face review at the time, Mr. Bick submitted documentation to the NYSDHR  that stated, "[Mr. Cardwell] had asked for mid-year feedback on his work, and this review is in response to that request." For the sake of clarity, where this Complaint references documentation that Davis Polk sent to the NYSDHR, such documentation was submitted while Mr. Cardwell was employed at Davis Polk.

review process, lied about how the review came about, and did not give Mr. Cardwell any advanced notice that a face-to-face review would be conducted.

101.    Consistent with Mr. Cardwell's real-time concerns that Mr. Bick was conducting a sham face-to-face review, Mr. Bick had suggested assessments about aspects of Mr. Cardwell's performance that, up to that point in Mr. Cardwell's tenure, were a wild departure from anything that had ever been communicated to Mr. Cardwell.

102.    Mr. Bick stated that, "*It's been noted on a few occasions that you have a pattern of missing deadlines*." Mr. Cardwell responded by saying "*That feedback is extremely surprising. I'm sitting here wracking my brain and I'm struggling to think of any deadlines that I've missed, and I can't think of any. I haven't missed any deadlines. Can you provide examples of 'deadlines' that I missed?*"

103.    Mr. Bick replied: "Well, don't think of it as deadlines" and proceeded to discuss general timing critiques that where phrased so vaguely that no associate would have been able to assess, verify, or dispute.

104.    Mr. Bick's response only created more concern because it was deeply inconsistent with the typical written and spoken precision practiced by Mr. Bick and other Davis Polk M&A partners, as well as the amount of pre-planning that Davis Polk M&A partners typically engage in prior to giving an associate a face-to-face review.

105.    Mr. Cardwell informed Mr. Bick that Mr. Bick's feedback was inconsistent with what had been communicated to Mr. Cardwell and that such feedback had never been communicated orally or in writing to Mr. Cardwell prior to their conversation. Mr. Cardwell pressed Mr. Bick for additional information, including to be provided with any specific examples

that served as the basis of such critiques, but Mr. Bick was unable to provide Mr. Cardwell with any specific examples.

106.    Mr. Cardwell thought Mr. Bick's inability to provide examples was alarming because Mr. Bick had critiqued Mr. Cardwell while pretending to be holding and reading performance reviews that were supposedly submitted and a part of Mr. Cardwell's file. Mr. Cardwell asked Mr. Bick if Mr. Bick could go back to the reviewers and try to learn what the reviewers could possibly be referring to. Mr. Bick indicated that he would but never followed up with Mr. Cardwell or subsequently provided Mr. Cardwell with any specific examples.

107.    Immediately after the meeting, Mr. Cardwell contacted a senior Davis Polk associate and informed that associate that Mr. Bick just conducted a surprise face-to-face review and opened the discussion with a blatant lie (i.e., that Mr. Bick was giving the face-to-face review in response to a request by Mr. Cardwell). Thereafter, they discussed whether Mr. Bick's actions were part of other racialized patterns at Davis Polk.

108.    The senior Davis Polk associate was immediately and similarly concerned and upset (i) that a partner or group of partners at Davis Polk made the conscious decision to not give Mr. Cardwell feedback informally but through a process that would become a part of his official record, (ii) that no one from Davis Polk provided any advance notice about the face-to-face review, and (iii) that it was highly unlikely that Mr. Bick, a Davis Polk partner with vast leadership experience at the Firm, coincidentally or carelessly used the words "missed deadlines." Mr. Bick's immediate retraction of the words "missed deadlines," when questioned, fueled further suspicion with the senior Davis Polk associate, as it is commonly known among Davis Polk associates that Davis Polk partners meet before giving associates face-to-face reviews

to discuss what should be said during an associate's face-to-face review and how such feedback should be communicated.

109.    After Mr. Bick met with Mr. Cardwell on June 30, 2016 under the false pretenses of assigning Mr. Cardwell "another research assignment," Mr. Bick did not respond to Mr. Cardwell's follow-up emails regarding the assignment itself. On July 19, 2016, Mr. Cardwell emailed Mr. Bick a 15-page research memo that Mr. Bick had requested on June 30, 2016. Mr. Bick never responded to Mr. Cardwell's email.

110.    On July 26, 2016, Mr. Cardwell sent another follow-up email to Mr. Bick about the 15-page memo. Once again, Mr. Bick never replied to Mr. Cardwell's email and never mentioned the "assignment" to Mr. Cardwell again. During the same time period, Mr. Bick, whose office was just two doors down the hall from Mr. Cardwell's, would often walk by Mr. Cardwell in the hallways without any physical or verbal acknowledgment that Mr. Cardwell was also in the hallways. Mr. Bick did not email Mr. Cardwell *any* emails (i.e., where Mr. Cardwell was listed in the "to" or "cc" line in the email) between July 15, 2016 and May 3, 2017—a time period that spans roughly 307 days.

### *Mr. Cardwell's Experience Was Not A Function of His Written Reviews.*

111.    Davis Polk and other law firms  rely on a formal system of written performance reviews in order to evaluate and document various assessments and conclusions about the quality of attorneys' work product, principal matters worked on, strengths and weaknesses, improvements, special recognitions earned (i.e., other contributions to the firm), and development priorities for the next year, among other things.

112.    On an annual basis, at Davis Polk, the process for creating and collecting performance reviews is done through a formal, systematic process that involves the Firm asking

associates and partners to complete and submit review forms for the applicable (and more junior) reviewee. After senior attorneys submit their completed reviews for an associate and the Firm compiles such reviews, a partner "reviewer" eventually has a face-to-face meeting with the relevant associate and discusses the submitted performance reviews with such associate. Such face-to-face reviews usually occur at the end of the year. Ultimately, the partner reviewer is supposed to summarize in a written "Summary Review" (that such partner submits to the Firm) (i) the key conclusions found in the submitted performance reviews and (ii) the key discussion points that were a part of the applicable face-to-face review.

113.    Reviewing attorneys, associates who are being reviewed, and the partner reviewers all understand that written performance reviews can, and often do, "make-or-break" attorneys' careers. For that reason (among others), the Firm gives both reviewing attorneys and associates who are being reviewed advance notice and a meaningful amount of time to either (i) submit performance reviews or (ii) prepare for their face-to-face review with their partner reviewer.

114.    Davis Polk uses performance reviews involving their standardized form documents as the official (i.e., authoritative) and permanent record for assessing and tracking (i) the difficulty of attorneys' assignments; (ii) attorneys' performance; (iii) assessing and verifying whether attorneys who submit performance reviews are evaluating attorneys in a non-discriminatory, consistent, and accurate way; and (iv) whether attorneys are perceived to be performing materially behind, with, or ahead of members in the reviewee's class.

115.    The chart below represents (i) all the reviews that were completed and submitted by Davis Polk associates for Mr. Cardwell that (ii) Davis Polk shared with either Mr. Cardwell's attorneys or the NYSDHR. If other associates submitted performance reviews for Mr. Cardwell, Mr. Cardwell has never seen them.

| Not Only Was Mr. Cardwell Qualified to Work at Davis Polk, Associates Who Submitted Performance Reviews for Mr. Cardwell Rated Mr. Cardwell as Performing on Par with Associates in His Class | | | | | |
|---|---|---|---|---|---|
| **Date Associate Completed Performance Review** | **Associate** | **Practice Group** | **Basis of Review[14]** | | **Performance Evaluation[15]** |
| | | | **Level of Contact with [Mr. Cardwell]** | **Difficulty of Assignment** | **Do you feel [Mr. Cardwell] is performing materially behind, with, or ahead of lawyer's class?** |
| March 13, 2015 | White senior associate | Credit | Extensive | Complex | With |
| March 16, 2015 | Non-Black Latino senior associate | Credit | Extensive | Complex | With |
| September 18, 2015 | White senior associate | M&A | Moderate | Routine | With |
| November 2, 2015 | Non-Black/Non-White senior associate | M&A | Extensive | Routine | With |
| June 22, 2016 | White senior associate | M&A | Moderate | Routine | With |

---

[14] Unless otherwise noted, the language for this header and the questions and answers under it are unchanged and are identical to the language that appears on Davis Polk's evaluations for Mr. Cardwell.

[15] Unless otherwise noted, the language for this header and the question and answers under it are unchanged and are identical to the language that appears on Davis Polk's evaluations for Mr. Cardwell.

116.     In an "interim [performance] review" that Jason Kyrwood, a Davis Polk Corporate Partner, submitted in May 2015,[16] Mr. Kyrwood was asked to provide comments related to the "substance of [the] evaluation (including reviewee's performance compared to expectations for a lawyer of the same seniority)." To that question prompt, Mr. Krywood wrote: "**Generally positive – organized, high quality work, good attention to detail, hard worker**." (emphasis added).

117.     Notably, it was only when Mr. Cardwell began vocalizing his concerns about racially based unfair treatment within the Firm (and, more specifically, about bias-related interactions within the Firm's M&A and Capital Markets groups), that he began to have conversations like the one that Mr. Bick and Mr. Cardwell had on June 30, 2016.

118.     As further explained in this Complaint, Mr. Reid, Mr. Bick, Ms. Hudson, and Davis Polk knowingly falsified and shifted their conclusions related to Mr. Cardwell's performance reviews and subsequently submitted to the NYSDHR dishonest conclusions about Mr. Cardwell's performance, competency, and future at the Firm. Mr. Cardwell has contemporaneous documentation that makes it plain that Davis Polk and certain defendants submitted false statements and characterizations to the NYSDHR.[17]

119.     For example, out of the eighteen different Davis Polk associates and partners who were named in the performance reviews that the Firm provided to either the NYSDHR or Mr. Cardwell's attorneys at the time, Ms. Hudson—a partner who did not work in the practice group

---

[16] Mr. Kyrwood's summary of Mr. Cardwell's performance reviews is consistent with (i) the feedback that Mr. Kyrwood communicated to Mr. Cardwell during his face-to-face review and (ii) the recap of the review that Mr. Cardwell had communicated with Davis Polk associates on or around the day of his review with Mr. Kyrwood.

[17] On April 27, 2018, Mr. Cardwell filed a supplemental charge of discrimination against Davis Polk, describing that Davis Polk's retaliatory decision to terminate Mr. Cardwell's employment was connected to performance evaluations that were contrary to real-time feedback and conclusions that Davis Polk partners had communicated to Mr. Cardwell. Upon information and belief, Ms. Hudson's last day as a partner at Davis Polk was in July or August 2018.

that Mr. Cardwell was permanently assigned to—was the only person according to the Firm's own NYSDHR-submitted documentation to answer "behind" when asked, "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class"?.

120.    The Ms. Hudson-related documentation that Davis Polk submitted to the NYSDHR—documentation that supposedly describes the Firm's then-accepted and legitimate conclusions about the quality of Mr. Cardwell's work product during Mr. Cardwell's rotation in the Firm's Capital Markets group in 2015 and 2016—is directly contradicted by Mr. Cardwell's March 2016 meeting with capital markets partner Byron Rooney (as further described below), as well as Sophia Hudson's own real-time, written and verbal statements to Mr. Cardwell. Ms. Hudson's purported performance review and conclusions, as well as the Firm's shifting conclusions about the veracity and relevancy of Ms. Hudson's assessment of Mr. Cardwell, were created (and are on based on) discriminatory and retaliatory considerations and actions.

121.    Out of roughly 200+ emails—spanning from October 28, 2015 through March 21, 2016—that involved Mr. Cardwell and Ms. Hudson during Mr. Cardwell's rotation in the Firm's Capital Markets group—the most direct and critical feedback that Ms. Hudson provided to Mr. Cardwell related to Mr. Cardwell incorrectly using the word "I" instead of "me" in an internal email (i.e., an email that was not sent to any of the Firm's contacts or otherwise impact the Firm's clients). The relevant exchange occurred on December 17, 2015 and was as follows:

Mr. Cardwell's email to Ms. Hudson (4:12 p.m.):

"*Hi Sophia, Attached, please find the following drafts (each clean and marked against the respective early tender documents): [REDACTED LIST OF DOCUMENTS]. Please let me know if you have any comments.*

*Also, before [the senior capital markets associate on the deal] heads off on vacation this*

*weekend, is there a time tomorrow that you'll be available to meet with [White senior associate] and I?"*

Ms. Hudson's response to the email above (5:42 p.m.):

*"[Mr. Cardwell], No one likes to be corrected on grammar, but it's something partners and sophisticated clients notice a lot so I hope you'll take my advice in the right spirit. Please be careful using I/me. 'Me' is the appropriate pronoun to use below as it is being used as an object of the preposition 'with.' Best, Sophia"*

122.    To be clear: Mr. Cardwell initially appreciated Ms. Hudson's feedback because, despite having already worked together for months, Ms. Hudson's email essentially represented the *first time* Ms. Hudson had given Mr. Cardwell somewhat critical feedback.

123.    To be even more clear: Not only did no one at Davis Polk ever treat Mr. Cardwell with so-called "kiddie gloves," but at no point during Mr. Cardwell's tenure at Davis Polk did Mr. Cardwell expect, desire, or request to be treated with "kiddie gloves." To the contrary, Mr. Cardwell worked every day at Davis Polk with the belief that unfiltered, constructive feedback was not just acceptable or necessary, but was the best way for all young attorneys to develop and progress. Accordingly, Mr. Cardwell responded to Mr. Hudson's email above with the following email:

Mr. Cardwell at 6:03 p.m. the same day (i.e., December 17, 2015):

*"[Ms. Hudson], Thank you for bringing the mistake to my attention. When I played college football, I performed best under coaches who demanded perfection. My favorite coaches seemingly noticed everything and were obsessively focused (sometimes to my displeasure) on making every player better. I say all that to say, I hope you continue to*

*correct me whenever and however you see fit. I'll be more careful going forward. Thank you."*

124.     After Mr. Cardwell's and Ms. Hudson's matters concluded and they stopped working together at the end of 2015/beginning of 2016, Ms. Hudson had virtually no communications with Mr. Cardwell, let alone any communications with Mr. Cardwell about Mr. Cardwell's work product. It should be noted that Ms. Hudson had no problem getting in touch with Mr. Cardwell or speaking directly with him when Ms. Hudson desired to do so. Once Mr. Cardwell and Ms. Hudson stopped working together, Ms. Hudson did, for example, reach out to Mr. Cardwell to ask Mr. Cardwell if he could recommend a Black restaurant that is in Harlem, New York City. Mr. Cardwell obliged.

### *After Mr. Bick's Sham Review, Mr. Cardwell's Assignments Go From Bad To None.*

125.     Both while Davis Polk was recruiting Mr. Cardwell and when Mr. Cardwell was a junior associate, Davis Polk routinely communicated to Mr. Cardwell and other Firm associates that the Firm designed its current procedures related to staffing attorneys in an effort to minimize and eliminate the racial bias flagged by Mr. Cardwell and the diversity and inclusion consultants hired by the Firm, among others. To that end, Davis Polk's policies discouraged partners and senior attorneys—especially when it came to deals and high-profile cases—from bypassing staffing coordinators and using informal channels to staff junior associates. Davis Polk understood, knew, and warned the Firm's associates and partners that such practices had been shown to disproportionately discriminate against and disadvantage women and non-White attorneys at law firms.

126.     During the period in which Mr. Cardwell was permanently assigned to Davis Polk's M&A group (i.e., April 2016 - August 2018), Davis Polk's policies and procedures

around staffing were as follows: each week, associates completed a "weekly workload request/capacity forms," indicating their availability, the type of matters such associate was working on (e.g., names of team members, expected number of hours one expected to work on that matter that week), upcoming vacations, and additional comments/requests, among other things. A staff person then compiled associates' weekly workload request/capacity forms into a single chart and sent it (i) to the M&A junior associate assignment coordinator (who used the chart as a guide to staff first- and second-year M&A associates) and (ii) to the two most junior M&A partners (who used the chart as a guide to staff third-year and more senior associates). When the Firm's M&A partners or associates had M&A staffing needs, the requesting attorney sent an email to the applicable coordinator based on the seniority level needed. It was not uncommon for staffing coordinators to ask an associate prior to staffing that associate, "Have you worked on 'x' yet or worked with this person already?" Because the two most junior M&A partners served as M&A staffing coordinators and did not have complete, independent control over staffing, the junior M&A staffing partners were often in constant communication with Mr. Bick about how third-year and more senior associates should be staffed to meet Firm needs (and policies) and partners' preferences. That said, the junior M&A staffing partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass when such persons served as staffing partners, had (and often acted with) significant and independent decision-making authority on M&A staffing decisions, including decisions related to which associates should be staffed on which matters and deals.

127.    For similar reasons as noted above, the junior associate assignment coordinators did not have complete, independent control over staffing and worked in connection with Mr. Bick. A Davis Polk Junior Staffing Coordinator ("Davis Polk Junior Staffing Coordinator #1")

was responsible for staffing Mr. Cardwell (and other second-year M&A associates) from April 2016 through the beginning of September 2016. When Davis Polk Junior Staffing Coordinator #1 was unavailable (e.g., on vacation), either the other Davis Polk Corporate Junior Staffing Coordinator ("Davis Polk Junior Staffing Coordinator #2"), a staffing coordinator for junior corporate associates who was a member of the Firm's staff (i.e., not a partner or associate), or an Associate Development Manager ("Davis Polk Junior Staffing Coordinator #3"), who was a member of the Firm's staff (i.e., not a partner or associate), would typically staff junior associates until Davis Polk Junior Staffing Coordinator #1 returned or was available.

