**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KALOMA CARDWELL,**<br><br>                              Plaintiff,<br><br>**v.**<br><br>**DAVIS POLK & WARDWELL LLP, Thomas Reid, John Bick, William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John Butler,**<br><br>                              Defendants. | **1:19-cv-10256-GHW** |

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**</u>
<u>**PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

Dated: June 4, 2020

David Jeffries, Esq.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-601-2770
djeffries@jeffrieslaw.nyc

Martin E. Restituyo, Esq.
Law Offices of Martin Restituyo, P.C.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-729-7900
Fax: 212-729-7490
restituyo@restituyolaw.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ……………………...….……………………...……………1

STATEMENT OF FACTS ……………………....…………………………………………2

    A.   Davis Polk Created an Antidiscrimination Mechanism
        to Address Race-Based Disparate Treatment and Outcomes …..………….…..……2

    B.   Cardwell Made a Series of Legally Protected
        Complaints, Which Led Defendants to Take Him "Out of the
        Game"…………………………………………………………………........4

    C.   Reid Threatens Cardwell, Cardwell Files Complaints, Defendants
        Terminate Him, and Cardwell Commences This Action …………………….……7

LEGAL STANDARD……..………………………………………………………....10

ARGUMENT……………………………………………………………………….…..10

    A.   All Claims Relate Back to the Original Pleading …………………………….......10

    B.   All Federal, State, and City Claims Are Timely …………….......….....………….11

        1.   The Timing of Certain Performance Reviews Are
            Disputed and Not Clear……………………………………........….…….11

        2.   Pre-October 2016 Title VII Claims Are Based on
            Continuing Violations ………..……………………………………...12

            i.   Davis Polk's Discriminatory Performance
                Review Policy……………………………….…….....................12

            ii.   Bick Ensures a Discriminatory Mechanism Tracks
                Cardwell's Employment…………………….……….….…..……13

        3.   State and City Claims Were Tolled Until the NYSDHR's
            Determination ………………………..…….….………………..……16

        4.   Equitable Tolling Applies and Makes All Allegations
            Timely…...................................................................................18

    C.   All Claims Against the Davis Polk Partners Are Proper ………..…..…………18

        1.   All Federal Discrimination Claims Were Properly Pleaded ……………18

            i.   Demotion by Eliminating Billable Hours, and Significantly
                Diminished Material Responsibilities ……..……….…....................22

            ii.   Other Indices Unique to a Particular Situation…...….…...…...…23

        2.   All Federal Retaliation Claims Were Properly Pleaded …..…………....24

        3.   All Defendants Had Knowledge of Cardwell's Complaints ……………26

            i.   Reid, Bick, and Chudd Had Knowledge of Cardwell's

ii

2015 Complaints…………………………………......................26

ii.  Reid, Bick, and Hudson Had Knowledge of Cardwell's
2015 and 2016 Complaints ……….………….…..……….….……..27

iii.  Wolfe, Birnbaum, and Brass Had Knowledge
of Cardwell's Complaints …………….…..……….………….……...29

iv.  Butler Had Knowledge of Cardwell's
2015 and 2016 Complaints ………….………………………………29

v.  The Davis Polk Partners Also Had Knowledge
of the Administrative Filings ……………………………………...30

D.  Defendants are Liable for Creating a Hostile Work
Environment and Harassment ……………….……….……………...…………….30

1.  Title VII's Exhaustion Requirements Were Satisfied ..………….………...…31

2.  Title VII Allegations Were Properly Pleaded ….........…………....…....32

E.  Parallel NYSHRL and NYCHRL Claims Survive
Defendants' MTD .………….……….……….….……….……………..………33

F.  Defendants Are Liable for Aiding and Abetting
Under NYSHRL and NYCHRL …………….………………..……….……...34

G.  The Untimely and Improper Request to Strike
Should Be Denied …………….……….……….……….……………………35

CONCLUSION .…………….……….……….….……………………….………35

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Almendral v. New York State Office of Mental Health,*
    743 F.2d 963 (2d Cir. 1984)…………………..……………………………………31

*Alexander v. The Turner Corp.*,
    2001 WL 11062 (S.D.N.Y. Jan. 4, 2001)…..……………….…………………….……….…7

*Alonzo v. Chase Manhattan Bank, N.A.*,
    25 F. Supp. 2d 455 (S.D.N.Y. 1998)………..……………….……………………………..30

*Alvi v. Aqua at Lakeshore E. LLC,*
    2013 WL 3785622 (E.D.N.Y. July 18, 2013)…..……………………………………17

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S.Ct. 1937 (2009) ……..…………….………………….……*passim*

*Atencio v. U.S. Postal Service,*
    2015 WL 7308664 (S.D.N.Y. Nov. 19, 2015)…..……………….…………….……..…..14, 17

*Bacchus v. N.Y. City Dep't of Educ.*,
    137 F. Supp. 3d 214 (E.D.N.Y. 2015)…..……………….………………..…..……..…..33

*Baez v. Anne Fontaine USA, Inc.*,
    2017 WL 57858 (S.D.N.Y. Jan. 5, 2017)…..……………….…………………………..14

*Bailey v. Pataki,*
    2010 WL 234995 (S.D.N.Y. Jan. 19, 2010)…..……………….………………………35

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 127 S.Ct. 1955 (2007)……..…..………….…………………………..*passim*

*Branch v. Guilderland Cent. School Dist.*,
    239 F. Supp. 2d 242 (N.D.N.Y. 2003)…..……………….……………………....15, 22

*Burch v. Pioneer Credit Recovery, Inc.,*
    551 F.3d 122 (2d Cir. 2008)…………....…..…………….…………………………..9

*Colliton v. Cravath, Swaine & Moore LLP,*
    2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008)……..…..……………….…………………9

*Cornwell v. Robinson,*
    23 F.3d 694 (2d. Cir. 1994)…..…..……………….……………………........................11

*Daniels v. City of N.Y.*,
  2019 WL 251511 (S.D.N.Y. Jan. 17, 2019)…..…………………………………………..20

*Daniels v. Wesley Gardens Corp.*,
  2011 WL 1598962 (W.D.N.Y. Apr. 27, 2011)....…………….…………………….……34

*Davila v. Lang*,
  343 F. Supp. 3d 254 (S.D.N.Y. 2018)....………………………………………….........32

*DeWitt v. Lieberman*,
  48 F. Supp. 2d 280 (S.D.N.Y. 1999)…….....……………………………………………34

*Dunson v. Tri-Maintenance Contractors*,
  171 F. Supp. 2d 103 (E.D.N.Y. 2001)…......………………………………………….....21

*Fargas v. Cincinnati Mach., LLC*,
  2013 WL 6508863 (S.D.N.Y. Dec. 12, 2013)…..…………….……………………....10, 11

*Fitzgerald v. Henderson*,
  251 F.3d 345 (2d Cir. 2001)……………....…...……………………………………....2, 13

*Galabya v. New York City Bd. of Educ.*,
  202 F.3d 636 (2d Cir. 2000)……………....…...……………………………………….....21

*Gillman v. Inner City Broad. Corp.*,
  2009 WL 3003244 (S.D.N.Y. Sept. 18, 2009)…..……………….……………………....31

*Goodwine v. City of N.Y.*,
  2016 WL 3017398 (S.D.N.Y. May 23, 2016)…..…………….………………………....16

*Gorman-Bakos v. Cornell Coop. Extension*,
  252 F.3d 545 (2d Cir. 2001)……………....…...………………………………….....24, 25

*Gorzynski v. JetBlue Airways Corp.*,
  596 F.3d 93 (2d Cir. 2010) …….…………....…...…………………………………….....25

*Graham v. Long Island R.R.*,
  230 F.3d 34 (2d Cir. 2000) …….…………....…...………………………………….....20

*Green v. Jacob Co. Watches, Inc.*,
  248 F. Supp. 3d 458 (S.D.N.Y. 2017)…......………………………………………….....30

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009)……………....…...……………….…………………….....9

*Hayden v. Paterson*,
   594 F.3d 150 (2d Cir. 2010)…………......………….………………………………..9

*Henry v. N.Y.C. Health & Hosp. Corp.*,
   18 F. Supp. 3d 396 (S.D.N.Y. 2014)………......……………………………………...20

*Hoffkins v. Monroe-2 Orleans Boces*,
   2007 WL 1288210 (W.D.N.Y. May 2, 2007)...………………………………………...18

*Jacobs v. SUNY at Buffalo Sch. of Med.*,
   204 F. Supp. 2d 586 (W.D.N.Y. 2002)…....……………………………………….....18

*Jianjun Chen v. 2425 Broadway Chao Restaurant, LLC*,
   2017 WL 2600051 (S.D.N.Y. June 15, 2017)…………….………………………...35

*Johnson v. Priceline.com, Inc.*,
   711 F.3d 271 (2d Cir. 2013)…………...………….………….…………………….....8

*Jones v. Onondaga Cty. Res. Recovery Agency*,
   2014 WL 2480170 (N.D.N.Y. June 3, 2014)...…………………………………….....25

*Jute v. Hamilton Sundstrand Corp.*,
   420 F.3d 166 (2d Cir. 2005) …………...………….………….……………………...7

*Kessler v. Westchester County Dep't of Soc. Servs.*,
   461 F.3d 199 (2d Cir. 2006)…………...………….……………………………….....26

*Kimball v. Vill. of Painted Post*,
   737 F. App'x 564 (2d Cir. 2018)………......….………….……………………...16, 17

*La Grande v. Decrescente Distr. Co.*,
   370 Fed. App'x 206 (2d Cir. 2010)……....……….………….………………………..5

*Legg v. Ulster Cnty.*,
   820 F.3d 67 (2d Cir. 2016)…………...………….………….………………….....12

*Littlejohn v. City of New York*,
   795 F.3d 297 (2d Cir. 2015)…………...………….………….………………….....19

*Long v. Frank*,
   22 F.3d 54 (2d Cir. 1994)…………...………….………….…………………………18

*Lopez v. Flight Servs. & Sys., Inc.*,
   881 F. Supp. 2d 431 (W.D.N.Y. 2012)…....…….………….……………………...33

*Maher v. Town of Stony Point*,
   2018 WL 4759786 (S.D.N.Y. Sept. 29, 2018)...…………………………………………...…25

*Malena v. Victoria's Secret Direct, LLC*,
   886 F. Supp. 2d 349 (S.D.N.Y. 2012)…....……………………………………………...…33

*Mathirampuzha v. Potter*,
   548 F.3d 70 (2d Cir. 2008)……………...…………………………………………………...30

*McPhee v. N.Y.C. Health and Hosps. Corp.*,
   2008 WL 3930089 (S.D.N.Y. Aug. 25, 2008)...……………….…………………………...11

*Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*,
   14 F. Supp. 3d 191 (S.D.N.Y. 2014)………....………………...………...…………...…...10, 11

*Mosier v. State Univ. of New York*,
   2020 WL 42830 (E.D.N.Y. Jan. 2, 2020)…...….…………….…...…………………….…...34

*Nguedi v. Fed. Reserve Bank of N.Y.*,
   2017 WL 5991757 (S.D.N.Y. Dec. 1, 2017)…....……………………………...…...19, 20, 32

*Nungesser v. Columbia University*,
   244 F. Supp. 3d 345 (2017)………………..…..…………….…………………………...…...4

*Patane v. Clark*,
   508 F.3d 106 (2d Cir. 2007)……………...….…………………………………………...…...26

*Perez v. Int'l Bhd. Of Teamsters, AFL-CIO*,
   2002 WL 31027580 (S.D.N.Y. Sept. 11, 2002)… ………………………………………...17

