PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3165

WRITER'S DIRECT FACSIMILE

(212) 492-0165

WRITER'S DIRECT E-MAIL ADDRESS

bbirenboim@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
PAUL M. BASTA
JOHN F. BAUGHMAN
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ANDREW J. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE

JONATHAN S. KANTER
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL
CATHERINE NYARADY
JANE B. O'BRIENS
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

December 5, 2017

**By Hand Delivery**

David E. Powell
Regional Director
New York State Division of Human Rights
Adam Clayton Powell State Office Building
163 W. 125th Street, Room 401
New York, NY 10027

RECEIVED

DEC 0 6 [...]

NYS DHR
Upper Manhattan Regional Office

*Kaloma Cardwell* v. *Davis Polk & Wardwell LLP*
(SDHR Case No. 10190523)

Dear Mr. Powell:

Please accept this letter and its attachments as the confidential response[1] of Davis Polk & Wardwell LLP ("Davis Polk" or "the Firm") to the Verified Complaint and attached EEOC Charge Particulars filed by Kaloma Cardwell (together, the

---

[1] The Firm requests that all of its submissions, including, without limitation, this response, all Firm documents or excerpts thereof (including personnel files and performance reviews), and the identities of any individuals mentioned in this or any submission, be treated as confidential and not disclosed to the public at any time, including in response to a FOIA or FOIL request. The Firm makes this request to protect the privacy interests of the individuals mentioned in this submission or any Firm documents, and the Firm's interest in confidential and proprietary commercial and financial information. *See, e.g.*, 5 U.S.C. § 552(b)(4) (FOIA Exemption 4). *See also, e.g.*, N.Y. PUB. OFF. L. Art. 6 §§ 87(2)(d), 89(2). Should any Firm submissions or documents be the subject of a FOIA or FOIL request for access, the Firm requests notice prior to disclosure, by letter and by telephone, to the attention of the undersigned counsel.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

"Complaint"), which was served upon the Firm pursuant to Section 297.2 of the Human Rights Law (N.Y. Exec. Law, art. 15).[2]

## I.   INTRODUCTION

The Complainant, Kaloma Cardwell, alleges discrimination and retaliation on the basis of race. Cardwell's claims are entirely without factual or legal support, and the Firm categorically denies each and every charge made in the Complaint.

Cardwell's principal complaint is that because of his race, he was provided insufficient opportunities for success and given insufficient work, as represented by billable hours. The unfortunate truth is that Cardwell, a fourth-year associate in the Corporate Department at Davis Polk, suffers from serious, persistent, and documented performance problems. It is these performance issues—not Cardwell's race—that explain his experience at Davis Polk.

Cardwell's performance was and remains critically deficient. He has made, and continues to make, mistakes that are unacceptable for an associate at any level of seniority. He has missed, and continues to miss, deadlines. He has been, and remains, unresponsive and unavailable. And he repeatedly has demonstrated a failure to understand the subject matter of his work. Because of Cardwell's performance deficiencies, others routinely have been called upon to complete, or redo, his work. Over the first year or two of his time at Davis Polk, as his deficiencies became manifest, it became difficult to assign work that Cardwell could perform reliably and in a timely manner. This reality has nothing to do with his race and everything to do with the fact that he could not perform to expectations. For these reasons, as Cardwell's performance problems became increasingly apparent, his hours became uneven and work assignments more sporadic. This issue has become increasingly acute as Cardwell has become more senior and the gap between his actual performance and the performance expected of an associate at his level has widened. And despite meaningful, real-time feedback over the course of years, together with repeated interventions and second chances, Cardwell's performance has failed to improve. As described in detail below, Cardwell's experience at the Firm is solely and directly a result of his own performance, not of any unlawful Firm act.

Indeed, the irony of this case is that, far from establishing that Cardwell was treated *less* favorably than others, the record here shows that the Firm frequently treated Cardwell *more* favorably than others. Among other efforts, the Firm made exceptions to policy for Cardwell's benefit by permitting him to try a third practice area to see if he could gain traction in his first year or so, allowing him to refuse a cross-departmental assignment, and paying for him to attend a conference. And the Firm's senior leadership—including the Managing Partner—expended considerable time and effort to coach Cardwell and give him time, and multiple opportunities, to improve.

---

[2]   The Notice of Charge filed with the New York State Division of Human Rights ("NYSDHR") and Mr. Cardwell's Complaint are attached as Exhibit 1.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

At this stage, the role of the Division is to determine "whether there is probable cause to believe" that the respondent "has engaged or is engaging in an unlawful discriminatory practice." If the Division "finds, either on the face of the complaint or after investigation, . . . that probable cause does not exist," the "complaint shall be dismissed." N.Y. Exec. Law § 297.2(a), 9 N.Y.C.R.R. § 465.5(d)(1).

Dismissal is the only appropriate result here. Cardwell's Complaint does not support a finding of probable cause to believe that either discrimination or retaliation occurred. Cardwell's assignments and hours were driven by his record of poor performance across three separate groups within the Davis Polk Corporate Department—not his race. And he has entirely failed to identify any evidence establishing discriminatory intent, as the law requires, because there is none. Cardwell's retaliation claim similarly fails. There was and has been no diminution in his salary, which is identical for associates at his level of seniority, nor has there been any change in Cardwell's hours or assignments attributable to his race or his purported raising of concerns about race. To the contrary, the Firm at all times has had legitimate, nondiscriminatory, and non-pretextual reasons for staffing Cardwell as it has, including meeting the needs of its clients and the Firm.

For these reasons and those discussed in greater detail below, the Firm respectfully requests that the Department make an immediate determination that there is no probable cause to believe the Firm has engaged in an act of unlawful discrimination or retaliation and dismiss the Complaint for want of probable cause pursuant to Section 297.2(a) of the Human Rights Law (N.Y. Exec. Law, art. 15; 9 N.Y.C.R.R. § 465.5(d)(1)).[3]

## II.   THE PARTIES

Complainant, Cardwell, began as a first-year associate in the Corporate Department at Davis Polk in September 2014. His annual compensation exceeded $160,000. Davis Polk is a lockstep compensation firm, meaning associates and partners are paid based on their seniority, not based on billable hours or performance reviews. Accordingly, his compensation has increased every year in lockstep with that of his class and is now, including a lockstep bonus paid to associates at his level of seniority, $260,000. Cardwell first worked at the Firm as a summer associate in 2013, while in law school at the University of California, Berkeley, and returned to the Firm upon graduation.

Respondent, Davis Polk, is a premier global law firm with offices in seven countries and headquarters in New York. The Firm currently has 161 partners, 103 counsel and 804 associates. It is an industry leader in diversity and inclusion. It has

---

[3]   To the extent the Complaint can be construed to assert a class claim, it fails on its face because it asserts no facts supporting an assertion that any other associates at the Firm—much less Cardwell—were subjected to discriminatory treatment. *See, e.g.*, Compl. ¶ 27 (purporting to file "on behalf of myself and all others similarly situated"). *But see* Notice of Charge at 1 (declining to select box announcing filing "on behalf of others").

strong and clear equal employment policies.[4]  It promotes diversity and inclusion at every level, including through firm-wide training and development programs for lawyers across the seniority spectrum—from first-year associate to partner—and devotes substantial resources to the recruitment, training, and retention of diverse talent, from pipeline programs to dedicated mentoring programs.  It has a dedicated task force of partners and administrators devoted solely to diversity issues.  And the Firm's Managing Partner has been an outspoken and forceful advocate for diversity in the legal profession.  Its practices throughout the Firm—in recruiting, training, mentorship and sponsorship, management, and client relations—are indisputably best in class.

        In recognition of its longstanding commitment to diversity and inclusion, the Firm has received awards from PepsiCo, the Minority Corporate Counsel Association, the Women in Law Empowerment Forum, and Morgan Stanley, among others.  It has consistently ranked in the top 20 firms on *The American Lawyer*'s Diversity Scorecard, an industry metric.

