

August 3, 2017

**By FedEx & Email**
John B. Douglass
Supervisory Investigator
U.S. Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, NY 10004
John.douglass@eeoc.gov

    Re:    *Kaloma Cardwell/Davis Polk & Wardwell LLP*

Dear Mr. Douglass:

    This firm represents the charging party, Kaloma Cardwell. Enclosed for filing is a charge of discrimination. Please file it and inform us of the charge number.

    Please ensure that we receive copies of all notices or other correspondence with our client. In addition, we request a copy of the Respondent's position statement so that we may respond to it.

    Please call me if you have any questions.

                Sincerely yours,

                Cara E. Greene

c: Monique E. Chase, Esq.

Enclosures

**New York**  685 Third Avenue  25th Floor  New York, NY 10017  Tel (212) 245-1000  Fax (646) 509-2060
**Chicago**  161 N Clark Street  Suite 1600  Chicago, IL 60601  Tel (312) 809-7010  Fax (312) 809-7011
**San Francisco**  One Embarcadero Center  38th Floor  San Francisco, CA 94111  Tel (415) 638-8800  Fax (415) 638-8810
**Washington, DC**  601 Massachusetts Ave NW  Second Floor West Suite  Washington, DC 20001  Tel (202) 847-4400  Fax (202) 847-4410

www.outtengolden.com

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA ■ EEOC | |

**NYC Human Rights Commission and EEOC**
*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Kaloma Cardwell | [redacted] |

| STREET ADDRESS | CITY, STATE & ZIP CODE | DATE OF BIRTH |
|---|---|---|
| [redacted] | New York, NY [redacted] | [redacted] |

**NAME OF THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)**

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Davis Polk & Wardwell LLP | 900+ | 212-450-4000 |

| STREET ADDRESS   CITY, STATE, AND ZIP CODE | COUNTY |
|---|---|
| 450 Lexington Avenue, New York, NY 10017 | New York |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS   CITY, STATE, ZIP CODE | COUNTY |
|---|---|
| | |

**CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))**

■ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ AGE
■ RETALIATION ☐ NATIONAL ORIGIN ☐ DISABILITY ☐ OTHER

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST (ALL)   LATEST (ALL)
July 1, 2017
☐ CONTINUING ACTION

**THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):**

Please see attached.

■ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedure.

I declare under penalty of perjury that the foregoing is true and correct.

7/27/17
Date

[signature]
Charging Party (Signature)

*NOTARY – (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

[signature]
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)
[signature] 27/7/2017

SHANTE GREENE
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY
LIC. #01GR6217567
COMM. EXP. 4/22/18

EEOC FORM 5 (Test 10/94)

Kaloma Cardwell
EEOC Charge Particulars
Page 1 of 5

## Introduction

1. My name is Kaloma Cardwell, and I am an African American/Black male.

2. On September 15, 2014, I was hired as an associate at the law firm Davis Polk & Wardwell LLP ("DPW" or "the Firm") in its New York office, where I am currently in my third year at the Firm. I have been a member of the Mergers & Acquisitions ("M&A") practice group since April 2016.

3. Prior to working at DPW, in 2011, I was one of 78 students selected from 750 applicants to participate in the prestigious Sponsors for Educational Opportunity (SEO) Corporate Law Internship Program. Currently, I am active in legal organizations such as the Metropolitan Black Bar Association and the New York City Bar Association Civil Rights Committee, and have a network of relationships in industry-leading companies that provide a promising pool of business opportunities for DPW in my future career.

4. As outlined below, the Firm, has discriminated against me because of my race and has retaliated against me because I have actively raised awareness and concerns regarding issues of racial bias and disparate outcomes, including by failing to offer me substantive and billable work commensurate with my similarly-situated White coworkers, depriving me of a meaningful chance of advancement to partnership, and threatening my employment, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. and the New York State and City Human Rights Laws, N.Y. Exec. L. §§ 290 *et seq*., and N.Y.C. Admin. Code §§ 8-101 *et seq*.

## DPW Discriminated Against Me on the Basis of My Race After I Raised Concerns About Racial Diversity and Inclusion at the Firm

5. After graduating from the UC Berkeley School of Law, I began at DPW in September 2014, as the only Black male associate in my class of approximately 120 attorneys (and I remain the only Black male associate at my year).

6. As an associate, the quality of my work, my willingness to go above-and-beyond to help others at the Firm, and my contributions to advancing diversity and inclusion have been praised by senior and junior associates at the Firm on numerous occasions, including orally and in writing.

