# Plaintiff's Exhibit A

# Plaintiff's September 10, 2020 Letter to Defendants Re: the Protective Order

September 10, 2020

**VIA E-MAIL**

Jeh Johnson and Susanna Buergel
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285Avenue of the Americas
New York, New York 10019-6064

Re: *Cardwell* v. *Davis Polk & Wardwell LLP,* et al. (1:19-cv-10256-GHW)

Dear Jeh Johnson and Susanna Buergel,

  This letter is a response to Defendants' September 9, 2020 email and Defendants' position on the protective order with regards to the sufficiency of the Court's model protective order and whether Plaintiff should be allowed to view certain documents related to certain Davis Polk clients and certain performance reviews.[1] Accordingly, and until the Court settles the parties dispute over Defendants' proposed changes to the Court's model protective order, Plaintiff agrees to treat as Confidential any documents received by Defendants in accordance with the Court's model protective order.

  For the sake of clarity, and for the reasons noted in this letter, Plaintiff's August 6, 2020 letter to Defendants (Ex. A), and other related communications, Plaintiff's position remains that Defendants' proposed changes are unacceptable and improper in light of the facts, allegations, and claims in this case.

  A core allegation in this case is that Defendants manipulated Plaintiff's performance reviews and personnel file in response to Plaintiff's legally protected complaints, including complaints about the Firm's representation of a certain client in the for-profit prison and immigrant detention industry.[2]

  Coupled with Plaintiff's priors communications where I indicated that Plaintiff was needed in order to fully assess Defendants' production, these allegations are rooted in facts that go to both the heart of Plaintiff's claims and discovery that is in Defendants' possession, including the following facts and evidence:

1.  At all relevant times, Davis Polk's policy handbook prohibited retaliation against any individual who raised any question concerning legal compliance or professional ethics, among other protected complaints. Am. Compl. ¶¶ 57 n.3; 228, 245, 251.

---

[1]  Among other things, Defendants' revised protective order seeks to explicitly prohibit Plaintiff from seeing various performance reviews and certain communications involving Davis Polk clients, including communications related to the for-profit prison client that Plaintiff alleged was related to retaliation that he experienced.
[2]  This letter does not provide an exhaustive list of arguments or evidence related to Plaintiff's allegations.

Sept. 10, 2020 Ltr. to Paul Weiss
Page **2** of **9**

<u>CARDWELL000954</u>:

> Lawyers' Handbook                                      Page 29 of 76
>
> If in the course of your practice you have any questions regarding ethical considerations or compliance with the law, you should promptly discuss the matter with the partner supervising the matter, the firm's General Counsel or Deputy General Counsel, or a member of the Management Committee. The Management Committee or General Counsel will seek to maintain confidentiality of any such inquiry to the extent possible and appropriate under the circumstances. The Firm prohibits any form of retaliation against any individual who raises any question concerning legal compliance or professional ethics in good faith.

  2. As early as April 21, 2015, Davis Polk and certain partners and Firm leaders understood that Black Americans were experiencing racial discrimination in the U.S. criminal justice system.

<u>CARDWELL001224</u>:



  3. As early as June 24, 2015, Davis Polk knew that Plaintiff was a member of the team working on a pro bono client matter and memo related to racial discrimination within the U.S. criminal justice system. Around this time, Davis Polk knew Plaintiff had a good faith concern about discrimination, human rights violations, and companies operating within the for-profit prison system (as evidenced by Plaintiff's work product on this topic, which was submitted for inclusion in the memo).

<u>CARDWELL002089</u>:

Sept. 10, 2020 Ltr. to Paul Weiss
Page **3** of **9**



4.  As of June 26, 2015, the assembled Davis Polk team shared Plaintiff's concerns about discrimination in the for-profit prison system. Not only did Davis Polk and a significant number of its attorneys agree with Plaintiff's conclusions on this issue, Davis Polk selected the for-profit prison topic from a larger list of potential topics and largely incorporated Plaintiff's analysis and research in a draft memo that was later submitted to one of the Firm's pro bono clients. *See* Am. Compl. ¶ 201 and CARDWELL001261-76, including the following excerpt (which closely follows Plaintiff's proposed edits and research at the time):



5. Several Davis Polk partners, leaders, and associates understood that the Firm's representation of a for-profit prison client (the "for-profit prison client") created several questions concerning legal compliance or professional ethics—questions and issues that are covered by the Firm's anti-retaliation policies and Plaintiff's protected complaints. *See* CARDWELL003318; Am. Compl. ¶ 201.

6. On December 5, 2016, and consistent with the Firm's policies (including its anti-retaliation policies), Plaintiff reached out to the supervising attorney on the pro bono matter and raised questions about the Firm's representation of the for-profit prison client. *See* CARDWELL003317-18; Am. Compl. ¶ 200.

7. Unknown to Plaintiff at the time, Plaintiff's December 5, 2016 email directly implicated Davis Polk's M&A partners, including revenue the Firm's M&A partners generated for themselves and the Firm. In March 2017, Thomas Reid informed Plaintiff that M&A partner ▓▓▓▓▓▓▓ was the relationship partner for the for-profit prison client that Plaintiff asked the Firm to end its relationship with.

8. From December 2016 to April 2016, Plaintiff was a member of the Firm's M&A group. During that time, however, and following Plaintiff's legally protected complaints about one of ▓▓▓▓ clients, none of Davis Polk's M&A partners staffed or worked with Plaintiff on any billable matters. *See* Am. Compl. ¶ 203.

