```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____               │
│ DATE FILED:  10/24/2020              │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

KALOMA CARDWELL,

        Plaintiff,

    -v-

DAVIS POLK & WARDWELL LLP, THOMAS
REID, JOHN BICK, WILLIAM CHUDD,
SOPHIA HUDSON, HAROLD BIRNBAUM,
DANIEL BRASS, BRIAN WOLFE, and JOHN
BUTLER,

        Defendants.

-----------------------------------------------------------------X

1:19-cv-10256-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

  Is Davis Polk & Wardwell LLP—one of the world's most prestigious law firms—a racist institution? Kaloma Cardwell says it is. Cardwell, who is Black, worked as an associate at Davis Polk for four years. There, he alleges that Defendants discriminated against him because of his race. When he complained about the discrimination, Cardwell alleges that Defendants orchestrated a campaign to retaliate against him by giving him negative performance evaluations. Defendants then allegedly used these performance evaluations as a pretext to stop assigning Cardwell work. And it worked: Cardwell billed two hours *per month* for three consecutive months. Cardwell complained to Davis Polk's management about his workload. The firm's Managing Partner, Defendant Thomas Reid, expressed regret and told Cardwell that Davis Polk had "dropped the ball." But when Cardwell demanded an explanation, Reid told Cardwell that he would be "out of the game" and "off the field" if he wouldn't drop the issue. Reid promised that the situation would improve.

  It didn't. Because you are reading this in a legal opinion, you can guess what happened next: Cardwell filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). Then

Davis Polk fired Cardwell.  He sued, alleging a bevy of discrimination and retaliation claims under federal, state, and New York City law.

Defendants now move to dismiss some of Cardwell's claims against all Defendants and all of Cardwell's claims against some Defendants.  The motion is GRANTED in part and DENIED in part.  Cardwell has not adequately alleged that his race was a motivating factor in the actions of any Additional Defendant,[1] so his discrimination claims against those Defendants are dismissed.  Cardwell has not plausibly pleaded that he was subjected to an objectively hostile work environment, so his hostile work environment claims against all Defendants are dismissed.  Most of Cardwell's retaliation claims against the Additional Defendants suffer from multiple pleading deficiencies, so most claims are also dismissed.  But Cardwell has plausibly alleged that Daniel Brass, Harold Birnbaum, and Brian Wolfe were part of a group that collectively decided to fire him because of his protected complaint to the EEOC, so the motion is denied as to those claims.  Cardwell's harassment and aiding and abetting claims under state and city law are dismissed, but Defendants' motion to strike is denied.  Because there are no remaining claims against Defendants Sophia Hudson, William Chudd, and John Butler, those Defendants are dismissed from the case.

## I. BACKGROUND

### A. Facts[2]

#### 1. Cardwell joins Davis Polk.

Cardwell first joined Defendant Davis Polk & Wardwell LLP (the "Firm" or "Davis Polk") as a summer associate in 2013.  AC ¶ 35.  He joined the Firm as a full-time associate September 2014 and worked there until August 2018.  *Id.* ¶ 4.  He rotated through three corporate departments, or "practice groups:"  Credit, Capital Markets, and Mergers & Acquisitions ("M&A").  *Id.*  After

---

[1] The "Additional Defendants" are defined below.
[2] The facts are drawn from Cardwell's amended complaint ("AC"), Dkt No. 37.  For this motion, the Court must accept as true the facts alleged in the amended complaint.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Cardwell did six-month rotations in those three departments, he was assigned to work permanently in M&A.  *Id.*  Cardwell was one of four Black associates hired to join Davis Polk's 2014 class of 120 associates.  *Id.*  He was the only male Black associate.  *Id.*

Cardwell alleges that the discrimination began early in his tenure at Davis Polk.  In May 2015, Cardwell complained that Davis Polk attorneys did not make eye contact or speak to junior or summer associates of color in meetings.  *Id.* ¶ 56.  Cardwell allegedly identified this "pattern" in an email to "Davis Polk's Executive Director" (the "Executive Director") who "worked closely with the Firm's management committee" and other partner committees on developing the firm's personnel, associate development, and firm management policies.  *Id.* ¶ 55.[3]

Cardwell was dissatisfied with the Executive Director's response.  The Executive Director emailed Cardwell that "unfortunately that happens to everyone" and attributed the lack of eye contact and communication to the "social awkwardness" of attorneys.  *Id.* ¶ 58.  So the Executive Director concluded, "[h]opefully if this happened to you, you showed them how to live in polite society(!) and introduced yourself."  *Id.*

Cardwell also alleges that he was "exclu[ded] from opportunities" that were "vital" to his professional development.  *Id.* ¶ 62.  For example, Cardwell was "left off email communications and meeting invitations" that were circulated to all attorneys working on a particular deal or that otherwise should have included him.  *Id.* ¶ 63.  Once, Cardwell walked into a white 2014 M&A associate's office; she and Cardwell were working on the same deal at the time.  *Id.* ¶ 64.  Cardwell was surprised to learn that she had been invited to listen to a conference call with "high-level clients and senior attorneys."  *Id.*  Cardwell asked this associate to forward emails or meeting invitations to

---

[3] Cardwell alleges that Davis Polk's "Lawyers Handbook," which describes the Firm's policies, states "[t]he Firm strongly recommends the prompt reporting of all perceived incidents of discriminatory behavior or harassment on the basis of . . . race, color . . . or any other basis prohibited by federal, state or local law, regardless of the offender's identity or position."  *Id.* at ¶ 57 n.3.  The Handbook also allegedly advises that "[l]awyers who believe they have been subjected to such prohibited conduct or who believe that they have witnessed such prohibited conduct or any other behavior should discuss their concerns immediately with Davis Polk's Executive Director."  *Id.* (brackets omitted).  So Cardwell allegedly followed firm policy and raised the issue with the Executive Director.

him if she thought he should have been included on them.  *Id.*  The associate agreed and
"periodically forwarded emails" from white senior M&A associates.  *Id.*

At a September 2015 meeting between Davis Polk's Diversity Committee and its Black
Attorney Group, Cardwell participated in a conversation about how Black Davis Polk attorneys
"were excluded from staffing-related opportunities at the Firm."  *Id.* ¶ 67.  Partners on Davis Polk's
Diversity Committee and the Firm's "Director of Associate Development" attended the meeting.
*Id.*  Cardwell "was directly asked whether he had personally experienced" racial discrimination at
Davis Polk.  *Id.*  Cardwell answered that he had.  *Id.*  And he clarified in the ensuing discussion that
he wasn't referring to a "feeling of being excluded."  *Id.*  Rather, Cardwell said that the "disparate
treatment" he experienced was harmful to his and other Black associates' professional development
because it gave them "fewer and different staffing-related opportunities."  *Id.*  No Davis Polk
employees followed up with Cardwell after the meeting to ask about his comments.  *Id.* ¶ 69.
During a January 2016 dinner with a "senior Black associate" and Defendant Thomas Reid, the
Firm's Managing Partner, Cardwell "educat[ed]" Reid about "how he had experienced interpersonal
and institutional discrimination at the Firm."  *Id.* ¶ 76.

### 2. Cardwell allegedly receives positive performance reviews.

Cardwell alleges that his performance reviews were positive during his first years at the Firm.
Davis Polk has "a formal system of written performance reviews" to evaluate its attorneys.  *Id.*
¶ 111.  The performance reviews are collected in a "formal, systematic process."  *Id.* ¶ 112.  As part
of that process, the Firm requires partners and senior associates to submit written performance
review forms for junior associates.  *Id.*  After the Firm compiles those reviews, a partner has a face-
to-face meeting with the associate to discuss her written performance reviews.  *Id.*; *see also id.* ¶ 88
n.10 (distinguishing between "written performance reviews," which the reviewing attorney
submitted to the Firm, and "face-to-face reviews," which are meetings between an associate and a
partner "to discuss the written performance reviews").  The partner reviewer then summarizes the

written reviews and the discussion during the face-to-face review in a written "Summary Review" that the partner submits to the Firm. *Id.* ¶ 112. The face-to-face reviews typically occur at the end of the year. *Id.*

Cardwell alleges that these reviews are important. He alleges that everyone involved understands that "written performance reviews can, and often do, 'make-or-break' attorneys' careers." *Id.* ¶ 113. According to Cardwell, performance reviews are an "official" and "authoritative" record of attorney performance at Davis Polk, including "whether attorneys are performing materially behind, with, or ahead of members in the reviewee's class." *Id.* ¶ 114. The Firm also allegedly uses the reviews to "assess[] and verify[] whether" reviewing attorneys evaluate junior associates "in a non-discriminatory, consistent, and accurate" manner. *Id.* Because the reviews are important, Davis Polk allegedly ensures that reviewers have adequate time to submit their written reviews and that reviewees have an opportunity to "prepare for their face-to-face review with their partner reviewer." *Id.* ¶ 113.

Cardwell had his first "face-to-face review" in May 2015 because it was Firm policy to conduct an associate's first such review after the associate spent six months at the firm. *Id.* ¶ 100 n.12. He had his second face-to-face review in December 2015 with Defendant William Chudd, an M&A partner at the Firm. *Id.* ¶¶ 10, 88. The review lasted "a few minutes" and Chudd gave "positive feedback" and two brief suggestions. *Id.* ¶ 88. The first was that Cardwell should "work on better setting expectations regarding how long it will take to do something." *Id.* The second was that Cardwell shouldn't "spend too much time thinking about the bigger picture." *Id.* Cardwell asked Chudd if he had advice about soliciting "real-time feedback" from supervising attorneys. *Id.* ¶ 90. Chudd "acknowledged" that it was difficult to get feedback from supervising attorneys but "encouraged Cardwell to continue trying to get such feedback." *Id.* ¶ 91. Cardwell alleges that Chudd's "comments and tone" made clear that Cardwell was "performing satisfactorily" and meeting "the Firm's and [the] M&A group's" expectations. *Id.* ¶ 93.

### 3. Cardwell allegedly receives a "sham" performance review from Bick.

In June 2016, Cardwell alleges that he received an irregular, unscheduled face-to-face review from Defendant John Bick. *Id.* ¶ 98.  Bick was the head of Davis Polk's M&A group and a member of the Firm's three-person Management Committee during Cardwell's tenure at the firm. *Id.* ¶ 8. Before the unscheduled review, Cardwell had co-authored a memo to Bick with another non-white junior M&A associate. *Id.* ¶ 96.  Bick emailed Cardwell that he should come to Bick's office for another research assignment about the same matter. *Id.* ¶ 97.  When Cardwell arrived at Bick's office, Bick described the new research assignment for a few minutes. *Id.* ¶ 98.  Bick then "abruptly" grabbed a folder and said:  "I know you asked for feedback, so I figured I'd take a few minutes to go through your reviews." *Id.*

Cardwell was alarmed by Bick's behavior.  Cardwell "had not requested a performance review or non-real-time feedback from anyone at the Firm." *Id.* ¶ 99.[4]  Cardwell alleges that Davis Polk attorneys do not typically receive "unannounced, mid-year" face-to-face reviews. *Id.*  In documents filed with the New York State Division of Human Rights ("NYSDHR") in response to Cardwell's complaint, Bick stated that Cardwell "had asked for mid-year feedback on his work" and that his review was "in response to that request." *Id.* ¶ 100 n.13.  But Cardwell was concerned because he did not receive advance notice that this type of review "would or could take place." *Id.* ¶ 100.  Bick allegedly "departed from the Firm's normal review process" and "lied about how the review came about." *Id.*  Cardwell characterizes Bick's review as a "sham." *Id.* ¶ 101.

Cardwell alleges that Bick's assessments during the face-to-face review were "wildly" different from contemporaneous feedback from his supervisors. *Id.*  Bick allegedly relayed that Cardwell's supervisors commented that he had "a pattern of missing deadlines." *Id.* ¶ 102.  Cardwell responded that he couldn't remember doing so. *Id.*  Bick replied that Cardwell shouldn't "think of it

---

[4] It is not clear how Cardwell squares this allegation with his allegation that he asked Chudd if he had advice about soliciting real-time feedback from his supervising attorneys. *Id.* ¶ 90.

as deadlines" and discussed "vague[]" and "general timing critiques." *Id.* ¶ 103. Cardwell believed that Bick's comments were inconsistent with the "typical written and spoken precision practiced by Bick and other Davis Polk M&A partners" and the extensive planning M&A partners conduct before giving an associate a face-to-face review. *Id.* ¶ 104. Cardwell pressed Bick for "specific examples" that "served as the basis for these critiques." *Id.* ¶ 105. But Bick couldn't provide any such examples. *Id.* Cardwell alleges that Bick's inability to provide examples shows that he had been pretending to read from Cardwell's performance reviews. *Id.* ¶ 106. Cardwell asked Bick if he would inquire with the reviewers about what deadlines he had missed. *Id.* Bick allegedly agreed to follow up but never did. *Id.*

A senior associate with whom Cardwell discussed the exchange was also alarmed by Bick's behavior. *Id.* ¶ 108. Cardwell contacted this associate after his meeting with Bick. *Id.* ¶ 107. The associate expressed concern that "a partner or group of partners at Davis Polk" decided to give Cardwell formal feedback that became part of his "official record," instead of giving informal feedback. *Id.* ¶ 108. The associate also was allegedly "upset" that Cardwell was not notified in advance about Bick's face-to-face review. *Id.* The associate commented that it was "unlikely" that Bick "coincidentally or carelessly" used the phrase "missed deadlines." *Id.* And the associate was "suspicio[us]" that the written performance reviews were not genuine" because "Davis Polk partners meet before giving associates face-to-face reviews to discuss . . . how feedback should be communicated." *Id.*

After Bick met with Cardwell under the allegedly "false pretenses" of assigning Cardwell another research project, Bick did not respond to Cardwell's emails about the assignment itself. *Id.* ¶ 109. Cardwell emailed a 15-page research memo to Bick in July 2016 and sent a follow-up email later in the month. *Id.* ¶¶ 109–10. But Bick never responded. *Id.* ¶ 110. Although Bick's office was two doors down from Cardwell's, Bick allegedly ignored Cardwell. *Id.* Indeed, Bick did not email Cardwell for about 300 days, from July 2016 to May 2017. *Id.*

Cardwell alleges that all the reviews submitted by Davis Polk associates before the June 2016 meeting with Bick that the Firm shared with his attorney or the NYSDHR rated him as performing "with" his class year. *Id.* ¶ 115. Jason Kyrwood, a corporate partner, wrote in an "interim performance review" that Cardwell's performance was "[g]enerally positive" and that he was "organized" and a "hard worker[,]" generated "high quality work," and had "good attention to detail." *Id.* ¶ 116 (brackets and emphasis omitted). Cardwell alleges that only after he "vocaliz[ed] his concerns" about racial discrimination at the Firm—and specifically, "bias-related interactions within the Firm's M&A and Capital Markets groups"—that his performance reviews became negative. *Id.* ¶ 117.

Cardwell alleges that Reid, Bick, and Defendant Sophia Hudson[5] "knowingly falsified" his performance reviews. *Id.* ¶¶ 118 & n.17. These Defendants also allegedly submitted "dishonest conclusions" to the NYSDHR about Cardwell's "performance" and "competency." *Id.* ¶ 118. Cardwell alleges that "contemporaneous document[s]" show that "Davis Polk" and "certain [unspecified] defendants submitted false statements" to the NYSDHR but does not elaborate on this allegation. *Id.* Of the eighteen partners and associates who were named in performance reviews that the Firm turned over to NYSDHR or Cardwell's counsel, only Hudson—who did not work in M&A, to which Cardwell was permanently assigned—rated Cardwell as "behind" his class year. *Id.* ¶ 119.

Cardwell alleges that the contemporaneous documents expressing Hudson's concerns are "contradicted" by her "real-time[] written and verbal statements" to Cardwell. *Id.* ¶ 120. These concerns are also allegedly at odds with the positive statements of "capital markets partner Byron Rooney" during a March 2016 meeting. *Id.* Cardwell thus alleges that Hudson's assessment of Cardwell was based on "discriminatory and retaliatory" animus. *Id.* Cardwell alleges that the only

---

[5] Hudson was a corporate partner at Davis Polk. *Id.* ¶ 9. She allegedly departed the firm in July or August 2018. *Id.*

"somewhat critical feedback" he received from Hudson was that Cardwell incorrectly used "I" instead of "me" as the object of a preposition in an internal email. *Id.* ¶ 121. When Hudson corrected Cardwell's grammar, he replied that he "hope[d]" Hudson would "continue to correct me whenever and however you see fit." *Id.* ¶ 124. Cardwell and Hudson "stopped working together" and had "virtually no communication[]" after early 2016. *Id.* But Hudson allegedly once emailed Cardwell and asked for a recommendation for a "Black restaurant" in Harlem. *Id.* Cardwell obliged. *Id.*

### 4. Cardwell allegedly receives undesirable work assignments.

Cardwell alleges that Defendants discriminated and retaliated against him by staffing him on undesirable assignments. The Firm had allegedly implemented systems to combat bias in assigning matters to associates. *Id.* ¶ 125. Cardwell alleges that Davis Polk implemented these systems to "discourage[]" partners and senior associates from assigning work to junior associates "through informal channels[,]" especially for "deals and high-profile cases." *Id.* The Firm allegedly "warned" partners and associates that assigning work through these "informal channels" discriminated against women and non-white attorneys. *Id.* At a public event, Reid said that he discusses "how work at the firm is . . . allocated" in triannual meetings with practice leaders. *Id.* ¶ 70.

The formal mechanism for assigning work to junior associates functioned as follows. Each week, associates completed a "'weekly workload request/capacity form[,]' indicating their availability," the matters they were working on, and other relevant information. *Id.* ¶ 126. "A staff person then complied" these forms "into a single chart" and sent it to "the M&A junior associate assignment coordinator" who "used the chart . . . to staff first- and second-year M&A associates" on specific assignments. *Id.* The chart was also sent to "the two most junior M&A partners" who used it "to staff third-year and more senior associates" on these matters. *Id.* M&A partners and senior associates who needed junior associates emailed the relevant staffing coordinator. *Id.*

The junior M&A staffing partners "had significant and independent decision-making authority on M&A staffing decisions." *Id.* But they allegedly did not have complete control over those decisions. *Id.* Cardwell alleges that those partners communicated with Bick "constant[ly]" about how to staff third-year and more senior associates. *Id.* Likewise, "the junior associate assignment coordinators" did not have "independent control over staffing." *Id.* ¶ 127. And so those coordinators also worked closely with Bick. *Id.*

An M&A associate can work on different kinds of "deals and matters." *Id.* ¶ 128. Cardwell alleges that there is an important difference between "deals" and "transactions" on the one hand and M&A "'work,' 'matters,' 'tasks,' 'projects,' 'research,' 'document review,' [and] 'assignments.'" *Id.* This difference is allegedly "widely understood and significant" among Davis Polk attorneys and in corporate law. *Id.* Deals and transactions influence "M&A rankings," fees, "prestige," and associates' "partnership and lateral prospects[,]" among other important metrics. *Id.* Other M&A work is less prestigious than working directly on a deal. *Id.*

Cardwell alleges that around the time that Bick conducted his "sham review," he noticed that he was being assigned to fewer deals than similarly situated non-Black associates. *Id.* ¶ 129. Instead, he was staffed on "research-related assignments" that did not require his level of experience and assignments in which he "temporarily assist[ed]" in an ongoing matter. *Id.* ¶ 130. Cardwell began to request work with five partners "who frequently ran M&A deals:" Reid, Defendant Harold Birnbaum—a corporate/M&A partner elected in July 2016—and "M&A partners Louis Goldberg, Oliver Smith, and Lee Hochbaum." *Id.* ¶¶ 11, 131–34. Cardwell made these requests "each week from July 2016 through May 2017." *Id.* ¶ 134. But most of Cardwell's assignments "continued to be either non-deals or with the same handful of senior associates" Cardwell had worked with previously. *Id.* ¶¶ 134–39.

