# EXHIBIT 3

Cardwell Rebuttal to Davis Polk NYSDHR (January 10, 2018)



OUTTEN & GOLDEN LLP

Advocates for Workplace Fairness

January 10, 2017

**Via Email and FedEx**
David E. Powell
Regional Director
New York State Division of Human Rights
Adam Clayton Powell State Office Building
163 W. 125th Street, Room 401
New York, NY 10027

Re:     *Kaloma Cardwell v. Davis Polk & Wardwell LLP*
        SDHR Case No. 10190523

Dear Mr. Powell:

We represent Mr. Kaloma Cardwell in this matter. Thank you for the opportunity to provide a written rebuttal to Respondent Davis Polk & Wardwell LLP's ("Davis Polk" or "the Firm") Answer and Position Statement ("Resp. Statement")[1].

Because the Firm cannot address the specific instances of protected activity and retaliation that Mr. Cardwell has alleged in his charge of discrimination, the Firm attempts to detract from its bad behavior by painting Mr. Cardwell as a poor performer. While Mr. Cardwell's accounts of Davis Polk's discriminatory and retaliatory conduct are hard to miss, the Firm intentionally avoids addressing his allegations and instead focuses on alleged performance problems, which are unsupported by the Firm's very own records.  Davis Polk's attempts are unavailing.

**Davis Polk Ignores, and Provides No Evidence to Dispute, the Allegations Comprising the Heart of Mr. Cardwell's Race Discrimination and Retaliation Claims**

Glaringly, Davis Polk fails to rebut meaningful claims that comprise Mr. Cardwell's race discrimination and retaliation claims. For instance, in detailing the level of indifference Davis Polk's leadership exhibited towards his concerns, Mr. Cardwell explains that, in May 2015, he emailed Sharon Crane, Executive Director of Personnel, and suggested that as part of an upcoming attorney training at the Firm, there be a discussion point regarding the importance of attorneys introducing themselves to other summer associates and junior attorneys of color. In response, Ms. Crane minimized the issue to the "social awkwardness" of attorneys and skirted

---

[1] Due to the length of Davis Polk's position statement, this submission is a general, and not a point by point, rebuttal. Should it be helpful to the investigator, Claimant is available to answer any specific questions not addressed herein.

David E. Powell
January 10, 2018
Page 2 of 7

the task by saying that she could bring it up at an appropriate time.  (Charge ¶ 7.) Mr. Cardwell additionally details that in September 2015, he raised similar concerns of exclusion to Partners Monica Holland and Maurice Blanco, and Renee DeSantis, the Director of Associate Development that went unaddressed.  (Charge ¶ 8.) In proving Mr. Cardwell's point, Davis Polk simply explains that its Firm training materials encourages senior attorneys to introduce themselves to new attorneys, and states that its Firm leadership "made note of [Mr. Cardwell's] concern," (Resp. Statement, pp. 18-19), but does not explain what, if any, other actions were taken.

Similarly, Davis Polk provides no reasonable, evidence-supported responses to Mr. Cardwell's claim that when he began to raise pointed, racial complaints in 2016, the Firm: (i) assigned him to fewer deals, (ii) gave him less substantive work, (iii) dismissed his weekly work capacity forms showing that he had abnormally high availability, (iv) repeatedly left him off of team member emails,[2] and, (v) from December 2016 - May 2017, effectively stopped communicating with Mr. Cardwell and deprived him of all billable work.  (Charge ¶¶ 12-15, 18.) Instead, Davis Polk falsely claims that Mr. Cardwell's performance was the driver of his low billable hours (discussed further below) and fails to provide any time records from other attorneys supporting its claim that Mr. Cardwell had in fact completed work on M&A matters with at least four partners (and, conveniently, failed to record his time). These are not Davis Polk's only inconsistencies; others include:

1.  Detailing a series of assignments Mr. Cardwell allegedly worked on that, by their very description, support Mr. Cardwell's specific contention that, after he raised certain complaints, the Firm failed to staff him on an M&A deal[3] for over eight months (i.e., from October 2016 through May 2017) (Charge ¶ 15; Resp. Statement, p. 15);

