# EXHIBIT 14

Confirmation Bias Among Lawyers and Writing Skills





THINK SMARTER | LEAD BETTER

# Yellow Paper Series

## Written in Black & White

## Exploring Confirmation Bias in Racialized Perceptions of Writing Skills

Lead Researcher

Dr. Arin N. Reeves




2014-0404

**RESEARCH QUESTION:** *Given our finding in a previous study that supervising lawyers are more likely than not to perceive African American lawyers as having subpar writing skills in comparison to their Caucasian counterparts, we asked if confirmation bias unconsciously causes supervising lawyers to more negatively evaluate legal writing by an African American lawyer.*

**CONFIRMATION BIAS:**

*A mental shortcut – a bias – engaged by the brain that makes one actively seek information, interpretation and memory to only observe and absorb that which affirms established beliefs while missing data that contradicts established beliefs.*

We first discovered empirical evidence that supervising lawyers perceived African Americans lawyers to be subpar in their writing skills in comparison to their Caucasian counterparts when we researched unconscious biases in the legal profession over ten years ago. Since our surveys and focus groups at the time were studying unconscious biases generally, we decided to study this specific bias of writing skills in greater detail via the cognitive construct of **confirmation bias.**

This research summary provides a general overview of the methodology, results and key takeaways from the study. Please note that we studied this question only from the unconscious or implicit bias perspective. While the possibility of explicit bias exists, our research has consistently shown that implicit bias is far more prevalent in our workplaces today than explicit bias, thereby guiding us to utilize our resources to study implicit instead of explicit biases.

## Methodology

Nextions, along with the assistance of 5 partners from 5 different law firms, drafted a research memo from a hypothetical third year litigation associate that focused on the issue of trade secrets in internet start-ups. We followed a simple Question Presented, Brief Answer, Facts, Discussion and Conclusion format for the memo, and we deliberately inserted 22 different errors, 7 of which were minor spelling/grammar errors, 6 of which were substantive technical writing errors, 5 of which were errors in fact, and 4 of which were errors in the analysis of the facts in the Discussion and Conclusion sections.

This memo was then distributed to 60 different partners (who had previously agreed to participate in a "writing analysis study" from 22 different law firms of whom 23 were women, 37 were men, 21 were racial/ethnic minorities, and 39 were Caucasian. While all of the partners received the same memo, half the partners received a memo that stated the associate was African American while the other half received a memo that stated the associate was Caucasian:

*While all of the partners received the same memo, half the partners received a memo that stated the associate was African American while the other half received a memo that stated the associate was Caucasian.*

| **Name:** Thomas Meyer | **Name:** Thomas Meyer |
|---|---|
| **Seniority:** 3rd Year Associate | **Seniority:** 3rd Year Associate |
| **Alma Mater:** NYU Law School | **Alma Mater:** NYU Law School |
| **Race/Ethnicity:** African American | **Race/Ethnicity:** Caucasian |

The 60 partners in the study received the memo electronically (an attached pdf) along with the research materials used in the preparation of the memo. The cover email thanked each of them for participating in a study on "writing competencies of young attorneys," and asked them to edit the memo for all factual, technical and substantive errors. The partners were also asked to rate the overall quality of the memo from a 1 to 5, with "1" indicating the memo was extremely poorly written and "5" extremely well written.

The partners were originally given 4 weeks to complete the editing and rating, but we had to extend deadline to 7 weeks in order to obtain more responses. 53 partners completed the editing and rating of the memo. Of the 53 completed responses, 24 had received the memo by the "African American" Thomas Meyer, and 29 had received the memo by the "Caucasian" Thomas.

## General Findings

*The exact same memo, averaged a 3.2/5.0 rating under our hypothetical "African American" Thomas Meyer and a 4.1/5.0 rating under hypothetical "Caucasian" Thomas Meyer.*

The exact same memo, averaged a 3.2/5.0 rating under our hypothetical "African American" Thomas Meyer and a 4.1/5.0 rating under hypothetical "Caucasian" Thomas Meyer. The qualitative comments on memos, consistently, were also more positive for the "Caucasian" Thomas Meyer than our "African American" Thomas Meyer:

| "Caucasian" Thomas Meyer | "African American" Thomas Meyer |
|---|---|
| "generally good writer but needs to work on…" | "needs lots of work" |
| "has potential" | "can't believe he went to NYU" |
| "good analytical skills" | "average at best" |

In regards to the specific errors in the memo:

- An average of 2.9/7.0 spelling grammar errors were found in "Caucasian" Thomas Meyer's memo in comparison to 5.8/7.0 spelling/grammar errors found in "African American" Thomas Meyer's memo.
- An average of 4.1/6.0 technical writing errors were found in "Caucasian" Thomas Meyer's memo in comparison to 4.9/6.0 technical writing errors found in "African American" Thomas Meyer's memo.
- An average of 3.2/5.0 errors in facts were found in "Caucasian" Thomas Meyer's memo in comparison to 3.9/5.0 errors in facts were found in "African American" Thomas Meyer's memo.

The 4 errors in analysis were difficult to parse out quantitatively because of the variances in narrative provided by the partners as to why they were analyzing the writing to contain analytical errors. Overall though, "Caucasian" Thomas Meyer's memo was evaluated to be better in regards to the analysis of facts and had substantively fewer critical comments.

