**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KALOMA CARDWELL,** | |
| Plaintiff, | |
| **v.** | |
| **DAVIS POLK & WARDWELL LLP, Thomas Reid, John Bick, William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John H. Butler,** | 1:19-cv-10256-GHW |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Dated: January 13, 2021

David Jeffries, Esq.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-601-2770
djeffries@jeffrieslaw.nyc

*Attorney for Plaintiff*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT …………………...….……………………...…………….1

STATEMENT OF FACTS ………………….....…….……………………………………6

LEGAL STANDARD………...……….……….……………………………….……....…9

ARGUMENT………...…….…………….……….……………….…………………..…...10

    A.    The SAC Properly Pleads Retaliation Against the Individual Defendants ……...10

        1.  Cardwell Engaged in Protected Activities as a Davis Polk Associate …...…..10

        2.  Hudson, Chudd, Wolfe, Birnbaum, and Butler, Defendants
            Had Knowledge of Cardwell's Protected Activities……………...…..…..11

        3.  Cardwell Experienced Adverse Employment Actions and Has
            Established a Causal Connection Between His Protected Activities
            and Those Adverse Actions ……………......................................…………13

    B.    The SAC Establishes a Plausible Inference of Discrimination Against Brass,
       Birnbaum and Wolfe………….......................................................…………23

        1.  Wide Departures From Davis Polk's Policies and Procedures………………23

        2.  Cardwell Was Treated Worse Than White Associates at the Firm…………25

    C.    Cardwell's Disparate Impact Claim Against Davis Polk Survives....…....……… 27

        1.  Defendants' Exhaustion Argument Regarding Cardwell's Discrimination
            Claim Against Davis Polk Is Untimely……………...................…..…………27

        2.  Cardwell Has Exhausted His Disparate Impact Claim……………...………29

CONCLUSION ………………...…….……….……………………………….…………31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937 (2009)............................................................................ 9, 10

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955 (2007) ................................................................................. 9

*Beyer v. County of Nassau,*
  524 F.3d 160 (2d Cir. 2008).............................................................................................. 14

*Burch v. Pioneer Credit Recovery, Inc.,*
  551 F.3d 122 (2d Cir. 2008).............................................................................................. 10

*Colliton v. Cravath, Swaine & Moore LLP,*
  2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008)........................................................ 10, 20, 24

*Derisme v. Hunt Leibert Jacobson, PC,*
  No. 10 Civ. 244, 2010 WL 3417857 at *4 (D. Conn. Aug. 26, 2010)................................... 28

*Eaton v. Coca–Cola Co.,*
  06–CV–1664, 2010 WL 2836737 (D. Conn. July 19, 2010)................................................ 24

*Edwards v. Huntington Union Free Sch. Dist.,*
  957 F. Supp. 2d 203 (E.D.N.Y. 2013) ................................................................................ 14

*Foss v. Coca Cola Enters.,*
  No. 07-CV-1322, 2011 WL 1303346 (E.D.N.Y. Mar. 31, 2011).................................... 23, 24

*Gomes v. Avco Corp.,*
  964 F.2d 1330 (2d Cir. 1992)............................................................................................ 30

*Graham v. Long Island R.R.,*
  230 F.3d 34 (2d Cir. 2000)................................................................................................ 26

*Gratton v. Jetblue Airways,*
  No. 04 CIV. 7561(DLC), 2005 WL 1251786 (S.D.N.Y. May 25, 2005) .............................. 27

*Hall v. N. Bellmore School Dist.,*
  55 F. Supp. 3d 286 (E.D.N.Y. 2014) ................................................................................. 23

*Harris v. Mills,*
  572 F.3d 66 (2d Cir. 2009)................................................................................................... 9

*Hayden v. Paterson*,
    594 F.3d 150 (2d Cir. 2010).................................................................................... 10

*Jenkins v. N.Y.C. Transit Auth.*,
    646 F. Supp. 2d 464 (S.D.N.Y. 2009)..................................................................... 28

*Johnson v. Priceline.com, Inc.*,
    711 F.3d 271 (2d Cir. 2013)...................................................................................... 9

*Kirkland v. Buffalo Bd. of Educ.*,
    622 F.2d 1066 (2d Cir. 1980).................................................................................. 29

*Little v. NBC*,
    210 F. Supp. 2d 330 (S.D.N.Y. 2002)..................................................................... 15

*Mandell v. County of Suffolk*,
    316 F.3d 368 (2d Cir. 2003).................................................................................... 27

*Maniatas v. N.Y. Hosp.-Cornell Med. Ctr.*,
    58 F. Supp. 2d 221 (S.D.N.Y. 1999)....................................................................... 29

*McGuinness v. Lincoln Hall*,
    263 F.3d 49 (2d Cir. 2001)...................................................................................... 25

*Otoole v. Cty. of Orange*,
    255 F. Supp. 3d 433 (S.D.N.Y. 2017)..................................................................... 10

*Redd v. N.Y. Div. of Parole*,
    678 F.3d 166 (2d Cir. 2012).................................................................................... 10

*Sears Petroleum & Transport Corp. v. Ice Ban Am., Inc.*,
    217 F.R.D. 305 (N.D.N.Y. 2003) ........................................................................... 28

*Stern v. Trustees of Columbia Univ.*,
    131 F.3d 305 (2d Cir. 1997).................................................................................... 23

*Terry v. Ashcroft*,
    336 F.3d 128 (2d Cir. 2003).................................................................................... 29

*Vega v. Hempstead.* ...........................................................................................................19
  801 F.3d 72 (2d Cir. 2015)

*Velasquez v. Gates*,
    No. 08–CV–2215, 2011 WL 2181625 (E.D.N.Y. June 3, 2011)............................ 14

*Williams v. R.H. Donnelley, Corp.*,
  368 F.3d 123 (2d Cir. 2004)............................................................................. 14

*Windham v. Time Warner, Inc.*,
  275 F.3d 179 (2d Cir. 2001)............................................................................. 24

*Wright v. National Archives & Records*,
  609 F.2d 702 (4th Cir. 1979) ........................................................................... 30

**Statutes, Rules, and Other Authorities**

Fed. R. Civ. P. 12(b)(6)......................................................................................... 9

Fed. R. Civ. P. 12(g)(2)........................................................................................ 27

Plaintiff Kaloma Cardwell ("Cardwell") respectfully submits this memorandum of law (the "Opposition") against Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), Thomas Reid and John Bick (the "Management Committee Defendants"), and William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John H. Butler (the "Additional Defendants") (together, "Defendants") in opposition to Defendants' memorandum of law in support of their partial motion to dismiss (the "Motion to Dismiss" or "MTD") Cardwell's second amended complaint (the "Second Amended Complaint", "SAC," or "ECF 99/100").

## PRELIMINARY STATEMENT

The Court has already held that "[t]he 'sequence of events' that Cardwell initiated by filing his administrative complaints," which "concluded with his termination suffices to permit an inference of retaliatory animus" and that "Cardwell has plausibly alleged that he would not have been terminated if he had not filed his administrative complaints." MTD Opinion at 78 (ECF 70).

Since 2015, Cardwell has alleged the same core set of arguments about Davis Polk, its anti-Black discriminatory performance review system, and the partners that he worked with. Not only has document discovery confirmed that these allegations, as amended in the SAC, are well-pleaded and plausible, but also that for the claims that survive Defendants' motion, will serve Plaintiff well at summary judgment. However, the Court need not reach these issues now because it must accept all well-pleaded allegations as true, including those included in the SAC.

In response to the SAC, Defendants largely deployed three strategies in seeking to dismiss Cardwell's claims—all designed to improperly put Cardwell to his proof at the pleading stage, coerce Cardwell with threats to withdraw well-pleaded allegations that have not been tested in discovery, or create insurmountable pleading standards and hurdles that would handicap most

plaintiffs' ability to assert federal, state, or city claims if their over-reaching interpretation of the law was a commonly-accepted reality.

