February 17, 2021

**By ECF**

The Honorable Gregory H. Woods
United States District Court
Southern District of New York
500 Pearl Street, Room 2260
New York, NY 10007

*Cardwell* v. *Davis Polk & Wardwell LLP,* et al.
19-cv-10256-GHW (S.D.N.Y.)

Dear Judge Woods:

Plaintiff respectfully seeks leave to amend the Corrected Second Amended Complaint (ECF 147, "Complaint") to add allegations related to Cardwell's retaliation and discrimination claims. Not only is Plaintiff diligent in seeking leave, this request satisfies Rule 16(b)'s good cause standard and no factor that would prevent amendment (e.g., undue prejudice,[1] futility,[2] or excessive delay[3]) is present. This is the second request to amend and Defendants do not consent.

Months after Plaintiff filed the SAC in November 2020 (ECF 99), Defendants produced roughly 166,000 pages of documents, with nearly 120,000 such pages being produced on January 11, 2021, and February 9, 2021 (after the last teleconference). As summarized herein,[4] Plaintiff seeks leave to add factual allegations that (i) are based on information gleaned from these recently produced documents and (ii) directly bear on issues that will affect the Court's adjudication of Defendants' partial motion to dismiss the SAC (ECF 116, the "Partial MTD").[5]

**The Court's Pending Ruling on Retaliation Claims Against Hudson, Butler, And Chudd**

Defendants have produced documents that show or support inferences that:

- Davis Polk's partners and managers routinely tracked and discussed Cardwell's and other Black Davis Polk associates' emails, complaints, interactions (formal and informal), and performance reviews. These facts bear on the Court's pending assessment as to whether Plaintiff has plausibly alleged that Hudson, Butler, and Chudd, among others, had knowledge of Cardwell's complaints and whether Hudson's performance reviews, other Firm assessments that Cardwell received, and staffing decisions following these complaints were in retaliation for such complaints.

---

[1] Permitting a further amended complaint to account for newly produced documents would not unduly prejudice Defendants as the amendment will only add factual allegations underlying Plaintiff's existing discrimination and retaliation claims, rather than add entirely new claims or defendants.

[2] The amendment would not be futile, including for reasons expressed in this letter. The Court has already held that six of Cardwell's statements (and possibly more) were legally protected, and the new factual allegations plausibly allege that at least Hudson, Butler, and Chudd had knowledge of certain of those complaints. ECF 78.

[3] The amendment would not significantly delay discovery in this case. Plaintiff is not seeking to add custodians, and the Court recently extended fact discovery through April 15 and expert discovery through July 15, 2021. Moreover, the Court already held that Cardwell adequately stated a claim for retaliation in connection with his termination.

[4] This list offers an overview of the types of allegations that Plaintiff would add if granted leave to amend. These allegations address various elements of Cardwell's discrimination and retaliation claims (e.g., knowledge, adverse employment actions, and causal connections between the protected activity and adverse employment action).

[5] In their Partial MTD, Defendants asked this Court to (i) dismiss with prejudice (a) all claims against Hudson, Chudd, and Butler, (b) all previously-dismissed claims against Birnbaum, Brass, and Wolfe, and (c) disparate impact claims against Davis Polk; and (ii) convert certain claims to a motion for summary judgment. *See* ECF 116 at 29-30.

- As a matter of Firm policy and practice, Davis Polk used "mid-year" performance review cycles to alter associates' staffing, titles, and compensation, and to terminate associates. This relates to whether Plaintiff's termination was the only adverse employment action that can be alleged against Defendants Hudson, Bick, Reid, Chudd, and Davis Polk (each of whom are connected to Cardwell's 2016 mid-year performance review cycle).

- In direct response to Cardwell's EEOC and New York State Division of Human Rights ("NYSDHR") Complaints, Davis Polk asserted in its NYSDHR Answer and Position Statement (the "NYSDHR Brief") that Cardwell's June 2016 mid-year performance review resulted because "Cardwell approached the Associate Development department and asked for feedback; the Firm granted his request, solicited reviews, and assigned a partner to meet with him." ECF 147-2 at 9 n. 9. This assertion is flatly contradicted by numerous documents just produced.

For example, on June 13, 2016, John Bick met with Davis Polk's Associate Development Department and gave them specific instructions to create a "mid-year" performance review cycle for Cardwell. In response, members of the Associate Development Department sent a flurry of emails that showed (i) the head of the Department wanted to discuss with the Department's managers how to "***get John Bick what he asked for*** with the least amount of negative blow back for [Cardwell]" because she was "worried" about Cardwell being associated with a "'mid year review' label"; (ii) the managers in the Department acknowledged that Cardwell "wasn't given any indication in his last annual review [meeting] that the [Firm] would be checking in mid-year"; (iii) they considered Bick's instructions and the review to be "sensitive"; and (iv) when discussing the "mid-year" review internally to others, they changed their explanations in an attempt to ***cover up that Cardwell's June 2016 mid-year review cycle was based on Bick's instructions and not Cardwell's performance or request*** (as Davis Polk's NYSDHR Brief claimed).

