# EXHIBIT B

PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KALOMA CARDWELL,** | |
| Plaintiff, | **1:19-cv-10256-GHW** |
| **v.** | ~~CORRECTED SECOND~~THIRD **AMENDED VERIFIED COMPLAINT WITH JURY DEMAND** |
| **DAVIS POLK & WARDWELL LLP, Thomas Reid, John Bick, William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John H. Butler,** | |
| Defendants. | |

"*I have never had a finer interview in 12-13 years of doing this. He is a profoundly poised, polished, mature fellow…. I think he will succeed.*"

– Neal Potischman, then-hiring partner for Davis Polk's Northern California office, in 2012, describing his interview with Kaloma Cardwell

"*Kaloma was one of the best applicants I have ever interviewed. He was dynamic, smart, and extremely engaging…. I think he would be a terrific addition to the firm.*"

– Maurice Blanco, co-head of Davis Polk's global Capital Markets group, in 2012, describing his interview with Cardwell

"*Generally positive – organized, high quality work, good attention to detail, hard worker[.]*"

– Jason Kyrwood, co-head of Davis Polk's Finance group, in May 2015, summarizing Cardwell's 2014-2015 first-year performance reviews

"*Kaloma generally received positive reviews….*"

– John Bick, then head of Davis Polk's global Corporate practice, in June 2016, summarizing Cardwell's performance reviews

"*Kaloma, we're pitching for a new client, couple of public company deals, and would like to include you on the pitch for the team…. [I]t wouldn't start until mid-September.*"

– Harold Birnbaum, M&A staffing partner, in the summer of 2017

But after making protected complaints: "*Cardwell's poor performance [from 2014 through April 2016] warranted giving Cardwell a message that it was time for him to look for another job.*"

– Davis Polk responding to Cardwell's EEOC Complaint in December 2017

**PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)**

**TABLE OF CONTENTS**

**Page**

SUMMARY OF CLAIMS …………………...…………………………...…………….………3

PARTIES …………………………...…………………………………………...………….4

JURISDICTION AND VENUE…...……………………………………….……………….....7

RELEVANT BACKGROUND………………………………………....………………….....7

STATEMENT OF FACTS……………………………………………...…………………....17

    i.    Mr. Cardwell Complained About Racial Bias After Davis
        Polk Associates and Mr. Cardwell Experienced Discrimination…………...……17

    ii.    Davis Polk Allowed Its Partners to Choose Who Should Receive
        "Time to Go" Messages Before Associates Received Mid-Year
        Performance Reviews . ……………………………………………….......35

    iii.    Efforts to Push Mr. Cardwell Out Were Not Successful So
        Additional Steps Are Taken ………………………………...……..……….98

    iv.    Mr. Cardwell Receives One Last Threat And Warning ……………...........122

    v.    Mr. Cardwell's EEOC Complaint Triggered His Termination……..………...161

    vi.    Mr. Cardwell's Similarly Situated, Non-Black Comparators
        Were Treated Better and More Favorably Than He Was ………...……….182

ADDITIONAL FACTS AND CONTEXT FOR THE
COMPLAINT'S ALLEGATIONS……………………...………………………….......192

COUNTS ……………………………...……....…………………………...……..206

PRAYER FOR RELIEF………………...……………...……………...…………….214

DEMAND FOR JURY TRIAL……………………...…………...…………...…….215

\*     \*     \*

Plaintiff, Kaloma Cardwell ("Cardwell"), a former associate of Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), by counsel, for his complaint against the Firm, Thomas Reid, John Bick, William Chudd, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John Butler (the "Management and M&A Defendants" and, together with Sophia Hudson, the "Individual Defendants"; the Individual Defendants together with Davis Polk, the "Defendants"), for racial discrimination and retaliation, among other unlawful acts, and alleges, upon actual knowledge as to his own acts, and upon information and belief as to all other matters, as follows:

## SUMMARY OF CLAIMS

1.     Mr. Cardwell was an associate at the Firm from September 2014 through August 2018.  During this period, Mr. Cardwell was subjected to discriminatory treatment by, among other things, Defendants' conduct of: (i) subjecting Mr. Cardwell to disparate impact as a result of Davis Polk's discriminatory performance review policies and system; (ii) disparate treatment of Mr. Cardwell compared to ~~White~~(a) associates (who were similarly situated to Mr. Cardwell in all material respects) who did not make any discrimination complaints about the Firm and its partners and (b) White and other non-Black associates (who were similarly situated to Mr. Cardwell; in all material respects); (iii) ignoring Mr. Cardwell's complaints of racially based disparate impact and treatment; (iv) rigging workplace systems and antidiscrimination policies and mechanisms, including limiting Mr. Cardwell's professional development and opportunities by assigning Mr. Cardwell to fewer deals and assignments; (v) unlawfully weaponizing and changing their conclusions about performance-related reviews, reviewers, and processes; (vi) effectively ceasing communication with Mr. Cardwell and thereby depriving him of mentorship opportunities; and (vii) ~~and~~ eliminating Mr. Cardwell's billable hours between September 2016

and April 2017 (e.g., going from a range of 100-235 billable hours per month to effectively zero billable hours for four consecutive months).

2.      When Mr. Cardwell complained of this conduct, Defendants, among other things, retaliated against him by: (i) threatening his employment and career; (ii) rigging workplace systems and antidiscrimination policies and mechanisms, including falsifying Mr. Cardwell's performance reviews and other inter-office communications in order to distort the quality of Mr. Cardwell's job performance and justify his firing; (iii) unlawfully weaponizing and changing its conclusions about performance-related reviews, reviewers, and processes; (iv) eliminating Mr. Cardwell's billable hours; and, ultimately, (ivv) terminating Mr. Cardwell's employment.

3.      Mr. Cardwell filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against Davis Polk on August 3, 2017 ("(the "Mr. Cardwell's August 2017 EEOC Filing").[1]  On August 6, 2019 the EEOC issued a Right to Sue letter. On November 4, 2019, Mr. Cardwell filed a lawsuit in federal court in accordance with the Right to Sue letter. On March 2, 2020, Mr. Cardwell filed the first amended complaint.

## PARTIES

*Mr. Cardwell*

4.      Mr. Cardwell is an African American/Black ("Black") male who at all relevant times was an employee of Davis Polk. Mr. Cardwell worked as a summer associate at the Firm in the summer of 2012 and as an associate at the Firm from September 2014 through August 2018. During his time at the Firm, Mr. Cardwell worked in three corporate departments (also known as "practice groups"): (i) Finance[2] (via a six-month rotation), (ii) Capital Markets (via a six-month

---

[1] *See* Ex. 1, Cardwell EEOC Charge. Note that Mr. Cardwell's complaint was dual-filed with the New York State Division of Human Rights ("NYSDHR") on or around August 3, 2017.
[2] This complaint refers to Davis Polk's "Finance" and "Credit" practice groups interchangeably, as Davis Polk changed the practice group's name from "Credit" to "Finance" subsequent to the commencement of this action.

rotation), and (iii) Mergers & Acquisitions ("M&A") (via a six-month rotation and later as an assigned member). He worked as an assigned member of the Firm's M&A group from April 2016 through August 2018. Mr. Cardwell worked in Davis Polk's New York office at 450 Lexington Avenue, New York, NY 10017. Mr. Cardwell is a resident of New York, New York.

5.     Mr. Cardwell was a "1L Leadership Council on Legal Diversity (LCLD) Scholar" in 2012 and is a life member of the NAACP, the National Bar Association, the Metropolitan Black Bar Association ("MBBA"), the National Association of Black Journalists, and the African American Intellectual History Society. Mr. Cardwell is also a former co-chair of the MBBA's Civil Rights Committee and a former member of both the New York City Bar Association's ("New York City Bar") Civil Rights Committee and its Diversity Pipeline Initiatives Committee. Mr. Cardwell advised certain authors of the New York City Bar's 2016 Law Firm Diversity Benchmarking Report and served on the steering committee for the New York City Bar's inaugural Associate Leadership Institute.

*Defendants*

6.     The Firm is a limited liability partnership formed pursuant to the laws of the state of New York, headquartered in New York City at 450 Lexington Avenue, New York, NY 10017, and was, at all relevant times hereto, Mr. Cardwell's employer. Davis Polk is a global law firm with offices in ten cities across the world. Upon information and belief, in 2019, Davis Polk had approximately 157 partners, 105 counsel, 632 associates, and 125 summer associates. According to *Chambers Associate*, a widely trusted and respected legal publication, approximately 87% of Davis Polk's partners are White, 81% of Davis Polk's partners are men, and less than 1% of Davis Polk's partners are Black. Davis Polk represents industry leaders and some of the largest

companies in the world, including, Comcast, JPMorgan Chase, Baker Hughes, and General Electric.

7.      Defendant Thomas Reid ("Reid") was, at all relevant times, a Corporate Partner, Chair, and Managing Partner of Davis Polk, and a member of the Firm's three-person Management Committee. Mr. Reid was elected partner in 1995.

8.      Defendant John Bick ("Bick") was, at all relevant times, a Corporate/M&A Partner at Davis Polk. He was the head of Davis Polk's global corporate practice and a member of the Firm's three-person Management Committee from 2011 through April 2019. Mr. Bick was the head of Davis Polk's M&A group during Mr. Cardwell's employment at the Firm. Mr. Bick was elected partner in 1991.

9.      Defendant Sophia Hudson ("Hudson") was, at all relevant times, a Corporate Partner at Davis Polk. Ms. Hudson was elected partner in 2014.

10.     Defendant William Chudd ("Chudd") was, at all relevant times, a Corporate/M&A partner at Davis Polk. He is currently co-head of Davis Polk's alumni committee, a leadership position that coordinates the Firm's alumni network of 3,000 lawyers. Mr. Chudd was elected partner in 2011.

11.     Defendant Harold Birnbaum ("Birnbaum") was, at all relevant times, a Corporate/M&A Partner at Davis Polk and served as a M&A staffing partner at various times during Mr. Cardwell's tenure at Davis Polk. Mr. Birnbaum was elected partner in July 2016.

12.     Defendant Daniel Brass ("Brass") was, at all relevant times, a Corporate/M&A associate or Partner at Davis Polk and served as a M&A staffing partner at various times during Mr. Cardwell's tenure at Davis Polk. Mr. Brass was elected partner in July 2017.

13.     Defendant Brian Wolfe ("Wolfe") was, at all relevant times, a Corporate/M&A Partner at Davis Polk and served as a M&A staffing partner at various times during Mr. Cardwell's tenure at Davis Polk. Mr. Wolfe was elected partner in July 2015.

14.     Defendant John Butler ("Butler") was, at all relevant times, a Corporate/M&A partner at Davis Polk. He was elected partner in 2002.

## JURISDICTION AND VENUE

15.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C §§ 1331 and 1343(a)(4), 29 U.S.C. §§ 621 et seq.; and the supplemental jurisdiction of this Court over state and city claims is invoked under 28 U.S.C. § 1367(a).

16.     Mr. Cardwell has exhausted his administrative remedies and on August 6, 2019 received a Right to Sue letter from the EEOC. According to letters dated November 27, 2019, December 11, 2019, and February 7, 2020, the New York State Division of Human Rights ("NYSDHR") issued a Dismissal for Administrative Convenience, noting in its final letter to the parties' counsels that the NYSDHR "declines to reopen the matter."

17.     Venue is proper within this District since the unlawful actions complained of herein all occurred within this District.

## RELEVANT BACKGROUND

### *The Firm*

18.     Davis Polk first began to evaluate Mr. Cardwell's abilities and motivation in the Summer/Fall of 2012. At the time, Mr. Cardwell was a law student, and Davis Polk was interviewing law students for the purposes of evaluating and hiring law students—first as interns (also known as "summer associates") for the Summer of 2013 and then as full-time associates for

its 2014 associate class. During the recruitment process, the Firm portrayed itself as it does on its website, and touted the following:

- **The Firm**: "For more than 165 years, Davis Polk has ranked among the premier law firms with practices that are world class across the board."

- **Pro Bono**: "Pro bono work is a core responsibility of Davis Polk. We are committed to serving the public good and providing legal services to those who cannot otherwise obtain legal representation."

- **Diversity and Inclusion**: "Davis Polk is a firm of well-rounded people who bring a wide range of perspectives and backgrounds to our work, resulting in a strong and inclusive culture, and more innovative solutions for our clients."

- **Alumni**: "Our alumni are a tremendous source of strength for the firm and are our best brand ambassadors. We have a dynamic alumni network of over 3,000 lawyers who live and work in over 51 countries worldwide across all sectors of business, government, law and academia."

- **History**: "We have worked on many of the most significant business and legal developments of the past 170 years…."

The quotations above are the very first sentences that appear on each of Davis Polk's "Who We Are" sub-sections.

19.     Davis Polk's self-described reputation and values, as noted above, are somewhat consistent with how Davis Polk is perceived by the larger legal and business community. It is not uncommon for Davis Polk to be ranked among the "top five" law firms in the world in multiple practice group or law firm categories. For example, in 2013, an international law publication noted that Davis Polk won "Americas law firm of the year at the annual IFLR Americas awards ceremony…becoming the first to win the coveted award two years in a row."

***Mr. Cardwell – Among the Top Recruits in The Country***

20.     Mr. Cardwell attended UC Berkeley School of Law ("Berkeley Law").  During the three years that Mr. Cardwell attended Berkeley Law, Berkeley Law was ranked in the "top 10" of U.S. law schools.

21.    Prior to law school, as an undergraduate student-athlete at Lehigh University

("Lehigh"), Mr. Cardwell was an exceptional student and recognized leader in his community.

At Lehigh, Mr. Cardwell received numerous undergraduate honors and awards and was

recognized as follows:

- Awarded the **Bosey Reiter Leadership Cup**, an annual award where the criteria are defined chiefly in terms of moral character and "a just regard for the rights of others, together with the unflinching determination to succeed, no matter what obstacles and barriers have to be beaten down";

- Awarded **Scholar-Athlete of the Year**, which is the Lehigh football program's highest honor and is given to the student-athlete who best combines success in both academics and athletics;

- Awarded the **Class of 1904 award**, which is awarded based on character, scholarship, qualifications indicating promise of future leadership, and extracurricular activities;

- Nominated and a finalist for the **Senior Male Leadership award**, which is the top athletic department leadership award for a graduating male athlete who best represents the Lehigh traditions of leadership, character, athleticism, scholarship, service, sportsmanship, a team attitude and passion for sports;

- Awarded the **Contribution to Student Life award**, an award that recognizes Lehigh seniors who have significantly contributed to the improvement and quality of student life during their years at Lehigh;

- Awarded Lehigh's **Office of Multicultural Affairs "MVP" award** as a junior and senior; and

- Voted **Captain** of Lehigh's Division 1-AA football team in both his junior and senior years, becoming one of a handful of two-time football captains in the program's 100-plus-year history.

22.    Mr. Cardwell's exceptional academic and professional record continued after

undergrad and through law school. In 2011, Mr. Cardwell was one of about 78 students selected

from about 750 applicants to participate in the highly competitive Sponsors for Educational

Opportunity ("SEO") Corporate Law Internship Program ("SEO Program"). As noted on their

website, the SEO Program starts the Summer before law school and gives "accepted law students

a paid internship at a top law firm, immersive mentorship and networking, and law school prep

and training." SEO's website also notes that "for 30 years, SEO…has served as a pipeline

linking talented pre-law students of color to elite global law firms."

23.     As a pre-law student in the SEO Program, Mr. Cardwell interned in the Summer

of 2011 at Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"), an international law

firm that is headquartered in New York City and that employed, at the time, about 600 attorneys.

At the conclusion of Mr. Cardwell's internship at Fried Frank, and prior to starting law school in

the Fall of 2011, Fried Frank evaluated Mr. Cardwell's performance and ultimately asked Mr.

Cardwell to return the following Summer to join their 2012 summer associate law class.

24.     In addition to the SEO Program, Berkeley Law also assessed Mr. Cardwell's

abilities and motivation prior to his matriculation to law school in the Fall of 2011. In the Spring

of 2011, Berkeley Law selected Mr. Cardwell to receive a *Berkeley Law Dean's Fellowship*

("Berkeley Law Dean's Fellowship"). At the time, Berkeley Law informed Mr. Cardwell that

"*this prestigious award, based on your strong record of achievement and professional promise,*

*is provided to only a few entering students each year. The purpose of the Dean's Fellowship is to*

*support students showing outstanding leadership experience, significant potential for success,*

*and innovation in their approach to seeking the nexus between law, policy, and justice. In other*

*words, Dean's Fellows are law students that we believe will bring new vision to the study of the*

*law, and will strive to transform that vision into action*."

25.     Mr. Cardwell's merit-based Berkeley Law Dean's Fellowship provided a total of

$75,000 of support and was in addition to any need-based grant. Ultimately, Berkeley Law

offered Mr. Cardwell an additional $30,000 in merit-based scholarships to discourage Mr.

Cardwell from accepting similar scholarships that other top-ranked law schools had offered Mr. Cardwell in the Spring of 2011.

26.     Though some Black law students are characterized as benefiting from affirmative action, at the time that Berkeley Law evaluated Mr. Cardwell's law school application, Berkeley Law was legally prohibited from using race-based affirmative action in their admission and evaluation process. Mr. Cardwell, along with just a handful of students, was awarded the above competitive, merit-based scholarship awards out of the 300-plus students who joined Berkeley Law in the Fall of 2011.

27.     Mr. Cardwell continued to demonstrate a distinguished record of academic achievement and commitment to service and justice as a Berkeley Law student. By the time Mr. Cardwell interviewed with Davis Polk in the Summer/Fall of 2012, Mr. Cardwell was:

- the Co-President of Berkeley Law's Black Law Student Association;

- an editor and member of *The Berkeley Journal of African-American Law & Policy*;

- a mock trial team member of Berkeley Law's prestigious and highly selective "Board of Advocates";

- honored as 1 of 8 out of 40 participants to win an individual "Outstanding Attorney" award in a Berkeley Law school-wide trial advocacy competition;

- recognized as a 1L Leadership Council on Legal Diversity (LCLD) Scholar; and

- a volunteer teacher to incarcerated youths in California's prison system.

28.     Between the time that Mr. Cardwell interviewed with Davis Polk in 2012 and graduated from Berkeley Law in May 2014, Mr. Cardwell had deepened his record of accomplishment and commitment to service and justice, as evidenced by the fact that Mr. Cardwell:

- worked as a research assistant to john a. powell, the director of the Othering and Belonging Institute (formerly the Haas Institute for a Fair and Inclusive Society) and the holder of the Robert D. Haas Chancellor's Chair in Equity and Inclusion;

- finished as a semi-finalist in the American Association for Justice (AAJ) National Student Trial Advocacy Competition;

- finished in the Top 10% (High Honors) and Top 40% (Honors) in several law classes that included both corporate courses and civil rights courses; and

- received one of the highest grades in his legal ethics and professional responsibility course due to an essay that Mr. Cardwell authored, which was entitled "An Opportune Time to Engage Inclusion, Democracy, and...Race."

***The Firm Recruits Mr. Cardwell – They Know He's Black***

29.     In the Fall semester of 2012, Mr. Cardwell participated in his law school's on-campus interviewing process. Davis Polk was one of several law firms that interviewed Mr. Cardwell in the Fall semester of 2012.

30.     On or about August 6, 2012, Davis Polk interviewed Mr. Cardwell. During this interview, Mr. Cardwell was interviewed by Neal Potischman, Davis Polk's then-hiring partner for Davis Polk's Northern California office.[3] In connection with the interview, the Firm received Mr. Cardwell's transcript, resume, and writing sample.

31.     Mr. Potischman believed that Mr. Cardwell's interview was among the best Mr. Potischman had ever experienced as an evaluator of law students. Mr. Potischman believed Mr. Cardwell would succeed at Davis Polk. Specifically, Mr. Potischman's written notes of the interview indicates that he summarized his interview with Mr. Cardwell by stating, "*I have never had a finer interview in 12-13 years of doing this. [Mr. Cardwell] is a profoundly poised, polished, mature fellow…. I think he will succeed.*"

---

[3] All descriptions and references to Davis Polk attorneys and staff refer to such persons and their status or title at the Firm at the time the applicable events or interactions occurred.

32.     On or about August 8, 2012, after reviewing Mr. Cardwell's academic and professional record, Davis Polk invited Mr. Cardwell to participate in a second round of interviews at their New York City headquarters ("Mr. Cardwell's Fall 2012 Second Round Davis Polk Interview"). Mr. Cardwell accepted Davis Polk's invitation and interviewed with the Firm shortly after.

33.     During Mr. Cardwell's Fall 2012 Second Round Davis Polk Interview, the Firm's interviewers made it clear that they viewed Mr. Cardwell's dedication to racial inclusion positively. Relatedly, during Mr. Cardwell's Fall 2012 Second Round Davis Polk Interview, Davis Polk partner Maurice Blanco explicitly told Mr. Cardwell that Mr. Cardwell was the type of candidate who would essentially have the country's best law firms competing to hire him, saying something to the effect of, "You're clearly very talented. Someone like you will be able to pick virtually any law firm he wants. Can you tell me why—out of all of the firms you could work at—you're interested in possibly working at Davis Polk?"

34.     Relatedly, and according to Mr. Blanco's written summary of the interview, Mr. Blanco evaluated Mr. Cardwell's candidacy and concluded that **"*Kaloma was one of the best applicants I have ever* interviewed*. He was dynamic, smart, and extremely engaging…. He was extraordinary. I think he would be a terrific addition to the firm.*"**

35.     On or about August 22, 2012, Davis Polk offered Mr. Cardwell a spot in their 2013 summer associate class.

36.     On or about August 28, 2012, Mr. Cardwell accepted the Firm's offer to join their 2013 summer associate class on the condition that Mr. Cardwell be allowed to split and work part of the 2013 Summer at another global law firm that was interested in hiring Mr. Cardwell.

37.     Throughout the Summer of 2013, Davis Polk repeatedly hinted that Mr. Cardwell would receive a job offer to join the Firm upon graduation. Knowing that Mr. Cardwell had other options, Davis Polk directly and indirectly checked-in with Mr. Cardwell throughout the Summer to assess which firm Mr. Cardwell believed might be a better fit for his short and long-term legal career and aspirations.

38.     In the Summer of 2013, Davis Polk had between 125 and 140 partners and just one Black partner.

39.     Thus, when asked about his prospects, Mr. Cardwell pointed to the numbers, the Firm's 165-year history, and expressed concerns.

40.     On multiple occasions in the Summer of 2013, Mr. Cardwell informed Davis Polk that his prior law school and interning experiences, among other experiences, helped him understand that appropriate staffing, feedback, training, and mentorship are critical to junior associates' skills, development, and future career opportunities. Within those same interactions, Mr. Cardwell communicated that these dynamics were even more critical for Black junior associates who work at law firms that have very few Black partners.

41.     Davis Polk attempted to address Mr. Cardwell's priorities and concerns by explaining to Mr. Cardwell that though the Firm had struggled in the past to recruit and retain Black law students and associates, the Firm had recently implemented and would continue to implement policies and practices that would allow the Firm to monitor Black associates' experiences and assignments to ensure Black associates would not "fall through the cracks" or receive fewer or worse opportunities and training than their non-Black and/or non-Black male peers.

42.     During these conversations, both Mr. Cardwell and Davis Polk understood that bias and discrimination—both in the form of disparate impact and disparate treatment—were among the main reasons why Black associates often "fall through the cracks' or receive fewer or worse opportunities and training than their non-Black and/or non-Black male peers.

43.     As part of the ongoing dialogue between Mr. Cardwell and Davis Polk about challenges unique to or associated with Black associates, Davis Polk described a series of antidiscrimination policies and mechanisms they relied upon to prevent and mitigate race based disparate impact and disparate treatment. These antidiscrimination policies and mechanisms related to staffing, performance reviews, and partner engagement with associates of color.

44.     Davis Polk attempted to prevent and mitigate bias in the Firm's staffing policies and practices through a number of mechanisms, , including tracking how Black associates were staffed, the types of assignments Black associates received, how many billable hours Black associates were billing, the quality of the deals and cases that Black associates worked on, and communicating with Black associates in real-time any relevant discrepancies and concerns.

45.     Also during the recruitment phase, Davis Polk attempted to address Mr. Cardwell's priorities and concerns regarding what was understood across the profession to be law firms' repeated failure to develop and mentor Black associates the way such firms develop and mentor White associates. Davis Polk also communicated that Davis Polk intended to assign Black associates mentors and work with Black associates if Black associates appeared to be or actually were behind their peers in terms of billable hours or quality of work.

46.     In other words, Davis Polk had recruited Mr. Cardwell and spent a significant amount of time directly and indirectly suggesting that Mr. Cardwell's race would not be a factor in his ability to be staffed or mentored fairly or properly. At the time, Davis Polk made it clear to

Mr. Cardwell that Davis Polk believed and understood that there were a number of law firm

dynamics (i) that were unrelated to Black associates' work ethic or abilities and (ii) that could

cause Black associates to have fewer hours and less quality work assignments than their law firm

peers.

47.     Additionally, Davis Polk explained to Mr. Cardwell that because Davis Polk hires

Black law students who are considered among the best in the country, the Firm would try to

prevent Black junior associates from thinking that they should leave Davis Polk early in their

careers for other seemingly better career opportunities.

48.     On multiple occasions in the Summer of 2013, Davis Polk attempted to recruit

Mr. Cardwell by informing Mr. Cardwell that the Firm wanted Mr. Cardwell and other Davis

Polk minorities to use their knowledge and experiences on race-related issues to (i) strengthen

the Firm's commitment to racial justice and diversity and inclusion issues and (ii) take an active

role in recruiting additional Black and non-White law students and lawyers.

49.     Davis Polk and various partners made no secret of the fact that they considered

Mr. Cardwell's dedication to racial inclusion an additional benefit to his already robust

qualifications. Mr. Cardwell was assured that Davis Polk would be an environment in which his

social advocacy would be valued and that they envisioned him taking an active role in recruiting

additional minority associates.

50.     From the time Mr. Cardwell first interviewed with Davis Polk, Mr. Cardwell

remained committed to racial inclusion and racial justice as a law student. During that time span,

Mr. Cardwell co-authored and/or contributed to the following Supreme Court briefs and articles:

- Co-authored "Homeownership, Wealth, and the Production of Racialized Space"
  along with john a. powell (published by both the *Harvard Joint Center for
  Housing Studies* and the *Brookings Institution Press* in the book "Homeownership

Built to Last: Balancing Access, Affordability, and Risk after the Housing Crisis");

- Assisted with underlying research used in an amicus Supreme Court brief of housing scholars in support of the respondent in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) (a Supreme Court case that concluded that disparate-impact claims are cognizable under the Fair Housing Act);

- Assisted with an amicus Supreme Court brief of housing scholars in support of respondents in *Township of Mount Holly, N.J.* v. *Mt. Holly Gardens Citizens in Action Inc.*, 133 S. Ct. 2824 (2013);

- Assisted with an article entitled "Fisher v. Texas: The Limits of Exhaustion and the Future of Race-Conscious University Admissions" by john a. powell;

- Assisted with an article entitled "America's Struggle with Integration: The Continued Struggle for Its Soul" by john a. powell;

- Assisted with an article entitled "Affirmative Action: Where Do We Go From Here?" by john a. powell; and

- Assisted with an article entitled "What Constitutes a Racial Classification? Equal Protection Doctrine Scrutinized" by Stephen Menendian.

51.     At the conclusion of Mr. Cardwell's Summer 2013 summer associate internships, Mr. Cardwell received job offers from several of the world's best law firms. Based in part on Davis Polk's strategic, persistent, and partially tailored recruitment of Mr. Cardwell, Mr. Cardwell accepted the Firm's full-time associate offer on or about October 4, 2013.

52.     Mr. Cardwell graduated from Berkeley Law School in May 2014 and commenced working at Davis Polk as an associate on September 15, 2014.

## STATEMENT OF FACTS

### i. Mr. Cardwell Complained About Racial Bias After Davis Polk Associates and Mr. Cardwell Experienced ~~Bias and Disparate Treatment.~~ Discrimination.

53.     As early as April 2014, Davis Polk had been notified of and accepted as fact that it had or likely had a problem with bias and unconscious bias at the Firm, that such bias often or

likely impacted Black associates' retention rates at Davis Polk, and that such bias often or likely created discriminatory assessments for Davis Polk's Black associates.[4]

54.     Part of the Firm's response involved inviting Jerry Kang—a scholar on the nexus between race, implicit bias, and the law and the current Vice Chancellor for Equity, Diversity and Inclusion at The University of California, Los Angeles (UCLA)—to give a presentation at the Firm focused on how bias functions in law firms. Mr. Kang presented at Davis Polk in April 2014.

55.     The Firm's problem with bias and Black associates was further highlighted in a June 2014 *American Lawyer* publication, wherein Davis Polk was publicly criticized for its poor track record with promoting its Black lawyers. One article gave Davis Polk a chance to explain their track record and noted that "Davis Polk managing partner Thomas Reid says that his firm recruits aggressively for top black law graduates, only to see them leave the firm a few years later for government or in-house positions."[5]

56.     Consistent with the Firm's recruitment of Mr. Cardwell—as well as the Firm's ongoing conversation about bias, diversity, and inclusion—Mr. Cardwell was encouraged to join Davis Polk's "Black ~~Attorney~~Affinity Group" ~~(or~~ ("BAG ~~as it is commonly called)~~") and provide feedback to the Firm with respect to these and related diversity and inclusion topics.

57.     On March 6, 2015, Davis Polk's "DPWomen Affinity Group" hosted a firm-wide discussion—which Mr. Reid and Mr. Cardwell attended and participated in—on women and discrimination in the workplace. As detailed in four essays that served as the basis of the discussion (i.e., the *New York Times* series, "Women at Work" by Adam Gran and Sheryl

---

[4] *See* Exhibit 14 (describing implicit bias patterns among lawyers).
[5] *See* Julie Triedman, *Big Law is Losing The Race*, THE AMERICAN LAWYER (June 2014), available at https://www.americanlawyer-digital.com/americanlawyer-ipauth/201406ip?pg=46#pg46.

Sandberg), Mr. Reid and other participants explicitly talked about, among other things, (i) how senior attorneys and partners at Davis Polk continue to favor men over equally qualified women in performance evaluations; (ii) how Davis Polk senior associates and partners disproportionately ask women to handle secretarial and less substantive aspects of cases and deals; (iii) how women reasonably choose to "speak up" less, in part, because women are often unfairly and disproportionately punished when they do speak up; and (iv) how Davis Polk disproportionately asks women associates to recruit and mentor women associates and help with diversity initiatives, and how such time commitments and contributions to the Firm are often uncompensated and effectively penalized in performance reviews.

58.     Davis Polk's program explicitly discussed an article entitled,: "When Talking About Bias Backfires," which noted that "new research suggests that if people are not careful, making people aware of bias can backfire, leading them to discriminate more rather than less."

59.     Mr. Cardwell experienced a series of discriminatory interactions that mirrored those analyzed at Davis Polk's March 6, 2015 DPWomen Affinity Group discussion.

60.     For example, in an email sent to anon May 8, 2015 Mr. Cardwell emailed Sharon Crane, Executive Director of Personnel at Davis Polk ("Davis Polk's Executive Director") on May 8, 2015, Mr. Cardwell of Personnel") and flagged a discriminatory "inter-office," personally-experienced pattern to

60.61.  At all times during Mr. Cardwell's employment at the Firm, Davis Polk's Executive Director, a director who of Personnel worked closely with and reported to the Firm's three-person management committee (i.e., Mr. andReid, Mr. Bick, and Jim Rouhandeh). In connection with the Firm's policy and practices and her official duties, Davis Polk's Executive Director of Personnel worked with the management committee, various other partner-level

committees, and the Firm's Associate Development Department on (i) policy formulation and (ii) compliance with Firm policies in the areas of personnel, associate development, and firm management.

62.     According to the Firm's policies and practices, the Firm's associates (including Mr. Cardwell), staff (including the Director of the Associate Development Department[6] and its managers), and partners, were all expected to discuss lawyers' concerns related to perceived incidents of discrimination or retaliation with Davis Polk's Executive Director of Personnel (i.e., Ms. Crane), among others.[7] According to the Firm's policies and practices, Davis Polk's Executive Director of Personnel (i.e., Ms. Crane) was responsible for ensuring that Davis Polk's Management Committee members (e.g., Mr. Reid and Mr. Bick) were promptly informed of discrimination and retaliation related discussions and complaints.

61.63.  Mr. Cardwell's email noted that interpersonal trainings that highlight the value of associates speaking to unfamiliar faces and creating a welcoming environment would benefit everyone. Specifically, Mr. Cardwell's email described situations where Davis Polk attorneys were not making eye contact with or speaking to summer associates and junior associates of color in meetings.

62.64.  Davis Polk's own training materials recognized that these types of interactions are related to bias and that they can enhance or hinder performance.[8]

---

[6] In terms of the Firm's organizational hierarchy, the Associate Development Department, including its Director, reported to (and effectively worked "under") Davis Polk's Executive Director of Personnel (i.e., Ms. Crane).
[7] As noted herein, the head of the Firm's Associate Development Department (i.e., DeSantis) and mangers in the Department (i.e., Carolina Fenner, Alicia Fabe, Rocio Clausen, and Nicole Katz) routinely and consistently communicated Mr. Cardwell's complaints and concerns related to race and discrimination to Davis Polk's Executive Director of Personnel (i.e., Ms. Crane), and she routinely relayed these discussions to Mr. Reid and Mr. Bick.
[8] *See* Ex. 5 (where Davis Polk's presentation on exclusion notes that "unconscious behaviors can enhance or hinder performance through inclusion or exclusion . . . [t]hese dynamics may include 'insider/outsider,' unconscious bias, confirmation bias" . . . and that "[f]eel[ing] isolated, [s]econd guess[ing] themselves, [h]esitant to offer suggestions or ideas[, and being] [f]earful that every mistake or misstep will be magnified" are frequent reactions of those who are made to feel like outsiders).

63.65.  This May 8, 2015 incident is the first time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.[9]

64.66.  In response, Davis Polk's Executive Director minimizedof Personnel reduced the issue to the "social awkwardness" of attorneys, said that "unfortunately that happens to everyone," recognized that Mr. Cardwell was possibly describing interactions that he had, and ultimately shifted the burden to Mr. Cardwell by telling him,: "Hopefully if this happened to you, you showed them how to live in polite society(!) and introduced yourself."

65.    Though Davis Polk's Executive Director of Personnel never inquired about or brought the incident up again with Mr. Cardwell, Davis Polk's policies and practices required Davis Polk's Executive Director to discuss Mr. Cardwell's May 2015 complaint with members of the Firm's Management Committee and any other Davis Polk partners deemed relevant to the Firm's investigation or follow-up efforts. Davis Polk's Executive Director of Personnel discussed Mr. Cardwell's Cardwell's May 2015 complaint with the Director of Associate Development (i.e., DeSantis) and had she followed Firm policies and practices, she also would have reported or discussed these concerns and suggestions with Davis Polk partners and staff members—the very same individuals who were responsible for and would be responsible for Mr.Mr. Cardwell's professional development within the Firm and within the Firm's M&A group, such as specifically, including Mr. Bick (the head of the Firm's M&A group.

---

[9] According to the Firm's "Lawyers Handbook," which serves as the Firm's official resource that describes the Firm's policies and procedures, "The Firm strongly recommends the prompt reporting of all perceived incidents of discriminatory behavior or harassment on the basis of…race, color…or any other basis prohibited by federal, state or local law, regardless of the offender's identity or position. Lawyers who believe they have been subjected to such prohibited conduct or who believe that they have witnessed such prohibited conduct or any other behavior should discuss their concerns immediately with[] [Davis Polk's Executive Director]…the practice group coordinator or head of their office…or any member of the Firm's Management Committee…. The Firm recognizes…that it is not necessary for an individual to talk directly to an offender if that individual feels uncomfortable doing so."

66.67.   ).  While Davis Polk's Executive ~~Director's excuse—~~Director of Personnel's explanation—namely, that ~~is,~~ some attorneys lack manners—and dismissal of Mr. Cardwell's complaint can seem reasonable in isolation, ~~Defendants' conduct toward Mr. Cardwell continued to escalate.~~ Davis Polk partners' conduct toward Mr. Cardwell became increasingly retaliatory *only after* this complaint was discussed between Davis Polk's Executive Director of Personnel, Director of Associate Development, and potentially others within the Firm (e.g., members of the management committee, other partners, and the Associate Development Department).

67.68.  Throughout his employment at the Firm, Mr. Cardwell suffered through a series of discriminatory interactions that were motivated by his race and resulted in exclusion from opportunities that are vital to a young attorney's professional development and career.

68.69.  While Mr. Cardwell was working in Davis Polk's M&A group, on multiple occasions, Mr. Cardwell was left off email communications and meeting invitations (i) that were circulated to all attorneys working on the same deal or (ii) that should have included Mr. Cardwell.

69.70.  On one occasion, Mr. Cardwell became aware of this type of disparate treatment when he spontaneously walked into the office of a White M&A associate (of Mr. Cardwell's same class year) who was working on the same deal as Mr. Cardwell. Mr. Cardwell noticed the associate was invited to and listening in on a conference call with high-level clients and senior attorneys for the exclusive purpose of listening and learning. The associate explained that she was only on the call for the purposes of listening. The associate apologized that Mr. Cardwell was not informed about the conference call and made it clear that she did not understand why Mr. Cardwell didn't receive an email or invitation to join the call. As a result of this experience, Mr. Cardwell asked the associate to forward all emails or meeting invitations to Mr. Cardwell if

she thought Mr. Cardwell was excluded when he should have been included. Without hesitation, the associate agreed and, for the rest of 2015, periodically forwarded emails to Mr. Cardwell that Mr. Cardwell should have received from White senior M&A associates.

70.71.  In September 2015, Mr. Cardwell became a second-year associate.

71.72.  InOn September 30, 2015, the Firm's Black AttorneyAffinity Group was having conversations with the Firm about how Davis Polk could improve its diversity and inclusion practices and outcomes. In preparation for a meeting between the Firm's Black associates and the Firm's (i) Associate Development Department and (ii) Diversity Committee, the Firm's Black AttorneyAffinity Group sent the Firm's Diversity Committee, on September 29, 2015, the following questions and statements, which were prepared for the purpose of discussing them with both the Firm's Diversity Committee and Mr. Reid in separate meetings:

    a.  *"How can we strengthen the relationship between the Diversity Committee and the affinity groups? What are some of the Diversity Committee's action items for this recruiting season/next year?"*

    b.  *"I would be interested in hearing about the diversity consultant that the firm is considering bringing in to talk to the partners.*"

    c.  *"What is the Diversity Committee's opinion as to where the biggest need is with respect to diversity at the firm (i.e., recruiting, retention, something else)?"*

    d.  *"Do you have a sense what our peer firms are doing with respect to diversity initiatives?"*

    e.  *"How can we further engage non-diverse lawyers in the discussion about diversity at the firm?"*

72.73.  InOn September 30, 2015, the Firm's Diversity Committee and the Firm's Black AttorneyAffinity Group met to discuss the questions above and other issues related to diversity and inclusion. Partners serving on the Firm's Diversity Committee, including capital markets partner Maurice Blanco, and the leaders of the Davis Polk's Associate Development Department

(i.e., Renee DeSantis, Davis Polk's Chief Development Officer (formerly known as the Firm's

Director of Associate Development, and Alicia Fabe, a manager in the Department), attended the

meeting. Many Black Davis Polk attorneys were also in attendance. During this meeting, Mr.

Cardwell participated in a conversation about the general issue of Black Davis Polk attorneys

being excluded from staffing-related opportunities at the Firm and was careful not to mention

any information that could be connected to any specific attorneys at the Firm. After Mr.

Cardwell flagged the issue to Mr. Blanco, other Davis Polk partners in attendance, and the

Firm's Associate Development Department, including the head of the Department (i.e., Ms.

DeSantis,). The Director of Davis Polk's Associate Development Department (i.e., Ms.

DeSantis) directly asked Mr. Cardwell whether Mr. Cardwell had personally experienced

exclusion and disparate treatment related to his race at the Firm (which is evidence that the

Firm's leaders understood Mr. Cardwell had made a discrimination complaint).

73.74.  Mr. Cardwell answered affirmatively and unequivocally. In the verbal exchange

that followed, Mr. Cardwell explicitly stated that he wasn't just talking about the feeling of being

excluded, but rather that the type of exclusion and disparate treatment he referred to was and is

harmful to his and other Black associates' professional development and careers because the

disparate treatment relates to fewer and different staffing-related opportunities.

74.75.  This September 2015 incident was the second time that Mr. Cardwell actively

flagged personally experienced discrimination and actively sought help from Davis Polk and

persons with sufficient authority to address it.

75.76.  Neither Ms. DeSantis nor any of Davis Polk's partners in attendance followed-up

with Mr. Cardwell about his comments or his (or others') experience.

~~76.~~77.   Davis Polk did, however, create an internal note (i.e., internal record) of Mr. Cardwell's complaint and discussed it internally with several Davis Polk partners.[10]

~~77.~~78.  Consistent with the Firm's complaint policies, which stated that "[c]omplaints of inappropriate conduct will be investigated promptly," Davis Polk promptly investigated Mr. Cardwell's complaint about personally experiencing exclusion and disparate treatment related to his race at the Firm.

~~78.~~79.  In the process of ~~making~~documenting and discussing Mr. Cardwell's ~~documented~~September 30, 2015 complaint, conducting a prompt investigation, and reaching out to Davis Polk partners who would become instrumental in Mr. Cardwell's professional development in the upcoming months, Davis ~~Polk~~Polk's Associate Development Department (i.e., Ms. DeSantis) discussed Mr. Cardwell's September 2015 complaint with (i) Ms. Crane~~Mr. Chudd, the M&A partner whose deal Mr. Cardwell had worked the most on during the prior six months and who was later selected by Mr. Bick and a group of M&A partners to deliver Mr. Cardwell's 2015 annual review~~; (ii) Mr. Bick, a management committee member and the head of the Firm's M&A group (i.e., the group Mr. Bick knew Mr. Cardwell would be permanently assigned to) and the person who was most responsible for staying in touch with and bringing the Firm's capital markets partners up to speed regarding Mr. ~~Cardwell~~Cardwell's professional development and experiences at the Firm; ~~and~~(iii) Ms. Hudson, a staffing partner in the Firm's capital markets group and the partner who the Firm chose more than any other capital markets partner to work with Mr. Cardwell during his rotation in the Firm's capital markets group; and

---

[10] *See* Ex. 2 at 18-19 (where Davis Polk acknowledged in its NYSDHR statement that "contrary to Cardwell's assertion that there was no 'follow[] up,' the Committee made note of the concern for future professional development discussions").  Those "future professional development discussions" occurred, among other times, over the course of various regularly scheduled professional development meetings, at the Firm including in connection with: (i) annual review cycles; (ii) mid-year review cycles; and (iii) scheduled meetings between Firm leaders responsible for staffing and professional development decisions (e.g., meetings between the managing partner and practice group heads (e.g., Bick) that occurred three times a year).

(iv) and other managers (i.e., Carolina Fenner and Rocio Clausen) within the Firm's Associate

Development Department.

80.      ~~Also, and consistent~~ On or around October 5, 2015, the head of Davis Polk's

Associate Development Department (i.e., Ms. DeSantis) met with Davis Polk's Executive

Director of Personnel (i.e., Ms. Crane) and discussed Mr. Cardwell's September 30, 2015

complaint. The Associate Development Department created the following summary following

the Firm's meeting with its Black associates on September 30, 2015.[11]

81.      The following summary (which was communicated to Davis Polk's Executive

Director of Personnel – i.e., Ms. Crane, on or around October 5, 2015) (the "Written Summary of

the September 2015 Complaint") describes the meeting and the specific complaints made by Mr.

Cardwell and other Black associates at the Firm as follows:

> "[Black Affinity Group] Meeting – more training for partners and mid-levels and
> [senior associates] needed; feeling excluded from [meetings]/calls; . . . skepticism
> about [the Firm's Career Advisor Program], [especially] in connection with
> improving opportunities to get in front of clients ([especially] difficult in
> litigation); issues [regarding] staffing more senior lawyers in litigation – to
> schedule meeting with Jim Rouhandeh, Jim McClammy and maybe Monica…."

The name "Kaloma" is handwritten immediately next to this language in Ms. DeSantis's Written

Summary of the September 2015 Complaint, which specifically referenced Mr. Cardwell's

complaint using the same language of "exclus[sion]" that he expressed during the September

2015 Black Affinity Group meeting.

82.      During the October 5, 2015 meeting, in accordance with the Firm's anti-

discrimination reporting policies and practices, the Associate Development Department

discussed and reported Mr. Cardwell's September 30, 2015 complaint to the Firm's Executive

Director of Personnel (i.e., Ms. Crane)—a person whose official human resource and business

---

[11] Ex. 2 at 19.

duties required her to address and discuss discrimination and retaliation complaints and concerns with the Firm's Management Committee members (e.g., Mr. Reid and Mr. Bick) and the Firm's partners.

83.     As of October 5, 2015, Davis Polk's Executive Director of Personnel had knowledge that, on September 30, 2015, Mr. Cardwell complained that he had personally experienced exclusion and disparate treatment related to his race at the Firm. In order to address Mr. Cardwell's and the other Black associates' September 30, 2015 complaints and concerns, the Associate Development Department (through Ms. DeSantis) informed Davis Polk's Executive Director of Personnel that the Department would "schedule meeting[s]" with Management Committee members and various Firm partners in the Firm's litigation and corporate departments. Davis Polk's Executive Director of Personnel's role at the Firm included obligations to routinely communicate personnel-related developments and updates to the Firm's management committee (e.g., Mr. Reid, Mr. Bick) and any other relevant Davis Polk partners.

84.     Around October 15, 2015, Mr. Cardwell started a rotation in the Firm's Capital Markets Group, the practice group where Ms. Hudson worked.  On information and belief, Ms. Hudson served as a staffing partner/coordinator in the Capital Markets Group.  In this role, Ms. Hudson would have been responsible for monitoring and managing staffing and distributing assignments to the Firm's Capital Markets associates.

85.     On or around October 26, 2015, Mr. Cardwell was assigned to work with Ms. Hudson for the first time. On November 9, 2015, Ms. Hudson requested to have access to Mr. Cardwell's performance reviews in a manner that was not in the ordinary course or typical.

86.     On November 9, 2015, in an email that had "Kaloma" as the subject line, Ms. Hudson emailed Rocio Clausen, a manager in the Firm's Associate Development Department,

and said: "May I please be sent a folder with his reviews since starting at DPW?" Ms. Hudson's request was so atypical that the manager in the Associate Development Department replied to Ms. Hudson's email and asked: "Is everything ok?" Ms. Hudson replied by saying: "Yes – just want to have a read on the situation. Thanks."

87.     On information and belief, the "situation" that Ms. Hudson referred to in her November 9, 2015 email related to the complaint that Cardwell made on September 30, 2015 to the head of the Davis Polk's Associate Development Department (i.e., Renee DeSantis), a manger in the Firm's Associate Development Department (i.e., Alicia Fabe), and a fellow capital markets partner (Mr. Blanco) who served on the Firm's Diversity Committee. The "situation" that Ms. Hudson referred to in her November 9, 2015 email also related to (ii) Mr. Bick's and the Firm's discussions about Mr. Cardwell's September 30, 2015 complaint (and their response to it, e.g., creating a mid-year review cycle for Cardwell in order to justify terminating him for making the September 30, 2015 complaint).

88.     Later in the day, on November 9, 2015, a manager in the Firm's Associate Development Department (i.e., Ms. Clausen) followed up with Ms. Hudson, presumably in response to a separate conversation about Mr. Cardwell's performance reviews where she stated: "I spoke with Renee [DeSantis] and Carolina Fenner re: Kaloma. Kaloma hasn't received his formal review yet."

89.     In other words, on and around November 9, 2015—just two weeks after Mr. Cardwell started working with Ms. Hudson and roughly a month after he complained that he had personally experienced exclusion and disparate treatment related to his race at the Firm—Ms. Hudson was participating in discussions regarding when Plaintiff would receive a "formal review," which either referred to (i) a formal, face-to-face review meeting that typically occurs

every December, or (ii) a mid-year review process that typically occurs in or around June (and, as described *infra*, was routinely used to terminate associate's employment).

90.    It was not uncommon for the Firm's to make preparations to create a six-month, mid-year review for an associate without telling that associate.  For example, in a January 2017 annual review meeting conducted by Ms. Hudson, she noted in an associate's written summary review of that meeting that "[Associate 12] will be put on a 6 month check-in but not told."

91.    As further explained herein, Ms. Hudson used the Firm's performance review system and worked with the Associate Development Department (which had knowledge of Mr. Cardwell's September 30, 2015 complaint) to participate in a pretextually created mid-year review cycle and alter Mr. Cardwell's employment. Ms. Hudson contributed to this pretextual review cycle by submitting a performance review that gave Davis Polk the ability to pretextually terminate Mr. Cardwell's employment.  To further this plan, Ms. Hudson made assertions in her June 2016 written performance review that enabled the Firm to claim Mr. Cardwell's performance warranted a "time to go" (or "TTG") meeting following the June 2016 mid-year review cycle, which were meetings in which associates were told they must leave the Firm (e.g., "move on" and "start looking for a position" with a different employer).[12]

79.92.  Also—the M&A group's ~~practice,~~partners and leaders of the Firm had a culture and practice where all of the M&A partners ~~met at the end of September/~~, as well as Mr. Reid, Ms. Crane, and Ms. DeSantis (along with the Firm's Associate Development Department managers) would meet annually at the beginning of October ~~2015~~ to discuss (i)~~Mr. Cardwell and~~ the ~~other~~Firm's M&A associates' professional development, performance, and performance

---

[12] In fact, in Davis Polk's NYSDHR Brief, Davis Polk argued that shortly after working with Ms. Hudson between October 2015 and March 2016, "Cardwell's poor performance . . . at the beginning of [April 2016] was such that it would have warranted giving Cardwell a message that it was time for him to look for another job." Davis Polk's NYSDHR Brief made this statement based off and in reliance on Ms. Hudson's pretextual reviews of Mr. Cardwell.

reviews, and ~~the M&A partners' collectively developed~~(ii) the Consensus Feedback messages (defined *infra* ~~at ¶ 125) for such~~) that would be delivered to associates. in their annual review meetings.[13]

93.   Mr. Reid ~~and~~, Mr. Bick, all of the Firm's M&A partners, as well as Ms. Crane, Ms. DeSantis, Ms. Fenner, and Ms. Fabe, all received electronic calendar invitations and reminders to attend the M&A Group's annual October 2015, October 2016, and October 2017 review meetings.

~~80.~~94.   Upon information and belief, Mr. Reid, Mr. Bick, all the M&A partners, Ms. Crane, Ms. DeSantis, Ms. Fenner, and Ms. Fabe attended the M&A Group's October 2015 annual reviews meetings and discussed Mr. Cardwell's September 2015 discrimination complaint during ~~their September/October professional development and performance review meeting.~~the one of the  meetings.[14]

~~81.~~95.  ~~During this meeting Mr.~~ In connection with the M&A group's annual October 2015 reviews meetings, Mr. Chudd was assigned to deliver the ~~M&A partners'~~Associate Development Department's Consensus Feedback~~, which~~ message that Mr. Chudd delivered to Mr. Cardwell during ~~their~~his December 2015 annual face-to-face performance review meeting.

~~82.~~96.  Thus, within a few weeks of Mr. Cardwell making his September 30, 2015 discrimination complaint about how he experienced race-based exclusion at Davis Polk, all of the M&A partners at that time, including Mr. Bick, Mr. Wolfe, Mr. Butler, and Mr. Chudd, had knowledge of and had participated in discussions related to Mr. Cardwell's September 2015 discrimination complaint.

---

[13] These meetings, among others, contributed to Mr. Reid, Mr. Bick, Ms. Crane, Ms. DeSantis, and the Firm's M&A partners knowing which associates had been rated or described as "behind" in performance reviews.
[14] As a matter of policy, practice, and culture, the Firm's M&A partners and Corporate partners met weekly to discuss sensitive issues, associates, and the practice group/department.

83.97.  TheAs further explained *infra,* Davis PolkPolk's M&A partners' practice of meeting annually as a group to create Consensus Feedback messages for each M&A associates' face-to-face reviews facilitated Mr. Bick's decision and ability to (i) continually violate Mr. Cardwell's rights and (ii) apply a years-long retaliatory policy against Mr. Cardwell and work with a group of Davis Polk partners to terminate Mr. Cardwell's employment, including because of his discrimination complaints.

84.98.  On or about December 1, 2015, Mr. Reid was a featured speaker at an hour and a half long New York City Bar event. The event mainly focused on what leaders in the legal profession can do to improve attorneys' happiness and development.  Most of the event's discussion was about diversity and included what appeared to be over 100 audience members in attendance. Mr. Cardwell and a senior Black associate were in attendance, a fact that Mr. Reid highlighted for the entire audience by introducing Mr. Cardwell and the senior Black associate by name and referring to both as two of Davis Polk's rising/shining stars. Upon information and belief, Ms. Hudson and Davis Polk's Executive Director of Personnel were also in attendance. Here's how *Bloomberg BNA*, a source for business and legal information, summarized the event and Mr. Reid's involvement in an article entitled "Law Firms Lose Talent In-House Because of Diversity, GC says":

> "*At one point, a plaintiffs [sic] attorney in the audience, Jeanne Christensen of Wigdor [i.e., one of the leading employment-discrimination law firms in the country], posed a question to Reid, asking how his law firm* **supports diverse and female attorneys so they can climb the ranks***.*
>
> *Reid acknowledged that 'the statistics are not impressive at all, clearly,' but said he makes a point to look at firm diversity in meetings with practice leaders three times a year as they 'talk about* **how work at the firm is getting allocated***.'*
>
> '***That's the foundation***,' said Reid. 'And on top of that we have a formalized mentoring program. It doesn't match up people who are alike.'*

*He said that at the end of the day, achieving diversity 'comes from an attitude of (leaders) caring and a desire to be engaged in everyone's career.' Reid added that firm leaders need to be 'connected' with their younger attorneys….*" (emphases added).

85.99.  In other words, Davis Polk's "foundation" for ensuring that Black associates (among others) climbed the ranks at Davis Polk involved Firm-created and monitored mechanisms that the Firm's leaders used to prevent and mitigate bias in work allocation, mentorship, decisions related to assessing how and why certain non-White associates are progressing and advancing relative to their class's peers, and partners' engagement with junior attorneys.

86.100.          At the conclusion of the event, Mr. Reid approached the senior Black associate and Mr. Cardwell and invited them to dinner. The dinner was ultimately scheduled for January 21, 2016.

87.101.          Both the senior Black associate and Mr. Cardwell realized that the dinner would be a good opportunity to ensure that Mr. Reid was informed about their individual (as well as other Black associates') goals and concerns. Both the senior Black associate and Mr. Cardwell understood how rare it was for associates, especially Black Davis Polk associates, to have a few uninterrupted hours of conversation with the Managing Partner of Davis Polk.

88.102.          On January 21, 2016, Mr. Reid, the senior Black associate, and Mr. Cardwell had dinner together at a restaurant. During dinner, Mr. Reid indicated that he had, as a matter of habit, reviewed the senior Black associate's and Mr. Cardwell's file and performance reviews prior to their meeting over dinner.[15] The conversation naturally transitioned to two

---

[15] Davis Polk's NYSDHR Statement confirms that Mr. Reid read and was familiar with Mr. Cardwell's reviews prior to their March 9, 2018 meeting. *See* Ex. 2 at 13 (claiming that "Reid—who had read Cardwell's reviews before the meeting, as he had before the January 2016 dinner with Cardwell….")

related discussion points, namely (i) the other associate's and Mr. Cardwell's performance at the

Firm and (ii) the Firm's diversity and inclusion issues.

89.103.          On the first discussion point, Mr. Reid made it clear that he was familiar

with Mr. Cardwell's evaluations and the M&A group's conclusions about Mr. Cardwell's

performance. Mr. Reid gave Mr. Cardwell *a verbatim description* of the same conclusion that

Mr. Chudd had communicated to Mr. Cardwell in December 2015, telling Mr. Cardwell to "do a

better job of setting people's expectations for how long it will take to do something."[16] Based on

the frankness of the entire conversation, there is no doubt that Mr. Reid would have told Mr.

Cardwell that Mr. Cardwell was behind in his class or performing below the Firm's standards

and expectations if either Mr. Cardwell's reviews indicated such a thing or if the M&A group's

leaders had reached such conclusions at the time. Both Mr. Cardwell and the other associate in

attendance left the meeting having no doubt that, based on Mr. Reid's assessment of and

conclusions about how Mr. Cardwell was performing at the Firm, that Mr. Cardwell was not only

qualified to be a Davis Polk associate, but that Mr. Cardwell was performing satisfactorily

according to the Firm's and M&A group's typical standards and expectations.

90.104.          On the second discussion point, Mr. Cardwell spent a significant amount

of time educating Mr. Reid on how he had experienced interpersonal and institutional

discrimination at the Firm.

91.105.          Mr. Cardwell spoke at length about implicit bias both conceptually and in

relation to the race-based discrimination he himself had experienced during his time at the Firm.

During the conversation Mr. Cardwell also inquired about how the Firm insulated assessments

and conclusions about performance reviews from the effects of bias and whether there were

---

[16] Mr. Reid's advice for the senior associate? "Be more confident."

mechanisms in place to ensure that feedback was reviewed between the reviewing attorney and the associate who received it.

92.106.        In response to such questions about written reviews and whether anyone was reviewing them for accuracy and potential bias, Mr. Reid mentioned two noteworthy Firm-wide interventions and remedies. The first was that he and the Firm were waiting to evaluate a certain diversity and inclusion consultant before "moving forward with a plan."

93.107.        The second Firm-wide bias-mitigation mechanism related to the Firm and practice group leaders having a process for accounting for various patterns and inconsistencies that appear in reviewing attorneys' written reviews, and that such leaders understand they must evaluate and communicate conclusions about the substance of written reviews to reviewee attorneys with certain bias-related patterns analyzed and removed from final, Firm- and practice group-accepted assessments and conclusions. In other words, Mr. Reid acknowledged that the Firm and practice group leaders do not automatically accept every assessment or criticism of an associate as accurate, free of bias, or the Firm's (or applicable practice group's) determination or conclusion about such associate's overall performance or contribution.

94.108.        Regarding issues of bias, Mr. Reid also explained there are a significant number of Davis Polk partners who hold seemingly contradictory views at the Firm. That is, according to Mr. Reid's remarks, many Davis Polk partners (i) believe that existing research confirms Black and other minority attorney groups experience bias in the workplace and at Davis Polk while they also (ii) believe that they themselves are fair and would never act with bias against attorneys from those groups. In other words, according to Mr. Reid, Davis Polk's partners apparently and conveniently maintained that race-related biased interactions and decisions exist—just not with themselves or any Davis Polk partners they work with.  By this

statement Defendant Reid directly acknowledged the prevalence of implicit bias within the Firm.[17]

95.109.        This January 21, 2016 incident was the third time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

96.110.        Mr. Cardwell had responsibly escalated his complaints from Davis Polk's Executive Director, of Personnel (Ms. Crane), then to Davis Polk's Diversity Committee (which included partners and the Firm's senior management),Associate Development Department, and finally to Davis Polk's Managing Partner, Mr. Reid, the person with the ultimate authority and obligation to investigate Mr. Cardwell's claimscomplaints. Notwithstanding Mr. Reid's empathetic statements, nothing improved. To the contrary, following the dinner with Mr. Reid, things changed for Mr. Cardwell in a distinctively negative manner.

**ii. Davis Polk Allowed Its Partners to Choose Who Should Receive "Time to Go" Messages _Before_ Associates Received Mid-Year Performance Reviews.**

111.    At no point during Mr. Cardwell's employment at Davis Polk did Davis Polk have any "material policies, practices, or guidelines related to when an associate [could] or should receive a [time-to-go]" meeting (i.e., the meeting in which an associate was told to seek employment based on their performance).

---

[17] Mr. Reid's admissions were consistent with the fact that Mr. Reid and the Firm's other leaders and partners were aware that credible research had confirmed that even when supervising attorneys in law firms review and rate the same exact hypothetical memo, supervising attorneys often rate the memo "higher" when the supervising attorney knows or believes the memo was written by a White attorney (in comparison to a Black attorney). For example, according to one widely discussed study, the supervising attorney reviewed and rated the same memo an average of 3.2/5.0 for a hypothetical "African American Thomas Meyer" and a 4.1/50 for a hypothetical "Caucasian Thomas Meyer." In the same study, the "qualitative comments on memos"—despite the memos being exactly the same—"were also more positive" for the study's "Caucasian Thomas Meyer" than the study's "African American Thomas Meyer." See Dr. Arin N. Reeves, _Written in Black & White: Exploring Confirmation Bias in Racialized Perceptions of Writing Skills_, Nextions (April 2014), available at https://nextions.com/portfolio-posts/written-in-black-and-white-yellow-paper-series/.

112.     For the entire period that Mr. Cardwell worked at Davis Polk, Davis Polk's partners did not have to follow or adhere to any material written policies related to whether the Firm's partners could terminate an associate based on performance.

113.     During Mr. ~~Mr. Cardwell Complains About Racism. Kindly Show Him the Way Out.~~ Cardwell's employment at the Firm, Davis Polk partners, the Firm's Executive Director of Personnel, and the Associate Development Department occasionally decided certain associates would receive  "time to go" meeting ***prior to the Firm actually*** (i) starting a "mid-year" review cycle for that associate, (ii) collecting performance reviews that purportedly assessed an associate's performance (and would have indicated that the associate was behind or was potentially behind), (iii) the assessing the associate's "performance" in response to the mid-year review meeting (and the feedback provided by the Firm) and (iv) ultimately delivering a message to the associate based on the so-called results of the mid-year review cycle. Increasingly, Defendants contributed to Mr. Cardwell being forced into this pretextual and predetermined Firm-wide "process."[18]

~~97.~~114.          Instead of conducting meaningful inquiries into the discriminatory activity highlighted by Mr. Cardwell, Defendants ~~began, at various stages,~~chose to jumpstart a year-long process to deprive Mr. Cardwell of work, distort assessments and conclusions related to the quality of Mr. Cardwell's performance, and obstruct his professional advancement in hopes that he would voluntarily leave the Firm~~.~~ or seek other employment upon the Firm's request (through the pre-textually created mid-year performance review cycle described above).

*First Annual Face-to-Face Performance Review Meeting.*

_____

[18] As explained in this Complaint, the purpose of a "mid-year" review cycle is to position the firm to be able to terminate an associate. Mid-year review cycles are not the same as "off-cycle reviews."

98.115.          In December 2015, Mr. Chudd gave Mr. Cardwell his first annual face-to-face review[19] at the Firm. The 2015 annual review lasted a few minutes, as Mr. Chudd briefly gave positive feedback and then briefly gave two suggestions. For the first suggestion, Mr. Chudd told Mr. Cardwell to "work on better setting expectations regarding how long it will take to do something." The second suggestion was a bit more cryptic and went something along the lines of, "Don't spend too much time thinking about the bigger picture."

99.116.          In response to Mr. Chudd's first suggestion, Mr. Cardwell responded during the face-to-face review by mentioning that he was a bit surprised by the feedback because it didn't match his habits or any feedback that had been communicated directly to him. Mr. Cardwell, however, indicated that he was open to constructive feedback and would work on better setting expectations for three primary reasons. First, based on his experiences and interactions at Davis Polk, Mr. Cardwell knew that such feedback was not uncommon for partners and senior associates to communicate to junior or mid-level Davis Polk associates. Second, Mr. Cardwell appropriately understood that the process of transitioning from law student to lawyer involved various learning processes and that such transitions and evolutions normally occur over a series of years and experiences. And third, Mr. Cardwell knew that the Firm knew that it routinely asked or expected Mr. Cardwell to commit to other Firm-related obligations that created additional time constraints and responsibilities for Mr. Cardwell, namely those related to recruiting (non-White law students) and the Firm's summer program.

100.117.          At the end of the meeting, Mr. Cardwell asked Mr. Chudd if he had any advice on how to get supervising attorneys to provide real-time feedback so that he could better

---

[19] This Complaint generally describes written performance reviews that the applicable reviewing attorneys completed and submitted to the Firm as a "written performance review" or "performance review." Meetings in which an associate met face-to-face with a partner to discuss the written performance reviews that were collected for such an associate are generally described in this Complaint as "face-to-face reviews."

account for attorneys' personal preferences. Mr. Cardwell asked about real-time feedback in his very first annual face-to-face review, in part, because Mr. Cardwell had already experienced certain bias-related interactions that he believed might impact his assessments and written performance reviews and because it quickly became apparent to Mr. Cardwell that the December 2015 face-to-face review was going to be like the first face-to-face review and not last very long. Mr. Chudd remarked something along the lines of, "The face-to-face reviews aren't that extensive at this stage because there often isn't that much to tell junior associates within their first couple of years at the Firm."

101.118.     Mr. Chudd also acknowledged that it could be difficult to get real-time feedback from senior attorneys and encouraged Mr. Cardwell to continue trying to get such feedback.[20]

102.119.     Mr. Cardwell did not question Mr. Chudd's second suggestion during the interview.

103.120.     Ultimately, Mr. Chudd had made it clear with both his comments and tone during the review that Mr. Cardwell was not only qualified to be a Davis Polk associate, but that Mr. Cardwell was performing satisfactorily according to the Firm's and M&A group's typical standards and expectations. Further, at no point during the meeting did Mr. Chudd state or suggest that Mr. Cardwell was under any kind of performance-related probation period or that the Firm or M&A group was going to or was contemplating giving Mr. Cardwell another review in six months to further assess his standing or performance.

---

[20] Both Mr. Cardwell's comments and questions and Mr. Chudd's responses made it clear that both of Mr. Cardwell and Mr. Chudd understood that there was a meaningful difference between real-time feedback and a face-to-face review and that Mr. Cardwell was seeking the former.

104.121.      Mr. Cardwell had a habit of discussing his meetings and interactions with Davis Polk partners, including his face-to-face reviews, with both Davis Polk associates and non-Firm associates shortly after such meetings and interactions. Accordingly, after his meeting with Mr. Chudd, Mr. Cardwell immediately discussed his face-to-face review with a few Davis Polk associates. In those conversations, Mr. Cardwell stated that he was a bit frustrated with the vague, unsupported reference to setting expectations and was confused and uncomfortable about the second point. Both Mr. Cardwell and the Davis Polk associates with whom he spoke with noted that Mr. Chudd's suggestion to not "spend too much time thinking about the bigger picture" was odd and inconsistent with how senior attorneys typically want junior associates to spend more time trying to figure out the bigger picture on deals and cases. Mr. Cardwell and the referenced Davis Polk associates discussed whether Mr. Chudd would have or ever had made a similar comment to White junior associates.

105.122.      Upon information and belief, sometime between February 2016 and June 2016, a senior non-White associate overheard a Davis Polk capital markets attorney refer to Mr. Cardwell in racially biased way. Upon information and belief, the capital markets attorney's comments were made to or in the presence of Mr. Reid. Upon information and belief, the senior non-White associate heard the comment as well and was so taken aback that such associate immediately told Mr. Reid something along the lines of: "If Mr. Cardwell were a White associate, we both know that you would let Mr. Cardwell know about this incident." Upon information and belief, Mr. Reid acknowledged and understood the senior non-White associate's concern and told such associate that he would personally follow-up with Mr. Cardwell. Upon information and belief, the senior non-White associate emailed Mr. Reid the next day and reminded him to follow-up with Mr. Cardwell. Upon information and belief, Mr. Reid responded

to that email and again promised to personally follow-up with Mr. Cardwell. Neither Mr. Reid nor any Davis Polk partner or staff member has ever mentioned this incident to Mr. Cardwell.

***A Sham Review Designed to*** ~~***Evade Firm Policies and the Law***~~ ***Give Mr. Cardwell a "Time-to-Go" Message.***

123.     At the first formal performance review opportunity following Mr. Cardwell's September 30, 2015 and January 21, 2016 complaints, Mr. Bick (the head of the Firm's Corporate Department and M&A group), departed from the Firm's performance review policies and instructed Renee DeSantis, the head of the Davis Polk's Associate Development Department, and the Associate Development Department's managers (e.g., Carolina Fenner, Rocio Clausen, and Alicia Fabe) to funnel Mr. Cardwell through a mid-year performance review process that (i) Davis Polk systematically, formally and routinely used to terminate associates and (ii) Mr. Bick used in June 2016 to pretextually alter Mr. Cardwell's staffing as an M&A associate and terminate Mr. Cardwell's employment.

124.     Mr. Cardwell made a complaint on September 30, 2015 to Renee DeSantis, the head of the Davis Polk's Associate Development Department, and Alicia Fabe, a manager in the Firm's Associate Development Department, among others.

125.     On October 5, 2015, the Firm's Associate Development Department stated that it would schedule a meeting or meetings in response to the September 30, 2015 BAG meeting where this complaint was made.  The Firm also acknowledged in its NYSDHR statement that note was made of Mr. Cardwell's complaint for "future professional development discussions."

126.     Meetings and discussions occurred as a follow-up to the October 5, 2015 meeting, including on June 10 and June 13, 2016.  Specifically, on June 10, 2016, Ms. Fabe circulated a "revised" PowerPoint presentation to Ms. DeSantis "for Monday's [m]eeting with John Bick."

In addition to describing other associates, the "revised" PowerPoint presentation had at least two detailed slides about Mr. Cardwell, which summarized (i) some "concern[s]" the Firm believed Mr. Cardwell to have raised in 2015, and (ii) Mr. Cardwell's 2015-2016 experiences in Capital Markets and M&A.  The "revised" PowerPoint also reflected information added "after [the Associate Development Department had a] talk with Sophia [Hudson]" on June 10, 2016.

127.    Once the presentation was finalized, Ms. DeSantis and Ms. Fabe had a "[m]eeting with John Bick on June 13 to discuss BAG corporate associates." The purpose of the meeting, at least in part, was to "focus on individual diverse associates" and "[m]onitor the professional development of diverse associates."  That is confirmed by the internal agenda prepared for this meeting, which stated that there was a "[m]eeting with John Bick re: black corporate/tax associates."

128.    During the June 13, 2016 meeting, Mr. Bick, Ms. DeSantis, and Ms. Fabe discussed Mr. Cardwell and the PowerPoint slides involving him, which related to his experiences as a "BAG corporate associate[]" and a "black corporate associate." By the time this meeting occurred, Mr. Cardwell had made a September 30, 2015 complaint to the very same individuals (i.e., Ms. DeSantis and Ms. Fabe) who created the presentation and met with Bick that day. These discussions resulted in Mr. Bick instructing the Associate Development Department (i.e., Ms. DeSantis and Ms. Fabe) to create a "sensitive" mid-year review cycle for Mr. Cardwell.

129.    On June 13, 2016, shortly after Mr. Bick's instructed the Associate Development Department (i.e., Ms. DeSantis, Ms. Fabe, and Ms. Fenner) to create a "sensitive" mid-year review for Mr. Cardwell, the head of the Associate Development Department (i.e., Ms. DeSantis) emailed the managers in the Department (i.e., Fabe and Fenner) and asked: "Can we talk

tomorrow about how we can get John Bick what he asked for with the least amount of negative blow back for [Cardwell]? Worried about the 'mid year review' label."

130.    As a matter of practice and culture, Davis Polk and its partners, including Mr. Bick and Ms. Hudson used "mid-year" performance review cycles to alter associates' staffing and trigger a process that often resulted in an associate receiving a "time to go" message/meeting (i.e. the associate being told they must leave the Firm) based on so-called performance issues.[21] Davis Polk and its partners, including Mr. Bick and Ms. Hudson used mid-year performance reviews to establish than an associate was seemingly terminated in the ordinary course and for legitimate, non-discriminatory reasons. Davis Polk and its partners, including Mr. Bick and Ms. Hudson, used mid-year performance reviews to systematically signal to other Davis Polk partners (sometimes in their annual review discussion meetings) that the Firm was positioning itself to terminate an associate in a subsequent review cycle if the Firm or a partner chose to do so.

131.    In other words, merely being associated with a "mid year review label" routinely and predictably had the effect of damaging an associate's standing, reputation, and employment status, as Davis Polk's partners (and some associates) (i) were familiar with how the mid year review process helped the Firm establish a seemingly legitimate, non-discriminatory basis for terminating associates and (ii) understood that the Firm did not create mid year performance review cycles for associates unless a partner or the Associate Development Department was comfortable signaling to other Davis Polk partners that the Firm was on the verge of "giving up" on the associate.

---

[21] For example, in a January 2017 annual review conducted by Ms. Hudson, Ms. Hudson noted in an associate's review that "[Associate 12] will be put on a 6 month check-in but not told."

132.    Ms. Crane explained how the Firm's performance review process allows this type of sequence of events to result: On March 21, 2017, Ms. Crane reminded Mr. Reid that "the individual reviews are discussed among partners, and a consensus is reached as to what the message should be. Some individual reviews are given more weight than others. Some are disregarded in part and some of the more recent feedback may be shared verbally during the [partners' annual] meeting and only be included in the final review message."

133.    Ultimately, Mr. Bick set in motion Mr. Cardwell's termination.  The Associate Development Department understood that once partners and associates obtained knowledge that Mr. Cardwell was receiving or had received a "mid year review," some partners and associates would likely view Mr. Cardwell as an associate that they should not work with or invest in because the associate might not be at the Firm much longer.

134.    In response to Ms. DeSantis's request for the Firm's Associate Development Department to meet and figure out a way to limit the amount of "negative blow back" Mr. Cardwell was about to receive, a manager and staffing coordinator in the Department (i.e., Fabe), immediately replied by saying: "Yes– agree it is sensitive." Immediately after that, Carolina Fenner, another manager and staffing coordinator in the Firm's Associate Development Department, replied and said: "Yes agree, especially since he wasn't given any indication in his last annual review [meeting] that we would be checking in mid-year."

135.    Ms. DeSantis quickly reached out to other managers at the Firm, telling one manager on June 13, 2016: "[Please] hold off on distributing any reviews on Kaloma. Alicia [Fabe] and Carolina [Fenner] and I want to discuss. [Thanks]." On June 17, 2016, Nicole Katz, a coordinator in the Associate Development Department, asked: "Can you please confirm for me whether the reviewer list in my previous email below works for reviewing Kaloma? Since this is

a sensitive review, I'm not sure if senior associates should be included as reviewers…."  Upon information and belief, Ms. Katz's reference to a "sensitive review" meant that Mr. Bick was starting a mid-year review process for the purpose of giving the Firm the ability to give Mr. Cardwell a "time to go" message/meeting (i.e., tell Mr. Cardwell that he must leave the Firm), which was a process that was a part of the Firm's practice and culture.[22]

136.    As of June 17, 2016—days before Ms. Hudson became the first person at the Firm to rate Mr. Cardwell as "behind"—Mr. Cardwell's then-upcoming June 2016 review cycle was described as "sensitive" and the type that did not need associates' input. The June 2016 mid-year review cycle was created for the purpose of obtaining a negative, "behind" rating from Ms. Hudson, a capital markets partner, and to give Mr. Bick and the Firm the ability to give Mr. Cardwell a "time to go" message/meeting.

137.    By June 20, 2016, the Associate Development Department figured out how they would comply with Mr. Bick's instructions, secure Ms. Hudson's review, and attempt to limit the predictable employment altering "blow back" that would follow: They decided to formally solicit potential reviewers (including Hudson) by telling them that the reason for Mr. Cardwell's June 2016 mid year performance review was that Mr. Cardwell "asked for more real-time feedback" "[d]uring [his] last annual review meeting."

138.    After Ms. Clausen emailed the above solicitation to Ms. Hudson, Ms. Clausen forwarded the email to Ms. Fenner and said this messaging was "[v]ery similar to your email." Davis Polk's Associate Development Department was careful about creating the appearance of a

---

[22] During Mr. Cardwell's employment, Ms. Katz worked with Ms. Crane, Ms. DeSantis, Ms. Fabe, and Ms. Clausen, and others in the Associate Development Department to create and maintain lists of associates whom Davis Polk partners determined would receive a mid-year review cycle and "time to go" message/meeting. On June 23, 2017, Ms. Katz emailed Ms. Crane with a "list of mid-year reviews for corporate and litigation" associates. This list included Mr. Cardwell's name (and a note that said "review on hold") and other associates' names, some of whom were scheduled to receive a "time to go" meeting *prior to the Firm deciding when they would actually receive a mid-year review cycle*.

legitimate, non-discriminatory email record, despite their concerns about Mr. Bick's request and the fact that the Firm has a practice and culture of pretextually creating mid-year review and TTG meetings.

139.    At all relevant times, those with knowledge of Mr. Cardwell's September 30, 2015 complaint were carefully working together to create career damaging mid-year performance reviews that Mr. Cardwell did not request and that were not based on his performance. At Davis Polk, the Firm's policy was for "mid year" performance review cycles to be based on demonstrable and documented performance issues and deficiencies, not associates' purported requests for "feedback," which could have been and often routinely was communicated through a variety of channels that did not involve official performance reviews.

140.    With a full understanding of these facts, the Associate Development Department went back and forth between attempting to comply with Mr. Bick's instructions to give Mr. Cardwell a performance based mid-year review—the type that was used to subsequently terminate associates in a following review—while limiting who at the Firm knew what Mr. Bick, not Mr. Cardwell, had set in motion.

141.    A brief recap of the Firm's shifting and contradictory explanations concerning Mr. Cardwell's June 2016 mid-year review appears below:

- On June 20, 2016 the Associate Development Department told a carefully curated list of potential reviewers that: "During Kaloma's last annual review meeting, Kaloma asked for more real-time feedback. Given he spent 6 months in the Capital Markets group, we would like to collect feedback regarding his rotation."

- On June 22, 2016, Ms. DeSantis received an email from Ms. Fenner in which the manager described the upcoming June 30, 2016 mid-year review with the words "real-time feedback" in quotation marks, seemingly to acknowledge the falsehood embedded in the description itself.

- On June 29, 2016, when emailing Mr. Bick, Ms. DeSantis told Mr. Bick: "There are a few performance-based mid years which we are in the midst of

**PROPOSED THIRD AMENDED COMPLAINT**
**(WITHOUT EXHIBITS)**

scheduling; we will an update on those in a week or two (Kaloma Cardwell –
you have file; [REDACTED], and REDACTED. . . [to] be scheduled in mid-
July)."

- On July 21, 2016, 2016, Ms. DeSantis emailed the Associate Development
  Department and asked: "Can you [please] confirm/remind me . . . who
  received or will receive performance related mid years . . . in [the corporate
  department]"? Ms. Fenner replied, saying, "[i]n M&A, we gave Kaloma
  Cardwell a 'check in review per his request', but we didn't call it a mid-year
  review." Again, Ms. Fenner used quotation marks when describing how the
  review occurred, continuing to acknowledge the falsehood embedded in the
  description itself.

- Later in the day on July 21, 2016, when emailing Davis Polk's Executive
  Director of Personnel (i.e., Ms. Crane), Ms. DeSantis said: "Kaloma Cardwell
  asked for feedback this summer and got it, but it wasn't a typical midyear."

- Lastly, the Firm stated in its response to Mr. Cardwell's EEOC Complaint that
  "Cardwell approached the Associate Development department and asked for
  feedback; the Firm granted his request, solicited reviews, and assigned a
  partner to meet with him."

142.    Mr. Cardwell did not "approach[] the Associate Development Department and

ask[] for feedback," nor did he "ask[] for feedback th[at] summer."  As described below, Mr.

Bick used deception to create the June 2016 mid-year review cycle itself.

~~106.~~143.        Mr. Cardwell experienced Mr. Bick's and Davis Polk's pretextual June

2016 performance review cycle as follows. On June 14, 2016, a non-White junior M&A

associate sent Mr. Cardwell feedback on a memo that she and Mr. Cardwell were working on for

(and had submitted to) Mr. Bick. In that email, the associate stated: "*Thank you for all the

detailed feedback and the wonderful tips! Wow, **it looks quite impressive with your section

added**! (I saw that you made some edits for my portion in this final version—thank you for

catching them all, and I promise I will work harder to identify these edits next time so that you

don't have to spend so much time correcting my portion.) I look forward to the next phase of this

project! Thanks so much, [Mr. Cardwell]!*" (emphasis added).

107.144.        On June 30, 2016, Mr. Bick sent Mr. Cardwell an email that stated: "Let me know when you have a spare moment to discuss another research assignment re: [REDACTED]." "The research assignment" in Mr. Bick's email referred to the same matter that involved the memo referenced in the prior paragraph.

108.145.        When Mr. Cardwell arrived at Mr. Bick's office, Mr. Bick spent just a few minutes describing the additional research assignment and then abruptly pulled out and opened a folder while stating: "*I know you asked for feedback, so I figured I'd take a few minutes to go through your reviews.*"

109.146.        Mr. Cardwell immediately became concerned because he had not requested a performance review or non-real time feedback from anyone at the Firm and because, at this stage in Mr. Cardwell's career, Mr. Cardwell had no knowledge that anyone at Davis Polk received this type of unannounced, mid-year face-to-face "review."

110.147.        Moreover, as noted above and is evident from Mr. Bick's own email, Mr. Cardwell went to Mr. Bick's office because Mr. Bick claimed he wanted to "discuss another research assignment." Unlike Mr. Cardwell's official prior face-to-face reviews,[23] Mr. Cardwell never received an email calendar invite or any type of advanced notice from Mr. Bick or anyone else that such a "review" would or could take place.[24]  Mr. Bick departed from the Firm's normal review process, lied about how the review came about, and did not give Mr. Cardwell any advanced notice that a face-to-face review would be conducted.

---

[23] As a technical matter, Mr. Cardwell's first face-to-face review occurred in May 2015, as Davis Polk conducts an "interim review" for all first-year associates during their first six months at the Firm.
[24] Tellingly, and in an attempt to mask his discriminatory intent and actions and the unusual nature of Mr. Bick giving Mr. Cardwell the face-to-face review at the time, Mr. Bick submitted documentation to the NYSDHR  that stated, "[Mr. Cardwell] had asked for mid-year feedback on his work, and this review is in response to that request." For the sake of clarity, where this Complaint references documentation that Davis Polk sent to the NYSDHR, such documentation was submitted while Mr. Cardwell was employed at Davis Polk.

148.    Mr. Bick did not give Mr. Cardwell any advance notice about this performance review, even though the Associate Development Department sent Mr. Bick all of the collected performance reviews on June 23, 2016—a full week before Mr. Bick deceptively told Mr. Cardwell on June 30, 2016 to stop by his office to discuss "another research assignment." Mr. Bick, a partner with extensive knowledge about the Firm's policies and practices as a member of the Firm's management committee, the head of Corporate Department, and head of M&A, departed from the Firm's annual review policy and did not "[g]ive the associate at least 48 hours' notice so that he/she can prepare for the meeting."

111.149.    Consistent with Mr. Cardwell's real-time concerns that Mr. Bick was conducting a sham face-to-face review, Mr. Bick had suggested assessments about aspects of Mr. Cardwell's performance that, up to that point in Mr. Cardwell's tenure, were a wild departure from anything that had ever been communicated to Mr. Cardwell.

112.150.    Mr. Bick stated: "*It's been noted on a few occasions that you have a pattern of missing deadlines.*" Mr. Cardwell responded by saying: "*That feedback is extremely surprising. I'm sitting here wracking my brain and I'm struggling to think of any deadlines that I've missed, and I can't think of any. I haven't missed any deadlines. Can you provide examples of 'deadlines' that I missed?*"

113.151.    Mr. Bick replied: "Well, don't think of it as deadlines" and proceeded to discuss general timing critiques that where phrased so vaguely that no associate would have been able to assess, verify, or dispute.

114.152.    At the time, Mr. Bick's response only created more concern because it was deeply inconsistent with (i) the typical written and spoken precision practiced by Mr. Bick and other Davis Polk M&A partners, (ii) the amount of pre-planning that Davis Polk M&A partners

typically engage in when they are meeting and collectively developing the Consensus Feedback

that is to be delivered to an associate in a face-to-face performance review meeting, (iii) and the

fact that Mr. Bick had claimed that the review cycle was in response to Mr. Cardwell's request, a

request that, if true, would have led Mr. Bick to make sure he was prepared to discuss specifics

and examples related to any feedback provided in any written performance reviews that were

submitted.

115.153.      Mr. Cardwell informed Mr. Bick that Mr. Bick's feedback was

inconsistent with what had been communicated to Mr. Cardwell and that such feedback had

never been communicated orally or in writing to Mr. Cardwell prior to their conversation. Mr.

Cardwell pressed Mr. Bick for additional information, including to be provided with any specific

examples that served as the basis of such critiques, but Mr. Bick was unable to provide Mr.

Cardwell with any specific examples.

154.    Unknown to Mr. Cardwell at the time, Mr. Bick was relying on Ms. Hudson's

June 2016 review as the basis for the general critiques and feedback that he conveyed to Mr.

Cardwell.  Indeed, Mr. Bick's Consensus Feedback Statement/Summary Review expressly

referenced the feedback and critiques of "Sophia Hudson," noting that "Kaloma generally

received positive reviews, with the notable exception of Sophia Hudson."

116.155.      Mr. Cardwell thought Mr. Bick's inability to provide examples was

alarming because Mr. Bick had critiqued Mr. Cardwell while pretending to be holding and

reading performance reviews that were supposedly submitted and a part of Mr. Cardwell's file.

Mr. Cardwell asked Mr. Bick if Mr. Bick could go back to the reviewers and try to learn what the

reviewers could possibly be referring to. Mr. Bick indicated that he would but never followed up

with Mr. Cardwell or subsequently provided Mr. Cardwell with any specific examples.

117.156.        Immediately after the meeting, Mr. Cardwell contacted a Black senior Davis Polk associate and informed that associate that Mr. Bick just conducted a surprise face-to-face-, mid-review and opened the discussion with a blatant lie (i.e., that Mr. Bick was giving the face-to-face review in response to a request by Mr. Cardwell). Thereafter, they discussed whether Mr. Bick's actions were part of other racialized patterns at Davis Polk.

118.157.        The Black senior Davis Polk associate was immediately and similarly concerned and upset (i) that a partner or group of partners at Davis Polk made the conscious decision to not give Mr. Cardwell feedback informally but through a process that would become a part of his official record, (ii) that no one from Davis Polk provided any advance notice about the face-to-face review, and (iii) that it was highly unlikely that Mr. Bick, a Davis Polk partner with vast leadership experience at the Firm, coincidentally or carelessly used the words "missed deadlines." Mr. Bick's immediate retraction of the words "missed deadlines," when questioned, fueled further suspicion with the senior Davis Polk associate because the associate knew that Davis Polk partners met collectively to decide what messages should be delivered in performance review meetings.

119.158.        Mr. Cardwell's race was aand September 20, 2015 complaint and January 2016 complaint were motivating factorfactors in Mr. Bick's decision to create a sham, pretextual mid-year performance review cycle for Mr. Cardwell in June 2016.

120.159.        As of June 2016, 100%[25] of the associates who submitted official performance reviews for Mr. Cardwell rated Mr. Cardwell as being on par with the lawyers in his class.

_____

[25] This percentage does not account for one associate who declined to answer a question about Mr. Cardwell's standing relative to his class because his "contact with Kaloma was very limited – only a couple of days…."

PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)

~~121.~~160.        Mr. Bick and the Firm did not create ~~an interim~~a mid-year performance review cycle in 2016 for any White M&A associates ~~in~~. As further explained *infra*, Mr. ~~Cardwell's 2014 class (e.g., the White M&A comparators), and he~~Bick did not conduct ~~an out of cycle~~or, as the head of the M&A group, approve a mid-year performance review cycle for ~~the~~any White M&A ~~comparators so that he could discuss general timing critiques that were not out of the norm for an associate of~~associates—even though some of them had been rated (and described) as "behind" in performance reviews during the prior review period~~Mr. Cardwell's seniority~~.

~~122.~~161.        After Mr. Bick met with Mr. Cardwell on June 30, 2016 under the false pretenses of assigning Mr. Cardwell "another research assignment," Mr. Bick did not respond to Mr. Cardwell's follow-up emails regarding the assignment itself. On July 19, 2016, Mr. Cardwell emailed Mr. Bick a 15-page research memo that Mr. Bick had requested on June 30, 2016. Mr. Bick never responded to Mr. Cardwell's email.

~~123.~~162.        On July 26, 2016, Mr. Cardwell sent another follow-up email to Mr. Bick about the 15-page memo. Once again, Mr. Bick never replied to Mr. Cardwell's email and never mentioned the "assignment" to Mr. Cardwell again. During the same time period, Mr. Bick, whose office was just two doors down the hall from Mr. Cardwell's, would often walk by Mr. Cardwell in the hallways without any physical or verbal acknowledgment that Mr. Cardwell was also in the hallways. Mr. Bick was trained against such interpersonal practices and informed that such practices were related to racial bias and could negatively impact minority associates. *See* Ex. 6 (noting that partners were to "[m]ake a conscious effort to build relationships with . . . [people of color] . . . associates in [their] practice group," "take the initiative to speak to people in the hallways/elevators"). Mr. Bick did not send Mr. Cardwell *any* emails (i.e., where Mr.

Cardwell was listed in the "to" or "cc" line in the email) between July 15, 2016 and May 3, 2017—a time period that spans roughly 307 days and goes against specific training and directives that Mr. Bick received from the Firm. *See* Ex. 5 (where Davis Polk's presentation notes that "unconscious behaviors can enhance or hinder performance through inclusion or exclusion").

163.    Mr. Bick created the mid-year June 2016 review cycle, and Ms. Hudson rated Mr. Cardwell as "behind" following her conversations with the same members of the Associate Development Department who received Mr. Cardwell's September 30, 2015 complaint.  These steps were taken in order to alter Mr. Cardwell's staffing, standing, and to position the Firm to terminate Mr. Cardwell's employment. *Cardwell's Experience Was Not a Function of His Performance or Written Reviews.*

164.    As further explained below, Ms. Hudson's 2016 performance reviews triggered and were used by Mr. Bick and Davis Polk in its NYSDHR Brief to justify altering Mr. Cardwell's staffing and ending his employment. Ms. Hudson's performance reviews were an adverse employment action connected to Defendants' decision and ability to terminate Mr. Cardwell's employment.

165.    As a result of Mr. Cardwell's complaints, including his September 2015 and January 2016 complaint, Davis Polk's leaders weaponized a second-year associate's request for "feedback" by deceptively attempting to put Mr. Cardwell in a "mid year" review pipeline that the Firm routinely used to put associates on track to receive a "time to go" message and meeting (i.e., be pushed out or fired).

166.    To this point, Mr. Cardwell observed how Davis Polk was able to routinely create a series of staffing changes that had the effect of nudging associates to become dispirited to the

point of "voluntarily" leaving the Firm; this level of manipulation through staffing was possible, in part, because the Firm maintained and used detailed profiles, surveys, and seemingly informal discussions to develop files and intel on their associates' assignment preferences and career aspirations.

***Mr. Cardwell's Complaints, not His Performance, Explains Mr. Cardwell's Experience***

124.167.      Contrary to the sham June 2016 review that Mr. Cardwell experienced, Davis Polk's Professional Development and Performance Review System was based on "Formal feedback" policies (the "Performance Review Policy").[26] *See* Ex. 13 at 2 (showing excerpted description of Davis Polk's "formal feedback" policy).

125.168.      Davis Polk's Performance Review Policy utilized written performance reviews in order to develop a message (i.e., "Consensus Feedback") that was to be communicated to an associate being reviewed and a "Consensus Feedback Statement" (i.e., a written summary that documented the Consensus Feedback) along with (i) principal matters worked on during the applicable review period, (ii) whether the reviewer has concluded that the reviewee-associate is "behind," "with," or "ahead" of lawyers in their class; (iii) strengths and weaknesses; (iv) improvements; (v) special recognitions earned (e.g., other contributions to the firm); (vi) development priorities for the next year; and (vii) whether the Firm concluded and informed the associate that they were at risk of needing an interim spring review or career counseling.

126.169.      More specifically, during Mr. Cardwell's tenure at Davis Polk, Davis Polk's Performance Review Policy included the following structure for performance evaluations:

---

[26] Though not escribed in detail in this Complaint, Davis Polk's Performance Review Policy also has an "upward review" process that allows associates to submit upward reviews to evaluate and provide feedback to supervising attorneys, including Davis Polk partners.

(i) performance evaluations ~~are~~were sent to partners, counsel, and associates who worked with each associate ~~up for~~for a certain number of hours during the review period (ii) a "select group of partners" "~~discusse[s]"~~discussed" associates' professional development, performance, and the written performance reviews submitted for the associate ~~up for~~during the review period; (iii) the group of partners then ~~decides~~decided what Consensus Feedback message would be communicated to the associate in a face-to-face annual performance review meeting (or interim review, under certain, limited circumstances); (iv) the "group of partners" ~~assign~~assigned one partner to communicate the Firm's Consensus Feedback message to the associate; and (iv) the assigned partner ~~memorializes~~memorialized both the Firm's Consensus Feedback message and the assigned partner's conversation with the reviewee-associate on a Consensus Feedback Statement.[27]

~~127.~~170.    Early in Mr. Cardwell's career at Davis Polk, Mr. Cardwell was told that the feedback that was delivered to M&A associates during their face-to-face performance review meetings was created by a process in which all of the partners in Davis Polk's M&A group would meet as a group, discuss the professional development, performance, and performance reviews for M&A associates and decide what feedback should be given to M&A associates in their respective performance review meetings (i.e., annual or interim).

~~128.~~171.    Based on Mr. Cardwell's experiences and interactions at the Firm, the partners in Davis Polk's M&A group did indeed have a practice where they routinely and consistently met as a group and discussed the professional development, performance, and performance reviews for Mr. Cardwell and other M&A associates.[28]

---

[27] Davis Polk's Consensus Feedback Statements are labeled "Summary Reviews."
[28] Davis Polk's statements in its NYSDHR statement refers to this process on a few occasions, including when it claimed that "when *the partners* met to decide on the *messages* to be given to associates as part of the formal, annual

**PROPOSED THIRD AMENDED COMPLAINT**
**(WITHOUT EXHIBITS)**

129.172.      As part of the Firm's annual review cycle, Davis Polk's M&A partners

would meetmet, "individual reviews [were] discussed" and decide as a "verbally share[d]," and

the group decided what the Consensus Feedback message should be for each M&A associate and

how the assigned partner should deliver the agreed upon Consensus Feedback message to the

applicable M&A associate.[29] Consistent with the Firm's practice, Mr. Reid, Ms. Crane, Ms.

DeSantis, and Ms. Fenner were regularly invited to and attended the M&A group's annual

October M&A review discussion meetings, which was also attended by all of the Firm's M&A

partners (many of which, if not all, typically had "[p]artner [r]eviewing [r]esponsibilities").

During these meetings, the M&A partners and participants routinely discussed associates whose

annual reviews meetings would involve "trickier" and sensitive messages/feedback. These

"trickier messages" were discussed with the reviewing partner and Mr. Bick, among others, to

"make sure everyone was on the same page."[30]

173.    During these meetings, sensitive information or topics were not written down or

otherwise recorded in advance of the meeting or during the meeting.[31]

174.    The M&A Group held their "M&A Group 2015 Annual Reviews Discussion" on

October 5, 2015, October 12, 2015, and October 19, 2015.

review cycle, Cardwell's second annual review cycle at the Firm, the Firm decided in October 2016 to try to give
Cardwell…. *The partners* appointed Kreynin to deliver Cardwell's review based on this consensus message. During
the review, Kreynin explained that *the partners* had identified…" Ex. 2, Davis Polk NYSDHR Statement at 10.
[29] As noted in this Complaint, Mr. Cardwell made a complaint about discrimination complaint in September 2015,
September 2016, and August 2017, among other complaints. Each of these complaints were followed by Davis
Polk's M&A partners meeting and discussing Mr. Cardwell's complaints just a month or so later in their 2015, 2016,
and 2017 October annual reviews meetings.
[30] On October 2016, in connection with discussions about the M&A partners 2016 annual review meetings, Mr. Bick
told a manager in the Associate Development Department that "Kaloma is one" of the associates who would be
receiving or was associated with a "trickier message."
[31] On one occasion, Ms. Fenner reminded the Firm's audio and video department that "these October M&A
meetings should not be recorded." On another occasion leading up to the M&A Group 2015 Annual Reviews
Discussion, Ms. Fenner removed certain references that appeared in document because she believed it was better to
discuss such topics in person: "I also deleted any reference to Brass being a two-partner review (better to bring this
up during the meeting rather than putting it on the chart.)"

175.     The M&A Group held their "M&A Group 2016 Annual Reviews Discussion" on October 5, 2016, October 10, 2016, and October 17, 2016, and October 24, 2016.

176.     Mr. Reid, Ms. DeSantis, Ms. Crane, Ms. Fenner, and all of the Firm's M&A partners, including Mr. Bick, Mr. Butler, Mr. Chudd, Mr. Wolfe, Mr. Birnbaum, were scheduled to discuss Mr. Cardwell at the M&A partners' October 5, 2016 meeting. Upon information and belief, Mr. Reid, Ms. DeSantis, Ms. Crane, Ms. Fenner, and all of the Firm's M&A partners, including Mr. Bick, Mr. Butler, Mr. Chudd, Mr. Wolfe, Mr. Birnbaum participated in discussions about Mr. Cardwell's September 8, 2016 complaint at the October 5, 2016 meeting (or one of the other scheduled review meetings for October 2016).

177.     The M&A Group held their "M&A Group 2017 Annual Reviews Discussion" on October 4, 2017, October 11, 2017, and October 18, 2017. Mr. Reid, Ms. DeSantis, Ms. Crane, Ms. Fenner, and all of the Firm's M&A partners, including Mr. Bick, Mr. Butler, Mr. Chudd, Mr. Wolfe, Mr. Birnbaum, Mr. Brass, were scheduled to discuss Mr. Cardwell at the partners' October 11, 2017 meeting.[32] Upon information and belief, Mr. Reid, Ms. DeSantis, Ms. Crane, Ms. Fenner, and all of the Firm's M&A partners, including Mr. Bick, Mr. Butler, Mr. Chudd, Mr. Wolfe, Mr. Birnbaum, Mr. Brass participated in discussions related to Mr. Cardwell's complaints, including his March 29, 2017, May 2017, and August 2017 EEOC complaint at the October 11, 2017 meeting (or one of the other scheduled review meetings for October 2017).

130.178.     Mr. Cardwell participated in five face-to-face performance review meetings in which an assigned partner communicated the Firm's Consensus Feedback to Mr.

---

[32] On September 8, 2017, a manager in the Associate Development Department emailed Mr. Bick, Mr. Reid, Mr. Butler, Mr. Chudd, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass and provided them with "this year's review discussion with allocations of partner responsibilities." A calendar invite to the review discussion was also provided to these individuals.

Cardwell and created a Consensus Feedback Statement. These meetings occurred in May 2015,

December 2015, June 2016, December 2016, and January 2017.

131.179.      Thus, Mr. Cardwell performance review file included five Consensus

Feedback Statements that supposedly memorialized the Firm's discussed and agreed upon

conclusions regarding whether Mr. Cardwell was determined to be "behind" lawyers in his class.

132.180.      Below is an example of the first Consensus Feedback Statement that the

Firm created for Mr. Cardwell. *See* Ex. 8, Kyrwood 2015 Consensus Feedback Statement.

Lawyer Reviews - Summary Reviews                                    Page 5 of 7

---

Associate: **Cardwell, Kaloma**
Reviewer: **Kyrwood, Jason**
Review Date: **May 11, 2015**

---

**1. Review Type:**

Interim Review

---

**2. Principal matters worked on by the reviewee which were considered in the evaluation:**

1. ██████████████████████████████ -
**151.7 hours**
2. ██████████████ - 140.9 hours
3. ████████████████████ - 89.4 hours
4. ████████████ - 73.4 hours
5. ██████████████ - 60.0 hours

(November 2014 - May 2015)

---

**3. Comments received from:**

Arnaldos, Nicholas, Yitz, Yuli, Sanders

---

**4. Substance of evaluation (including reviewee's performance compared to expectations for a
lawyer of the same seniority, observed strengths and weaknesses in the reviewee's performance
in the last 12 months, improvements, if any, from prior year's review, and the like):**

Generally positive - organized, high quality work, good attention to detail, hard worker. Some notice that he is a
little slow in turnaround time and thought would benefit from asking more questions. Also he should take more
initiative

---

**5. Comments from the reviewee regarding his or her evaluation of his or her performance.**

Accepted feedback and agreed.

---

**6. Development of priorities for the next year (including generally types of matters and tasks to be done,
level of responsibility to be assumed, training, and special assignments and any other appropriate implementing**

---

Lawyer Reviews - Summary Reviews                              Page 6 of 7

action to be considered - list the three most important).

No Answer

7. Other comments or considerations not otherwise addressed that the reviewee
thinks relevant
to his or her performance or professional development.

No Answer

8. Compensation Issues (including, if relevant, need for spring review; whether his/her
bonus(es) are in jeopardy;
whether he/she was informed of the availability of career counseling).

Not Applicable to Interim Reviews

Submitted on: 5/11/2015, 5:35 PM

133.181.    According to documents Defendants provided to Mr. Cardwell, the

Consensus Feedback Statements that the Firm created for Mr. Cardwell were submitted to the

Firm on May 11, 2015; December 22, 2015; June 30, 2016; March 28, 2017; and January 12,

2018.

134.182.    ***None of the Consensus Feedback Statements*** for Mr. Cardwell states that

anyone at Davis Polk thought or concluded Mr. Cardwell was "behind" lawyers in his class or

needed to be staffed at a level junior to his seniority, which was the Management and M&A

partners' purported basis for eliminating Mr. Cardwell's billable hours and later terminating Mr.

Cardwell's employment.

**PROPOSED THIRD AMENDED COMPLAINT**
**(WITHOUT EXHIBITS)**

135.183.        Reviewing attorneys, associates who are being reviewed, and the partner reviewers all understand that written performance reviews can, and often do, "make-or-break" attorneys' careers. For that reason (among others), the Firm gives both reviewing attorneys and associates who are being reviewed advance notice and a meaningful amount of time to either (i) submit written performance reviews or (ii) prepare for their face-to-face performance review meeting with the partner assigned to conduct the meeting.

136.184.        Davis Polk used Consensus Feedback Statements as the official (i.e., authoritative) and permanent record for the Firm's discussed and agreed upon conclusions about an attorney's standing in their class. The written performance reviews were used by the Firm to assess and track (i) the difficulty of attorneys' assignments; (ii) attorneys' performance; (iii) assessing and verifying whether attorneys who submit performance reviews are evaluating attorneys in a non-discriminatory, consistent, and accurate way; and (iv) whether a particular reviewer concluded that an associate was performing materially behind, with, or ahead of members in the associate's class.

185.     As referenced *supra*, Davis Polk's termination practices and culture used "mid year" performance reviews and "time to go" messages/meetings to terminate associates based on so-called performance-related issues.

186.     During Mr. Cardwell's tenure at the Firm, Davis Polk did not have a rubric or objective set of metrics that it used to determined when an associate's performance triggered or mandated that an associate receive a "mid-year" performance review cycle.

187.     However, once an associate received a mid-year performance review cycle, Davis Polk's practices and culture allowed Davis Polk partners to deliver a "time to go" message to that

**PROPOSED THIRD AMENDED COMPLAINT**
**(WITHOUT EXHIBITS)**

associate (i.e., tell the associate he/she must leave the Firm and work for a different employer) in a subsequent review meeting.

188.    Specifically, the Davis Polk's practice during a "time to go" meeting was for a partner who was assigned to deliver the "time to go" message to tell the associate the "reasons for dismissal" and to explicitly reference a prior review meeting (often a mid-year performance review meeting). For example, a "time to go" message included a statement along the lines of: "As we discussed back in [month], we needed to see consistent and improved behavior in [describe]. Unfortunately, we have not seen sufficient progress in these areas and, as a result, we have concluded that [you should start looking for a position more in line with your skills and interests]."

189.    Associates who were perceived to be "behind" associates in their class or who were rated as "behind" in official performance reviews did not automatically receive a mid-year performance review cycle or a "time to go" meeting/message, however. Rather, the determination for who received a mid-year performance review cycle or "time to go" meeting/message was based on a centralized, highly subjective, disparately applied process that included whenever Mr. Bick decided an M&A associate must leave Davis Polk.

190.    Critically, associates, including Mr. Cardwell, were led to believe that the "process" for mid-year performance reviews involved the following sequence: (i) associates receive a performance related mid-year review, (ii) associates are told during their review that the Firm expects (or will be checking in the future to see if there has been) improvement or progress in some area,  (iii) during the next review cycle, performance reviews are solicited and collected, and (iv) the Firm assesses, at that point, whether sufficient improvement or progress has been made *in response to the feedback provided during the mid-year review cycle*.  This

sequence of events allowed Davis Polk partners to tell associates during a "time to go" meeting that "[a]s we discussed back in [month], we needed to see consistent and improved behavior in [describe]. Unfortunately, we have not seen sufficient progress in these areas and, as a result, we have concluded that [you should start looking for a position more in line with your skills and interests]."

191.    However, in total disregard of this sequence (which is how the Firm's standard "time to go" message describes this process)—on occasion Davis Polk partners and Mr. Bick (through Ms. Crane and the Associate Development Department) requested and/or scheduled "time to go" meetings for associates *before* they received their mid-year review and *before* any separate assessment had been made following their mid-year review to see if "sufficient" "progress" or "improvement" had indeed been made.

192.    In other words, Davis Polk's mid-year review system allowed Davis Polk partners and Mr. Bick to put associates in a "time to go" pipeline that predetermined associates' departures from the Firm—separate from those associates' actual performance or any assessments made by the Firm following these associates' mid-year reviews.

193.    At Davis Polk, many of the same partners and employees who had duties and responsibilities related to investigating associates' discrimination, harassment, and retaliation complaints were the same partners and employees with power and authority to influence which associates received a mid-year performance review cycle or a "time to go" meeting/message.

194.    As explained in this Complaint, Mr. Bick and Ms. Hudson's mid-year performance review cycle and reviews in 2016 were created and used to ensure that Mr. Cardwell could receive a "time to go" meeting/message if Mr. Bick or the Firm subsequently wanted to do so for *any* reason.

195.    At Davis Polk, "behind" performance reviews often resulted from and after a significant amount of communication and coordination among the heads of practice groups, partners (i.e., reviewers), and parties who were responsible for documenting, reporting, or investigating associates' legally protected complaints.

196.    During Mr. Cardwell's tenure at the Firm, all of the partners who rated Mr. Cardwell as "behind" had knowledge of discrimination complaints that Mr. Cardwell made prior to such partners' completing their performance evaluation for Mr. Cardwell.

*During Mr. Cardwell's Nearly Four* During Mr. Cardwell's Nearly Four *Year Career at Davis Polk, 100%[33] of the Associates Who Submitted Reviews for Him Rated Him as on Par With His Class*

137. 197.    The chart below represents all the reviews that were completed and submitted by Davis Polk associates for Mr. Cardwell.[34]  Over the course of Mr. Cardwell's nearly four-year career at Davis Polk, 100%[35] of the associates who submitted official performance reviews[36] for Mr. Cardwell answered "with" when asked on a performance evaluation: "Do you feel [Mr. Cardwell] is performing materially behind, with or ahead of lawyer's class?"

**100%[37] of Davis Polk's Associates Who Submitted Performance Reviews for Mr. Cardwell Rated Mr. Cardwell as Performing on Par with Associates in His Class**

---

[33] This percentage does not account for one associate who declined to answer a question about Mr. Cardwell's standing relative to his class because his "contact with Kaloma was very limited – only a couple of days…."
[34] That is, according to the documents and records Defendants produced in discovery.
[35] This percentage does not account for one associate who declined to answer a question about Mr. Cardwell's standing relative to his class because his "contact with Kaloma was very limited – only a couple of days…."
[36] Official performance reviews are non-anonymous reviews that were submitted and summarized in the Consensus Feedback Statements that the Firm created for Mr. Cardwell.
[37] This percentage does not account for one associate who declined to answer a question about Mr. Cardwell's standing relative to his class because his "contact with Kaloma was very limited – only a couple of days…."

**PROPOSED THIRD AMENDED COMPLAINT**
**(WITHOUT EXHIBITS)**

| Date Associate Completed Performance Review | Associate | Practice Group | Basis of Review[38] | | Performance Evaluation[39] |
|---|---|---|---|---|---|
| | | | Level of Contact with [Mr. Cardwell] | Difficulty of Assignment | Do you feel [Mr. Cardwell] is performing materially behind, with, or ahead of lawyer's class? |
| March 13, 2015 | White senior associate | Finance | Extensive | Complex | With |
| March 16, 2015 | Non-Black Latino senior associate | Finance | Extensive | Complex | With |
| March 23, 2015 | White senior associate | Finance | Moderate | Moderately Difficult | With |
| April 6, 2015 | Asian senior associate | Finance | Moderate | Moderately Difficult | With |
| April 10, 2015 | White senior associate | Finance | Extensive | Complex | With |
| April 13, 2015 | Non-Black Latino senior associate | Finance | Extensive | Moderately Difficult | With |
| September 18, 2015 | White senior associate | M&A | Moderate | Routine | With |
| November 2, 2015 | Non-Black/Non-White senior associate | M&A | Extensive | Routine | With |
| June 21, 2016 | White senior associate | M&A | Moderate | Moderately Difficult | With |
| June 22, 2016 | White senior associate | M&A | Moderate | Routine | With |
| October 4, 2016 | White senior associate | M&A | Extensive | Moderately Difficult | With |
| October 4, 2016 | White senior associate | M&A | Extensive | Moderately Difficult | With |

~~138.~~198.        As depicted above, in an "interim [performance] review" that Jason

Kyrwood, a Davis Polk Corporate Partner, submitted in May 2015,[40] Mr. Kyrwood was asked to

---

[38] Unless otherwise noted, the language for this header and the questions and answers under it are unchanged and are identical to the language that appears on Davis Polk's evaluations for Mr. Cardwell.
[39] *Id.*
[40] Mr. Kyrwood's summary of Mr. Cardwell's performance reviews is consistent with (i) the feedback that Mr. Kyrwood communicated to Mr. Cardwell during his face-to-face review and (ii) the recap of the review that Mr. Cardwell had communicated with Davis Polk associates on or around the day of his review with Mr. Kyrwood.

provide comments related to the "substance of [the] evaluation (including reviewee's performance compared to expectations for a lawyer of the same seniority)." To that question prompt, Mr. Krywood wrote: "**Generally positive – organized, high quality work, good attention to detail, hard worker**." (emphasis added).

139.199.        Notably, it was only when Mr. Cardwell began vocalizing his concerns about racially based unfair treatment within the Firm (and, more specifically, about the discriminatory impact of Davis Polk's evaluation system and certain bias-related interactions within the Firm's M&A and Capital Markets groups), that he began to have conversations like the one that Mr. Bick and Mr. Cardwell had on June 30, 2016.

*After Mr. Bick's Sham Review Meeting, Mr. Cardwell's Assignments Go From Bad To None.*

140.200.        Both while Davis Polk was recruiting Mr. Cardwell and when Mr. Cardwell was a junior associate, Davis Polk routinely communicated to Mr. Cardwell and other Firm associates that the Firm designed a set of antidiscrimination policies and procedures related to staffing attorneys in an effort to minimize and eliminate the type of racial bias flagged by Mr. Cardwell and the diversity and inclusion consultants hired by the Firm, among others. *See* Ex. 7, Verna Myers Interrupting Bias Presentation.

141.201.        Davis Polk's antidiscrimination staffing policies were intended to discourage partners and senior attorneys—especially when it came to deals and high-profile cases—from bypassing staffing coordinators and using informal channels to staff junior associates.

142.202.        Defendants understood, knew, and warned by the Firm that bypassing staffing coordinators and using informal channels to staff associates had been shown to have a disparate and discriminatory impact on Davis Polk's Black attorneys.

143.203.          During the period in which Mr. Cardwell was permanently assigned to Davis Polk's M&A group (i.e., April 2016 to August 2018), Davis Polk's policies and procedures around staffing were as follows: each week, associates completed a "weekly workload request/capacity forms," indicating their availability, the type of matters such associate was working on (e.g., names of team members, expected number of hours one expected to work on that matter that week), upcoming vacations, and additional comments/requests, among other things. A staff person then compiled associates' weekly workload request/capacity forms into a single chart and sent it (i) to the M&A junior associate assignment coordinator (who used the chart as a guide to staff first- and second-year M&A associates) and (ii) to the two most junior M&A partners (who used the chart as a guide to staff third-year and more senior associates). When the Firm's M&A partners or associates had M&A staffing needs, the requesting attorney sent an email to the applicable coordinator based on the seniority level needed. It was not uncommon for staffing coordinators to ask an associate prior to staffing that associate: "Have you worked on 'x' yet or worked with this person already?" Because theThe two most junior M&A partners served as M&A staffing coordinators and did not have complete, independent control over staffing, the. The junior M&A staffing partners were often in constant communication with Mr. Bick about how third-year and more senior associates should be staffed to meet Firm needs (and policies) and partners' preferences. That said, and Mr. Bick often dictated or authorized which associates should be staffed on certain matters. Still, the junior M&A staffing partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass when such persons served as staffing partners, had (and often acted with) significant and independent decision-making authority on M&A staffing decisions, including decisions related to which associates should be staffed on which matters and deals.

144.204.        For similar reasons as noted above, the junior associate assignment

coordinators did not have complete, independent control over staffing and worked in connection

with Mr. Bick. Carolina Fenner, a Davis Polk junior staffing coordinator was responsible for

staffing Mr. Cardwell (and other second-year M&A associates) from April 2016 through the

beginning of September 2016. When Ms. Fenner was unavailable (e.g., on vacation), either the

other Rosio Clausen, a Davis Polk corporate junior staffing coordinator for junior corporate

associates who was a member of the Firm's staff (i.e., not a partner or associate), or an Associate

Development Manager ("Davis Polk Junior Staffing Coordinator #3"), who was a member of the

Firm's staff (i.e., not a partner or associate), would typically staff junior associates until Ms.

Fenner returned or was available.

145.205.        Relevant to Mr. Cardwell's claims are not just how the Firm staffed Mr.

Cardwell but also what deals and matters the Firm allowed Mr. Cardwell to work on. In

corporate law and among partners and associates at Davis Polk, the difference between (i) M&A

"deals" and "transactions" and (ii) M&A "work," "matters," "tasks," "projects," "research,"

"document review," or "assignments" is both widely understood and significant. "Deals"

influence heavily tracked and publicized M&A rankings, M&A fees, legal awards and prestige,

associates' partnership and lateral prospects, and clients' and potential clients' perceptions of

attorneys' and firms' sophistication and ability to handle complex matters. As such, within the

Firm's M&A group and across the Firm and legal profession, Davis Polk routinely (A) discussed

during Mr. Cardwell's tenure at Davis Polk and continues to discuss its M&A deal rankings (for

the applicable time period), (B) highlighted during Mr. Cardwell's tenure and continues to

highlight "deals and cases" on its homepage (among other places), and (C) emphasized during

Mr. Cardwell's tenure and continues to emphasize rankings in its "Who We Are" section on the

Firm's website (e.g., "For more than 165 years, Davis Polk has **ranked** among the premier law

firms with practices that are world class across the board)." (emphasis added).

146.206.    Around the time that (i) Mr. Bick conducted a sham review of Mr.

Cardwell and (ii) both a non-White senior associate and Davis Polk's Asian/South Asian/Middle

Eastern group had asked Mr. Reid to take specific actions to interrupt, prevent, or eliminate race-

related bias and disparate treatment at the Firm,[41] Mr. Cardwell began to notice an overall pattern

where he was assigned to fewer deals (which are central to the revenue of the Firm, the M&A

practice group, and the reputation of associates) than White(i) associates (who were similarly

situated to Mr. Cardwell in all material respects.) who did not make any discrimination

complaints about the Firm and its partners and (ii) White and other non-Black associates (who

were similarly situated to Mr. Cardwell in all material respects).

147.207.    Instead, and as compared to the White M&A associates at the Firm, Mr.

Cardwell was assigned to more (i) research-related assignments (which are only tangential to the

Firm's M&A business and core revenue streams); (ii) assignments that did not require Mr.

Cardwell's or his Davis Polk peers' level of experience; (iii) assignments that involved

temporarily assisting in the middle or end of a matter (which, if staffed repeatedly on such

matters, makes it difficult for an attorney to get the type of experiences that are expected or

required of mid-level and senior associates); (iv) assignments that involved M&A partners being

able to ignore and not communicate with Mr. Cardwell with very little impact to the Firm or

M&A group.

---

[41] *See* Ex. 18, Follow-up Presentation with Tom Reid.

148.208.        On June 28, 2016, Ms. Clausen emailed Mr. Cardwell and asked him to

reach out to a White senior M&A associate to assist M&A partner Gar Bason on a non-deal

assignment. The email stated:

> "*Can you please reach out to [the senior M&A associate] to assist [*the associate*] with a [Directors & Officers] review assignment for Gar and [REDACTED]. She said it's not a rush but should be completed in the next week or two. It is the **review** of indemnity **agreements**, so probably would take 20-30 hours*." (emphasis added).

Mr. Cardwell agreed and was staffed on the assignment.

149.209.        On June 30, 2016, Ms. Clausen asked Mr. Cardwell (and Mr. Cardwell

agreed) to help a senior M&A associate on a PowerPoint presentation that did not require the

legal experience or knowledge of a second-year associate. The associate's staffing request for

this assignment stated: "*I need a **first** or second year to help me update the statistic in the

attached as soon as possible.*" (emphasis added). At the time, the associate indicated to Mr.

Cardwell that the associate was surprised that they were once again working together.

150.210.        On June 30, 2016, as noted above, Mr. Bick staffed Mr. Cardwell on an

additional research assignment. Mr. Bick's email to Mr. Cardwell stated: "Let me know when

you have a spare moment to discuss **another research assignment** re [REDACTED]."

(emphasis added).

151.211.        Thereafter and for each week from  July 2016 through May 2017, Mr.

Cardwell included in his weekly workload request/capacity form an additional request to work

with five specific partners who frequently ran M&A deals: Mr. Reid, Mr. Birnbaum, and M&A

partners Mr. Goldberg, Oliver Smith, and Lee Hochbaum. Although Mr. Cardwell's requests

were in line with the Firm's normal, nondiscriminatory staffing protocols, most of Mr.

Cardwell's assignments, to his and other Firm associates' confusion, continued to be either non-

deals or with the same handful of senior associates with whom Mr. Cardwell was already working or had already worked with.

~~152.~~212.      On July 8, 2016, Mr. Cardwell was staffed on a simple matter with a non-White senior M&A associate. The associate's staffing request to Ms. Fenner stated:

> "*Hi [Ms. Fenner], Now that [REDACTED] is away on secondment, would it be possible to have another second year help me with the corporate governance matters for [REDACTED]? The only immediate task is a **simple matter** for Monday, otherwise **10% is enough** until towards the end of the year.*"

(emphasis added). The associate's reference to "10% is enough" meant that the senior associate estimated that the assigned associate would only use about 10% of their total weekly capacity on the matter. Notably, and predictably, if an associate's capacity is full of similarly small matters (i.e., as measured by the estimated or actual capacity required), such associate will not have enough capacity to work on a M&A deal, which can often require an associate to have an available capacity around 40-100%.

~~153.~~213.      On July 13, 2016, Mr. Cardwell was staffed on a non-deal matter involving a White woman senior M&A associate. At the time, the senior associate had informed Mr. Cardwell that she had a discussion with either the supervising partner on the matter or her M&A partner advisor to discuss her concern that this matter was (i) not a deal, (ii) not the type of matter clients typically hire the Firm's M&A group to work on, (iii) unlikely to help her develop critical and desired deal experience, and (iv) potentially the type to become too cumbersome and ultimately soak up her capacity such that she'd be effectively prevented from having enough capacity to work on deals.

~~154.~~214.      On July 19, 2016, as referenced above, Mr. Cardwell sent an email to Mr. Bick, stating: "*John, As discussed, please find attached a draft summary of the financial*

*arrangement between [REDACTED] and [REDACTED]. Please let me know if you have any questions or comments. Happy to discuss.*" Mr. Bick never responded to Mr. Cardwell's email.

~~155.~~215.    On July 20, 2016, Davis Polk Junior Staffing Coordinator #3 reached out to Mr. Cardwell and staffed Mr. Cardwell on a small project that would only require a handful of sporadic hours. Davis Polk Junior Staffing Coordinator #3's email stated: "*Hi [Mr. Cardwell], Darren Schweiger needs some help with a **small project** for a joint venture. It will be a **handful of hours** between today and Wednesday, then more **sporadic** after that. Can you please help out with this?*" (emphasis added).

~~156.~~216.    On July 22, 2016, after many months, Mr. Cardwell was finally staffed on an M&A deal. As instructed by Ms. Fenner, on July 22, 2016, Mr. Cardwell reached out to Mr. Brass, a White then-senior M&A associate and current M&A Davis Polk partner. Mr. Cardwell's email exchange with Mr. Brass went as follows:

- **Mr. Cardwell to Mr. Brass** (2:39 p.m.): "*Hi Daniel, I'll be assisting you on the [REDACTED] deal. When your schedule permits, please let me know when you'd like to discuss.*"

- **Mr. Brass's Response** (2:41 p.m.): "*Thanks. [The senior associate] will reach out to you [sic]*"

- **Mr. Cardwell's Response** (2:46 p.m.): "*Thanks, Daniel.*"

- **Mr. Brass's Response** (5:38 p.m.): "*I think you stand down for now!*"

- **Mr. Cardwell's Response** (5:42 p.m.): "*Thanks, Daniel. Will do. Any sense if and when the status of the deal could change?*"

- **Mr. Brass's Response** (5:43 p.m.): "*I think we are ok for the near future.*"

- **Mr. Cardwell's Response** (5:44 p.m.): "*Understood.*"

~~157.~~217.    Mr. Brass's abrupt removal of Mr. Cardwell from the M&A deal was done in secret and without the permission of Ms. Fenner, the staffing coordinator. It is a practice at Davis Polk for senior associates to explain to junior associates how the status or nature of a deal

has changed and how the change impacts the junior associates previously discussed role on the deal.

158.218.    Despite Mr. Cardwell's follow-up questions and the fact that Mr. Brass knew that it was a Davis Polk practice for senior associates to explain material changes to a junior associate's assigned role on a matter, Mr. Brass provided no such explanations and Mr. Cardwell had not choice to accept that Mr. Brass was not going to provide any such explanations to him.

159.219.    Mr. Brass's discriminatory actions were willful and blatant. After this incident, Mr. Brass never worked on any active deals with Mr. Cardwell and never had any conversations with Mr. Cardwell about the July 22, 2016 deal that he replaced Mr. Cardwell on.

160.220.    On July 22, 2016, at 6:04 p.m., Mr. Cardwell emailed the above email conversation to Ms. Fenner, alerting her to Mr. Brass's unauthorized, disparate treatment of Mr. Cardwell. Ms. Fenner did not provide an explanation for Mr. Brass's behavior and merely acknowledged receipt of Mr. Cardwell's email.

161.221.    On July 26, 2016, as referenced above, Mr. Cardwell sent a follow-up email to Mr. Bick (that included the July 19, 2016 email to Mr. Bick), stating: "*Hi John, Just a quick follow-up on the below. Happy to discuss if you have any questions or comments.*" Mr. Bick never responded to Mr. Cardwell.

162.222.    On August 4, 2016, Ms. Fenner asked Mr. Cardwell if Mr. Cardwell could temporarily "cover" for a first-year associate who was going on vacation for two weeks. Mr. Cardwell agreed, and the first-year associate replaced Mr. Cardwell once she returned from vacation.

163.223.        Also, on August 4, 2016, Mr. Cardwell followed-up with Ms. Fenner to try to understand why Mr. Brass removed Mr. Cardwell from the deal on July 22, 2016. Mr. Cardwell asked Ms. Fenner the following: "*Separately, and in light of the email that I forwarded to you on the 22nd, has **anyone** made a decision to limit my involvement to certain types of deals and matters?*" (emphasis added).

164.224.        This August 4, 2016 incident is the fourth time that Mr. Cardwell flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

165.225.        Rather than email Mr. Cardwell back, Ms. Fenner called Mr. Cardwell and passionately told him: "*Not at all. I'm not sure what happened on that deal [with Mr. Brass] and haven't talked to anyone since. Do you know what happened?*" After Mr. Cardwell responded that he never received any explanation for why he was removed, Ms. Fenner informed Mr. Cardwell that Mr. Brass replaced Mr. Cardwell with a White associate and remarked that Mr. Brass's behavior was "weird."

166.226.        The White M&A associate that Mr. Brass replaced Mr. Cardwell with was similarly situated in all material respects to Mr. Cardwell Cardwell, including because both were under the authority and supervision of Mr. Bick, they had the same core responsibilities as M&A/Davis Polk associates, were subjected to the same performance evaluation and discipline standards, and engaged in comparable conduct at the Firm.

167.227.        Mr. Cardwell's performance was on par with or better than the White M&A associate who replaced Mr. Cardwell.

168.228.        Mr. Cardwell's performance was not the reason Mr. Brass replaced him with a White M&A associate and was not the reason Mr. Brass went around the Firm's staffing

procedures which were designed in part to prevent White senior associates from making up reasons to find ways to put White associates on their matters.

~~169.~~229.         Prior to replacing Mr. Cardwell on the deal, Mr. Brass did not ask Mr. Cardwell any questions that would have given Mr. Brass an ability to assess Mr. Cardwell's availability to work on the deal in a particular way or whether Mr. Cardwell had relevant experience or expertise on the tasks that ultimately were given to the replacement White M&A associate.

~~170.~~         Mr. Brass did not ask Mr. Cardwell any questions that would have allowed Mr. Brass to determine if the White M&A associate that he replaced Mr. Cardwell with was actually a better fit ~~for the deal~~(based on performance) for the deal. In fact, the opposite happened: On July 22, 2016, Mr. Brass was hoping to work with any associate as long as that associate was not Mr. Cardwell.

230.     Specifically, on July 22, 2016, Ms. Fenner attempted to staff Mr. Cardwell with Mr. Brass by telling him: "Hi Dan, The only 2nd year I can offer today/foreseeable future is Kaloma Cardwell. . . . Would that work?" Mr. Brass replied by saying: "How is he rating at the moment? Last time I used him it really wasn't great."[42] Ms. Fenner replied by making it clear that Mr. Cardwell's performance would not be an issue, saying: "I think with the proper amount of supervision he can do a good job. . . . Laura has worked with him lately."

231.     Mr. Brass was simply looking to avoid working with Mr. Cardwell. Once Mr. Brass realized he might be staffed with Mr. Cardwell, Mr. Brass stopped looking for an associate with a particular type of documented performance or ability. Mr. Brass immediately replied to

---

[42] Mr. Brass made this statement after the Firm's pretextually created June 2016 mid-year review cycle for Mr. Cardwell.

Ms. Fenner's comments about Mr. Cardwell being able to do a "good job" by asking Ms. Fenner: "Ok – what other first years (regardless of ability) have time?"

232.    After initially asking Ms. Fenner if she could find him a second-year associate, which Mr. Cardwell was at the time, Mr. Brass made it clear that he would be willing to work with a first-year associate—regardless of that associate's ability, and regardless of the fact that first-year associates typically required more supervision and assistance than second year associates (which Mr. Cardwell was at the time).

233.    To be clear, all of Davis Polk's first and second-year M&A associates—no different than the Firm's slightly more senior M&A associates—required "supervision" from someone who was one year removed from being elected partner and was senior as Mr. Brass was at the time.  Mr. Brass did not have a legitimate, non-discriminatory reason for seeking to replace Mr. Cardwell regardless of the potential replacement associate's ability.

234.    Mr. Brass was willing to tell Ms. Fenner whatever needed to be said in order to not work with Mr. Cardwell. The following sequence illustrates how Mr. Brass provided shifting explanations in order to distance himself from Mr. Cardwell:

- On October 28, 2015, in an email with the subject line "Feedback for Kaloma Cardwell," Ms. Fenner asked Mr. Brass: "Hi Dan, Do you mind providing your review? I'm chasing after some additional reviews because his folder is currently very thin." Mr. Brass replied to Ms. Fenner by telling her: "I really only had a very little direct context with him on [the deal] – I think [another associate's] review would be much more realistic. I don't think I would be able to say much worthwhile."

- Yet, on July 22, 2016, Mr. Brass attempted to avoid being staffed with Mr. Cardwell by stating that the "[l]ast time I used him it really wasn't great."

- Then, on September 28, 2016, Ms. Fenner once against asked Mr. Brass if he "[w]ould be willing to give feedback on Kaloma based on the [2015] deal (or any other interaction)?" Mr. Brass replied to Ms. Fenner, claiming: "I am afraid that for Kaloma I had virtually no direct interaction."

**PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)**

235.    Tellingly, Mr. Brass acted as if he did not have enough interaction with Mr. Cardwell to provide positive feedback about Mr. Cardwell even though Mr. Brass and Mr. Cardwell worked on a three-person team in 2015 and the other, mid-level associate on the deal described Mr. Cardwell in his performance review as "with" his class, "hardworking and willing to help," and having done "a good job with the schedules and other diligence matters on the deal."

236.    In the second half of 2016, Mr. Brass did not want to work with Mr. Cardwell, the Black associate who was talking about race and discrimination at Davis Polk and who Mr. Bick had stigmatized as an associate who received a "mid year" review." Mr. Brass was willing to and did say whatever needed to be said about Mr. Cardwell's performance in order to avoid working with him.

~~171.~~237.    Lastly, and as stated above, the way in which Mr. Brass replaced Mr. Cardwell was in violation of antidiscrimination protections that were part of the Firm's staffing policies. Davis Polk's staffing policies did not give Mr. Brass, an associate at the time, any authority or permission to unilaterally and permanently replace Mr. Cardwell on a deal that the Firm's staffing coordinators had assigned to Mr. Cardwell.

~~172.~~238.    When Ms. Fenner questioned Mr. Brass, Mr. Brass admitted that he made the decision to replace Mr. Cardwell on the deal.

~~173.~~239.    Mr. Cardwell's race was a motivating factor in Mr. Brass's decision to replace Mr. Cardwell with a White M&A associate ~~and~~. to depart from the Firm's staffing policies by not inform the staffing coordinator who assigned Mr. Cardwell on the deal that he had replaced Mr. Cardwell, and to provide shifting explanations as to why he could not and would not work with Mr. Cardwell.

174.240.    Despite a Davis Polk staffing coordinator's insistence that Mr. Cardwell's staffing was not in any way limited to certain types of deals and matters, as a result of how the Firm did and didn't staff Mr. Cardwell during 2016, Mr. Bick, Mr. Wolfe, and Mr. Birnbaum ensured that Mr. Cardwell was unjustifiably underutilized and underdeveloped. For more than five successive weeks in mid-2016, Mr. Cardwell indicated on his weekly workload request/capacity form that he had a capacity of greater than 50% (i.e., more than half of his hours were available for new assignments).

175.241.    Mr. Cardwell's race was a motivating factor in Mr. Bick, Mr. Wolfe, and Mr. Birnbaum's decisions to impermissibly underutilize Mr. Cardwell. None of the Firm's White M&A(i) associates (who were similarly situated to Mr. Cardwell in all material respects as Mr. Cardwell ) who did not make any discrimination complaints about the Firm and its partners and (ii) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects) were underutilized through staffing the way that Mr. Cardwell was.

242.    As a result of Mr. Bick's pretextual mid-year 2016 review cycle, and Mr. Cardwell's complaints about discrimination, the Firm's M&A partners repeatedly went out of their way to avoid any direct or meaningful interaction with Mr. Cardwell.

176.243.    On August 16, 2016, Mr. Cardwell was staffed on an M&A deal with a senior M&A associate and Leonard Kreynin, a Davis Polk Corporate Partner, which was essentially the first and last M&A deal that Mr. Cardwell was staffed on in 2016 ("Mr. Cardwell's Last 2016 Deal").

177.244.    On August 18, 2016, per a White senior M&A associate's instruction, Mr. Cardwell emailed M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis and cc'd the senior associate. In connection with the June 28, 2016 assignment that Mr. Cardwell was staffed

on, Mr. Cardwell sent the M&A partners Mr. Cardwell's draft of an indemnification agreement

for their review and edits. Mr. Cardwell's email stated:

> "*All, A few weeks back, [REDACTED] asked us to take a look at their current indemnification agreement and summary of indemnification policy as part of a general corporate housekeeping review. We reviewed the indemnification agreement against [Davis Polk's] standard form and other resources/precedents we found. Generally, we thought that the agreement was in good shape and only had a few suggestions. Attached please find our comments to the indemnification agreement and policy summary. Also attached for your reference is [REDACTED] main indemnification policy. We are happy to discuss.*"

Neither Arthur Golden, Gar Bason Jr., nor Michael Davis responded to Mr. Cardwell's email or

otherwise communicated with Mr. Cardwell.

178.245.     On September 7, 2016, per the senior associate's instruction, Mr. Cardwell

emailed M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis again with a follow-up

reminder regarding Mr. Cardwell's email. The email stated:

> "*All, Quick follow-up regarding our review of [REDACTED] indemnification agreement and indemnification policy. Please let us know if we can be of any* further *assistance or if you have any questions or comments.*"

Again, neither Arthur Golden, Gar Bason Jr., nor Michael Davis responded to Mr. Cardwell's

email or otherwise communicated with Mr. Cardwell.

179.246.     Instead, and even though it was clear from the email that Mr. Cardwell

was the primary reviewer and editor of the documents, Arthur Golden chose to separately reach

out to the White senior associate and exclusively discuss with the senior associate his edits to the

documents.

180.247.     On September 9, 2016, per the same White senior associate's instruction,

Mr. Cardwell emailed Gar Bason Jr. a third time and cc'd Arthur Golden and the senior

associate. The email stated: "Gar, *Attached, please find revised drafts that reflect Arthur's*

*comments…. Please let us know if you have any further comments.*" Gar Bason Jr. never

responded to Mr. Cardwell's email.

~~181.~~248.       At the time, the White senior M&A associate expressed confusion to Mr.

Cardwell as to why none of Davis Polk's M&A partners ever responded to Mr. Cardwell's

emails. At no point during the matter, did of any of Davis Polk's partners ever respond to Mr.

Cardwell's email or verbally communicate with Mr. Cardwell.

~~182.~~249.       Arthur Golden's, Gar Bason Jr.'s, and Michael Davis's lack of

communication with Mr. Cardwell cannot be explained by the quality of Mr. Cardwell's work on

the assignment or the senior attorney's conclusions at the time about the quality of Mr.

Cardwell's work. In an email dated August 15, 2016, the White senior M&A associate provided

the following feedback to Mr. Cardwell regarding the relevant indemnification assignment:

> "*I'm so sorry it took me forever to review this. **Very good work** on it. Attached please
> find my comments/thoughts. Some items I thought we could [revert back to the original
> language as opposed to using your edits] just to minimize changes. Please let me know if
> it would be helpful to discuss.*" (emphasis added).

~~183.~~250.       On September 8, 2016, within days of Mr. Cardwell becoming a third-year

associate, Ms. Clausen asked Mr. Cardwell if he could and would accept being staffed on a

potentially lengthy non-M&A matter (i) that did not involve Mr. Cardwell working directly with

any Davis Polk partners (from any practice group) or M&A associates, or require Mr. Cardwell's

(or his peers') level of experience and (ii) that would have further stalled Mr. Cardwell's

development as a soon-to-be mid-level M&A attorney who would be evaluated within the Firm

as an M&A attorney. Specifically, in Ms. Clausen's initial email and inquiry, Ms. Clausen asked

Mr. Cardwell if Mr. Cardwell could assist with a list of tasks, including "one-off tasks," that are

widely understood within Davis Polk and corporate law to be tasks that are routinely assigned to

first-year (and possibly second-year) associates.

184.251.       What is more, Ms. Clausen's initial email and inquiry made it clear that

Mr. Cardwell was not being staffed as part of a larger plan to develop Mr. Cardwell as an

attorney but because, at least according to Ms. Clausen, "[the Firm's finance] juniors [were] over

capacity and [the Firm had] a few juniors going on vacation." For these reasons and others,[43] and

because Ms. Clausen merely asked Mr. Cardwell about his interest and capacity to work on the

non-M&A matter (as opposed to instructing Mr. Cardwell to work on the non-M&A matter), Mr.

Cardwell called Ms. Clausen to discuss.

185.252.       During their phone call, Ms. Clausen stated that she was apologetic for

having to ask Mr. Cardwell if he could accept a non-M&A assignment. Mr. Cardwell asked if

they could briefly meet to discuss Ms. Clausen's inquiry. Ms. Clausen and Mr. Cardwell met

shortly thereafter.

186.253.       In their meeting, Ms. Clausen repeated the statements in her email and

described how the attorneys in the Firm's Finance Group were unusually busy and could use

assistance. Ms. Clausen explicitly stated that she had reached out to a number of associates who

had previously rotated through the Firm's Finance Group and that she had similarly reached out

to Mr. Cardwell because he had experience working in the Firm's Finance Group.

187.254.       Mr. Cardwell briefly described his assignment history and told Ms.

Clausen something that is substantially similar to the following:

> "*I'm more than happy to work on anything you or anyone else would like me to, but I
> wanted to share two concerns that I have. **As a Black associate, I'm concerned** about the
> **general pattern** that exists across the legal profession and **within Davis Polk**. That is, it's
> typically the case that when Black associates are fourth-, fifth-, and sixth-year associates,
> White associates often have—for reasons that have nothing to do with merit or work
> ethic—a resume with more experience and better quality work than Black associates of
> the same year. Because those are my concerns, I am trying to get as much work in M&A*

---

[43] At Davis Polk, it was and is not uncommon for associates to receive an inquiry related to a possible assignment
and for the associate to discuss the timing or "fit" with the staffing coordinator, as all parties are incentivized to
assess whether accepting the assignment makes sense or is best.

*as possible and work with as many M&A attorneys and partners as possible. The reality is that a potentially lengthy [Finance] assignment, which we know expected-to-be short [Finance] assignments can unavoidably become virtually year-long assignments in the Firm's [*Finance*] group, will pull me away from opportunities to learn and work with M&A attorneys.*" (emphasis added).

~~188.~~255.    Mr. Cardwell expressly noted that he didn't want his career and trajectory to become a part of the pattern described above. During the conversation, Mr. Cardwell also explicitly told Ms. Clausen that he'd be happy to work on any assignment that the Firm wanted him to work on, including the non-M&A assignment she initially inquired about, as long as she and the Firm could ensure that the staffing was not a part of the pattern of discrimination described above.

~~189.~~256.    While Mr. Cardwell does not remember every word from their conversation, Mr. Cardwell remembers that he made it clear that he was not just talking about a general pattern in the legal profession, but that he was talking about what he was observing and experiencing at Davis Polk.

~~190.~~257.    Ms. Clausen responded in a way that made it clear to Mr. Cardwell that she understood that he just made a race-based discrimination complaint about what he had observed at Davis Polk and that he thought ~~he~~ she was staffing him in a racially biased way.

~~191.~~258.    Ms. Clausen responded by trying to reassure Mr. Cardwell that her attempt to staff him on the finance assignment had nothing to do with his race or anyone else's race.

~~192.~~259.    In her attempt to convince Mr. Cardwell that his race had nothing to do with it, Ms. Clausen told Mr. Cardwell the names of about five or six other associates (i) who she claimed she had asked to help with Firm's finance group and, similar to Mr. Cardwell, (ii) whose assigned practice groups were not finance.

193.260.        Mr. Cardwell listened patiently as she attempted to explain the process that she used to staff other associates and Mr. Cardwell and how that process was not impacted by race.

194.261.        Mr. Cardwell responded by pointing her to specific racial dynamics related to way she was attempting to staff him and specific advantages that the process was conferring to the Firm's White associates, especially the Firm's White male associates.

195.262.        At one point, Mr. Cardwell explicitly said: "I don't know if you noticed, but of the names you just listed, every name belongs to a person of color or someone who isn't a White man."

196.263.        Ms. Clausen tried again to explain that the way in which she was attempting to staff him had nothing to do with race, saying: "No, I didn't notice that. Wait. That can't be true, because I've also asked [PERSON A] and [PERSON B]."

197.264.        After stating two more names, Ms. Clausen stopped midsentence, realized that she had just named two more Davis Polk associates who were people of color, and told Mr. Cardwell: "**I get your point**." (emphasis added.)

198.265.        After hearing the above statements, and after Mr. Cardwell went back and forth with her to make sure she understood that he believed she and the Firm were, in that moment, staffing associates of different races differently and to the advantage of White associates, Ms. Clausen told Mr. Cardwell that she would not staff him on the Finance/non-M&A matter.

199.266.        Ms. Clausen added: "*You clearly have thought about **this** a lot more than I have. If you feel strongly about **this**, then I understand and simply won't staff you on any [Finance] assignments.*" Mr. Cardwell then reiterated again that, if the Firm had a plan to

prevent him from being staffed in a discriminatory manner, he'd be happy to work any assignment the Firm wanted him to, including the Finance/non-M&A assignment. Ms. Clausen again responded by saying she wouldn't staff Mr. Cardwell on the non-M&A assignment.

~~200.~~267.    Following their conversation and Mr. Cardwell's complaints about race impacting how and why he was being asked to work on this particular assignment, Ms. Clausen did not arrange or coordinate any new assignments for Mr. Cardwell and did not have any subsequent conversations with Mr. Cardwell about the concerns he shared with her.

~~201.~~268.    Both (i) Ms. Clausen decision not to staff Mr. Cardwell and (ii) certain defendants' decision not to staff Mr. Cardwell on (and remove Mr. Cardwell from) deals in the weeks and months that followed this incident, ~~constitute~~were adverse employment actions.

~~202.~~269.    Ms. Clausen did not staff Mr. Cardwell ~~because she understood~~ and was aware that Mr. Cardwell had just raised a race--based discrimination complaint regarding how she was attempting to staff him and attempted to staff others on assignments that were not related to associates' assigned practice groups.

~~203.~~270.    In August and September of 2016, Ms. Clausen worked with Mr. Bick, Mr. Wolfe, and Mr. Birnbaum to determine which M&A associates she could reach out to and staff on finance matters (i.e., matters outside of M&A associates' assigned practice groups).

~~204.~~    In August and September of 2016, Mr. Bick, Mr. Wolfe, and Mr. Birnbaum did not ask (or give Ms. Clausen permission to staff) any of the ~~White M&A~~(i) associates (who were similarly situated to Mr. Cardwell in all material respects ~~(i.e., the White M&A Comparators) to Mr. Cardwell on any finance matters (i.e., matters outside of the White M&A associates' assigned practice group of M&A) the way Mr. Cardwell was.~~

**PROPOSED THIRD AMENDED COMPLAINT**
**(WITHOUT EXHIBITS)**

205.271.        ~~In August and September of 2016, Ms. Clausen~~ ) who did not ~~attempt~~

~~staff~~make any ~~of~~discrimination complaints about the Firm and its partners and (ii) White

~~M&A~~and other non-Black associates (who were similarly situated to Mr. Cardwell in all material

respects ~~(i.e., the White M&A Comparators) to Mr. Cardwell~~) on any finance matters ~~(i.e.,~~

~~matters outside of the White M&A associates' assigned practice group of M&A)~~ the way ~~that~~

Mr. Cardwell was.

206.272.        Throughout the entire meeting, and in every conversation since, Ms.

Clausen's and Mr. Cardwell's conversation was cordial, professional, and non-confrontational.[44]

207.273.        This September 8, 2016 incident is the fifth time that Mr. Cardwell

flagged personally experienced discrimination and actively sought help from Davis Polk and

persons with sufficient authority to address it.[45]

208.274.        Shortly after his conversation with Ms. Clausen, Mr. Cardwell informed a

Black Davis Polk associate of his conversation, as it is described in this Complaint, and the

discrimination and staffing concerns that he raised. This lawyer is now counsel at Davis Polk.

275.    Immediately following the September 8, 2016 complaint, Ms. Clausen discussed

Mr. Cardwell's complaint with Davis Polk's Executive Director of Personnel (Ms. Crane), the

head of Davis Polk's Associate Development Department (i.e., Ms. DeSantis), and the

Department's other managers (i.e., Ms. Fenner and Ms. Fabe).

---

[44] On August 3, 2017, Davis Polk received the substance of the above description of Mr. Cardwell's conversation involving Ms. Clausen in Mr. Cardwell's August 2017 EEOC Filing. Upon information and belief, Ms. Clausen's last day as an employee of Davis Polk was August 18, 2017, which suggests that Ms. Clausen 's exit (or termination) from the Firm was in connection with Mr. Cardwell's August 2017 EEOC Filing.
[45] The discrimination and retaliation stemming from this incident was not restricted to September 8, 2016; rather, such discrimination and retaliation continued—and were in connection with—the lack of staffing and disparate treatment that Mr. Cardwell experienced over the following six to eight months, including, as explained below, Mr. Birnbaum's and Mr. Wolfe's refusal to staff Mr. Cardwell in September, October, November, and December 2016.

209.276.          Shortly after his conversation with Associate Development manager and staffing coordinator Ms. Clausen, Mr. Bick, Mr. Wolfe, and Mr. Birnbaum were informed of Mr. Cardwell's September 8, 2016 complaint.

277.     Specifically, on September 9, 2016, Sharon Crane, Davis Polk's Executive Director of Personnel, emailed the head of the Associate Development Department (i.e., Ms. DeSantis) and told her: "If you talk to John [Bick] today about the other stuff please mention Kaloma. As discussed, he needs to be someone's project as soon as possible i.e. get work and hours and direct feedback. Given his conversation with Rocio [Clausen] I don't think it makes sense to wait to implement sometime in January after review season."

278.     On or around September 9, 2016, upon information and belief, Mr. Bick discussed Mr. Cardwell's September 8, 2016 complaint with Ms. DeSantis and had knowledge of Mr. Cardwell's September 8, 2016 complaint.

279.     As of September 9, 2016, and in direct response to Mr. Cardwell's September 8, 2016 complaint, the Firm was coordinating with Mr. Bick to ensure that Mr. Cardwell would receive enough "feedback" to establish a basis for subjecting Mr. Cardwell to another pretextual "mid year" performance review—the very thing the Firm needed as a matter of Firm practice to terminate Mr. Cardwell and claim Mr. Cardwell's termination was justified.

280.     Mr. Bick did not wait to "implement" their plan to lay the groundwork to terminate Mr. Cardwell "sometime in January after review season."

281.     Between October 2016 and November 2016, Associate Development Department assessed Mr. Cardwell's performance and reviews for the period of September 2015 – September 2016 and explicitly recommended that the Firm not give Mr. Cardwell a 2017 performance based

mid-year review in connection with this review period (which was the period covered in his December 2016 annual review meeting).

282.     Between October 2016 and November 2016, the head of Davis Polk's Associate Development Department and its managers had created a list of M&A associates who they believed should receive a mid-year review in 2017, and they did not include Mr. Cardwell on that list. When discussing this list of associates who should receive a 2017 mid-year performance review, they did not mention Mr. Cardwell's name. In fact, on November 7, 2016, the Associate Development Department explicitly told Mr. Bick that "[Associate #5]" "would be the only midyear review out of M&A in this review cycle."

283.     Later that day, however, Mr. Bick instructed a manger in the Associate Development Department (i.e., Ms. Fenner) to add Mr. Cardwell to a list of M&A associates who would receive a performance-based mid-year review in 2017.[46] Shortly after, Mr. Cardwell's name appeared on a series of email chains that included lists of associates who were scheduled to be told they must leave the Firm (i.e., receive "time to go messages"), among others whom the Firm scheduled to receive a mid-year performance review (i.e., a review cycle used to give an associate a chance to see if sufficient progress has been made and if a "time to go" meeting is warranted).

284.     These emails indicate that Davis Polk used a "process" that involves scheduling "mid-year reviews" in connection with "[time to go]" meetings. Sometimes, Davis Polk

---

[46] On November 14, 2016, upon receiving Mr. Bick's instructions, Ms. Fenner emailed Mr. Kreynin, the partner scheduled to conduct Mr. Cardwell's December 2016 annual review and said, "When you meet with Kaloma to deliver his review, would you please mention that we'll plan to meet with him again in June 2017 (midyear review) to see if there has been progress in the areas discussed? Also, please let me know if you'd like me to do a first draft of the message to be delivered to him (positives, areas of improvement, etc.). I know it's a tricky one."

simultaneously scheduled "time to go meetings" prior to or around the same time associates were expected to receive a mid-year performance review cycle/meeting.

210.285.    Consistent with the M&A partners' practice, all of the M&A partners met at the end of September/beginning of October to discuss Mr. Cardwell and the other M&A associates' professional development, performance, and performance reviews, and the M&A partners' Consensus Feedback for such associates.

211.286.    Mr. Reid and the M&A partners discussed Mr. Cardwell's September 98, 2016 discrimination complaint during these October meetings and conversations.[47]

212.287.    Thus, withinWithin about a month of Mr. Cardwell making his race-based discrimination complaint about how he was being staffed on September 98, 2016, all of the Davis Polk's M&A partners at that time, including Mr. Bick, Mr. Chudd, Mr. Wolfe, Mr. Birnbaum, Mr. Butler, and Mr. Kreynin had knowledge of Mr. Cardwell's September 98, 2016 discrimination complaint.

213.288.    In September 2016, Mr. Cardwell became a third-year associate.

214.289.    On September 29, 2016, and after Mr. Cardwell had billed almost 235230 hours for the month, Davis Polk removed Mr. Cardwell from Mr. Cardwell's Last 2016 Deal. The Firm removed Mr. Cardwell from the deal with the following email, which was sent by the senior associate on the deal:

> "*[Mr. Cardwell], Since you have been tied up with the [REDACTED] restructuring, we have asked [REDACTED/a second-year associate] to fill in for you through signing on [REDACTED]. Please let us know when you free up. I hope things get more manageable soon.*"

---

[47] Davis Polk's statements in its NYSDHR statement described this meeting, asserting that "when *the partners* met to decide on the *messages* to be given to associates as part of the formal, annual review cycle, Cardwell's second annual review cycle at the Firm, the Firm decided in October 2016 to try to give Cardwell…. *The partners* appointed Kreynin to deliver Cardwell's review based on this consensus message. During the review, Kreynin explained that *the partners* had identified…" Davis Polk NYSDHR Statement, Ex. 2 at 10.

215.290.     The "restructuring" matter that the associate referred to in his email was the same matter that a senior M&A associate had flagged for a M&A partner when she was staffed on it and had described as (i) not a deal, (ii) not the type of matter the Firm's M&A group typically works on, (iii) unlikely to help her develop critical and desired M&A/deal experience, and (iv) the type to become too cumbersome and potentially consume so much of her capacity that she'd effectively be prevented from having enough capacity to work on a deal. The Firm did not staff Mr. Cardwell on another M&A deal over the next eight months.

216.291.     Mr. Reid, Mr. Wolfe, and Mr. Birnbaum's decision to pull Mr. Cardwell from the deal on September 29, 2016 and to not to staff Mr. Cardwell on an M&A deal for over the next eight months was a retaliation in response to Mr. Cardwell's September 98, 2016 discrimination complaint about staffing.[48]

217.292.     Within months of Mr. Cardwell being permanently assigned to Davis Polk's M&A group in April 2016, (i) Mr. Bick conducted a sham face-to-face review designed to set the foundation for Davis Polk terminating Mr. Cardwell; (ii) Davis Polk, including Mr. Bick, Mr. Wolfe, and Mr. Birnbaum, effectively went an entire year without staffing Mr. Cardwell on deals and matters at the same rate or in the same way as White(a) associates (who were similarly situated to Mr. Cardwell in all material respects to Mr. Cardwell;) who did not make any discrimination complaints about the Firm and its partners and (b) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects); (iii) a White senior Davis Polk attorney violated the Firm's staffing policies and practices and removed Mr.

---

[48] In Davis Polk's NYSDHR Answer and Position Statement, Davis Polk attempted to re-characterize Mr. Cardwell's discrimination complaint to Ms. Clausen by claiming that Mr. Cardwell "signaled his refusal to accept a cross-department assignment." *See* Ex. 2, Davis Polk NYSDHR Statement at 20.

Cardwell from a deal; and (iv) the Firm strategically used Mr. Cardwell's non-deal assignments

as a justification to remove Mr. Cardwell from Mr. Cardwell's Last 2016 Deal.

***Coincidence? Of Course Not.***

218.293.　　　In accordance with the Firm's policy at the time, the two most junior

M&A partners were responsible for staffing all third-year and more senior associates.[49, 50] This

meant that asAs early as September 2016, Mr. Birnbaum and Mr. Wolfe received and reviewed

Mr. Cardwell's (and other M&A associates in Mr. Cardwell's class) weekly workload

request/capacity forms, which noted the matters he and other associates were working on and

how many hours they had available to take on additional work. Moreover, Davis Polk had

computer programs that tracked how many billable hours associates had and hadn't billed,

among other data related to staffing. In this role, Mr. Birnbaum and Mr. Wolf had direct

knowledge of Mr. Cardwell's availability and were the individuals responsible for staffing Mr.

Cardwell on assignments.

219.294.　　　Mr. Birnbaum and Mr. Wolfe knowingly did not staff Mr. Cardwell on

any matters in 2016, which means that, for consecutive months, Mr. Birnbaum and Mr. Wolfe

ensured that Mr. Cardwell was assigned to and had zero hours of work.  Mr. Birnbaum and Mr.

Wolfe did not attempt to discuss, or have any conversations, with Mr. Cardwell about why they

and the Firm decided not to assign Mr. Cardwell to any new matters. Mr. Birnbaum never

---

[49] On July 1, 2016, Mr. Wolfe emailed the Firm's entire corporate department to notify the Firm's corporate associates and partners that Mr. Wolfe and Mr. Birnbaum were the staffing coordinators for the Firms M&A group. Mr. Wolfe's email stated that, "Going forward, requests for senior and mid-level M&A associates staffing should be directed to [Mr. Birnbaum] or me [i.e., Mr. Wolfe]. [Ms. Fenner] will continue to oversee staffing for junior associates in the M&A group."
[50] In response to Mr. Cardwell, who was a third-year associate at the time, asking Ms. Fenner: "When a staffing request is made, you determine which associates could be and ultimately are asked to work on matters, correct?", Ms. Fenner stated that, "The staffing partners (currently Brian Wolfe and Harold Birnbaum) handle staffing for third years and more senior…. [A staff person] puts all updates [from the weekly workload request/capacity forms] together in one chart, which gets sent to the staffing partners…."

mentioned or addressed Mr. Cardwell's unjustifiably low hours, or anything related to the quality

of Mr. Cardwell's work product. Contrary to their interactions with Mr. Cardwell, Mr. Birnbaum

and Mr. Wolfe routinely and consistently staffed and communicated with ~~White~~(i) associates

(who were similarly situated to Mr. Cardwell in all material respects) who did not make any

discrimination complaints about the Firm and its partners and (ii) White associates and other

non-Black associates (who were similarly situated to Mr. Cardwell in all material respects) about

such associates' hours, workload, and staffing. *See* "Comparators" Section *infra* (defining these

individuals as "Presently Known Comparators" of Mr. Cardwell).

~~220.~~295.        Davis Polk, as well as Mr. Bick, Mr. Birnbaum, and Mr. Wolfe,

knowingly departed from the Firm's normal staffing process and intentionally eliminated Mr.

Cardwell's billable hours in ways that did not happen to any ~~White associates who were~~

~~similarly situated in all material respects to Mr. Cardwell.~~ (i) associates (who were similarly

situated to Mr. Cardwell in all material respects) who did not make any discrimination

complaints about the Firm and its partners  and (ii) White associates and other non-Black (who

were similarly situated in all material respects to Mr. Cardwell). *See generally* "Comparators"

Section (defining these individuals as "Presently Known Comparators" of Mr. Cardwell).

~~221.~~296.        Mr. Bick, Mr. Birnbaum, and Mr. Wolfe pretextually obfuscated evidence

that Mr. Cardwell's experiences (i.e., negative changes in the terms and conditions of his

employment) and Firm-related assessments (and the Firm's conclusions of those assessments)

were or might in the future be unlawfully influenced by Mr. Cardwell's race and/or racial and

legally protected complaints.

~~222.~~297.        The unlawful actions stemming from the June 30, 2016 face-to-face

review was not restricted to June 30, 2016; rather, such discrimination and retaliation

continued—and was in connection with—the dishonest control and influence that Mr. Bick

exerted over Mr. Cardwell's staffing and assessments (and the Firm's conclusions in connection

with such assessments) over the following six to nine months, including Mr. Birnbaum's and Mr.

Wolfe's refusal to staff Mr. Cardwell in September, October, November, and December of 2016.

223.298.          In other words, there was a pattern where week after week, for months,

Mr. Bick, Mr. Birnbaum, and Mr. Wolfe created and implemented a discriminatory and

retaliatory staffing policy that resulted in a continuing violation of Mr. Cardwell rights and

eventual termination, as evidenced, in part, by (i) Mr. Cardwell's weekly request for work via the

Firm's standard weekly workload request/capacity forms, (ii) Mr. Bick, Mr. Birnbaum, and Mr.

Wolfe—partners whose Firm-created responsibilities mandated that they make staffing decisions

for and with Mr. Cardwell—intentionally deciding to not have any conversations with Mr.

Cardwell about staffing opportunities from September 2016 through March 2017, and (iii) Mr.

Bick's, Mr. Birnbaum's, and Mr. Wolfe's decisions to not staff Mr. Cardwell over that same time

period despite Mr. Cardwell's weekly workload request/capacity forms.[51]

---

[51] Not only were these continuing violations known to be unremedied continuing violations by Mr. Cardwell—who subsequently asked Davis Polk's Executive Director of Personnel to investigate Mr. Bick, Mr. Birnbaum and Mr. Wolfe, among others, for their role in Mr. Cardwell's hours and staffing and who filed a supplemental charge of discrimination with the EEOC—they were also considered related instances by Davis Polk itself. For example, it was Davis Polk who argued while Mr. Cardwell was still employed at the Firm, that there were specific and related instances connecting Mr. Cardwell's June 2016 sham review with (i) Mr. Cardwell's staffing in the second half 2016/early 2017; (ii) certain defendants, including Mr. Bick, Mr. Reid, Ms. Hudson, Mr. Birnbaum, Mr. Wolfe, and Mr. Brass; and (iii) the Firm's eventual decision to terminate Mr. Cardwell's employment.

From Davis Polk's NYSDHR Answer and Position Statement: "By the fall of 2016, reviews of Cardwell's performance [namely, two reviews submitted by Ms. Hudson, both in mid-2016, regarding Mr. Cardwell's work with Ms. Hudson that was primarily in 2015] reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role…. This fact was reflected in Cardwell's hours, which were uneven over the course of 2016— relatively low in the early months of the year, during Cardwell's Capital Markets rotation, higher in the summer [when Mr. Cardwell was staffed by non-partners at Davis Polk], and relatively low again later in the fall and for the remainder of the year, in M&A [despite Mr. Cardwell's repeated requests for work via the Firm's standard weekly workload request/capacity forms]."

PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)

224.299.      In the case of Mr. Birnbaum, Mr. Birnbaum went about 443 days (from

about June 14, 2016 to August 31, 2017) without sending Mr. Cardwell a single email,

notwithstanding group emails to practice groups and other listservs (e.g., emails to "All

Lawyers").

225.300.      In the case of Mr. Wolfe, Mr. Wolfe went over 628 days (i.e., from about

April 13, 2016 to the beginning of 2018) without sending Mr. Cardwell a single email (i.e.,

notwithstanding group emails to practice groups and other listservs).

226.301.      Mr. Bick, then the head of the Firm's M&A practice group, similarly

ignored and isolated Mr. Cardwell. Mr. Bick went about 292 days (from about July 15, 2016 to

May 3, 2017) without sending Mr. Cardwell a single email, notwithstanding group emails to

practice groups and other listservs (e.g., to "All Lawyers"). As a result of the coordinated efforts

of Mr. Bick, Mr. Birnbaum, Mr. Wolfe, among others, and the Firm, Mr. Cardwell experienced,

at various times, both unjustifiably low billable hours and drastic drops in billable hours. Mr.

Cardwell's number of hours billed in the second half of 2016 and beginning of 2017, as

determined by the billable hours that Mr. Cardwell submitted and the Firm tracked and accepted

without any disagreement or questioning of Mr. Cardwell, were as follows:

| Mr. Cardwell's Billable Hours[52] | |
| --- | --- |
| Month | # of Hours Billed |
| May 2016<br><br>(Note: Cardwell took a two-week vacation this month)[53] | 101.1 |

---

[52] For additional context, Davis Polk associates typically average between 133 and 175 billable hours a month.
[53] Cardwell took a two-week vacation this month.

**PROPOSED THIRD AMENDED COMPLAINT**
**(WITHOUT EXHIBITS)**

| Mr. Cardwell's Billable Hours[52] |  |
|---|---|
| June 2016<br><br>(Note: Cardwell's hours/staffing were impacted by his vacation and by traveling for his swearing-ceremony)[54] | ~~99.7~~96.9 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | ~~234.7~~229.6 |
| October 2016 | ~~113~~112.4 |
| November 2016 | ~~69~~68.9 |
| December 2016 | 14.1 |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.~~8~~9 |

~~227.~~302.    It is clear from the chart above (and the underlying time sheets) that there is a stark difference between the months where Ms. Fenner (or, in the event of her absence, her non-Firm partner replacement) had primary responsibilities for staffing Mr. Cardwell and the months where Mr. Bick, Mr. Birnbaum, and Mr. Wolfe had exclusive and primary control over staffing Mr. Cardwell. ~~Virtually every~~Every billable hour noted in the chart above (~~and the underlying time sheets) relates~~i.e., that Cardwell accumulated from May 2016 to March 2017) reflects a staffing assignment that Mr. Cardwell received from a ~~non-~~staffing coordinator who was not a Davis Polk partner. In fact, Ms. Fenner, a manager in the Associate Development Department and assignment coordinator repeatedly checked-in with Mr. Birnbaum and other M&A partners and encouraged the Firm's partners to staff Mr. Cardwell.

303.    On November 18, 2016, Ms. Fenner told Mr. Birnbaum in an email that it "would be great if we could give [Mr. Cardwell] *something*." (emphasis added.)

---

[54] Cardwell's hours/staffing were impacted by his vacation and by traveling for his swearing-ceremony.

304.    On December 27, 2016, Ms. Fenner told Mr. Wolfe and Mr. Birnbaum in an email that it "would be great if we could give [Mr. Cardwell] *something*." (emphasis added.)

305.    To further put the elimination of Mr. Cardwell's billable hours into context, on November 22, 2016, M&A partner Gar Bason Jr. described an M&A associate (i.e., "Associate # 5") who had billed 813 hours between May 2016 and October 2016 as "exceptionally low." Even though M&A partners and associates rated Associate #5 as "behind" in at least *seven* separate performance reviews during this May 2016 and October 2016, this associate billed and was allowed to bill almost the same amount of hours as Mr. Cardwell—despite the fact that Mr. Cardwell had never been rated as "behind" by *any* M&A partners between 2014 and August 2017.

~~228.~~306.    As previously noted, when asked on December 1, 2015 "how [Mr. Reid's] law firm supports diverse and female attorneys so they can climb the ranks," Mr. Reid explicitly answered that "the foundation" of such support involved Mr. Reid meeting with "practice leaders three times a year as they 'talk about work at the firm is getting allocated.'" When it came to Mr. Cardwell, Mr. Reid and the leaders of the Firm's M&A group did indeed discuss how work should be allocated to Mr. Cardwell. The evidence indicates that Mr. Cardwell didn't merely slip through so-called cracks in Davis Polk's staffing system; rather, Defendants took strategic steps to dig a hole to later—and dishonestly—make, if necessary, an argument that Mr. Cardwell was simply in a hole that he could not climb out of it.

~~229.~~307.    Mr. Reid's, Mr. Bick's, Mr. Birnbaum's, and Mr. Wolfe's decision to properly staff Mr. Cardwell and to increasingly stop communicating with Mr. Cardwell during the second half of 2016 and the beginning of 2017 cannot be legitimately explained by Mr.

Cardwell's performance or the Firm's non-fabricated and pre-litigation conclusions about Mr.

Cardwell's performance reviews (as highlighted in the chart below).

### Mr. Cardwell Is Respected in and Out of the Firm.

230.308.      On October 7, 2016, a Davis Polk associate from a non-M&A group sent

the following email to Mr. Cardwell: "Was just at drinks with a classmate of mine, he was

RAVING about how wonderful you are to work with, etc etc [sic] etc." (emphasis in original).

The non-M&A associate was referring to a White junior M&A associate who was working on

the restructuring deal (as noted above) with a senior M&A associate and Mr. Cardwell.

231.309.      The same institutions and individuals that Davis Polk viewed as the

authority with respect to a variety of assessments and trainings related to measuring and

improving law firms, lawyers' development, and diversity and inclusion outcomes, are the same

institutions and individuals that objectively viewed Mr. Cardwell as having exceptional judgment

and competencies related to lawyering, law firms, and the legal profession.

310.      In October 2016, a senior director of Diversity and Inclusion at the New York

City Bar recruited Mr. Cardwell to join the New York City Bar's Civil Rights Committee. Mr.

Cardwell subsequently joined.

232.311.      A few months later, that same director, a person with a widely recognized

expertise related to working with legal employers (including Davis Polk) to foster more diverse

and inclusive work environments, recruited Mr. Cardwell to serve on the planning committee for

the New York City Bar's inaugural Associate Leadership Institute, an American Bar Association

award-winning series of high-level development trainings for mid-level and senior corporate law

associates. Mr. Cardwell was recruited to help design curriculum and training modules for the

program's participants—i.e., over 100 law firm associates from 47 law firms within the first two

years of the program's operation. Mr. Cardwell served on the planning committee and helped

recommend, evaluate, and select participants from the program's applicant pool, the curriculum,

and instructors for the training sessions.

233.312.        Not only did members of Davis Polk's leadership reach out to Mr.

Cardwell at the time to hear Mr. Cardwell's assessment of the quality of the New York City

Bar's Associate Leadership Institute, Davis Polk subsequently and successfully worked to get

two of its highest performing and most respected senior non-White associates to apply and be

accepted into the associate leadership program that Mr. Cardwell helped design. Since the

associate leadership program's inception, every year, Davis Polk has sent at least two of its

highest performing senior non-White attorneys to participate in the program.

234.313.        On October 31, 2016, in a communication to a third-party, a senior Black

associate of the Firm and recipient of some of the Firm's highest honors and praise, described

Mr. Cardwell in the following way:

> *"I first became aware of [Mr. Cardwell] in the fall of 2014 through
> the Black Affinity Group (BAG), a support network and networking
> outlet for black attorneys at the law firm where he and I work,
> Davis Polk & Wardwell LLP. As I have found to be the case for
> others who come to know [Mr. Cardwell], before I met him, I knew
> his name and of his ability to connect people to actionable ideas.
> In BAG, he exhibits leadership among more senior attorneys and
> partners and quite frequently is deferred to once he has given his
> input....[O]ur many conversations...have led me to see [Mr.
> Cardwell] as one of the few people in an office of over 700 people
> who is my go-to person for key decision points, whether I'm
> considering navigating the politics of potential partnership
> consideration or troubleshooting ways to get better to ensure the
> success of our diverse peers."*

235.314.        On December 5, 2016, a senior Black associate voluntarily emailed the

Black AttorneyAffinity Group's listserv and stated: "*All, [o]ne of our own has been featured in

the [Metropolitan's Black Bar Association's] newsletter below. Congratulations, [Mr.*

Cardwell].” The senior Black associate was drawing attention to the fact that the Metropolitan

Black Bar Association (i.e., New York City's largest Black Bar Association) had featured Mr.

Cardwell in its "MBBA Leadership Spotlight."

236.315.      Also, in the Winter of 2016, a senior Black associate, then one of the

Firm's most senior Black associates and a member of the Black AttorneyAffinity Group's

Steering Committee (which served as a leadership sub-committee for the Black AttorneyAffinity

Group and a liaison between the Firm's leadership and the Black attorneys at the Firm), began to

recruit Mr. Cardwell to join and serve on the steering committee. The senior Black associate

recruited Mr. Cardwell instead of and over a handful of eligible Black Davis Polk associates who

were more senior than Mr. Cardwell. Mr. Cardwell officially joined the Black AttorneyAffinity

Group's Steering Committee in December 2016 and at the time was the most junior Black Davis

Polk associate on the committee.

316.      Throughout Mr. Cardwell's time at the Firm, the Firm's recruiting department

routinely praised Mr. Cardwell for his effort and impact and frequently asked Mr. Cardwell to

attend or assist with various recruiting and interviewing events. According to the performance

review documentation the Firm submitted to the NYSDHR, Mr. Cardwell's 2015 annual

Summary Review stated that Mr. Cardwell "went above and beyond in regarding [sic] to

recruiting and the summer program."

237.317.      In other words, as noted previously, Davis Polk's partners initially

evaluated Mr. Cardwell in a context that recognized that the Firm routinely asked or expected

Mr. Cardwell to commit to other Firm-related obligations that created additional time constraints

and responsibilities for Mr. Cardwell, his class's only Black male associate. Similarly, according

to the performance review documentation the Firm submitted to the NYSDHR, Mr. Cardwell's

2016 annual Summary Review noted that Mr. Cardwell received a "commendation" for his pro bono/recruiting efforts.

***Still No Work.***

~~238.~~318.        Defendants' treatment and termination of Mr. Cardwell's employment is directly at odds with performance-related conclusions that Mr. Cardwell received from departments and associates that Defendants could not easily manipulate or distort.

~~239.~~319.        Regarding the same months and years that Davis Polk associates, the Firm's non-Partner leadership, and countless others across the legal profession were increasingly praising, recognizing, and consulting Mr. Cardwell for his ability to evaluate, navigate, and shape Davis Polk and other legal institutions, Davis Polk pretextually argued to the NYSDHR that the abrupt changes to Mr. Cardwell's staffing and evaluation were because Davis Polk partners repeatedly and legitimately ~~reached a radically opposite conclusion about~~rated Mr. Cardwell ~~and his competency.~~as "behind."

~~240.~~320.        Defendants' actions during the second half of 2016 and the beginning of 2017 cannot be credibly and honestly explained as anything other than discriminatory and retaliatory conduct.

~~241.~~321.        In addition to not staffing Mr. Cardwell on any deals and matters, virtually all of Davis Polk's M&A partners isolated and ignored Mr. Cardwell.

~~242.~~322.        Week after week, for months, Davis Polk M&A partners walked by Mr. Cardwell while knowing that they were not going to staff Mr. Cardwell on any assignments—while knowing that at a law firm like Davis Polk, it is virtually impossible for an associate to go throughout his or her day without encountering multiple lawyers and colleagues who would ask:

"So, what are you working on?" "Working on anything interesting?" "Have things been pretty busy for you or the group?"

243.323.      Week after week, for months, Mr. Reid, Mr. Bick, Mr. Birnbaum, and Mr. Wolfe, refused to staff Mr. Cardwell and isolated Mr. Cardwell with the knowledge that otherwise routine daily interactions—such as constantly being asked what type of legal matters one is working on—would become a form of harassment and humiliation that almost always harms associates' well-being and leads to isolated associates feeling like they have no other choice but to so-called voluntarily leave their law firms.[55] During this period, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and the other Individual Defendants caused Mr. Cardwell to similarly experience a constant barrage of inquiries about staffing that contributed to a level of direct and indirect forms of harassment and humiliation.

### *Cardwell's Second Annual Face-to-Face Performance Review Meeting.*

244.324.      On December 20, 2016, Mr. Kreynin met with Mr. Cardwell and gave Mr. Cardwell his December 2016 annual face-to-face review. Defendants' treatment of Mr. Cardwell in the second half of 2016 was not acknowledged or explained to Mr. Cardwell in his December 2016 annual face-to-face review. Like Mr. Cardwell's June 2016 face-to-face review, at no point during the conversation did Mr. Kreynin state or suggest (i) that Mr. Cardwell's performance or quality of work was inferior to the associates in his class or (ii) that someone at the Firm might reach or had reached that conclusion.[56]

---

[55] The harmful nature of the harassment and hostility that Mr. Cardwell suffered was recognized as such by Mr. Goldberg on February 8, 2018, as Mr. Goldberg acknowledged how the Firm's refusal to staff Mr. Cardwell was impacting Mr. Cardwell when he stated: "[Mr. Cardwell] can't just sit here. It is demoralizing for [Mr. Cardwell]."
[56] Notably, when considerations related to poor performance are at issue, it is standard practice for Davis Polk to make a distinction between (i) constructive criticism and suggestions for improvement and (ii) the Firm concluding that an associate is performing poorly. In the case of the latter, it is standard practice for Davis Polk to uniformly document associates' poor performance with associates (particularly, performance issues that would have warranted giving an associate a message that it was time for him or her to look for another job), any issued warnings, and the

245.325.      During Mr. Cardwell's December 2016 annual face-to-face review with Mr. Kreynin, Mr. Kreynin briefly mentioned a few criticisms that were inconsistent with the real-time feedback Mr. Cardwell had received during the period covered by the reviews. When Mr. Cardwell explained that Mr. Kreynin's feedback was inconsistent with his experiences and communications, he asked Mr. Kreynin for specific examples related to the criticisms. Mr. Kreynin struggled to identify specific examples and ultimately gave Mr. Cardwell one example of a single drafting mistake (i.e., the misspelling of an entity's name that was spelled similar to another entity referenced in the applicable documents) from Mr. Cardwell's Last 2016 Deal, which Mr. Cardwell was staffed on in August 16, 2016 and involved months werewhere Mr. Cardwell had billed almost 235230 hours.

246.326.      When Mr. Cardwell asked Mr. Kreynin if he was aware of any other mistakes or could provide any other examples related to Mr. Kreynin's criticisms, Mr. Kreynin said that he didn't have any other examples at that moment. Despite Mr. Cardwell's request at the time, Mr. Kreynin never followed-up with Mr. Cardwell to provide additional examples.

247.327.      Notably, Mr. Kreynin made comments during the December 2016 face-to-face review that clearly indicated that not only did Mr. Kreynin conclude that Mr. Cardwell was qualified to be a Davis Polk associate, but that he thought Mr. Cardwell was ready to be staffed on M&A deals that make up the core of Davis Polk's mid-level and senior associate M&A deal flow. It was in the context of reviewing and summarizing Mr. Cardwell's reviews and telling Mr. Cardwell that Mr. Cardwell was ready for more M&A responsibilities and complex work, not

---

written communications to such associates regarding the Firm's conclusions and corrective plan of action. Davis Polk failed to do so with Mr. Cardwell—over more than three years—because not only did Davis Polk, the Firm's M&A group, or the partners who gave Mr. Cardwell his face-to-face reviews never conclude prior to Mr. Cardwell raising racial complaints and litigation that Mr. Cardwell was a poor performer or behind in his class, Mr. Cardwell did not have a record of poor performance and did not make any mistakes that the Firm and M&A group considered to be fundamentally different than the type made by a typical Davis Polk associate of Mr. Cardwell's seniority. *See* Ex. 15, Presentation for Third-Year Associates.

less, that Mr. Kreynin said something to the effect of, "It would be good if you were the lead

attorney at the beginning of a deal that involved a stock purchase agreement."[57] After the

December 2016 face-to-face review,[58] however, Mr. Cardwell's workload continued to be almost

completely nonexistent:

| Mr. Cardwell's Billable Hours[59] | |
|---|---|
| **Month** | **# of Hours Billed** |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.~~8~~9 |

328.   By March 2017, members of the Associate Development Department had sent

emails among each other about how Mr. Cardwell was "given almost no work since his last

review meeting."

**iii. Efforts to Push Mr. Cardwell Out Were Not Successful ~~Defendants Turn Up the Dial.~~,**

**So Additional Steps Are Taken**

~~248.~~329.         In the aftermath of Donald Trump being elected president in November

2016, Mr. Cardwell contacted Davis Polk's pro bono leaders to see if they would be open to

---

[57] At no point during the meeting did Mr. Kreynin state or suggest that Mr. Cardwell was under any kind of
performance-related probation period or that the Firm or M&A group was going to or was contemplating giving Mr.
Cardwell another review in six months to further evaluate his standing or performance.
[58] As described below, Mr. Kreynin claimed in March 2017 that he had no idea that the Firm's M&A staffing
partners were not staffing Mr. Cardwell on any assignments.
[59] For additional context, Davis Polk associates typically average between 133 and 175 billable hours a month.

realigning Davis Polk's relationship with certain workers and immigrants who are routinely

othered[60] and don't yet belong,[61] namely Black, Latino, and other stigmatized groups.

249.330.        On December 5, 2016, Mr. Cardwell, in good faith,[62] raised questions

concerning legal compliance and professional ethics about the Firm's representation of The GEO

Group, Inc., a for-profit and immigrant detention company that is commonly called Geo Group.

250.331.        Geo Group's profits as well as its human rights violations grew

exponentially as a result by Donald Trump's racism and his administration's anti-immigrant

policy of separating mothers from their infant children.

251.332.        On December 5, 2016, Mr. Cardwell asked then-Davis Polk partner, Carey

Dunne, the current general counsel of the Manhattan District Attorney's office, if Davis Polk

would consider ending its relationship with Geo Group.

252.333.        Mr. Dunne was the supervising partner who the criminal justice pro bono

matter in which a Firm perceived potential conflict of interest arose between the Firm's

representation of the pro bono client and the Firm's representation of Geo Group.

253.334.        Mr. Cardwell's December 5 email triggered a Firm policy that expressly

"prohibit[ed] any form of retaliation against any individual who raises any question concerning

legal compliance or professional ethics in good faith."[63]

254.335.        Mr. Cardwell's December 5, 2016 email read as follows:

---

[60] According to the Othering and Belonging Institute ("OBI"), "othering" is a set of dynamics, processes, and structures that [cause] marginality and persistent inequality across any of the full range of human differences based on group identities. Dimensions of othering include, but are not limited to, religion, sex, race, ethnicity, socioeconomic status (class), disability, sexual orientation, and skin tone." People who are "othered" are often seen as less than fully human.
[61] According to john a. powell and OBI: "To not belong is to be othered. To be less than. To be, as W. E. B. Dubois said, a 'problem.' To belong is not just to be a citizen or member in the weakest sense, but to be able to participate in cocreating the thing you belong to. This makes it different than inclusion."
[62] *See* Ex. 9 (describing a summary of publicly available facts that Mr. Cardwell created and emailed to himself).
[63] *See* Ex. 10 at 28, Davis Polk Policy Handbook - "General Ethical Considerations and Questions."

*"Hi [Mr. Dunne],*

*Hope this email finds you well. In light of the Presidential election, the conditions that contributed to its outcome and what is happening in our country, I wanted to briefly follow-up on our memo to [REDACTED].*

*As a reminder, our initial memo detailed how blacks were being disproportionately and unfairly harmed by certain for-profit prison industries and companies. I'm hoping we can discuss what can be done to distance ourselves from GEO and ultimately end the firm's relationship with GEO.*

*I'm not sure what that internal process would or could look like, or whether the firm has ever distanced itself from certain clients in the past, but I'd be interested in hearing what you think could or should be done. I look forward to hearing from you. Regards, [Mr. Cardwell]"*

255.336.     The memo that Mr. Cardwell referred to in the email referenced above used publicly available information to research and detail several civil rights and human rights violations that disproportionately impact Blacks, Latinos, Muslims, and immigrants. On this pro bono matter, Mr. Dunne was aware that the Firm had authorized the removal of one of the memo's topics/sections due to what the Firm claimed was the possibility of a private for-profit prison and immigrant detention company being "negatively impacted" ("Potentially Negatively Impacted Private Prison Company") by the memo. The removed/topic section did not mention or name any companies, let alone the name of the Potentially Negatively Impacted Private Prison.

256.337.     Mr. Dunne replied to Mr. Cardwell's email and noted that he "did not know what relationship, if any, the firm still ha[d] with" the Potentially Negatively Impacted Private Prison Company. In his reply, Mr. Dunne also indicated that he thought it might make sense for him (i.e., Mr. Dunne) to "flag for the management committee the concern about this type of client."

257.338.     After Mr. Cardwell's inquiry with Mr. Dunne about a racially harmful Davis Polk client and related discrimination, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Davis Polk did not staff Mr. Cardwell on any billable assignments for the next four months (i.e., from

December 2016 through April 2017). As noted in the charts above, from January 2017 through

March 2017, Mr. Cardwell billed a total of only ~~5.9~~6 hours, a number that is jarring in any law

firm context and even more when one considers how busy Davis Polk's M&A group was during

this period.

~~258.~~339.      Mr. Cardwell's questions about Davis Polk's representation of Geo Group

complied with Davis Polk's policies and was made to the supervising attorney of the pro bono

matter in which certain Davis Polk leaders believed Davis Polk's representation of Geo Group

had created a conflict on their matter.[64]

~~259.~~340.      As a result of this December 5, 2016 complaint, as well as the

discrimination complaint that Mr. Cardwell made on September 8, 2016, Mr. Bick, Mr. Wolfe,

and Mr. Birnbaum did not staff Mr. ***Cardwell on any matters from December 2016 through***

***April 2017***.

~~260.~~341.      Mr. Bick, Mr. Wolfe, and Mr. Birnbaum's decision to not staff Mr.

Cardwell from December 2016 through April 2017 was a violation of the antiretaliation policy

that protected Mr. Cardwell's questions about the Firm's representation and conflicts involving

Geo Group, as they were questions concerning legal compliance and professional ethics.

~~261.~~342.      To this point, Mr. Cardwell observed that ~~White~~(i) associates (who were

similarly situated to Mr. Cardwell in all material respects) who did not make any discrimination

complaints about the Firm and its partners  and (ii) White associates and other non-Black

associates (who were similarly situated to Mr. Cardwell in all material respects) remained

continuously staffed on assignments by Mr. Birnbaum and Mr. Wolfe, thereby allowing such

associates to generate billable hours, further develop as attorneys, and continue to build

---

[64] *See* Ex. 11 (describing legal compliance and ethical questions about Geo Group).

relationships with attorneys and professionals in and outside of the Firm. As stated previously, Mr. Cardwell was the only Black male in his class of over 120 associates.  Defendants' actions resulted in disparate treatment of Mr. Cardwell in comparison to ~~White~~(i) associates (who were similarly situated to Mr. Cardwell in all material respects~~.~~) who did not make any discrimination complaints about the Firm and its partners and (ii) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects). *See generally* "Comparators" Section (defining these individuals as "Presently Known Comparators" of Mr. Cardwell).

~~262.~~343.      The elimination of Mr. Cardwell's billable hours is noteworthy considering both the Firm's revenue and profit structure and Firm's primary reason for hiring Mr. Cardwell and other associates, are, at their core, primarily and inextricably tied to associates' billable hours. This, of course, is in addition to the Firm's perennial emphasis on the billable hour as the measuring stick by which one escalates the rungs of partnership. In the context of Davis Polk and its staffing systems and practices, it is not plausible that one of the Firm's only Black M&A associates could be staffed on zero assignments by Mr. Birnbaum and Mr. Wolfe and bill zero or virtually zero hours for months at a time, all without M&A and Firm partners and leaders noticing and wondering what was going on.

~~263.~~344.      As early as January 2017, and for the next couple of months, Mr. Cardwell had indicated on his weekly workload request/capacity form that he had 100% availability to take on new assignments.[65] As noted earlier, the weekly workload request/capacity form is regularly reviewed and relied upon to make staffing decisions.  It is not possible that Mr.

---

[65] Certainly, prior to January 2017, Mr. Cardwell's steady decrease in billable hours beginning in September 2016 and the weekly workload request/capacity forms that Mr. Cardwell was submitting from that time going forward made it objectively known and predictable to Mr. Bick, Mr. Birnbaum, and Mr. Wolfe that if they did not staff Mr. Cardwell, his billable hours would increasingly and drastically decline or be effectively eliminated in October, November, and December of 2016.

Cardwell's availability to take on deals and assignments was merely overlooked for four to six months.  Mr. Reid's, Mr. Bick's, Mr. Wolfe's, Mr. Birnbaum's, and Davis Polk's decision to cease assigning work to Mr. Cardwell was made intentionally, with malice or reckless disregard, and was motivated in whole or in part by Mr. Cardwell's race and his legally protected complaints.

264.345.      After Mr. Cardwell raised a racial complaint on December 5, 2016, it took the following number of days for the following Davis Polk partners to send Mr. Cardwell an email of any kind (notwithstanding group emails to practice groups and other listservs (e.g., to "All Lawyers")):

    a.  Mr. Bick, an M&A partner, went the next **148** days without emailing Mr.
        Cardwell (from about December 6, 2016 - May 3, 2017);

    b.  Louis Goldberg, an M&A partner, went the next **148** days without emailing Mr.
        Cardwell (from about December 6, 2016 - May 3, 2017);

    c.  Phillip Mills, an M&A partner, went the next **190** days without emailing Mr.
        Cardwell (from about December 6, 2016 - June 14, 2017);

    d.  Lee Hochbaum, an M&A partner, went the next **225** days without emailing Mr.
        Cardwell (from about December 6, 2016 - July 19, 2017);

    e.  Mr. Birnbaum—except for a February 24, 2017 email to Mr. Cardwell that
        instructed Mr. Cardwell where he could pick up his paycheck—went the next **268**
        days without emailing Mr. Cardwell (from about December 6, 2016 - August 31,
        2017);

    f.  John Amorosi, an M&A partner, went the next **276** days without emailing Mr.
        Cardwell (from about December 6, 2016 - September 8, 2017);

    g.  Michael Davis, an M&A partner, went the next **276** days without emailing Mr.
        Cardwell (from about December 6, 2016 - September 8, 2017);

    h.  Leonard Kreynin, an M&A partner, went the next **320** days without emailing Mr.
        Cardwell (from about December 6, 2016 - October 22, 2017);

    i.  Oliver Smith, an M&A partner, went the next **374** days without emailing Mr.
        Cardwell (from about December 6, 2016 - December 15, 2017); and

j.   Mr. Chudd, Mr. Wolfe, Mr. Butler, Gar Bason Jr., Joe Rinaldi, William Aaronson, and William Taylor—all M&A partners—did not send Mr. Cardwell a single email in all of 2017 (which means that, from December 6, 2016 - January 1, 2018, these M&A partners went about **391** days without emailing Mr. Cardwell).

265.346.       At all relevant times, all of Davis Polk's M&A partners were White men.

266.347.       The lack of written communication from Davis Polk's M&A partners was not mitigated through face-to-face or phone conversations between such persons and Mr. Cardwell, as such conversations were similarly and virtually non-existent. Relatedly, the lack of communication noted in this Complaint was not because Davis Polk's M&A partners were vastly outnumbered by Davis Polk's M&A associates, as Davis Polk's M&A group had approximately one M&A partner in the Firm's New York office for every two M&A associates in its New York office.

### Mr. Cardwell Gains New "Career Advisors" But They Don't Talk to Him Either.

267.348.       On January 20, 2017, Ms. Clausen emailed Mr. Cardwell (with Mr. Bick and Mr. Butler cc'd) informing Mr. Cardwell that Mr. Bick and Mr. Butler had recently become Mr. Cardwell's "Career Advisors" through the Firm's corporate department's Career Advisor program.

268.349.       This pairing allowed Mr. Bick, Mr. Butler and the other defendants to create a roadblock between Mr. Cardwell and Davis Polk partners who otherwise would have treated Mr. Cardwell as White similar to (i) associates (who were similarly situated to Mr. Cardwell in all material respects.) who did not make any discrimination complaints about the Firm and its partners and (ii) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects). *See generally* "Comparators" Section (defining these individuals as "Presently Known Comparators" of Mr. Cardwell).

269.350.    According to the Firm's description of the program at the time, advisors (i) "will be strongly encouraged to work with their advisees to foster direct involvement with skill building," (ii) "are encouraged to include their advisees on pitches, client service team discussions, and general conversations about the firm's business goals," and (iii) are "expected to maintain a dialogue with his or her advisees for the duration of the associate's time at the firm." (emphasis added).

270.351.    Such communications and internal programs, among others, recognize that there is a causal relationship between partners having "direct involvement" with junior associates and (i) associates' development in the areas of "skill building," (ii) "pitches" that enable attorneys to become familiar with and ultimately obtain high-paying and sophisticated clients, and (iii) "client service"—all things that impact an associate's financial/professional trajectory and partnership prospects within Davis Polk and the broader legal profession.

271.352.    In keeping with both the Firm's Career Advisor Program and the discrimination complaints that Mr. Cardwell raised in 2015 and 2016, on or about January 20, 2017, Mr. Cardwell responded to Ms. Clausen's email (with Mr. Bick and Mr. Butler cc'd) with the following:

> "*Many thanks. I look forward to learning how the Career Advisor Program will supplement experiences and conversations that I've had (i.e., with **managing partners**, **assignment coordinators**, **BAG meeting participants**, etc.) regarding **DPW interactions**, **opportunity/assignments**, and **career development**.*" (emphasis added).

272.353.    Mr. Cardwell's email directly refers to the same discriminatory acts that are described in this Complaint, including the discrimination that Mr. Cardwell experienced and complained about to (i) managing partner Mr. Reid in January 2016, (ii) Associate Development Department manager/assignment coordinator Ms. Clausen in September 2016, (iii) and multiple Davis Polk partners and Ms. DeSantis in the September 2015 Black Attorney's group meeting.

Neither Mr. Bick nor Mr. Butler responded to or otherwise discussed the January 2016 email with Mr. Cardwell.

273.354.   From January 20, 2017 (i.e., the day the Firm assigned Mr. Cardwell "Career Advisors") to August 10, 2018 (i.e., Mr. Cardwell's last day at the Firm), in direct violation of its own career advisor policy and practices, Mr. Cardwell did not receive any communications from Mr. Bick or Mr. Butler about either the Career Advisor program, their role as "advisors," or anything related to Mr. Cardwell's long-term career.

274.355.   Also, Mr. Bick's and Mr. Butler's (among other defendants') actions in connection with Mr. Cardwell's lack of interactions with the Firm's Career Advisors program were consistent with and reflected such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

356.   Notably, the Firm described the Career Advisor program at the time by stating, "We believe the addition of advisory relationships will further ensure that Davis Polk's associates develop and succeed in a manner that continues to distinguish the firm." To the contrary, Defendants' abrupt and complete isolation of Mr. Cardwell, as well as their decision to knowingly restrict Mr. Cardwell's "Career Advisors" to some of the ring leaders driving Mr. Cardwell's isolation, worked to ensure ensured Mr. Cardwell would not be treated as well as (i) associates (who were similarly situated to Mr. Cardwell in all material respects) who did not make any discrimination complaints about the Firm and its partners and (ii) White associates and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects). *See generally* "Comparators" Section (defining these individuals as "Presently Known Comparators" of Mr. Cardwell). As if such actions weren't enough, even after becoming Mr. Cardwell's "Career Advisor," Mr. Bick, as he had done in the past, would routinely walk by Mr.

Cardwell in the hallway without speaking or even acknowledging Mr. Cardwell's presence. Mr. Cardwell observed that Mr. Bick did not ignore Mr. Cardwell's White colleagues in this way.

357.    On January 25, 2017, Ms. Fenner discussed Mr. Cardwell's January 20, 2017 email with Mr. Wolfe and Mr. Birnbaum. While forwarding Mr. Cardwell's email, Ms. Fenner stated: "Please see below from Kaloma. John Bick/John Butler have just been designated as his advisors. . . . [I]s there by any chance some work we can send his way? He billed 2 hours in the past 30 days and has 100% capacity. Happy to discuss by phone." Mr. Birnbaum replied, "We should discuss but I don't know what to say.  What message was he given in his last review?"

275.358.        Mr. Birnbaum did not "know what to say" in response to an inquiry as to whether there was "any chance" "some work" could be sent to Mr. Cardwell.  Instead, he inquired about the "message" Mr. Cardwell received "in his last review" (i.e., whether a "time-to-go" message was given to Mr. Cardwell). Upon information and belief, any attempt to staff Mr. Cardwell contradicted Mr. Birnbaum's understanding that (i) Mr. Bick, Mr. Wolfe, and Mr. Birnbaum would not staff Mr. Cardwell and (ii) Mr. Bick planned to give Mr. Cardwell a "time to go" message—regardless of Mr. Cardwell's actual performance or performance reviews.

***Mr. Cardwell Is Completely Isolated After He Makes Legally-Protected Complaints.***

276.359.        Some evidence suggests that Defendants kept Davis Polk's diversity and inclusion leadership completely in the dark regarding Defendants' unlawful treatment of Mr. Cardwell. It is inconceivable that Mr. Cardwell's performance was not both (i) so poor over an extended period of time that it triggered Mr. Cardwell receiving no billable work for months and eventually termination and (ii) somehow not poor enough to trigger a member of Davis Polk's Diversity Committee to reach out to Mr. Cardwell to discuss Mr. Cardwell's performance and

work product, let alone work with Mr. Cardwell to implement a remediation plan over an extended period of time.

     277.360.     The following is a list of Davis Polk partners and staff persons who, at the time, were a part of Davis Polk's official (and unofficial) Diversity Committee. The list below also shows the number of days (leading up to January 1, 2018) that passed before Mr. Cardwell received an email from each person listed below (i.e., notwithstanding group emails sent by such persons to practice groups and other listservs (e.g., to "All Lawyers," to the Black Attorneys Group's listserv)):

     a.   Kyoko Takahashi Lin, a Corporate Partner, went about **458** days without sending Mr. Cardwell any emails (from about September 30, 2016 - January 1, 2018).

     b.   Davis Polk's Executive Director went about **593** days without sending Mr. Cardwell any emails (from about May 18, 2016 - January 1, 2018.

     c.   Monica Holland, a Corporate Partner who also served as the Chair of the Diversity Committee, went about **584** days without sending Mr. Cardwell any emails (from about May 27, 2016 - January 1, 2018).

     d.   Maurice Blanco, a Corporate Partner who also served as the Firm's hiring partner, went about **584** days without sending Mr. Cardwell any emails (from about May 27, 2016 - January 1, 2018).

     e.   James McClammy, Davis Polk's only Black partner at the time, went about **613** days without sending Mr. Cardwell any emails (from about April 28, 2016 - January 1, 2018, except for an October 30, 2017 email that was sent to confirm whether Mr. Cardwell would be attending an affinity group meeting).

     f.   Byron Rooney, a Corporate Partner, went about **670** days without sending Mr. Cardwell any emails (from about March 2, 2016 - January 1, 2018).

     g.   Sartaj Gill, a Corporate Partner, went about **730** days without sending Mr. Cardwell any emails (i.e., he did not email Mr. Cardwell at any point in 2016 or 2017).

     h.   Elliot Moskowitz, a Litigation Partner, went about **730** days without sending Mr. Cardwell any emails (i.e., he did not email Mr. Cardwell at any point in 2016 or 2017).

278.361.    Notably, Mr. Reid went about **711** days without sending Mr. Cardwell any emails (i.e., from about January 21, 2016 - January 1, 2018). The lack of written communication from partners and staff persons who, at the time, were a part of Davis Polk's official (and unofficial) Diversity Committee was not mitigated through face-to-face or phone conversations between such persons and Mr. Cardwell, as such conversations were similarly and virtually non-existent.

279.362.    Mr. Cardwell's isolation included both a lack of direct communication from Defendants and senior members of the Firm and a complete lack of assignments for an impermissible period of time.

280.363.    Davis Polk did not staff Mr. Cardwell on any matters in December 2016.

281.364.    Davis Polk did not staff Mr. Cardwell on any matters in January 2017.

282.365.    Davis Polk did not staff Mr. Cardwell on any matters in February 2017.[66]

283.366.    Davis Polk did not staff Mr. Cardwell on any matters in March 2017.

284.367.    After almost a full year of constant disparate treatment, Defendants decided that they had to go beyond merely waiting for Mr. Cardwell and his career "to implode." Instead, Defendants attempted to permanently collapse and cripple Mr. Cardwell's career themselves.

285.368.    Defendants' intentional Mr. Bick, Mr. Wolfe, and Mr. Birnbaum's decision to not staff Mr. Cardwell on any matters from December 2016 through March 2017 was motivated, in whole or in part, by Mr. Cardwell's race and his legally protected September 30, 2015 complaint, January 2016 complaint, and September 8, 2016 complaints.

---

[66] In February 2017, Davis Polk staff members confirmed that Mr. Birnbaum and Mr. Wolfe had been consistently receiving Mr. Cardwell's weekly capacity form. This February 2017 incident is the sixth time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

369.     Mr. Bick, Mr. Wolfe, and Mr. Birnbaum's decision to not staff Mr. Cardwell on any matters from December 2016 through March 2017 were adverse employment actions that materially altered Mr. Cardwell's employment at Davis Polk.

286.370.     In a March 3, 2017 email to Sharon Katz, Davis Polk's Special Counsel for Pro Bono, Mr. Cardwell again raised the issue of the Firm's relationship with a private for-profit prison and immigrant detention company whose policies and practices disproportionately discriminated against and dehumanized Blacks and other marginalized groups.[67]

371.     On March 6, 2017, Mr. Reid and Davis Polk's Executive Director of Personnel (Ms. Crane) participated in email communications with Davis Polk's deputy general counsel to

---

[67]Mr. Cardwell's email to Ms. Katz stated:

"*In light of your and the firm's recent efforts to address Trump's Muslim ban (and his immigration and policing policies more broadly), I wanted to loop you into the email conversations below. As you'll read, [Mr. Dunne]'s comments suggest that he did not have a conversation with the management committee at the time the conflict first became known and that he hadn't discussed it with them prior to the communications below. Considering [Mr. Dunne]'s public track record with [REDACTED] and other related efforts, I was disappointed to not receive confirmation that he or someone else had attempted to resolve the conflict, as I understand occasionally is attempted when billable work is at issue.*

*Based on [Mr. Dunne]'s response, I can only assume that [Mr. Dunne] and I reached different conclusions about the nature of the firm's conflict of interest, as well as the scale and scope of the racial and moral dimensions that are bound in the links between (i) race and U.S. incarceration and (ii) Trump's (and his administration's) recent actions and U.S. incarceration. To this point, and I'm happy to say more later, I think both the conflict noted below and current political realities bear a striking resemblance to [Davis Polk's] history with* Brown v. Board of Education, *a case that led then present-day thinkers and legal communities to conclude that the government's position and actions would inevitably create and maintain racial hierarchies and dehumanizing practices.*

*Certainly, and in addition to the findings in the (attached) memo, many have recently concluded that a number of groups—blacks, Latinos, Muslims, immigrants, LGBTQ and trans folks, among others—have been experiencing harms that in many ways go beyond separate and supposedly equal treatment. (Relatedly, see "Sessions Indicates Justice Department Will Stop Monitoring Troubled Police Agencies" and Sessions: "US to continue use of privately run prisons.").*

*It is my hope that my comments above will provide additional context and guidance on what could and should be done regarding [Davis Polk's] relationship with [REDACTED]. Obviously, there's much that could be said and that must be considered. Please let me know if you're available next week to discuss the above and below.*

*I'd greatly appreciate hearing what you think could be done to ensure that [Davis Polk] isn't simultaneously assisting (i) clients that are being targeted by racist and xenophobic policies and practices and (ii) clients that are incarcerating them.*"

the Firm concerning "Mr. Cardwell's performance and staffing" and "Mr. Cardwell's performance reviews and employment at the Firm." This means that roughly 79 days ***before*** Davis Polk received notice from Mr. Cardwell's counsel that he had retained counsel, Davis Polk had internally discussed Mr. Cardwell's "employment at the Firm" with the Firm's in-house general counsel (i.e., in response to Mr. Cardwell raising the issue of the Firm's relationship with that for-profit prison and immigrant detention company).

287.372.        At Ms. Katz's request and arrangement, Mr. Cardwell later met with her and Mr. Reid on March 9, 2017.

288.373.        Prior to Mr. Cardwell's March 9, 2017 meeting with Mr. Reid, however, Mr. Reid or Mr. Bick accessed and revised (or authorized the access and revision of) Mr. Cardwell performance reviews on March 6, 2017, just one business day after Mr. Cardwell made a complaint on March 3, 2017 that triggered a Davis Polk-specific anti-retaliation policy.

289.374.        On March 6, 2017, one business day after Mr. Cardwell sent the March 3, 2017 complaint that led Ms. Katz to voluntarily set up a meeting with Mr. Reid, arguably the busiest person at Davis Polk, someone at Davis Polk authorized Mr. Cardwell's performance reviews to be accessed and revised in a way that led the Consensus Feedback Statements for 2014, 2015, and June 2016 to all bear a March 6, 2017 timestamp at the bottom of the documents.

290.375.        OnAs of March 6, 2017, Mr. Reid and Mr. Bick beganDavis Polk's leaders were thinking about how to (and actually started to) manipulate Mr. Mr. Cardwell's complaints and the written performance reviews and the Consensus Feedback Statements that were created or would be created for Mr. Cardwell.

291.376.         During their meeting, Mr. Reid gave Mr. Cardwell a verbal commitment

that the Firm would no longer represent the private prison and immigrant detention client.

292.377.         At the conclusion of the March 9, 2017 meeting—and without any prior

discussion related to Mr. Cardwell's workload, assignment history, or quality of work—Mr. Reid

voluntarily acknowledged and conceded that Mr. Cardwell's prior and current workloads were

low, that they were low for reasons that were "not [Mr. Cardwell's] fault," and that the staffing

issue needed to be "fixed" by the Firm and M&A group. Mr. Reid made such statements in the

presence of Ms. Katz.

293.378.         Mr. Reid read Mr. Cardwell's performance reviews prior to meeting with

Mr. Cardwell on March 9, 2017.

294.379.         Mr. Reid had described Mr. Cardwell's staffing issues as "not [Mr.

Cardwell's] fault."

295.380.         Mr. Cardwell's performance reviews and Consensus Feedback Statements

as of March 9, 2017 did not include *any conclusions* that could have led Mr. Reid or any other

partner to think that Mr. Cardwell's performance was the reason he was not being staffed.

296.381.         Mr.With knowledge of Mr. Cardwell's performance and staffing history,

Mr. Reid described Mr. Cardwell's staffing issues as "not [Mr. Cardwell's fault" because." Upon

information and belief, Mr. Reid had knowledge that Mr. Reid, Mr. Wolfe, and Mr. Birnbaum,

along with the other Davis Polk M&A partners, were already working together to not staff Mr.

Cardwell on any assignments because of Mr. Cardwell's September 8, 2016 and December 5,

2016 complaints, both of which triggered Davis Polk's anti-retaliation policies.

297.382.         Upon information and belief, Mr. Reid had knowledge that Mr. Bick was

the main person at fault forhad primary control over Mr. Cardwell's billable hours being

eliminated and that Mr. Bick had been applying a retaliatory policy to Mr. Cardwell dating back to when Mr. Bick, Mr. Reid, and Davis Polk had created a sham performance review cycle in June 2016 for Mr. Cardwell.

298.383.      Mr. Cardwell's race was a motivating factor in Mr. Bick, Mr. Wolfe, and Mr. Birnbaum's decision to eliminate Mr. Cardwell's billable hours and not staff Mr. Cardwell on any matters between September 2016 and March 2017.

299.384.      Mr. Bick, Mr. Wolfe, and Mr. Birnbaum did not stop staffing and eliminate the billable hours of (i) any White M&A associates in (who were similarly situated to Mr. Cardwell's 2014 class (e.g.,Cardwell in all material respects) who did not make any discrimination complaints about the White M&A comparatorsFirm and its partners and (ii) White and other non-Black associates (who were similarly situated in all material respects but not Mr. Cardwell) the way they did Mr. Cardwell's billable hours. *See generally* "Comparators" Section (defining these individuals as "Presently Known Comparators" of Mr. Cardwell).

300.      Mr. Bick, Mr. Wolfe, and Mr. Birnbaum did not stop staffing any White M&A associates in Mr. Cardwell's 2014 class (e.g., the White M&A comparators) the way they did Mr. Cardwell.

301.385.      Almost two weeks went by and Mr. Cardwell still had not been assigned to or staffed on any matters.

386.      On March 21, 2017, Mr. Cardwell emailed a written request to Ms. DeSantis and asked if Mr.Between March 3, 2017 and March 21, 2017, Davis Polk's management committee (e.g., Mr. Reid and Mr. Bick); in house general counsel team; Executive Director of Personnel (i.e., Ms. Crane); and Associate Development Department (e.g., Ms. DeSantis and Ms. Fenner)

were sending emails between each other and having discussions related to Mr. Cardwell's "performance and staffing" and "performance reviews and employment at the Firm."

387.    On March 20, 2017, emailed a written request to coordinator who worked in the Firm's Associate Development Department (Nicole Katz) and asked if Mr. Cardwell could review his personnel "file and all the performance reviews that [he] had received to date."

388.    Unknown to Mr. Cardwell at the time, Mr. Cardwell's request triggered a series of internal emails among Davis Polk's Executive Director of Personnel (Ms. Crane), Director of Associate Development (Ms. DeSantis), managers in the Associate Development Department (Ms. Fenner), and various partners, including Mr. Reid, Mr. Bick, and Mr. Kreynin. These emails gave various partners and Firm leaders a "heads up" about Cardwell's request and how to respond.

389.    On March 20, 2017, Davis Polk's Executive Director of Personnel responded to one of these "heads up" emails by asking: "What's the current state of play? He is supposed to get a mid year in June?" The head of the Associate Development Department responded, saying: "I think so but I'm not 100%." Davis Polk's Executive Director of Personnel replied: "I just need confirmation on timing."

390.    After receiving a request to view his personnel file and performance reviews, the leaders of the Firm, including the individuals who had knowledge of Mr. Cardwell's May 2015 complaint, September 30, 2015 complaint, and September 2016 complaint, immediately began to discuss the "timing" of a pretextual a mid-year performance review cycle that (i) the Firm routinely used to terminate associates and (ii) that Firm's leaders who had knowledge of Mr. Cardwell's complaints were planning to use to further lay the foundation for Mr. Cardwell's termination.

**PROPOSED THIRD AMENDED COMPLAINT**
**(WITHOUT EXHIBITS)**

302.391.       On March 21, 2017, Mr. Cardwell emailed a written request to Davis Polk's Director of Associate Development (Ms. DeSantis) and asked if he could review his personnel "file and all the performance reviews that [he] had received to date."

303.392.       Ms. DeSantis said that she would "look into [Mr. Cardwell's] request" and almost certainly asked either Mr. Reid or Mr. Bick (or both) if Mr. Cardwell could view his performance reviews.

393.    Ms.On March 21, 2017, a manager in the Associate Development Department received a forwarded email that referenced Mr. Cardwell's request and replied: "Yikes."

304.394.       Later on March 21, 2017, Ms. DeSantis followed up with Mr. Cardwell and declined his request. Ms. DeSantis informed Mr. Cardwell that once she received his request, she decided to arrange a meeting between Mr. Cardwell, Mr. Reid, and Mr. Kreynin. Mr. Cardwell asked Ms. DeSantis if the Firm was prohibiting Mr. Cardwell's request because doing so was the Firm's policy or practice. Despite the fact that, atAt the time, the Firm's Lawyer's Handbook[68] did not prohibit attorneys from reviewing their performance reviews, Ms. DeSantis told Mr. Cardwell that it was both "a policy and practice" at Davis Polk to prohibit associates from reviewing or accessing their performance reviews.

395.    In fact, and contrary to Ms. DeSantis's and the Firm's refusal to allow Mr. Cardwell to access any of his reviews, Davis Polk's "Managers' Human Resources Handbook" stated:

> "*If an employee requests to see their personnel file, Firm policy is that only a summary of review meetings can be seen. The employee may take notes but is not permitted to make photocopies of the contents. If such a request to review the personnel file is made, a memo is inserted in the employee's file indicating the request and the date the summary review was reviewed. Contact HR with request and HR will meet with employee*."

---

[68] As noted above, Davis Polk's "Lawyers' Handbook" serves as the Firm's official resource that describes the Firm's policies and procedures.

305.396.        Because Mr. Cardwell did not have any conversations with Ms. DeSantis about his recent conversations with Mr. Reid, and did not ask Ms. DeSantis to arrange any meetings, Mr. Cardwell emailed the following second request to Ms. DeSantis:

> "[I]n light of the fact that you informed me that I'll be meeting with [Mr. Reid, Mr. Kreynin, and Ms. Fenner]—I'd like to repeat my request to review my file and all of the reviews to date. At the moment, I'll be the only person in the meeting who hasn't had a chance to review my file and I think the conversation will be much more productive if I have that opportunity and can start the meeting with a shared understanding as the other participants. Can you follow-up with [Mr. Reid] and let me know if you'll be able to satisfy my second request? Regards, Kaloma"

306.397.        Mr. Cardwell's request was once again rejected. At no point during any of Mr. Cardwell's reviews—i.e., his May 2015 face-to-face review, his December 2015 face-to-face review, his sham June 2016 face-to-face review, or his December 2016 face-to-face review—was Mr. Cardwell allowed to review any of the documents associated with Mr. Cardwell's performance reviews (e.g., performance reviews or Summary Reviews submitted by Davis Polk's attorneys).

307.398.        After receiving Mr. Cardwell's second request on March 21, 2017, Ms. DeSantis, Mr. Reid, and Davis Polk did not offer Mr. Cardwell the option to review a redacted version of his performance reviews, which, at the least, would have provided a layer of anonymity for the reviewers. Ms. DeSantis, Mr. Reid, and Davis Polk also did not offer Mr. Cardwell the option of viewing his performance reviews on the condition that he would be prohibited from (i) taking the performance reviews out of a Firm-designated reviewing room or (ii) making copies. Instead, Ms. DeSantis, Mr. Reid, and Davis Polk categorically denied Mr. Cardwell's requests and did not allow him to review his personnel file and performanceor any of his reviews and arranged a meeting with . No one in the Firm's Managing Partner and Human Resources Department met with Mr. KreyninCardwell.

399.    Ms. DeSantis arranged a meeting with the Firm's Managing Partner, Mr. Kreynin, and Mr. Cardwell.

308.400.        Davis Polk's and Mr. Reid's refusal to allow Mr. Cardwell to review his performance reviews was alarming not just for the reasons stated above but also because Davis Polk and Mr. Reid, among other Firm partners, were aware (and previously acknowledged) that the Firm's performance-related assessments and reviews often contained evidence of racial bias and disparate treatment.

401.    For example, emails from the Associate Development Department informed the Firm's partners in September 2016 and 2017 that the Department "would like to remind you of the firm's commitment to conducting a review proves that is objective and unbiased. To that end, we appreciate your continued efforts to consider all of your comments and responses in a manner that is watchful of unconscious bias."

309.402.        Mr. Cardwell's race was a and September 30, 2015 complaint, January 2016 complaint, and September 8, 2016 complaint were motivating factorfactors in Davis Polk's, Mr. Reid's, and Mr. Bick's refusal to allow Mr. Cardwell to view any his performance reviews. (which included the Consensus Feedback Statements/Summary Reviews).

310.403.        Ms. DeSantis scheduled Mr. Cardwell's meeting with Mr. Reid and Mr. Kreynin for March 29, 2017.

311.404.        According to the dates that appear on Mr. Kreynin's March 2017 Consensus Feedback Statement for Mr. Cardwell, Mr. Kreynin did not submit his Consensus Feedback Statement to the Firm's records department, which was supposed to include a summary of his December 2016 annual face-to-face review, until March 28, 2017—a date that is

almost **100 days after** Mr. Kreynin met and delivered Mr. Cardwell's face-to-face review on December 20, 2016 and **just one day before** Mr. Cardwell met with Mr. Reid and Mr. Kreynin.

312.405.        Mr. Kreynin's March 2017 Consensus Feedback Statement incorporated comments and guidance from Mr. Reid and Mr. Bick that were not based on Mr. Cardwell's performance but rather Mr. Reid and Mr. Bick's desire to protect the Firm from any liability that might result if Mr. Cardwell continued to pursue or communicate his legally-protected complaint, which included complaints of discrimination.

313.406.        To this point, Mr. Kreynin's late-submitted Consensus March 2017 Feedback Statement included (i) an exaggerated criticism that did not appear in the draft review message for Mr. Cardwell that the Associate Development Department had prepared and given to Mr. Kreynin and (ii) a falsehood that does not reflect what was actually said or discussed with Mr. Cardwell during their December 2016 annual face-to-face annual review.

407.    First, the Associate Development Department's draft message summary for Mr. Cardwell and his performance during his second-year noted and gave examples related to "Positives" and "Areas for Improvement." The Associate Development Department's description of "Areas of Improvement," as provided to Mr. Kreynin, stated:

- "Slow down. Pay attention to detail. Make sure that all the details that need to be in the document are there.
- Ask questions to be sure you understand what you're doing and why.
- Seek to understand the key aspects of the overall transaction
- Work to convey more confidence so that people know that you have a good handle on the matters that have been delegated to you."

408.    However, **after** Mr. Kreynin discussed Mr. Cardwell's yet-to-be completed summary review with Mr. Bick (i.e., the partner most responsible for Mr. Wolfe and Mr. Birnbaum not staffing Mr. Cardwell over the prior couple of months), Mr. Kreynin completed

the 2017 Consensus Feedback Statement for Mr. Cardwell and claimed that he "[told Cardwell] that there [were] *significant* areas of improvement that we identified." (emphasis added.)

409.    As noted above, the Associate Development Department's draft message/summary for Mr. Cardwell did not describe these "[a]reas of [i]mprovement" as "significant." After discussing what his summary review for Mr. Cardwell should include with Mr. Bick, the word "significant" was pretextually added to the Review.  By doing so, it exaggerated (and misrepresented) the Associate Development Department's and the Firm's own stated beliefs about the "Areas of Improvement" identified for Mr. Cardwell.  Mr. Kreynin never told Mr. Cardwell that Mr. Cardwell needed to "significant[ly]" improve or that there were "significant areas of improvement" that the Firm identified.

410.    Second, Mr. Kreynin's 2017 Consensus Feedback Statement for Mr. Cardwell also claimed that their December 2016 meeting concluded with Mr. Kreynin "saying that we plan to meet again in June 2017 to discuss whether there have been improvements in these areas." ~~Mr. Kreynin never discussed or communicated this to Mr. Cardwell, and Mr.~~

411.    The message to "meet again in June 2017 to discuss . . . improvements" related to Mr. Bick's order that Mr. Cardwell receive a mid-year performance review in June 2017. Specifically, Mr. Kreynin's assertion about planning to "meet again in June 2017" occurred because Mr. Bick instructed (i) the Associate Development Department to include this reference in the "review folder" for Mr. Cardwell's 2016 annual review meeting and later instructed Mr. Kreynin (on March 23, 2017) to "write up and submit your summary review before you and Tom [Reid] meet with [Mr. Cardwell] next week" and to include the "bullet points that [a manager in the Associate Development Department] sent [Mr. Kreynin] with [Mr. Cardwell's] review folder before [Mr. Kreynin] gave [his] review."

412.    At the time that Mr. Bick gave his instructions on March 23, 2017, Mr. Bick and the Associate Development Department did not actually know if Mr. Kreynin had communicated the "bullet points" in the review folder and "didn't really know" "whether or not that's how the conversation went" (i.e., whether Mr. Kreynin had told Mr. Cardwell that Mr. Kreynin or someone from the Firm would meet with Mr. Cardwell again in June 2017).

314.413.    Mr. Kreynin, however, ***never*** discussed or communicated that Mr. Cardwell and Mr. Kreynin would meet again in June 2017, and Mr. Kreynin and Mr. Cardwell never met in June 2017 to discuss anything related to Mr. Cardwell's performance.

315.414.    Before Mr. Reid and Mr. Kreynin met with Mr. Cardwell on March 29, 2017, Mr. Reid met with Mr. Bick and possibly other M&A partners Mr. Kreynin to discuss Mr. Cardwell's performance and performance reviews., as well as what would be told to Mr. Cardwell during the March 29 meeting. The exaggerated and false statements that appeared in Mr. Kreynin's 2017 Consensus Feedback Statement for Mr. Cardwell were created to provide cover for Mr. Bick, Mr. Wolfe, and Mr. Birnbaum's failure to staff Mr. Cardwell (between October 2016 and March 2017) in accordance with the Firm's staffing policies, practices, and the law.

415.    Indeed, the Firm claimed in its NYSDHR Brief that "[d]uring [Mr. Kreynin's and Mr. Cardwell's December 2016 review meeting], Kreynin explained that the partners had identified four 'significant areas for improvement'" and "[a]s the record . . . demonstrates, Cardwell's record of performance problems made it difficult to find teams that had sufficient confidence in him to provide him assignments that he could reliably perform." Ex. 2 at 12.

***One Final Warning: Let the Past Be the Past, Or Else.***

316.416.      On March 29, 2017, Mr. Cardwell met with Mr. Reid and Mr. Kreynin. Mr. Reid began the meeting by attributing Mr. Cardwell's dearth of work assignments to himself (i.e., Mr. Reid) and the Firm and stated that he (i.e., Mr. Reid) and the Firm had "dropped the ball" and made mistakes. Regarding staffing deficiencies and which Davis Polk partners were responsible, Mr. Reid stated that Mr. Cardwell should let the past be the past and focus on things going forward. Without using any aggressive or threatening body language or verbal tones, Mr. Cardwell responded by asking Mr. Reid to explain how multiple staffing partners and other partners "dropped the ball," over the last five or six months, all at the same time. Mr. Reid responded by saying that it wouldn't be helpful to discuss the past. Mr. Cardwell responded by asking Mr. Reid and Mr. Kreynin if they thought it was unreasonable for Mr. Cardwell to want to know who "dropped the ball" and how they "dropped the ball." Mr. Reid responded by telling Mr. Cardwell again that the Firm simply wasn't going to answer those questions. Mr. Cardwell asked Mr. Reid if Mr. Reid could arrange a meeting with Mr. Bick so that Mr. Bick could help Mr. Cardwell understand how the Firm and the M&A partners "dropped the ball" and how it was possible that Mr. Bick didn't know that Mr. Cardwell wasn't receiving any assignments. Mr. Reid responded by saying that he and the Firm weren't going to allow Mr. Cardwell and Mr. Bick to discuss the past. Mr. Reid also told Mr. Cardwell "it's not like your career has been destroyed."

317.417.      During the meeting, Mr. Cardwell noted that he was uncomfortable with the Firm's performance review process and noted that racial biases were influencing performance evaluations.

318.418.          This March 29, 2017 incident is the seventh time that Mr. Cardwell flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

319.419.          Mr. Cardwell reminded Mr. Reid that the diversity and inclusion consultants that the Firm brought in had also noted the Firm's performance reviews were likely to reflect racial biases.

320.420.          Mr. Reid was unrelenting in stating that there wouldn't be any discussions or investigations of Mr. Cardwell's past complaints or experiences. Notwithstanding that this was not the first occasion that Mr. Cardwell had directly raised racial complaints with Mr. Reid, Mr. Reid's statements and actions evidence that Mr. Reid understood that Mr. Cardwell was making a discrimination complaint. Mr. Reid should have but didn't investigate Mr. Cardwell's expressed concerns and complaints about his interactions and the Firm's performance reviews being influenced by improper racial perceptions. Mr. Reid's failure and refusal to investigate and/or remedy the role that racial bias played in Mr. Cardwell's reviews was a retaliation of Mr. Cardwell's legally protected complaints.

321.421.          Mr. Reid told Mr. Cardwell that if Mr. Cardwell "let the past be the past," the Firm would be prepared to offer Mr. Cardwell unprecedented opportunities "unlike anything that ha[d] ever been done." Here, Mr. Reid had made it clear that he had enormous influence in decision-making processes related to Mr. Cardwell's staffing, assessments, and the Firm's conclusions of those assessments. Mr. Reid was increasingly communicating Davis Polk's ultimatum to Mr. Cardwell: Mr. Cardwell could either have a career or he could seek the truth and a lawful response to his employer's illegal actions.  Davis Polk would not allow Mr. Cardwell to do both.

~~322.~~422.        Mr. Cardwell reasonably and essentially asked how the Davis Polk leaders most responsible for a coordinated and strategic disregard of the law and equitable systems had miraculously reinvented themselves into the solutions of problems they actively created and maintained.[69]

~~323.~~423.        Specifically, Mr. Cardwell explained to Mr. Reid it would be difficult to have confidence in a plan going forward because Mr. Reid and the Firm were refusing to (i) tell Mr. Cardwell how the "ball was dropped" over the last six months and who "dropped the ball," (ii) arrange a meeting with Mr. Cardwell and Mr. Bick, the head of M&A, to discuss what went wrong, or (iii) allow Mr. Cardwell to review his performance reviews.

**iv. Mr. ~~Reid Threatens Mr. Cardwell's Career to Halt Complaints and Protect Defendants~~Cardwell Receives One Last Threat And Warning.**

424.        Mr. Reid told Mr. Cardwell that if "this continues" and if Mr. Cardwell did not simply drop whatever mistakes the M&A partners and the Firm made in the past and move forward, Mr. Cardwell would be "out of the game" and "off the field." Indeed, Mr. Reid's comments revealed that not only could the Firm take Mr. Cardwell "out of the game" and "off the field" (with an adverse employment action), but certain defendants had already taken steps to create the appearance of a legitimate, non-discriminatory ~~reason for past and future unlawful actions—namely Mr. Bick's sham June 2016 performance review meeting.~~ actions that were triggered by Cardwell's September 30, 2015, January 2016, and September 8, 2016 complaints— namely Mr. Bick's decision to instruct the Associate Development Department to create a pretextual June 2016 mid-year performance review cycle, Ms. Hudson's 2016 reviews, and Mr.

---

[69] Aa further explained below, the same Davis Polk partners and leaders that were connected to Mr. Cardwell's discrimination and retaliation experiences from 2015 through 2018, among other unlawful interactions, were the persons who were the primary decision-makers in Davis Polk's decision to terminate Mr. Cardwell's employment.

Bick's November 2016 instruction that Mr. Cardwell be added to the M&A group's 2017 mid-year performance review list.

324.425.    Relatedly, and more directly, Mr. Reid's comments revealed that if Mr. Cardwell didn't stop flagging and requesting that the Firm address racial discrimination that Mr. Cardwell was experiencing at Davis Polk, Mr. Reid and the other defendants would exert his and their enormous influence not just over Mr. Cardwell's staffing but Mr. Cardwell's employment status and career.

325.426.    The meeting ended shortly after Mr. Reid made such threats to Mr. Cardwell and with Mr. Reid emphatically insisting that Mr. Cardwell take a few days, or as much time as Mr. Cardwell needed, to think things over. Mr. Cardwell responded by informing Mr. Reid that Mr. Cardwell wasn't sure what he was supposed to think over. Mr. Cardwell then explained that he had never rejected any assignments or been a distraction to anyone at the Firm. Critically, both Mr. Reid and Mr. Kreynin accepted, without objection, Mr. Cardwell's description of when and how Mr. Cardwell accepted assignments.[70] Mr. Cardwell then explained that if the Firm assigned him work—any work—Mr. Cardwell would do the work and conduct himself with the same professionalism that he had always displayed at the Firm. Mr. Reid ended the meeting by repeating his statement that Mr. Cardwell should take some time and just think about things, noting that they could have a follow-up conversation in a few days.

326.427.    Mr. Reid's message that if Mr. Cardwell did not "drop" his inquiries into "whatever mistakes the Firm made in the past and move forward, [he] would be 'out of the game' and 'off the field'" was clear in its intent to halt Mr. Cardwell's complaints and

---

[70] According to comments made by Mr. Reid and Mr. Kreynin during the meeting, Mr. Cardwell's performance reviews described Mr. Cardwell as engaged, hardworking, and enthusiastic.

reasonable search for answers. Mr. Reid's message was per se retaliation, as it was delivered to chill and halt Mr. Cardwell's protected activity.

327.428.    All of Mr. Reid's comments, including Mr. Reid's retaliatory threat, were made in front of and was observed by Mr. Kreynin.

328.429.    Mr. Reid's (among other Defendants') actions in connection with Mr. Cardwell's March 29, 2017 meeting are consistent with and reflects such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and his rights.

329.430.    At no point during Mr. Cardwell's March 29, 2017 meeting did Mr. Reid or Mr. Kreynin state or conclude that Mr. Cardwell's quality of work was a reason, let alone the reason, why the Firm stopped staffing Mr. Cardwell on deals or giving him assignments. At no point during Mr. Cardwell's March 29, 2017 meeting did Mr. Reid or Mr. Kreynin state or conclude that Mr. Cardwell's performance reviews indicated that he was "behind" his peers or that his performance was inferior to his peers at Davis Polk.

431.    As noted above, between March 3, 2017 and March 21, 2017, Davis Polk's management committee (e.g., Mr. Reid and Mr. Bick); in house general counsel team; Executive Director of Personnel (i.e., Ms. Crane); Associate Development Department (e.g., Ms. DeSantis and Ms. Fenner), and M&A partner Mr. Kreynin were sending emails between each other and having discussions related to Mr. Cardwell's "performance and staffing" and "performance reviews and employment at the Firm." Leading up to the March 29 meeting, Davis Polk, Mr. Reid, and Mr. Kreynin had plenty of opportunities to determine whether Mr. Cardwell's performance was the cause of the staffing issues he experienced, and to communicate any such

conclusions to Mr. Cardwell. Neither of these possibilities resulted in Mr. Cardwell being told that his performance was the cause of his staffing experiences.

330.432.    Immediately after the meeting, as Mr. Kreynin and Mr. Cardwell were walking back to their offices, Mr. Kreynin told Mr. Cardwell that he had no idea Mr. Cardwell wasn't receiving any assignments. Having worked with Mr. Cardwell and being intimately familiar with his performance reviews, Mr. Kreynin knewcould not state or suggest (and did not state or suggest) that there was noa legitimate reason for the Firm's M&A staffing leadersMr. Reid, Mr. Wolfe, or Mr. Birnbaum to not have staffed him on deals and assignments. Mr. Kreynin ended the brief conversation by telling Mr. Cardwell that had he known that he wasn't being assigned work, Mr. Kreynin would have made sure Mr. Cardwell was staffed on his matters.

331.433.    Two days later, on March 31, 2017, Mr. Cardwell emailed Mr. Reid and accepted Mr. Reid's offer to "take as much time as [Mr. Cardwell] need[ed]" to regroup: Mr. Cardwell requested to use his unused vacation time, which totaled four weeks. Mr. Reid approved the request the same day. Prior to this incident, Mr. Cardwell never requested to take four consecutive weeks off.

332.434.    In his March 29, 2017 meeting with Mr. Reid and Mr. Kreynin, Mr. Cardwell put them and Davis Polk on notice that he was opposing discrimination in the Firm's performance review process.

333.435.      Shortly after this meeting, in April 2017, Mr. Reid or Mr. Kreynin met

with the Firm's M&A partners and discussed the meeting they had with Mr. Cardwell and the

discrimination complaints that Mr. Cardwell made during the meeting.[71]

334.436.      Thus, asAs of April 2017, Davis Polk's M&A partners, including Mr.

Bick, Mr. Wolfe, Mr. Butler, Mr. Birnbaum, and Mr. Amorosi, had knowledge of and discussed

that Mr. Cardwell opposed discrimination in Davis Polk's performance review policies and in

connection with some of the Firm's M&A partners.

335.437.      Mr. Cardwell returned to the Firm on May 2, 2017. When Mr. Cardwell

returned, the Firm did not have a concrete plan in place (or communicate such plan) to staff Mr.

Cardwell on deals or address the issues discussed in the March 29, 2017 meeting with Mr. Reid.

336.438.      Mr. Bick and Mr. Cardwell met on May 2, 2017. Instead of telling Mr.

Cardwell that Mr. Cardwell would be staffed in a manner that was consistent with the Firm's

normal weekly work form request/capacity system (or why such system was sufficient for

White(i) associates (who were similarly situated to Mr. Cardwell in all material respects) who

did not make any discrimination complaints about the Firm and its partners and (ii) White and

other non-Black associates (who were similarly situated in all material respects but not Mr.

Cardwell),)). Mr. Bick told Mr. Cardwell that he was going to "walk the halls and talk to partners

to see what tasks [Mr. Cardwell] could be staffed on." (emphasis added). Unlike Mr. Cardwell,

Davis Polk's White associates who were similarly situated to Mr. Cardwell in all material

---

[71] Davis Polk's NYSDHR Statement references this April 2017 meeting among the Firm's M&A partners, arguing that "[d]uring the month of April 2017, when Cardwell was out of the office at his own request, the Firm discussed a . . . plan for Cardwell. Partners who had worked with Cardwell when he was more junior—for example, John Amorosi—were of the view that Cardwell was not capable of performing at the level needed for more senior-level assignments." Ex. 2 at 14.

respects were staffed on deals and matters without Mr. Bick having to "walk the halls and talk to partners."

439.    Unlike Mr. Cardwell, Davis Polk's (i) associates (who were similarly situated to Mr. Cardwell in all material respects) who did not make any discrimination complaints about the Firm and its partners and (ii) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects) were staffed on deals and matters without Mr. Bick having to "walk the halls and talk to partners."  *See generally* "Comparators" Section (defining these individuals as "Presently Known Comparators" of Mr. Cardwell).

337.440.    Though Mr. Reid, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Davis Polk had all of April 2016 to ensure that Mr. Cardwell would be staffed in a non-retaliatory manner that wasand consistent with the Firm's normal weekly work form request/capacity system, such parties departed from the Firm's normal staffing process because of Mr. Cardwell's race, his race-related discrimination complaints, and Defendants' unlawful actions.

441.    Despite being Mr. Cardwell's so-called "Career Advisor," and despite the gross gaps that M&A partners had created in Mr. Cardwell's billable hours and resume, Mr. Bick also told Mr. Cardwell that no one at the Firm was going to "actively monitor" Mr. Cardwell's hours.

338.442.    For the reasons noted in this Complaint, Mr. Bick's statement is evidence ofthat the Firm was not going to "actively monitor" Mr. Cardwell's hours was discriminatory and retaliatory treatment, as it does not make sense for. Mr. Bick and Davis Polk, among other law firms and their practice group leaders to, did not ordinarily tell associates that they will not actively monitor associates' hours. SuchAs a matter of practice and culture, Mr. Bick, the Associate Development Department, and other leaders at Davis Polk regularly and consistently monitored M&A associates' hours. Deviating from this practice, especially in the case of Mr.

Bick and Mr. Cardwell, Mr. Bick's Firm-assigned mentee, would undermine the basic incentive structure of a profitable, sustainable, non-discriminatory law firm and practice group. that Bick's roles at the Firm obligated him to monitor and maintain.

339.443.    At no point during Mr. Cardwell's May 2, 2017 meeting with Mr. Bick did Mr. Bick state or suggest that Mr. Cardwell's prior work performance was inferior to his peers or below the Firm's standards. At no point during Mr. Cardwell's May 2, 2017 meeting with Mr. Bick did Mr. Bick state or suggest that Mr. Cardwell's prior assignment history was related to Mr. Cardwell's prior performance.

340.444.    About fifty-five days after Mr. Reid first acknowledged that Mr. Cardwell's workload needed to be "fixed," the Firm, on May 3, 2017, finally staffed Mr. Cardwell on his first assignment. The Firm staffed Mr. Cardwell on a legal research memo that could have been completed by a law student summer associate (i.e., a non-lawyer) who had little substantive corporate experience or knowledge. Mr. Goldberg, an M&A partner, was the partner who oversaw the legal research memo. At the time, Mr. Goldberg told Mr. Cardwell that the assignment was not particularly time sensitive and that he did not need to see a first draft of the memo for another two or three weeks.

445.    On or about May 19, 2017, Mr. Bick informed Mr. Cardwell that the Firm was not going to staff Mr. Cardwell on another assignment until the legal research assignment was completed. Mr. Cardwell informed Mr. Bick that the memo was not an assignment that required 100% of his capacity and that Mr. Goldberg set a deadline for the next stage of the draft that was still a few days away.

446.    Mr. Cardwell also told Mr. Bick: "You do understand that this is the first time anyone has told me that I wouldn't receive another assignment until this first one was finished?

And that since no one is ever staffed on a one-on-one basis, I had no way of knowing that until this conversation?"

341.447.     Mr. Bick's immediate response was: "Well, I'm sorry you didn't ask the right questions." Consistent with his prior actions, Mr. Bick's insult was entirely at odds with the Firm's policies and practices and directly reflects the discriminatory attitude Mr. Bick had toward Mr. Cardwell.

342.448.     Mr. Bick's (among other defendants') actions in connection with Mr. Cardwell's May 19, 2017 meeting are consistent with and reflects such defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

343.449.     All of Mr. Cardwell's billable hours in May 2017 related to the legal research memo.

344.450.     On May 22, 2017, just a few days after meeting with Mr. Bick, and in direct connection to Mr. Bick's behavior and the environment Mr. Bick had created for Mr. Cardwell, Mr. Cardwell informed Mr. Goldberg that he was feeling ill and that his sickness was caused by experiences that he was having at the Firm. As a follow-up to a conversation about discrimination that Mr. Goldberg had previously shared with Mr. Cardwell, Mr. Cardwell emailed the following to Mr. Goldberg:

"[Mr. Goldberg] [a]pologies for my delay in checking-in with you. Quite some time ago, you shared a story about your [family member] and certain improper factors…. Though I'm sure you had your own way of processing that experience, it appeared to me that the experience involved unnecessary insults and a feeling that made you sick to your stomach.

Last week, I thought about that story as I thought more about my own story and experience here at [Davis Polk] (in addition to other similarly situated workers at [Davis Polk]), and I became ill. Though I'm still feeling and navigating the effects, I expect to return to the office tomorrow. Upon my return, I will complete the write-up as discussed

*and asap. I think that it will be in final form within 1 or 2 quick turnarounds. Regards, Kaloma*"

~~345.~~451.        In response to Mr. Cardwell's email, Mr. Goldberg scheduled a May 23, 2017 meeting for himself, Davis Polk's Executive Director~~,~~ of Personnel (i.e., Ms. Crane), and Mr. Cardwell. The three of them met on May 23, 2017.

~~346.~~452.        During the meeting on May 23, 2017, Mr. Goldberg told Mr. Cardwell that Mr. Goldberg didn't know that Mr. Cardwell had requested to work with him on Mr. Cardwell's weekly workload request/capacity form. Mr. Goldberg also told Mr. Cardwell that Mr. Goldberg didn't know the degree to which Mr. Cardwell was currently staffed on other projects or hadn't previously been staffed on other projects. Regarding the legal research assignment, Mr. Goldberg told Mr. Cardwell "this isn't a test" to see if Mr. Cardwell should be staffed on more or different types of assignments.

~~347.~~453.        During the meeting on May 23, 2017, and like Mr. Goldberg, Davis Polk's Executive Director of Personnel claimed that she wasn't fully aware of how Mr. Cardwell had been previously staffed and that Mr. Reid and Mr. Bick hadn't yet brought her up to speed. ~~Mr. Cardwell told Davis Polk's Executive Director~~Davis Polk's Executive Director of Personnel's (Ms. Crane) statement to Mr. Cardwell regarding her lack of knowledge about Mr. Cardwell's staffing history was pretextual and contradicted by numerous contemporaneous documents created by Defendants and Davis Polk's managers. At all relevant times, including the weeks and months leading up to May 23, 2017, Ms. Crane received updates about Mr. Cardwell, his staffing, his experience at the Firm, and Mr. Cardwell's professional activities that took place outside the Firm. On May 23, 2017, Mr. Cardwell told Davis Polk's Executive Director of Personnel that, without any reasonable justification, the people responsible for staffing him did not staff Mr. Cardwell on any assignments.

348.454.      This May 23, 2017 incident is the eighth time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

455.      Davis Polk's Executive Director of Personnel asked Mr. Cardwell who were the persons who were primarily responsible for staffing him. Mr. Cardwell told Davis Polk's Executive Director and Mr. Goldberg that Mr. Reid, Mr. Bick, Mr. Birnbaum, and Mr. Wolfe were responsible for staffing Mr. Cardwell.

349.456.      Mr. Cardwell asked Davis Polk's Executive Director of Personnel to talk to those individuals, to investigate his staffing history and experience at the Firm, and to assess whether Mr. Cardwell's experience was in anyway normal. Davis Polk's Executive Director of Personnel suggested that she would reach out to some or all the partners that Mr. Cardwell mentioned.

350.457.      Notably, (i) the trigger for the meeting (i.e., Mr. Cardwell's May 22, 2017 email to Mr. Goldberg describing disparate treatment, harassment, and a hostile environment), (ii) Davis Polk's Executive Director's involvement in the meeting (which was not requested by Mr. Cardwell and is consistent with Davis Polk's Executive Director's role in addressing both race-related issues at the Firm[72] and official discrimination complaints, and her knowledge of Mr. Cardwell's September 2015 complaint and September 2016 complaint), and (iii) Davis Polk's Executive Director'sDirector of Personnel's suggestion to follow-up on Mr. Cardwell's request for an investigation all indicate that Davis Polk's Executive Director of Personnel and Davis Polk understood that Mr. Cardwell had made a complaint due to discrimination on the basis of his race, harassment, and/or a hostile environment. Consistent with this inference, and in

---

[72] As a reminder, on May 8, 2015, Mr. Cardwell sent an email to Davis Polk's Executive Director of Personnel and flagged a racially discriminatory "inter-office," personally-experienced pattern.

connection with Mr. Cardwell's May 22 email and the May 23 meeting, Davis Polk's Davis Polk's Executive Director of Personnel and Mr. Goldberg emailed the Firm's General Counsel's office on May 23, 2017, and the Firm's General Counsel's office emailed the Firm's outside employment counsel shortly thereafter on May 23, 2017.

458.    Davis Polk's Executive Director of Personnel never followed-up with Mr. Cardwell or had a subsequent conversation with Mr. Cardwell about his staffing history, performance, or experience at Davis Polk.

459.    On May 23, 2017, Davis Polk's Executive Director of Personnel did, however, email Mr. Reid and Mr. Bick after the May 23 meeting and tell them: "Louis [Goldberg] and I spoke to Kaloma today I can [sic] fill you in tomorrow at your convenience."

460.    Upon information and belief, on or around May 23, 2017, Mr. Reid and Mr. Bick had knowledge of Mr. Cardwell's May 22 complaint.

351.461.        Davis Polk's refusal or failure to investigate (in addition to their decision not to communicate with Mr. Cardwell about his specific request for an investigation into his staffing history and experience) were violations violated of the Firm's discrimination policies and a anti-retaliation of Mr. Cardwell's legally protected complaintspolicies.

352.462.        Notably, however, there is evidence that someone at Davis Polk had determined that Mr. Bick's treatment of Mr. Cardwell and the environment that he had created for Mr. Cardwell constituted unlawful, adverse employment actions, as Mr. Bick was demoted and replaced as practice group leader of the Firm's M&A group shortlyShortly after Mr. Cardwell had asked Davis Polk's Executive Director of Personnel and Mr. Goldberg to follow-up with Mr. Reid and Mr. Bick and investigate Mr. Cardwell's staffing history, performance, or

experience at Davis Polk, Mr. Bick was demoted and replaced as practice group leader of the Firm's M&A group.

***Mr. Cardwell Continues to Demand Equal Treatment and Files an EEOC Complaint.***

353.463.      On May 24, 2017, Davis Polk received notice that Mr. Cardwell had engaged Outten & Golden LLP as his legal counsel. It was not until Mr. Cardwell's counsel informed Davis Polk of that fact (i.e., that Mr. Cardwell had engaged counsel) did the Firm assign Mr. Cardwell to his first M&A deal in over eight months. For an M&A associate to not be staffed on an M&A deal for such a long period of time (let alone without explanation), during a time period in which the market is relatively healthy for M&A deal work, in a practice group whose core revenue and advancement decisions are inextricably linked to M&A deals, constitutes diminished responsibilities.

464.      Davis PolkOn May 25, 2017, Mr. Reid, Mr. Bick, Mr. Goldberg, Mr. Kreynin, and certain defendants' refusal to not staff Mr. Ms. Crane received emails and had discussions related to the fact that Mr. Cardwell on a had legal representation in connection with his employment at Davis Polk.

465.      On June 7, 2017, about 15 M&A partners—including Mr. Chudd, Mr. Wolfe, Mr. Birnbaum, Mr. Hochbaum, Mr. Mills, Mr. Goldberg, and Mr. Amorosi—received communications related to "document preservation notices" relating to Mr. Cardwell's complaints and the fact that Davis Polk had been informed that Mr. Cardwell obtained legal counsel around that time.[73]

---

[73] Mr. Birnbaum, Mr. Chudd, and Mr. Wolfe also received this communication related to "document preservation notices" on June 7, 2017.  On July 24, 2017, Mr. Brass received communications related to "document preservation notices" relating to Mr. Cardwell's complaints and the fact that Davis Polk he been informed that Mr. Cardwell had obtained legal counsel around that time.

466.    On June 13, 2017, Mr. Birnbaum emailed Mr. Wolfe and Mr. Brass and told them, "FYI, talked to Louis [Goldberg]. As I suspected, basically, for every deal ~~for the periods~~ that comes in, we should think about whether it's right for [Mr. Cardwell]. Mr. Brass replied saying: "Understood."[74]

467.    Between May 23, 2017 and June 13, 2017, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass, among others, discussed Mr. Cardwell with Mr. Goldberg (the same individual to whom Mr. Cardwell made the May 22, 2017 complaint).

468.    Upon information and belief, Mr. Birnbaum "suspected" that now that Mr. Cardwell (i) made a complaint on May 22, 2017, and (ii) had retained counsel as of May 24, 2017, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass, could no longer refuse to staff Mr. Cardwell on deals without thinking about Mr. Cardwell's actual abilities, competence, and performance.

469.    It was not until Mr. Cardwell's counsel informed Davis Polk of the fact that Mr. Cardwell had engaged counsel did the Firm's M&A partners assign Mr. Cardwell to his first M&A deal in over eight months. ~~time and manner described in~~

470.    The decision by Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to not staff Mr. Cardwell on an M&A deal for over eight months (without explanation), diminished Mr. Cardwell's responsibilities and altered the conditions of his employment as an associate at Davis Polk.

~~354.~~471.        Such persistent refusal to staff Mr. Cardwell on any M&A deal during this ~~Complaint constitutes both~~eight-month period, in direct response to Mr. Cardwell's September

---

[74] Around June 13, 2017, which was prior to Mr. Brass officially being assigned as a "staffing partner," Mr. Brass had a role in deciding whether Mr. Cardwell was staffed on deals and assignments and the types of deals and assignments.

2015, January 2016, September 2016, and March 2017 complaints, was an adverse employment

action. that pre-textually enabled the Firm to (i) alter his staffing, (ii) create "behind"

performance reviews, and (iii) give Mr. Cardwell a "time to go" message/meeting.

355.472.    After effectively experiencing radio silence with Davis Polk's M&A

attorneys for months—beginning at the end of March 2017 and continuing throughout the rest of

the year—Mr. Cardwell's experience at the Firm continued[75] to be marked by a series of

interactions where Davis Polk partners treated Mr. Cardwell as if they were strategically trying

to frustrate him or get him to assume blame for things that were not incorrect, his fault, or under

his control.

356.473.    On June 21, 2017, Mr. Cardwell informed the Firm, in an email, that he

had experienced some health complications as a result of the Firm's treatment of Mr. Cardwell.

357.474.    On July 5, 2017, Mr. Brass replaced Mr. Wolfe as a staffing coordinator

for the M&A group.[76]

358.475.    On August 3, 2017, Mr. Cardwell filed Mr. Cardwell's August 2017

EEOC Filing and noted, among other things, that "the Firm has discriminated against [Mr.

Cardwell] because of [Mr. Cardwell's] race and has retaliated against [Mr. Cardwell] because

[Mr. Cardwell has] actively raised awareness and concerns regarding issues of racial bias and

disparate outcomes."[77]

---

[75] Mr. Cardwell experienced similar interactions on certain matters in 2016.

[76] On July 5, 2017, Mr. Birnbaum emailed the Firm's entire corporate department to notify the Firm's corporate associates and partners that Mr. Brass and Mr. Birnbaum were the staffing coordinators for the Firms M&A group. Mr. Birnbaum's email stated that, "Going forward, requests for senior and mid-level M&A associates staffing should be directed to [Mr. Brass] or me [i.e., Mr. Birnbaum]. [Ms. Fenner] will continue to oversee staffing for junior associates in the M&A group."

[77] Mr. Cardwell's August 2017 EEOC Filing, specifically named, among others, Mr. Reid, Mr. Bick, Mr. Brass, Mr. Birnbaum, and Mr. Butler in connection with various descriptions of unlawful violations and actions.

476.    On August 3, 2017, Davis Polk's Executive Director of Personnel (i.e., Ms. Crane) was notified in an email that Mr. Cardwell decided to file the August 2017 EEOC Filing.

359.477.    On December 5, 2017, Davis Polk filed an Answer and Position Statement with the NYSDHR in response to Mr. Cardwell's August 2017 EEOC Filing ("(Ex. 2, "Davis Polk's NYSDHR Answer and Position Statement"). Davis Polk's NYSDHR Answer and Position Statement detailed and confirmed additional discrimination and retaliation against Mr. Cardwell, as their response included a number of intentionally false mischaracterizations that was triggered by, including in response to Mr. Cardwell's complaints (including the August 2017 EEOC Filing.).

478.    As with Ms. Hudson's June 2016 and September 2016 reviews, which were created and used for the purpose of ensuring Mr. Cardwell received a mid-year performance review, Davis Polk's NYSDHR Brief was an adverse employment action that materially altered the condition of Mr. Cardwell's employment and triggered Mr. Cardwell's employment being terminated.  The NYSDHR Brief reflected the feedback, statements, and records (e.g., performance reviews and emails) from at least the following Davis Polk partners: Ms. Hudson, Mr. Brass, Mr. Butler, Mr. Chudd, Mr. Bick, and Mr. Reid.

479.    Davis Polk, Mr. Bick, Mr. Birnbaum, and Mr. Brass did not staff Mr. Cardwell on any matters after Davis Polk filed their NYSDHR Brief on December 5, 2017.

### *Davis Polk Changed Its Performance Review System Because It Was Discriminatory*

360.480.    As explained *infra*, Mr. Cardwell had his final face-to-face annual review on January 11, 2018 with M&A partners Mr. Goldberg and Mr. Smith. At the start of the meeting, Mr. Smith told Mr. Cardwell that the M&A group was switching to a new system where the same partner would give everyone reviews for each class in order to "have more

consistency" in the delivery of the feedback. Mr. Smith was the partner who was assigned to deliver feedback regarding Mr. Cardwell's performance reviews for the 2017 reviewing period and for all the associates in his class.

361.481.     Davis Polk decided its review system needed to be more "consistent" in part because Davis Polk's performance review system was not consistently applied to associates and because their performance review system was having a disparate impact on Mr. Cardwell and other Black and non-White associates.

362.482.     Along with this role, Mr. Smith was assigned and expected to provide summary reviews that captured the written performance reviews submitted for Mr. Cardwell and also the feedback that was delivered to Mr. Cardwell during the review.

### *The Final, Sham Face-to-Face "Performance Review."*

363.483.     After Davis Polk received notice that the relevant authorities had granted Mr. Cardwell an extension (i.e., to January 10, 2018) to file a rebuttal to Davis Polk's NYSDHR Answer and Position Statement,[78] Davis Polk strategically rescheduled and pushed back Mr. Cardwell's annual face-to-face review to January 11, 2018.

364.484.     On January 11, 2018, just one day after Mr. Cardwell's attorneys submitted on his behalf a written rebuttal[79] to Davis Polk's NYSDHR Answer and Position Statement, M&A partners Mr. Goldberg and Mr. Smith conducted Mr. Cardwell's annual face-to-face review meeting and delivered to Mr. Cardwell the M&A partners' Consensus Feedback, which was supposed to be based on an assessment of Mr. Cardwell's performance and lawfully created written performance reviews, for work done from September 2016 through September 2017 ("January 11, 2018 Consensus Feedback").

---

[78] *See* Ex. 2, Davis Polk NYSDHR Statement.
[79] *See* Ex. 3, Cardwell Rebuttal to Davis Polk NYSDHR Statement

365.485.      As described *supra* at ¶ 128, the M&A partners at Davis Polk had a practice where they would all meet and discuss M&A associates professional development, performance, and performance reviews as a group and collectively decide what the Consensus Feedback should be given to each M&A associates during a given review period.[80]

366.486.      The January 11, 2018 Consensus Feedback that was delivered to Mr. Cardwell was partially based on written performance reviews that were submitted by M&A partners Lee Hochbaum (on September 19, 2017), Phillip Mills (on October 2, 2017), Mr. Goldberg (on October 6, 2017), and John Amorosi (on October 9, 2017).

367.487.      M&A partners Mr. Hochbaum, Mr. Mills, Mr. Goldberg, and Mr. Amorosi all had knowledge of Mr. Cardwell's August 3, 2017 EEOC complaint.

368.488.      M&A partners Mr. Hochbaum, Mr. Mills, Mr. Goldberg, and Mr. Amorosi rated Mr. Cardwell as "behind" after and within about a month and half of Mr. Cardwell's EEOC complaintand NYSDHR complaints and in response to Mr. Cardwell's EEOC and NYSDHR complaints.

489.    M&A partners Mr.On September 7, 2017, one of the M&A partners who created a performance review for Mr. Cardwell after he filed his EEOC Complaint participated in communications "concerning responses to Mr. Cardwell's August 2017 EEOC and NYSDHR filings." Upon information and belief, these communications, among others, contributed to this partner having knowledge that Mr. Cardwell filed an EEOC and/or NYSDHR complaint. This M&A partner then submitted a performance review that rated Mr. Cardwell "behind" on

---

[80] Davis Polk's statements in its NYSDHR statement refers to this process on a few occasions, including when it claimed that "when *the partners* met to decide on the *messages* to be given to associates as part of the formal, annual review cycle, Cardwell's second annual review cycle at the Firm, the Firm decided in October 2016 to try to give Cardwell…. *The partners* appointed Kreynin to deliver Cardwell's review based on this consensus message. During the review, Kreynin explained that *the partners* had identified…" Davis Polk NYSDHR Statement, Ex. 2 at 10.

September 19, 2017. This partner's performance review was an adverse employment action that triggered Defendants' decision and ability to terminate Mr. Cardwell's employment.

490.    On September 11, 2017, one of the M&A partners who created a performance review for Mr. Cardwell after he filed his EEOC Complaint participated in communications concerning the Firm's collection of information, materials, data, and analyses in response to Mr. Cardwell's August 2017 EEOC and NYSDHR filings.

491.    Upon information and belief, these communications, among others, contributed to this partner having knowledge that Mr. Cardwell filed an EEOC and/or NYSDHR complaint. This M&A partner then submitted a performance review that rated Mr. Cardwell "behind" on October 2, 2017. This partner's performance review was an adverse employment action that triggered Defendants' decision and ability to terminate Mr. Cardwell's employment.

492.    On August 8, 2017, one of the M&A partners who created a performance review for Mr. Cardwell after he filed his EEOC Complaint participated in communications concerning the Firm's responses to Mr. Cardwell's August 2017 EEOC and NYSDHR filings. Upon information and belief, these communications, among others, contributed to this partner having knowledge that Mr. Cardwell filed an EEOC and/or NYSDHR complaint. This M&A partner then submitted a performance review that rated Mr. Cardwell "behind" on October 6, 2017. This partner's performance review was an adverse employment action that triggered Defendants' decision and ability to terminate Mr. Cardwell's employment.

369.    Hochbaum, Mr. Mills, Mr. Goldberg, and Mr. Amorosi rated Mr. Cardwell as "behind' in response to Mr. Cardwell's August 3, 2017 EEOC complaint and for the purposes of completely eliminating Mr. Cardwell's billable hours and terminating his employment.

370.493.       The January 11, 2018 Consensus Feedback delivered to Mr. Cardwell represented ***the first negative performance evaluation that Mr. Cardwell received at Davis Polk***.

371.494.       Mr. Reid and all of Davis Polk's M&A partners, including Mr. Bick, Mr. Wolfe, Mr. Birnbaum, Mr. Butler, and Mr. Brass, were responsible for and contributed to the negative performance evaluation that Mr. Cardwell received on January 11, 2018.

372.495.       Mr. Cardwell's race was a motivating factor in the January 11, 2018 Consensus Feedback (i.e., negative performance review) that Mr. Reid, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, Mr. Butler, and Mr. Brass discussed, created, and had Mr. Goldberg and Mr. Smith deliver to Mr. Cardwell.

373.496.       Both the Firm's conspicuous rescheduling of Mr. Cardwell's January meeting and the January 11, 2018 Consensus Feedback that was delivered to Mr. Cardwell are consistent with and reflects Mr. Reid, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, Mr. Butler, and Mr. Brass's malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

374.497.       Davis Polk's January 11, 2018 Consensus Feedback was contrary to real-time feedback Davis Polk partners, including Mr. Goldberg, had given Mr. Cardwell during the periods covered in the annual face-to-face review (covering work done in 2017).

375.498.       In their January 11, 2018 face-to-face performance review meeting, Mr. Goldberg and Mr. Smith told Mr. Cardwell that staffing him would be "challenging."

376.499.       Mr. Goldberg and Mr. Smith could not tell Mr. Cardwell the truth, which was that it would be "challenging" staffing Mr. Cardwell because the M&A partners had recently

met as a group and had already signaled to Mr. Goldberg and Mr. Smith that they were not going

to work with Mr. Cardwell in light of the EEOC complaint that he filed.

377.500.         As of January 11, 2018, all of Davis Polk's M&A partners had retaliated

against Mr. Cardwell based on his August 2017 complaint, among others.

378.501.         As of January 11, 2018, all of Davis Polk's White M&A(i) associates,

including those (who were similarly situated to Mr. Cardwell in all material respects) who did

not make any discrimination complaints about the Firm and its partners and (ii) White and other

non-Black M&A associates, (who were similarly situated to Mr. Cardwell in all material respects

(including work performance).,)). were being treated more favorably than Mr. Cardwell.

379.502.         During the face-to-face review, Mr. Cardwell explicitly asked Mr.

Goldberg and Mr. Smith if they could provide Mr. Cardwell with any examples where Mr.

Cardwell received, either in real-time or prior to the face-to-face review, any of the criticisms

about his work performance that Mr. Goldberg and Mr. Smith had communicated during the

face-to-face review. Mr. Cardwell also asked if Mr. Goldberg and  Mr. Smith could provide any

examples that show that someone at the Firm had communicated to Mr. Cardwell that the quality

of his work was poor or that Mr. Cardwell was behind in his class. On both questions, Mr.

Goldberg and Mr. Smith failed to provide Mr. Cardwell with any examples.

380.503.         Mr. Goldberg—whom Mr. Cardwell worked directly with during the

applicable review period and who stated in the aftermath of Mr. Cardwell not receiving any

assignments for months that he'd "love to make [Mr. Cardwell] a better lawyer as best he

could"—acknowledged that neither him nor any other M&A partner had explicitly given Mr.

Cardwell negative feedback while working on any assignments that were a part of the review

period.

381.504.        Mr. Cardwell explained that he had previously and repeatedly (i) requested real-time feedback, including constructive criticism, (ii) informed (or made it clear to) Davis Polk partners that he wasn't the type of person to become combative or "shrink" or give less effort upon receiving criticism, and (iii) explained that it was problematic that Mr. Cardwell was once again in a face-to-face review with Davis Polk M&A partners where the real-time feedback he received was radically different than the feedback in the face-to-face review.

382.505.        Mr. Cardwell stated during the face-to-face review that, prior to the review and while working on the discussed assignments, Mr. Cardwell never explicitly or implicitly received the type of negative feedback that he was receiving during the face-to-face review. Mr. Cardwell explained during the face-to-face review that it was a theme of his career and other Black attorneys at Davis Polk that Davis Polk attorneys would say one thing while working with him and other Black attorneys and then say another thing in his and other Black attorneys' performance reviews. Additionally, Mr. Cardwell explicitly talked about the role that implicit bias, among other forms of bias, played in the timing and accuracy of the feedback that Mr. Cardwell had received.[81]

506.    According to a written summary Mr. Smith created, Mr. Smith described that part of the meeting by saying, "Kaloma indicated that he believed that this inconsistent feedback (i.e., seemingly positive feedback at the time of the project, followed by negative feedback) is a problem for many African American and minority associates…. Kaloma also indicated that he believed, and believed that it had been proved out by studies, that the longer time goes between actual work and feedback, the worse the review will be for minority associates. Kaloma indicated that this was driven by inherent bias."

---

[81] At the time of this complaint, Defendants were aware that implicit bias included "[r]ecall bias – [i]nformation that conforms to [people's] stereotypes is remembered better." *See* Ex. 7, Verna Myers Interrupting Bias Presentation.

507.    Mr. Smith's written summary was shared with Ms. Crane, the person with a practice and pattern of sharing Mr. Cardwell's complaints with Mr. Reid, Mr. Bick, various Davis Polk partners, Ms. DeSantis, and others within the Firm's Associate Development Department. Upon information and belief, Ms. Crane discussed Mr. Smith's written summary and comments about "bias" with Mr. Reid, Mr. Bick, various Davis Polk partners, and Ms. DeSantis.

383.508.    This January 11, 2018 incident is the ninth time that Mr. Cardwell actively flagged personally experienced discrimination and actively sought help from Davis Polk and persons with sufficient authority to address it.

384.509.    Mr. Cardwell explained that he and other Black attorneys at the Firm had flagged this discrepancy multiple times throughout his career and that he hoped  Mr. Goldberg and Mr. Smith understood why such a discrepancy had led him to ask for specific examples where such negative feedback was indeed communicated to Mr. Cardwell prior to the face-to-face review.

385.510.    Throughout the meeting, Mr. Smith looked stressed and uncomfortable, and at one point attempted to distance himself from the actual reviews by stating that he was just or merely "reading the reviews."

386.511.    Later in the meeting, Mr. Smith acted as if he were confused by how the written performance reviews and Mr. Goldberg's statements about the quality of Mr. Cardwell's work did not match Mr. Cardwell's responses. To this point, and in tone that indicated Mr. Smith could not believe that a Davis Polk M&A partner had given Mr. Cardwell positive feedback, Mr. Smith excitedly asked Mr. Cardwell: "Are you saying you actually received positive feedback on these assignments while working with Mr. Goldberg?"

387.512.        Mr. Cardwell responded by saying: "Absolutely. Not only did I explicitly

and implicitly receive positive feedback and also did not receive the type of feedback you're now

giving me."

388.513.        The meeting ended with a back and forth exchange that was prompted by

Mr. Smith asking Mr. Cardwell if he had any questions. Mr. Cardwell asked  Mr. Goldberg and

Mr. Smith: "What is the Firm's approach to staffing me?" Mr. Smith replied by saying that "the

Firm was trying to figure out what [Mr. Cardwell] could be staffed on." Mr. Cardwell replied

with something along the lines of: "Are you saying the Firm isn't able to staff me on any

matters?"

389.514.        Mr. Goldberg responded by saying that Mr. Cardwell may need to be

"flexible" in terms of the type of matters he would be staffed on going forward.  Mr. Smith asked

Mr. Cardwell what Mr. Cardwell would like to be staffed on so that he could go back to the

M&A "staffing partners" to explain what Mr. Cardwell's expectations were around staffing.

390.515.        Mr. Cardwell stated that the Firm only needed to staff him "appropriately"

and that the M&A staffing partners shouldn't think that staffing Mr. Cardwell appropriately

means that the Firm should or must staff Mr. Cardwell based Mr. Cardwell's so-called

"expectations." The meeting ended shortly after Mr. Cardwell informed  Mr. Goldberg and  Mr.

Smith that he wasn't currently staffed on any assignments, that he had always worked on

whatever the Firm staffed him on, and that going forward he would also work on any assignment

the Firm chose to staff him on.

391.516.        This January 11, 2018 meeting was the very first time anyone at Davis

Polk had ever expressed to Mr. Cardwell that someone at the Firm believed or had concluded (i)

that Mr. Cardwell appeared to be or was "behind" associates of the same class year or (ii) that

the quality of his work was supposedly poor.

~~Mr. Cardwell was not treated the same as White associates who were similarly situated to Mr. Cardwell in all material respects.~~***Contrary to their Treatment of Cardwell, Davis Polk Routinely Staffed and Employed Non-Black Associates Who Were Rated As "Behind" In Performance Reviews***

517.    Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass, including the

Firm's M&A partners, routinely staffed and worked with associates who were rated as "behind"

or not meeting their performance expectations.  Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum,

and Mr. Brass, including the Firm's M&A partners routinely were "flexible" in allowing

associates who were rated as "behind" or not meeting their or M&A partners' expectations to (i)

receive assignments, (ii) be staffed junior to their class year or on "routine" and manageable

assignments, and (iii) remain employed at Davis Polk for many years after receiving such

performance reviews.[82]

518.    For example, between June 2016 and September 2017—which is the same period

that Cardwell worked as an assigned/permanent member of the Firm's M&A group—a non-

Black associate ("Associate #5") similarly situated in all material respects as Cardwell, and

fellow member of the Firm's M&A group, was rated as "behind" a total of ***nine*** separate

occasions by M&A partners and M&A senior associates, with M&A partners having created six

of these reviews.

519.

---

[82] Upon and information and belief, the Firm's M&A partners and Defendants were aware that some associates had their compensation altered as a result of performance-related issues.

| M&A Partners and Associates Who Rated Associate #5 "Behind" in Performance Reviews | | |
|---|---|---|
| Date | Rated "Behind" (Is the associate ahead, with, or behind their class?) | M&A Reviewer |
| June 22, 2016 | "Behind" | M. Davis (partner) |
| July 11, 2016 | "Behind" | E. R. (associate) |
| Sept. 19, 2016 | "Behind" | Lee Hochbaum (partner) |
| Sept. 22, 2016 | "Behind" | William Chudd (partner) |
| Sept. 28, 2016 | "Behind" | Phillip Mills (partner) |
| October 3, 2016 | "Behind" | L. T. (associate) |
| October 4, 2016 | "Behind" | J. K. (associate) |
| July 11, 2017 | "Behind" | Phillip Mills (partner) |
| Sept. 11, 2017 | "Behind" | Lee Hochbaum (partner) |

520.    Associate #5 is not Black/African-American. Associate #5 was rated as "behind" by two M&A partners in consecutive years (2016 and 2017), was explicitly told during Associate #5's November 2016 Annual Review that Associate #5 "should view the fact that [Associate #5] was being given lower level tasks as an indication of [Associate #5's] failure to demonstrate a skill set and energy level consistent with higher level tasks," and was subsequently allowed to remain employed at Davis Polk by doing work that M&A partners "classif[ied]" as below or junior to [Associate #5's] class year.

521.    During Associate #5's 2017 annual review, the M&A partner noted (i) Associate #5's "low hours" to Associate #5 and that (ii) some reviewers "commented on [Associate #5's] relative lack of experience and substantive skills relative to [Associate #5's] class year."

522.    Associate #5's performance reviews were not a barrier to Mr. Bick, Mr. Wolfe, Mr. Birnbaum, Mr. Brass, or the Firm's other M&A partners' willingness to staff and work with Associate #5. During Associate #5's 2017 annual review, the Firm's and M&A group's consensus message to Associate #5 was that "the key for this year" was for Associate #5 "to try to take on as much work as possible…." Upon information belief, and consistent with the Firm's

and M&A group's consensus message that was delivered to Associate #5 in an interim review in August 2017, the December 2017 consensus message that Associate #5 received was previewed and approved by Mr. Bick (the head of the Firm's Corporate Department and former head of the M&A group), Mr. Goldberg and Mr. Aaronson (the co-heads of the M&A group), and Mr. Birnbaum and Mr. Brass (the M&A group's staffing coordinators).

523.    Despite nearly 10 separate performance reviews, low hours, and continually being staffed or doing work that was below Associate #5's class year, Mr. Bick, Mr. Goldberg and Mr. Aaronson (the co-heads of the M&A group), and Mr. Birnbaum and Mr. Brass (the M&A group's staffing coordinators), and the Firm's M&A partners were willing to and attempting to help Associate #5 "take on as much work as possible."

524.    Between December 2017 and Associate #5's departure from the Firm, Davis Polk's M&A partners staffed Associate #5 and created workable staffing arrangements to deal with Associate #5's performance issues.

525.    Associate #5 and Mr. Cardwell were similarly in all material respects and it was Mr. Cardwell's race and complaints that led Davis Polk's M&A partners, including Mr. Bick, Mr. Birnbaum, Mr. Brass, and Mr. Chudd, and Mr. Butler to staff and evaluate Mr. Cardwell differently and worse than Associate #5 and to allow Associate #5 to continue working at Davis Polk until *Associate #5 told them* that the Firm's work may not be what Associate #5 wanted to do. Mr. Cardwell's performance, including relative to the associates in his class year as compared to Associate #5 and the associates in Associate #5's class year, was at least on par with (if not better than) Associate #5's performance. Upon information and belief, Associate #5 worked at the Firm until January 2019 and received a bonus for work done in 2018.

526.

PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)

| M&A Partners and Associates Who Rated Mr. Cardwell "Behind" in Performance Reviews | | |
|---|---|---|
| Date | Rated "Behind" (Is the associate ahead, with, or behind their class?) | M&A Reviewer |
| April 2015 – Cardwell becomes a Rotator in the M&A Group | | |
| April 2015 – September 2015 | N/A | N/A |
| April 2016 – Cardwell becomes Permanent Member of M&A Group | | |
| April 2016 – August 2017 | N/A | N/A |
| August 2017 – Cardwell files EEOC and NYSDHR Complaints Naming M&A Partners | | |
| September 19, 2017 | "Behind" | Lee Hochbaum (partner) |
| October 2, 2017 | "Behind" | Phillip Mills (partner) |
| October 6, 2017 | "Behind" | Louis Goldberg (partner) |
| October 9, 2017 | "Behind" | John Amorosi (partner) |

527.     Unlike Associate #5, Mr. Cardwell had never been rated as "behind" by an M&A associate in a performance review, had never been rated as "behind" multiple times, in two different years, by the same Davis Polk partner in performance reviews, and had only been rated as "behind" by M&A partners in one review cycle following his EEOC Complaint. Even if one considers the performance reviews that followed Mr. Cardwell's EEOC Complaint, Mr. Cardwell still had fewer performance reviews where he was rated "behind" than Associate #5. Mr. Cardwell was asked to leave the Firm sooner than Associate #5 and Mr. Cardwell was never given work after he had his annual review meeting related to the performance reviews where M&A partners rated Mr. Cardwell as "behind."

392.528.     As further explained in the "Comparators" section *infra*, Mr. Cardwell was not treated the same as (i) associates (who were similarly situated to Mr. Cardwell in all material respects) who did not make any discrimination complaints about the Firm and its partners and (ii) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects). Between the meeting on January 11, 2018 and February 8, 2018, Mr. Reid,

Mr. Bick, Mr. Birnbaum, Mr. Brass, and Davis Polk did not staff Mr. Cardwell on any matters. Once again, Defendants retaliated against Mr. Cardwell for his legally protected, race-based discrimination complaints, including the complaints that he filed in the rebuttal that he filed on January 10, 2018 and communicated on January 11, 2018. Here, as in other cases described in this Complaint, Mr. Cardwell's protected activity was followed closely by discriminatory treatment and an adverse employment actionactions.

### *Davis Polk's 2017 Performance Reviews for Mr. Cardwell Were Not Legitimate*

393.529.      As noted herein, Davis Polk's Performance Review Policy and practice mandates that the partner who is assigned to deliver the Firm's Consensus Feedback to an associate during their face-to-face performance review meeting must also complete and submit a Consensus Feedback Statement.

394.530.      Mr. Smith was assigned to deliver the Firm's Consensus Feedback to Mr. Cardwell and did so on January 11, 2018. However, Mr. Smith completely distanced himself from the M&A partners' 2017 written performance reviews for Mr. Cardwell and refused to include any substantive information on the Consensus Feedback Statement that he created for Mr. Cardwell.

## Lawyer Reviews - Summary Reviews

Associate: **Cardwell, Kaloma**
Reviewer: **Smith, H. Oliver**
Review Date: **January 12, 2018**

**1. Review Type:**
Annual Review

**2. Principal matters worked on by the reviewee which were considered in the evaluation:**

1. ████████████████████████ - 362.3 hours
2. ████████████████████ - 78.9 hours
3. ████████████████████████ - 57.9 hours

[September 2016 - September 2017]

**3. Comments received from:**
No Answer

**4. Substance of evaluation (including reviewee's performance compared to expectations for a lawyer of the same seniority, strengths and weaknesses in the reviewee's performance in the last 12 months, improvements, if any, from prior year's review, etc.):**
No Answer

**5. Did the reviewee receive a commendation for his/her pro bono work or recruiting efforts?**
No Answer

**6. Comments from the reviewee regarding his or her evaluation of his or her performance.**
No Answer

**7. Developmental priorities for the next year (including types of matters, level of responsibility, training, etc.)**
No Answer

Submitted on: 1/16/2018, 5:53 PM

**Lawyer Reviews - Summary Reviews**

Associate: Cardwell, Kaloma
Reviewer: Smith, H. Oliver
Review Date: January 12, 2018

**1. Review Type:**
Annual Review

**2. Principal matters worked on by the reviewee which were considered in the evaluation:**

| | |
|---|---|
| 1. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | - 362.3 hours |
| 2. ▓▓▓▓▓▓▓▓▓▓▓▓ | - 78.9 hours |
| 3. ▓▓▓▓▓▓▓▓▓ | - 57.9 hours |

[September 2016 - September 2017]

**3. Comments received from:**
No Answer

**4. Substance of evaluation (including reviewee's performance compared to expectations for a lawyer of the same seniority, strengths and weaknesses in the reviewee's performance in the last 12 months, improvements, if any, from prior year's review, etc.):**
No Answer

**5. Did the reviewee receive a commendation for his/her pro bono work or recruiting efforts?**
No Answer

**6. Comments from the reviewee regarding his or her evaluation of his or her performance.**
No Answer

**7. Developmental priorities for the next year (including types of matters, level of responsibility, training, etc.)**
No Answer

Submitted on: 1/16/2018, 5:53 PM

395.531.    In January 2018, Mr. Smith effectively submitted a blank Consensus Feedback Statement for to be included in Mr. Cardwell's personnel file. Unknown to Mr. Cardwell in January 2018. at the time of its creation, the Associate Development Department was aware that Mr. Smith's Consensus Feedback Statement—that is, the summary review that was supposed to summarize Mr. Cardwell's performance for the annual review cycle covering his last year of work at Davis Polk—was "blank intentionally."

396.532.    Specifically, Mr. Smith refused to provide any information or answers for the following questions:

- "Comments [i.e., performance reviews] received from:"

- "Substance of evaluation (including reviewee's performance compared to expectations for a lawyer of the same seniority, strengths and weaknesses in the reviewee's performance in the last 12 months, improvements, if any, from prior year's review, etc.):"

- Did the reviewee receive a commendation for his/her pro bono work or recruiting efforts?"

- "Comments from the review regarding his or her evaluation of his or her performance."

- "Developmental priorities for the next year (including types of matters, level of responsibility, training, etc.)"

397.533.      Mr. Smith was concerned about the legality of that the M&A partners' 2017 performance reviews and the Consensus Feedback he was asked to deliver to Mr. Cardwell. Cardwell, and the Firm kept a "full version" of Mr. Cardwell's out of his official personnel file and in the possession of Davis Polk's Executive Director of Personnel (i.e., Sharon Crane).

398.534.      Mr. Smith refused to document any of the M&A partners' 2017 written performance reviews or the Consensus Feedback they assigned him to document in the January 2018 Consensus Feedback Statement because Mr. Cardwell's January 2018 annual review was not a legitimate, nondiscriminatory review.

399.535.      By this time in Mr. Smith's career, Mr. Smith had been at Davis Polk for about thirteen years and a partner for about five years. It is not possible that Mr. Smith did not know how to prepare the Firm's Standard Consensus Feedback Statement or that his submission was mistakenly completed and submitted.

400.536.      Mr. Smith chose not to summarize Mr. Cardwell's 2018 annual performance review because he did not want to participate in Defendants' discrimination and retaliation against Mr. Cardwell.

~~Davis Polk Dated~~ Sophia Hudson's Performance Reviews ~~as of June and September 2016 But Her Reviews Actually~~ Were ~~Created After Mr. Cardwell Filed His EEOC Charge in 2017 and Were Created~~Used for the Purpose of Helping Mr. Bick and Davis Polk Terminate Mr. Cardwell's Employment

~~401.~~537.        As touched on *supra,* Mr. Cardwell requested and was granted permission to complete a third six-month rotation instead of two-six month rotations. Mr. Cardwell's third rotation was in the Firm's Capital Markets group and ran from approximately October 2015 through April 2016. Ms. Hudson worked as a partner in the Firm's Capital Markets group.

~~402.~~538.        Around the same time (i.e., September and October 2015), Mr. Bick, Ms. Crane, and ~~Davis Polk~~the Associate Development Department had conversations with Ms. Hudson about Mr. Cardwell's professional development and experiences at the Firm. At the time, Davis Polk partners had discussions with Ms. Hudson that explained how the Firm permitted Mr. Cardwell, an expected and soon-to-be permanently assigned member of the Firm's M&A group, to rotate through Capital Markets despite Mr. Cardwell already completing two-six month rotations in different practice areas and not having any prior Capital Markets experience.

~~403.~~539.        Davis Polk leaders coordinated Mr. Cardwell's staffing in Capital Markets so that he would mostly work with Ms. Hudson during his rotation in that group.

~~404.~~540.        From October 2015 through April 2016, Mr. Cardwell worked directly with Ms. Hudson and (i) billed more than 100+ hours with Ms. Hudson and (ii) billed more hours on matters involving Ms. Hudson than any other Davis Polk Capital Markets partner during that period.

~~405.    Between October 2015 and July 2016, Ms. Hudson had multiple conversations with Mr. Bick about Mr. Cardwell's professional development and performance.~~

~~406.~~541.        At all relevant times, Ms. Hudson had knowledge that Mr. Cardwell filed a complaint to the EEOC and NYSDHR in August 2017.

407.542.        After Mr. Cardwell filed a complaint with the EEOC and NYSDHR

alleging discrimination and retaliation, Davis Polk submitted documentation to the NYSDHR

showing that claimed Ms. Hudson had completed written performance reviews for Mr. Cardwell

in June 2016 and September 2016 and that both of Ms. Hudson's performance reviews

purportedly indicated that Ms. Hudson had answered "behind" to the question: "Do you feel this

lawyer is performing materially behind, with or ahead of lawyer's class"?

408.543.        As noted *supra* at ¶¶ 302-08, on March 21, 2017, Davis Polk, Ms. Reid,

Mr. Bick, Ms. Crane, and Ms. DeSantis refused to allow Mr. Cardwell to view his performance

reviews.

544.    By June 20, 2016 (the date this review was submitted), Ms. Hudson had

knowledge of Mr. Cardwell's September 2015 complaint (and possibly his January 2016

complaint).

545.    Beyond the timing of her reviews, Ms. Hudson's September 2016 review

contained intentional misstatements about Mr. Cardwell's performance and his purported

understanding of the impact that his Capital Markets rotation would have on his performance.

Specifically, Ms. Hudson's September 2016 review stated that "Kaloma completed a rotation in

Capital Markets as his third rotation and was aware that he would be behind others in his class as

a result of doing so."

546.    Ms. Hudson's assertion regarding Mr. Cardwell's awareness was pretextual and

false (as Mr. Cardwell never believed that he would be "behind others in his class as a result" of

completing this rotation and was assured (prior to accepting a third rotation) by M&A and

Capital Markets partners that they did not think that any material setbacks would occur).  The

review's misleading assertion is further belied by the fact that the Associate Development

Department described Mr. Cardwell as a "former M&A rotator[] who asked to assign [to M&A] last October, but w[as] told to help the firm and do 6 months in [Capital Markets] first. So they [i.e., Mr. Cardwell and another associate] now get to assign to M&A."  Certainly, Mr. Cardwell would not have accepted a rotation—in order to help the Firm—if he knew or believed that doing so would make him "behind others in his class."

409.547.    Between May 2015 and May 2017, Mr. Cardwell had ten face-to-face meetings with Davis Polk partners—all meetings where Davis Polk partners initiated the meetings and planned in advance and prepared for the meetings—where Mr. Cardwell's performance, performance reviews, and professional development were discussed by partners who had specific knowledge about Mr. Cardwell performance and performance reviews:

      a.  May 2015 mid-year performance review meeting (given to all first-year associates) with Mr. Kyrwood, finance partner

      b.  December 2015 annual performance review meeting (given to all associates) with Mr. Chudd, M&A partner

      c.  January 2016 meeting with Mr. Reid (where Mr. Reid reviewed Mr. Cardwell's reviews in preparation for their meeting)[83]

      d.  March 2016 meeting with Byron Rooney, capital markets partner

      e.  June 2016 mid-year performance review (which Mr. Bick falsely claimed resulted from Mr. Cardwell's request) with Mr. Bick

      f.  December 2016 annual performance review meeting with Mr. Kreynin, M&A partner

      g.  March 3, 2017 meeting with Mr. Reid

      h.  March 29, 2017 meeting with Mr. Reid and Mr. Kreynin

      i.  May 23, 2017 meeting with Mr. Goldberg and Ms. Crane

[83] Davis Polk's NYSDHR Statement confirms that Mr. Reid read and was familiar with Mr. Cardwell's reviews prior to their January 2016 meeting. *See* Ex. 2 at 13 (claiming that "Reid—who had read Cardwell's reviews before the meeting, as he had before the January 2016 dinner with Cardwell….").

410.548.       Despite having almost ten face-to-face meetings with Davis Polk partners who (i) worked in Davis Polk's Finance, M&A, and Capital Markets groups, (ii) served on Davis Polk's management committee, and (iii) had specific knowledge of Mr. Cardwell's professional development, performance, and performance reviews, and various Consensus Feedback that was discussed and prepared for Mr. Cardwell, ***not one partner in any of these meetings ever told Mr. Cardwell*** that Ms. Hudson or the Firm believed or noted in a performance review that Mr. Cardwell was "behind" lawyers in his class or that the quality of his work was poor and/or contributing to issues related to his staffing.

411.549.       During Mr. Cardwell's entire employment at Davis Polk, no one at Davis Polk ever told Mr. Cardwell that Ms. Hudson believed or noted in a performance review that Mr. Cardwell was "behind" lawyers in his class or that the quality of his work was poor and/or contributing to issues related to his staffing.

412.    Moreover, multiple Davis Polk partners made statements during Mr. Cardwell's employment that contradict any notion that Ms. Hudson's June and September 2016 written performance reviews were created prior to the filing of Mr. Cardwell's August 2017 EEOC Filing.

413.550.       As noted herein, Mr. Reid explained to Mr. Cardwell in March of 2017 that Mr. Cardwell's low workload was not Mr. Cardwell's fault—which would not be so if such decisions were truly attributable to Mr. Cardwell's purportedly poor performance.

414.    Moreover, Mr. Bick's statements to Mr. Cardwell in his June 2016 face-to-face performance review meeting with Mr. Bick contradict the idea and argument that the reviews that Mr. Cardwell received in this case for Mr. Hudson were created prior to the filing of Mr. Cardwell's August 2017 EEOC Filing.

415.551.         Mr. Bick's comments to Mr. Cardwell during their June 2016 meeting

reflected a review of the written performance reviews that were submitted for matters worked on

between September 2014December 2015 through June 2016 and the discussed and developed

Consensus Feedback that Mr. Bick was assigned to deliver to Mr. Cardwell.

416.552.         The Consensus Feedbackfeedback that Mr. Bick delivered accountedto

Mr. Cardwell was supposed to account for matters that Mr. Cardwell had worked on with Ms.

Hudson and any reviews that Ms. Hudson submitted prior[84] to Mr. Bick and Mr. Cardwell's June

2016 meeting.

417.553.         As noted *supra* at ¶ 116, Mr. Bick conducted Mr. Cardwell's June 2016

performance review meeting while holding and flipping through written performance reviews

that were supposedly a part of the review that took place for that meeting.

418.     If Mr. Hudson submitted any written performance reviews for Mr. Cardwell prior

to Mr. Bick and Mr. Cardwell's June 2016 meeting, Mr. Bick had them in his hands during the

meeting.

419.554.         During Mr. Cardwell's face-to-face meeting with Mr. Bick in June 2016,

Mr. Bick never mentioned or referenced Ms. Hudson.

420.555.         Mr. Bick never told Mr. Cardwell that Ms. Hudson or anyone believed or

noted in a performance review that Mr. Cardwell was "behind" lawyers in his class or that the

quality of his work was poor and/or contributing to issues related to his staffing.

---

[84] The Consensus Feedback Statement form has a category for "[p]rincipal matters worked on by the reviewee which
were considered in the evaluation."  On Mr. Bick's 2016 Consensus Feedback Statement, all of the hours noted
relate to matters that Mr. Cardwell worked on with Ms. Hudson.

421.556.        Despite the fact that Mr. Cardwell asked Mr. Bick multiple follow-up

questions, Mr. Bick only communicated feedback related to general responsiveness.[85] When Mr.

Cardwell inquired further and asked Mr. Bick during their June 2016 meeting and asked if Mr.

Bick had any examples related to his feedback, Mr. Bick indicated that he did not have any

examples.

422.557.        Even though Mr. Cardwell asked Mr. Bick if he could go back to

reviewers and follow-up with him once he had specific examples or any additional information

related to his general critiques around responsiveness, Mr. Bick never followed up with any

examples or information related to any Davis Polk attorney, let alone Ms. Hudson.

558.    Mr. Cardwell's experiences with Mr. Bick during this meeting contradict explicit

instructions that Mr. Bick (and all Firm partners) receive annually, which emphasized the

importance of "giv[ing] the associate [receiving the review] some advance notice and let[ting]

them know what the purpose of the meeting is" and to provide "[s]pecific examples of behaviors

discussed."  None of this was done in connection with the June 2016 mid-year review (and in

fact, Mr. Bick attempted to disguise the review as a one where they would discuss a research

assignment).

423.559.        Six months after Mr. Bick's June 2016 meeting with Mr. Cardwell, Mr.

Cardwell had his regularly scheduled 2016 annual face-to-face performance review meeting with

M&A partner Mr. Kreynin in December 2016.[86]

---

[85] Mr. Bick's feedback related to responsiveness related to learning curves and skills that Davis Polk knew often takes its associates many years to master and learn. Davis Polk's training materials for third year and fifth year associates focuses on the same responsiveness feedback that Mr. Bick was communicating to Mr. Cardwell as a second-year associate in June 2016.

[86] Despite the fact that they cover the exact same matters and time period, the documents Davis Polk provided during the NYSDHR's investigation suggest that Davis Polk treated Ms. Hudson's purported June 2016 and September 2016 reviews as two separate reviews and thus two separate occasions in which a Davis Polk partner supposedly rated Mr. Cardwell as "behind."

424.560.        Mr. Kreynin's comments to Mr. Cardwell during their December 2016 meeting (i.e., the Consensus Feedback that Mr. Kreynin delivered) reflected a review of the written performance reviews that were submitted for matters worked on between September 2015 and September 2016 and the discussed and developed Consensus Feedback that Mr. Kreynin was assigned to deliver to Mr. Cardwell.

425.561.        The Consensus Feedback that Mr. Kreynin delivered to Mr. Cardwell in December 2016 accounted for matters that Mr. Cardwell worked on with Ms. Hudson and any reviews that Ms. Hudson submitted in 2016.[87]

426.562.        In Mr. Cardwell's December 2016 annual review meeting, like Mr. Bick, Mr. Kreynin had all of Mr. Cardwell's 2016 written performance reviews within his reach.

427.563.        Any written performance reviews submitted by Mr. Hudson in 2016 would have been available for Mr. Kreynin to take examples from or reference during the meeting.

428.564.        Mr. Kreynin never told Mr. Cardwell that Ms. Hudson or anyone at the Firm believed Mr. Cardwell was "behind" lawyers in his class or that the quality of his work was poor and/or contributing to issues related to his staffing.[88]

429.565.        Because Mr. Kreynin gave vague and inconsistent feedback, as described *supra* ¶¶ 244-47, Mr. Cardwell asked Mr. Kreynin if he had any specific examples that Mr.

---

[87] The written performance evaluation form has a category for "[p]rincipal matters worked on by the reviewee which were considered in the evaluation." Kreynin's 2017 Consensus Feedback Statement, confirms that work done on Ms. Hudson's matters were accounted for and a part of the evaluation. *See* Ex. 19, Kreynin 2017 Consensus Feedback Statement.
[88] As noted *supra* at ¶ 330, in on March 29, 2017, Mr. Kreynin told Mr. Cardwell he had no idea that Mr. Cardwell was not being staffed.

Kreynin could share with Mr. Cardwell. Mr. Kreynin responded by giving Mr. Cardwell a single example that related to a deal that Mr. Cardwell worked on with Mr. Kreynin.[89]

~~430.~~566.    Mr. Cardwell directly asked Mr. Kreynin if Mr. Kreynin had any other examples related to his feedback or the review and Mr. Kreynin explicitly told Mr. Cardwell that he "did not have any examples on hand."

~~431.~~ Notably, the 2016 reviews ~~that Defendants attributed to~~ created by Ms. Hudson are full of details and examples—all provided *after* (i) Mr. Cardwell ~~filed~~made his ~~EEOC~~ September 2015 and January 2016 complaints and, in the case of her September 2016 review, after Mr. Cardwell made his September 8, 2016 complaint ~~are full of details and examples.~~[90]

~~432.~~567.    ~~It defies logic that Mr. Bick and Mr. Kreynin both (i) had~~ , (ii) Ms. ~~Hudson's~~Hudson sought all of Mr. Cardwell's prior performance reviews ~~within reach during the~~ to get a "read on the situation," and (iii) Mr. Bick instructed the Associate Development Department to create a mid-year review cycle for Mr. Cardwell (where Ms. Hudson's June 2016 ~~face-to-face performance review meeting with Mr. Reid and December 2016 face-to-face annual performance review meeting with Mr. Kreynin, after both became familiar with all submitted reviews in preparation for the meeting, and (ii) and~~review was solicited, by the very same members of the Associate Development Department who received Mr. ~~Bick~~Bick's instruction and Mr. ~~Kreynin did not have any specific examples to provide Mr. Cardwell when Mr. Cardwell~~

[89] *See* Ex. 19, Kreynin March 2017 Consensus Feedback Statement. Mr. Kreynin's March 2017 Consensus Feedback Statement for Mr. Cardwell noted that after Mr. Cardwell asked if Mr. Kreynin if he had any specific examples related to the feedback that he gave, Mr. Kreynin communicated that he gave an example related to a deal for "Hoffmaster"—which was a deal that Mr. Cardwell worked on with Mr. Kreynin. Mr. Kreynin's March 2017 Consensus Feedback Statement also noted that Mr. Cardwell "asked for other specific examples" and that Mr. Kreynin "said that [he] didn't have [any] at hand."
Mr. Kreynin's March 2017 Consensus Feedback Statement for Mr. Cardwell explicitly states that Mr. Cardwell "asked for other specific examples which [Mr. Kreynin] said that [he] didn't have at hand."
[90] ~~It defies logic that Mr. Kreynin would not have remembered examples from reviews that Defendants argue (i) existed in June and Sept. 2016 and (ii) were the first and second performance reviews to assess Mr. Cardwell as "behind."~~

~~requested if they had any examples related to their feedback.~~Cardwell's September 2015 and September 2016 complaints).

~~433.~~568.        Ms. Hudson's ~~purported~~ June 2016 and September 2016 reviews ~~would have~~ represented the first and second performance reviews in Mr. Cardwell's career that had the answer "behind" for the question: "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class"?

~~434.~~569.        On Davis Polk's performance evaluation forms: "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class?" is the first question that appears under the header "Performance Evaluation."

~~435.~~570.        It is the only question on Davis Polk's performance evaluation form that tracks whether associates are perceived to be "behind" in their class with a specific question that provides reviewing attorneys with three unambiguous options to choose from: behind, with, or ahead of lawyer's class.

~~436.~~571.        Even though presented as a mandatory question on Davis Polk's form, and is arguably the most important question on the form itself, Ms. Hudson's performance reviews are the only documents to state that Ms. Hudson concluded Mr. Cardwell was "behind" lawyers in his class.

~~437.~~572.        ***None*** of the Consensus Feedback that was discussed and delivered to Mr. Cardwell in December 2015, June 2016, or December 2016 ever mentioned that Ms. Hudson or any believed Mr. Cardwell was "behind" lawyers in his class or that the quality of his work creating issues with his staffing.

~~438.~~573.        ***None*** of the Consensus Feedback Statements that were created for Mr. Cardwell's December 2015 annual face-to-face annual performance review meeting, June 2016

face-to-face mid-year performance review meeting, or December 2016 annual face-to-face

annual performance review meeting, or January 2018 annual face-to-face performance review

meeting states that Ms. Hudson or anyone at the Firm believed or rated Mr. Cardwell as "behind"

lawyers in his class. This fact stands in stark contrast to many of the performance reviews

referenced in the "Comparators" section *infra*; many other attorneys' Consensus Feedback

Statements explicitly note when a partner rated or perceived an associate to be "behind."

439.574.     Not one partner who conducted or participated in Mr. Cardwell's

December 2015 annual face-to-face annual performance review meeting, June 2016 face-to-face

mid-year performance review meeting, December 2016 annual face-to-face annual performance

review meeting told Mr. Cardwell that he would need or should consider some type of "career

counseling," career coaching, or a performance remediation program or plan because Ms.

Hudson or someone at the Firm believed Mr. Cardwell was "behind" lawyers in his class.

440.575.     Lastly, Ms. Hudson's own statements to Mr. Cardwell contradict her and

Davis Polk's attempt to claim that she non-pretextually concluded and documented in June 2016

and September 2016 that Mr. Cardwell was "behind" lawyer's in his class.

441.576.     In fact, out of roughly 200+ emails—spanning from October 28, 2015

through March 21, 2016—that involved Mr. Cardwell and Ms. Hudson during Mr. Cardwell's

rotation in the Capital Markets group—the most direct and critical feedback that Ms. Hudson

provided to Mr. Cardwell related to Mr. Cardwell incorrectly using the word "I" instead of "me"

in an internal email (i.e., an email that was not sent to any of the Firm's contacts or otherwise

impact the Firm's clients). The relevant exchange occurred on December 17, 2015 and was as

follows:

Mr. Cardwell's email to Ms. Hudson (4:12 p.m.):

"*Hi Sophia, Attached, please find the following drafts (each clean and marked against the respective early tender documents): [REDACTED LIST OF DOCUMENTS]. Please let me know if you have any comments.*
*Also, before [the senior capital markets associate on the deal] heads off on vacation this weekend, is there a time tomorrow that you'll be available to meet with [White senior associate] and I?*"

Ms. Hudson's response to the email above (5:42 p.m.):

"*[Mr. Cardwell], No one likes to be corrected on grammar, but it's something partners and sophisticated clients notice a lot so I hope you'll take my advice in the right spirit. Please be careful using I/me. 'Me' is the appropriate pronoun to use below as it is being used as an object of the preposition 'with.' Best, Sophia*"

442.577.    To be clear: Mr. Cardwell initially appreciated Ms. Hudson's feedback because, despite having already worked together for months, Ms. Hudson's email essentially represented the *first time* Ms. Hudson had given Mr. Cardwell somewhat critical feedback.

443.578.    To be even more clear: Not only did no one at Davis Polk ever treat Mr. Cardwell with so-called "kiddie gloves," but at no point during Mr. Cardwell's tenure at Davis Polk did Mr. Cardwell expect, desire, or request to be treated with "kiddie gloves."

444.579.    To the contrary, Mr. Cardwell worked every day at Davis Polk with the belief that unfiltered, constructive feedback was not just acceptable or necessary, but was the best way for all young attorneys to develop and progress. Accordingly, Mr. Cardwell responded to Mr. Hudson's email above with the following email:

Mr. Cardwell at 6:03 p.m. the same day (i.e., December 17, 2015):

"*[Ms. Hudson], Thank you for bringing the mistake to my attention. When I played college football, I performed best under coaches who demanded perfection. My favorite coaches seemingly noticed everything and were obsessively focused (sometimes to my displeasure) on making every player better. I say all that to say, I hope you continue to correct me whenever and however you see fit. I'll be more careful going forward. Thank you.*"

445.580.    After Mr. Cardwell's and Ms. Hudson's matters concluded and they stopped working together at the end of 2015/beginning of 2016, Ms. Hudson had virtually no

communications with Mr. Cardwell, let alone any communications with Mr. Cardwell about Mr.

Cardwell's work product. It should be noted that Ms. Hudson had no problem getting in touch

with Mr. Cardwell or speaking directly with him when Ms. Hudson desired to do so.

446.581.    At the direction of and in coordination with Mr. Bick or Mr. Reid (or

someonethe Associate Development Department acting at their direction or approval), Ms.

Hudson created her June 2016 and September 2016 performance reviews to help Davis Polk give

Mr. Cardwell a "time to go" meeting (i.e., terminate Mr. Cardwell's employment.).

582.    Ms. Hudson workedprovided the Associate Development Department (and the

Firm) with Mr. Bick or Mr. Reid to complete her written performance reviews in June 2016 and

September 2016 with knowledge (i) of Mr. Cardwell's prior September 2015 and January 2016

complaints; and (ii) that their intent was to use her reviews to eliminatethe Firm routinely used

mid-year review cycles (like the one Mr. Bick created for Mr. Cardwell billable hours and) to

give the Firm the ability to terminate associates' employment (much like what was done to Mr.

Cardwell's employment.Cardwell).

583.    Last but not least, Ms. Hudson shared Mr. their intent and knewHudson's June 20,

2016 review claimed that her falsified reviews would be used to retaliate against"[o]n the

[REDACTED] deal, diligence and other preparatory tasks were completed so slowly that a

second junior associate needed to be staffed." This statement is also pretextual, false, and

contradicted by Ms. Hudson's own emails (which reveal the reason this "second junior

associate" was added to the deal team).

447.584.    Rather than having anything to do with Mr. Cardwell (or the pace at which

he performed tasks), that "second junior associate" was staffed because a manager in the

Associate Development Department and staffing coordinator (i.e., Ms. Clausen) "reached out [to

PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)

a member of Ms. Hudson's and Mr. ~~Cardwell for his complaints and to eliminate his billable hours and terminate Mr.~~ Cardwell's ~~employment.~~team] about taking on another first-year" because the Capital Markets group was "pretty slow right now" and "things [were] not as much as they were a few weeks ago."

~~448.~~585.      The pretextual statements in Ms. Hudson's ~~falsified performance~~ reviews ~~triggered~~were used to trigger and did trigger Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Butler, and Mr. Brass's ability to terminate Mr. Cardwell's employment.

~~449.~~586.      ~~As a result of Mr. Reid, Mr. Bick, and Davis Polk's influence of~~ Ms. Hudson ~~with regards to her aid to the Management and M&A Partners' decision to terminate Mr. Cardwell, her actions against Mr. Cardwell, and the friction that resulted between Ms. Hudson and Davis Polk's partners, Ms. Hudson~~has since left Davis Polk and now works as a partner at another law firm.

**v. ~~Defendants Terminate~~ Mr. Cardwell's ~~Employment~~EEOC Complaint Triggered His Termination.**

~~450.~~587.      At all relevant times, Mr. Reid, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, Mr. Butler, and Mr. Brass had knowledge that Mr. Cardwell filed a complaint to the EEOC and NYSDHR in August 2017.

~~451.~~588.      On February 8, 2018, Mr. ~~Cardwell met with Mr.~~ Goldberg ~~and Mr. Smith to discuss~~(the then-head of the Firm's ~~purported inability to staff~~M&A Group and Mr. Smith met with Mr. Cardwell and delivered the Firm's "time to go" message (i.e., that Mr. Cardwell~~.~~ must leave the Firm and that the Firm was firing Mr. Cardwell).

~~452.~~589.      Mr. Goldberg opened the meeting by telling Mr. Cardwell:

> "*We've confirmed, as you can tell because you're not getting staffed, that the staffing has been very challenging and the reality is that the staffing situation is we*

*don't think we can staff you at the level of seniority of where you are—in terms of your year. People think you're just not performing at the level where they can staff you at your level of seniority.…"*

453.590.    Mr. Goldberg "confirmed" that no Davis Polk M&A partner was willing to work with ~~Mr. Cardwell after he made his complaint with the EEOC.~~ —and Mr. Reid, Mr. Bick, Mr. Birnbaum, and Mr. Brass would not require any M&A partner to work with—Mr. Cardwell after he made his complaints with the EEOC and NYSDHR. As a result, neither Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Brass, Mr. Butler, Mr. Chudd, or any other Davis Polk partner was willing to adhere to and enforce Davis Polk's anti-retaliation policies (or apply them to Mr. Cardwell).

454.591.    When Mr. Cardwell replied with: "[Y]ou said, 'we can't staff you at your seniority level?' . . . Who made that decision?", M&A partner Mr. Goldberg admitted, among other things: "Ultimately, we made it as a group."

455.592.    Shortly thereafter, Mr. Goldberg and Mr. Smith informed Mr. Cardwell that Davis Polk would be terminating Mr. Cardwell's employment. Mr. Goldberg explained that such decision resulted from "talk[ing] to Bick," "gather[ing] [Mr. Cardwell's] reviews," and collectively deciding "as a group" that staffing Mr. Cardwell was "not a situation that's workable." During this exchange, Mr. Goldberg and Mr. Smith described not simply who had the power and authority to terminate Mr. Cardwell's employment, but the Davis Polk partners in the "group" who had indeed decided to terminate Mr. Cardwell's employment.  Mr. Goldberg and Mr. Smith explained, by naming various individual partners and titles, that Mr. Reid, Mr. Bick, Mr. Brass and the other M&A staffing partners (i.e., Mr. Birnbaum and Mr. Wolfe) had collectively decided to terminate Mr. Cardwell's employment.

456.593.        As Mr. Goldberg was telling Mr. Cardwell names of Davis Polk partners

who participated in the decision to terminate his employment, Mr. Smith became visibly

uncomfortable and abruptly shifted the conversation so that Mr. Goldberg would not disclose any

other names.

457.594.        In addition to Mr. Reid, all of the M&A partners in the Firm'Firm's New

York office—including Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr.

Brass—discussed whether and which M&A partners would be willing to work with Mr.

Cardwell or if the Firm should alternatively terminate Mr. Cardwell's employment.

458.595.        As noted herein, all of the M&A partners in the Firm's New York office—

including Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass—

previously met and discussed Mr. Cardwell and the consensus feedback the M&A partners

wanted Mr. Smith to deliver to Mr. Cardwell during his annual performance review meeting on

January 11, 2018.[91]

459.596.        In addition to Mr. Reid, all of the M&A partners in Firm's New York

office —including Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass—

—had knowledge of Mr. Cardwell's August 3, 2017 EEOC complaint and discussed Mr.

Cardwell's complaint leading up to his annual performance review meeting on January 11, 2018.

460.597.        In connection with their conversations about the (i) January 2018

Consensus Feedback that the M&A partners wanted Mr. Smith to deliver to Mr. Cardwell on

January 11, 2018 and (ii) Mr. Smith and Mr. Goldberg's process of confirming that "the staffing

has been challenging," Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler,

---

[91] Mr. Reid also was a part of the group that had knowledge of Mr. Cardwell's August 3, 2017 complaint. Mr. Reid participated in and approved of the Firm's decision to terminate Mr. Cardwell's employment.

and Mr. Brass, and all of Davis Polk's M&A partners, decided as a "group" to terminate Mr. Cardwell's employment.[92]

461.598.        The fact that all of the M&A partners—each refusing to work with Mr. Cardwell at this point—collectively decided to terminate Mr. Cardwell is consistent with the M&A group's practice of meeting as a group and developing the Consensus Feedback for the Firm's M&A associates.

462.599.        All of the M&A partners who participated in the decision to terminate Mr. Cardwell, including Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass, were influenced by Mr. Reid and Mr. Bick's influence and approval of the group's decision to terminate Mr. Cardwell's employment.

463.600.        If either Mr. Reid or Mr. Bick—members of the Firm's management committee and Davis Polk's most powerful and influential partners—opposed the M&A partners' collective decision to not work with Mr. Cardwell on any assignments and to terminate his employment, Mr. Cardwell's employment would not have been terminated.[93]

464.601.        If Mr. Cardwell did not file his complaintcomplaints with the EEOC and NYSDHR, Davis Polk, Mr. Reid, Mr. Bick Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, Mr. Brass, and Ms. Hudson would not have terminated Mr. Cardwell's employment.

465.602.        Notably, Davis Polk allowed the same M&A partners who Mr. Cardwell (i) accused of engaging in racial discrimination and retaliation or (ii) directly implicated in Mr.

---

[92] *See* ¶ 459 (where Mr. Goldberg admitted that he, Mr. Smith, and other M&A partners "talked to Bick" before concluding that Mr. Cardwell's employment was going to be terminated).
[93] Shortly after Mr. Cardwell was terminated both Mr. Reid and Mr. Bick left Davis Polk. Both Mr. Reid and Mr. Bick's departures from Davis Polk related to the allegations and claims in this Complaint and Mr. Cardwell's EEOC complaint, as well as the actions they took against Mr. Cardwell.

Cardwell's August 2017 EEOC Filing and NYSDHR complaints to have exclusive or enormous influence over the Firm's decision to terminate Mr. Cardwell's employment.

466.603.    Mr. Cardwell's race was a motivating factor in Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass's decision to both conclude that staffing Mr. Cardwell was "not a situation that's workable" and to terminate his employment.

467.604.    During Mr. Cardwell's tenure at Davis Polk, the M&A partners routinely allowed (with the approval of Mr. Bick's and the M&A partners) White Davis Polk(i) associates (who were similarly situated to Mr. Cardwell in all material respects to Mr. Cardwell) who did not make any discrimination complaints about the Firm and its partners and (ii) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects) *to not do any legal work* for periods up to six months, including in circumstances where the M&A partners allowed White M&A associates to fulfil the role of a "summer associate coordinator"[94]—a position that involved associates not doing any legal work while they coordinated summer associate classes that often had more than 100 summer associates/law school interns.

468.605.    Unlike Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass's decision and treatment of Mr. Cardwell, such partners did not terminate the employment of any such White associates or conclude that their being roughly six months behind their peers in legal work meant that staffing them was "not a situation that's workable" or that the Firm's sole options were to staff them at a junior level or terminate their employment.

469.606.    Such White associates who stopped doing legal work for up to six months were not at risk in any way of being staffed at a junior level and were never told that it was even

---

[94] Such associates included, but were not limited to, M&A associates Camila Panama and Lilly DeSouza Barr.

a possibility the way that the M&A partners told Mr. Cardwell through Mr. Goldberg. Such

White associates' employment were never terminated the way Mr. Cardwell's employment was.

470.607.        Despite claiming that the M&A partners thought they could not staff Mr.

Cardwell at his "level of seniority . . . in terms of [his] year," Mr. Reid, Mr. Bick, Mr. Birnbaum,

Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass never gave Mr. Cardwell the option or asked

him to consider it as a way to remain employed at Davis Polk.

471.608.        Nonetheless, Mr. Goldberg's message that the M&A partners did not

think they could staff Mr. Cardwell at his level of seniority was pretextual and in response to his

September 30, 2015 complaint with the, September 8, 2016 complaint, March 2017 complaint,

May 2017 complaint, August 2017 EEOC. and NYSDHR complaints, and January 2018

complaint.

472.609.      Despite Mr. Cardwell's performance being equal or better than all of the

White M&A(i) associates (who were similarly situated to Mr. Cardwell in all material respects,

Mr.) who did not make any discrimination complaints about the Firm and its partners and (ii)

White and other non-Black associates (who were similarly situated to Mr. Cardwell in all

material respects), Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and

Mr. Brass did not decide to terminate any similarly situated (i) associates (who were similarly

situated to Mr. Cardwell in all material respects) who did not make any discrimination

complaints about the Firm and its partners and (ii) White M&A associates (i.e., the White M&A

Comparatorsand other non-Black associates (who were similarly situated to Mr. Cardwell in all

material respects) in 2015, 2016, 2017, or 2018.

473.610.          As noted *infra* at footnote 105 at ¶ 580, and, prior to Mr. Reid, Mr. Bick,

Mr. Goldberg, and the Firm had pretextually decided that the Firm would respond to Mr.

Cardwell's ~~complaint to the~~ EEOC~~, Mr.~~ and NYSDHR complaints by arguing that the Firm struggled and could not staff Mr. Cardwell because of his performance, Mr. Birnbaum and Mr. Brass ~~were attempting~~attempted to in the summer of 2017 to staff Mr. Cardwell on multiple public companies deals that would have lasted beyond January and February 2018—~~that is,~~which overlapped with the time period in which Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass and other M&A partners had purportedly decided that staffing Mr. Cardwell was a "situation that's not workable" and that they had to terminate Mr. Cardwell's employment because he was "behind."

~~474.~~611.      If Mr. Cardwell ~~were~~was not a ~~White M&A~~Black associate ~~instead of a Black M&A associate, Mr.~~or had never made his May 2015 complaint, September 2015 complaint, January 2016 complaint, September 2016 complaint, May 2017 complaint, EEOC and NYSDHR complaints, or the January 2018 complaint, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass would not have concluded that staffing Mr. Cardwell was a "situation that's not workable" and that ~~could~~the Firm's only ~~be resolved by terminating~~option was to terminate Mr. Cardwell's employment.

~~475.~~612.      Mr. Goldberg's comments later in the conversation reflected the reality that Mr. Cardwell's race ~~was a~~and complaints were motivating ~~factor~~factors in Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass's decision to terminate Mr. Cardwell's employment.

~~476.~~613.      In the course of this conversation, Mr. Goldberg stated that Mr. Cardwell's departure was "not a good situation" and that what was happening to Mr. Cardwell at Davis Polk was not good for Mr. Cardwell.   Mr. Goldberg also stated: "We have a thousand percent confidence in your integrity…There's no issue with your integrity or behavior."

477.614.          Later in the conversation, Mr. Goldberg added: "We don't feel good about this. Okay? I wish this had been a much better experience and that it wasn't ending this way. […] That's my personal view. You probably are very unhappy. […] If I were you, I would be furious and unhappy and bitter. […] You may highly resent any number of us, including me."

478.615.          If Mr. Cardwell had truly been terminated because of his performance and a pattern of Davis Polk M&A partners legitimately concluding that Mr. Cardwell was "behind" lawyers in class despite Mr. Cardwell having ample time and opportunities to improve, as Davis Polk repeatedly argued in their NYSDHR Statement, Mr. Goldberg would not have told Mr. Cardwell that if he were Mr. Cardwell that he would be "furious and unhappy and bitter."

479.1.   Mr. Goldberg told Mr. Cardwell that if he were Mr. Cardwell that he would be "furious and unhappy and bitter" because he knew that Mr. Cardwell's race was a motivating factor in Davis Polk, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass' collective decision to terminate Mr. Cardwell's employment.

480.616.          Mr. Goldberg also told Mr. Cardwell during the meeting that "most people who come here don't end up staying or making partner, and some of them leave reasonably unhappy. Yet many of them become clients…. In any given departure situation, we want it to be the best it can be…. The relationships that come back to us . . . are very valuable."

481.617.          To this latter point, Mr. Goldberg essentially concluded the meeting by describing how the Firm and M&A partners who terminated him were still maintaining hope that at some point in the future Mr. Cardwell might decide to send Davis Polk lucrative business opportunities.

482.618.          Less than a year after Mr. Reid threatened that Mr. Cardwell would be "out the game" and "off the field" if Mr. Cardwell didn't seize making legally protected

complaints, about six months after Mr. Cardwell filed Mr. Cardwell's August 2017 EEOC

Filing, and less than a month after Mr. Cardwell met with two Davis Polk M&A partners and

expressly flagged personally experienced discrimination in response to comments such partners

made on January 11, 2018,  Mr. Goldberg and Mr. Smith told Mr. Cardwell on behalf of Davis

Polk, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler, and Mr. Brass that

his employment was being terminated.

483.619.      Davis Polk, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd,

Mr. Butler- termination of Mr. Cardwell's employment constitutes an adverse employment

action.

620.     Similar to Ms. Hudson's 2016 reviews, which were created in connection with

Mr. Cardwell's September 30, 2015 complaint and were adverse employment actions, M&A

partners Mr. Hochbaum (on September 19, 2017), Mr. Mills (October 2, 2017), Mr. Goldberg

(on October 6, 2017), and Mr. Amorosi (on October 9, 2017) rated Mr. Cardwell as "behind" in

response to Mr. Cardwell's August 3, 2017 EEOC complaint and for the purposes of helping the

Firm eliminate alter Cardwell's billable hours and staffing and terminate his employment. But

for Ms. Hudson's, Mr. Hochbaum, Mr. Mill's, Mr. Goldberg's, and Mr. Amorosi's reviews (in

the case of Mr. Amorosi, his 2017 review), Davis Polk would not have terminated Mr.

Cardwell's employment.[95]

621.     At all relevant times, the defendants in this case were not the only Davis Polk

partners who had knowledge of Mr. Cardwell's EEOC complaint, nor were they the only Davis

---

[95] In fact, Davis Polk has already acknowledged the role that partners' performance reviews played in causing Davis Polk to terminate Mr. Cardwell's employment, and have noted that "Davis Polk states that Messrs. Goldberg and Smith were tasked with delivering a message reflecting the views of the Firm with respect to Plaintiff's staffing and future at the firm reflected input from the Management Committee; the co-heads of the M&A Group, and *reviews* of partners who had evaluated Plaintiff's performance." (emphasis added.)

Polk partners whose actions helped Davis Polk terminate Mr. Cardwell's employment in response to his complaints.

484.622.     Davis Polk, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, Mr. Butler terminated Mr. Cardwell's employment (i) in whole or in part because of Mr. Cardwell's race and (ii) because of the legally protected race-related discrimination complaints that Mr. Cardwell complained about at Davis Polk. During the relevant periods, Defendants' did not similarly staff, isolate, or otherwise discriminate against, harass, or terminate the employment of White(i) associates (who were similarly situated to Mr. Cardwell in all material respects, including [____insert defined term of) who did not make any discrimination complaints about the Firm and its partners and (ii) White and other non-Black associates (who were similarly situated associates].to Mr. Cardwell in all material respects).

485.623.     Defendants' discriminatory and retaliatory actions in connection with Mr. Cardwell's February 8, 2018 meeting and related termination are consistent with and reflects Defendants' malice, as well as their willful discrimination of and wantonly negligent or reckless disregard for Mr. Cardwell and Mr. Cardwell's rights.

486.624.     On April 27, 2018, Mr. Cardwell filed a supplemental charge of discrimination against Davis Polk[96] and noted (i) that Davis Polk continued to discriminate and retaliate against Mr. Cardwell and (ii) that Davis Polk's treatment of Mr. Cardwell was consistent with its treatment of other Black attorneys and workers who have worked or currently worked at Davis Polk.

487.625.     Mr. Cardwell's final date of employment at the Firm was August 10, 2018.

---

[96] *See* Ex. 4, Cardwell Supplemental EEOC Charge.

488.626.     Despite Defendants' pretextual attempts to falsify and shift their

conclusions about Mr. Cardwell's performance, staffing, and termination, Mr. Cardwell was

fully qualified to be a Davis Polk associate (and, especially, a Davis Polk M&A associate)

throughout his entire tenure at Davis Polk.

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| Shifting Conclusions and Explanations About Mr. Cardwell's Performance | **May 2015:**<br><br>*"Generally positive – organized, high quality work, good attention to detail, hard worker."*<br><br>- Davis Polk and Finance partner Jason Kyrwood's summary of (i) Mr. Cardwell's performance during the first six months at Davis Polk (i.e., his first rotation, which was with the Firm's Finance group) and (ii) Mr. Cardwell's Sept. 2014 – May 2015 Performance Reviews | **December 5, 2017:**<br><br>*"Cardwell exhibited performance problems during his first rotation (September 2014 – April 2015)*<br><br>*Cardwell's first rotation was with the Credit group of the Davis Polk Corporate Department....Senior lawyers in the Credit group who worked with Cardwell noted performance issues that were troubling…*<br><br>*The Firm delivered this feedback to Cardwell at the end of his Credit rotation...."*<br><br>*"Similar problems emerged during the next rotation, in the M&A group…echoing the themes that had emerged during Cardwell's first rotation in the Credit group."*<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement<br>- |
| Shifting | **December 1, 2015:** | **December 5, 2017:** |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| ~~Conclusions and Explanations About Mr.~~ Mr. Reid's and the Firm's Interest in Mr. Cardwell and Mr. Cardwell's Future at the Firm | *"Rising/Shining Star at Davis Polk"*<br><br>- Mr. Reid's description of Mr. Cardwell during Mr. Cardwell's third rotation (i.e., in ~~the~~ Capital Markets ~~group~~) and after Mr. Cardwell ~~had~~ completed a rotation in the Firm's M&A group | *"And the Firm's senior leadership—including the Managing Partner—expended considerable time and effort to coach Cardwell and give him time, and multiple opportunities, to improve."*<br><br>- Davis Polk (~~with substantial assistance from~~and the Individual Defendants) in its EEOC Answer and Position Statement<br><br>- |
| ~~Shifting Conclusions and Explanations About~~ Mr. Cardwell's hours, assignments, and staffing | **March 2, 2016** (paraphrasing):<br><br>*"I'm sorry we couldn't get you more work during your capital markets rotation. There was an unusual slowdown in the capital markets industry. Our Capital Markets group was slow as a result and many of the Firm's junior capital markets associates had periods where they were just sitting around."*<br><br>- Capital Markets partner Byron Rooney to Mr. Cardwell about why Mr. Cardwell wasn't staffed on more capital markets assignments during his rotation in capital markets (i.e., from Oct. 2015 – April 2016)<br><br>**From a 2017 Publication**:<br><br>*"Capital markets is a large part of our firm…. In the beginning of 2016, the signs ahead were challenging."* | **December 5, 2017:**<br><br>*"Rather, Cardwell's hours already had been uneven throughout 2016, as noted above. This unevenness reflected what partners in both Capital Markets and M&A had explained: Cardwell's record of poor performance made it difficult to staff him."*<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |

| | | |
|---|---|---|
| **TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION** | | |
| | Prior Conclusion | Pretextual Conclusion/Lie |
| | - Mr. Reid, as quoted in an *American Lawyer* article that described a decrease in capital markets work at Davis Polk by writing, "Although demand increased in restructuring, it declined in [Davis Polk's] capital markets practice." | |
| ~~Shifting Conclusions and Explanations about~~ Mr. Cardwell's Staffing | **August 4, 2016:** <br><br> "*Not at all.*" <br><br> - Ms. Fenner's response when Mr. Cardwell asked, "[H]as anyone made a decision to limit my involvement to certain types of deals and matters"? | **December 5, 2017:** <br><br> "*By [the summer of 2016], the substantive problems with Cardwell's work...were significant and were translating into increasingly serious problems staffing him on a consistent basis.*" <br><br> - Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement <br> - |
| ~~Shifting Conclusions and Explanations about~~ Mr. Cardwell's Staffing | **September 8, 2016** (paraphrasing): <br><br> "*I asked you if you'd accept a non-M&A assignment because the Credit group is slammed with work and because you and the other non-Credit attorneys I asked have experience working in the Credit group.*" <br><br> - Ms. Clausen to Mr. Cardwell | **December 5, 2017:** <br><br> "*By [the summer of 2016], the substantive problems with Cardwell's work...were significant and were translating into increasingly serious problems staffing him on a consistent basis.*" <br><br> - Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement <br> - |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| ~~Shifting Conclusions and Explanations about~~ How Mr. Cardwell Should Have Been Staffed in M&A in 2016 and Should be Staffed in M&A 2017 | December 20, 2016 (paraphrasing):<br><br>*"It would be good if you were the lead attorney at the beginning of a deal that involved a stock purchase agreement."*<br><br>- M&A partner Mr. Kreynin to Mr. Cardwell during an annual face-to-face review in which Mr. Kreynin (i) had summarized all the performance reviews attorneys had submitted for Mr. Cardwell for the months covering Sept. 2015 - Sept. 2016 and (ii) was asserting that Mr. Cardwell was ready to be given more responsibilities and more complex work, not less | December 5, 2017:<br><br>*"By the fall of 2016, reviews of Cardwell's performance reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role….*<br><br>*By this point, and consistent with Davis Polk's practices, Cardwell's poor performance over three rotations and at the beginning of his post-rotation assignment to the M&A group was such that it would have warranted giving Cardwell a message that it was time for him to look for another job."*<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |
| ~~Shifting Conclusions and Explanations about~~ ~~Mr.~~ Mr. Cardwell's performance, hours, assignmen | March 9, 2017:<br><br>*"It's not your fault. It needs to get fixed."*<br><br>- Mr. Reid's unsolicited comment, in the presence of Ms. Katz, to Mr. Cardwell about Mr. Cardwell's hours, assignments, and staffing issues with Davis Polk's M&A group | December 5, 2017:<br><br>*"…Cardwell's experience at the Firm is solely and directly a result of his own performance….*<br><br>*Cardwell's assignments and hours were driven by his record of poor performance across three separate groups within the Davis Polk Corporate Department…."* |

| | | |
|---|---|---|
| **TO COVER UP WHAT HAPPENED,<br>DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S<br>PERFORMANCE, STAFFING, AND TERMINATION** | | |
| | Prior Conclusion | Pretextual Conclusion/Lie |
| ts, and<br>staffing | | -   Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement<br>- |
| ~~Shifting Conclusions and Explanations about the~~The **Type and Frequency of Feedback that Mr. Cardwell Received** | **March 21, 2017:**<br><br>*"It is both a policy and practice of the Firm to prohibit associates from reviewing their performance reviews."*<br><br>-   Renee DeSantis's (i.e., Davis Polk's ~~Chief~~Director of Associate Development ~~Officer~~) initial and subsequent responses to Mr. Cardwell after Mr. Cardwell asked if he could review his performance reviews before meeting with Mr. Reid and Mr. Kreynin and after Mr. Cardwell stated, "At the moment, I'll be the only person in the meeting who hasn't had a chance to review my file and I think the conversation will be much more productive if I have that opportunity and can start the meeting with a shared understanding as the other participants."<br>- | **December 5, 2017:**<br><br>*"And despite meaningful, real-time feedback over the course of years, together with repeated interventions and second chances, Cardwell's performance has failed to improve."*<br><br>-   Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |
| ~~Shifting Conclusions and Explanations about~~ ~~Mr.~~Mr. **Cardwell's** | **March 29, 2017:**<br><br>*"We dropped the ball…. The lack of work was due to human error and people making natural mistakes in a large organization."*<br><br>-   Mr. Reid, in the presence of Mr. Kreynin, to Mr. Cardwell in a | **December 5, 2017:**<br><br>*"…Cardwell's experience at the Firm is solely and directly a result of his own performance….*<br><br>*Cardwell's assignments and hours were driven by his record of poor performance across three separate* |

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| performance, hours, assignments, and staffing | meeting in which Mr. Cardwell stated that there was no permissible reason that could explain how five different individuals all dropped the ball and made the same so-called mistake in staffing over the course of five to six months<br>- | groups within the Davis Polk Corporate Department...."<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement |
| ~~Shifting Conclusions and Explanations about Mr.~~ Mr. Cardwell's performance, hours, assignments, and staffing | **March 29, 2017:**<br><br>*"Had I known you weren't getting work, I would have tried to get you on something with me sooner."*<br><br>- Mr. Kreynin\*[97] to Mr. Cardwell immediately after the two of them had a meeting with Mr. Reid<br><br><br>~~* Mr. Kreynin is the M&A partner who worked with Mr. Cardwell in 2016, conducted a face-to-face annual review with Mr. Cardwell in December 2016, and had summarized all the performance reviews attorneys had submitted for Mr. Cardwell for the months covering Sept. 2015-Sept. 2016.~~ | **December 5, 2017:**<br><br>*"By [the summer of 2016], the substantive problems with Cardwell's work...were significant and were translating into increasingly serious problems staffing him on a consistent basis."*<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement<br><br>**January 11, 2018:**<br><br>*"It's challenging getting [you] work and the firm [is] trying to figure out what [you] could be staffed on."*<br><br>- A Davis Polk M&A partner to Mr. Cardwell the day after Mr. Cardwell filed more complaints with the EEOC (i.e., a written rebuttal to Davis Polk's |

[97] Mr. Kreynin is the M&A partner who worked with Mr. Cardwell in 2016, conducted a face-to-face annual review with Mr. Cardwell in December 2016, and had summarized all the performance reviews attorneys had submitted for Mr. Cardwell for the months covering Sept. 2015 - Sept. 2016.

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| | | EEOC Answer and Position Statement) - |
| ~~Shifting Conclusions and Explanations about Mr.~~Mr. Cardwell's performance, hours, assignments, and staffing | **May 23, 2017:**<br><br>"*I haven't been in the loop enough to comment specifically on how you've been previously staffed and [Mr. Reid] and [Mr. Bick] haven't brought me up to speed yet.*"<br><br>- ~~Sharon~~Ms. Crane,*[98] a director at Davis Polk, to Mr. Cardwell after the Firm's M&A partners went months without staffing Mr. Cardwell on any assignments<br><br>~~*Davis Polk has described Ms. Crane as "one of the leaders of the Firm's diversity and inclusion efforts," a description that is consistent with the fact that Ms. Crane often participated in formal and informal conversations about Black attorneys' experiences and professional development at Davis Polk.~~<br><br>~~Among the Firm's Black associates in particular, many Black Davis Polk attorneys viewed Ms. Crane as Davis Polk's most senior and influential executive director, as it was widely understood within the Firm that the Firm's management committee, and Mr. Reid in particular, utilized Ms. Crane to understand and address Black associates' experiences, grievances, and requests.~~ | **December 5, 2017:**<br><br>"*By the fall of 2016, reviews of Cardwell's performance reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role….*"<br><br>*By this point, and consistent with Davis Polk's practices, Cardwell's poor performance over three rotations and at the beginning of his post-rotation assignment to the M&A group was such that it would have warranted giving Cardwell a message that it was time for him to look for another job.*"<br><br>- Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement - |
| | **May 23, 2017:** | **January 11, 2018:** |

---

[98] Davis Polk has described Ms. Crane as "one of the leaders of the Firm's diversity and inclusion efforts," a description that is consistent with the fact that Ms. Crane often participated in formal and informal conversations about Black attorneys' experiences and professional development at Davis Polk.

Among the Firm's Black associates in particular, many Black Davis Polk attorneys viewed Ms. Crane as Davis Polk's most senior and influential executive director, as it was widely understood within the Firm that the Firm's management committee, and Mr. Reid in particular, utilized Ms. Crane to understand and address Black associates' experiences, grievances, and requests.

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| ~~Shifting Conclusions and Explanations about Mr.~~ Mr. Cardwell's performance, hours, assignments, and staffing | *"I don't know the degree to which you are staffed on other projects or that you weren't staffed on other projects…I'd love to work with you."*<br><br>*"You'd be surprised how not uncommon it is for people to fall into a black hole at this firm…. There is elitism at this firm."*<br><br>- An M&A partner to Mr. Cardwell after the Firm's M&A partners went months without staffing Mr. Cardwell on any assignments<br>- | *"It's challenging getting you work and the firm is trying to figure out what you could be staffed on."*<br><br>- The same Davis Polk M&A partner (in the left column) to Mr. Cardwell the day after he filed more complaints with the EEOC (i.e., a written rebuttal to Davis Polk's EEOC Answer and Position Statement) |
| ~~Shifting Conclusions and Explanations about~~ Mr. Cardwell's performance | **May/June 2017** (paraphrasing):<br><br>*"This is spot on and 100% correct and exactly what I wanted to know. Ok, now let's think about how we can turn this into the type of memo I've produced for clients in the past. Everyone has their way of doing these things, but I like to do mine a certain way."*<br><br>- An M&A partner to Mr. Cardwell after Mr. Cardwell turned in a memo and before the M&A partner instructed Mr. Cardwell to (i) turn the research into an article (ii) follow an outline the M&A partner created<br><br>*"This is good. I did some more thinking and I changed my mind about how I want to approach this."*[99] | **December 5, 2017:**<br><br>*"The draft was unusable…. [The M&A partner] had to conduct the research himself and redraft the entire article."*<br><br>- Davis Polk (with substantial assistance from the Individual Defendants), without any supporting documents or emails to demonstrate that that was the applicable M&A's position at the time, in its EEOC Answer and Position Statement regarding the research and memo referenced in the column to the left |

[99] Before Mr. Goldberg shifted his conclusion about Mr. Cardwell's work product on the memo, Mr. Goldberg was pleased with Mr. Cardwell's work product. Mr. Goldberg, not Mr. Cardwell, added Mr. Cardwell's name to the final version of the memo. Mr. Goldberg put Mr. Cardwell's name and contact information on the published client memo and allowed Mr. Cardwell to have receive and answer questions with potential clients and third-parties about the

| TO COVER UP WHAT HAPPENED, DAVIS POLK CHANGED ITS CONCLUSIONS ABOUT MR. CARDWELL'S PERFORMANCE, STAFFING, AND TERMINATION | | |
|---|---|---|
| | Prior Conclusion | Pretextual Conclusion/Lie |
| | - The same M&A partner to Mr. Cardwell after Mr. Cardwell submitted a draft of the article according to the M&A partner's instructions and outline | |
| ~~Shifting Conclusions and Explanations about Mr.~~ Mr. Cardwell's performance, hours, assignments, and staffing | **February 8, 2018:** *"There's no issue with your integrity or behavior…. If I were you, I would be furious and unhappy and bitter."* <br><br> - An M&A partner to Mr. Cardwell as he explained that Mr. Reid, Mr. Bick, Mr. Brass and the other M&A staffing partners (i.e., Mr. Birnbaum and Mr. Wolfe) collectively decided to terminate Mr. Cardwell's employment | **December 5, 2017:** *"To the contrary, the Firm at all times has had legitimate, nondiscriminatory, and non-pretextual reasons for staffing Cardwell as it has, including meeting the needs of its clients and the Firm."* <br><br> - Davis Polk (with substantial assistance from the Individual Defendants) in its EEOC Answer and Position Statement <br> - |

~~489.~~ 627.    Associates rated Mr. Cardwell rated on par with associates in his class even though Davis Polk's interim review process, was inherently discriminatory and racially biased against Black men and was applied to Mr. Cardwell.

~~490.~~ 628.    During Mr. Cardwell's tenure at Davis Polk, Defendants evaluated Mr. Cardwell and associates without any formal objective criteria[100] and effectively had a Black Box

---

substance of the memo without any attorney supervision. *See* Ex. 16, Published Client Memo that Cardwell Co-Authored.

[100] Mr. Reid's departures from Davis Polk related to the allegations and claims in this Complaint and Mr. Cardwell's EEOC complaint.

performance evaluation system that Defendants intentionally and unintentionally used as a

vehicle for discrimination.

~~491.~~629.    Davis Polk's lack of an objective criteria in its performance review

policies, or their refusal to apply them to Mr. Cardwell, subjected Mr. Cardwell to (i) in group

favoritism bias—"bias that favors [the reviewer's] group"; (ii) leniency bias—"[o]bjective rules

[that] are applied flexibly to in-group members" while "'others' are treated 'by the book'"; (iii)

recall bias—"[i]nformation that conforms to [one's] stereotypes is remembered better; and (iv)

confirmation bias (as explained below)—all of which are biases that tracked Mr. Cardwell and

the fact that he was the only Black associate in his class.[101]

~~492.~~630.    Regarding confirmation bias, Davis Polk's own internally accepted and

relied upon implicit bias studies gave Defendants notice in 2014 that, with regards to at least

Black male lawyers, "confirmation bias on the part of [] evaluators occur[s] in the data collection

phase of their evaluation processes" and "[w]e see more errors when we expect to see errors, and

we see fewer errors when we do not expect to see errors."[102]

~~493.~~631.    Since at least 2014, Defendants have accepted and been on notice that "if

there is bias in the finding of the errors, even a fair final analysis cannot, and will not, result in a

fair result."[103]

~~494.~~632.    Notably, and based on observations and conversations that Mr. Cardwell

had at Davis Polk, including conversations with an associate who is now counsel, Davis Polk's

"interim review" process was understood within the Firm and its partners to be warranted when

---

[101] *See* Ex. 7 at 19 (where a consultant Verna Myers presented and informed Davis Polk of various types of "biased behaviors").
[102] Davis Polk and its partners are aware of such studies and were aware of them when Mr. Cardwell worked at Davis Polk. *See* Ex. 14 (describing implicit bias patterns among lawyers and Black male lawyers in particular).
[103] *Id.*

an associate was performing poorly, was suspected of performing poorly, or the Firm wanted to signal to other partners that the Firm was positioning itself to be able to terminate an associate's employment on a performance-related justification.

~~495.~~633.      In June 2016, Mr. Bick and Davis Polk lied about the reasons for Mr. Cardwell's 2016 interim review in response to his September 2015 and January 2016 legally protected complaints, and further subjected Mr. Cardwell to a performance interim review policy that had a disparate impact against Mr. Cardwell in comparison to ~~White~~(i) associates (who were similarly situated to Mr. Cardwell in all material respects~~, namely~~) who did not make any discrimination complaints about the ~~White M&A~~Firm and its partners and (ii) White and other non-Black associates (who were ~~in~~ similarly situated to Mr. ~~Cardwell's class and in the Firm's M&A group in 2016.~~Cardwell in all material respects).

~~496.~~634.      Associates who assessed Mr. Cardwell's performance rated him as on par with his class, despite the fact that Mr. Bick and Davis Polk were creating performance review cycles that inherently told reviewers in the data collection phase that (i) Mr. Cardwell, a Black male, was suspected of performing poorly and requires an interim review and (ii) look for and expect to find errors or flaws in his work product.

~~497.~~635.      At all relevant times, Defendants failed to evaluate Mr. Cardwell's performance with a performance evaluation policy that included objective ~~criteria~~and non-discriminatory processes that ~~was~~were applied and ~~compared to White~~ (i) associates (who were similarly situated to Mr. Cardwell in all material respects ~~or~~) who did not make any discrimination complaints about the ~~type~~Firm and its partners and (ii) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects). All relevant times, Defendants failed to interrupt or mitigate reviewers' likely or actual subjective racial

biases regarding Mr. ~~Cardwell and White associates who were similarly situated to Mr. Cardwell in all material respects~~Cardwell .

498.636.    At all relevant times, Defendants never evaluated Mr. Cardwell's work product with (i) "blind evaluations" that compared his work product with the rest of ~~White~~(i) associates (who were similarly situated to Mr. Cardwell in all material respects~~,~~) who did not make any discrimination complaints about the Firm and its partners and (ii) White and other non-Black associates (who were similarly situated to Mr. Cardwell in all material respects), or (ii) similar policies and processes that Defendants have known since 2014 to be policies that could lead to assessments that confirm that "blind evaluations were generally more positive for minorities . . . and less positive for majority men."

499.637.    At all relevant times, Defendants failed to ensure that Mr. Cardwell's reviewers had received "training on unconscious bias for everyone who is in an evaluative position," or known and available trainings that have been "proven effective in reducing bias through raising awareness and insights into how unconscious bias operate and can be interrupted."

500.638.    As a direct result of the unlawful actions described in this Complaint, including but not limited to Davis Polk, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Chudd, and Mr. Butler's termination of Mr. Cardwell's employment, Mr. Cardwell has suffered (and continues to suffer) damages, including, but not limited to, substantial economic losses, lost professional opportunities and career prospects, humiliation, impairment to his name and reputation, embarrassment, emotional and physical distress, and mental anguish.

501.639.    Defendants are not incompetent or inexperienced. Defendants, some of whom have 20-plus-years of legal experience, are elite strategists and practitioners. Individually

and collectively, Defendants have achieved world class status for their ability to create and coordinate rules, legal teams, and documentation across a variety of complex human, legal, and institutional relationships.

502.640.    To this point, it is common for M&A attorneys, as well as partners on firms' management committees, to be viewed as the "quarterbacks" of the world's most complex legal deals and institutions.

503.641.    The facts reveal that, between 2015 and 2018, Defendants quarterbacked and permitted a playbook that marginalized, discriminated against, and retaliated (among other unlawful acts) against Mr. Cardwell, the only Black male associate in Davis Polk's 2014 associate class.

504.642.    Defendants' knew and understood that they had a duty to maintain a workplace free of discrimination, hostility, harassment, and retaliation. Relatedly, Davis Polk is not "just another cold law firm" where its leaders simply did not know better—where its leaders weren't routinely asked by its non-White associates to prevent bias from impacting such associates' training, assessments, and advancement.[104] In order to create the appearance that Davis Polk's termination of Mr. Cardwell's employment was timely, inevitable, and legal,

---

[104] On June 15, 2016, Davis Polk's Asian/South Asian/Middle Eastern group—which is one of Davis Polk's largest racial/ethnic affinity groups—took their concerns about racial bias at Davis Polk directly to Mr. Reid in the form of a 12-page PowerPoint presentation that they presented to Mr. Reid. Davis Polk's Asian/South Asian/Middle Eastern group's presentation emphasized how (i) "unfair stereotypes" often prevent Asian attorneys from being perceived favorably in highly subjective assessments and (ii) "implicit bias and exclusion from informal support networks and client development are common and affect the ways in which Asians are evaluated and considered for promotion."

Further, Davis Polk's Asian/South Asian/Middle Eastern group and its presentation encouraged Mr. Reid and Davis Polk's Management Committee to take the lead on improving partners' commitment to (i) mentoring and developing Davis Polk's non-White associates; (ii) implementing implicit bias and unconscious stereotypes trainings for all personnel (noting that it could be a part of trainings for first-year associates or as standalone seminars); (iii) implementing trainings for "partners, counsel and senior associates on managing a diverse associate pool and the specific challenges and barriers to internal advancement"; and (iv) tracking and incorporating the number of hours attorneys spend on diversity initiatives in performance reviews and rewarding such attorneys for such hours.

Defendants dismantled the "foundation" that it specifically designed with Black associates in mind, including its discrimination-prevention and mitigation mechanisms.

505.643.        In whole or in part because of Mr. Cardwell's race, Davis Polk and the other defendants committed themselves to in an illegal playbook and "game" until Mr. Cardwell was "off the field."

## COMPARATORS

### Thevi.  Mr. Cardwell's Similarly Situated, Non-Black Comparators Were Treated Better and More Favorably Than He Was

644.    Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass, among others, evaluated, staffed, and employed associates (i) who weredid not Black make any discrimination complaints about the Firm and its partners associates (and were similarly situated to Mr. Cardwell in all material respects () and (ii) who were White or non-Black associates (who were similarly situated to Mr. Cardwell in all material respects) better and more favorably than Mr. Cardwell, including work performance) involved, but are not limited to, (i) the associates in Cardwell's 2014 class who rotated through the Firm's finance group during the same period as Mr. Cardwell (i.e., Sept. 2015 through approximately March 2015) (the "Finance Rotation Comparators"); (ii) the associates in Mr. Cardwell's 2014 class who rotated through the Firm'sthe following associates:[105] "Associate #5" (described *supra*); "Associate #10"; "Associate #9"; "Associate #3"; "Associate # 8"; "Associate #6"; and "Associate #7" (collectively, the "Presently Known Comparators").[106]

---

[105] The associates in this list and Complaint were anonymized by Defendants. This Complaint uses the identifier used by Defendants in the documents that they have produced in discovery to date.
[106] This list is not exhaustive, as Defendants have in their possession and have yet to produce responsive discovery that more fully allows Mr. Cardwell to identify similar-situated comparators.

**PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)**

645.    Unlike Associate #5, Associate #10, Associate #9, and Associate #3, Mr. Cardwell was never rated as "behind" in performance reviews by M&A ~~group during the same period as Mr. Cardwell (i.e., approximately April 2015 through September 2015) (the "~~partners from more than one review cycle, let alone consecutive review cycles. In fact, more M&A ~~Rotation Comparators"); (iii) associates in Mr. Cardwell's 2014 class who were permanently assigned members of the Firm's M&A group between April 2016 and August 2018 (the "M&A Members~~partners rated Associate #5, Associate #10, and Associate #3 as "behind" than Mr. Cardwell.

~~506.~~646.    Unlike the Presently Known Comparators~~"[107]"~~., Mr. Cardwell was subjected to a mid-year performance review cycle differently and prior to any M&A partners rating Mr. Cardwell as "behind" in a performance review. Unlike the Presently Known Comparators, only Mr. Cardwell was given a mid-year performance review cycle based solely on Mr. Bick's instructions and request.

~~507.    The M&A Members Comparators can be further broken down into two groups: (i) White M&A associates who were similarly situated in all material respects to Mr. Cardwell (i.e., the White M&A Comparators (defined in the footnote below[108])) and (ii) Asian M&A associates who were similarly situated in all material respects to Mr. Cardwell (i.e., the Asian M&A Comparators (defined in the footnote below[109])).~~

~~508.~~647.    ~~All of the Finance Comparators, M&A Rotation Comparators, and M&A Members Comparators~~At all relevant times, the Presently Known Comparators and Mr. Cardwell

---

~~[107] *See* Ex. 17, Davis Polk's Corporate and M&A Roster as of January 2017. The M&A Comparators includes, but is not limited to M&A associates Reid Fitzgerald (White), Caitlin Cunningham (White), Camila Panama (White), Martin Hui (Asian), Katherine Jan (Asian), Albert Zhu (Asian), Elyka Anvari (White) — none of whom are Black.~~
~~[108] The White M&A Comparators refers to White M&A associates Reid Fitzgerald, Caitlin Cunningham, Camila Panama, and Elyka Anvari.~~
~~[109] The Asian M&A Comparators refers to Asian M&A associates Martin Hui, Katherine Jan, and Albert Zhu.~~

were subject to the same performance evaluation and discipline standards and engaged in comparable conduct as Mr. Cardwell.

509.648.      All of the FinanceThe Presently Known Comparators, M&A Rotation Comparators, M&A Members Comparators had and Mr. Cardwell completed the samematerially similar interview process as Mr. Cardwellprocesses, were hired based on the same standards and assessments as Mr. Cardwell, and had the same core responsibilities as a Davis Polk associate as Mr. Cardwell.

649.    The head of the Firm's M&A group, atAt all relevant times, Mr. Bick had primary authority over and the same authority over the M&A Rotation Comparators and the M&A MembersPresently Known Comparators and Mr. Cardwell.

650.    Upon information and belief, Associate #5's race is not Black/African-American.[110] In addition to the descriptions noted *supra*, unlike Mr. Cardwell, seven Davis Polk M&A partners in nine separate performance evaluations rated Associate #5 as "behind" across two consecutive years. Mr. Chudd is one of the partners who rated Associate #5 as "behind."

651.    Associate #5's performance reviews were not a barrier to Mr. Bick and the Firm's M&A partners', including Mr. Wolfe's, Birnbaum's, and Mr. Brass's, willingness and ability to create a workable staffing and employment arrangement for Associate #5 after M&A partners rated Associate #5 as "behind" in performance reviews. Unlike with Mr. Cardwell, Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #5's billable hours within 2-3 months of an M&A partner rating Associate #5 as "behind." Unlike with Mr. Cardwell, Associate #5 remained employed for several years after the Firm's M&A

---

[110] For confidentiality purposes, Defendants requested that Mr. Cardwell not specify the comparators' race and to merely refer to them as "non-Black" or "not Black" (as opposed to specifying whether an associate is "White," "Asian," or "Latino/Latina"). Mr. Cardwell has complied with Defendants' request and believes and alleges that each comparator's race is not Black.

partners rated Associate #5 as "behind" in performance reviews. Mr. Cardwell's performance, including relative to the associates in his class year as compared to Associate #5 and the associates in Associate #5's class year, was better than Associate #5's performance

652.    Associate #5 and Mr. Cardwell were similarly situated in all material respects and it was Mr. Cardwell's race and complaints that led Mr. Reid, Mr. Bick, and Davis Polk's M&A partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to staff, mentor, evaluate, and employ Mr. Cardwell differently and worse than Associate #5.

| M&A Partners and Associates Who Rated Associate #5 "Behind" in Performance Reviews | | |
|---|---|---|
| **Date** | **Rated "Behind"** (Do you feel this lawyer is performing materially behind, with, or ahead of lawyer's class?) | **M&A Reviewer** |
| June 22, 2016 | "Behind" | M. D. (partner) |
| July 11, 2016 | "Behind" | E. R. (associate) |
| Sept. 19, 2016 | "Behind" | Lee Hochbaum (partner) |
| Sept. 22, 2016 | "Behind" | William Chudd (partner) |
| Sept. 28, 2016 | "Behind" | Phillip Mills (partner) |
| October 3, 2016 | "Behind" | L. T. (associate) |
| October 4, 2016 | "Behind" | J. K. (associate) |
| July 11, 2017 | "Behind" | Phillip Mills (partner) |
| Sept. 11, 2017 | "Behind" | Lee Hochbaum (partner) |

653.    Upon information and belief, Associate #7's race is not Black/African-American. Unlike Mr. Cardwell, eight different Davis Polk M&A partners rated Associate #7 as "behind" across four consecutive years (2014, 2015, 2016, and 2017). Mr. Chudd, Mr. Butler, Mr. Birnbaum, and Mr. Bick were among the partners who rated Associate #7 as "behind" in a performance review. Being assessed as "behind" was not a barrier to Mr. Bick and the Firm's M&A partners', including Mr. Wolfe's, Birnbaum's, and Mr. Brass's, willingness and ability to create a workable staffing and employment arrangement for Associate #7 after M&A partners rated Associate #7 as "behind" in performance reviews. Unlike with Mr. Cardwell, Davis Polk,

PROPOSED THIRD AMENDED COMPLAINT
(WITHOUT EXHIBITS)

Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #7's billable hours within 2-3 months of an M&A partner rating Associate #7 as "behind." Unlike with Mr. Cardwell, Associate #7 remained employed for several years after the Firm's M&A partners rated Associate #7 as "behind" in performance reviews. Mr. Cardwell's performance, including relative to the associates in his class year as compared to Associate #7 and the associates in Associate #7's class year, was at least on par with (if not better than) Associate #7's performance.

654.    Associate #7 and Mr. Cardwell were similarly situated in all material respects and it was Mr. Cardwell's race and complaints that led Mr. Reid, Mr. Bick, and Davis Polk's M&A partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to staff, mentor, evaluate, and employ Mr. Cardwell differently and worse than Associate #7.

| M&A Partners and Associates Who Rated Associate #7 "Behind" in Performance Reviews Based on Their Personal Interactions | | |
|---|---|---|
| Date | Rated "Behind" (Do you feel this lawyer is performing materially behind, with, or ahead of lawyer's class?) | M&A Reviewer |
| Sept. 19, 2014 | "Behind" | William Chudd (partner) |
| Sept. 23, 2015 | "Behind" | William Chudd (partner) |
| October 11, 2015 | "Behind" | L.K. (partner) |
| October 9, 2016 | "Behind" | John Butler (partner) |
| September 22, 2016 | "Behind" | M.D. (partner) |
| Sept. 11, 2017 | "Behind" | Lee Hochbaum (partner) |
| Sept. 17, 2017 | "Behind" | Louis Goldberg (partner) |
| Sept. 25, 2017 | "Behind" | William Chudd (partner) |
| October 3, 2017 | "Behind" | Harold Birnbaum (partner) |
| October 16, 2017 | "Behind" | John Bick (partner) |

655.    Upon information and belief, Associate #9's race is not Black/African-American. Unlike Mr. Cardwell, Davis Polk's M&A partners rated Associate #9 as "behind" based on their

personal assessment in three consecutive years (2015, 2016, and 2017). Mr. Wolfe and Mr. Goldberg were among the partners who rated Associate #9 as "behind" in a performance review. One of the partners who rated Associate #9 as "behind" noted in Associate #9's review that the associate's "positive qualities are outweighed by ["Associate #9's] significant substantive shortcomings," that Associate #9 "routinely misreads and misunderstands contractual provisions," has "analysis of the issues" that are "often superficial or wrong" and has "drafting" that "needs to be carefully checked for both conceptual and sloppy errors." The M&A partner who gave this particular review noted "I would be hesitant to leave [Associate #9] unsupervised on any substantive tasks that are not routine in nature." Mr. Cardwell never received these types of criticisms from an M&A partner prior to filing his EEOC Complaint and in many instances never received these criticisms at any point.

656.    Being assessed as "behind" was not a barrier to Mr. Bick and Firm's M&A partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass's, willingness and ability to create a workable staffing and employment arrangement for Associate #9 after the Firm's M&A partners had rated Associate #9 as "behind" in performance reviews. Unlike with Mr. Cardwell, Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #9's billable hours within 2-3 months of an M&A partner rating Associate #9 as "behind." Unlike with Mr. Cardwell, Associate #9 remained employed for several years after the Firm's M&A partners rated Associate #9 as "behind" in performance reviews. Mr. Cardwell's performance, including relative to the associates in his class year as compared to Associate #9 and the associates in Associate #9's class year, was at least on par with (if not better than) Associate #9's performance.

657. Associate #9 and Mr. Cardwell were similarly situated in all material respects and it was Mr. Cardwell's race and complaints that led Mr. Reid, Mr. Bick and Davis Polk's M&A partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to staff, mentor, evaluate, and employ Mr. Cardwell differently and worse than Associate #9. Upon information and belief, Associate #9 still works at the Firm and has received their full salary and bonus for each year Associate #9 has been at the Firm.

| Date | Rated "Behind" (Do you feel this lawyer is performing materially behind, with, or ahead of lawyer's class?) | M&A Reviewer |
|------|------|------|
| September 24, 2015 | "Behind" | Brian Wolfe (partner) |
| September 20, 2016 | "[b]ehind . . . on substantive areas, both in terms of analysis and drafting." | Louis Goldberg (partner) |
| Sept. 27, 2017 | "Behind" | M. W. (partner) |
| October 15, 2017 | "Behind" | L. K. (partner) |

*Table title: M&A Partners and Associates Who Rated Associate #9 "Behind" in Performance Reviews Based on Their Personal Interactions*

658. Upon information and belief, Associate #3's race is not Black/African-American. Unlike Mr. Cardwell, six different Davis Polk M&A partners rated Associate #3 as "behind" across three consecutive years (2015, 2016, and 2017). Mr. Birnbaum and Mr. Bick were among the partners who rated Associate #3 as "behind" in a performance review. Being assessed as "behind" was not a barrier to Mr. Bick and the Firm's M&A partners', including Mr. Wolfe's, Birnbaum's, and Mr. Brass's, willingness and ability to create a workable staffing and employment arrangement for Associate #3 after the Firm's M&A partners had rated Associate #3 as "behind" in performance reviews. Unlike with Mr. Cardwell, Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #3's billable hours within 2-3 months of an M&A partner rating Associate #3 as "behind." Unlike with Mr. Cardwell, Associate #3 remained employed for several years after the Firm's M&A partners

rated Associate #3 as "behind" in performance reviews. Mr. Cardwell's performance, including

relative to the associates in his class year as compared to Associate #3 and the associates in

Associate #3's class year, was at least on par with (if not better than) Associate #3's

performance.

659.    Associate #3 and Mr. Cardwell were similarly situated in all material respects and

it was Mr. Cardwell's race and complaints that led Mr. Reid, Mr. Bick, and Davis Polk's M&A

partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to staff, mentor, evaluate, and

employ Mr. Cardwell differently and worse than Associate #3.

| M&A Partners and Associates Who Rated Associate #3 "Behind" in Performance Reviews Based on Their Personal Interactions | | |
|---|---|---|
| **Date** | **Rated "Behind"** (Do you feel this lawyer is performing materially behind, with, or ahead of lawyer's class?) | **M&A Reviewer** |
| September 17, 2015 | "Behind" | Phillip Mills (partner) |
| October 11, 2015 | "Behind" | Oliver Smith (partner) |
| October 9, 2016 | "Behind" | L. K. (partner) |
| Sept. 27, 2017 | "Behind" | M. W. (partner) |
| October 3, 2017 | "Behind" | Harold Birnbaum (partner) |
| October 16, 2017 | "Behind" | John Bick (partner) |

660.    Upon information and belief, Associate #8's race is not Black/African-American.

Unlike Mr. Cardwell, Davis Polk M&A partners rated Associate #8 as "behind" in 2016. The

reviewer who rated Associate #8 as "behind" stated that Associate #8 "seems to have a real

knack for getting stuff wrong and not just slightly wrong but in 180 degrees opposite of what

was discussed with a client. I think [Associate #8] just doesn't understand what is going on,

doesn't let it on (or thinks he understand it) and fills gaps as [Associate #8] sees fit. I have

reached a point where I don't believe that any document that [Associate #8] drafts or revises

should go out without review by someone else. I am not sure what to do about [Associate #8]:

[Associate #8] can be a useful citizen (due to [Associate #8's] energy and willingness) but only if closely supervised and at [Associate #8's] level of seniority it doesn't really work for most transactions."

661.    Being assessed as "behind" was not a barrier to Mr. Bick and the Firm's M&A partners', including Mr. Wolfe's, Birnbaum's, and Mr. Brass's, willingness and ability to create a workable staffing and employment arrangement for Associate #8 after a Firm M&A partner had rated Associate #8 as "behind" and unable to send documents out without prior review. Unlike with Mr. Cardwell, Davis Polk, Mr. Bick, Mr. Wolfe, and Mr. Birnbaum did not completely eliminate Associate #8's billable hours within 2-3 months of an M&A partner rating Associate #8 as "behind." Unlike with Mr. Cardwell, Associate #8 remained employed after an M&A partner rated Associate #8 as "behind" in a performance review. Mr. Cardwell's performance, including relative to the associates in his class year as compared to Associate #8 and the associates in Associate 8's class year, was at least on par with (if not better than) Associate #8's performance.

662.    Associate #8 and Mr. Cardwell were similarly situated in all material respects and it was Mr. Cardwell's race and complaints that led Mr. Reid, Mr. Bick, and Davis Polk's M&A partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to staff, mentor, evaluate, and employ Mr. Cardwell differently and worse than Associate #8. Upon information and belief, Associate #8 remained employed at the Firm through 2018.

| M&A Partners and Associates Who Rated Associate #8 "Behind" in Performance Reviews Based on Their Personal Assessment | | |
|---|---|---|
| Date | Rated "Behind" (Do you feel this lawyer is performing materially behind, with, or ahead of lawyer's class?) | M&A Reviewer |
| October 4, 2016 | "Behind" | L. K. (partner) |

663.     Upon information and belief, Associate #6's race is not Black/African-American. Unlike Mr. Cardwell, Associate #6 was rated as "behind" and "not on the same level" as Associate 6's "other classmates *and* was perceived to simply "need[] more experience" and [m]ore experience with more 'regular' assignments to see if [Associate #6] can get up in the learning curve." Associate # 6 was rated as "behind" in performance reviews on multiple occasions after 2016. Associate #6 was repeatedly evaluated using different standards than those used to evaluate Mr. Cardwell. The Firm's M&A group continued to staff and employ Associate #6, in part because partners' had stated in Associate #6's revies messages like the following: "I also don't think that [Associate #6] needs to be rushed out the door, we can continue to use [Associate #6] and train [Associate #6], and let [Associate #6] develop here at the firm, in particular because [Associate #6] has such a great attitude and is a good ambassador for our group." Defendants and the Firm's M&A partners did not view Mr. Cardwell as a "good ambassador" because of Mr. Cardwell's discrimination complaints about the Firm and its M&A group.

664.     Being assessed as "behind" was not a barrier to Mr. Bick and the Firm's M&A partners', including Mr. Wolfe's, Birnbaum's, and Mr. Brass's, willingness and ability to create a workable staffing and employment arrangement for Associate #6 after a Firm M&A partner had rated Associate #6 as "behind" in a performance review. Unlike with Mr. Cardwell, Davis Polk, Mr. Bick, Mr. Wolfe, and Mr. Birnbaum did not completely eliminate Associate #6's billable hours within 2-3 months of an M&A partner rating Associate #6 as "behind" or because the associate was assessed to be not on the same level as their other classmates in January 2018. Unlike with Mr. Cardwell, Associate #6 remained employed after an M&A partner rated Associate #6 as "behind" in a performance review and not on the same level as their other

classmates in January 2018. Mr. Cardwell's performance, including relative to the associates in his class year as compared to Associate #6 and the associates in Associate 6's class year, was at least on par with (if not better than) Associate #6's performance.

665.    Mr. Cardwell's race and complaints led Mr. Reid, Mr. Bick, and Davis Polk's M&A partners, including Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to staff, mentor, evaluate, and employ Mr. Cardwell differently and worse than Associate #6. Upon information and belief, Associate #6 remained employed at the Firm through 2019.

| M&A Partners and Associates Who Rated Associate #6 as "Behind" in Performance Reviews Based on Their Personal Assessment | | |
|---|---|---|
| Date | Rated "Behind" (Do you feel this lawyer is performing materially behind, with, or ahead of lawyer's class?) | M&A Reviewer |
| October 9, 2017 | "Behind" | Harold Birnbaum (partner) |
| January 2018 (annual review summary) | "[Associate #6] is not at the same level as [Associate 6's] other classmates." | Oliver Smith |

510.

## ADDITIONAL FACTS AND CONTEXT FOR THE COMPLAINT'S ALLEGATIONS

*Cardwell's Decision to Summer at Davis Polk and Accept a Full-Time Offer There*

511.    Mr. Cardwell joined Davis Polk as an associate in September 2014.

512.666.    Mr. Cardwell is the first person in his family to become a lawyer.

513.    Mr. Cardwell was the only Black male (and just one of four Black associates) hired to join Davis Polk's 2014 associate class of over 120 associates.

514.667.    Mr. Cardwell chose to start his legal career at Davis Polk largely because Mr. Cardwell believed that Davis Polk's strength came from their lawyers' willingness to work

together and that Davis Polk's leadership wanted to create a firm where its lawyers would work together no matter where they came from or the color of their skin.

515.668.    During a phase in which Davis Polk aggressively recruited Mr. Cardwell to join their firm, Davis Polk's partners and associates often claimed that Davis Polk's strength came from the Firm's willingness and ability to work together. They repeatedly stressed to Mr. Cardwell, in varying iterations, that "[Davis Polk's] 'lockstep' compensation structure – which is increasingly rare among today's global law firms – and our firm culture promote a cooperative and team-oriented environment."

516.669.    Davis Polk's strength also comes from the fact that it is one of the most prestigious and powerful law firms in the world. Its power and reach are almost immeasurable. This is also true with respect to their influence on the largest and most powerful U.S. law firms, corporations, governments, and non-profit organizations—employers who are responsible for producing or hiring many U.S. judges, legislators, government officials, and business leaders.

517.670.    Based on conversations and observations that Mr. Cardwell had at the Firm, it was commonly discussed and understood that, for most current and former Davis Polk lawyers, becoming a Davis Polk partner, associate, or alumnus, meant that if one chose to, one was almost certain to have a life that would include a guaranteed and stable income, career, health care, and professional opportunities.

518.671.    Based on conversations and observations that Mr. Cardwell had at the Firm, it was also commonly discussed and understood that for a relatively high percentage of lawyers, being a current or former Davis Polk partner, associate, or alumnus meant that one already had (or was on the verge of having) not just prestige and wealth, but a "life of significance and consequence" that makes "some sort of mark on history."

519.672.      Undoubtedly, proximity to people and institutions who have power is a fact of life for virtually every current or former Davis Polk lawyer.

***Donald Trump's Judicial Appointments Are More Diverse Than Davis Polk's Partnership***

520.673.      It is also a fact that for almost all of Davis Polk's history, including Plaintiff's entire tenure at Davis Polk, the degree of racial diversity among Davis Polk's partnership has been roughly on par or worse than the degree of racial diversity among Donald Trump's judicial appointees.

| Donald Trump's Judicial Appointees[111] | Davis Polk's Partnership[112] | Davis Polk's M&A Group[113] |
|:---:|:---:|:---:|
| 85% | 88% | 100% |
| the % of Trump's judicial appointees who are White | the % of Davis Polk's partners who are White | the % of Davis Polk M&A partners who are White |
| 76% | 80% | 100% |
| the % of Trump's judicial appointees who are male | the % of Davis Polk's partners who are male | the % of Davis Polk M&A partners who are male |

521.674.      To be clear, the racial outcomes in the Davis Polk-portion of the chart above—and the actors and policies (and prestigious institutions) that created them—are not because Davis Polk's partners (or Defendants' for the matter) are the same as Donald Trump.[114]

---

[111] Source: https://theconversation.com/trump-and-mcconnells-mostly-white-male-judges-buck-30-year-trend-of-increasing-diversity-on-the-courts-146828

[112] Source: https://www.chambers-associate.com/davis-polk-wardwell/true-picture/3833/1

[113] That is, during Mr. Cardwell's tenure at Davis Polk.

[114] The lack of diversity among Davis Polk's partnership is also not a function of its recruitment classes, as the diversity among its first-year associate classes are significantly and always more diverse (along race and gender lines) than the diversity among the partners who are elected from a particular class. *See* Ex. 18, Follow-Up Presentation with Tom Reid (highlighting that Davis Polk's Asian attorneys are hired for associate positions but not promoted are comparable rates due to stereotypes and biases in Davis Polk's evaluation, staffing processes).

522.675.      In fact, the overwhelming majority of Davis Polk's partners do not hate

Black people or people of color. Defendants do not have a Donald Trump-like hatred for Mr.

Cardwell because he is Black. That is simply not the case.

523.676.      Defendants, however, have demonstrated that they are capable of

engineering and are willing to intentionally engineer a process that (i) shields discriminatory

policies and practices, and (ii) undermines employees' ability to lawfully challenge how its most

powerful partners abused their positions, authority, and power, when such abuse occurs.

524.677.      Neither Defendants' actions, nor the racial outcomes in the chart above,

can be accurately explained without an honest and intellectually coherent engagement with how

power is concentrated among and within certain people and institutions, how policies

systemically disadvantage certain groups, and how and why certain leaders use their positions to

secure others' compliance or silence regarding decisions that predictably pressure, divide, or

harm people.

525.678.      At Davis Polk, the racial outcomes in the chart above are largely the result

of (i) Davis Polk's evaluation and staffing policies impacting White Davis Polk associates

differently than Davis Polk's non-White associates who are similarly situated in all material

respects, and some of Davis Polk's partners treating and evaluating White Davis Polk associates

differently than Davis Polk's non-White associates who are similarly situated in all material

respects; and (ii) many Davis Polk partners choosing not to intervene when they obtain

knowledge that certain Davis Polk policies and lawyers are working to exclude and harm the

careers of associates who belong to certain racial groups.

***Davis Polk's Discriminatory Performance Review Policy Had a Disparate Impact on
Mr. Cardwell***

526.679.      Throughout Mr. Cardwell's entire tenure at Davis Polk, Davis Polk's

Performance Review Policy continually subjected Mr. Cardwell to discrimination and had a

disparate impact on him.  In four consecutive face-to-face performance review meetings, Mr.

Cardwell questioned the Firm's Performance Review Policy and sought examples. At every turn

Davis Polk's Performance Review Policy was nonresponsive or, worse, discriminatory. Davis

Polk's Performance Review Policy was highly subjective, easy to manipulate (and actually

manipulated by Defendants), and widely known within the Firm to be infected with bias.

527.680.      The drivers of Davis Polk's discriminatory Performance Review Policy

are Davis Polk's Consensus and Consensus Feedback Statement elements, both of which are

centralized, subjective, and unable to be challenged or corrected once they are set in motion. The

disparate impact that flows from them continues from year to year, and they harmed Mr.

Cardwell year after year.

528.681.      Making matters worse, Davis Polk's refusal to allow Mr. Cardwell to view

his performance reviews or the Consensus Feedback Statements themselves was based on Firm

policy according to Ms. DeSantis. Thus, theThe discriminatory nature of Davis Polk's

Performance Review Policy was exacerbated by the policy that prevented Mr. Cardwell from

viewing his performance reviews. Mr. Cardwell was told he could not review his reviews after

he had complained about their discriminatory nature and the refusal to allow Mr. Cardwell to

view his reviews or discuss the "past" was intended to and had the effect of quashing Mr.

Cardwell's complaints about the review process.

529.682.      Ultimately Davis Polk's Performance Review Policy (i) allowed

Defendants and others to us subjective-decision making processes to cherry pick feedback from

some but not all evaluations, (ii) lacked transparency, and had a disparate impact on Mr.
Cardwell.

530.683.      Mr. Cardwell communicated his complaints professionally and
respectfully at every turn.

531.684.      And yet, when it mattered most—when Defendants could have come
together to work with Mr. Cardwell across racial lines to make sure that everyone was treated as
equals and Davis Polk works for all—Mr. Reid and Mr. Bick used their power to work with Ms.
Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to rig Davis Polk's
policies against Mr. Cardwell and to destroy his ability to be treated in accordance with Firm
policies and remain employed at Davis Polk.

### Davis Polk's Easy to Manipulate Performance Review System Was Supercharged By Davis Polk's Power and Compensation Structure

532.685.      As the leaders of Davis Polk, Mr. Reid and Mr. Bick were among the most
powerful lawyers in the United States and had and continue to have powerful relationships with
industry leaders and the world's largest and most profitable corporations.

533.686.      As the leaders of Davis Polk, enormous power was concentrated in the
hands of Mr. Reid and Mr. Bick.

534.687.      Through a variety of formal and informal processes, Mr. Reid and Mr.
Bick set and shaped policies and practices for the rest of Davis Polk's partnership, including the
corporate practice groups that Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum,
and Mr. Brass worked in.

535.688.      Mr. Reid and Mr. Bick did not just shape policies, they also shaped the
career trajectories of the Firm's partners, especially the Firm's junior partners.

536.689.        Relative to the Firm's senior partners, some of whom have been partners for twenty-plus years, Ms. Hudson, Mr. Chudd, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass were junior partners within Mr. Cardwell's first couple of years at the Firm.

537.690.        At Davis Polk, Mr. Bick had been a Davis Polk partner roughly 26 years, 25 years, 24 years, 23 years, and 20 years longer than Mr. Brass, Mr. Birnbaum, Mr. Wolfe, Ms. Hudson, and Mr. Chudd were partners at Davis Polk, respectively.

538.691.        At Davis Polk, Mr. Reid had been a Davis Polk partner roughly 21 years, 20 years, 19 years, 17 years, and 15 years longer than Mr. Brass, Mr. Birnbaum, Mr. Wolfe, Ms. Hudson, and Mr. Chudd were partners at Davis Polk, respectively.

539.692.        Mr. Reid and Mr. Bick distributed business and career opportunities to various Davis Polk partners, including Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass.

540.693.        The business and career opportunities that Mr. Reid and Mr. Bick distributed gave Davis Polk's partners, including Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass, the opportunity to accumulate prestige, wealth, and networks that Firm partners would overtime be able to leverage into even more prestige, wealth, and power.

541.694.        Equally or more important to some Davis Polk partners, Mr. Reid and Mr. Bick distributed business and career opportunities to Davis Polk partners that would increase their chances of (i) having a life of significance and consequence and (ii) making some sort of mark on history.

542.695.        Mr. Reid and Mr. Bick could not and did not distribute business and career opportunities to all of Davis Polk's partners equally or based on a strict formula.

543.696.         Mr. Reid and Mr. Bick distributed business and career opportunities to

Firm partners, including Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and

Mr. Brass, based on a mix of their professional judgment, certain obligations that were created

by their official roles at the Firm, and their personal discretion.

544.697.         Mr. Reid and Mr. Bick, as Mr. Cardwell observed and experienced, could

and did wield enormous influence over the careers and trajectory of Ms. Hudson, Mr. Chudd,

Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass.

545.698.         Mr. Reid's and Mr. Bick's power over partners' and associates' careers

was partly the result of their titles at the Firm, but that was not the only source of their power and

influence over Davis Polk partners.

546.699.         Mr. Reid and Mr. Bick also had enormous power over partners and

associates' careers because of the Firm's compensation model.

547.700.         At all relevant times during Mr. Cardwell's tenure at Davis Polk, Davis

Polk was a "lock-step" law firm, which meant that partners' and associates' pay were "solely on

the basis of seniority."[115]

548.701.         Davis Polk's lock-step compensation model was in part made possible by

the fact that the Firm is over 160 years old and has many institutional clients—long term clients

who are loyal to Davis Polk or its senior partners and thus routinely send Davis Polk legal work

and pay Davis Polk's legal fees.

549.702.         Davis Polk's lock-step compensation system allowed Davis Polk to create

a partnership full of junior partners who did not have their own clients or need to spend

significant time looking to secure their own clients early in their careers or from year to year.

---

[115] Source: https://news.bloomberglaw.com/business-and-practice/elite-wall-street-firm-davis-polk-moves-to-modified-lockstep-pay

550.703.      Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass, were made partners with the expectation that they would do legal work for matters and clients that Davis Polk's senior partners had already secured for the Firm, and that the Firm's management and senior partners would increasingly transition control and influence of certain clients and contacts to them and other non-senior Davis Polk partners.

551.704.      As Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass increasingly became more senior, Mr. Reid and Mr. Bick, Davis Polk's senior partners used their discretion to transition control and influence over the Firm's contacts, clients, and various business opportunities to them and other Davis Polk partners.

552.705.      At Davis Polk, control and influence over particular clients is sometimes the result of a formal relationship or title, such as a client's "relationship partner." Sometimes the control and influence that a partner has over a particular client is based on informal relationships, such as a partner's personal relationship with a particular client or its leaders.

553.706.      The process by which Mr. Reid, Mr. Bick and other senior Davis Polk partners transitioned control and influence over lucrative and potentially career-defining contacts, clients, and professional opportunities is a process that took and was expected to take many years—sometimes over a decade-plus depending on how junior a particular Davis Polk partner was in relationship to other, more senior Davis Polk partners.

554.707.      During the process in which Mr. Reid, Mr. Bick and other senior Davis Polk partners transitioned control and influence over lucrative and career-defining contacts, clients, and professional opportunities to junior Davis Polk partners, Mr. Reid, Mr. Bick and other senior Davis Polk partners routinely evaluated and selected which Davis Polk partners

should be positioned to receive or actually receive such contacts, clients, and professional opportunities.

555.708.    At all relevant times, Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass knew and were aware that Mr. Reid, Mr. Bick and other senior Davis Polk partners had the ability to give them or share with them lucrative and potentially career-defining contacts, clients, and professional opportunities that could go to other Davis Polk partners.

556.709.    During Mr. Cardwell's tenure at Davis Polk, Mr. Reid and Mr. Bick had significant control and influence over the professional trajectory and types of clients and matters that Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass had access to as partners at Davis Polk.

557.710.    In a joint interview that Mr. Reid and Mr. Bick participated in, Mr. Bick acknowledged how Davis Polk's lockstep compensation system concentrated power and influence in the hands of the Firm's management committee members (i.e., Mr. Reid and Mr. Bick) and allowed them to create cooperation among Davis Polk's partners.

558.711.    When asked: "What projects are you working on on the management side?", Mr. Bick answered by saying "[t]he fact that we operate a lockstep system means we can align our partners' interests."[116]

559.712.    In other publications, Davis Polk has acknowledged the relationship between Davis Polk's lock-step compensation system and cooperation by saying, "Our

---

[116] Source: https://www.leadersleague.com/en/news/interview-with-thomas-j-reid-managing-partner-davis-polk-and-john-a-bick-managing-partner-of-the-corporate-practice-davis-polk. At Davis Polk, and "[m]anagement is kept to a strict minimum (with three partners on the management committee)...."

"lockstep" compensation structure – which is increasingly rare among today's global law firms – and our firm culture promote a cooperative and team-oriented environment."[117]

560.713.     Davis Polk's lock-step compensation is a part of Davis Polk's organizational structure and its culture. Davis Polk's compensation model, organizational structure, and culture facilitated Mr. Reid's and Mr. Bick's ability to expect, demand, or receive deference, cooperation, and constant communication from Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass.

561.714.     While the Firm's compensation model, organizational structure, and culture were frequently marketed by Defendants as a positive, its compensation model, organizational structure, and culture also enabled Mr. Reid, Mr. Bick, and the Firm's senior partners to more easily receive cooperation when they instructed or worked with Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to eliminate Mr. Cardwell's billable hours, manipulate his performance reviews, and terminate his employment.

562.715.     Davis Polk's lock-step compensation structure contributed to Defendants ability to actively harm Mr. Cardwell and his career without any fear or possibility that their compensation would be negatively impacted.

563.716.     In a September 2020 announcement, Davis Polk announced that it was changing its compensation model and explicitly noted that the Firm changed its compensation model in part to "recognize[] and reward[] the entirety of a partner's contributions on behalf of clients and in support of firm priorities, including associate development, mentorship, and diversity and inclusion initiatives."

---

[117] Source: https://www.nalpdirectory.com/content/OrganizationalSnapshots/OrgSnapshot_2109.pdf

564.717.     Davis Polk's lock-step compensation model during Mr. Cardwell's time at Davis Polk incentivized Ms. Hudson, Mr. Chudd, Mr. Butler, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass to prioritize becoming a senior partner at Davis Polk and comply with Mr. Reid and Mr. Bick instructions and requests regarding Mr. Cardwell.[118]

565.718.     During Mr. Cardwell's tenure at Davis Polk, the average Davis Polk partner made between $3 million and $5 million dollars a year, with some senior Davis Polk partners making close to $10 million a year.

566.719.     During Mr. Cardwell's tenure at Davis Polk, the difference in pay between the lowest paid Davis Polk partner (i.e., junior partner) and the highest paid Davis Polk partner (i.e., senior partner) was significant and in the range of millions of dollars.

### *Davis Polk's Power and Compensation Structure Contributed to Widespread Silence and Complicity*

567.720.     Defendants did not attempt to force Mr. Cardwell out of Davis Polk because Mr. Cardwell was the only lawyer at Davis Polk who knew or believed Davis Polk had policies, practices, and partners who were discriminatory or retaliatory.

568.721.     Many people at Davis Polk—from partners, to associates, to lawyers who are now Firm alumni—knew or believed Davis Polk had policies, practices, and partners (during Mr. Cardwell's tenure) who have treated individuals or groups differently based on associates' race, gender, or complaints about unlawful treatment.

569.722.     Despite many people knowing that Davis Polk had policies and lawyers who caused associates (during Mr. Cardwell's tenure) to experience disparate impact and

---

[118] Even after Davis Polk management committee members retire or leave Davis Polk, they still have significant power and influence over the careers of their former, junior Davis Polk partners. For example, as the current general counsel of Comcast, Mr. Reid is responsible for directing and has directed or allowed millions of dollars' worth of Comcast's legal work, revenue, and deal value to go to Davis Polk and its M&A group.

treatment, most people never said anything about the disparate impact and treatment they observed or experienced. Most of these people never will.

570.723.     Why? Davis Polk's partners, associates, and alumni are smart, rational people. Most worked incredibly hard to achieve their level of professional status. They all have families. They all have future professional aspirations.

571.724.     Mr. Cardwell observed at Davis Polk that Davis Polk's partners, associates, and alumni often predicted or thought that if they spoke out against Davis Polk-specific racism, discrimination, or retaliation, that they would likely be risking the very things that come with having worked as a Davis Polk lawyer—a life with an almost guaranteed, stable income, career, healthcare, prestige, and professional opportunities.

572.725.     Many Davis Polk's partners, associates, and alumni are not willing to risk having a "life of significance and consequence" or their chance to make "some sort of mark on history" or their current proximity to power, in order to speak truthfully or publicly about Davis Polk colleagues who engaged in discrimination or retaliation. That simply is not the case.

573.726.     Mr. Cardwell is different from those lawyers in that he did what Defendants considered to be unacceptable offense: he spoke up, refusing to suffer in silence like so many had and have at Davis Polk—by communicating that he was seeing and experiencing bias and discrimination at Davis Polk to Davis Polk's partners.

574.727.     From April 2015 through Mr. Cardwell's termination in 2018, Mr. Bick had primary control and influence over Mr. Cardwell's billable hours and professional development, and he had routine communication with Davis Polk's partners, especially Mr. Reid, about Mr. Cardwell's experiences and development.

575.728.        As explained herein, Mr. Bick's retaliatory refusal to apply the Firm's

policies, including the Firm's anti-discrimination policies to Mr. Cardwell were triggered by and

the result of complaints Mr. Cardwell made in September 2015, January 2016, September 2016,

December 2016, March 2017, May 2017, August 2017, and January 2018, not his performance.

576.729.        And so, with virtually no supportive contemporaneous documentation, and

within mere months of Davis Polk's M&A partners attempting to use Mr. Cardwell and his racial

diversity on pitches to secure multiple, long term legal clients and deals,[119] Defendants worked to

terminate Mr. Cardwell's employment on a strategically timed and fabricated notion that

Cardwell's performance reviews noted that he was "behind" in his class and that Davis Polk had

no other choice but to terminate Mr. Cardwell's employment.

577.730.        In this case, a concentrated group of powerful Davis Polk partners

convinced other Davis Polk partners to accept, participate in, and turn a blind eye to racism,

discrimination, and retaliation.

578.731.        Many of Davis Polk's partners, especially M&A partners Mr. Goldberg

and Mr. Smith, know this is true.

579.732.        During Mr. Cardwell's tenure at Davis Polk, Defendants' performance

review system was a vehicle for discrimination and disparate impact.

580.733.        In response to Mr. Cardwell's complaints, Defendants turned Davis Polk's

performance review system into a vehicle for retaliation. Many of Davis Polk's partners know

this too is true, including M&A partner Mr. Smith.[120]

---

[119] During the summer of 2017, Mr. Birnbaum sent Mr. Cardwell an email (with Mr. Brass cc'd) that stated:
"Kaloma, we're pitching for a new client, couple of public company deals, and would like to include you on the
team for the pitch. Nothing to do right now, just wanted to give you a heads-up. Who knows if we'll get it, but
here's to hoping. Sounds like it wouldn't start until mid-September, FYI."
[120] See Ex. 12, Smith 2018 Consensus Feedback Statement (where Oliver Smith refused his Firm-assigned
obligation to complete a Consensus Feedback Statement of Mr. Cardwell's 2018 annual review and refused to

581.734.        Thus, Mr. Cardwell's allegations and claims are not just about how Mr.

Cardwell, a Black lawyer, experienced discrimination and retaliation while employed at Davis

Polk.

582.735.        Mr. Cardwell's allegations and claims are also about how one of the most

powerful and prestigious law firms in the world, in 2020, was and remains willing to lock itself

into racist, retaliatory decisions and systems to protect and continue profiting from its most

powerful current and former partners.

583.736.        While Defendants' decisions may seem reasonable to many people and

U.S. lawyers—and may help Davis Polk maintain its power, wealthy and prestige—such

decisions and systems were not inevitable. Worse, they violated Mr. Cardwell's rights and the

law—things every lawyer at Davis Polk is supposed to care about.

584.737.        Such decisions gutted Mr. Cardwell's career and harmed him and his

family.

585.738.        Mr. Cardwell's allegations and claims include but are not limited to Davis

Polk's performance review system. All of the claims are based on facts and evidence, some of

which Defendants have attempted to skillfully hide from Mr. Cardwell and this Federal Court.

586.739.        Accordingly, Mr. Cardwell's allegations and claims require a faithful and

fair application of the rule of law and discovery that is consistent with the reality that

discrimination and retaliation claims almost always involve attempts by defendants to prevent

wrongdoing from coming to light.

---

memorialize any information or feedback from M&A partners 2017 written performance reviews or the M&A
group's discussion about such written reviews (i.e., Consensus Feedback)—the latter of which is what the
Management and M&A partners claimed were the basis for Mr. Cardwell's termination).

587.740.      For all practical purposes, the law is the only thing that can or will address Defendants' actions and remedy the harms they have caused Mr. Cardwell.


## COUNT ONE

### Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964

588.741.      Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

589.742.      By the acts and practices detailed in this Complaint, Davis Polk discriminated against Mr. Cardwell on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII").

590.743.      As a result of Davis Polk' discriminatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

591.744.      Davis Polk intentionally discriminated against Mr. Cardwell with malice or reckless indifference to Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT TWO

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964

592.745.      Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

593.746.      By the acts and practices described in this Complaint, Davis Polk

retaliated against Mr. Cardwell in the conditions of his employment for his opposition to

unlawful employment practices in violation of Title VII.

594.747.      As a result of Davis Polk' retaliatory acts and practices, Mr. Cardwell

suffered and continues to suffer harm and substantial economic losses, including but not limited

to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and

emotional harm and psychological trauma, with associated physical symptoms.

595.748.      Davis Polk intentionally retaliated against Mr. Cardwell with malice or

reckless indifference to Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive

damages.

## COUNT THREE

### Racial Discrimination in Violation of 42 U.S.C. § 1981(a)

596.749.      Mr. Cardwell re-alleges and incorporates every allegation in this

Complaint as if each allegation was recounted at length herein.

597.750.      By the acts and practices detailed in this Complaint, Davis Polk, Mr. Reid,

Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr. Brass intentionally discriminated against Mr.

Cardwell on the basis of his race in violation of 42 U.S.C § 1981(a) ("Section 1981").

598.751.      As a result of Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr.

Brass's discriminatory acts and practices, Mr. Cardwell has suffered and continues to suffer

harm and substantial economic losses, including, but not limited to, salary, bonuses, and other

monetary benefits, impairment to his name and reputation, and emotional harm and

psychological trauma, with associated physical symptoms.

599.752.    Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr. Brass intentionally discriminated against Mr. Cardwell with malice or reckless indifference to Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT FOUR

### Retaliation in Violation of 42 U.S.C. § 1981(a)

600.753.    Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

601.754.    By the acts and practices detailed in this Complaint, Defendants intentionally retaliated against Mr. Cardwell for his opposition to unlawful discriminatory practices in violation of Section 1981.

602.755.    As a result of Defendants' retaliatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

603.756.    Defendants intentionally retaliated against Mr. Cardwell with malice or reckless indifference to Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

604.757.    As explained *supra* at ¶¶ 401-53, Ms. Hudson's falsified performance reviews for Mr. Cardwell both triggered Mr. Cardwell's termination and provided cover to Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr. Butler decision to terminate Mr. Cardwell on the purported basis that Mr. Cardwell was "behind" lawyers in his class.

## COUNT FIVE

### Racial Discrimination in Violation of the New York State Human Rights Law § 296(1)(a)

605.758.        Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

606.759.        By the acts and practices described in this Complaint, Davis Polk, Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Brass discriminated against Mr. Cardwell on the basis of his race in violation of the New York State Human Rights Law ("NYSHRL") § 296(1)(a).

607.760.        As a result of Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr. Brass's discriminatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

608.761.        Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr. Brass's discriminatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Mr. Cardwell and Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT SIX

### Aiding and Abetting Racial Discrimination in Violation of the

### New York State Human Rights Law § 296(6)

609.762.        Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

610.763.        By the acts and practices described in this Complaint, Defendants discriminated against Mr. Cardwell on the basis of his race in violation of NYSHRL § 296(1)(a).

611.764.        By the acts and practices described in this Complaint, Mr. Reid and Mr. Bick aided and abetted violations of NYSHRL § 296(1)(a), which were violations of NYSHRL § 296(6).

612.765.        As a result of Mr. Reid's and Mr. Bick's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT SEVEN

### Retaliation in Violation of the New York State Human Rights Law § 296(1)(e)

613.766.        Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

614.767.        By the acts and practices described in this Complaint, Defendants retaliated against Mr. Cardwell for his opposition to unlawful discriminatory practices in violation of NYSHRL § 296(1)(e).

615.768.        As a result of Defendants' retaliatory acts and practices, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

616.769.        Defendants' retaliatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Mr. Cardwell and Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT EIGHT

### Aiding and Abetting Retaliation in Violation of the

**New York State Human Rights Law § 296(6)**

617.770.    Mr. Cardwell re-alleges and incorporates every allegation in this

Complaint as if each allegation was recounted at length herein.

618.771.    By the acts and practices described in this Complaint, Defendants

retaliated against Mr. Cardwell for his opposition to unlawful discriminatory practices in

violation of NYSHRL § 296(1)(e).

619.772.    By the acts and practices described in this Complaint, Mr. Reid and Mr.

Bick, aided and abetted violations of NYSHRL § 296(1)(e), which were violations of NYSHRL

§ 296(6).

620.773.    As a result of Mr. Reid's and Mr. Bick's aiding and abetting, Mr.

Cardwell has suffered and continues to suffer harm and substantial economic losses, including,

but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and

reputation, and emotional harm and psychological trauma, with associated physical symptoms.

**COUNT NINE**

**Racial Discrimination in Violation of the New York City Administrative Code § 8-107(1)(a)**

621.774.    Mr. Cardwell re-alleges and incorporates every allegation in this

Complaint as if each allegation was recounted at length herein.

622.775.    By the acts and practices described in this Complaint, Davis Polk, Mr.

Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr. Brass discriminated against Mr. Cardwell in

the conditions of his employment on the basis of his race in violation of the New York City

Administrative Code ("NYCHRL") § 8-107(1)(a).

623.776.    As a result of Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr.

Brass's discriminatory acts and practices, Mr. Cardwell has suffered and continues to suffer

harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

624.777.    Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, and Mr. Brass's discriminatory acts and practices were willful, wantonly negligent or reckless, amounting to a conscious disregard of Mr. Cardwell and Mr. Cardwell's rights thereby entitling Mr. Cardwell to punitive damages.

## COUNT TEN

### Aiding and Abetting Racial Discrimination in Violation of the

### New York City Administrative Code § 8-107(6)

625.778.    Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

626.779.    By the acts and practices described in this Complaint, Defendants discriminated against Mr. Cardwell in the conditions of his employment on the basis of his race in violation of NYCHRL § 8-107(1)(a).

627.780.    By the acts and practices described in this Complaint, Mr. Reid and Mr. Bick aided and abetted violations of NYCHRL § 8-107(1)(a), which were violations of NYCHRL § 8-107(6).

628.781.    As a result of Mr. Reid's and Mr. Bick's aiding and abetting, Mr. Cardwell has suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

### COUNT ELEVEN

**Retaliation in Violation of the New York City Administrative Code § 8-107(7)**

629.782.    Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

630.783.    By the acts and practices described in this Complaint, Defendants retaliated against Mr. Cardwell in the conditions of his employment for opposing unlawful discriminatory practices in violation of New York City Administrative Code § 8-107(7).

631.784.    As a result of Defendants' retaliatory acts and practices, Mr. Cardwell suffered and continues to suffer harm and substantial economic losses, including, but not limited to, salary, bonuses, and other monetary benefits, impairment to his name and reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## COUNT TWELVE

**Aiding and Abetting Retaliation in Violation of the**

**New York City Administrative Code 8-107(6)**

632.785.    Mr. Cardwell re-alleges and incorporates every allegation in this Complaint as if each allegation was recounted at length herein.

633.786.    By the acts and practices described in this Complaint, Defendants retaliated against Mr. Cardwell in the conditions of his employment for opposing unlawful discriminatory practices in violation of New York City Administrative Code § 8-107(7).

634.787.    By the acts and practices described in this Complaint, Mr. Reid and Mr. Bick aided and abetted violations of NYCHRL § 8-107(7), which were violations of NYCHRL § 8-107(6).

635.788.    As a result of Mr. Reid's and Mr. Bick's aiding and abetting, Mr. Cardwell suffered and continues to suffer harm and substantial economic losses, including, but

not limited to, salary, bonuses, and other monetary benefits, impairment to his name and

reputation, and emotional harm and psychological trauma, with associated physical symptoms.

## PRAYER FOR RELIEF

636.789.        WHEREFORE, Mr. Cardwell respectfully requests that this Court enter a

Judgment in favor of Mr. Cardwell against Defendants, providing for the following relief:

  a. Declaring that the acts and practices complained of herein are unlawful and

    violate Title VII; Section 1981; New York State Human Rights Law §§

    296(1)(a), 296(1)(e), and 296(6); and the New York City Administrative Code

    §§ 8-107(1)(a), 8-107(7), and 8-107(6);

  b. Directing Defendants to pay compensatory damages for back and front pay,

    bonuses and other monetary benefits to which Mr. Cardwell is entitled;

  c. Directing Defendants to pay compensatory damages for reputational damage,

    emotional harm, psychological harm and any physical impairments resulting

    from Defendants' acts and practices;

  d. Directing Defendants to pay punitive damages for engaging in discriminatory

    acts or practices with malice or reckless indifference to Mr. Cardwell's rights;

  e. Directing Defendants to pay punitive damages for their willful, wantonly

    negligent or reckless disregard of Mr. Cardwell's rights;

  f. Directing Defendants to pay punitive damages to the extent allowable by law,

    including Title VII; Section 1981; New York State Human Rights Law §§

    296(1)(a), 296(1)(e), and 296(6); and New York City Administrative Code §§

    8-107(1)(a), 8-107(7), and 8-107(6);

g.   Costs and disbursements incurred in connection with this action, including,

without limitation, reasonable attorneys' fees, expenses, and costs, to the

extent allowable by law;

h.   Pre-judgment and post-judgment interest, as provided by law; and

i.   Such other and further legal and equitable relief as this Court deems

necessary, just, and proper.

## DEMAND FOR JURY TRIAL

637.790.        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mr.

Cardwell demands a trial by jury in this action.

Dated: New York, New York
February 5,March [●], 2021                        /s/ David Jeffries
                                          By: David Jeffries, Esq.
                                          1345 Avenue of the Americas, 33rd Floor
                                          New York, New York 10105
                                          Tel: 212-601-2770
                                          Djeffries@Jeffrieslaw.nyc


                                          *Attorney for Plaintiff*