UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

KALOMA CARDWELL,

                      Plaintiff,

         -v-

DAVIS POLK & WARDWELL LLP, THOMAS
REID, JOHN BICK, WILLIAM CHUDD,
SOPHIA HUDSON, HAROLD BIRNBAUM,
DANIEL BRASS, BRIAN WOLFE, and JOHN
BUTLER,

                    Defendants.

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/23/2021

1:19-cv-10256-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

     Kaloma Cardwell was an associate at the prestigious international law firm Davis Polk &
Wardwell LLP for four years.  He was the only Black male associate in his class.  Cardwell alleges
that Davis Polk and its partners discriminated against him because of his race.  During his time at
Davis Polk, Cardwell raised complaints about racist practices in staffing and performance
evaluations.  After he did that, he found that he received fewer and worse assignments and poor
evaluations.  His billable hours dropped from one or two hundred a month to two.  Cardwell alleges
that this treatment was part of a retaliation campaign orchestrated by Davis Polk and its partners.
He filed an administrative complaint with the EEOC.  Ultimately, Cardwell was terminated from
Davis Polk.  Cardwell brought this case, alleging racial discrimination and retaliation claims against
Davis Polk and the partners in the Mergers & Acquisitions group, the group where Cardwell had
worked, under city, state, and federal law.

     Cardwell has twice amended his complaint.  The Court previously dismissed Cardwell's
discrimination claims against Davis Polk partners Harold Birnbaum, Daniel Brass, John Butler,
William Chudd, Sophia Hudson, and Brian Wolfe, and his retaliation claims against Butler, Chudd,

and Hudson.  The Court granted Cardwell leave to replead the dismissed claims.  Cardwell filed a corrected second amended complaint (the "SAC") and Defendants again moved to dismiss the repleaded claims.  After Defendants filed their motion, they began producing copious amounts of discovery—over 100,000 pages in total.  Like many plaintiffs in employment cases, Cardwell had little information about particular Davis Polk practices, meetings, or internal documents until such information was produced by Defendants.  Based on the information he learned in discovery, Cardwell filed a motion for leave to file a third amended complaint.  The Court takes up both of those motions here.

Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Cardwell has not adequately alleged that his race was a motivating factor in the actions of Birnbaum and Wolfe, so his discrimination claims against those defendants are dismissed.  But Cardwell has adequately alleged that Brass discriminated against him because of his race when Brass removed him from a deal team, so the motion is denied as to that claim.  And Cardwell has plausibly alleged that Birnbaum, Brass, Butler, Chudd, Hudson, and Wolfe were part of a group that collectively decided to fire him because of his protected complaint to the EEOC, so the motion is also denied as to his retaliation claim.

Plaintiff's motion to AMEND is GRANTED, with the exception that Plaintiff is not permitted to allege a new disparate impact claim.  Because Plaintiff's proposed amendments to his discrimination and retaliation claims are based on information that he could not have reasonably known prior to reviewing Defendants' productions, he has demonstrated good cause.  To the extent that Plaintiff is attempting to allege a new disparate impact claim, that claim is not based on information he learned in discovery and he has not demonstrated good cause as to that claim.  While his proposed amendments to his discrimination and retaliation claims will cause Defendants some additional time and expense, they will not unduly prejudice defendants.  And Plaintiff's proposed amendments are not futile.

## I. DEFENDANTS' MOTION TO DISMISS

### A. Background

#### 1. Facts[1]

##### a. Cardwell joins Davis Polk.

Cardwell first joined Defendant Davis Polk & Wardwell LLP (the "Firm" or "Davis Polk")
as a summer associate in 2013. SAC ¶ 37. He joined the Firm as a full-time associate September
2014 and worked there until August 2018. *Id.* ¶ 4. He rotated through three corporate departments,
or "practice groups:" Finance, Capital Markets, and Mergers & Acquisitions ("M&A"). *Id.* After
Cardwell did six-month rotations in those three departments, he was assigned to work permanently
in M&A. *Id.* Cardwell was one of four Black associates hired to join Davis Polk's 2014 class of over
120 associates. *Id.* ¶ 513. He was the only male Black associate. *Id.*

Cardwell alleges that he began to experience racial discrimination early in his tenure at the
Firm. In May 2015—less than a year after joining the Firm—Cardwell complained that Davis Polk
attorneys did not make eye contact or speak to junior or summer associates of color in meetings. *Id.*
¶ 61. Cardwell identified this "pattern" in an email to "Davis Polk's Executive Director" (the
"Executive Director") who "worked closely with the Firm's management committee" and other
partner committees on developing the firm's personnel, associate development, and firm
management policies. *Id.* ¶ 60.[2] Cardwell alleges the Davis Polk's training materials "recognized that

---

[1] The facts are drawn from Cardwell's corrected second amended complaint (the "SAC"), Dkt. No. 147. The Court
notes that many of the facts in the SAC are unchanged from Cardwell's first amended complaint (the "FAC"). The
Court recounted the FAC facts in detail in its October 2020 opinion on the first motion to dismiss. Dkt. No. 78 (the
"October Order" or " October Ord."). Nonetheless, for the sake of clarity, the Court lays out in detail the facts that
Cardwell has alleged in the SAC. For this motion, the Court must accept as true the facts alleged in the amended
complaint. *See, e.g., Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002). But "the tenet that a court must
accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556
U.S. 662, 678 (2009).

[2] Cardwell alleges that Davis Polk's "Lawyers Handbook," which describes the Firm's policies, states that "[t]he Firm
strongly recommends the prompt reporting of all perceived incidents of discriminatory behavior or harassment on the
basis of . . . race, color . . . or any other basis prohibited by federal, state or local law, regardless of the offender's identity
or position." *Id.* at ¶ 63 n.7. The Handbook also allegedly advises that "[l]awyers who believe they have been subjected
to such prohibited conduct or who believe that they have witnessed such prohibited conduct or any other behavior
should discuss their concerns immediately with Davis Polk's Executive Director." *Id.* (brackets omitted). So Cardwell
allegedly followed firm policy and raised the issue with the Executive Director.

these types of interactions are related to bias and that they can enhance or hinder performance." *Id.* ¶ 62.

Cardwell was dissatisfied with the Executive Director's response. The Executive Director emailed Cardwell that "unfortunately that happens to everyone" and attributed the lack of eye contact and communication to the "social awkwardness" of attorneys. *Id.* ¶ 64. So the Executive Director concluded, "[h]opefully if this happened to you, you showed them how to live in polite society(!) and introduced yourself." *Id.* Cardwell alleges that the Executive Director "discussed Mr. Cardwell's concerns and suggestions with Davis Polk partners and staff members" who were "responsible for Mr. Cardwell's professional development within the Firm's M&A group." *Id.* ¶ 65.

Cardwell also alleges that he was "exclu[ded] from opportunities" that were "vital" to his professional development. *Id.* ¶ 67. For example, Cardwell was "left off email communications and meeting invitations" that were circulated to all attorneys working on a particular deal or that otherwise should have included him. *Id.* ¶ 68. Once, Cardwell walked into a white 2014 M&A associate's office; she and Cardwell were working on the same deal at the time. *Id.* ¶ 69. Cardwell was surprised to learn that she had been invited to listen to a conference call with "high-level clients and senior attorneys." *Id.* Cardwell asked this associate to forward emails or meeting invitations to him if she thought he should have been included on them. *Id.* The associate agreed and "periodically forwarded emails" from white senior M&A associates. *Id.*

At a September 2015 meeting between Davis Polk's Diversity Committee and its Black Attorney Group, Cardwell participated in a conversation about how Black Davis Polk attorneys "were excluded from staffing-related opportunities at the Firm." *Id.* ¶ 72. Partners on Davis Polk's Diversity Committee, including Maurice Blanco, and the Firm's Chief Development Officer, Renee DeSantis, attended the meeting. *Id.* DeSantis "directly asked whether Mr. Cardwell had personally experienced" racial discrimination at Davis Polk. *Id.* Cardwell answered that he had. *Id.* 73. And he clarified in the ensuing discussion that he wasn't referring to a "feeling of being excluded." *Id.*

Rather, Cardwell said that he and other Black associates experienced disparate treatment that harmed their professional development by giving them "fewer and different staffing-related opportunities." *Id.* The Court refers to this as the "September 2015 complaint." No Davis Polk employees followed up with Cardwell after the meeting to ask about his comments. *Id.* ¶ 75. But Cardwell alleges that Davis Polk did "create an internal note" of his complaint and "discussed it internally with several Davis Polk partners. *Id.* ¶ 76. Davis Polk "promptly investigated Mr. Cardwell's complaint," which included discussions of the complaint with Davis Polk partners John Bick, William Chudd, and Sophia Hudson.[3]  *Id.* ¶¶ 10, 77, 78, 98.

Cardwell alleges that all of the M&A partners met regularly to discuss the M&A associates, including Cardwell. One such meeting took place at the end of September or beginning of October 2015. *Id.* ¶ 79. At that meeting, the M&A partners "discuss[ed] Mr. Cardwell and the other M&A associates' professional development, performance, and performance reviews." *Id.* Specifically, Reid and the M&A partners discussed Cardwell's September 2015 complaint about racial discrimination in staffing-related opportunities at Davis Polk. *Id.* ¶ 80. Cardwell alleges that during the meeting, Chudd was assigned to deliver Cardwell's annual face-to-face performance review meeting. *Id.* ¶ 81.

### b. Cardwell allegedly receives positive performance reviews.

Cardwell alleges that his performance reviews were positive during his first years at the Firm. Davis Polk's "Performance Review Policy" utilizes "written performance reviews" to "develop a message" that was to be communicated to an associate being reviewed. *Id.* ¶ 125. Cardwell refers to this message as the "consensus feedback." *Id.* As part of the review process, the Firm requires partners and senior associates to submit written performance review forms for junior associates. *Id.*

---

[3] Bick was the head of Davis Polk's M&A group and a member of the Firm's three-person Management Committee during Cardwell's tenure at the firm. *Id.* ¶ 8. Chudd was an M&A partner at the firm. *Id.* ¶ 10. Hudson was a corporate partner at Davis Polk who did not work in M&A. *Id.* ¶ 9.

A "select group of partners" discusses associates' professional development, performance, and the written performance reviews submitted for the associate up for review. *Id.* ¶ 126. The group of partners then decides what consensus feedback should be communicated to the associate in a face-to-face annual performance review meeting (or interim review, under certain circumstances). *Id.* The group of partners then assigns one partner to communicate the consensus feedback to the associate. *Id.* The assigned partner memorializes both the Firm's consensus feedback and the assigned partner's conversation with the reviewee on what Cardwell refers to alternatively as the "consensus feedback statement" and "summary review." *Id.* That document also includes the principal matters on which the associate worked, whether the reviewer concluded that the associate was "behind," "with," or "ahead" of lawyers in their class; strengths and weaknesses; improvements; other contributions to the firm; development priorities for next year; and whether the Firm "concluded and informed the associate that they were a risk of needing an interim spring review or career counseling." *Id.* ¶ 125.

Cardwell alleges that early in his career at Davis Polk, he "was told that the feedback that was delivered to M&A associates during their face-to-face performance review meetings was created by a process in which all of the partners in Davis Polk's M&A group would meet as a group, discuss the professional development, performance, and performance reviews for M&A associates and decide what feedback should be given to M&A associates." *Id.* ¶ 127.

Cardwell alleges that these reviews are important. He alleges that everyone involved understands that "written performance reviews can, and often do, 'make-or-break' attorneys' careers." *Id.* ¶ 135. According to Cardwell, performance reviews are an "official" and "authoritative" record of attorney performance at Davis Polk, including whether attorneys are "performing materially behind, with, or ahead of members in the associate's class." *Id.* ¶ 136. The Firm also allegedly uses the reviews to "assess[] and verify[] whether" reviewing attorneys evaluate junior associates "in a non-discriminatory, consistent, and accurate" manner. *Id.* Because the

reviews are important, Davis Polk allegedly ensures that reviewers have adequate time to submit their written reviews and that reviewees have an opportunity to "prepare for their face-to-face performance review meeting with the partner assigned to conduct the meeting." *Id.* ¶ 135.

Cardwell participated in five face-to-face performance review meetings at Davis Polk. *Id.* ¶ 130. Cardwell had his first "face-to-face review" in May 2015 because it was Firm policy to conduct an associate's first such review after the associate spent six months at the firm. *Id.* ¶ 110 n.14. Jason Kyrwood, a corporate partner, wrote in the review that Cardwell's performance was "[g]enerally positive" and that he was "organized" and a "hard worker[,]" generated "high quality work," and had "good attention to detail." *Id.* ¶ 138 (brackets and emphasis omitted).

Cardwell had his second face-to-face review in December 2015 with Chudd. *Id.* ¶¶ 10, 98. The review lasted "a few minutes" and Chudd gave "positive feedback" and two brief suggestions. *Id.* ¶ 98. The first was that Cardwell should "work on better setting expectations regarding how long it will take to do something." *Id.* The second was that Cardwell shouldn't "spend too much time thinking about the bigger picture." *Id.* Cardwell asked Chudd if he had advice about soliciting "real-time feedback" from supervising attorneys. *Id.* ¶ 100. Chudd "acknowledged" that it was difficult to get feedback from supervising attorneys but "encouraged Cardwell to continue trying to get such feedback." *Id.* ¶ 101. Cardwell alleges that Chudd's "comments and tone" made clear that Cardwell was "performing satisfactorily" and meeting "the Firm's and [the] M&A group's" expectations. *Id.* ¶ 103.

Shortly after that review, in January 2016, Cardwell had dinner with Defendant Thomas Reid, the Firm's Managing Partner, together with a senior Black associate. *Id.* ¶ 88. The conversation naturally transitioned between "the other associate's and Mr. Cardwell's performance at the Firm" and "the Firm's diversity and inclusion issues." *Id.* Reid "made it clear that he was familiar with Mr. Cardwell's evaluations" and gave Cardwell "a verbatim description" of the conclusions Chudd had communicated to Cardwell in December. *Id.* ¶ 89. Cardwell "left the

meeting having no doubt" that he "was performing satisfactorily according to the Firm's and M&A's group's typical standards and expectations."  *Id.*  Cardwell also spent a significant amount of time "educating" Reid about "how he had experienced interpersonal and institutional discrimination at the Firm."  *Id.* ¶ 90.

### c. Cardwell allegedly receives a "sham" performance review from Bick.

In June 2016, Cardwell alleges that he received an irregular, unscheduled face-to-face review from Bick.  *Id.* ¶ 108.  Before the unscheduled review, Cardwell had co-authored a memo to Bick with another non-white junior M&A associate.  *Id.* ¶ 106.  Bick emailed Cardwell that he should come to Bick's office for another research assignment about the same matter.  *Id.* ¶ 107.  When Cardwell arrived at Bick's office, Bick described the new research assignment for a few minutes.  *Id.* ¶ 108.  Bick then "abruptly" grabbed a folder and said:  "I know you asked for feedback, so I figured I'd take a few minutes to go through your reviews."  *Id.*

Cardwell was alarmed by Bick's behavior.  Cardwell "had not requested a performance review or non-real-time feedback from anyone at the Firm."  *Id.* ¶ 109.[4]  Cardwell alleges that Davis Polk attorneys do not typically receive "unannounced, mid-year" face-to-face reviews.  *Id.*  In documents filed with the New York State Division of Human Rights (the "NYSDHR") in response to Cardwell's complaint, Bick stated that Cardwell "had asked for mid-year feedback on his work" and that his review was "in response to that request."  *Id.* ¶ 110 n.15.  But Cardwell was concerned because he had not received advance notice that this type of review "would or could take place."  *Id.* ¶ 110.  Bick allegedly "departed from the Firm's normal review process" and "lied about how the review came about."  *Id.*  Cardwell characterizes Bick's review as a "sham."  *Id.* ¶ 111.

---

[4] The complaint does not reconcile this allegation with Cardwell's allegation that he asked Chudd if he had advice about soliciting real-time feedback from his supervising attorneys.  *Id.* ¶ 100.

Cardwell alleges that Bick's assessments during the face-to-face review were a "wild departure" from contemporaneous feedback from his supervisors. *Id.* Bick allegedly relayed that Cardwell's supervisors commented that he had "a pattern of missing deadlines." *Id.* ¶ 112. Cardwell responded that he couldn't remember doing so. *Id.* Bick replied that Cardwell shouldn't "think of it as deadlines" and discussed "vague[]" and "general timing critiques." *Id.* ¶ 113. Cardwell believed that Bick's comments were inconsistent with the "typical written and spoken precision" and "extensive planning" Davis Polk partners conduct before developing and giving an associate feedback in a performance review meeting. *Id.* ¶ 114. Cardwell pressed Bick for "specific examples" that "served as the basis for these critiques." *Id.* ¶ 115. But Bick couldn't provide any such examples. *Id.* Cardwell alleges that Bick's inability to provide examples shows that he had been pretending to read from Cardwell's performance reviews. *Id.* ¶ 116. Cardwell asked Bick if he would inquire with the reviewers about what deadlines he had missed. *Id.* Bick allegedly agreed to follow up but never did. *Id.*

A senior associate with whom Cardwell discussed the exchange was also alarmed by Bick's behavior. *Id.* ¶ 118. Cardwell contacted this associate after his meeting with Bick. *Id.* ¶ 117. The associate expressed concern that "a partner or group of partners at Davis Polk" had decided to give Cardwell formal feedback that became part of his "official record," instead of giving informal feedback. *Id.* ¶ 118. The associate also was allegedly "upset" that Cardwell had not been notified in advance about Bick's face-to-face review. *Id.* The associate commented that it was "unlikely" that Bick "coincidentally or carelessly" used the phrase "missed deadlines." *Id.* And the associate was "suspicio[us]" because "Davis Polk partners met collectively to decide what messages should be delivered in performances review meetings." *Id.* Cardwell alleges that his "race was a motivating factor in Mr. Bick's decision to create a sham performance review," and that Bick did not conduct interim performance reviews in 2016 for any white M&A associates in Cardwell's class. *Id.* ¶¶ 119, 121.

Cardwell alleges that all the reviews submitted by Davis Polk associates before the June 2016 meeting with Bick rated him as performing "with" his class year. *Id.* ¶ 137. Cardwell alleges that only after he "vocaliz[ed] his concerns" about racial discrimination at the Firm—specifically, the "discriminatory impact" of Davis Polk's evaluation system and "bias-related interactions within the Firm's M&A and Capital Markets groups"—that his performance reviews became negative. *Id.* ¶ 139.

