**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KALOMA CARDWELL,

                              *Plaintiff*,

        v.

DAVIS POLK & WARDWELL LLP,
THOMAS REID, JOHN BICK, WILLIAM
CHUDD, SOPHIA HUDSON, HAROLD
BIRNBAUM, DANIEL BRASS, BRIAN
WOLFE, and JOHN BUTLER,

                              *Defendants*.

19 Civ. 10256 (GHW)

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: (212) 373-3000

*Attorneys for Defendants*

Dated: December 3, 2021

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 6

    A.    The Parties ........................................................................................... 6

    B.    Cardwell Had Persistent, Demonstrated Performance Issues ................................. 7

          1.    Cardwell Exhibited Performance Problems During His First Rotation ................................................................................ 7

          2.    Cardwell's Performance Problems Continued During His Second Rotation ................................................................................ 8

          3.    Cardwell Was Difficult To Staff During His Third Rotation .................. 10

          4.    Cardwell's Performance Issues Became Increasingly Problematic as He Became More Senior ................................................................ 12

          5.    Cardwell's Performance Did Not Improve Despite Efforts by the Firm to Assist Him ................................................................ 14

    C.    Cardwell's Staffing and Termination Were a Function of His Unsatisfactory Performance, Not His Race or Communications About Race ................................................................................ 20

ARGUMENT ................................................................................ 23

I.      LEGAL STANDARD ................................................................................ 23

II.     DEFENDANTS DID NOT DISCRIMINATE AGAINST PLAINTIFF ......................... 24

    A.    Cardwell's Discrimination Claims Fail at the *Prima Facie* Stage ...................... 24

          1.    Cardwell Was Not Performing His Duties Satisfactorily To Remain a Firm Associate ................................................................ 26

          2.    No "Circumstances Giv[e] Rise to an Inference of Discrimination" ........ 27

    B.    Cardwell's Performance Was a Legitimate, Non- Discriminatory, and Non-Pretextual Reason for Terminating Him ................................................ 34

    C.    None of Cardwell's Remaining Allegations Alters This Result ......................... 36

    D.    Cardwell's Aiding and Abetting Claims Fail ................................................ 39

III.    DEFENDANTS DID NOT RETALIATE AGAINST CARDWELL ............................. 39

    A.    Cardwell Has Not Shown a *Prima Facie* Case of Retaliatory Staffing .............. 39

    B.    Cardwell's Claim of Retaliatory Termination Likewise Fails ........................... 41

    C.    Cardwell Again Has Identified No Evidence of Pretext ................................... 44

    D.    None of Cardwell's Remaining Allegations Alters This Result ......................... 49

    E.    This Court Should Exercise Supplemental Jurisdiction To Deny All of Cardwell's Claims ................................................................ 50

IV.    PLAINTIFF IS NOT ENTITLED TO ANY DAMAGES ................................................ 52

A.     Cardwell Is Not Entitled to Front Pay Damages.................................................... 52

    1.     Cardwell's Baseless Speculation That He Would Have Become a Davis Polk Partner Cannot Support a Damages Claim........................... 53

    2.     Cardwell's Failure to Make Any Effort to Seek Alternative Employment Bars Recovery of Front Pay Damages ............................... 54

B.     Cardwell Also Is Not Entitled to Back Pay Damages............................................ 55

C.     Cardwell Is Not Entitled to Compensatory Damages ........................................... 56

D.     There Are No Facts Supporting Punitive Damages or Injunctive Relief.............. 58

CONCLUSION.................................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdu–Brisson* v. *Delta Air Lines, Inc.*,
239 F.3d 456 (2d Cir. 2001).............................................................................23, 24

*Alejandro* v. *New York City Dep't of Educ.*,
2017 WL 1215756 (S.D.N.Y. Mar. 31, 2017) ........................................................48

*Andreos* v. *Kraft Foods Glob., Inc.*,
2009 WL 10670397 (S.D.N.Y. Nov. 5, 2009) ...................................................46, 48

*Arroyo* v. *N.Y. State Ins. Dep't*,
1995 WL 611326 (S.D.N.Y. Oct. 18, 1995), *aff'd,* 104 F.3d 349 (2d Cir.
1996) ........................................................................................................................27

*Assue* v. *UPS, Inc.*,
2018 WL 3849843 (S.D.N.Y. Aug. 13, 2018) ................................................. *passim*

*Baity* v. *Kralik*,
51 F. Supp. 3d 414 (S.D.N.Y. 2014)........................................................................30

*Balderas* v. *Barmadon Mgmt. LLC*,
2019 WL 1258921 (S.D.N.Y. Mar. 19, 2019) (Woods, J.)......................................24

*Bentley* v. *AutoZoners, LLC*,
935 F.3d 76 (2d Cir. 2019)................................................................................45, 48

*E.E.O.C. v. Bloomberg L.P.*,
967 F. Supp. 2d 816 (S.D.N.Y. 2013)............................................................. *passim*

*Bourara* v. *N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*,
2020 WL 5209779 (S.D.N.Y. Sept. 1, 2020).........................................................47

*Braunstein* v. *Sahara Plaza, LLC*,
2021 WL 2650369 (S.D.N.Y. June 28, 2021) ........................................................46

*Brown* v. *Henderson*,
257 F.3d 246 (2d. Cir. 2001)..................................................................................24

*Brown* v. *Johnson & Johnson Consumer Products, Inc.*,
1994 WL 361444 (S.D.N.Y. July 11, 1994) ...........................................................46

*Cameron* v. *Cmty. Aid For Retarded Children, Inc.*,
335 F.3d 60 (2d Cir. 2003)......................................................................................46

*Capek* v. *BNY Mellon, N.A.*,
2018 WL 1353269 (S.D.N.Y. Mar. 15, 2018) ........................................................47

iii

*Celotex Corp.* v. *Catrett*,
    477 U.S. 317 (1986)................................................................................23, 24, 44, 48

*Chapkines* v. *New York Univ. Sch. of Continuing & Pro. Stud.*,
    2005 WL 167603 (S.D.N.Y. Jan. 25, 2005) ....................................................46

*Conway* v. *Microsoft Corp.*,
    414 F. Supp. 2d 450 (S.D.N.Y. 2006).............................................................30

*Croons* v. *N.Y. State Off. of Mental Health*,
    18 F. Supp. 3d 193 (N.D.N.Y. 2014)...............................................................29

*Deshpande* v. *Medisys Health Network, Inc.*,
    2010 WL 1539745 (E.D.N.Y. Apr. 16, 2010), *aff'd*, 423 F. App'x 31 (2d Cir.
    2011) ................................................................................................................52

*Dixon* v. *Int'l Fed'n of Accountants*,
    416 F. App'x 107 (2d Cir. 2011) ......................................................................49

*Dixon* v. *Int'l Fed'n of Accts.*,
    2010 WL 1424007 (S.D.N.Y. Apr. 9, 2010), *aff'd*, 416 F. App'x 107 (2d Cir.
    2011) ................................................................................................................45

*Ebbert* v. *Nassau Cty.*,
    2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) .................................................31

*Eka* v. *Brookdale Hosp. Med. Ctr.*,
    247 F. Supp. 3d 250 (E.D.N.Y. 2017) ..............................................................31

*Emmanuel* v. *Cushman & Wakefield, Inc.*,
    2015 WL 5036970 (S.D.N.Y. Aug. 26, 2015) (Woods, J.) ..............................29

*Erasmus* v. *Deutsche Bank Am. Holding Corp.*,
    2015 WL 7736554 (S.D.N.Y. Nov. 30, 2015)..................................................38

*Fahrenkrug* v. *Verizon Servs. Corp.*,
    652 F. App'x 54 (2d Cir. 2016) ........................................................................31

*Falchenberg* v. *New York State Dep't of Educ.*,
    338 F. App'x 11 (2d Cir. 2009) ........................................................................39

*Ferraro* v. *Kellwood Co.*,
    440 F.3d 96 (2d Cir. 2006)...............................................................................48

*Filozof* v. *Monroe Cmty. Coll.*,
    411 Fed. App'x 423 (2d Cir. 2011)...................................................................38

*Fleming* v. *MaxMara USA, Inc.*,
    644 F. Supp. 2d 247 (E.D.N.Y. 2009), *aff'd*, 371 F. App'x 115 (2d Cir. 2010)....................51

*Valencia ex rel. Franco* v. *Lee*,
   316 F.3d 299 (2d Cir. 2003)...........................................................................52

*Gaudioso* v. *Enlarged City Sch. Dist. of Newburgh*,
   2008 WL 11395572 (S.D.N.Y. Feb. 22, 2008).............................................41

*Goldman* v. *Admin. for Children's Servs.*,
   2007 WL 1552397 (S.D.N.Y. May 29, 2007) ...............................................29

*Gonzalez* v. *City of New York*,
   442 F. Supp. 3d 665 (S.D.N.Y. 2020) (Woods, J.), *aff'd*, 845 F. App'x 11 (2d
   Cir. 2021) ................................................................................................ passim

*Graham* v. *Long Island R.R.*,
   230 F.3d 34 (2d Cir. 2000)......................................................................28, 30

*Grant* v. *Roche Diagnostics Corp.*,
   2011 WL 3040913 (E.D.N.Y. July 20, 2011) ...............................................31

*Hannah* v. *Walmart Stores, Inc.*,
   803 F. App'x 417 (2d Cir. 2020) .................................................................41

*Hubbard* v. *Port Auth.*,
   2008 WL 464694 (S.D.N.Y. Feb. 20, 2008)..................................................39

*Isaac* v. *City of N.Y.*,
   271 F. App'x 60 (2d Cir. 2008) ...................................................................47

*Isienyi* v. *Interactive Data Corp.*,
   2018 WL 1578173 (S.D.N.Y. Mar. 27, 2018) (Woods, J.)..........................34, 39

*Jones* v. *Ford Motor Credit Co.*,
   358 F.3d 205 (2d Cir. 2004)........................................................................51

*Kaur* v. *New York City Health & Hosps. Corp.*,
   688 F. Supp. 2d 317 (S.D.N.Y. 2010)..........................................................52

*Kemp* v. *A & J Produce Corp.*,
   164 F. App'x 12 (2d Cir. 2005) ...................................................................45

*Klein* v. *City of New York*,
   2011 WL 5248169 (S.D.N.Y. Oct. 28, 2011) ...............................................52

*Konteye* v. *N.Y.C. Dep't of Educ.*,
   2019 WL 4418647 (S.D.N.Y. Apr. 10, 2019)...........................................25, 40

*Lawless* v. *TWC Media Sols., Inc.*,
   487 F. App'x 613 (2d Cir. 2012) .................................................................48

*Lawson* v. *Getty Terminals Corp.*,
866 F. Supp. 793 (S.D.N.Y. 1994) ........................................................................27

*Lee* v. *Healthfirst, Inc.*,
2007 WL 634445 (S.D.N.Y. Mar. 1, 2007) ............................................................48

*Levitant* v. *City of New York Hum. Res. Admin.*,
558 F. App'x 26 (2d Cir. 2014) .............................................................................40

*Martinez-Santiago* v. *Zurich N. Am. Ins. Co*,
2010 WL 184450 (S.D.N.Y. Jan. 20, 2010) ..........................................................30

*Maynard* v. *Montefiore Med. Ctr.*,
2021 WL 396700 (S.D.N.Y. Feb. 4, 2021) ...........................................................49

*McDonnell Douglas Corp* v. *Green*,
411 U.S. 792 (1973) ...............................................................................................25

*McDowell* v. *T-Mobile USA, Inc*.,
2007 WL 2816194 (E.D.N.Y. Sept. 26, 2007), *aff'd*, 307 F. App'x 531 (2d
Cir. 2009) ...............................................................................................................30

*Messinger* v. *JPMorgan Chase Bank, N.A.*,
126 F. Supp. 3d 376 (S.D.N.Y. 2015) ..............................................................35, 36

*Meyer* v. *Shinseki*,
2016 WL 11263169 (E.D.N.Y. July 28, 2016) ......................................................47

*Meyer* v. *Shulkin*,
710 F. App'x 453 (2d Cir. 2017) ...........................................................................47

*Motorola Credit Corp.* v. *Uzan*,
388 F.3d 39 (2d Cir. 2004).....................................................................................51

*Nassry* v. *St. Luke's Roosevelt Hosp.*,
2016 WL 1274576 (S.D.N.Y. Mar. 31, 2016) (Woods, J.)............................. passim

*Nguedi* v. *Fed. Reserve Bank of N.Y.*,
2019 WL 1083966 (S.D.N.Y. Mar. 7, 2019) (Woods, J.)............................... passim

*Nguedi* v. *Fed. Reserve Bank of N.Y.*,
813 Fed. Appx. 616 (2d Cir. 2020).........................................................................25

*Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co.*,
875 F.3d 107 (2d Cir. 2017)....................................................................................24

*In re Nigeria Charter Flights Contract Litigation*,
520 F. Supp. 2d 447 (E.D.N.Y. 2007) ...................................................................51

*Nowak* v. *Ironworkers Local 6 Pension Fund*,
  81 F.3d 1182 (2d Cir. 1996)..............................................................................51

*Pennington* v. *D'Ippolito*,
  855 F. App'x 779 (2d Cir. 2021) .........................................................................24

*Philippeaux* v. *Fashion Inst. of Tech.*,
  1996 WL 164462 (S.D.N.Y. Apr. 9, 1996), *aff'd*, 104 F.3d 356 (2d Cir. 1996)...................41

*Pierre* v. *N. Y. S. Dep't of Corr. Servs.*,
  2009 WL 1583475 (S.D.N.Y. June 1, 2009) .........................................................28

*Potash* v. *Florida Union Free Sch. Dist.*,
  972 F. Supp. 2d 557 (S.D.N.Y. 2013)..................................................................37

*Quarless* v. *Brooklyn Botanic Garden Corp.*,
  611 F. App'x 28 (2d Cir. 2015) ......................................................................48, 49

*Radolf* v. *Univ. of Conn.*,
  364 F. Supp. 2d 204 (D. Conn. 2005) .................................................................52

*Ragin* v. *E. Ramapo Cent. Sch. Dist.*,
  2010 WL 1326779 (S.D.N.Y. Mar. 31, 2010), *aff'd*, 417 F. App'x 81 (2d Cir.
  2011) ..............................................................................................24, 41, 44

*Ramsaran* v. *Booz & Co. (N.A.) Inc.*,
  2015 WL 5008744 (S.D.N.Y. Aug. 24, 2015) (Woods, J.) ........................................34

*Raucci* v. *Town of Rotterdam*,
  902 F.2d 1050 (2d Cir. 1990).............................................................................51

*Rogers* v. *Bank of New York Mellon*,
  2016 WL 4362204 (S.D.N.Y. Aug. 15, 2016) ........................................................48

*Ruth* v. *Infonet Servs. Corp.*,
  1997 WL 189038 (S.D.N.Y. Apr. 17, 1997)...........................................................36

*Salib* v. *P & O Ports N. Am., Inc.*,
  2008 WL 4724008 (E.D.N.Y. Oct. 28, 2008) .........................................................29

*Serby* v. *N.Y.C. Dep't of Educ.*,
  526 F. App'x 132 (2d Cir. 2013) .........................................................................47

*Shaw* v. *McHugh*,
  2015 WL 1400069 (S.D.N.Y. Mar. 26, 2015), *aff'd*, 641 F. App'x 95 (2d Cir.
  2016) ..................................................................................................32, 33

*Shumway* v. *United Parcel Serv., Inc.*,
  118 F.3d 60 (2d Cir. 1997)................................................................................31

*Simmons* v. *Akin Gump Strauss Hauer & Feld, LLP*,
2011 WL 4634155 (S.D.N.Y. Oct. 6, 2011) ...................................................35

*St. Mary's Honor Ctr.* v. *Hicks*,
509 U.S. 502 (1993) .................................................................................34, 35

*Trane* v. *Northrop Grumman Corp.*,
94 F. Supp. 3d 367 (E.D.N.Y. 2015), *aff'd*, 639 F. App'x 50 (2d Cir. 2016) .........................47

*Varughese* v. *Mount Sinai Med. Ctr.*,
2015 WL 1499618 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 693 F. App'x 41 (2d Cir.
2017) ....................................................................................................40, 44

*Vazquez* v. *Southside United Hous. Dev. Fund Corp.*,
2009 WL 2596490 (E.D.N.Y. Aug. 21, 2009) ................................................27

*Venezia* v. *Luxoticca Retail N. Am. Inc.*,
2015 WL 5692146 (S.D.N.Y. Sept. 28, 2015) ..............................25, 26, 34, 40

*Wallace* v. *Skadden, Arps, Slate, Meagher & Flom LLP*,
799 A.2d 381 (D.C. 2002) ........................................................................35

*Wallen* v. *Teknavo Grp.*,
2019 WL 1435879 (E.D.N.Y. Mar. 30, 2019), *reconsideration denied*, 2021
WL 768133 (E.D.N.Y. Feb. 26, 2021) ....................................................31, 32

*Weber* v. *City of New York*,
973 F. Supp. 2d 227 (E.D.N.Y. 2013) .......................................................42

*Weinstock* v. *Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) ......................................................................35

*White* v. *Eastman Kodak Co.*,
368 F. App'x 200 (2d Cir. 2010) ..............................................................48

*Williams* v. *Home Depot U.S.A., Inc.*,
2005 WL 2429421 (S.D.N.Y. Sept. 30, 2005) ............................26, 27, 29, 35

*Woodard* v. *TWC Media Solutions, Inc.*,
2011 WL 70386 (S.D.N.Y. Jan 4, 2011) ....................................................33

*Ya-Chen Chen* v. *City Univ. of New York*,
805 F.3d 59 (2d Cir. 2015) .............................................................35, 45, 48

*Zheng-Smith* v. *Nassau Health Care Corp.*,
486 F. Supp. 3d 611 (E.D.N.Y. 2020) .............................................46, 47, 48

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6) ..............................................................................1

Fed. R. Civ. P. 11 ........................................................................................................................43

Fed. R. Civ. P. 56 ....................................................................................................................6, 24

Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), and John Bick, Harold Birnbaum, Daniel Brass, John Butler, William Chudd, Sophia Hudson, Thomas Reid, and Brian Wolfe (the "Individual Defendants") (with the Firm, "defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the amended complaint filed October 4, 2021 by plaintiff, Kaloma Cardwell (ECF 200) ("TAC").

## PRELIMINARY STATEMENT

In Cardwell's telling, when he joined Davis Polk as an associate in 2014, he was an "exceptional" candidate who signed up for "a life that would include a guaranteed and stable income [and] career." TAC ¶¶ 21–22, 670. Cardwell promised that the evidence would show him "as having exceptional judgment and competencies related to lawyering, law firms, and the legal profession." TAC ¶ 309. He says he was terminated from the Firm not because of his unsatisfactory performance, but because of his race or concerns he raised related to race. TAC ¶ 1.

The undisputed facts tell a different story. Cardwell simply was not able to perform at the level expected of a Davis Polk associate. That—and only that—is why he was asked to seek other employment. Race played no part in that decision.

Cardwell's performance was not at a level to be a successful associate at Davis Polk and, over time, it became apparent that he was unable consistently to do the types of client-critical tasks he would need to be able to do in order to continue at the Firm. Despite meaningful real-time feedback, performance coaching, second chances, exceptions to policy, and repeated interventions by the Firm's senior-most personnel, Cardwell ultimately was unable successfully to make the transition from junior to midlevel associate or to demonstrate that he had the skills necessary to succeed at the Firm.

In 2014, Cardwell began as an associate in the Firm's Corporate Department. By

the end of his second year, senior lawyers in three independent practice groups within the department had observed—and documented—similar and increasingly troubling problems with his performance.  Cardwell neglected the tasks assigned to him.  He came to incorrect conclusions that often required his work to be redone.  He failed to meet deadlines, at times requiring that others be staffed on his matters to pick up the slack in order to avoid jeopardizing the delivery of work to Firm clients.  He was unavailable when tasks needed to be completed in real time and could not complete the tasks expected of him—tasks that others of his seniority could handle.

The Firm explained to Cardwell, in the course of his assignments and in three formal reviews, that he would need to make substantial improvements in his performance.  By the fall of 2016, Cardwell's performance, as reflected in his reviews, was considered to be poor.

The Firm decided to attempt to help Cardwell succeed by devoting significant, senior-level resources to his development.  Specifically, at the end of 2016 and the beginning of 2017, Cardwell was told during his annual review, based on consolidated feedback from partners in the Corporate Department, that he needed to make significant improvements in concrete areas.  The Firm offered to make available to Cardwell a variety of resources, including individualized performance coaching by several partners.