128.    Relevant to Mr. Cardwell's claims are not just how the Firm staffed Mr. Cardwell but also what deals and matters the Firm allowed Mr. Cardwell to work on. In corporate law and among partners and associates at Davis Polk, the difference between (i) M&A "deals" and "transactions" and (ii) M&A "work," "matters," "tasks," "projects," "research, "document review," or "assignments" is both widely understood and significant. "Deals" influence heavily tracked and publicized M&A rankings, M&A fees, legal awards and prestige, associates' partnership and lateral prospects, and clients' and potential clients' perceptions of attorneys' and firms' sophistication and ability to handle complex matters. As such, within the Firm's M&A group and across the Firm and legal profession, Davis Polk routinely (A) discussed during Mr. Cardwell's tenure at Davis Polk and continues to discuss its M&A deal rankings (for the applicable time period), (B) highlighted during Mr. Cardwell's tenure and continues to highlight "deals and cases" on its homepage (among other places), and (C) emphasized during Mr. Cardwell's tenure and continues to emphasize rankings in its "Who We Are" section on the Firm's website (e.g., "For more than 165 years, Davis Polk has **ranked** among the premier law firms with practices that are world class across the board).") (emphasis added).

129.    Around the time that (i) Mr. Bick conducted a sham review of Mr. Cardwell and (ii) both a non-White senior associate and Davis Polk's Asian/South Asian/Middle Eastern group had asked Mr. Reid to take specific actions to interrupt, prevent, or eliminate race-related bias and disparate treatment at the Firm, Mr. Cardwell began to notice an overall pattern where he was assigned to fewer deals (which are central to the revenue of the Firm, the M&A practice group, and the reputation of associates) than similarly situated non-Black associates.

130.    Instead, and as compared to the White M&A associates at the Firm, Mr. Cardwell was assigned to more (i) research-related assignments (which are only tangential to the Firm's M&A business and core revenue streams); (ii) assignments that did not require Mr. Cardwell's or his Davis Polk peers' level of experience; (iii) assignments that involved temporarily assisting in the middle or end of a matter (which, if staffed repeatedly on such matters, makes it difficult for an attorney to get the type of experiences that are expected or required of mid-level and senior associates); (iv) assignments that involved M&A partners being able to ignore and not communicate with Mr. Cardwell with very little impact to the Firm or M&A group.

131.    On June 28, 2016, Davis Polk Junior Staffing Coordinator #2 emailed Mr. Cardwell and asked him to reach out to a White senior M&A associate to assist M&A partner Gar Bason on a non-deal assignment. The email stated, "*Can you please reach out to [the senior M&A associate] to assist [*the associate*] with a [Directors & Officers] review assignment for Gar and [REDACTED]. She said it's not a rush but should be completed in the next week or two. It is the **review** of indemnity **agreements***, so probably would take 20-30 hours*." (emphasis added). Mr. Cardwell agreed and was staffed on the assignment.

132.    On June 30, 2016, Davis Polk Junior Staffing Coordinator #2 asked Mr. Cardwell (and Mr. Cardwell agreed) to help a senior M&A associate on a PowerPoint presentation that did

not require the legal experience or knowledge of a second-year associate. The associate's staffing request for this assignment stated, "*I need a **first** or second year to help me update the statistic in the attached as soon as possible.*" (emphasis added). At the time, the associate indicated to Mr. Cardwell that the associate was surprised that they were once again working together.

133.    On June 30, 2016, as noted above, Mr. Bick staffed Mr. Cardwell on an additional research assignment. Mr. Bick's email to Mr. Cardwell stated: "Let me know when you have a spare moment to discuss **another research assignment** re [REDACTED]. (emphasis added).

134.    Thereafter and for each week from  July 2016 through May 2017, Mr. Cardwell included in his weekly workload request/capacity form an additional request to work with five specific partners who frequently ran M&A deals: Mr. Reid, Mr. Birnbaum, and M&A partners Louis Goldberg, Oliver Smith, and Lee Hochbaum. Although Mr. Cardwell's requests were in line with the Firm's normal, nondiscriminatory staffing protocols, most of Mr. Cardwell's assignments, to his and other Firm associates' confusion, continued to be either non-deals or with the same handful of senior associates with whom Mr. Cardwell was already working or had already worked with.

135.    On July 8, 2016, Mr. Cardwell was staffed on a simple matter with a non-White senior M&A associate. The associate's staffing request to Davis Polk Junior Staffing Coordinator #1 stated: "*Hi [Davis Polk Junior Staffing Coordinator #1], Now that [REDACTED] is away on secondment, would it be possible to have another second year help me with the corporate governance matters for [REDACTED]? The only immediate task is a **simple matter** for Monday, otherwise **10% is enough** until towards the end of the year.*" (emphasis added). The associate's reference to "10% is enough" meant that the senior associate estimated that the assigned associate would only use about 10% of their total weekly capacity on the

matter. Notably, and predictably, if an associate's capacity is full of similarly small matters (i.e., as measured by the estimated or actual capacity required), such associate will not have enough capacity to work on a M&A deal, which can often require an associate to have an available capacity around 40-100%.

136.    On July 13, 2016, Mr. Cardwell was staffed on a non-deal matter involving a White woman senior M&A associate. At the time, the senior associate had informed Mr. Cardwell that she had a discussion with either the supervising partner on the matter or her M&A partner advisor to discuss her concern that this matter was (i) not a deal, (ii) not the type of matter clients typically hire the Firm's M&A group to work on, (iii) unlikely to help her develop critical and desired deal experience, and (iv) potentially the type to become too cumbersome and ultimately soak up her capacity such that she'd be effectively prevented from having enough capacity to work on deals.

137.    On July 19, 2016, as referenced above, Mr. Cardwell sent an email to Mr. Bick, stating, "*John, As discussed, please find attached a draft summary of the financial arrangement between [REDACTED] and [REDACTED]. Please let me know if you have any questions or comments. Happy to discuss.*" Mr. Bick never responded to Mr. Cardwell's email.

138.    On July 20, 2016, Davis Polk Junior Staffing Coordinator #3 reached out to Mr. Cardwell and staffed Mr. Cardwell on a small project that would only require a handful of sporadic hours. Davis Polk Junior Staffing Coordinator #3's email stated: "*Hi [Mr. Cardwell], Darren Schweiger needs some help with a **small project** for a joint venture. It will be a **handful of hours** between today and Wednesday, then more **sporadic** after that. Can you please help out with this?*" (emphasis added).

139.     On July 22, 2016, after many months, Mr. Cardwell was finally staffed on an

M&A deal. As instructed by Davis Polk Junior Staffing Coordinator #1, on July 22, 2016, Mr.

Cardwell reached out to Mr. Brass, a White then-senior M&A associate and current M&A Davis

Polk partner. Mr. Cardwell's email exchange with Mr. Brass went as follows:

- **Mr. Cardwell to Mr. Brass** (2:39 p.m.): "*Hi Daniel, I'll be assisting you on the [REDACTED] deal. When your schedule permits, please let me know when you'd like to discuss.*"

- **Mr. Brass's Response** (2:41 p.m.): "*Thanks. [The senior associate] will reach out to you [sic]*"

- **Mr. Cardwell's Response** (2:46 p.m.): "*Thanks, Daniel.*"

- **Mr. Brass's Response** (5:38 p.m.): "*I think you stand down for now!*"

- **Mr. Cardwell's Response** (5:42 p.m.): "*Thanks, Daniel. Will do. Any sense if and when the status of the deal could change?*"

- **Mr. Brass's Response** (5:43 p.m.): "*I think we are ok for the near future.*"

- **Mr. Cardwell's Response** (5:44 p.m.): "*Understood.*"

140.     Mr. Brass's abrupt removal of Mr. Cardwell from the M&A deal was done in

secret and without the permission of the deal's staffing coordinator. Davis Polk senior associates

almost always explain to junior associates how the status or nature of a deal has changed and

how the change impacts the junior associates previously discussed role on the deal. Mr. Brass's

discriminatory actions were willful and blatant. After this incident, Mr. Brass never worked on

any active deals with Mr. Cardwell.

141.     On July 22, 2016, at 6:04 p.m., Mr. Cardwell emailed the above email

conversation to Davis Polk Junior Staffing Coordinator #1, alerting her to Mr. Brass's

unauthorized, disparate treatment of Mr. Cardwell. Davis Polk Junior Staffing Coordinator #1 did not provide an explanation for Mr. Brass's behavior and merely acknowledged receipt of Mr. Cardwell's email.

142.     On July 26, 2016, as referenced above, Mr. Cardwell sent a follow-up email to Mr. Bick (that included the July 19, 2016 email to Mr. Bick), stating, "*Hi John, Just a quick follow-up on the below. Happy to discuss if you have any questions or comments.*" Mr. Bick never responded to Mr. Cardwell.

143.     On August 4, 2016, Davis Polk Junior Staffing Coordinator #1 asked Mr. Cardwell if Mr. Cardwell could temporarily "cover" for a first-year associate who was going on vacation for two weeks. Mr. Cardwell agreed, and the first-year associate replaced Mr. Cardwell once she returned from vacation.

144.     Also, on August 4, 2016, Mr. Cardwell followed-up with Davis Polk Junior Staffing Coordinator #1 to try to understand why Mr. Brass removed Mr. Cardwell from the deal on July 22, 2016. Mr. Cardwell asked Davis Polk Junior Staffing Coordinator #1 the following: "*Separately, and in light of the email that I forwarded to you on the 22nd, has **anyone** made a decision to limit my involvement to certain types of deals and matters?*" (emphasis added).

145.     This August 4, 2016 incident is the fourth time that Mr. Cardwell flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

146.     Rather than email Mr. Cardwell back, Davis Polk Junior Staffing Coordinator #1 called Mr. Cardwell and passionately told him, "*Not at all. I'm not sure what happened on that deal [with Mr. Brass] and haven't talked to anyone since. Do you know what happened?*" After Mr. Cardwell responded that he never received any explanation for why he was removed, Davis

Polk Junior Staffing Coordinator #1 informed Mr. Cardwell that Mr. Brass replaced Mr.

Cardwell with a White associate and remarked that Mr. Brass's behavior was "weird."

147.    Despite a Davis Polk staffing coordinator's insistence that Mr. Cardwell's staffing

was not in any way limited to certain types of deals and matters, as a result of how the Firm did

and didn't staff Mr. Cardwell during 2016, Mr. Bick, Mr. Wolfe, and Mr. Birnbaum ensured that

Mr. Cardwell was often underutilized and underdeveloped. For more than five successive weeks

in mid-2016, Mr. Cardwell indicated on his weekly workload request/capacity form that he had a

capacity of greater than 50% (i.e., more than half of his hours were available for new

assignments).

148.    On August 16, 2016, Mr. Cardwell was staffed on an M&A deal with a senior

M&A associate and Leonard Kreynin, a Davis Polk Corporate Partner, which was essentially the

first and last M&A deal that Mr. Cardwell was staffed on in 2016 ("Mr. Cardwell's Last 2016

Deal").

149.    On August 18, 2016, per a White senior M&A associate's instruction, Mr.

Cardwell emailed M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis and cc'd the

senior associate. In connection with the June 28, 2016 assignment that Mr. Cardwell was staffed

on, Mr. Cardwell sent the M&A partners Mr. Cardwell's draft of an indemnification agreement

for their review and edits. Mr. Cardwell's email stated: "*All, A few weeks back, [REDACTED]

asked us to take a look at their current indemnification agreement and summary of

indemnification policy as part of a general corporate housekeeping review. We reviewed the

indemnification agreement against [Davis Polk's] standard form and other resources/precedents

we found. Generally, we thought that the agreement was in good shape and only had a few

suggestions. Attached please find our comments to the indemnification agreement and policy*

*summary. Also attached for your reference is [REDACTED] main indemnification policy. We are happy to discuss.*" Neither Arthur Golden, Gar Bason Jr., nor Michael Davis responded to Mr. Cardwell's email or otherwise communicated with Mr. Cardwell.

150.    On September 7, 2016, per the senior associate's instruction, Mr. Cardwell emailed M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis again with a follow-up reminder regarding Mr. Cardwell's email. The email stated, "*All, Quick follow-up regarding our review of [REDACTED] indemnification agreement and indemnification policy. Please let us know if we can be of any further assistance or if you have any questions or comments.*" Again, neither Arthur Golden, Gar Bason Jr., nor Michael Davis responded to Mr. Cardwell's email or otherwise communicated with Mr. Cardwell.

151.    Instead, and even though it was clear from the email that Mr. Cardwell was the primary reviewer and editor of the documents, Arthur Golden chose to separately reach out to the White senior associate and exclusively discuss with the senior associate his edits to the documents.

152.    On September 9, 2016, per the same White senior associate's instruction, Mr. Cardwell emailed Gar Bason Jr. a third time and cc'd Arthur Golden and the senior associate. The email stated, "*Gar, Attached, please find revised drafts that reflect Arthur's comments…. Please let us know if you have any further comments.*" Gar Bason Jr. never responded to Mr. Cardwell's email.

153.    At the time, the White senior M&A associate expressed confusion to Mr. Cardwell as to why none of Davis Polk's M&A partners ever responded to Mr. Cardwell's emails. At no point during the matter, did of any of Davis Polk's partners ever respond to Mr. Cardwell's email or verbally communicate with Mr. Cardwell.

154.    Arthur Golden's, Gar Bason Jr.'s, and Michael Davis's lack of communication with Mr. Cardwell cannot be explained by the quality of Mr. Cardwell's work on the assignment or the senior attorney's conclusions at the time about the quality of Mr. Cardwell's work. In an email dated August 15, 2016, the White senior M&A associate provided the following feedback to Mr. Cardwell regarding the relevant indemnification assignment: "*I'm so sorry it took me forever to review this. **Very good work** on it. Attached please find my comments/thoughts. Some items I thought we could [revert back to the original language as opposed to using your edits] just to minimize changes. Please let me know if it would be helpful to discuss.*" (emphasis added).

155.    On September 8, 2016, within days of Mr. Cardwell becoming a third-year associate, Davis Polk Junior Staffing Coordinator #2 asked Mr. Cardwell if he could and would accept being staffed on a potentially lengthy non-M&A matter (i) that did not involve Mr. Cardwell working directly with any Davis Polk partners (from any practice group) or M&A associates, or require Mr. Cardwell's (or his peers') level of experience and (ii) that would have further stalled Mr. Cardwell's development as a soon-to-be mid-level M&A attorney who would be evaluated within the Firm as an M&A attorney. Specifically, in Davis Polk Junior Staffing Coordinator #2's initial email and inquiry, Davis Polk Junior Staffing Coordinator #2 asked Mr. Cardwell if Mr. Cardwell could assist with a list of tasks, including "one-off tasks," that are widely understood within Davis Polk and corporate law to be tasks that are routinely assigned to first-year (and possibly second-year) associates.

156.    What is more, Davis Polk Junior Staffing Coordinator #2's initial email and inquiry made it clear that Mr. Cardwell was not being staffed as part of a larger plan to develop Mr. Cardwell as an attorney but because "[the Firm's] credit juniors [were] over capacity and

[the Firm had] a few juniors going on vacation." For these reasons and others,[18] and because

Davis Polk Junior Staffing Coordinator #2 merely asked Mr. Cardwell about his interest and

capacity to work on the non-M&A matter (as opposed to instructing Mr. Cardwell to work on the

non-M&A matter), Mr. Cardwell called Davis Polk Junior Staffing Coordinator #2 to discuss.

157.     During their phone call, Davis Polk Junior Staffing Coordinator #2 stated that she

was apologetic for having to ask Mr. Cardwell if he could accept a non-M&A assignment. Mr.

Cardwell asked if they could briefly meet to discuss Davis Polk Junior Staffing Coordinator #2's

inquiry. Davis Polk Junior Staffing Coordinator #2 and Mr. Cardwell met shortly thereafter.

158.     In their meeting, Davis Polk Junior Staffing Coordinator #2 repeated the

statements in her email and described how the attorneys in the Firm's Credit Group were

unusually busy and could use assistance. Davis Polk Junior Staffing Coordinator #2 explicitly

stated that she had reached out to a number of associates who had previously rotated through the

Firm's Credit Group and that she had similarly reached out to Mr. Cardwell because he had

experience working in the Firm's Credit Group.

159.     Mr. Cardwell briefly described his assignment history and told Davis Polk Junior

Staffing Coordinator #2 something that is substantially similar to the following:

*"I'm more than happy to work on anything you or anyone else would like me to, but I*

*wanted to share two concerns that I have. **As a Black associate, I'm concerned** about the*

***general pattern** that exists across the legal profession and **within Davis Polk**. That is, it's*

*typically the case that when Black associates are fourth-, fifth-, and sixth-year associates,*

*White associates often have—for reasons that have nothing to do with merit or work*

---

[18] At Davis Polk, it was and is not uncommon for associates to receive an inquiry related to a possible assignment and for the associate to discuss the timing or "fit" with the staffing coordinator, as all parties are incentivized to assess whether accepting the assignment makes sense or is best.

*ethic—a resume with more experience and better quality work than Black associates of the same year. Because those are my concerns, I am trying to get as much work in M&A as possible and work with as many M&A attorneys and partners as possible. The reality is that a potentially lengthy credit assignment, which we know expected-to-be short credit assignments can unavoidably become virtually year-long assignments in the Firm's Credit group, will pull me away from opportunities to learn and work with M&A attorneys.*" (emphasis added).

160.    Mr. Cardwell expressly noted that he didn't want his career and trajectory to become a part of the pattern described above. During the conversation, Mr. Cardwell also explicitly told Davis Polk Junior Staffing Coordinator #2 that he'd be happy to work on any assignment that the Firm wanted him to work on, including the non-M&A assignment she initially inquired about, as long as she and the Firm could ensure that the staffing was not a part of the pattern of discrimination described above. After hearing Mr. Cardwell's above statements, and after Mr. Cardwell pointed to specific, documented, disparate staffing patterns involving non-White and White Firm associates, Davis Polk Junior Staffing Coordinator #2 told Mr. Cardwell that she would not staff him on the non-M&A matter.