*Redd v. N.Y. Div. of Parole*,
   678 F.3d 166 (2d Cir. 2012)……………...…...…….…………………………………...…...9

*Reed v. A.W. Lawrence & Co., Inc.*,
   95 F.3d 1170 (2d Cir. 1996)……………...….………………………………………...…...30

*Richardson v. New York State Dep't of Corr. Serv.*,
   180 F.3d 426 (2d Cir. 1999)……………..…………………………………………………...20

*Rogers v. Fashion Inst. of Tech.*,
   2016 WL 889590 (S.D.N.Y. Feb. 26, 2016)…...……………………………………………...20

*Rosen v. Thornburgh*,
   928 F.2d 528 (2d Cir. 1991)..……………...…..……………………………………...…...27

*Russell v. New York Univ.*,

2017 WL 3049534 (S.D.N.Y. July 17, 2017)......……………….…………………………….…..19

*Sanders v. N.Y. City Human Res. Admin.*,
361 F.3d 749 (2d Cir. 2004)……………...….…………………………………………….…..20

*Schade v. Coty, Inc.*,
2001 WL 709258 (S.D.N.Y. June 25, 2001)…..………………….………………………….…..17

*Shomo v. City of New York*,
579 F.3d 176 (2d Cir. 2009)……………...….…………………………………………….…..12

*Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*,
915 F. Supp. 2d 498 (S.D.N.Y. 2013)…...….……………………………………………….…..23

*Sotomayor v. City of New York*,
862 F. Supp. 2d 226 (E.D.N.Y. 2012)…...….…………….……………….……………...12, 16

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)……………….….…………………………………………….…..10

*Summa v. Hofstra Univ.*,
708 F.3d 115 (2d Cir. 2013)), *aff'd*,
611 F. App'x 28 (2d Cir. 2015)……………………………...….………………………….…..25

*Taft v. Agric. Bank of China Ltd.*,
2016 WL 2766661 (S.D.N.Y. May 12, 2016)……………….….………………………….…..25

*Tainsky v. Clarins USA, Inc.*,
363 F. Supp. 2d 578 (S.D.N.Y. 2005)…...….…………………………………………….…..19

*Tolton v. Day*,
2020 WL 2542129 (D.D.C. May 19, 2020)…...….……….……….……….………...13, 24

*Valerio v. City of New York*,
2020 WL 353749 (S.D.N.Y. Jan. 21, 2020)…...….………………………………………….…..33

*White v. White Rose Food*,
128 F.3d 110 (2d Cir. 1997)……………...….………………………………………….…..10

*Wilson v. Fairchild Republic*,
143 F.3d 733 (2d Cir. 1998)……………...….………………………………………….…..10

*Zoulas v. New York City Dep't of Educ.*,
400 F. Supp. 3d 25 (S.D.N.Y. 2019)……...….……….……….……………………..21, 24, 25

**Statutes, Rules, and Other Authorities**

9 N.Y.C.R.R. § 465.4……...…..……………….…………….…………………………..…17

29 C.F.R. § 1614.106(d)……...…..……………….…………….…………………………..…17

42 U.S.C. § 1981……...…..…………….……./…………….…………….…………...…10, 19, 24

Fed. R. Civ. P. 12 ……...…..……….…………….…………….…………………………...…8, 35

Fed. R. Civ. P. 15(c)(2)……...…..……………….…………….…………………………...…10

N.Y. Exec. L. § 296(6)……...…..……………….…………….…………………………....…21, 33

N.Y.C. Admin. Code § 8-107(6)……...…..……………….…………………………………..…33

Second Circuit L.R. § 32.1.1(a)……...…..……………….…………….…………...…16

Wright & Miller Federal Practice and Procedure, § 1382……...…..…………………………...…35

Plaintiff Kaloma Cardwell ("Cardwell") respectfully submits this memorandum of law against Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm") and named defendants Thomas Reid, John Bick, William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John Butler (the "Davis Polk Partners," and, together with Davis Polk, "Defendants") in opposition to Defendants' memorandum of law in support of their partial motion to dismiss (the "Motion to Dismiss" or "MTD") the amended complaint (the "Amended Complaint" or "AC").

For the reasons stated herein, Cardwell requests that the Court maintain all claims alleged in the AC against Defendants and deny Davis Polk's partial Motion to Dismiss in its entirety.

## PRELIMINARY STATEMENT

Davis Polk and the Davis Polk Partners do not believe their actions are constrained by the law or reality.  Between 2012 and 2016, Davis Polk and its leaders implemented a series of anti-discriminatory policies and mechanisms designed to address the fact that non-White Davis Polk associates routinely experienced disparate treatment and outcomes in performance reviews, staffing, and formal and informal partner-associate interactions.  Yet, after Cardwell made a series of legally protected complaints to the Firm, in compliance with and in the spirit of those very policies, the leaders of Davis Polk coordinated an attack against Cardwell and his career.

Over time, Bick—who was demoted as head of the Firm's Corporate Department and M&A group, and removed from the Firm's Management Committee after Cardwell took legal action against the Firm—engaged in continuous and deliberate disregard of these stated antidiscriminatory policies in concert with other Davis Polk partners.  Despite their own policies, Defendants discriminated and retaliated against Cardwell for complaining about racial bias, refused to staff Cardwell, provided discriminatory performance reviews and then weaponized them

against him, threatening to take Cardwell "out of the game" unless he halted his legally protected activity, and ultimately terminated him upon his refusal to do so.

As a result of Defendants' conduct, and the irreparable damage done to Cardwell's career as a lawyer, Cardwell filed suit seeking the full protection of applicable federal, state, and city civil rights laws. That Defendants have declined to challenge virtually all claims as to Reid and Bick (*see, e.g.*, MTD at 2 n.1) while seeking dismissal of *all* claims as to Chudd, Hudson, Birnbaum, Brass, Wolfe, and Butler (the so-called "Additional Defendants") is telling and built on a hope that the Court will stretch what the law and common sense require. Thus, for the reasons set forth *infra*, Defendants' partial Motion to Dismiss should be denied.

## STATEMENT OF FACTS

### A. DAVIS POLK CREATED AN ANTIDISCRIMINATION MECHANISM TO ADDRESS RACE-BASED DISPARATE TREATMENT AND OUTCOMES

In direct response to incidents of racial discrimination at Davis Polk, and the harm to and shortening of Black associates' careers that resulted year after year, Davis Polk created a multi-pronged antidiscrimination mechanism, a series of formal[1] and informal[2] antidiscrimination policies and practices.  AC ¶¶ 39-41; *id.* ¶¶ 70-71 (where Reid refers to the "foundation" of the mechanism). In connection with its non-retaliation and investigation policies, Davis Polk created antidiscrimination policies and practices/mechanisms with respect to the following areas:

- **<u>Staffing</u>**: *Id.* ¶ 70 (noting the practice where Reid met with Bick three times each year to discuss how work was allocated to Black associates); *id.* ¶¶ 125-27 (noting that staffing coordinators and weekly workload capacity forms were Firm-created antidiscrimination mechanisms); *id.* ¶ 169 (noting the role computer programs played in helping staffing partners track and make staffing decisions based on less subjective, easier to manipulate factors).

---

[1] *See Fitzgerald v. Henderson*, 251 F.3d 345, 362 (2d Cir. 2001) (noting the district court erred in "[f]aulting [plaintiff] for failure to make a showing of formal policy—or of other matters that would similarly be beyond her personal knowledge—was incompatible with the court's denial of discovery").
[2] *See Fitzgerald*, 251 F.3d at 362 (the continuing violation theory may be used "where there is no formal policy").

- **Performance Reviews**: *Id.* ¶¶ 41, 77-79 (noting the policy where partners who summarize other partners' feedback must assess and, if needed, disregard biased and discriminatory feedback); 111-12 (noting "Summary Reviews" are Firm policies and governed by Firm policies); MTD at 4 (M&A partners are "assigned to deliver" annual reviews).

- **Partner Engagement**: *Id.* ¶ 70 (noting the Firm's "formalized mentoring program" and an informal but monitored policy related to Firm leaders being "connected" to certain associates); *id.* ¶ 216; MTD at 4 (stating that "Butler was an M&A partner *assigned* with Bick in 2017 as one of [Cardwell's] *career advisors*") (emphases added)).

- **Various Bias-Intervention Policies**: *Id.* ¶¶ 66, 78, 125, 129, 244, 311 n.43 (referencing policies that were created in connection with internal and external recommendations).

These antidiscrimination policies and mechanisms were not recommendations or suggestions—nor were they charity. They also were not concessions that partners could barter in exchange for Black associates keeping legally protected complaints to themselves. Such policies and mechanisms were a Firm-created response to White Davis Polk partners and associates who, like clockwork, "dropped the ball" with Black associates year after year. Such policies reflected and incorporated years of empirical studies and reports, many of which were (i) made directly to Davis Polk's partnership by internal and external experts, and (ii) designed to account for White Davis Polk partners' resistance to facts about bias within the Firm. *Id.* ¶ 80.

All Davis Polk partners were mandated to adhere to such policies and practices, especially those whose title (e.g., head of the corporate department) or role (e.g., staffing associates; summarizing performance reviews; participating in the Firm's Career Advisor program) inherently established such persons as Firm leaders with respect to Davis Polk's antidiscrimination policies.

## B. CARDWELL MADE A SERIES OF LEGALLY PROTECTED COMPLAINTS, WHICH LED DEFENDANTS TO "TAKE HIM OUT OF THE GAME"

Throughout the relevant period, and in accordance with stated Firm policies, Cardwell made a series of legally protected complaints regarding the biased treatment that he observed and received. In May 2015, while Cardwell was an M&A associate, he made a legally protected

complaint concerning disparate treatment that he experienced and observed during M&A group meetings.[3] AC ¶¶ 55-61. He made the complaint to the Davis Polk administrator most likely to understand that Cardwell was making a complaint about racial bias.[4] Such complaint was consistent with the Firm's "Non-Discrimination & Professional Conduct" policy, which "strongly recommends prompt reporting of **all perceived incidents** of discriminatory behavior," including by "[l]awyers who believe they have been **subjected to** such prohibited conduct or who believe that they have **witnessed** such prohibited conduct or any other behavior inappropriate to the workplace." Ex. 1, Policy Handbook at 35; *see also* AC ¶ 57 n.3.[5] Davis Polk's policies at the time noted that its "[Executive Director]," "practice group coordinator[s]" and "member[s] of the Firm's Management Committee" were leaders[6] with a responsibility to document, investigate, and discuss perceived incidents of discrimination or inappropriate behavior. Ex. 1 at 35.

As early as May 2015, Davis Polk and its Executor Director complied with the Firm's nondiscrimination and professional conduct policies and began documenting, investigating, and discussing Cardwell's complaints with administrators and various M&A partners, including Bick (who, again, served as a management committee member, the head of the Firm's Corporate Department, and the head of the practice group that was at the center of Cardwell's complaints).

In September 2015, Cardwell made another complaint, this time concerning the disparate treatment that he experienced and observed while working with certain M&A partners and associates. AC ¶¶ 66-67. Yet again, Davis Polk created an internal record and had subsequent

---

[3] At the time, Davis Polk and its partners were particularly sensitive to discrimination-related incidents, complaints, and retaliation. *See* AC ¶¶ 52-53 (noting a relevant Firm-wide discussion).

[4] *Id.* ¶ 306 at 111 (describing the director's formal and informal role at the Firm).