        Consistent with this commitment, approximately 30% of the Firm's lawyers, and 40% of its newest partners, are diverse.  Its lawyers speak 40 languages and come from 46 countries, and 22% of its partners were born outside the United States.  Approximately 20% of Firm-wide committees, and 40% of the Firm's offices, are led or co-chaired by diverse partners.  All of these initiatives and attributes are consistent with best practices.  *See, e.g.*, Equal Employment Opportunity Commission, Best Practices of Private Sector Employers, Section III.A.[5]

## III.    FACTUAL BACKGROUND

### A.    Cardwell's Allegations

        Cardwell alleges discrimination and retaliation by the Firm.  He alleges that because he "periodically notified" members of the Firm about what he perceived to be issues of bias, he was assigned work that did not require his "level of legal experience," that his hours were uneven, and that, in the end, he was deprived of meaningful work because of his race.  In support of his retaliation claim, he relies on an allegation that, following a concern he raised in December 2016 about whether the Firm should be doing work for a particular former Firm client that he believed engaged in a business—"for-profit prisons"—that he thought inappropriate, his hours "dropped precipitously" and "Firm leadership" allegedly "virtually ignored" him as a result. Further, he asserts that the Firm retaliated against him by "not staffing [him] on any matters" in the wake of his complaints concerning that former Firm client.  Compl. ¶¶ 7, 11, 18–19.

        Each of these allegations is false and directly contradicted by the record. The Firm has not discriminated against Cardwell at any time.  To the contrary, the Firm

---

[4]  *Ex. 2.*

[5]  *Online at* https://www1.eeoc.gov//eeoc/task_reports/best_practices.cfm.  *See also, e.g., Ex. 3* (announcing the launch of a partnership between Davis Polk and the Minority Corporate Counsel Association to establish best practices and diversity metrics for law firms).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

and its senior leadership—including the Managing Partner, the head of the Corporate Department, and the co-head of Cardwell's practice group—invested substantial time and effort in Cardwell's career development, including in efforts to provide him opportunities commensurate with his experience and class year and to improve his performance. Nor has the Firm retaliated against Cardwell for inquiring about the former Firm client (an inquiry that was moot at the time he raised it). Neither Cardwell's hours nor his assignments had anything to do with his race or his raising of any concerns related to race or issues of diversity.

At bottom, Cardwell's claim is that he was a strong performer praised for the "quality of [his] work" who received "positive feedback" during his time at the Firm, and that the only reason demand for his work decreased was a direct result of his race. Compl. ¶¶ 6, 10.

The record tells an entirely different story.

**B.      Cardwell Has Demonstrated Performance Issues that Have Persisted Over the Course of His Tenure at the Firm and that Repeatedly Have Been Communicated to Him**

Cardwell has suffered from persistent, demonstrated performance problems throughout his tenure at Davis Polk that have been separately memorialized by senior attorneys in three parts of the Firm. Although these problems repeatedly have been communicated to Cardwell, his performance has not improved over time. The fact that the quality of his work has been and remains unreliable has made it difficult to find him work. This result has had nothing to do with race. In corporate law (or any type of law, for that matter), a poor reputation for producing quality work inevitably leads to staffing difficulties, based on the appropriate and entirely non-discriminatory view that a person who makes errors on elementary tasks cannot be relied upon to perform more sophisticated assignments. These issues become more serious and consequential as the associate moves from junior to more senior classes, as would become evident here.

Cardwell began his tenure at the Firm, as all associates who join the Corporate Department of Davis Polk, with two six-month rotations through different departmental groups. These rotations are designed to expose associates to a variety of work and people in the Corporate Department for purposes of training and career focus.

The Corporate Department—as opposed to other departments, like Litigation—handles transactional work, such as mergers or sales, often for large public corporations and other significant corporate entities. Clients contact the Firm with time-sensitive needs, such as major transactions that need to be completed in a span of days. Davis Polk's clients expect the Firm's full and immediate attention—and pay significant hourly rates in exchange for that attention. In order to meet its clients' needs, the Firm must quickly assemble teams of professionals and often must begin to produce extremely high quality work within hours. Teams across the Corporate Department work under immense time pressure, and delays in responsiveness, even of an hour or two, or lost time

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

because work has to be redone, can compromise the team, the deal, the clients' interests and, ultimately, the Firm's relationships with its clients.

At the end of their first two rotations, first-year Corporate associates are expected to "assign" formally to a group within the Corporate Department, so that they may begin their training in earnest in a specific practice. Cardwell demanded—and the Firm granted—an exception to this policy to complete a third rotation. The senior attorneys with whom Cardwell worked—in each of his three rotations and after he assigned to the Mergers & Acquisitions (M&A) group upon completion of his third rotation in April 2016—noted similar problems with his performance.

### 1.    Cardwell Exhibited Performance Problems During His First Rotation (September 2014–April 2015)

Cardwell's first rotation was with the Credit group of the Davis Polk Corporate Department, where he worked on at least five separate matters. Senior lawyers in the Credit group who worked with Cardwell noted performance issues that were troubling. For example, and among other issues, senior Credit attorneys noted that Cardwell was "on the slow side in producing drafts," and took "longer than expected to complete certain tasks." *Exs. 4, 5.*[6] Cardwell came "to incorrect conclusions that often require[d] his work to be redone," and his work product "need[ed] improvement." *Id.* He neglected to "ask questions when he does not understand," and "even when offered assistance," declined it. And although Cardwell was "easygoing" and "proactive in offering help," he neglected the "simpler matters"—the domain of the junior associate on a team tasked with completing a client assignment, as explained in detailed memoranda distributed to new associates at the start of each rotation.[7] Cardwell was not sufficiently "prompt to respond and act." *Exs. 4, 5.*

The Firm delivered this feedback to Cardwell at the end of his Credit rotation, as part of its routine professional development and training initiatives. A partner from the Credit group, Jason Kyrwood, met with Cardwell to discuss his performance and the areas that needed improvement. Cardwell, according to a contemporaneous note, accepted the feedback and agreed. *Ex. 7.*

### 2.    Cardwell's Performance Problems Continued Throughout His Second Rotation (April 2015–October 2015)

Similar problems emerged during Cardwell's next rotation, in the M&A group. During his M&A rotation, Cardwell worked on at least nine separate matters, and attorneys on multiple teams noted increasingly serious performance issues, echoing the themes that had emerged during Cardwell's first rotation in the Credit group.

For example, it took Cardwell a "very long time" to complete drafts, a problem "made worst [*sic*] by constant assurances [from Cardwell] that work will be

---

[6]    These exhibits are contemporaneous written performance reviews prepared by attorneys senior to Cardwell.

[7]    *See, e.g., Ex. 6.*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

ready shortly, even though it is still many hours from being delivered." Cardwell was not sufficiently "responsive[] to email communications," particularly during time-sensitive phases of client assignments. Cardwell neglected the tasks that were assigned to him, or that were appropriate for lawyers of his seniority, and instead "push[ed] to be involved in tasks where he was not really needed." Most critically, Cardwell's work product was of a lesser quality than that of other first-year associates assigned to the M&A group. Whereas "another first year could take the lead" on a "diligence report," Cardwell could not, and his "due diligence summaries needed quite a bit of work."

Although more senior M&A lawyers noted Cardwell's willingness to "volunteer[] to join calls and take on work," the fact remained that Cardwell's work was sufficiently unreliable that they were reluctant to provide him with responsibility for time-critical tasks. In this regard, a reviewer noted that Cardwell's performance issues both made things "difficult with assignments that you ask him to complete" and could "make a person hesitant to ask him to take on additional tasks because the timing for delivery is unclear." *Exs. 8–10.* Cardwell's performance issues were of sufficient concern that another attorney in M&A raised those concerns with Carolina Fenner, the M&A staffing coordinator, in the middle of Cardwell's rotation. That attorney explained to Fenner that there were problems with Cardwell's accuracy, responsiveness, and attention to detail.

The Firm delivered this feedback to Cardwell. Consistent with Firm practice, a partner from M&A, William Chudd, met with Cardwell to deliver his reviews as part of the Firm's formal annual review process after Cardwell's first year at the Firm. Cardwell's early performance was notably problematic, and his reviews reflected this. Chudd delivered a specific and direct message: although reviewers appreciated Cardwell's eagerness to help, Cardwell needed to be "more responsive on email communication," needed to "improve his communication with senior lawyers regarding task deadlines and timing of deliverables," and needed to be more careful not to "overlook more basic tasks in favor of more substantive work," as this could work to "the detriment of being able to deliver on the more basic tasks." *Ex. 11.* Above all, Cardwell needed to "focus on delivering excellent work product on time and communicat[ing] his deadlines and timing," as only "[o]nce he does this" would "senior lawyers . . . feel more comfortable delegating more work to him." *Id.*

Cardwell knew what was expected of him: The junior associate role, as explained in detailed memoranda distributed to associates at the start of their two rotations in the Corporate Department, often is to handle projects that, while relatively routine, require precision and attention to detail. *See, e.g., Ex. 6.* This is because mistakes on small tasks—like memorializing a key deadline or failing to implement a change made in one location in a document in corresponding locations throughout the document—can lead to major team-wide errors. Cardwell, as all of his peers, received these memoranda.