7. Throughout my employment at DPW, I have consistently advocated for and supported diversity and inclusion efforts within the Firm. I have also periodically notified members of the Firm of issues of interpersonal and structural racial bias, and racially uneven practices and outcomes. In many instances, my concerns were met either with indifference or hostility. For instance, in May 2015, I emailed Sharon Crane, Executive Director of Personnel, and suggested that as part of an upcoming attorney training at the Firm, there be a discussion point regarding the importance of attorneys introducing themselves to other summer associates and junior attorneys of color. In response, Ms. Crane minimized the issue to the "social

Kaloma Cardwell
EEOC Charge Particulars
Page 2 of 5

awkwardness" of attorneys, and skirted the task by saying that she could bring it up at an appropriate time.

8. On another occasion, during a September 2015 DPW Black Attorney group meeting, I raised the general issue of Black DPW attorneys being excluded in the workplace. Partners Monica Holland and Maurice Blanco, and Renee DeSantis, the Director of Associate Development, attended the meeting. After I made my comment, Ms. DeSantis directly asked whether I had personally experienced race-related exclusion at the Firm. Although I answered affirmatively, and described how such exclusion is harmful to Black associates' professional development and careers, neither Ms. DeSantis nor any of the partners in attendance followed up with me about my (or others') experience.

9. A few months later in January 2016, I approached Tom Reid, DPW Managing Partner, with an inquiry about whether the Firm would be willing to sponsor me to attend a Black lawyer professional development conference. Unexpectedly, Mr. Reid advised that I should not sign up for the conference, despite my explanation that such opportunities would foster relationships between Black attorneys at DPW and senior executives at Fortune 100 companies that could be leveraged for DPW business in the future. Mr. Reid ultimately agreed to sponsor our participation, but only after I and another associate spent a considerable amount of time explaining to him how this would benefit us—as Black associates. In that conversation, and prior to Mr. Reid agreeing to sponsor our participation, we also explicitly raised the institutional bias that we, as Black associates, had experienced at DPW.

10. In May or June 2016, John Bick, head of DPW's Global Corporate Practice and then head of M&A, called me to an impromptu mid-year review meeting and made critiques regarding my performance that were inconsistent with my experience and the positive feedback I had received up to that point. I explained such critiques were inconsistent (as previously noted herein) and requested additional information, including to be provided with any specific examples that served as the basis of such critiques, but he was unable to provide me with specific examples.

11. In the course of the summer of 2016, I began to notice an overall pattern where I was assigned to fewer deals, which are central to the revenue of the Firm and the M&A practice group, than the White third-year associates in my practice group. Instead, I was assigned to more research-related assignments, which are only tangential to the Firm's business and which did not require my level of legal experience. During that same period, Daniel Brass, a senior White associate at DPW (now a partner), abruptly removed me from a deal without explanation or prior notice. On July 22, 2016 and August 4, 2016, I raised concerns about Mr. Brass's behavior and staffing discrepancies to Carolina Fenner, an Associate Development Manager.

12. As a result, I was underutilized and for more than five successive weeks in mid-2016, I indicated on my weekly work capacity form a capacity of greater than 50% (denoting that more than half of my hours were available for new assignments).

Kaloma Cardwell
EEOC Charge Particulars
Page 3 of 5

13. Beginning in the summer/fall of 2016, I included in my weekly capacity form a request to work with five specific partners who frequently ran M&A deals. Although my request was in line with the Firm's normal and preferred protocol, the vast majority of my assignments, to my and other associates' confusion, continued to be with the same handful of senior associates with whom I was already working.

14. Moreover, although I routinely had one-on-one interactions with Harold Birnbaum (in his office), a DPW partner tasked by other partners to staff junior associates (including third-year associates) and who received such associates' weekly capacity forms since the fall of 2016, Mr. Birnbaum never mentioned or addressed my unusually low hours and has never staffed me on a single matter.

15. On September 29, 2016, I was removed from another M&A deal – what turned out to be the last M&A deal I was staffed on for over eight months.

### When I Raised Concerns about Systemic Racial Bias, DPW Retaliated by Depriving Me of All Substantive Work

16. On September 8, 2016, I met with Rocio Clausen, a DPW Professional Development Manager, regarding her inquiry as to whether I could and would accept being staffed on a potentially lengthy non-M&A matter that did not require my level of legal experience and would have further retarded my M&A development and relationships with the Firm's M&A attorneys. I noted my assignment history and added that I did not want my career and trajectory to be a part of the pattern in the legal profession and the Firm where White associates have, for reasons that are unrelated to merit or work ethic, more experience and better-quality work than Black associates of the same year. Following our conversation, Ms. Clausen did not arrange or coordinate new assignments for me, did not assign me to the non-M&A matter, and did not have any subsequent conversations with me about the concerns I shared with her.

17. Throughout the fall and winter of 2016, I continued to raise concerns related to associates of color and the Firm's overall role in addressing systemic racial inequities. On December 5, 2016, I emailed Carey Dunne, a longtime DPW partner, about the Firm's representation of a DPW client in an industry especially harmful to racial minorities and suggested that the Firm distance and ultimately end its relationship with that client.