    9.     Plaintiff sent Sharon Katz, Davis Polk's Special Counsel for Pro Bono, an email on March 3, 2017 that was also (i) a part of legally protected complaints under federal law and (ii) a complaint that was protected by Davis Polk's anti-retaliation policies regarding questions about legal compliance and professional ethics (as noted above). *See* Am. Compl. ¶ 229; CARDWELL000533-36.

    10.    On March 6, 2017, the next business day, certain Davis Polk partners printed and reviewed Plaintiff's performance reviews and/or revised Plaintiff's performance reviews in Davis Polk's online system.

*Defendant Chudd's Summary Review of Plaintiff (CARDWELL002022-23)*:



*Defendant Bick's Summary Review of Plaintiff (Bates # 002030-31)*:

[Image of redacted Lawyer Reviews - Summary Reviews form. Associate: Cardwell, Kaloma; Reviewer: Bick, John A.; Review Date: June 30, 2016 (circled). Review Type: Interim Review. Sections 2, 3, and 4 show redacted (blacked out) content. Page 2 of 7 shows sections 5, 6, 7 with "No Answer" responses. Submitted on: 6/30/2016, 12:34 PM. URL footers with "3/6/2017" circled on both pages.]

11. On March 9, 2017, Plaintiff attended a meeting with Thomas Reid, arranged by Sharon Katz in response to Plaintiff's March 3 email. During the March 9 meeting, in the presence of Sharon Katz and after reviewing Plaintiff performance reviews, Thomas Reid explicitly told Plaintiff that his low workload was not his fault. *See* Am. Compl. ¶¶ 230-32.[3]

12. On March 21, 2017, Plaintiff asked Renee DeSantis, Davis Polk's Chief Professional Development Officer, to see his performance reviews and personnel file. Renee DeSantis "look[ed] into" Plaintiff's request, categorically denied it, presumably after receiving an answer from Thomas Reid or John Bick, and immediately set up a meeting with Plaintiff, Thomas Reid, and M&A partner Len Kreynin. *See* CARDWELL001618; Am. Compl. ¶¶ 237-40.

---

[3] On March 10, 2017, Plaintiff emailed a description of his March 9 meeting to an associate who is now a Davis Polk Partner. Plaintiff's email explicitly referenced Thomas Reid's remarks about Plaintiff's workload not being his fault. *See* CARDWELL001515.

13.     On March 29, 2017, Plaintiff met with Thomas Reid and Len Kreynin. During the meeting, in the presence of Len Kreynin, Thomas Reid began the meeting by attributing Plaintiff's dearth of work assignments to himself (Thomas Reid) and the Firm, and stated that he (Thomas Reid) and the Firm had "dropped the ball" and made mistakes. *See* CARDWELL002080; Am. Compl. ¶¶ 241-52.

14.     On March 28, 2017—one day before this meeting—Kreynin strategically summarized Plaintiff's December 2016 annual performance reviews and entered it into the Firm's system and Plaintiff's personnel file. Kreynin's March 28, 2017 summary meant that—for the first time during Plaintiff's tenure at the Davis Polk—Plaintiff now received an annual review summary that included a notation that claimed Plaintiff was going to have a follow-up mid-year review—done in order to justify various adverse actions, including terminating Plaintiff on the basis of "performance." After the March 28, 2017, at no point did Kreynin discuss with Plaintiff anything related to Plaintiff's performance, let alone have a follow-up meeting or mid-year performance review to discuss "whether there have been improvements," as his review indicated.

*Len Kreynin's Summary Review of Plaintiff (CARDWELL002033-34)*:



15.     Other facts indicate that Len Kreynin's March 28, 2017 summary review was not created in the ordinary course, contradicting Davis Polk's public statements that "Mr. Cardwell . . . was **terminated** for legitimate, non-discriminatory reasons **following negative performance reviews given in the ordinary course**." (emphasis added.)

\*     \*     \*     \*

Plaintiff is objecting to Defendants' proposed changes to the Court's model protective order because such changes would prohibit Plaintiff from seeing the very documents at the heart of Plaintiff's allegations and claims. Such allegations undoubtedly involve the same performance reviews and communications that Defendants now seek to prohibit Plaintiff from seeing in discovery.

In essence, Defendants' approach to the protective order (i) argues that Plaintiff should not have access to discovery that's critical to Plaintiff's ability to litigate his claims and (ii) proposes conditions that would increase Defendants' ability to further financially harm and retaliate against Plaintiff.

If Defendants want to address concerns about its exposure to liability—especially that which is a direct result of Defendants' unlawful choices and actions—there are alternatives available to Defendants that do not involve their current approach to the protective order.

Defendants, however, should not be allowed to address legally unsupported and speculative concerns by prohibiting the person most familiar with Defendants' documents and practices from being able to review critical evidence in Defendants' possession. This is especially true regarding discovery related to (i) performance reviews (which implicates Plaintiff's performance reviews and the purported basis that Defendants' publicly claim led to Plaintiff's termination); and (ii) certain clients, Plaintiff's complaints about the Firm's representation of such clients, and the Firm's anti-retaliation policies about such complaints and clients.

Ultimately, as noted above, Plaintiff understands that the parties are at an impasse regarding the Court's model protective order's applicability to certain performance reviews and documents related to certain clients. Until the Court settles the parties' dispute, Plaintiff agrees to treat as Confidential any documents received by Defendants in accordance with the Court's model protective order.

Plaintiff reserves all rights.

Sincerely,

/s/ David Jeffries

David Jeffries