Cardwell was abruptly removed from a deal team in July 2016. That month, Cardwell was staffed on an M&A deal. *Id.* ¶ 139. Cardwell emailed Defendant Daniel Brass, then a senior M&A

associate who was elected partner in July 2017, to inquire about what work he should do on the deal. *Id.* ¶¶ 12, 139. Brass initially responded that a different senior associate would "reach out" to Cardwell. *Id.* But hours later, Brass emailed again and told Cardwell that he should "stand down for now!" *Id.* Cardwell asked in response if Brass knew "if and when the status of the deal could change." *Id.* Brass replied that the deal team was "ok for the near future." *Id.* Cardwell alleges that his "abrupt removal from the M&A deal was done in secret and without the permission of the deal's staffing coordinator." *Id.* ¶ 140. According to Cardwell, Davis Polk senior associates "almost always explain to junior associates" if a deal changes and the change influences the junior associate's role in the deal. *Id.* So Cardwell alleges that Brass "willful[ly] and blatant[ly]" discriminated against him by removing him from the deal team without explanation. *Id.* Cardwell never worked on a deal with Brass. *Id.*

Cardwell emailed his conversation with Brass to a junior staffing coordinator to "alert[] her" to Brass's "unauthorized [and] disparate treatment" of Cardwell. *Id.* ¶ 141. The junior staffing coordinator acknowledged receipt of Cardwell's email but did not respond substantively. *Id.* About two weeks later, Cardwell again emailed the junior staffing coordinator to ask for an explanation of why he was removed from the July 2016 deal team. *Id.* ¶ 144. Cardwell asked the junior staffing coordinator "in light of" his conversation with Brass whether "anyone ha[d] made a decision to limit [his] involvement to certain types of deals and matters." *Id.* The junior staffing coordinator called Cardwell in response and told him that no one had decided to limit the type of work he could be assigned. *Id.* ¶ 146. She also explained that she was "not sure what happened" when Brass removed Cardwell. *Id.* After Cardwell told her that Brass never explained his behavior, the junior staffing coordinator told Cardwell that Brass had replaced him with a white associate and said that Brass's behavior was "weird." *Id.*

Cardwell alleges that Bick, Birnbaum, and Defendant Brian Wolfe[6] "ensured that Cardwell was often underutilized and underdeveloped." *Id.* ¶ 147. "For more than five successive weeks in mid-2016," Cardwell "indicated on his weekly workload request/capacity that . . . more than half of his hours were available for new assignments." *Id.* But Cardwell continued to receive fewer assignments than his peers. *Id.*

Even for the matters on which Cardwell was staffed, Cardwell alleges that the partners did not communicate with him. In August 2016, a white senior M&A associate instructed Cardwell to email M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis, attaching documents he had reviewed and edited. *Id.* ¶ 149. None of the partners responded to Cardwell's email. *Id.* The associate instructed Cardwell to follow up a few weeks later. *Id.* ¶ 150. Again, none of the partners responded to Cardwell's email. *Id.* Cardwell alleges that "even though it was clear from the email that" Cardwell reviewed and edited the documents, Golden chose to reach out to the white senior associate and discuss his edits to the document. *Id.* ¶ 151. The white senior associate gave Golden's comments to Cardwell. *Id.* Two days later, Cardwell emailed Bason Jr. and Golden with further revisions. *Id.* ¶ 152. Yet again, neither partner communicated with Cardwell. *Id.* The white senior M&A associate commended Cardwell on the quality of his work product and was allegedly "confus[ed]" that none of the M&A partners responded to Cardwell's email. *Id.* ¶¶ 153–54.

Cardwell alleges that Davis Polk "strategically used" Cardwell's non-deal assignments to justify removing him from a deal in September 2016. *Id.* ¶ 167. Cardwell was again removed from a deal team in September 2016. In August, Cardwell had been "staffed on an M&A deal with a senior M&A associate and Leonard Kreynin, a Davis Polk Corporate Partner." *Id.* ¶ 148. Cardwell alleges that this was "essentially the first and last M&A deal that" Cardwell "was staffed on in 2016." *Id.* In late September, the senior associate on the deal team removed Cardwell because Cardwell was busy

---

[6] Wolfe is an M&A partner who was elected to the partnership in July 2015. *Id.* ¶ 13. He served as staffing partner at various times during Cardwell's tenure. *Id.*

on a different restructuring matter.  *Id.*  Indeed, Cardwell billed 235 hours in September 2016, which is well above the Firm average.  *Id.* ¶¶ 166, 176 n.25.  The senior associate added that Cardwell should let him "know when [he] free[d] up" and that he "hope[d] things get more manageable soon."  *Id.* ¶ 166.

This restructuring matter allegedly did not help Cardwell develop as an M&A attorney.  A senior associate who had been staffed on the restructuring matter had previously complained to an M&A partner that the restructuring matter was unlikely to help her develop "deal" experience and that it might soak up "so much of her capacity that she'd effectively be prevented" from having adequate capacity to be staffed on a deal.  *Id.* ¶ 167.

Cardwell allegedly flagged perceived discrimination in his work assignments to a junior staffing coordinator in September 2016.  In that month—shortly after Cardwell became a third-year associate—a junior staffing coordinator asked Cardwell if she could staff him on a "potentially lengthy" matter in the Firm's Credit group.  *Id.* ¶ 155.  Because it was in the Credit group, Cardwell believed that this assignment would not help him develop as an M&A attorney.  *Id.*  The assignment also would not permit Cardwell to work directly with Davis Polk partners from any practice group and did not require Cardwell's level of experience.  *Id.*  Indeed, the junior staffing coordinator asked if Cardwell could assist with a list of "one-off tasks" that are "routinely assigned" to first- and second-year associates.  *Id.*  The junior staffing coordinator explained that she was asking Cardwell to help with the assignment because the junior associates in the credit group "were over capacity" and that a few associates were "going on vacation."  *Id.* ¶ 156.  She also explained that she had contacted "a number of associates who[,]" like Cardwell, "had previously rotated through the credit group."  *Id.* ¶ 158.

Cardwell responded that he would accept the assignment but was "concerned about [a] general pattern that exists across the legal profession and within Davis Polk."  *Id.* ¶ 159 (emphasis omitted).  This pattern was that white associates have "a resume with more experience and better

quality work than Black associates of the same year." *Id.* Cardwell explained that he was trying to maximize the time he spent on M&A work. *Id.* And he explained that the "potentially lengthy credit assignment" would inevitably mean that he had fewer opportunities to work with M&A attorneys. *Id.* Cardwell also "pointed to specific, documented, disparate staffing patterns" between white and non-white Firm associates. *Id.* ¶ 160. Cardwell noted that he would be happy to work on any assignment, so long as the Firm guaranteed that its staffing decisions were not part of the same "pattern of discrimination." *Id.* The junior staffing coordinator decided not to staff Cardwell on the assignment in the Credit group. *Id.* This junior staffing coordinator "did not arrange or coordinate any new assignments for" Cardwell after this conversation. *Id.* ¶ 161. Cardwell alleges that the junior staffing coordinator refused to staff him on new matters because she "understood" that Cardwell had "raised a discrimination complaint." *Id.* ¶ 163. Cardwell alleges that this was the fifth time that he complained that he had been discriminated against at the Firm. *Id.* ¶ 164.

### 5. Cardwell's billable hours decline precipitously.

Cardwell's billable hours fell sharply beginning in October 2016. After Cardwell became a third-year associate in September 2016, Wolfe and Birnbaum were responsible for staffing Cardwell and other senior associates because they were the two most junior M&A partners. *Id.* ¶¶ 165, 169. In their capacity as staffing partners, Wolfe and Birnbaum reviewed M&A associates', including Cardwell's, weekly workload request/capacity forms. *Id.* ¶ 169. Davis Polk also has software to track associates' billable hours. *Id.* So Cardwell alleges that Wolfe and Birnbaum "had direct knowledge of" Cardwell's "availability." *Id.* But Wolfe and Birnbaum allegedly did not staff Cardwell on any new matters. *Id.* ¶ 170.

Cardwell's billable hours declined to near zero by early 2017. He billed 146 hours in July, 161 hours in August, and 235 hours in September 2016. *Id.* ¶ 176. But Cardwell billed 113 hours in October, 69 hours in November, and 14 hours in December 2016. *Id.* He billed only 2 hours in each of January, February, and March 2017. *Id.* Virtually all these billable hours resulted from a

staffing assignment from an associate, not a partner.  *Id.* ¶ 177.  Cardwell alleges that Davis Polk

associates typically bill "between 133 and 175" hours per month.  *Id.* ¶ 176 n.25.  Cardwell also

alleges that Davis Polk's M&A group was "busy" during this period.  *Id.* ¶ 203.  And he allegedly

"observed that similarly situated non-Black associates" were staffed on assignments "continuously."

*Id.* ¶ 204.  Wolfe and Birnbaum did not explain why they decided not to staff Cardwell on any new

matters.  *Id.* ¶ 170.  But they "routinely and consistently staffed and communicated with similarly

situated non-Black associates about" their assignments.  *Id.*

Cardwell alleges that the Firm's "revenue and profit structure" are "inextricably" linked to

associates' billable hours.  *Id.* ¶ 205.  And billable hours are the "measuring stick" by which

associates are evaluated for their partnership prospects.  *Id.*  For those reasons, Cardwell alleges that

"it is not plausible that one of the Firm's only Black M&A associates could be staffed on zero

assignments" and bill "virtually zero hours for months at a time" without attracting notice of M&A

and other Firm partners.  *Id.*  From January to March 2017, Cardwell "indicated on his weekly

workload request/capacity forms that he had 100% availability to take on new assignments."  *Id.*

¶ 206.  Cardwell thus alleges that it is incredible that Defendants "merely overlooked" him for four

to six months.  *Id.*  Thus, Cardwell alleges that Reid's, Bick's, Wolfe's, Birnbaum's, and Davis Polk's

decisions to "cease assigning work" to Cardwell was "intentional[]" and "motivated" by

discriminatory and retaliatory animus.  *Id.*

Cardwell alleges that Defendants hid that they were treating him "unlawful[ly]" from "Davis

Polk's diversity and inclusion leadership."  *Id.* ¶ 219.  If Cardwell had actually been performing so

poorly that the Firm was unable to staff him on any assignments, he alleges that a "a member of

Davis Polk's Diversity Committee" would have contacted Cardwell to discuss his "performance and

work product." *Id.* But no member of "Davis Polk's official (and unofficial) Diversity Committee"[7] reached out to Cardwell in 2017. *Id.* ¶¶ 220–21.

Cardwell alleges that Davis Polk, Bick, Birnbaum, and Wolfe "knowingly departed from the Firm's normal staffing process" to "create[] a near-career ending gap in" Cardwell's "work experience." *Id.* ¶ 171. They allegedly did this "to pretextually obfuscate" their discriminatory and retaliatory animus. *Id.* Cardwell alleges that Bick exerted control over his staffing and assessments following the "sham review" in June 2016. *Id.* ¶ 172. Bick, Birnbaum, and Wolfe allegedly did not speak with Cardwell about staffing opportunities from September 2016 through March 2017 and did not staff him on any matters, even though Cardwell indicated that he had capacity to take on more work. *Id.* ¶ 173. Birnbaum did not email Cardwell directly for 443 days. *Id.* ¶ 174. Wolfe did not email Cardwell directly for 628 days. *Id.* ¶ 175. And Bick did not email Cardwell directly for 292 days. *Id.* ¶ 176.

Cardwell alleges that Defendants took "strategic steps" to short-circuit his career. *Id.* ¶ 178. Cardwell alleges that his work performance and his performance reviews cannot explain Reid's, Bick's, Birnbaum's, and Wolfe's decisions to cease communicating with him and assigning him work. *Id.* ¶ 179. Cardwell alleges that if the Firm "conclud[es] that an associate is performing poorly[,]" it "is standard practice" for the Firm to "document associates' poor performance." *Id.* ¶ 194 n.27. This documentation includes any warnings issued and "written communications" about "the Firm's conclusions and corrective plan of action." *Id.* Cardwell alleges that Davis Polk did not document his negative performance because no one at the Firm sincerely concluded that he was a "poor performer." *Id.* While Cardwell acknowledges mistakes, he alleges that these mistakes are not "fundamentally different" from the mistakes made by a typical Davis Polk associate of Cardwell's seniority. *Id.*

---

[7] Cardwell does not explain what the Firm's "unofficial" Diversity Committee is.

Because he was the only Black male associate in his class, Cardwell alleges that the Firm expected him to make extraordinary contributions to the Firm's recruiting efforts.  Cardwell's 2015 annual Summary Review stated that he "went above and beyond" when assisting with the Firm's recruiting and summer program.  *Id.* ¶ 187.  Cardwell's 2016 annual Summary Review likewise "commend[ed]" Cardwell for his pro bono/recruiting efforts.  *Id.*  And Cardwell joined the Davis Polk Black Attorney Group's Steering Committee in the winter of 2016.  *Id.* ¶ 186.  Cardwell alleges that the Firm expected him to do this extra work, which "created additional time constraints and responsibilities" for him.  *Id.* ¶ 187.

Kreynin conducted Cardwell's annual face-to-face review in December 2016.  *Id.* ¶ 194.  Kreynin noted a "few criticisms" in his written performance reviews.  *Id.* ¶ 195.  But Cardwell alleges that he told Kreynin that these contradicted the "real-time feedback" he had received.  *Id.*  Cardwell "asked for specific examples."  *Id.*  Kreynin noted that Cardwell made a "drafting mistake" by misspelling "an entity's name that was spelled" similarly "to another entity" in the same documents.  *Id.*  Cardwell requested that Kreynin follow up with other specific examples, but he never did so.  *Id.* ¶ 196.

Despite these critiques, Kreynin allegedly "made comments" that "indicated that" he believed that Cardwell was performing in line with the Firm's expectations.  *Id.* ¶ 197.  Cardwell alleges that these comments signaled that Kreynin believed that Cardwell could contribute to deals that are "the core of Davis Polk's mid-level and senior associate M&A deal flow."  *Id.*  Kreynin allegedly told Cardwell that "[i]t would be good if [he] were the lead attorney at the beginning of a deal that involved a stock purchase agreement."  *Id.*  Kreynin did not suggest that Cardwell was subject to a "performance-related probation period" during the review.  *Id.* ¶ 197 n.28.

In January 2017, a junior staffing coordinator emailed Cardwell that Bick and Defendant John Butler, a "[c]orporate/M&A partner at Davis Polk[,]" were his new "Career Advisors."  *Id.* ¶¶ 14, 210.  Bick and Butler were cc'd on the email.  *Id.* ¶ 210.  Bick and Butler had been assigned

through "the Firm's corporate department's Career Advisor program." *Id.* As the Firm described the program, advisors were "encouraged to work with their advisees to foster direct involvement with skill building" and to "include their advisees on pitches, client service team discussions, and general conversations about the firm's business goals." *Id.* ¶ 212 (emphasis omitted). Advisors were also "expected to maintain a dialogue with" their advisees during the advisee's tenure at the Firm. *Id.* Cardwell alleges that Bick and Butler's assignment as his "Career Advisor" permitted them and the "other defendants to create a roadblock between" Cardwell and other Davis Polk partners who would have treated him fairly. *Id.* ¶ 211. Cardwell does not elaborate on what this "roadblock" was or how it functioned.

Cardwell replied to the junior staffing coordinator's email—with Bick and Butler still cc'd—that he "look[ed] forward to learning how the Career Advisor Program will supplement experiences and conversations" that Cardwell had in the past with "managing partners, assignments coordinators, [Black Attorney's Group] meeting participants, etc." about "DPW interactions, opportunity/assignments, and career development." *Id.* ¶ 214 (emphasis omitted). Cardwell alleges that this email "directly refers to" discrimination that Cardwell "experienced and complained about to" the "Firm's Director of Associate Development and multiple Davis Polk partners at the September 2015 Black Attorney's [G]roup meeting[,]" to Reid in January 2016, and to a junior staffing coordinator in September 2016. *Id.* ¶ 215.

Neither Bick nor Butler ever spoke to Cardwell about his career prospects. *Id.* ¶ 216. Even after Bick became Cardwell's Career Advisor, Bick "routinely walk[ed] by" Cardwell "in the hallway without speaking or even acknowledging [his] presence." *Id.* ¶ 218. Cardwell allegedly "observed" that Bick treated white associates differently. *Id.*

Reid allegedly told Cardwell that the Firm's failure to staff him was not his fault. In March 2017, Cardwell emailed Sharon Katz, Davis Polk's Special Counsel for Pro Bono, to "raise[] the issue of the Firm's relationship with a private for-profit prison and immigrant detention company"

that allegedly discriminated against "Blacks and other marginalized groups."  *Id.* ¶ 229.  Katz

requested that Cardwell meet with her and Reid.  *Id.* ¶ 230.  At the meeting, Reid "verbal[ly]

commit[ted] that the Firm would no longer represent the private prison and immigrant detention

client."  *Id.*  At the end of the "meeting—and without any prior discussion" of Cardwell's

workload—Reid "conceded" that Cardwell's "prior and current workloads were low," and that this

was "not [Cardwell's] fault."  *Id.* ¶ 231.  Reid acknowledged that the Firm and the M&A group

"needed" to "fix[]" this problem.  *Id.*  Cardwell alleges that "[i]t is not plausible that" Reid made

these "comments without first speaking with the Firm's M&A partners and reviewing Cardwell's file

and performance reviews."  *Id.* ¶ 232.  But even after the meeting with Reid, Cardwell still was not

staffed on any matters.  *Id.* ¶ 233.

### 6. Cardwell expresses concern about his workload to firm management, and Reid threatens to take Cardwell "out of the game" and "off the field."

Cardwell was concerned about his lack of work assignments, so he tried to access his written

performance reviews.  Two weeks after the meeting with Reid and Katz, Cardwell emailed the

Director of Associate Development and asked to "review his personnel 'file and all of the

performance reviews that he had received to date.'"  *Id.* ¶ 234 (brackets omitted).  The Director of

Associate Development declined Cardwell's request.  *Id.*  But she arranged a meeting between

Cardwell, Reid, and Kreynin.  *Id.*  Cardwell asked if "the Firm's policy or practice" prohibited

"attorneys from reviewing their performance reviews."  *Id.*  The Director of Associate Development

responded "that it was both 'a policy and practice'" to prohibit attorneys from accessing their

written performance reviews.  *Id.*  Cardwell alleges that "at the time, the Firm's Lawyer's Handbook"

did not state that Davis Polk had such a policy or practice.  *Id.*

After the Director of Associate Development arranged the meeting, Cardwell renewed his

request to review his performance reviews.  *Id.* ¶ 235.  Cardwell explained that he would be "the only

person in the meeting who hasn't had a chance to review [his] file" and that he thought "the

conversation [would] be much more productive" if he had an opportunity to read his performance reviews before the meeting. *Id.* Again, the Director of Associate Development rejected Cardwell's request. *Id.* ¶ 236. Cardwell alleges that this refusal "was alarming" because Reid and other Firm partners "were aware (and previously acknowledged) that the Firm's performance-related assessments and reviews often contained evidence of racial bias and disparate treatment." *Id.* ¶ 238.