2.  Disputing Mr. Cardwell's characterization that his hours declined "precipitously," while failing to provide any of Mr. Cardwell's time records to the contrary (Resp. Statement, p. 12);

---

[2] In the Fall of 2015, Mr. Cardwell repeatedly requested to be included on team emails that other White first-year associate team members had received. As the Davis Polk's email record will make clear, these situations occurred when other junior associates were included and often involved other White junior associates who apologized that Mr. Cardwell was not included in team communications. During the same time period, on a deal Mr. Cardwell had worked extensively on, Mr. Cardwell was left off an important team email that notified and thanked *all* associates and partners who had worked on the deal. Mr. Cardwell only learned that he had not been included on the team email after two White junior associates in his same class year separately noticed that he had not been included on the email and forwarded the same to him.

[3] Mr. Cardwell alleges that he was not staffed on an M&A *deal* for over eight months, not that he went 100% without any work of any kind. In corporate law and among partners and associates at Davis Polk, the difference between M&A "deals" and M&A "work" is both widely understood and significant. "Deals" influence heavily tracked and publicized M&A rankings, M&A fees, legal awards and prestige, associates' partnership and lateral prospects, and clients' and potential clients' perceptions of attorneys' and firms' sophistication and ability to handle complex matters. As such, Davis Polk internally circulates, every quarter, its M&A deal rankings (for the measured time period) and it highlights "deals and cases" on its homepage (among other places). See www.davispolk.com.

2

David E. Powell
January 10, 2018
Page 3 of 7

3. Failing to reconcile its argument that Mr. Cardwell's performance prevented the Firm from staffing him on work with the unrebutted fact that prior to Mr. Cardwell's December 2016 complaint, Mr. Cardwell had billed over 100 hours per month from May through October 2016 (Charge ¶ 18); and

4. Implementing a "[c]omprehensive [p]lan to [a]ddress Cardwell's…[p]erformance [i]ssues," while failing to provide any email communications that were sent to Mr. Cardwell that related to the "plan" or Mr. Cardwell's performance "not improv[ing]" (Resp. Statement, p. 14).

Significantly, while Davis Polk had ample opportunity to provide the Division with an affidavit from Tom Reid himself – one of a host of supervisors whom it so liberally quotes and relies upon in its position statement – Davis Polk instead relies solely upon its lawyer's assertions. This omission is important as Mr. Cardwell maintains that Mr. Reid (i) was initially hostile to supporting Mr. Cardwell's attendance at a black attorneys' professional development conference (Charge ¶ 9), (ii) was non-communicative with Mr. Cardwell from late January 2016-March 2017, and (iii) had told Mr. Cardwell, in March 2017, that if he did not "drop" his inquiries into "whatever mistakes the Firm made in the past and move forward, [he] would be 'out of the game' and 'off the field.'" (Charge ¶ 23.) This message, which cannot be viewed as anything but threatening despite Davis Polk's attempts to frame it in a positive light, is clear in its intent to halt Mr. Cardwell's complaints and search for answers.  It is *per se* retaliation, as it was delivered in an effort to chill and halt Mr. Cardwell's protected activity.  Because Davis Polk cannot swear and affirm that Mr. Reid did not utter this message to Mr. Cardwell, Davis Polk, in response, only offers a blanket denial of Mr. Cardwell's stated interactions with Mr. Reid.  (Resp. Statement, 14.)

**<u>Davis Polk Grossly Mischaracterizes Mr. Cardwell's Work Performance</u>**

Since Davis Polk cannot not deny Mr. Cardwell's specific allegations, it instead uses the bulk of its response to make false and damaging mischaracterizations about Mr. Cardwell's performance and contributions to the Firm. Specifically, Davis Polk makes the incredible claim that Mr. Cardwell was not given substantive and meaningful work because it was difficult to staff Mr. Cardwell on projects since he was a "persistent" poor performer throughout his tenure. (Resp. Position Statement, 2.) To understand the absurdity of Davis Polk's argument, a review of Mr. Cardwell's background is instructive.