## General Findings Cont.

We did not ask for edits and/or comments on formatting. However, we did receive such edits and/or comments in 41 out of the 53 responses, and all of them regarded changes that the partners would have liked to see on the formatting in the memo. Of the 41 edits and/or comments on formatting, 11 were for "Caucasian" Thomas Meyer's memo in comparison to 29 for "African American" Thomas Meyer's memo.

There was no significant correlation between a partner's race/ethnicity and the differentiated patterns of errors found between the two memos. There was also no significant correlation between a partner's gender and the differentiated patterns of errors found between the two memos. We did find that female partners generally found more errors and wrote longer narratives than the male partners.

## Analysis & Discussion

We undertook this study with the hypothesis that unconscious confirmation bias in a supervising lawyer's assessment of legal writing would result in a more negative rating if that writing was submitted by an African American lawyer in comparison to the same submission by a Caucasian lawyer. In order to create a study where we could control for enough variables to truly see the impact of confirmation bias, we did not study the potential variances that can be caused due to the intersection of race/ethnicity, gender, generational differences and other such salient identities. Thus, our conclusion is limited to the impact of confirmation bias in the evaluation of African American men in comparison to Caucasian men. We do not know (although we plan to study the issue in the very near future!) how this impact will splinter or strengthen when gender and/or other identities are introduced.

*Confirmation bias manifests itself most often in the "data gathering" phase of our evaluation – the time during which we seek out errors, and this manifestation is almost always unconscious.*

The data findings affirmed our hypothesis, but they also illustrated that the confirmation bias on the part of the evaluators occurred in the data collection phase of their evaluation processes – the identification of the errors – and not the final analysis phase. When expecting to find fewer errors, we find fewer errors. When expecting to find more errors, we find more errors. That is unconscious confirmation bias. Our evaluators unconsciously found more of the errors in the "African American" Thomas Meyer's memo, but the final rating process was a conscious and unbiased analysis based on the number of errors found. When partners say that they are evaluating assignments without bias, they are probably right in believing that there is no bias in the assessment of the errors found; however, if there is bias in the finding of the errors, even a fair final analysis cannot, and will not, result in a fair result.

## Key Takeaways

There are commonly held racially-based perceptions about writing ability that unconsciously impact our ability to objectively evaluate a lawyer's writing. Most of the perceptions uncovered in research thus far indicate that commonly held perceptions are biased against African Americans and in favor of Caucasians.

These commonly held perceptions translate into confirmation bias in ways that impact what we see as we evaluate legal writing. We see more errors when we expect to see errors, and we see fewer errors when we do not expect to see errors.

## Recommendations for Next Actions

Infusing the point at which unconscious thought has greatest impact with objective mechanisms that force the conscious brain to add input, decreases unconscious bias greatly. We have worked with many employers to revise their formal and informal evaluation processes to be more infused with objective interrupters that compel unconscious biases to be filtered through conscious analysis, and we have seen many success stories. **So, make the subjective more objective in order to make the unconscious more conscious.**

**EXAMPLE:** In one law firm where we found that minority summer associates were consistently being evaluated more negatively than their majority counterparts, we created an interruption mechanism to infuse the subjective with objective. We worked with the firm to create an Assignment Committee, comprised of 3 partners through whom certain assignments were distributed to the summer associates and through whom the summer associates submitted work back to the partners who needed the work done. When the work was evaluated, the partners evaluating the work did not know which associate had completed the work. The assignments for this process were chosen judiciously, and there was a lot of work done to ensure buy-in from all partners. At the end of the summer, every associate had at least 2 assignments that had been graded blindly. The firm then examined how the blind evaluations compared with the rest of the associate's evaluations and found that the blind evaluations were generally more positive for minorities and women and less positive for majority men.

*There are commonly held racially-based perceptions about writing ability that unconsciously impact our ability to objectively evaluate a lawyer's writing… These commonly held perceptions translate into confirmation bias in ways that impact what we see as we evaluate legal writing. We see more errors when we expect to see errors, and we see fewer errors when we do not expect to see errors.*

## Ideas for Inclusion

- Distribute and discuss this study with senior lawyers in your organization to gather their reactions and perspectives. Ask them how they would recommend making the subjective more objective in order to reduce confirmation bias in their evaluation processes.

- If racial/ethnic minorities are deemed to be subpar in writing skills, send out samples of a minority lawyer's writing and a sample of a majority lawyer's writing without any identifying information attached. Ask a few senior lawyers to evaluate both samples. Explore how the samples may be evaluated differently when the lawyer's background is not available.

- Implement training on unconscious bias for everyone who is in an evaluative position.  Our unconscious bias trainings have proven effective in reducing bias through raising awareness and insights into how unconscious biases operate and can be interrupted.

- If you offer writing assistance in the form of coaches, workshops and such, offer the assistance to everyone, not just racial/ethnic minorities in order to prevent the reification of the bias.

*Distribute and discuss this study with senior lawyers in your organization to gather their reactions and perspectives.*

**Lead Researcher:**

Dr. Arin N. Reeves | 312.922.0226