Defendants' first strategy is to use the largest corporate law firm in New York, Davis Polk and the individual defendants continue to push for pleading standards and premature rulings (e.g., moving for summary judgment before fact discovery is completed) that, if adopted as precedent, would significantly narrow everyday plaintiffs' and workers' ability to pursue federal and/or state discrimination and retaliation claims past the motion to dismiss stage.[1,2]

But perhaps more to the point, Defendants' second strategy is to simply ignore the allegations that Cardwell made in the SAC, including those first appearing in the August 2017 EEOC Complaint (ECF 99-1), January 2018 NYSDHR Rebuttal (ECF 99-3), November 2019 initial federal complaint (ECF 1), and March 2020 First Amended Complaint (ECF 37, "FAC").[3]

Most important, however, is Defendants' third strategy, which involves various attempts to argue the allegations are implausible. Defendants assert implausibility while simultaneously producing and continuing to produce documents seen by Plaintiff for the *first time* during discovery (i.e., within the last few weeks and months)—as well as responses to Plaintiff's interrogatories—that confirm **what he has alleged all along**: namely, that but for Cardwell's protected activities, he would not (i) have experienced a reduction and ultimate elimination of his material responsibilities and hours as a Davis Polk associate; and (ii) ultimately (and pretextually)

---

[1] This is particularly true where plaintiffs typically have virtually no discovery at the time of filing their complaints, as is the case here (and is often the case in discrimination cases where defendants took deceptive steps to avoid liability). In this case, prior to ***December 11, 2020***, Defendants had only produced *58* documents—none of which included metadata, and were grossly non-responsive to Plaintiff's First Request for the Production of Documents. Since then, Defendants have produced 99k pages of discovery. For this reason alone, if the Court elects to grant any portion of the MTD, Cardwell requests leave to amend because, as set forth *infra*, doing so would not be futile.
[2] Putting aside Defendants' blatant refusal to acknowledge that Cardwell made various allegations in his filings, it is troubling that Defendants' MTD essentially argues that the federal rules require a level of detail and precision in discrimination and retaliation complaints that all but a tiny fraction of plaintiffs would ever be able to satisfy.
[3] Unlike the FAC, Plaintiff filed the SAC after Plaintiff and Defendants commenced document productions.

have been terminated.  Defendants' own document productions and discovery responses has only widened the orbit of people with knowledge of Cardwell's complaints, strengthened the nexus between these individuals and their coordination to create pretextual performance reviews of Cardwell in violation of Firm policy, and ultimately double down decisions designed to kill his career at the firm (including eliminating his billable hours and work responsibilities, and ultimately terminating him).

For instance, discovery has revealed that as of August 2017 (after Bick was replaced as the head of M&A and the M&A Group had new leadership), Cardwell was entrusted by a non-Defendant partner with advising Davis Polk clients Morgan Stanley and Credit Suisse in connection with a SEC-regulated $10.4 billion Deal.  This alone flies in the face of Defendants' claims that Cardwell was a poor performer for the three-year period spanning 2014 to 2017. ███

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[4]  Within weeks, however, the tables turned when that very same partner submitted a performance review for Cardwell that (i) was created about a month after Cardwell filed his EEOC Charge and (ii) made it seem like Cardwell was a Black attorney who could barely read and write.

To state the obvious, a Davis Polk partner would ████████████████ while entrusting a third-year associate to edit and finalize, without attorney supervision, the main documents underpinning $10 billion transactions if they simultaneously believed that the associate would make or has made a █████████████████████████████████████████████████

████████████." DPW_SDNY-000000120. Permitting Cardwell to advise two of the Firm's

---

[4] *See* https://www.law360.com/articles/952583/vantiv-inks-8b-takeover-of-uk-peer-worldpay (noting in an article that "Morgan Stanley and Credit Suisse are advised by a Davis Polk & Wardwell LLP team including . . .  associate Kaloma Cardwell"); https://www.legal-monitor.com/news/vantiv-acquires-worldpay (which appears to be a version of a press release that Davis Polk circulated to the public).

most important clients on documents and disclosures that are routinely subject to regulatory and shareholder scrutiny and potential lawsuits not only undermines the very substance of Defendants' pretextual performance reviews, it underscores that Cardwell would have continued to be entrusted with similar legal work had he not filed his EEOC charge.

Within the four corners of the SAC exists a plausible explanation for this shift and contradiction, as well as how a group of partners retaliated against Cardwell by terminating him:

- After Cardwell filed the EEOC and NYSDHR Complaints against Davis Polk and explicitly named many of the Firm's M&A partners in August 2017, word spread to partners who were willing to distort Cardwell's performance reviews (in order to help their fellow partners and Davis Polk avoid an adverse finding from the New York State Division of Human Rights and any future litigation.[5]

- Davis Polk partners' willingness and ability to distort Cardwell's performance reviews was assisted by Davis Polk's black-box performance review system and the Firm's refusal to allow Cardwell to see any of his performance reviews during his tenure at Davis Polk (SAC ¶¶ 302-08, 530-34).

- With knowledge that the Firm created retaliatory performance reviews for Cardwell, M&A partner Oliver Smith refused his Firm-assigned obligation and did not document or summarize *any* of the written performance reviews, verbal feedback, or "consensus" messages created for Cardwell between **September 2016 and 2018**.

- As a result, the substantive portions of the review "summary" that were supposed to summarize the Firm's assessment of his performance between September 2016 and 2018 is almost entirely blank (SAC ¶¶ 393-400; *see also* ECF 99-12).

None of these allegations, or their relationship to the others, is implausible. To be sure, the SAC specifically and plausibly alleges, among other things, that a series a legally protected complaints served as the trigger for (i) Renee DeSantis, the Firm's Director of Associate Development, and several Davis Polk managers and partners to make "note" of Cardwell's legally protected complaint for "future professional development discussions" (SAC ¶¶ 72-79), (ii) Defendants'

---

[5] *See* ████████████████████████████████████████████████████████.

departure from staffing and performance evaluation policies and procedures,[6] (iii) █████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████,[7] and, ultimately, (iv) Defendants' collective decision to terminate his

employment. It was Cardwell's EEOC and NSYSDHR Complaints against Davis Polk in August

2017—not Cardwell's sudden and purported inability to practice law—that was the final trigger

causing Davis Polk's partners to shift their conclusions about Cardwell and his performance while

working together to position the Firm to adopt the pretextual position that staffing him was "not a

situation that's workable." SAC ¶¶ 454-59.

 As discovery is confirming,[8] the SAC's allegations are not only plausible on their face but

supported by the very documents, particularly emails, that Defendants have produced (and will

continue to produce until their productions are complete). The SAC sufficiently alleges context-

relevant facts and allegations in support of Cardwell's claims against the Additional Defendants,

including facts and allegations relevant to Hudson's, Chudd's, and Butler's willingness to work

with other Davis Polk partners to pretextually and unlawfully retaliate against Cardwell.

 Accordingly, for the reasons stated in this Opposition and the SAC, Cardwell respectfully

requests that the Court deny Defendants' Partial MTD and if any portion of the MTD is granted,

---



[6] *See* ████████████████████████████████████████████████ Defendants produced this document
to Plaintiff on January 11, 2020 (mere weeks before the fact discovery cutoff).
[7] *See* ████████████████████████████████████████████ . D████████████████████
████████████████████████████████████████ .
[8] *See* █████████████████████████████████████ .
████████████████████████████████████████████████████████████
████████████████████████████████████████

permit Plaintiff leave to amend in the interests of justice (and to incorporate documents produced for the first time by Defendants on December 23, 2020 and January 11, 2020 during discovery).

## ABBREVIATED STATEMENT OF FACTS[9]

Because the Court is familiar with many of the SAC's facts, ECF 78, this section reflects only a subset of relevant facts and allegations for purposes of this Opposition. Cardwell joined Davis Polk as a summer associate in 2013. He started the Firm as a full-time associate September 2014 and worked there until August 2018. He rotated through three corporate departments, or "practice groups": Credit, Capital Markets, and Mergers & Acquisitions ("M&A"). After his six-month rotations in each of these departments, Cardwell was assigned to work permanently in M&A in April 2016. He was one of four Black associates hired to join Davis Polk's 2014 class among over 120 associates. He was the only Black male associate in the class of 2014.