This sequence of events, along with other facts, reveals that Bick and Hudson used Cardwell's 2016 mid-year performance review cycle to materially alter Cardwell's employment. This allows Cardwell to plausibly allege that the following events were adverse employment actions that led to material changes in Cardwell's employment and, ultimately, his termination: (i) the entire mid-year performance review cycle requested by Bick (designed to manufacture performance issues); (ii) Defendants' NYSDHR Brief (which repeated and weaponized these so-called issues); and (iii) Bick, Birnbaum, and Wolfe's decisions not to staff Cardwell (which the NYSDHR Brief claimed was the result of these very issues)—as each of these acts was designed to materially affect (and did materially affect) the terms and conditions of Cardwell's employment.

- On June 20, 2016, Hudson's review was formally solicited and completed, and her review became a part of Cardwell's June 2016 mid-year performance review cycle. Hudson's review marked for the first time that a Davis Polk partner claimed in a performance review that any partner of the Firm had concluded Cardwell was so-called "behind."[6] However, prior to completing this performance review, Hudson emailed a manager in the Firm's Associate Development Department and requested that she "be sent a folder with [Cardwell's] reviews since starting at [Davis Polk]". Hudson's request prompted a manager in the Department to immediately ask: "Is everything ok?" Hudson responded: "Yes—just want to have a read on the situation."

---

[6] Importantly, Hudson's June 2016 review included explanations and criticisms that are contradicted by Ms. Hudson's earlier-in-time emails (which were also produced during discovery after Plaintiff filed the SAC).

2

- After this unusual series of events began to unfold, Cardwell requested to see his personnel file. Emails demonstrate that Davis Polk's managing partner (Thomas Reid), head of Corporate and M&A (John Bick), certain M&A partners, and the head of the Firm's Associate Development Department were informed that (i) Cardwell requested to view his personnel file and "all of his evaluations to date," and (ii) Davis Polk denied Cardwell's request. The Firm did not allow Cardwell to review his personnel file or any of his evaluations. Defendants also produced documents that show Cardwell's request triggered a series of internal emails intended to give various partners and Firm leaders a "heads up" about Cardwell's request and how to respond. A manager in the Associate Development Department received one such email and replied: "Yikes."

- Relatedly, the head of Davis Polk's Associate Development Department received instructions on how to respond to Cardwell's request and told Cardwell that Davis Polk's policies and practices did not allow Cardwell to review his personnel file and evaluations. However, Defendants produced documents in discovery that state "[i]f an employee requests to see their personnel file, Firm policy is that only a summary of review meetings can be seen. The employee may take notes but is not permitted to make photocopies of the contents." During Cardwell's employment, Davis Polk did not allow Cardwell to view *any* summaries of his review meetings.

- The Complaint describes a blank summary review that was supposed to summarize Cardwell's performance for the annual review cycle covering his last year of work at Davis Polk. Defendants produced documents and emails that (i) acknowledge that "[t]he summary for Kaloma is blank intentionally," (ii) reveal that a separate "full version of this review" was created (but seemingly not included in the version of Cardwell's personnel file produced in discovery), and (iii) suggest that such actions may depart from and violate Davis Polk's policies, including those that stated "[c]ompleted forms will be retained in the system as required by law." If a "full version" of Plaintiff's blank summary review exists, not only must Defendants produce such document(s)—it appears that they still have not—but Plaintiff must also be permitted to allege how the information in this "full version" supports Cardwell's claims of discrimination and retaliation.

**The Court's Pending Ruling on Discrimination Claims Against Brass**

- The Court previously dismissed Cardwell's discrimination claims against Daniel Brass, in part because Plaintiff "failed to plausibly allege that his performance was similar to his replacement's." ECF 78 at 41. Defendants have produced emails showing that on the day Brass abruptly removed Cardwell (a second year) from an M&A deal, and replaced him with a White associate, earlier that day Brass responded to a staffing coordinator's attempt to staff Cardwell on that very matter by asking: "[W]hat other first years (*regardless of ability*) have time?" (emphasis added). Stated differently, on July 22, 2016, Brass attempted to prevent himself from being staffed with Cardwell while expressing a preference for any other associates "regardless of [their] ability." These facts, along with other newly discovered facts specific to Brass, bear on the Court's assessment as to whether Cardwell has plausibly alleged that his performance was not the basis for his removal from the deal, or how Cardwell was otherwise evaluated, staffed, and later fired.

*   *   *   *

Thus, Cardwell seeks leave to amend and thanks the Court for its attention to this matter.

3

Respectfully submitted,

/s/ David Jeffries

David Jeffries

cc (via ECF):

Jeh C. Johnson
Bruce Birenboim
Susanna M. Buergel
Marissa C.M. Doran

*Attorneys for Defendants*