After Bick met with Cardwell under the allegedly "false pretenses" of assigning Cardwell another research project, Bick did not respond to Cardwell's emails about the assignment itself. *Id.* ¶ 122. Cardwell emailed a 15-page research memo to Bick in July 2016 and sent a follow-up email later in the month. *Id.* ¶¶ 122–23. But Bick never responded. *Id.* ¶ 123. Although Bick's office was two doors down from Cardwell's, Bick allegedly ignored Cardwell. *Id.* Indeed, Bick did not email Cardwell for another 300 days, from July 2016 to May 2017. *Id.* Cardwell alleges that Bick was "trained against such interpersonal practices and informed that such practices were related to racial bias and could negatively impact minority associates." *Id.*

### d. Cardwell allegedly receives undesirable work assignments.

Cardwell alleges that Defendants discriminated and retaliated against him by staffing him on undesirable assignments. The Firm had allegedly implemented systems to combat bias in assigning matters to associates, and had communicated those "antidiscrimination staffing policies" to Cardwell and other associates. *Id.* ¶¶ 140, 142. The policies were designed to "discourage[]" partners and senior associates from assigning work to junior associates "through informal channels[,]" especially for "deals and high-profile cases." *Id.* ¶ 141. The Firm allegedly warned partners and associates that assigning work through these "informal channels" discriminated against women and non-white attorneys. *Id.* ¶ 142. At a public event, Reid said that he discussed "how work at the firm is . . . allocated" in triannual meetings with practice leaders. *Id.* ¶ 84.

The formal mechanism for assigning work to junior associates like Cardwell functioned as follows.  Each week, associates completed a "'weekly workload request/capacity form[,]' indicating their availability," the matters on which they were working, and other relevant information.  *Id.* ¶ 143.  A staff person then compiled these forms into a single chart and sent it to "the M&A junior associate assignment coordinator" who "used the chart . . . to staff first- and second-year M&A associates" on specific assignments.  *Id.*  The chart was also sent to "the two most junior M&A partners" who used it "to staff third-year and more senior associates" on these matters.  *Id.*  M&A partners and senior associates who needed junior associates emailed the relevant staffing coordinator.  *Id.*

The junior M&A staffing partners "had significant and independent decision-making authority on M&A staffing decisions."  *Id.*  But they allegedly did not have complete control over those decisions.  *Id.*  Cardwell alleges that those partners communicated with Bick "constant[ly]" about how to staff third-year and more senior associates.  *Id.*  Likewise, "the junior associate assignment coordinators" did not have "independent control over staffing."  *Id.* ¶ 144.  Those coordinators also worked closely with Bick.  *Id.*

An M&A associate can work on different kinds of "deals and matters."  *Id.* ¶ 145.  Cardwell alleges that there is an important difference between "deals" and "transactions" on the one hand and M&A "'work,' 'matters,' 'tasks,' 'projects,' 'research,' 'document review,' [and] 'assignments.'"  *Id.*  This difference is allegedly "widely understood and significant" among Davis Polk attorneys and in corporate law.  *Id.*  Deals and transactions influence M&A rankings, fees, prestige, and associates' "partnership and lateral prospects[,]" among other important metrics.  *Id.*  Other M&A work is less prestigious than working directly on a deal.  *Id.*

Cardwell alleges that around the time that Bick conducted his "sham review," he noticed that he was being assigned to fewer deals than "White associates who were similarly situated to Mr. Cardwell in all material respects."  *Id.* ¶ 146.  With respect to both this allegation and his other

allegations about how he was treated differently than white associates, Cardwell states that those associates were "similarly situated to Mr. Cardwell in all material respects (including work performance)." *Id.* ¶ 506.  In support of that statement, he alleges that the "similarly-situated" associates were in his class, that they were "subject to the same performance evaluation and discipline standards," and that they "engaged in comparable conduct" as Cardwell.  *Id.* ¶ 508.  He also alleges that they "completed the same interview process as Mr. Cardwell, were hired based on the same standards and assessments as Mr. Cardwell, and had the same responsibilities." *Id.* ¶ 509. But Cardwell does not allege any specific facts regarding the associates' performance.

Instead of deals, Cardwell was staffed on "research-related assignments" that did not require his level of experience and assignments in which he "temporarily assist[ed]" in an ongoing matter. *Id.* ¶ 147.  Cardwell began to request work with five partners "who frequently ran M&A deals:" Reid, Defendant Harold Birnbaum—a corporate/M&A partner elected in July 2016—and "M&A partners Mr. Goldberg, Oliver Smith, and Lee Hochbaum." *Id.* ¶¶ 11, 151.  Cardwell made these requests each week from July 2016 through May 2017.  *Id.* ¶ 151.  But most of Cardwell's assignments "continued to be either non-deals or with the same handful of senior associates" with whom Cardwell had worked previously.  *Id.*

Cardwell was abruptly removed from a deal team in July 2016.  *Id.* ¶ 156–57.  That month, Cardwell was staffed on an M&A deal.  *Id.* ¶ 156.  Cardwell emailed Defendant Daniel Brass, then a senior M&A associate who was elected partner in July 2017 and who served as an M&A staffing partner at various times during Cardwell's tenue at the Firm, to inquire about what work he should do on the deal. *Id.* ¶¶ 12, 156.  Brass initially responded that a different senior associate would "reach out" to Cardwell.  *Id.* ¶ 156.  But hours later, Brass emailed again and told Cardwell that he should "stand down for now!"  *Id.*  Cardwell asked in response if Brass knew "if and when the status of the deal could change."  *Id.*  Brass replied that the deal team was "ok for the near future."  *Id.* Cardwell alleges that his "abrupt removal from the M&A deal was done in secret and without the

permission of Carolina Fenner, the staffing coordinator." *Id.* ¶ 157.  According to Cardwell, "[i]t is a practice at Davis Polk for senior associates to explain to junior associates" if a deal changes and how the change influences the junior associate's role in the deal.  *Id.*  So Cardwell alleges that Brass "willful[ly] and blatant[ly]" discriminated against him by removing him from the deal team without explanation, even when Cardwell asked follow-up questions and even when Brass "knew that it was a Davis Polk practice for senior associates to explain material changes to a junior associate's assigned role on a matter." *Id.* ¶¶ 158–59.  Cardwell never worked on a deal with Brass.  *Id.*

Cardwell emailed Fenner about his conversation with Brass to "alert[] her" to Brass's "unauthorized [and] disparate treatment" of Cardwell.  *Id.* ¶ 160.  Fenner acknowledged receipt of Cardwell's email but did not respond substantively.  *Id.*  About two weeks later, Cardwell again emailed Fenner to ask for an explanation of why he had been removed from the July 2016 deal team.  *Id.* ¶ 163.  Cardwell asked Fenner whether "anyone ha[d] made a decision to limit [his] involvement to certain types of deals and matters." *Id.*  Fenner called Cardwell in response and told him that no one had decided to limit the type of work he could be assigned.  *Id.* ¶ 165.  She also explained that she was "not sure what happened" when Brass removed him.  *Id.*  After Cardwell told her that Brass never explained his behavior, Fenner told Cardwell that Brass had replaced him with a white associate and said that Brass's behavior was "weird." *Id.*

Cardwell alleges that the white M&A associate who Brass replaced Cardwell with was "similarly situated in all material respects" to Cardwell, and that Cardwell's performance was "on par with or better than" the white associate who replaced him. *Id.* ¶¶ 166–67.  Cardwell alleges that his performance was not the reason that Brass replaced him with a white M&A associate.  *Id* ¶ 168. Brass did not ask Cardwell any questions that would have given Brass to ability to assess Cardwell's availability to work on the deal in a particular way or whether the white associate who replaced Cardwell was actually a better fit for the deal.  *Id.* ¶¶ 169–70.  The manner in which Brass replaced Cardwell—to not inform the staffing coordinator who had assigned him to the deal—was "in

violation of antidiscrimination protections that were part of the Firm's staffing policies." *Id.* ¶171. Cardwell states that his race "was a motivating factor in Mr. Brass's decision." *Id.* ¶ 173.

Brass was not the only partner who failed to give Cardwell work that would facilitate his development as an attorney. Cardwell alleges that Bick, Birnbaum, and Defendant Brian Wolfe[5] "ensured that Cardwell was unjustifiably underutilized and underdeveloped." *Id.* ¶ 174. "For more than five successive weeks in mid-2016," Cardwell "indicated on his weekly workload request/capacity that . . . more than half of his hours were available for new assignments." *Id.* But Cardwell continued to receive fewer assignments than his peers. *Id.* ¶ 175. Cardwell states that his race was a "motivating factor" in Bick, Birnbaum, and Wolfe's decisions to "impermissibly underutilize" Cardwell, and that none of the Firm's white M&A associates "who were similarly situated in all material respects" were "underutilized through staffing" the way that Cardwell was. *Id.* But Cardwell, again, does not allege any specific facts about those associates' work performance.

Even for the matters on which Cardwell was staffed, Cardwell alleges that the partners did not communicate with him. In August 2016, a white senior M&A associate instructed Cardwell to email M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis, attaching documents he had reviewed and edited. *Id.* ¶ 177. None of the partners responded to Cardwell's email. *Id.* The associate instructed Cardwell to follow up a few weeks later. *Id.* ¶ 178. Again, none of the partners responded to Cardwell's email. *Id.* Cardwell alleges that "even though it was clear from the email that" Cardwell had reviewed and edited the documents, Golden chose to reach out to the white senior associate and discuss his edits to the document. *Id.* ¶ 179. Two days later, Cardwell emailed Bason Jr. and Golden with further revisions. *Id.* ¶ 180. Yet again, neither partner communicated with Cardwell. *Id.* The white senior M&A associate commended Cardwell on the quality of his

---

[5] Wolfe is an M&A partner who was elected to the partnership in July 2015. *Id.* ¶ 13. He served as staffing partner at various times during Cardwell's tenure. *Id.*

work product and was allegedly "confus[ed]" that none of the M&A partners responded to Cardwell's email.  *Id.* ¶¶ 181–82.

Cardwell was again removed from a deal team in September 2016.  In August, Cardwell had been "staffed on an M&A deal with a senior M&A associate and Leonard Kreynin, a Davis Polk Corporate Partner."  *Id.* ¶ 176.  Cardwell alleges that this was "essentially the first and last M&A deal" that Cardwell was staffed on in 2016.  *Id.*  Cardwell alleges that Davis Polk "strategically used" Cardwell's non-deal assignments to justify removing him from the deal.  *Id.* ¶ 217.  In late September, the senior associate on the deal team removed Cardwell because Cardwell was busy on a different restructuring matter.  *Id.* ¶ 214.  Indeed, Cardwell billed 235 hours in September 2016, which is well above the Firm average.  *Id.* ¶¶ 214, 226 n.38.  The senior associate added that Cardwell should let him "know when [he] free[d] up" and that he "hope[d] things get more manageable soon."  *Id.* ¶ 214.

This restructuring matter allegedly did not help Cardwell develop as an M&A attorney.  A senior associate who had been staffed on the restructuring matter had previously complained to an M&A partner that the restructuring matter was unlikely to help her develop "deal" experience and that it might soak up "so much of her capacity that she'd effectively be prevented" from having adequate capacity to be staffed on a deal.  *Id.* ¶ 215.  Cardwell alleges that Reid, Wolfe, and Birnbaum's decision to pull him from the deal on September 29, 2016 and to not staff him on an M&A deal for the next eight months constituted "retaliation in response to Mr. Cardwell's September 9, 2016 discrimination complaint about staffing."  *Id.* ¶ 216.

Cardwell flagged perceived discrimination in his work assignments to a junior staffing coordinator, Rosio Clausen, on September 9, 2016.  In that month—shortly after Cardwell became a third-year associate—Clausen asked Cardwell if she could staff him on a "potentially lengthy" matter in the Firm's Finance group.  *Id.* ¶ 183.  Because it was in the Finance group, Cardwell believed that this assignment would not help him develop as an M&A attorney.  *Id.*  The assignment also would

not permit Cardwell to work directly with Davis Polk partners from any practice group and did not require Cardwell's level of experience. *Id.* Indeed, Clausen asked if Cardwell could assist with a list of "one-off tasks" that are "routinely assigned" to first- and second-year associates. *Id.* Clausen explained that she was asking Cardwell to help with the assignment because the junior associates in the Finance group "were over capacity" and a few were "going on vacation." *Id.* ¶ 184. She also explained that she had contacted "a number of associates who[,]" like Cardwell, "had previously rotated through the Firm's Finance Group." *Id.* ¶ 186.

Cardwell responded that he would accept the assignment but was "concerned about [a] general pattern that exists across the legal profession and within Davis Polk." *Id.* ¶ 187 (emphasis omitted). This pattern he perceived was that white associates have "a resume with more experience and better quality work than Black associates of the same year." *Id.* Cardwell alleges that he "made it clear" that he was "not just talking about a general pattern in the legal profession," but that he was "talking about what he was observing and experiencing at Davis Polk." *Id.* ¶ 189. Cardwell explained that he was trying to maximize the time he spent on M&A work. *Id.* ¶ 187. And he explained that the potentially lengthy Finance assignment would inevitably mean that he had fewer opportunities to work with M&A attorneys. *Id.* Cardwell noted that he would be happy to work on any assignment, so long as the Firm guaranteed that its staffing decisions were not part of the same "pattern of discrimination." *Id.* ¶ 188.

Cardwell alleges that Clausen responded in a way that "made it clear to Mr. Cardwell that she understood that he just made a race-based discrimination complaint about what he had observed at Davis Polk" and that he thought "she was staffing him in a racially biased way." *Id.* ¶ 190. She responded by trying to reassure Cardwell that her attempt to staff him on the Finance assignment "had nothing to do with his race." *Id.* ¶ 191. In her attempt to convince Cardwell that his race had nothing to do with her trying to staff him on the Finance assignment, she told him the names of several other associates who she had asked to help with the Finance group and, similar to Cardwell,

whose assigned practice groups were not Finance.  *Id.* ¶ 192.  When Clausen attempted to explain the process that she used to staff associates and how that process was not impacted by race, Cardwell responded by "pointing her to specific racial dynamics related to way she was attempting and specific advantages that the process was conferring to the Firm's White associates, especially the Firm's White male associates."  *Id.* ¶ 193–94.  Cardwell pointed out that every name that she listed "belongs to a person of color or someone who isn't a White man."  *Id.* ¶ 195.  Clausen responded, "No, I didn't notice that.  Wait.  That can't be true, because I've also asked [PERSON A] and [PERSON B]."  *Id.* ¶ 196.  Clausen realized that she "had just named two more Davis Polk associates who were people of color," and told Cardwell, "I get your point.'"  *Id.* ¶ 197.

Clausen decided not to staff Cardwell on the assignment in the Finance group.  *Id.* ¶ 199.  She "did not arrange or coordinate any new assignments for" Cardwell after this conversation.  *Id.* ¶ 200.  Cardwell alleges that Clausen failed to staff him on new matters because she understood that Cardwell had "raised a race-based discrimination complaint."  *Id.* ¶ 202.  Cardwell alleges that during August and September of 2016, Clausen worked with Bick, Wolfe, and Birnbaum to determine which M&A associates she could staff on Finance matters, and that Bick, Wolfe, and Birnbaum did not ask or give Clausen permission to staff any of the white M&A associates "who were similarly situated in all material respects" to Cardwell on any Finance matters the way Cardwell was.  *Id.* ¶¶ 203–04.

Bick, Wolfe, and Birnbaum were informed of Cardwell's September 2016 complaint shortly after Cardwell's conversation with Clausen.  *Id.* ¶ 209.  Recall that the M&A partners met periodically to discuss the M&A associates.  Cardwell alleges that such a meeting took place at the end of September or beginning of October.  At the meeting, the partners discussed "Mr. Cardwell and the other M&A associates' professional development, performance, and performance reviews, and the partners' Consensus Feedback" for those associates.  *Id.* ¶ 210.  Cardwell alleges that Reid and the M&A partners discussed Cardwell's September 9, 2016 discrimination complaint during that

meeting, and that accordingly, all of the M&A partners—including Bick, John Butler,[6] Birnbaum, Kreynin, and Wolfe—knew about Cardwell's September 2016 discrimination complaint.  *Id.* ¶¶ 211–12.

### e. Cardwell's billable hours decline precipitously.

Wolfe and Birnbaum were responsible for staffing mid-level and senior associates because they were the two most junior M&A partners.  *Id.* ¶¶ 218.  So they were responsible for staffing Cardwell after he became a third-year associate in September 2016.  *Id.*  In their capacity as staffing partners, Wolfe and Birnbaum reviewed M&A associates' weekly workload request/capacity forms, including Cardwell's.  *Id.*  Davis Polk also has software to track associates' billable hours.  *Id.*  So Cardwell alleges that Wolfe and Birnbaum "had direct knowledge of" Cardwell's "availability."  *Id.* But Wolfe and Birnbaum allegedly did not staff Cardwell on any new matters.  *Id.* ¶ 219.  Cardwell's billable hours fell sharply beginning in October 2016.  He billed 146 hours in July, 161 hours in August, and 235 hours in September 2016.  *Id.* ¶ 226.  But Cardwell billed 113 hours in October, 69 hours in November, and 14 hours in December 2016.  *Id.*

On December 5, 2016, Cardwell "raised questions concerning legal compliance and professional ethics about the Firm's representation" of a for-profit prison and immigration detention company.  *Id.* ¶ 249.  He asked Carey Dunne, then a Davis Polk partner, whether the firm "would consider ending its relationship" with the company.  *Id.* ¶ 251.  Cardwell alleges that this email "triggered a Firm policy that expressly prohibited any form of retaliation against any individual who raises any question concerning legal compliance or professional ethics in good faith."  *Id.* ¶ 253. After he made this inquiry, Bick, Birnbaum, Wolfe, and Davis Polk "did not staff Mr. Cardwell on any billable assignment for the next four months."  *Id.* ¶ 257.

---

[6] Butler was also a "[c]orporate/M&A partner at Davis Polk."  *Id.* ¶ 14.

On December 20, 2016, Kreynin conducted Cardwell's annual face-to-face review.  *Id.* ¶ 244.
Kreynin noted a "few criticisms" in his written performance reviews.  *Id.* ¶ 245.  But Cardwell alleges
that he told Kreynin that these contradicted the "real-time feedback" he had received.  *Id.*  Cardwell
"asked for specific examples."  *Id.*  Kreynin noted that Cardwell made a "drafting mistake" by
misspelling "an entity's name that was spelled" similarly "to another entity" in the same documents.
*Id.*  Cardwell requested that Kreynin follow up with other specific examples, but he never did so.  *Id.*
¶ 246.  Despite these critiques, Kreynin made comments that indicated that he believed that
Cardwell was performing in line with the Firm's expectations.  *Id.* ¶ 247.  Cardwell alleges that these
comments signaled that Kreynin believed that Cardwell could contribute to deals that are "the core
of Davis Polk's mid-level and senior associate M&A deal flow."  *Id.*  Kreynin allegedly told Cardwell
that "[i]t would be good if [he] were the lead attorney at the beginning of a deal that involved a stock
purchase agreement."  *Id.*  Kreynin did not suggest that Cardwell was subject to a "performance-
related probation period" during the review.  *Id.* ¶ 247 n.41.