Despite these concrete and sustained efforts by the Firm throughout the spring, summer and fall of 2017—and personal investment in Cardwell's professional development by the heads of the Firm, the Corporate Department, the Mergers and Acquisitions ("M&A") Group, and others—his performance did not improve.

In 2017, for example, one partner assigned Cardwell to assist in writing an important article for clients the partner expected to publish.  Three weeks after receiving the assignment, Cardwell delivered a draft in which he expressly acknowledged that he had failed to confirm whether "relevant and recent case law exists and/or can be cited" in connection with the

article's conclusions. The draft, in other words, was unsupported and therefore unusable. Cardwell offered no explanation for his failure to deliver appropriate work product—and at no time during the three-week period during which he purportedly worked on the assignment did Cardwell seek help or raise questions. The partner was forced to conduct the research himself and completely rewrite the article.

A second partner staffed Cardwell on a fast-moving M&A transaction. Two days later, when the partner requested to review a draft of the papers assigned to Cardwell, he simply could not be found, despite attempts over more than ten hours to locate him. The M&A group was forced to arrange replacement staffing for the deal.

A third partner staffed plaintiff on a financial advisory matter throughout the summer and fall of 2017. Cardwell prepared a draft disclosure that included inapplicable sections from precedents describing entire analyses that were irrelevant to the matter and that the client had not performed. This partner, too, was forced to rewrite the document essentially from scratch. In addition, throughout the assignment, Cardwell often was unreachable, failing to respond to the partner for many hours, leaving the partner to handle time-sensitive client requests without support.

A fourth partner staffed Cardwell on an M&A deal in September 2017 and received from plaintiff a draft so substandard that this partner, like the others, was forced to redo the work himself. Cardwell's draft made clear that he had failed to appreciate the difference between two key (and very different) types of agreements and, as a result, had tried to force changes appropriate for one type of transaction into the other. Cardwell, whose claims in this lawsuit are based on a claim that he was deprived of billable work, failed to bill any of this time.

For his work in 2017, Cardwell was paid $260,000 (consisting of $210,000 in salary and $50,000 in bonus)—exactly the same as his peers. By year-end 2017, it was clear that, despite repeated efforts and interventions, Cardwell's performance problems had not been cured.

Cardwell—by this point a fourth-year associate in the M&A group—was not performing at the level expected of a midlevel associate, and, indeed, in certain respects, was performing at a level unacceptable for an associate at any level.

In early 2018, Cardwell was told during his annual review that his poor performance had made it increasingly challenging to staff him at a level consistent with that of his peers and that it was time for him to begin—supported by his full Firm salary and with the assistance of job placement services paid for by the Firm—to seek alternative employment. (As discussed further below, Cardwell never availed himself of any of these services or, as of 2021, ever sought other employment.) The Firm made clear—again, consistent with Firm practice—that Cardwell was not required to depart immediately and would have his full salary and use of Firm resources for three months. At Cardwell's request, the Firm later extended this period to six months, purportedly because he wished to continue looking for another job. (He now admits he never did so.) Cardwell's employment ended in August 2018.

Cardwell has alleged that it was his race and his strong and vocal interest in issues of diversity and inclusion that caused Davis Polk to terminate his employment. Summary judgment is the point at which Cardwell's allegations must be assessed against the evidentiary record. That assessment unequivocally reveals that none of the defendants discriminated or retaliated against Cardwell at any time, in any respect. He was asked to leave because he did not perform at the level Davis Polk expects and its clients demand. That decision had nothing whatsoever to do with Cardwell's race or his alleged complaints about race.

The evidentiary record is clear and unmistakable. Cardwell's repeated performance deficits were memorialized across the Firm: by senior attorneys in several practice groups, by the Associate Development Department, and by the Diversity Committee. *See, e.g.*, Stmt. ¶¶ 52, 62,

74, 117, 125, 129, 132, 135, 195.[1]  Cardwell himself now contends, far from arguing that he was an exceptional performer, that he is properly compared not to the strongest associates in his class, but to those that, like him, "had been rated as behind" their class.  Stmt. ¶ 270, *e.g.*, TAC ¶ 160. His performance reviews noted numerous significant issues with his performance, including his failure to meet deadlines, inefficiency, nonresponsiveness, and poor substantive legal skills.  Stmt. ¶¶ 52, 62, 74, 117, 125, 129, 132, 135, 195.  When confronted with those reviews, Cardwell testified that he had "no reason to think" at least certain critiques of his performance did not reflect senior lawyers' "honestly"-held beliefs of his performance.  *E.g.*, Stmt. ¶ 55.

Over time, and particularly as he became more senior and the rates charged for his time were to increase, Cardwell's performance made it difficult for the Firm to find him work that he could perform at a level consistent with his seniority and on which senior lawyers could rely. *See, e.g.*, Stmt. ¶¶ 100, 102, 108, 140(c), 141.  As a result of the lack of trust in Cardwell's ability to perform more senior tasks, staffing him was doubly difficult because associates more junior to him would have to be called upon to perform the more senior transaction tasks and Cardwell the more junior tasks on transactions.  This result had nothing to do with race.  In corporate law, producing poor-quality work often leads to staffing difficulties, based on the appropriate and entirely non-discriminatory view that a person who makes errors on elementary tasks cannot be relied upon to perform more sophisticated assignments.  *See, e.g.*, Stmt. ¶¶ 108, 109, 117, 152(e), 154.  These issues become more serious and consequential as associates move from junior to more senior classes, as happened here.

Defendants produced for deposition every witness Cardwell asked for.  Cardwell himself was given the opportunity, over the course of a two-day deposition, to tell his full story under oath.  Now, after nearly two years of litigation and extensive discovery—multiple

---

[1]   Defendants refer throughout to the Statement of Undisputed Material Facts ("Stmt.") filed separately.

depositions, hundreds of thousands of documents produced, interrogatories, requests to admit, opportunities to submit expert proof—no witness or document corroborates Cardwell's claims that the documented evidence of his unsatisfactory performance is a sham or that the Firm sought to punish Cardwell for any complaints he allegedly made.  Cardwell has elicited no testimony from any witness that any of the acts of which he complains were pretext to get rid of him.  Cardwell's case is based only on speculation and innuendo of his own making, not evidence.  There is no genuine issue of material fact for the jury to decide.

Moreover, Cardwell—who practiced law for only four years, who is now unable to practice due to his failure to maintain his law license, and who now admits that he never made a single attempt to "appl[y] for any jobs" *of any kind* since 2018—claims, incredibly, that he is so devoted to the profession that he would have become a Davis Polk partner and should be paid more than $20 million in lost partnership income.  Stmt. ¶¶ 1, 218(b), 243(c), 252.

There is no support, in fact or law, for Cardwell's claims.  The undisputed facts establish that this case can—and should—be resolved on summary judgment.  Defendants respectfully request that the Court dispose of Cardwell's lawsuit, in its entirety, pursuant to Rule 56.

## FACTUAL BACKGROUND

Plaintiff claims that he was deprived of billable work and ultimately terminated because of his race or complaints he made relating to race.  The undisputed facts, described below, refute both claims.

### A.    The Parties

Plaintiff began as a first-year associate in Davis Polk's Corporate Department in September 2014, after a 2013 summer internship, and worked at the Firm until August 2018.  Stmt. ¶ 1.  He was at all times compensated in lockstep with the members of his class.  Stmt. ¶ 238.

Defendant Davis Polk is a premier global law firm with headquarters in New York. Stmt. ¶ 2. The Firm is an industry leader in diversity and inclusion, consistently ranking in the top 26 firms on *The American Lawyer*'s Diversity Scorecard. Buergel Decl. ¶ 81(c). The Firm also ranks in the top five law firms by "highest representation of minorities in their equity partnerships." Buergel Decl. ¶ 81(b). Approximately 35% of the Firm's U.S. lawyers, and 26.8% of its newest partners, are diverse, and its lawyers speak 49 languages and come from 52 countries. Duggan Decl. ¶ 2. The remaining defendants are current or former partners of the Firm (the "Individual Defendants"). Stmt. ¶ 3.[2]

## B. Cardwell Had Persistent, Demonstrated Performance Issues

Cardwell began his tenure at the Firm, like the rest of his class, with two six-month rotations through different practice groups within the Corporate Department. Stmt. ¶¶ 45–46. At the end of these rotations, first-year associates are expected to "assign" formally to one practice group on a full-time basis. Stmt. ¶ 45. Cardwell sought an exception to this policy, and the Firm granted him permission to complete a third rotation. Stmt. ¶¶ 45–46. From the very outset, the senior attorneys with whom he worked—in each rotation and after he was ultimately assigned to M&A in April 2016—noted problems with his performance, which became increasingly problematic in terms of quality of work, client service, reliability and staffing as he became more senior. Stmt. ¶¶ 52, 62, 74, 117, 125, 129, 132, 135, 195.

### 1. Cardwell Exhibited Performance Problems During His First Rotation

Cardwell first rotated through the Firm's Credit (also called "Finance") group, from

---

[2] Two (Messrs. Bick and Reid) were members of the Management Committee during Cardwell's tenure. Stmt. ¶ 18. Three (Birnbaum, Brass, and Wolfe) were junior M&A staffing partners for portions of the Relevant Period (Sept. 15, 2014–Aug. 10, 2018), Stmt. ¶ 4:
    -- Wolfe from approximately July 2015 to July 2017, *id.*;
    -- Birnbaum from approximately July 2016 through the end of the Relevant Period, *id.*; and
    -- Brass from approximately July 2017 through the end of the Relevant Period, *id.*.
All worked in the Firm's M&A Group, except Ms. Hudson, who worked in Capital Markets. Stmt. ¶ 3. Brass (elected 2017), Birnbaum (elected 2016), and Wolfe (elected 2015) were associates for part of the Relevant Period. *Id.*

September 2014 to April 2015.  Stmt. ¶ 46.  Certain reviewers commented on positive aspects of Cardwell's approach to his work—one, for instance, noted that Cardwell was a "hard worker" and "proactive in offering help," and another that he was "easygoing."  Stmt. ¶ 54.  But senior Credit lawyers documented troubling performance issues.  *E.g.*, Stmt. ¶ 52.  Reviewers noted, for example, that Cardwell was "on the slow side in producing drafts," and took "longer than expected to complete certain tasks."  Stmt. ¶¶ 53(a), 53(c).  He came "to incorrect conclusions that often require[d] his work to be redone," and his work product "need[ed] improvement."  Stmt. ¶ 53(c).  He did not "focus on the big picture," and "miss[ed] higher level connections."  Stmt. ¶ 53(d).  He neglected to "ask questions when he does not understand," and "even when offered assistance," declined it.  Stmt. ¶ 53(c).  Cardwell also neglected the "simpler matters" and was not sufficiently "prompt to respond and act."  Stmt. ¶ 53(b).  A Firm partner delivered this collective feedback shortly after his first rotation to Cardwell.  Stmt. ¶¶ 47, 56.  Cardwell, per a contemporaneous note, "accepted feedback and agreed."  Stmt. ¶ 56(b).

All of the reviews described above were written and submitted *before* Cardwell made (in September 2015) the first of the complaints this Court has held plausibly allege protected activity, as shown in Figure 2, *infra*.  Stmt. ¶¶ 47, 53, 54, 56.

### 2. Cardwell's Performance Problems Continued During His Second Rotation

Similar problems emerged during Cardwell's next rotation, in M&A (April to October 2015, Stmt. ¶ 46).  Certain reviews noted certain positives—for instance, that Cardwell was "hardworking" and "did a good job with the schedules," and "very quickly volunteers to join calls and take on work."  Stmt. ¶¶ 65(a), 66.  But attorneys on multiple teams noted increasingly serious performance issues, echoing the themes that had emerged during Cardwell's prior Credit rotation.

For example, it took Cardwell a "very long time" to complete drafts, a problem

"made worst [*sic*] by constant assurances [from Cardwell] that work will be ready shortly, even though it is still many hours from being delivered."  Stmt. ¶ 65(a).  Cardwell was not sufficiently responsive to email communications, particularly during time-sensitive phases of client assignments.  Stmt. ¶ 65(e).  He neglected the tasks assigned to him and instead "push[ed] to be involved in tasks where he was not really needed."  Stmt. ¶ 65(a).

Most critically, Cardwell's work product was of a lesser quality than that of other first-year associates.  Stmt. ¶¶ 65(b), 65(c).  Cardwell's performance both made things "difficult with assignments that you ask him to complete" and could "make a person hesitant to ask him to take on additional tasks because the timing for delivery is unclear."  Stmt. ¶ 65(a).  One partner, William Chudd, noted that whereas "another first year could take the lead" on a "diligence report," Cardwell could not; that his "due diligence summaries needed quite a bit of work"; and that his "ability to inspire client confidence" was "below expectations."  Stmt. ¶¶ 65(b), 65(d).  Even this early on in his career, Chudd noted that Cardwell "may be 'behind' in his class."  Stmt. ¶ 65(b).

Contemporaneous emails corroborate these observations; for example, around this time, a more senior associate noted that he was "getting a bit frustrated . . . as I am doing a lot of heavy lifting on small things which Kaloma should be taking care of."  Stmt. ¶ 62.

The Firm again delivered this collective feedback to Cardwell, this time in a December 2015 review meeting with Chudd.  Stmt. ¶ 47.  Chudd delivered a specific and direct message: Cardwell needed to be "more responsive on email communication," "improve his communication with senior lawyers regarding task deadlines and timing of deliverables," and be more careful not to "overlook more basic tasks in favor of more substantive work," as this could work to "the detriment of being able to deliver on the more basic tasks."  Stmt. ¶ 68(a).  Above all, Cardwell needed to "focus on delivering excellent work product on time and communicat[ing] his deadlines and timing," as only "[o]nce he does this" would "senior lawyers . . . feel more

comfortable delegating more work to him." Stmt. ¶ 68(c). Chudd, in other words, highlighted for Cardwell the relationship between performing quality work and being entrusted with additional and more complex assignments. Chudd memorialized the review and Cardwell's request for "more direct real-time performance evaluations," which, as described below, the Firm delivered. Stmt. ¶ 68(b).

All but one of the reviews described above were written and submitted at least a week before Cardwell made (at a meeting in September 2015) the first of the alleged complaints this Court has held plausibly allege protected activity, as shown in Figure 2, *infra*. Stmt. ¶¶ 65(a)– 65(d). The only exception was a review drafted by a non-defendant associate. Stmt. ¶ 65(e).

### 3.   Cardwell Was Difficult To Staff During His Third Rotation

Cardwell then began the third rotation he had requested, in Capital Markets (October 2015–April 2016, Stmt. ¶ 46). As before, reviewers noted certain positives—"diligent research of relevant press statements," for one matter, and an "excellent job" "summarizing the terms of a credit card affiliation agreement," for another. Stmt. ¶ 82.

But reviewers again noted serious performance problems, echoing those reported by other groups and delivered to Cardwell during his prior review meeting with Chudd. Indeed, contemporaneous notes reflect "difficulty staffing him in Capital Markets based on performance issues." Stmt. ¶ 70.

One reviewer noted that Cardwell was "unavailable at times when tasks needed to be completed in real time," and kept inadequate "track of deal timing and the status of documentation." Stmt. ¶ 80(a). Another, defendant Sophia Hudson, noted that Cardwell "worked very slowly," "had difficulty meeting deadlines," failed to balance the need for "great attention to detail" with the need to "meet the time demands of [the] transaction/client," and failed to "ask for clarification in a timely manner," "jeopardiz[ing] the timing of providing work product to a client."

Stmt. ¶ 80(b).

As before, there were also serious problems with the substance of Cardwell's work. Hudson noted that Cardwell "provided work product that was disappointing" and "that had to be substantially redone by the senior associate." Stmt. ¶ 80(b). When Hudson "worked directly with Kaloma to see if [she] could help," she "found that he did not understand key aspects of the transaction at a relatively late stage," "lacked attention to detail," and had inappropriately "spent dozens of hours" doing work that should have been delegated to a "legal assistant." Stmt. ¶ 80(b). Hudson described Cardwell as "behind" his class. Stmt. ¶ 114(b).

The Firm again delivered this feedback to Cardwell, in real time and after his rotation.[3]

For example, during the rotation, Hudson spoke with Cardwell about the need to raise the substantive quality of his work. Stmt. ¶ 80(b). (Indeed, mid-rotation, in January 2016, Cardwell cited Hudson as someone who was "particularly good at giving feedback!" Stmt. ¶ 174.) Likewise during the rotation, the then-Managing Partner of the Firm, Thomas Reid, had dinner with Cardwell and another Black associate (now a partner), read their reviews so he could provide feedback, and emphasized to Cardwell that problems like lack of "timeliness and setting expectations" "really do need to be fixed early" in a career. Stmt. ¶ 179. (Cardwell, in a contemporaneous note, called the January 2016 conversation "incredibly helpful." Stmt. ¶ 183(b).)[4]

The Firm also ensured that Cardwell received feedback after his third rotation. In

---

[3]   Cardwell's contentions that Hudson falsified her reviews, or did not create them contemporaneously, are baseless and conclusively refuted by evidence in the record, including contemporaneous emails and electronic files, as set forth herein.

[4]   Cardwell—who now claims that he raised a race-related complaint at this dinner (about "discrimination he himself had experienced during his time at the Firm") that constituted protected activity, see TAC ¶ 105—felt differently at the time, writing that evening in his journal that "everyone left the dinner with an increased amount of respect at the other participants," that "Tom [Reid] cares about and wants improved diversity outcomes," and "[a]ll in all it was a wonderful blessing." Stmt. ¶¶ 183(b), 183(c), 183(d).

the June 2016 time period, a department-wide review of associates flagged Cardwell as "with to behind" his class and struggling in notable respects.  Stmt. ¶ 186.  The Associate Development Department scheduled an interim review for Cardwell, "in response to [his] request" to Chudd for feedback.[5]   John Bick, then serving as the temporary head of the M&A group, learned of Cardwell's unsatisfactory performance and progress and concluded that it was important to give Cardwell interim feedback about his performance issues and not delay providing that feedback until the end of the year.  *E.g.*, Stmt. ¶ 195.  The Associate Development Department asked Bick to deliver the interim review, and Bick agreed to do so.  Stmt. ¶¶ 190–191. Bick subsequently met with Cardwell, explaining to him that although reviewers "saw progress and liked working with him," the review had flagged serious concerns that went to "the core of our service to clients," including problems with time management, deadlines, availability, and prompt communication. Stmt. ¶¶ 81, 196.

4.     Cardwell's Performance Issues Became
Increasingly Problematic as He Became More Senior

Cardwell was formally assigned to M&A, the group of his choosing, in the spring of 2016, Stmt. ¶ 48.  His performance continued to be unsatisfactory, and he continued to exhibit serious and fundamental deficits in the execution of his work as an associate.  *See, e.g.*, Stmt. ¶ 104.

In August and September 2016, for example, Cardwell worked on a deal with senior partner Leonard Kreynin.  *Id*.  Cardwell made major mistakes in revising an important document; among other things, "changes that he made . . . were adverse to [the Firm's] client," and Cardwell introduced a "mismatch between parties and signature pages."  Stmt. ¶ 121.

---

[5]     Stmt. ¶ 81(a) (Bick's summary of the review, noting that Cardwell had "asked for mid-year feedback on his work," and that "this review is in response to that request").  Junior associates customarily receive interim reviews after their two rotations, Stmt. ¶ 192; having requested and obtained permission for a third rotation, and given his request for more feedback, Cardwell received a review on this extra rotation as well.  Bick was "concerned" that without such a review, Cardwell's "serious issues" would otherwise not be addressed until the end-of-year reviews six months later. Stmt. ¶ 195.

Likewise in the summer of 2016, defendant John Butler worked with Cardwell and found that he appeared not to "fully underst[and] what he was talking about." Stmt. ¶ 114(a). When asked to explain the basis for a conclusion he had drawn, Cardwell told Butler "he would have to follow up on that" (Butler noted in his review that "[t]hat did not inspire confidence"). Stmt. ¶ 114(a). In contemporaneous emails, Butler explained to staffing partners that Cardwell was not up to covering a deal in another associate's absence *("[i]f we have to do deal docs next week I need more"*), and that Cardwell was "*just not up to running [a deal]*." Stmt. ¶¶ 98(b), 100.