161.    Davis Polk Junior Staffing Coordinator #2 added: "*You clearly have thought about **this** a lot more than I have. If you feel strongly about **this**, then I understand and simply won't staff you on any credit assignments.*" (emphasis added). Mr. Cardwell then explained again that, if the Firm had a plan to prevent the previously described discrimination-related pattern, he'd be happy to work any assignment the Firm wanted him to, including the non-M&A assignment. Davis Polk Junior Staffing Coordinator #2 again responded by saying she wouldn't staff Mr. Cardwell on the non-M&A assignment. Following their conversation, Davis Polk

Junior Staffing Coordinator #2 did not arrange or coordinate any new assignments for Mr. Cardwell and did not have any subsequent conversations with Mr. Cardwell about the concerns he shared with her.

162.   Both (i) Davis Polk Junior Staffing Coordinator #2's decision not to staff Mr. Cardwell and (ii) certain defendants' decision not to staff Mr. Cardwell on (and remove Mr. Cardwell from) deals in the weeks and months that followed this incident, constitute adverse employment actions.

163.   Davis Polk Junior Staffing Coordinator #2 did not staff Mr. Cardwell because she understood and was aware that Mr. Cardwell had just raised a discrimination complaint.[19] Throughout the entire meeting, and in every conversation since, Davis Polk Junior Staffing Coordinator #2's and Mr. Cardwell's conversation was cordial, professional, and non-confrontational.[20]

164.   This September 8, 2016 incident is the fifth time that Mr. Cardwell flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.[21]

165.   In September 2016, Mr. Cardwell became a third-year associate.

---

[19] In the alternative, Davis Polk Junior Staffing Coordinator #2] did not staff Mr. Cardwell because she understood and was concerned that Mr. Bick was a discriminatory driving force behind the request for Mr. Cardwell to be staffed on non-M&A matters, which in this case would have been just days and weeks before Mr. Wolfe and Mr. Birnbaum was to become responsible for staffing Mr. Cardwell on M&A matters.

[20] On August 3, 2017, Davis Polk received the substance of the above description of Mr. Cardwell's conversation involving Davis Polk Junior Staffing Coordinator #2 in Mr. Cardwell's August 2017 EEOC Filing. Upon information and belief, Davis Polk Junior Staffing Coordinator #2's last day as an employee of Davis Polk was August 18, 2017, which suggests that Davis Polk Junior Staffing Coordinator #2's exit (or termination) from the Firm was in connection with Mr. Cardwell's August 2017 EEOC Filing.

[21] The discrimination and retaliation stemming from this incident was not restricted to September 8, 2016; rather, such discrimination and retaliation continued—and were in connection with—the lack of staffing and disparate treatment that Mr. Cardwell experienced over the following six to eight months, including, as explained below, Mr. Birnbaum's and Mr. Wolfe's refusal to staff Mr. Cardwell in September, October, November, and December of 2016.

166.     On September 29, 2016, and after Mr. Cardwell had billed almost 235 hours for the month, Davis Polk removed Mr. Cardwell from Mr. Cardwell's Last 2016 Deal. The Firm removed Mr. Cardwell from the deal with the following email, which was sent by the senior associate on the deal: "*[Mr. Cardwell], Since you have been tied up with the [REDACTED] restructuring, we have asked [REDACTED/a second-year associate] to fill in for you through signing on [REDACTED]. Please let us know when you free up. I hope things get more manageable soon.*"

167.     The "restructuring" matter that the associate referred to in his email was the same matter that a senior M&A associate had flagged for a M&A partner when she was staffed on it and had described as (i) not a deal, (ii) not the type of matter the Firm's M&A group typically works on, (iii) unlikely to help her develop critical and desired M&A/deal experience, and (iv) the type to become too cumbersome and potentially consume so much of her capacity that she'd effectively be prevented from having enough capacity to work on a deal. The Firm did not staff Mr. Cardwell on another M&A deal over the next eight months.

168.     Within months of Mr. Cardwell being permanently assigned to Davis Polk's M&A group in April 2016, (i) Mr. Bick conducted a sham face-to-face review; (ii) Davis Polk, including Mr. Bick, Mr. Wolfe, and Mr. Birnbaum, effectively went an entire year without staffing Mr. Cardwell on deals and matters at the same rate or in the same way as similarly situated non-Black associates; (iii) a White senior Davis Polk attorney violated the Firm's staffing policies and practices and removed Mr. Cardwell from a deal; and (iv) the Firm strategically used Mr. Cardwell's non-deal assignments as a justification to remove Mr. Cardwell from Mr. Cardwell's Last 2016 Deal.

**Coincidence? Of course not.**

169.    In accordance with the Firm's policy at the time, the two most junior M&A partners were responsible for staffing all third-year and more senior associates[22, 23] This meant that as early as September 2016, Mr. Birnbaum and Mr. Wolfe received and reviewed Mr. Cardwell's (and other M&A associates in Mr. Cardwell's class) weekly workload request/capacity forms, which noted the matters he and other associates were working on and how many hours they had available to take on additional work. Moreover, Davis Polk had computer programs that tracked how many billable hours associates had and hadn't billed, among other data related to staffing. In this role, Mr. Birnbaum and Mr. Wolf had direct knowledge of Mr. Cardwell's availability and were the individuals responsible for staffing Mr. Cardwell on assignments.

170.    Mr. Birnbaum and Mr. Wolfe knowingly did not staff Mr. Cardwell on *any* matters in 2016, which means that, for consecutive months, Mr. Birnbaum and Mr. Wolfe ensured that Mr. Cardwell was assigned to and had *zero* hours of work.  Mr. Birnbaum and Mr. Wolfe did not attempt to discuss, or have any conversations, with Mr. Cardwell about why they and the Firm decided not to assign Mr. Cardwell to any new matters. Mr. Birnbaum never mentioned or addressed Mr. Cardwell's unjustifiably low hours, or anything related to the quality of Mr. Cardwell's work product. Contrary to their interactions with Mr. Cardwell, Mr. Birnbaum

---

[22] On July 1, 2016, Mr. Wolfe emailed the Firm's entire corporate department to notify the Firm's corporate associates and partners that Mr. Wolfe and Mr. Birnbaum were the staffing coordinators for the Firms M&A group. Mr. Wolfe's email stated that, "Going forward, requests for senior and mid-level M&A associates staffing should be directed to [Mr. Birnbaum] or me [i.e., Mr. Wolfe]. [Davis Polk Junior Staffing Coordinator #1] will continue to oversee staffing for junior associates in the M&A group."

[23] In response to Mr. Cardwell, who was a third-year associate at the time, asking Davis Polk Junior Staffing Coordinator #1, "When a staffing request is made, you determine which associates could be and ultimately are asked to work on matters, correct?", Davis Polk Junior Staffing Coordinator #1 stated that, "The staffing partners (currently Brian Wolfe and Harold Birnbaum) handle staffing for third years and more senior…. [A staff person] puts all updates [from the weekly workload request/capacity forms] together in one chart, which gets sent to the staffing partners…."

and Mr. Wolfe routinely and consistently staffed and communicated with similarly situated non-Black associates about such associates' hours, workload, and staffing.

171.     Davis Polk, as well as Mr. Bick, Mr. Birnbaum, and Mr. Wolfe, knowingly departed from the Firm's normal staffing process and intentionally created a near-career ending gap in Mr. Cardwell's work experience relative to similarly situated non-Black associates. Mr. Bick, Mr. Birnbaum, and Mr. Wolfe did so, among other unlawful reasons, in order to pretextually obfuscate evidence that Mr. Cardwell's experiences (i.e., negative changes in the terms and conditions of his employment) and Firm-related assessments (and the Firm's conclusions of those assessments) were or might in the future be unlawfully influenced by Mr. Cardwell's race and/or racial and legally protected complaints.

172.     The unlawful actions stemming from the June 30, 2016 face-to-face review was not restricted to June 30, 2016; rather, such discrimination and retaliation continued—and was in connection with—the dishonest control and influence that Mr. Bick exerted over Mr. Cardwell's staffing and assessments (and the Firm's conclusions in connection with such assessments) over the following six to nine months, including Mr. Birnbaum's and Mr. Wolfe's refusal to staff Mr. Cardwell in September, October, November, and December of 2016.

173.     In other words, there was a pattern where week after week, for months, Mr. Bick, Mr. Birnbaum, and Mr. Wolfe created and implemented a discriminatory and retaliatory staffing policy that resulted in a continuing violation of Mr. Cardwell rights and eventual termination, as evidenced, in part, by (i) Mr. Cardwell's weekly request for work via the Firm's standard weekly workload request/capacity forms, (ii) Mr. Bick, Mr. Birnbaum, and Mr. Wolfe—partners whose Firm-created responsibilities mandated that they make staffing decisions for and with Mr. Cardwell—intentionally deciding to not have any conversations with Mr. Cardwell about staffing

opportunities from September 2016 through March 2017, and (iii) Mr. Bick's, Mr. Birnbaum's, and Mr. Wolfe's decisions to not staff Mr. Cardwell over that same time period despite Mr. Cardwell's weekly workload request/capacity forms.[24]

174.    In the case of Mr. Birnbaum, Mr. Birnbaum went about 443 days (i.e., from about June 14, 2016 to August 31, 2017) without sending Mr. Cardwell a single email (i.e., notwithstanding group emails to practice groups and other listservs (e.g., emails to "All Lawyers")).

175.    In the case of Mr. Wolfe, Mr. Wolfe went over 628 days (i.e., from about April 13, 2016 to the beginning of 2018) without sending Mr. Cardwell a single email (i.e., notwithstanding group emails to practice groups and other listservs).

176.    Mr. Bick, then the head of the Firm's M&A practice group, similarly ignored and isolated Mr. Cardwell. Mr. Bick went about 292 days (i.e., from about July 15, 2016 to May 3, 2017) without sending Mr. Cardwell a single email (i.e., notwithstanding group emails to practice groups and other listservs (e.g., to "All Lawyers")). As a result of the coordinated efforts of Mr. Bick, Mr. Birnbaum, Mr. Wolfe, among others, and the Firm, Mr. Cardwell experienced,

---

[24] Not only were these continuing violations known to be unremedied continuing violations by Mr. Cardwell—who subsequently asked Davis Polk's Executive Director to investigate Mr. Bick, Mr. Birnbaum and Mr. Wolfe, among others, for their role in Mr. Cardwell's hours and staffing and who filed a supplemental charge of discrimination with the EEOC—they were also considered related instances by Davis Polk itself. For example, it was Davis Polk who argued while Mr. Cardwell was still employed at the Firm, that there were specific and related instances connecting Mr. Cardwell's June 2016 sham review with (i) Mr. Cardwell's staffing in the second half 2016/early 2017; (ii) certain defendants, including Mr. Bick, Mr. Reid, Ms. Hudson, Mr. Birnbaum, Mr. Wolfe, and Mr. Brass; and (iii) the Firm's eventual decision to terminate Mr. Cardwell's employment.

From Davis Polk's NYSDHR Answer and Position Statement: "By the fall of 2016, reviews of Cardwell's performance [namely, two reviews submitted by Ms. Hudson, both in mid-2016, regarding Mr. Cardwell's work with Ms. Hudson that was primarily in 2015] reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role…. This fact was reflected in Cardwell's hours, which were uneven over the course of 2016— relatively low in the early months of the year, during Cardwell's Capital Markets rotation, higher in the summer [when Mr. Cardwell was staffed by non-partners at Davis Polk], and relatively low again later in the fall and for the remainder of the year, in M&A [despite Mr. Cardwell's repeated requests for work via the Firm's standard weekly workload request/capacity forms]."

at various times, both unjustifiably low billable hours and drastic drops in billable hours. Mr.

Cardwell's number of hours billed in the second half of 2016 and beginning of 2017, as

determined by the billable hours that Mr. Cardwell submitted and the Firm tracked and accepted

without any disagreement or questioning of Mr. Cardwell, were as follows:

| Mr. Cardwell's Billable Hours[25] | |
|---|---|
| Month | # of Hours Billed |
| May 2016<br><br>(Note: Mr. Cardwell was on vacation for two-weeks during this month) | 101.1 |
| June 2016<br><br>(Note: Mr. Cardwell's hours/staffing were impacted by Mr. Cardwell's vacation the prior month and by traveling for his swearing-ceremony) | 99.7 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | 234.7 |
| October 2016 | 113 |
| November 2016 | 69 |
| December 2016 | 14.1 |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.8 |

177.    It is clear from the chart above (and the underlying time sheets) that there is a

stark difference between the months where Davis Polk Junior Staffing Coordinator #1 (or, in the

---

[25] For additional context, Davis Polk associates typically average between 133 and 175 billable hours a month.

event of her absence, her non-Firm partner replacement) had primary responsibilities for staffing Mr. Cardwell and the months where Mr. Bick, Mr. Birnbaum, and Mr. Wolfe had exclusive and primary control over staffing Mr. Cardwell. Virtually every billable hour noted in the chart above (and the underlying time sheets) relates to a staffing assignment that Mr. Cardwell received from a non-Davis Polk partner.

178.    As previously noted, when asked on December 1, 2015 "how [Mr. Reid's] law firm supports diverse and female attorneys so they can climb the ranks," Mr. Reid explicitly answered that "the foundation" of such support involved Mr. Reid meeting with "practice leaders three times a year as they 'talk about work at the firm is getting allocated.'" When it came to Mr. Cardwell, Mr. Reid and the leaders of the Firm's M&A group did indeed discuss how work should be allocated to Mr. Cardwell. The evidence indicates that Mr. Cardwell didn't merely slip through so-called cracks in Davis Polk's staffing system; rather, Defendants took strategic steps to dig a hole to later—and dishonestly—make, if necessary, an argument that Mr. Cardwell was simply in a hole that he could not climb out of it.

179.    Mr. Reid's, Mr. Bick's, Mr. Birnbaum's, and Mr. Wolfe's decision to properly staff Mr. Cardwell and to increasingly stop communicating with Mr. Cardwell during the second half of 2016 and the beginning of 2017 cannot be legitimately explained by Mr. Cardwell's performance or the Firm's non-fabricated and pre-litigation conclusions about Mr. Cardwell's performance reviews (as highlighted in the chart below).

### Mr. Cardwell is respected in and out of the Firm.

180.    On October 7, 2016, a Davis Polk associate from a non-M&A group sent the following email to Mr. Cardwell: *"Was just at drinks with a classmate of mine, he was RAVING about how wonderful you are to work with, etc etc [sic] etc."* (emphasis in original email). The

non-M&A associate was referring to a White junior M&A associate who was working on the restructuring deal (as noted above) with a senior M&A associate and Mr. Cardwell.

181.     The same institutions and individuals that Davis Polk viewed as the authority with respect to a variety of assessments and trainings related to measuring and improving law firms, lawyers' development, and diversity and inclusion outcomes, are the same institutions and individuals that objectively viewed Mr. Cardwell as having exceptional judgment and competencies related to lawyering, law firms, and the legal profession.

182.     In October 2016, a senior director of Diversity and Inclusion at the New York City Bar recruited Mr. Cardwell to join the New York City Bar's Civil Rights Committee. Mr. Cardwell subsequently joined. A few months later, that same director, a person with a widely recognized expertise related to working with legal employers (including Davis Polk) to foster more diverse and inclusive work environments, recruited Mr. Cardwell to serve on the planning committee for the New York City Bar's inaugural Associate Leadership Institute, an American Bar Association award-winning series of high-level development trainings for mid-level and senior corporate law associates. Mr. Cardwell was recruited to help design curriculum and training modules for the program's participants—i.e., over 100 law firm associates from 47 law firms within the first two years of the program's operation. Mr. Cardwell served on the planning committee and helped recommend, evaluate, and select participants from the program's applicant pool, the curriculum, and instructors for the training sessions.

183.     Not only did members of Davis Polk's leadership reach out to Mr. Cardwell at the time to hear Mr. Cardwell's assessment of the quality of the New York City Bar's Associate Leadership Institute, Davis Polk subsequently and successfully worked to get two of its highest performing and most respected senior non-White associates to apply and be accepted into the

associate leadership program that Mr. Cardwell helped design. Since the associate leadership program's inception, every year, Davis Polk has sent at least two of its highest performing senior non-White attorneys to participate in the program.

184.    On October 31, 2016, in a communication to a third-party, a senior Black associate of the Firm and recipient of some of the Firm's highest honors and praise, described Mr. Cardwell in the following way: "*I first became aware of [Mr. Cardwell] in the fall of 2014 through the Black Affinity Group (BAG), a support network and networking outlet for black attorneys at the law firm where he and I work, Davis Polk & Wardwell LLP. As I have found to be the case for others who come to know [Mr. Cardwell], before I met him, I knew his name and of his ability to connect people to actionable ideas. In BAG, he exhibits leadership among more senior attorneys and partners and quite frequently is deferred to once he has given his input….[O]ur many conversations…have led me to see [Mr. Cardwell] as one of the few people in an office of over 700 people who is my go-to person for key decision points, whether I'm considering navigating the politics of potential partnership consideration or troubleshooting ways to get better to ensure the success of our diverse peers.*"

185.    On December 5, 2016, a senior Black associate voluntarily emailed the Black Attorney Group's listserv and stated: "*All, [o]ne of our own has been featured in the [Metropolitan's Black Bar Association's] newsletter below. Congratulations, [Mr. Cardwell].*" The senior Black associate was drawing attention to the fact that the Metropolitan Black Bar Association (i.e., New York City's largest Black Bar Association) had featured Mr. Cardwell in its "MBBA Leadership Spotlight."

186.    Also, in the Winter of 2016, a senior Black associate, then one of the Firm's most senior Black associates and a member of the Black Attorney Group's Steering Committee (which

served as a leadership sub-committee for the Black Attorney Group and a liaison between the Firm's leadership and the Black attorneys at the Firm), began to recruit Mr. Cardwell to join and serve on the steering committee. The senior Black associate recruited Mr. Cardwell instead of and over a handful of eligible Black Davis Polk associates who were more senior than Mr. Cardwell. Mr. Cardwell officially joined the Black Attorney Group's Steering Committee in December 2016 and at the time was the most junior Black Davis Polk associate on the committee.