[5] *Id.* (noting associates can make reports by "discuss[ing] their concerns" with the Firm); *id.* ("[c]omplaints of inappropriate conduct will be investigated promptly"). That such complaints of "inappropriate conduct will be investigated promptly" amounts to a promise under the Firm's policies. *See, e.g.*, *Nungesser v. Columbia University*, 244 F. Supp. 3d 345 (2017) (Woods, J.) (actions that "may" be taken do not amount to a promise).

[6] Certainly, such persons were not the only individuals with such responsibilities, as the Policy Handbook does not state that complaints "must" be made to such persons.

4

discussions about such complaint. *Id.* ¶¶ 64, 67. In fact, Defendants' New York State Division of Human Rights ("NYSDHR") Brief confirms as much, stating that "contrary to Cardwell's assertion that there was *no 'follow[] up,'* the Committee *made note of the concern* for future professional development discussions." Ex. 2, NYSDHR Brief at 18-19 (emphases added).

As of December 2015, and despite making protected complaints to the Firm, Cardwell's performance reviews *accurately* concluded that Cardwell was on par with associates in his class.

In January 2016, Cardwell made a legally protected complaint to Reid concerning interpersonal and institutional discrimination that he had experienced at the Firm. *Id.* ¶¶ 76-77.[7] At the time, Cardwell was rotating through the Firm's capital markets group. From October 2015 through January 2016, Cardwell worked directly with Hudson more (and had billed more hours on matters involving Hudson) than any other Davis Polk capital markets partner.

Due to the mounting pressure of and discomfort surrounding Cardwell's 2015-2016 complaints, Bick—a Firm and M&A practice group leader with knowledge of such complaints— began to retaliate against Cardwell and deliberately disregard the Firm's antidiscrimination policies and mechanisms (as applied to Cardwell), including by manipulating the Firm's performance review process. The review process only allowed second-years like Cardwell to receive one face-to-face review during the Firm's ***end-of-year***, annual review cycle. Undeterred, Bick covertly disregarded set policies and practices so that he and other M&A partners could (over the next year) alter the terms of Cardwell's employment and, if necessary, manufacture a Firm-accepted conclusion that Cardwell was "behind."[8] *See, e.g.*, AC ¶ 231 (noting Reid's unprompted

---

[7] *See La Grande v. Decrescente Distr. Co.*, 370 Fed. App'x 206, 212 (2d Cir. 2010) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination. . . .").
[8] AC ¶ 294 (noting that it wasn't until January 11, 2018 that "anyone at Davis Polk had ever expressed to Cardwell . . . (i) that Cardwell appeared to be or was 'behind' . . . or (ii) that the quality of his work was supposedly poor").

March 2017 comments to Cardwell that his "prior and current workloads were low," "for reasons that were 'not [Cardwell's] fault,' . . . .").

Between 2015 and mid-2016, Bick orchestrated behind-the-scenes discriminatory policies and practices that governed Cardwell's employment at the Firm. Cardwell encountered one part of this discriminatory mechanism during the sham, face-to-face performance review that he received in June 2016, contrary to the Firm's policies for conducting such reviews.[9] *Id.* ¶¶ 97-109.

In connection with that review, Bick worked with Hudson, a non-M&A partner, to provide the one thing the Firm needed in order to continually violate (or cover that Bick and the Firm were violating) Cardwell's rights with impunity—a written performance review purporting to memorialize that Firm partners lawfully concluded that Cardwell was, in fact, "behind."[10]

In September 2016, "within days" of Cardwell being under the staffing control of M&A partners Wolfe and Birnbaum, Cardwell made a subsequent complaint to a non-M&A staffing coordinator related to certain White associates having more "experience" and "quality work" than Black associates of the same class year. *Id.* ¶¶ 157-63. Wolfe and Birnbaum were responsible for staffing such associates, *id.* ¶ 169 n.22, and thus, the complaint concerned how Wolfe and Birnbaum staffed mid-level M&A associates. In response to Cardwell's complaint, Wolfe and Birnbaum went the next eight months without staffing Cardwell on a ***single*** assignment.

In January 2017, Cardwell received an email informing him that Bick and Butler (also recipients of the email) had been assigned as his "Career Advisors" for "the duration of [his] time at the [F]irm." *Id.* ¶¶ 210-13. Cardwell replied, with Bick and Butler copied, making specific

---

[9] Bick knew that the deceptive nature of the review was contrary to the Firm's own policies and practices and would disadvantage Cardwell. Bick knew that the Firm's Professional Development team implemented specific practices around advance notice and that such notice was intended to benefit associates and their development.

[10] *Id.* ¶ 119 (alleging that "out of the eighteen . . . associates and partners . . . named in the performance reviews . . . provided to either the NYSDHR or Cardwell's attorneys at the time, Hudson . . . was the only person . . . to answer 'behind' when asked, 'Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class'?").

references to his September 2015, January 2016, and September 2016 complaints. *Id.* ¶¶ 214-15. After receiving the email, Butler went the next 567 days or thereabouts without having a ***single*** conversation with Cardwell about his career or Butler's role as his "Career Adviser."  *Id.* ¶ 216.

## C. REID THREATENS CARDWELL, CARDWELL FILES COMPLAINTS, DEFENDANTS TERMINATE, AND CARDWELL COMMENCES THIS ACTION

On August 3, 2017, within months of Reid threatening that Cardwell's employment and career would be over unless he stopped making legally protected complaints (*id.* ¶¶ 249-51, 300), and after it became clear that Bick was applying a discriminatory policy against Cardwell, Cardwell submitted a dual-filed EEOC charge (Ex. 3, the "EEOC Charge"). The EEOC Charge explicitly named Reid, Bick, Birnbaum, Butler, and Brass, while directly referencing Wolfe's behavior.  AC ¶ 280 n.42.  In its NYSDHR Brief, Davis Polk indicated that all parties understood Cardwell's allegations also implicated Wolfe, Hudson, and Chudd.[11]  Ex. 2.  The NYSDHR rebuttal that Cardwell submitted on January 10, 2018 (*id.* ¶¶ 281-83) specifically named Chudd, referenced Hudson's discriminatory and retaliatory role, and concluded with a request for targeted and comprehensive discovery.[12] Ex. 4, at pp. 4-5, 7. The Supplemental Charge referenced how Davis Polk's decision to terminate Cardwell was connected to a negative performance evaluation the Firm claimed was based on Chudd's and Hudson's reviews.[13] Ex. 5; *see also* AC ¶¶ 285-86.

Shortly after the Supplemental Charge, Davis Polk informed Cardwell, through their respective counsel, that it would soon terminate Cardwell if he refused to modify certain pending,

---

[11] "'Loose pleading' is permitted before the EEOC," *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d. Cir. 2005), and "the presence of counsel does not obviate the need for a . . . broad reading of EEOC charges," *Alexander v. The Turner Corp.*, 2001 WL 11062, at *4 (S.D.N.Y. Jan. 4, 2001).

[12]   The parties did not hear from the NYSDHR again in connection with the administrative filings between December 2017 and November 2019.  *See also* Ex. 6, Dec. 2019 NYSDHR Letter (acknowledging the same).

[13] Both the EEOC Charge and Supplemental Charge stated that "[t]his charge is not intended to be exhaustive, but it is representative of the treatment to which [Davis Polk] has subjected [Cardwell]." Ex. 3 ¶ 29; Ex. 5 ¶ 7.

legally protected claims. Cardwell rejected the retaliatory offer. Davis Polk terminated Cardwell on August 10, 2018—two months prior to the birth of Cardwell's first child. *Id.* ¶ 305.

The EEOC issued a dismissal and Notice of Right to Sue letter on August 6, 2019, to which Cardwell filed the federal complaint on November 4, 2019 (the "Federal Complaint"). On November 20, 2019, the NYSDHR indicated that it was "contemplating dismissing [the] complaint for administrative convenience," noting that "[t]he Division has been advised that [Cardwell] is pursuing federal remedies in court, in which forum all issues [sic] concerning the question of the discrimination charged can be resolved."[14]

On December 5, 2019, Davis Polk contacted the "the Commissioner, the Deputy Commissioner, and the General Counsel" of the NYSDHR, threatening to consider appealing the supposed "unlawful" decision. Ex. 6. On December 11, 2019, the NYSDHR informed Cardwell that Davis Polk "submitted a request to the [NYSDHR] to reopen this proceeding in order to vacate the Administrative Convenience Dismissal ["DAC"] issued by the Division," while noting that (i) "the Division did not issue any determination on this case until it issued" its prior DAC notices and (ii) "[p]rior to the issuance of the [DAC], the case was being investigated by the [NYSDHR]." Ultimately, the NYSDHR reaffirmed its DAC, "declining to reopen this matter." Ex. 7.

The AC was filed on March 2, 2020. On April 30, 2020, Defendants filed the MTD.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*,

---

[14]   Cardwell and his counsel did not learn until December 2019 that the EEOC sent an incorrect Right to Sue Notice. *Id.* ¶ 16. On December 9, 2019, the EEOC explained in a letter: "[T]he wrong closure document was issued due to a clerical error. The erroneous document indicated that the case was being closed because the EEOC has adopted the findings of the . . . agency that investigated this charge. Instead, the Notice of Right to Sue Letter should have stated that it was being issued at the request of the Charging Party." As a result, Cardwell filed his federal suit prior to the NYSDHR's determination or any particular findings.

711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937 (2009). *First*, the "court must accept as true all of the allegations contained in a complaint," disregarding "legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted (quoting *Iqbal*, 556 U.S. at 678). *Second*, a court determines if "the 'well-pleaded factual allegations,' assumed to be true,[15] 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Such determination is a "context-specific task that requires the . . . court to draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, accepting all facts alleged as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

Moreover, "[t]he Second Circuit has emphasized that, in the context of employment discrimination cases, courts should evaluate the facts holistically rather than 'view individual incidents in isolation' or in a 'piecemeal fashion.'" *Otoole v. Cty. of Orange*, 255 F. Supp. 3d 433, 441 (S.D.N.Y. 2017) (quoting *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012)).

## ARGUMENT

### A.  ALL CLAIMS RELATE BACK TO THE ORIGINAL PLEADING

An amended pleading "relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth

---

[15] Defendants assert that "courts are not required to 'accept as true' facts alleged in an amended pleading." MTD at 8. Yet Defendants' own cited authority holds that the relevant consideration (which does not apply to this case), is where a plaintiff "*blatantly* changes his statement of the facts to respond to [a] motion to dismiss . . . [*and*] directly contradicts the facts set forth in his original complaint." *Colliton* v. *Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (where plaintiff initially asserted he was employed as an attorney and then stated in his amended complaint that he was employed as a "specialist" to circumvent pleading requirements) (emphasis added). Here, Defendants cannot point to any "blatant[] changes," let alone *any* such "changes."

or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). "The pertinent inquiry . . . is whether the original complaint gave the defendant fair notice of the new alleged claims." *Wilson v. Fairchild Republic*, 143 F.3d 733, 738 (2d Cir. 1998). If "the amended pleading is based on the same series of transactions and occurrences . . . , the revised pleading will relate back to the original pleading, even where the revised pleading contains legal theories not included in the original." *White v. White Rose Food*, 128 F.3d 110, 116 (2d Cir. 1997).

The AC is based on the same series of conduct and occurrences alleged in the EEOC Charge, Supplemental Charge, and Federal Complaint—pleadings that provided adequate and fair notice to Defendants and exhausted all applicable administrative requirements.

## B. ALL FEDERAL, STATE, AND CITY CLAIMS ARE TIMELY

A statute-of-limitations argument is an affirmative defense for which they bear the burden of proof. *See, e.g.*, *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014). Here, the defense must be rejected because (i) a statute of limitations bar is not obvious on the face of the Amended Complaint,[16] (ii) the continuing violation doctrine applies, (iii) the city and state claims were tolled,[17] and (iv) the theory of equitable tolling applies.