Nonetheless, at the conclusion of Cardwell's required two rotations through two separate groups within Davis Polk's Corporate Department, attorneys on multiple deal teams in both groups had observed similar dynamics: Cardwell tended to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

neglect the details on core, basic tasks, despite the Firm's clear expectations for junior associates. The fundamental problems with both the quality and timeliness of Cardwell's work made it difficult for senior lawyers to rely upon him or his work product.

### 3. Cardwell Exhibited Similar Problems During His Requested Third Rotation (October 2015–April 2016)

After completing his M&A rotation, Cardwell began the third rotation he had demanded (and been granted, in an effort to be responsive to his views and to give him additional exposure to a core corporate practice, Capital Markets).[8]

Serious performance problems, echoing those that had emerged in his first two rotations, became apparent during his third rotation in the Capital Markets group. Indeed, the great weight of senior attorneys' experience with Cardwell during his third rotation pointed to very serious difficulties. As before, Cardwell "worked very slowly," "had difficulty meeting deadlines," was "unavailable at times when tasks needed to be completed in real time," and kept inadequate track of "deal timing and the status of documentation." In one instance, Cardwell's "diligence and other preparatory tasks were completed so slowly that a second junior associate needed to be staffed." Cardwell failed adequately to balance the need for "great attention to detail" and the need to "meet the time demands of [the] transaction/client." And Cardwell's failure to "ask for clarification in a timely manner" risked "jeopardiz[ing] the timing of providing work product to a client." *Exs. 12, 13.*

Also as before, there were serious problems with the substance of Cardwell's work. Cardwell "provided work product that was disappointing" and "that had to be substantially redone by the senior associate." A partner "found that he did not understand key aspects of the transaction at a relatively late stage," and further that he "lacked attention to detail." A reviewer noted that Cardwell's delegation practices were not in keeping with the Firm's expectations, and described Cardwell as "behind" his class even when it came to performing "routine" tasks. To the question whether she would "work with this person again," this reviewer answered "no." *Exs. 13, 14.*

Once again, the Firm delivered this feedback to Cardwell, both in real time and at the end of his third rotation. For example, one partner, Sophia Hudson, provided Cardwell with detailed feedback over the course of their work together and spoke with him about the need to raise the substantive quality of his work. *Id.* Likewise, shortly after Cardwell completed his third rotation, John Bick, the head of the Corporate Department, met with him to discuss his reviews.[9] Bick explained that although

---

[8]   As noted above, Firm policy is that Corporate associates complete two six-month rotations and then "assign" to a group. However, during his second rotation, Cardwell approached a partner on the Diversity Committee and indicated that he wanted an exception to this policy.

[9]   Cardwell alleges that this meeting was "impromptu." Compl. ¶ 10. It was not. In fact, Cardwell approached the Associate Development department and asked for feedback; the Firm granted his request, solicited reviews, and assigned a partner to meet with him. *Ex. 15* (noting that Cardwell had "asked for mid-year feedback on his work," and that "this review is in response to that request."). Based on timing, the review delivered at this time encompassed Cardwell's time in Capital Markets and the first several weeks of his permanent assignment to M&A.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

reviewers had noted Cardwell's positive attitude and willingness to help, senior lawyers had noted problems with Cardwell's time management, prompt communication with the team, availability, and ability to meet deadlines.

By this point, the substantive problems with Cardwell's work—now memorialized by senior attorneys in three groups and communicated to Cardwell in real time and as part of formal reviews—were significant and were translating into increasingly serious problems staffing him on a consistent basis. Indeed, contemporaneous notes memorialized difficulty staffing Cardwell in Capital Markets based on performance issues. This problem—which Cardwell suggests emerged in the summer or winter of 2016 at the earliest,[10] but which in fact emerged considerably earlier—would worsen in the fall of 2016, as Cardwell moved into his third year, the time when associates make the transition from junior- to midlevel associate and are expected to demonstrate greater facility with the complex substance of the work and handle tasks requiring greater skill and precision.

### 4. Cardwell's Performance Deficiencies Became Increasingly Problematic as He Became More Senior

As Cardwell was nearing the end of his third rotation, in late January 2016, Tom Reid, the Firm's managing partner, took Cardwell and another associate out to dinner. Cardwell and the other associate had attended a presentation Reid had given at a Bar association event in early December, and the three of them spoke at that event after Reid's presentation. Reid expressed gratitude that Cardwell and the other associate had come to the presentation, which included a discussion of diversity and inclusion. He thought it would be worthwhile to continue the dialogue they started after the presentation, so he suggested they arrange a dinner. The dinner ultimately got scheduled for January 2016. Reid prepared for the dinner by reading Cardwell's and the other associate's reviews so that he could be in a position to provide feedback on how they were doing. They did ask for feedback, and Reid offered it. Because the dinner was not a one-on-one discussion but included two associates, Reid did not get into any pointed criticisms in providing feedback, but he did give both Cardwell and the other associate a few pointers that their review folders indicated were important for their continued development. As it related to Cardwell, Reid emphasized the critical importance for young lawyers of paying close attention to all of the details of their assignments because without exhibiting the ability to handle the details, senior lawyers would not be comfortable relying on his work in any respect. As discussed in more detail *infra*, Cardwell made the point at this dinner that he appreciated Reid's feedback and that, as a former football player with professional ambitions in the sport, he often thought of his legal career in sports analogies and that football had prepared him well to be able to take criticism and feedback.

At the conclusion of his third rotation a few months after his January 2016 dinner with Reid, Cardwell formally assigned to M&A—the group he requested.

---

[10]   *See, e.g.*, Compl. ¶ 18 (suggesting that his hours became uneven as a result of a communication in December 2016).

Highly Confidential
FOIA/FOIL Confidential Treatment Requested by Davis Polk

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Unfortunately, the performance issues that had been apparent throughout Cardwell's tenure at the Firm became increasingly problematic as he became more senior, as evidenced by his work on several matters in mid-2016.

In August and September, for example, Cardwell was staffed on a private equity deal with a senior partner in M&A, Leonard Kreynin. Kreynin, like Hudson before him, worked directly with Cardwell and found his performance seriously deficient. Among other issues, Cardwell made major mistakes in revising an important document.

Markups require junior associates to understand the reason for the proposed changes, and to implement those changes thoughtfully, carefully and consistently. But Cardwell failed to do so. Instead, as Kreynin noted both during their work together and in his subsequent review, Cardwell made changes in a way that expanded the scope of an agreement in a manner adverse to the client's interests, rather than narrowing it. In addition, when asked to change the name of the party that would execute a document, Cardwell made the change to the header of the document, but not to the signature block. While this may appear relatively unimportant, it was in fact a fundamental error in the context of the deal; mistakes in signature blocks can render entire agreements invalid. And mistakes of this nature undermine clients' trust and confidence that their counsel are completing their assignments with the care, attention to detail, and exacting precision that clients are entitled to demand when engaging—and compensating—counsel of Davis Polk's stature. Kreynin, after working closely with Cardwell, felt he could not entrust Cardwell with even the simplest tasks.

Another M&A partner, John Butler, worked with Cardwell on a diligence assignment and found that Cardwell appeared not to "fully underst[and] what he was talking about." Butler gave Cardwell instructions on what he "wanted [Cardwell] to focus on," including a specific question about the mechanics of a security important to the transaction. Cardwell wrote a report stating that the security worked in a particular manner, but when Butler asked Cardwell to explain the basis for his belief, Cardwell was unable to explain it and "said he would have to follow up on that." This did "not inspire confidence." *Ex. 16.*

By the fall of 2016, reviews of Cardwell's performance reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role. Indeed, by the fall, senior attorneys from M&A noted that Cardwell's performance was so deficient that it was translating into difficulties staffing him. This fact was reflected in Cardwell's hours, which were uneven over the course of 2016— relatively low in the early months of the year, during Cardwell's Capital Markets rotation, higher in the summer, and relatively low again later in the fall and for the remainder of the year, in M&A.