18. After raising my concerns to Mr. Dunne, my assignments and corresponding hours dropped precipitously. From May through October 2016, I billed over 100 hours per month, once over 200 hours in a single month. In stark contrast, from January through March 2017, I billed a <u>total</u> of only 5.9 hours. From at least the week of January 23rd forward, my weekly capacity form indicated that I had 100% availability to take on new assignments, yet the Firm did not staff me on any matters.

19. In addition to the Firm not staffing me on any matters, Firm leadership virtually ignored me. For example, on January 20th, I received an email from Ms. Clausen informing me

Kaloma Cardwell
EEOC Charge Particulars
Page 4 of 5

that Mr. Bick and John Butler, a DPW M&A partner, were to be my "Career Advisors." Nevertheless, to this date, I have not received any communication from Mr. Bick or Mr. Butler about the Career Advisor program, nor have I had a one-on-one conversation with either partner about my career. In another instance, in February 2017, as he had done in the past, Mr. Bick walked by me in the hallway without speaking or even acknowledging my presence. I have observed that he does not ignore my colleagues in this way.

20. In a March 3, 2017 email to Sharon Katz, Special Counsel for Pro Bono, I again raised the issue of the Firm's relationship with a client whose business negatively and disproportionately exploited and harmed racial minorities. At Ms. Katz's request, I later met with her and Mr. Reid on March 9th, in which Mr. Reid gave me a verbal commitment that the Firm would not represent the aforementioned client. He would not, however, discuss or commit to any tangible mechanisms that would monitor or ensure firm-wide compliance with such commitment.

21. At the conclusion of the March 9th meeting, and without any prior discussion related to my workload or assignment history, Mr. Reid voluntarily acknowledged and conceded that my prior and current workloads were low, that they were low for reasons that were "not [my] fault," and stated that it needed to be "fixed."

22. On March 21st, I emailed Ms. DeSantis and requested to review my file and a copy of my past performance evaluations. Ms. DeSantis declined my request and voluntarily and subsequently scheduled a meeting for me and Mr. Reid.

23. On March 29th, I met with Mr. Reid and Leonard Kreynin, a DPW partner. During that meeting, I noted that I was uncomfortable with the Firm's review process, and noted that racial biases can influence performance evaluations. I also raised the issue of my low utilization and lack of work assignment, and Mr. Reid attributed my lack of work to himself and others at the Firm "dropping the ball." He added that if I "let the past be the past," the Firm would be prepared to offer me unprecedented opportunities "unlike anything that ha[d] ever been done." When I followed-up with questions and asked Mr. Reid to specify (or, alternatively, arrange for Mr. Bick or another DPW partner to specify) "how the 'ball was dropped' and who 'dropped the ball'" for such a lengthy time period, Mr. Reid forcefully said, "we're not going to do that" and told me that if I did not simply drop whatever mistakes the Firm made in the past and move forward, I would be "out of the game" and "off the field." The meeting ended with Mr. Reid emphatically insisting that I take a few days, or as much time as I needed, to think things over.

24. Two days later, on March 31st, I emailed Mr. Reid and accepted his offer to "take as much time as I need[ed]" to regroup and requested four weeks' vacation. He approved the request the same day.

25. I returned to the Firm on May 2, 2017. When I returned, the Firm did not have a concrete plan in place (or communicate such plan) to staff me on deals or address the issues discussed in the March 29th meeting with Mr. Reid. Fifty-six (56) days after Mr. Reid said my

Kaloma Cardwell
EEOC Charge Particulars
Page 5 of 5

workload needed to be "fixed," the Firm finally gave me my first (and, for the next week or two, only) assignment, a legal research memo that could have been completed by a summer associate with little substantive corporate experience or knowledge. It was not until the Firm was informed (by my counsel) that I had engaged counsel did the Firm assign me to my first M&A deal in over eight months.

26. As a direct result of the discrimination and retaliation described above, I have suffered damages including, but not limited to lost professional opportunities and career prospects, humiliation, embarrassment, emotional and physical distress, and mental anguish.

27. DPW's treatment of me is consistent with its treatment of other Black attorneys and workers who have worked or currently work at the Firm, and accordingly, I file this Charge on behalf of myself and all others similarly situated.

**<u>Charge</u>**

28. Accordingly, I charge DPW with violating my rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. and the New York State and City Human Rights Laws, N.Y. Exec. L. §§ 290 *et seq*., and N.Y.C. Admin. Code §§ 8-101 *et seq*.

29. I swear under penalty of perjury that I have read the above charge and that it is true and correct to the best of my knowledge, information and belief. This charge is not intended to be exhaustive but it is representative of the treatment to which DPW has subjected me.