Cardwell alleges that "[a]ccording to document[s] that Davis Polk" sent to "the NYSDHR," Kreynin "did not submit his Summary Review of" his "2016 annual face-to-face review" with Cardwell "to the Firm's records department until" one day before the scheduled meeting. *Id.* ¶ 239. Cardwell alleges that this was "almost 100 days after" Kreynin delivered the oral review to Cardwell. *Id.*

Cardwell met with Reid and Kreynin in late March 2017. *Id.* ¶ 241. Reid again allegedly took responsibility for Cardwell's "dearth of work assignments" and conceded that "the Firm had 'dropped the ball' and made mistakes." *Id.* Reid and Kreynin told Cardwell that his "performance reviews described [him] as engaged, hardworking, and enthusiastic." *Id.* ¶ 250 n.38. Neither Reid nor Kreynin identified the "quality of his work product" as the reason that "the Firm stopped staffing" Cardwell "on deals or giving him assignments." *Id.* ¶ 254. Nor did Reid or Kreynin tell Cardwell that his performance reviews "indicated that he was 'behind' his peers." *Id.*

Reid encouraged Cardwell to "let the past be the past" and focus on the future. *Id.* ¶ 241. Cardwell asked Reid "to explain how multiple staffing partners and other partners [had] 'dropped the ball'" for almost six months. *Id.* Reid responded that it "wouldn't be helpful to discuss the past." *Id.* Cardwell asked Reid and Kreynin "if they thought it was unreasonable for" Cardwell to ask "who 'dropped the ball'" and how precisely it had been dropped. *Id.* Reid replied that the Firm wouldn't "answer those questions." *Id.* Cardwell asked Reid if he would arrange a meeting with Bick so that Bick could help ascertain how the Firm "'dropped the ball' and how it was possible that" Bick "didn't know that Cardwell wasn't receiving any assignments." *Id.* Reid told Cardwell

that the Firm would not "allow" Cardwell and Bick "to discuss the past." *Id.* Reid also told

Cardwell that it was "not like [his] career has been destroyed." *Id.*

Cardwell allegedly told Reid and Kreynin that "racial biases were influencing performance

evaluations." *Id.* ¶ 242. Cardwell said that the Firm's diversity and inclusion consultants had noted

that "the Firm's performance reviews were likely to reflect racial biases." *Id.* ¶ 244. Reid again

allegedly told Cardwell that the Firm would not "discuss[] or investigat[e]" Cardwell's "complaints or

experiences." *Id.* ¶ 245. Cardwell alleges that Reid understood that he was raising "a discrimination

complaint." *Id.* Reid allegedly refused to investigate the role of racial bias in Cardwell's reviews to

retaliate against him for raising "legally protected complaints." *Id.*

Reid said that if Cardwell "let the past be the past," the Firm would offer Cardwell

"unprecedented opportunities 'unlike anything that had ever been done.'" *Id.* ¶ 246 (brackets

omitted). Cardwell alleges that this statement reflected that Reid "had enormous influence" to

decide how Cardwell was staffed and assessed. *Id.* Cardwell alleges that Reid "communicat[ed]

Davis Polk's ultimatum[:]" Cardwell could either continue to pursue his career at the Firm or "seek

the truth and a lawful response to" the Firm's illegal discrimination. *Id.* Cardwell responded that he

would not "have confidence" in a future plan unless Reid and the Firm shared details about how the

"'ball was dropped' over the last six months." *Id.* ¶ 248.

Reid told Cardwell that if he continued to demand that the firm investigate his complaints

"would be 'out of the game' and 'off the field.'" *Id.* ¶ 249. Cardwell alleges that this comment

showed that Reid was empowered to take him "out of the game" and "off the field." *Id.* Reid's

comments allegedly "revealed" that if Cardwell continued to complain about discrimination, Reid

and the other defendants would "exert" their "influence" over Cardwell's "employment status and

career." *Id.*

Shortly after Reid "threat[ened]" Cardwell, he "insist[ed]" that Cardwell "take a few days" to

"think things over." *Id.* ¶ 250. Cardwell responded that he "wasn't sure what he was supposed to

think over." *Id.* Cardwell "explained that he had never rejected any assignments" or otherwise been a "distraction." *Id.* Reid and Kreynin allegedly accepted Cardwell's "description of when and how" he "accepted assignments." *Id.* Reid again encouraged Cardwell to "take some time and just think about things" and said that "they could have a follow-up conversation in a few days." *Id.* Cardwell alleges that Reid intended his threat to halt Cardwell's complaints and his "reasonable search for answers." *Id.* ¶ 251.

After the meeting, Kreynin told Cardwell that "he had no idea" Cardwell "wasn't receiving any assignments." *Id.* ¶ 255. And Kreynin said that "had he known that" Cardwell "wasn't being assigned work," he would have staffed Cardwell "on his matters." *Id.*

Two days after the meeting, Cardwell emailed Reid and accepted his offer to "take as much time as" Cardwell "'needed' to regroup." *Id.* ¶ 256 (brackets omitted). Cardwell requested that Reid allow him "to use his unused vacation time, which totaled four weeks." *Id.* Reid "approved the request the same day." *Id.*

### 7. Cardwell still does not receive work assignments.

Cardwell returned to the Firm in early May 2017. *Id.* ¶ 257. Cardwell alleges that the Firm had not implemented a "concrete plan" to staff Cardwell on deals or to address the issues discussed in Cardwell's meeting with Reid and Kreynin. *Id.*

Bick met Cardwell the day he returned. *Id.* ¶ 258. Bick told Cardwell that he would "walk the halls and talk to partners to see what tasks [Cardwell] could be staffed on." *Id.* (emphasis omitted). Bick did not explain why he proposed to deviate from the Firm's normal protocol for staffing associates. *Id.* Bick told Cardwell that "no one at the Firm" would "actively monitor" his hours. *Id.* ¶ 260. During this meeting, Bick did not suggest that Cardwell's "assignment history" was related to his prior performance. *Id.* ¶ 261.

The day after he returned, the Firm staffed Cardwell on an assignment for the first time in months. *Id.* ¶ 262. The assignment was a "legal research memo" that required little "substantive

corporate experience or knowledge." *Id.*  Louis Goldberg, an M&A partner, oversaw the memo.  *Id.*

Goldberg told Cardwell that the assignment was not "time sensitive" and that Cardwell need not

complete a first draft for "two or three weeks."  *Id.*

Almost three weeks later, Bick allegedly informed Cardwell that the Firm would not staff

him on another assignment until he completed the memo.  *Id.* ¶ 263.  Cardwell responded that the

memo did not "require[] 100% of his capacity" and that the deadline for the first draft "was still a

few days away."  *Id.*  Cardwell told Bick that he was unaware that he wouldn't receive another

assignment until he completed the memo because associates are not typically staffed on one

assignment at a time.  *Id.*  Bick told Cardwell that he had not "ask[ed] the right questions" about the

assignment.  *Id.*  All of Cardwell's billable hours in May 2017 were related to this memo.  *Id.* ¶ 265.

Cardwell alleges that his health began to deteriorate because of his experiences at the Firm.

A few days after Cardwell met with Bick, Cardwell emailed Goldberg that he was out of the office.

*Id.* ¶ 266.  Cardwell explained that he was feeling "ill" because of his experience at Davis Polk.  *Id.*

Goldberg then scheduled a meeting for the next day between Goldberg, Cardwell, and the Firm's

Executive Director.  *Id.* ¶ 267.  During that meeting, Goldberg told Cardwell that he didn't know

that Cardwell had requested an opportunity "to work with him on his weekly workload

request/capacity form."  *Id.* ¶ 268.  Goldberg assured that Cardwell that the memo was not "a test"

of whether Cardwell could handle more rigorous assignments.  *Id.*  Both Goldberg and the

Executive Director told Cardwell that they weren't aware of how Cardwell had been previously

staffed.  *Id.* ¶¶ 268–69.  When the Executive Director asked, Cardwell said that Reid, Bick,

Birnbaum, and Wolfe were "primarily responsible" for staffing him.  *Id.* ¶ 271.  The Executive

Director said she would reach out to these partners.  *Id.*  Cardwell alleges that the Executive

Director understood that he was again lodging a complaint about racial discrimination at the Firm.

*Id.* ¶ 272.  But the Executive Director never followed up with Cardwell "about his staffing history,

performance, or experience at Davis Polk." *Id.* ¶ 273. Cardwell alleges that this meeting was the eighth time he complained about racial discrimination at the Firm. *Id.* ¶ 270.

Bick was allegedly "demoted and replaced as practice group leader" of M&A "shortly after" Cardwell asked the Executive Director and Goldberg to ask Reid, Bick, Birnbaum, and Wolfe to investigate his staffing history. *Id.* ¶ 274. Cardwell alleges that this was because "someone at Davis Polk" determined that Bick had unlawfully discriminated against Cardwell. *Id.*

### 8. Cardwell files a charge of discrimination with the EEOC, and he begins to receive negative performance evaluations.

One day after his meeting with Goldberg and the Executive Director, Davis Polk "received notice" that Cardwell had engaged counsel. *Id.* ¶ 275. After Cardwell's newly retained counsel contacted Davis Polk, the Firm staffed Cardwell on "his first M&A deal in over eight months." *Id.* Cardwell alleges that Davis Polk partners treated Cardwell "as if they were strategically trying to frustrate him or get him to assume blame for things that were not incorrect, his fault, or under his control" from late March through the rest of 2017. *Id.* ¶ 277.

In June 2017, Cardwell "informed the Firm" that he was experiencing "health complications" because of the treatment he experienced at the Firm. *Id.* ¶ 278. Brass replaced Wolfe as staffing coordinator for the M&A group in July 2017. *Id.* ¶ 279.

In early August 2017, Cardwell filed a claim with the Equal Employment Opportunity Commission (the "EEOC Charge"). *Id.* ¶ 280. Cardwell alleged that "the Firm ha[d] discriminated against [him] because of [his] race and ha[d] retaliated against [him] because" he had complained about racial discrimination. *Id.* The EEOC Charge named Reid, Bick, Birnbaum, Butler, and Brass as defendants. *Id.* ¶ 280 n.42. Davis Polk filed an Answer and Position Statement with the NYSDHR in response to the EEOC Charge in December 2017. *Id.* ¶ 281. Cardwell's attorneys requested an extension to January 2018 to file a rebuttal to the Answer and Position Statement. *Id.* ¶ 282.

Cardwell received his first negative performance review in January 2018.  After Davis Polk learned that Cardwell received an extension, Cardwell alleges that it "strategically rescheduled" Cardwell's "annual face-to-face review" to the day after the rebuttal was due.  At that review, two Davis Polk partners gave Cardwell a "negative performance evaluation."  *Id.* ¶ 283.  The negative evaluation allegedly contradicted "real-time feedback" that Davis Polk partners, including one of the partners conducting the evaluation, had given Cardwell during 2017.  *Id.* ¶ 285.  The partners told Cardwell that "staffing him would be 'challenging'" going forward.  *Id.*  Cardwell asked for examples of when someone at the Firm had "communicated" that his work was "poor" or that he was behind his class.  *Id.* ¶ 286.  Neither partner did so.  *Id.*  Indeed, one of the partners with whom Cardwell had worked directly "acknowledged" that no M&A partner had given Cardwell "negative feedback" while Cardwell had been working on assignments that were part of the review period.  *Id.* ¶ 287.  Cardwell noted that it was jarring to receive these criticisms because he had never received negative feedback in real time.  *Id.* ¶ 289.  Cardwell also discussed how "implicit bias" and other biases might have affected the "timing and accuracy of the feedback" he received.  *Id.*  Cardwell explained that he asked for specific examples because "he and other Black attorneys at the Firm" had flagged this discrepancy "multiple times" during his career at the Firm.  *Id.*

Cardwell asked what the "Firm's approach to staffing [him]" was.  *Id.* ¶ 292.  One of the partners responded that "the Firm was trying to figure out what [Cardwell] could be staffed on."  *Id.*  Cardwell asked if the partner meant that the Firm wasn't "able to staff [him] on any matters."  *Id.*  The other partner responded that Cardwell might need to be "flexible" in the "type of matters he would be staffed on going forward."  *Id.*  One of the partners asked Cardwell what he preferred to be staffed on so that he would relay those preferences to the M&A staffing partners.  *Id.*  Cardwell responded that he hoped the Firm would staff him "appropriately" and that he was not requesting that the Firm staff him based on his "expectations."  *Id.* ¶ 293.  Cardwell alleges that this was the

first time anyone at Davis Polk told him that his work was poor or that he was "behind" associates in his class year.  *Id.* ¶ 294.

### 9. Cardwell is fired.

Davis Polk told Cardwell it intended to fire him in February 2018.  The Firm did not staff Cardwell on any matters between his face-to-face review in early January and February 2018.  *Id.* ¶ 295.  In early February, Cardwell met with two M&A partners to "discuss the Firm's purported inability to staff" him.  *Id.* ¶ 296.  During that meeting, the partners informed Cardwell that the Firm intended to terminate his employment.  *Id.*  The partners told Cardwell that the M&A partners had spoken with Bick, "gather[ed] [his] reviews," and "collectively decided 'as a group'" that staffing Cardwell was "not a situation that's workable."  *Id.*  Davis Polk allegedly permitted "the same partners who" Cardwell "accused of engaging in racial discrimination and retaliation" and who Cardwell "implicated" in his EEOC filing "and other complaints" to influence the Firm's decision to terminate his employment.  *Id.* ¶ 297.

One of the M&A partners described Cardwell's departure as "not a good situation."  *Id.* ¶ 298.  The same partner stated that the partners had "a thousand percent confidence in your integrity" and there was "no issue" with Cardwell's "integrity or behavior."  *Id.*  The partner also acknowledged that the partners didn't "feel good about this" and that he "wish[ed]" that Cardwell had had a "better experience" with the Firm.  *Id.* ¶ 299.  He or she expressed regret that Cardwell's tenure was "ending this way."  *Id.*  And the partner noted that Cardwell might reasonably "resent" Davis Polk M&A partners.  *Id.*

In April 2018, Cardwell filed a supplemental charge of discrimination against Davis Polk (the "Supplemental Charge" and together with the EEOC Charge, the "Charges").  *Id.* ¶ 304.  Cardwell left the firm in August 2018.  *Id.* ¶ 305.  Cardwell received a right to sue letter from the EEOC in August 2019.  *Id.* ¶ 16.  The NYSDHR dismissed Cardwell's claim for "Administrative Convenience" in November 2019 and declined to reopen the matter in February 2020.  *Id.*

**B. Procedural History**

Cardwell filed this lawsuit in November 2019.  Dkt No. 1.  Cardwell amended his complaint in March 2020.  The amended complaint has sixteen counts.  AC ¶¶ 313–79.  Counts one and two allege that Davis Polk discriminated and retaliated against Cardwell in violation of Title VII of the Civil Rights Act of 1964.  *Id.* ¶¶ 313–20.  Count three alleges that Davis Polk created a hostile work environment in violation of Title VII.  *Id.* ¶¶ 321–23.  Counts four and five allege that all Defendants discriminated and retaliated against Cardwell in violation of 42 U.S.C. § 1981(a).  *Id.* ¶¶ 324–35.  Count six alleges that all Defendants created a hostile work environment in violation of section 1981.  *Id.* ¶¶ 336–40.

Count seven alleges that all Defendants discriminated against Cardwell in violation of the New York State Human Rights Law ("NYSHRL") § 296(1)(a).  *Id.* ¶¶ 341–44.  Count eight alleges that Reid, Bick, Hudson, Birnbaum, Wolfe, and Butler aided and abetted Defendants' violations of section 296(1)(a) in violation of NYSHRL § 296(6).  *Id.* ¶¶ 345–48.  Count nine alleges that all Defendants retaliated against Cardwell in violation of NYSHRL § 296(1)(e).  *Id.* ¶¶ 349–52.  Count ten alleges that Reid, Bick, Birnbaum, Wolfe, and Butler aided and abetted Defendants' violations of section 296(1)(e) in violation of section 296(6).  *Id.* ¶¶ 353–56.  Count eleven alleges harassment in violation of NYSHRL § 296(1)(h).  *Id.* ¶¶ 357–60.  Count twelve alleges that Bick, Birnbaum, Wolfe, and Butler aided and abetted Defendants' violations of section 296(1)(h) in violation of section 296(6).  *Id.* ¶¶ 361–64.

Count thirteen alleges that all Defendants discriminated against Cardwell in violation of New York City Human Rights Law ("NYCHRL") § 8-107(1)(a).  *Id.* ¶¶ 365–68.  Count fourteen alleges that Reid, Bick, Hudson, Birnbaum, Wolfe, and Butler aided and abetted violations of section 8-107(1)(a) in violation of NYCHRL § 8-107(6).  *Id.* ¶¶ 369–72.  Count fifteen alleges that all Defendants retaliated against Cardwell in violation of NYCHRL § 8-107(7).  *Id.* ¶¶ 373–75.  Count

sixteen alleges that Reid, Bick, Hudson, Birnbaum, Wolfe, and Butler aided and abetted violations of section 8-107(7) in violation of section 8-107(6). *Id.* ¶¶ 376–79.

Defendants moved to partially dismiss the amended complaint and filed a declaration in support in April 2020. Dkt Nos. 43–45. Defendants move to dismiss all claims against Chudd, Hudson, Birnbaum, Brass, Wolfe, and Butler. Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem."), Dkt No. 44, at 1. Defendants refer to this group as the "Additional Defendants," and the Court does so as well. Defendants also move to dismiss "all claims to the extent that they are barred by the relevant statutes of limitations," the "hostile work environment and harassment claims," and "the aiding and abetting claims under" section 1981 to the extent that Cardwell had attempted to allege any such claims. *Id.*

Cardwell opposed the motion and filed a declaration in opposition. Dkt Nos. 51–52. Defendants replied to Cardwell's opposition. Dkt No. 53.

## II. LEGAL STANDARD

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And "[t]he tenet that a court must accept" as true a complaint's factual allegations does not apply "to legal conclusions." *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim. *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts to support the

reasonable inference that the defendant has acted unlawfully. *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). The plaintiff's claim must be more than merely "speculative." *Twombly*, 550 U.S. at 545. And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility. *Iqbal*, 556 U.S. at 679 (citation omitted).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006). But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)). A court may also consider a document "solely relie[d]" on by the plaintiff if it "is integral to the complaint." *Id.* (quotation and brackets omitted). A document is "integral to the complaint" if the complaint "relies heavily" on the document's "terms and effect." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 305 n.3 (2d Cir. 2015) (holding that a court may "consider the plaintiff's relevant filings with the EEOC" on a motion to dismiss if the filings "are integral to and solely relied upon by the complaint" (quotation and brackets omitted)). A plaintiff must "*rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough." *Nicosia*, 834 F.3d at 231 (emphasis added) (quoting *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

The Court has considered Cardwell's EEOC Charges. Cardwell's EEOC Charges are not attached to the amended complaint. Nor are they explicitly incorporated by reference. But they are integral to the amended complaint. Cardwell relied on his EEOC Charge and his Supplemental EEOC Charge in framing the complaint. *See, e.g.*, AC ¶¶ 280, 304. And courts in this Circuit regularly conclude that administrative charges are integral to a plaintiff's complaint. *See, e.g.*, *Thomson v. Odyssey House*, No. 14-cv-3857 (MKB), 2015 WL 5561209, at *3 n.7 (E.D.N.Y. Sept. 21, 2015)

(collecting cases), *aff'd*, 652 F. App'x 44 (2d Cir. 2016).[8]  The Court has thus considered Cardwell's

EEOC Charges.

The Court has not considered the other documents attached to the parties' declarations.

These documents are neither attached to the amended complaint nor incorporated by reference.

And the Court cannot conclude that they are integral to the amended complaint.  The Court cannot

determine that the amended complaint relies on the terms and effect of these documents.  So the

Court has considered only Cardwell's EEOC Charges—and not the briefing the parties submitted to

the NYSDHR or the other documents attached to the parties' dueling declarations—in deciding this

motion.

## III. DISCUSSION

### A. Discrimination Claims Against the Additional Defendants

#### 1. Legal Standard

Defendants move to dismiss Cardwell's discrimination claims under section 1981, the

NYSHRL, and the NYCHRL against the Additional Defendants.[9]  "Section 1981 provides that '[a]ll

persons within the jurisdiction of the United States shall have the same right in every State . . . to the

full and equal benefit of all laws and proceedings for the security of persons and property as is

enjoyed by white citizens.'"  *Littlejohn*, 795 F.3d at 320 (quoting 42 U.S.C. § 1981).  "[T]he NYSHRL

similarly prohibits employers from 'discriminating against [an] individual in compensation or in

terms, conditions or privileges of employment.'"  *Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015)

(quoting N.Y. Exec. Law § 296(1)(a)).  The pleading standards are generally the same for Title VII,

section 1981, and NYSHRL claims.  *See Awad v. City of N.Y.*, No. 13 civ. 5753 (BMC), 2014 WL

---

[8] Indeed, it may be particularly appropriate to consider a plaintiff's administrative charges in Title VII cases because a plaintiff "is generally required to exhaust [her] administrative remedies" before she "can assert a Title VII claim in federal court."  *Duplan v. City of N.Y.*, 888 F.3d 612, 621 (2d Cir. 2018).  So a plaintiff's Title VII claim will often rely on terms and effect of the administrative charge.