Prior to working at Davis Polk, Mr. Cardwell was a highly accomplished UC Berkley Law student who received a $90,000 merit-based, academic scholarship to the school – the largest scholarship UC Berkeley Law awards to a select group of admitted students each year. By the time Mr. Cardwell accepted Davis Polk's offer of employment in 2014, he had co-authored and published an article in both Harvard University's Joint Center for Housing Studies and the Brookings Institution Press; and had finished in the Top 10% (High Honors) and Top 40% (Honors) in a number of his law classes. Simply put, Mr. Cardwell had all the makings of being a highly-successful attorney at Davis Polk.

3

David E. Powell
January 10, 2018
Page 4 of 7

Opting to gloss over Mr. Cardwell's demonstrated record for success,[4] Davis Polk creates a fiction regarding his performance that its own documentation fails to support. For instance, the Firm claims that during his first rotation with the Credit group in the Corporate Department, Mr. Cardwell exhibited slowness in completing assignments and sometimes neglected to ask questions. What Davis Polk downplays, however, are that its very own records show that Mr. Cardwell's supervisors rated him *very favorably* in March and May 2015, and that all of his supervisors noted that he was performing at the level of his class. (See Resp. Statement, Exs. 4-5, 7.) Specifically, Andres Arnaldos, a senior attorney who had "extensive" contact with Mr. Cardwell, stated that Mr. Cardwell "was very easygoing and easy to work with," he is "able to understand issues and deal with the mechanics of a complex closing," and that the "overall quality of his work is quite good." (Resp. Statement, Ex. 4.) Similarly, Jason Kyrwood, a Credit partner, described the substance of Mr. Cardwell's performance as "generally positive – organized, high quality work, good attention to detail, hard worker." (Resp. Statement, Ex. 7.)

Again, contrary to Mr. Cardwell's actual performance, Davis Polk states in its position statement that "increasingly serious performance issues" emerged during Mr. Cardwell's second rotation in the Firm's M&A group. In truth, the reviews Mr. Cardwell received during the time period were generally favorable, and the majority of his supervisors continued to rate his performance on par with his peers.[5] Tellingly, the most unfavorable review Mr. Cardwell received during the time period was from William Chudd, an M&A partner, who admitted to having limited contact with Mr. Cardwell. Mr. Chudd noted that he had no basis to review Mr. Cardwell in a majority of the categories listed on his review. (See Resp. Position Statement, Ex. 9.) The equivocal tone of Mr. Chudd's evaluation is especially apparent when he states, "my impression is based off of third party accounts, I do not feel totally confident with this determination." [6] (*Id.* at Ex. 9.) Mr. Chudd's evaluation highlights, at best, the implicit bias to which the Firm was already subjecting Mr. Cardwell; even at this early stage of his tenure with the Firm, an M&A partner was evaluating him not on his actual performance, but on biased perceptions.

In a shallow attempt to cast Mr. Cardwell as not only being deficient in his duties, but also as difficult, Davis Polk makes the wholly false claim that Mr. Cardwell "demanded" a third rotation in the Capital Market group in contravention of the Firm's policy that Corporate associates only complete two rotations before assigning to a permanent group. (Resp. Position Statement, 8.) On the contrary, Mr. Cardwell was deeply committed to preparing and developing into a successful M&A attorney, and he considered whether spending an additional six months in

---

[4] At Lehigh University, Mr. Cardwell's alma mater, Mr. Cardwell's record of success includes being a 2x-Captain of the football team, his team's "Scholar-Athlete of the Year," a 2x All-Conference Player, and the recipient of some of Lehigh University's most prestigious academic and leadership awards, including the Bosey Reiter Leadership Cup Award, Class of 1904 Leadership Award, and Contribution to Student Life Award.

[5] Zain Ur Rehman, a senior attorney having "extensive" contact with Mr. Cardwell, stated that Mr. Cardwell was "hardworking" and "did a good job with the schedules and other diligence matters on the deal." (Resp. Position Statement, Ex. 10.)