Though Davis Polk employs numerous partners and managers, power, authority, and influence are particularly concentrated among members of the Firm's three person-Management Committee, the heads of departments (e.g., head of Corporate Department, Director of the Firm's Associate Development Department), and the Firm's most senior partners. SAC ¶¶ 536-50. During Cardwell's entire tenure at the Firm, Reid and Bick were members of the Firm's three-person Management Committee, with Reid as the Firm's managing partner. Bick was the head of Davis Polk's Corporate Department, which oversaw the Firm's Credit, Capital Markets, and M&A practice groups. Until approximately May/June 2017, Bick was the head of the M&A group.

At all relevant times, Davis Polk relied on its leaders on the management committee, heads of departments (e.g., chairs, directors, executives), staffing partners, and managers in the Associate Development Department—as well as various antidiscrimination policies and procedures—to

---

[9] Because Davis Polk, Reid, and Bick did not move to dismiss claims alleged against them, this Opposition does not present all relevant facts alleged in connection with such parties and the claims asserted against them.

consistently monitor Cardwell's and other Black associates' professional development, staffing, assignments, experiences, performance, and complaints. *Id.* ¶¶ 41-47, 56-58, 71, 84-85, 92, 93, 140-42, 218, 319; DPW_SDNY-000045291.[10] For example, the Managing Partner (Reid) met with the head of the Corporate Department and M&A group (Bick) (and other practice group leaders) three times a year to discuss how work was being allocated to Cardwell and other Black associates. SAC ¶¶ 84-85. And, though document discovery was severely limited when the FAC and SAC were filed, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████. *See* DPW_SDNY-000045291.

Davis Polk's policies and procedures routinely caused the Firm's Associate Development Department[11] and a group of partners to work together prior to and in connection with the creation of (i) written performance reviews, (ii) the Firm's Consensus Feedback message that was routinely developed and delivered to each associate during their face-to-face review meetings (i.e., annual review or mid-year review), and (iii) a Consensus Feedback Statement (i.e., summary review) that was supposed to summarize topics discussed with reviewee-associates and the Firm's key conclusions. SAC ¶¶ 124-30; ECF 99-13[12]; DPW_SDNY-000097947 (produced on 1/11/21), DPW_SDNY-000097948 (produced on 1/11/21).[13] Indisputably, associates' reviews were often

---

[10] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

[11] During Cardwell's tenure at the Firm, Davis Polk's Associate Development Department was comprised of, among others, (i) Renee DeSantis, Director of Associate Development (SAC ¶ 72); (ii) Alicia Fabe, Associate Development Manager (referred to as "Davis Polk Junior Staffing Coordinator #3" in SAC ¶ 144); (iii) Carlina Fenner, Associate Development Manager (referred to as a Junior Staffing Coordinator in SAC ¶ 144); and (iv) Rocio Clausen, Associate Development Manager (referred to as a Junior Staffing Coordinator in SAC ¶ 144).

[12] Defendants produced this document, which demonstrates that partners work together to create performance reviews, on September 10, 2020—over seven months after Cardwell filed the FAC.

[13] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████.

created from discussions between partners and/or the Firm's Associate Development Department—discussions that sometimes resulted in Davis Polk partners declining the Firm's request to complete or submit a review for an associate. SAC ¶¶ 124-30.

During the relevant period, Davis Polk also had policies and procedures that governed when and how the Firm would address associates it believed experienced performance issues or were at risk of falling "behind" associates in one's class. These policies and procedures included (i) informing associates of the availability of career counseling (SAC ¶ 125); (ii) working with associates to create performance remediation plans; (iii) giving associates written warnings; (iv) informing associates during their annual review that they would receive a "spring review" or mid-year review (*id.*) and then following up with such associates to have such a review; and (v) penalizing associates by decreasing or altering such associates' compensation (collectively, the "Firm's Policies & Remedies for Performance Issues"). SAC ¶ 132 (listing various interventions under "8. Compensation Issues"). At no point during Cardwell's career, did anyone at the Firm discuss with Cardwell that he was being (or at-risk of being) subjected to any of the Firm's Policies & Remedies for Performance Issues. *Id.* ¶¶ 244-47, 412-14, 440-42.

In fact, the SAC alleges that Cardwell was fully qualified to be a Davis Polk associate during his tenure at the Firm, and his performance was equal or better than the White M&A associates similarly situated in all material respects. *Id.* ¶ 476. "Over the course of [his] nearly four-year career at Davis Polk, 100%[14] of the associates who submitted official performance reviews for Mr. Cardwell answered 'with' when asked on a performance evaluation: 'Do you feel [Mr. Cardwell] is performing materially behind, with or ahead of lawyer's class?'" *Id.* ¶ 137. Cardwell's staffing and billable hours, as well as Defendants' decision to terminate his

---

[14] This percentage does not account for one associate who declined to answer a question about Mr. Cardwell's standing relative to his class because his "contact with Kaloma was very limited – only a couple of days…."

employment, "cannot be legitimately explained by [] Cardwell's performance or the Firm's non-fabricated and pre-litigation conclusions about [] Cardwell's performance reviews." *Id.* ¶ 229.

Nonetheless, despite electing not to terminate the employment of associates deemed "behind" associates in their respective class (SAC ¶ 471), in favor of following the Firm's policies for handling such issues (e.g., mid-year reviews and loss of Firm benefits like bonuses)—the context and sequence of events preceding Cardwell's termination sheds light on why a group of Davis Polk partners abandoned Firm policy, only to later try to pretextually use a Bick-created mid-year review process (only after Cardwell's engaged in protected activity) to coerce him to "move on," lest the Firm conclude that staffing Cardwell had become "not a situation that's workable." SAC ¶ 459.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937 (2009). *First*, the "court must accept as true all of the allegations contained in a complaint," disregarding "legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted (quoting *Iqbal*, 556 U.S. at 678). *Second*, a court determines if "the 'well-pleaded factual allegations,' assumed to be true,[15] 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161

---

[15] Defendants assert that "courts are not required to 'accept as true' facts alleged in an amended pleading." MTD at 8. Yet Defendants' own cited authority holds that the relevant consideration (which does not apply to this case), is where a plaintiff "*blatantly* changes his statement of the facts to respond to [a] motion to dismiss . . . [*and*] directly

(2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Such determination is a "context-specific task that requires the . . . court to draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, accepting all facts alleged as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

## ARGUMENT

## A. THE SAC PROPERLY PLEADS RETALIATION AGAINST THE ADDITIONAL DEFENDANTS

"To survive a motion to dismiss a retaliation claim, a plaintiff must allege (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." MTD Opinion at 53 (citing cases). "Generally, the same pleading standards apply to retaliation claims under Title VII, section 1981, and the NYSHRL." *Id.* at 54 (citing cases). Retaliation under the NYCHRL is interpreted broadly, such that satisfying Title VII, section 1981 and the NYSHRL retaliation pleading standards generally satisfies the NYCHRL.

### 1. Cardwell Engaged in Protected Activities As a Davis Polk Associate

The Court has already held that Cardwell's September 2015 Complaint (SAC ¶¶ 72-79), January 2016 Complaint (*id.* ¶¶ 88-94), March 29, 2017 Complaint (*id.* ¶¶ 316-26) (defined in the MTD Opinion as the "March 2017 Complaint"), May 2017 Complaint (*id.* ¶¶ 344-53), EEOC and NYSDHR Complaints (*id.* ¶ 358; ECF 99-2; ECF 99-4), and January 2018 Complaint (SAC ¶ 382) qualify as protected activity under federal, state, and city law. *See* MTD Opinion at 58-63.

---

contradicts the facts set forth in his original complaint." *Colliton* v. *Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (plaintiff initially asserted that he was employed as an attorney and then stated in his amended complaint that he was employed as a "specialist" to circumvent pleading requirements) (emphasis added). Here, Defendants cannot point to any "blatant[] changes," let alone *any* such "changes."

The SAC now sufficiently pleads that Cardwell's September 2016 Complaint (*id.* ¶¶ 183-203) qualifies as legally protected activity under federal, state, and city law, as Cardwell did not merely speak about a discriminatory pattern within the legal profession but rather a discriminatory staffing pattern that he observed and was being subjecting to at Davis Polk. *Id.* ¶¶ 183-203.[16] The SAC now sufficiently pleads that the December 5, 2016 (*id.* ¶¶ 249-60) and March 3, 2017 Complaints (*id.* ¶¶ 286-89) were protected by the Firm's anti-retaliation polices at that time.