Cardwell's billable hours fell to nearly zero in early 2017.  He billed only 2 hours in each of
January, February, and March 2017.  *Id.*  Virtually all those billable hours resulted from a staffing
assignment from an associate, not a partner.  *Id.* ¶ 227.  Cardwell alleges that Davis Polk associates
typically bill "between 133 and 175" hours per month.  *Id.* ¶ 226 n.38.  Cardwell also alleges that
Davis Polk's M&A group was "busy" during this period.  *Id.* ¶ 257.  And he allegedly "observed that
White associates who were similarly situated to Mr. Cardwell in all material respects" were staffed on
assignments "continuously."  *Id.* ¶ 261.  Wolfe and Birnbaum did not explain why they decided not
to staff Cardwell on any new matters.  *Id.* ¶ 219.  But they "routinely and consistently staffed and
communicated with White associates who were similarly situated to Mr. Cardwell in all material
respects" about their assignments.  *Id.*  Cardwell does not allege any facts about those associates'
work performance.

Cardwell alleges that the Firm's "revenue and profit structure" are "inextricably" linked to associates' billable hours. *Id.* ¶ 262. And billable hours are the "measuring stick" by which associates are evaluated for their partnership prospects. *Id.* For those reasons, Cardwell alleges that "it is not plausible that one of the Firm's only Black M&A associates could be staffed on zero assignments" and bill "virtually zero hours for months at a time" without attracting the notice of M&A and other Firm partners. *Id.* From January to March 2017, Cardwell "indicated on his weekly workload request/capacity forms that he had 100% availability to take on new assignments." *Id.* ¶ 263. Cardwell alleges that it is incredible that Defendants "merely overlooked" him for four to six months. *Id.* Thus, Cardwell alleges that Reid's, Bick's, Wolfe's, Birnbaum's, and Davis Polk's decisions to "cease assigning work" to Cardwell were "intentional[]" and "motivated" by discriminatory and retaliatory animus. *Id.*

Cardwell alleges that Davis Polk, Bick, Birnbaum, and Wolfe "knowingly departed from the Firm's normal staffing process" to "eliminate[] Mr. Cardwell's billable hours in ways that did not happen to any White associates who were similarly situated in all material respects to Mr. Cardwell." *Id.* ¶ 220. They allegedly did this "to pretextually obfuscate[]" their discriminatory and retaliatory animus. *Id.* ¶ 221. Cardwell alleges that Bick exerted control over his staffing and assessments following the "sham review" in June 2016. *Id.* ¶ 222. Bick, Birnbaum, and Wolfe did not speak with Cardwell about staffing opportunities from September 2016 through March 2017 and did not staff him on any matters, even though Cardwell indicated that he had capacity to take on more work. *Id.* ¶ 223. Birnbaum did not email Cardwell directly for 443 days. *Id.* ¶ 224. Wolfe did not email Cardwell directly for 628 days. *Id.* ¶ 225. And Bick did not email Cardwell directly for 292 days. *Id.* ¶ 226.

Cardwell alleges that Defendants took "strategic steps" to short-circuit his career. *Id.* ¶ 228. Cardwell alleges that his work performance and his performance reviews cannot explain Reid, Bick, Birnbaum, and Wolfe's decisions to cease communicating with him and assigning him work. *Id.*

¶ 229.  Cardwell alleges that if the Firm "conclud[es] that an associate is performing poorly[,]" it "is standard practice" for the Firm to "document associates' poor performance."  *Id.* ¶ 244 n.40.  This documentation includes any warnings issued and "written communications" about "the Firm's conclusions and corrective plan of action."  *Id.*  Cardwell alleges that Davis Polk did not document his negative performance because no one at the Firm sincerely concluded that he was a "poor performer."  *Id.*  While Cardwell acknowledges mistakes, he alleges that these mistakes are not "fundamentally different" from the mistakes made by a typical Davis Polk associate of Cardwell's seniority.  *Id.*

Because he was the only Black male associate in his class, the Firm expected him to make extraordinary contributions to the Firm's recruiting efforts.  Cardwell's 2015 annual Summary Review stated that he "went above and beyond" when assisting with the Firm's recruiting and summer program.  *Id.* ¶ 237.  Cardwell's 2016 annual Summary Review likewise "commend[ed]" Cardwell for his pro bono/recruiting efforts.  *Id.*  And Cardwell joined the Davis Polk Black Attorney Group's Steering Committee in the winter of 2016.  *Id.* ¶ 236.  Cardwell alleges that the Firm expected him to do this extra work, which "created additional time constraints and responsibilities" for him.  *Id.* ¶ 237.

In January 2017, Clausen emailed Cardwell that Bick and Butler were his new "Career Advisors."  *Id.* ¶¶ 14, 267.  Bick and Butler were cc'd on the email.  *Id.* ¶ 267.  Bick and Butler had been assigned through "the Firm's corporate department's Career Advisor program."  *Id.*  As the Firm described the program, advisors were "encouraged to work with their advisees to foster direct involvement with skill building" and to "include their advisees on pitches, client service team discussions, and general conversations about the firm's business goals."  *Id.* ¶ 269 (emphasis omitted).  Advisors were also "expected to maintain a dialogue with" their advisees during the advisee's tenure at the Firm.  *Id.*  Cardwell alleges that Bick and Butler's assignment as his "Career Advisor" permitted them and the "other defendants to create a roadblock between" Cardwell and

other Davis Polk partners who would have treated him as white associates who were similarly situated to Cardwell. *Id.* ¶ 268. Cardwell does not elaborate on what this "roadblock" was or how it functioned.

Cardwell replied to Clausen's email—with Bick and Butler still cc'd—that he "look[ed] forward to learning how the Career Advisor Program will supplement experiences and conversations" that Cardwell had in the past with "managing partners, assignments coordinators, [Black Attorney's Group] meeting participants, etc." about "DPW interactions, opportunity/assignments, and career development." *Id.* ¶ 271 (emphasis omitted). Cardwell alleges that this email "directly refers to" discrimination that Cardwell "experienced and complained about to . . . multiple Davis Polk partners at the September 2015 Black Attorney's [G]roup meeting[,]" to Reid in January 2016, and to Clausen in September 2016. *Id.* ¶ 272.

Neither Bick nor Butler ever spoke to Cardwell about his career prospects. *Id.* ¶ 273. Even after Bick became Cardwell's Career Advisor, Bick "routinely walk[ed] by" Cardwell "in the hallway without speaking or even acknowledging [his] presence." *Id.* ¶ 275. Cardwell allegedly "observed" that Bick treated white associates who he broadly alleges to have been similarly situated to him in all material respects differently. *Id.*

Cardwell alleges that Defendants hid that they were treating him "unlawful[ly]" from Davis Polk's diversity and inclusion leadership. *Id.* ¶ 276. If Cardwell had actually been performing so poorly that the Firm was unable to staff him on any assignments, he alleges that a "a member of Davis Polk's Diversity Committee" would have contacted Cardwell to discuss his "performance and work product." *Id.* But no member of "Davis Polk's official (and unofficial) Diversity Committee"[7] reached out to Cardwell in 2017. *Id.* ¶¶ 277–78.

---

[7] Cardwell does not explain what the Firm's "unofficial" Diversity Committee is.

On March 3, 2017, Cardwell emailed Sharon Katz, Davis Polk's Special Counsel for Pro Bono, to once again "raise[] the issue of the Firm's relationship with a private for-profit prison and immigrant detention company" that allegedly discriminated against "Blacks and other marginalized groups." *Id.* ¶ 286. Cardwell alleges that this complaint also triggered the Davis Polk-specific anti-retaliation policy. *Id.* ¶ 288. Katz requested that Cardwell meet with her and Reid. *Id.* ¶ 287.

On March 6, 2017, prior to the meeting with Katz and Reid, Reid or Bick allegedly "accessed and revised (or authorized the access and revision of)" Cardwell's performance reviews "in a way that led the Consensus Feedback Statement for 2014, 2015, and June 2016 to all bear a March 6, 2017 timestamp at the bottom of the documents." *Id.* ¶ 288–89. Reid and Bick allegedly "began thinking about how to (and actually started to) manipulate Mr. Cardwell's written performance reviews and the Consensus Feedback Statements that were created or would be created for Mr. Cardwell." *Id.* ¶ 290.

During the meeting, Reid "verbal[ly] commit[ted] that the Firm would no longer represent the private prison and immigrant detention client." *Id.* ¶ 291. At the end of the "meeting—and without any prior discussion" of Cardwell's workload—Reid also "conceded" that Cardwell's "prior and current workloads were low," and that this was "not [Cardwell's] fault." *Id.* ¶ 292. Reid acknowledged that the Firm and the M&A group "needed" to "fix[]" this problem. *Id.* Cardwell alleges that "Mr. Reid read Mr. Cardwell's performance reviews prior to meeting with [him]." *Id.* ¶ 293. He further alleges that his performance reviews as of March 9, 2017 "did not include any conclusions that could have led Mr. Reid or any other partner to think that Mr. Cardwell's performance was the reason he was not being staffed." *Id.* ¶ 295. Cardwell alleges that Reid described Cardwell's staffing issues as not Cardwell's fault because Reid knew that "the Davis Polk M&A partners[] were already working together to not staff Mr. Cardwell on any assignments because of Mr. Cardwell's September 2016 and December 5, 2016 complaints." *Id.* ¶ 296. Cardwell further alleges that Reid knew that Bick "was the main person at fault" for Cardwell's billable hours

being eliminated and that Bick "had been applying a retaliatory policy" to Cardwell going all the way back to when Bick, Reid, and the Firm "had created a sham performance review cycle in June 2016" for Cardwell. *Id.* ¶ 297.

Cardwell also alleges that his race was a motivating factor in Bick, Wolfe, and Birnbaum's decision to eliminate his billable hours and not staff him on any matters between September 2016 and March 2017, and that they did not eliminate the billable hours of or stop staffing any white M&A associates in Cardwell's class. *Id.* ¶¶ 298–300. Even after the meeting with Reid, Cardwell still was not staffed on any matters. *Id.* ¶ 301.

> ### f. Cardwell expresses concern about his workload to firm management, and Reid threatens to take Cardwell "out of the game" and "off the field."

Cardwell was concerned about his lack of work assignments, so he tried to access his written performance reviews. On March 21, 2017, two weeks after the meeting with Reid and Katz, Cardwell emailed DeSantis, the Director of Associate Development, and asked to "review his personnel 'file and all of the performance reviews that he had received to date.'" *Id.* ¶ 302 (brackets omitted). DeSantis said that she would look into his request, and "almost certainly asked Mr. Reid or Mr. Bick (or both) if Cardwell could view his performance reviews. *Id.* ¶ 303. DeSantis declined Cardwell's request. *Id.* ¶ 304. But she arranged a meeting between Cardwell, Reid, and Kreyin. *Id.* Cardwell asked if "the Firm's policy or practice" prohibited "attorneys from reviewing their performance reviews." *Id.* DeSantis responded "that it was both 'a policy and practice'" to prohibit associates from accessing their written performance reviews. *Id.* Cardwell alleges that "at the time, the Firm's Lawyer's Handbook" did not state that Davis Polk had such a policy or practice. *Id.*

After DeSantis arranged the meeting, Cardwell renewed his request to review his performance reviews. *Id.* ¶ 305. Cardwell explained that he would be "the only person in the meeting who hasn't had a chance to review [his] file" and that he thought "the conversation [would] be much more productive" if he had an opportunity to read his performance reviews before the

meeting. *Id.* Again, DeSantis rejected Cardwell's request. *Id.* ¶ 306. Cardwell alleges that this refusal "was alarming" because Reid and other Firm partners "were aware (and previously acknowledged) that the Firm's performance-related assessments and reviews often contained evidence of racial bias and disparate treatment." *Id.* ¶ 308. Cardwell alleges that his race "was a motivating factor in Davis Polk's, Mr. Reid's, and Mr. Bick's refusal to allow Mr. Cardwell to review his performance reviews." *Id.* ¶ 309.

Cardwell alleges that "[a]ccording to the dates that appear on Mr. Kreynin's March 2017 Consensus Feedback Statement for Mr. Cardwell," Kreynin "did not submit his Consensus Feedback Statement to the Firm's records department" until "almost 100 days after Mr. Kreynin met and delivered Mr. Cardwell's face-to-face review on December 20, 2016 and just one day before Mr. Cardwell met with Mr. Reid and Mr. Kreynin." *Id.* ¶ 311. Cardwell alleges that Kreynin's March 2017 Consensus Feedback Statement "incorporated comments and guidance from Mr. Reid and Mr. Bick that were not based on Mr. Cardwell's performance but rather Mr. Reid and Mr. Bick's desire to protect the Firm from any liability that might result if Mr. Cardwell continued to pursue or communicate his legally-protected complaint," including "complaints of discrimination." *Id.* ¶ 312. Cardwell alleges that Kreynin's "late-submitted Consensus March 2017 Feedback Statement" included "a falsehood that does not reflect what was actually said or discussed" with Cardwell during the December 2016 face-to-face annual review. *Id.* ¶ 313. The feedback statement claimed that the December 2016 meeting concluded with Kreynin "saying that we plan to meet again in June 2017 to discuss whether there have been improvements in these areas. *Id.* ¶ 314. But, according to Cardwell, Kreynin never discussed or communicated this to Cardwell. *Id.*

On March 29, 2017, Cardwell met with Reid and Kreynin. *Id.* ¶ 316. Cardwell alleges that prior to the meeting, Reid met with Bick and "possibly other M&A partners" to discuss Cardwell's performance and reviews. *Id.* ¶ 315. Reid again allegedly took responsibility for Cardwell's "dearth of work assignments" and conceded that "the Firm had 'dropped the ball' and made mistakes." *Id.*

¶ 316.  Reid and Kreynin told Cardwell that his "performance reviews described [him] as engaged, hardworking, and enthusiastic."  *Id.* ¶ 325 n.54.  Neither identified the "quality of work" as the reason that the Firm stopped staffing Cardwell on deals or giving him assignments.  *Id.* ¶ 329.  Nor did they tell Cardwell that his performance reviews "indicated that he was 'behind' his peers."  *Id.*

Reid encouraged Cardwell to "let the past be the past" and focus on the future.  *Id.* ¶ 316.  Cardwell asked Reid "to explain how multiple staffing partners and other partners [had] 'dropped the ball'" for almost six months.  *Id.*  Reid responded that it "wouldn't be helpful to discuss the past."  *Id.*  Cardwell asked Reid and Kreynin "if they thought it was unreasonable for" Cardwell to ask "who 'dropped the ball'" and how precisely it had been dropped.  *Id.*  Reid replied that the Firm wouldn't "answer those questions."  *Id.*  Cardwell asked Reid if he would arrange a meeting with Bick so that Bick could help ascertain how the Firm "'dropped the ball' and how it was possible that" Bick "didn't know that Cardwell wasn't receiving any assignments."  *Id.*  Reid told Cardwell that the Firm would not "allow" Cardwell and Bick "to discuss the past."  *Id.*  Reid also told Cardwell that it was "not like [his] career has been destroyed."  *Id.*

Cardwell allegedly told Reid and Kreynin that "racial biases were influencing performance evaluations."  *Id.* ¶ 317.  Cardwell said that the Firm's diversity and inclusion consultants had noted that "the Firm's performance reviews were likely to reflect racial biases."  *Id.* ¶ 319.  Reid again allegedly told Cardwell that the Firm would not "discuss[] or investigat[e]" Cardwell's "complaints or experiences."  *Id.* ¶ 320.  Cardwell alleges that Reid understood that he was raising "a discrimination complaint."  *Id.*  Reid allegedly refused to investigate the role of racial bias in Cardwell's reviews to retaliate against him for raising "legally protected complaints."  *Id.*

Reid said that if Cardwell "let the past be the past," the Firm would offer Cardwell "unprecedented opportunities 'unlike anything that had ever been done.'"  *Id.* ¶ 321 (brackets omitted).  Cardwell alleges that this statement reflected that Reid "had enormous influence" to decide how Cardwell was staffed and assessed.  *Id.*  Cardwell alleges that Reid "communicat[ed]

Davis Polk's ultimatum[:]"  Cardwell could either continue to pursue his career at the Firm or "seek the truth and a lawful response to" the Firm's illegal discrimination.  *Id.*  Cardwell responded that he would not "have confidence" in a future plan unless Reid and the Firm shared details about how the "'ball was dropped' over the last six months."  *Id.* ¶ 323.

Reid told Cardwell that if he continued to demand that the firm investigate his complaints, he "would be 'out of the game' and 'off the field.'"  *Id.* ¶ 324.  Cardwell alleges that this comment showed that Reid was empowered to take him "out of the game" and "off the field."  *Id.*  Reid's comments allegedly "revealed" that if Cardwell continued to complain about discrimination, Reid and the other defendants would "exert" their "influence" over Cardwell's "employment status and career."  *Id.*

Shortly after Reid "threat[ened]" Cardwell, he "insist[ed]" that Cardwell "take a few days" to "think things over."  *Id.* ¶ 325.  Cardwell responded that he "wasn't sure what he was supposed to think over."  *Id.*  Cardwell "explained that he had never rejected any assignments" or otherwise been a "distraction."  *Id.*  Reid and Kreynin allegedly accepted Cardwell's "description of when and how" he "accepted assignments."  *Id.*  Reid again encouraged Cardwell to "take some time and just think about things" and said that "they could have a follow-up conversation in a few days."  *Id.*  Cardwell alleges that Reid intended his threat to halt Cardwell's complaints and his "reasonable search for answers."  *Id.* ¶ 326.

Cardwell alleges that during this March 29, 2017 meeting with Reid and Kreynin, he "put them and Davis Polk on notice that he was opposing discrimination in the Firm's performance review process."  *Id.* ¶ 332.  Cardwell alleges that shortly after this meeting, in April 2017, Reid or Kreynin met with the Firm's M&A partners and discussed the meeting they had with Cardwell and the discrimination complaints that Cardwell made during the meeting and that as of April 2017, all of the M&A partners, including Bick, Wolfe, Butler, and Birnbaum, "had knowledge that Cardwell

opposed discrimination in Davis Polk's performance review policies and in connection with some of the Firm's M&A partners.  *Id.* ¶¶ 333–34.

After the meeting, Kreynin told Cardwell that "he had no idea" Cardwell "wasn't receiving any assignments."  *Id.* ¶ 330.  And Kreynin said that "had he known that" Cardwell "wasn't being assigned work," he would have staffed Cardwell "on his matters."  *Id.*

Two days after the meeting, Cardwell emailed Reid and accepted his offer to "take as much time as" Cardwell "'needed' to regroup."  *Id.* ¶ 331 (brackets omitted).  Cardwell requested that Reid allow him "to use his unused vacation time, which totaled four weeks."  *Id.*  Reid "approved the request the same day."  *Id.*

### g.  Cardwell still does not receive work assignments.

Cardwell returned to the Firm in early May 2017.  *Id.* ¶ 335.  Cardwell alleges that the Firm had not implemented a "concrete plan" to staff him on deals or to address the issues discussed in Cardwell's meeting with Reid and Kreynin.  *Id.*

Bick met Cardwell the day he returned.  *Id.* ¶ 336.  Bick told Cardwell that he would "walk the halls and talk to partners to see what tasks [Cardwell] could be staffed on."  *Id.* (emphasis omitted).  Cardwell alleges that white associates who were similarly situated to Cardwell were staffed on deals and matters without Bick having to "walk the halls and talk to partners."  *Id.*  Bick did not explain why he proposed to deviate from the Firm's normal protocol for staffing associates, or why that system was "sufficient for White associates who were similarly situated in all material respects but not Mr. Cardwell."  *Id.*  Bick told Cardwell that "no one at the Firm" would "actively monitor" his hours.  *Id.* ¶ 338.  During this meeting, Bick did not suggest that Cardwell's "assignment history" was related to his prior performance.  *Id.* ¶ 339.