By the fall of 2016, written reviews of Cardwell's performance and the views of the M&A partners reflected an increasing concern that his work was not at the level expected of a Firm associate, much less one making the transition from the junior to the midlevel role. *See, e.g.*, Stmt. ¶ 109. Cardwell's reputation as "a very poor performer" who "required very careful supervision" was making him "very hard to staff," continuing a dynamic that began when Cardwell was completing his rotations. Stmt. ¶ 109. For instance, one of the junior partners tasked with staffing associates, Harold Birnbaum, spent "a lot of time trying to find deals that Cardwell could do," but would "often get pushback" when proposing that teams take Cardwell "on the basis [that Cardwell] couldn't do the job," and was "a poor performer." Stmt. ¶ 110–11. (Cardwell had by this time a reputation of someone who "couldn't perform at the level of an associate [in] his class year, [did] sloppy work, missed issues, didn't understand issues, [and] missed deadlines," and Birnbaum found it difficult due to his performance issues to staff him on deals ("his performance was so bad, he was very hard to staff.") Stmt. ¶ 109.) Contemporaneous emails show Cardwell being proposed for teams, but teams choosing "higher caliber" associates instead. *See, e.g.*, Stmt. ¶ 101(d).[6] This dynamic was reflected in Cardwell's hours, which were uneven in 2016—low in

---

[6]   For example, in July 2016, then-associate Daniel Brass needed assistance with a deal and reached out to the staffing coordinator, Carolina Fenner, asking for a "good second year or great first year." Stmt. ¶ 83(a); *see generally* Brass Decl.  Fenner responded that "the only 2nd year I can offer today/foreseeable future is Kaloma Cardwell . . . There's no strong 1st year available." Stmt. ¶ 83(b).  Brass, who had worked previously with Cardwell, asked Fenner how

the early months, during his Capital Markets rotation (as noted above, contemporaneous notes reflect "difficulty staffing him in Capital Markets based on performance issues," Stmt. ¶ 70, higher in the summer as he changed groups, and low again from the fall forward, as his reputation became known within his new group (M&A), including in the course of the 2016 annual review cycle, Stmt. ¶ 121, and the gap between his seniority and skills widened and became increasingly apparent. Stmt. ¶¶ 65, 115–17.

That winter, the Firm again delivered clear feedback to Cardwell, noting four "significant areas for improvement." Stmt. ¶ 121. Kreynin, appointed to deliver the December 2016 review, explained that Cardwell needed to (i) "slow do[w]n, pay attention to detail, and ma[ke] sure that all of the de[ta]ils that need to be refl[ec]ted in the document are there"; (ii) ask "questions to be sure" he understood "what [he was] doing and why"; (iii) "seek[] to under[sta]nd key aspects of the overall transaction"; and (iv) ensure that senior attorneys could trust that he had a "good handle on t[he] matters delegated" to him. *Id.*

It was clear, by this time, that Cardwell was not doing well at the Firm. Shortly after this review, Cardwell sent out applications for a full-time position at a California nonprofit. Stmt. ¶ 122.

5.     Cardwell's Performance Did Not Improve
       Despite Efforts by the Firm to Assist Him

By January 2017, a Firm document, prepared for the Diversity Committee, ranked

---

Cardwell was currently rating, as "last time [he] used him it really wasn't great." Stmt. ¶ 83(c); accord Stmt. ¶ 53. Fenner replied, "I think with the proper amount of supervision he can do a good job, but needs to be supervised. Laura has worked with him lately." Stmt. ¶ 83(d). Brass (who had initially limited his request to "great" first years) asked Fenner "what other first years (regardless of ability) have time?" Stmt. ¶ 86(a). At Fenner's suggestion, Brass reached out to Laura Turano, who confirmed that Cardwell had not done mark-up work for her. Stmt. ¶ 84. Brass needed someone with strong and reliable performance and, if possible, proven ability to execute markups reliably. Stmt. ¶ 93(b). Fenner confirmed that "on paper, none" of the other first years had time ("staffing has been painfully thin!"). Stmt. ¶ 86(b). At 2:06 p.m., Brass initially accepted Cardwell ("let's go with Kaloma then. Thanks very much for hunting!"), but Cardwell never worked on the matter; by 5:38, Brass had found a more experienced associate to assist (Cardwell concedes that "the person that he replaced me with was one year senior than me") and informed Cardwell that he would not be needed on the matter. Stmt. ¶¶ 86(g), 87(b), 88, 89; *see generally* Brass Decl.

Cardwell among a group of "low"-performing associates.  Stmt. ¶ 125.

Cardwell continued to neglect even basic matters.  For instance, in March 2017, a law firm in Japan with which Davis Polk had an important relationship contacted a Firm partner to report that Cardwell had failed since November to respond to repeated outreach.  Stmt. ¶ 126. The Japanese firm's representative explained that she had "*not previously experienced such a lapse in communication despite working with the Davis Polk NY team over the past five years*."  Stmt. ¶ 126(e).

At the end of March, the managing partner of the Firm (Reid) and Kreynin met with Cardwell and explained that he was exhibiting the same performance issues he and Reid had discussed a year earlier and some additional issues that were quite serious.  Stmt. ¶ 127(d). Cardwell took a different view of the seriousness of the issue from a performance perspective, characterizing errors Kreynin cited in his review as a "typo."  Stmt. ¶ 127(f).  The partners explained that the issues the Firm had identified went to the fundamental nature of the Firm's work for its clients.  Stmt. ¶ 127(h).

Reid explained that the Firm was going to try to put resources in place to attempt to address Cardwell's performance problems and the staffing difficulties that were a direct result of those problems.  Stmt. ¶ 127(k)–127(m).  (It did so, as described below.)  Reid explained that this would take effort on Cardwell's part as well:  that Cardwell needed to "get in the game or [he would] find [him]self off the field" (meaning, in Reid's words, to use "application and hard work and attending to what . . . need[ed] to be fixed" to "turn [the situation] around").[7]  Stmt. ¶ 127(m).

In response to Cardwell's questions about the cause of his staffing issues, Reid offered Cardwell specifics, as did Kreynin, and explained that it was apparent that Cardwell's low

---

[7]   Cardwell—who now claims that the words "off the field" were a retaliatory "threat" of considerable significance to him, *see* TAC ¶¶ 424, 427, 618, 643—prepared three single-spaced pages of notes of the meeting the same day, and nowhere do the notes include the phrase.  Stmt. ¶ 128 (citing March 29, 2017 notes).

hours indicated that people had lost confidence in Cardwell's performance abilities.   Stmt. ¶ 127(c).

Reid offered Cardwell time off if he wanted it, and indicated that the Firm would work on a further plan with respect to his staffing for his return.  Stmt. ¶¶ 127(j), 127(k).  Cardwell requested and was granted what he described to a friend as four weeks' "vacation."  Stmt. ¶ 40(a).

During his vacation, the Firm worked to identify opportunities to provide Cardwell with "realtime feedback, hands-on training, and teaching" from "partners who were really good teachers."  Stmt. ¶ 129.  Bick met with Cardwell after he returned from vacation (May 2), and explained that partners (including Louis Goldberg, a partner with whom Cardwell had requested to work (*see* Stmt. ¶ 131)), had agreed to coach Cardwell through a series of assignments and give him direct feedback at each stage.  Stmt. ¶ 129.

Cardwell thereafter worked on assignments with four partners.   He performed poorly on each of them.

*First*, in May 2017, Goldberg asked Cardwell to assist with drafting a memorandum for clients on a recent development in Delaware law.  *See* Stmt. ¶ 132.  The underlying legal issue was one of importance to M&A lawyers and the Firm's clients.  *See* Stmt. ¶ 133.  At the request of Harvard, this client memorandum was subsequently published by a prestigious Harvard Law School corporate online forum.  *See* Stmt. ¶ 135(a).  Cardwell expressed unhappiness that the assignment was a legal research and analysis project and not a transaction.  *Id*.  On May 31, a full three weeks after being given the assignment, Cardwell sent a draft to Goldberg.  Stmt. ¶ 132(a).  It was unusable.  Among other issues, Cardwell had included a note indicating that he had not yet even done the research necessary to confirm the article's conclusions ("TBD," Cardwell wrote, "whether relevant and recent case law exists and/or can be cited").  Stmt. ¶ 132(c).  Goldberg was forced to "substantially rewrite work product [from Cardwell]."  Stmt. ¶¶ 132(e), 135(a).  When

the article was published, virtually nothing remained of the draft Cardwell had submitted. Stmt. ¶ 132(e). Goldberg found that Cardwell, now a midlevel associate, "seemed to lack any fundamental grasp of basic corporate law concepts." Stmt. ¶ 136; *see also id.* ¶¶ 132(e).

       *Second*, Cardwell was staffed on a deal with M&A partner Phillip Mills on Thursday, June 14, 2017. Stmt. ¶ 138. By midday the following Tuesday, when Mills requested to review draft work product with Cardwell, Cardwell could not be found. Stmt. ¶ 140. At 10:43 p.m., having still heard nothing despite repeated outreach, Mills wrote to Goldberg, copying Bick:

> Louis: I have a problem here.
>
> Kaloma and I agreed last night that we would discuss his work product today—see attached email.
>
> I first reached out to him today per the first email below at 12:21pm to schedule a meeting for 1:30pm. When I heard nothing from him by mid-afternoon I called and left a message having been told by his assistant that she did not know where he was or whether he was in the office today. As you can see below, I sent him a further message at 5:18pm today. It's now 10:40pm and I have had no response at all— over 10 hours after my original message—nor has he reached out to me.
>
> I plan to reach out to Carolina [Fenner] tomorrow morning for new staffing as [the client] has focused today on the need for a draft letter and just now asked for a draft tomorrow.
>
> Sorry to burden you with this but I tried to make it work. However, it is simply not acceptable when associates are non-responsive for a protracted period especially when they are supposed to be at their desks during business hours.

Stmt. ¶ 140(c). The department was forced to arrange replacement staffing for the deal. Stmt. ¶ 140(c). Mills later described Cardwell's performance as "very disappointing": "his inability to handle a routine assignment is troubling[.]" Stmt. ¶ 141.

       *Third*, in July and August 2017, Cardwell "struggled with the substantive elements" of his work on a "financial advisory assignment" with partner Lee Hochbaum. Stmt. ¶ 144(a). (Cardwell respected Hochbaum; when asked that fall to recommend partners strong on "D[iversity] & I[nclusion]" issues, Cardwell cited Hochbaum (and Amorosi, discussed below) as

"worth [your] time."  Stmt. ¶ 175.**8**)  Hochbaum noted serious problems with the substance of

Cardwell's work.  "For example," Hochbaum wrote,

> I asked Kaloma to prepare a first draft of our client's disclosure for the proxy
> statement and the draft he sent to me included a number of sections lifted from the
> disclosure from another transaction that I pointed him to as a reference that were
> not applicable to the transaction at hand (including sections of disclosure that
> described entire analyses that were not performed by our clients or included in their
> board decks).  As a result, I ended up rewriting the disclosure essentially from
> scratch.

Stmt. ¶ 144(a).  Hochbaum also noted that Cardwell

> tends to make a significant number of careless errors that I would not expect from
> an associate at any level.  For example, I have frequently noted specific changes for
> him and asked him to make corresponding changes throughout the disclosure, only
> to find that he has made only the change specifically identified and failed to make
> conforming changes throughout the remainder of the document.

*Id.*  Hochbaum also reported that Cardwell took "an inordinate amount of time to perform tasks,"

and that his "responsiveness has been generally poor"; that "lack of responsiveness has been

particularly problematic because the transaction has involved a large number of time-sensitive

issues . . . and it has often fallen upon me to respond without any support from Kaloma"; and that

the client had a "lack of confidence in Kaloma."  *Id.*

*Fourth*, Cardwell displayed similar problems on an M&A deal with partner John

Amorosi in September 2017.  Stmt. ¶¶ 147–148.  Cardwell was asked to handle "relatively

circumscribed" assignments, but "his substantive work was below expectations," and the drafts he

returned "did not accurately capture the business deal in fundamental respects."  Stmt. ¶ 148.

Amorosi described Cardwell's work as "sub-par and reflect[ing] a lack of understanding of the

business deal and how to reflect it accurately in the documents."  *Id*.

---

**8**  In the middle of this period, on August 3, 2017, Cardwell filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC"), which was later referred for processing to the New York State Division of Human Rights ("NYSDHR") (the "EEOC/NYSDHR Charge").  Stmt. ¶ 176.  He named <u>*only*</u> the Firm as a defendant; contrary to the statement in the Court's September 23, 2021 opinion (ECF 198 at 30), he did not name as defendants any of the Individual Defendants named in this lawsuit, and he made no mention at all of Chudd, Hudson, or Wolfe.  Stmt. ¶¶ 11, 13, 15, 176.

The fall of 2017 marked the culmination of three years of progressively worsening performance problems.  When Cardwell received his annual review for that year, "all reviews consistently noted that the depth and quality of [Cardwell's] work and legal [] analysis was below" that of other third-year associates, and noted "a problem in his timeliness in completing projects as well as his responsiveness to emails and calls."  Stmt. ¶ 152(a).  The Firm explained to Cardwell, on January 11, 2018, that it had become "increasingly challenging to staff him due to his performance," Stmt. ¶ 152(e), and, in a related meeting on February 8, that it was time for Cardwell to seek alternate employment.[9]  Stmt. ¶ 153.  (As Bick testified, by this time, "[t]he work [Cardwell] was capable of doing would be the work of a first- or second-year associate, and we didn't think that was tenable to staff him on those matters."  Stmt. ¶ 154(b).)  The Firm granted Cardwell up to three months to find other employment.  Stmt. ¶ 155.  The Firm made clear that Cardwell would maintain his full Firm salary and could use Firm resources and job placement services.  Stmt. ¶ 155.  At Cardwell's request, this period was extended to six months.  Stmt. ¶ 157.  Cardwell's last day of employment was August 10, 2018.  Stmt. ¶ 159.

Cardwell now admits that, unbeknownst to the Firm, he made no effort at all to apply for a job at any point between February, when he was asked to leave, and August 2018, his last day of work, or at any point prior to his 2021 deposition, Stmt. ¶ 243.  He filed this lawsuit in November 2019, and subsequently let his license to practice law lapse.  Stmt. ¶¶ 245–246.  Davis Polk made no public comment about Cardwell, his performance, his termination, or this lawsuit until the day after he publicly filed it in federal court, in response to press inquiries.  Stmt. ¶ 220.

---

[9]  Cardwell claims that at this time, the Firm was aware that he had sought an extension to January 2018 to file a rebuttal to the Firm's position statement submitted to the NYSDHR and "strategically rescheduled" his review meeting for the day after the rebuttal was due.  This is false.  The Firm was not aware that Cardwell had submitted a rebuttal and, indeed, did not receive a copy of any rebuttal until after commencement of this lawsuit in November 2019, when it submitted a FOIL request.  Duggan Decl. ¶ 8; Buergel Decl. Ex. 72 (Nov. 19, 2019 letter to NYSDHR Records Access Officer), noting that Davis Polk had received "no communication from the NYSDHR regarding the matter since December 2017, nor have we received copies of (i) any briefs or replies filed by Mr. Cardwell, if any were ever filed[.]")

In October 2020, and again in September 2021, this Court granted in part defendants' partial motion to dismiss. ECF 78, 198 ("MTD Orders"). On October 14, 2021, Cardwell filed the Third Amended Complaint. ECF 200.

### C.     Cardwell's Staffing and Termination Were a Function of His Unsatisfactory Performance, Not His Race or Communications About Race

The undisputed evidence establishes that Cardwell's performance made it difficult to staff him and ultimately to retain him as a midlevel associate. Rather than acknowledge this, Cardwell contends that he was assigned less billable work, and ultimately terminated, because of his race or concerns he raised that focused on race.

Cardwell makes two principal claims in this lawsuit.[10]

*First*, Cardwell alleges that his "billable hours" were "eliminat[ed] . . . between September 2016 and April 2017" (the "**Staffing Allegation**"). TAC ¶¶ 1, 383. [11] Cardwell alleges that this was done by "Mr. Bick, Mr. Wolfe, and Mr. Birnbaum," TAC ¶ 383, and either that his "race was a motivating factor" in their decision, *id.*, or that this reflected a "retaliatory staffing policy." TAC ¶¶ 297–298.

*Second*, Cardwell alleges that he was unlawfully terminated (the **"Termination Allegation"**). TAC ¶ 2. Cardwell claims he was told that "Mr. Reid, Mr. Bick, Mr. Brass and the other M&A staffing partners (*i.e.*, Mr. Birnbaum and Mr. Wolfe) had collectively decided to terminate" him, TAC ¶ 592, and, separately, alleges that Butler and Chudd participated. TAC

---

[10]   None of Cardwell's other claims rises to the level of an actionable adverse employment action or otherwise supports a claim, as set forth herein.

[11]   In any event (and not necessary for this motion), Cardwell also misrepresents the record. For one, Cardwell was on vacation for every business day of April 2017. Stmt. ¶ 40. Moreover, it is not clear that Cardwell recorded his time accurately in the seven months prior to April 2017; at a minimum, the fact that Cardwell failed accurately to record his time in the months after April 2017 warrants an inference that he may have failed accurately to record his time prior to that point. (After engaging litigation counsel in the spring of 2017, Cardwell did not record his time accurately on at least three matters. Stmt. ¶¶ 41–44. For instance, he recorded no billable time for June 2017, despite doing extensive work with Goldberg and Mills. *Id.* He billed only one hour to a matter with Amorosi in September 2017, despite having joined calls and meetings (and made revisions that alone should have taken longer). *Id.*)

¶¶ 597–99.[12]   He claims that "race was a motivating factor" for the Firm, Bick, Birnbaum, Brass, Butler, Chudd, Reid, and Wolfe (but not Hudson), TAC ¶¶ 603, 622, and that the Firm, Bick, Birnbaum, Brass, Butler, Chudd, Reid, and Wolfe (but not Hudson) also terminated him because he made "legally-protected race-related complaints."  TAC ¶¶ 585, 592, 622.[13]   (The retaliation claim against Hudson is premised on an unsupportable claim that, in the words of the Court, she "created false review for the purpose of firing him," ECF 198 at 66, addressed separately herein.)

These allegations are summarized below, by defendant.  As set forth above, Cardwell does not bring all claims against all defendants.

| Figure 1 (Allegations By Defendant) | | |
|---|---|---|
| | **Alleges "Race Was a Motivating Factor"** TAC ¶¶ 383, 612, 622 | **Alleges Retaliation Motivated Decision** TAC ¶¶ 297–98, 592, 622 |
| **Staffing Allegation** | | |
| Bick | ✓ | ✓ |
| Birnbaum | ✓ | ✓ |
| Wolfe | ✓ | ✓ |
| **Termination Allegation** | | |
| Bick | ✓ | ✓ |
| Birnbaum | ✓ | ✓ |
| Brass | ✓ | ✓ |
| Butler | ✓ [abandoned] | ✓ |
| Chudd | ✓ [abandoned] | ✓ |
| DPW | ✓ | ✓ |
| Hudson | No [also abandoned] | No |
| Reid | ✓ | ✓ |
| Wolfe | ✓ | ✓ |

There is not a shred of evidence to support any of these claims.

As to the Staffing Allegation, as we show below, Cardwell's assignments were

---

[12]   Cardwell is generally consistent in arguing that the decision to terminate him was made by this group, *e.g.*, TAC ¶¶ 603, 605, 607, though he later speculates that "all of the M&A partners in the Firm'[s] New York office" "discussed" whether he should be terminated and "collectively decided" to do so, TAC ¶¶ 595, 598.  Cardwell includes only one stray reference to Hudson as part of this group, at TAC ¶ 601; no other paragraphs allege that she was part of the decision-making group, nor would she have been; she worked in Capital Markets, not M&A.  Hudson has given sworn testimony that she did not participate, Stmt. ¶ 25, and the remaining allegations against her involving her reviews are baseless and entirely rebutted by the evidence, as set forth below.