187.    Throughout Mr. Cardwell's time at the Firm, the Firm's recruiting department routinely praised Mr. Cardwell for his effort and impact and frequently asked Mr. Cardwell to attend or assist with various recruiting and interviewing events. According to the performance review documentation the Firm submitted to the NYSDHR, Mr. Cardwell's 2015 annual Summary Review stated that Mr. Cardwell "went **above and beyond** in regarding [sic] to recruiting and the summer program." (emphasis added). In other words, as noted previously, Davis Polk's partners initially evaluated Mr. Cardwell in a context that recognized that the Firm routinely asked or expected Mr. Cardwell to commit to other Firm-related obligations that created additional time constraints and responsibilities for Mr. Cardwell, his class's only Black male associate. Similarly, according to the performance review documentation the Firm submitted to the NYSDHR, Mr. Cardwell's 2016 annual Summary Review noted that Mr. Cardwell received a "commendation" for his pro bono/recruiting efforts.

*Still no work.*

188.    Defendants' treatment and termination of Mr. Cardwell's employment is directly at odds with performance-related conclusions that Mr. Cardwell received from departments and associates that Defendants could not easily manipulate or distort.

189.     Regarding the same months and years that Davis Polk associates, the Firm's non-Partner leadership, and countless others across the legal profession were increasingly praising, recognizing, and consulting Mr. Cardwell for his ability to evaluate, navigate, and shape Davis Polk and other legal institutions, Davis Polk pretextually argued to the NYSDHR that the abrupt changes to Mr. Cardwell's staffing and evaluation were because Davis Polk partners repeatedly and legitimately reached a radically opposite conclusion about Mr. Cardwell and his competency.

190.     Defendants' actions during the second half of 2016 and the beginning of 2017 cannot be credibly and honestly explained as anything other than discriminatory and retaliatory conduct.

191.     In addition to not staffing Mr. Cardwell on any deals and matters, virtually all of Davis Polk's M&A partners isolated and ignored Mr. Cardwell.

192.     Week after week, for months, Davis Polk M&A partners walked by Mr. Cardwell while knowing that they were not going to staff Mr. Cardwell on any assignments—while knowing that at a law firm like Davis Polk, it is virtually impossible for an associate to go throughout his or her day without encountering multiple lawyers and colleagues who would ask, "So, what are you working on?" "Working on anything interesting?" "Have things been pretty busy for you or the group?"

193.     Week after week, for months, Mr. Reid, Mr. Bick, Mr. Birnbaum, and Mr. Wolfe, refused to staff Mr. Cardwell and isolated Mr. Cardwell with the knowledge that otherwise routine daily interactions—such as constantly being asked what type of legal matters one is working on—would become a form of harassment and humiliation that almost always harms associates' well-being and leads to isolated associates feeling like they have no other choice but

to so-called voluntarily leave their law firms.[26] During this period, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and the other Individual Defendants caused Mr. Cardwell to similarly experience a constant barrage of inquiries about staffing that contributed to a level of direct and indirect forms of harassment and humiliation.

### *Second Annual Face-to-Face Performance Review.*

194.     On December 20, 2016, Mr. Kreynin met with Mr. Cardwell and gave Mr. Cardwell his December 2016 annual face-to-face review. Defendants' treatment of Mr. Cardwell in the second half of 2016 was not acknowledged or explained to Mr. Cardwell in his December 2016 annual face-to-face review. Like Mr. Cardwell's June 2016 face-to-face review, at no point during the conversation did Mr. Kreynin state or suggest (i) that Mr. Cardwell's performance or quality of work was inferior to the associates in his class or (ii) that someone at the Firm might reach or had reached that conclusion.[27]

195.     During Mr. Cardwell's December 2016 annual face-to-face review with Mr. Kreynin, Mr. Kreynin briefly mentioned a few criticisms that were inconsistent with the real-time feedback Mr. Cardwell had received during the period covered by the reviews. When Mr. Cardwell explained that Mr. Kreynin's feedback was inconsistent with his experiences and

---

[26] The harmful nature of the harassment and hostility that Mr. Cardwell suffered was recognized as such by a Davis Polk M&A partner on February 8, 2018, as such partner acknowledged how the Firm's refusal to staff Mr. Cardwell was impacting Mr. Cardwell when he stated "[Mr. Cardwell] can't just sit here. It is demoralizing for [Mr. Cardwell]."

[27] Notably, when considerations related to poor performance are at issue, it is standard practice for Davis Polk to make a distinction between (i) constructive criticism and suggestions for improvement and (ii) the Firm concluding that an associate is performing poorly. In the case of the latter, it is standard practice for Davis Polk to uniformly document associates' poor performance with associates (particularly, performance issues that would have warranted giving an associate a message that it was time for him or her to look for another job), any issued warnings, and the written communications to such associates regarding the Firm's conclusions and corrective plan of action. Davis Polk failed to do so with Mr. Cardwell—over more than three years—because not only did Davis Polk, the Firm's M&A group, or the partners who gave Mr. Cardwell his face-to-face reviews never conclude prior to Mr. Cardwell raising racial complaints and litigation that Mr. Cardwell was a poor performer or behind in his class, Mr. Cardwell did not have a record of poor performance and did not make any mistakes that the Firm and M&A group considered to be fundamentally different than the type made by a typical Davis Polk associate of Mr. Cardwell's seniority.

communications, he asked Mr. Kreynin for specific examples related to the criticisms. Mr.

Kreynin struggled to identify specific examples and ultimately gave Mr. Cardwell one example

of a single drafting mistake (i.e., the misspelling of an entity's name that was spelled similar to

another entity referenced in the applicable documents) from Mr. Cardwell's Last 2016 Deal,

which Mr. Cardwell was staffed on in August 16, 2016 and involved months were Mr. Cardwell

had billed almost 235 hours.

196.    When Mr. Cardwell asked Mr. Kreynin if he was aware of any other mistakes or

could provide any other examples related to Mr. Kreynin's criticisms, Mr. Kreynin said that he

didn't have any other examples at that moment. Despite Mr. Cardwell's request at the time, Mr.

Kreynin never followed-up with Mr. Cardwell to provide additional examples.

197.    Notably, Mr. Kreynin made comments during the December 2016 face-to-face

review that clearly indicated that not only did Mr. Kreynin conclude that Mr. Cardwell was

qualified to be a Davis Polk associate, but that he thought Mr. Cardwell was ready to be staffed

on M&A deals that make up the core of Davis Polk's mid-level and senior associate M&A deal

flow. It was in the context of reviewing and summarizing Mr. Cardwell's reviews and telling Mr.

Cardwell that Mr. Cardwell was ready for more M&A responsibilities and complex work, not

less, that Mr. Kreynin said something to the effect of, "It would be good if you were the lead

attorney at the beginning of a deal that involved a stock purchase agreement."[28] After the

December 2016 face-to-face review,[29] however, Mr. Cardwell's workload continued to be almost

---

[28] Note that at no point during the meeting did Mr. Kreynin state or suggest that Mr. Cardwell was under any kind of performance-related probation period or that the Firm or M&A group was going to or was contemplating giving Mr. Cardwell another review in six months to further evaluate his standing or performance.

[29] As described below, Mr. Kreynin claimed in March 2017 that he had no idea that the Firm's M&A staffing partners were not staffing Mr. Cardwell on any assignments.

completely nonexistent:

| Mr. Cardwell's Billable Hours[30] | |
|---|---|
| Month | # of Hours Billed |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.8 |

### iii. Efforts to push Mr. Cardwell out not successful. Defendants step it up.

198.     In the aftermath of Donald Trump being elected president in November 2016—

that is, a person who claimed the U.S.'s first Black president was not born in the United States

and who said there were "fine people on both sides" of a rally that involved members of White

Supremacist groups doing Nazi salutes and killing a woman with a vehicle—Mr. Cardwell

contacted Davis Polk's pro bono leaders to see if they would be open to realigning Davis Polk's

relationship with certain workers and immigrants who are routinely *othered*[31] and don't yet

*belong*,[32] namely Black, Latino, and other stigmatized groups.

199.     On December 5, 2016, Mr. Cardwell sent an email to Carey Dunne, a Davis Polk

partner who often oversaw criminal justice pro bono matters, regarding a Firm Client with a

violent and discriminatory reputation towards certain racial groups. That did not go well, as

several Davis Polk partners reacted as if Mr. Cardwell made an unforgivable demand.

---

[30] For additional context, Davis Polk associates typically average between 133 and 175 billable hours a month.
[31] According to the Othering and Belonging Institute ("OBI"), "othering" is a set of dynamics, processes, and structures that [cause] marginality and persistent inequality across any of the full range of human differences based on group identities. Dimensions of othering include, but are not limited to, religion, sex, race, ethnicity, socioeconomic status (class), disability, sexual orientation, and skin tone." People who are "othered" are often seen as less than fully human.
[32] According to john a. powell and OBI, "To not belong is to be othered. To be less than. To be, as W. E. B. Dubois said, a 'problem.' To belong is not just to be a citizen or member in the weakest sense, but to be able to participate in cocreating the thing you belong to. This makes it different than inclusion."

200.   Mr. Cardwell's December 5, 2016 email read as follows:

"*Hi [Mr. Dunne],*

*Hope this email finds you well. In light of the Presidential election, the conditions that contributed to its outcome and what is happening in our country, I wanted to briefly follow-up on our memo to [REDACTED].*

*As a reminder, our initial memo detailed how blacks were being disproportionately and unfairly harmed by certain [prison-related] industries and companies. I'm hoping we can discuss what can be done to distance ourselves from [REDACTED] and ultimately end the firm's relationship with [REDACTED].*

*I'm not sure what that internal process would or could look like, or whether the firm has ever distanced itself from certain clients in the past, but I'd be interested in hearing what you think could or should be done. I look forward to hearing from you. Regards, [Mr. Cardwell]*"

201.   The memo that Mr. Cardwell referred to in the email referenced above used publicly available information to research and detail several civil rights and human rights violations that disproportionately impact Blacks, Latinos, Muslims, and immigrants. On this pro bono matter, Mr. Dunne was aware that the Firm had authorized the removal of one of the memo's topics/sections due to what the Firm claimed was the possibility of a private for-profit prison and immigrant detention company being "negatively impacted" ("Potentially Negatively Impacted Private Prison Company") by the memo. The removed/topic section did not mention or name any companies, let alone the name of the Potentially Negatively Impacted Private Prison.

202.     Mr. Dunne replied to Mr. Cardwell's email and noted that he "did not know what relationship, if any, the firm still ha[d] with" the Potentially Negatively Impacted Private Prison Company. In his reply, Mr. Dunne also indicated that he thought it might make sense for him (i.e., Mr. Dunne) to "flag for the management committee the concern about this type of client."

203.     After Mr. Cardwell's inquiry with Mr. Dunne about a racially harmful Davis Polk client and related discrimination, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Davis Polk did not staff Mr. Cardwell on any billable assignments for the next four months (i.e., from December 2016 through April 2017). As noted in the charts above, from January 2017 through March 2017, Mr. Cardwell billed a total of only 5.9 hours, a number that is jarring in any law firm context and even more when one considers how busy Davis Polk's M&A group was during this period.

204.     To this point, Mr. Cardwell observed that similarly situated non-Black associates remained continuously staffed on assignments by Mr. Birnbaum and Mr. Wolfe, thereby allowing such associates to generate billable hours, further develop as attorneys, and continue to build relationships with attorneys and professionals in and outside of the Firm. As stated previously, Mr. Cardwell was the only Black male in his class of over 120 associates. Defendants' actions resulted in disparate treatment of Mr. Cardwell in comparison to similarly situated non-Black associates.

205.     The elimination of Mr. Cardwell's billable hours is noteworthy considering both the Firm's revenue and profit structure and Firm's primary reason for hiring Mr. Cardwell and other associates, are, at their core, primarily and inextricably tied to associates' billable hours. This, of course, is in addition to the Firm's perennial emphasis on the billable hour as the measuring stick by which one escalates the rungs of partnership. In the context of Davis Polk and its staffing systems and practices, it is not plausible that one of the Firm's only Black M&A

associates could be staffed on zero assignments by Mr. Birnbaum and Mr. Wolfe and bill zero or virtually zero hours for months at a time, all without M&A and Firm partners and leaders noticing and wondering what was going on.

206.    As early as January 2017, and for the next couple of months, Mr. Cardwell had indicated on his weekly workload request/capacity form that he had 100% availability to take on new assignments.[33] As noted earlier, the weekly workload request/capacity form is regularly reviewed and relied upon to make staffing decisions.  It is not possible that Mr. Cardwell's availability to take on deals and assignments was merely overlooked for four to six months.  Mr. Reid's, Mr. Bick's, Mr. Wolfe's, Mr. Birnbaum's, and Davis Polk's decision to cease assigning work to Mr. Cardwell was made intentionally, with malice or reckless disregard, and was motivated in whole or in part by Mr. Cardwell's race and his legally protected complaints.

207.    After Mr. Cardwell raised a racial complaint on December 5, 2016, it took the following number of days for the following Davis Polk partners to send Mr. Cardwell an email of any kind (notwithstanding group emails to practice groups and other listservs (e.g., to "All Lawyers")):

   a.   Mr. Bick, an M&A partner, went the next **148** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - May 3, 2017);

   b.   Louis Goldberg, an M&A partner, went the next **148** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - May 3, 2017);

---

[33] Certainly, prior to January 2017, Mr. Cardwell's steady decrease in billable hours beginning in September 2016 and the weekly workload request/capacity forms that Mr. Cardwell was submitting from that time going forward made it objectively known and predictable to Mr. Bick, Mr. Birnbaum, and Mr. Wolfe that, if they did not staff Mr. Cardwell, Mr. Cardwell's billable hours would increasingly and drastically decline or be effectively eliminated in October, November, and December of 2016.

c. Phillip Mills, an M&A partner, went the next **190** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - June 14, 2017);

d. Lee Hochbaum, an M&A partner, went the next **225** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - July 19, 2017);

e. Mr. Birnbaum—except for a February 24, 2017 email to Mr. Cardwell that instructed Mr. Cardwell where he could pick up his paycheck—went the next **268** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - August 31, 2017);

f. John Amorosi, an M&A partner, went the next **276** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - September 8, 2017);

g. Michael Davis, an M&A partner, went the next **276** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - September 8, 2017);

h. Leonard Kreynin, an M&A partner, went the next **320** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - October 22, 2017);

i. Oliver Smith, an M&A partner, went the next **374** days without emailing Mr. Cardwell (i.e., from about December 6, 2016 - December 15, 2017); and

j. Mr. Chudd, Mr. Wolfe, Mr. Butler, Gar Bason Jr., Joe Rinaldi, William Aaronson, and William Taylor—all M&A partners—did not send Mr. Cardwell a single email in all of 2017 (which means that, from December 6, 2016 -January 1, 2018, these M&A partners went about **391** days without sending Mr. Cardwell any emails).

208. At all relevant times, all of Davis Polk's M&A partners were White men.

209.    The lack of written communication from Davis Polk's M&A partners was not mitigated through face-to-face or phone conversations between such persons and Mr. Cardwell, as such conversations were similarly and virtually non-existent. Relatedly, the lack of communication noted in this Complaint was not because Davis Polk's M&A partners were vastly outnumbered by Davis Polk's M&A associates, as Davis Polk's M&A group had approximately one M&A partner in the Firm's New York office for every two M&A associates in its New York office.

### *Mr. Cardwell Gains New "Career Advisors." They Don't Talk to Mr. Cardwell Either.*

210.    On January 20, 2017, Davis Polk Junior Staffing Coordinator #2 emailed Mr. Cardwell (with Mr. Bick and Mr. Butler cc'd) informing Mr. Cardwell that Mr. Bick and Mr. Butler had recently become Mr. Cardwell's "Career Advisors" through the Firm's corporate department's Career Advisor program.

211.    This pairing allowed Mr. Bick, Mr. Butler and the other defendants to create a roadblock between Mr. Cardwell and Davis Polk partners who otherwise would have treated Mr. Cardwell as similarly situated non-Black Davis Polk attorneys.

212.    According to the Firm's description of the program at the time, advisors (i) "will be strongly encouraged to work with their advisees to foster **direct involvement with skill building**," (ii) "are encouraged to include their advisees on pitches, client service team discussions, and general conversations about the firm's business goals," and (iii) are "expected to maintain a dialogue with his or her advisees **for the duration of the associate's time at the firm**." (emphasis added).

213.    Such communications and internal programs, among others, recognize that there is a causal relationship between partners having "direct involvement" with junior associates and

(i) associates' development in the areas of "skill building," (ii) "pitches" that enable attorneys to become familiar with and ultimately obtain high-paying and sophisticated clients, and (iii) "client service"—all things that impact an associate's financial/professional trajectory and partnership prospects within Davis Polk and the broader legal profession.

214.    In keeping with both the Firm's Career Advisor Program and the discrimination complaints that Mr. Cardwell raised in 2015 and 2016, on or about January 20, 2017, Mr. Cardwell responded to Davis Polk Junior Staffing Coordinator #2's email (with Mr. Bick and Mr. Butler cc'd) with the following:

> "*Many thanks. I look forward to learning how the Career Advisor Program will supplement experiences and conversations that I've had (i.e., with **managing partners**, **assignment coordinators**, **BAG meeting participants**, etc.) regarding **DPW interactions**, **opportunity/assignments**, and **career development***." (emphasis added).

215.    Mr. Cardwell's email directly refers to the same discriminatory acts that are described in this Complaint, including the discrimination that Mr. Cardwell experienced and complained about to (i) managing partner Mr. Reid in January 2016, (ii) assignment coordinator Davis Polk Junior Staffing Coordinator #2 in September 2016, (iii) and multiple Davis Polk partners and the Firm's Director of Associate Development in the September 2015 Black Attorney's group meeting. Neither Mr. Bick nor Mr. Butler responded to or otherwise discussed the January 2016 email with Mr. Cardwell.