### 1. The Timing of Certain Performance Reviews Are Disputed and Not Clear

With respect to two named defendants, Cardwell asserts claims against Chudd and Hudson in connection with their purported performance reviews—the timing for which is not clear from the AC.[18] Cardwell disputes when Chudd's purported September 2015 review (*see* AC ¶¶ 84, 84

---

[16] It is well-established that "a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." *Id.* (quoting *Fargas v. Cincinnati Mach.*, LLC, 2013 WL 6508863, at *7 (S.D.N.Y. Dec. 12, 2013)); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.").

[17] Thus, at a minimum, Cardwell's claims are tied to the following statute of limitations periods: November 4, 2015 for Section 1981 claims; October 7, 2016 for Title VII claims; and August 3, 2014 for state and city claims.

[18] The AC does not allege a specific date as to when such reviews were created, but it "need not allege a specific . . . date . . . ." *Mosdos*, 14 F. Supp. 3d at 209 (quoting *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d

n.6, 84 n.7, 234-38, 241-48) and Hudson's reviews (*id.* ¶¶ 106, 118, 120) were created, including (among other reasons) because (i) Chudd's 2015 review contains inaccuracies such as incorrect dates on which the relevant face-to-face review occurred, (ii) the primary conclusions from Chudd's and Hudson's disputed reviews implausibly were not documented in three subsequent summary reviews (i.e., Chudd's December 2015 Summary Review, Bick's June 2016 Summary Review, or Kreynin's December 2016 Summary Review), (iii) Davis Polk created a policy to prevent Cardwell from accessing his reviews, and (iv) Cardwell only gained access to his reviews after commencing a lawsuit.  That Cardwell disputes the timing of such reviews is sufficient to deny a statute of limitations defense as to all claims made in connection with Chudd and Hudson's reviews at this stage.  *See, e.g.*, *Mosdos*, 14 F. Supp. 3d at 209 (declining to grant motion to dismiss on statute of limitations grounds because plaintiff disputed when certain events occurred).

### 2.   Pre-October 2016 Title VII Claims Are Based on Continuing Violations[19,20]

"When a plaintiff experiences a continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* To assert a continuing violation for statute of limitations purposes, the plaintiff must allege: (i) the existence of an ongoing policy that violates his constitutional rights and (ii) some "non-time-barred

---

175, 182 (S.D.N.Y. 2007)); *see also Fargas*, 2013 WL 6508863, at *7 (denying motion to dismiss on statute of limitations grounds where "the Complaint contain[ed] no information as to the [relevant dates]").

[19] Accordingly, none of the claims against Reid or Bick are time-barred.

[20] Defendants cite *McPhee v. N.Y.C. Health and Hosps. Corp.*, 2008 WL 3930089 (S.D.N.Y. Aug. 25, 2008) (MTD at 26) which involves facts and claims that are plainly inapplicable (e.g., a failure to rehire, an EEOC charge filed more than 300 days after plaintiff's termination, and claims the court concluded were not "reasonably related").

acts taken in furtherance of that policy."[21] *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009). As explained *infra*, the continuing violation doctrine saves any purportedly untimely claims due to the existence of a continuous policy and practice orchestrated to take Cardwell "out of the game" and numerous non-time-barred acts taken in furtherance of such policy.

Notwithstanding the antidiscrimination policies specified in the Firm's Policy Handbook, Defendants continuously applied two specific policies to Cardwell's employment, including a policy that was intentionally created to permanently impact Cardwell's career at the Firm.

### i. *Davis Polk's Discriminatory Performance Review Policy*

Davis Polk's multi-pronged antidiscrimination mechanism was in part a response to the fact that the Firm's standard performance review policy had a disparate impact on non-White associates. *See generally Legg v. Ulster Cnty.*, 820 F.3d 67, 72 (2d Cir. 2016) ("Title VII discrimination claims . . . may be proven under a disparate treatment or disparate impact theory of liability"). The Firm had been provided with reports by internal and external consultants, all of which showed that the Firm's performance review policy had a disparate negative impact. *Id.* ¶¶ 52-53, 66, 78. Davis Polk's associates spent years cautiously but repeatedly flagging and attempting to get the Firm's Management Committee to remedy the discriminatory nature of the performance review policy. *Id.* ¶¶ 41, 66, 77-79, 244-45, 311 n.43.

It is against this backdrop that the Firm continuously subjected Cardwell to a discriminatory performance review policy and practice between November 2014 and February 2018. *Id.* ¶¶ 88-91, 97-106, 194-96, 283-86 (noting four consecutive face-to-face performance

---

[21] NYSHRL and NYCHRL apply lower, more generous pleading standards for the continuing violation doctrine. *See, e.g.*, *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012) ("[S]tate courts have since held that the . . . more generous, continuing violations doctrine continues to apply to claims under that statute.").

reviews where Cardwell questioned the Firm's review policy's disparate impact[22] that he was being subjected to and Davis Polk partners' failure to provide Cardwell with examples of "poor performance" that were not highly subjective, easy to manipulate, and widely known (within and outside the Firm) to be routinely infected with racial bias). Undoubtedly, these reviews were part of a continuing violation that furthered "the disparate impact caused by the centralized, subjective, consensus evaluation system to continue from year to year."[23]  The discriminatory nature of such reviews was exacerbated by Defendants' practice of quashing associate complaints about the review process, and the Firm's policy of preventing Cardwell from seeing his own reviews.

### ii.  Bick Ensures a Discriminatory Mechanism Tracks Cardwell's Employment

Potentially as early as 2015, Bick—a policy-making partner at Davis Polk—applied (i) a policy of retaliating against Cardwell[24] and (ii) a policy of deliberately disregarding Firm-created antidiscrimination policies and practices that were supposed to apply to Cardwell (and all Black associates at the Firm). With respect to the first prong, under Title VII, purportedly "time-barred" actions in connection with the discriminatory policy include the following actions:

- Bick's retaliatory response to Cardwell's legally protected complaints (e.g., the September 2015 and January 2016 complaints, and EEOC Charge) and the coordination that occurred in connection with (i) Chudd's purported September 2015 review, (ii) Hudson's reviews, and (iii) Cardwell's mid-year 2016 face-to-face review (AC ¶¶ 84, 94, 97-109, 118-20);

- Bick's effort to deceive Cardwell and M&A partners into thinking that the mid-year 2016 review, which was contrary to the Firm's policy that such second-year associates were only supposed to receive a professional development department-coordinated end-of-the-year performance evaluation, resulted from Cardwell making a request for "mid-year feedback" (id. ¶ 100 n.13);

---

[22] Both (i) the consensus feedback prepared in advance of the face-to-face reviews and communicated during the reviews (AC ¶ 108) and (ii) its related written "Summary Reviews" (id. ¶¶ 111-12), use a highly subjective evaluation process (id. ¶¶ 85, 103, 311 n.43) that cherry picks feedback from some but not all evaluations.

[23] Tolton v. Day, 2020 WL 2542129, at *23 (D.D.C. May 19, 2020) (denying motion to dismiss as "Plaintiffs need identify only a single, specific employment practice that plausibly caused the asserted disparate impact," including where "subjective decisionmaking" lacks transparency and contributes to disparate impact alleged).

[24] See Fitzgerald, 251 F.3d at 362 ("[T]he continuing violation theory may be applied where there is a showing of specific and related instances of discrimination against a single plaintiff[.]").

- Bick's refusal to be "connected" to Cardwell after the sham mid-year 2016 review (*id.* ¶¶ 109-10, 137, 142, 176, 209);

- Bick's failures to investigate a racial complaint made on behalf of Cardwell (¶ 95)[25] and, as explained *infra*, Mr. Cardwell's September 2015 complaint (*id.* ¶¶ 159-63, 163 n.19), both of which were acts of retaliation of Cardwell's prior complaints;[26]

- Bick, in response to Cardwell's discrimination and harassment complaints, treating Cardwell less favorably than similarly situated non-Black associates whose complaints of discrimination and harassment Bick and Davis Polk had knowledge of (*id.* ¶¶ 168-79);

- Bick's involvement in Brass's decision to remove Cardwell from a deal and to never work with Cardwell again, both done after a non-M&A staffing coordinator assigned Brass to work with Cardwell, in violation of the Firm's antidiscrimination policies (*id.* ¶¶ 125-27, 139-41);

- Bick's role in certain M&A partners' decisions to ignore and refuse to train Cardwell in ways such partners routinely did with similarly situated non-Black associates (*id.* ¶¶ 62, 149-54, 168-79, 204, 207-09);

- Bick's role in having Cardwell removed from a deal in September 2016 in connection with Bick, Birnbaum, and Wolfe disregarding the Firm's antidiscrimination staffing policies and mechanisms and refusing to staff Cardwell on any matters over the next eight months (i.e., from September 2016 and April 2017) or on any deals over the next nine months (i.e., from September 2016 and May 2017) (*id.* ¶¶ 204-06, 221, 228, 275-76); and

- Bick's strategic and continuous decision to keep certain M&A partners and Firm leaders in the dark about Cardwell's experience in the M&A group (*id.* ¶¶ 197 n.29, 220, 255).

Post-September 2016 acts in furtherance of the discriminatory policy include the following:

- Bick, Birnbaum, and Wolfe disregarding antidiscrimination staffing policies and mechanisms and not staffing Cardwell on any billable matters between October 7, 2016 and April 2017 (*id.* ¶¶ 170-77, 197, 204-05, 219, 258-59);[27]

- Bick's refusal to be "connected" to Cardwell (*id.* ¶¶ 109-10, 176, 209, 218, 260);

---

[25] *See Baez v. Anne Fontaine USA, Inc.*, 2017 WL 57858, at *5 (S.D.N.Y. Jan. 5, 2017) (finding "sufficient evidence to support NYCHRL aider and abettor liability claim when plaintiff asserted her coworkers spread a rumor . . . and plaintiff's supervisor failed to sufficiently investigate or discipline employees for the rumor").

[26] *See Atencio v. U.S. Postal Service*, 2015 WL 7308664, at *9 (Nov. 19, 2015) (Woods, J.) (finding retaliatory failure to investigate where the employer's failure to investigate was alleged to be a retaliation of a separate act).

[27] Defendants falsely assert that Cardwell "concedes that staffing decisions are made by networks of individuals." MTD at 19. The AC plainly alleges that Cardwell experienced discrimination and retaliation because of staffing decisions that required Birnbaum and Wolfe's participation and approval. AC ¶¶ 169-76, 197, 204-05, 219, 258-59.

- Bick's and Butler's categorical disregard of their Firm-assigned duties in the Firm's Career Advisor program (*id.* ¶¶ 211-21, 260);

- The Firm's "look[ed] into" decision to not allow Cardwell to see his personnel file and reviews (*id.* ¶¶ 234-39);

- Reid and the Firm's refusal to investigate Cardwell's complaints about Bick, which were a retaliation against Cardwell for his prior complaints (*id.* ¶ 245);

- Reid's threat and warning to Cardwell, which explicitly argued that Bick's and the Firm's discriminatory policy against Cardwell would continue if Cardwell did not let his past complaints go and stop making legally protected complaints (*id.* ¶¶ 240-52);

- Bick's and Davis Polk's refusal to staff Cardwell the way similarly situated non-Black associates were staffed (*id.* ¶¶ 258-60, 295);

- Bick and other partners shifting their conclusions about Cardwell's performance and his reviews in response to his legally protected complaints (*id.* ¶¶ 197; 231-32, 240);

- Bick and the Firm's submission of false statements and fabricated documents and conclusions to the NYSDHR (*id.* ¶¶ 118, 281);

- Bick working with other M&A partners to terminate Cardwell's employment in response to Cardwell's legally protected complaints (*id.* ¶¶ 247, 296-302); and

- Bick's and Davis Polk's discrimination and retaliation in response to Cardwell filing the Supplemental Charge (*id.* ¶ 304, and as described *supra* at 7).