By this point, and consistent with Davis Polk's practices, Cardwell's poor performance over three rotations and at the beginning of his post-rotation assignment to the M&A group was such that it would have warranted giving Cardwell a message that it was time for him to look for another job. Nevertheless, when the partners met to decide

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

on the messages to be given to associates as part of the formal, annual review cycle, Cardwell's second annual review cycle at the Firm, the Firm decided in October 2016 to try to give Cardwell (i) additional time to improve his performance, (ii) clear feedback about areas on which to focus, and (iii) consistent with the Firm's practice in annual reviews where an associate's performance is deficient, an interim review in six months.

The partners appointed Kreynin to deliver Cardwell's review based on this consensus message. During the review, Kreynin explained that the partners had identified four "significant areas for improvement": Cardwell needed to improve the substantive quality of his work by ensuring that "all of the de[ta]ils" that needed to be reflected in a document were there, by taking the time to understand what he was doing and why, by making sure that he understood "key aspects of the overall transaction" before executing tasks, and by ensuring that senior attorneys could trust that he had a "good handle on t[he] matters delegated" to him. *Ex. 17.* When Cardwell characterized his mistakes as merely "typos" and asked for specific examples, Kreynin explained that Cardwell had introduced changes adverse to Firm clients, and that these errors could not be dismissed as mere "typos" but instead reflected a fundamental misunderstanding of the task and risked clients' interests and trust.

### C. Cardwell's Hours and Assignments Were a Function of His Poor Performance, Not the Result of His Race or Communications with Partners of the Firm Concerning a Client Relationship

As the record above demonstrates, Cardwell's record of performance problems made it difficult to find teams that had sufficient confidence in him to provide him assignments that he could reliably perform. Rather than acknowledge this issue, Cardwell argues that he was offered less "substantive and billable work" than others because of his race or because he "periodically notified members of the Firm" of issues of bias. Compl. ¶¶ 4, 7. He argues, in particular, that his hours dropped "precipitously" as a direct result of a concern he raised in December 2016, months after his second negative annual performance review, about what he viewed as the unacceptable business practices of a former Firm client. Compl. ¶¶ 17–18. There is no support for this claim. Instead, the facts demonstrate that Cardwell's hours and assignments were driven by his record of poor performance, and none of the events he identifies supports a claim that the Firm penalized Cardwell for voicing any concerns.

The December 2016 event is no exception. At a time when Davis Polk was no longer representing a former client that operated in the for-profit prison industry, Cardwell wrote to a partner of the Firm to discuss "end[ing] the Firm's relationship" with the entity. The then (soon to be former) partner, Carey Dunne—the former President of the New York City Bar Association and former Chair of the Firm's Litigation Department—said that he did not know if the "firm still ha[d]" a relationship with the client, but offered to follow up. Cardwell told Dunne during their email exchange in December 2016 that he (Cardwell) would do so himself since Dunne was about to retire from the Firm. Nearly three months later, on Friday March 3, 2017, Cardwell wrote to Sharon Katz, the chair of the Firm's *pro bono* practice, with the same question.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Cardwell alleges that Firm leadership "virtually ignored" him following his expression of these concerns. Compl. ¶ 19. But far from dismissing Cardwell's concern, Katz arranged a meeting between Cardwell and the Managing Partner of the Firm, Tom Reid, in just a few days' time, on March 9. During that meeting, Reid both explained that the Firm no longer represented the client and indicated to Cardwell, as Cardwell concedes, that the Firm was not then representing the entity and did not intend to take on future representations of the entity. Compl. ¶ 20.

There is no evidence that Cardwell's hours dropped "precipitously" as a result of his "raising [these] concerns to Mr. Dunne" in December 2016. Compl. ¶¶ 17–18. Indeed, there is no indication that Dunne, who retired from Davis Polk only a few weeks after Cardwell raised this issue with him, discussed Cardwell's having reached out to him with anyone else in the Firm, as Cardwell himself said he would raise the issue with others, given that Dunne would be retiring shortly.

Nor does it make any sense that raising these concerns would cause any reaction, given that the Firm was not then working for the entity and did not intend to do so in the future. Rather, Cardwell's hours already had been uneven throughout 2016, as noted above. This unevenness reflected what partners in both Capital Markets and M&A had explained: Cardwell's record of poor performance made it difficult to staff him.

Moreover, to the extent Cardwell's hours were again relatively low in the fall and early winter, they declined gradually, from a peak in September—not "precipitously" following his December email to Dunne. Compl. ¶ 18. This relative decline reflected a widening gap between Cardwell's skills and his seniority. Cardwell, by this juncture, had become a third-year associate, the time when associates transition from the junior to the midlevel role. But his performance and skills were markedly below the level expected. By mid-October 2016, once reviews were in for the 2016 review cycle, it was understood that Cardwell was a poor performer, in the bottom performance tier relative to his peers. None of these dynamics had anything to do with Cardwell's race or his raising any concerns, and there is not a shred of evidence cited in Cardwell's Complaint or otherwise to the contrary.

**D. Firm Leadership Did Not "Ignore" Cardwell; to the Contrary, the Firm Devoted Substantial and Senior-Level Resources to Cardwell, But His Performance Did Not Improve**

Despite Cardwell's poor track record, the Firm continued to invest in him. Contrary to Cardwell's suggestion that "Firm leadership virtually ignored" him, the Firm's senior leadership—including the heads of the Firm, the Corporate Department, and the M&A group—each personally invested in Cardwell and his career. Compl. ¶ 19.

**1. Firm Leadership Intervened to Address Cardwell's Performance Issues and Staffing Challenges**

The Firm made sustained efforts to find Cardwell work, including in the period after Cardwell sent his December 2016 email to Dunne, negating any inference of

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

discriminatory treatment or retaliation. In January 2017, for example, Fenner, the M&A staffing manager, noted Cardwell's low hours and reached out to the M&A group in search of work for him. Senior and junior partners in the M&A group then became involved in the effort. Subsequently, Fenner in fact found Cardwell some work with a busy senior lawyer that month. Nevertheless, by January, the flow of work in M&A had slowed, and given the poor quality of work Cardwell had repeatedly delivered, finding assignments he could reliably and timely complete proved difficult.

Nonetheless, and consistent with the efforts to address Cardwell's performance and the staffing difficulties posed by his poor performance, at the close of Reid's March 9 meeting with Cardwell concerning the for-profit prison issue, Reid noted that in preparation for the meeting he had reviewed Cardwell's hours and was aware that they were uneven, and scheduled a follow-up meeting with Cardwell and Kreynin to discuss Cardwell's staffing and performance.

Reid and Kreynin met with Cardwell on March 29, 2017. In the intervening period, an additional performance issue involving Cardwell was brought to the attention of Marc Williams, a Davis Polk M&A partner. Cardwell had failed to respond to repeated requests—dating to November—from an important Japanese law firm inquiring about the status of the Firm's payment for transaction work done by the Japanese firm. The representative of the Japanese firm explained that she had "*not previously experienced such a lapse in communication despite working with the Davis Polk NY team over the past five years.*" *Ex. 18A* (emphasis added). When Williams asked Cardwell whether he had responded to two March emails, Cardwell admitted that he had not. *Ex. 18B.*

At their meeting, Reid and Kreynin explained to Cardwell that the continuing performance problems he was exhibiting went to the fundamental nature of the Firm's practice and its work for, and service to, its clients. As he had at the December review, Cardwell repeatedly mischaracterized his errors as "typos." But the partners explained that they were not typos, and further emphasized that the points that had been delivered in Cardwell's reviews were the points on which the broader group of Corporate Department partners had agreed Cardwell needed to work. Reid explained that the Firm was going to try to put resources in place to address Cardwell's performance and staffing problems. (It did so, as described below.)