[9] Defendants have not moved to dismiss Cardwell's Title VII claims.  "Title VII does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers."  *Littlejohn*, 795 F.3d at 313 (quotation omitted).  Thus, Cardwell has alleged his Title VII claims only against Davis Polk.

1814114, at *5 (E.D.N.Y. May 7, 2014) ("Discrimination claims under § 1981 . . . and [the]

NYSHRL are analyzed under the same framework and pleading standard as Title VII claims." (citing

*Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42

n.1 (2d Cir. 2000); *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 72 (2d Cir. 2006) (per curiam)).[10]

"To defeat a motion to dismiss or a motion for judgment on the pleadings in a Title VII

discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against

him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the

employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015); *see also*

*Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) ("To survive a motion to dismiss, a plaintiff

need only [allege] a prima facie case of . . . discrimination by [alleging] that (1) he was within [a]

protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment

action; and (4) the adverse action occurred under circumstances giving rise to an inference of

discrimination." (quotation and brackets omitted)).[11]  At the pleading stage, the plaintiff need only

"sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation."

*Littlejohn*, 795 F.3d at 311.[12]

---

[10] Section 1981 claims are subject to different standards for causation.  Under section 1981, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  By contrast, under Title VII and the NYSHRL, a plaintiff need only allege that her protected characteristic was a "motivating factor in the employment decision." *Vega*, 801 F.3d at 87; *see also* 42 U.S.C. § 2000e-2(m); *Daniels v. City of N.Y.*, 17 civ. 9960 (LGS), 2019 WL 251511, at *3 (S.D.N.Y. Jan. 17, 2019) (applying "motivating factor" standard to NYSHRL claim).  The different standards are immaterial to the analysis of this motion.

[11] This opinion uses the term "discrimination claim" to distinguish between Cardwell's claims that he was subjected to an adverse employment action and his hostile work environment claims.  The Court adopts that nomenclature because it has been widely adopted in the caselaw.  But it is potentially misleading because a hostile environment claim is a subspecies of a discrimination claim.  *See Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ("A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of [a protected characteristic], or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment.").  For that reason, the term "adverse action" claim may be more precise than the term "discrimination" claim.

[12] The parties do not dispute that Cardwell is a member of a protected class or that he was otherwise qualified to be an associate at Davis Polk, and Cardwell has adequately alleged both of those elements.

"[T]he 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason." *Vega*, 801 F.3d at 87 (quoting *Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869, 878 (2d Cir. 1997)). "A plaintiff can meet that burden through direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination." *Id.* (citations omitted). "A plaintiff may prove discrimination indirectly either by . . . showing that the employer's stated reason for its employment action was pretext to cover up discrimination or by otherwise creating a mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Id.* (citations omitted). "At the pleading[] stage . . . a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* (citation omitted).

An adverse employment action is "a materially adverse change in the terms and conditions of employment such as termination, demotion evidenced by a decrease in salary or wage, being given a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or some other action deleterious to the plaintiff's current or future employment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019) (quotation, citations, and emphasis omitted). The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Vega*, 801 F.3d at 85 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "An inference of discrimination can arise from circumstances including . . . 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312

(quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).  "[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class."  *Id.* at 312–13 (citations omitted). Still, a plaintiff must plausibly allege that her protected characteristic was causally linked to the adverse employment action.  "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude."  *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).  Thus, courts should not "consider[] personnel decisions that" are not "link[ed] or correlat[ed] to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals."  *Id.* (citations omitted).

In applying these standards, courts must also keep in mind that "while 'the central statutory purpose of Title VII was eradicating discrimination' in employment, Title VII 'does not set forth a general civility code for the American workplace.'"  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (first quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 771 (1976), then quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (brackets omitted).  The same is true of section 1981, *see Morrison v. United Parcel Serv., Inc.*, No. 17-cv-2885 (WHP), 2019 WL 109401, at *4 (S.D.N.Y. Jan. 4, 2019), and the NYSHRL, *see Heap v. CenturyLink, Inc.*, No. 18-cv-1220 (LAP), 2020 WL 1489801, at *11 (S.D.N.Y. Mar. 27, 2020) (citing *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012)).

NYCHRL claims are subject to a more liberal pleading standard.  "Section 8-107(1)(a) of the NYCHRL makes it 'an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the [protected characteristic] of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.'"  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting N.Y.C. Admin. Code § 8-107(1)(a)) (brackets and ellipsis omitted).  Although NYCHRL claims had for many years "been treated as

33

coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted).[13]

The Restoration Act established two new rules of construction for the NYCHRL. First, the NYCHRL is "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a floor below which the City's Human Rights law cannot fall.'" *Mihalik*, 715 F.3d at 109 (quoting *Loeffler*, 582 F.3d at 278, in turn quoting Restoration Act § 1)). Thus, "[t]he NYCHRL's standards governing discrimination claims are as or more generous to plaintiffs than those under the analogous federal statutes," so "that a claim that satisfies federal law necessarily satisfies the NYCHRL." *Estevez v. S & P Sales & Trucking LLC*, No. 17-cv-1733 (PAE), 2017 WL 5635933, at *3 (S.D.N.Y. Nov. 22, 2017). Second, NYCHRL provisions must "be construed liberally for the accomplishment of [its] uniquely broad and remedial purposes." *Mihalik*, 715 F.3d at 109 (quoting Restoration Act § 7). That is so even if similar "federal or New York State civil and human rights laws" with "comparably-worded" provisions have been construed more narrowly. *Id.* (quoting Restoration Act § 7) (emphasis omitted).

---

[13] The New York legislature amended the NYSHRL on August 19, 2019 to establish that its provisions should be construed liberally even if "federal civil rights law, including those laws with provisions worded comparably to the provisions of this article" have been construed narrowly. *Deveaux v. Skechers USA, Inc.*, No. 19-cv-9734 (DLC), 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting NY Legis 160 (2019), 2019 Sess. Law News of N.Y. Ch. 160 (A. 8421)). In at least some respects, this language mirrors the provisions of the NYCHRL discussed in *Mihalik*. But as discussed further below, "these amendments only apply to claims that accrue on or after the effective date of October 11, 2019." *Wellner v. Montefiore Med. Ctr.*, No. 17 civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019). Cardwell left the firm in August 2018, so his claims accrued in that month at the latest and the amendment does not affect his claims in this case. *See, e.g.*, *Washington v. Cnty. of Rockland*, 373 F.3d 310, 319 (2d Cir. 2004) ("As with all discrimination claims, plaintiffs' claims accrued when they knew or should have known of the discriminatory action."); *see also Bd. of Educ. v. C.M.*, 744 F. App'x 7, 9 (2d Cir. 2018) ("In analyzing the timing of accrual in the context of discrimination claims, the Supreme Court has instructed that 'the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful.'" (quoting *Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992), in turn quoting *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (emphases omitted)). And Cardwell does not argue that the lenient NYCHRL standard should apply to his NYSHRL claims, so he has waived that argument to the extent it is viable.

To plead a discrimination claim under the NYCHRL, a plaintiff must allege only that "she [was] treated 'less well' . . . because of a discriminatory intent." *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (2009)). "[T]he challenged conduct need not even be "'tangible" (like hiring or firing).'" *Id.* (quoting *Williams*, 872 N.Y.S.2d at 40); *see also Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) ("To state a claim for discrimination, a plaintiff must only show differential treatment of any degree based on a discriminatory motive."). Because the NYCHRL standard is more liberal than the corresponding federal and state law standards, courts must analyze NYCHRL claims "separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d at 109 (citations omitted).[14]

Even under this more liberal pleading standard, the plaintiff must allege "that the conduct is caused by a discriminatory motive." *Id.* at 110. "It is not enough" for a plaintiff to allege that she "has an overbearing or obnoxious boss. She must [allege] that she has been treated less well at least in part *because* of her [protected characteristic].'" *Id.* (quoting *Williams*, 872 N.Y.S.2d at 39, 40 n.27)).[15] Under the NYCHRL, the plaintiff must allege that "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for" her unequal treatment. *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d at 40–41 (1st Dep't 2012) (citing *Williams*, 872 N.Y.S.2d at 27

---

[14] *Mihalik* also cautioned that "district courts must be mindful that the NYCHRL is not a 'general civility code.'" 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 40–41). Thus, defendants "can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* at 111 (quoting *Williams*, 872 N.Y.S.2d at 41). But this is "an affirmative defense." *Id.* (quoting *Williams*, 872 N.Y.S.2d at 41). And "[a]s with most affirmative defenses, the employer has the burden of proving the conduct's triviality under the NYCHRL." *Id.* (citing *Drexel Burnham Lambert Grp. Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir. 1985), in turn citing *Blunt v. Barrett*, 124 N.Y. 117, 119 (1891)). So a defendant "may prevail *on summary judgment* if it shows that a reasonable jury could conclude only that the conduct amounted to no more than a petty slight." *Id.* (citing *Williams*, 872 N.Y.S.2d at 41) (emphasis added). Dismissal of a claim under Rule 12(b)(6) based on an affirmative defense is "warranted only if the [defense]'s applicability [is] shown on the face of the complaint." *Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 212 (2d Cir. 2018) (quotation omitted), *cert. denied sub nom. YPF S.A. v. Petersen Energia Inversora S.A.U.*, 139 S. Ct. 2741 (2019).

[15] Section 1981, the NYSHRL, and the NYCHRL all require a plaintiff to allege that a defendant was personally involved in the discrimination. *See Littlejohn*, 795 F.3d at 314 ("An individual may be held liable under §[] 1981 . . . only if that individual is personally involved in the alleged deprivation.") (quotation omitted); *see also Daniels*, 2019 WL 251511, at *5 ("The NYSHRL and NYCHRL also require Defendant's personal involvement.") (citing N.Y. Exec. L. § 296(6); N.Y.C. Admin. Code § 8-107(6); *Feingold*, 366 F.3d at 158).

n.27); *see also Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 120 (1st Dep't 2011) ("It is not uncommon for covered entities to have multiple or mixed motives for their action, and the [NYC]HRL proscribes such 'partial' discrimination." (quoted in *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (alterations omitted)).

This seems to be equivalent to the "motivating factor" standard of causation under Title VII and the NYSHRL.  "[E]ven after enactment of the Restoration Act, the Second Circuit has continued to apply the same 'motivating factor' causation standard to employment discrimination claims under the NYCHRL that applies to equivalent claims under Title VII." *Bivens v. Inst. for Cmty. Living*, 14-cv-7173 (PAE), 2016 WL 11701799, at *1 (S.D.N.Y. Feb. 3, 2016) (quoting *Weiss v. JPMorgan Chase & Co.*, No. 06-cv-4402 (DLC), 2010 WL 114248, at *3 (S.D.N.Y. Jan. 13, 2010), in turn citing *Patane v. Clark*, 508 F.3d 106, 112–13 (2d Cir. 2007)) (discussing this issue after soliciting supplemental briefing on it); *see also id.* ("Each statute uses the same words ('because of') to describe the causation element.") (citing 42 U.S.C. § 2000e-2(a)(1); N.Y.C. Admin. Code § 8-107(1)(a)).[16]

---

[16] In their briefing on this motion, the parties did not address whether a different standard of causation applies under the NYCHRL.  It does not appear that any Second Circuit or New York Court of Appeals case has explicitly decided the issue since the New York City Council passed the Restoration Act.  *Cf. Forrester v. Corizon Health, Inc.*, 752 F. App'x 64, 66 (2d Cir. 2018) (summary order) ("Although the NYCHRL's *retaliation* provision is broader than at least some federal anti-discrimination laws, a plaintiff bringing a retaliation claim under the NYCHRL still must adduce admissible evidence that retaliation was at least a partial motivating factor."  (citing *Mihalik*, 715 F.3d at 113, 116; *Williams*, 872 N.Y.S.2d at 33–35) (emphasis added)).  Judge Engelmayer has also observed that "in various cases, courts have used the expression 'play no role' to describe the causation requirement of the NYCHRL."  *Bivens*, 2016 WL 11701799, at *2.  "But these usages have been made in passing, in *dicta*, or otherwise in a context that fails to suggest any substantive distinction with federal law.  And several cases . . . have used that term interchangeably with Title VII's 'motivating factor' standard."  *Id.* (citing *Carryl v. MacKay Shields, LLC*, 941 N.Y.S.2d 116, 117 (1st Dep't 2012); *Bennett*, 936 N.Y.S.2d at 120; *Williams*, 872 N.Y.S.2d at 40 n.27); *see also Hamburg v. N.Y. Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 39 (1st Dep't 2017) (using "motivating factor" to describe causation standard under the NYCHRL (quoting *Melman*, 946 N.Y.S.2d at 40)); *Bourara v. New York Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*, No. 17-cv-7895 (DF), 2020 WL 5209779, at *11 (S.D.N.Y. Sept. 1, 2020) (citing *Weiss*, 2010 WL 114248, at *3–4) ("NYCHRL claims are analyzed under the 'motivating factor' standard.").  Indeed, although these standards are linguistically different, they seem to be substantively the same.  If a protected characteristic is a motivating factor in a decision, it played at least some role in that decision.  And if a protected characteristic played no role in a decision, it was not a motivating factor for that decision.  In any event, the Court finds *Bivens*'s and *Weiss*'s interpretation of New York law (and the First Department's more recent decision in *Hamburg*) persuasive, so it applies the "motivating factor" standard of causation to Cardwell's claims under all three statutes.

### 2. Application

Cardwell's discrimination claims against the Additional Defendants are inadequately pleaded principally because he has failed to plausibly allege facts that give rise to an inference of discriminatory animus.  In his opposition, Cardwell makes two arguments as to why his allegations raise an inference of discriminatory motivation as to all Additional Defendants.  Neither is convincing.

*First*, Cardwell argues that "the sequence of events" leading up to his termination, as alleged in the amended complaint, "plausibly support an inference of discrimination against all of the Davis Polk [p]artners."  Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"), Dkt No. 51, at 19.  But that is not true. Cardwell highlights that Reid allegedly told him that the staffing failures were not his "'fault'—only for the Firm to assert in January 2018 that (according to his 2015–16 [performance] reviews) Cardwell was 'behind' and 'the quality of his was work was supposedly poor.'"  *Id.* (quoting AC ¶ 294); *see also* AC ¶ 231.  The allegation undergirding this argument is that two unnamed Davis Polk partners told Cardwell that the Firm would have difficulty staffing him because his work was "poor" in January 2018.  AC ¶¶ 283–294.  But those allegations do not support even a minimal inference that Cardwell's race was a motivating factor for this performance review.  And there are no plausible allegations in the amended complaint to support such an inference.

In any event, even if Cardwell had plausibly alleged that the race was a motivating factor for these unnamed partners, his allegations do not raise an inference about any Additional Defendant's intent.  Cardwell does not allege that any of the Additional Defendants delivered this negative performance evaluation.  And there are no other allegations in the amended complaint that link any Additional Defendants to the negative performance review.  As best the Court can tell, Cardwell seems to argue that these allegations support the inference that the Additional Defendants (and, perhaps, the whole Davis Polk partnership) conspired to fabricate a negative performance review as a pretextual justification for his eventual termination.  But there are no plausible factual allegations

in the complaint to substantiate that conjecture.  Thus, Cardwell has not plausibly alleged that the unnamed Davis Polk partners delivered this performance review because of his race or that the Additional Defendants had anything to do with the performance review.  Because the same standard of causation applies to Cardwell's NYCHRL claim, Cardwell has also failed to plausibly alleged a discrimination claim under the NYCHRL.

*Second*, Cardwell argues that the amended complaint "provides the 'minimal support' required to suggest that [the] defendant[s] [were] motivated by discriminatory intent by alleging the existence of similarly situated comparable Caucasians who were treated better than he."  Pl.'s Opp'n at 19 (citation omitted).  Again, that is not so.  True, "[a] plaintiff may support an inference of race discrimination by [alleging] that similarly situated employees of a different race were treated more favorably" than the plaintiff.  *Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 205 (2d Cir. 2003) (quoting *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999)); *see also Littlejohn*, 795 F.3d at 312–13 ("[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class.").

But a plaintiff alleging that her "employer treated her less favorably than a similarly situated employee outside her protected group" must allege that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Littlejohn*, 795 F.3d at 312 (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'"  *Ruiz*, 609 F.3d at 493–94 (2d Cir. 2010) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).  The alleged comparator must be similar enough "to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see also Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018).  Cardwell argues that his allegations are

sufficient to raise an inference of discrimination because he was fired (and allegedly suffered other materially adverse employment actions) while white associates did not.

Cardwell has not adequately pleaded that race was a motivating factor in his termination or any other unequal treatment he allegedly suffered because he has not plausibly alleged that he was similarly situated to his alleged comparators.  Cardwell has not plausibly alleged that there were white associates whose work performance was similar to his who were treated more favorably than he was.  And "[w]ithout alleging a single comparator as to these allegations, Plaintiff falls well short of satisfying the disparate treatment standard 'requiring a reasonably close resemblance of the facts and circumstances of Plaintiff's and comparator's cases.'"  *Anderson v. New York City Dep't of Fin.*, No. 19-cv-7971 (RA), 2020 WL 1922624, at *7 (S.D.N.Y. Apr. 21, 2020) (quoting *Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 471 (S.D.N.Y. 2013)) (brackets omitted); *see also Daniels*, 2019 WL 251511, at *4 (dismissing complaint that "lack[ed] any specificity as to the alleged comparators' qualifications, responsibilities, employment history and conduct that gave rise to their reprimands").

Cardwell relies heavily on *Nguedi v. Fed. Reserve Bank of New York*, but that decision is distinguishable.  No. 1:16-cv-0636 (GHW), 2017 WL 5991757, at *6–8 (S.D.N.Y. Dec. 1, 2017).  There, the Court noted the plaintiff's specific allegations of disparate treatment.  *See id.* at *8.  For example, the Court noted that the plaintiff alleged that "Caucasian employees in his 'area' and who had also obtained security clearances were not surrounded by armed police officers to surveil them like he was."  *Id.* at *8 (citation omitted).  That is precisely the sort of specific allegation that Cardwell's amended complaint lacks.  Thus, *Nguedi* does not support Cardwell's argument that he has adequately pleaded a discrimination claim against the Additional Defendants.

At bottom, Cardwell's argument rests on two allegations: 1) he is Black and 2) he suffered adverse treatment, including termination, and white associates did not.  But to plausibly allege a discrimination claim, "[i]t is not enough merely to assert that the defendant took adverse action

against the plaintiff, and that the action was the product of racial animus.  The complaint must allege specific facts supporting both the existence of the racial animus and the inference of a link between the adverse treatment and the racial animus." *Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, No. 11-cv-3327 (ER), 2013 WL 417406, at *9 (S.D.N.Y. Feb. 4, 2013) (quoting *Dickerson v. State Farm Fire & Cas. Co.*, No. 95-cv-10733 (MBM), 1996 WL 445076, at *3 (S.D.N.Y. Aug. 1, 1996)); *see also Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 338 (S.D.N.Y. 1999) ("Fact-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required."), *aff'd sub nom. Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000).  Cardwell's vague allegations that he was treated less well than white associates are inadequate to plausibly plead either the existence of racial animus or a causal connection between his experiences and any such animus.