[6] Notably, Mr. Chudd explicitly answered "no basis" to the questions, "Overall, do you feel like this lawyer is performing materially behind, with or ahead of the lawyer's class[?]" and "Potential for growth and versatility[?]" (Resp. Statement, Ex. 9.)

David E. Powell
January 10, 2018
Page 5 of 7

the Capital Markets group – a group that worked closely with the M&A group – might help in that regard.

Mr. Cardwell did not unilaterally dictate that he be given a third rotation. Davis Polk conveniently omits that Mr. Cardwell met with John Amorosi, an M&A partner, in July 2015, and discussed the idea, while also expressly contemplating whether a third rotation could negatively impact his permanent placement within the M&A group or otherwise cause him to fall behind his M&A peers. Mr. Amorosi assured Mr. Cardwell that "he had nothing to worry about," and explained that a Capital Markets rotation would likely benefit Mr. Cardwell in the long-run. Mr. Amorosi even added that he believed that he (Mr. Amorosi) would have been a better M&A attorney had he completed a Capital Markets rotation earlier in his career.

At the conclusion of their meeting, Mr. Amorosi volunteered to vouch for Mr. Cardwell should he need his support in making the rotation request and recommended that Mr. Cardwell meet with Capital Markets partner Maurice Blanco to discuss whether the Capital Markets group had a need for extra associates. Less than two weeks later, in August 2015, Mr. Cardwell met with Mr. Blanco and Mr. Blanco expressed his approval and noted that the Capital Markets group had an overflow of work and an extra pair of hands would lighten the group's load. Davis Polk's complete omission of these conversations not only evidences the overall weakness of its position statement, but also the falsity of its narrative with respect to Mr. Cardwell's performance and character.

As is true for Mr. Cardwell's first and second rotations, Davis Polk's documentation contradicts its descriptions of his performance during his third rotation – a time period Davis Polk maintains Mr. Cardwell's performance continued to worsen. For instance, John Bick specifically notes on Mr. Cardwell's midyear review that "other reviewers saw progress and like[d] working with [Mr. Cardwell]," and that Mr. Cardwell "generally received positive reviews," with the exception of one partner. (Resp. Position Statement, Ex. 15.) Notably, it is standard practice for Davis Polk to uniformly document associates' poor performance (particularly, performance issues that would "have warranted giving Cardwell a message that it was time for him to look for another job") and issue warnings. Davis Polk's failure to do so – over more than three years – suggests that Mr. Cardwell's so-called "poor performance" is a lately created excuse. *See Tainsky v. Clarins USA, Inc.*, 363 F. Supp. 2d 578, 585 (S.D.N.Y. 2005) (stating that lack of verbal or written warnings regarding poor performance, among other factors, undercut employer's suggestion that employee was fired due to poor work performance); *see also Conklin v. Cnty. of Suffolk*, No. 09 Civ. 3014, 2012 WL 1560390, at *17 (E.D.N.Y. May 3, 2012) (holding that employer's lack of documentation of supposed longstanding attendance problems supported inference that attendance issue was a pretext for retaliation).

Even if one were to fully accept Davis Polk's performance critiques – an outcome that, in addition to the aforementioned reasons, is untenable in light of the fact that Davis Polk omitted certain reviews in making its claim[7] – what remains clear is that they were not of the type that should have completely disqualified, or that normally would disqualify, Mr. Cardwell

---

[7] Tellingly, Davis Polk did not submit 2016 reviews from Laura Turano or Francesca Campbell, two senior M&A attorneys Kaloma Cardwell worked extensively with after he assigned to M&A in April 2016.

David E. Powell
January 10, 2018
Page 6 of 7

or any other Davis Polk junior associate from receiving billable and core M&A work. Stated plainly, Davis Polk's failure to document or communicate meaningful performance criticisms sufficiently establishes that its stated reasons for assigning Mr. Cardwell to fewer deals in the Summer of 2016 and virtually eliminating his hours after December 2016 are pretext.