## 2. Hudson, Chudd, Wolfe, Birnbaum, and Butler, Defendants Had Knowledge of Cardwell's Protected Activities

At all relevant times, Davis Polk (i) partners on the management committee, (ii) heads of departments (e.g., chairs, directors, executives), (iii) staffing partners, (iv) managers in the Associate Development Department, and (v) partners selected to work on matters with Cardwell consistently monitored and discussed his development, staffing, assignments, experiences, performance, and complaints. *Id.* ¶¶ 41-47, 56-58, 71, 84-85, 92, 93, 140-42, 218, 319.[17]

Regarding the September 2015 Complaint, the SAC plausibly alleges that Hudson, Chudd, Wolfe, and Butler had knowledge. *Id.* ¶¶ 72-82 (alleging knowledge by Hudson, Chudd, and "the M&A partners," which included Butler, Chudd, and Wolfe at the time, and specifically naming Butler, Chudd, and Wolfe),[18] 127-30 (alleging knowledge in connection with the meeting practices

---

[16] For example, Cardwell (i) "made it clear . . . that he was talking about what he was observing and experiencing at Davis Polk," (ii) "responded to [the manager in the Associate Development Department/assignment coordinator] by pointing her to specific racial dynamics related to way she was attempting to staff him and specific advantages that the process was conferring to the Firm's White associates, especially the Firm's White male associates," and (iii) responded to her inquiries by stating: "I don't know if you noticed, but of the names you just listed, every name belongs to a person of color or someone who isn't a White man."

[17] Indeed, documents produced during discovery evidence (i) routine meetings between the various departments and associate affinity groups across the Firm and describing various Diversity Action Plans (ii) the creation of a presentations to partners with statistics that show the number of minorities in each department by seniority and as compared to peer firms; and (iii) various trainings and assessments created by consultants. *See* SAC ¶¶ 92, 140, 319.

[18] These paragraphs note that Davis Polk "create[d] an internal note" "for future professional development discussions" and explaining how Chudd (the partner assigned to deliver Cardwell's 2015 annual review), Hudson (the partner the Firm choose to work with Cardwell more than any other capital markets partner), and Butler (who was a part of M&A practice group meetings concerning associates' experiences and development) were both a part of discussions related to Cardwell's professional development and the September 2015 Complaint.

of Chudd, Wolfe, and Butler, as M&A partners at the time); 401-06 (alleging that Firm leaders coordinated with Hudson to work with Cardwell, an M&A associate who was completing a third rotation in Capital Markets, despite having no prior Capital Markets experience).

Regarding Cardwell's September 2016 Complaint, the SAC likewise alleges that Butler, Chudd, Wolfe, and Birnbaum had knowledge. *See* SAC ¶¶ 209 (Wolfe and Birnbaum's knowledge); 210-12 (knowledge among "all of the Davis Polk M&A partners at the time," which included Butler, Chudd, Wolfe, and Birnbaum, and naming Butler, Wolfe, and Birnbaum); 127-30 (alleging knowledge in connection with the meeting practices of Butler, Chudd, Wolfe, and Birnbaum, as M&A partners at the time); DPW_SDNY-000045291 (███████████████████████████████████████████████████████████████████████████).

Regarding the March 29, 2017 Complaint, Cardwell has plausibly alleged that Butler, Chudd, Wolfe, and Birnbaum had knowledge. *See id.* ¶¶ 332-34 (alleging knowledge among "the Firm's M&A partners," which included Butler, Chudd, Wolfe, and Birnbaum at the time, and identifying Butler, Wolfe, and Birnbaum), 127-130 (alleging knowledge in connection with the meeting practices of Butler, Chudd, Wolfe, and Birnbaum, as M&A partners at the time).[20]

Regarding the EEOC and NYSDHR Complaints, Cardwell has plausibly alleged that the Additional Defendants, including Hudson, Chudd, and Butler had knowledge. *See* MTD Opinion at 66 ("Cardwell has plausibly alleged that he engaged in protected activity known to the Additional Defendants when he filed complaints with the EEOC and NYSDHR"); *id.* ¶ 406 (alleging Hudson's knowledge); 463 (same as to Butler, Chudd, Wolfe, Birnbaum, and Brass).

---

[20] Davis Polk already acknowledged that Davis Polk partners met in April to discuss Cardwell's March 29, 2017 meeting with the Firm's Managing Partner (Reid). ECF 99-2 at 15.

Regarding the January 2018 Complaint, the SAC plausibly alleges that Hudson, Butler, Chudd, Wolfe, Birnbaum, and Brass were aware of this complaint. *See* SAC ¶¶ 456 (alleging that, subsequent to the January 2018 meeting, Goldberg "confirmed" by talking to M&A partners and various partners and leaders that the Firm and M&A staffing partners (Birnbaum and Brass at the time) would not staff Cardwell), 459 (alleging knowledge attributable to Wolfe, Birnbaum, and Brass), 460 (alleging that a wider group of partners had knowledge but an M&A partner interrupted the conversation to avoid a disclosure of their names),[21] 461 (alleging knowledge attributable to Butler, Chudd, Wolfe, Birnbaum, and Brass), 468 (alleging Hudson's knowledge).

Through these paragraphs, including their reference to Defendants' meeting practices, and the specific knowledge of Hudson, Birnbaum, Brass, Wolfe, and Chudd, the SAC pleads facts from which this Court "could infer such knowledge." *Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F.Supp.3d 336, 355 (S.D.N.Y.2014).[22]

### 3. Cardwell Experienced Adverse Employment Action and Has Established a Causal Connection Between His Protected Activity and Those Adverse Actions

The third and fourth prongs necessary to plausibly plead a retaliation claim requires that a "plaintiff must allege 'an adverse employment action' and 'a causal connection between the protected activity and the adverse employment action.'" MTD at Opinion at 77 (citing cases).

There need not be any direct evidence of retaliation to establish causal connection; rather, it may be established from temporal proximity, or indirect evidence. In *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, (2d Cir. 2000) the court stated that this circuit "has consistently held

---

[21] *See* Davis Polk's response to Interrogatory No. 16, though deficient and incomplete, noting other M&A partners not mentioned during the conversation, including partners from the "Corporate Department."

[22] Further, as this Court recognized, "even when a plaintiff does not allege that 'the individual decision-maker' had 'knowledge of protected activity,' the plaintiff may survive a motion to dismiss by pleading that 'the decision-maker was at least influenced or encouraged to take the adverse action by a superior with knowledge of the protected activity.'" MTD Opinion (citing cases).

that proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."

To establish a causal connection based on temporal proximity, a protected activity must be "closely followed in time by the adverse action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996). *See, e.g.*, *Clark County Sch. Dist. v. Breede*, 532 U.S. 268, 273 (2001) (stating that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'").[23]

For the Additional Defendants, as explained *infra*, the SAC now sufficiently alleges adverse employment actions and causal connections between: (i) Bick, Birnbaum, and Wolfe's collective decision to not staff Cardwell on any matters in September 2016 through April 2017—following Cardwell's September and December 2016 Complaints; and (ii) a group of partners' and the Firm's collective decision to terminate Cardwell in February 2018 response to his August 2017 EEOC and NYSDHR Complaints, and after their December 2017 NYSDHR Brief (which itself constitutes an adverse employment action, given the proven falsehoods contained therein).[24]

     i.  <u>Wolfe, Birnbaum, and Brass Eliminated Cardwell's Billable Hours and Material Responsibilities Immediately After His Legally Protected Complaints</u>

---

[23] It is worth noting that some courts in this Circuit have denied motions to dismiss even where no evidence of causal connection has been alleged. *See, e.g.*, *Doraz v. Tect Utica Corp.*, 12 Civ. 391, 2013 WL 316614, at *5 (N.D.N.Y. Jan. 28, 2013) ("denying motion to dismiss retaliation claim even where plaintiff does not identify whether defendant was aware of plaintiff's protected activity nor does []he allege a causal connection ..." as "plaintiffs complaint provides defendant with fair notice of his retaliation claim." (citing *Jordan v. Potter*. No 12 Civ. 391, 2007 WL 952070, at *7-8 (E.D.N.Y. Mar. 29, 2007)).