The day after he returned, the Firm staffed Cardwell on an assignment for the first time in months.  *Id.* ¶ 340.  The assignment was a "legal research memo" that required little "substantive corporate experience or knowledge."  *Id.*  Louis Goldberg, an M&A partner, oversaw the memo.  *Id.*

Goldberg told Cardwell that the assignment was not "time sensitive" and that Cardwell need not complete a first draft for "two or three weeks."  *Id.*

Almost three weeks later, Bick allegedly informed Cardwell that the Firm would not staff him on another assignment until he completed the memo.  *Id.* ¶ 341.  Cardwell responded that the memo did not "require[] 100% of his capacity" and that the deadline for the first draft "was still a few days away."  *Id.*  Cardwell told Bick that he was unaware that he wouldn't receive another assignment until he completed the memo because associates are not typically staffed on one assignment at a time.  *Id.*  Bick told Cardwell that he had not "ask[ed] the right questions" about the assignment.  *Id.*  All of Cardwell's billable hours in May 2017 were related to this memo.  *Id.* ¶ 343.

Cardwell alleges that his health began to deteriorate because of his experiences at the Firm. A few days after Cardwell met with Bick, Cardwell emailed Goldberg that he was out of the office. *Id.* ¶ 344.  Cardwell explained that he was feeling "ill" because of his experience at Davis Polk.  *Id.* Goldberg then scheduled a meeting for the next day between Goldberg, Cardwell, and the Firm's Executive Director.  *Id.* ¶ 345.  During that meeting, Goldberg told Cardwell that he didn't know that Cardwell had requested an opportunity "to work with him on his weekly workload request/capacity form."  *Id.* ¶ 346.  Goldberg assured Cardwell that the memo was not "a test" of whether Cardwell could handle more rigorous assignments.  *Id.*  Both Goldberg and the Executive Director told Cardwell that they weren't aware of how Cardwell had been previously staffed.  *Id.* ¶¶ 346–47.  When the Executive Director asked, Cardwell said that Reid, Bick, Birnbaum, and Wolfe were "primarily responsible" for staffing him.  *Id.* ¶ 349.  The Executive Director said she would reach out to these partners.  *Id.*  Cardwell alleges that the Executive Director understood that he was again lodging a complaint about racial discrimination at the Firm.  *Id.* ¶ 350.  But the Executive Director never followed up with Cardwell "about his staffing history, performance, or experience at Davis Polk."  *Id.* ¶ 351.  Cardwell alleges that this meeting was the eighth time he complained about racial discrimination at the Firm.  *Id.* ¶ 348.

Bick was allegedly "demoted and replaced as practice group leader" of M&A "shortly after" Cardwell asked the Executive Director and Goldberg to ask Reid, Bick, Birnbaum, and Wolfe to investigate his staffing history. *Id.* ¶ 352. Cardwell alleges that this was because "someone at Davis Polk" determined that Bick had unlawfully discriminated against Cardwell. *Id.*

### h. Cardwell files a charge of discrimination with the EEOC, and he begins to receive negative performance evaluations.

One day after his meeting with Goldberg and the Executive Director, Davis Polk "received notice" that Cardwell had engaged counsel. *Id.* ¶ 353. After Cardwell's newly retained counsel contacted Davis Polk, the Firm staffed Cardwell on his first M&A deal in over eight months. *Id.* Cardwell alleges that Davis Polk partners treated Cardwell "as if they were strategically trying to frustrate him or get him to assume blame for things that were not incorrect, his fault, or under his control" from late March through the rest of 2017. *Id.* ¶ 355.

In June 2017, Cardwell "informed the Firm" that he was experiencing "health complications" because of the treatment he experienced at the Firm. *Id.* ¶ 356. In July, Brass replaced Wolfe as staffing coordinator for the M&A group. *Id.* ¶ 357.

In early August 2017, Cardwell filed a claim with the Equal Employment Opportunity Commission (the "EEOC Charge"). *Id.* ¶ 358. Cardwell alleged that "the Firm ha[d] discriminated against [him] because of [his] race and ha[d] retaliated against [him] because" he had complained about racial discrimination. *Id.* The EEOC Charge named Reid, Bick, Birnbaum, Butler, and Brass as defendants. *Id.* ¶ 358 n.59. In December 2017, Davis Polk filed an Answer and Position Statement with the NYSDHR in response to the EEOC Charge. *Id.* ¶ 359. Cardwell's attorneys requested an extension to January 2018 to file a rebuttal to the Answer and Position Statement. *Id.* ¶ 363. After Davis Polk learned that Cardwell received an extension, Cardwell alleges that it "strategically rescheduled" Cardwell's "annual face-to-face review" to the day after the rebuttal was due. *Id.*

Cardwell alleges that he received his first negative performance review in January 2018. Cardwell alleges that at the start of the meeting, Smith, another M&A partner, told Cardwell that the M&A group was switching to a new system where the same partner would give everyone reviews for each class in order to "have more consistency" in the delivery of the feedback.  *Id.* ¶ 360.  Cardwell alleges that Davis Polk "decided its review system needed to be more 'consistent' in part because Davis Polk's performance review system was not consistently applied to associates and because their performance review system was having a disparate impact" on Cardwell and other associates of color.  *Id.* ¶ 361.

The January 11, 2018 "Consensus Feedback" that was delivered to Cardwell was partially based on written performance reviews that were submitted by M&A partners Lee Hochbaum (on September 19, 2017), Phillip Mills (on October 2, 2017), Goldberg (on October 6, 2017), and John Amorosi (on October 9, 2017).  *Id.* ¶ 366.  Cardwell alleges that each of those partners had knowledge of Cardwell's August 3, 2017 EEOC complaint.  *Id.* ¶ 367.  They each rated Cardwell as "behind" his class.  *Id.* ¶368.  Cardwell alleges that was "in response to Mr. Cardwell's August 3, 2017 EEOC complaint and for the purpose of completely eliminating Mr. Cardwell's billable hours and terminating his employment."  *Id.* ¶ 369.

At the review, two Davis Polk partners gave Cardwell the first negative performance evaluation he had received at Davis Polk.  *Id.* ¶ 370.  Cardwell alleges that Reid and all of Davis Polk's M&A partners, including Bick, Wolfe, Birnbaum, Butler, and Brass, "were responsible for and contributed to the negative performance evaluation that Cardwell received on January 11, 2018."  *Id.* ¶ 371.  Cardwell alleges that his race was a motivating factor in the January 11, 2018 Consensus Feedback and that Reid, Bick, Wolfe, Birnbaum, Butler, and Brass discussed, created, and had Goldberg and Smith deliver the feedback to Cardwell.  *Id.* ¶ 372.

The negative evaluation allegedly contradicted "real-time feedback" that Davis Polk partners, including Goldberg, had given Cardwell during 2017.  *Id.* ¶ 374.  The partners told Cardwell that

"staffing him would be 'challenging'" going forward.  *Id.* ¶ 375.  Cardwell alleges that Goldberg and Smith "could not tell Mr. Cardwell the truth, which was that it would be 'challenging' staffing Mr. Cardwell because the M&A partners had recently met as a group and had already signaled to Mr. Goldberg and Mr. Smith that they were not going to work with Mr. Cardwell in light of the EEOC complaint that he filed."  *Id.* ¶ 376.  Cardwell alleges that as of this time, "all of Davis Polk's White M&A associates, including those who were similarly situated to Mr. Cardwell in all material respects (including work performance), were being treated more favorably than Mr. Cardwell."  *Id.* ¶ 378. Beyond that statement, he does not allege any specific facts about those associates' work performance.

Cardwell asked for examples of when someone at the Firm had "communicated" that his work was "poor" or that he was behind his class.  *Id.* ¶ 379.  Neither partner did so.  *Id.*  Indeed, one of the partners with whom Cardwell had worked directly "acknowledged" that no M&A partner had given Cardwell "negative feedback" while Cardwell had been working on assignments that were part of the review period.  *Id.* ¶ 380.  Cardwell noted that it was jarring to receive these criticisms because he had never received negative feedback in real time.  *Id.* ¶ 381.  Cardwell also discussed how "implicit bias" and other biases might have affected the "timing and accuracy of the feedback" he received.  *Id.* ¶ 382.  Cardwell explained that he asked for specific examples because "he and other Black attorneys at the Firm" had flagged this discrepancy "multiple times" during his career at the Firm.  *Id.* ¶ 384.  Cardwell alleges that Smith "looked stressed and uncomfortable" throughout the meeting and "attempted to distance himself from the actual reviews by stating he was just or merely 'reading the reviews.'"  *Id.* ¶ 385.  Later in the meeting, Smith "acted as if he were confused by how the written performance review and Mr. Goldberg's statements about the quality of Mr. Cardwell's work did not match Mr. Cardwell's responses."  *Id.* ¶ 386.

Cardwell asked what the "Firm's approach to staffing [him]" was.  *Id.* ¶ 388.  One of the partners responded that "the Firm was trying to figure out what [Cardwell] could be staffed on."  *Id.*

Cardwell asked if the partner meant that the Firm wasn't "able to staff [him] on any matters." *Id.*
The other partner responded that Cardwell might need to be "flexible" in the "type of matters he
would be staffed on going forward." *Id.* ¶ 389.  One of the partners asked Cardwell what he
preferred to be staffed on so that he would relay those preferences to the M&A staffing partners.  *Id.*
Cardwell responded that he hoped the Firm would staff him "appropriately" and that he was not
requesting that the Firm staff him based on his "expectations." *Id.* ¶ 390.  Cardwell alleges that this
was the first time anyone at Davis Polk told him that his work was poor or that he was "behind"
associates in his class year.  *Id.* ¶ 391.

Cardwell alleges that the 2017 performance reviews delivered at the January 2018 meeting
were "not legitimate."  He alleges that Smith "completely distanced himself from the M&A partners'
2017 written performance reviews" for Cardwell and "refused to include any substantive
information on the Consensus Feedback Statement that he created" for Cardwell.  *Id.* ¶ 394.  The
"Consensus Feedback Statement" Smith submitted for Cardwell in January 2018 was "effectively
blank." *Id.* ¶ 395.  Smith did not provide any information or answers for the following questions:
"Comments [i.e., performance reviews] received from;" "Substance of evaluation (including
reviewee's performance compared to expectations for a lawyer of the same seniority, strengths and
weaknesses in the reviewee's performance in the last 12 months, improvements, if any, from prior
year's review, etc.);" "Did the reviewee receive a commendation for his/her pro bono work or
recruiting efforts?;" "Comments from review regarding his or her evaluation or his or her
performance;" "Developmental priorities for next year (including types of matters, level of
responsibility, training, etc.)" *Id.* ¶ 396.  Cardwell alleges that Smith was concerned about the legality
of the reviews, and that as a result, he "refused to document any of the M&A partners' 2017 written
performance reviews or the Consensus Feedback they assigned him to document." *Id.* ¶¶ 397–98.
Cardwell alleges that Smith "chose not to summarize Mr. Cardwell's 2018 annual performance

review because he did not want to participate in Defendants' discrimination and retaliation against Mr. Cardwell." *Id.* ¶ 400.

Cardwell also alleges that some of his performance reviews were retroactively falsified after he filed his EEOC charge. Cardwell alleges that reviews that appear to have been created by Sophia Hudson in June 2016 and September 2016 were actually created "at the direction and in coordination with Mr. Bick and Mr. Reid (or someone acting at their direction or approval), to "help Davis Polk terminate Mr. Cardwell's employment." *Id.* ¶ 446. Cardwell alleges that Hudson worked with Bick or Reid to complete her written performance reviews with knowledge that their intent was to "use her reviews to eliminate Mr. Cardwell's billable hours and to terminate Mr. Cardwell's employment." *Id.* ¶ 447. These "falsified performance reviews" "triggered Mr. Reid, Mr. Bick, Mr. Birnbaum, Mr. Wolfe, Mr. Butler, and Mr. Brass's ability to terminate Mr. Cardwell's employment." *Id.* ¶ 448. In support of this theory, Cardwell offers various facts that he alleges are circumstantial evidence that Hudson falsified the reviews.

### i. Cardwell is fired.

In February 2018, Davis Polk told Cardwell it intended to fire him. The Firm did not staff Cardwell on any matters between his face-to-face review in early January and February. *Id.* ¶ 392. In early February, Cardwell met with two M&A partners to "discuss the Firm's purported inability to staff" him. *Id.* ¶ 451. Goldberg opened the meeting by telling Cardwell:

> We've confirmed, as you can tell because you're not getting staffed, that the staffing has been very challenging and the reality is that the staffing situation is we don't think we can staff you at the level of seniority of where you are—in terms of your years. People think you're just not performing at the level where they can staff you at your level of seniority.

*Id.* ¶ 452. Goldberg confirmed that no Davis Polk M&A partner was willing to work with Cardwell. *Id.* ¶ 453. During that meeting, the partners informed Cardwell that the Firm intended to terminate his employment. *Id.* ¶ 455. The partners told Cardwell that the M&A partners had spoken with Bick, "gather[ed] [his] reviews," and "collectively decided 'as a group'" that staffing Cardwell was

"not a situation that's workable." *Id.* Davis Polk allegedly permitted "the same M&A partners who" Cardwell "accused of engaging in racial discrimination and retaliation" and who Cardwell "implicated" in his EEOC filing and other complaints to influence the Firm's decision to terminate his employment. *Id.* ¶ 465.

One of the M&A partners described Cardwell's departure as "not a good situation." *Id.* ¶ 476. The same partner stated that the partners had "a thousand percent confidence in your integrity" and there was "no issue" with Cardwell's "integrity or behavior." *Id.* The partner also acknowledged that the partners didn't "feel good about this" and that he "wish[ed]" that Cardwell had had a "better experience" with the Firm. *Id.* ¶ 477. He or she expressed regret that Cardwell's tenure was "ending this way." *Id.* And the partner noted that Cardwell might reasonably "resent" Davis Polk M&A partners. *Id.*

In April 2018, Cardwell filed a supplemental charge of discrimination against Davis Polk (the "Supplemental Charge" and together with the EEOC Charge, the "Charges"). *Id.* ¶ 486. Cardwell left the firm in August 2018. *Id.* ¶ 487. Cardwell received a right to sue letter from the EEOC in August 2019. *Id.* ¶ 16. The NYSDHR dismissed Cardwell's claim for "Administrative Convenience" in November 2019 and declined to reopen the matter in February 2020. *Id.*

### 2. Procedural History

Cardwell filed this lawsuit in November 2019. Dkt. No. 1. Cardwell amended his complaint in March 2020. First Amended Complaint (the "FAC"). The FAC had sixteen counts. FAC ¶¶ 313–79. Defendants moved to partially dismiss the FAC and filed a declaration in support in April 2020. Dkt Nos. 43–45. Defendants moved to dismiss all claims against the group they refer to as the "Additional Defendants"—that is, Chudd, Hudson, Birnbaum, Brass, Wolfe, and Butler.[8] Mem. in Supp. of Mot. to Dismiss, Dkt. No. 44, at 1. Defendants also moved to dismiss "all claims

---

[8] The Court adopts Defendants' nomenclature and also refers to that group of defendants as the Additional Defendants.

to the extent that they are barred by the relevant statutes of limitations," the "hostile work environment and harassment claims," and "the aiding and abetting claims under" section 1981 to the extent that Cardwell had attempted to allege any such claims. *Id.* On October 24, 2020 the Court granted in part and denied in part Defendants' partial motion to dismiss. The Court granted the motion with respect to Plaintiff's hostile work environment and harassment claims, discrimination and aiding and abetting claims against all of the Additional Defendants; and retaliation claims against Chudd, Hudson, and Brass. The Court did not dismiss Plaintiff's retaliation claims against Birnbaum, Wolfe, and Brass insofar as they related to Plaintiff's termination. Dkt. No. 78 (the "October Order"). Plaintiff was granted leave to replead his dismissed claims.

On November 18, 2020, Plaintiff filed a second amended complaint (the "Second Amended Complaint"). Dkt. No. 99. On February 5, 2021, Plaintiff filed a corrected version of his second amended complaint (the "Corrected Second Amended Complaint" or "SAC"). Dkt. No. 147. Plaintiff asserts twelve claims in the SAC. Counts one and two allege that Davis Polk discriminated and retaliated against Cardwell in violation of Title VII of the Civil Rights Act of 1964. SAC ¶¶ 588–95. Count three alleges that Defendants Davis Polk, Bick, Birnbaum, Brass, Reid, and Wolfe discriminated against Cardwell in violation of 42 U.S.C. § 1981(a). *Id.* ¶¶ 596–99. Count four alleges that all Defendants retaliated against Cardwell in violation of 42 U.S.C. § 1981(a). *Id.* ¶¶ 600–04. Count five alleges that Defendants Davis Polk, Bick, Birnbaum, Brass, Reid, and Wolfe discriminated against Cardwell in violation of the New York State Human Rights Law (the "NYSHRL") § 296(1)(a). *Id.* ¶¶ 605–08. Count six alleges that Reid and Bick aided and abetted Defendants' violations of section 296(1)(a) in violation of NYSHRL § 296(6). *Id.* ¶¶ 609–12. Count seven alleges that all Defendants retaliated against Cardwell in violation of NYSHRL § 296(1)(e). *Id.* ¶¶ 613–16. Count eight alleges that Reid and Bick aided and abetted Defendants' violations of section 296(1)(e) in violation of section 296(6). *Id.* ¶¶ 617–20. Count nine alleges that Davis Polk,

Reid, Bick, Birnbaum, Wolfe, and Brass discriminated against Cardwell in violation of New York City Human Rights Law (the "NYCHRL") § 8-107(1)(a).  *Id.* ¶¶ 621–24.  Count ten alleges that Reid, and Bick aided and abetted violations of section 8-107(1)(a) in violation of NYCHRL § 8-107(6).  *Id.* ¶¶ 625–28.  Count eleven alleges that all Defendants retaliated against Cardwell in violation of NYCHRL § 8-107(7).  *Id.* ¶¶ 629–31.  Count twelve alleges that Reid and Bick aided and abetted violations of section 8-107(7) in violation of section 8-107(6).  *Id.* ¶¶ 632–35.

Defendants moved to dismiss with prejudice all previously-dismissed claims against the Additional Defendants as well as the "the discrimination claims, to the extent plaintiff improperly amended those claims in violation of the October Order."  Dkt. No. 116, Defs.' Mem. of Law in Supp. of Their Partial Mot. to Dismiss ("Defs.' Mem") at 1.  Plaintiff opposed.  Dkt. No. 128, Pl.'s Mem. of Law in Opp'n to Defs.' Partial Mot. to Dismiss ("Pl.'s Opp'n").  Defendants replied.  Dkt. No. 140, Defs.' Reply Mem. of Law ("Defs.' Reply").