[13]   Cardwell has since abandoned discrimination claims against Butler, Chudd, and Hudson.  TAC Cts 3, 5, 9.

driven solely by his record of unsatisfactory performance.  By the fall of 2016, Cardwell was unable to transition from junior to midlevel associate—a struggle that is well-documented in contemporaneous performance reviews and correspondence; demand for his services fell for this reason, not issues of race.  *See, e.g.*, Stmt. ¶¶ 52, 53, 62, 64, 65, 74, 117, 125.  There is no credible, admissible evidence to the contrary, and therefore no genuine issue of material fact for a jury to consider.  Cardwell's claim of retaliatory staffing fails for the further reason that there is no evidence that any of the three individuals he alleges "eliminat[ed]" his hours beginning in September 2016 (Bick, Birnbaum, and Wolfe) had any knowledge of the only three protected activities in which he had allegedly engaged by that time, as shown in Figure 2 below.  Stmt. ¶¶ 8, 14, 21.[14]

The Termination Allegation likewise is utterly unsupported.  There is zero evidence of discriminatory animus towards Cardwell, nor that he was treated less well than similarly-situated others.  (He was not; he lasted approximately four years at the Firm, almost exactly the

---

[14] Cardwell contends that by September 2016, the alleged onset of the drop in his hours, he had engaged in five protected activities.  But as set forth below, this Court has ruled that only three were plausibly alleged to have been protected; the others cannot therefore form the basis for a retaliation claim.

| Figure 2 (Allegedly Protected Activities) | | | |
|---|---|---|---|
| No. (ECF 78) | Allegedly Protected Activity | Ruling at Pleading Stage (ECF 78 at 58–63; ECF 198 at 55–59) | Individual Defs. with Contemp. Knowledge |
| 1. | May 2015 email re. "eye contact" | **Not Protected** (198:56) | |
| 2. | Sept. 2015 convo at Diversity Cttee/BAG mtg | Protected (198:56) | None |
| 3. | Jan. 2016 dinner with Reid & associate | Protected (78:59) | None (except Reid)* |
| 4. | Aug. 2016 email re. alleged deal team removal | **Not Protected** (78:59) | |
| 5. | Sept. 2016 convo re. credit group assignment | Protected (198:57–58) | None* |
| 6. | Dec. 2016 email re. prison issue | **Not Protected** (78:60–61); *accord* 198:55–59, 61 | |
| 7. | Jan. 2017 email re. CAP program | **Not Protected** (78:61) | |
| 8. | Dec. 2016–Mar. 2017 workload capacity forms | **Not Protected** (198:58) | |
| 9. | Mar. 2017 mtg with Reid and Kreynin | Protected (198:58–59) | None (except Reid, Bick) |
| 10. | May 2017 email to Goldberg re. "became ill" | Protected (78:62) | None |
| 11. | Aug. 2017 EEOC/NYSDHR filing | Protected (198:59) | None (except Bick, Brass, Reid) |
| 12. | Jan. 2018 review mtg w/Smith and Goldberg | Protected (78:63) | None (except Bick; Reid) |

*(Bick learned of the fact of the dinner in Mar. 2017.  Stmt. ¶ 21.)  (The allegations are described in detail at ECF 78 and 198.)

median tenure of Davis Polk associates (4.2 years).  Stmt. ¶ 235–236.)  Nor was Cardwell's

termination retaliatory; there is no evidence that Cardwell's termination was driven by anything

other than his unsatisfactory performance and, moreover, most defendants had no knowledge of

his allegedly protected activity and/or played no role in the decision to terminate him.[15]

<strong>ARGUMENT</strong>

Summary judgment should be entered dismissing the TAC in its entirety.  The

undisputed facts establish that there was neither discrimination nor retaliation here.  Cardwell's

claims to the contrary are based solely on speculation and innuendo—but not evidence.

## I.    LEGAL STANDARD

"It is now beyond cavil that summary judgment may be appropriate even in the

fact-intensive context of discrimination cases" and that "'the salutary purposes of summary

judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination

cases than to . . . other areas of litigation.'"  *Abdu–Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456,

466 (2d Cir. 2001) (quoting *Meiri* v. *Dacon*, 759 F.2d 989, 998 (2d. Cir. 1985)).

Summary judgment is warranted "when there are no genuine issues of material fact

and the movant is entitled to judgment as a matter of law."  *Abdu–Brisson,* 239 F.3d at 465; *see*

*Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56).  Movants are

"'entitled to judgment as a matter of law' [where] the nonmoving party . . . fail[s] to make a

sufficient showing on an essential element of her case with respect to which she has the burden of

proof."  *Celotex*, 477 U.S. at 323.

When the non-moving party bears the ultimate burden of proof at trial on an issue,

the moving party's initial burden of production under Rule 56 is discharged by "pointing out . . .

---

[15]   *See* Figure 2.  For example, Cardwell recorded the meeting in which it was allegedly "explained" to him who made the decision to terminate him; Wolfe—who was by that point no longer a staffing partner, TAC ¶ 474—was not mentioned, nor was Butler, Chudd, or Hudson.  Stmt. ¶ 28.

that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co.*, 875 F.3d 107, 116 n.5 (2d Cir. 2017) (citations omitted); *see Balderas* v. *Barmadon Mgmt. LLC*, 2019 WL 1258921, at *3 (S.D.N.Y. Mar. 19, 2019) (Woods, J.) (quoting *Celotex Corp.*, 477 U.S. at 325).   To avoid summary judgment, the opposing party must come forward with specific facts that demonstrate the existence of issues that must be decided by a factfinder.  *Celotex Corp.*, 477 U.S. at 323–25; *Pennington* v. *D'Ippolito*, 855 F. App'x 779, 781 (2d Cir. 2021); *Gonzalez* v. *City of New York*, 442 F. Supp. 3d 665, 682 (S.D.N.Y. 2020) (Woods, J.), *aff'd*, 845 F. App'x 11 (2d Cir. 2021).

Although the Court must view the evidence "in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor," *Abdu-Brisson*, 239 F.3d at 466, "[m]ere conclusory statements, conjecture or speculation by the plaintiff . . . will not defeat a summary judgment motion," *Ragin* v. *E. Ramapo Cent. Sch. Dist.*, 2010 WL 1326779, at *6 (S.D.N.Y. Mar. 31, 2010) (internal quotation marks and citation omitted), *aff'd*, 417 F. App'x 81 (2d Cir. 2011).  Plaintiffs "must 'do more than simply show that there is some metaphysical doubt as to the material facts'"; they must "come forth with evidence sufficient to allow a reasonable jury to find in [thei]r favor."  *Brown* v. *Henderson,* 257 F.3d 246, 252 (2d. Cir. 2001) (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## II.    DEFENDANTS DID NOT DISCRIMINATE AGAINST PLAINTIFF

Cardwell's discrimination claims fail as a matter of law.  None survives the *prima facie* stage (described below).  And, even if one were to assume (solely for the sake of argument) that they could, Cardwell cannot show and the record does not support that the Firm's reason for Cardwell's termination—his unsatisfactory performance over multiple years—was pretextual.

### A.    Cardwell's Discrimination Claims Fail at the *Prima Facie* Stage

Under the burden-shifting framework set forth in *McDonnell Douglas Corp* v.

*Green*, 411 U.S. 792, 802–05 (1973), Cardwell bears the burden of establishing a *prima facie* case of discrimination.[16]   To accomplish this, Cardwell must show—with more than just "conclusory allegations and speculations," *Nguedi*, 2019 WL 1083966, at *1—not only that he (i) belongs to a protected group, which is undisputed, but that (ii) he was "qualified for his position" (meaning, in a discrimination case such as this, "performing his duties satisfactorily," *Nassry* v. *St. Luke's Roosevelt Hosp.*, 2016 WL 1274576, at *6 (S.D.N.Y. Mar. 31, 2016) (Woods, J.) (quoting *Graham* v. *Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000))), (iii) "his employer took an adverse action against him," and (iv) the "adverse employment action occurred in circumstances giving rise to an inference of . . . discrimination," *Nassry*, 2016 WL 1274576, at *6.

Cardwell's federal and state claims fail at the *prima facie* stage because Cardwell has developed no evidence that would permit a reasonable jury to conclude that he was "performing his duties satisfactorily" or that there were "circumstances giving rise to an inference of . . . discrimination." *Id.* (quoting *Graham*, 230 F.3d at 38).  Cardwell's city claim fails because Cardwell has not identified similarly-situated others and, even if he had, there is no evidence that he was treated "less well" than they, much less because of his race.  *Venezia*, 2015 WL 5692146, at *4.

---

[16]   The *McDonnell-Douglas* framework applies to all of Cardwell's claims under federal, state, and city law.  *Venezia* v. *Luxoticca Retail N. Am. Inc.*, 2015 WL 5692146, at *3 (S.D.N.Y. Sept. 28, 2015) (establishing that *McDonnell Douglas* applies to claims under 42 U.S.C. § 2000e-2 ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law (N.Y. Exec. L. § 296 *et seq.*) ("NYSHRL"), and the New York City Human Rights Law (N.Y.C. Admin. Code § 8–107 et seq.) ("NYCHRL")), *aff'd*, 699 F. App'x 53 (2d Cir. 2017); *accord Konteye* v. *N.Y.C. Dep't of Educ.*, 2019 WL 4418647, at *19 (S.D.N.Y. Apr. 10, 2019), *report and recommendation adopted*, 2019 WL 3229068 (S.D.N.Y. July 18, 2019) (granting summary judgment for defendants), *appeal dismissed*, 2020 WL 4559499 (2d Cir. Mar. 19, 2020).  The only circumstances in which *McDonnell-Douglas* does not apply are inapplicable here: cases involving "'direct evidence,'" which "would roughly equate to a 'smoking gun' indicating that plaintiff's firing was discriminatory."  *Venezia*, 2015 WL 5692146, at *3 (quoting *Shao* v. *City Univ. of N.Y.*, 2014 WL 5038389, at *5 (S.D.N.Y. Sept. 30, 2014)).  Although *McDonnell-Douglas* applies to NYCHRL claims, *Venezia*, 2015 WL 5692146, at *3, courts apply a "modified . . . analysis in which, in the first step, 'a plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason.'"  *Id.* at *4 (describing standard in detail and collecting cases) (quoting *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n. 8 (2d Cir. 2013); *Nguedi* v. *Fed. Reserve Bank of N.Y.*, 2019 WL 1083966 at *10 (S.D.N.Y. Mar. 7, 2019) (Woods, J.) (describing NYCHRL); *Nguedi* v. *Fed. Reserve Bank of N.Y.*, 813 Fed. App'x. 616, 618 (2d Cir. 2020).

1.      Cardwell Was Not Performing His Duties Satisfactorily
        To Remain a Firm Associate

*First*, Cardwell's discrimination claims fail because he cannot show that he was "performing his duties satisfactorily" (the second *McDonnell-Douglas* prong).  *See Nassry*, 2016 WL 1274576, at *6 (quoting *Graham*, 230 F.3d at 38).  Cardwell has "failed to adduce evidence" that he was in fact performing satisfactorily, *Nguedi*, 2019 WL 1083966, at *1, does not dispute that at least certain of his poor reviews reflected reviewers' honestly-held beliefs, and concedes that he is properly grouped with associates "rated as 'behind'" their class. Stmt. ¶¶ 54, 247.

This disposes of both the Staffing and Termination Allegations.  Cardwell alleges that his hours began to decrease at the start of his third year (September 2016, TAC ¶¶ 288, 301); by that time, Cardwell was known as a poor performer in three groups, by the Associate Development Department, and soon thereafter by the Diversity Committee.  Law firm associates' responsibilities increase as they become more senior, and Cardwell was unable to make the transition.  By the time he was told to seek alternative employment, "the work he was capable of doing w[as] the work of a first- or second-year associate," and it was no longer "tenable" to staff him at a fourth-year level, consistent with the Firm's obligations to its clients.  Stmt. ¶ 154(b); *accord* ¶¶ 425 n.2.

Courts routinely grant summary judgment for failure to make a *prima facie* case where an employee is not "performing his duties satisfactorily." *Nassry*, 2016 WL 1274576, at *6 (quoting *Graham*, 230 F.3d at 38); *see e.g.*, *Williams* v. *Home Depot U.S.A., Inc.*, 2005 WL 2429421 at *11 (S.D.N.Y. Sept. 30, 2005).  The fact that an employee has certain positive attributes, or received certain positive or mixed reviews, does not alter this result.  For instance, in *Williams*, even though "in every performance review plaintiff received at the Home Depot . . . he was rated three out of five, which signifies 'Solid Performance' and indicates that plaintiff '[m]eets job expectations,'" the Court found that "it cannot be said that plaintiff necessarily meets the

employer's performance criteria," and granted summary judgment for the employer.  2005 WL 2429421, at *11 ("Given this documented evidence from plaintiff's personnel record, the Court finds that plaintiff failed to meet defendant's performance criteria to be qualified for his position, and thus fails to satisfy the job qualification prong of the *prima facie* case"), *aff'd*, 196 F. App'x 47 (2d Cir. 2006).[17]

The same result is appropriate here.[18]  Without any "effort to refute" "evidence of [his] poor job performance," Cardwell cannot "demonstrate that he was qualified" to remain an associate at the Firm.  *Lawson*, 866 F. Supp. at 801.

## 2.     No "Circumstances Giv[e] Rise to an Inference of Discrimination"

Cardwell's discrimination claims fail at the *prima facie* stage for the independent reason that he has failed to adduce evidence—as he must under the fourth *McDonnell-Douglas* prong—of "circumstances giving rise to an inference of discrimination."  *Nguedi*, 2019 WL 1083966 at *8 (Woods, J.); *Nassry*, 2016 WL 1274576, at *6 (Woods, J.).

Cardwell attempts to raise such an inference through the use of what he calls "comparators."  This technique requires Cardwell to adduce evidence showing that the Firm "treated him less favorably than a similarly situated employee outside his protected group."  *Nguedi*, 2019 WL 1083966, at *7 (quoting *Graham*, 230 F.3d at 39).  But Cardwell "has failed to

---

[17]   *Accord Lawson* v. *Getty Terminals Corp.,* 866 F. Supp. 793, 801 (S.D.N.Y. 1994) (granting summary judgment where plaintiff failed, at the *prima facie* stage, to establish he was qualified for his job and defendant listed several specific instances of plaintiff's unsatisfactory performance, even though plaintiff submitted affidavits describing himself as "hardworking, cooperative, sincere, and dedicated," and "intelligent, competent, and hard working"); *see also Arroyo* v. *N.Y. State Ins. Dep't*, 1995 WL 611326, at *3 (S.D.N.Y. Oct. 18, 1995) (granting summary judgment at *prima facie* stage where there was "overwhelming, largely unrebutted evidence that plaintiff was not qualified to perform her duties at the time she was discharged"), *aff'd,* 104 F.3d 349 (2d Cir. 1996); *Vazquez* v. *Southside United Hous. Dev. Fund Corp.,* 2009 WL 2596490, at *10 (E.D.N.Y. Aug. 21, 2009) (granting summary judgment because plaintiff failed to establish she was qualified to perform her job).

[18]   In its September 2021 Order, the Court indicated that "the parties do not dispute that Cardwell . . . was otherwise qualified to be an associate at Davis Polk."  ECF 198 at 41 n. 10.  Defendants understand the Court to be referring to the questions placed at issue for purposes of the partial motion to dismiss.  For avoidance of doubt, defendants have, as early as their first submission to this Court, preserved the argument that Cardwell was not qualified to remain a Firm associate.  ECF 25 at 2–3.

identify a comparator who is 'similarly situated' to himself, and was treated better, which is fatal

to this potential basis to establish his *prima facie* case" of discrimination, because it leaves "no

basis for a reasonable jury to infer" that his treatment "had anything to do with his race." *Id.* at

*8.  Courts "properly grant summary judgment" on this basis, and this record warrants the same

result.  *Pierre* v. *N. Y. S. Dep't of Corr. Servs.*, 2009 WL 1583475, at *12 (S.D.N.Y. June 1, 2009).

To raise an inference by comparison to others, Cardwell must "show that [h]e was

'similarly situated in all material respects,'" meaning that he and the "individuals with whom [h]e

seeks to compare himself" not only (i) were "subject to the same performance evaluation and

discipline standards," but also (ii) "engaged in comparable conduct."  *Graham*, 230 F.3d at 39–40

(quoting *Shumway* v. *United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *see Assue* v. *UPS,*

*Inc.*, 2018 WL 3849843, at *13 (S.D.N.Y. Aug. 13, 2018).  In other words, "'a plaintiff's and his

comparator's conduct'"—*e.g.*, the "conduct for which the employer imposed discipline," *Graham*,

230 F.3d at 40—must have been "'of comparable seriousness.'"  *Assue*, 2018 WL 3849843, at *13

(quoting *Graham*, 230 F.3d at 40); *see generally Graham*, 230 F.3d at 40.  At summary judgment,

the "determination that two acts are of comparable seriousness requires—in addition to an

examination of the acts—an examination of the context and surrounding circumstances in which

those acts are evaluated."  *Graham*, 230 F.3d at 40.

Cardwell cannot and does not meet this standard.

Cardwell identified twelve purported comparators in discovery, anonymized here

as Associates 1–12 (the "Twelve Associates").  Stmt. ¶¶ 259–60.  He now focuses on seven

(Associates 3 and 5–10).  TAC ¶¶ 644–65.

As a preliminary matter, and as summarized in Figure 3, at least five (2, 3, 5, 7, and

9) cannot be comparators as a matter of law, either because they were of a different professional

rank,[19] or because they were not "outside [Cardwell's] protected group."[20]

There are three core remaining problems with Cardwell's comparator analysis.

*First*, Cardwell has not identified any individuals who were treated "'more favorably by the *same decisionmaker*.'" *Emmanuel* v. *Cushman & Wakefield, Inc.*, 2015 WL 5036970, at *6 (S.D.N.Y. Aug. 26, 2015) (Woods, J.) (emphasis added) (quoting *White* v. *Connecticut, Dep't of Corr.*, 2010 WL 3447505, at *6 (D. Conn. Aug. 24, 2010). This is dispositive here. *Id.* Plaintiff makes clear that the (alleged) decisionmakers with respect to the Staffing Allegation were Bick, Birnbaum, and Wolfe, TAC ¶ 240, but has put forth no evidence establishing who made final determinations with respect to the staffing of any of the Twelve Associates, Stmt. ¶ 275. Plaintiff likewise is clear as to which partners made the decision to terminate his employment, *see* Figure 1, but has put forth no evidence as to who made the decision *not* to terminate those who were not terminated. Stmt. ¶¶ 276.[21] There can be no comparator-based claim on this record; the fact that "different decisionmakers were involved" is a difference "significant enough to prevent a reasonable jury from finding that [potential comparator] and plaintiff were similarly situated so as to allow the drawing of an inference of discrimination." *Baity* v. *Kralik*, 51 F. Supp. 3d 414, 447 (S.D.N.Y. 2014).

---

[19]  Associates 3, 5, 7 and 9 were either two or three years senior to Cardwell; 2 was one year senior. These associates were of different rank and not therefore "subject to the same performance evaluation," because their responsibilities and the expectations of them were different. Moreover, when an associate in the class of 2012 is described as "behind," she is being described as "behind" an entirely different group of associates (the class of 2012) than Cardwell's Class of 2014. Fig. 3; *see, e.g.*, *Croons* v. *N.Y. State Off. of Mental Health*, 18 F. Supp. 3d 193, 204 (N.D.N.Y. 2014) (finding, at summary judgment, that a potential comparator was not similarly situated where she and plaintiff had the same position, but she was "senior" and he was "non-senior," and plaintiff provided no "evidence" that "senior and non-senior [positions] were treated identically"); *Salib* v. *P & O Ports N. Am., Inc.*, 2008 WL 4724008, at *13 (E.D.N.Y. Oct. 28, 2008) (finding "plaintiffs have not produced any evidence indicating that the comparators they have chosen are 'similarly situated in all material respects,'" where "defendant produce[d] evidence demonstrating that at least two of the comparators were more senior than plaintiffs and therefore necessarily would have had more opportunities to work than plaintiffs").

[20]  Associate 2, who is Black, cannot be a comparator as a matter of law, because he is in the same "Title VII-protected class" as plaintiff. Duggan Decl. ¶ 4; *see Williams*, 2005 WL 2429421, at *10; *Goldman* v. *Admin. for Children's Servs.*, 2007 WL 1552397, at *7 (S.D.N.Y. May 29, 2007) (plaintiff who "presents no evidence of[] the race or national origin of alleged comparators[] [cannot] satisfy the similarly situated test"); *Nguedi*, 2019 WL 1083966, at *7.

[21]  Five of twelve associates were given "time to go" messages (3,5,7,8,10). Stmt. ¶ 242.