216.    From January 20, 2017 (i.e., the day the Firm assigned Mr. Cardwell "Career Advisors") to August 10, 2018 (i.e., Mr. Cardwell's last day at the Firm), in direct violation of its own career advisor policy and practices, Mr. Cardwell did not receive any communications from

Mr. Bick or Mr. Butler about either the Career Advisor program, their role as "advisors," or anything related to Mr. Cardwell's long-term career.

217.    Also, Mr. Bick's and Mr. Butler's (among other defendants') actions in connection with Mr. Cardwell's lack of interactions with the Firm's Career Advisors program were consistent with and reflected such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

218.    Notably, the Firm described the Career Advisor program at the time by stating, "We believe the addition of advisory relationships will further ensure that Davis Polk's associates develop and succeed in a manner that continues to distinguish the firm." To the contrary, Defendants' abrupt and complete isolation of Mr. Cardwell, as well as their decision to knowingly restrict Mr. Cardwell's "Career Advisors" to some of the ring leaders driving Mr. Cardwell's isolation, worked to ensure Mr. Cardwell would not be treated as similarly situated non-Black Davis Polk attorneys. As if such actions weren't enough, even after becoming Mr. Cardwell's "Career Advisor," Mr. Bick, as he had done in the past, would routinely walk by Mr. Cardwell in the hallway without speaking or even acknowledging Mr. Cardwell's presence. Mr. Cardwell observed that Mr. Bick did not ignore Mr. Cardwell's White colleagues in this way.

### *Mr. Cardwell is Completely Isolated.*

219.    Some evidence suggests that Defendants kept Davis Polk's diversity and inclusion leadership completely in the dark of Defendants' unlawful treatment of Mr. Cardwell. It is inconceivable that Mr. Cardwell's performance was both (i) so poor over an extended period of time that it triggered Mr. Cardwell receiving no billable work for months and eventually termination and (ii) somehow not poor enough to trigger a member of Davis Polk's Diversity Committee to reach out to Mr. Cardwell to discuss Mr. Cardwell's performance and work

product, let alone work with Mr. Cardwell to implement a remediation plan over an extended period of time.

220.    The following is a list of Davis Polk partners and staff persons who, at the time, were a part of Davis Polk's official (and unofficial) Diversity Committee. The list below also shows the number of days (leading up to January 1, 2018) that passed before Mr. Cardwell received an email from each person listed below (i.e., notwithstanding group emails sent by such persons to practice groups and other listservs (e.g., to "All Lawyers," to the Black Attorneys Group's listserv)):

    a.  Kyoko Takahashi Lin, a Corporate Partner, went about **458** days without sending Mr. Cardwell any emails (i.e., from about September 30, 2016 - January 1, 2018).

    b.  Davis Polk's Executive Director went about **593** days without sending Mr. Cardwell any emails (i.e., from about May 18, 2016 - January 1, 2018.

    c.  Monica Holland, a Corporate Partner who also served as the Chair of the Diversity Committee, went about **584** days without sending Mr. Cardwell any emails (i.e., from about May 27, 2016 - January 1, 2018).

    d.  Maurice Blanco, a Corporate Partner who also served as the Firm's hiring partner, went about **584** days without sending Mr. Cardwell any emails (i.e., from about May 27, 2016 - January 1, 2018).

    e.  James McClammy, Davis Polk's only Black partner at the time, went about **613** days without sending Mr. Cardwell any emails (i.e., from about April 28, 2016 - January 1, 2018, except for an October 30, 2017 email that was sent to confirm whether Mr. Cardwell would be attending an affinity group meeting).

f.   Byron Rooney, a Corporate Partner, went about **670** days without sending Mr. Cardwell any emails (i.e., from about March 2, 2016 - January 1, 2018).

g.   Sartaj Gill, a Corporate Partner, went about **730** days without sending Mr. Cardwell any emails (i.e., he did not email Mr. Cardwell at any point in 2016 or 2017).

h.   Elliot Moskowitz, a Litigation Partner, went about **730** days without sending Mr. Cardwell any emails (i.e., he did not email Mr. Cardwell at any point in 2016 or 2017).

221.   Notably, Mr. Reid went about **711** days without sending Mr. Cardwell any emails (i.e., from about January 21, 2016 - January 1, 2018). The lack of written communication from partners and staff persons who, at the time, were a part of Davis Polk's official (and unofficial) Diversity Committee was not mitigated through face-to-face or phone conversations between such persons and Mr. Cardwell, as such conversations were similarly and virtually non-existent.

222.   Mr. Cardwell's isolation included both a lack of direct communication from Defendants and senior members of the Firm and a complete lack of assignments for an impermissible period of time.

223.   Davis Polk did not staff Mr. Cardwell on any matters in December 2016.

224.   Davis Polk did not staff Mr. Cardwell on any matters in January 2017.

225.   Davis Polk did not staff Mr. Cardwell on any matters in February 2017.[34]

226.   Davis Polk did not staff Mr. Cardwell on any matters in March 2017.

---

[34] In February 2017, Davis Polk staff members confirmed that Mr. Birnbaum and Mr. Wolfe had been consistently receiving Mr. Cardwell's weekly capacity form. This February 2017 incident is the sixth time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

227.    After almost a full year of constant disparate treatment, Defendants decided that they had to go beyond merely waiting for Mr. Cardwell and his career "to implode." Instead, Defendants attempted to permanently collapse and cripple Mr. Cardwell's career themselves.

228.    Defendants' intentional decision to not staff Mr. Cardwell on any matters from December 2016 through March 2017 was motivated, in whole or in part, by Mr. Cardwell's race and his legally protected complaints.

229.    In a March 3, 2017 email to Sharon Katz, Davis Polk's Special Counsel for Pro Bono, Mr. Cardwell again raised the issue of the Firm's relationship with a private for-profit prison and immigrant detention company whose policies and practices disproportionately discriminated against and dehumanized Blacks and other marginalized groups.[35]

---

[35]Mr. Cardwell's email to Ms. Katz stated:

"*In light of your and the firm's recent efforts to address Trump's Muslim ban (and his immigration and policing policies more broadly), I wanted to loop you into the email conversations below. As you'll read, [Mr. Dunne]'s comments suggest that he did not have a conversation with the management committee at the time the conflict first became known and that he hadn't discussed it with them prior to the communications below. Considering [Mr. Dunne]'s public track record with [REDACTED] and other related efforts, I was disappointed to not receive confirmation that he or someone else had attempted to resolve the conflict, as I understand occasionally is attempted when billable work is at issue.*

*Based on [Mr. Dunne]'s response, I can only assume that [Mr. Dunne] and I reached different conclusions about the nature of the firm's conflict of interest, as well as the scale and scope of the racial and moral dimensions that are bound in the links between (i) race and U.S. incarceration and (ii) Trump's (and his administration's) recent actions and U.S. incarceration. To this point, and I'm happy to say more later, I think both the conflict noted below and current political realities bear a striking resemblance to [Davis Polk's] history with <u>Brown v. Board of Education</u>, a case that led then present-day thinkers and legal communities to conclude that the government's position and actions would inevitably create and maintain racial hierarchies and dehumanizing practices.*

*Certainly, and in addition to the findings in the (attached) memo, many have recently concluded that a number of groups—blacks, Latinos, Muslims, immigrants, LGBTQ and trans folks, among others—have been experiencing harms that in many ways go beyond separate and supposedly equal treatment. (Relatedly, see "Sessions Indicates Justice Department Will Stop Monitoring Troubled Police Agencies" and Sessions: "US to continue use of privately run prisons.")*

*It is my hope that my comments above will provide additional context and guidance on what could and should be done regarding [Davis Polk's] relationship with [REDACTED]. Obviously, there's much that could be said and that must be considered. Please let me know if you're available next week to discuss the above and below.*

*I'd greatly appreciate hearing what you think could be done to ensure that [Davis Polk] isn't simultaneously assisting (i) clients that are being targeted by racist and xenophobic policies and practices and (ii) clients that are incarcerating them.*"

230.     At Ms. Katz's request and arrangement, Mr. Cardwell later met with her and Mr. Reid on March 9, 2017. During their meeting, Mr. Reid gave Mr. Cardwell a verbal commitment that the Firm would no longer represent the private prison and immigrant detention client.

231.     At the conclusion of the March 9, 2017 meeting—and without any prior discussion related to Mr. Cardwell's workload, assignment history, or quality of work—Mr. Reid voluntarily acknowledged and conceded that Mr. Cardwell's prior and current workloads were low, that they were low for reasons that were "not [Mr. Cardwell's] fault," and that the staffing issue needed to be "fixed" by the Firm and M&A group. Mr. Reid made such statements in the presence of Ms. Katz.

232.     As a reminder, Mr. Reid was Davis Polk's managing partner and had previously communicated that he had a personal habit of reviewing associates' files and performance reviews prior to meeting with associates. It is not plausible that, out of thin air, Mr. Reid had described Mr. Cardwell's staffing issues as "not [Mr. Cardwell's] fault"—or that Mr. Reid would make such comments without first speaking with the Firm's M&A partners and reviewing Mr. Cardwell's file and performance reviews.

233.     Almost two weeks went by and Mr. Cardwell still had not been assigned to or staffed on any matters.

234.     On March 21, 2017, Mr. Cardwell emailed a written request to Davis Polk's Director of Associate Development and asked if Mr. Cardwell could review his personnel "file and all the performance reviews that [he] had received to date." Davis Polk's Director of Associate Development said that she would "look into [Mr. Cardwell's] request," subsequently declined Mr. Cardwell's request, and informed Mr. Cardwell that once she received his request, she decided to arrange a meeting between Mr. Cardwell, Mr. Reid, and Mr. Kreynin. Mr.

Cardwell asked Davis Polk's Director of Associate Development if the Firm was prohibiting Mr. Cardwell's request because doing so was the Firm's policy or practice. Despite the fact that, at the time, the Firm's Lawyer's Handbook[36] did not prohibit attorneys from reviewing their performance reviews, Davis Polk's Director of Associate Development told Mr. Cardwell that it was both "a policy and practice" at Davis Polk to prohibit associates from reviewing or accessing their performance reviews.

235.    Because Mr. Cardwell did not have any conversations with Davis Polk's Director of Associate Development about his recent conversations with Mr. Reid, and did not ask Davis Polk's Director of Associate Development to arrange any meetings, Mr. Cardwell emailed the following second request to Davis Polk's Director of Associate Development:

"*[I]n light of the fact that you informed me that I'll be meeting with [Mr. Reid, Mr. Kreynin, and Davis Polk Junior Staffing Coordinator #1]—I'd like to repeat my request to review my file and all of the reviews to date. At the moment, I'll be the only person in the meeting who hasn't had a chance to review my file and I think the conversation will be much more productive if I have that opportunity and can start the meeting with a shared understanding as the other participants. Can you follow-up with [Mr. Reid] and let me know if you'll be able to satisfy my second request? Regards, [Mr. Cardwell]*"

236.    Mr. Cardwell's request was once again rejected. At no point during any of Mr. Cardwell's face-to-face reviews—i.e., his May 2015 face-to-face review, his December 2015 face-to-face review, his sham June 2016 face-to-face review, or his December 2016 face-to-face review—was Mr. Cardwell allowed to review any of the documents associated with Mr.

---

[36] As noted above, Davis Polk's "Lawyers' Handbook" serves as the Firm's official resource that describes the Firm's policies and procedures.

Cardwell's performance reviews (e.g., performance reviews or Summary Reviews submitted by Davis Polk's attorneys).

237.    After receiving Mr. Cardwell's second request on March 21, 2017, Davis Polk's Director of Associate Development, Mr. Reid, and Davis Polk did not offer Mr. Cardwell the option to review a redacted version of his performance reviews, which, at the least, would have provided a layer of anonymity for the reviewers. Davis Polk's Director of Associate Development, Mr. Reid, and Davis Polk also did not offer Mr. Cardwell the option of viewing his performance reviews on the condition that he would be prohibited from (i) taking the performance reviews out of a Firm-designated reviewing room or (ii) making copies. Instead, Davis Polk's Director of Associate Development, Mr. Reid, and Davis Polk categorically denied Mr. Cardwell's requests to review his personnel file and performance reviews and arranged a meeting with the Firm's Managing Partner and Mr. Kreynin.

238.    Davis Polk's and Mr. Reid's refusal to allow Mr. Cardwell to review his performance reviews was alarming not just for the reasons stated above but also because Davis Polk and Mr. Reid, among other Firm partners, were aware (and previously acknowledged) that the Firm's performance-related assessments and reviews often contained evidence of racial bias and disparate treatment.

239.    Davis Polk's Director of Associate Development scheduled Mr. Cardwell's meeting with Mr. Reid and Mr. Kreynin for March 29, 2017. According to the documentation that Davis Polk provided to the NYSDHR, Mr. Kreynin did not submit his Summary Review of Mr. Cardwell's December 2016 annual face-to-face review to the Firm's records department until March 28, 2017—a date that is almost 100 *days* after Mr. Kreynin met and gave Mr.

Cardwell his face-to-face review on December 20, 2016 and just *one day* before Mr. Cardwell met with Mr. Reid and Mr. Kreynin.

240.    Common sense and this Complaint make it clear that it is not plausible that Mr. Reid met with Mr. Cardwell on March 29, 2017 without first speaking with the Firm's M&A partners and reviewing Mr. Cardwell's file and performance reviews.

*One Final Warning: Let the Past be the Past, Or Else.*

241.    On March 29, 2017, Mr. Cardwell met with Mr. Reid and Mr. Kreynin. Mr. Reid began the meeting by attributing Mr. Cardwell's dearth of work assignments to himself (i.e., Mr. Reid) and the Firm and stated that he (i.e., Mr. Reid) and the Firm had "dropped the ball" and made mistakes. Regarding staffing deficiencies and which Davis Polk partners were responsible, Mr. Reid stated that Mr. Cardwell should let the past be the past and focus on things going forward. Without using any aggressive or threatening body language or verbal tones, Mr. Cardwell responded by asking Mr. Reid to explain how multiple staffing partners and other partners "dropped the ball," over the last five or six months, all at the same time. Mr. Reid responded by saying that it wouldn't be helpful to discuss the past. Mr. Cardwell responded by asking Mr. Reid and Mr. Kreynin if they thought it was unreasonable for Mr. Cardwell to want to know who "dropped the ball" and how they "dropped the ball." Mr. Reid responded by telling Mr. Cardwell again that the Firm simply wasn't going to answer those questions. Mr. Cardwell asked Mr. Reid if Mr. Reid could arrange a meeting with Mr. Bick so that Mr. Bick could help Mr. Cardwell understand how the Firm and the M&A partners "dropped the ball" and how it was possible that Mr. Bick didn't know that Mr. Cardwell wasn't receiving any assignments. Mr. Reid responded by saying that he and the Firm weren't going to allow Mr. Cardwell and Mr.

Bick to discuss the past. Mr. Reid also told Mr. Cardwell "it's not like your career has been destroyed."

242.    During the meeting, Mr. Cardwell noted that he was uncomfortable with the Firm's performance review process and noted that racial biases were influencing performance evaluations.

243.    This March 29, 2017 incident is the seventh time that Mr. Cardwell flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

244.    Mr. Cardwell reminded Mr. Reid that the diversity and inclusion consultants that the Firm brought in had also noted the Firm's performance reviews were likely to reflect racial biases.

245.    Mr. Reid was unrelenting in stating that there wouldn't be any discussions or investigations of Mr. Cardwell's past complaints or experiences. Notwithstanding that this was not the first occasion that Mr. Cardwell had directly raised racial complaints with Mr. Reid, Mr. Reid's statements and actions evidence that Mr. Reid understood that Mr. Cardwell was making a discrimination complaint. Mr. Reid should have but didn't investigate Mr. Cardwell's expressed concerns and complaints about his interactions and the Firm's performance reviews being influenced by improper racial perceptions. Mr. Reid's failure and refusal to investigate and/or remedy the role that racial bias played in Mr. Cardwell's reviews was a retaliation of Mr. Cardwell's legally protected complaints.

246.    Mr. Reid told Mr. Cardwell that if Mr. Cardwell "let the past be the past," the Firm would be prepared to offer Mr. Cardwell unprecedented opportunities "unlike anything that ha[d] ever been done." Here, Mr. Reid had made it clear that he had enormous influence in

decision-making processes related to Mr. Cardwell's staffing, assessments, and the Firm's conclusions of those assessments. Mr. Reid was increasingly communicating Davis Polk's ultimatum to Mr. Cardwell: Mr. Cardwell could either have a career or he could seek the truth and a lawful response to his employer's illegal actions.  Davis Polk would not allow Mr. Cardwell to do both.

247.    Mr. Cardwell reasonably and essentially asked how the Davis Polk leaders most responsible for a coordinated and strategic disregard of the law and equitable systems had miraculously reinvented themselves into the solutions of problems they actively created and maintained.[37]

248.    Specifically, Mr. Cardwell explained to Mr. Reid it would be difficult to have confidence in a plan going forward because Mr. Reid and the Firm were refusing to (i) tell Mr. Cardwell how the "ball was dropped" over the last six months and who "dropped the ball," (ii) arrange a meeting with Mr. Cardwell and Mr. Bick, the head of M&A, to discuss what went wrong, or (iii) allow Mr. Cardwell to review his performance reviews.