Thus, for Cardwell's discrimination and retaliation Title VII claims, the continuing violation doctrine makes acts prior to October 7, 2016 timely. Repeated conduct related to Bick's (i) longstanding and unremedied retaliation (which amounted to a policy)[28] and (ii) deliberate and continuous disregard of Firm-created antidiscrimination policies—both of which "cannot be said

---

[28] *See Branch* v. *Guilderland Cent. School Dist.*, 239 F. Supp. 2d 242, 261 (N.D.N.Y. 2003) (denying motion to dismiss, noting "plaintiff is alleging a policy of retaliation . . . [where] each act was a building block or pinprick, of the retaliatory policy" and by not "allow[ing] such policy claims, . . . employers could . . . insulate themselves from liability by simply instructing their charges to do anything detrimental . . . short of actual termination or demotion").

to [have] occur[red] on any particular day" and "occur[red] over a series of days or perhaps years." *Sotomayor*, 862 F. Supp. 2d at 250 (internal quotations and citation omitted).[29]

### 3. State and City Claims Were Tolled Until the NYSDHR's Determination

It is black-letter law that "parallel claims brought under the NYCHRL and NYSHRL . . . which have three-year statutes of limitations . . . are subject to tolling during the pendency of plaintiff's complaint with the New York State Department of Human Rights." *Goodwine v. City of N.Y.*, 2016 WL 3017398, at *4 (S.D.N.Y. May 23, 2016). "Moreover, the weight of legal authority suggests that [both] the NYCHRL and NYSHRL statutes of limitations are also 'tolled during the period in which a complaint is filed with the EEOC.'" *Id.* (quotation omitted). It is undisputed that Cardwell filed the EEOC Charge in August 2017, and the NYSDHR made its determination in December 2019—and, thus, state and city claims were tolled during this period.

Defendants rely on *Kimball v. Vill. of Painted Post*, 737 F. App'x 564 (2d Cir. 2018), an unpublished summary order that addressed a summary judgment ruling, to assert that there is "no tolling against individual defendant[s] not named" in EEOC/NYSDHR filings and thus all "state and city claims . . . should be dismissed as time-barred to the extent they are based upon [acts] prior to November 4, 2016" or "March 2, 2017 as to Butler." MTD at 27. However, rulings by summary order lack precedential effect. *See* Second Circuit L.R. § 32.1.1(a). Beyond the nonprecedential nature of the sole case cited in support of their tolling argument, *Kimball* is readily distinguishable in numerous respects. *First*, the *Kimball* court declined "to address the merits of [plaintiff's] tolling argument because . . . [the] EEOC complaint did not give specific notice of her NYSHRL claims against [individual defendant]." *Kimball*, 737 F. App'x at 572 (noting the

---

[29] For similar reasons, all of Defendants' actions that occurred before October 7, 2016 and contributed to Cardwell's Title VII hostile work environment claim are timely. *See Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25 (S.D.N.Y. 2019) (Woods, J.) (denying motion to dismiss).

"complaint does not *reference* [the individual defendant] *at all*" nor their "behavior"). *Second*, *Kimball*'s emphasis on filings that "reference" individuals' "behavior" underscores the obvious—namely, that plaintiffs are not required to explicitly name individuals in such complaints.

Moreover, Defendants cannot claim the Davis Polk Partners lacked adequate notice of Cardwell's NYSDHR claims (or that they were prejudiced).[30] In *Kimball*, the plaintiff filed her EEOC Complaint "more than three years after her employment . . . ended," *id.* at 572, and the only reference to the unnamed defendant appeared in a "letter submitted by Kimball's lawyer," *id.* at 573 n.5. Here, as early as November 2019, Defendants had notice of three sworn and filed statements where Cardwell described discrimination and retaliation—two EEOC charges and an 86-page Federal Complaint—all of which explicitly named or referenced the behavior of every individual defendant in this case.[31] Certainly, Defendants had notice of the state and city claims when they urged the NYSDHR in December 2019 to continue investigating such claims (one month after all defendants except Butler[32] were named in the Federal Complaint).

### 4. Equitable Tolling Applies and Makes All Allegations Timely[33]

Where equity so requires, equitable tolling permits plaintiffs to file Title VII claims outside the statutory 300-day period. *See, e.g.*, *Long v. Frank*, 22 F.3d 54, 58 (2d Cir. 1994). "The Second Circuit has identified three general instances in which equitable tolling is appropriate, including

---

[30] Defendants have always been represented by the same counsel. *Schade v. Coty, Inc.*, 2001 WL 709258, at *5 (S.D.N.Y. June 25, 2001) ("[W]here the EEOC makes no investigatory or conciliatory efforts, courts will find that an unnamed party has not suffered any prejudice."); *Perez v. Int'l Bhd. Of Teamsters, AFL-CIO*, 2002 WL 31027580, at *7 (S.D.N.Y. Sept. 11, 2002) ("[T]here is no evidence the [unnamed defendant] was prejudiced" because of the EEOC's dismissal.).

[31] As of August 2019, the EEOC misled Cardwell into thinking that he could not amend the complaint before the NYSDHR. However, Cardwell could have at the time.  *See* 9 N.Y.C.R.R. § 465.4; *see also Atencio*, 2015 WL 7308664, at *9 (Woods, J.) (amendments are permitted under 29 C.F.R. § 1614.106(d) "at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint").  Here, the AC effectively amended the complaint before the NYSDHR (months before its investigation concluded).

[32]  Butler was named as a defendant pursuant to Rule 15(a)(1)(B).

[33] "Because the purported [conduct] [was] alleged in the Complaint . . . , it is appropriate to consider plaintiff's equitable tolling argument in the context of a motion to dismiss." *Alvi* v. *Aqua at Lakeshore E. LLC*, 2013 WL 3785622, at *5 (E.D.N.Y. July 18, 2013).

where (1) a plaintiff was unaware of his . . . cause of action due to misleading conduct of the defendant; (2) a plaintiff actively pursued judicial remedies by filing defective pleadings during the statutory period; or (3) extraordinary circumstances have prevented the employee from exercising his or her right. . . .  Equitable tolling will stay the running of the statutory period "only so long as the plaintiff has exercised reasonable care and diligence." *Jacobs v. SUNY at Buffalo Sch. of Med.*, 204 F. Supp. 2d 586, 592 (W.D.N.Y. 2002) (citations and footnote omitted).

As described *supra* at 12-15, Defendants actively concealed many unlawful actions and certain partners' roles (AC ¶¶ 107-10, 231, 234-38, 255, 268-69) until Reid's March 2017 threats (*id.* ¶¶ 241-54) confirmed that Cardwell was indeed experiencing a Bick- and Davis Polk-driven retaliatory policy.[34] As Cardwell continually made reasonable requests throughout 2015-2017, he diligently investigated unlawful conduct, filed administrative charges with the EEOC, sought broad discovery, and commenced this lawsuit after receiving a Right to Sue Letter.  *See supra* at 8.  Because Cardwell exercised diligence in pursuing his claims, he is entitled to the benefit of equitable tolling, which makes every well-pleaded claim timely.[35]

## C.  ALL CLAIMS AGAINST THE DAVIS POLK PARTNERS ARE PROPER

### 1.  All Federal Discrimination Claims Were Properly Pleaded

To state a claim for employment discrimination pursuant to Title VII and Section 1981 "absent direct evidence of discrimination, a plaintiff must allege facts sufficient to plausibly support the inference that he (1) is a member of a protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) has "at least minimal support for the

---

[34] As of March 2017, it became obvious that Davis Polk hid certain defendants' roles and blocked routine workplace interactions in order to silo Cardwell and prevent him from obtaining information relevant to filing a lawsuit.

[35]  In the alternative, Defendants' concealment and misleading conduct creates a question of fact to be resolved by a jury.  *See, e.g.*, *Hoffkins v. Monroe-2 Orleans Boces*, 2007 WL 1288210, at *2 (W.D.N.Y. May 2, 2007) ("Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a . . . motion to dismiss (where review is limited to the complaint) if equitable tolling is at issue.").

proposition that the employer was motivated by discriminatory intent." *Nguedi v. Fed. Reserve Bank of N.Y.*, 2017 WL 5991757, at *5 (S.D.N.Y. Dec. 1, 2017) (Woods, J). Defendants' concede that Cardwell has adequately alleged the first two elements.

Taking the fourth element next, "[plaintiffs] need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). "Examples of circumstances that may give rise to an inference of discrimination include . . . the sequence of events leading to the plaintiff's discharge." *Russell v. New York Univ.*, 2017 WL 3049534, at *32 (S.D.N.Y. July 17, 2017) (Woods, J.).

Here, the sequence of events set forth in the AC includes Davis Polk's managing partner explicitly telling Cardwell that his 2016 and early 2017 M&A experience was not Cardwell's "fault"—only for the Firm to assert in January 2018 that (according to his 2015-2016 reviews) Cardwell was "behind" and "the quality of his work was supposedly poor" (AC ¶ 294). Taken together, this overarching sequence, and the specific allegations in the AC, plausibly support an inference of discrimination against all of the Davis Polk Partners.[36] *Id.* ¶ 231. The AC also "provides the 'minimal support' required to suggest that [defendant] was motivated by discriminatory intent by alleging the existence of similarly situated comparable Caucasians who were treated better than he." *Nguedi*, 2017 WL 2557263 at *6. Thus, with respect to Chudd (*id.* ¶¶ 84-90, 94), Birnbaum and Wolfe (*id.* ¶¶ 168-73, 216, 258-60, 302), Brass (*id.* ¶¶ 168, 302), Hudson (*id.* ¶¶ 294-95, 302, and as further described *supra* at 12-13), and Butler (*id.* ¶¶ 211-18, 260-63, 302), the AC has met the fourth element's pleading burden.

None of the cases cited by Defendants, including *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396 (S.D.N.Y. 2014) and *Rogers v. Fashion Inst. of Tech.*, 2016 WL 889590

---

[36] *See Tainsky v. Clarins USA, Inc.*, 363 F. Supp. 2d 578, 585 (S.D.N.Y. 2005) (stating that a lack of warnings regarding poor performance undercuts an argument that an employee was fired due to poor work performance).

(S.D.N.Y. Feb. 26, 2016), counsels a different outcome. *See Nguedi*, 2017 WL 2557263 at *8 (denying motion to dismiss while (i) noting that "[a]ny specific information concerning the . . . other Caucasian comparators, is likely to be developed during discovery and will be more appropriately considered at later stages of the litigation" and (ii) quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 36 (2d Cir. 2000) ("Ordinarily whether two employees are similarly situated . . . presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss.")). Defendants also cite *Daniels* v. *City of N.Y.*, 2019 WL 251511 (S.D.N.Y. Jan. 17, 2019), a similarly inapposite case where the court emphasized there was a "dearth of information" and "[plaintiff] neglect[ed] to describe the circumstances that gave rise to [plaintiff's] reprimand and ultimate resignation." The AC does not share these flaws.