Reid—who had read Cardwell's reviews before the meeting, as he had before the January 2016 dinner with Cardwell—understood that Cardwell was struggling to perform, and explained to Cardwell that he and the Firm were determined to make additional efforts to invest in Cardwell and to improve his performance. Reid explained that this would take effort on Cardwell's part. Cardwell agreed. When Cardwell expressed concern about his recent hours, Reid indicated that a few months of uneven hours was not by itself overly concerning from a career development perspective. Reid picked up on the football analogy Cardwell had used himself in the past in connection with his legal career, including during Reid's and Cardwell's January 2016 dinner, and explained that the important thing for Cardwell's future development was for him to focus on making necessary improvements going forward, not to be concerned that his

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

recent uneven activity level would impact his ability to improve his performance going forward. In the course of the discussion, Cardwell raised, for the first time, the question whether his assignments or hours were connected to his race, and he was assured they were not.

Cardwell alleges that he raised concerns about his hours and the review process at the meeting, and that Reid told him at this meeting that "if [he] did not simply drop whatever mistakes the Firm made in the past and move forward," Cardwell would be "off the field." Compl. ¶ 23. Any suggestion that the Managing Partner of the Firm conditioned Cardwell receiving future work on his "drop[ping]" any purported concerns about the Firm is utterly false, without any basis, entirely contrary to his specific treatment of Cardwell, and completely antithetical to the Firm's demonstrated commitment to diversity and inclusion generally. In fact, the Firm has assigned Cardwell subsequent work and, as described below, made considerable efforts to do so. Cardwell's suggestion is also inconsistent with the particular interest Reid had shown in Cardwell and his performance dating back for more than a year.

At the close of the meeting, contrary to Cardwell's allegation that Reid "emphatically insist[ed]" that Cardwell take time off, Reid offered Cardwell the chance to take time off if he needed it. Compl. ¶ 23. Cardwell accepted this invitation, shortly thereafter requesting four weeks off. Compl. ¶ 24. The Firm granted his request.

During the month of April 2017, when Cardwell was out of the office at his own request, the Firm discussed a remediation plan for Cardwell. Partners who had worked with Cardwell when he was more junior—for example, John Amorosi—were of the view that Cardwell was not capable of performing at the level needed for more senior-level assignments. Cardwell's performance problems were so significant that the view was that Cardwell might need to be staffed at a level a full year junior to his class. Cardwell's history of producing unreliable work presented significant obstacles to assigning him work.

The Firm nonetheless made clear to Cardwell that a further plan would be in place when he returned from his time off, and indeed it was.

### 2. The Firm Put in Place a Comprehensive Plan to Address Cardwell's Staffing and Performance Issues, But Cardwell's Performance Did Not Improve

Cardwell contends that by the time he returned to the Firm from his four week vacation on May 2, "the Firm did not have a concrete plan in place" with respect to his staffing, or did not "communicate" the plan. Compl. ¶ 25. Cardwell likewise suggests that he was given an assignment that "could have been completed by a summer associate with little substantive corporate experience," and that he went "eight months" without deal work. *Id.* This again is false.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

   As a preliminary matter, Cardwell's allegation that he was without M&A work for eight months is contradicted by his own time records.[11] These records also demonstrate that Cardwell had more work than he alleges. Neither Cardwell's completed time records nor his suggestion that he had "100% availability" from January 2017 forward accurately reflect his work or staffing. Compl. ¶ 18. First, Cardwell was, as he concedes, on vacation all of April 2017. Compl. ¶¶ 24–25. More importantly, after Cardwell engaged litigation counsel, his completed time records do not reflect his work or meetings on matters with at least four partners. Cardwell worked on a joint venture deal with Louis Goldberg, an M&A partner, in June, but despite spending considerable time on the matter—including meetings with Goldberg and work on a draft document— Cardwell's completed time records contain no billable time for the month. He met with partner Phillip Mills and worked on a draft document in June, but again his completed time records contain no billable time for the month. He did considerable work on a matter for Lee Hochbaum, another partner, over the summer and into September, but again did not properly record time for the matter until he was prompted to do so by Hochbaum. Likewise, he joined calls and meetings and made revisions to a document for a matter with Amorosi, but his completed time records reflect only one hour despite the fact that the changes he made to the document alone should have taken more time to implement.

   Moreover, the Firm did, in fact, put in place a comprehensive plan to address Cardwell's staffing and communicated it to him immediately upon his return. On the day after Cardwell returned to the office (May 3), Cardwell's Career Advisor—John Bick, the head of the Corporate Department—met with Cardwell to explain the plan: Cardwell's performance issues continued to pose problems, but several partners nevertheless were going to work with Cardwell in an effort to help and in the hopes of turning around Cardwell's performance. In particular, Goldberg, a partner with whom Cardwell had requested to work, agreed to coach Cardwell through a series of individual assignments and give him direct feedback at each stage.[12]

   As part of this plan, Goldberg met with Cardwell shortly thereafter to give him a detailed primer about an assignment he was about to be given. Cardwell was to work on research for what would become an article published by a Harvard forum. Contrary to Cardwell's suggestion that the project did not require his level of "experience or knowledge," Compl. ¶ 25, the assignment was highly substantive and complex and concerned an important issue of interest both to a particular client, who had requested the

---

[11]   Cardwell billed time to M&A deals in November and December 2016, took time off from March 31 to May 2, 2017, and worked on M&A matters in May, June, and into the fall, including as part of larger deal teams.

[12]   Cardwell alleges that neither of his Career Advisors had any "communication[s]" with him about his career. Compl. ¶ 19. As the record demonstrates, this too is false. As described above, Bick met with Cardwell at his request in the spring of 2016 to discuss Cardwell's performance reviews. Bick was then assigned, in January 2017, to be one of Cardwell's advisors under the banner of the Career Advisor Program. By spring 2017, Bick in fact had not met with any of his advisees in Cardwell's class year—including those who had been given Career Advisors six months earlier than Cardwell, because they had not done third rotations—but did in fact meet with Cardwell in May to discuss Cardwell's performance struggles and a plan for his staffing.

Highly Confidential
FOIA/FOIL Confidential Treatment Requested by Davis Polk

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

research, and to the Firm's broader client base.[13]  It is not unusual for midlevel associates to work on such projects.

Cardwell in fact struggled to complete the assignment.  On May 10, Goldberg requested an update; Cardwell responded with a short email that made it apparent that he had done little work and misunderstood the assignment.  When nearly another two weeks had passed, and Cardwell still had not circulated a draft, Goldberg reached out to Cardwell in order to get an update on his progress.  Cardwell indicated to Goldberg in response that he was not yet ready to circulate a draft and that he was not having a good experience at the Firm.

Goldberg then scheduled a meeting, on May 23, with both Cardwell and Sharon Crane.[14]  (Crane, the Firm's Executive Director of Personnel, is herself African-American and a former Davis Polk associate.)  Goldberg again explained to Cardwell during the meeting with Cardwell and Crane that the Firm had put in place a plan to staff Cardwell, monitor his workload, and provide concrete and real-time feedback, and that, as part of this plan, he had been asked to work with Cardwell.  Goldberg asked Cardwell if he was interested in doing the work and noted that if Cardwell was willing to invest the effort so was Goldberg.  Alongside these efforts, Goldberg endeavored to find deal teams for Cardwell to join.  The next day, the Firm was notified that Cardwell had engaged a lawyer.

On May 31, a full three weeks after being given the assignment, Cardwell sent a draft of the article to Goldberg.  The draft was unusable.  Among other issues, Cardwell had included a note indicating that he had not yet even done the research necessary to confirm the article's conclusions ("TBD," Cardwell wrote, "whether relevant and recent case law exists and/or can be cited").  Goldberg had to conduct the research himself and redraft the entire article.  When the article was published, virtually nothing remained of the draft Cardwell had submitted.  Despite this, Goldberg allowed Cardwell to be listed as a co-author of the article and also explained to him during the course of the project why the project was important to the Firm's clients and why Cardwell's efforts had fallen well short.

Nevertheless, as part of the same effort to find Cardwell work and address his performance issues, the Firm identified two opportunities for Cardwell in June.  On the first, a joint venture deal, Goldberg gave Cardwell a detailed training session on the assignment, consistent with the plan the Firm had put in place, and met again with Cardwell to review the work he had submitted.

The second was a deal with Mills, an M&A partner.  Cardwell was staffed on the matter on Thursday, June 14, and worked on a draft document over the next two

---

[13]  John Bick, et al., *Just How Iron-Clad are Contractual Rights to Payment On Preferred Stock of a Solvent Company?*, HARV. L. SCH. FORUM ON CORP. GOV. & FIN. REG. (June 27, 2017), *online at* https://corpgov.law.harvard.edu/2017/06/27/just-how-iron-clad-are-contractual-rights-to-payment-on-preferred-stock-of-a-solvent-company/.