Because these arguments are unconvincing, the Court next considers Cardwell's allegations against each Additional Defendant individually.  As with his allegations against the Additional Defendants collectively, Cardwell has failed to plausibly allege that his race was a motivating factor for any Additional Defendant's action.[17]

---

[17] Defendants argue that "[t]here is no plausible allegation of an 'adverse employment action' attributable to the Additional Defendants, which is fatal to plaintiff's discrimination and retaliation claims."  Defs.' Mem. at 13 (emphasis omitted).  The Court disagrees because Cardwell has plausibly alleged that some Additional Defendants retaliated against him by terminating him.  Although the definitions of "adverse employment action" are not coterminous under federal antidiscrimination and antiretaliation statutes (as discussed further below), termination qualifies as an adverse employment action under any definition of that term.

But even if it were true that Cardwell had not pleaded an adverse employment action, Defendants are wrong that this would be "fatal to [Cardwell]'s discrimination . . . claims." *Id.*  The lack of an allegation of an adverse employment action would be fatal to Cardwell's section 1981 and NYSHRL claims, but it would not be for his NYCHRL claims.  An adverse employment action is "a materially adverse change in the terms and conditions of employment[.]" *Davis-Garett*, 921 F.3d at 43 (quotation omitted).  But "the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.  Instead, 'a focus on unequal treatment based on [a protected characteristic]—regardless of whether the conduct is "tangible" (like hiring or firing) or not—is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute.'" *Mihalik*, 715 F.3d at 114 (quoting *Williams*, 872 N.Y.S.2d at 40) (citation omitted).  Thus, Cardwell need not plead an adverse employment action to plausibly plead NYCHRL claims.

True, "[e]ven if the plaintiff establishes that she was treated 'less well' because of her" protected characteristic under the NYCHRL, "defendants may assert 'an affirmative defense whereby they can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences.'" *Id.* at 111 (quoting *Williams*, 872 N.Y.S.2d at 41) (some quotation marks and brackets omitted).  But this is an affirmative defense.  And, as discussed above, "an affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6)" only "if the defense appears on the face of the complaint." *Cnty. of*

### i. Brass

Cardwell has not plausibly alleged that Brass took any adverse action against him because of his race.  Cardwell alleges that Brass "remov[ed]" him from a deal team and "replaced" him with a white associate in 2016.  AC ¶¶ 139–40, 146.  Cardwell has not plausibly alleged facts to support an inference that Brass removed him from the deal team because of his race.  Cardwell's lone allegation that would support an inference that Brass acted because of a discriminatory motive is that his replacement on the deal team was white.  That is inadequate because, as with Cardwell's allegations against the Additional Defendants collectively, he has not alleged that he was similarly situated to his replacement on the deal team.  *See Anderson*, 2020 WL 1922624, at *7.  Most importantly, Cardwell has failed to plausibly allege that his performance was similar to his replacement's.  Absent any other allegations that Brass acted because of discriminatory animus, Cardwell has not plausibly pleaded that Brass was motivated by Cardwell's race and not his performance.  So Cardwell has not plausibly alleged facts adequate to support the inference that Brass replaced him because of discriminatory animus.

Cardwell also pleads that Brass did not staff him on any matters for about a month in 2018 when he was the "staffing coordinator for the M&A group."  *Id.* ¶¶ 279, 295.  Leave aside whether the allegation that Brass didn't staff Cardwell for a month could sustain a disparate treatment claim, even under the more plaintiff-friendly NYCHRL standard.  *Cf. Johnson v. Morrison & Foerster LLP*, No. 14-cv-428 (JMF), 2015 WL 845723, at *5 (S.D.N.Y. Feb. 26, 2015) (holding that "subjective dissatisfaction with assignments does not constitute adverse employment action" but declining

---

*Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 (2d Cir. 2013) (quotation omitted).  For that reason, "motions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road." *Garcia v. Doe*, 779 F.3d 84, 97 (2d Cir. 2014).  The Court cannot determine on the face of the amended complaint that the conduct of which Cardwell complains consists of mere "petty slights and trivial inconveniences."  *Mihalik*, 715 F.3d at 111 (quoting *Williams*, 872 N.Y.S.2d at 41).  So the Court cannot dismiss Cardwell's NYCHRL claims against the Additional Defendants because their conduct was trivial.  But the Court must dismiss Cardwell's NYCHRL claims for a different reason:  Even assuming he has alleged that he was treated "less well" because of his race, he has failed to allege that race was a motivating factor in any adverse treatment he suffered.

supplemental jurisdiction over NYCHRL claims).  This allegation fails to state a discrimination claim for the same reasons discussed above:  Cardwell has not plausibly alleged that Brass's decision not to staff him was the result of a discriminatory motive.  *See Rogers v. Fashion Inst. of Tech.*, No. 14-cv-6420 (AT), 2016 WL 889590, at *6 (S.D.N.Y. Feb. 26, 2016) (being assigned only three hours of work per week did "not plausibly support even a minimal inference of discriminatory motive").

Cardwell finally alleges that Brass was part of a "group" that "collectively decided to terminate" his employment.  AC ¶ 296.  Again, Cardwell has failed to plausibly allege that race was a motivating factor in the decision to terminate his employment.  But to survive this motion to dismiss, Cardwell must plausibly allege that Brass terminated him because of discriminatory animus. Cardwell has not met that pleading standard.  In his opposition, Cardwell relies exclusively on his allegation that Brass, among other Defendants, "terminated Mr. Cardwell's employment . . . in whole or in part because of [his] race" and that Brass, among other Defendants, did not "terminate the employment of similarly situated non-Black associates."  Pl.'s Opp'n at 19 (citing AC ¶ 302).  These allegations are conclusory.  Cardwell alleges no facts to support his assertion that Brass terminated him because of his race.  And he likewise provides no support for his allegation that there were "similarly situated non-Black associates"—that is, those who were "sufficiently similar . . . to support at least a minimal inference that the difference of treatment may be attributable to discrimination"— who were not terminated.  *McGuinness*, 263 F.3d at 54.  Because he fails to plausibly allege that Brass acted because of discriminatory animus, Cardwell has failed to state a discrimination claim against Brass under section 1981, the NYSHRL, and the more liberal NYCHRL standard.

### ii. Birnbaum and Wolfe

Cardwell's allegations against Birnbaum and Wolfe suffer from similar deficiencies.  Cardwell alleges that Birnbaum and Wolfe were, like Brass, part of the "group" that decided to terminate his employment.  AC ¶ 296; *see also id.* ¶ 302.  But like his allegations against Brass, Cardwell has again

failed to plausibly allege that race was a motivating factor in Birnbaum and Wolfe's employment decisions, so this allegation cannot form the basis for Cardwell's discrimination claim.

Cardwell also alleges that both Birnbaum and Wolfe went long stretches of time without emailing him. *Id.* ¶¶ 174–75, 207. Again, leave aside whether this is an adverse action under federal and state law or even is adequate to allege that Birnbaum and Wolfe treated Cardwell "less well" under the NYCHRL. *Cf. Ward v. Shaddock*, No. 14-cv-7660 (KMK), 2016 WL 4371752, at *6 (S.D.N.Y. Aug. 11, 2016) ("[O]stracism and isolation at work is not enough to constitute an adverse employment action." (quoting *Miksic v. TD Ameritrade Holding Corp.*, No. 12-cv-4446 (AJN), 2013 WL 1803956, at *4 (S.D.N.Y. Mar. 7, 2013))). This claim is inadequately pleaded because Cardwell has not alleged facts to support an inference that his race was a motivating factor in Birnbaum and Wolfe's decisions not to email him. Thus, these allegations cannot serve as a predicate for his discrimination claim.

Cardwell's allegation that Birnbaum and Wolfe caused him to be "underutilized" is similarly flawed because Cardwell has not plausibly alleged that Birnbaum and Wolfe failed to staff him because of discriminatory animus. AC ¶ 147; *see also id.* ¶¶ 126–27, 168–77, 193, 203–06, 295. Again, Cardwell seeks to rely on a comparison to how white associates were staffed. But Cardwell does not allege that his comparators are "similarly situated in all material respects." *Norville*, 196 F.3d at 95 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). The allegation that white associates received more favorable work assignments does not raise even a minimal inference of discriminatory motivation absent plausible allegations that their work performance was similar to Cardwell's. *See Rogers*, 2016 WL 889590, at *6. Thus, Cardwell has not plausibly pleaded that his race was a motivating factor in Birnbaum and Wolfe's decision to ensure that he was "underutilized" and Cardwell's discrimination claims against Birnbaum and Wolfe are inadequately pleaded.

### iii. Chudd

Cardwell's discrimination claims against Chudd are inadequately pleaded for similar reasons. Cardwell alleges that Chudd failed to email him for "all of 2017." AC ¶ 207. But Cardwell has not alleged facts that would support an inference that his race was a motivating factor in Chudd's alleged decision not to email him.

Cardwell also alleges that Chudd "went out of his way to not document positive conclusions" about Cardwell's performance in a September 2015 performance review. *Id.* ¶ 85. In that performance review, Chudd commented that he had "limited" contact with Cardwell and then said that he had "[n]o basis" on which to evaluate Cardwell across several dimensions. *Id.* ¶ 84. Cardwell also alleges that Chudd delivered Cardwell's "first annual face-to-face review at the Firm[,]" during which Chudd "gave positive feedback and then briefly gave two suggestions." *Id.* ¶ 88 (footnote omitted). These suggestions were that Cardwell "work on better setting expectations regarding how long it will take to do something" and that Cardwell should not "spend too much time thinking about the bigger picture." *Id.*

These allegations are not actionable. For one, Chudd's performance review allegedly contained "positive feedback[,]" and so was, at worst for Cardwell, a mixed review. *Id.* But even "a negative performance evaluation alone . . . [w]ithout more—such as allegations of a detrimental effect on salary, benefits, or title— . . . does not constitute an adverse employment action." *Mira v. Argus Media*, No. 15-cv-9990 (RJS), 2017 WL 1184302, at *4 n.5 (S.D.N.Y. Mar. 29, 2017) (Sullivan, J.) (citing *Chung v. City Univ. of New York*, 605 F. App'x 20, 22 (2d Cir. 2015)). Cardwell does not argue that Chudd's performance review caused negative consequences. *See* Pl.'s Opp'n at 21 (arguing that Hudson's (but not Chudd's) negative performance reviews "triggered various adverse employment actions"). And Cardwell has not alleged that Chudd was involved in his termination or the alleged diminution of his responsibilities. Indeed, Cardwell alleges that the events that led to the claims in this case began after he stopped working with Chudd.

Ultimately, the Court need not decide whether this amounts to an allegation that he was treated "less well" because of his race. That is because Cardwell has not plausibly alleged that Chudd delivered his mixed performance review because of his race. There are no plausible allegations in the amended complaint that Chudd delivered his performance review because of discriminatory animus. Thus, Cardwell's discrimination claims against Chudd under federal, state, and city law are dismissed.

### iv. Hudson

Cardwell's discrimination claims against Hudson are inadequately pleaded because he has again failed to plausibly allege that race was a motivating factor for any of her actions. Cardwell alleges that Hudson corrected his grammar in an email. AC ¶ 121. This is not actionably adverse even under the plaintiff-friendly NYCHRL standard. And Cardwell again fails to allege that Hudson corrected his grammar because of his race. Cardwell also alleges that he and Hudson had "virtually no communications" with him after "they stopped working together" in early 2016. *Id.* ¶ 124. Even if that is adequate to plausibly plead that Cardwell was treated less well than other Davis Polk associates, there are no plausible allegations in the amended complaint that Hudson failed to communicate with him because of his race. *Id.* And Cardwell alleges that Hudson asked him "if he could recommend a Black restaurant . . . in Harlem" after they stopped working together. *Id.* Accepting the facts pleaded in the complaint as true, that is not actionable even under the NYCHRL standard. *See Moore v. Verizon*, No. 13-cv-6467 (RJS), 2016 WL 825001, at *8 (S.D.N.Y. Feb. 5, 2016) (Sullivan, J.) (holding that "stray remarks" are not actionable even under the NYCHRL).[18]

---

[18] Moreover, the content of the actual email exchange at issue, which is incorporated by reference into the complaint, does not suggest any inference of discrimination:

> Hudson:  Hi Kaloma, A client just asked me for a recommendation for a restaurant near the Apollo. I remembered our ride up to the [Columbia Law School] dinner this spring and wondered if you have any ideas - thoughts? Thanks! Sophia
>
> Plaintiff:  Hi Sophia, Definitely. A few suggestions: Red Rooster[;] Angel of Harlem[;] The Cecil[.] Most of my friends would suggest Red Rooster (as a safe bet) but I've heard good things about the other restaurants.
>
> Hudson:  Awesome - thanks!

Cardwell finally alleges that Hudson created "dishonest conclusions" in her 2016 performance review that allegedly "contradicted" her "real-time feedback." AC ¶ 118 & n.17. Hudson allegedly rated Cardwell as "behind" his peers in her 2016 performance review. *Id.* ¶ 119. Cardwell's amended complaint does not explain how Hudson's "conclusions" were "dishonest." Cardwell argues in his opposition that he "disputes when . . . Hudson's reviews were created." Pl.'s Opp'n at 11 (citing AC ¶¶ 106, 118, 120). But none of the well-pleaded allegations in the amended complaint support that assertion.

The first allegation Cardwell points to in support of his argument is that Bick "critiqued Mr. Cardwell while pretending to be holding and reading performance reviews that were supposedly submitted and a part of Mr. Cardwell's file." AC ¶ 106. That allegation has nothing to with Hudson. The second allegation Cardwell points to in support of his argument is that Hudson, among others, "knowingly falsified and shifted [her] conclusion[] related to Mr. Cardwell's performance reviews." AC ¶ 118. That allegation is conclusory, and the Court need not accept it as true. Cardwell does not appear to dispute that Hudson rated him as "behind" other associates in his class year. *Id.* ¶ 119. The third allegation that Cardwell points to in support of his argument is that Hudson's conclusions were "contradicted by" sentiments allegedly expressed by Byron Rooney, a partner in capital markets. *Id.* ¶ 120. This allegation is consistent with Hudson having rated Cardwell as "behind" his peers. Because it is not supported by the well-pleaded factual allegations in the complaint, the Court does not accept the legal conclusion that Hudson's performance review was based in part on discriminatory animus.[19] Thus, Cardwell's discrimination claims against Hudson are dismissed.

---

Decl. of Susanna Buergel, Dkt. No. 45, Ex. G.

[19] Even if the factual matters Cardwell alleges in his opposition might support a discrimination claim, "[a] party opposing a motion to dismiss cannot amend its complaint by making new factual allegations in a memorandum of law opposing that motion or attaching evidentiary matter." *Lesser v. TD Bank, N.A.*, No. 18-cv-9922 (PAE) (GWG), 2020 WL 1943050, at *11 (S.D.N.Y. Apr. 23, 2020) (slip op.), *report and recommendation adopted*, 2020 WL 2787645 (S.D.N.Y. May 28, 2020); *see also Keller Founds., LLC v. Zurich Am. Ins. Co.*, 758 F. App'x 22, 26 n.1 (2d Cir. 2018).

### v. Butler

Cardwell has also failed to meet the pleading standard for a discrimination claim against Butler.  Again, the problem is that Cardwell has not alleged that his race was a motivating factor in any of Butler's behavior.  Cardwell alleges that the Firm designated Butler as one of his "Career Advisors."  *Id.* ¶¶ 210–18.  Butler allegedly did not email Cardwell even after he was assigned as Cardwell's career advisor.  *See id.* ¶ 216.  Butler's failure to email Cardwell is not an adverse employment action under federal and state law, and it is not clear that this is adequate to allege even that Butler treated Cardwell "less well" under the NYCHRL standard.  *See Ward*, 2016 WL 4371752, at *6 n.4 (holding that a defendant's "refus[al] to directly communicate [with] or acknowledge" a plaintiff was not an adverse employment action under federal or state law).  But in any event, Cardwell has not plausibly alleged that his race was a motivating factor in Butler's decision not to email him.

Cardwell also alleges that Butler created a "roadblock" between him and other non-defendant Davis Polk partners.  AC ¶ 211.  But this allegation is conclusory.  Cardwell does not allege what this "roadblock" consisted of.  There are no well-pleaded allegations in the amended complaint to suggest that Butler prevented Cardwell from communicating with other Davis Polk partners.  And whatever this roadblock consisted of, Cardwell has not plausibly alleged that Butler erected it because of his race.  The deficiency of Plaintiff's claims of discrimination against Butler and the Additional Defendants is resonant of the "familiar faulty syllogism: something bad happened to me at work; I am (fill in the blank with one or more protected categories); therefore it must have happened because I am (fill in the blank with the applicable protected category)." *Edwards v. N.Y. State Unified Court Sys.*, 2012 WL 6101984, at *5 (S.D.N.Y. Nov. 20, 2012) (internal quotation marks omitted).  For those reasons, the discrimination claims against Butler and the other Additional Defendants are inadequately pleaded.

### B. Hostile Work Environment Claims Against All Defendants

#### 1. Legal Standard

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Vega*, 801 F.3d at 85 (quoting 42 U.S.C. § 2000e-2(a)(1)). Title VII extends to hostile environment claims because its "prohibition on discrimination covers more than 'economic' or 'tangible discrimination' and more than the 'terms and conditions' of employment in the 'narrow contractual sense.'" *Id.* at 88 n.10 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002)).[20] "Section 1981 has" also "been interpreted to provide a cause of action for race-based employment discrimination based on a hostile work environment." *Littlejohn*, 795 F.3d at 320 (quotation and brackets omitted). "The standard for hostile work environment claims under Title VII [and] § 1981 . . . and the NYSHRL is the same." *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 655 n.6 (S.D.N.Y. 2017) (quotation omitted); *see also Tolbert*, 790 F.3d at 439. "Cases interpreting hostile work environment claims under these provisions are generally cited interchangeably." *Lamarr-Arruz*, 271 F. Supp. 3d at 655 n.6.

---

[20] Contrary to Defendants' arguments, Cardwell properly exhausted his administrative remedies for his Title VII hostile environment claim. Defendants argue that Cardwell did not properly raise his hostile work environment claim before the EEOC. "As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC" or a parallel state agency. *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quotation and citations omitted). "[E]xhaustion is an essential element of Title VII's statutory scheme." *Id.* (quotation omitted). "[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense." *Id.* at 491. Although a plaintiff must generally present a claim in his EEOC complaint before filing that claim in federal court, "[c]laims not raised in an EEOC complaint may be brought in federal court if they are reasonably related to the claim filed with the agency." *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 110 n.5 (2d Cir. 2018) (en banc) (quotation and ellipsis omitted). "A claim is considered reasonably related if the alleged conduct would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.* (quotation omitted).

Though the Charges did not state a hostile work environment claim, that claim is reasonably related to claims Cardwell raised. The Charges allege that Cardwell was subjected to various forms of discrimination and retaliation during his tenure at Davis Polk. So the allegations undergirding his hostile work environment claim would reasonably have been expected to fall "within the scope of the EEOC investigation" and "to grow out of the charge that was made." *Id.* For that reason, Cardwell's Title VII hostile work environment claim is reasonably related to the conduct he alleged before the EEOC, and Cardwell properly exhausted his administrative remedies with respect to his Title VII claim.

To allege a hostile environment claim under federal and New York law, a plaintiff must allege that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (quotation omitted).

"In determining whether a plaintiff suffered a hostile work environment," a court "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Tolbert*, 790 F.3d at 439 (quoting *Alfano*, 294 F.3d at 374) (internal quotation marks omitted). To survive a motion to dismiss, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Patane*, 508 F.3d at 113 (ellipsis omitted). The Second Circuit has "repeatedly cautioned against setting the bar too high in this context." *Id.* (quoting *Terry*, 336 F.3d at 148).

"[T]he plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert*, 790 F.3d at 439 (citation omitted). Cardwell's hostile work environment claims are subject to the same standards of causation as his other discrimination claims. *See, e.g.*, *Hernandez v. New York City Dep't of Sanitation*, No. 18-cv-1808 (LGS), 2018 WL 5447540, at *2

49

(S.D.N.Y. Oct. 29, 2018) ("[O]ne of the elements of a race-based hostile work environment claim is conduct that creates a hostile or abusive environment 'because of the employee's protected characteristic, such as race or national origin,' although the protected characteristic need not be 'the only motivating factor.'" (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20, 23 (2d Cir. 2014) (brackets omitted)).