Interestingly, Davis Polk makes the argument that from December 2016 through the present, the Firm put in place a "comprehensive plan" to address Mr. Cardwell's staffing and performance issues, but fails to include any details of the plan. Moreover, while the Firm claims that Mr. Cardwell's Firm-selected Career Advisor, John Bick, explained the Firm's "plan" to Mr. Cardwell in May 2017, it later admits that after their May 2017 meeting, Mr. Bick did not meet with Mr. Cardwell again. (Resp. Statement, p. 15 & n. 12.) The Firm's failure to implement a concrete plan is further evidenced by the fact that Mr. Cardwell spent *all of his time* in May 2017 on a research-related memo – a fact that Davis Polk does not dispute, but nonetheless, attempts to downplay by making the irrelevant point that it is not "unusual for midlevel associates to work on such projects." (Resp. Position Statement, p. 16.)

Davis Polk's argument is additionally weakened by the fact that Mr. Cardwell's purported "performance issues" did not impact his assignment to matters generating over 100 billable hours a month before he complained to Mr. Carey Dunne on December 5, 2016. It was only after he made protected complaints that the Firm subsequently gutted his workload to 5.9 hours total from January through March 2017, marking Mr. Cardwell's fourth consecutive month without being staffed on any billable assignments. While Davis Polk disputes the reasons why Mr. Cardwell's hours drastically declined, it does not dispute that they in fact declined at or after he complained to Mr. Dunne.

**Davis Polk's Written Employment Discrimination Policies Do Not Shield It from Its Discriminatory Practices**

Davis Polk asserts that it has "strong and clear" equal employment policies, along with dedicated mentoring programs and a task force devoted solely to diversity issues. (See Resp. Statement, p. 4.) Davis Polk's self-professed commitment to maintaining a non-discriminatory work environment is not a sufficient defense to Mr. Cardwell's discrimination claims. The law is clear that Davis Polk's written policies do not shield it from liability when such policies were not actually implemented or followed. *EEOC v. GLC Rest., Inc.*, CV 05-0618 PCT DGC, 2006 WL 3052224, at *6 (D. Ariz. Oct. 26, 2006) ("Existence of a discrimination policy alone, however, is insufficient. The employer must implement the policy.") (internal citation omitted); *Swinton v. Potomac Corp.*, 270 F.3d 794, 811 (9th Cir. 2001) ("It is well established that it is insufficient for an employer simply to have in place anti-harassment policies; it must also implement them."). Mr. Cardwell's facts not only make clear that Davis Polk's policies exist merely on paper and are not implemented nor enforced by its management, but they also track a documented pattern of racial bias raised by other minority attorneys[8] at the Firm. Ultimately,

---

[8] For instance, throughout 2015 and 2016, Mr. Cardwell and other members of Davis Polk's diversity affinity groups (including Davis Polk's "Black Attorney Group") repeatedly and strongly encouraged Tom Reid and Davis Polk's Diversity Committee to hire a "diversity consultant" and a full-time Director of Diversity, in part, because the

David E. Powell
January 10, 2018
Page 7 of 7

however "strong" Davis Polk's written policies may have been, Davis Polk and its leadership failed to appropriately address the legitimate and legally protected concerns and experiences of Mr. Cardwell and the Firm's other Black attorneys.  Perhaps the Firm's failings are made most evident in this regard by the fact that Davis Polk altogether fails to address the systemic claims Mr. Cardwell raises in his charge.

**<u>Conclusion</u>**

 We are confident that further investigation by the Division will ultimately result in a finding of probable cause for discrimination and retaliation by Davis Polk. We believe that the additional information we present adds support to Mr. Cardwell's charge and are hopeful that it better assists the Division in making targeted and comprehensive discovery requests from Davis Polk.

 We thank the Division for its time and attention to this matter. We look forward to the agency's continued investigation of Mr. Cardwell's claims.

Respectfully submitted,

Cara E. Greene

c. Monique E. Chase, Esq.
  Kaloma Cardwell

---

Firm's minority attorneys believed Davis Polk's Diversity Committee lacked expertise and experience on diversity and inclusion issues and rarely addressed attorneys' bias-related concerns.