[24] Their actions, individually and collectively, effectively ensured that Cardwell had zero billable hours from December 2016 to March 2017, which eliminated his material responsibilities as a junior associate at the Firm and permanently (but needlessly) handicapped Cardwell's career.

*Adverse Employment Action.* "[A] change in duties . . . may be an adverse employment action, 'if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.'" *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013) (quoting *Galabya*, 202 F.3d at 641); *see also Velasquez v. Gates*, No. 08–CV–2215, 2011 WL 2181625, at *10 (E.D.N.Y. June 3, 2011) (same). "Employment actions that the Second Circuit has deemed sufficiently disadvantageous to constitute an adverse employment action include "'. . . significantly diminished material responsibilities" and "other indices … unique to a particular situation."' *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[T]here is no exhaustive list of what constitutes an adverse employment action. Courts have held that . . .  denial of training that may lead to promotional opportunities . . . among other things, constitute adverse employment actions." *Little v. NBC*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002).

At all relevant times during Cardwell's employment, and as a matter of Firm policy, a material responsibility for associates at Davis Polk was to "account for a minimum of seven hours for each business day. . . ." ECF 99-10 at 47. Practically speaking, Davis Polk associates, including Cardwell, were expected to aim to average seven hours of billable work per day. This was in part because Davis Polk's business model was built upon billing clients for hours of work completed (*see* SAC ¶ 262[25]) and because, as a matter of Firm policy, attorneys were expected, on a day-by-day basis, to "provide reasonably detailed descriptions of the work done." ECF 99-10 at 47. Further to this point, Firm policy generally prohibited "recent law school graduates" from working on a "[r]educed work schedule[]" because "Davis Polk believes that working on a reduced basis at the beginning of a legal career makes it difficult for an associate to receive the training, experience and exposure necessary for his or her successful professional development." ECF 99-10 at 47.

---

[25] "[T]he Firm's revenue and profit structure and Firm's primary reason for hiring Mr. Cardwell and other associates, are, at their core, primarily and inextricably tied to associates' billable hours."

Davis Polk's policies considered "2,000 hours" to be a reasonable target for the average number of billable hours . . . worked by the Firm's full time-associates. Cardwell was no exception.

Lastly, it was Firm policy that "working less than 1,000 hours per year may affect a lawyer's entitlement to certain employee benefits" and that "[o]verall, lawyers on reduced schedules generally work between 50% and 80% of a full-time schedule." Thus, between September 2016 and April 2017 specifically, maintaining a full schedule and working on Firm-assigned matters that produced billable hours were material responsibilities for Cardwell.

With knowledge of Cardwell's September 2016 Complaint (SAC ¶ 209), Wolfe and Birnbaum did not staff Cardwell on any assignments between September 2016 and April 2017, which led Cardwell to bill only *202* hours during the first full six months under Birnbaum and Wolfe's staffing authority—without a single explanation or related conversation from either of them. SAC ¶¶ 223-29.  As such, Wolfe and Birnbaum's actions put Cardwell on track to not be entitled to employee benefits, as they put Cardwell on pace to only bill 400 hours for his entire third-year at Davis Polk—a figure that, for Cardwell (as a recent law school graduate) would violate the Firm's policies even for associates working under the Firm's Flextime Program. ECF 99-10 at 25-26. Indeed, Defendants have opportunistically twisted the harmful impacts of Wolfe and Birnbaum's retaliatory actions—actions that caused Reid to tell Cardwell that his low workload was not Cardwell's fault (SAC ¶ 292)—into a justification for terminating Cardwell's employment under the pretextual basis that Cardwell was "behind" associates in his class.

Moreover, the elimination of Cardwell's material responsibilities (i.e., billable hours) between the specific December 2016 and April 2017 period resulted from Wolfe and Birnbaum not staffing Cardwell, as required by the Firm's staffing policies, (i) on new matters as pre-September 2016 matters reached their natural conclusion, or (ii) in accordance with Cardwell's

weekly capacity forms (which progressively indicated during the fall and winter of 2016 that Cardwell was available and interested in taking on new work). SAC ¶¶ 226-27, 262, 263 n.49.

At a fundamental level, Wolfe and Birnbaum's elimination of Cardwell's billable hours for over four months, is not a trivial harm or petty slight. Their actions created a setback in Cardwell's career, significantly diminished material responsibilities that were central to his employment as an associate, and made it difficult for Cardwell "to receive the training, experience and exposure necessary for his . . . successful professional development" (ECF 99-10 at 47)—let alone be treated in accordance with the Firm's policies. *See, e.g.*, SAC ¶¶ 44 (alleging that "Davis Polk attempted to prevent and mitigate bias in the Firm's staffing policies and practices through a number of mechanisms, including . . . how many billable hours Black associates were billing…"), 218, 226 n.38 ("Davis Polk associates typically average between 133 and 175 billable hours").

*Causal Connection – Wolfe and Birnbaum.* The SAC plausibly alleges a causal connection between Wolfe and Birnbaum's knowledge of Cardwell's September 2016 Complaint and their decision to not staff Cardwell on any matters between September 2016 and April 2016 given the temporal scope between the two, the sequence of events leading up to and following the September 2016 Complaint, and the allegations' satisfaction of the but-for causation standard.

Specifically, Cardwell alleges that (i) "[i]n September 2016, Mr. Cardwell became a third-year associate" (*id.* ¶ 213), (ii) Birnbaum and Wolfe "were responsible for staffing all third-year and more senior associates" (*id.* ¶ 218), (iii) "as early as September 2016, Mr. Birnbaum and Mr. Wolfe received and reviewed Mr. Cardwell's . . . weekly workload request/capacity forms, which noted the matters he and other associates were working on and how many hours they had available to take on additional work" (*id.*), (iv) Birnbaum and Wolfe "knowingly did not staff Mr. Cardwell on any matters in 2016" (*id.* ¶ 219) after receiving knowledge of the Complaint through a manager

in the Associate Development Department (Clausen) (¶¶ 208-09) (v) "virtually every billable hour [generated between 2016 and March 2017] relates to a staffing assignment that Mr. Cardwell received from a non-Davis Polk partner" (*id.* ¶¶ 226-27), and (vi) Birnbaum and Wolfe "intentionally decid[ed] to not have any conversations with Mr. Cardwell about staffing opportunities from September 2016 through March 2017, and . . . to not staff Mr. Cardwell over that same . . . period despite [his] weekly workload request/capacity forms" (*id.* ¶ 223).

ii. <u>Butler, Chudd, and Hudson Participated in the Termination of Cardwell's Employment After His EEOC Charge</u>

*Adverse Employment Action.* As the Court has already held, "termination qualifies as an adverse employment action under any definition of that term." MTD Opinion at 40 n. 17.

*Causal Connection – Butler and Chudd.* The SAC now plausibly alleges a causal connection between Butler and Chudd, their knowledge of the EEOC and NYSDHR Complaints, and Cardwell's termination, as the SAC's allegations concerning these events satisfies the temporal scope, sequence of events, and but-for causation standards.

Specifically, Cardwell alleges (i) "Mr. Chudd, Mr. Butler . . . discussed whether and which M&A partners would be willing to work with Mr. Cardwell or if the Firm should alternatively terminate Mr. Cardwell's employment" (SAC ¶ 461); (ii) "Mr. Chudd, Mr. Butler . . . had knowledge of Mr. Cardwell's August 3, 2017 EEOC complaint and discussed Mr. Cardwell's complaint leading up to his annual performance review meeting on January 11, 2018" (*id.* ¶ 462); (iii) "[i]n connection with their conversations about the [A] January 2018 Consensus Feedback that the M&A partners wanted Mr. Smith to deliver to Mr. Cardwell on January 11, 2018 and [B] Mr. Smith and Mr. Goldberg's process of confirming that 'the staffing has been challenging,' . . . Mr. Chudd, Mr. Butler . . . decided as a 'group' to terminate Mr. Cardwell's employment" (*id.* ¶ 464); (iv) "[i]f Mr. Cardwell did not file his complaint with the EEOC and NYSDHR, Davis Polk,

Mr. Reid, Mr. Bick Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, Mr. Brass, and Ms. Hudson would not have terminated Mr. Cardwell's employment" (*id.* ¶ 468).