### B. Legal Standard

#### 1. Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor.  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when a plaintiff "pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 185 (2d Cir. 2012)). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ." *Twombly*, 550 U.S. at 556.

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### 2.  Consideration of Exhibits Attached to Defendants' Memoranda of Law

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). In that context, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch*, 952 F.3d at 75. "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint,

but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). As the Second Circuit recently reaffirmed in *Lynch*, "[i]t is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch*, 952 F.3d at 79 (citations omitted).

A court can also consider documents that are "integral to" the complaint. In order for a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects. *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effects, thereby rendering the document integral to the complaint.") (internal quotation marks and citation omitted). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.*

Here, Defendants have attached several documents to their motion to dismiss that were not included in the SAC. Exhibit 1 consists of a performance review of Cardwell by Sophia Hudson; Exhibit 2 consists of a summary review of Cardwell's performance reviews prepared by Bick; Exhibit 3 consists of another performance review by Hudson; and Exhibit 4 consist of metadata extracted from the Davis Polk Lawyer Review System corresponding to Cardwell's performance reviews. Dkt. No. 117, Decl. of Susanna Buergel in Supp. of Defs.' Mot to Dismiss. The Court has

not considered the documents attached to Defendants' declaration. These documents are neither attached to the SAC nor incorporated by reference. Although Cardwell mentions each of these review documents and the meetings during which the reviews were delivered, Cardwell does not rely heavily on their terms or effects, and the Court cannot conclude that they are integral to the amended complaint. Moreover, the documents that Defendants attached as exhibits are not "written instruments" and do not define rights, duties, or liabilities. So the Court has not considered those exhibits in deciding this motion.

### C. Discussion

#### 1. Discrimination Claims Against Birnbaum, Wolfe, & Brass

##### a. Legal Standard

Defendants move to dismiss Cardwell's previously dismissed discrimination claims under Section 1981, the NYSHRL, and the NYCHRL against Birnbaum, Wolfe, and Brass. "Section 1981 provides that '[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015) (quoting 42 U.S.C. § 1981). "[T]he NYSHRL similarly prohibits employers from 'discriminating against [an] individual in compensation or in terms, conditions or privileges of employment.'" *Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015) (quoting N.Y. Exec. Law § 296(1)(a)). The pleading standards are generally the same for Title VII, Section 1981, and NYSHRL claims. *See Awad v. City of N.Y.*, No. 13 civ. 5753, 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014) ("Discrimination claims under § 1981 . . . and [the] NYSHRL are analyzed under the same framework and pleading standard as Title VII claims." (citing *Ruiz v. Cnty. of Rockland*, 609 F.3d

486, 491 (2d Cir. 2010); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000); *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 72 (2d Cir. 2006) (per curiam))).[9]

"To defeat a motion to dismiss or a motion for judgment on the pleadings in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015); *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) ("To survive a motion to dismiss, a plaintiff need only [allege] a prima facie case of . . . discrimination by [alleging] that (1) he was within [a] protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." (quotation and brackets omitted)).  At the pleading stage, the plaintiff need only "sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311.[10]

"[T]he 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason." *Vega*, 801 F.3d at 87 (quoting *Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869, 878 (2d Cir. 1997)).  "A plaintiff can meet that burden through direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination." *Id.* (citations omitted).  "A plaintiff may prove discrimination indirectly either by . . . showing that the employer's stated reason for its employment action was

---

[9] Section 1981 claims are subject to different standards for causation.  Under section 1981, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  By contrast, under Title VII and the NYSHRL, a plaintiff need only allege that her protected characteristic was a "motivating factor in the employment decision." *Vega*, 801 F.3d at 87; *see also* 42 U.S.C. § 2000e-2(m); *Daniels v. City of N.Y.*, 17 civ. 9960, 2019 WL 251511, at *3 (S.D.N.Y. Jan. 17, 2019) (applying "motivating factor" standard to NYSHRL claim).  The different standards are immaterial to the analysis of this motion.

[10] The parties do not dispute that Cardwell is a member of a protected class or that he was otherwise qualified to be an associate at Davis Polk, and Cardwell has adequately alleged both of those elements.

pretext to cover up discrimination or by otherwise creating a mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Id.* (citations omitted). "At the pleading[] stage . . . a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* (citation omitted).

An adverse employment action is "a materially adverse change in the terms and conditions of employment such as termination, demotion evidenced by a decrease in salary or wage, being given a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or some other action deleterious to the plaintiff's current or future employment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019) (quotation, citations, and emphasis omitted). The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Vega*, 801 F.3d at 85 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "An inference of discrimination can arise from circumstances including . . . 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). "[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* at 312–13 (citations omitted). Still, a plaintiff must plausibly allege that her protected characteristic was causally linked to the adverse employment action. "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). Thus, courts should not "consider[] personnel decisions that" are not "link[ed] or correlat[ed] to the claimed ground of

discrimination.  Otherwise, the federal courts will become a court of personnel appeals."  *Id.* (citations omitted).

In applying these standards, courts must also keep in mind that "while 'the central statutory purpose of Title VII was eradicating discrimination' in employment, Title VII 'does not set forth a general civility code for the American workplace.'"  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (first quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 771 (1976), then quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (brackets omitted).  The same is true of Section 1981, *see Morrison v. United Parcel Serv., Inc.*, No. 17-cv-2885, 2019 WL 109401, at *4 (S.D.N.Y. Jan. 4, 2019), and the NYSHRL, *see Heap v. CenturyLink, Inc.*, No. 18-cv-1220, 2020 WL 1489801, at *11 (S.D.N.Y. Mar. 27, 2020) (citing *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012)).

NYCHRL claims are subject to a more liberal pleading standard.  "Section 8-107(1)(a) of the NYCHRL makes it 'an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the [protected characteristic] of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.'"  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting N.Y.C. Admin. Code § 8-107(1)(a)) (brackets and ellipsis omitted).  Although NYCHRL claims had for many years "been treated as coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope.  *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted).[11]

---

[11] The New York legislature amended the NYSHRL on August 19, 2019 to establish that its provisions should be construed liberally even if "federal civil rights law, including those laws with provisions worded comparably to the provisions of this article" have been construed narrowly.  *Deveaux v. Skechers USA, Inc.*, No. 19-cv-9734, 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting NY Legis. 160 (2019), 2019 Sess. Law News of N.Y. Ch. 160 (A.

The Restoration Act established two new rules of construction for the NYCHRL. First, the NYCHRL is "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a floor below which the City's Human Rights law cannot fall.'" *Mihalik*, 715 F.3d at 109 (quoting *Loeffler*, 582 F.3d at 278, in turn quoting Restoration Act § 1)). Thus, "[t]he NYCHRL's standards governing discrimination claims are as or more generous to plaintiffs than those under the analogous federal statutes," so "that a claim that satisfies federal law necessarily satisfies the NYCHRL." *Estevez v. S & P Sales & Trucking LLC*, No. 17-cv-1733, 2017 WL 5635933, at *3 (S.D.N.Y. Nov. 22, 2017). Second, NYCHRL provisions must "be construed liberally for the accomplishment of [its] uniquely broad and remedial purposes." *Mihalik*, 715 F.3d at 109 (quoting Restoration Act § 7). That is so even if similar "federal or New York State civil and human rights laws" with "comparably-worded" provisions have been construed more narrowly. *Id.* (quoting Restoration Act § 7) (emphasis omitted).

To plead a discrimination claim under the NYCHRL, a plaintiff must allege only that "she [was] treated 'less well' . . . because of a discriminatory intent." *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (2009)). "[T]he challenged conduct need not even be "'tangible" (like hiring or firing).'" *Id.* (quoting *Williams*, 872 N.Y.S.2d at 40); *see also Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) ("To state a claim for discrimination, a plaintiff must only show differential treatment of any degree based on a discriminatory motive."). Because the NYCHRL standard is more liberal than the corresponding federal and state law

---

8421)). In at least some respects, this language mirrors the provisions of the NYCHRL discussed in *Mihalik*. But as discussed further below, "these amendments only apply to claims that accrue on or after the effective date of October 11, 2019." *Wellner v. Montefiore Med. Ctr.*, No. 17 civ. 3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019). Cardwell left the firm in August 2018, so his claims accrued in that month at the latest and the amendment does not affect his claims in this case. *See, e.g., Washington v. Cnty. of Rockland*, 373 F.3d 310, 319 (2d Cir. 2004) ("As with all discrimination claims, plaintiffs' claims accrued when they knew or should have known of the discriminatory action."); *see also Bd. of Educ. v. C.M.*, 744 F. App'x 7, 9 (2d Cir. 2018) ("In analyzing the timing of accrual in the context of discrimination claims, the Supreme Court has instructed that 'the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful.'" (quoting *Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992), in turn quoting *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (emphases omitted)). And Cardwell does not argue that the lenient NYCHRL standard should apply to his NYSHRL claims, so he has waived that argument to the extent it is viable.

standards, courts must analyze NYCHRL claims "separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d at 109 (citations omitted).[12]

Even under this more liberal pleading standard, the plaintiff must allege "that the conduct is caused by a discriminatory motive." *Id.* at 110. "It is not enough" for a plaintiff to allege that she "has an overbearing or obnoxious boss. She must [allege] that she has been treated less well at least in part '*because* of her [protected characteristic].'" *Id.* (quoting *Williams*, 872 N.Y.S.2d at 39, 40 n.27)).[13] Under the NYCHRL, the plaintiff must allege that "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for" her unequal treatment. *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d at 40–41 (1st Dep't 2012) (citing *Williams*, 872 N.Y.S.2d at 27 n.27); *see also Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 120 (1st Dep't 2011) ("It is not uncommon for covered entities to have multiple or mixed motives for their action, and the [NYC]HRL proscribes such 'partial' discrimination." (quoted in *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (alterations omitted)).

This seems to be equivalent to the "motivating factor" standard of causation under Title VII and the NYSHRL. "[E]ven after enactment of the Restoration Act, the Second Circuit has continued to apply the same 'motivating factor' causation standard to employment discrimination

---

[12] *Mihalik* also cautioned that "district courts must be mindful that the NYCHRL is not a 'general civility code.'" 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 40–41). Thus, defendants "can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* at 111 (quoting *Williams*, 872 N.Y.S.2d at 41). But this is "an affirmative defense." *Id.* (quoting *Williams*, 872 N.Y.S.2d at 41). And "[a]s with most affirmative defenses, the employer has the burden of proving the conduct's triviality under the NYCHRL." *Id.* (citing *Drexel Burnham Lambert Grp. Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir. 1985), in turn citing *Blunt v. Barrett*, 124 N.Y. 117, 119 (1891)). So a defendant "may prevail *on summary judgment* if it shows that a reasonable jury could conclude only that the conduct amounted to no more than a petty slight." *Id.* (citing *Williams*, 872 N.Y.S.2d at 41) (emphasis added). Dismissal of a claim under Rule 12(b)(6) based on an affirmative defense is "warranted only if the [defense]'s applicability [is] shown on the face of the complaint." *Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 212 (2d Cir. 2018) (quotation omitted), *cert. denied sub nom. YPF S.A. v. Petersen Energía Inversora S.A.U.*, 139 S. Ct. 2741 (2019).

[13] Section 1981, the NYSHRL, and the NYCHRL all require a plaintiff to allege that a defendant was personally involved in the discrimination. *See Littlejohn*, 795 F.3d at 314 ("An individual may be held liable under §[] 1981 . . . only if that individual is personally involved in the alleged deprivation.") (quotation omitted); *see also Daniels*, 2019 WL 251511, at *5 ("The NYSHRL and NYCHRL also require Defendant's personal involvement.") (citing N.Y. Exec. L. § 296(6); N.Y.C. Admin. Code § 8-107(6); *Feingold*, 366 F.3d at 158).

claims under the NYCHRL that applies to equivalent claims under Title VII." *Bivens v. Inst. for Cmty. Living*, 14-cv-7173, 2016 WL 11701799, at *1 (S.D.N.Y. Feb. 3, 2016) (quoting *Weiss v. JPMorgan Chase & Co.*, No. 06-cv-4402, 2010 WL 114248, at *3 (S.D.N.Y. Jan. 13, 2010), in turn citing *Patane v. Clark*, 508 F.3d 106, 112–13 (2d Cir. 2007)) (discussing this issue after soliciting supplemental briefing on it); *see also id.* ("Each statute uses the same words ('because of') to describe the causation element.") (citing 42 U.S.C. § 2000e-2(a)(1); N.Y.C. Admin. Code § 8-107(1)(a)).[14]

### b. Application

Cardwell's discrimination claims against Brass are adequately pleaded because he alleges that he was replaced on a deal team with a similarly-situated white associate whose work performance was the same as or worse than his. But Cardwell's discrimination claims against Birnbaum and Wolfe are inadequately pleaded because he has failed to plausibly allege facts that give rise to an inference of discriminatory animus.

### i. Brass

Cardwell alleges that Brass "remov[ed]" him from a deal team and "replaced" him with a white M&A associate in 2016. SAC ¶¶ 156–60. Removal from a deal team is more than "a mere

---

[14] In their briefing on this motion, the parties did not address whether a different standard of causation applies under the NYCHRL. It does not appear that any Second Circuit or New York Court of Appeals case has explicitly decided the issue since the New York City Council passed the Restoration Act. *Cf. Forrester v. Corizon Health, Inc.*, 752 F. App'x 64, 66 (2d Cir. 2018) (summary order) ("Although the NYCHRL's *retaliation* provision is broader than at least some federal anti-discrimination laws, a plaintiff bringing a retaliation claim under the NYCHRL still must adduce admissible evidence that retaliation was at least a partial motivating factor." (citing *Mihalik*, 715 F.3d at 113, 116; *Williams*, 872 N.Y.S.2d at 33–35) (emphasis added)). Judge Engelmayer has also observed that "in various cases, courts has used the expression 'play no role' to describe the causation requirement of the NYCHRL." *Bivens*, 2016 WL 11701799, at *2. "But these usages have been made in passing, in *dicta*, or otherwise in a context that fails to suggest any substantive distinction with federal law. And several cases . . . have used that term interchangeably with Title VII's 'motivating factor' standard." *Id.* (citing *Carryl v. MacKay Shields, LLC*, 941 N.Y.S.2d 116, 117 (1st Dep't 2012); *Bennett*, 936 N.Y.S.2d at 120; *Williams*, 872 N.Y.S.2d at 40 n.27); *see also Hamburg v. N.Y. Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 39 (1st Dep't 2017) (using "motivating factor" to describe causation standard under the NYCHRL (quoting *Melman*, 946 N.Y.S.2d at 40)); *Bourara v. New York Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*, No. 17-cv-7895, 2020 WL 5209779, at *11 (S.D.N.Y. Sept. 1, 2020) (citing *Weiss*, 2010 WL 114248, at *3–4) ("NYCHRL claims are analyzed under the 'motivating factor' standard."). Indeed, although these standards are linguistically different, they seem to be substantively the same. If a protected characteristic is a motivating factor in a decision, it played at least some role in that decision. And if a protected characteristic played no role in a decision, it was not a motivating factor for that decision. In any event, the Court finds *Bivens*'s and *Weiss*'s interpretation of New York law (and the First Department's more recent decision in *Hamburg*) persuasive, so it applies the "motivating factor" standard of causation to Cardwell's claims under all three statutes.

inconvenience." *See Vega*, 801 F.3d at 85. Cardwell alleges that that there is an important difference between "deals" and "transactions" on the one hand and M&A "'work,' 'matters,' 'tasks,' 'projects,' 'research,' 'document review,' [and] 'assignments,'" and that deals and transactions influence "M&A rankings," fees, "prestige," and associates' "partnership and lateral prospects[,]" among other important metrics. SAC ¶ 145. Cardwell alleges that being deprived of "deal" work is deleterious to a corporate associate's current or future employment. *Id.* ¶¶ 145–46; *see Davis-Garett*, 921 F.3d at 43. Accordingly, viewed in the light most favorable to Cardwell, being removed from this deal was a materially adverse change in the conditions of Cardwell's employment as an associate as Davis Polk.

Cardwell makes two allegations that support an inference that Brass removed him from the deal because of a discriminatory motive. First, Cardwell alleges that he was replaced on the deal team with a white associate whose performance was the same as or worse than Cardwell's. SAC ¶¶ 166–68. "A plaintiff may support an inference of race discrimination by [alleging] that similarly situated employees of a different race were treated more favorably" than the plaintiff. *Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 205 (2d Cir. 2003) (quoting *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999)); *see also Littlejohn*, 795 F.3d at 312–13 ("[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class."). A plaintiff alleging that her "employer treated her less favorably than a similarly situated employee outside her protected group" must allege that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Littlejohn*, 795 F.3d at 312 (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz*, 609 F.3d at 493–94 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)). The alleged comparator must be similar enough "to support at least a minimal inference that the difference of

treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see also Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018).

Here, Cardwell alleges that his replacement on the deal team was a white M&A associate, and that Cardwell's performance "was on par with or better than" the white associate. SAC ¶ 167. That is similar enough to support at least a minimal inference that the difference of treatment may be attributable to discrimination. And Cardwell believes that his performance could not possibly have been the reason that he was removed from the deal because prior to replacing Cardwell, Brass "did not ask Mr. Cardwell any questions that would have given Mr. Brass an ability to assess Mr. Cardwell's availability to work on the deal in a particular way or whether Mr. Cardwell had relevant experience or expertise on the tasks that ultimately were given to the replacement White M&A associate." SAC ¶ 169.

Second, Cardwell alleges that the way in which he was taken off the deal team was "in violation of antidiscrimination protections that were part of the Firm's staffing policies." SAC ¶ 171. The Second Circuit has noted that "departures from procedural regularity" can create an inference of discriminatory intent, sufficient to establish a prima facie case of discrimination. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997). Brass was a senior associate at the time of this incident. In not going through the staffing coordinator, Brass "went around the Firm's staffing procedures which were designed in part to prevent White senior associates from making up reasons to find way to put White associates on their matters." SAC ¶ 168.

Those allegations—that Brass replaced Cardwell with a white M&A associate whose performance was the same as or less good than Cardwell's, and that there were procedural irregularities in the manner in which Cardwell was replaced—are sufficient to reveal a minimal inference of discriminatory intent. Accordingly, Cardwell has adequately pleaded a discrimination claim against Brass.