*Second*, no evidence would permit a reasonable jury to conclude that any of the Twelve Associates were "similarly situated" to him in "all material respects."[22]

Most critically, Cardwell cannot show that his purported "comparator[s'] conduct," *Assue*, 2018 WL 3849843, at *13, meaning the "conduct for which the employer imposed discipline," *Graham*, 230 F.3d at 40, was "'of comparable seriousness.'" *Assue*, 2018 WL 3849843, at *13 (quoting *Graham*, 230 F.3d at 40). The record contains detailed evidence of Cardwell's inability to perform his duties to Firm standards. But while Cardwell has assembled the Twelve Associates' performance reviews, he has "presented no evidence" permitting an "examination of the context and surrounding circumstances in which" their performance must be "evaluated." *Graham*, 230 F.3d at 39–40. The record developed during discovery is utterly devoid of documents—like performance-related emails or work product—permitting comparison of their performance, and Cardwell took no testimony from the vast majority of those who supervised them. (Between them, the Twelve Associates were reviewed by approximately 131 attorneys in approximately 345 reviews, only seventeen of whom also reviewed Cardwell, and only four of whom were deposed. Stmt. ¶ 271–74.) Cardwell's failure to put forth evidence permitting a reasonable jury to find that his purported comparators' performance, in "context," was as poor as his is dispositive here, as it was in *Shumway*. 118 F.3d at 63; *see also Assue*, 2018 WL 3849843,

---

[22]   As noted above, this prong asks whether purported comparators were "subject to the same performance evaluation . . . standards," *Graham*, 230 F.3d at 39-40; associates of different ranks were not. Cardwell has not carried his burden for this reason, and further because he has put forth no evidence that he shared a supervisor with the Twelve Associates, beyond the sweeping claim that Bick—temporary head of M&A, from early 2016 to 2017—supervised everyone, TAC ¶ 649. The unrebutted evidence shows that of the more than 300 reviews submitted for the Twelve Associates in a seven-year period (Sept. 2012 to Dec. 2019), a mere three were submitted by Bick. *McDowell* v. *T-Mobile USA, Inc.*, 2007 WL 2816194, at *9 (E.D.N.Y. Sept. 26, 2007) (at summary judgment, at the pretext stage, finding no inference of discrimination where "there is no evidence that" alleged comparators and plaintiff "had the same supervisor," despite them being "under the broader supervision" of another), *aff'd*, 307 F. App'x 531 (2d Cir. 2009); *see also Martinez-Santiago* v. *Zurich N. Am. Ins. Co*, 2010 WL 184450, at *8–9 (S.D.N.Y. Jan. 20, 2010) (dismissing case at summary judgment, finding in part that none of the proposed comparators were similarly situated to plaintiff where they did not have the same supervisor, or "team leader"); *accord Conway* v. *Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006).

at *13.  Courts routinely dispose of claims for this reason.[23]  Nor will Cardwell—who submitted no expert reports—be capable of presenting any expert proof at trial that his performance was in fact similar to that of the Twelve Associates.[24]

Even were Cardwell correct that the performance reviews, standing alone, permitted comparison to the other associates, they do not demonstrate that the others' performance was of "comparable seriousness."  *Assue*, 2018 WL 3849843, at *13 (citation omitted).  For one, Cardwell focuses solely on the use of one word—"behind"—in one field of his reviews, ignoring the significant substantive commentary in the narrative fields of the same documents.  But even the data from that one field—which asks whether the reviewer considered an associate "behind" or "ahead" of his class—is not in his favor; three of the Twelve Associates were never rated "behind," during Cardwell's tenure (*see* Fig. 3), and all but one received at least one (and many multiple) "ahead" ratings in the same period, something Cardwell never achieved.  Stmt. ¶ 267.  Courts considering similar fields in reviews have granted summary judgment on the basis that where a plaintiff and a purported comparator have different quantities of a particular rating, their "levels of underperformance were not of comparable seriousness."  *Assue*, 2018 WL 3849843, at *13 (comparing "improvement needed" and "significant improvement needed" ratings).[25]  (The

---

[23]  *See, e.g.*, *Grant* v. *Roche Diagnostics Corp.*, 2011 WL 3040913, at *9 (E.D.N.Y. July 20, 2011) (rejecting argument that purported comparator "exhibited 'sufficiently similar' performance deficiencies," where plaintiff "[m]erely stat[ed] that [the purported comparator] received preferential treatment without setting forth specific facts"); *Eka* v. *Brookdale Hosp. Med. Ctr.*, 247 F. Supp. 3d 250, 270 (E.D.N.Y. 2017) (finding "conclusory statements" by plaintiff "cannot give rise to an inference of discrimination," where plaintiff's only evidence was her own testimony that two alleged comparators were treated better); *Fahrenkrug* v. *Verizon Servs. Corp.*, 652 F. App'x 54, 57 (2d Cir. 2016) (affirming finding at summary judgment lack of inference of gender discrimination, where "plaintiff did not submit any evidence pertaining to her male peers' job duties, assignments, bonuses, or salary increases"); *Wallen* v. *Teknavo Grp.*, 2019 WL 1435879, at *16 (E.D.N.Y. Mar. 30, 2019) (finding at summary judgment no evidence that purported comparators were treated more favorably, where there was "no evidence to support [plaintiff's] assumptions that they were" "given better assignments" and where "plaintiff fail[ed] to provide evidence to compare and contrast the type and scope of work assigned to similarly situated employees"), *reconsideration denied*, 2021 WL 768133 (E.D.N.Y. Feb. 26, 2021).

[24]  *See, e.g.*, *Ebbert* v. *Nassau Cty.*, 2008 WL 4443238, at *2, *13 (E.D.N.Y. Sept. 26, 2008) (denying in part motion *in limine* directed at expert report submitted in discrimination case "for the purpose of assisting the trier of fact in evaluating the jobs performed by the plaintiffs and those of their comparators").

[25]  *See also, e.g.*, *Shaw* v. *McHugh*, 2015 WL 1400069, at *10 (S.D.N.Y. Mar. 26, 2015) (finding at summary judgment

only other associate who was, like Cardwell, never ranked "ahead" was, like him, given a time to go message—and even earlier in his/her career than Cardwell.  Stmt. ¶¶ 263, 267–68.)

        *Third*, plaintiff has put forth no evidence that any similarly-situated individual was in fact treated more "favorably" than he.  *Nguedi*, 2019 WL 1083966 at *7.  While thousands of lawyers have worked at Davis Polk, with varied levels of success, tenure, and experiences in a broad range of practice areas, Cardwell's alleged comparators represent a tiny fraction of the associate population over time.  Even as to that small universe, however, Cardwell's allegations are woefully lacking under applicable standards for comparator analysis.

- As to the Staffing Allegation, plaintiff has put forth no evidence with respect to the quality or appropriateness of the Twelve Associates' billable assignments, or establishing that their supervisors—like his—felt they could not trust them with further assignments (but nevertheless gave them work).  Stmt. ¶ 277.  Absent any such evidence, no reasonable jury could find that plaintiff was treated less favorably in terms of hours or assignments.[26]

- As to the Termination Allegation, plaintiff has put forth no evidence that the Twelve Associates were similarly situated, or even if they were, that they were treated more favorably than he.  In particular:

  - Several (at least 1, 4, 11) were clearly better performers.  Stmt. ¶ 267.
  - All but Associate 5 received "ahead" reviews, unlike Cardwell.  *Id.*
  - Five (3, 5, 7, 8, 10) were told they should find other employment after a string of poor reviews, like Cardwell.  Stmt. ¶ 268.
  - The only three alleged comparators whose performance even arguably was similar to Cardwell's (5, 8, 10)—all of whom were asked to leave—left at a similar juncture to Cardwell, around the three- to four-year mark.  (Cardwell worked at the Firm for three years and eleven months; two of the other associates worked for ten and three months shorter, respectively, than he did, and one worked three months longer, as shown in Figure 3.)  Stmt. ¶¶ 263–68.  Even these associates, as set forth above, cannot be comparators for the independent reasons set forth above.
  - Cardwell worked at the Firm a month shy of four years; the median tenure of a

---

plaintiff, who made mistakes regarding two contracts leading to his suspension, did not "identify anyone who engaged in conduct comparable to the actions that resulted in [his] suspension," where he only argued others "made equally serious errors" as to one, but not both contracts, "defeat[ing] Plaintiff's attempt to identify similarly situated individuals"), *aff'd*, 641 F. App'x 95 (2d Cir. 2016).

[26]  *Wallen* v. *Teknavo Grp.*, 2019 WL 1435879, at *16 (E.D.N.Y. Mar. 30, 2019) (granting summary judgment where there was "no evidence to support [plaintiff's] assumptions that [purported comparators] were" "given better assignments" or to enable factfinder "to compare and contrast the type and scope of work assigned to similarly situated employees"), *reconsid. denied*, 2021 WL 768133 (E.D.N.Y. Feb. 26, 2021).

Firm associate in the class of 2014 is approximately four years and two to three months.  Stmt. ¶¶ 235. (Median tenure for the classes of 2009–2012 is 4.6 years. Stmt. ¶ 234 (McCrary Rep't).)
- o All Twelve Associates have left the Firm; none became a partner at Davis Polk. Stmt. ¶ 261.

| | | | | | |
|---|---|---|---|---|---|
| **Figure 3** <br> **Differences Between Cardwell and Purported Comparators** | | | | | |
| Assoc. | Not Same Decisionmkr. | Not Same "Rank" | More "Aheads"[27] | Fewer "Behinds" | Also Given Time to Go ("TTG") Msg |
| 1 | ✓ | | ✓ (12) | ✓ (0) | |
| 2 | ✓ | ✓ (2013) *Also not outside protected class | ✓ (5) | ✓(2) | |
| 3 | ✓ | ✓ (2012) | ✓ (2) | | ✓ |
| 4 | ✓ | | ✓ (4) | ✓ (0) | |
| 5 | ✓ | ✓ (2012) | | | ✓(2 y. 7 mo. (TTG); 3 y. 1 mo. (Last Day)) |
| 6 | ✓ | | ✓ (3) | ✓ (1) | |
| 7 | ✓ | ✓ (2011) | ✓ (6) | | ✓ |
| 8 | ✓ | | ✓ (1) | ✓ (1) | ✓ (4 y. 1 mo. (TTG); 4 y. 2 mo. (LD)) |
| 9 | ✓ | ✓ (2012) | ✓ (16) | ✓(3) | |
| 10 | ✓ | | ✓ (1) | ✓ (3) | ✓ (3 y. 6 mo. (TTG); 3 y. 8 mo. (LD)) |
| 11 | ✓ | | ✓ (3) | ✓ (0) | |
| 12 | ✓ | | ✓ (3) | ✓ (3) | |
| *Cardwell* | | *(2014)* | *0* | *6* | *(3 y. 5 mo. (TTG); 3 y. 11 mo. (LD))* |

Cardwell's failure to identify comparators who were "similarly situated in terms of performance" and treated more favorably warrants a grant of summary judgment here for failure to make a *prima facie* case.   Courts routinely dispose of cases where "'there are many distinguishing factors between plaintiff and the comparators'" such that "'the court may conclude as a matter of law that they are not similarly situated.'"  *Shaw*, 2015 WL 1400069, at *10 (quoting *Watson* v. *Geithner*, 2013 WL 5420932, at *10 (S.D.N.Y. Sept. 27, 2013)); *Assue*, 2018 WL 3849843 at *13; *Woodard* v. *TWC Media Solutions, Inc.*, 2011 WL 70386 at *14 (S.D.N.Y. Jan 4, 2011).  The same evidence dooms Cardwell's city claim; Cardwell has not identified similarly-situated others and, even if he had, there is no evidence that he was treated "less well" than they,

---

[27] "Aheads" and "behinds" are counted from the associate's first day to Cardwell's last (August 10, 2018).

much less because of his race.  *Venezia*, 2015 WL 5692146, at *4.

       For all of these reasons, Cardwell has failed to make a *prima facie* case.

**B.**    **Cardwell's Performance Was a Legitimate, Non-Discriminatory, and Non-Pretextual Reason for Terminating Him**

       As demonstrated above, Cardwell's discrimination claims fail at the *prima facie* stage as a matter of law.  But even if they did not, Davis Polk had a legitimate, non-discriminatory reason for terminating his employment—his performance—and Cardwell cannot come close to satisfying his "burden" to demonstrate pretext.  *Nassry*, 2016 WL 1274576 at *6–7.

       Davis Polk has easily met its burden to "introduce evidence that *taken as true*, would *permit* the conclusion that there was a non-discriminatory reason" for its actions—all that is required on summary judgment.  *St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original); *accord Isienyi* v. *Interactive Data Corp.*, 2018 WL 1578173, at *5 (S.D.N.Y. Mar. 27, 2018) (Woods, J.).  The record makes clear that plaintiff's performance was unsatisfactory and unreliable, and that it became increasingly difficult to staff him as the gap between his skills and seniority widened.  It is well settled in the Southern District of New York that unsatisfactory performance is a legitimate, non-discriminatory reason to terminate an employee, even if some evaluations were "not negative."  *Ramsaran* v. *Booz & Co. (N.A.) Inc.*, 2015 WL 5008744 at *7 (S.D.N.Y. Aug. 24, 2015) (Woods, J.) (collecting cases).  The Firm also had a legitimate reason not to give Cardwell assignments he could not handle; firms such as Davis Polk have a legitimate interest in ensuring that work is performed appropriately, including to "protect clients" and appropriately staff "from a client point of view."  Stmt. ¶¶ 145, 154(b).

       Under *McDonnell-Douglas*, the burden then shifts to Cardwell to "produce not simply some evidence, but *sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action*."  *Nassry*, 2016 WL 1274576, at *6

(quoting *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)) (emphasis added).  ("To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." *Weinstock*, 224 F.3d at 42.)  The law of the Second Circuit is clear: "'Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual.'"  *Messinger* v. *JPMorgan Chase Bank, N.A.*, 126 F. Supp. 3d 376, 385 (S.D.N.Y. 2015) (quoting *Fleming* v. *MaxMara USA, Inc.*, 371 Fed. App'x 115, 118 (2d Cir. 2010)).

Cardwell's documented, subpar performance prevents him from "show[ing] *both* that [Davis Polk's] reason [for his termination] was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.  Performance evaluations are "among the clearest indicia of whether an employee meets the employer's performance criteria." *Williams*, 2005 WL 2429421 at *11.[28]  And where, as here, "the undisputed evidence indicates that [a law firm associate's] work performance was, at best, mediocre," and when "several of [the associate's] supervisors contemporaneously complained of deficiencies in [his] work," "no reasonable juror could infer that [the Firm's] decision to terminate [him] was based, in any material respect, on racial discrimination." *Simmons* v. *Akin Gump Strauss Hauer & Feld, LLP*, 2011 WL 4634155, at *7 (S.D.N.Y. Oct. 6, 2011) (granting summary judgment on associate's race discrimination claim).[29]  "[A]ny dispute regarding whether [Cardwell's] performance errors were egregious enough to warrant termination is insufficient to demonstrate pretext," *Nassry*, 2016 WL 1274576

---

[28] "The mere fact" that Cardwell  may "disagree" with the complaints against him "[and] think that [his] behavior was justified does not raise an inference of pretext." *Ya-Chen Chen* v. *City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015).  (internal quotation marks and citation omitted); *accord E.E.O.C.* v. *Bloomberg L.P.*, 967 F. Supp. 2d 816, 875 (S.D.N.Y. 2013); *Assue*, 2018 WL 3849843, at *14 ("plaintiff's disagreement with [his performance] evaluations does not create an inference of discrimination");

[29] *Accord Wallace* v. *Skadden, Arps, Slate, Meagher & Flom LLP*, 799 A.2d 381, 387 (D.C. 2002) (fact that associate was "not timely with some of h[is] work product[]" and introduced "errors which prompted negative evaluations" was fatal to his claims at the pretext stage under state law, even though his work was "'at times' considered  "good.")

at *16, and Cardwell has adduced no evidence permitting a reasonable jury to conclude that "what 'motivated the employer'" was in fact Cardwell's race.[30] *Id.* (quoting *McPherson* v. *N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)). Not a single witness has testified that race played any role in the decision to terminate him, nor does any document so indicate; Cardwell's "own vague, conclusory, and speculative statements" that race motivated the defendants are "insufficient to defeat summary judgment." *Messinger*, 126 F. Supp. 3d at 385 (collecting cases).

Moreover, there is no evidence that the alleged comparators to whom Cardwell points were given the significant "opportunit[ies] that plaintiff was afforded" for improvement (working with partners known as good teachers) and experience (the accommodation of the third rotation he was permitted on request). *Ruth* v. *Infonet Servs. Corp.*, 1997 WL 189038, at *10 (S.D.N.Y. Apr. 17, 1997) (crediting the fact that plaintiff was treated more favorably than comparators in finding no pretext at summary judgment phase). Nothing supports a finding here that the Firm's decision to terminate Cardwell on the basis of performance was "'so implausible as to call into question its genuineness.'" *Messinger*, 126 F. Supp. 3d at 385 (citation omitted).

### C. None of Cardwell's Remaining Allegations Alters This Result

Cardwell devotes 790 paragraphs, and 215 pages, to making his allegations. But aside from the Staffing and Termination Allegations, addressed above, none of Cardwell's other allegations rises to the level of an adverse employment action, nor can Cardwell show, as to these allegations, that he was treated "less well" than others for purposes of the NYCHRL. *See* ECF 198 at 44–50; ECF 78 at 32, 40 n. 17 (MTD Orders, reviewing case law), 41–42. None otherwise alters the analysis above. For example:

- ***Brass Transaction (July 2016).*** Cardwell claims that on July 22, 2016, he was the victim of an "abrupt removal" from an "M&A deal" by Brass, TAC ¶ 217, and that this

---

[30] Cardwell makes no discrimination claims against Hudson, nor any claims that her reviews were motivated by race; his (baseless) claims that her reviews were motivated by retaliation are addressed below.

was an act of discrimination on the basis of race.  TAC ¶ 219.

- Cardwell never worked on the matter, and so was not "removed" from it; the entire exchange discussing the possibility of his joining the team spanned less than four hours, Stmt. ¶¶ 83-89, and Cardwell's monthly billable hours *increased* after this exchange, rebutting any claim of adverse impact.  Stmt. ¶ 123.  Thus nothing about the exchange "'radical[ly] change[d]' the nature of [Cardwell's] work."  *Potash* v. *Florida Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (finding no adverse action).  Nor is there any evidence, as set forth below, that he was treated "less well" than similarly-situated others, for purposes of the NYCHRL.

- Nor does the evidence remotely support Cardwell's claim that Brass acted in a "discriminatory," "willful and blatant" way.  TAC ¶ 219.  Cardwell contends that the evidence that Brass was motivated by race was that Brass "would be willing to work with a first-year associate, *regardless of that associate's ability*."  TAC ¶¶ 231–32.  Cardwell mischaracterizes a record that speaks for itself.

- As set forth at footnote 6, *supra*, Brass, who needed mark-up assistance with a deal, initially limited his request for help to a "*good* second year or *great* first year."  Stmt. ¶ 83(a).  The staffing coordinator, Fenner, responded that "the *only* 2nd year I can offer today/foreseeable future is Kaloma Cardwell . . . There's no *strong* 1st year available."  Stmt. ¶ 83(b).  Brass, who had worked previously with Cardwell, asked Fenner how Cardwell was currently rating, as "last time [he] used him it really wasn't great."  Stmt. ¶ 83(c); *accord* Stmt. ¶¶ 61–62.  Fenner replied, "I think with the proper amount of supervision he can do a good job, but needs to be supervised.  Laura has worked with him lately."  Stmt. ¶ 83(d).  At Fenner's suggestion, Brass reached out to Laura (Turano), who confirmed that Cardwell had not done mark-up work for her, which Brass perceived as a worrying indicator, given Cardwell's class year, of Cardwell's reliability and performance.  Stmt. ¶¶ 83(d), 84.  Brass (who, again, had initially limited his request to "*great*" first years) also expanded his search, asking Fenner "what other first years (regardless of ability) have time?"  Stmt. ¶ 86(a).  Fenner confirmed that "on paper, none" of the other first years had time ("staffing has been painfully thin!").  Stmt. ¶ 86(b).  At 2:06 p.m., Brass initially accepted Cardwell ("let's go with Kaloma then.  Thanks very much for hunting!"), but then learned that a more experienced (and more senior) associate was in fact available to assist.  Stmt. ¶¶ 86(g), 84.  By 5:38, Brass informed Cardwell that he would not be needed on the matter.  Stmt. ¶ 87(d).

- Cardwell—who initially claimed that the coordinator "did not provide an explanation for Mr. Brass's behavior," TAC ¶ 220, suggesting that Brass somehow violated policy by keeping her out of the loop—now admits that she was in the loop, and "told me that Mr. Brass's justification to her, communicated through the phone, was that he needed someone more senior to have worked the deal."  Stmt. ¶ 90(b).

- Indeed, Cardwell now concedes that "the person that he replaced me with was one year senior than me," Stmt. ¶ 90(c), negating any claim that the replacement was "similarly situated in all material respects to Mr. Cardwell."  TAC ¶ 226.  The

replacement was a midlevel; Cardwell was a junior.