**iv. Explicit Threats to Mr. Cardwell's Career to Halt Racial Complaints and Protect Defendants.**

249.    Mr. Reid told Mr. Cardwell that if "this continues" and if Mr. Cardwell did not simply drop whatever mistakes the M&A partners and the Firm made in the past and move forward, Mr. Cardwell would be "out of the game" and "off the field." Indeed, Mr. Reid's comments revealed that not only could the Firm take Mr. Cardwell "out of the game" and "off the field" (with an adverse employment action), but certain defendants had already taken steps to

---

[37] Aa further explained below, the same Davis Polk partners and leaders that were connected to Mr. Cardwell's discrimination and retaliation experiences from 2015 through 2018, among other unlawful interactions, were the persons who were the primary decision-makers in Davis Polk's decision to terminate Mr. Cardwell's employment.

create the appearance of a legitimate, non-discriminatory reason for past and future unlawful

actions—namely Mr. Bick's and Ms. Hudson's 2016 sham performance review. Relatedly, and

more directly, Mr. Reid's comments revealed that if Mr. Cardwell didn't stop flagging and

requesting that the Firm address racial discrimination that Mr. Cardwell was experiencing at

Davis Polk, Mr. Reid and the other defendants would exert his and their enormous influence not

just over Mr. Cardwell's staffing but Mr. Cardwell's employment status and career.

250.    The meeting ended shortly after Mr. Reid made such threats to Mr. Cardwell and

with Mr. Reid emphatically insisting that Mr. Cardwell take a few days, or as much time as Mr.

Cardwell needed, to think things over. Mr. Cardwell responded by informing Mr. Reid that Mr.

Cardwell wasn't sure what he was supposed to think over. Mr. Cardwell then explained that he

had never rejected any assignments or been a distraction to anyone at the Firm.  Critically, both

Mr. Reid and Mr. Kreynin accepted, without objection, Mr. Cardwell's description of when and

how Mr. Cardwell accepted assignments.[38] Mr. Cardwell then explained that if the Firm assigned

him work—any work—Mr. Cardwell would do the work and conduct himself with the same

professionalism that he had always displayed at the Firm. Mr. Reid ended the meeting by

repeating his statement that Mr. Cardwell should take some time and just think about things,

noting that they could have a follow-up conversation in a few days.

251.    Mr. Reid's message that if Mr. Cardwell did not "drop" his inquiries into

"whatever mistakes the Firm made in the past and move forward, [he] would be 'out of the

game' and 'off the field'" was clear in its intent to halt Mr. Cardwell's complaints and

reasonable search for answers. Mr. Reid's message was *per se* retaliation, as it was delivered to

chill and halt Mr. Cardwell's protected activity.

---

[38] According to comments made by Mr. Reid and Mr. Kreynin during the meeting, Mr. Cardwell's performance
reviews described Mr. Cardwell as engaged, hardworking, and enthusiastic.

252.    All of Mr. Reid's comments, including Mr. Reid's retaliatory threat, were made in front of and was observed by Mr. Kreynin.

253.    Mr. Reid's (among other defendants') actions in connection with Mr. Cardwell's March 29, 2017 meeting are consistent with and reflects such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

254.    At no point during Mr. Cardwell's March 29, 2017 meeting did Mr. Reid or Mr. Kreynin state or conclude that Mr. Cardwell's quality of work was a reason, let alone the reason, why the Firm stopped staffing Mr. Cardwell on deals or giving him assignments. At no point during Mr. Cardwell's March 29, 2017 meeting did Mr. Reid or Mr. Kreynin state or conclude that Mr. Cardwell's performance reviews indicated that he was "behind" his peers or that his performance was inferior to his peers at Davis Polk.

255.    Immediately after the meeting, as Mr. Kreynin and Mr. Cardwell were walking back to their offices, Mr. Kreynin told Mr. Cardwell that he had no idea Mr. Cardwell wasn't receiving any assignments. Having worked with Mr. Cardwell and being intimately familiar with Mr. Cardwell's performance reviews, Mr. Kreynin knew that there was no legitimate reason for the Firm's M&A staffing leaders to not have staffed Mr. Cardwell on deals and assignments. Mr. Kreynin ended the brief conversation by telling Mr. Cardwell that had he known that Mr. Cardwell wasn't being assigned work, Mr. Kreynin would have made sure Mr. Cardwell was staffed on his matters.

256.    Two days later, on March 31, 2017, Mr. Cardwell emailed Mr. Reid and accepted Mr. Reid's offer to "take as much time as [Mr. Cardwell] need[ed]" to regroup: Mr. Cardwell requested to use his unused vacation time, which totaled four weeks. Mr. Reid approved the

request the same day. Prior to this incident, Mr. Cardwell had never requested to take four consecutive weeks off.

257.    Mr. Cardwell returned to the Firm on May 2, 2017. When Mr. Cardwell returned, the Firm did not have a concrete plan in place (or communicate such plan) to staff Mr. Cardwell on deals or address the issues discussed in the March 29, 2017 meeting with Mr. Reid.

258.    Mr. Bick and Mr. Cardwell met on May 2, 2017. Instead of telling Mr. Cardwell that Mr. Cardwell would be staffed in a manner that was consistent with the Firm's normal weekly work form request/capacity system (or why such system was sufficient for similarly situated non-Black associates but not Mr. Cardwell), Mr. Bick told Mr. Cardwell that he was going to "walk the halls and talk to partners to see what *tasks* [Mr. Cardwell] could be staffed on." (emphasis added). Unlike Mr. Cardwell, Davis Polk's similarly situated non-Black associates were staffed on deals and matters without Mr. Bick having to "walk the halls and talk to partners."

259.    Though Mr. Reid, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Davis Polk had all of April 2016 to ensure that Mr. Cardwell would be staffed in a manner that was consistent with the Firm's normal weekly work form request/capacity system, such parties departed from the Firm's normal staffing process because of Mr. Cardwell's race, his race-related discrimination complaints, and Defendants' unlawful actions.

260.    Despite being Mr. Cardwell's so-called "Career Advisor," and despite the gross gaps that M&A partners had created in Mr. Cardwell's billable hours and resume, Mr. Bick also told Mr. Cardwell that no one at the Firm was going to "actively monitor" Mr. Cardwell's hours. For the reasons noted in this Complaint, Mr. Bick's statement is evidence of discriminatory and retaliatory treatment, as it does not make sense for law firms and their practice group leaders to

tell associates that they will not actively monitor associates' hours. Such a practice, especially in the case of Mr. Bick and Mr. Cardwell, Mr. Bick's Firm-assigned mentee, would undermine the basic incentive structure of a profitable, sustainable, non-discriminatory law firm and practice group.

261.    At no point during Mr. Cardwell's May 2, 2017 meeting with Mr. Bick did Mr. Bick state or suggest that Mr. Cardwell's prior work performance was inferior to his peers or below the Firm's standards. At no point during Mr. Cardwell's May 2, 2017 meeting with Mr. Bick did Mr. Bick state or suggest that Mr. Cardwell's prior assignment history was related to Mr. Cardwell's prior performance.

262.    About fifty-five days after Mr. Reid first acknowledged that Mr. Cardwell's workload needed to be "fixed," the Firm, on May 3, 2017, finally staffed Mr. Cardwell on his first assignment. The Firm staffed Mr. Cardwell on a legal research memo that could have been completed by a law student summer associate (i.e., a non-lawyer) who had little substantive corporate experience or knowledge. Louis Goldberg, an M&A partner, was the partner who oversaw the legal research memo. At the time, Mr. Goldberg told Mr. Cardwell that the assignment was not particularly time sensitive and that he did not need to see a first draft of the memo for another two or three weeks.

263.    On or about May 19, 2017, Mr. Bick informed Mr. Cardwell that the Firm was not going to staff Mr. Cardwell on another assignment until the legal research assignment was completed. Mr. Cardwell informed Mr. Bick that the memo was not an assignment that required 100% of his capacity and that Mr. Goldberg set a deadline for the next stage of the draft that was still a few days away. Mr. Cardwell also told Mr. Bick, "*You do understand that this is the first time anyone has told me that I wouldn't receive another assignment until this first one was*

*finished? And that since no one is ever staffed on a one-on-one basis, I had no way of knowing that until this conversation?*" Mr. Bick's immediate response was, "*Well, I'm sorry you didn't ask the right questions.*" Consistent with his prior actions, Mr. Bick's insult was entirely at odds with the Firm's policies and practices and directly reflects the discriminatory attitude Mr. Bick had toward Mr. Cardwell.

264.     Mr. Bick's (among other defendants') actions in connection with Mr. Cardwell's May 19, 2017 meeting are consistent with and reflects such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

265.     All of Mr. Cardwell's billable hours in May 2017 related to the legal research memo.

266.     On May 22, 2017, just a few days after meeting with Mr. Bick, and in direct connection to Mr. Bick's behavior and the environment Mr. Bick had created for Mr. Cardwell, Mr. Cardwell informed Mr. Goldberg that he was feeling ill and that his sickness was caused by experiences that he was having at the Firm. As a follow-up to a conversation about discrimination that Mr. Goldberg had previously shared with Mr. Cardwell, Mr. Cardwell emailed the following to Mr. Goldberg:

> "*[Mr. Goldberg] [a]pologies for my delay in checking-in with you. Quite some time ago, you shared a story about your [family member] and certain improper factors…. Though I'm sure you had your own way of processing that experience, it appeared to me that the experience involved unnecessary insults and a feeling that made you sick to your stomach.*

> *Last week, I thought about that story as I thought more about my own story and experience here at [Davis Polk] (in addition to other similarly situated workers at [Davis Polk]), and I became ill. Though I'm still feeling and navigating the effects, I expect to return to the office tomorrow. Upon my return, I will complete the write-up as discussed and asap. I think that it will be in final form within 1 or 2 quick turnarounds. Regards, [Mr. Cardwell]"*

267.    In response to Mr. Cardwell's email, Mr. Goldberg scheduled a May 23, 2017 meeting for himself, Davis Polk's Executive Director, and Mr. Cardwell. The three of them met on May 23, 2017.

268.    During the meeting on May 23, 2017, Mr. Goldberg told Mr. Cardwell that Mr. Goldberg didn't know that Mr. Cardwell had requested to work with him on Mr. Cardwell's weekly workload request/capacity form. Mr. Goldberg also told Mr. Cardwell that Mr. Goldberg didn't know the degree to which Mr. Cardwell was currently staffed on other projects or hadn't previously been staffed on other projects. Regarding the legal research assignment, Mr. Goldberg told Mr. Cardwell "this isn't a test" to see if Mr. Cardwell should be staffed on more or different types of assignments.

269.    During the meeting on May 23, 2017, and like Mr. Goldberg, Davis Polk's Executive Director claimed that she wasn't fully aware of how Mr. Cardwell had been previously staffed and that Mr. Reid and Mr. Bick hadn't yet brought her up to speed. Mr. Cardwell told Davis Polk's Executive Director that, without any reasonable justification, the people responsible for staffing him did not staff Mr. Cardwell on any assignments.

270.    This May 23, 2017 incident is the eighth time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

271.    Davis Polk's Executive Director asked Mr. Cardwell who were the persons who were primarily responsible for staffing him. Mr. Cardwell told Davis Polk's Executive Director and Mr. Goldberg that Mr. Reid, Mr. Bick, Mr. Birnbaum, and Mr. Wolfe were responsible for staffing Mr. Cardwell. Mr. Cardwell asked Davis Polk's Executive Director to talk to those individuals, to investigate his staffing history and experience at the Firm, and to assess whether Mr. Cardwell's experience was in anyway normal. Davis Polk's Executive Director suggested that she would reach out to some or all the partners that Mr. Cardwell mentioned.

272.    Notably, (i) the trigger for the meeting (i.e., Mr. Cardwell's May 22, 2017 email to Mr. Goldberg describing disparate treatment, harassment, and a hostile environment), (ii) Davis Polk's Executive Director's involvement in the meeting (which was not requested by Mr. Cardwell and is consistent with Davis Polk's Executive Director's role in addressing both race-related issues at the Firm[39] and official discrimination complaints), and (iii) Davis Polk's Executive Director's suggestion to follow-up on Mr. Cardwell's request for an investigation all indicate that Davis Polk's Executive Director and Davis Polk understood that Mr. Cardwell had made a complaint due to discrimination on the basis of his race, harassment, and/or a hostile environment.

273.    Davis Polk's Executive Director never followed-up with Mr. Cardwell or had a subsequent conversation with Mr. Cardwell about his staffing history, performance, or experience at Davis Polk. Davis Polk's refusal or failure to investigate (in addition to their

---

[39] As a reminder, on May 8, 2015, Mr. Cardwell sent an email to Davis Polk's Executive Director and flagged a racially discriminatory "inter-office," personally-experienced pattern.

decision not to communicate with Mr. Cardwell about his specific request for an investigation into his staffing history and experience) were violations of the Firm's discrimination policies and a retaliation of Mr. Cardwell's legally protected complaints.

274.    Notably, however, there is evidence that someone at Davis Polk had determined that Mr. Bick's treatment of Mr. Cardwell and the environment that he had created for Mr. Cardwell constituted unlawful, adverse employment actions, as Mr. Bick was demoted and replaced as practice group leader of the Firm's M&A group shortly after Mr. Cardwell had asked Davis Polk's Executive Director and Mr. Goldberg to follow-up with Mr. Reid and Mr. Bick and investigate Mr. Cardwell's staffing history, performance, or experience at Davis Polk.

***Mr. Cardwell Continues to Demand Equal Treatment and Files an EEOC Complaint.***

275.    On May 24, 2017, Davis Polk received notice that Mr. Cardwell had engaged Outten & Golden LLP as his legal counsel. It was not until Mr. Cardwell's counsel informed Davis Polk of that fact (i.e., that Mr. Cardwell had engaged counsel) did the Firm assign Mr. Cardwell to his first M&A deal in over eight months. For an M&A associate to not be staffed on an M&A deal for such a long period of time (let alone without explanation), during a time period in which the market is relatively healthy for M&A deal work, in a practice group whose core revenue and advancement decisions are inextricably linked to M&A deals, constitutes diminished responsibilities.

276.    Davis Polk and certain defendants' refusal to not staff Mr. Cardwell on a M&A deal for the periods of time and manner described in this Complaint constitutes both an adverse employment action and a hostile work environment.

277.    After effectively experiencing radio silence with Davis Polk's M&A attorneys for months—beginning at the end of March 2017 and continuing throughout the rest of the year—

Mr. Cardwell's experience at the Firm continued[40] to be marked by a series of interactions where Davis Polk partners treated Mr. Cardwell as if they were strategically trying to frustrate him or get him to assume blame for things that were not incorrect, his fault, or under his control.

278.   On June 21, 2017, Mr. Cardwell informed the Firm, in an email, that he had experienced some health complications as a result of the Firm's treatment of Mr. Cardwell.

279.   On July 5, 2017, Mr. Brass replaced Mr. Wolfe as a staffing coordinator for the M&A group.[41]

280.   On August 3, 2017, Mr. Cardwell filed Mr. Cardwell's August 2017 EEOC Filing and noted, among other things, that "the Firm has discriminated against [Mr. Cardwell] because of [Mr. Cardwell's] race and has retaliated against [Mr. Cardwell] because [Mr. Cardwell has] actively raised awareness and concerns regarding issues of racial bias and disparate outcomes."[42]

281.   On December 5, 2017, Davis Polk filed an Answer and Position Statement with the NYSDHR in response to Mr. Cardwell's August 2017 EEOC Filing ("Davis Polk's NYSDHR Answer and Position Statement"). Davis Polk's NYSDHR Answer and Position Statement detailed and confirmed additional discrimination and retaliation against Mr. Cardwell, as their response included a number of intentionally false mischaracterizations that was triggered by Mr. Cardwell's August 2017 EEOC Filing.

**The Final, Sham Face-to-Face "Performance Review."**

---

[40] Mr. Cardwell experienced similar interactions on certain matters in 2016.

[41] On July 5, 2017, Mr. Birnbaum emailed the Firm's entire corporate department to notify the Firm's corporate associates and partners that Mr. Brass and Mr. Birnbaum were the staffing coordinators for the Firms M&A group. Mr. Birnbaum's email stated that, "Going forward, requests for senior and mid-level M&A associates staffing should be directed to [Mr. Brass] or me [i.e., Mr. Birnbaum]. [Davis Polk Junior Staffing Coordinator #1] will continue to oversee staffing for junior associates in the M&A group."

[42] Mr. Cardwell's August 2017 EEOC Filing, specifically named, among others, Mr. Reid, Mr. Bick, Mr. Brass, Mr. Birnbaum, and Mr. Butler in connection with various descriptions of unlawful violations and actions.

282.    After Davis Polk received notice that the relevant authorities had granted Mr. Cardwell an extension (i.e., to January 10, 2018) to file a rebuttal to Davis Polk's NYSDHR Answer and Position Statement, Davis Polk strategically rescheduled and pushed back Mr. Cardwell's annual face-to-face review to January 11, 2018.

283.    On January 11, 2018, just one day after Mr. Cardwell's attorneys submitted on his behalf a written rebuttal to Davis Polk's NYSDHR Answer and Position Statement, two M&A partners ("DAVIS POLK PARTNER #3" and "DAVIS POLK PARTNER #4") conducted Mr. Cardwell's annual face-to-face review and gave Mr. Cardwell a negative performance evaluation.

284.    Both the Firm's conspicuous rescheduling of Mr. Cardwell's January meeting and the related negative performance review are consistent with and reflects Defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

285.    Davis Polk's negative performance evaluation was contrary to real-time feedback Davis Polk partners, including DAVIS POLK PARTNER #3, had given Mr. Cardwell during the periods covered in the annual face-to-face review (covering work done in 2017). In the face-to-face review, DAVIS POLK PARTNER #3 and DAVIS POLK PARTNER #4 told Mr. Cardwell that staffing him would be "challenging."

286.    During the face-to-face review, Mr. Cardwell explicitly asked DAVIS POLK PARTNER #3 and DAVIS POLK PARTNER #4 if they could provide Mr. Cardwell with any examples where Mr. Cardwell received, either in real-time or prior to the face-to-face review, any of the criticisms about his work performance that DAVIS POLK PARTNER #3 and DAVIS POLK PARTNER #4 had communicated during the face-to-face review. Mr. Cardwell also

asked if DAVIS POLK PARTNER #3 and DAVIS POLK PARTNER #4 could provide any examples that show that someone at the Firm had communicated to Mr. Cardwell that the quality of his work was poor or that Mr. Cardwell was behind in his class. On both questions, DAVIS POLK PARTNER #3 and DAVIS POLK PARTNER #4 failed to provide Mr. Cardwell with any examples.