Regarding the third element, an adverse employment action is a "materially adverse change in the terms and conditions of employment." *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). "[N]o bright-line rules . . . determine whether the challenged employment action reaches the level of [being] adverse." *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) (abrogated on other grounds). Even if none of the actions that a plaintiff alleges could individually be characterized as adverse, a series of actions taken against a plaintiff may, in the aggregate, constitute such conduct. *Id*. Examples of adverse employment actions include "***termination*** of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, ***significantly diminished material responsibilities***, or ***other indices unique to a particular situation***." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (emphases added).

Defendants argue that "[t]here is no plausible allegation of 'adverse employment action' attributable to [Birnbaum, Wolfe, Hudson, Butler, and Brass]." MTD at 13. *First*, that argument

ignores the AC, which alleges (i) that Birnbaum, Wolfe, and Brass, *inter alia*, were responsible for Davis Polk's decision to terminate Cardwell's employment (AC ¶¶ 296-97)[37] and (ii) that both Cardwell *and* Davis Polk have argued that Hudson's reviews triggered various adverse employment actions, including termination (*id.* ¶¶ 118-20, 173 n.24, 189-90, 249, 254, 283, 285-86, 294, 306, 328; NYSDHR Brief at 10).[38] *See, e.g.*, *Zoulas*, 400 F. Supp. 3d at 53 ("'Negative employment evaluation letters may . . . be considered adverse' if they trigger other negative consequences in the terms and conditions of . . . employment[.]") (citation omitted).[39]

*Second*, Defendants' real argument is one that would effectively take federal, state, and city civil rights laws "out of the game" for thousands of lawyers at corporate firms—namely that "termination" is the only adverse employment action that is cognizable for associates who work for big firms like Davis Polk. That completely eviscerates the "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. It is undisputed that Davis Polk is a "lock-step" law firm, which means associate pay and bonuses are based on the associate's class year, not assessments related to performance, hours billed, or titles. In other words, "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits" are potentially impossible outcomes for lawyers working as full-time associates at lock-step firms.[40] That reality cannot be ignored in this case, where doing so would eviscerate the viability of claims against lock-step law firms by lawyer-plaintiffs who are

---

[37] The argument that Reid and Bick are the only individual defendants with "management responsibilities" (MTD at 4) is both incorrect and misses the point, particularly where, *inter alia*, this Circuit has held that, under NYSHRL § 296(6), defendants who have no control or authority over plaintiffs can be held liable for aiding and abetting. *See, e.g.*, *Dunson v. Tri-Maintenance Contractors*, 171 F. Supp. 2d 103, 114-15 (E.D.N.Y. 2001) (citing standard).

[38] Beyond referencing Hudson in its NYSDHR Brief by name, the Brief repeatedly notes critiques and conclusions from her reviews to justify materially adverse employment actions alleged in the AC, including termination.

[39] It cannot be said that Cardwell's allegations regarding Hudson's reviews are merely about "negative observation reports," "negative" comments or feedback, Cardwell having a "thin-skinned worker's reaction to . . . criticism," or Davis Polk "merely enforc[ing] its preexisting disciplinary policies. *See* AC ¶¶ 118-23, 173 n.24, 249, 328.

[40]  Relatedly, there is no other title or role other than "associate" that is available for recent U.S. law school graduates who are hired as associates in the Firm's U.S. offices.

not terminated but can only salvage their careers by quitting their respective firms.[41] However, for the reasons set forth herein, Cardwell pleads adverse employment actions against each of the individual defendants under several viable standards capable of withstanding a motion to dismiss.

> ### i. Demotion by Eliminating Billable Hours, and Significantly Diminished Material Responsibilities

Associates at the Firm, as is the case at many other large law firms, are expected to generate revenue and profits for the Firm through attorney fees that are primarily based on attorneys' "billable hours."   Because the single most material responsibility for a Davis Polk associate involves doing Firm-assigned work that produces billable hours (AC ¶¶ 40, 169, 176 n.25, 197 n.30, 204-05), the primary way Davis Polk creates a "materially adverse change in the terms and conditions of [an associate's] employment" is demotion as evidenced by a radical elimination of billable hours, for months at a time. In fact, Davis Polk has a policy that prohibits the Firm from allowing junior associates to have work schedules at the levels to which Defendants knowingly subjected Cardwell.[42, 43] This policy underscores the relationship between billable hours and an attorney's ability to practice law—not receive "preferred" or "desirable" assignments. For months at a time, Cardwell did not just have **reduced** billable hours or a "reduced work schedule," he had **no billable hours** and **no work schedule**. Id. ¶¶ 1, 134, 147, 162, 164 n.21, 166, 168-79, 193, 197 n.30, 203-09, 231, 249, 259, 260, 265, 274, 276, 295, 306.[44]

---

[41] See Branch, 239 F. Supp. 2d at 261 (denying motion to dismiss, finding that work environments where "plaintiffs' only recourse would be to quit . . . is clearly not what Congress intended in enacting . . . Title VII").

[42]   See Ex. 1, "Availability of Flextime Work" at 25 ("Reduced work schedules generally are not available to associates who are recent law school graduates. Davis Polk believes that working on a reduced basis at the beginning of a legal career makes it **difficult for an associate to receive the training, experience and exposure necessary for his or her successful development**.") (emphasis added).

[43] Id. at 25 (noting that "lawyers on reduced schedules generally work between 50% and 80% of a full-time schedule[,]" or between 83 and 133 billable hours per month).

[44] See Zoulas, 400 F. Supp. 3d at 55 ("The denial of professional training opportunities may constitute an adverse employment action . . . ." especially where plaintiff "contend[s] that [he] was . . . terminated[.]") (citations omitted).

Thus, Birnbaum, Wolfe, Hudson, Chudd, Brass, and Butler permanently handicapped Cardwell's ability to have a career not just as a Davis Polk associate, but as a *lawyer* in the legal profession. As such, they knowingly set back Cardwell's career. *See Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498 (S.D.N.Y. 2013) ("To be "materially adverse," the action must "result[] in a change in responsibilities so significant as to constitute a setback to the plaintiff's career."). As a result of their actions, Cardwell will never have certain law-related responsibilities again. Accordingly, Cardwell sufficiently alleges that Birnbaum, Wolfe, Hudson, Chudd, Brass, and Butler's actions constitute adverse employment actions.

### ii.   *Other Indices Unique to a Particular Situation*

Not being staffed and afforded opportunities for professional development in accordance with the Firm's antidiscrimination policies cannot be construed as actions that are about Cardwell's subjective personal disappointment.   For many reasons, Birnbaum,[45] Wolfe, Hudson, Chudd, Brass, and Butler's deliberate disregard of the Firm's antidiscrimination policies constitutes adverse employment actions.[46] *See supra* at 12-13. Accordingly, all of Cardwell's federal discrimination claims are properly pleaded and are capable of withstanding Defendants' MTD.

### 2.   All Federal Retaliation Claims Were Properly Pleaded

---

[45] Defendants argue that Cardwell's "interactions" with Birnbaum establish no adverse actions involving Birnbaum. MTD at 15 n.9. This is an obvious overreach. If necessary, Cardwell will clarify in an amended complaint that the referenced "interactions" involve exchanges lasting nearly 10-seconds and involved the Firm assigning Birnbaum to hand Cardwell his paycheck. For example, on January 25, 2018, Cardwell and other M&A attorneys received an email from a Firm assistant stating: "Harold Birnbaum has your paycheck, please stop by to pick up, thank you."

[46] Defendants unsuccessfully attempt to rebut several inferences by arguing that Cardwell's "billable hours increased after his purported 'removal'" involving Brass (AC ¶¶ 139-41,144-46) and that he "billed more in the months after Birnbaum and Wolfe assumed a role with respect to his staffing (416.7) than in the three months prior (406.6)." MTD at 18-19. The AC, however, plainly states that Cardwell's 2016 billable hours existed *despite* Brass, Birnbaum, Wolfe not staffing Cardwell on any matters. *Id.* ¶¶ 170-77, 197, 204-05, 219, 258-59.

For retaliation claims under Title VII and Section 1981, a plaintiff must allege that "(1) [he] was engaged in protected activity;[47] (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Zoulas*, 400 F. Supp. 3d at 56-57 (citation omitted). "[T]he . . . question . . . is whether the [adverse action] . . . could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Id.* at 57. No "bright line . . . define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001).

The AC plainly satisfies all four elements. On the first, the AC adequately alleges that Cardwell engaged in protected activity, including (i) certain 2015 complaints, (ii) certain 2016 complaints, (iii) certain 2017 complaints, (iv) the EEOC Charge, and (v) the Supplemental Charge. *See* AC ¶¶ 3, 55-61, 67, 74-81, 139-41, 144-46 and 159-61,[48] 169 n.23 and 225 n.34, 200-203 and 229,[49] 214, 241-252, 263, 266-273, 280, 282, 286-293, 298, 304. On the second element, the AC adequately alleges that Birnbaum, Wolfe, Hudson, Chudd, Brass, and Butler had knowledge of Cardwell's complaints prior to, and in connection with, the adverse employment actions taken against Cardwell. *See infra* at 25-30. On the third element, the AC adequately alleges adverse employment actions. *See supra* at 20-23. On the fourth element, Bick's retaliatory policy and

---

[47] *See Tolton*, 2020 WL 2542129 at \*34 (noting that "a plaintiff need not . . . have opposed an action that in fact violated Title VII to win a retaliation claim" and that plaintiff's question constituted protected activity because her "question contained within it a factual premise that, when viewed in the light most favorable to Plaintiffs, conveyed a complaint about the conduct of a partner at the firm") (internal quotations and citation omitted).

[48] *Id.*

[49] Cardwell sent the first email to the partner supervising the matter. Thus, not only are these complaints protected activity under Title VII and Section 1981, they are protected activity according to the Firm's Policy Handbook. *See* Ex. 1, "General Ethical Considerations and Questions" at 28-29 ("If in the course of your practice you have *any questions* regarding ethical considerations or compliance with the law, you should promptly discuss the matter with the *partner supervising* the matter . . . . The Firm prohibits any form of *retaliation* against any individual who raises *any question* concerning *legal compliance* or *professional ethics* in good faith.") (emphases added).

24

Reid's retaliatory threat against Cardwell (which followed his 2015-2018 complaints) were intended to track Cardwell's *employment* with the Firm, and thus there is a causal connection between the protected activity and adverse employment actions (including Cardwell's termination).[50, 51]

Moreover, with respect to causation, although the Firm's January 2018 performance evaluation (which triggered Cardwell not being staffed again and his ultimate termination the following month) and Defendants' decision to terminate occurred five and six months after the EEOC Charge was filed, respectively, the AC alleges that Defendants purposefully deferred retaliating against Cardwell until Cardwell submitted his rebuttal to the Firm's NYSDHR Brief, which was sent to the NYSDHR on January 10, 2018.[52] AC ¶¶ 282-83, 295-300. *See Zoulas*, 400 F. Supp. 3d at 59 (plaintiff established causation despite "eight months" between the filed complaint and defendants' retaliation because defendants "purposefully deferred retaliating").[53] Thus, all of Cardwell's federal retaliation claims should survive Defendants' MTD.[54]

### 3. All Defendants Had Knowledge of Cardwell's Complaints

---

[50] Reid's comments that Cardwell workflow was not his fault; Reid's refusal to allow Cardwell to discuss his staffing history with Reid, Birnbaum, or Wolfe (or "the past" with any Firm partner); Reid's threat and admission that there was a direct relationship between Cardwell's complaints and him being "out of the game"; Kreynin's comments to Cardwell in 2016 and 2017; and Bick's demotion confirm that there was a causal connection between Cardwell's 2015-2016 complaints, the Davis Polk Partners, and all 2016-2018 adverse employment actions.