[14]  Crane, who is often a resource for associates at the Firm, attended the meeting to better understand Cardwell's perspectives on his experience at the Firm and to be an additional resource to him.

days. By the following Tuesday, when Mills requested to review the draft with Cardwell at midday, Cardwell could not be found, despite repeated efforts. By 5:00, having heard nothing, Mills again attempted to reach Cardwell. At 10:43 p.m., still having heard nothing, Mills wrote to Goldberg, copying Bick:

> *Louis: I have a problem here.*
>
> *Kaloma and I agreed last night that we would discuss his work product today— see attached email.*
>
> *I first reached out to him today per the first email below at 12:21pm to schedule a meeting for 1:30pm. When I heard nothing from him by mid-afternoon I called and left a message having been told by his assistant that she did not know where he was or whether he was in the office today. As you can see below, I sent him a further message at 5:18pm today. It's now 10:40pm and I have had no response at all—over 10 hours after my original message—nor has he reached out to me.*
>
> *I plan to reach out to Carolina [Fenner] tomorrow morning for new staffing as [the client] has focused today on the need for a draft letter and just now asked for a draft tomorrow.*
>
> *Sorry to burden you with this but I tried to make it work. However, it is simply not acceptable when associates are non-responsive for a protracted period especially when they are supposed to be at their desks during business hours.*

*Ex. 19.* The department arranged replacement staffing for the deal.

Throughout the summer and fall of 2017, the Firm continued to invest in efforts to staff Cardwell. But despite the Firm's sustained efforts with respect to Cardwell's career, his performance did not improve. For example, Cardwell struggled to understand the substance of his work on a financial advisory matter with Hochbaum, an M&A partner, throughout the summer and fall. He prepared a draft disclosure for a client's proxy statement that included inapplicable sections from a sample disclosure, including sections describing entire analyses the client had not performed. In other words, for a document that as a matter of law has to be factually accurate, he was making up facts. Hochbaum, like Goldberg before him, was forced to rewrite the document essentially from scratch. Likewise, Cardwell made unacceptable mistakes for an associate at any level: As previously noted, Cardwell made individual changes but failed to make conforming changes through documents, and he failed to check his work sufficiently for errors. Finally, Cardwell was often unresponsive and unavailable. When Hochbaum would try to reach Cardwell, he was rarely in his office and often failed to respond for many hours, leaving Hochbaum to respond to time-sensitive client requests without support.[15]

---

[15] This is a marked departure from the expectation in corporate law. As explained to associates in detailed training sessions and memoranda distributed at the start of rotations, associates are expected to be available and responsive. *See, e.g., Ex. 6, Ex. 20* at 24.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Cardwell displayed similar problems on an M&A deal with Amorosi in September 2017. Cardwell was asked to implement client-requested changes following a client call with Amorosi. The draft Cardwell submitted was so substandard that Amorosi, in order not to miss a client deadline, came into the office on a Sunday to redo Cardwell's work. Cardwell's work showed that he had failed to understand the difference between two key types of agreements and, as a result, he tried to force edits appropriate for one type into the other. Consistent with the Firm's plan for Cardwell, both Hochbaum and Amorosi met with Cardwell to discuss their feedback.

September marked the culmination of three years of progressive performance problems and the beginning of Cardwell's fourth year at the Firm. Despite sustained feedback and investment, Cardwell's performance continued to falter. Cardwell's experience at the Firm, in terms of both assignments and hours, reflected these performance difficulties. Far from either discriminating or retaliating against Cardwell, the Firm in fact invested uncommon time and effort in support of Cardwell.

## E.    None of the Other Events That Cardwell Complains About Was Discriminatory

Cardwell points to three other instances where concerns he raised with the Firm allegedly were "met either with indifference or hostility," and which he therefore believes constituted actionable discrimination. Compl. ¶ 7. Cardwell again has his facts wrong. The record demonstrates that the Firm made significant efforts both to invite and attend to Cardwell's concerns.

First, Cardwell alleges that in May 2015, he contacted the Firm's Executive Director of Personnel, Sharon Crane—one of the leaders of the Firm's diversity and inclusion efforts—to suggest that attorneys be encouraged to introduce themselves to other attorneys, including attorneys of color. Compl. ¶ 7. This message was in fact included in the Firm's 2015 training materials, as it had been in the past and would be again in 2016, *Ex. 20* at 26, *Ex. 21* at 26, and *Ex. 22* at 29 (reminding attorneys to "[i]ntroduce yourself!" and to "please remember to introduce yourself, always"), as well as in 2016 partner training, *Ex. 23* at 20 (suggesting, as a way to promote inclusion "[a]t Firm functions, meetings and events, talk with associates you don't already know"), and in 2016 all-lawyer training, *Ex. 24* at 23 (encouraging the audience to expand their comfort zone and "[s]ay hello; move toward difference; [p]urposely connect and work with those who are not like you.").

Cardwell next alleges that he raised a general concern about workplace exclusion at a meeting of the Black Affinity Group ("BAG") with the Diversity Committee in September 2015. According to Cardwell, after he did so, he indicated that he himself had experienced race-related exclusion at the Firm, but nobody followed up with him to ask him about his experience. Compl. ¶ 8. Cardwell completely mischaracterizes the discussion at the meeting. Contrary to his depiction, the leaders of the Firm's Diversity Committee, a dedicated task force of partners and administrators, initiated a meeting with associate members of the BAG to solicit ideas and feedback relating to diversity and inclusion initiatives at the Firm. When the Committee asked if

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

associates had ever experienced workplace exclusion, Cardwell said that he had walked by a conference room and seen members of one of his teams on a conference call that he had not been invited to join.  Attendees at the meeting responded to Cardwell's observation by discussing the fact that it is not uncommon, particularly in the context of client concerns and high billable rates, not to include all members of teams on every call, particularly junior associates.  But contrary to Cardwell's assertion that there was no "follow[] up," the Committee made note of the concern for future professional development discussions.  Compl. ¶ 8.

Finally, Cardwell alleges that he "approached" the Firm's Managing Partner, Tom Reid, in January 2016 to request that the Firm sponsor his attendance at a conference, and that Reid "[u]nexpectedly . . . advised that [he] should not sign up for the conference."  Compl. ¶ 9.  This, too, is contradicted by the record.  As discussed above, on December 1, 2015, Reid reached out to Cardwell and another associate, also African-American, and invited them to dinner to take place in January.  At the January dinner, which spanned two hours, the associates asked if the Firm would sponsor their attendance at a conference.  In response, Reid explained that the Firm's policy is to bring speakers in house, rather than to sponsor individual attendance at conferences of interest, so that more associates could benefit from the programming.  This exchange lasted five to ten minutes, after which the conversation moved to other topics, including, as described at length above, the associates' performance at the Firm and their requests for career advice.  After the dinner, and without any additional prompting, Reid rethought his initial view in this instance and decided to encourage the initiative displayed by Cardwell and the other associate by agreeing to sponsor their attendance at the conference.  And, indeed, both associates attended the conference as requested, sponsored by the Firm.

Referring to these three purported incidents, Cardwell alleges that his staffing was altered as a result, in particular noting two events that followed this period.  Compl. ¶¶ 10, 16.  Cardwell again mischaracterizes the facts and the record.

Cardwell first suggests that a senior associate, Daniel Brass, retaliated against him in relation to these events by "abruptly" removing him from a deal.[16]  Compl. ¶ 11.  This is false.  In fact, over the course of about four hours on the afternoon of July 22, 2016, Brass approached Fenner, the M&A staffing coordinator, in search of urgent help.  When it initially appeared that a particular associate with skill in the necessary task was not available, Brass signaled that he would accept Cardwell's help.  Within hours, however, the experienced associate in fact became available and was assigned to the matter.  Because there was neither a client need nor a justification for adding two associates, Cardwell was told he would not be joining the team.  Cardwell relayed this to Fenner and, two weeks later, asked Fenner whether the exchange reflected a decision to "limit [his] involvement to certain types of deals and matters[.]"  *Ex. 25.*  Fenner told Cardwell by phone that she was aware of no such decision, and indeed there had been none.  These events had nothing to do with Cardwell's race or the three purported incidents he has identified.  There is no connection at all between any alleged issues

---

[16]   Brass later became a partner.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Cardwell raised and these events other than that they followed each other in time. This is not enough to allege discrimination.