"Hostile environment claims are different in kind from" other discrimination claims because the "very nature" of hostile environment claims "involves repeated conduct." *Morgan*, 536 U.S. at 115. By contrast, adverse action claims are premised on a "discrete act." *Id.* For hostile environment claims, "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years." *Id.* And "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* Because of the difference between hostile work environment and other discrimination claims, "[a]llegations of 'discrete, adverse employment decisions concerning promotions, discipline, and appraisal, and about employer criticism' are insufficient to state a claim for hostile work environment." *Calise v. New York State Dep't of Motor Vehicles*, No. 17-cv-791 (VB), 2018 WL 4350247, at *7 (S.D.N.Y. Sept. 12, 2018) (quoting *Olivier v. Cnty. of Rockland*, No. 15-cv-8337 (KMK), 2018 WL 401187, at *5 (S.D.N.Y. Jan. 11, 2018)); *cf. Littlejohn*, 795 F.3d at 312–13, 320–21 (holding that a plaintiff had adequately alleged a discrimination claim based on adverse action but dismissing her hostile environment claim).

### 2. Application

Cardwell has not plausibly alleged that he was subjected to an objectively hostile work environment. Cardwell uses the phrase "hostile work environment" only once in his complaint. In that paragraph, he alleges that "Davis Polk and certain defendants' refusal to not staff [sic] Mr. Cardwell on a[n] M&A deal for the periods of time and manner described in this Complaint constitutes both an adverse employment action and a hostile work environment." AC ¶ 276. That

allegation is insufficient to plausibly allege that Cardwell was subjected to a hostile work environment.  True, an allegation that an employee was subjected to a "disproportionately heavy workload" can contribute to a hostile work environment claim.  *Feingold*, 366 F.3d at 153.  The same logic applies to allegations that a plaintiff received less work than similarly situated coworkers, at least when, as here, the plaintiff alleges that his career prospects suffered because he received less work.  But even when considered in the context of the other allegations in the amended complaint, that allegation is inadequate to plausibly allege that Cardwell was subjected to a hostile work environment.

In his opposition, Cardwell points to other allegations in the amended complaint that he argues adequately plead his hostile work environment claim.  Cardwell alleges that partners ignored him in the hallways, and that they tried to "get him to assume blame for things that were not incorrect, his fault, or under his control."  *See* AC ¶¶ 173, 277.  He also alleges that Bick told him that Cardwell would be "out of the game" and "off the field" if he did not stop complaining and that he was ultimately fired for making protected complaints.  *Id.* ¶¶ 249, 296–302.

These allegations do not sufficiently allege that Cardwell's work environment was objectively hostile.  The allegation that partners ignored him in the hallways is insignificant.  *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010) (holding that some allegations "are too trivial to contribute to a Title VII hostile work environment claim" because "Title VII simply 'does not set forth a general civility code for the American workplace'" (quoting *Burlington*, 548 U.S. at 68)).  The allegation that partners tried to blame Cardwell for mistakes that were not "his fault" is too vague to support a hostile environment claim.  And Cardwell's allegation that he was terminated for making complaints supports Cardwell's adverse action discrimination claims, not his hostile work environment claim.

In deciding whether Cardwell has adequately alleged that he was subjected to an objectively hostile work environment, the Court has considered all the allegations in the amended complaint.  It

discusses the inadequacy of the allegations Cardwell points to as specifically supporting his hostile work environment claim in the amended complaint and his opposition only as an illustration.  For brevity, the Court will not rehash every allegation in the amended complaint that might plausibly support Cardwell's hostile work environment claim.  But considering all the allegations in the amended complaint collectively (as the Court has), Cardwell has not plausibly alleged that he was subjected to an objectively hostile work environment.  Cardwell complains not of severe offensive conduct directed toward him:  instead, he complains of conduct that made him feel excluded—fewer emails, no eye-contact in the halls—a kind of social ostracism, or, viewed in the light most favorable to him, a kind of passive-aggressive behavior toward him by other Davis Polk lawyers.

To be sure, some of these allegations—especially the allegation that Cardwell received less work than his peers—might contribute to a hostile work environment claim if coupled with other troublesome conduct.  *See, e.g.*, *Raniola v. Bratton*, 243 F.3d 610, 621 (2d Cir. 2001) (concluding that a hostile environment existed when a plaintiff "was subjected to offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm").  And the Court can understand why the lack of warmth and outreach in his workplace made Cardwell feel bad, particularly when the alleged social ostracism was combined with a reduction in his work assignments.

But viewing the allegations collectively, Cardwell has inadequately pleaded that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris*, 510 U.S. at 21).[21]  The

---

[21] Cardwell asserts separate "discrimination" and "hostile work environment" claims under Title VII and section 1981 in his amended complaint.  AC ¶¶ 313–16, 321–29, 336–40.  He asserts only "discrimination" claims under the NYSHRL and NYCHRL.  *Id.* ¶¶ 341–44, 365–68.  As noted above, the term "discrimination" claim is ambiguous because hostile work environment claims are a subspecies of discrimination claims.  Thus, it is unclear whether Cardwell intended to assert hostile work environment claims under the NYSHRL and NYCHRL.  But this is immaterial to the Court's analysis.  The pleading standard for an NYSHRL is the same as for the analogous federal law claims.  *See, e.g.*, *Tolbert*, 790

Defendants may not have acted in the best possible way to help Cardwell feel included, but they did not behave badly in a way that would support a hostile work environment claim.

### C. Retaliation Claims Against the Additional Defendants

#### 1. Legal Standard

##### a. Section 1981 and the NYSHRL

Section 1981 "encompasses claims of retaliation." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). Similarly, "[t]he NYSHRL makes it unlawful for 'any employer to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.'" *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 581 (2d Cir. 2020) (summary order) (quoting N.Y. Exec. Law § 296(1)(e)) (ellipsis omitted).

To survive a motion to dismiss a retaliation claim, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting

---

F.3d at 439; *Lamarr-Arruz*, 271 F. Supp. 3d at 655 n.6. Because the Court dismisses Cardwell's hostile work environment claims under federal law, it would do the same under the NYSHRL.

There is no separate "hostile work environment" claim under the NYCHRL. A plaintiff asserting a discrimination claim must allege "that she has been treated less well than other employees because of her" protected characteristic. *Mihalik*, 715 F.3d at 110 (citations omitted). The NYCHRL does not draw the same distinctions between "adverse action" and "hostile work environment" claims as do federal and state law. As noted above, "the NYCHRL does not require" a plaintiff to allege a "materially adverse employment action[]" to assert a discrimination claim. *Id.* at 114 (citing *Williams*, 872 N.Y.S.2d at 34, 37–39). Of course, a materially adverse employment action may form the basis for an NYCHRL discrimination claim; an employee who suffers a materially adverse employment action has surely been treated "less well" than her colleagues. Similarly, a plaintiff asserting an NYCHRL discrimination claim need not allege that she was subjected to "severe and pervasive conduct" as would be required for a hostile work environment claim under federal or state law. *Id.* (citing *Williams*, 872 N.Y.S.2d at 34, 37–39). "[L]iability is normally determined simply by the existence of differential treatment[,]" although "the NYCHRL is not a 'general civility code.'" *Id.* at 110 (quoting *Williams*, 872 N.Y.S.2d at 38, 40–41). Thus, for the reasons discussed above as to Cardwell's discrimination claims against the Additional Defendants, the Court would dismiss a hostile work environment claim against those Defendants under the NYCHRL. To summarize, Cardwell has not plausibly alleged that his race was a motivating factor in any negative treatment to which he was subjected to by the Additional Defendants. That is fatal to a NYCHRL discrimination claim against those Defendants, whether phrased as a "hostile work environment" claim or otherwise.

*Littlejohn*, 795 F.3d at 316).[22]  Generally, the "same pleading standards apply" to retaliation claims under Title VII, section 1981, and the NYSHRL.  *See Guity v. Uniondale Union Free Sch. Dist.*, No. 15-cv-5693 (SJF) (AKT), 2017 WL 9485647, at *21 n.14 (E.D.N.Y. Feb. 23, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 1233846 (E.D.N.Y. Mar. 31, 2017).  So although Defendants did not move to dismiss the Cardwell's Title VII claims, the Court discusses Title VII case law because it is relevant to Cardwell's section 1981 claims.

### b. NYCHRL

The NYCHRL also prohibits retaliation.  "Section 8-107(7) of the NYCHRL prohibits employers from 'retaliating or discriminating in any manner against any person because such person has opposed any practice forbidden under this chapter.'"  *Mihalik*, 715 F.3d at 112 (quoting former N.Y.C. Admin. Code § 8-107(7)) (alterations omitted).

> The Restoration Act amended this section to further provide:  "The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, or in a materially adverse change in the terms and conditions of employment, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."

*Id.* (quoting Restoration Act § 3 (amending N.Y.C. Admin. Code § 8-107(7)) (ellipses omitted)).  So to plausibly plead "a retaliation claim under the NYCHRL, the plaintiff must [allege] that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  *Id.* (citing *Albunio v. City of N.Y.*, 16 N.Y.3d 472, 479 (2011); *Williams*, 872 N.Y.S.2d at 33–34); *see also Warmin v. New York City Dep't of Educ.*, No. 16-cv-8044 (KPF), 2019 WL 3409900, at *7 (S.D.N.Y. July 29, 2019) ("To plead retaliation under the NYCHRL, Plaintiff must show that he 'took an action opposing his employer's discrimination, and that, as a result, the employer engaged in conduct that

---

[22] *See also Vega*, 801 F.3d at 90 ("[F]or a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that:  (1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice." (quotation omitted)).

was reasonably likely to deter a person from engaging in such action.'" (quoting *Mihalik*, 715 F.3d at 112) (brackets omitted)).

Like the NYCHRL's discrimination provision, "New York courts have broadly interpreted the NYCHRL's retaliation provisions." *Taylor v. City of N.Y.*, 207 F. Supp. 3d 293, 308 (S.D.N.Y. 2016) (quoting *Mihalik*, 715 F.3d at 112); *see also Mestecky v. N.Y.C. Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (summary order) ("[The] NYCHRL's retaliation provision is broader than Title VII's." (citing *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015)).  And as discussed, the NYCHRL is a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the City's Human Rights law cannot fall." *Mihalik*, 715 F.3d at 109 (quotation omitted).

## 2. Protected Activity and Knowledge

### a. Legal Standard

#### i. Section 1981 and the NYSHRL

A plaintiff engages in protected activity when she "oppose[s]" discrimination.  *Littlejohn*, 795 F.3d at 316 (quotation omitted).  A plaintiff "need not [allege] that the behavior he opposed in fact violated" federal or state antidiscrimination statutes.  *Cooper v. N.Y. State Dep't of Labor*, 819 F.3d 678, 680–81 (2d Cir. 2016).  Instead, she must only allege "that [s]he possessed a good faith, reasonable belief that the" employer unlawfully discriminated.  *Id.* at 681 (citations omitted); *see also Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("[T]he plaintiff 'is required to have had a good faith, reasonable belief that she was opposing an [unlawful] employment practice.'" (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001)).  "A plaintiff's belief" that an employer's employment practice was unlawful "is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Kelly*, 716 F.3d at 14.

A plaintiff must also "ordinarily plead that the defendant had knowledge of the protected activity." *Stern v. State Univ. of N.Y.*, No. 16-cv-5588 (NGG) (LB), 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018).  A plaintiff may meet this pleading standard by pleading facts that permit the Court to "reasonably infer that she engaged in protected activity known to the Defendants." *Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 57 n.8 (S.D.N.Y. 2019); *see also Belizaire v. Rav Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 355 (S.D.N.Y. 2014).  And even when a plaintiff does not allege that "the individual decision-maker" had "knowledge of protected activity," the plaintiff may survive a motion to dismiss by pleading that "the decision-maker was at least influenced or encouraged to take the adverse action by a superior with knowledge of the protected activity." *Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein Coll. of Med.*, No. 11-cv-8934 (AJN), 2014 WL 896744, at *12 (S.D.N.Y. Mar. 3, 2014) (citing *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 147–48 (2d Cir. 2010); *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

"[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (citations omitted); *see also Venezia v. Luxoticca Retail N. Am. Inc.*, No. 13-cv-4467 (RJS), 2015 WL 5692146, at *12 (S.D.N.Y. Sept. 28, 2015).  "The employee's complaint must be sufficiently pointed to be reasonably understood as a complaint [about] discrimination." *Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 187 (S.D.N.Y. 2020) (quoting *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-cv-2456 (MKB), 2013 WL 1211496, at *9 (E.D.N.Y. Mar. 25, 2013)).  In other words, "a plaintiff 'must allege that her employer was on notice that her complaints were about statutorily prohibited discrimination, not just general unsatisfactory or unfair conduct.'" *Id.* (quoting *Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 (2d Cir. 2015)) (brackets omitted).

"Although particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the

substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." *Kelly*, 716 F.3d at 17 (citations omitted); *see also Galdieri–Ambrosini v. Nat'l Realty and Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Thus, "[m]ere complaints of unfair treatment are not protected speech in the employment retaliation context," and it is the speaker's responsibility "to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (quotation and ellipsis omitted).

### ii. NYCHRL

To plausibly plead an NYCHRL retaliation claim, "the plaintiff must [allege] that she took an action opposing her employer's discrimination." *Mihalik*, 715 F.3d at 112. Opposing discrimination "can include situations where a person, before the retaliatory conduct occurred, merely 'made clear her disapproval of the defendant's discrimination by communicating to him, in substance, that she thought his treatment of the victim was wrong.'" *Id.* (quoting *Albunio*, 16 N.Y.3d at 479) (brackets omitted). "NYCHRL claims must be reviewed considering the totality of the circumstances, and the New York Court of Appeals has held that an employee can oppose his employer's discrimination without expressly mentioning discrimination as the source of his discontent." *Benzinger*, 447 F. Supp. 3d at 124 (citing *Mihalik*, 715 F.3d at 113; *Albunio*, 16 N.Y.3d at 479). Still, courts have dismissed NYCHRL retaliation claims for failure to meet this standard. *See Fattoruso v. Hilton Grand Vacations Co., LLC*, 525 F. App'x 26, 28 (2d Cir. 2013) (dismissing the plaintiff's NYCHRL retaliation claim because the plaintiff's "belief that he was being treated 'unfairly'" does not "transform his complaints to [the employer] into charges over unlawful discrimination."); *Farzan v. Wells Fargo Bank, N.A.*, No. 12-cv-1217 (RJS) (JLC), 2013 WL 6231615, at *29 (S.D.N.Y. Dec. 2, 2013) (granting summary judgment on NYCHRL retaliation claim because the plaintiff did not "ma[ke] clear her disapproval of the defendant's discrimination by communicating to [the employer], in substance," the alleged illegal treatment) (quoting *Mihalik*, 715 F.3d at 112) (brackets omitted),

*aff'd sub nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015); *Mi-Kyung Cho v. Young Bin Café*, 42 F. Supp. 3d 495, 507 (S.D.N.Y. 2013) (similar).

### b. Application

#### i. Protected Activity

Cardwell alleges that he engaged in protected activity on twelve occasions during his tenure at Davis Polk. As alleged, six of these complaints qualify as protected activity, while six do not.

First, Cardwell alleges that he emailed "Davis Polk's Executive Director" in May 2015 and "noted that interpersonal trainings that highlight the value of associates speaking to unfamiliar faces and creating a welcoming environment would benefit everyone. Specifically, Mr. Cardwell's email described situations where Davis Polk attorneys were not making eye contact with or speaking to summer associates and junior associates of color in meetings." AC ¶ 56. As alleged, this is an ambiguous complaint that does not qualify as protected activity because it was not sufficiently pointed to put any Defendant on notice that Cardwell was complaining about discrimination under federal, state, or city law.

Second, Cardwell alleges that he "participated in a conversation about the general issue of Black Davis Polk attorneys being excluded from staffing-related opportunities at the Firm" at a meeting between "the Firm's Diversity Committee and the Firm's Black Attorney Group" in September 2015 (the "September 2015 Complaint"). *Id.* ¶ 67. Cardwell alleges that he told the meeting's attendees—including "[p]artners serving on the Firm's Diversity Committee, and the Firm's Director of Associate Development"—that he "personally experienced exclusion and disparate treatment related to his race at the Firm." *Id.* This allegation qualifies as protected activity because Cardwell alleges that he "personally experienced" discrimination at the Firm because of his race. The Court observes, however, that not every conversation about equity and inclusion qualifies as protected activity. A standard for protected activity that swept in any conversation about race and inclusion might have the perverse effect of discouraging employers from encouraging such

conversations.  But because Cardwell alleges that he discussed racial discrimination that he personally had experienced—in those terms—during the September 2015 meeting, it qualifies as protected activity under federal, state, and city law.

Third, Cardwell alleges that he engaged in protected activity during a dinner with Reid and a Black senior associate in January 2016 (the "January 2016 Complaint").  *See id.* ¶ 74.  During this dinner, the three men discussed "the Firm's diversity and inclusions issues."  *Id.*  Cardwell allegedly "educat[ed] Mr. Reid on how he had experienced interpersonal and institutional discrimination at the Firm."  *Id.* ¶ 76.  Cardwell alleges that he "spoke at length about implicit bias both conceptually and in relation to the race-based discrimination he himself had experienced during his time at the Firm."  *Id.* ¶ 77.  Viewing the alleged facts in the light most favorable to Cardwell, this qualifies as protected activity.  If Cardwell alleged only that his conversation with Reid remained "conceptual[]," that would be unlikely to qualify as protected activity.  *Id.*  But Cardwell alleges that he told Reid— the firm's Managing Partner—that he personally "had experienced interpersonal and institutional discrimination at the Firm."  *Id.* ¶ 76.  That is adequate to qualify as protected activity under federal, state, and city law.

Fourth, Cardwell alleges that, in August 2016, he emailed a junior staffing coordinator after Brass removed him from a deal team.  *Id.* ¶ 144.  Cardwell asked whether "anyone [at Davis Polk] ha[d] made a decision to limit [his] involvement to certain types of deals and matters."  *Id.* (emphasis omitted).  As alleged, this also does not qualify as protected activity.  Asking whether someone at the Firm had decided to limit Cardwell's involvement is not "sufficiently pointed to be reasonably understood as a complaint [about] discrimination."  *Cornetta*, 434 F. Supp. 3d at 187 (quotation omitted).  It is also inadequate to "communicat[e]" to the junior staffing coordinator "in substance, that [Cardwell] thought" the Firm's treatment of him "was wrong."  *Mihalik*, 715 F.3d at 112 (quotation omitted).  Indeed, Cardwell's question did not refer to his race and thus cannot be reasonably understood as a complaint about discrimination.  Thus, this does not qualify as protected

activity that can serve as the basis for a retaliation claim even under the more liberal NYCHRL standard.

Fifth, Cardwell alleges that he engaged in protected activity when he declined an assignment in the credit group from a different junior staffing coordinator in September 2016.  The junior staffing coordinator asked Cardwell to work on a credit assignment because "the attorneys in the Firm's Credit Group were unusually busy and could use assistance." *Id.* ¶ 158.  In response, Cardwell allegedly told the junior staffing coordinator that he was "more than happy to work on anything you or anyone else would like me to, but" that he was "concern[ed]." *Id.* ¶ 159.  "As a Black associate," Cardwell allegedly told the junior staffing coordinator, he was "concerned about the general pattern that exists across the legal profession and within Davis Polk." *Id.*  This "pattern" was that "typically . . . when Black associates" reach their fourth, fifth, or sixth year, they have less experience than white associates of the same year. *Id.*  Cardwell allegedly told the junior staffing coordinator that he didn't want his career to follow this pattern. *Id.*  This does not qualify as protected activity as alleged.  Again, Cardwell's complaint was not sufficiently pointed to put the junior staffing coordinator on notice that Cardwell was complaining about statutorily prohibited discrimination that he personally experienced at the Firm.  And again, it fails to communicate to the junior staffing coordinator that Cardwell believed that anyone at the Firm was engaging in statutorily prohibited discrimination.  Cardwell allegedly spoke in general terms about a "general pattern" in the legal profession—and not discrimination that he had witnessed or experienced at the Firm.  Thus, Cardwell's statements cannot serve as the basis for a retaliation claim under federal, state, or city law.