*Causal Connection – Hudson*. The SAC plausibly alleges a causal link between Hudson's reviews, the EEOC and NYSDHR Complaints, Davis Polk's December 2017 NYSDHR Brief (which ***attached Hudson's reviews to support the pretextual claim that Cardwell's performance was deficient over a three-year period***, and "***behind***" his class), and Cardwell's termination in February 2018, due to temporal scope, but-for causation, and the circumstances of these events.

Specifically, Cardwell alleges "Ms. Hudson's June 2016 and September 2016 reviews for Mr. Cardwell were created after Mr. Cardwell filed his complaint with the EEOC in August 2017 and were created for the purpose of helping Davis Polk eliminate Mr. Cardwell's billable hours, not staff Mr. Cardwell on any assignments, and terminate Mr. Cardwell's employment." *Id.* ¶ 410. Cardwell also alleges that if he "did not file his complaint with the EEOC and NYSDHR, Davis Polk . . . , and Ms. Hudson would not have (i) terminated Mr. Cardwell's employment" (*id.* ¶ 468) or (ii) asserted demonstrable falsehoods concerning Cardwell and his performance in their NYSDHR Brief—both of which "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega v. Hempstead*, 801 F.3d 72, 90. *See also id.* ¶¶ 408, 443, 450-52.

Even if her reviews were not fabricated, they were retaliatorily used in December 2018 in the NYSDHR Brief where Defendants attempted to use Hudson's reviews to establish a supposed appearance of "consistent performance deficiencies . . . [that] would defeat any suggestion that this 'reason' [i.e., performance deficiencies] was pretextual." ECF 99-2 at 24; *see also* ¶ 407. Not only does the SAC assert that "Davis Polk ***pretextually argued*** to the NYSDHR that the abrupt changes to Mr. Cardwell's staffing and evaluation were because Davis Polk partners repeatedly and legitimately reached a radically opposite conclusion about Mr. Cardwell and his competency,"

19

but their use of Hudson's reviews in response to the EEOC Charge supports a claim of retaliation against Hudson. *Id.* ¶ 239 (emphasis added). That is supported by the well-pleaded allegations and Cardwell's experiences at the Firm. *See, e.g.*, *id.* ¶ 137; *id.* ¶¶ 366-70 (showing that virtually 100% of Cardwell's performance reviews went from rating him as being on par with his class to 100% of Davis Polk partners rating Cardwell as "behind" after and within two months of Cardwell's EEOC and NYSDHR Complaints).

To circumvent the SAC's well-pleaded allegations, Defendants assert that Cardwell ***knowingly filed false allegations against Hudson***. That is both baseless and incorrect. Specifically, Defendants argue that (i) allegations regarding the performance reviews that were submitted to the NYSDHR and attributed to Ms. Hudson "are known by Cardwell to be false [and] proven false by Cardwell's own prior admissions and documents appended to his pleadings" and (ii) current and prior filings establish that he was contemporaneously aware, in 2016, of Hudson's performance reviews, and therefore that they were contemporaneously created…."

But such arguments are contradicted by Cardwell's prior filings, the Court's October Ruling, facts and documentation in Defendants' possession, and computer-generated metadata for Defendants' performance review that has not yet been produced to Plaintiff. At the outset, it is undisputed and cannot be disputed that Cardwell did not have access to ***any of his performance reviews*** prior to the filing of the EEOC Complaint or Davis Polk's December 2017 NYSDHR Statement, in part, because Davis Polk claimed in emails to Cardwell that it was Firm policy to prohibit associates from viewing them. *See* CARDWELL003272 - CARDWELL003274; 2019 Initial Complaint, ECF 1 ¶ 77 n.4[26], *id.* ¶¶ 208-10; FAC ¶ 84 n.6[27]; SAC ¶¶ 302-07.

---

[26] "Every reference to Plaintiff's written performance reviews in this Complaint relates to documentation that Plaintiff only became aware of after Plaintiff engaged in litigation with Davis Polk and after the EEOC or Davis Polk shared documents that were a part of the Firm's EEOC response." ECF 1 ¶ 77 n.4.
[27] *Id.*

Moreover, the Hudson-related allegations that appear in the SAC, including those that provide additional facts and context related to the timing of and purpose of the creation of Hudson's NYSDHR performance reviews, are consistent with (and do not "blatantly contradict") the allegations that Cardwell plainly alleged in the 2019 Initial Complaint. For example, it alleges:

- "When Plaintiff complained of this conduct, Defendants retaliated against him by: (i) threatening his employment and career; (ii) falsifying Plaintiff's performance reviews . . . in order to distort the quality of Plaintiff's job performance and justify his firing…." ECF 1 ¶ 2 (emphasis added).

- "Regarding documentation related to Plaintiff's performance reviews in 2016, Mr. Reid, *Ms. Hudson*, Mr. Bick, and Davis Polk knowingly created and later submitted to the EEOC negative conclusions about Plaintiff's work that did not fully or accurately capture the context, nature, and substance of Plaintiff's work product or the real-time assessments of attorneys who worked with Plaintiff." ECF 1 ¶ 105 (emphasis added).

- "[T]he *documentation* that Davis Polk *attributed to* Ms. Hudson and that *supposedly* describes the quality of Plaintiff's work product during Plaintiff's rotation in the Firm's Capital Markets group in 2015 and 2016 is directly contradicted by meetings and conversations that Plaintiff had with Capital Markets partners, as well as Ms. Hudson's own realtime statements to Plaintiff." ECF 1 ¶ 106 (emphases added).

- "Davis Polk's EEOC Answer and Position Statement detailed and confirmed additional discrimination and retaliation against Plaintiff, as their response included a number of *intentionally false mischaracterizations* that was *triggered by* Plaintiff's August 2017 EEOC Filing." ECF 1 ¶ 239 (emphases added).

The FAC repeated the allegations that appear above and added a few additional allegations. FAC ¶¶ 2, 118, 120, 179, 281. These allegations are consistent with (and do not "blatantly contradict") the Hudson-related allegations that appear in the SAC.

Undoubtedly, the Court's October Ruling explicitly recognized that Cardwell's prior filings pleaded (or, at a minimum, attempted to plead) allegations related to Ms. Hudson falsification of performance reviews that were submitted to the NYSDHR. MTD Opinion, ECF 78 at 8 ("Cardwell alleges that Reid, Bick, and Defendant Sophia Hudson 'knowingly falsified' his performance reviews.); *id*. at 46 ("As best the Court can tell, Cardwell seems to argue that these

allegations support the inference that the Additional Defendants . . . conspired to fabricate a negative performance review as a pretextual justification for his eventual termination").

Beyond Defendants' blatant disregard of Cardwell's previously filed allegations and this Court's recognition of them, Defendants also ignore that Cardwell produced contemporaneous kept notes in discovery that confirm that Cardwell believed, while he was employed at Davis Polk, the reviews attributed to Ms. Hudson in Davis Polk's NYSDHR Statement were not contemporaneously created documents. *See, e.g.*, CARDWELL000878 (emphases added). Yet, Defendants' MTD asserts that Plaintiff "admit[ted] and "concedes" various points related to Hudson's performance reviews and that such "concessions alone render Cardwell's claim that Hudson 'retroactively created' her June 2016 review implausible." MTD at 26. They are wrong.