## ii. Birnbaum & Wolfe

Cardwell alleges that Birnbaum and Wolfe were part of the "group" that decided to terminate his employment; that they went long stretches of time without emailing him; and that they caused him to be "underutilized."  SAC ¶¶ 174, 204, 216–20, 222–27, 243, 257, 259–63; 296.  ¶ 484. Leave aside whether a failure to email is an adverse action under federal and state law or even is adequate to allege that Birnbaum and Wolfe treated Cardwell "less well" under the NYCHRL.  *Cf. Ward v. Shaddock*, No. 14-cv-7660, 2016 WL 4371752, at *6 (S.D.N.Y. Aug. 11, 2016) ("[O]stracism and isolation at work is not enough to constitute an adverse employment action." (quoting *Miksic v. TD Ameritrade Holding Corp.*, No. 12-cv-4446, 2013 WL 1803956, at *6 n.4 (S.D.N.Y. Mar. 7, 2013))). Each of those allegations is flawed because Cardwell has not plausibly alleged that Birnbaum and Wolfe engaged in that conduct because of discriminatory animus.  SAC ¶¶ 174, 204, 216–20, 222–27, 243, 257, 259–63; 296; 392.  Plaintiff did not make any substantive changes to his discrimination claims against Birnbaum and Wolfe from the FAC, other than to add conclusory assertions about comparators, which the Court will address below.  As the Court noted in its opinion on the October Order, Cardwell has failed to plausibly allege that race was a motivating factor in Birnbaum and Wolfe's decision to terminate his employment, their failure to email him, or their causing him to be underutilized.  October Ord. at 42–43.

Cardwell seeks to rely on a comparison to how Wolfe and Birnbaum treated white associates.  But "[w]ithout alleging a single comparator as to these allegations, Plaintiff falls well short of satisfying the disparate treatment standard 'requiring a reasonably close resemblance of the facts and circumstances of Plaintiff's and comparator's cases.'"  *Anderson v. New York City Dep't of Fin.*, No. 19-cv-7971, 2020 WL 1922624, at *7 (S.D.N.Y. Apr. 21, 2020) (quoting *Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 471 (S.D.N.Y. 2013)) (brackets omitted); *see also Daniels*, 2019 WL 251511, at *4 (dismissing complaint that "lack[ed] any specificity as to the alleged

comparators' qualifications, responsibilities, employment history and conduct that gave rise to their reprimands").

Here, Cardwell states that "[n]one of the Firm's White M&A associates who were similarly situated in all material respects as Mr. Cardwell were underutilized through staffing the way that Mr. Cardwell was" and that Wolfe and Birnbaum "did not decide to terminate any similarly situated White M&A associates." SAC ¶¶ 175, 472.  He defines his comparators as "[t]he associates who were not Black and were similarly situated to Mr. Cardwell in all material respects (including work performance), involved . . . the associates in Mr. Cardwell's 2014 class who were permanently assigned members of the Firm's M&A group between April 2016 and August 2018." *Id.* ¶ 506.  But although Cardwell states that his comparators are "similarly situated in all material respects," beyond this conclusory parroting of that legal standard, he does not allege any facts about their conduct or work performance.

The allegation that those associates received more favorable work assignments than Cardwell, or were not terminated as Cardwell was, does not raise even a minimal inference of discriminatory motivation absent plausible allegations that their work performance was similar to Cardwell's.  *See Rogers v. Fashion Inst. of Tech.*, No. 14-cv-6420, 2016 WL 889590, at *6 (S.D.N.Y. Feb. 26, 2016).  Cardwell has not made any such factual allegations.  Accordingly, Cardwell has not plausibly pleaded that his race was a motivating factor in Birnbaum and Wolfe's decision to ensure that he was "underutilized," to fail to communicate with him, or to terminate his employment at Davis Polk, and those allegations cannot serve as a predicate for his discrimination claim.  Cardwell's discrimination claims against Birnbaum and Wolfe are inadequately pleaded.

### 2. Retaliation Claims Against the Additional Defendants

#### a. Legal Standard

#### i. Section 1981 and the NYSHRL

Section 1981 "encompasses claims of retaliation." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). Similarly, "[t]he NYSHRL makes it unlawful for 'any employer to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.'" *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 581 (2d Cir. 2020) (summary order) (quoting N.Y. Exec. Law § 296(1)(e)) (ellipsis omitted).

To survive a motion to dismiss a retaliation claim, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting *Littlejohn*, 795 F.3d at 316).[15]  Generally, the "same pleading standards apply" to retaliation claims under Title VII, section 1981, and the NYSHRL. *See Guity v. Uniondale Union Free Sch. Dist.*, No. 15-cv-5693, 2017 WL 9485647, at *21 n.14 (E.D.N.Y. Feb. 23, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 1233846 (E.D.N.Y. Mar. 31, 2017). So although Defendants did not move to dismiss the Cardwell's Title VII claims, the Court discusses Title VII case law because it is relevant to Cardwell's Section 1981 claims.

#### ii. NYCHRL

The NYCHRL also prohibits retaliation. "Section 8-107(7) of the NYCHRL prohibits employers from 'retaliating or discriminating in any manner against any person because such person

---

[15] *See also Vega*, 801 F.3d at 90 ("[F]or a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that:  (1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice." (quotation omitted)).

has opposed any practice forbidden under this chapter.'"  *Mihalik*, 715 F.3d at 112 (quoting former

N.Y.C. Admin. Code § 8-107(7)) (alterations omitted).

> The Restoration Act amended this section to further provide:  "The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, or in a materially adverse change in the terms and conditions of employment, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."

*Id.* (quoting Restoration Act § 3 (amending N.Y.C. Admin. Code § 8-107(7)) (ellipses omitted)).  So

to plausibly plead "a retaliation claim under the NYCHRL, the plaintiff must [allege] that she took

an action opposing her employer's discrimination and that, as a result, the employer engaged in

conduct that was reasonably likely to deter a person from engaging in such action."  *Id.* (citing

*Albunio v. City of N.Y.*, 16 N.Y.3d 472, 479 (2011); *Williams*, 872 N.Y.S.2d at 33–34); *see also Warmin v.*

*New York City Dep't of Educ.*, No. 16-cv-8044, 2019 WL 3409900, at *7 (S.D.N.Y. July 29, 2019) ("To

plead retaliation under the NYCHRL, Plaintiff must show that he 'took an action opposing his

employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably

likely to deter a person from engaging in such action.'" (quoting *Mihalik*, 715 F.3d at 112) (brackets

omitted)).

Like the NYCHRL's discrimination provision, "New York courts have broadly interpreted

the NYCHRL's retaliation provisions."  *Taylor v. City of N.Y.*, 207 F. Supp. 3d 293, 308 (S.D.N.Y.

2016) (quoting *Mihalik*, 715 F.3d at 112); *see also Mestecky v. N.Y.C. Dep't of Educ.*, 791 F. App'x 236,

239 (2d Cir. 2019) (summary order) ("[The] NYCHRL's retaliation provision is broader than Title

VII's." (citing *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015)).  And as

discussed, the NYCHRL is a "one-way ratchet, by which interpretations of state and federal civil

rights statutes can serve only as a floor below which the City's Human Rights law cannot fall."

*Mihalik*, 715 F.3d at 109 (quotation omitted).

### b. Protected Activity and Knowledge

### i. Legal Standard

*A. Section 1981 and the NYSHRL*

A plaintiff engages in protected activity when she "oppose[s]" discrimination. *Littlejohn*, 795 F.3d at 316 (quotation omitted). A plaintiff "need not [allege] that the behavior he opposed in fact violated" federal or state antidiscrimination statutes. *Cooper v. N.Y. State Dep't of Labor*, 819 F.3d 678, 680–81 (2d Cir. 2016). Instead, she must only allege "that [s]he possessed a good faith, reasonable belief that the" employer unlawfully discriminated. *Id.* at 681 (citations omitted); *see also Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("[T]he plaintiff 'is required to have had a good faith, reasonable belief that she was opposing an [unlawful] employment practice.'" (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001)). "A plaintiff's belief" that an employer's employment practice was unlawful "is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Kelly*, 716 F.3d at 14.

A plaintiff must also "ordinarily plead that the defendant had knowledge of the protected activity." *Stern v. State Univ. of N.Y.*, No. 16-cv-5588, 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018). A plaintiff may meet this pleading standard by pleading facts that permit the Court to "reasonably infer that she engaged in protected activity known to the Defendants." *Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 57 n.8 (S.D.N.Y. 2019); *see also Belizaire v. Rav Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 355 (S.D.N.Y. 2014). And even when a plaintiff does not allege that "the individual decision-maker" had "knowledge of protected activity," the plaintiff may survive a motion to dismiss by pleading that "the decision-maker was at least influenced or encouraged to take the adverse action by a superior with knowledge of the protected activity." *Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein Coll. of Med.*, No. 11-cv-8934, 2014 WL 896744,

at *12 (S.D.N.Y. Mar. 3, 2014) (citing *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 147–48 (2d Cir. 2010); *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

"[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (citations omitted); *see also Venezia v. Luxoticca Retail N. Am. Inc.*, No. 13-cv-4467, 2015 WL 5692146, at *12 (S.D.N.Y. Sept. 28, 2015). "The employee's complaint must be sufficiently pointed to be reasonably understood as a complaint [about] discrimination." *Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 187 (S.D.N.Y. 2020) (quoting *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-cv-2456, 2013 WL 1211496, at *9 (E.D.N.Y. Mar. 25, 2013)). In other words, "a plaintiff 'must allege that her employer was on notice that her complaints were about statutorily prohibited discrimination, not just general unsatisfactory or unfair conduct.'" *Id.* (quoting *Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 (2d Cir. 2015)) (brackets omitted).

"Although particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." *Kelly*, 716 F.3d at 17 (citations omitted); *see also Galdieri–Ambrosini v. Nat'l Realty and Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Thus, "[m]ere complaints of unfair treatment are not protected speech in the employment retaliation context," and it is the speaker's responsibility "to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (quotation and ellipsis omitted).

### B. NYCHRL

To plausibly plead an NYCHRL retaliation claim, "the plaintiff must [allege] that she took an action opposing her employer's discrimination." *Mihalik*, 715 F.3d at 112.  Opposing discrimination "can include situations where a person, before the retaliatory conduct occurred, merely 'made clear her disapproval of the defendant's discrimination by communicating to him, in substance, that she thought his treatment of the victim was wrong.'" *Id.* (quoting *Albunio*, 16 N.Y.3d at 479) (brackets omitted).  "NYCHRL claims must be reviewed considering the totality of the circumstances, and the New York Court of Appeals has held that an employee can oppose his employer's discrimination without expressly mentioning discrimination as the source of his discontent." *Benzinger*, 447 F. Supp. 3d at 124 (citing *Mihalik*, 715 F.3d at 113; *Albunio*, 16 N.Y.3d at 479).  Still, courts have dismissed NYCHRL retaliation claims for failure to meet this standard.  *See Fattoruso v. Hilton Grand Vacations Co., LLC*, 525 F. App'x 26, 28 (2d Cir. 2013) (dismissing the plaintiff's NYCHRL retaliation claim because the plaintiff's "belief that he was being treated 'unfairly'" does not "transform his complaints to [the employer] into charges over unlawful discrimination."); *Farzan v. Wells Fargo Bank, N.A.*, No. 12-cv-1217, 2013 WL 6231615, at *29 (S.D.N.Y. Dec. 2, 2013) (granting summary judgment on NYCHRL retaliation claim because the plaintiff did not "ma[ke] clear her disapproval of the defendant's discrimination by communicating to [the employer], in substance," the alleged illegal treatment) (quoting *Mihalik*, 715 F.3d at 112) (brackets omitted), *aff'd sub nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015); *Mi-Kyung Cho v. Young Bin Café*, 42 F. Supp. 3d 495, 507 (S.D.N.Y. 2013) (similar).

### ii. Application

#### A. Protected Activity

Cardwell alleges that he engaged in protected activity on many occasions during his tenure at Davis Polk.  The Court details those that pertain to the renewed retaliation claims against the Additional Defendants below.  As alleged, four constitute protected activity and two do not.

First, Cardwell alleges that he emailed Davis Polk's Executive Director in May 2015 and "noted that interpersonal trainings that highlight the value of associates speaking to unfamiliar faces and creating a welcoming environment would benefit everyone." SAC ¶ 61. His email "described situations where Davis Polk attorneys were not making eye contact with or speaking to summer associates and junior associates of color in meetings." *Id.* According to Cardwell, "Davis Polk's own training materials recognized that these types of interactions are related to bias and that they can enhance or hinder performance." *Id.* ¶ 62. Although the Executive Director never inquired about or brought up the incident again with Cardwell, the Executive Director "discussed Mr. Cardwell's concerns and suggestions with Davis Polk partners and staff members who were responsible for and would be responsible for Mr. Cardwell's professional development within the Firm's M&A group." *Id.* ¶ 65. As alleged, this is an ambiguous complaint that does not qualify as protected activity because it was not sufficiently pointed to put any Defendant on notice that Cardwell was complaining about discrimination under federal, state, or city law.

Second, Cardwell alleges that he "participated in a conversation about the general issue of Black Davis Polk attorneys being excluded from staffing-related opportunities at the Firm" at a meeting between the Firm's Diversity Committee and the Firm's Black Attorney Group in September 2015 (the "September 2015 Complaint"). *Id.* ¶ 72. Cardwell told the meeting's attendees—including partners serving on the Firm's Diversity Committee, and the Firm's Director of Associate Development—that he "personally experienced exclusion and disparate treatment related to his race at the Firm." *Id.* This allegation qualifies as protected activity because Cardwell alleges that he "personally experienced" discrimination at the Firm because of his race. The Court observes, however, that not every conversation about equity and inclusion qualifies as protected activity. A standard for protected activity that swept in any conversation about race and inclusion might have the perverse effect of discouraging employers from encouraging such conversations. But because Cardwell alleges that he discussed racial discrimination that he personally had

experienced—in those terms—during the September 2015 meeting, it qualifies as protected activity under federal, state, and city law.

Third, Cardwell alleges that he engaged in protected activity when he declined an assignment in the credit group from a different junior staffing coordinator, Rosio Clausen, in September 2016 (the "September 2016 Complaint"). Clausen asked Cardwell to work on a credit assignment because "the attorneys in the Firm's Finance Group were unusually busy and could use assistance." *Id.* ¶ 186. In response, Cardwell told Clausen that he was "more than happy to work on anything you or anyone else would like me to, but" that he was "concern[ed]." *Id.* ¶ 187. "As a Black associate," Cardwell told Clausen, he was "concerned about the general pattern that exists across the legal profession and within Davis Polk." *Id.* Cardwell explained that "typically . . . when Black associates" reach their fourth, fifth, or sixth year, they have less experience than white associates of the same year. *Id.* Cardwell told Clausen that he didn't want his career to follow this pattern. *Id.* He alleges that he "made it clear that he was not just talking about a general pattern in the legal profession, but that he was talking about what he was observing and experiencing at Davis Polk." *Id.* ¶ 189.

Clausen "responded in a way that made it clear" that she understood Cardwell had "just made a race-based discrimination complaint about what he had observed at Davis Polk" and that he thought she was staffing him in a racially biased way. *Id.* ¶ 190. Clausen tried to reassure Cardwell that her attempt to staff him on the Finance assignment "had nothing to do with his race or anyone else's race." *Id.* ¶ 191. She told Cardwell the names of five or six other associates who she claimed she had also asked to help with the Firm's finance group and, similar to Cardwell, whose assigned practice groups were not finance. *Id.* ¶ 192. Cardwell alleges he "listened patiently as she attempted to explain the process that she used to staff other associates and Mr. Cardwell and how that process was not impacted by race." *Id.* ¶ 193. He responded by "pointing her to specific racial dynamics related to [the] way she was attempting to staff him" and "specific advantages that the process was

conferring to the Firm's White associates, especially the Firm's White male associates." *Id.* ¶ 194. Cardwell said, "I don't know if you noticed, but of the names you just listed, every name belongs to a person of color or someone who isn't a White man." *Id.* ¶ 195. Clausen responded, "No, I didn't notice that. Wait. That can't be true, because I've also asked [PERSON A] and [PERSON B]." *Id.* ¶ 196. Cardwell alleges that after stating two more names, Clausen stopped midsentence, realized that she had just named two more Davis Polk associates who were people of color, and told Cardwell, "I get your point." *Id.* ¶ 197. Cardwell alleges that he then "went back and forth with her to make sure she understood" that he believed she and the Firm were, in that moment, "staffing associates of different races differently and to the advantage of White associates." *Id.* ¶ 198.

This qualifies as protected activity under federal, state, and city law. Cardwell's complaint was sufficiently pointed to put Clausen on notice that Cardwell was complaining about statutorily prohibited discrimination that he personally experienced at the Firm. It communicated to Clausen that Cardwell believed that Clausen and the Firm were engaging in statutorily prohibited discrimination.

Fourth, Cardwell alleges that he engaged in protected activity by indicating that he had capacity on his weekly workload capacity forms from December 2016 to March 2017. *Id.* ¶ 282 n.50. Cardwell alleges that the Firm did not staff him on any new matters during that time frame. *Id.* ¶¶ 279–83. The Court previously found that this did not qualify as protected activity because Cardwell indicating that he had capacity could not be construed as a complaint about discrimination even under the NYCHRL's more plaintiff-friendly standard. October Ord. at 61–62. Cardwell did not make any modifications to the dismissed allegations.

Fifth, Cardwell alleges that he engaged in protected activity during a meeting with Reid and Kreynin in March 2017 (the "March 2017 Complaint"). *Id.* ¶¶ 316, 318. During that meeting, Reid allegedly told Cardwell that he and the Firm "had 'dropped the ball' and made mistakes" as to Cardwell's staffing. *Id.* ¶ 316. When Cardwell inquired about who had "dropped the ball," Reid

allegedly told Cardwell that he and other members of the Firm would not permit him to discuss the past.  *Id.*  During this meeting, Cardwell said that "he was uncomfortable with the Firm's performance review process and noted that racial biases were influencing performance evaluations."  *Id.* ¶ 317.  If Cardwell continued to complain, Reid allegedly threatened to take Cardwell "out of the game" and "off the field" at the Firm.  *Id.* ¶ 324.  Cardwell's complaint is protected activity because, viewing the alleged facts in the light most favorable to Cardwell, it was sufficient to put Reid and Kreynin on notice that Cardwell had opposed discrimination in the Firm's performance review process.  Because this qualifies as protected activity under federal and state law, it also necessarily qualifies under the NYCHRL.

Sixth, Cardwell alleges that he filed the EEOC Charge in August 2017.  *Id.* ¶ 358.  Davis Polk filed an "Answer and Position Statement" with the NYSDHR in December 2017.  *Id.* ¶ 359.  Cardwell alleges that he filed a rebuttal to Davis Polk's answer filed at the EEOC in January 2018.  *Id.* ¶ 363.  And Cardwell filed the Supplemental Charge in April 2018.  *Id.* ¶ 486.  Defendants do not dispute that this is protected activity.  *See Vega*, 801 F.3d at 91 (noting that an EEOC charge is protected activity).

## B. Knowledge[16]

The Court analyzes whether each Additional Defendant had knowledge of Cardwell's alleged protected activity.

*Chudd*:  Cardwell alleges that Chudd had knowledge of the September 2015 Complaint.  He alleges that Davis Polk promptly investigated his complaint, and that as a part of that process, "Davis Polk discussed Mr. Cardwell's September 2015 complaint with (i) Mr. Chudd, the M&A partner whose deal Mr. Cardwell has worked the most on during the prior six months."  SAC ¶ 78.  Cardwell also alleges that Chudd was aware of Cardwell's September 2016 Complaint.  Specifically,

---

[16] Because Defendants have not moved to dismiss Cardwell's claims against Reid and Bick, the Court does not decide whether Cardwell has plausibly alleged that those defendants had knowledge of his protected activity.