- Brass's email supplies no basis to presume discriminatory intent, and his attempts a year later to (in Cardwell's words) "staff Mr. Cardwell on multiple public companies deals" would rebut it.  TAC ¶ 610; *cf. Filozof* v. *Monroe Cmty. Coll.*, 411 Fed. App'x 423, 427 (2d Cir. 2011) (holding that it is "difficult to impute" "insidious motivation" where same actor made decision to hire and fire).[31]

- Cardwell has produced no evidence *at all* corroborating his assertion that his "performance was on par with or better than" the associate who ultimately joined the team, or that "race was a motivating factor" in Brass's decision—and, notably, Cardwell chose not to depose Brass in an effort to develop any such evidence.  TAC ¶¶ 227, 239.[32]

- ***Performance Reviews.***  Cardwell makes a series of claims broadly related to his performance reviews in the 2015 to 2016 time period.  But none supports a discrimination claim here.

  o Cardwell has abandoned his discrimination claims against Chudd, *Fig. 1*; any contentions with respect to Chudd's delivery of Cardwell's 2015 annual review (*e.g.*, that the review "didn't match his habits or any feedback that had been communicated directly to him," TAC ¶ 116) are thus irrelevant.[33]

  o Cardwell likewise has abandoned his discrimination claims against Hudson, *Fig. 1*; because he asserts that her motivation was retaliation, not race (*e.g.*, TAC ¶¶ 581–85), her reviews cannot support a claim of discrimination.[34]

  o Cardwell contends that his 2016 midyear review with Bick was a "sham."  But no reasonable jury could so find for Cardwell.  No document or witness corroborates Cardwell's speculation that the review was motivated by Cardwell's race or concerns he raised related to race (TAC ¶ 158).  To the contrary, the record establishes that Cardwell made a request for feedback; that

---

[31]  Nor can any inference be drawn from what Cardwell claims was Brass's decision "not [to] ask Mr. Cardwell any questions that that would have allowed Mr. Brass to determine if the White M&A associate that he replaced Mr. Cardwell with was actually a better fit (based on performance) for the deal."  TAC ¶ 229.  Brass did not need to ask Cardwell questions to make this determination; he had worked with Cardwell previously, and spoken with others who had as well.

[32]  In addition, Brass is not liable under the NYSHRL for acts that occurred when he was an associate, not a partner, because he then had no "ownership interest" in the Firm, and the Firm reserves personnel decisions for those outside associate ranks.  *Erasmus* v. *Deutsche Bank Am. Holding Corp.*, 2015 WL 7736554, at *8 (S.D.N.Y. Nov. 30, 2015) (quotation omitted) (no direct liability under the NYSHRL for individuals without an "ownership interest or any power to do more than carry out personnel decisions made by others").

[33]  In any event, Chudd's "at worst" "mixed review" is not even alleged to have "caused negative consequences" and therefore is not an adverse employment action.  ECF 78 at 44; TAC ¶¶ 115–21.  And because Cardwell has adduced no evidence establishing that his purported comparators did not experience similar events, as set forth in detail above, no reasonable jury could determine that this event was discriminatory.

[34]  Nor is there any support for Cardwell's slanderous suggestion that Hudson was somehow directed to draft negative reviews by anyone (including Reid or Bick).  TAC ¶ 581.  The undisputed testimony shows that she was not, as set forth below, and that she drafted the reviews contemporaneously.  Stmt. ¶¶ 34–37.

the review was a "response to th[e] request" by Cardwell for "mid-year feedback on his work," Stmt. ¶ 181, and to an early 2016 department-wide review of associates that flagged Cardwell as "with to behind" his class and struggling in notable respects; and came at the end of Cardwell's third rotation (and rotators are customarily reviewed after each rotation). *See* footnote 5, *supra*; Stmt. ¶¶ 185-96. In any event, Cardwell's allegations regarding Bick's 2016 mid-year review, TAC ¶ 146, do not rise to the level of a "materially adverse change" in employment. *Isienyi*, 2018 WL 1578173, at *4 (Woods, J.) (noting that "[a] negative performance evaluation—without more—does not ordinarily constitute an adverse employment action for purposes of a discrimination claim") (internal quotation marks and citation omitted). Even "excessive scrutiny do[es] not constitute adverse employment action[]," especially since Cardwell's billable hours *increased*, rather than decreased, after that meeting. *Hubbard* v. *Port Auth.*, 2008 WL 464694, at *12 (S.D.N.Y. Feb. 20, 2008) (internal quotation marks and citation omitted); Stmt. ¶ 123. Nor has Cardwell introduced any evidence establishing that similarly-situated others were treated better, in this regard, than he—for instance, that others with third rotations were not reviewed thereafter, or that others with concerning performance were not given reviews.

### D. Cardwell's Aiding and Abetting Claims Fail

Plaintiff's failure on the merits also extinguishes his aiding and abetting claims against Bick and Reid. It is axiomatic that "aiding and abetting is only a viable theory where an underlying violation has taken place." *Falchenberg* v. *New York State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009). There was none here.

## III. DEFENDANTS DID NOT RETALIATE AGAINST CARDWELL

Cardwell's retaliation claims likewise fail.

### A. Cardwell Has Not Shown a *Prima Facie* Case of Retaliatory Staffing

In his complaint, Cardwell expressly tethers his retaliation claim related to the Staffing Allegation to two alleged complaints, made in September and December 2016. TAC ¶¶ 340–341, 377; *see* Figure 2. This Court has now ruled that one of these, the alleged December 2016 complaint, did not constitute protected activity. Fig. 2 (collecting citations from ECF 78 and 198). Cardwell's retaliation claim premised on the Staffing Allegation therefore should be dismissed to the extent predicated on the alleged December 2016 complaint. *Varughese* v. *Mount

*Sinai Med. Ctr.*, 2015 WL 1499618, at \*65 (S.D.N.Y. Mar. 27, 2015) (plaintiff failed to establish a *prima facie* case when she "explicitly linked the alleged retaliation to non-protected activities"), *aff'd*, 693 F. App'x 41 (2d Cir. 2017).

Cardwell's Staffing-based retaliation claim fails in any event at the *prima facie* stage. To make a *prima facie* retaliation case,[35] Cardwell must "show[]: (1) participation in a protected activity; (2) that the [defendant] knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Gonzalez* v. *City of New York*, 442 F. Supp. 3d 665, 687 (S.D.N.Y. 2020), *aff'd*, 845 F. App'x 11 (2d Cir. 2021). Cardwell cannot make this showing.

Cardwell's Staffing-based retaliation claim fails because it is undisputed that no defendant accused in connection with it (Bick, Birnbaum, or Wolfe) had any knowledge of the only three allegedly protected activities predating the alleged September 2016 (to April 2017) decline in Cardwell's hours, the basis for this claim. TAC ¶¶ 240, 241, Stmt. ¶¶ 8, 14, 21. Birnbaum testified that he knew of none of them (or, for that matter, any of the other protected activities that remain in the case); Wolfe submitted a declaration to the same effect; and Bick testified that he did not know of any of Cardwell's relevant alleged complaints until well after the alleged onset of the staffing decline[36] (in which he, in any event, played no part[37] ). *Fig. 2*; Stmt.

---

[35] The *McDonnell-Douglas* framework applies to Cardwell's federal and state claims. *Venezia*, 2015 WL 5692146, at \*11. As set forth below, Cardwell's claims also fail under the NYCHRL. *Konteye*, 2019 WL 4418647; *Levitant* v. *City of New York Hum. Res. Admin.*, 558 F. App'x 26, 30 (2d Cir. 2014).

[36] In particular, Bick testified that he did not become aware of the September 2015 alleged complaint (Fig. 2 #2) or the September 2016 conversation with Clausen (Fig. 2 #5) until at least after the NYSDHR/EEOC charge was filed. Stmt. ¶ 21. Likewise, Bick testified that he merely learned of the dinner at which the January 2016 complaint (Fig. 2 #3) allegedly occurred—but not about the alleged complaint itself—in March 2017. *Id.* All of these dates were after the onset and after (or nearly after) completion of the date range of the Staffing Allegation (September 2016 to March 2017, TAC ¶ 298, as Cardwell was on vacation for all of April 2017, *see* footnote 11, *supra*).

[37] The undisputed evidence shows that Bick did not "refuse[] to staff" Cardwell in the "second half of 2016 and the beginning of 2017." TAC ¶¶ 301, 323. Bick has provided undisputed testimony that he was "not responsible for day-to-day" staffing and that he did not know Cardwell's staffing situation from October 2016 to March 2017. Stmt. ¶¶ 112–113. Cardwell provides no evidence to counter this, asserting only (for instance) that "it is not plausible that the firm's M&A partners, particularly Mr. Bick . . . was unaware I was not being staffed." Cardwell Tr. 401:5–9. This is the precise type of "[m]ere conclusory statement[]" that does not suffice to "defeat a summary judgment motion."

¶¶ 8, 14, 21. It is axiomatic that for a defendant to have retaliated, they must have "kn[own] of [the plaintiff's] protected activity." *Hannah* v. *Walmart Stores, Inc.*, 803 F. App'x 417, 421 (2d Cir. 2020) (affirming grant of summary judgment absent such evidence); *Gaudioso* v. *Enlarged City Sch. Dist. of Newburgh*, 2008 WL 11395572, at *11 (S.D.N.Y. Feb. 22, 2008) ("[I]f a decision-maker was not even aware that a plaintiff engaged in a protected activity, that decision-maker could not possibly have made a decision in retaliation of that protected activity."). The lack of "direct or indirect evidence" of knowledge merits dismissal of the Staffing-based retaliation claim. *Hannah*, 803 F. App'x at 421. Similar logic compels dismissal of any Staffing-based retaliation claim against Davis Polk, because Cardwell fails to "demonstrate not only that [Davis Polk] as an entity knew of his engagement in the protected activity, but also that the actual decisionmaker(s) knew about it as well." *Philippeaux* v. *Fashion Inst. of Tech.*, 1996 WL 164462, at *6 (S.D.N.Y. Apr. 9, 1996), *aff'd*, 104 F.3d 356 (2d Cir. 1996).[38]

## B.   Cardwell's Claim of Retaliatory Termination Likewise Fails

Cardwell's Termination-based retaliation claims likewise fail at the *prima facie* stage. As set forth above, Cardwell brings this claim against the Firm, Bick and Reid (both on the Management Committee), Birnbaum, Brass, and Wolfe (then-current or then-former staffing partners), and Butler and Chudd (but not Hudson). *Fig. 1.* Cardwell also asserts a retaliation claim against Hudson premised on an unsupportable claim that she "created false review for the purpose of firing him," ECF 198 at 66; *see also* TAC ¶¶ 163–64.[39]

---

*Ragin*, 2010 WL 1326779, at *6.

[38]   Separately, no causal inference can be drawn from the September 2015 and January 2016 alleged complaints (Fig. 2, Nos. 2 and 3). As "[c]ourts in this Circuit have consistently held," the substantial gaps (eight months to a year) between these alleged complaints and the alleged onset, in September 2016, of the Staffing Allegation—indeed, even "the passage of two to three months"—"do[] not allow for an inference of causation." *Gonzalez*, 442 F. Supp. 3d at 688 (internal quotation marks and citation omitted). Any inference is further rebutted by the fact that his hours at points *increased* between January and September 2016. Stmt. ¶¶ 72, 123.

[39]   Although Cardwell includes one stray reference to Hudson as part of the group who decided to terminate his employment, the undisputed evidence establishes that Hudson did not participate in that decision. Stmt. ¶ 25; *see* n.12, *supra*.

*First*, Cardwell's retaliation claim against Hudson—that, in the words of the Court, her "June 2016 and September 2016 reviews for Cardwell were actually created after Cardwell filed his complaint with the EEOC in August 2017," "for the purpose of helping Davis Polk eliminate Cardwell's billable hours," not staff him, and ultimately terminate him, and that the reviews were "used and developed as part of a retaliatory scheme in order to establish a supposed appearance of consistent performance deficiencies that would defeat any suggestion that this reason was pretextual," ECF 198 at 65—is based on rank speculation, and utterly refuted by the indisputable evidence.

Cardwell's retaliation claim against Hudson cannot survive summary judgment, as the undisputed evidence establishes that Hudson was not contemporaneously aware of any of Cardwell's allegedly protected activities (including his EEOC complaint, which made no mention of her).  *See* Stmt. ¶ 12.[40]  The undisputed fact that Hudson was not even aware of Cardwell's alleged protected activity when she prepared her performance reviews precludes Cardwell from establishing "the necessary causal connection" between his alleged protected activity and Hudson's reviews.  *Weber* v. *City of New York*, 973 F. Supp. 2d 227, 272 n.25 (E.D.N.Y. 2013).  Cardwell's retaliation claim against Hudson fails as a matter of law for this reason alone.

Cardwell's retaliation claim against Hudson independently fails because the undisputed evidence conclusively disproves Cardwell's allegations that Hudson's reviews were backdated or altered after Cardwell's August 2017 EEOC filing:[41]

- Metadata show that Hudson's 2016 reviews were created on June 20 and

---

[40]   The Court has held that Cardwell only plausibly alleged that Hudson had knowledge of his September 2015 and EEOC complaints (Fig. 2 Nos. 2, 11).  ECF 198 at 60.  The undisputed evidence belies these allegations.  Hudson's unrebutted testimony establishes that she was not contemporaneously aware of the September 2015 complaint, Stmt. ¶ 12, or of the EEOC complaint, *id.*, and that she does not recall learning of any of Cardwell's alleged comments about race or bias until she "read the complaint" in this matter in 2019 (ECF 1).  *Id.*

[41]   Defendants note that they address this claim to the extent it survives in the Third Amended Complaint, but maintain that this allegation should have been withdrawn subject to the parties' exchange before the Court pursuant to Rule 11.  *E.g.*, ECF 138 *et seq.*

September 27, 2016, and were not subsequently altered.  Stmt. ¶ 35-36.

- Emails sent on September 2016 and May 2017—prior to the filing of Cardwell's EEOC complaint—attached Hudson's June 20 and September 27, 2016 reviews of Cardwell in unaltered form.  *Id.*

- Cardwell has now conceded, as to Hudson's June 2016 review, that he no longer has "any doubts that she created it in June 2016."  *Id.*

The undisputed evidence likewise refutes Cardwell's allegations that Hudson created "pretextual" reviews "[a]t the direction of and in coordination with Mr. Bick or Mr. Reid (or the Associate Development Department acting at their direction or approval)."  TAC ¶¶ 581, 585.  Hudson's unrebutted sworn testimony establishes that she was the sole creator of her reviews, and that no one influenced her drafting of those reviews in any way.  Stmt. 37-38.  In light of this undisputed evidence, no reasonable jury could believe Cardwell's version of events, and his retaliation claims fail as a matter of law.  In any event, any allegations relating to mid-2016 acts of Hudson—who is not alleged to have participated in the termination—are discrete and time-barred.  *See* ECF 78 at 70–75 (summarizing law and reserving issue for summary judgment); ECF 34 at 6, 26–27 (presenting argument as to Hudson).

*Second*, it is unrebutted that none of Birnbaum, Butler, Chudd or Wolfe had any knowledge of any of Cardwell's protected activities at the time the decision to terminate him was made.  Birnbaum offered unrebutted sworn deposition testimony regarding his lack of knowledge, and the others offered sworn declarations to the same effect; Cardwell has offered no contrary evidence at all.  Stmt. ¶¶ 8–10, 16. (Cardwell's broad assertions that M&A partners "routinely talked about [his] complaints" do not save him; when pressed on this, Cardwell merely states this "practice is a fact.  It is an observable fact, it is a demonstrable fact."  Stmt. ¶ 16.  He has not, however, demonstrated it: he asserts that "numerous documents" demonstrate this, but none exists. *Id.*)  The "lack of evidence indicating knowledge" on the part of these defendants also "doom[s]" Cardwell's "ability to show the fourth element (causation)."  *E.E.O.C.* v. *Bloomberg L.P.*, 967 F.

Supp. 2d 816, 859 (S.D.N.Y. 2013).

The undisputed evidence also establishes that Butler, Chudd, and Wolfe were not part of the "group" that decided to terminate Cardwell.

- Birnbaum testified that Butler was not part of this "group." Stmt. ¶ 23. Cardwell was not told Butler or Chudd was a part of this "group," Stmt. ¶ 27, and has provided no "specific facts" to the contrary.

- Cardwell's recording of his February 8, 2018 meeting with Smith and Goldberg shows that Cardwell was not told that Wolfe (by then no longer a staffing partner) was part of this group, and Cardwell has put forth *no evidence*.  Stmt. ¶¶ 28.

- Each of Butler, Chudd, and Wolfe has submitted a sworn declaration in connection with this motion averring that they were not part of the "group." Stmt. ¶¶ 23–24, 26.

Cardwell musters only speculation as to these defendants' involvement, but "mere conclusory statements" are insufficient to "defeat a summary motion." *Ragin*, 2010 WL 1326779, at *6.

*In any event,* Cardwell's claim also fails at the *prima facie* stage because he cannot prove—against his performance record—that retaliatory intent was the cause of the challenged employment action.[42]  He has put forth no "specific facts" as to any defendant.[43]  *Celotex*, 477 U.S. at 324.  A plaintiff who "continu[ally] fail[ed] to meet company standards" and offers only "rank speculation" to the contrary cannot demonstrate causal connection.  *E.E.O.C.*, 967 F. Supp. 2d at 897.

### C.  Cardwell Again Has Identified No Evidence of Pretext

Even assuming *arguendo* that Cardwell could make a *prima facie* case—which we

---

[42]  *See generally* ECF 198 at 61 *et seq.* (reviewing case law on causation standard).  Even under the NYCHRL, plaintiff must link the adverse employment action to a discriminatory motive—which Cardwell has failed to do here. *Varughese*, 2015 WL 1499618, at *40.

[43]  *See* Cardwell Tr. 564:9–565:15, 567:13–570:3 (testifying his termination was, in part, "based on the fact . . . that I had filed an EEOC charge" and that "the M&A partners at Davis Polk routinely talked about me in a racial context," but providing no actual basis for knowing these conversations).  Temporal proximity alone cannot establish *prima facie* causation where the plaintiff was "subjected to repeated critiques and complaints about . . . [his] performance skills before [he] ever lodged any complaints about discrimination." *Dixon* v. *Int'l Fed'n of Accts.*, 2010 WL 1424007, at *6 (S.D.N.Y. Apr. 9, 2010) (dismissing retaliation claim for failure to make out a *prima facie* case), *aff'd*, 416 F. App'x 107 (2d Cir. 2011).

submit he cannot—he cannot overcome his "weightier burden at the pretext stage," *E.E.O.C.*, 967 F. Supp. 2d at 898, to "demonstrate that there is sufficient evidence upon which a reasonable jury could find" pretext as to the Staffing or Termination Allegations. *Kemp* v. *A & J Produce Corp.*, 164 F. App'x 12, 15 (2d Cir. 2005) (granting summary judgment). The Second Circuit routinely upholds dismissals of cases with similar flaws at the pretext stage. *See, e.g.*, *id.* at 16; *Ya-Chen Chen* v. *City Univ. of New York*, 805 F.3d 59, 73 (2d Cir. 2015); *Bentley* v. *AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019).

To carry his burden, Cardwell "must produce evidence 'to prove by a preponderance of the evidence'" *both* that Davis Polk's proffered legitimate and non-retaliatory reasons for reducing his hours and terminating him were "'false *and* that [retaliation] was the real reason.'" *Gonzalez*, 442 F. Supp. 3d at 688–89 (quoting *Back* v. *Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) and *Quaratino* v. *Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995)) (emphasis and alteration in original). Cardwell can prove neither.

*First*, Cardwell has offered no evidence (because there is none) that defendants' proffered reason for difficulty staffing him, or for terminating him—his unsatisfactory performance—was false. *See* Stmt. ¶ 154. The evidence—contemporaneous documentation, performance reviews, sworn testimony—establishes that Cardwell's performance was unreliable and subpar. Courts routinely dismiss cases for lack of pretext in the face of an employer's "extensive evidence" of unsatisfactory performance. *E.g.*, *Zheng-Smith* v. *Nassau Health Care Corp.*, 486 F. Supp. 3d 611, 625 (E.D.N.Y. 2020)[44]; *Gonzalez*, 442 F. Supp. 3d at 691 ("[A] court applying anti-discrimination statutes does not sit as a super-personnel department that reexamines

---

[44] *See also Andreos* v. *Kraft Foods Glob., Inc.*, 2009 WL 10670397, at *5 (S.D.N.Y. Nov. 5, 2009) (granting summary judgment for defendants, crediting defendant's "compelling evidence of poor performance"); *E.E.O.C.*, 967 F. Supp. 2d at 898 (dismissing case at summary judgment "in light of [defendant's] legitimate, non-retaliatory reason: that [plaintiff] continued to perform below expectations"); *Braunstein* v. *Sahara Plaza, LLC*, 2021 WL 2650369, at *13 (S.D.N.Y. June 28, 2021) (crediting a performance review resulting in termination in granting summary judgment at the pretext stage though plaintiff "repeatedly challenge[d] the substance of [the] performance review").

employers' judgments.") (internal quotation marks omitted).