287.    DAVIS POLK PARTNER #3—whom Mr. Cardwell worked directly with during the applicable review period and who stated in the aftermath of Mr. Cardwell not receiving any assignments for months that he'd "love to make [Mr. Cardwell] a better lawyer as best he could"—acknowledged that neither him nor any other M&A partner had explicitly given Mr. Cardwell negative feedback while working on any assignments that were a part of the review period.

288.    Mr. Cardwell explained that he had previously and repeatedly (i) requested real-time feedback, including constructive criticism, (ii) informed (or made it clear to) Davis Polk partners that he wasn't the type of person to become combative or "shrink" or give less effort upon receiving criticism, and (iii) explained that it was problematic that Mr. Cardwell was once again in a face-to-face review with Davis Polk M&A partners where the real-time feedback he received was radically different than the feedback in the face-to-face review.

289.    Mr. Cardwell stated during the face-to-face review that, prior to the review and while working on the discussed assignments, Mr. Cardwell never explicitly or implicitly received the type of negative feedback that he was receiving during the face-to-face review. Mr. Cardwell explained during the face-to-face review that it was a theme of his career and other Black attorneys at Davis Polk that Davis Polk attorneys would say one thing while working with him and other Black attorneys and then say another thing in his and other Black attorneys'

performance reviews. Additionally, Mr. Cardwell explicitly talked about the role that implicit

bias, among other forms of bias, played in the timing and accuracy of the feedback that Mr.

Cardwell had received.

290.     This January 11, 2018 incident is the ninth time that Mr. Cardwell actively

flagged personally experienced discrimination and actively sought help from Davis Polk and

persons with sufficient authority to address it.

291.     Mr. Cardwell explained that he and other Black attorneys at the Firm had flagged

this discrepancy multiple times throughout his career and that he hoped DAVIS POLK

PARTNER #3 and DAVIS POLK PARTNER #4 understood why such a discrepancy had led

him to ask for specific examples where such negative feedback was indeed communicated to Mr.

Cardwell prior to the face-to-face review.

292.     The meeting ended with a back and forth exchange that was prompted by DAVIS

POLK PARTNER #4 asking Mr. Cardwell if he had any questions. Mr. Cardwell asked DAVIS

POLK PARTNER #3 and DAVIS POLK PARTNER #4, "What is the Firm's approach to

staffing me?" [DAVIS POLK PARTNER #4] replied by saying that "the Firm was trying to

figure out what [Mr. Cardwell] could be staffed on." Mr. Cardwell replied with something along

the lines of, "Are you saying the Firm isn't able to staff me any matters?"

DAVIS POLK PARTNER #3 responded by saying that Mr. Cardwell may need to be "flexible"

in terms of the type of matters he would be staffed on going forward. DAVIS POLK PARTNER

#4] asked Mr. Cardwell what Mr. Cardwell would like to be staffed on so that he could go back

to the M&A "staffing partners" to explain what Mr. Cardwell's expectations were around

staffing.

293.    Mr. Cardwell stated that the Firm only needed to staff him "appropriately" and that the M&A staffing partners shouldn't think that staffing Mr. Cardwell appropriately means that the Firm should or must staff Mr. Cardwell based Mr. Cardwell's so-called "expectations." The meeting ended shortly after Mr. Cardwell informed DAVIS POLK PARTNER #3 and DAVIS POLK PARTNER #4 that he wasn't currently staffed on any assignments, that he had always worked on whatever the Firm staffed him on, and that going forward he would also work on any assignment the Firm chose to staff him on.

294.    This January 11, 2018 meeting was the very first time anyone at Davis Polk had ever expressed to Mr. Cardwell that someone at the Firm believed or had concluded (i) that Mr. Cardwell appeared to be or was "behind" associates of the same class year or (ii) that the quality of his work was supposedly poor.

295.    Mr. Cardwell was not treated the same as similarly situated non-Black associates. Between the meeting on January 11, 2018 and February 8, 2018, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Brass, and Davis Polk did not staff Mr. Cardwell on any matters. Once again, Defendants retaliated against Mr. Cardwell for his legally protected, race-based discrimination complaints, including the complaints that he filed in the rebuttal that he filed on January 10, 2018 and communicated on January 11, 2018. Here, as in other cases described in this Complaint, Mr. Cardwell's protected activity was followed closely by discriminatory treatment and an adverse employment action.

**v. Defendants Terminate Mr. Cardwell's Employment.**

296.    On February 8, 2018, Mr. Cardwell met with two M&A Davis Polk partners to discuss the Firm's purported inability to staff Mr. Cardwell. During the meeting, the M&A partners informed Mr. Cardwell that Davis Polk would be terminating Mr. Cardwell's

employment and that such decision resulted from "talk[ing] to Mr. Bick," "gather[ing] [Mr. Cardwell's] reviews," and collectively deciding "as a group" that staffing Mr. Cardwell was "not a situation that's workable." After a brief exchange, the M&A partners described not simply who had the power and authority to terminate Mr. Cardwell's employment, but *the* Davis Polk partners in the "group" who had indeed decided to terminate Mr. Cardwell's employment. Ultimately, the M&A partners explained, by naming various individual partners, that Mr. Reid, Mr. Bick, Mr. Brass and the other M&A staffing partners (i.e., Mr. Birnbaum and Mr. Wolfe) had collectively decided to terminate Mr. Cardwell's employment.

297.    Notably, Davis Polk allowed the same partners who Mr. Cardwell (i) accused of engaging in racial discrimination and retaliation or (ii) directly implicated in Mr. Cardwell's August 2017 EEOC Filing and other complaints (as noted in this Complaint) to have exclusive or enormous influence over the Firm's decision to terminate Mr. Cardwell's employment.

298.    In the course of this conversation, one of the M&A partners stated that Mr. Cardwell's departure was "not a good situation" and that what was happening to Mr. Cardwell at Davis Polk was not good for Mr. Cardwell.  The same M&A partner stated: "*We have a thousand percent confidence in your integrity…There's no issue with your integrity or behavior*."

299.    Later in the conversation, the same M&A partner added: "*We don't feel good about this. Okay? I wish this had been a much better experience and that it wasn't ending this way. […] That's my personal view. You probably are very unhappy. […] If I were you, I would be furious and unhappy and bitter. […] You may highly resent any number of us, including me.*"

300.    Less than a year after Mr. Reid threatened that Mr. Cardwell would be "out the game" and "off the field" if Mr. Cardwell didn't seize making legally protected complaints, about six months after Mr. Cardwell filed Mr. Cardwell's August 2017 EEOC Filing, and less

than a month after Mr. Cardwell met with two Davis Polk M&A partners and expressly flagged personally experienced discrimination in response to comments such partners made on January 11, 2018, the same two Davis Polk M&A partners from the January 2018 meeting told Mr. Cardwell Davis Polk was terminating his employment.

301.    Defendants' termination of Mr. Cardwell's employment constitutes an adverse employment action.

302.    Defendants' terminated Mr. Cardwell's employment (i) in whole or in part because of Mr. Cardwell's race and (ii) because of the legally protected race-related discrimination complaints that Mr. Cardwell complained about at Davis Polk. During the relevant periods, Defendants' did not similarly staff, isolate, or otherwise discriminate against, harass, or terminate the employment of similarly situated non-Black associates.

303.    Defendants' discriminatory and retaliatory actions in connection with Mr. Cardwell's February 8, 2018 meeting and related termination are consistent with and reflects Defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

304.    On April 27, 2018, Mr. Cardwell filed a supplemental charge of discrimination against Davis Polk and noted (i) that Davis Polk continued to discriminate and retaliate against Mr. Cardwell and (ii) that Davis Polk's treatment of Mr. Cardwell was consistent with its treatment of other Black attorneys and workers who have worked or currently worked at Davis Polk.

305.    Mr. Cardwell's final date of employment at the Firm was August 10, 2018.

306.    Despite Defendants' pretextual attempts to falsify and shift their conclusions about Mr. Cardwell's performance, staffing, and termination, Mr. Cardwell was fully qualified to

be a Davis Polk associate (and, especially, a Davis Polk M&A associate) throughout his entire

tenure at Davis Polk.

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations About Mr. Cardwell's Performance** | **May 2015:**<br><br>"*Generally positive – organized, high quality work, good attention to detail, hard worker.*"<br><br>- Davis Polk and Credit partner Jason Kyrwood's summary of (i) Mr. Cardwell's performance during the first six months at Davis Polk (i.e., his first rotation, which was with the Firm's Credit group) and (ii) Mr. Cardwell's Sept. 2014 – May 2015 Performance Reviews | **December 5, 2017:**<br><br>"*Cardwell exhibited performance problems during his first rotation (September 2014 – April 2015)*<br><br>*Cardwell's first rotation was with the Credit group of the Davis Polk Corporate Department....Senior lawyers in the Credit group who worked with Cardwell noted performance issues that were troubling…*<br><br>*The Firm delivered this feedback to Cardwell at the end of his Credit rotation....*"<br><br>"*Similar problems emerged during the next rotation, in the M&A group…echoing the themes that had emerged during Cardwell's first rotation in the Credit group.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations About Mr. Reid's and the Firm's Interest in Mr. Cardwell and Mr. Cardwell's Future at the Firm** | **December 1, 2015:**<br><br>"*Rising/Shining Star at Davis Polk*"<br><br>- Mr. Reid's description of Mr. Cardwell during Mr. Cardwell's third rotation (i.e., in the Capital Markets group) and after Mr. Cardwell had completed a rotation in the Firm's M&A group | **December 5, 2017:**<br><br>"*And the Firm's senior leadership—including the Managing Partner—expended considerable time and effort to coach Cardwell and give him time, and multiple opportunities, to improve.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED,<br>DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S<br>PERFORMANCE, STAFFING, AND TERMINATION | | |
| --- | --- | --- |
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations About Mr. Cardwell's hours, assignments, and staffing** | **March 2, 2016** (paraphrasing):<br><br>"*I'm sorry we couldn't get you more work during your capital markets rotation. There was an unusual slowdown in the capital markets industry. Our Capital Markets group was slow as a result and many of the Firm's junior capital markets associates had periods where they were just sitting around.*"<br><br>- Capital Markets partner Byron Rooney to Mr. Cardwell about why Mr. Cardwell wasn't staffed on more capital markets assignments during his rotation in capital markets (i.e., from Oct. 2015 – April 2016)<br><br>**From a 2017 Publication**:<br><br>"*Capital markets is a large part of our firm…. In the beginning of 2016, the signs ahead were challenging.*"<br><br>- Mr. Reid, as quoted in an *American Lawyer* article that described a decrease in capital markets work at Davis Polk by writing, "Although demand increased in restructuring, it declined in [Davis Polk's] capital markets practice." | **December 5, 2017:**<br><br>"*Rather, Cardwell's hours already had been uneven throughout 2016, as noted above. This unevenness reflected what partners in both Capital Markets and M&A had explained: Cardwell's record of poor performance made it difficult to staff him.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about Mr. Cardwell's Staffing** | **August 4, 2016:**<br><br>"*Not at all.*"<br><br><br><br>- Davis Polk Junior Staffing Coordinator #1's response when Mr. Cardwell asked, "[H]as anyone made a decision to limit my involvement to certain types of deals and matters"? | **December 5, 2017:**<br><br>"*By [the summer of 2016], the substantive problems with Cardwell's work…were significant and were translating into increasingly serious problems staffing him on a consistent basis.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |
| **Shifting Conclusions and Explanations about Mr. Cardwell's Staffing** | **September 8, 2016** (paraphrasing):<br><br>"*I asked you if you'd accept a non-M&A assignment because the Credit group is slammed with work and because you and the other non-Credit attorneys I asked have experience working in the Credit group.*"<br><br>- Davis Polk Junior Staffing Coordinator #2 to Mr. Cardwell | **December 5, 2017:**<br><br>"*By [the summer of 2016], the substantive problems with Cardwell's work…were significant and were translating into increasingly serious problems staffing him on a consistent basis.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about How Mr. Cardwell Should Have Been Staffed in M&A in 2016 and Should be Staffed in M&A 2017** | **December 20, 2016** (paraphrasing)**:**<br><br>"*It would be good if you were the lead attorney at the beginning of a deal that involved a stock purchase agreement.*"<br><br>- M&A partner Mr. Kreynin to Mr. Cardwell during an annual face-to-face review in which Mr. Kreynin (i) had summarized all the performance reviews attorneys had submitted for Mr. Cardwell for the months covering Sept. 2015 - Sept. 2016 and (ii) was asserting that Mr. Cardwell was ready to be given more responsibilities and more complex work, not less | **December 5, 2017:**<br><br>"*By the fall of 2016, reviews of Cardwell's performance reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role….*<br><br>*By this point, and consistent with Davis Polk's practices, Cardwell's poor performance over three rotations and at the beginning of his post-rotation assignment to the M&A group was such that it would have warranted giving Cardwell a message that it was time for him to look for another job.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about Mr. Cardwell's performance, hours, assignments, and staffing** | **March 9, 2017:**<br><br>"*It's not your fault. It needs to get fixed.*"<br><br>- Mr. Reid's unsolicited comment, in the presence of Ms. Katz, to Mr. Cardwell about Mr. Cardwell's hours, assignments, and staffing issues with Davis Polk's M&A group | **December 5, 2017:**<br><br>"…*Cardwell's experience at the Firm is solely and directly a result of his own performance….*<br><br>*Cardwell's assignments and hours were driven by his record of poor performance across three separate groups within the Davis Polk Corporate Department….*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about the Type and Frequency of Feedback that Mr. Cardwell Received** | **March 21, 2017:**<br><br>"*It is both a policy and practice of the Firm to prohibit associates from reviewing their performance reviews.*"<br><br>- Renee DeSantis's (i.e., the Director of Associate Development) initial and subsequent responses to Mr. Cardwell after Mr. Cardwell asked if he could review his performance reviews before meeting with Mr. Reid and Mr. Kreynin and after Mr. Cardwell stated, "At the moment, I'll be the only person in the meeting who hasn't had a chance to review my file and I think the conversation will be much more productive if I have that opportunity and can start the meeting with a shared understanding as the other participants." | **December 5, 2017:**<br><br>"*And despite meaningful, real-time feedback over the course of years, together with repeated interventions and second chances, Cardwell's performance has failed to improve.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about Mr. Cardwell's performance, hours, assignments, and staffing** | **March 29, 2017:** <br><br> *"We dropped the ball…. The lack of work was due to human error and people making natural mistakes in a large organization."* | **December 5, 2017:** <br><br> *"…Cardwell's experience at the Firm is solely and directly a result of his own performance….* <br><br> *Cardwell's assignments and hours were driven by his record of poor performance across three separate groups within the Davis Polk Corporate Department…."* |
| | - Mr. Reid, in the presence of Mr. Kreynin, to Mr. Cardwell in a meeting in which Mr. Cardwell stated that there was no permissible reason that could explain how five different individuals all dropped the ball and made the same so-called mistake in staffing over the course of five to six months | - Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about Mr. Cardwell's performance, hours, assignments, and staffing** | **March 29, 2017:**<br><br>"*Had I known you weren't getting work, I would have tried to get you on something with me sooner.*"<br><br>- Mr. Kreynin* to Mr. Cardwell immediately after the two of them had a meeting with Mr. Reid<br><br><br>* As a reminder, Mr. Kreynin is the M&A partner who worked with Mr. Cardwell in 2016, conducted a face-to-face annual review with Mr. Cardwell in December 2016, and had summarized all the performance reviews attorneys had submitted for Mr. Cardwell for the months covering Sept. 2015 - Sept. 2016 | **December 5, 2017:**<br><br>"*By [the summer of 2016], the substantive problems with Cardwell's work…were significant and were translating into increasingly serious problems staffing him on a consistent basis.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement<br><br><br>**January 11, 2018:**<br><br>"*It's challenging getting [you] work and the firm [is] trying to figure out what [you] could be staffed on.*"<br><br>- A Davis Polk M&A partner to Mr. Cardwell the day after Mr. Cardwell filed (with Davis Polk's knowledge) more complaints with the EEOC (i.e., Mr. Cardwell's official written rebuttal to Davis Polk's EEOC Answer and Position Statement) |