[51] *See Summa v. Hofstra Univ.*, 708 F.3d 115, 128-29 (2d Cir. 2013)), aff'd, 611 F. App'x 28 (2d Cir. 2015) (finding "context . . . sufficient to infer causation" despite seven-month gap between filing of suit and decision to terminate).

[52] Defendants also delayed retaliation because it could not manufacture a negative performance review (i.e., a Summary Review concluding Cardwell was "behind") until the Firm first conducted an end-of-the-year review.

[53] *See also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[F]ive months is not too long to find the causal relationship."); *Gorman-Bakos*, 252 F.3d at 554 n.5 and *Maher v. Town of Stony Point*, 2018 WL 4759786, at *6 (S.D.N.Y. Sept. 29, 2018) (collecting Second Circuit cases causation found despite more than a five-month gap between EEOC filings and retaliation).

[54] *See generally Jones v. Onondaga Cty. Res. Recovery Agency*, 2014 WL 2480170, at *8 (N.D.N.Y. June 3, 2014) ("Whether the alleged acts of retaliation were causally related to the alleged protected conduct . . . is a matter of proof that is not susceptible to resolution at this stage of the proceedings" because "[d]iscovery can be used to delineate and define these issues").

Prior to, and in connection, with subsequent adverse employment actions, the Davis Polk Partners had knowledge of Cardwell's legally protected complaints. As the Second Circuit held in *Patane v. Clark*, 508 F.3d 106 (2d Cir. 2007), a plaintiff sufficiently pleaded a defendant's knowledge of its complaints where it (i) complained to an employee whose job it was to investigate and resolve such complaints and (ii) the court held that it is "not inappropriate" at the motion to dismiss stage to assume that in investigating the complaint, the defendant (whose conduct was the subject of plaintiff's complaint) was made aware of such complaints.  As the AC makes clear, legally protected complaints were made concerning each Davis Polk Partner.  With respect to Davis Polk, "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).  Here, ample facts demonstrate Davis Polk's knowledge, including where the AC alleges that Cardwell made the 2015-2016 complaints directly to David Polk employees and Davis Polk was a respondent in the administrative action.  *See Patane*, 508 F.3d at 115.

### i.   *Reid, Bick, and Chudd Had Knowledge of Cardwell's 2015 Complaints*

As stated *supra* at 4-5, Cardwell's 2015 complaints (related to Chudd) were raised with the Firm's Diversity Committee, which "made note of the concern for future professional development discussions."  It is implausible to think that such "concern[s]" were not raised directly with Chudd, particularly where Davis Polk's own "Non-Discrimination & Professional Conduct" policies (noted in the Firm's Policy Handbook) obligated the Firm to have such discussions with Chudd (and likely all of the M&A partners with whom Cardwell had worked during his 2015 rotation in that group, including Bick) about Cardwell, including his legally protected complaints about the

26

M&A group.[55] It is even less implausible that Chudd was "assigned to deliver an annual review to [Cardwell] in December 2015" without participating in internal conversations prior to the review about Cardwell's documented and discussed 2015 complaints. AC ¶ 88; MTD at 4. For similar reasons, it is plausible that Reid had knowledge of Cardwell's September 2015 complaint in his capacity as a member of the Firm's three-person Management Committee (AC ¶ 7), or at the very latest, by January 2016 when Cardwell directly communicated a complaint to Reid (*id.* ¶¶ 74-82).

### ii. *Reid, Bick, and Hudson Had Knowledge of Cardwell's 2015-2016 Complaints*

The facts in this case and the practices and culture at Davis Polk demonstrate that it is plausible that Hudson had knowledge of Cardwell's September 2015 and January 2016 complaints, the latter of which involved Reid. Between September 2015 and March 2016, Cardwell worked extensively with Hudson (more than any other partner). Davis Polk's description of Cardwell's September 2015 complaint as a "concern" that triggered "future professional development discussions" within the firm increases the plausibility that Hudson was looped into discussions about such complaint.[56] Ex. 2, NYSDHR Brief at 18-19.

Further, Hudson did not initiate the mid-2016 performance review process for Cardwell—an associate at the Firm for less than two years and permanently assigned to an entirely different practice group. *See id.* ¶ 100 n.13.  The reality is that, at some point prior to Hudson's creation of her review, Bick (or someone acting at his direction) requested it.[57] On information and belief, Bick discussed with Hudson why he wanted Hudson to claim that Cardwell was "behind" in a

---

[55] *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("[E]mployment discrimination is often accomplished by discreet manipulations" such that "[a] victim . . . is . . . seldom able to prove his . . . claim by direct evidence and is . . . constrained to rely on the cumulative weight of circumstantial evidence.").

[56] Such conversations were consistent with Reid and Hudson's professional relationship. *See, e.g.*, AC ¶ 70 (noting related interactions where Hudson was one of a few, if not the only, Davis Polk partner in attendance).

[57] Conducting an official midyear face-to-face performance review, against Firm policy, makes little sense for an attorney (i) whose prior official reviews all rated such associate as being on par with his class and (ii) who had just joined a new practice group. Thus, to justify his unlawful scheme, Bick had no choice but to claim that the June 2016 face-to-face review was in response to a purported "request" made by Cardwell.

performance review process that was outside and contrary to the Firm's normal policies and practices for second-year associates. Thus, at some point prior to when Hudson created that performance review for Cardwell, Bick discussed with Hudson how the review would impact (and benefit) the M&A group and the Firm.[58] In connection with these conversations and the planned demise of Cardwell's career, Bick discussed Cardwell's prior complaints with Hudson.

It is telling that despite certain categorical denials in parts of their MTD, Defendants do not assert that Hudson lacked knowledge of Cardwell's legally protected complaints during the relevant times. Defendants did not do so because such argument runs contrary to known and alleged facts, a yet-to-be seen evidentiary record, and common sense. With knowledge of Cardwell's complaints and Bick's unlawful scheme, Hudson complied with Bick's request for a pretextual performance review, and thus discriminated and retaliated against Cardwell.

### iii. Wolfe, Birnbaum, and Brass Had Knowledge of Cardwell's Complaints

With respect to Brass's knowledge, Brass was directly asked about Cardwell's August 2016 complaint. *Id.* ¶¶ 139-41,144-46.  With respect to Birnbaum and Wolfe, it is plausible that in September 2016, the non-M&A staffing coordinator—who lacked M&A staffing authority or knowledge about the M&A group's staffing needs—told Wolfe and Birnbaum that Cardwell made a complaint implicating them—the very partners responsible for staffing associates at the heart of his complaint. *Id.* ¶¶ 157-63, 164 n.21, 165, 169 n.22. Such plausibility increases if one considers Davis Polk's claim that Cardwell "signaled his refusal to accept a cross-department assignment" and that the non-M&A staffing coordinator did not staff Cardwell going forward as a result—

---

[58] Concluding that an associate is "behind" in their class can and does affect the Firm's long-term interests. Hudson did not register in an official performance review that Cardwell—a junior associate outside of her practice group— was "behind" without discussing with Bick how such conclusions could impact the Firm and the M&A group's short- and long-term plans for Cardwell. This is consistent with the M&A group's practice of meeting with reviewing partners to discuss how feedback should be given during M&A associates' performance reviews, only this time Bick met with Hudson prior to her creation of the mid-year review. *See, e.g.*, AC ¶ 119.

something that would have been communicated to them.[59] Ex. 2, NYSDHR Brief at 20. Further, it is plausible that Birnbaum and Wolfe had knowledge of Cardwell's May 2017 complaint because Davis Polk's Executive Director was, per the Firm's Non-Discrimination & Professional Conduct policies, obligated to follow up with them and she indicated that she would do so. *Id.* ¶¶ 266-73.

### iv.    *Butler Had Knowledge of Cardwell's 2015 and 2016 Complaints*

As stated *supra* at 2-3, in January 2017, Bick and Butler were "assigned" as Cardwell's "Career Advisors." *Id.* ¶¶ 214-15. Ex. 8, at 1. To state the obvious, Butler did not "assign" himself to be Cardwell's Career Advisor, nor did he agree to be a Career Advisor without having conversations about why he was asked to be Cardwell's Career Advisor. Given the Firm's culture, it is improbable that Butler would have been so assigned without having first discussed it with Reid (the Firm's Managing Partner) and Bick (the head of the Firm's Corporate Department and M&A group) both of whom were aware of Cardwell's complaints. Even if Butler was unaware of Cardwell's complaints prior to their pairing, on the day Cardwell received notice about his Career Advisors, Cardwell informed Butler of the complaints he made between September 2015 and September 2016 (which put him on notice). Thus, January 2017 is the latest point by which Butler had notice and knowledge of some, if not all, of Cardwell's legally protected complaints.

### v.    *The Davis Polk Partners Also Had Knowledge of the Administrative Filings*

It is likewise plausible that the Davis Polk Partners had knowledge of Cardwell's agency filings, including the EEOC Charge and Supplemental Charge, because (i) as stated *supra*, those

---

[59] At Davis Polk, if a member of a practice group is perceived to refuse assignments, all staffing partners for such associate will discuss both (i) the associate's refusal and (ii) how the staffing partners will staff the associate going forward. Relatedly, Cardwell's September 2016 complaint is the type of complaint that every M&A staffing coordinator at the time, and in the following year (e.g., with respect to Brass, AC ¶ 279), would have known about and discussed because the complaint was about how the Firm was likely to staff Cardwell over time.

filings explicitly named or referenced the behavior of each named defendant, and (ii) Davis Polk had knowledge of such filings, as it retained legal counsel to respond to the filings on its behalf.[60]

Tellingly, at no point between 2015 and the present have any of the Davis Polk Partners ever told Cardwell or affirmed for this Court that they lacked knowledge of any of Cardwell's complaints. *See, e.g.*, MTD at 13, 20 (merely pointing to a lack of knowledge-based allegations).

## D. DEFENDANTS ARE LIABLE FOR CREATING A HOSTILE WORK ENVIRONMENT AND HARASSMENT

### 1. Title VII's Exhaustion Requirements Were Satisfied

The law is clear that Title VII "[c]laims not raised in an EEOC complaint . . . may be brought in federal court if . . . reasonably related to the claim filed with the agency." *Williams v. New York City Housing*, 458 F.3d 67, 70 (2d Cir. 2006) (internal quotations and citations omitted). "[A] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge . . . made," which requires a "focus . . . on the factual allegations . . . in the . . . charge itself." *Id.* "It is the substance of the charge and not its label that controls." *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998). The Second Circuit "frequently invoke[s] the 'reasonably related' doctrine when the factual allegations made . . . can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised." *Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008).