Finally, Cardwell alleges that Rocio Clausen, one of his prior assigning administrators, did not "arrange or coordinate new assignments" for him after September 2016. Compl. ¶ 16. This was entirely standard. By the fall of 2016, Cardwell had assigned to M&A, and his staffing was coordinated by M&A. Clausen was no longer the administrator responsible for assigning matters to Cardwell. To be sure, Clausen did reach out to Cardwell in September seeking his help on a Credit group matter. (As is explained in orientation, associates are expected to be available for cross-departmental assignments when the need arises, and when Credit is in need of help, it routinely reaches out to associates in other groups who, like Cardwell, had rotated through Credit.[17]) Once Cardwell signaled his refusal to accept a cross-departmental assignment, there was no further reason for Clausen to coordinate his assignments.[18]

None of these events was either discriminatory or retaliatory.

\* \* \* \* \*

In short, the record establishes beyond any question that Cardwell's experience at the Firm, in both hours and assignments, was solely a function of consistent and documented performance problems, not of any unlawful act by the Firm.

## IV. POSITION STATEMENT OF THE FIRM

Cardwell asserts claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), based principally on the allegation that he experienced a decrease in billable work as a result of his race.

Cardwell's claims have no support in fact or in law. Cardwell has not alleged, as he must to prevail on a claim of discrimination, any facts establishing that anyone at the Firm acted with an intent to discriminate against him. The record

---

[17] Cardwell's tenure at the Firm began with a comprehensive training program that emphasized, among other issues, the Firm's expectations for junior associates, skills development, and the Firm's commitment to diversity and inclusion. As relevant here, associates were told to arrive to work on time, to be available for cross-departmental assignments when the need arose, to pay careful attention to the changes senior lawyers made to their work and to other analogous forms of feedback, and to introduce themselves to other attorneys. *See, e.g., Exs. 20-22.*

[18] Remarkably, the Complaint also suggests that, as part of a "pattern" of being underutilized that Cardwell allegedly began to notice during the summer of 2016, Cardwell "was removed from another M&A deal" on September 29, 2016. Compl. ¶ 15. In fact, it was the demands of another M&A deal on which Cardwell was simultaneously working (which contributed to his relatively high September 2016 billables) that prompted a more senior associate to find another associate to "fill in" for Cardwell through signing of the deal. Far from being "removed" from the deal, Cardwell was asked to let the team know "when [he] free[s] up," to which he responded, "Understand completely. I'll be sure to let you know." *Ex. 26.*

establishes the contrary: Cardwell's hours and assignments were uneven because his performance was deficient, not because of his race. Cardwell's retaliation claim fails for a similar reason: there is no causal relationship between any of the events to which Cardwell points and the work he received. Absent any facts that even suggest that the Firm's staffing decisions were the result of Cardwell's race or any views he expressed, Cardwell's claims are precisely the type of conclusory allegations of discrimination and retaliation that should be, and routinely are, dismissed at the outset for want of probable cause. *See, e.g.*, *Smith* v. *New York State Div. of Human Rights*, 142 A.D.3d 1362, 1362–64 (4th Dep't 2016) (affirming decision of the NYSDHR to dismiss a complaint without a hearing, and noting that "while petitioner's factual showing must be accepted as true on a probable cause determination," "full credence need not be given to the allegations in petitioner's complaint that he was discriminated against on the basis of [race], for this is the ultimate conclusion, which must be determined solely by the Division based upon all of the facts and circumstances") (internal quotations, citations, and alterations omitted).

## A. Davis Polk Did Not Discriminate or Retaliate Against Cardwell

To prevail on a claim of disparate treatment under Title VII, a plaintiff must "prove that [he was], individually, the victim[] of intentional discrimination." *Simmons-Grant* v. *Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 505 (S.D.N.Y. 2013).[19] To do so, the plaintiff must first establish a *prima facie* case of discrimination. This requires the plaintiff to show "(1) membership in a protected class, (2) satisfactory job performance, (3) adverse employment action, and (4) circumstances giving rise to an inference of discrimination on the basis of [his] membership in that class." *Simmons*, 508 F. App'x. at 12.

Similarly, to allege a *prima facie* case of retaliation, the plaintiff must plead that (1) he engaged in a "protected activity," (2) the employer was "aware" of that activity, (3) he suffered a "materially adverse action," and (4) there was a "causal connection" between the alleged "protected activity" and the "materially adverse action." *Kelly* v. *Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).

In discrimination and retaliation cases, if the plaintiff cannot establish a *prima facie* case, the inquiry ceases, and if the plaintiff establishes a *prima facie* case, "the burden then falls on the defendant to articulate a legitimate, non-discriminatory reason for its actions." *Simmons-Grant*, 915 F. Supp. 2d at 503. If the defendant meets this burden, the plaintiff "must then show that the stated reason was merely a pretext." *Id.* (citing *McDonnell Douglas Corp* v. *Green*, 411 U.S. 792 (1973)).

---

[19] The standards under Title VII and the NYSHRL are the same for both discrimination, *see Simmons* v. *Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x. 10, 12 (2d Cir. 2013), and retaliation, *Russo* v. *N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 454 (E.D.N.Y. 2013).

1.   **Cardwell's Discrimination Claim Fails Because There Are No Facts That Would Support Even an Inference of Discriminatory Intent**

Cardwell has failed to allege a *prima facie* case of discrimination.

In the first instance, Cardwell cannot establish that his performance was "satisfactory." The indisputable record makes clear that it was not. This alone is fatal to his claims.

Equally important, Cardwell's claim of discrimination also fails because the circumstances here, as alleged in the complaint, do not "giv[e] rise to an inference of discrimination" on the basis of race. *Simmons*, 508 F. App'x. at 13. The "critical question" is "whether those involved in the [relevant] decision . . . acted with discriminatory animus." *Ragin* v. *E. Ramapo Cent. Sch. Dist.*, No. 05-CV-6496, 2010 WL 1326779, at *12 (S.D.N.Y. Mar. 31, 2010), *aff'd*, 417 F. App'x. 81 (2d Cir. 2011). Here, there are no *facts* (as opposed to conclusions) alleged in the complaint that, even if proved, come anywhere near suggesting—much less establishing—discriminatory animus.

In support of his discrimination claim, Cardwell identifies the following issues and events: (i) a belief that his hours were improperly low and that he should have been permitted to work on assignments other than those he was given, (ii) a May 2015 exchange with Crane suggesting that attorneys be reminded to introduce themselves, (iii) a concern he raised in September 2015 with respect to not being invited to join a conference call, (iv) an allegation that despite the fact that the Firm's Managing Partner decided to make an exception to policy to sponsor Cardwell's attendance at a conference, it was somehow discriminatory that Cardwell needed to explain why he requested the exception, and (v) the fact that Bick delivered critiques of Cardwell's performance in an off-cycle review that Cardwell had requested. None of these issues or events, individually or taken together, gives rise to an inference of discrimination.

First and foremost, as detailed extensively above, Cardwell's hours were uneven because his work was of a poor quality and was therefore not sought after at the Firm. The antidiscrimination laws do not require a firm to staff an associate on matters or assignments where doing so would compromise either the client or the team, and the Firm's appropriate exercise of its discretion to make staffing decisions here does not give rise to an inference of discrimination. *Morris* v. *New York City Dep't of Sanitation*, No. 99-CV-4376, 2003 WL 1739009, at *7 (S.D.N.Y. Apr. 2, 2003) ("It is not the Court's role to second guess a decision that was based on Defendant's view of the work of its employees."). Neither the nature of Cardwell's assignments nor the fact that his hours were at times lower than those of his peers demonstrates "discriminatory animus." *Ragin*, 2010 WL 1326779, at *12.