Sixth, Cardwell alleges that he engaged in protected activity by emailing "Carey Dunne, a Davis Polk partner who often oversaw criminal justice pro bono matters, regarding a Firm Client with a[n allegedly] violent and discriminatory reputation towards certain racial groups" in December 2016. *Id.* ¶ 199.  Cardwell's email referred to a memo that Cardwell and other associates had previously written about "how blacks were being disproportionately and unfairly harmed by certain

prison-related industries and companies." *Id.* ¶ 200 (brackets omitted).  Cardwell again "raised the issue of the Firm's relationship with [the] private for-profit prison and immigrant detention company" in an email to Sharon Katz, Davis Polk's Special Counsel for Pro Bono.  *Id.* ¶ 229.  These communications do not qualify as protected activity because they are not about discrimination at Davis Polk.  Cardwell's complaints about Davis Polk's choice of clients could not be reasonably understood as complaints about discrimination at the Firm.  So this allegation is not actionable under federal, state, or city law.

Seventh, Cardwell alleges that he engaged in protected activity by emailing Butler and Bick after they were assigned as his career advisors in January 2017.  *Id.* ¶¶ 214–15.  The Career Advisor program was allegedly a formal mentorship program at the firm.  *See id.* ¶¶ 212–13.  After Bick and Butler were assigned as Cardwell's Career Advisors, he emailed them and a junior staffing coordinator to say that he "look[ed] forward to learning how the Career Advisor Program will supplement experiences and conversations [Cardwell] had (i.e., with managing partners, assignment coordinators, BAG meeting participants, etc.) regarding DPW interactions, opportunity/assignments, and career development."  *Id.* ¶ 214 (emphasis omitted).  Cardwell's email does not qualify as protected activity because it is not sufficiently pointed to put Bick and Butler on notice that Cardwell was complaining about unlawful discrimination at Davis Polk.  Nor does it adequately communicate to them that Cardwell is complaining about discrimination.  Cardwell's vague references to other "experiences and conversations" he had does not adequately communicate that he opposed discrimination.  So this allegation cannot serve as the basis for a retaliation claim under federal, state, or city law.

Eighth, Cardwell alleges that he engaged in protected activity by indicating that he had capacity on his weekly workload capacity forms from December 2016 to March 2017.  *Id.* ¶ 225 n.34.  Cardwell alleges that the Firm did not staff him on any new matters during this time frame. *Id.* ¶¶ 223–26.  This does not qualify as protected activity because Cardwell indicating that he had

capacity cannot be construed as a complaint about discrimination even under the NYCHRL's more plaintiff-friendly standard.

Ninth, Cardwell alleges that he engaged in protected activity during a meeting with Reid and Kreynin in March 2017 (the "March 2017 Complaint").  *Id.* ¶ 241.  During that meeting, Reid allegedly told Cardwell that he and the Firm "had 'dropped the ball' and made mistakes" as to Cardwell's staffing.  *Id.*  When Cardwell inquired about who had "dropped the ball," Reid allegedly told Cardwell that he and other members of the Firm would not permit him to discuss the past. During this meeting, Cardwell said that "he was uncomfortable with the Firm's performance review process and noted that racial biases were influencing performance evaluations."  *Id.* ¶ 242.  If Cardwell continued to complain, Reid allegedly threatened to take Cardwell "out of the game" and "off the field" at the Firm.  *Id.* ¶ 249.  Cardwell's complaint is protected activity because, viewing the alleged facts in the light most favorable to Cardwell, it was sufficient to put Reid and Kreynin on notice that Cardwell had opposed discrimination in the Firm's performance review process.  Because this qualifies as protected activity under federal and state law, it also necessarily qualifies under the NYCHRL.

Tenth, Cardwell alleges that he engaged in protected activity when he emailed Goldberg that he had "bec[o]me ill" when he "thought more about [his] own story and experiences" at Davis Polk in May 2017 (the "May 2017 Complaint").  *Id.* ¶ 266.  This also qualifies as protected activity under federal, state, and city law.  That is because—again viewing the alleged facts in the light most favorable to Cardwell—his statement that thinking about his experiences at Davis Polk made him feel "ill" was sufficiently pointed to put Goldberg on notice that Cardwell had opposed unlawful discrimination at the Firm.  Again, because this qualifies as protected activity under federal and state law, it also qualifies as protected activity under the NYCHRL.

Eleventh, Cardwell alleges that he filed the EEOC Charge in August 2017.  *Id.* ¶ 280.  This charge was apparently transferred to the NYSDHR because Davis Polk filed an "Answer and

Position Statement" with the NYSDHR in December 2017.  *Id.* ¶ 281.  Cardwell alleges that he filed a rebuttal to Davis Polk's answer filed at the EEOC in January 2018.  *Id.* ¶ 282.  And Cardwell filed the Supplemental Charge in April 2018.  *Id.* ¶ 304.  Defendants do not dispute that this is protected activity.  *See Vega*, 801 F.3d at 91 (noting that an EEOC charge is protected activity).

Twelfth, Cardwell alleges that he engaged in protected activity by opposing the Firm's performance review process in January 2018 (the "January 2018 Complaint").  Cardwell alleges that he told his reviewers, two unnamed Davis Polk partners, that "it was a theme of his career and other Black attorneys at Davis Polk that Davis Polk attorneys would say one thing while working with him and other Black attorneys and then say another thing in his and other Black attorneys' performance reviews," and that he "explicitly talked about the role that implicit bias, among other forms of bias, played in the timing and accuracy of the feedback that Mr. Cardwell had received."  AC ¶ 289.  This qualifies as protected activity under federal, state, and city law because Cardwell opposed perceived discrimination in the performance review process, which he might have reasonably believed was unlawful.

In sum, Cardwell has plausibly alleged six instances in which he engaged in protected activity during his tenure at Davis Polk.

### ii. Knowledge[23]

The Court analyzes whether each Additional Defendant had knowledge of Cardwell's alleged protected activity.  As to each Additional Defendant, Cardwell has asserted new factual allegations in this motion to dismiss.  Yet, as noted above, "a party opposing a motion to dismiss cannot amend its complaint by making new factual allegations in a memorandum of law opposing that motion or attaching evidentiary matter."  *Lesser*, 2020 WL 1943050, at *11.  The Court cannot consider novel

---

[23] Because Defendants have not moved to dismiss Cardwell's claims against Reid and Bick, the Court does not decide whether Cardwell has plausibly alleged that these Defendants had knowledge of his protected activity.

allegations in Cardwell's *opposition* in assessing whether his *amended complaint* has stated a claim on which relief can be granted.

Cardwell has not plausibly alleged that Chudd, Hudson, and Butler had knowledge of his protected activity when they allegedly retaliated against him.  And although he has plausibly alleged that Brass, Birnbaum, and Wolfe had knowledge of the Charges when they terminated him, the other bases for his retaliation claims against these Defendants are inadequately pleaded.

*Chudd*:  Cardwell argues that Chudd had knowledge of the September 2015 Complaint.  Pl.'s Opp'n at 26.  But the amended complaint does not so allege.  Cardwell argues that his 2015 complaints were "related to Chudd."  *Id.*  That argument is not supported by the amended complaint, which does not allege that Cardwell's 2015 complaints mentioned Chudd.  Cardwell also alleges that it is "implausible" that his 2015 complaints were not raised directly with Chudd.  *Id.* That, too, is unsupported by any allegation in the amended complaint.  There is no allegation in the amended complaint to support Cardwell's assertion that Chudd knew about the September 2015 Complaint.

*Hudson*:  The same is true of Cardwell's assertion in his opposition that Hudson knew about his 2015–16 complaints.  As discussed above, many of these complaints do not qualify as protected activity.  Cardwell asserts that because Davis Polk described the September 2015 Complaint as a "concern" in its responsive brief before the NYSDHR, Hudson must have been "looped into discussions" about his complaint.  *Id.* at 27.  But there is no allegation in the amended complaint that would support the assertion that Hudson was "looped in" to any discussion about the September 2015 Complaint.  Cardwell also asserts in his opposition, "[o]n information and belief" that "at some point prior to when Hudson created" Cardwell's negative performance review, Bick requested that Hudson rate Cardwell as "behind" his peers to torpedo his career.  *Id.*  But that argument is also unsupported by any allegation in the amended complaint.

*Butler*:  Cardwell argues in his opposition that Butler had knowledge of his 2015 and 2016 complaints because he was assigned as Cardwell's "Career Advisor."  *Id.* at 29.  The Court has already determined that Cardwell's email—which stated that Cardwell "look[ed] forward to learning how the Career Advisor Program" would supplement the "experiences and conversations" he had "regarding DPW interactions, opportunity/assignments, and career development" and on which Bick and Butler were cc'd—is not protected activity.  AC ¶ 214.  Cardwell asserts that "it is improbable that Butler would have been so assigned without" discussing Cardwell's complaints with Reid and Bick.  Pl.'s Opp'n at 29.  But, again, the amended complaint does not support that assertion.  There are no allegations in the amended complaint that would plausibly suggest that Reid and Bick discussed anything about Cardwell with Butler.  So this allegation also cannot be the basis of a retaliation claim.

*Brass*:  Cardwell argues in his opposition that Brass had knowledge of the August 2016 Complaint.  The Court has already held that this complaint did not constitute protected activity, however.  In any event, there is no allegation in the amended complaint that Brass knew that Cardwell complained about his staffing assignments.  Cardwell alleges that he was initially told that he would be staffed on a deal in July 2016.  AC ¶ 139.  He allegedly emailed Brass, who emailed him that he should "stand down" after a few hours.  *Id.*  Cardwell alleges that he then emailed a junior staffing coordinator to "alert[] her" to Brass's behavior.  *Id.* ¶ 141.  Cardwell alleges that he again emailed the junior staffing coordinator two weeks later to ask if "anyone" at the Firm had "made a decision to limit [his] involvement to certain types of deals and matters."  *Id.* ¶ 144.  The junior staffing coordinator allegedly noted that Brass had replaced Cardwell with a white associate and said that his behavior was "weird."  *Id.* ¶ 146.  Even if Cardwell's emails to the junior staffing coordinator qualified as protected activity, there is no allegation in the amended complaint that the junior staffing coordinator relayed these emails to Brass.  Thus, there is no basis in the amended complaint to conclude that Brass knew about Cardwell's emails to the staffing coordinator.

*Birnbaum & Wolfe*:  In his opposition, Cardwell argues that he has plausibly alleged that Birnbaum and Wolfe had knowledge of his September 2016 Complaint to the junior staffing coordinator.  Cardwell alleges that he told the junior staffing coordinator that he was "concerned" about the "pattern" in the legal profession that Black associates received less desirable work assignments than their white peers.  *Id.* ¶ 159.  Again, the Court has already determined that this did not constitute protected activity.  But even if it did, Cardwell has not shown that Birnbaum and Wolfe had knowledge of these complaints.  In his opposition, Cardwell asserts that it is "plausible" that the junior staffing coordinator relayed his complaints to Birnbaum and Wolfe.  Pl.'s Opp'n at 28.  Yet the amended complaint does not allege that the junior staffing coordinator actually did so.  Thus, Cardwell has not plausibly alleged that Birnbaum and Wolfe knew about the September 2016 Complaint.

Cardwell finally asserts in his opposition that all Additional Defendants were aware of his administrative filings with the EEOC and the NYSDHR.  Pl.'s Opp'n at 29–30.  The amended complaint supports that assertion.  It is a reasonable inference from the facts alleged in the amended complaint that all Davis Polk partners were aware that Cardwell—then still employed as an associate—had filed a discrimination complaint with the EEOC.  Thus, Cardwell has plausibly alleged that he engaged in protected activity known to the Additional Defendants when he filed complaints with the EEOC and the NYSDHR.

### 3. Adverse Employment Action and Causal Connection

#### a. Legal Standard

##### i. Section 1981 and the NYSHRL

Recall that in addition to alleging that he participated in a protected activity known to the defendant, a plaintiff must allege "an adverse employment action" and "a causal connection between the protected activity and the adverse employment action" to plausibly allege a retaliation claim.  *Littlejohn*, 795 F.3d at 316.  "The Supreme Court has held that in the context of a Title VII retaliation

claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57).  "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII:  'The antiretaliation provision, unlike the substantive discrimination provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Id.* (quoting *Burlington*, 548 U.S. at 64) (brackets omitted).  But "[a]ctions that are 'trivial harms'—*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68).

A plaintiff must also "plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90 (citing 42 U.S.C. § 2000e-3(a)).  "A retaliatory purpose can be shown indirectly by timing:  protected activity followed closely in time by adverse employment action." *Id.* (citation omitted).  For "an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360); *see also Spratt v. Verizon Commc'ns Inc.*, 633 F. App'x 72, 73 (2d Cir. 2016) ("A supervisor's retaliatory actions must be the 'but-for' cause of the employer's adverse employment action" under section 1981.) (citing *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) for the proposition that "substantive legal principles for claims under Title VII also apply to claims under § 1981").[24]  So a plaintiff must allege

---

[24] But the "[t]he Second Circuit has yet to decide explicitly whether the but-for causation standard applies to [retaliation] claims under the NYSHRL, as it does under Title VII."  *Benzinger*, 447 F. Supp. 3d at 125 n.17 (collecting cases); *see also Holcomb v. State Univ. of N.Y. at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017) (summary order) ("We need not decide today whether the 'but-for' standard of causation applies to all of [the plaintiff's] retaliation claims because each fails under both the 'but-for' causation standard and the 'substantial or motivating factor' causation standard.").  But the Circuit has "implicitly applied the but-for standard to NYSHRL claims."  *Benzinger*, 447 F. Supp. 3d at 125 n.17 (citing *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14–16 (2d Cir. 2018)).  The distinction between the "but for" and "motivating factor" standard is immaterial to the Court's analysis.

facts suggesting that "the adverse action would not have occurred in the absence of the retaliatory motive." *Vega*, 801 F.3d at 91 (quotation omitted).

"A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (citation omitted); *see also Duplan*, 888 F.3d at 625 (holding that a causal connection may be "inferred through temporal proximity to the protected activity." (citing *Vega*, 801 F.3d at 90–91)). A plaintiff can also plead that his protected activity "initiated a sequence of events that satisfactorily plead causation by suggesting retaliatory animus." *Gonzalez v. City of N.Y.*, 377 F. Supp. 3d 273, 292 (S.D.N.Y. 2019).

### ii. NYCHRL

To plausibly plead a retaliation claim under the NYCHRL, the plaintiff must plausibly allege that "the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citing *Albunio*, 16 N.Y.3d at 479; *Williams*, 872 N.Y.S.2d at 33–34). "The NYCHRL imposes an identical standard to that of the NYSHRL, except that the plaintiff need not [allege] any 'adverse' employment action; instead, she must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Benzinger*, 447 F. Supp. 3d at 129 (quotation and brackets omitted). "As with [federal and state law] retaliation claims, temporal proximity may be used to support an inference of indirect causation, and there is no bright line rule to determine when a gap in time attenuates an inference of retaliatory motive." *Mooney v. City of N.Y.*, No. 18-cv-328 (DLC), 2018 WL 4356733, at *9 (S.D.N.Y. Sept. 12, 2018) (citing *Harrington v. City of N.Y.*, 70 N.Y.S.3d 177, 181 (1st Dep't 2018)).

The higher but-for causation standard does not apply to NYCHRL retaliation claims. To survive a motion to dismiss, a plaintiff need only allege that retaliatory animus played *some* role in the employer's decision. *Cf. Mihalik*, 715 F.3d at 112 ("[S]ummary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." (citing *Melman*, 946

68

N.Y.S.2d at 30–31; *Furfero v. St. John's Univ.*, 941 N.Y.S.2d 639, 642 (2d Dep't 2012)); *see also Graciani v. Patients Med., P.C.*, No. 13-cv-2751 (NGG) (RLM), 2015 WL 5139199, at *20 (E.D.N.Y. Sept. 1, 2015) ("[T]he but-for standard that applies to Title VII retaliation claims (and may or may not apply to NYSHRL retaliation claims) does not apply to NYCHRL retaliation claims." (citing *Mihalik*, 715 F.3d at 116)). Although neither the Second Circuit nor the New York Court of Appeals has expressly decided whether this standard is the same as the "motivating factor" causation standard, it appears to be the same. *See* n.16, *supra*.

### b. Application

The Court discussed Cardwell's allegations that he suffered adverse employment actions because of Defendants' discriminatory animus in its discussion of Cardwell's discrimination claims. The Court need not undertake that detailed analysis again. The Court has already held that Cardwell's retaliation claims fail because he has failed to allege knowledge or protected activity except as to his filings at the EEOC and the NYSDHR. The Court discusses those allegations below. As for the rest of Cardwell's claims against the Additional Defendants, he has failed to plausibly allege that retaliatory animus was even a motivating factor in any Additional Defendant's action. Thus, even if Cardwell had plausibly alleged that the Additional Defendants had knowledge of his protected activity, he has not plausibly alleged that the Additional Defendants did anything that was reasonably likely to deter him from engaging in further protected activity *because of* his race. This is an alternative ground on which to dismiss Cardwell's claims against Butler, Chudd, and Hudson and against Brass, Birnbaum, and Wolfe to the extent those claims are based on adverse actions other than his firing. And this is true even under the NYCHRL's lower standard of causation.

Cardwell has plausibly alleged a causal connection between Brass, Birnbaum, and Wolfe's collective decision to fire him and his protected complaints, however. Cardwell alleges that he was informed that he was being fired less than one month after his lawyers filed their response to Davis

69

Polk's NYSDHR Answer and Position Statement.  AC ¶¶ 282, 296.  And Cardwell need not rely on this temporal proximity alone to plausibly allege a causal connection.  The "sequence of events" that Cardwell initiated by filing his administrative complaints and that concluded with his termination suffices to permit an inference of retaliatory animus.  *Gonzalez*, 377 F. Supp. 3d at 292.  Cardwell has plausibly alleged that he would not have been terminated if he had not filed his administrative complaints.  Thus, he has satisfied the "but for" causation standard.  He has also therefore satisfied the lower causation standard that applies to NYCHRL retaliation claims.

Contrary to Defendants' argument, it is not impermissible group pleading for Cardwell to allege that Brass, Birnbaum, and Wolfe were part of a group that collectively decided to terminate plaintiff.  A complaint need only give a defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests."  *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)); *see also* Fed. R. Civ. P. 8(a)(2).  Cardwell satisfies this standard:  He alleges that two M&A partners told him directly that a group including Brass, Birnbaum, and Wolfe decided to fire him.  AC ¶ 296.  That allegation gives Brass, Birnbaum, and Wolfe notice of the ground on which Cardwell's claim rests.  It is not impermissible group pleading to allege that defendants acted collectively to take a retaliatory action.  Thus, Cardwell has plausibly alleged retaliation claims under federal, state, and city law against Brass, Birnbaum, and Wolfe based on his termination.  The rest of Cardwell's retaliation claims against the Additional Defendants are dismissed.

### D. Statute of Limitations

The Court will not dismiss any of Cardwell's claims as time barred because it cannot do so on Defendants' motion to dismiss.  Defendants assert that Cardwell's claims are untimely to the extent that they are based on actions occurring outside the statute of limitations.  "Before bringing a Title VII suit in federal court, an individual must first present the claims forming the basis of such a suit in a complaint to the EEOC or the equivalent state agency."  *Littlejohn*, 795 F.3d at 322

(quotation and alterations omitted).  "[T]he limitations period for filling" a Title VII action "is 300 days after the alleged unlawful practice." *Davis-Garett*, 921 F.3d at 42; *see also* 42 U.S.C. § 2000e-5(e)(1) (stating that a claim must be filed within 300 days "after the alleged unlawful employment practice occurred").  This requirement "is analogous to a statute of limitations." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir. 2006) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir.1996)).  The statute of limitations for a section 1981 claim is four years.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *see also Lawson v. Rochester City Sch. Dist.*, 446 F. App'x 327, 328 (2d Cir. 2011) (citing *Jones*, 541 U.S. at 382).  The statute of limitations for NYSHRL and NYCHRL claims is three years.  *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (citing N.Y. Exec. Law § 296; N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d)).