Contrary to Defendants' argument that Cardwell's January 2017 NYSDHR Rebuttal "concedes that performance reviews came from one partner" in 2016, the Rebuttal merely noted (i) what "John Bick specifically note[d]" in the documentation that Davis Polk submitted to the NYSDHR, (ii) "Davis Polk's documentation contradicts its [own] descriptions of [Cardwell's] performance during his [the rotation where he worked with Ms. Hudson]," (iii) arguments related to Hudson's reviews were "lately created excuse[s]." The Rebuttal directly challenged the authenticity and timing of the reviews that Davis Polk attributed to Cardwell's third rotation (i.e., the time Cardwell worked with Hudson)—including because Cardwell was not permitted to see these reviews in real time, and because not a single person (including Hudson) ***ever informed Cardwell at that time that the Firm or anyone considered him to be "behind."***

Ultimately, and consistent with Cardwell's prior filings and contemporaneous documentation, Cardwell's allegations related to these performance reviews during the NYSDHR investigation consistently explained that such reviews were only described in a context where

Cardwell acknowledged that they were submitted to the NYSDHR (not that they were the same written reviews that existed on their purported creation date)[28] and that certain written reviews were falsified and retroactively created in connection with Davis Polk's NYSDHR Statement.

Finally, Defendants argue that Cardwell's allegations are "wholly rebut[ted]" by referencing a made-for-litigation "metadata chart" that was produced to Plaintiff on December 11, 2020. There are numerous issues with their argument.  Defendants seem to suggest that the Court must reject the pleading standard of treating well-pled allegations as true at the motion to dismiss stage because Ms. Hudson's "review[s] show[] on [their] face that [they were] created on" the dates that appear on the documents that Davis Polk submitted to the NYSDHR and that Cardwell purportedly "incorporated by reference." Defendants wish for the Court to treat their own characterizations about Ms. Hudson's performance reviews (and documents specifically created for this litigation), not the SAC's allegations, as true for purposes of their Rule 12(b) motion to dismiss. Without the benefit of full discovery, including a complete production by Davis Polk and deposition testimony, Plaintiff is not required to accept Defendants' views as to the creation of Hudson's reviews. This is especially true where Defendants "meta data" chart (i) is not actual metadata and (ii) includes dates that are contradicted by documents Defendants' produced in discovery.

## B. THE SAC ESTABLISHES A PLAUSIBLE INFERENCE OF DISCRIMINATION AGAINST BRASS, BIRNBAUM AND WOLFE

### 1. Cardwell Experienced Wide Departures From the Firm's Policies and Procedures

---

[28] To this point, Cardwell has repeatedly argued that various review related documents were manipulated (e.g., when Defendants accessed and/or printed Chudd's 2015 Consensus Statement and Bick's 2016 Consensus Statement; *see* ECF 85-9 at 6 regarding such documents), so it is disingenuous to claim that Cardwell's mere reference to such documents is a concession that they are the exact same documents that existed at their purported creation. At all times, Cardwell merely referred to the versions of such documents that were submitted to the NYSDHR.

23

As courts in this Circuit recognize, "departures from procedural regularity" can create an inference of discriminatory intent, sufficient to establish a prima facie case of discrimination. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (internal citation and quotation marks omitted); *see also Hall v. N. Bellmore School Dist.*, 55 F. Supp. 3d 286, 299 (E.D.N.Y. 2014) ("'Procedural irregularities' are circumstances which permit an inference of discrimination"). Here, the SAC alleges that Birnbaum, Wolfe, and Brass violated numerous Davis Polk policies in their interactions with Cardwell from 2016 onward.

For instance, "if a defendant's own progressive discipline policies recommend using counseling before taking adverse action, the failure to follow those policies 'may be circumstantial evidence supporting an inference of discrimination.'" *Foss v. Coca Cola Enters.* recognized that, like here, "departures from procedural regularity" can create such an inference of discriminatory intent. No. 07-CV-1322, 2011 WL 1303346, at *9 (E.D.N.Y. Mar. 31, 2011) (quoting *Eaton v. Coca–Cola Co.*, 06–CV–1664, 2010 WL 2836737, at *11 (D. Conn. July 19, 2010)).

In *Foss*, the plaintiff alleged that her former employer "used a progressive discipline policy, which escalated from counseling, to an oral warning, to a written warning and, eventually, to termination," which the employer "did not follow . . . when it terminated [the plaintiff]." *Id*. As a result, the court found that these allegations met the "'de minimis burden' of showing an inference of discriminatory intent and, thus, establishing her prima facie case." *Id*. (quoting *Windham v. Time Warner, Inc.*, 275 F.3d 179, 188 (2d Cir. 2001).

Likewise, the SAC alleges that (i) Birnbaum and Wolfe "knowingly departed from the Firm's normal staffing process and intentionally eliminated Mr. Cardwell's billable hours in ways that did not happen to any White associates who were similarly situated in all material respects to

24

Mr. Cardwell,"[29] in violation of the Firm's policy that associates be staffed according to a Firm-wide staffing system (*see* SAC ¶ 143), including a "weekly request for work via the Firm's standard weekly workload request/capacity forms"[30]; and (ii) Brass failed to follow the Firm's policy of utilizing staffing coordinators (a position intentionally created in part as a way to prevent minorities from being excluding from staffing and development opportunities) when he unilaterally and permanently replaced Cardwell on the 2016 deal with a "White M&A associate . . . [who] was similarly situated in all material respects" to Cardwell (*see id.* ¶¶ 156-60, 163-75).

### 2. Cardwell Was Treated Worse Than Other Associates at the Firm

As amended, the SAC now "provides the 'minimal support' required" to suggest that Wolfe, Birnbaum, and Brass were motivated by discriminatory intent, by alleging (i) the existence of "similarly situated [comparators] who were treated better than [Cardwell]." *Nguedi*, 2017 WL 2557263 at *6. The SAC alleges five classes of comparators: (i) Finance Rotation Comparators, (ii) M&A Rotation Comparators; (iii) M&A Members Comparators; (iv) White M&A Comparators; and (iv) Asian M&A Comparators—all of whom were Davis Polk associates during the relevant period and subject to the same policies, practices, and standards. SAC ¶¶ 510-14.

"A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz*, 609 F.3d at 493 (cited in MTD Opinion at 38). "[T]he standard for comparing conduct

---

[29] SAC ¶ 220. *See also id.* ¶ 263 ("[T]he weekly workload request/capacity form is regularly reviewed and relied upon to make staffing decisions. It is not possible that Mr. Cardwell's availability to take on deals and assignments was merely overlooked for four to six months…. Mr. Wolfe's, Mr. Birnbaum's . . . decision to cease assigning work to Mr. Cardwell was . . . motivated in whole or in part by Mr. Cardwell's race….").

[30] SAC ¶ 223. *See also id.* ¶ 337 ("Though . . . Mr. Wolfe, Mr. Birnbaum . . . had all of April 2016 to ensure that Mr. Cardwell would be staffed in a manner that was consistent with the Firm's normal weekly work form request/capacity system, such parties departed from the Firm's normal staffing process because of Mr. Cardwell's race….")

requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id*. "In other words, the comparator must be similarly situated . . .in all material respects." *Id*. "All material respects" does not mean "all respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001).

For example, the alleged comparator need not "ha[ve] the same supervisor, work[ ] under the same standards, and engage[ ] in the same conduct." *Id*. at 53. Instead, the applicable standard requires only "a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Id*. at 54.

As to the White M&A Comparators, the SAC alleges that (i) "Mr. Wolfe, and Mr. Birnbaum, effectively went an entire year without staffing Mr. Cardwell on deals and matters at the same rate or in the same way as White associates who were similarly situated in all material respects to Mr. Cardwell" (SAC ¶ 217); (ii) "[c]ontrary to their interactions with Mr. Cardwell, Mr. Birnbaum and Mr. Wolfe routinely and consistently staffed and communicated with White associates who were similarly situated to Mr. Cardwell in all material respects about such associates' hours, workload, and staffing" (*id.* ¶ 219); (iii) "White associates who were similarly situated to Mr. Cardwell in all material respects remained continuously staffed on assignments by Mr. Birnbaum and Mr. Wolfe, thereby allowing such associates to generate billable hours, further develop as attorneys, and continue to build relationships with attorneys . . . in and outside of the Firm" (*id.* ¶ 261); (iv) "the M&A partners routinely allowed . . . White Davis Polk associates who were similarly situated in all material respects to Mr. Cardwell to not do any legal work for periods up to six months" (*id.* ¶ 261); and (v) Birnbaum, Wolfe, and Brass "did not decide to terminate any similarly situated [White M&A Comparators] in 2015, 2016, 2017, or 2018" (*id.* ¶ 476).