Cardwell states that the M&A partners met in late September or early October to discuss "Cardwell and the other M&A associates' professional development, performance, and performance reviews," and that "the M&A partners discussed Mr. Cardwell's September 9, 2016 discrimination complaint during these October meetings and conversations." *Id.* ¶¶ 210–12. Chudd was an M&A partner at the time and thus attended the meeting. Cardwell also alleges that Chudd had knowledge of the March 29, 2017 complaint. Cardwell states that "in April 2017, Mr. Reid or Mr. Kreynin met with the Firm's M&A partners and discussed the meeting they had with Mr. Cardwell and the discrimination complaints that Mr. Cardwell made during the meeting." *Id.* ¶ 333. As the Court explained in the October Order, Cardwell plausibly alleges that Chudd had knowledge of his EEOC and NYSDHR complaints. *Id.* ¶ 459. Although Cardwell argues in his opposition brief that Chudd had knowledge of the complaint made during his January 2018 review meeting, the SAC does not contain any such allegations—the paragraphs Cardwell cites to allege only that Chudd and the other M&A partners had knowledge of complaints he made prior to that date. *See* Pl.'s Opp'n at 13.

*Hudson*: Cardwell alleges that Ms. Hudson had knowledge of his September 2015 Complaint. He states that "Davis Polk discussed Mr. Cardwell's September 2015 complaint with . . . Ms. Hudson. SAC ¶ 78. As the Court found before, Cardwell plausibly alleges that Hudson had knowledge of his EEOC and NYSDHR complaints. *Id.* ¶ 406. Cardwell does not plausibly allege that Hudson had knowledge of any other protected activity.

*Butler*: Butler was an M&A partner during relevant time period. Accordingly, for the same reasons that Cardwell has plausibly alleged that Chudd had knowledge of his September 2015, September 2016, March 2017, and EEOC and NYSDHR complaints, he has plausibly alleged that Butler had knowledge of those complaints.

*Brass*: As the Court found before, Cardwell plausibly alleges that Brass had knowledge of his EEOC and NYSDHR complaints. *Id.* ¶ 450. Cardwell does not plausibly allege that Brass had knowledge of any other protected activity.

*Birnbaum & Wolfe*:  Cardwell alleges that Wolfe had knowledge of his September 2015 complaint as an M&A partner.  *Id.* ¶ 80.  Birnbaum was not a partner at that time—he did not become a partner until 2016—and Cardwell has not plausibly alleged that Birnbaum had knowledge of that complaint.  Cardwell plausibly alleges that Wolfe and Birnbaum had knowledge of his September 2016 complaint, however.  Cardwell plausibly alleges that, as M&A partners, Birnbaum and Wolfe had knowledge of the September 2016, March 29, 2017 complaint and EEOC and NYSDHR complaints for the same reasons he plausibly alleged that Chudd and Butler did.  And, as the Court found in its earlier motion to dismiss opinion, he plausibly alleged that they were aware of the EEOC and NYSDHR filings.  October Ord. at 66.

### c. Adverse Employment Action and Causal Connection

#### i.  Legal Standard

##### A.  *Section 1981 and the NYSHRL*

Recall that in addition to alleging that he participated in a protected activity known to the defendant, a plaintiff must allege "an adverse employment action" and "a causal connection between the protected activity and the adverse employment action" to plausibly allege a retaliation claim.  *Littlejohn*, 795 F.3d at 316.  "The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57).  "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII:  'The antiretaliation provision, unlike the substantive discrimination provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'"  *Id.* (quoting *Burlington*, 548 U.S. at 64) (brackets omitted).  But "[a]ctions that are 'trivial harms'—*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse."  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68).

A plaintiff must also "plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90 (citing 42 U.S.C. § 2000e-3(a)). "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Id.* (citation omitted). For "an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360); *see also Spratt v. Verizon Commc'ns Inc.*, 633 F. App'x 72, 73 (2d Cir. 2016) ("A supervisor's retaliatory actions must be the 'but-for' cause of the employer's adverse employment action" under section 1981.) (citing *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) for the proposition that "substantive legal principles for claims under Title VII also apply to claims under § 1981").[17] So a plaintiff must allege facts suggesting that "the adverse action would not have occurred in the absence of the retaliatory motive." *Vega*, 801 F.3d at 91 (quotation omitted).

"A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (citation omitted); *see also Duplan*, 888 F.3d at 625 (holding that a causal connection may be "inferred through temporal proximity to the protected activity." (citing *Vega*, 801 F.3d at 90–91)). A plaintiff can also plead that his protected activity "initiated a sequence of events that satisfactorily plead causation by suggesting retaliatory animus." *Gonzalez v. City of N.Y.*, 377 F. Supp. 3d 273, 292 (S.D.N.Y. 2019).

---

[17] But the "[t]he Second Circuit has yet to decide explicitly whether the but-for causation standard applies to [retaliation] claims under the NYSHRL, as it does under Title VII." *Benzinger*, 447 F. Supp. 3d at 125 n.17 (collecting cases); *see also Holcomb v. State Univ. of N.Y. at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017) (summary order) ("We need not decide today whether the 'but-for' standard of causation applies to all of [the plaintiff's] retaliation claims because each fails under both the 'but-for' causation standard and the 'substantial or motivating factor' causation standard."). But the Circuit has "implicitly applied the but-for standard to NYSHRL claims." *Benzinger*, 447 F. Supp. 3d at 125 n.17 (citing *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14–16 (2d Cir. 2018)). The distinction between the "but for" and "motivating factor" standard is immaterial to the Court's analysis.

### B.  NYCHRL

To plausibly plead a retaliation claim under the NYCHRL, the plaintiff must plausibly allege that "the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citing *Albunio*, 16 N.Y.3d at 479; *Williams*, 872 N.Y.S.2d at 33–34).  "The NYCHRL imposes an identical standard to that of the NYSHRL, except that the plaintiff need not [allege] any 'adverse' employment action; instead, she must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Benzinger*, 447 F. Supp. 3d at 129 (quotation and brackets omitted).  "As with [federal and state law] retaliation claims, temporal proximity may be used to support an inference of indirect causation, and there is no bright line rule to determine when a gap in time attenuates an inference of retaliatory motive." *Mooney v. City of N.Y.*, No. 18-cv-328, 2018 WL 4356733, at *9 (S.D.N.Y. Sept. 12, 2018) (citing *Harrington v. City of N.Y.*, 70 N.Y.S.3d 177, 181 (1st Dep't 2018)).

The higher but-for causation standard does not apply to NYCHRL retaliation claims.  To survive a motion to dismiss, a plaintiff need only allege that retaliatory animus played *some* role in the employer's decision.  *Cf. Mihalik*, 715 F.3d at 112 ("[S]ummary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." (citing *Melman*, 946 N.Y.S.2d at 30–31; *Furfero v. St. John's Univ.*, 941 N.Y.S.2d 639, 642 (2d Dep't 2012)); *see also Graciani v. Patients Med., P.C.*, No. 13-cv-2751, 2015 WL 5139199, at *20 (E.D.N.Y. Sept. 1, 2015) ("[T]he but-for standard that applies to Title VII retaliation claims (and may or may not apply to NYSHRL retaliation claims) does not apply to NYCHRL retaliation claims." (citing *Mihalik*, 715 F.3d at 116)). Although neither the Second Circuit nor the New York Court of Appeals has expressly decided whether this standard is the same as the "motivating factor" causation standard, it appears to be the same.  *See* n.15, *supra*.

### ii.  Application

The Court has already held that Cardwell adequately pleaded retaliation claims as to his filings at the EEOC and the NYSDHR and Brass, Birnbaum, and Wolfe's collective decision to fire him.  October Order at 69–70.  In the SAC, Cardwell has bolstered those claims by alleging that Birnbaum, Wolfe, and Brass were also "responsible for and contributed to the negative performance evaluation that [Cardwell] received on January 11, 2018," which Cardwell alleges was "contrary to [the] real-time feedback" he had been given, and that they "signaled" to other partners that they were not willing to work with Plaintiff in light of his EEOC filing.  SAC ¶ 371–74, 276, 457, 461–62, 465, 467.  The Court will analyze the previously dismissed retaliation claims below.

*Birnbaum & Wolfe*.  Cardwell alleges that Wolfe and Birnbaum failed to staff Cardwell on any assignments between September 2016 and April 2017, following his September 2016 complaint.  SAC ¶¶ 209, 223–29.  Failure to staff Cardwell on any matters for several months is an action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *See Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57).  It is more than a trivial harm or a petty slight.  And Cardwell has plausibly pleaded a connection between Birnbaum and Wolfe's failure to staff him and his September and December 2016 complaints.  The failure of Birnbaum and Wolfe to staff Cardwell came directly after his September 2016 complaint.  "A retaliatory purpose can be shown indirectly by timing:  protected activity followed closely in time by adverse employment action." *Id.* (citation omitted).  That his hours decreased in the months following his complaint suggests that the failure to staff him resulted from the complaint.

*Butler & Chudd*.  Cardwell alleges that Chudd and Butler were part of the group that discussed whether and which M&A partners would be willing to work with Cardwell or if the Firm should instead terminate Cardwell's employment, and that they were "responsible for and contributed to the negative performance evaluation Mr. Cardwell received on January 11, 2018," which was "contrary to [the] real-time feedback" he had been given."  SAC ¶¶ 371–74, 461–62.

Cardwell has also alleged that Chudd and Butler were among those Davis Polk partners who decided as a group to terminate Cardwell's employment. *Id.* ¶¶ 452, 459, 461, 464–66, 468, 486. Those allegations support Cardwell's claim that he was ultimately terminated because of his EEOC and NYSDHR complaints. Cardwell alleges that he received the news that he was going to being fired less than one month after his lawyers filed their response to Davis Polk's NYSDHR Answer and Position Statement. *Id.* ¶¶ 363, 451–55. And Cardwell need not rely on this temporal proximity alone to plausibly allege a causal connection. The "sequence of events" that Cardwell initiated by filing his administrative complaints and that concluded with his termination suffices to permit an inference of retaliatory animus. *Gonzalez*, 377 F. Supp. 3d at 292. Cardwell has plausibly alleged that he would not have been terminated if he had not filed his administrative complaints.

*Hudson*: Cardwell alleges that Hudson's June 2016 and September 2016 reviews for Cardwell were actually created after Cardwell filed his complaint with the EEOC in August 2017 and were, Cardwell alleges, created for the purpose of helping Davis Polk eliminate Cardwell's billable hours, not staff Cardwell on any assignments, and terminate Cardwell's employment. SAC ¶ 446–47. Cardwell further alleges that Hudson's reviews were used and developed as part of a retaliatory scheme in order to establish a supposed appearance of consistent performance deficiencies that would defeat any suggestion that this reason was pretextual. *Id.* ¶ 448. Those allegations support Cardwell's claim that he was ultimately terminated because of his EEOC and NYSDHR complaints. Cardwell alleges that he received the news that he was going to being fired less than one month after his lawyers filed their response to Davis Polk's NYSDHR Answer and Position Statement, and alleges that "Hudson's falsified performance reviews triggered [the M&A partners'] ability to terminate Mr. Cardwell's employment." SAC ¶¶ 363, 451–55, 448. And the "sequence of events" that Cardwell initiated by filing his administrative complaints and that concluded with his termination suffices to permit an inference of retaliatory animus. Cardwell has plausibly alleged that

Hudson would not have created these "falsified performance reviews" that "triggered" his termination if he had not filed his administrative complaints.

Defendants argue that Cardwell's allegations that Butler, Chudd and Hudson participated in his termination are "opportunistic" and "entirely implausible" because Plaintiff did not plead that they participated in his termination in prior complaints and because those claims are "tailored-to-survive-dismissal." Defs.' Mem. at 17–18. But Defendants' arguments are contrary to the law. The Court must, at this stage, accept all well-pleaded allegations as true and draw all inferences in favor of the plaintiff. Defendants also point to the metadata of Hudson's June 2016 and September 2016 reviews in support of their argument that Cardwell's claims that those reviews were created at a later date are false. *Id.* at 21–22. But for the reasons the Court has explained above, those documents are not incorporated by reference or integral to the SAC and the Court cannot properly consider them at this time.

A complaint need only give a defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)); *see also* FED. R. CIV. P. 8(a)(2). Cardwell satisfies this standard: he alleges that Hudson created false reviews for the purpose of firing him, and that a group of M&A partners including Brass, Birnbaum, and Wolfe, Butler, and Chudd, decided to fire him. Those allegations give each of those Defendants notice of the ground on which Cardwell's claim rests. Thus, Cardwell has plausibly alleged retaliation claims under federal, state, and city law against Butler, Brass, Birnbaum, Chudd, Hudson, and Wolfe based on his termination and against Birnbaum and Wolfe based on their failure to staff him.

### 3. Disparate Impact Discrimination Claim

To the extent that the SAC raises a new disparate impact claim, it is dismissed because the Court did not grant him leave to add new claims in the SAC in the October Order. Cardwell has added language suggesting that he is bringing a disparate impact claim in several paragraphs of the

SAC.  *See* SAC ¶¶ 1, 42, 43, 361, 495, 526–29, 569, 579; *id.* ¶ 495 ("Mr. Bick and Davis Polk lied about the reasons for Mr. Cardwell's 2016 interim review in response to his September 2015 and January 2016 legally protected complaints, and further subjected Mr. Cardwell to a performance interim review policy that had a disparate impact against Mr. Cardwell in comparison to White associates who were similarly situated to Mr. Cardwell."); *id.* ¶ 526 ("Davis Polk's Performance Review Policy continually subjected Mr. Cardwell to discrimination and had a disparate impact on him.  In four consecutive face-to-face performance review meetings, Mr. Cardwell questioned the Firm's Performance Review Policy and sought examples.  At every turn Davis Polk's Performance Review Policy was nonresponsive or, worse, discriminatory.  Davis Polk's Performance Review Policy was highly subjective, easy to manipulate (and actually manipulated by Defendants), and widely known within the Firm to be infected with bias.").  Defendants argue that Cardwell's "disparate impact" claim should be dismissed because he was not granted leave to plead new claims and because he failed to exhaust administrative remedies.  Defs.' Mot. at 24; Defs.' Reply at 1–3.  Defendants' argument is correct.

It is worth noting, however, that Cardwell's complaint does not plausibly allege a separate cause of action under a disparate impact theory; indeed, that theory arguably runs contrary to the thrust of his principal claim.  Disparate impact claims under Title VII "are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate effect on [a] protected group."  *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012) (alteration in original) (quoting *Robinson v. Metro-N. Commuter R.R.*, 267 F.3d 147, 160 (2d Cir. 2001)).  At the pleading stage, the plaintiff "must at least set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim."  *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020).  "To nudge a disparate impact claim across the line from conceivable to plausible—and, indeed, to ultimately prove such a claim— plaintiffs typically rely on statistical evidence to show a disparity in outcome between groups."  *Id.*

"At the prima facie stage, a plaintiff's statistical analysis 'must [demonstrate] that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity.'" *Id.* (quoting *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 151 (2d Cir. 2012)). However, to survive a motion to dismiss, a plaintiff is not required "to prove in detail the methodological soundness of her statistical assessment" or to "supplement [the complaint's] statistical analysis with corroborating evidence," but "the statistics must plausibly suggest that the challenged practice actually has a disparate impact." *Id.* at 209–10. "This means that the statistical analysis must, at the very least, focus on the disparity between appropriate comparator groups" or "reveal disparities between populations that are relevant to the claim the plaintiff seeks to prove." *Id.* at 210.

Cardwell does not plead facts that show a disparity between appropriate comparator groups. His complaint is replete with allegations that white associates were reviewed less favorably than him. He has not provided data or statistics that suggest that the firm's review process was discriminatory. Instead, his claims rest upon allegations that the system was not transparent and was therefore susceptible to manipulation by the individual partners at Davis Polk who sought to discriminate against him. While Mr. Cardwell loosely uses the term "disparate impact" in his complaint, it is not apparent that he is attempting to bring a separate disparate impact claim.[18] Rather, it appears that he has used the term "disparate impact" loosely to describe the impact of the allegedly discriminatory conduct of Davis Polk partners on him through their alleged targeted manipulation of the firm's review system against him.

---

[18] He has not adequately pleaded the elements of such a claim: he has not provided evidence of a disparate impact of the review system on others apart from the single point of observation that the members of the M&A group at Davis Polk are white. The data presented in his complaint regarding comparators show equivalent or lower ratings for white associates than for him. The research that he notes regarding discrimination in the legal industry generally, SAC ¶ 108 n. 17, does not pertain to Davis Polk.

To the extent that Plaintiff did seek to plead a disparate impact claim, that claim is dismissed because Plaintiff did not seek leave to file additional new claims.  As Defendant correctly points out, Plaintiff's First Amended Complaint did not allege disparate impact.  Defs.' Mem. at 24; *see also*  SAC ¶ 1 (adding "disparate impact" allegation and changing reference from "disparate treatment" to "disparate impact and treatment").  The Court's October Order granted Cardwell leave to replead only "the dismissed claims."  October Ord. at 79.  "The dismissed claims" did not include a disparate impact claim, as Plaintiff did not make a disparate impact claim in the FAC.  Plaintiff did not seek leave of Court to file additional new claims prior to filing the SAC.

Fed. R. Civ. P. 15(a)(2) provides that additional allegations can only be added "with the opposing party's written consent or the court's leave."  "District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted."  *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012).  In *Palm Beach Strategic Income*, the court explained that "although the district court couched its ruling as a Rule 12(b)(6) dismissal of the amended complaint, in essence it was holding that [plaintiff] had gone beyond the limited leave it had been given to amend its original complaint, and the court instead considered the sufficiency of the prior complaint."  *Id.*; *Pagan v. N.Y. State Div. of Parole,* No. 98 Civ. 5840, 2002 WL 398682 (S.D.N.Y. Mar.13, 2002) (granting defendants' motion to dismiss as to new state law claims alleged in amended complaint when court's order granted plaintiff leave to replead only his § 1981 and NYSHRL claims); *see also Willett v. City Univ. of N.Y.,* No. 94 CV 3873, 1997 WL 104769 (E.D.N.Y. Feb.18, 1997) (declining to consider five of eight new claims in amended complaint, on basis they exceeded scope of court's order granting plaintiff leave to amend).

To the extent that Plaintiff sought to amend his complaint to add a new disparate impact claim without seeking leave of Court, Plaintiff violated Fed. R. Civ. P. 15(a)(2).  Accordingly, Defendant's motion to dismiss any disparate impact asserted in the SAC is granted.  Because the

Court is dismissing this claim—again, to the extent that Plaintiff is making one—on the basis that

Plaintiff exceeded the scope of the permission he was granted to replead his formerly dismissed

claims, the Court will not consider at this time the parties' arguments regarding whether Plaintiff

raised this claim in his administrative complaint.