 Cardwell implies that because he either was not told, or did not understand, that his performance was poor, it was not thus. *E.g.*, TAC ¶ 325. He argues—without proffering any evidence demonstrating that a single detail contained in the reviews was false—that his 2017 performance reviews from Amorosi, Goldberg, Hochbaum and Mills were dishonest. *E.g.*, TAC ¶¶ 487–48, 626. Cardwell's claim of pretext in essence asks the Court to find—"based on nothing but speculation, lacking in the concrete particulars required to defeat summary judgment"—that all of the sworn testimony with respect to his performance, and his contemporaneous negative performance reviews, were false. *Cameron* v. *Cmty. Aid For Retarded Children, Inc.*, 335 F.3d 60, 66 (2d Cir. 2003). Such speculation cannot establish pretext. *Brown* v. *Johnson & Johnson Consumer Products, Inc.*, 1994 WL 361444, at *3 n.3 (S.D.N.Y. July 11, 1994) ("To assert that [defendant's] witnesses may be lying, without any evidence to contradict the witnesses' testimony, cannot defeat a motion for summary judgment. . . . If the most that can be hoped for is the discrediting of defendants' denials at trial no question of material fact is presented.") (citation omitted).[45]

 That Cardwell cannot substantively refute the content of his poor 2017 reviews underscores the propriety of summary judgment here. *E.E.O.C.*, 967 F. Supp. 2d at 816 (dismissing retaliation claim at pretext stage where plaintiff "has not proffered evidence that the contents of the review were unwarranted").[46] Moreover, the fact that the "overwhelming

---

[45] *See also Chapkines* v. *New York Univ. Sch. of Continuing & Pro. Stud.*, 2005 WL 167603, at *12 (S.D.N.Y. Jan. 25, 2005) (finding no evidence of pretext where a plaintiff "purport[ed] to cast a wide net over all of the defendants, ensnaring them in a tenuous conspiracy theory that defendants engaged in an elaborate scheme to remove him from NYU," but "failed to present any evidence in support of these conclusory allegations").

[46] *See Serby* v. *N.Y.C. Dep't of Educ.*, 526 F. App'x 132, 134 (2d Cir. 2013) (citing the fact that "two evaluators . . . had objective bases for the unfavorable ratings" in dismissing plaintiff's claims at the pretextual stage); *Capek* v. *BNY Mellon, N.A.*, 2018 WL 1353269, at *10 (S.D.N.Y. Mar. 15, 2018) (granting summary judgment for defendants, in part, when plaintiff could not rebut that her failure to meet sales goals was a contributing factor to her unsatisfactory performance reviews); *Bourara* v. *N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*, 2020 WL 5209779, at *14 (S.D.N.Y. Sept. 1, 2020) (granting summary judgment for defendants because plaintiff's concession of "an unannounced failure to report to work when scheduled" and "admitting to later, unauthorized

evidence" of Cardwell's unsatisfactory performance in 2017 comes "from people against whom no allegations of discrimination have been made"—*i.e.*, the reviews prepared by Amorosi, Goldberg, Hochbaum, and Mills—further confirms that his termination was "based on legitimate non-discriminatory reasons." *Zheng-Smith*, 486 F. Supp. 3d at 623, 625.[47] (Indeed, Cardwell himself—as late as September 2017, in an email chain about his EEOC charge—recommended Amorosi and Hochbaum as "worth [the] time on [diversity and inclusion] issues." Stmt. ¶ 161 (further listing Chudd, Smith, and Turano).) Cardwell's choice to file an administrative charge cannot insulate him from the consequences of his unsatisfactory performance.[48]

   *Second*, Cardwell has offered no evidence at all that the "real reason" for his termination was retaliation.[49] The Second Circuit has affirmed dismissals of cases in similar

---

absences during his work shift," the plaintiff "effectively conceded that he violated Defendant's employment policies."); *Isaac* v. *City of N.Y.*, 271 F. App'x 60 (2d Cir. 2008) (affirming summary judgment for defendants when plaintiff could not adequately rebut defendant's reasons for termination—that plaintiff "required an inappropriate level of supervision and oversight," "failed to show the necessary leadership qualities," and "made little progress on the project he was hired to undertake").

[47] "It is 'well-established that a plaintiff's subjective opinion about his own performance is insufficient to give rise to a triable inference of pretext.'" *Meyer* v. *Shinseki*, 2016 WL 11263169, at *12–13 (E.D.N.Y. July 28, 2016) (cleaned up) (quoting *Pergament* v. *Fed. Express Corp.*, 2007 WL 1016993, at *12 (E.D.N.Y. Mar. 30, 2007)), *R&R adopted*, 2016 WL 8673140 (E.D.N.Y. Sept. 30, 2016), *aff'd sub nom. Meyer* v. *Shulkin*, 710 F. App'x 453 (2d Cir. 2017), *as amended* (Oct. 11, 2017); *Trane* v. *Northrop Grumman Corp.*, 94 F. Supp. 3d 367, 381 (E.D.N.Y. 2015) ("Plaintiff's assertion that negative comments regarding his work are false is, once again, insufficient to show that Defendant's reasons are pretexts."), *aff'd*, 639 F. App'x 50 (2d Cir. 2016).

Likewise, "the law is clear that a claimant cannot merely point to prior favorable evaluations to satisfy her burden at the pretext stage"; this is "particularly so as here where" "prior favorable review foresaw some problems with the claimant's performance." *E.E.O.C.*, 967 F. Supp. 2d at 858 (citing *Viola* v. *Philips Med. Sys. of N. Am.*, 42 F.3d 712, 717–18 (2d Cir. 1994)); *id.* at 860 ("[T]he mere fact plaintiff may disagree'" with the complaints against her "and think that [her] behavior was justified does not raise an inference of pretext." (citation omitted)).

[48] Cardwell knew his performance had been poor at the time he first memorialized his grievances. "Where an employee has been warned that her job performance is unsatisfactory and she continues the same conduct, she cannot shield herself from legitimate managerial prerogatives by threatening a discrimination complaint and then alleging unlawful retaliation." *Lee* v. *Healthfirst, Inc.*, 2007 WL 634445, at *24 (S.D.N.Y. Mar. 1, 2007); *Nassar*, 570 U.S. at 358 ("Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance . . . . To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial [] discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation.").

[49] The Second Circuit has "long held that 'temporal proximity' between a protected complaint and an adverse employment action 'is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.'" *Chen*, 805 F.3d at 72 (quoting *El Sayed* v. *Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (*per curiam*)); *see also, e.g., Lawless* v. *TWC Media Sols., Inc.*, 487 F. App'x 613, 617 (2d Cir. 2012) (applying *El Sayed* to retaliation claims under Section 1981, the NYSHRL, and the NYCHRL); *accord Nassry*, 2016 WL 1274576, at *16 (Woods, J.). Nor is there any evidence, as set forth at length above, that Cardwell was treated differently than his purported comparators, much less comparators who were similarly situated in all material respects.

circumstances, and the same result is appropriate here. *Chen*, 805 F.3d at 73; *Bentley* v. *AutoZoners, LLC*, 935 F.3d 76, 89–90 (2d Cir. 2019); *Gonzalez*, 845 F. App'x at 15.[50]   A "terminated employee faced with overwhelming evidence that his employer possessed a legitimate reason for termination must present more than a few isolated pieces of contrary evidence to survive summary judgment." *Andreos* v. *Kraft Foods Glob., Inc.*, 2009 WL 10670397, at \*5 (S.D.N.Y. Nov. 5, 2009).   Cardwell has not done so here; the contrary claims Cardwell presents, as summarized further below, are either legally irrelevant or entirely contradicted by the record.

Cardwell's unsupported incantation of retaliation, devoid of any "specific facts," cannot survive summary judgment. *Celotex*, 477 U.S. at 324.[51]

The same facts end Cardwell's claims under city law.   Cardwell cannot show, as he must, that "retaliation played any part in the employer's decision" here.   *Quarless* v. *Brooklyn Botanic Garden Corp.*, 611 F. App'x 28, 30 (2d Cir. 2015) (quoting *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)).   He has elicited no testimony from any defendant corroborating any claim to the contrary.   "Simply stating that the NYCHRL encompasses a broader standard does not absolve [plaintiff] from putting forth evidence tending to show a causal connection between [his protected act] . . . and the alleged [retaliatory] actions." *EEOC*, 967 F.Supp.2d at 862.[52]   Moreover, the mere suggestion of temporal proximity

---

[50]   At the trial level, *see, e.g.*, *Alejandro* v. *New York City Dep't of Educ.*, 2017 WL 1215756, at \*23 (S.D.N.Y. Mar. 31, 2017) (Nathan, J.) (discussing pretext).

[51]   *White* v. *Eastman Kodak Co.*, 368 F. App'x 200, 202 (2d Cir. 2010) (rejecting argument that the "asserted reason for [plaintiff's] firing was pretextual" when plaintiff "present[ed] no evidence to support this allegation"); *Zheng-Smith*, 486 F. Supp. 3d at 623 ("Conclusory allegations of discrimination are insufficient to show that a defendant's non-discriminatory reasons are pretexts and avoid summary judgment."); *Ferraro* v. *Kellwood Co.*, 440 F.3d 96, 100 (2d Cir. 2006) (affirming summary judgment where plaintiff's claim of pretext was unsupported by any evidence other than her own speculation); *Rogers* v. *Bank of New York Mellon*, 2016 WL 4362204, at \*20–21 (S.D.N.Y. Aug. 15, 2016) (finding a lack of pretext despite plaintiff's "own speculation that she was singled out and the temporal proximity between" the protected act and the adverse employment action), *on reconsideration*, 2017 WL 4157376 (S.D.N.Y. Sept. 19, 2017) (dismissing additional claims upon reconsideration that had not been initially dismissed).

[52]   *See also, e.g.*, *Quarless*, 611 F. App'x at 30 (holding that plaintiff's NYCHRL retaliation claim failed as a matter of law because he "failed to come forward with any evidence that retaliation played a role in" his termination); *Dixon* v. *Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 n.1 (2d Cir. 2011) (summary order) (holding that plaintiff's NYCHRL retaliation claim failed as a matter of law where plaintiff could produce no admissible evidence of

is not enough under city law, much as under the other statutes, to save his claim.  *See id.* at 898

(rejecting NYCHRL retaliation claim, and noting that even temporal proximity relative to a

protected administrative filing "does not rebut the clear evidence that [plaintiff's] performance

continued to decline).

### D.    None of Cardwell's Remaining Allegations Alters This Result

Putting aside the Staffing and Termination Allegations, none of the hundreds of

ancillary remaining details in Cardwell's complaint supports a claim of retaliation.  For example:

- ***September 2016 Clausen Conversation (Fig. 2 #5[53]).***  On September 8, 2016, because (as she told Cardwell by email) the "credit juniors [we]re over capacity," Rocio Clausen, the staffing coordinator for the Credit group, began "reaching out to other groups for support if possible," and asked Cardwell, who had rotated through Credit and thus had both availability and relevant experience, if he could help.  Stmt. ¶ 202. (As is explained in orientation, associates are expected to be available for cross-departmental assignments when the need arises.  Stmt. ¶¶ 197–99.)  Cardwell alleges that he asked Clausen whether her request was related to his race and that, after doing so, she "did not arrange or coordinate any new assignments" for him.  TAC ¶¶ 267, 268.  No reasonable jury could base a retaliation finding on that assertion. Documentary evidence shows that the process of identifying associates potentially available to assist in Credit was one by which associates from the classes of 2014 and 2015 with both capacity and experience rotating through Credit were selected.  Stmt. ¶ 200.  By the fall of 2016, Cardwell's assignments were coordinated by his group (M&A); once he signaled his refusal to accept a cross-departmental assignment, there was no further reason for Clausen to coordinate his assignments.  Cardwell's hours were significant in September 2016; he establishes no adverse action, nor that others were treated more favorably.  Indeed, Cardwell could not identify under oath a single one of the other associates he claims she had contacted for the same assignment, *see* ECF 198 at 15.  Stmt. ¶ 203(b).  Of the five associates Clausen was directed to contact, four were White.  Stmt. ¶ 201.

- ***September 2016 Deal.***  Cardwell also claims that later in September, "the Firm strategically used Mr. Cardwell's non-deal assignments as a justification to remove Mr. Cardwell from" a matter on which he worked with Kreynin ("Project Giant").  TAC ¶ 292.  Cardwell misrepresents the record.  In fact, it was the demands of another M&A deal on which Cardwell was working that led to this change: Cardwell admits that on September 29, 2016, he told the staffing coordinator that his "**capacity is at zero**, as

---

a causal connection between her protected activity and any adverse action); *Maynard* v. *Montefiore Med. Ctr.*, 2021 WL 396700, at *12 (S.D.N.Y. Feb. 4, 2021) (holding that NYCHRL retaliation claim failed as a matter of law where plaintiff's only evidence of causation was temporal proximity, "conclusory denials, and vague conspiracy allegations").

[53]   Defendants address this allegation separately, above, to the extent Cardwell claims it was the predicate for the Staffing Allegation against Bick, Birnbaum, and Wolfe.

the [Client N] spinoff continues to expand and as we have been frequently holding calls with [international] counsel." Stmt. ¶ 107(b) (emphasis added). He further admits that on the same day, when an associate on the [Project Giant] team wrote him, "[s]ince you have been tied up with the [Client N] restructuring, we have asked [another associate] to fill in for you through signing on [Project Giant]. Please let us know when you free up. I hope things get more manageable soon," Cardwell responded, "Thanks, [Associate]. Understand completely. I'll be sure to let you know." Stmt. ¶ 107(c).

- ***December 2016 Annual Review.*** Cardwell contends vaguely that Kreynin, the partner appointed to deliver Cardwell's annual review in December 2016, did not "state or suggest" that Cardwell's performance was inferior to that of others in his class, TAC ¶ 432. But Cardwell makes no concrete allegation of retaliation tethered to this review, nor does he allege knowledge, by Kreynin, of any pre-review activity plausibly alleged to have been protected. *Fig. 2.* Even if he had, Cardwell has adduced no evidence corroborating any claim that partners' contemporaneous critiques of his performance were not genuine, nor establishing that the gap between his skills and seniority did not widen thereafter.[54]

- ***March 2017 Meeting.*** Cardwell contends that Reid made the "get in the game/off the field" remark as a threat. TAC ¶¶ 424, 427. This is factually wrong; it was not a threat but an explanation of Cardwell's obligation to take ownership of his career by focusing on making needed performance improvements, as shown above. Moreover, a contemporaneous memo of the meeting prepared by Cardwell does not include this remark, negating any claim that Cardwell viewed it as notable—or actionable as discriminatory—at the time. Stmt. ¶ 128. Nor is there any support for Cardwell's claim, tailored for litigation, that Reid "emphatically insist[ed]" that Cardwell take time off, TAC ¶ 426; Cardwell described the time off to a friend contemporaneously as "vacation." Stmt. ¶ 40(a).[55]

## E.    This Court Should Exercise Supplemental Jurisdiction To Deny All of Cardwell's Claims

Defendants respectfully request that the Court resolve all of plaintiff's federal, state,

---

[54]   Indeed, Cardwell concedes that Kreynin "mentioned a few criticisms," and gave him an example from the matter on which they worked together; even if Kreynin was not able to provide "other specific examples," Cardwell has no proof they did not exist. TAC ¶¶ 325, 565 n.89. Cardwell's conspiracy theory—that because Kreynin's annual review summary was entered late into the computerized review system, it must have incorporated views of Bick and Reid generated after the review itself, TAC ¶¶ 404–405—is refuted by the fact that detailed talking points, sent to Kreynin in November 2016 (prior to the review), mirror Kreynin's summary of the review as delivered. *Compare* Stmt. ¶ 119 *with* Stmt. ¶ 121. A related email from Fenner, dated November 2016, reminded Kreynin to "please mention [to Cardwell] that we'll plan to meet with him again in June 2017 (midyear review) to see if there has been progress in the areas discussed." Stmt. ¶ 118. Once again, no reasonable jury could base a retaliation claim on these undisputed facts.

[55]   Cardwell also alleges that in December 2016, he flagged an apparent conflict of interest between the Firm's work for a nonprofit client and a client operating for-profit prisons, triggering a Firm obligation relating to the raising of ethical concerns. Because this Court has ruled that this did not constitute protected activity (*see* Figure 2, *supra*, collecting citations), it cannot form the basis of a retaliation claim. In any event, this is a manufactured controversy: by December 2016, Cardwell had been aware *for nearly 18 months* that there was in fact no ethical issue, because the conflict had been disclosed to the nonprofit. Stmt. ¶¶ 204–217 (describing issue in detail).

and city law claims here.

The Second Circuit has endorsed retention of supplemental jurisdiction where, as here, requiring this "court's efforts in acquainting itself with the facts and issues of the case to be substantially replicated in state court would not serve the interests of judicial economy, convenience, and fairness that are central to the exercise of supplemental jurisdiction." *Nowak* v. *Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996).[56]  The fact that discovery is complete, together with the fact that this Court has resolved more than one dispositive motion and that the case is nearly trial-ready, all weigh strongly in favor of this Court retaining jurisdiction over Cardwell's remaining claims.[57]  Plaintiff has had years to press his claims and chose a federal forum; the Firm, which defended itself patiently before a silent state tribunal (the NYSDHR), deserves finality and resolution.  This is not a case in which any remaining state law claims would "present potentially novel questions of state law, involve state officials, or state interests," *Radolf* v. *Univ. of Conn.*, 364 F. Supp. 2d 204, 229 (D. Conn. 2005), and there would be no injustice in retaining jurisdiction.[58]

---

[56]  Under Second Circuit precedent, a district court "should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated [by the Supreme Court in *United Mine Workers* v.] *Gibbs*, 383 U.S. 715, 726 (1966): economy, convenience, fairness, and comity." *Jones* v. *Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004).

[57]  The Second Circuit has endorsed retaining supplemental jurisdiction in circumstances such as this. *See*, e.g., *Raucci* v. *Town of Rotterdam*, 902 F.2d 1050, 1055 (2d Cir. 1990) (retaining supplemental jurisdiction when discovery had been completed, three dispositive motions had been decided, and the case was ready for trial, and stating that "denial of pendent jurisdiction here would be a waste of judicial resources, given the extensive proceedings involving the pendent claims prior to the dismissal of the federal claim"); *Fleming* v. *MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 267 (E.D.N.Y. 2009) (retaining jurisdiction in light of "the substantial resources already expended by the parties in developing, and the Court in reviewing, the voluminous factual record and the numerous legal arguments in [the] case."), *aff'd*, 371 F. App'x 115 (2d Cir. 2010); *In re Nigeria Charter Flights Contract Litigation*, 520 F. Supp. 2d 447, 471 (E.D.N.Y. 2007) (finding that, because the parties "have been litigating in federal court for several years, and discovery has taken place," "dismissal on jurisdictional grounds . . . would frustrate the goals of judicial economy, convenience, and fairness"); *see also Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) ("[W]hen the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair.  Nor is it by any means necessary." (internal quotation marks omitted) (quoting *Purgess* v. *Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994)).

[58]  *Compare Valencia ex rel. Franco* v. *Lee*, 316 F.3d 299, 306 (2d Cir. 2003) (remanding state law claims to state court partly because the action was commenced in state court, and also because the case involved "fundamental and complex questions involving the balancing of important policies of state government") *with Kaur* v. *New York City Health &*

## IV.    PLAINTIFF IS NOT ENTITLED TO ANY DAMAGES

Summary judgment should be granted dismissing all of Cardwell's claims.  Even decoupled from the liability issues—Cardwell's claims cannot survive summary judgment, for the reasons set forth above—Cardwell's theory of damages for between $38.8 and $52.8 million has no basis in fact or law, and independently warrants dismissal on summary judgment.  Stmt. ¶ 218.  *See generally* Fed. R. Civ. P. 56(g) (permitting Court, on summary judgment, to "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.").