| | | |
|---|---|---|
| **TO COVER UP WHAT HAPPENED,**<br>**DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S**<br>**PERFORMANCE, STAFFING, AND TERMINATION** | | |
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about Mr. Cardwell's performance, hours, assignments, and staffing** | **May 23, 2017:**<br><br>"*I haven't been in the loop enough to comment specifically on how you've been previously staffed and [Mr. Reid] and [Mr. Bick] haven't brought me up to speed yet.*"<br><br>- Sharon Crane,\* a director at Davis Polk, to Mr. Cardwell after the Firm's M&A partners went months without staffing Mr. Cardwell on any assignments<br><br>\*Davis Polk has described Ms. Crane as "one of the leaders of the Firm's diversity and inclusion efforts," a description that is consistent with the fact that Ms. Crane often participated in formal and informal conversations about Black attorneys' experiences and professional development at Davis Polk.<br><br>Among the Firm's Black associates in particular, many Black Davis Polk attorneys viewed Ms. Crane as Davis Polk's most senior and influential executive director, as it was widely understood within the Firm that the Firm's management committee, and Mr. Reid in particular, utilized Ms. Crane to understand and address Black associates' experiences, grievances, and requests. | **December 5, 2017:**<br><br>"*By the fall of 2016, reviews of Cardwell's performance reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role….*<br><br>*By this point, and consistent with Davis Polk's practices, Cardwell's poor performance over three rotations and at the beginning of his post-rotation assignment to the M&A group was such that it would have warranted giving Cardwell a message that it was time for him to look for another job.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| TO COVER UP WHAT HAPPENED,<br>DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S<br>PERFORMANCE, STAFFING, AND TERMINATION | | |
| --- | --- | --- |
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about Mr. Cardwell's performance, hours, assignments, and staffing** | **May 23, 2017:**<br><br>"*I don't know the degree to which you are staffed on other projects or that you weren't staffed on other projects…I'd love to work with you.*"<br><br>"*You'd be surprised how not uncommon it is for people to fall into a black hole at this firm…. There is elitism at this firm.*"<br><br>- An M&A partner to Mr. Cardwell after the Firm's M&A partners went months without staffing Mr. Cardwell on any assignments | **January 11, 2018:**<br><br>"*It's challenging getting you work and the firm is trying to figure out what you could be staffed on.*"<br><br>- The same Davis Polk M&A partner (in the left column) to Mr. Cardwell the day after Mr. Cardwell filed (with Davis Polk's knowledge) more complaints with the EEOC (i.e., Mr. Cardwell's official written rebuttal to Davis Polk's EEOC Answer and Position Statement) |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about Mr. Cardwell's performance** | **May/June 2017** (paraphrasing)**:**<br><br>*"This is spot on and 100% correct and exactly what I wanted to know. Ok, now let's think about how we can turn this into the type of memo I've produced for clients in the past. Everyone has their way of doing these things, but I like to do mine a certain way."*<br><br>- An M&A partner to Mr. Cardwell after Mr. Cardwell turned in a memo and before the M&A partner instructed Mr. Cardwell to (i) turn the research into an article (ii) follow an outline the M&A partner created<br><br>*"This is good. I did some more thinking and I changed my mind about how I want to approach this."*<br><br>- The same M&A partner to Mr. Cardwell after Mr. Cardwell submitted a draft of the article according to the M&A partner's instructions and outline | **December 5, 2017:**<br><br>*"The draft was unusable…. [The M&A partner] had to conduct the research himself and redraft the entire article."*<br><br>- Davis Polk (with substantial assistance from the Individual Defendants), without any supporting documents or emails to demonstrate that that was the applicable M&A's position at the time, in its EEOC Answer and Position Statement regarding the research and memo referenced in the column to the left |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| **Shifting Conclusions and Explanations about Mr. Cardwell's performance, hours, assignments, and staffing** | **February 8, 2018:** <br><br> *"There's no issue with your integrity or behavior…. If I were you, I would be furious and unhappy and bitter."* <br><br> - An M&A partner to Mr. Cardwell as he explained that Mr. Reid, Mr. Bick, Mr. Brass and the other M&A staffing partners (i.e., Mr. Birnbaum and Mr. Wolfe) collectively decided to terminate Mr. Cardwell's employment | **December 5, 2017:** <br><br> *"To the contrary, the Firm at all times has had legitimate, nondiscriminatory, and non-pretextual reasons for staffing Cardwell as it has, including meeting the needs of its clients and the Firm."* <br><br> - Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

307.     As a direct result of the unlawful actions described in this Complaint, including but not limited to Defendants' termination of Mr. Cardwell's employment, Mr. Cardwell has suffered (and continues to suffer) damages, including, but not limited to, substantial economic losses, lost professional opportunities and career prospects, humiliation, impairment to his name and reputation, embarrassment, emotional and physical distress, and mental anguish.

308.     Defendants are not incompetent or inexperienced. Defendants, some of whom have 20-plus-years of legal experience, are elite strategists and practitioners. Individually and collectively, Defendants have achieved world class status for their ability to create and coordinate rules, legal teams, and documentation across a variety of complex human, legal, and institutional relationships.

309.     To this point, it is common for M&A attorneys, as well as partners on firms'

management committees, to be viewed as the "quarterbacks" of the world's most complex legal

deals and institutions.

310.     The facts reveal that, between 2015 and 2018, Defendants quarterbacked and

permitted a playbook that marginalized, discriminated against, and retaliated (among other

unlawful acts) against Mr. Cardwell, the only Black male associate in Davis Polk's 2014

associate class.

311.     Defendants' knew and understood that they had a duty to maintain a workplace

free of discrimination, hostility, harassment, and retaliation. Relatedly, Davis Polk is not "just

another cold law firm" where its leaders simply did not know better—where its leaders weren't

routinely asked by its non-White associates to prevent bias from impacting such associates'

training, assessments, and advancement.[43] In order to create the appearance that Davis Polk's

termination of Mr. Cardwell's employment was timely, inevitable, and legal, Defendants

dismantled the "foundation" that it specifically designed with Black associates in mind,

including its discrimination-prevention and mitigation mechanisms.

---

[43] On June 15, 2016, Davis Polk's Asian/South Asian/Middle Eastern group—which is one of Davis Polk's largest racial/ethnic affinity groups—took their concerns about racial bias at Davis Polk directly to Mr. Reid in the form of a 12-page PowerPoint presentation that they presented to Mr. Reid. Davis Polk's Asian/South Asian/Middle Eastern group's presentation emphasized how (i) "unfair stereotypes" often prevent Asian attorneys from being perceived favorably in highly subjective assessments and (ii) "implicit bias and exclusion from informal support networks and client development are common and affect the ways in which Asians are evaluated and considered for promotion."

Further, Davis Polk's Asian/South Asian/Middle Eastern group and its presentation encouraged Mr. Reid and Davis Polk's Management Committee to take the lead on improving partners' commitment to (i) mentoring and developing Davis Polk's non-White associates; (ii) implementing implicit bias and unconscious stereotypes trainings for all personnel (noting that it could be a part of trainings for first-year associates or as standalone seminars); (iii) implementing trainings for "partners, counsel and senior associates on managing a diverse associate pool and the specific challenges and barriers to internal advancement"; and (iv) tracking and incorporating the number of hours attorneys spend on diversity initiatives in performance reviews and rewarding such attorneys for such hours.

312.     In whole or in part because of Mr. Cardwell's race, Davis Polk and the other defendants committed themselves to in an illegal playbook and "game" until Mr. Cardwell was "off the field."

## COUNT ONE

### Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964

313.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

314.     By the acts and practices detailed in this Complaint, Davis Polk discriminated against Mr. Cardwell on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").

315.     As a result of Davis Polk' discriminatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

316.     Davis Polk intentionally discriminated against Mr. Cardwell with malice or reckless indifference to Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT TWO

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964

317.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

318.     By the acts and practices described in this Complaint, Davis Polk retaliated against Mr. Cardwell in the conditions of his employment for his opposition to unlawful employment practices in violation of Title VII.

319.     As a result of Davis Polk' retaliatory acts and practices, Mr. Cardwell suffered and continues to suffer harm and substantial economic losses, including but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

320.     Davis Polk intentionally retaliated against Mr. Cardwell with malice or reckless indifference to Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT THREE

### Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964

321.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

322.     By the acts and practices described in this Complaint, Davis Polk created a hostile work environment in violation of Title VII.

323.     As a result of Davis Polk's unlawful actions, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT FOUR

### Racial Discrimination in Violation of 42 U.S.C. § 1981(a)

324.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

325.     By the acts and practices detailed in this Complaint, Defendants intentionally discriminated against Mr. Cardwell on the basis of his race in violation of 42 U.S.C § 1981(a) ("Section 1981").

326.     As a result of Defendants' discriminatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

327.     Defendants intentionally discriminated against Mr. Cardwell with malice or reckless indifference to Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

328.     By the acts and practices detailed in this Complaint, Mr. Reid, Mr. Bick, Ms. Hudson, Mr. Birnbaum, Mr. Brass, Mr. Wolfe, and Mr. Butler aided and abetted one another and the Firm in their intentional discrimination against Mr. Cardwell.

329.     As a result of Mr. Reid's, Mr. Bick's, Ms. Hudson's, Mr. Birnbaum's, Mr. Brass's, Mr. Wolfe's, and Mr. Butler's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT FIVE

### Retaliation in Violation of 42 U.S.C. § 1981(a)

330.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

331.     By the acts and practices detailed in this Complaint, Defendants intentionally retaliated against Mr. Cardwell for his opposition to unlawful discriminatory practices in violation of Section 1981.

332.     As a result of Defendants' retaliatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

333.     Defendants intentionally retaliated against Mr. Cardwell with malice or reckless indifference to Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

334.     By the acts and practices detailed in this Complaint, Mr. Reid, Mr. Bick, Ms. Hudson, Mr. Birnbaum, Mr. Brass, Mr. Wolfe, and Mr. Butler aided and abetted one another and the Firm in their intentional retaliation against Mr. Cardwell.

335.     As a result of D Mr. Reid's, Mr. Bick's, Ms. Hudson's, Mr. Birnbaum's, Mr. Brass's, Mr. Wolfe's, and Mr. Butler's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT SIX

### Hostile Work Environment in Violation of 42 U.S.C. § 1981(a)

336.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

337.     By the acts and practices detailed in this Complaint, Defendants intentionally created a hostile work environment in violation of Section 1981.

338.    As a result of Defendants' unlawful actions, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

339.    By the acts and practices detailed in this Complaint, Mr. Reid, Mr. Bick, Ms. Hudson, Mr. Birnbaum, Mr. Brass, Mr. Wolfe, and Mr. Butler aided and abetted one another and the Firm in their creation of a hostile work environment and the subjugation of Mr. Cardwell to that environment.

340.    As a result of Mr. Reid's, Mr. Bick's, Ms. Hudson's, Mr. Birnbaum's, Mr. Brass's, Mr. Wolfe's, and Mr. Butler's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT SEVEN

**Racial Discrimination in Violation of the New York State Human Rights Law § 296(1)(a)**

341.    Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

342.    By the acts and practices described in this Complaint, Defendants discriminated against Mr. Cardwell on the basis of his race in violation of the New York State Human Rights Law ("NYSHRL") § 296(1)(a).

343.    As a result of Defendants' discriminatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited

to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

344.    Defendants' discriminatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Mr. Cardwell and Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT EIGHT

### Aiding and Abetting Racial Discrimination in Violation of the

### New York State Human Rights Law § 296(6)

345.    Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

346.    By the acts and practices described in this Complaint, Defendants discriminated against Mr. Cardwell on the basis of his race in violation of NYSHRL § 296(1)(a).

347.    By the acts and practices described in this Complaint, Mr. Reid, Mr. Bick, Ms. Hudson, Mr. Birnbaum, Mr. Wolfe, and Mr. Butler aided and abetted violations of NYSHRL § 296(1)(a), which were violations of NYSHRL § 296(6).

348.    As a result of Mr. Reid's, Mr. Bick's, Ms. Hudson's, Mr. Birnbaum's, Mr. Wolfe's, and Mr. Butler's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT NINE

### Retaliation in Violation of the New York State Human Rights Law § 296(1)(e)

349.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

350.     By the acts and practices described in this Complaint, Defendants retaliated against Mr. Cardwell for his opposition to unlawful discriminatory practices in violation of NYSHRL § 296(1)(e).

351.     As a result of Defendants' retaliatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

352.     Defendants' retaliatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Mr. Cardwell and Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT TEN

### Aiding and Abetting Retaliation in Violation of the
### New York State Human Rights Law § 296(6)

353.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

354.     By the acts and practices described in this Complaint, Defendants retaliated against Mr. Cardwell for his opposition to unlawful discriminatory practices in violation of NYSHRL § 296(1)(e).

355.     By the acts and practices described in this Complaint, Mr. Reid, Mr. Bick, Ms. Hudson, Mr. Birnbaum, Mr. Wolfe, and Mr. Butler aided and abetted violations of NYSHRL § 296(1)(e), which were violations of NYSHRL § 296(6).

356.     As a result of Mr. Reid's, Mr. Bick's, Ms. Hudson's, Mr. Birnbaum's, Mr. Wolfe's, and Mr. Butler's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT ELEVEN

**Harassment in Violation of the New York State Human Rights Law § 296(1)(h)**

357.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

358.     By the acts and practices described in this Complaint, Defendants harassed Mr. Cardwell for his opposition to unlawful discriminatory practices in violation of NYSHRL § 296(1)(h).

359.     As a result of Defendants' harassment, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

360.     Defendants' harassment was willful, wantonly negligent or reckless, amounting to a conscious disregard of Mr. Cardwell and Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT TWELVE

**Aiding and Abetting Harassment in Violation of the**

**New York State Human Rights Law § 296(6)**

361. Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

362. By the acts and practices described in this Complaint, Defendants harassed Mr. Cardwell for his opposition to unlawful discriminatory practices in violation of NYSHRL § 296(1)(h).

363. By the acts and practices described in this Complaint, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr. Butler aided and abetted violations of NYSHRL § 296(1)(h), which were violations of NYSHRL § 296(6).

364. As a result of Mr. Bick's, Mr. Birnbaum's, Mr. Wolfe's, and Mr. Butler's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT THIRTEEN

**Racial Discrimination in Violation of the New York City Administrative Code § 8-107(1)(a)**

365. Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

366. By the acts and practices described in this Complaint, Defendants discriminated against Mr. Cardwell in the conditions of his employment on the basis of his race in violation of the New York City Administrative Code ("NYCHRL") § 8-107(1)(a).

367. As a result of Defendants' discriminatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited

to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

368.     Defendants' discriminatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Mr. Cardwell and Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT FOURTEEN

**Aiding and Abetting Racial Discrimination in Violation of the**

**New York City Administrative Code § 8-107(6)**

369.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

370.     By the acts and practices described in this Complaint, Defendants discriminated against Mr. Cardwell in the conditions of his employment on the basis of his race in violation of NYCHRL § 8-107(1)(a).

371.     By the acts and practices described in this Complaint, Mr. Reid, Mr. Bick, Ms. Hudson, Mr. Birnbaum, Mr. Wolfe, and Mr. Butler aided and abetted violations of NYCHRL § 8-107(1)(a), which were violations of NYCHRL § 8-107(6).

372.     As a result of Mr. Reid's, Mr. Bick's, Ms. Hudson's, Mr. Birnbaum's, Mr. Wolfe's, and Mr. Butler's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT FIFTEEN

**Retaliation in Violation of the New York City Administrative Code § 8-107(7)**

373.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

374.     By the acts and practices described in this Complaint, Defendants retaliated against Mr. Cardwell in the conditions of his employment for opposing unlawful discriminatory practices in violation of New York City Administrative Code § 8-107(7).

375.     As a result of Defendants' retaliatory acts and practices, Mr. Cardwell suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

**COUNT SIXTEEN**

**Aiding and Abetting Retaliation in Violation of the**

**New York City Administrative Code 8-107(6)**

376.     Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

377.     By the acts and practices described in this Complaint, Defendants retaliated against Mr. Cardwell in the conditions of his employment for opposing unlawful discriminatory practices in violation of New York City Administrative Code § 8-107(7).

378.     By the acts and practices described in this Complaint, Mr. Reid, Mr. Bick, Ms. Hudson, Mr. Birnbaum, Mr. Wolfe, and Mr. Butler aided and abetted violations of NYCHRL § 8-107(7), which were violations of NYCHRL § 8-107(6).

379.     As a result of Mr. Reid's, Mr. Bick's, Ms. Hudson's, Mr. Birnbaum's, Mr. Wolfe's, and Mr. Butler's aiding and abetting, Mr. Cardwell suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other

monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## **PRAYER FOR RELIEF**

380.     WHEREFORE, Mr. Cardwell respectfully requests that this Court enter a Judgment in favor of Mr. Cardwell against Defendants, providing for the following relief:

     a.  Declaring that the acts and practices complained of herein are unlawful and violate Title VII; Section 1981; New York State Human Rights Law §§ 296(1)(a), 296(1)(e), 296(1)(h), and 296(6); and the New York City Administrative Code §§ 8-107(1)(a), 8-107(7), and 8-107(6);

     b.  Directing Defendants to pay compensatory damages for back and front pay, bonuses and other monetary benefits to which Mr. Cardwell is entitled;

     c.  Directing Defendants to pay compensatory damages for reputational damage, emotional harm, psychological harm and any physical impairments resulting from Defendants' acts and practices;

     d.  Directing Defendants to pay punitive damages for engaging in discriminatory acts or practices with malice or reckless indifference to Mr. Cardwell's rights;

     e.  Directing Defendants to pay punitive damages for their willful, wantonly negligent or reckless disregard of Mr. Cardwell's rights;

     f.  Directing Defendants to pay punitive damages to the extent allowable by law, including Title VII; Section 1981; New York State Human Rights Law §§ 296(1)(a), 296(1)(e), 296(1)(h), and 296(6); and New York City Administrative Code §§ 8-107(1)(a), 8-107(7), and 8-107(6);

g.  Costs and disbursements incurred in connection with this action, including, without limitation, reasonable attorneys' fees, expenses, and costs, to the extent allowable by law;

h.  Pre-judgment and post-judgment interest, as provided by law; and

i.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

381.  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mr. Cardwell demands a trial by jury in this action.

Dated: New York, New York
March 2, 2020

By: David Jeffries, Esq.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-601-2770
Djeffries@Jeffrieslaw.nyc

Martin E. Restituyo, Esq.
Law Offices of Martin Restituyo, P.C.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-729-7900
Fax: 212-729-7490
restituyo@restituyolaw.com

*Attorneys for Plaintiff*

## **VERIFICATION**

KALOMA CARDWELL being duly sworn, deposes and says:

I am the plaintiff in this action and as such I am fully familiar with the facts alleged herein. I have read the foregoing Amended Verified Complaint and know the contents thereof. The same are true to my knowledge, except as to those matters to be alleged upon information and belief, and as to those matters I believe then to be true.

By: Kaloma Cardwell

Sworn before me this
**02** day of March 2020

Notary Public.

MOHAMMED N HOSSAIN
NOTARY PUBLIC, STATE OF NEW YORK
01HO6356839
QUALIFIED IN QUEENS COUNTY
COMMISSION EXPIRES APRIL 10, 20___