Defendants ask this Court to dismiss the hostile work environment claims for failure to exhaust administrative remedies and cite *Green v. Jacob Co. Watches, Inc.*, 248 F. Supp. 3d 458, 467 (S.D.N.Y. 2017), a case that explained that a hostile work environment claim can be

---

[60] *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (knowledge requirement "easily prove[n]" where corporate entity aware of plaintiff's complaints).

reasonably related to an EEOC charge when it "reference[s] [] *repeated conduct* or *the cumulative effect of individual acts*." Such references undoubtedly appear in the administrative filings.[61] For instance, the EEOC Charge described incidents where Davis Polk "threaten[ed] [Cardwell's] employment." Ex. 3 at ¶¶ 4, 23. The Supplemental Charge noted, *inter alia*, that (i) after Cardwell filed the Charge "against [Davis Polk], the Firm *continued* to discriminate and retaliate against [him]" and (ii) the same M&A partner who received Cardwell's complaint detailing a hostile work environment (*see infra* at 8) concluded that if he were Cardwell he would be "furious and unhappy and bitter." Ex. 5 at ¶¶ 1, 4; *see also* Ex. 9. These facts, coupled with relevant case law[62] and "[t]he Second Circuit [view] that a single incident of harassment . . . could provide a sufficient basis for a hostile work environment claim," confirm the filings provided ample information for such claim to fall within the scope of the EEOC and NYSDHR's investigation.[63]

## 2. Title VII Allegations Were Properly Pleaded

To claim a violation of Title VII, a plaintiff must plead "facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, . . . [the conduct] creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment

---

[61] *See* Ex. 3, EEOC Charge ¶ 4 (noting the Firm was "failing to offer . . . billable work commensurate with similarly situated White coworkers"); *id.*¶ 7 (noting Cardwell "periodically notified members of the Firm of . . . interpersonal and structural racial bias, and racial[ly] uneven practices and outcomes," which "[i]n many instances" was "met either with indifference or *hostility*") (emphasis added); *id.* ¶¶ 12-30 (noting that, despite "weekly" requests, the Firm unlawfully staffed him for "five successive weeks in mid [-]2016" and continued for almost an entire year after that to staff and ignore Cardwell in ways that violated Firm policies and the law; *id.* ¶ 23 (noting the unlawful treatment spanned "a lengthy period"); *id.* ¶ 25 (noting disparate treatment lasting "over eight months").
[62] The "reasonably related" test is also satisfied where "defendants' alleged subsequent acts are essentially the same as the earlier allegedly wrongful conduct contained in the EEOC complaint." *Almendral v. New York State Office of Mental Health*, 743 F.2d 963, 967 (2d Cir. 1984).
[63] *See Gillman v. Inner City Broad. Corp.*, 2009 WL 3003244, at *4 (S.D.N.Y. Sept. 18, 2009) (whether "acts actually qualify as discriminatory conduct severe or pervasive enough to create an objectively hostile or abusive work environment is a question to be determined at a later stage of this action").

because of [any characteristic protected by Title VII]." *Nguedi*, 2017 WL 5991757 at *9. As part of this determination, "a court must consider the totality of the circumstances[.]" *Id.*

Defendants did not merely create the type of environment that a reasonable person would find hostile or abusive, they knowingly created an environment that internal and external consultants of the Firm routinely recognized as one that causes attorneys, especially Black attorneys, to change employers, give up on corporate law, and/or quit the legal profession. Consistent with this reality, Cardwell made a hostile work environment complaint to M&A partner Louis Goldberg. AC ¶¶ 266-74. Similarly situated non-Black associates at Davis Polk did not experience continuous and deliberate disregard of the Firm's antidiscrimination policies; did not submit weekly workload capacity forms to M&A partners who, for months on end, pretended those requests never existed while either (i) mockingly smiling at or (ii) completely ignoring them in the hallway (*id.* ¶ 173); did not experience a coordinated effort where partners tried to blame them for others' mistakes (*id.* ¶ 277); and were not explicitly threatened (*id.* ¶¶ 240-52) and ultimately terminated for making protected complaints (*id.* ¶¶ 247, 296-302). Far from subjective, it was Defendants' "objectively severe [and] pervasive" conduct that led an M&A partner familiar with Cardwell's work product, character, and genuine performance reviews to comment: "If I were you, I would be ***furious*** and ***unhappy*** and ***bitter***." *Id.* ¶ 299. Because Cardwell's hostile work environment (and harassment) claims satisfy all three elements, they should survive the MTD.

**E.  PARALLEL NYSHRL AND NYCHRL CLAIMS SURVIVE DEFENDANTS' MTD**

Under New York City Human Rights Law ("NYCHRL"), the Local Civil Rights Restoration Act of 2005 established that (i) "state and federal civil rights statutes can serve only as a floor below which the City's Human Rights law cannot fall," and (ii) a requirement that the NYCHRL provisions "be construed liberally." *Davila v. Lang*, 343 F. Supp. 3d 254, 282 (S.D.N.Y.

2018) (Woods, J.) (internal quotations omitted). Because Cardwell adequately pleaded federal and state discrimination and retaliation, claims with more demanding standards than the NYCHRL claims,[64] the NYCHRL claims[65] should survive. *See Valerio v. City of New York*, 2020 WL 353749, at \*7 (S.D.N.Y. Jan. 21, 2020) (denying motion to dismiss where plaintiff "satisfied the more demanding standards that govern his federal and NYSHRL claims" and thus he "also satisfied the forgiving standards that govern his NYCHRL claims").

## F. DEFENDANTS ARE LIABLE FOR AIDING AND ABETTING UNDER NYSHRL AND NYCHRL

Bick, Reid, Birnbaum, Wolfe, Hudson, and Butler aided and abetted each other and the Firm in violation of Cardwell's rights.  Section 296(6) of the NYSHRL makes it unlawful for anyone "to aid, abet, incite, compel or coerce" discrimination, retaliation, and harassment, "or to attempt to do so." N.Y. Exec. Law § 296(6). "To be liable under § 296(6), an . . . employee need not have supervisory or hiring and firing power, but must have 'actually participated in the conduct giving rise to the claim.'" *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) (citation omitted).  "The NYCHRL's § 8-107(6) also supports claims for aiding and abetting, which are 'susceptible to the same standard as under the NYSHRL . . . .'" *Id.* (citation omitted). Such claims are capable of withstanding the MTD for two independent reasons.

*First*, Defendants did not move to dismiss *any* federal, state, or city discrimination or retaliation claims against Davis Polk, Reid, or Bick, except as to timeliness.  Thus, where these underlying claims have not been challenged, aiding and abetting (or accessorial) liability in

---

[64] *See Lopez v. Flight Servs. & Sys., Inc.*, 881 F. Supp. 2d 431, 438 (W.D.N.Y. 2012) (noting NYSHRL claims are "analytically identical to claims brought under Title VII" and Section 1981) (citation and quotations omitted).
[65] The counts section of the AC states but doesn't explicitly delineate a hostile work environment claim under NYCHRL. AC ¶¶ 240 (noting violations of Section 8-107(1)(a)). *See Nguedi*, 2017 WL 5991757 at \*10 ("A plaintiff may bring claims under the NYCHRL for both discrimination and hostile work environment."); *Bacchus v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 214, 246 (E.D.N.Y. 2015) (noting NYCHRL hostile work environment and discrimination claims analyzed under same standard). Thus, if permitted, Cardwell will amend to clarify the AC.

connection with such claims should survive with respect to: (i) the acts of Bick, Reid, Birnbaum, Wolfe, Hudson, and Butler in aiding and abetting Davis Polk's unchallenged actions, and (ii) the acts of Birnbaum, Wolfe, Hudson, and Butler in aiding and abetting Reid and/or Bick's unchallenged actions. *See Daniels v. Wesley Gardens Corp.*, 2011 WL 1598962, at *4 (W.D.N.Y. Apr. 27, 2011) (dismissal of aiding and abetting violations of NYSHRL appropriate only where principal cause of action was dismissed on the merits); *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999).

*Second*, for conduct that the Court finds does not rise to the level of discrimination, retaliation, or harassment itself for pleading purposes, Defendants can still be liable under NYHRL for aiding and abetting a prohibited act as an alternative theory of liability. In fact, the case law is clear that it would be "premature to dismiss . . . § 296(6) claim[s]" at the motion to dismiss stage where the "threshold determination regarding [defendants'] liability . . . remains an open issue." *Mosier v. State Univ. of New York*, 2020 WL 42830, at *11 (E.D.N.Y. Jan. 2, 2020); *see also Taft v. Agric. Bank of China Ltd.*, 2016 WL 2766661, at *11 (S.D.N.Y. May 12, 2016) (courts "need not resolve . . . whether . . . aiding and abetting . . . would represent a possible violation[,]" as plaintiffs "are at liberty in discovery to pursue" alternative theories, given the issues of fact inherent in such analysis). Because the AC lays out the active collaboration underlying the discriminatory, retaliatory, and harassing conduct that Cardwell suffered during his tenure at the Firm, such claims have been adequately pleaded and should survive.[66]

## G.  THE UNTIMELY AND IMPROPER REQUEST TO STRIKE SHOULD BE DENIED

---

[66]   The AC and Plaintiff's Opposition are replete with examples of coordinated efforts taken in furtherance of the discrimination, retaliation, and harassment that Cardwell alleges, namely: (i) that Bick aided and abetted Reid, Hudson, Birnbaum, Wolfe, Butler, Chudd, and Brass; (ii) that Reid aided and abetted Bick, Hudson, Birnbaum, Wolfe, Butler, Chudd, and Brass; (iii) that Birnbaum aided and abetted non-Management Committee members Wolfe, Butler, and Brass; (iv) that Wolfe aided and abetted non-Management Committee members Birnbaum, Butler, and Brass; (v) that Hudson abetted non-Management Committee members Birnbaum, Butler, and Brass; and (vi) Butler aided and abetted non-Management Committee members Birnbaum, Wolfe, Hudson, and Brass.

In a footnote, Defendants purport to move this Court to strike paragraphs from the AC.[67] *See* MTD at 22 n.18.  The Court should deny such request for at least two independent reasons.

*First*, the request is time-barred.  Fed. R. Civ. P. 12(f)(2) requires that a Rule 12(f) motion be filed "within 21 days after being served with the pleading" containing the allegations to be stricken. The AC was filed on March 2. Defendants' purported "motion to strike" was filed on April 30—more than one month past the limitations period set forth by the very rule upon which their request is predicated. *Second*, the sole basis offered in support of their belated request (i.e., that certain defendants are "members of the Bar," MTD at 22 n.18), finds no support in the Federal Rules or the law of this jurisdiction.  In fact, "motions to strike are disfavored and should not be granted 'unless there is a strong reason for so doing.'"  *Bailey v. Pataki*, 2010 WL 234995, at *3 (S.D.N.Y. Jan. 19, 2010) (citation omitted); *see generally* Wright & Miller Federal Practice and Procedure, § 1382, at 809-10 (1969) (motions to strike "usually will be denied unless the allegations have no possible relation to the controversy . . . .").

Defendants have not met the high standard for granting a motion to strike. Far from scandalous or immaterial, the challenged allegations relate to several articulated claims and defenses.  There is no basis for employing such a drastic and disfavored remedy as to strike claims that go to the heart of Cardwell's claims.  Thus, Defendants' untimely request should be denied.

## CONCLUSION

For the reasons stated above, Cardwell respectfully urges the Court to deny the MTD.[68]

---

[67] Defendants make similarly improper assertions and requests of this Court. *See, e.g.*, MTD at 22 n.18 (citing inapplicable breach of contract case to argue that a Davis Polk-created "administrative record" eviscerates the AC's well-pleaded allegations).

[68]  In the alternative, if the Court elects to grant any portion of the MTD, Cardwell requests leave to amend as there has "not yet [been] an opportunity to do so in response to an opinion of the Court," *Jianjun Chen v. 2425 Broadway Chao Restaurant, LLC*, 2017 WL 2600051, at *9 (S.D.N.Y. June 15, 2017) (Woods, J.), and thus granting leave would not be futile.

Dated: New York, New York
      June 4, 2020

Respectfully submitted,

By: David Jeffries, Esq.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-601-2770
djeffries@jeffrieslaw.nyc

Martin E. Restituyo, Esq.
Law Offices of Martin Restituyo, P.C.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-729-7900
Fax: 212-729-7490
restituyo@restituyolaw.com

*Attorneys for Plaintiff*