Nor do Cardwell's remaining allegations support an inference of discrimination. Three of the events to which Cardwell points—the May 2015 email exchange with Crane, the September 2015 Black Affinity Group meeting with the

Diversity Committee, and the fact that Reid initially indicated to Cardwell and another associate that the Firm did not intend to sponsor the attendance of two associates at a conference outside the Firm[20]—are too attenuated in time from any alleged drop in hours (in the summer or winter of 2016) to support an inference of discriminatory intent. *See, e.g.*, *Kouakou* v. *Fideliscare New York*, 920 F. Supp. 2d 391, 399 (S.D.N.Y. 2012) (collecting cases holding that a four to five month separation between events and an adverse employment action is too attenuated to support an inference of discriminatory intent).

Nor do these events themselves, or the fact that Bick gave Cardwell a mid-year review in 2016, constitute discrimination. Cardwell requested the mid-2016 review, and even if he had not, the fact that an organization delivers performance critiques—particularly when those critiques are supported by the record—does not give rise to an inference of discriminatory animus. *See, e.g.*, *Bernard* v. *J.P. Morgan Chase Bank N.A.*, No. 08-CV-4784, 2010 WL 423102, at *12 (S.D.N.Y. Feb. 5, 2010), *aff'd*, 408 F. App'x. 465 (2d Cir. 2011) (finding that an employer's "[h]olding a meeting to convey th[e] message" that an employee "needed to improve," and "to offer suggestions," does "not give rise to an inference of discrimination").

Not only does Cardwell point to nothing supporting an inference of discrimination, he points to no employee "similarly situated [to him] in all material respects" who was treated more favorably than he based on race, as he must to make out a claim. *Perez* v. *New York State Office of Temp. & Disability Assistance*, No. 14-CV-1621, 2015 WL 3999311, at *6 (S.D.N.Y. June 30, 2015). And even if Cardwell could show that he was treated "differently" from similarly-situated others in terms of assignments, the evidence here would rebut any suggestion that this treatment was "related to a protected characteristic . . . as opposed to his deficient work performance," particularly because "such treatment is not surprising when supervising the work of a failing employee." *Id.*; *Simmons* v. *Akin Gump Strauss Hauer & Field, LLP* [sic], No. 10-CV-8990, 2011 WL 4634155, at *7 (S.D.N.Y. Oct. 6, 2011), *aff'd sub nom. Simmons*, 508 F. App'x. 10 (differences in assignments did not create an inference of discriminatory intent where the associate's performance was "at best[] mediocre," the associate had received poor reviews, and the associate's work reflected mistakes).

Even were Cardwell to establish a *prima facie* case, Cardwell's claims fail because the Firm had a "legitimate, non-discriminatory reason" for its actions—Cardwell's ongoing and consistent performance deficiencies, which risked impacting the Firm's ability to meet its clients' needs—and the evidence would defeat any suggestion that this "reason" was pretextual. Indeed, the record shows that the Firm gave Cardwell several second chances, even when his performance would have merited a decision to end his tenure at the Firm, rebutting any inference of pretext. *Ruth* v. *Infonet Servs. Corp.*, No. 94-CV-5576, 1997 WL 189038, at **9–11 (S.D.N.Y. Apr. 17, 1997) (in finding no pretext, crediting the fact that the plaintiff was given extra time to improve, while others were not).

---

[20] As indicated above, Reid subsequently decided that the Firm would sponsor Cardwell's and the other associate's attendance at the conference, and the Firm did so.

Case 1:19-cv-10256-GHW   Document 52-4   Filed 06/05/20   Page 24 of 25

In sum, the "mere fact" that Cardwell can point to his race and a series of events with which he is dissatisfied does not establish discrimination, at the *prima facie* stage or otherwise. Where a pleading "amount[s] to 'I am (fill in the protected class of which the plaintiff is a member); something bad happened to me at work; therefore the bad thing happened because I am (fill in the protected class),'" the pleading amounts to a "'false syllogism'" that "'does not support any inference of discrimination.'" *Johnson* v. *Morrison & Foerster LLP*, No. 14-CV-428, 2015 WL 845723, at *6 (S.D.N.Y. Feb. 26, 2015), *appeal dismissed*, No. 15-956 (2d Cir. May 13, 2015) (citing *Ochei* v. *The Mary Manning Walsh Nursing Home Co.*, No. 10–CV–2548, 2011 WL 744738, at *3 (S.D.N.Y. Mar. 1, 2011)). Because none of the evidence Cardwell offers "raises a genuine issue of material fact that the *actual* reason for [the drop in his hours] was racial animus," Cardwell's claims fail. *Ray* v. *Ropes & Gray LLP*, 799 F.3d 99, 114 (1st Cir. 2015) (granting summary judgment for law firm on associate's discrimination claim); *Simmons*, 2011 WL 4634155, at *7 (law firm did not discriminate in terminating an associate, particularly where supervisors complained about the quality of her work).[21]

## 2.    Cardwell's Retaliation Claim Likewise Fails

Cardwell's retaliation claim likewise fails because Cardwell cannot demonstrate the requisite causal connection between any allegedly protected activity and any allegedly adverse action.

In the first instance, Cardwell has not identified any *protected activity* in which he engaged. Cardwell's key allegation in support of his claim of purported retaliation—that he complained about a former Firm client—does not satisfy the protected activity test.[22] *See, e.g., Kelly*, 716 F.3d at 15 (protected activity must be "directed at an unlawful *employment practice* of [the] employer") (citation and quotation marks omitted). Second, even if Cardwell could establish that any of the events he has identified qualify as him having raised complaints about employment practices, he has not established that the senior attorneys who made decisions not to, for example, staff him on particular teams were even aware of these alleged events, much less that they chose not to staff him on the basis of these events.[23] Third, Cardwell's retaliation claim fails because Cardwell has not demonstrated the requisite causal connection between his email to Dunne and any alleged retaliation: the allegedly adverse action to which

---

[21] Cardwell's claims likewise would fail under the NYCHRL, because the evidence does not establish that he was treated less well than his similarly-situated peers on the basis of his race, as that statute requires. *See, e.g., Simmons*, 508 Fed. Appx. at 14 (holding that a law firm associate's claims failed under Title VII, the NYSHRL, and the NYCHRL, on the basis of the same evidence).

[22] As described above, Cardwell also appears to complain that other actions he took—such as encouraging attorneys to introduce themselves or requesting sponsorship to attend a conference—also resulted in retaliatory action. These complaints similarly fail to meet the requisite standard.

[23] *See, e.g., Joseph* v. *Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 320, 322 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x. 29 (2d Cir. 2015) (finding that, "[i]n the absence of evidence beyond Plaintiff's speculation that [the person tasked with the staffing decision] w[as] motivated to terminate Plaintiff in response to Plaintiff's complaints, . . . Plaintiff cannot establish retaliation" under Title VII, the NYSHRL, or "[even] under the less stringent standard of the NYCHRL.").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Cardwell points—the drop in his hours in late 2016—had begun months before, negating any claim of causation.

Indeed, far from retaliating against Cardwell, and as noted above, the Firm in fact took extraordinary steps to hear and respond to Cardwell's concerns, even when unwarranted (as was the case, for example, when Cardwell sought to add a reminder to associate training that was already included, or when Cardwell sought to discuss ending a relationship with a client that had already been ended). The Firm and its senior leadership sought out Cardwell's views, invested in Cardwell and his future, made available to Cardwell the resources he requested (even when doing so required an exception to policy), and gave him second chances. Each of these actions—and the Firm's dedicated efforts to improve Cardwell's performance in the spring and summer of 2017—rebuts any allegation of retaliation. Cardwell's claim of retaliation, like his claim of discrimination, fails at the *prima facie* stage, and even if it did not, is rebutted by the Firm's legitimate, nondiscriminatory, and nonpretextual reasons for its staffing decisions here: its fundamental obligations to its clients.

## V.    CONCLUSION

The Firm respectfully requests that the Department make a determination in this matter that there is no probable cause to believe the Firm has engaged in an act of unlawful discrimination or retaliation, and requests that the Complaint be dismissed pursuant to Section 297.2 of the Human Rights Law (N.Y. Exec. Law, art. 15; 9 N.Y.C.R.R. § 465.5(d)(1)).

The Firm reserves all rights to supplement or modify this response and otherwise reserves all rights to present any claims or defenses in this matter.

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:    _____
Bruce Birenboim (bbirenboim@paulweiss.com)
Susanna M. Buergel (sbuergel@paulweiss.com)

1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000 (telephone)

*Attorneys for Respondent Davis Polk & Wardwell LLP*