"[T]he word 'practice'" under Title VII "refers to 'a discrete act or single occurrence,'" and "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Vega*, 801 F.3d at 79 (quoting *Morgan*, 536 U.S. at 110–11) (some quotation marks omitted).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* (quoting *Morgan*, 536 U.S. at 113).  When a "plaintiff complains of discrete discriminatory or retaliatory acts such as 'termination, failure to promote, denial of transfer, or refusal to hire,' such claims are not actionable if they occurred prior to the 300-day period even though they may be 'related to' acts that occurred within the permissible 300-day period." *Davis-Garett*, 921 F.3d at 42 (quoting *Morgan*, 536 U.S. at 113–14).  Claims accrue, and the statute of limitations begins to run, on the date that a "plaintiff 'knows or has reason to know of the harm.'" *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (quoting *Cullen v. Margiotta*, 811 F.2d 698, 725 (2d Cir. 1987), *cert. denied,* 483 U.S. 1021 (1987); *see also, e.g.*, *Washington v. Cnty. of Rockland*, 373 F.3d 310, 319 (2d Cir. 2004) ("[D]iscrimination claims . . . accrue[] when [the plaintiff] knew or should have known of the discriminatory action."); *Williams v. N.Y.C. Dep't of Educ.*, No. 19-cv-1353 (CM), 2019

WL 4393546, at *20 (S.D.N.Y. Aug. 28, 2019) ("Retaliation claims under the NYSHRL and NYCHRL accrue on the date on which the retaliatory act is taken.") (collecting cases).

In response to Defendants' statute-of-limitations argument, Cardwell asserts that his claims are timely under the continuing violation doctrine.  "There is . . . a 'continuing violation' exception to the normal knew-or-should-have-known accrual date of a discrimination claim when there is evidence of an ongoing discriminatory policy or practice." *Harris v. City of N.Y.*, 186 F.3d 243, 248 (2d Cir. 1999) (quotation omitted).  "It applies to claims composed of a series of separate acts that collectively constitute one unlawful practice." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quotation and brackets omitted); *see also Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("[W]hen a plaintiff experiences a continuous practice and policy that violates his or her rights, the commencement of the statute of limitations period may be delayed until the last violation." (quotation and alterations omitted)).

"The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation,' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Hasty*, 802 F.3d at 220 (quoting *Morgan*, 536 U.S. at 114–15) (brackets omitted).  A claim is timely under the continuing violation doctrine "if the plaintiff alleges some non-time-barred acts contributing to the alleged violation." *Id.* (quotation and alterations omitted).  But "[d]iscrete acts . . . which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012).  Although some courts have held that there is a "split in authority as to whether the" standard for the "continuing violation doctrine established" by the Supreme Court in *Morgan* "applies to NYSHRL claims, the weight of authority has held that *Morgan* applies to the NYSHRL." *Taylor*, 207 F. Supp. 3d at 302 n.5 (S.D.N.Y. 2016) (collecting cases); *see also Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012) (holding that the "definition

of the continuing violations doctrine" established by the Supreme Court in *Morgan* "applies to

plaintiff's discrimination claims under state law" (citing *Milani v. Int'l Bus. Machs. Corp., Inc.*, 322 F.

Supp. 2d 434, 452 n.32 (S.D.N.Y. 2004)), *aff'd*, 713 F.3d 163 (2d Cir. 2013).

 "The continuing violation doctrine is given a broader construction under the NYCHRL than

under Title VII or the NYSHRL." *Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16-cv-4897

(AT) (JCF), 2017 WL 2258374, at *9 (S.D.N.Y. May 22, 2017) (citation omitted), *report and

recommendation adopted*, 2017 WL 2709747 (S.D.N.Y. June 22, 2017).[25]  So under the NYCHRL,

"[o]therwise time-barred discrete acts can be considered timely 'where specific and related instances

of discrimination are permitted by the employer to continue unremedied for so long as to amount to

a discriminatory policy or practice.'" *Id.* (quoting *Sotomayor*, 862 F. Supp. 2d at 250, in turn quoting

*Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)).[26]  In other words, an employee can assert a

continuing violation based on discrete acts under the NYCHRL if they are unremedied by an

employer.

 "[T]he statute of limitations is ordinarily an affirmative defense that must be raised in the

answer." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (quotation omitted).  While "a statute

---

[25] *See also Sotomayor*, 862 F. Supp. 2d at 250 ("Although earlier decisions applied *Morgan* to NYCHRL claims, New York state courts have since held that the prior, more generous[] continuing violation[] doctrine continues to apply to claims under that statute." (citing *Williams*, 872 N.Y.S.2d at 35; other citation omitted)); *Dimitracopoulos v. City of N.Y.*, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014); *Diaz v. City Univ. of New York*, No. 13-cv-2038 (PAC) (MHD), 2014 WL 10417871, at *11 (S.D.N.Y. Nov. 10, 2014), *report and recommendation adopted in part*, 2015 WL 5577905 (S.D.N.Y. Sept. 22, 2015); *Mohamed v. N.Y.U.*, No. 14-cv-8373 (GBD) (MHD), 2015 WL 5307391, at *3 n.8 (S.D.N.Y. Sept. 10, 2015).  Some courts have held that "[t]here is 'a split in authority as to whether analysis of a continuing violation under New York law should proceed according to Second Circuit precedent, or according to a broader standard, established by some state courts, that focuses on whether the discriminatory practice had a continuing impact on the complainant.'" *Kalola v. Int'l Bus. Machs. Corp.*, No. 13-cv-7339 (VB), 2015 WL 861718, at *9 (S.D.N.Y. Feb. 3, 2015) (quoting *Brennan v. City of White Plains*, No. 97-cv-2709 (RWS), 1998 WL 75692, at *10 (S.D.N.Y. Feb. 20, 1998)); *see also Torres v. N.Y. Methodist Hosp.*, No. 15-cv-1264 (PKC) (PK), 2016 WL 3561705, at *8 (E.D.N.Y. Jan. 7, 2016).  To the extent there are decisions applying *Morgan* to continuing violation claims under the NYCHRL, the Court disagrees with those decisions because they do not accord with the Restoration Act as explained in *Loeffler* and *Mihalik*.

[26] Recent Second Circuit cases have repeatedly used this standard, even as applied to federal claims.  *See Daly v. Citigroup Inc.*, 939 F.3d 415, 428 (2d Cir. 2019) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997)); *Purcell v. N.Y. Inst. of Tech.*, 931 F.3d 59, 65 (2d Cir. 2019) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)).  But those courts did not (and could not) modify *Morgan*'s central holding that when a plaintiff alleges discrete acts of discrimination, the plaintiff's claims are untimely unless filed within the limitations period after a specific discrete act occurred.  In any event, neither *Daly* nor *Purcell* applied the continuing violation doctrine to their respective plaintiffs' claims.

of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint," *id.* (quotation omitted), granting a motion to dismiss portions of a claim based on the statute of limitations "is appropriate only if a complaint clearly shows the claim is out of time," *Harris*, 186 F.3d at 250. For a continuing violation, "the mere allegation of the existence of such a continuing policy would be sufficient to withstand a challenge for failure to state a claim." *Id.* (quotation and brackets omitted).

It is also true that "[d]etermining whether the events comprising the basis for [a] plaintiff's claim are part of a single, continuing course of conduct is" a "fact-intensive" inquiry. *Drees v. Cnty. of Suffolk*, No. 06-cv-3298 (JFB) (ETB), 2007 WL 1875623, at *9 (E.D.N.Y. June 27, 2007) (quoting *Allen v. Egan*, 303 F. Supp. 2d 71, 79 (D. Conn. 2004)). Courts have thus declined to decide whether the continuing violation doctrine applies at the motion to dismiss phase. *See Fitchett v. City of N.Y.*, No. 18-cv-8144 (PAE), 2019 WL 3430726, at *7 (S.D.N.Y. July 30, 2019) (collecting cases); *Goodwine v. City of N.Y.*, No. 15-cv-2868 (JMF), 2016 WL 3017398, at *5 (S.D.N.Y. May 23, 2016); *see also Bloom v. N.Y.C. Bd. of Educ. Teachers' Ret. Sys. of Cnty of New York*, No. 00-cv-2728 (HBP), 2003 WL 1740528, at *9 (S.D.N.Y. Apr. 2, 2003) ("[C]onsistently with the Amended Complaint it is possible that [the plaintiff] could demonstrate some discriminatory act that did occur within the statute of limitations, so that his claim would not be time-barred." (quoting *Harris*, 186 F.3d at 250, in turn citing *Lightfoot*, 110 F.3d at 907; *Egelston v. State Univ. Coll. at Geneseo*, 535 F.2d 752, 755 (2d Cir. 1976))).

The Court "declines to parse" how the continuing violation doctrine may apply to Cardwell's claims at the motion to dismiss stage. *Goodwine*, 2016 WL 3017398, at *5. Resolving whether the continuing violation doctrine renders portions of Cardwell's claims timely will "have no bearing on the scope of discovery." *Id.* That is because even "untimely acts may be admissible as evidence in support of timely claims." *Id.* (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005)). Given this principle—and the broader construction of the continuing violation doctrine

under the NYCHRL—the Court concludes that "there is little or nothing gained at this stage of the litigation" in deciding whether the continuing violation doctrine applies to some of Cardwell's claims. *Id.* That conclusion is bolstered by the fact that it will be simpler to adjudicate whether Cardwell's claims are timely at a subsequent stage of the litigation when the Court can look beyond the pleadings. Thus, the Court will not decide whether any portion of Cardwell's claims are time barred at this stage of the litigation.

### E. NYSHRL Harassment Claim

Cardwell's harassment claim must be dismissed because section 296(1)(h) of the NYSHRL does not apply retroactively. The New York legislature amended the NYSHRL in August 2019 to add section 296(1)(h). *See* NY Legis 160 (2019), 2019 Sess. Law News of N.Y. Ch. 160 (A. 8421); *see also Deveaux*, 2020 WL 1812741, at *3 n.3. But the amendment "only applies to claims filed after the amendment's effective date of October 11, 2019." *Golston-Green v. City of N.Y.*, No. 2016-02462, 2020 WL 2462411, at *7 n.3 (2d Dep't 2020) (slip op.) (citing Laws 2019, ch 160, § 16). And "New York courts disfavor retroactive application of statutes." *Deveaux*, 2020 WL 1812741, at *3 n.3 (citing *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 143 (2d Cir. 2013)). Under New York law, there must be a "clear expression of the legislative purpose to justify a retroactive application" of a statute. *Gold*, 730 F.3d at 143 (quoting *Majewski v. Broadalbin–Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 584 (1998)). But "neither the text nor the legislative history of" section 296(1)(h) mentions retroactivity, so it does not apply to claims that accrued before its effective date in October 2019. *Deveaux*, 2020 WL 1812741, at *3 n.3; *see also Wellner*, 2019 WL 4081898, at *5 n.4 ("[T]hese amendments only apply to claims that accrue on or after the effective date of October 11, 2019."); *Chauhan v. MM Hotel Mgmt. LLC*, No. 18-cv-5963 (DRH) (SIL), 2019 WL 6118006, at *6 n.7 (E.D.N.Y. Nov. 18, 2019) (holding that the amendments "do not apply retroactively"). Cardwell's last day working at Davis Polk was in August 2018, so his claims accrued in that month at the latest. His harassment claim is not viable.

### F. Aiding and Abetting Claims Against the Additional Defendants

#### 1. Section 1981 Claim

To the extent Cardwell attempted to bring aiding and abetting claims under section 1981, those claims are dismissed.  None of the counts in the amended complaint is styled as a claim for "aiding and abetting" under section 1981.  *Cf.* AC ¶¶ 345–48 (alleging "aiding and abetting racial discrimination in violation of the New York State Human Rights Law" (capitalization altered)).  But Defendants note that Cardwell uses the phrase "aiding and abetting" in his section 1981 claims.  *See, e.g.*, *id.* ¶¶ 328–29, 334–35, 339–40.  There is no cause of action for aiding and abetting violations of section 1981.  *See Lue v. JPMorgan Chase & Co.*, No. 16-cv-3207 (AJN), 2018 WL 1583295, at *10 (S.D.N.Y. Mar. 27, 2018), *aff'd*, 768 F. App'x 7 (2d Cir. 2019).  So to the extent that Cardwell was attempting to state a claim for aiding and abetting violations of section 1981, that claim is dismissed.

#### 2. NYSHRL and NYCHRL

##### a. Legal Standard

###### i. NYSHRL

Under the NYSHRL, it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [under the NYSHRL] or to attempt to do so."  *Griffin v. Sirva Inc.*, 835 F.3d 283, 293 (2d Cir. 2016) (quoting N.Y. Exec. Law § 296(6)) (ellipsis omitted).  "At least where the alleged aider and abettor is an individual employee of the corporate employer," the Second Circuit has "held that this provision requires that the alleged aider and abettor actually participated in the conduct giving rise to the claim of discrimination, and that the aider and abettor share the intent or purpose of the principal actor."  *Id.* (quotation omitted).  So "a co-worker who actually participates in the conduct giving rise to a discrimination claim" can "be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff."  *Feingold*, 366 F.3d at 158 (quotation omitted).

### ii. NYCHRL

It is unlawful "to aid, abet, incite, compel or coerce" any discriminatory or retaliatory acts

forbidden by the NYCHRL.  N.Y.C. Admin. Code 8-107(6).  "The same standards of analysis used

to evaluate aiding and abetting claims applies to claims brought under both the NYCHRL and the

NYSHRL because the language of the two laws is 'virtually identical.'"  *United States v. N.Y.C. Dep't of*

*Educ.*, 407 F. Supp. 3d 365, 401 (S.D.N.Y. 2018) (quoting *Feingold*, 366 F.3d at 158); *see also Gonzalez*,

377 F. Supp. 3d at 300.[27]  So as under the NYSHRL, "an individual who 'actually participates in the

conduct giving rise to a discrimination claim' may be liable as an aider and abettor, regardless [of]

whether that individual is the plaintiff's employer."  *Gonzalez v. N.Y.U. Langone Med. Ctr.*, No. 18-cv-

1797 (PAE), 2019 WL 4194313, at *8 (S.D.N.Y. Sept. 3, 2019) (quoting *Tomka v. Seiler Corp.*, 66 F.3d

1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc., v. Ellerth*, 524 U.S. 742

(1998)).

### b. Application

Cardwell's aiding and abetting claims against the Additional Defendants are dismissed.  The

Court has dismissed Cardwell's discrimination claims against the Additional Defendants.  For the

same reasons, Cardwell has not plausibly alleged that the Additional Defendants "actually

participated in the conduct giving rise to the claim of discrimination."  *Griffin*, 835 F.3d at 293

(quotation omitted).  Although the Court has not dismissed Cardwell's retaliation claims against

Brass, Birnbaum, and Wolfe to the extent they are predicated on his termination, Cardwell's

allegations about his termination cannot serve as the basis for an aiding and abetting claim under the

NYSHRL and the NYCHRL.  Cardwell alleges that Brass, Birnbaum, and Wolfe retaliated against

---

[27] The Second Circuit last published a decision regarding aider and abettor liability under the NYCHRL in *Feingold*.  That decision predates the amendments to the Restoration Act mandating that the NYCHRL must "be construed liberally for the accomplishment of [its] uniquely broad and remedial purposes." *Mihalik*, 715 F.3d at 109 (quotation omitted). District courts have continued to describe the NYSHRL and NYCHRL standards as "virtually identical." *See, e.g., Xiang v. Eagle Enters., LLC*, No. 19-cv-1752 (PAE), 2020 WL 248941, at *7 (S.D.N.Y. Jan. 16, 2020) (quotation omitted).  But even if the NYCHRL standard is more plaintiff-friendly, that would not change the Court's analysis.

him, not that they aided and abetted some other defendant's retaliation.  Thus, Cardwell's NYSHRL and NYCHRL aiding and abetting claims are inadequately pleaded.

### G. Motion to Strike

Defendants' motion to strike allegations from the complaint is denied.  Defendants move to strike Cardwell's allegation that Chudd "retroactively created" reviews "after [plaintiff] engaged litigation," AC ¶ 84, and that Reid, Bick, Hudson, and the Firm "knowingly falsified and shifted their conclusions" about plaintiff's performance and "submitted false statements to the NYSDHR," *id.* ¶ 118.  Under Federal Rule of Civil Procedure 12, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "The courts should not tamper with pleadings unless there is a strong reason for so doing." *Morelli v. Alters*, No. 1:19-cv-10707 (GHW), 2020 WL 1285513, at *15 (S.D.N.Y. Mar. 18, 2020) (quoting *Quanta Specialty Lines Ins. Co. v. Inv'rs Capital Corp.*, No. 06-cv-4624 (PKL), 2008 WL 1910503, at *4 (S.D.N.Y. Apr. 30, 2008)).  For that reason "motions to strike are generally disfavored."  *Id.* (quoting *Quanta*, 2008 WL 1910503, at *4).  Unless the "allegations in question can have no possible bearing on the subject matter of the litigation, motions to strike allegations in the pleadings should be denied."  *Id.* (quoting *Quanta*, 2008 WL 1910503, at *4).  So "'[a] movant must meet a high bar to prevail on' a motion to strike."  *Id.* (quoting *Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*, No. 09-cv-2669 (LAP), 2015 WL 4757601, at *3 (S.D.N.Y. Aug. 12, 2015)).

Defendants have failed to meet the high bar necessary to prevail on their motion to strike. In support of the motion, Defendants ask the Court to look at materials outside the pleadings that the Court has declined to consider.  And these allegations could well "bear[] on the subject matter of the litigation."  *Id.* (quotation omitted).  Indeed, they are directly relevant to Cardwell's claims.  So Defendants' motion to strike is denied.

## IV. LEAVE TO AMEND

Although Cardwell has already amended his complaint in response to the Defendants' first motion to dismiss, Dkt. No. 36, the Court grants Cardwell leave to replead the dismissed claims with the exceptions noted below.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.") (citation omitted); see also Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  While leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party[,]" those circumstances do not apply in this case with respect to the majority of the dismissed claims. *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (citation omitted).  However, any attempt by Cardwell to replead his harassment claim under the NYSHRL and his aiding and abetting claim under Section 1981 would necessarily be futile; Cardwell may not amend those claims.  *Cf. Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (noting that leave to amend need not be granted where the proposed amendment would be futile).  Cardwell should not expect any additional opportunities to amend his complaint. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 397 (S.D.N.Y. 2003) ("[W]here pleading deficiencies have been identified a number of times and not cured, there comes a point where enough is enough." (citations omitted)).  Any amended complaint must be filed no later than fourteen days from the date of this order.

## V. CONCLUSION

Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Cardwell's discrimination claims against the Additional Defendants are dismissed.  His hostile work environment claims against all Defendants are dismissed.  Cardwell's retaliation claims against Chudd, Hudson, and Butler are dismissed.  But his retaliation claims against Brass, Birnbaum, and Wolfe are adequately pleaded to the extent they are predicated on his termination.  His retaliation claims against those Defendants are dismissed to the extent they are based on any other actions,

however.  Cardwell's NYSHRL harassment claim and his aiding and abetting claims are also

dismissed.  Defendants' motion to strike is denied.  Because there are no remaining claims against

Defendants Sophia Hudson, William Chudd, and John Butler, those Defendants are dismissed from

the case.

     The Clerk of Court is directed to terminate the motion pending at Dkt No. 43.

     SO ORDERED.

Dated:  October 24, 2020

                                        GREGORY H. WOODS

                                United States District Judge