The SAC also alleges which years and practice groups had comparators, while otherwise identifying comparator names. *Id.* ¶¶ 510-14. As to these comparator groups and individuals, (i) all were subject to the same workplace policies in their capacity as associates as Cardwell during the relevant period (*id.* ¶¶ 512-14); and (ii) none of these comparator groups or individuals received any sort of punishment or discipline by Davis Polk, Birnbaum, Wolfe, or Brass, including termination, a reduction in their billable hours, or any comparable adverse employment action on account of similar conduct that Cardwell was penalized for engaging in (e.g., making legally protected complaints, or for purportedly deficient performance). *Id.* ¶¶ 476, 488.

As a result, the SAC pleads discrimination against Birnbaum, Brass, and Wolfe under a comparator theory. Importantly, Defendants' attempts to litigate any incongruity between these comparators and Cardwell is premature. *See, e.g., Graham v. Long Island R.R.*, 230 F.3d 34, 36 (2d Cir. 2000) ("Ordinarily whether two employees are similarly situated . . . presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss.")). Defendants cannot maintain their position while simultaneously withholding discovery into the very class of information that would support the SAC's comparator allegations.

Likewise, "[w]hether or not [Cardwell] has correctly defined which employees are similarly situated . . . is a question of fact that is not appropriately resolved on a motion to dismiss." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Instead, the central inquiry facing this Court is whether Cardwell has provided Defendants fair notice of his claim and the grounds upon which it rests." *Gratton v. Jetblue Airways*, No. 04 CIV. 7561 (DLC), 2005 WL 1251786, at *8 (S.D.N.Y. May 25, 2005). For reasons set forth *supra*, and in the SAC, Plaintiff has done so.

## C.  CARDWELL'S DISPARATE IMPACT CLAIM AGAINST DAVIS POLK SURVIVES

### 1.  Defendants' Exhaustion Argument Regarding Cardwell's Discrimination Claim Against Davis Polk Is Untimely

Defendants' exhaustion argument is a naked attempt to seek the dismissal of claims that Defendants elected not to dismiss, and thus waived, in filing their original Partial Motion to Dismiss the FAC. *See* Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.").

It is undisputed that Defendants did not seek to dismiss either the discrimination or retaliation claims asserted against Davis Polk and Named Defendants Reid and Bick. And, it cannot be disputed that the Court's MTD Ruling held that Cardwell's allegation that "he was uncomfortable with the Firm's performance review process and noted that racial biases were influencing performance evaluations" was sufficient to put Reid and Kreynin on notice that Cardwell opposed discrimination in the Firm's performance review process." ECF 78 at 62. Thus, Defendants were on notice of Cardwell's disparate impact allegations regarding the Firm's performance review process on four consecutive occasions, as the EEOC Complaint (ECF 99-1 ¶ 23), Initial Complaint (ECF 1 ¶ 213), FAC (ECF 37 ¶ 242), and SAC (ECF 99 ¶ 317) includes a verbatim description of what the Court deemed in the MTD Opinion sufficient to put Davis Polk's managing partner on notice regarding Davis Polk's performance review system.[31]

As cases in this Circuit are clear, any arguments pertaining to claims that could have been asserted at the time of Defendants' original motion are deemed waived. *See, e.g.*, *Derisme v. Hunt Leibert Jacobson, PC*, No. 10 Civ. 244, 2010 WL 3417857 at *4 (D. Conn. Aug. 26, 2010) (defendant waived right on second motion to dismiss to advance argument "plainly" available at

---

[31] Notably, all four filings further put Defendants on notice as to these claims, as each "Count" sections notes claims are based on "the acts and practices described [herein]," including these two theories of discrimination.

time of first motion to dismiss).[32] Because Defendants could have challenged this theory of discrimination long ago, but chose not to, their belated attempt to do so now should be denied.

### 2.  Cardwell Has Exhausted His Disparate Impact Claim

Even if Defendants are permitted to maintain this position, their exhaustion argument fails. The EEOC Charge (ECF 99-1 ¶ 23), Initial Complaint (ECF 1 ¶ 213), and FAC (ECF 37 ¶ 242) all explicitly make clear that Cardwell was challenging performance review policies that had a ***disparate impact on him as an African-American associate***. *See*, e.g., Jenkins v. N.Y.C. Transit Auth., 646 F. Supp. 2d 464, 470 (S.D.N.Y. 2009) (though plaintiff may not have used term disparate impact in charge, court found "substance" and "not its label that controls"). Defendants' arguments to the contrary fly in the face of the record and apposite cases from this District.

Specifically, the EEOC Charge explained that the Firm discriminated against Cardwell "because of [his] race" and "retaliated against [him] because [he] actively raised awareness and concerns regarding issues of racial bias and ***disparate outcomes***, including by failing to offer [him] substantive and billable work commensurate with my similarly-situated White coworkers, depriving [him] of a meaningful chance of advancement to partnership, and threatening [his] employment." ECF 99-1 ¶ 4 (emphasis added). As a result, Defendants were on notice of Cardwell's "disparate outcomes" theory by August 3, 2017 at the very latest (and even earlier because disparate impact was the subject of Cardwell's March 29, 2017 Complaint).

As a final consideration, even if the Court were to find that Defendants lacked notice, plaintiffs are entitled to litigate claims "reasonably related to the allegations in the[ir] complaint filed with the EEOC." *Kirkland v. Buffalo Bd. of Educ.*, 622 F.2d 1066, 1068 (2d Cir. 1980). A claim is reasonably related to allegations in an EEOC charge where the conduct complained of

---

[32] *Sears Petroleum & Transport Corp. v. Ice Ban Am., Inc.*, 217 F.R.D. 305, 307 (N.D.N.Y. 2003) ("Nor may defendant advance arguments that could have been made in the first motion . . . [where it] neglected to do so.").

"would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (internal quotation marks omitted).[33] Cardwell's disparate impact theory is "reasonably related" to the allegations in the EEOC Charge. Here, the complained-of conduct, including Cardwell's experiences not being "commensurate with [his] similarly-situated White coworkers" falls squarely within the scope of any reasonable EEOC investigation.

Not only is it irrelevant that the EEOC Charge does not use the words "disparate impact," this Circuit has held that a plaintiff is not barred from asserting a claim in federal court relating to the precise incidents alleged in an EEOC complaint merely because it fails to identify the precise theory of discrimination. *See Gomes v. Avco Corp.*, 964 F.2d 1330, 1335 (2d Cir. 1992). Indeed, plaintiffs are entitled to pursue multiple theories of discrimination arising out of the same incidents.

Likewise, that the EEOC Charge also reference instances of intentional discrimination that Cardwell suffered while at Davis Polk does not negate the fact that the EEOC Charge supports a disparate impact theory of liability, which it describes as "disparate outcome." *See, e.g.*, *id.* at 1334-35 (concluding that EEOC charge supported disparate impact claim even though it "most naturally supports a claim of intentional discrimination").

Thus, as the cases make clear, disparate impact and treatment theories are "rightly treated simply as alternative theories upon which a right to relief under Title VII may be established." *Wright v. National Archives & Records*, 609 F.2d 702, 711 (4th Cir. 1979). Such is the case here. Because Defendants were on notice of Cardwell's disparate impact claims against Davis Polk, and they chose not move to dismiss ***any claims against the Firm*** (*see* ECF 44), they cannot now claim to lack notice of claims that were asserted years before the instant Action was commenced.

---

[33] *See also Maniatas v. N.Y. Hosp.-Cornell Med. Ctr.*, 58 F. Supp. 2d 221, 227 (S.D.N.Y. 1999) (allowing disparate impact claim not asserted in charge because it was reasonably related to intentional discrimination asserted).

**CONCLUSION**

For the reasons stated above, Cardwell respectfully urges the Court to deny the MTD.

Dated: New York, New York                    Respectfully submitted,
       January 13, 2021

                                            /s/ David Jeffries

                                 David Jeffries

                                 1345 Avenue of the Americas, 33rd Floor
                                 New York, New York 10105
                                 Tel: 212-601-2770
                                 djeffries@jeffrieslaw.nyc

                                 *Attorney for Plaintiff*