## II. PLAINTIFF'S MOTION TO AMEND

### A. Background

Some background regarding Cardwell's previous amendments and the Court's scheduling

order is necessary to set the stage for a discussion of Plaintiff's Proposed Third Amended Complaint

(the "PTAC").  Cardwell commenced this action in November 2019.  Dkt. No. 1.  A case

management conference was held on December 20, 2019, and a Civil Case Management Plan and

Scheduling Order were entered later that day.  Dkt. No. 27.  The Scheduling Order required that

motions to amend the pleadings be filed no later than January 20, 2020.  *Id.*  It also set a deadline of

September 16, 2020 for the completion of fact discovery and December 16, 2020 for the completion

of expert discovery.  *Id.*  The deadlines for the completion of discovery were subsequently extended

on July 29, 2020 and February 2, 2021.  Dkt. Nos. 66, 143.  The deadline for amendments to the

pleadings was not extended.

Defendants moved to dismiss in part in February 2020.  Dkt. No. 34.  On March 2, 2020,

Plaintiff amended the complaint.  Dkt. No. 37.  Defendants again moved to dismiss in April 2020.

Dkt. No. 44.  The Court granted Defendants' motion in part and denied it in part in October 2020.

October Ord.  In the October Order, the Court noted that Plaintiff "should not expect any

additional opportunities to amend his complaint."  *Id.* at 79.  Plaintiff amended his complaint for a

second time in November 2020, adding 260 new paragraphs.  Dkt. No. 99.  Defendants again

moved to dismiss.  Dkt. No. 116.  On February 5, 2021, Plaintiff filed a corrected second amended

complaint.  Dkt. No. 147.  For the reasons explained above, Defendants' motion was granted in part

and denied in part.

Discovery was ongoing during this time.  On August 11, 2020, Plaintiff served Defendants with RFPs.  Defendants produced very few documents until December 23, 2020.  Dkt. No. 166, Pl.'s Mot. to Amend, at 4.  Between January 11 and February 26, 2021, Defendants produced over 120,000 pages.  *Id.*  On February 1, 2021, Plaintiff informed the Court that he intended to seek leave to amend the complaint again.  On February 17, 2021, Plaintiff filed a pre-motion letter seeking leave to file a third amended complaint.  Dkt. No. 152.  On March 9, 2021, the Court held a teleconference and granted Plaintiff's request to file a motion for leave to amend.

Plaintiff now seeks amend his complaint for a third time to add an additional 153 paragraphs.  Dkt. No. 167-2.  Plaintiff filed a motion seeking leave to amend.  Dkt. No. 166.  Defendants filed an opposition, Dkt. No. 171, and Plaintiff replied, Dkt. Nos. 174–75.  Plaintiff states that the facts he seeks to add to the complaint are based on information that he only recently learned during discovery.  Pl.'s Mot. to Amend, Dkt. No. 166, at 10.  Plaintiff's proposed amendments include facts supporting his discrimination claims against Wolfe, Birnbaum, and Brass; establishing Defendants' knowledge of Cardwell's complaints; identifying Cardwell's comparators; and identifying adverse employment actions that Defendants took other than Cardwell's termination.  *Id.* at 1–2.  The Court notes that the PTAC also contains the disparate impact allegations that the Court dismissed above because the Court had not granted Plaintiff leave to make them.

## B.  Legal Standard

Under the Federal Rules of Civil Procedure, a party may amend a pleading once as a matter of right within 21 days of serving it or, "if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  FED. R. CIV. P. 15(a)(1)(A), (B).  After that point, absent written consent from the opposing party, a party must obtain leave to amend from the district court.  FED. R. CIV. P. 15(a)(2).  Rule 15(a)(2) provides that courts "should freely give leave when justice so

71

requires."  "Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party."  *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (citation omitted); *see also id.* ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.") (citation omitted).

The burden on a party seeking to amend the pleadings is heavier after the court has entered a case management order, however.  At that point, "[a] schedule may be modified only for good cause and with the judge's consent."  FED. R. CIV. P. 16(b)(4); *see also Cummins, Inc. v. New York Life Ins.*, No. 10-cv-9252, 2012 WL 3870308, at *3 (S.D.N.Y. Sept. 6, 2012) (holding that when "the court has already entered a scheduling order in the case, a party requesting leave to amend must satisfy the 'good cause' standard set forth in Rule 16(b)").  Thus, when "a scheduling order governs amendments to the complaint, the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause."  *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009) (internal quotation marks and citation omitted); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) ("[We hold] that despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause.").  The purpose of Rule 16(b) is "to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed."  *Parker*, 204 F.3d at 340 (quotation and citation omitted).

"[T]he primary consideration" to determine whether good cause exists "is whether the moving party can demonstrate diligence."  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).  "The party moving to amend bears the burden of demonstrating good cause."  *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 1:15-cv-2457, 2019 WL 1245013, at *3 (S.D.N.Y. Mar. 18, 2019) (citing *Tchatat v. O'Hara*, No. 14-cv-2385, 2017 WL 3172715, at *8 (S.D.N.Y. July 25, 2017);

*Semple v. Eyeblaster, Inc.*, No. 08-cv-9004, 2009 WL 1748062, at *2 (S.D.N.Y. June 19, 2009)).  "[T]he moving party must demonstrate that it has been diligent in its efforts to meet the Court's deadlines, and that despite its having exercised diligence, the applicable deadline could not have been reasonably met."  *Id.* (quoting *Lee v. Kylin Management LLC*, No. 17-cv-7249, 2019 WL 917097, at *1 (S.D.N.Y. Feb. 25, 2019)).  "A party cannot make that showing 'when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline.'"  *Lee*, 2019 WL 917097, at *1 (citation omitted).

Diligence is not the only consideration.  "The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice [the opposing party]."  *Kassner*, 496 F.3d at 244.  "In determining what constitutes 'prejudice' courts consider whether the assertion of a new claim would:  (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."  *Verint*, 2019 WL 1245013, at *5 (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  "[T]he risk of substantial prejudice increases with the passage of time."  *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 100 (2d Cir. 2019) (quotation and citation omitted).

## C.  Discussion

Cardwell has demonstrated good cause as to the amendments bolstering his discrimination and retaliation claims because he could not have reasonably known the information that he obtained through Defendants' productions prior to the deadline to amend.  And while permitting amendment at this time will prejudice Defendants, it will not unduly prejudice them.  And those amendments are not futile because Plaintiff's claims would survive a motion to dismiss.

Defendants make three primary arguments why Cardwell should not be granted leave to amend:  First, that the PTAC is excessively lengthy, in violation of Rule 8.  Second, Defendants

argue that Cardwell has not demonstrated good cause under Rule 16.  Defs.' Opp'n to Mot. for Leave to Amend, Dkt. No. 171, at 2.  Third, Defendants argue that Cardwell's motion should be denied on the basis of futility and prejudice under Rule 15.  *Id.* at 2–3.  The Court addresses each in turn below.

### 1. Rule 8

First, Defendants argue that the proposed amendments violate Rule 8, which provides that "[e]ach allegation must be simple, concise, and direct."  *Id.* at 3.  The PTAC should be more concise. It is 169 pages long and weighs in at 368 pages including exhibits.  Plaintiff appears to operate under the assumption that a complaint must detail all relevant facts, rather than being guided by Rule 8's direction that a claim for relief must contain "a short and plain" statement of the claim.  FED. R. CIV. P. 8(a)(2).  Excessively verbose complaints overburden the parties and the Court and can, as here, result in substantial delays of the case as the parties and Court wade through a torrent of extraneous facts.  Nonetheless, the Court declines to deny Plaintiff leave to amend in this case merely because the complaint is excessively long.  Although Defendants argue that Plaintiff's request "should be denied for this reason alone," neither of the cases they cite support this proposition.  *See White v. Smith*, No. 9:17-cv-1094, 2018 WL 8576594, at *9 (N.D.N.Y. Dec. 12, 2018) (denying the plaintiff's request for leave to file an amended complaint because his proposed amendments were futile); *Johnson & Johnson v. Guidant Corp.*, No. 06 Civ. 7685, 2010 WL 571814, at *10–11 (Feb. 16, 2010) (denying the plaintiff's request for leave to file an amended complaint under Rule 15). Plaintiff's counsel is inexperienced in civil litigation.  The FAC was similarly exceedingly verbose and contained irrelevant information, but it was considered by the Court.  While the Court agrees that the SAC should have been more concise, it declines to deny Plaintiff leave to amend solely on this basis.

### 2. Good Cause

Plaintiff has satisfied Rule 16's good cause standard as to the amendments bolstering his discrimination and retaliation claims. Cardwell "must demonstrate that [he] has been diligent in [his] efforts to meet the Court's deadlines, and that despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Verint*, 2019 WL 1245013, at *3 (quoting *Lee*, 2019 WL 917097, at *1). Facts learned during discovery that a plaintiff could not reasonably have known prior to the deadline to amend can demonstrate diligence. *See, e.g., Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*, 283 F.R.D. 142, 148–49 (S.D.N.Y. 2012) (finding diligence and allowing amendment in light of facts learned during discovery); *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010) (noting that the plaintiff's "argument that it discovered the facts underlying its new cause of action for breach of the supply agreement followed by filing a motion to amend within two months of acquiring the information is sufficient to show diligence"); *Permatex, Inc. v. Loctite Corp.*, No. 03 Civ. 943, 2004 WL 1354253, at *3 (S.D.N.Y. June 17, 2004) (holding that the Plaintiff exhibited diligence by moving to amend less than two months after deposition that brought new information to light).

Here, Cardwell has demonstrated diligence as to the amendments bolstering the discrimination and retaliation claims that were not dismissed and the dismissed retaliation claims against Wolfe and Birnbaum. Those proposed amendments rely on information that Cardwell did not have and could not have reasonably been expected to have prior to the deadline to amend his complaint. That information included who attended and what was discussed at particular meetings (PTAC ¶¶ 80–83, 92–95, 123–27, 172–77); internal emails (*id.* ¶¶ 86–89, 132–43; 388–91), performance review policies and practices (*id.* ¶¶ 188–196), and information about his comparators' performance (*id.* ¶¶ 517–28, 644–65).

Cardwell acted quickly after receiving the information to seek leave to amend. Cardwell served Defendants with requests for production on August 11, 2020. Pl.'s Mot. for Leave to Amend

at 4.  On September 10, 2020, Defendants produced 58 documents.  Between December 23, 2020 and February 26, 2021, Defendants produced 120,000 pages of documents.  The deadline for Plaintiff to file the SAC was November 9, 2020.  October Ord.  Plaintiff received the bulk of documents in discovery after he filed the SAC and seeks to amend his complaint because of the information disclosed in those documents.  Just over a month after Defendants began producing the bulk of the documents, Plaintiff informed the Court that he intended to seek leave to file a Proposed Third Amended Complaint based on a partial review of Defendants' productions.  On February 17, 2021 Plaintiff filed a pre-motion letter seeking leave to file the PTAC.  On March 9, 2021, the Court held a teleconference and granted Plaintiff's request to file a motion for leave to amend by March 17, 2021.  Plaintiff filed his motion on March 17, 2021.

Given the volume and timing of the productions—Cardwell received over 100,000 pages of documents between December 23, 2020 and February 26, 2021, and requested a pre-motion conference seeking leave to amend on February 1, 2021—the Court agrees that Cardwell has shown diligence.  He could not have reasonably known that information prior to reviewing Defendants' productions.

Defendants argue that "courts routinely find that the fact that information has been provided in discovery does not constitute 'good cause' to amend."  Defs.' Opp'n to Mot. for Leave to Amend at 8.  Defendants point to *Southern Telecom v. Threesixty Brands Group, LLC*, No. 20-CV-2151, 2021 WL 979567, at *6–7 (S.D.N.Y. Mar. 16, 2021), and *Geo-Grp. Commc'ns, Inc. v. Shah*, No. 15 CIV. 1756, 2020 WL 5743516 at *17 (S.D.N.Y. Sept. 25, 2020) in support of that proposition.  But neither of those cases counsels against finding good cause here.  In *Southern Telecom*, the court denied the request because the plaintiff did not "identify any information . . . that it learned after the deadline for amendments that it did not know before that deadline."  *Southern Telecom*, 2021 WL 979567, at *7.  In *Geo-Group*, the court found that the plaintiff was not diligent when it "waited 14 months from when it discovered the new evidence to notify the Court of its intent to bring [the] motion [for leave to

amend]." *Geo-Grp. Commc'ns*, 2020 WL 5743516, at *17.  Here, on the other hand, the proposed

amendments in the PTAC bolstering his discrimination and retaliation claims are based on documents

Defendants produced (and facts Cardwell learned) after the January and November 2020 deadlines to

amend had passed.  And Cardwell sought leave to make the proposed amendments weeks, not

months, after receiving the documents.

Cardwell does not address any proposed "disparate impact" claim in his briefing on this

motion.  As the Court explained above, the Court does not believe that Plaintiff seeks to allege a

disparate impact claim.  But, to the extent Cardwell is now[19] alleging a disparate impact claim, he has

not shown good cause as to that claim because it is not based on information he learned during

discovery.  Cardwell does not allege that he only recently learned those facts.  There is no reason

that he could not have made this claim earlier, so Cardwell has not demonstrated good cause as to

that claim.  Because he has not demonstrated good cause, he is not permitted to add a disparate

impact claim at this time.

### 3.  Prejudice

Permitting Cardwell to file the PTAC would not unduly prejudice Defendants because, as

the Court is not permitting Cardwell to bring a new disparate impact claim, the remaining proposed

amendments do not add any new parties or claims and would not result in significant delay in the

resolution of the dispute.

"The district court, in the exercise of its discretion under Rule 16(b), also may consider other

relevant factors including, in particular, whether allowing the amendment of the pleading at this

stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 244.  "In determining what

constitutes 'prejudice' [courts] consider whether the assertion of a new claim would:  (i) require the

---

[19]  To the that extent Cardwell made such a claim in the SAC, the Court dismissed it because Cardwell did not have the
Court's permission to make that amendment.  Accordingly, the Court considers this claim, to the extent Cardwell is
making it, to be newly added.

opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350.  But mere "[a]llegations that an amendment will require the expenditure of additional time, effort, or money do not constitute 'undue prejudice.'" *A.V. by Versace, Inc. v. Gianni Versace*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000).

Applying the *Block* factors, the Court concludes that permitting Cardwell to file the PTAC would not unduly prejudice Defendants, and that any prejudice can be mitigated by permitting further discovery by Defendant.  In support of its motion to amend, Cardwell argues the PTAC "will not result in any significantly increased burden in terms of discovery" because "Defendants have already produced a vast majority of the documents that they intend to produce," and Cardwell "does not seek to add new parties or new claims."  Pl.'s Mem. of Law ISO Mot. to Amend, Dkt. No. 166, at 13.  Cardwell's argument ignores the possibility that Defendants may need to conduct additional discovery from him to meet the new allegations.  Given the nature of the additional allegations, the Court does not anticipate that such additional discovery by Defendants will be needed.  If it is, however, Defendants can make an appropriate application to the Court for leave to conduct it.

And as Cardwell points out, this case is not on the eve of trial.  Although permitting Cardwell to file the PTAC will somewhat delay the resolution of this dispute, it will not significantly do so.  *See State Tchrs. Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981) (reversing denial of leave to amend sought promptly after learning new facts, where "no trial date had been set by the court and no motion for summary judgment had yet been filed by the defendants" and where "the amendment will not involve a great deal of additional discovery").  Any prejudice to Defendants here is nothing more than "[a]llegations that an amendment will require the expenditure of additional time, effort, or money," which "do not constitute 'undue prejudice.'"  *See A.V. by Versace*, 87 F. Supp. 2d at 299.

### 4. Futility

Finally, Cardwell's proposed amendments are not futile.  A proposed amendment "is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *See Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *see also Sumitomo Elec. Rsch. Triangle, Inc. v. Corning Glass Works*, 109 F.R.D. 627, 628 (S.D.N.Y. 1986) (court need only be satisfied that amendment "is colorable and not frivolous" to grant leave).  In analyzing whether a Rule 15(a) application is futile, "the allegations of the [proposed] pleading . . . must be presumed true, and the Court must draw all inferences in the pleading party's favor." *U.S. v. District Council of New York City and Vicinity of the United Bd. of Carpenters and Joiners of America*, 2005 U.S. Dist. LEXIS 26696, at \*14 (S.D.N.Y. 2005).

Here, Cardwell has further bolstered his claims that were not dismissed. *See, e.g.*, PTAC ¶¶ 80–95, 123–43, 172–78, 185–96, 302–05, 357–59, 384–94, 406–15 (adding allegations regarding Cardwell's retaliation claims); *id.* ¶¶ 230–36 (adding allegations regarding discrimination claims against Brass).  Those amendments are not futile because the Court has already ruled that they are adequately pleaded.  Cardwell has also added additional allegations regarding the claims that were dismissed. *See, e.g.*, PTAC ¶¶ 644–65 (adding allegations regarding comparators in the context of Plaintiff's discrimination claims against Birnbaum and Wolfe).

The Court next considers whether the proposed amendments to the dismissed claims—that is, Plaintiff's discrimination claims against Birnbaum and Wolfe—could withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Regarding his discrimination claims against Birnbaum and Wolfe, Plaintiff has added specific allegations regarding the comparators.  Recall that in evaluating Defendants' motion to dismiss the SAC, the Court found that Plaintiff's discrimination claims against Birnbaum and Wolfe were not adequately pleaded because Plaintiff had failed to allege facts giving rise to a minimal inference of discrimination. *See* October Ord. § III(A)(2)(ii).  In particular, the Court concluded that Plaintiff's discrimination claims against Birnbaum and Wolfe were not

adequately pleaded in the SAC because he did not allege any facts regarding his comparators' work performance—he only parroted the legal standard, asserting that he was "similarly situated in all material respects." *Id.* That statement, as the Court explained above, is conclusory. In the PTAC, however, Plaintiff has remedied this deficiency. He has identified particular associates who received worse performance reviews from some of the same partners—associates who received ratings of "behind" for several review cycles—who were not Black, and who were not denied staffing opportunities in the same way as Cardwell. PTAC ¶ 644–65. That is sufficient to support a minimal inference of discrimination and push Cardwell's discrimination claims against Birnbaum and Wolfe across the line from conceivable to plausible. Accordingly, granting Plaintiff leave to amend those claims is not futile.

## III. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Cardwell's discrimination claims against Birnbaum and Wolfe are dismissed. His disparate impact discrimination claims are also dismissed. But Cardwell's discrimination claims against Brass, his retaliation claims against each of the Additional Defendants predicated on his termination, and his retaliation claims against Birnbaum and Wolfe predicated on their failure to staff him, are all adequately pleaded. Accordingly, Defendants' motion is denied as to those claims. Plaintiff's motion to amend is GRANTED, except to the extent that Plaintiff seeks to add a disparate impact claim. Plaintiff is directed to file his third amended complaint no later than ten days after the date of this opinion.

The Clerk of Court is directed to terminate the motions pending at Dkt Nos. 115 and 165.

SO ORDERED.

Dated:  September 23, 2021
New York, New York

_____
GREGORY N. WOODS
United States District Judge

80