### A.    Cardwell Is Not Entitled to Front Pay Damages

Cardwell first seeks "at least $20 million over a ten-year period" in "[f]rontpay (*i.e.* lost future earnings) damages,"[59] supposedly because "Defendants' conduct caused [him] to lose the opportunity to become a partner at Davis Polk."  Stmt. ¶¶ 218(b).  Courts deny "unduly speculative" claims for lost future earnings at the summary judgment stage, and the same result is appropriate here.  *E.g.*, *Consolmagno* v. *Hosp. of St. Raphael Sch. of Nurse Anesthesia*, 72 F. Supp. 3d 367, 384 (D. Conn. 2014) (granting defendants' motion for summary judgment on discrimination plaintiff's claim for lost future earnings).  Where, as here, a plaintiff's history of

---

*Hosps. Corp.*, 688 F. Supp. 2d 317, 338 (S.D.N.Y. 2010) (exercising supplemental jurisdiction over NYSHRL and NYCHRL claims after dismissing federal claims where the state and city law claims could "be determined without further trial proceedings and without entanglement with any difficult issues of state law") (internal quotation marks and citation omitted); *Klein* v. *City of New York*, 2011 WL 5248169, at *9 n.5 (S.D.N.Y. Oct. 28, 2011) (exercising supplemental jurisdiction over NYSHRL and NYCHRL claims after dismissal of all federal claims because "all of the claims arise from the same set of operative facts and are plainly lacking in merit"), *R&R adopted*, 2012 WL 546786 (S.D.N.Y. Feb. 21, 2012); *Deshpande* v. *Medisys Health Network, Inc.*, 2010 WL 1539745, at *21 (E.D.N.Y. Apr. 16, 2010) (same), *aff'd*, 423 F. App'x 31 (2d Cir. 2011).

[59]   Front pay—"money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement," *Pollard* v. *E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001)—is available in situations where (i) reinstatement is not appropriate; (ii) plaintiff has been unable to find another job; and, (iii) plaintiff has no reasonable prospect of obtaining comparable alternative employment.  *Brady* v. *Wal-Mart Stores, Inc.*, 2005 WL 1521407, at *7 (E.D.N.Y. June 21, 2005) (citing *Reed* v. *A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir. 1996)).  Even after trial, "[b]ecause of the potential for windfall, the use of front pay must be tempered and the court should employ the equitable principles of discretion, restraint, and balance in assessing whether to award front pay, and, if so, in what amount." *Levy* v. *Powell*, 2005 WL 1719972, at *4 (E.D.N.Y. July 22, 2005).

performance difficulties would "force a jury to speculate and ultimately guess whether [h]e would have" secured the position or qualification on which the damages claim is based (here, Firm partner), a plaintiff has not "'present[ed] evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages,'" and the lost future earnings claim is properly denied, on summary judgment, as "unduly speculative." *Id.* (quoting *Sir Speedy, Inc.* v. *L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992)).[60]

The undisputed evidence shows that Cardwell is not entitled to front pay damages, for at least two independent reasons.

1.   Cardwell's Baseless Speculation That He Would Have
     <u>Become a Davis Polk Partner Cannot Support a Damages Claim</u>

*First*, Cardwell's front pay claim is based on the highly speculative and utterly unsupported contention that he would have become a Davis Polk partner. There is no support whatsoever in the record for this fanciful claim. Cardwell admits that no one suggested to him that he would be promoted to partner, Stmt. ¶ 255, much less guaranteed it. (Cardwell was an at-will employee. *Tse* v. *New York Univ.*, 2016 WL 10907062, at *36 (S.D.N.Y. Aug. 29, 2016) (denying front pay where plaintiff could be terminated at any time for any non-discriminatory reason).) Cardwell acknowledges that exceedingly few ("one to two people in any given year") become Firm partners, Stmt. ¶ 254; indeed, only 2.7% to 5.7% of Davis Polk associates in the classes of 2009 to 2012 were promoted to partner. Stmt. ¶ 256(a).[61] Only the very top associates have a chance at being considered for partnership, *see* Stmt. ¶ 256, and no reasonable jury could find that

---

[60]   Courts in New York regularly deny front pay claims on this basis. *Tse* v. *New York Univ.*, 2016 WL 10907062, at *36 (S.D.N.Y. Aug. 29, 2016); *Chisholm* v. *Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 577 (S.D.N.Y. 2011) (finding that full award of front pay unduly speculative and would be a "windfall" where evidence showed "it is unlikely that [plaintiff] would have remained employed").

[61]   Davis Polk's and its peers' labor market structure reflects an up-or-out model in which new associates sign up to work exceptionally hard for an uncertain and small chance at promotion to partner. Stmt. ¶ 254, 256. Cardwell himself understood this. Stmt. ¶ 254–55. Under this model, employees who do not meet the standard for promotion do not stay at the Firm. Stmt. ¶ 254, 256.

Cardwell was among the best associates in his class.  *E.g.*, Stmt. ¶ 267(m).  Tellingly, none of

Cardwell's twelve purported comparators remain at the Firm, much less as partners.  Stmt. ¶ 261.

Cardwell's own actions also showed that he did not intend to become a Firm

partner.  He applied for a job outside the Firm in the January 2017 time period, and told a contact

in 2017 that he "would be interested in getting a master's in public administration" or working at

a "place like DEMOS (which works on policy, transforming institutions, [etc.])."  *See* Stmt. ¶¶ 253.

Cardwell, *who made no effort to seek legal employment of any kind after leaving the Firm*, let his

law license expire.  Stmt. ¶¶ 244–45.  Cardwell's assertion that he would have become a partner is

based entirely on conjecture; a claim that would "force a jury to speculate and ultimately guess"

cannot support his claim for damages.  *Consolmagno*, 72 F. Supp. 3d at 384.[62]

> ### 2.    Cardwell's Failure to Make Any Effort to Seek Alternative Employment <u>Bars Recovery of Front Pay Damages</u>

*Second*, Cardwell's admitted failure to make *any* effort, let alone reasonably

diligent efforts, to seek alternative employment completely bars recovery of front pay damages

here as a matter of law.  Stmt. ¶¶ 243.  "[B]efore being awarded front pay, 'a claimant is required

to use reasonable diligence in finding other suitable employment'"; "without evidence of any

current [effort] to find comparable work, an award of front pay would be speculative."  *Clark* v.

*Gotham Lasik, PLLC*, 2013 WL 4437220, at *5 (S.D.N.Y. Aug. 20, 2013) (quoting *Padilla* v.

*Metro–North Commuter R.R.*, 92 F.3d 117, 125 (2d Cir. 1996)).[63]  Cardwell's admission that he

made no effort to find comparable work is dispositive.  *Mihalik* v. *Credit Agricole Cheuvreux N.*

*Am., Inc.*, 2015 WL 13699239, at *3–4 (S.D.N.Y. Mar. 25, 2015) (finding that plaintiff failed to

---

[62]    In addition, Cardwell offers no support for his $20 million calculation; he merely states that Davis Polk's "profits per equity partner was $4,514,000," and concludes that he thus "estimates frontpay damages to be at least $20 million over a ten year period."  Stmt. ¶ 218(b).  Cardwell offers no further support for this assertion.

[63]    The "'ultimate question is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment.'"  *Arbercheski* v. *Oracle Corp.*, 650 F. Supp. 2d 309, 312 (S.D.N.Y. 2009) (quoting *Hawkins* v. *1115 Legal Svc. Care*, 163 F.3d 684, 695 (2d Cir. 1998)).

mitigate where she could not provide more detail on her search efforts and had not sent applications to prospective employers or had any interviews).

Nor would any reasonable jury be able to find, against the record of Cardwell's failure to look for a job, that Cardwell had "no reasonable prospect of obtaining comparable alternative employment." *Brady* v. *Wal-Mart Stores, Inc.*, 2005 WL 1521407, at \*7 (E.D.N.Y. June 21, 2005).[64]  Where a plaintiff "never applied for other jobs, it is pure speculation that no one else would have hired him." *Sanderson* v. *City of New York*, 1998 WL 187834, at \*7 (S.D.N.Y. Apr. 21, 1998) (denying the award of front pay to a plaintiff).  Virtually all former Davis Polk associates find comparable alternative employment, including all of the Twelve Associates.  Stmt. ¶¶ 251.  Cardwell's only claim to the contrary—that the managing partner of the Firm issued a short statement the day *after* Cardwell publicly filed his federal lawsuit in November 2019— cannot excuse his failure to look for a job in the year and a half following the February 2018 meeting in which he was told to do so.  Stmt. ¶¶ 243.  (Cardwell admits that he cannot point to any "false, created-for-litigation statements to the press" about his performance—indeed, "any public statement by Davis Polk in a court filing or otherwise, prior to the moment [he] brought the complaint in this lawsuit."  Stmt. ¶¶ 220–24.)

## B.   Cardwell Also Is Not Entitled to Back Pay Damages

Cardwell's claim to "approximately $2,030,000" in back pay damages— purportedly for "amounts related to salary and bonuses" for the period from August 2018 through 2021—likewise is insupportably speculative and barred by his failure to mitigate.  Stmt. ¶ 218(a).

Accrual of back pay ceases when a plaintiff ends the search for substantially equivalent employment (or rejects—or accepts—a substantially equivalent job). *Arbercheski*, 650

---

[64]   Positions need not have identical pay or responsibilities to be considered comparable alternative employment.  *See Greenbaum* v. *Svenska Handelsbanken, N.Y.*, 979 F. Supp. 973, 988 n.5 (S.D.N.Y. 1997); *Bonura* v. *Chase Manhattan Bank, N.A.*, 629 F. Supp. 353, 362 n.3 (S.D.N.Y. 1986).

F. Supp. 2d at 313.  Courts also halt calculation of back pay at the point at which the plaintiff would have been terminated for nondiscriminatory reasons.  *Cf. Jowers* v. *DME Interactive Holdings, Inc.*, 2006 WL 1408671, at *2 (S.D.N.Y. May 22, 2006); *Bonura* v. *Chase Manhattan Bank, N.A.*, 629 F. Supp. 353, 356 (S.D.N.Y. 1986).  Both principles bar Cardwell's claims here.

      *First*, Cardwell's failure to seek alternative employment alone disqualifies him from back pay damages.  *Arbercheski*, 650 F. Supp. 2d at 312–13.  (Cardwell's admitted failure to seek work means that the Firm is "released from the duty to establish the availability of comparable employment."  *Id.* at 313 (quoting *Greenway* v. *Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998).)

      *Second*, Cardwell improperly assumes that he would have remained a Davis Polk associate through 2021, his eighth year.  But plaintiffs may not recover damages for the period beyond which they would have been terminated for a nondiscriminatory reason.  *Cf. Jowers*, 2006 WL 1408671, at *2; *Bonura*, 629 F. Supp. at 355.  Few Firm associates remain at the Firm until the eighth year; indeed, only one of Cardwell's purported comparators (the Twelve Associates) stayed at the Firm until the eighth year, and none remains at the Firm today.  Stmt ¶¶ 261.  The median tenure of associates in Cardwell's class was 4.2 years.  Stmt. ¶ 235.  No evidence—as opposed to speculation—would permit a reasonable jury to conclude that Cardwell would have lasted roughly twice as long as this average, especially given his performance record.[65]

### C.    Cardwell Is Not Entitled to Compensatory Damages

      No reasonable jury could find that Cardwell is owed, as he claims, "approximately $2.8 million" in compensatory damages.  Stmt. ¶ 218(c).  Cardwell claims entitlement to such damages due to purported "reputational damage, emotional harm, psychological harm and any physical impairments resulting from Defendants' acts," including the Firm's release of what

---

[65]   In addition, Cardwell let his license to practice law lapse as of 2020.  Stmt. ¶¶ 224–25.  He would not in any event be entitled to back pay for a period in which he was not permitted to practice law.

Cardwell characterizes as "false, created-for-litigation statements to the press concerning [his] alleged performance and abilities as an attorney." Stmt. ¶ 219.

As a preliminary matter, Cardwell now admits that the "statements" referenced above were made *after* he filed this lawsuit, as shown above. The Firm is not liable to Cardwell for such statements. *See, e.g.*, *Marchuk* v. *Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 311 (S.D.N.Y. 2015) (granting judgment as matter of law because plaintiff could not show that "press release constituted adverse employment action" where plaintiff had not worked at the firm for more than a year at the time it was released; *see also id.* at 311 n.5, 312–13).[66] And because Cardwell has offered no evidence (or expert testimony) explaining which portions of the $2.8 million are attributable to these "statements" and which are not, the jury would need to engage in impermissible speculation to apportion damages. Summary judgment is warranted where claims are unduly speculative.

In any event, no credible evidence—only Cardwell's uncorroborated testimony—supports any award of any compensatory damages here. Emotional distress damages fall into "three categories of claims: 'garden-variety,' 'significant' and 'egregious.'" *Cartagena* v. *Providence Constr. Corp.*, 2017 WL 9286986, at *4 (E.D.N.Y. May 1, 2017), *R&R adopted*, 2018 WL 2088004 (E.D.N.Y. May 3, 2018). Where, as here, the "evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or the consequences of the injury," the claim

---

[66] Cardwell does not tether the statement to either his discrimination or his retaliation claim—indeed, there is no mention of it in the complaint (Cardwell only mentioned it in connection with a claim for damages, in initial disclosures), and cannot therefore recover for it. But even if he had, Cardwell would be unable to show, as he must, that any consequences from the statement "caused a *reputational* harm—injury to his professional standing, character, or reputation—which in turn resulted in a narrowing of economic opportunities," where he did not even apply to any jobs in the years prior to issuance of the statement. *U.S.* v. *Vulcan Soc'y., Inc.*, 897 F. Supp. 2d 30, 48 (E.D.N.Y. 2012) (emphasis in original) (noting plaintiff "must produce competent evidence" showing that act "narrowed range of economic opportunities" (internal citations and quotation marks omitted)), *order clarified sub nom. U.S.* v. *City of N.Y.*, 2013 WL 12318105 (E.D.N.Y. June 3, 2013).

is "garden variety," and damages are limited.[67] *Id*. at *4, 5 (awarding $5,000 in compensatory damages where plaintiff did not seek psychological or medical treatment). [68]

Cardwell admits that since 2014, he has not been diagnosed "with any mental health issue[]," taken "any prescribed medications," or consulted any "mental health professionals" (except once, in July 2017, when he needed a clearance to return to work; he also claims "conversations with [his] mom," who "is a clinical social worker"). Stmt. ¶ 226. None of Cardwell's testimony about purported symptoms—he claims "suffering," "increased anxiety," trouble sleeping, "bouts of fatigue," "headaches," and a "feeling in my body that I have never had," Stmt. ¶ 227(a)—rises beyond the conclusory. He has provided no expert reports, medical records, or testimony corroborating his claims. Stmt. ¶ 228.

Nothing in the record would permit a reasonable jury to award the millions in damages Cardwell seeks. Summary judgment should be granted with respect to his claim for $2.8 million in compensatory damages. *See Consolmagno*, 72 F. Supp. 3d at 384 (disposing of damages claims at summary judgment stage); Fed. R. Civ. P. 56(g).

### D.     There Are No Facts Supporting Punitive Damages or Injunctive Relief

Finally, Cardwell has asserted no allegations and developed no record evidence

---

[67] In garden-variety cases, as summarized by the court in *Rainone* v. *Potter*, 388 F. Supp. 2d 120, 126 (E.D.N.Y. 2005), courts have awarded "damages for emotional distress ranging from $5,000 to $35,000," and ordered remittitur when awards exceed those amounts, *e.g.*, *id.* at 123 (collecting cases); $50,000 to $100,000 in cases of "significant" claims (which "'differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony or evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses'"), and more than $100,000 only in "egregious" cases (such "awards have only been warranted where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected") (internal citation omitted). *Accord Francis* v. *Ideal Masonry, Inc.*, 2018 WL 4292171, at *11 (E.D.N.Y. Aug. 3, 2018), *R&R adopted*, 2018 WL 4288625 (E.D.N.Y. Sept. 7, 2018); *Cartagena*, 2017 WL 9286986, at *4.

[68] Cardwell also asserts reputational harm, but can provide no evidence that support this claim for damages. No questions of material fact exist for a jury to resolve. *See U.S. & Vulcan Soc'y, Inc.* v. *City of N.Y.*, 2015 WL 11348177, at *5 (E.D.N.Y. Dec. 21, 2015) (denying damages due to lost future earning capacity based on reputational harm where claimant "provided no facts or documents" supporting this), *R&R adopted*, 2016 WL 4197585 (E.D.N.Y. Aug. 8, 2016). Cardwell's reputational harm claim is based on statements made public *after* Cardwell filed his lawsuit publicly. Stmt. ¶¶ 220–24. Cardwell cannot point to any evidence of any actual reputational impact—for example, as discussed above, he did not apply to any jobs, such that his reputation would be evaluated.

whatsoever to support his claim to "$14 to $28 million" in punitive damages.  Stmt. ¶ 218(d).

Under Title VII and Section 1981, punitive damages are awarded only in the rare case where the conduct at issue is outrageous and shocking,[69] and only where the employer "engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  *Kolstad*, 527 U.S. at 529–30 (internal quotation marks and citation omitted); *Carrion* v. *Agfa Const., Inc.*, 720 F.3d 382, 386–87 (2d Cir. 2013).[70]  The "standard for determining [punitive] damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'"  *See Chauca* v. *Abraham*, 885 F.3d 122, 124 (2d Cir. 2018) (quotations omitted).

For the reasons discussed throughout this brief, Cardwell cannot withstand summary judgment with respect to his claim that any defendants intentionally discriminated against him on the basis of race, nor that they retaliated against him.  And the record is unmistakably clear that there is no evidence that any defendant's conduct rose to the level of "malice" or "willful or wanton negligence" or recklessness required to support an award of punitive damages.  *Id.*; *see Carrion*, 720 F.3d at 387; *Chauca*, 885 F.3d at 124; *see also Wiercinski*

---

[69]  None of plaintiff's allegations come close to establishing the "requisite evil motive" needed to support an award of punitive damages.  *Kolstad* v. *Am. Dental Ass'n*, 527 U.S. 526, 538 (1999); *cf. Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 2010 WL 8938797, at *7, *12–13 (S.D.N.Y. Mar. 16, 2010) (punitive damages not available where, among other things, after plaintiff was sexually harassed and assaulted, his supervisor told him that he was being "overemotional" and threatened to kick him off of his work site, and subsequent to plaintiff filing a formal complaint, his supervisor said to a group including plaintiff "there are some people here I don't like" while staring at plaintiff), *aff'd*, 663 F.3d 556 (2d Cir. 2011); *Weissman* v. *Dawn Joy Fashions, Inc.*, 214 F.3d 224, 236 (2d Cir. 2000) (in disability discrimination lawsuit, evidence that employer fired employee "less than two weeks after he suffered a heart attack," "fail[ed] to contact [the plaintiff's] doctor to determine when [the plaintiff] could return to work, and . . . cancel[ed] plaintiff's health insurance" not sufficient to support an award of punitive damages).

[70]  "Malice and reckless indifference refer to 'the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'"  *Farias* v. *Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001) (quoting *Kolstad*, 527 U.S. at 535).  "As an alternative to proving that the defendant knew it was acting in violation of federal law, '[e]gregious or outrageous acts may serve as evidence supporting an inference of the requisite evil motive.'"  *Id.* (quoting *Kolstad*, 527 U.S. at 538).  Simple failure to act, however, without a showing of either factor above, will not justify punitive damages.  *See Wiercinski* v. *Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015).

v. *Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015); *Kolstad*, 527 U.S. at 529–30.  No reasonable juror would award punitive damages on this record.  Indeed, even Cardwell does not claim the sort of "outrageous" or "egregious" acts supporting an inference of "evil motive."  *See, e.g.*, TAC ¶ 675 (stating that the complaint is not alleging that defendants have discriminatory hatred).

Finally, Cardwell also asserts he is entitled to unspecified injunctive relief and attorney's fees.  Stmt. ¶¶ 218(e), 218(f).  Cardwell, who is no longer employed at Davis Polk and does not seek reinstatement, lacks standing to seek injunctive relief, *see, e.g.*, *Kassman* v. *KPMG LLP*, 925 F. Supp. 2d 453, 465–66 (S.D.N.Y. 2013); *Hill* v. *City of N.Y.*, 2019 WL 1900503, at *3 (E.D.N.Y. Apr. 29, 2019), and is not entitled to attorney's fees absent success on the merits.[71]

### CONCLUSION

For the foregoing reasons, defendants respectfully request that their Motion for Summary Judgment be granted.

Dated:          December 3, 2021
                New York, New York

                              Respectfully submitted,

                              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

                              By: /s/ Bruce Birenboim
                                  Bruce Birenboim
                                  Jeh C. Johnson
                                  Susanna Buergel
                                  Marissa C.M. Doran

                                  1285 Avenue of the Americas
                                  New York, New York 10019-6064
                                  Telephone: (212) 373-3000
                                  bbirenboim@paulweiss.com
                                  jjohnson@paulweiss.com
                                  sbuergel@paulweiss.com
                                  mdoran@paulweiss.com
                                  *Attorneys for Defendants*

---

[71] Even in the event of an award of nominal damages, plaintiff would not be entitled to fees here.  *See, e.g.*, *Farrar* v. *Hobby*, 506 U.S. 103, 115 (1992); *Pino* v. *Locascio*, 101 F.3d 235, 238 (2d Cir. 1996).