**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KALOMA CARDWELL,

                            *Plaintiff*,

    v.

DAVIS POLK & WARDWELL LLP,
THOMAS REID, JOHN BICK, WILLIAM
CHUDD, SOPHIA HUDSON, HAROLD
BIRNBAUM, DANIEL BRASS, BRIAN
WOLFE, and JOHN BUTLER,

                            *Defendants*.

19 Civ. 10256 (GHW)

**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: (212) 373-3000

*Attorneys for Defendants*

Dated: December 3, 2021

## TABLE OF CONTENTS

I.  Parties ........................................................................................................................ 3
    A.  Cardwell ........................................................................................................ 3
    B.  Davis Polk ..................................................................................................... 3
    C.  Individual Defendants .................................................................................. 3

II.  Retaliation Claims ..................................................................................................... 4
    A.  Knowledge .................................................................................................... 4
    B.  Alleged Adverse Employment Action (Termination) ............................... 8
    C.  Alleged Adverse Employment Action (Other) ......................................... 9

III.  Discrimination Claims ............................................................................................ 12
    A.  Employment History .................................................................................. 12
    B.  Cardwell's First Rotation (Credit, September 2014 to April 2015) .................... 13
    C.  Cardwell's Second Rotation (M&A, April to October 2015) ............................. 15
    D.  Cardwell's Third Rotation (Capital Markets, October 2015 to April 2016) ......... 19
    E.  Assignment to M&A (Through December 2016 Annual Review) ...................... 24
    F.  Assignment to M&A, Cont'd. (January to December 2017) ............................... 35

IV.  Other Issues ............................................................................................................ 50
    A.  Defendants .................................................................................................. 50
    B.  January 2016 Dinner ................................................................................... 51
    C.  June 2016: Purported "Sham" Review with Bick .............................. 53
    D.  August 2016 Clausen Request ................................................................. 56
    E.  December 2016 For-Profit Prison Issue .................................................. 58

V.  Alleged Damages ..................................................................................................... 60
    A.  Claims .......................................................................................................... 60
    B.  Claims for Compensatory Damages ....................................................... 61
    C.  Claims for Attorneys' Fees ....................................................................... 64
    D.  Claims for Front and Back Pay ................................................................ 64
    E.  Claims for Punitive Damages ................................................................... 68

VI.  Alleged Comparators ............................................................................................. 69
    A.  The Twelve Associates .............................................................................. 69
    B.  Charts ........................................................................................................... 70
    C.  Reviews ........................................................................................................ 73

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, defendants, Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), John Bick, Harold Birnbaum, Daniel Brass, John Butler, William Chudd, Sophia Hudson, Thomas Reid, and Brian Wolfe (the "Individual Defendants") (with the Firm, "defendants"), respectfully submit the following statement of undisputed material facts in support of their Motion for Summary Judgment on all claims brought by plaintiff, Kaloma Cardwell, in the amended complaint filed October 4, 2021 ("TAC") (ECF 200).

## I.   PARTIES

### A.   Cardwell

1.      Cardwell worked as an associate in the Firm's Corporate Department from September 15, 2014 to August 10, 2018 (and as a summer associate from approximately May to July 2013).  (TAC ¶¶ 52, 625; Buergel Decl. Ex. 53(b) (DPW_SDNY-000141985 at -985).)

### B.   Davis Polk

2.      Davis Polk is a limited liability partnership engaged in the practice of law and headquartered New York.  (Duggan Decl. ¶ 1.)

### C.   Individual Defendants

3.      In the September 15, 2014 to August 10, 2018 time period (the "Relevant Period"), John Bick, Harold Birnbaum, Daniel Brass, John Butler, William Chudd, and Brian Wolfe were partners in the Firm's Mergers and Acquisitions ("M&A") group; Sophia Hudson was a partner in the Firm's Capital Markets group; and partner Tom Reid was affiliated with both groups, except that Wolfe did not become a partner until July 2015; Birnbaum did not become a partner until July 2016; and Brass did not become a partner until July 2017.  (Buergel Decl. Ex. 75 (Responses and Objections ("R&Os") to Plaintiff's Requests for Admissions ("RFAs") Nos. 38, 40, 43, 45–49).)

4.       In the Relevant Period, the following partners served as junior M&A staffing partners at the following times: Wolfe, from approximately July 2015 to July 2017; Birnbaum, from approximately July 2016 through August 10, 2018; and Brass, from approximately July 2017 through August 10, 2018.  (Buergel Decl. Exs. 68 (DPW_SDNY-000085152), 5 (Birnbaum Tr. 54:17–55:11, 61:5–10); Wolfe Decl. ¶ 12; Brass Decl. ¶ 29.)

5.       In the Relevant Period, Messrs. Bick and Reid, but no other Individual Defendants, were members of the Firm's Management Committee; Reid was at this time Managing Partner of the Firm, and Bick was head of the Corporate Department.  (Buergel Decl. Ex. 2 (Crane Tr. 30:17–24); 4 (Reid Tr. 31:6–32:9); 5 (Bick Tr. 28:15–25; 31:4–5 34:5–8).)

6.       From approximately early 2016 to May 2017, John Bick served as interim head of the Firm's M&A group.  (Buergel Decl. Ex. 5 (Bick Tr. 31:10–32:8).)

## II.       RETALIATION CLAIMS

### A.       Knowledge

7.       *For ease of reference in the paragraphs that follow, defendants note that Cardwell claims that during his time at the Firm, he engaged in the twelve allegedly protected activities listed in the chart below, each of which is described (as alleged) at length by the Court at ECF 78 and 198.  Of these, the Court has ruled that seven are plausibly alleged as protected (Fig. 2[1] Nos. 2, 3, 5, and 9–12, the "Allegedly Protected Activities") and five are not.  Defendants will refer to these by number (e.g. "Allegedly Protected Activity 2, 3, 5, 9–12").*

---

[1]   Defendants refer to this chart as Figure 2 in the accompanying memorandum of law and do the same here.

| **Figure 2** (Allegedly Protected Activities) | | | |
|---|---|---|---|
| No. (ECF 78) | Allegedly Protected Activity | Ruling (ECF 78 at 58–63; ECF 198 at 55–59) | Individual Defendants with Contemporaneous Knowledge[2] |
| 1. | May 2015 email re. "eye contact" | **Not Protected** (198:56) | |
| 2. | Sept. 2015 convo at Diversity Cttee/BAG mtg | Protected (198:56) | None |
| 3. | Jan. 2016 dinner with Reid & associate | Protected (78:59) | None (except Reid) (Bick learned of the fact of the dinner in Mar. 2017) |
| 4. | Aug. 2016 email re. alleged deal team removal | **Not Protected** (78:59) | |
| 5. | Sept. 2016 convo re. credit group assignment | Protected (198:57–58) | None |
| 6. | Dec. 2016 email re. prison issue | **Not Protected** (78:60–61); *accord* 198:55–59, 61) | |
| 7. | Jan. 2017 email re. CAP program | **Not Protected** (78:61) | |
| 8. | Dec. 2016–Mar. 2017 workload capacity forms | **Not Protected** (198:58) | |
| 9. | Mar. 2017 mtg with Reid and Kreynin | Protected (198:58–59) | None (except Reid, Bick) |
| 10. | May 2017 email to Goldberg re. "became ill" | Protected (78:62) | None |
| 11. | Aug. 2017 EEOC/NYSDHR filing | Protected (198:59) | None (except Bick, Brass, Reid) |
| 12. | Jan. 2018 review mtg w/Smith and Goldberg | Protected (78:63) | None (except Bick; Reid) |

### 1.   Defendants with No Knowledge

8.      Birnbaum was not aware, at any point prior to Cardwell's filing of the complaint in this action in November 2019, of any of the Protected Activities listed in Figure 2.  (Buergel Decl. Ex. 6 (Birnbaum Tr. 274:24–275:8 (Fig. 2 #2); 274:24–275:8 (Fig. 2 #3); 177:22–178:4 (Fig. 2 #5); 188:2–5 (Fig. 2 #9); 191:21–192:2 (Fig. 2 #10); 109:3–18 (Fig. 2 #11);  274:24–275:8 (Fig. 2 #12).)

9.      Butler was not aware, at any point prior to Cardwell's filing of the complaint in this action in November 2019, of any of the Protected Activities listed in Figure 2.  (Butler Decl. ¶¶ 3 (Fig. 2 #2); 4 (Fig. 2 #3); 5 (Fig. 2 #5); 6 (Fig. 2 #9); 7 (Fig. 2 #10); 8 (Fig. 2 #11); 9 (Fig. 2 #12).)

10.     Chudd was not aware, at any point prior to Cardwell's filing of the complaint in this action in November 2019, of any of the Protected Activities listed in Figure 2.  (Chudd Decl.

---

[2]   *See* ¶ 19.

¶¶ 3 (Fig. 2 #2); 4 (Fig. 2 #3); 5 (Fig. 2 #5); 6 (Fig. 2 #9); 7 (Fig. 2 #10); 8 (Fig. 2 #11); 9 (Fig. 2 #12).)

11.      Chudd is not mentioned in the charge Cardwell filed with the Equal Employment Opportunity Commission ("EEOC") on August 3, 2017 (which was subsequently referred to the New York State Division of Human Rights ("NYSDHR")) ("Cardwell's EEOC/NYSDHR Charge").  (Buergel Decl. Ex. 62 (KCARDWELL011422).)

12.      Hudson was not aware, at any point prior to Cardwell's filing of the complaint in this action in November 2019, of any of the Protected Activities listed in Figure 2.  (Buergel Decl. Ex. 7 (Hudson Tr. 133:11-19 (Fig. 2 #2); 133:11-19 (Fig. 2 #3); 133:11–19 (Fig. 2 #5); 133:11–19 (Fig. 2 #9); 133:11–19 (Fig. 2 #10); 153:3–154:21 (Fig. 2 #11); 133:11–19 (Fig. 2 #12).)

13.      Hudson is not mentioned in Cardwell's EEOC/NYSDHR Charge.  (Buergel Decl. Ex. 62 (KCARDWELL011422).)

14.      Wolfe was not aware, at any point prior to Cardwell's filing of the complaint in this action in November 2019, of any of the Protected Activities listed in Figure 2.  (Wolfe Decl. ¶¶ 3 (Fig. 2 #2); 4 (Fig. 2 #3); 5 (Fig. 2 #5); 6 (Fig. 2 #9); 7 (Fig. 2 #10); 8 (Fig. 2 #11); 9 (Fig. 2 #12).)

15.      Wolfe is not mentioned in Cardwell's EEOC/NYSDHR Charge.  (Buergel Decl. Ex. 62 (KCARDWELL011422).)

16.      When asked for the basis for his assertion that M&A partners "routinely talked about [his] complaints," Cardwell claimed that this "practice is a fact.  It is an observable fact, it is a demonstrable fact," without citing any specific supporting evidence.  (Buergel Decl. Ex. 1 (Cardwell Tr. 568:11–23).)

## 2.   Defendants with Limited Knowledge

17.      In or about August 2017, Bick and Reid, each then members of the Management Committee, became aware that Cardwell had filed his EEOC/NYSDHR Charge (Fig. 2 #11).

(Buergel Decl. Ex. 5 (Bick Tr. 230:9–13); 4 (Reid Tr. 271:4–8).)  Brass also became aware of the filing of the Charge in or around the same time period.  (Brass Decl. ¶ 27.)

18.    Bick and Reid received copies of the EEOC/NYSDHR Charge.  (Buergel Decl. Exs. 4 (Reid Tr. 12:18–21); 4 (Bick Tr. 11:5–11).)  Brass did not.  (Brass Decl. ¶ 27.)

19.    The EEOC/NYSDHR Charge mentioned certain other of the Protected Activities listed in Figure 2.  (Buergel Decl. Ex. 62 (KCARDWELL011422).)

20.    Except as noted at paragraph 17, Brass was not aware, at any point prior to Cardwell's filing of the complaint in this action in November 2019, of any of the Protected Activities listed in Figure 2.  (Brass Decl. ¶¶ 22 (Fig. 2 #2); 23 (Fig. 2 #3); 24 (Fig. 2 #5); 25 (Fig. 2 #9); 26 (Fig. 2 #10); 28 (Fig. 2 #12).)

21.    Except as noted at paragraphs 17 through 19, Bick was not aware, at any point prior to Cardwell's filing of the complaint in this action in November 2019, of any of the Protected Activities listed in Figure 2 (Buergel Decl. Ex. 5 (Bick Tr. 184:25–185:8 (Fig. 2 #2); 199:10–16 (Fig. 2 #5); 225:20–226:7 (Fig. 2 #10 (no knowledge of a May email to Goldberg))), except that Bick became aware (i) in or about March 2017, of the March 2017 meeting between Cardwell, Reid, and Kreynin at which Cardwell alleges he engaged in Protected Activity 9; and (ii) in or about January 2018 of the January 2018 meeting between Cardwell, Smith, and Goldberg at which Cardwell alleges he engaged in Protected Activity 12.  (Buergel Decl. Ex. 5 (Bick Tr. 273:13-22 (Fig. 2 #9); 152:3–16 (Fig. 2 #12).)[3]

22.    Except as noted at paragraphs 17 through 19, Reid was not aware, at any point prior to Cardwell's filing of the complaint in this action in November 2019, of any of the Protected

---

[3]    (Bick also became aware, in or about March 2017, of the fact that Reid had dinner with Cardwell more than a year earlier, in early 2016, but Bick testified that he had "no recollection of the substance of the discussions at that dinner."  (Buergel Decl. Ex. 5 (Bick Tr. 196:10–15 (Fig. 2 #3).))

Activities listed in Figure 2 (Buergel Decl. Ex. 4 (Reid Tr. 151:25–152:8 (Fig. 2 #2); 191:3–11 (Fig. 2 #5); 253:9–16 (Fig. 2 #10))), except that Reid participated in the January 2016 dinner and March 2017 meeting at which Cardwell alleges he engaged in Protected Activities 3 and 9 and became aware of the January 2018 discussion at which Cardwell alleges he engaged in Protected Activity 12.  (Buergel Decl. Ex. 4 (Reid Tr. 156:22–157:6 (Fig. 2 #3); 132:16–133:4 (Fig. 2 #9)).)

**B.    Alleged Adverse Employment Action (Termination)**

23.    Butler did not participate in the decision regarding whether to terminate Cardwell's employment.  (Butler Decl. ¶ 11; Buergel Decl. Ex. 6 (Birnbaum Tr. 273:13–17).)

24.    Chudd did not participate in the decision regarding whether to terminate Cardwell's employment.  (Chudd Decl. ¶ 10.)

25.    Hudson did not participate in the decision regarding whether to terminate Cardwell's employment.  (Buergel Decl. Ex. 7 (Hudson Tr. 199:12–13).)

26.    Wolfe did not participate in the decision regarding whether to terminate Cardwell's employment.  (Wolfe Decl. ¶ 10.)

　　(a)    As of February 2018, Wolfe was no longer a staffing partner.  (Brass Decl. ¶ 29; Wolfe Decl. ¶ 11; Buergel Decl. Ex. 69 (CARDWELL001521); Buergel Decl. Ex. 1 (Cardwell Tr. 555:10–19).)

27.    At Cardwell's deposition, when Cardwell was asked whom he was "told was involved in the decision to terminate" his employment, Cardwell did not list Butler, Chudd, or Hudson.  (Buergel Decl. Ex. 1 (Cardwell Tr. 555:24–556:14).)

28.    Cardwell was not told that Butler, Chudd, Hudson, or Wolfe participated in the decision to terminate Cardwell.  (Buergel Decl. Ex. 69 (CARDWELL001521).)

29.    It was reported to Reid that the M&A group was of the view that Cardwell's performance and the difficulty of staffing him as he got more and more senior was not going to turn around, and Reid accepted that view and also accepted, along with the rest of the Management

Committee, that Cardwell should be told it was time for him to look for another position because his performance was such he could not be staffed in a manner consistent with his seniority and he had not demonstrated that there was a prospect for improvement going forward.  (Buergel Decl. Ex. 4 (Reid Tr. 315:16–316:18).)

30.     Bick, as a member of the Management Committee, participated in discussions regarding Cardwell's performance and the difficulty of staffing him as he got more senior and likewise accepted that Cardwell should be told it was time for him to look for another position because his performance was such that he could not be staffed in a manner consistent with his seniority and he had not demonstrated that there was a prospect for improvement going forward. (Buergel Decl. Ex. 5 (Bick Tr. 284:23–285:18).)

31.     Birnbaum and Brass, then junior staffing partners for the Corporate Department, participated in discussions regarding Cardwell's performance and whether Cardwell could be staffed in a manner consistent with his seniority.  (Buergel Decl. Ex. 6 (Birnbaum Tr. 268:18–269:2); Brass Decl. ¶¶ 35–36.)

**C.     Alleged Adverse Employment Action (Other)**

**1.     Allegedly "False Reviews" Created by Hudson (ECF 198 at 66)**

32.     In a complaint filed with this Court on November 9, 2020, Cardwell alleged that "Ms. Hudson's June 2016 and September 2016 reviews for Mr. Cardwell were created after Mr. Cardwell filed his complaint with the EEOC in August 2017," and that they were "falsified, retroactively created documents."  ECF 88 ¶¶ 408, 410.

33.     Hudson's June and September 2016 reviews for Cardwell were created in June and September 2016, long before Cardwell filed his EEOC/NYSDHR Charge in August 2017.  *See* ¶¶ 35–39 *infra* and evidence cited therein.

34.     Hudson's reviews were not "falsified, retroactively created documents."  *See*

¶¶ 35–39 *infra* and evidence cited therein.

35.     Hudson authored two performance reviews for Cardwell.  (Buergel Decl. Ex. 9

(DPW_SDNY-000144354 at -369, -371).)  Hudson's first review of Cardwell bears, on its face,

the date "June 20, 2016" (the "June Hudson Review").  (Buergel Decl. Ex. 9 (DPW_SDNY-

000144354 at -371).)

> (a)     Metadata from the Davis Polk Lawyer Review System shows that the June
>         Hudson Review was created by Hudson on June 20, 2016.  (Buergel Decl.
>         Ex. 10 (DPW_SDNY-000000818).)
>
> (b)     Metadata from the Davis Polk Lawyer Review System shows that the June
>         Hudson Review was not altered by Hudson at any point after June 20,
>         2016.  (Buergel Decl. Ex. 10 (DPW_SDNY-000000818).)
>
> (c)     An email dated May 2017, transmitted over Davis Polk's servers and
>         produced to plaintiff in discovery, attached the June Hudson Review in
>         unaltered form.  (Buergel Decl. Ex. 53(a)–53(b) (DPW_SDNY-
>         000141984, DPW_SDNY-000141985 at -003).)
>
> (d)     At Cardwell's deposition, Cardwell testified, as to the June Hudson
>         Review, that he no longer has "any doubts that she created it in June
>         2016."  (Buergel Decl. Ex. 1 (Cardwell Tr. 495:11–21).)

36.     Hudson's second review of Cardwell bears, on its face, the date "September 27,

2016" (the "September Hudson Review").  (Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -

369).)

> (a)     Metadata from the Davis Polk Lawyer Review System shows that the
>         September Hudson Review was created by Hudson on September 27,
>         2016.  (Buergel Decl. Ex. 10 (DPW_SDNY-000000818).)
>
> (b)     Metadata from the Davis Polk Lawyer Review System shows that the
>         September Hudson Review was not altered by Hudson at any point after
>         September 27, 2016.  (Buergel Decl. Ex. 10 (DPW_SDNY-000000818).)
>
> (c)     Emails dated September 2016 and May 2017, transmitted over Davis
>         Polk's servers and produced to plaintiff in discovery, attached the
>         September Hudson Review in unaltered form.  (Buergel Decl. Exs. 38
>         (DPW_SDNY-000134245); 51 (DPW_SDNY-000141984)).

37.    Hudson was the "only one who decided what was going to be put in" the June and September Hudson Reviews.  (Buergel Decl. Ex. 7 (Hudson Tr. 176:14–24).)

38.    "[N]o Davis Polk partner ever told [Hudson] what to say or tried to influence what [she] said about Mr. Cardwell in his performance reviews."  (Buergel Decl. Ex. 7 (Hudson Tr. 250:9–12).)

39.    Hudson's descriptions of Cardwell's performance in her June and September 2016 reviews are accurate.

### 2.   Billable Hours

40.    Cardwell was on vacation for every business day in April 2017 ("beginning 4/3, returning 5/2").  (Buergel Decl. Ex. 1 (Cardwell Tr. 340:12–20); 11 (DPW_SDNY-000143583)); 61 (DPW_SDNY-000098096 ).)

   (a)    Cardwell described this time as "vacation" to a fellow associate.  (Buergel Decl. Ex. 21 (KCARDWELL025615)).

41.    The Firm received notice that Cardwell had engaged litigation counsel in or about May 2017.  (TAC ¶ 463.)

42.    Cardwell failed to record billable time in at least June and September 2017.

43.    In June 2017, Cardwell worked on assignments with partners Louis Goldberg and Phillip Mills.  (Buergel Decl. Ex. 55 (DPW_SDNY-000045238); 56 (DPW_SDNY-000084998).)

   (a)    In the June 2017 time period, Cardwell worked on drafting a joint venture agreement for a matter with Goldberg.  (Buergel Decl. Ex. 56 (DPW_SDNY-000045239).)

   (b)    Produced emails show that Cardwell worked on the joint venture matter in June 2017.  (*E.g.*, Buergel Decl. Exs. 51 (DPW_SDNY-000052002–04); 57 (DPW_SDNY-000139494).)

   (c)    Cardwell did not record any billable time for the month of June 2017.  (Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

44. In September 2017, Cardwell worked on an assignment with partner John Amorosi. (Buergel Decl. Ex. 66 (DPW_SDNY-000005803).)

    (a)    As part of this assignment, Cardwell joined calls and meetings and made revisions over multiple days. (*E.g.*, Buergel Decl. Exs. 64 (DPW_SDNY-000005551); 66 (DPW_SDNY-000005803); and 67 (DPW_SDNY-000006873).)

    (b)    On September 17, 2017, Cardwell sent Amorosi a "draft of [a] Transaction Agreement and LLC Agreement" for the [Client V] matter. (Buergel Decl. Exs. 66 (DPW_SDNY-000005803 at -803); 65 (DPW_SDNY-000000866 at -866).)

    (c)    Cardwell billed only one hour on a single day to the matter with Amorosi in September 2017. (Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

## III. DISCRIMINATION CLAIMS

### A. Employment History

45. Corporate associates at the Firm typically complete two rotations. (Buergel Decl. Ex. 1 (Cardwell Tr. 451:24–452:4); Duggan Decl. ¶ 6.) At the end of these rotations, first-year associates are expected to assign formally to one group on a permanent basis. (Duggan Decl. ¶ 6.) Cardwell asked for, and received, the opportunity to complete a third rotation. (Buergel Decl. Exs. 1 (Cardwell Tr. 452:21–453:15); 23(b) (DPW_SDNY-000140609 at -624).) Cardwell made this request to at least Maurice Blanco, a member of the Diversity Committee. (Buergel Decl. Ex. 1 (Cardwell Tr. 454:20–455:11).)

46. After joining the Firm as an associate in 2014, Cardwell rotated through three Firm practice groups, each for approximately six months: Credit (or "Finance"), from September 2014 to April 2015; M&A, from April 2015 to October 2015, and Capital Markets, from October 2015 to April 2016. (Buergel Decl. Ex. 53(b) (DPW_SDNY-000141985 at -985).)

47. Cardwell had a performance review after each rotation: with partner Jason Kyrwood, in May 2015; with partner William Chudd, in December 2015; and with partner John

Bick, in June 2016.  (Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -389 (Kyrwood); *Id.* at -387 (Chudd); *Id.* at -385 (Bick).)

48.    After his third rotation, Cardwell "assigned" to M&A in April 2016.  (Buergel Decl. Ex. 22 (DPW_SDNY-000045700).)

49.    Cardwell had an annual review in December 2016 with partner Len Kreynin. (Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -383).)

50.    Cardwell had an annual review in January 2018 with partners Oliver Smith and Louis Goldberg and a "follow-up discussion" with them in February 2018.  (Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -391–392; -393–394).)

51.    The "summary review" forms from each review meeting, and the underlying performance reviews submitted in connection with each, appear at Buergel Decl. Ex. 9 (DPW_SDNY-000144354 *et seq.*).

**B.    Cardwell's First Rotation (Credit, September 2014 to April 2015)**

**1.   Performance Reviews**

52.    Cardwell's reviews from his first rotation contained feedback critical of his performance.  *See* ¶¶ 53–56 *infra* and evidence cited therein.

53.    Cardwell's performance reviews from the period leading to his May 2015 review with Kyrwood include the following comments:

    (a)    "Sometimes he lacks a bit of initiative and takes longer than expected to complete certain tasks."

    (Buergel Decl. Ex. 9 (Arnaldos, March 2015) (DPW_SDNY-000144354 at -358).)

    (b)    "Try to take more initiative with the simpler matters and be more prompt to respond and act."

    (Buergel Decl. Ex. 9 (Arnaldos, March 2015) (DPW_SDNY-000144354 at -358).)

(c)    "But Kal[om]a is on the slow side in producing drafts, and his work product needs improvement.  Part of the reason for this is learning to ask questions when he does not understand instead of taking lots of time to try to figure out everything himself (even when offered assistance) and come to incorrect conclusions that often require his work to be redone."

(Buergel Decl. Ex. 9 (Segal, March 2015) (DPW_SDNY-000144354 at -375).)

(d)    "This may just be a personal pet peeve, but I think he's sometimes so focused on making sure that he takes detailed notes that he doesn't focus on the big picture and might miss higher level connections that could help him better understand how a specific assignment fits into the broader context of a deal."

(Buergel Decl. Ex. 9 (Witkow, April 2015) (DPW_SDNY-000144354 at -380).)

54.    Cardwell's performance reviews from the period leading to his May 2015 review with Kyrwood also include the following comments:

(a)    "Kaloma is a hard worker and tries to please.  He is proactive in offering help."

(Buergel Decl. Ex. 9 (Segal, March 2015) (DPW_SDNY-000144354 at -375).)

(b)    "He's very easygoing and easy to work with."

(Buergel Decl. Ex. 9 (Arnaldos, March 2015) (DPW_SDNY-000144354 at -358).)

55.    As to Arnaldos's review, Cardwell testified that "I have no reason to think this is not a reflection of what he may honestly have believed at the time that this review was created." (Buergel Decl. Ex. 1 (Cardwell Tr. 467:8–15).)  As to Segal's review, Cardwell testified he had the "[s]ame answer" as his did with respect to Arnaldos's review.  (Buergel Decl. Ex. 1 (Cardwell Tr. 461:10–462:5, 467:12–18).)

56.    In the "summary review[]" form describing Cardwell's May 2015 review:

(a)    Kyrwood described the "substance of the evaluation" as follows:

"Generally positive—organized, high quality work, good attention to detail, hard worker.  Some notice that he is a little slow in turnaround time and thought would benefit from asking more questions.  Also he should take more initiative."

    (b)    Kyrwood described "comments from the reviewee" as follows:

"Accepted feedback and agreed."

(Buergel Decl. Ex. 9 (Kyrwood Summary) (DPW_SDNY-000144354 at -389).)

### 2.  Hours

57.    In the September 2014 to April 2015 time period, Cardwell reported the following billable hours:

| Month | Billable Hours |
| --- | --- |
| September | 29.5 |
| October | 202.6 |
| November | 73.8 |
| December | 138.5 |
| January | 71.2 |
| February | 148.7 |
| March | 119.6 |
| April | 160.1 |

(Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

### C.    Cardwell's Second Rotation (M&A, April to October 2015)

### 1.  Contemporaneous Notes

58.    Defendant Daniel Brass had firsthand experience working with Cardwell (and with Cardwell's performance) prior to the date, in 2016, on which Cardwell alleges that Brass "removed" him from a deal.  *See* ¶¶ 59–63 *infra* and evidence cited therein.

59.    In the September to October 2015 time frame, Cardwell worked on a matter codenamed "Project Spring" with then-associates Brass and Zain Rehman.  (Buergel Decl. Ex. 11

(DPW_SDNY-000143583 (Master Time Spreadsheet ("Project Spring"); Brass Decl. Ex. _ (DPW_SDNY-000086743).)

60.     In the September 2015 time frame, Cardwell at times worked directly with Brass in connection with Project Spring.  (*E.g.*, Brass Decl. Exs. 1 (DPW_SDNY-000088484); 2 (DPW_SDNY-000074596).)

61.     In Brass's view, Cardwell's performance on Project Spring was "unreliable and substandard."  (Brass Decl. ¶ 2.)  Cardwell "made errors in the work he delivered to [Brass] that made it difficult to trust the work product [Brass] received from him," and "was at times not available when [Brass] needed assistance, or delivered work so slowly that [Brass] either had to handle it [him]self or learned not to entrust Mr. Cardwell with time-sensitive work," and "also often had to redo the work he had sent [him]."  (Brass Decl. ¶¶ 2–3.)

62.     On September 9, 2015, Rehman sent Brass an email in connection with Project Spring that included the following text:

> "I am getting a bit frustrated on the junior staffing on this deal—as I am doing a lot of heavy lifting on small things which Kaloma should be taking care of."

(Brass Decl. ¶¶ 4 and Ex. 3 (DPW_SDNY-000086743).)

63.     On September 30, 2015:

(a)     At 8:54 p.m., Brass wrote, "Kaloma, would you mind sending me revised execution word and PDFs of the SPA and disclosure schedules with the dates changed to this Friday?"

(b)     At 9:05 p.m., Cardwell replied, "No problem.  I'll send revised drafts shortly."

(c)     At 9:47 p.m., Brass wrote, "Any estimate on timing?  I need to get the email out very soon."

(d)     At 9:51 p.m., Cardwell wrote, "15-20 minutes."

(e)     At 9:51 p.m., Brass wrote, "I will do it myself."

(Brass Decl. ¶¶ 2 and Ex. 1 (DPW_SDNY-000088484).)

### 2. Performance Reviews

64.     Cardwell's reviews from his second rotation contained feedback critical of his performance.  *See* ¶¶ 65–68 *infra* and evidence cited therein.

65.     Cardwell's performance reviews from the period leading to his annual 2015 review with William Chudd include the following comments:

> (a)     "Kaloma acted as the junior associate on [an entity's] acquisition of [another entity's businesses].  In that role he coordinated the drafting of a due diligence report and provided other support.  I appreciate that Kaloma wants to learn and be involved in the deal [and] he very quickly volunteers to join calls and take on work.  He needs to make sure to focus, however, on still doing the tasks that are appropriate for his class.  For example, although he quickly volunteers to help with items it can take a very long time for him to complete a draft.  (A process that is made worst by constant assurances that work will be ready shortly, even though it is still many hours from being delivered.)  This not only makes it difficult with assignments that you ask him to complete, but also can make a person hesitant to ask him to take on additional tasks because the timing for delivery is unclear.  My impression is that this problem is caused potentially by (1) him taking on too many deals and not being able to dedicate enough time to the projects he is already staffed on, (2) pushing to be involved in tasks where he is not really needed, taking away from time he could be spending on his assignments, or (3) not effectively communicating timing (i.e., its ok to say something will take a few hours)."
>
> (Buergel Decl. Ex. 9 (Turano, September 2015) (DPW_SDNY-000144354 at -378).)
>
> (b)     "[W]e were very stretched on the transaction, and the impression I got from the team was that they did not have confidence that Kaloma could interact directly with the client (as much as, for instance, some of the other first years could). Also, my understanding was that he was not yet able to take the lead on the diligence report, while another first year could take the lead (and that his due diligence summaries needed quite a bit of work). For this reason, my impression is that Kaloma may be 'behind' in his class, although because my impression is based off of third party accounts, I do not feel totally confident with this determination."
>
> (Buergel Decl. Ex. 9 (Chudd, September 2015) (DPW_SDNY-000144354 at -362).)

 (c) "Drafting skills (including logical organization, clarity, brevity. consistency. intelligent use of precedents and ability to do original drafting): below expectations."

  (Buergel Decl. Ex. 9 (Chudd, September 23, 2015) (DPW_SDNY-000144354 at -362).)

 (d) "Ability to inspire client confidence: below expectations."

  (Buergel Decl. Ex. 9 (Chudd, September 23, 2015) (DPW_SDNY-000144354 at -363).)

 (e) "My suggestion would be increased responsiveness to email communications and performing the tasks assigned - especially when a deal is approaching signing. When a task is assigned without a deadline, please confirm [with] the assigning attorney as to when they would like to see the first draft to avoid any confusion."

  (Buergel Decl. Ex. 9 (Rehman, November 2015) (DPW_SDNY-000144354 at -374).)

66. Cardwell's performance reviews from the period leading to his annual 2015 review with Chudd also include the following comments:

 (a) Cardwell was "hardworking" and "did a good job with the schedules."

  (Buergel Decl. Ex. 9 (Rehman, November 2015) (DPW_SDNY-000144354 at -374).)

67. As to Turano's review, Cardwell testified, "I do not have any knowledge of anything that would lead me to believe this was not an honest review or not honest comments described in this particular review." (Buergel Decl. Ex. 1 (Cardwell Tr. 481:14–19).)

68. In the "summary review" form describing Cardwell's December 2015 review:

 (a) Chudd described the "substance of the evaluation" as follows:

  "Kaloma received praise for being engaged and eager, he is hard working and always willing to help. Reviewers also noted that he could be more responsive on email communication, and improve his communication with senior lawyers regarding task deadlines and timing of deliverables. He also seemed to overlook more basic tasks in favor of more substantive work, often at the detriment of being able to deliver on the more basic tasks."

(b)     Chudd described "comments from the reviewee" as follows:

"Kaloma asked for more direct real-time performance evaluations. I told him that the best way to do this was to seek input from the more senior lawyers on his team after a signing/closing when it is still fresh in his mind.  To get constructive feedback, I suggested that he should ask for areas where he could improve.  He was also concerned about his billable hours compared to others, as well as his standing in his class."

(c)     Chudd described "developmental priorities for the next year" as follows:

"Kaloma needs to focus on delivering excellent work product on time and communicate his deadlines and timing.  Once he does this, senior lawyers will feel more comfortable delegating more work to him."

(Buergel Decl. Ex. 9 (Chudd Summary) (DPW_SDNY-000144354 at -387–88).)

### 3.   Hours

69.     In the April to October 2015 time period, Cardwell reported the following billable hours:

| Month | Billable Hours |
| --- | --- |
| April 2015 | 160.1 |
| May 2015 | 190.0 |
| June 2015 | 192.7 |
| July 2015 | 266.5 |
| August 2015 | 169.2 |
| September 2015 | 181.0 |
| October 2015 | 47.7 |

(Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

### D.     Cardwell's Third Rotation (Capital Markets, October 2015 to April 2016)

### 1.   Hours

70.     A document emailed in the June 2016 time frame reported "difficulty staffing [Cardwell] in Capital Markets based on performance issues."   (Buergel Decl. Ex. 23(b) (DPW_SDNY-000140609 at -624).)

71.     Cardwell's hours during his Capital Markets rotation were uneven and low.  *See*
¶ 72 *infra* and evidence cited therein.

72.     In the October 2015 to April 2016 time period, Cardwell reported the following
billable hours:

| Month | Billable Hours |
|---|---|
| October 2015 | 47.7 |
| November 2015 | 134.1 |
| December 2015 | 94.4 |
| January 2016 | 56.7 |
| February 2016 | 44.1 |
| March 2016 | 4.3 |
| April 2016 | 43.6 |

(Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

## 2.  **Contemporaneous Notes**

73.     On Sunday, November 8, 2015:

(a)     Cardwell emailed Hudson certain work product at 4:03 a.m.  (Buergel
Decl. Ex. 16 (DPW_SDNY-000095576).)

(b)     Hudson forwarded Cardwell's 4:03 email to a more senior associate
working on the matter, in an email including the following text: "Why do
you think he was up until 4:03 working on this?  I think he could have just
included my comments rather than copying them over (if that's what took
him so long)."  (Buergel Decl. Ex. 16 (DPW_SDNY-000095576).)

74.     Hudson gave the following testimony at her deposition:

"I can remember one instance where I had given him comments on an
offering document and the next morning I woke up to see that he had sent
an email at it 4:00-something in the morning, and he had copied all of my
comments over, in his own handwriting. And I was surprised,
flabbergasted actually, because that was certainly not a typical practice; a
typical practice which is reuse the partner's comments. And it was frankly,
time consuming for him to copy them over and a completely unnecessary
waste of client's money to do that."  (Buergel Decl. Ex. 7 (Hudson Tr.
251:7-20).)

75. On November 9, 2015,

    (a) Hudson asked to be sent "a folder with [Cardwell's] reviews since starting at DPW."  (Buergel Decl. Ex. 17 (DPW_SDNY-000096002).)

    (b) Clausen wrote, "Sure.  Will send to you this afternoon.  Is everything ok?"  *Id.*

    (c) Hudson replied, "Yes – just want to have a read on the situation.  Thanks."  *Id.*

76. Hudson gave the following testimony at her deposition:

> "Q. So it's your testimony that when you stated you wanted to have a read on the situation in that message to Rocio, you were talking about his performance, right?  A. Yes."  (Buergel Decl. Ex. 7 (Hudson Tr. 244:3–7).)

77. On December 7, 2015, an associate more senior than Cardwell sent Hudson an email including the following text: "Sorry for the delay—the draft required a bit of massaging after I received it."  The associate received the document from Cardwell.  (Buergel Decl. Exs. 18 (DPW_SDNY-000093462)); 19 (DPW_SDNY-000166121).)

78. On December 28, 2015, Cardwell sent an email to the senior associate on the deal described immediately above including the following text: "Thanks again (for everything on this deal) and apologies for missing your instructions/suggested language for the opening paragraph of the memo.  I did not intentionally disregard those edits."  (Buergel Decl. Ex. 19 (DPW_SDNY-000166121).)

### 3.  **Performance Reviews**

79. Cardwell's reviews from his third rotation contained feedback critical of his performance.  *See* ¶¶ 80–82 *infra* and evidence cited therein.

80. Cardwell's performance reviews from the period leading to his June 2016 review with John Bick included the following comments:

(a)     "He was generally eager to help but was unavailable at times when tasks needed to be completed in real time.  I would suggest keeping better track of deal timing and the status of documentation."

(Buergel Decl. Ex. 9 (Bezeg, June 2016) (DPW_SDNY-000144354 at -359).)

(b)     "Kaloma worked on two of my deals during his rotation through capital markets, a follow on offering for [Client U] and a tender offer for [Client T] notes.  On both deals, Kaloma reported directly to an associate rather than me (a third year for [Client U] and a fifth year for [Client T]). Both associates reported that Kaloma worked very slowly and provided work product that was disappointing.  On the [Client U] deal, diligence and other preparatory tasks were completed so slowly that a second junior associate needed to be staffed.  The deal was postponed shortly thereafter. On the [Client T] deal, Kaloma had difficulty meeting deadlines and turned in work product that had to be substantially redone by the senior associate given client deadlines.  When the senior associate went on vacation, I worked directly with Kaloma to see if I could help.  I found that he did not understand key aspects of the transaction at a relatively late stage.  He also lacked attention to detail.  When I later billed the client, I learned that he spent dozens of hours compiling the closing set rather than enlisting a legal assistant to do so, as would be standard practice. However, throughout the entire process, Kaloma was eager to work on the transactions and displayed a very good attitude.  He was attentive over holiday weekends and wanted to do a good job. . . .

I would suggest that Kaloma ensures that he fully understands what is being asked of him when an assignment is given to him.  If he later realizes that he doesn't understand something, he should ask for clarification in a timely manner rather than jeopardize the timing of providing work product to a client by trying to work through it himself and turning in work to a senior associate that needs significant reworking. Kaloma has such wonderful personal / communications skills, and he should use them with his senior associates to get all of the information and context that he needs in order to hit it out of the ballpark.  He then needs to execute with great attention to detail while working sufficiently quickly to meet the time demands of a transaction/client I would note that I gave Kaloma real-time feedback on these points during the [Client T] tender offer and found that he was extremely willing to hear the feedback and took it with grace.  I did not have another chance to work with him before he went back to M&A, but I have attended recruiting events with him subsequently and continued to find him engaging and interested in learning more about the firm and different practices."

(Buergel Decl. Ex. 9 (Hudson, June 2016) (DPW_SDNY-000144354 at -371.)

81.     In the "summary review" form describing Cardwell's June 2016 review:

(a)     Bick described the "substance of the evaluation" as follows:

"Kaloma had asked for mid-year feedback on his work, and this review is in response to that request.  Kaloma generally received positive reviews, with the notable exception of Sophia Hudson, who spoke directly to Kaloma about the need to raise the substantive quality of his work, pay more attention to detail, and focus on time management and task deadlines.  Sophia reports that Kaloma took her review well, and my discussions with Kaloma today confirmed that.

I noted that while the other reviewers saw progress and liked working him, he should continue to focus on time management, understand the timeline for work tasks and projects, and make sure that he is available and can meet deadlines.  I advised him to communicate clearly with senior lawyers on his matters to make sure he understands what is needed and expected from him.  I did note that reviewing lawyers had seen improvement from him on these issues.

Kaloma received this advice well from what I could tell."

(Buergel Decl. Ex. 9 (Bick Summary) (DPW_SDNY-000144354 at -385).)

82.     Cardwell's performance reviews from the period leading to his annual 2016 review with Chudd also include the following comments:

(a)     Cardwell conducted "diligent research of relevant press articles."

(Buergel Decl. Ex. 9 (Turano, June 2016) (DPW_SDNY-000144354 at -377).)

(b)     "Kaloma did an excellent job on a difficult diligence assignment summarizing the terms of a credit card affiliation agreement.  His work was thoughtful and comprehensive.  I look forward to working with him again."

(Buergel Decl. Ex. 9 (Amorosi, June 2016) (DPW_SDNY-000144354 at -355).)

| E. | **Assignment to M&A (Through December 2016 Annual Review)** |

| 1. | **Contemporaneous Notes** |

         *a.*     ***Staffing Needs for [Client S] Matter (Purported Brass Deal "Removal")***

83.      On July 22, 2016:

      (a)      At 1:28 p.m., defendant Daniel Brass, then an associate, sent staffing coordinator Carolina Fenner an email including the following text: "I need some additional staffing to help out [Associate C] on a [Client S] deal. Brian Wolfe is out next week and I will be covering for him on it. [Associate C] currently has [Associate H] to help, but I think she might need some more as the deal is going to be very fast moving with many documents to review. Is there a good second year or great first year with some capacity to help?"

      (b)      At 1:36 p.m., Fenner responded in full, "Hi Dan. The only 2nd year I can offer today/foreseeable future is Kaloma Cardwell. He has 50 percent. Would that work? There's no strong 1st year available... Sorry!"

      (c)      At 1:38 p.m., Brass responded in full, "How is he rating at the moment? Last time I used him it really wasn't great."

      (d)      At 1:42 p.m., Fenner responded in full, "I think that with the proper amount of supervision he can do a good job, but needs to be supervised. Laura has worked with him lately."

(Brass Decl. Ex. 4 (DPW_SDNY-000088628–29).)

84.      Between 1:43 and 1:57 on July 22, 2016, Brass and Laura Turano exchanged the following emails:

      (a)      Brass: "How good is Kaloma these days?"

      (b)      Turano: "I think he's doing great. Big difference from last year."

      (c)      Brass: "Able to mark-up documents by himself reliably?"

      (d)      Turano: "He hasn't done markups for me."

(Brass Decl. Ex. 5 (DPW_SDNY-000086917).)

85.      Brass submitted sworn testimony in this litigation stating that he viewed Cardwell, based on personal experience working directly with him, as lacking "the professional skillset

necessary for this particular deal and assignment [the July 2016 assignment], which was fast-moving, complex, and required the ability to execute detail-oriented work with precision and without laborious, line-by-line and step-by-step handholding or supervision."  (Brass Decl. ¶ 8.) Brass stated that he formed this view based on multiple data points.  (Brass Decl. ¶ 8.)

86.    Continuing on July 22, 2016:

(a)    At 1:42 p.m., Brass sent Fenner an email, responding to her 1:42 email, that read, in full: "Ok – what other first-years (regardless of ability) have time?"  (Brass Decl. Ex. 4 (DPW_SDNY-00088628).)

(b)    At 1:53 p.m., Fenner responded in full: "On paper none but I am emailing some people to confirm.  Staffing has been painfully thin!" *Id.*

(c)    At 1:57 p.m., Fenner emailed an associate in the class of 2015 with the subject line, "Any time left?" stating: "Hi [Associate K]. Sorry for having to ask but need to. Thanks."  (Buergel Decl. Exs. 32 (DPW_SDNY-000143350))

(d)    At 2:00 p.m., Associate K responded, "Hey Carolina, I just got picked back up on Project Derby contract review for the weekend following DOJ filing suit.  Seems like a busy weekend, but what's the scope on this one?" (*Id.*)

(e)    At 2:02 p.m., Fenner forwarded her email with Associate K to Brass, asking, "Possible to have him start next week?  How much capacity should I say will be needed?  Everyone already has a lot on their plate but perhaps he can squeeze."  (*Id.*)

(f)    At 1:57 p.m., Brass had asked Fenner, in response to the 1:53 email referencing "painfully thin" staffing, "Wow - even [Associate J] who just came back from secondment?"  At 1:59 p.m., Fenner responded in full, "Yes, the [Client P] deal team had been waiting for him since the prior Thursday, and he was scheduled to return the following Tuesday . . . It's how bad things have been.  The deal is expected to sign this coming week or the following."  (Brass Decl. Ex. 4 (DPW-SDNY-000088628–29).)

(g)    At 2:05 p.m., Brass responded, "Let's go with Kaloma then. Thanks very much for hunting!"  (*Id.*)

87.    Later on July 22, 2016:

    (a)    At 2:39 p.m., Cardwell emailed Brass, "Hi Daniel, I'll be assisting you on the [Client S] deal.  When your schedule permits, please let me know when you'd like to discuss.  Regards, Kaloma."

    (b)    At 5:38 p.m., Brass sent an email to Cardwell including the following text: "I think you stand down for now!"

    (c)    At 5:42 p.m., Cardwell replied, "Thanks, Daniel.  Will do.  Any sense if and when the status of the deal could change?"

    (d)    At 5:43 p.m., Brass responded, "I think we are ok for the near future," and Cardwell responded, "Understood.  Regards, Kaloma."

(Buergel Decl. Ex. 31 (DPW_SDNY-000045710–11).)

88.    Between 2:39 and 5:38 p.m., Brass learned that another associate ("Associate J"), had more availability than Brass initially understood.  (Brass Decl. ¶ 15.)

89.    Associate J was staffed on the deal in lieu of Cardwell.  (Brass Decl. ¶ 16.)

90.    Cardwell:

    (a)    alleges that Fenner "did not provide an explanation for Mr. Brass's behavior."  (TAC ¶ 220.)

    (b)    admits that Fenner "told me that Mr. Brass's justification to her, communicated through the phone, was that he needed someone more senior to have worked the deal."  (Buergel Decl. Ex. 1 (Cardwell Tr. 532:7–535:17).)

    (c)    admits that "the person that he replaced me with was one year senior than me."  (*Id*.)

    (d)    never performed work on this matter.  (Buergel Decl. Ex. 75 (R&O to RFA 3); Brass Decl. ¶ 16.)

91.    Associate J:

    (a)    was "one year senior than [Cardwell]," in the class of 2013 (Buergel Decl. Ex. 1 (Cardwell Tr. 535:4–12));

    (b)    was at this time a midlevel associate whereas Cardwell was a junior associate (Brass Decl. ¶¶ 12–13; *e.g.*, Buergel Decl. Ex. 1 (Cardwell Tr. 376:4–5));

(c)     was not only more senior than Cardwell, but had both relevant experience and was understood by Brass at the time he accepted Associate J to the team to be substantially more competent and capable of working on a very fast-moving transaction than Cardwell (Brass Decl. ¶ 12);

(d)     "had a professional skillset—the ability to work to deadline even under significant time pressure, a good substantive understanding of the issues, the ability to execute appropriate tasks with significant autonomy—that w[as] needed on this particular deal" (Brass Decl. ¶ 12).

92.     There was neither a client need nor a justification to add both Cardwell and Associate J to the team.  (Brass Decl. ¶ 16.)

93.     In Brass's professional opinion:

(a)     The speed at which the deal was moving required that markups be sent to Brass and the client concurrently.  (Brass Decl. ¶ 13.)

(b)     Brass needed someone with strong and reliable performance and, if possible, proven ability to execute markups reliably.  (Brass Decl. ¶ 13.)

(c)     The markup assignment in question would not have been appropriate for someone with limited reliable skill in handling markups.  (Brass Decl. ¶ 13.)

(d)     The markup assignment in question would not have been appropriate for Cardwell based on what Brass himself knew of Cardwell's performance from working together in the past.  (Brass Decl. ¶ 13.)

94.     Cardwell has produced no evidence *at all* corroborating his assertion that his "performance was on par with or better than" the associate who ultimately joined the team.  (TAC ¶ 239.)

95.     Cardwell "had on several occasions sent [Brass] work with substantive errors that would have been embarrassing to the Firm had they been sent directly to the client."  (Brass Decl. ¶ 13.)

96.     Cardwell has produced no evidence *at all* corroborating his assertion that "race was a motivating factor" in Brass's decision.  (TAC ¶ 239.)

97.     While serving as a staffing coordinator, Brass attempted, in Cardwell's words, to

"staff Mr. Cardwell on multiple public companies deals."  TAC ¶ 610; (Brass Decl. ¶ 31.)

### b.     *Staffing Needs for Butler Matter*

98.     On August 4, 2016:

    (a)     Fenner asked Cardwell to cover for an associate who was going on vacation for a week and a half on a matter involving defendant Butler.

    (Buergel Decl. Ex. 33 (DPW_SDNY-000105316).)

    (b)     The associate leaving for vacation sent Butler an email stating that "Kaloma has kindly offered to provide coverage" for her.  Butler forwarded this email to Birnbaum and Wolfe, stating, "[i]f we have to do deal docs next week I need more than this."

    (Buergel Decl. Ex. 34 (DPW_SDNY-000086014).)

99.     Cardwell was staffed on the matter.   (Buergel Decl. Ex. 35 (DPW_SDNY-000086053).)

100.    On August 9, 2016, Butler sent an email to Birnbaum and Wolfe including the

following text: "Kaloma is just not up to running this."   (Buergel Decl. Ex. 35 (DPW_SDNY-000086053).)

### c.     *Fall 2016 Staffing Needs*

101.    On September 19, 2016:

    (a)     Fenner asked Brass if he would "be open to taking Kaloma" on an assignment.  (Brass Decl. Ex. 6 (DPW_SDNY-000088630).)

    (b)     Brass forwarded this to Oliver Smith, an M&A partner, asking, "What do you think?  Never had a great experience with him." (*Id.*)

    (c)     Smith replied: "I don't have much firsthand experience, but anecdotally does not sound like a great fit for a project like this which is not straightforward." (*Id.*)

    (d)     Brass responded to Fenner on a separate thread, "Oliver and I think we need someone of a slightly higher caliber (hard to put…)." (Brass Decl. Ex. 7 (DPW_SDNY-000086919).)

102.    Around October 19, 2016, Brass and Smith again discussed staffing for a matter.
Smith told Brass "help is going to be someone good, but junior, like [Associate L], [Associate M],
or [Associate N] (all second years, newly above the line, or someone like [Associate O], [Associate
P], or Kaloma."  (Cardwell was at this time a third-year associate.)  Brass stated "[Associate L] is
outstanding."  Smith stated, "will see if we can do that [staff Associate L]."  (Brass Decl. Ex. 8
(DPW_SDNY-000086924).)

103.    Associate L was a Black/African-American female associate in Cardwell's class.
(Buergel Decl. Ex. 6 (Birnbaum Tr. 88:4).)

### d.      *Performance on Project Giant*

104.    In the fall 2016 time frame, partner Len Kreynin worked directly with Cardwell
and personally observed that Cardwell's overall performance was poor, that his work product was
not what Kreynin expected from a junior associate at Davis Polk, and that Cardwell made what
Kreynin considered unacceptable and fundamental errors.  Kreynin Decl. ¶¶ 2–7.

### e.      *Staffing Needs for Client N & Project Giant*

105.    Cardwell was not "removed" from the Project Giant matter; he became (by his own
admission) busy, another associate filled in for him, and Cardwell promised to let his Project Giant
team know when he again became available.  *See* ¶¶ 106–107 *infra* and evidence cited therein.

106.    In the September 2016 time period, Cardwell was working on at least two matters:

(a)    a matter for a client anonymized for present purposes as "Client N" with
Marc Williams, an M&A partner.  (Buergel Decl. Ex. 47 (DPW_SDNY-
000051958).); and

(b)    Project Giant, with Len Kreynin, an M&A partner.  (Buergel Decl. Ex. 39
(DPW_SDNY-000084698).)

107.    On September 29, 2016:

(a)    Carolina Fenner wrote to Cardwell, "Hi Kaloma, the partners are asking us
to follow up with associates who didn't fill out the form/provide their

29

capacity on Tues[day]. How much should we say for you?  Thanks."
(Buergel Decl. Ex. 40 (DPW_SDNY-000105318).)

(b)  Cardwell responded, "[f]or this week, my capacity is at zero, as the [Client N] spin-off continues to expand and as we have been frequently holding calls with Netherlands and Mexican counsel in the mornings/during the day and calls with Japanese/Shanghai/Hong Kong/Singapore counsel at night."  (Buergel Decl. Exs. 40 (DPW_SDNY-000105318); 1 (Cardwell Tr. 530:4–25)).

(c)  An associate on the Project Giant team emailed Cardwell, "[s]ince you have been tied up with the [Client N] restructuring, we have asked [another associate] to fill in for you through signing on [Project Giant]. Please let us know how you free up.  I hope things get more manageable soon."  (Buergel Decl. Exs. 39 (DPW_SDNY-000084698 at -698).)  Cardwell responded, "[t]hanks [associate].  Understand completely.  I'll be sure to let you know."  (*Id.*)

### *f.*  *Difficulty Staffing Cardwell in M&A Based on Performance*

108.  In corporate law, poor-performing associates can be difficult to staff.  (Buergel Decl. Ex. 5 (Bick Tr. 116:19–117:12).)

109.  By 2016, Cardwell had gained a "general reputation" within the M&A group as "a very poor performer" who "required very careful supervision," and "couldn't perform at the level of an associate his class year, [did] sloppy work, missed issues, didn't understand issues, missed deadlines . . . ."  (Buergel Decl. Ex. 6 (Birnbaum Tr. 101:15–102:3; 195:25–196:8).)  "[H]is performance was so bad, he was very hard to staff."  (Buergel Decl. Ex. 6 (Birnbaum Tr. 103:20–23).)

110.  Birnbaum "spent a lot of time t[r]ying to find deals that Mr. Cardwell could do and failed over and over again."  (Buergel Decl. Ex. 6 (Birnbaum Tr. 194:19–195:11).)

111.  "[I]n staffing discussions with partners, when [Birnbaum] would propose Mr. Cardwell, [Birnbaum] would often get pushback on the basis he couldn't do the job . . . that happened quite a bit because he was such a poor performer."  (Buergel Decl. Ex. 6 (Birnbaum Tr. 96:3–17).)

112.    As interim head of the M&A group, Bick was "not responsible for the deal-to-deal,

day-to-day staffing for associates."  (Buergel Decl. Ex. 5 (Bick Tr. 80:19–81:2).)

113.    In the October 2016 through March 2017 time period,

    (a)    Bick did not directly or indirectly tell Birnbaum not to staff Cardwell. (Buergel Decl. Ex. 6 (Birnbaum Tr. 94:18–95:3).)

    (b)    Bick did not "know [Cardwell's] staffing or his particular hours until maybe March."  (Buergel Decl. Ex. 5 (Bick Tr. 109:24–110:8).)

**2.   Performance Reviews**

114.    Cardwell's performance reviews from the period leading to his December 2016

annual review with Leonard Kreynin include the following comments, submitted in September

2016:

    (a)    "My experience with Kaloma was pretty abbreviated and I am not sure it will be representative of his work more broadly, but here it is: Kaloma was enthusiastic but very inexperienced.  He was asked to diligence the corporate structure of a venture stage company.  In conversations I did not get the sense that he fully understood what he was talking about.  I walked him through the handful of things I wanted him to focus on, one of which was the equity capital structure and how the preferred stock worked.  His diligence report said the preferred was convertible into common stock.  I asked him on what basis, and he said he would have to follow up on that. That did not inspire confidence.  However, he did a good job of coordinating the diligence requests of the specialist groups (benefits) and passing them on to the client.  The deal died shortly after that, so we didn't get much of a chance to work together."

    (Buergel Decl. Ex. 9 (Butler, September 2016) (DPW_SDNY-000144354 at -360).)

    (b)    "Kaloma completed a rotation in Capital Markets as his third rotation and was aware that he would be behind others in his class as a result of doing so.  He was staffed like a 1st year associate on several deals with me - in particular two [Client T] tender offers and a [Client U] follow on.  In particular on the [Client T] tender offer project, he struggled.  The very good senior associate . . . was very careful to thoroughly explain assignments to him and give him firm deadlines so that [the senior associate] would have time to review his work before sending the documents to me and then to the client.  Kaloma had difficulties meeting the deadlines, would then admit that he didn't understand the assignment

and send work product that was incomplete.  [The senior associate] continued to work closely with him, including on more simple aspects of the project such as press releases and closing certificates.  The same thing played out several times. At the end of the project (which was actually two nearly identical tender offers in a row), I worked directly with him while [the senior associate] was on vacation.  During those two weeks, it became clear to me that Kaloma did not understand key aspects of the transaction. I do not know whether he should have asked more questions earlier or been more careful to seek to understand what he was doing rather than just processing paperwork.  In any event, as I have told him, it is really essential to seek to understand what you are doing and why.  I do want to commend Kaloma for his positive attitude.  He did not give up or get frustrated, even when I gave him direct feedback.  In fact, when I corrected his grammar in an email and proved a point with a grammar handbook, he not only bought himself the book, he also gamely bought me an updated version.  We have subsequently collaborated on recruiting and I believe he does want to do well at the firm.”

(Buergel Decl. Ex. 9 (Hudson, September 2016) (DPW_SDNY-000144354 at -369).)

115.    Certain M&A partners met in or about October 2016 to discuss the consensus review message to be given to certain associates, including Cardwell.  (Kreynin Decl. ¶ 8.)  At this meeting, Kreynin described his experience working with Cardwell on the “Project Giant” transaction; Cardwell, in Kreynin’s view, had not performed well.  (Kreynin Decl. ¶ 9.)

116.    In the 2016 review cycle, the Firm decided to give Cardwell additional time to try to improve his performance, and to tell him he would receive a midyear review in 2017.  (Buergel Decl. Ex. 5 (Bick Tr. 326:21–329:12).)

117.    “[A]fter the review period ended in 2016, significant issues had been identified and communicated to him [Cardwell] and that made it hard to staff him on many transactions based on that performance.”  (Buergel Decl. Ex. 5 (Bick Tr. 113:25–114:7).)

118.    An email from Carolina Fenner to Kreynin dated November 14, 2016, with the subject line “Message for Kaloma,” reads in its entirety,

“Hi Len.  When you meet with Kaloma to deliver his review, would you please mention that we’ll plan to meet with him again in June 2017

> (midyear review) to see if there has been progress in the areas discussed?
> Also, please let me know if you'd like me to do a first draft of the message
> to be delivered to him (positives, areas for improvement, etc.).  I know it's
> a tricky one.  Many thanks, Carolina."

(Buergel Decl. Ex. 41 (DPW_SDNY-000137552).)

119.    On November 15, 2016, Fenner emailed Kreynin talking points for Cardwell's

upcoming review meeting.  They read:

> "Positives:
>
> You are enthusiastic, hardworking and have a positive attitude. You are
> open to constructive criticism and want to develop.  One reviewer noted
> significant improvement in the timeliness of your work as compared with
> last year and that you've been more focused on the task.
>
> Areas for improvement:
>
> Slow down.  Pay attention to detail.  Make sure that all the details that
> need to be in the document are there.
>
> Ask questions to be sure you understand what you're doing and why.
>
> Seek to understand the key aspects of the overall transaction.
>
> Work to convey more confidence so that people know that you have a
> good handle on the matters that have been delegated to you.
>
> Action item:
>
> We will plan to meet with you again in June 2017 to discuss whether there
> have been any improvement in these areas."

(Buergel Decl. Ex. 44 (DPW_SDNY-000137555).)

120.    Kreynin delivered his review on December 19, 2016.   (Buergel Decl. Ex. 9

(DPW_SDNY-000144354 at -383–84).)

121.    In the "summary review" form describing Cardwell's December 2016 review,

Kreynin described the "substance of the evaluation" as follows:

> "I met with Kaloma in the second half of Dec. 2016, before Christmas.  I
> have expressed gratitude for his enthusiastic and positive attitude and hard
> work and noted that he was open to constructive criticism and

improvement.  I remarked that at least [one] person noted significant improvement in the timel[i]ness of his work com[pa]red to t[he] last year and greater focus on h[is] work.

I then said that there are significant areas for improvement that we identified and l[is]ted them.  They were ( 1) the need to slow do[w]n, pay attention to detail and ma[k]ing sure that all of the de[ta]ils that need to be refl[ec]ted in t[he] document are there, (2) asking questions to be sure what you are doing and why, (3) seeking to under[sta]nd key aspects of the overall transaction, and (4) conveying more confidence so that peopl[]e working with you know that you have a good handle on t[he] matters delegated.

Kaloma pushed back and asked for specific examples, at which time I pointed out issues that[] [w]e had with exclusivity agre[e]ments for [Project Giant] deal, such as mismatch between parties and signature pages and changes that he made which were adverse to our client.  He accepted that but asked for other specific examples which I said that I didn[']t have at hand.  The conversation remained friendly despite the pushback by him and concluded with me saying that we plan to meet again in June 2017 to discuss whet[he]r there have been improvements in these areas."

(Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at 383–84).)

122.   On January 3, 2017, Cardwell "submitted [an] application for the Tides/HFIS Fellowship," a year-long position at the Haas Institute for a Fair & Inclusive Society, University of California, Berkeley (Buergel Decl. Ex. 42 (KCARDWELL001786); Ex. 1 (Cardwell Tr. 219:24–220:10).)  The pay was between $80,000 and $105,000 for the year.  (Buergel Decl. Ex. 1 (Cardwell Tr. 221:11–18).)   Cardwell was not hired for the position.  (Buergel Decl. Ex. 1 (Cardwell Tr. 222:23–223:4.)

### 3. <u>Hours</u>

123.    In the May to December 2016 time period, Cardwell reported the following billable hours:

| Month | Billable Hours |
|---|---|
| May 2016 | 101.1 |
| June 2016 | 96.9 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | 229.6 |
| October 2016 | 112.4 |
| November 2016 | 68.9 |
| December 2016 | 14.1 |

(Buergel Decl. Ex. 11 (DPW_SDNY-0000143583).)

### 4. <u>Other</u>

124.    Bick testified that Cardwell "had performance issues" that "were significant" around September and October 2016, "[b]ased on the feedback [he] received from others, looking at his reviews, [and] talking to others." (Buergel Decl. Ex. 5 (Bick Tr. 203:19–204:10).)

## F.    Assignment to M&A, Cont'd. (January to December 2017)

### 1. <u>List of Low-Performing Associates</u>

125.    A Firm document, prepared for the Diversity Committee in or around January 2017, ranked Cardwell among a group of "low"-performing associates. (Buergel Decl. Ex. 43 (DPW_SDNY-000144029).) In March 2017, the Diversity Committee met to discuss these associates. (Buergel Decl. Ex. 46 (DPW_SDNY-000143345–46).)

### 2. <u>Local Counsel Invoice Issue</u>

126.    In the 2016 timeframe, Cardwell worked on a matter with partner Marc Williams in which the Firm was also working with local counsel in Japan. (Buergel Decl. Exs. 47 (DPW_SDNY-000051958); 11 (DPW_SDNY-000143583).) In connection with this matter:

35

(a)     Local counsel and Cardwell had corresponded with respect to invoices related to this matter since November 2016, when local counsel sent a final invoice to Cardwell.  (*See* Buergel Decl. Ex. 47 (DPW_SDNY-000051958).)

(b)     Cardwell, on January 23, 2017, told local counsel "[w]e'll continue to nudge [the client] on our end," with regard to payment of this invoice, which local counsel thanked him for on January 24, 2017.  (*Id*. at -959.)

(c)     Local counsel thereafter followed up with Cardwell on March 5, 2017, asking, "[i]s there any update on our invoice?  Please let us know whether the client has an intention to pay for our legal fees."  (*Id*.)

(d)     Local counsel again followed up with Cardwell on March 11, 2017, asking to "let us know whether we can issue our invoice to [the client] now.  We understand that the separation transaction was completed last November . . . .  Also please let us know the name of your firm's partner in charge of this separation matter."  (*Id*. at -958–59.)

(e)     Local counsel eventually reached out to Williams on March 24, 2017, stating, "[a]lthough I sent Mr. Cardwell two messages about this issue on January 24 and March 5 respectively, I did not receive any responses.  This has come as some surprise, as I have not previously experienced such a lapse in communication despite working with the Davis Polk NY team over the past five years."  *Id*. at -958.

(f)     Williams emailed Cardwell and another associate, asking, "[w]hat is the story with this?  We have an important relationship with this firm."  *Id*.

### 3.  March 29, 2017 Meeting

127.   On March 29, 2017:

(a)     Cardwell met with Reid and Kreynin.  (Buergel Decl. Ex. 4 (Reid Tr. 215:8–15; Cardwell Tr. 341:8, *cf. id.* 420:19–22).)

(b)     The meeting was a follow-up to a meeting earlier in March 2017 in which Reid had raised on his own that he had noticed in preparing for the earlier March meeting that Cardwell's hours had been low recently and that he (Reid) wanted to have a follow-up meeting with Cardwell to discuss that. (Buergel Decl. Ex. 4 (Reid Tr. 216:3–7).)

(c)     During the March 29, 2017 meeting, Reid addressed Cardwell's low hours and indicated that it was apparent to him (Reid) that Cardwell's performance reviews were such that people appeared to have lost confidence in his abilities.  (Buergel Decl. Ex. 4 (Reid Tr. 218:3–7).)

(d)     Reid communicated to Cardwell, in sum or substance, that he was seeing in part some of the same issues that he had spoken to Cardwell about at the January 2016 dinner, such as issues of timeliness and expectation-setting, and also that some additional issues reflected in Cardwell's reviews were quite serious.  Reid invited Kreynin to the meeting to speak to one of those more serious issues.  (Buergel Decl. Ex. 4 (Reid Tr. 216:13–217:4).)

(e)     Kreynin described his personal experience with Cardwell on the Project Giant matter.  (Buergel Decl. Ex. 4 (Reid Tr. 237:9–19).)

(f)     Kreynin talked about a particular episode where Cardwell had gotten the wrong signatory to a particular contract that he was working on for Kreynin. Cardwell dismissed Kreynin's description of this performance issue as merely just a typo and did not acknowledge the actual legal consequences of a mistake like that in a binding contract.  (Buergel Decl. Ex. 4 (Reid Tr. 217:5–22).)

(g)     An issue Kreynin had observed with respect to Cardwell's performance, in the course of his work on Project Giant, was that Cardwell had swapped entity names—a substantive error, because mistakes with respect to entity names can affect which party is legally bound by a contract.  Kreynin Decl. ¶ 5.

(h)     Reid told Cardwell that the issue Kreynin identified was not a typo and that the performance issues generally should not be dismissed as just typos. (Buergel Decl. Ex. 4 (Reid Tr. 217:5–22).)

(i)     Reid explained that Cardwell's performance issues, as he understood them from Cardwell's reviews, called for intensive coaching to confirm that Cardwell could do the job he needed to do in the corporate department of Davis Polk.  (Buergel Decl. Ex. 4 (Reid Tr. 222:20–25).)

(j)     Reid told Cardwell that the Firm was willing to put in place a plan to try and get Cardwell the work and supervision that would hopefully assist his development going forward.  (Buergel Decl. Ex. 4 (Reid Tr. 310:22–311:12).)

(k)     Reid offered Cardwell time off if he wanted it.  (Buergel Decl. Ex. 4 (Reid Tr. 274:24-275:7.)

(l)     As Reid envisioned it, the plan was to look for a good mix of assignments with good teaching partners.  (Buergel Decl. Ex. 4 (Reid Tr. 310:22–311:12).)

(m)     Reid explained to Cardwell that he would need to work had and that doing so would require enormous sacrifice.  In Reid's view, he tried to tap into Cardwell's college football experience (which Reid and Cardwell had previously discussed) to emphasize the importance of focus and

commitment to work and improvement, saying "you've got to get in the game or you'll find yourself off the field, or words to that effect." (Buergel Decl. Ex. 4 (Reid Tr. 241:15–242:23).)  To Reid, this meant that Cardwell would need to use "application and hard work and attending to what need[ed] to be fixed" to "turn this [situation] around."  (Buergel Decl. Ex. 4 (Reid Tr. 242:7–23).)

128.    Cardwell prepared three single-spaced pages of notes of the March 29, 2017 meeting the same day, and emailed them to himself that day at 8:09 p.m.  (Buergel Decl. Exs. 1 (Cardwell Tr. 420:15–422:11); 48(a) (KCARDWELL003291); 48(b) (KCARDWELL003292).) The notes do not include the phrase "off the field."    (Buergel Decl. Ex. 48(b) (KCARDWELL003292 at -292–94).)

### 4.  <u>Performance from Spring 2017 Forward</u>

129.    While Cardwell was on vacation in April 2017, the Firm worked to identify "partners who were really good teachers" so that Cardwell could be provided with "realtime feedback, hands-on training, and teaching." (Buergel Decl. Ex. 5 (Bick Tr. 268:3–13).)  Cardwell returned to the office on or about May 2, 2017, and Bick discussed this plan with Cardwell on May 3, 2017.  (Buergel Decl. Ex. 50 (DPW_SDNY-000097880).)

### 5.  <u>Goldberg Assignments</u>

130.    Cardwell did not perform well on assignments for M&A partner Louis Goldberg in 2017.  *See* ¶¶ 131–135 *infra* and evidence cited therein.

131.    In the June 2016 to March 2017 time period, Cardwell identified Goldberg as a partner with whom he would like to work in Cardwell's weekly capacity forms.  (Buergel Decl. Ex. 12 (DPW_SDNY-000143599).)

132.     On May 3, 2017, the day after Cardwell's return, Goldberg emailed Cardwell concerning a new assignment: to prepare a draft article.  (*See* Buergel Decl. Ex. 49 (DPW_SDNY-000138823).

     (a)     Cardwell sent Goldberg a draft on May 31, 2017.  (Buergel Decl. Exs. 52(a)–52(b) (DPW_SDNY-000138793–96).)

     (b)     The draft was less than three full pages long.  (Buergel Decl. Ex. 52(b) (DPW_SDNY-000138794–96).)

     (c)     The draft included the following footnote: "TBD whether relevant and recent case law exists and/or can be cited."  (Buergel Decl. Ex. 52(b) (DPW_SDNY-000138794).)

     (d)     A version of the article was later published as a client memorandum on the Firm's website.  (Buergel Decl. Ex. 52(c).)

     (e)     A redline comparing the draft Cardwell sent Goldberg on May 31, 2017 to the as-published version appears at Buergel Decl. Ex. 52(d) (redline).

     (f)     As shown by the redline, Goldberg essentially rewrote the entire draft.

133.     The underlying legal issue discussed in the article was one of importance to M&A lawyers and the Firm's clients.

134.     On June 1, 2017, Cardwell received a second assignment from Goldberg: to work on a "new m&a deal with a corporate client."  (Buergel Decl. Ex. 54 (DPW_SDNY-000086118).).

135.     In a written performance review completed in the fall of 2017:

     (a)     Goldberg wrote the following text in the field labeled "Please provide specific examples which support your comments":

     "I have worked with Kaloma on two assignments in the last several months.

     (1) Memo to clients on covenants in preferred stock (published by Harvard). Kaloma was very slow in producing work product (seemed like he thought this was not a real assignment, until he saw it got a lot of outside attention). His version largely repeated substance he had seen in emails from others, and did not analyze the issues in a manner designed for a practical client memo. He also did not analyze the cases (and footnoted asking whether he should do so).

> (2) [Client M] JV. Much better effort level and met deadlines. His first draft required significant work and I provided a full markup and spent considerable time talking him through the issues and items that needed fixing. This exercise clearly showed he is behind his class.  His subsequent absence meant he was not involved through signing of the deal."

(b)   Goldberg wrote the following text in the field labeled "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class": "behind."

(Buergel Decl. Ex. 9 (Goldberg, October 2017) (DPW_SDNY-000144354 at -366).)

136.    Reid spoke with Goldberg and Lee Hochbaum, another M&A partner, about their "experiences [] working with Mr. Cardwell," following his "return to work" in 2017, and he "learned from Mr. Goldberg [] that Mr. Cardwell seemed to lack any fundamental grasp of basic corporate law concepts, and that one particularly disappointing episode was when Mr. Goldberg had to substantially rewrite work product he had been given by Mr. Cardwell, sat down with Mr. Cardwell, gave him direction as to how to take it on to a subsequent draft and do a better job[,] and when he got the subsequent draft, it wasn't much better, and there were notes in it saying I haven't done the legal research to substantiate what I'm writing here, I'll do that later, to that effect."  (Buergel Decl. Ex. 4 (Reid Tr. 284:6–285:10).)

### 6.   Mills Assignment

137.    Cardwell did not perform well on an assignment for M&A partner Phillip Mills in 2017.  *See ¶¶* 138–141 *infra* and evidence cited therein.

138.    Cardwell was staffed on a deal with Mills on or about June 14, 2017.  (Buergel Decl. Ex. 58 (DPW_SDNY-000099113 at -114).)

139.    On Friday, June 16, 2017, Cardwell sent Mills a draft "bid letter," to which Mills responded "Thx—let's discuss on Monday."  (Buergel Decl. Ex. 59 (DPW_SDNY-000084998).)

140.    The following events took place on Tuesday, June 20, 2017:

(a)    At 12:21 p.m., Mills wrote to Cardwell, asking, "Can we plan to meet at 1:30pm to go over your draft LOI letter?"  Cardwell did not respond.

(b)    At 5:18 p.m., Mills wrote to Cardwell, "I very much need to get the letter revised.  Pls get back to me ASAP."  Cardwell did not respond.

(c)    At 10:43 p.m., Mills wrote the following email to Goldberg, copying Bick:

Louis: I have a problem here.

Kaloma and I agreed last night that we would discuss his work product today—see attached email.

I first reached out to him today per the first email below at 12:21pm to schedule a meeting for 1:30pm.  When I heard nothing from him by mid-afternoon I called and left a message having been told by his assistant that she did not know where he was or whether he was in the office today.  As you can see below, I sent him a further message at 5:18pm today.  It's now 10:40pm and I have had no response at all—over 10 hours after my original message—nor has he reached out to me.

I plan to reach out to Carolina [Fenner] tomorrow morning for new staffing as [the client] has focused today on the need for a draft letter and just now asked for a draft tomorrow.

Sorry to burden you with this but I tried to make it work.  However, it is simply not acceptable when associates are non-responsive for a protracted period especially when they are supposed to be at their desks during business hours.

(Buergel Decl. Ex. 60 (DPW_SDNY-000097890).)

141.    In a written performance review completed in the fall of 2017:

(a)    Mills wrote the following text in the field labeled "Please provide specific examples which support your comments":

I had a very disappointing experience with Kaloma.  He was assigned to help me prepare a first round bid letter for [Client P], a routine and simple exercise for which I gave him a precedent.  I first reached out to him in the middle of the day on a Thursday but did not hear [b]ack from him until 6:40pm in an email in which he explained that his mother was in town from NC.  [T]o his credit he offered to meet that evening but I did not think that necessary.  I briefed him Friday morning and he gave me his draft Friday night.  Although we agreed to discuss it Monday, I was tied up through Tuesday morning.  I reached out to him shortly after noon on

41

Tuesday and didn't hear back.  I sent a follow-up email at 5:18pm and got no response.  Since the client was now pressing for a draft, I arranged for another associate to make the changes and get it to the client.  At 1:47pm the next day I still had not heard from Kaloma so I alerted the practice coordinators and Bick fearing that Kaloma had a health issue.  I understand that the matter was investigated but to this day I have never heard back from Kaloma.  His inability to handle a routine assignment is troubling and his failure to apologize does not inspire me to work further with him.

(Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -372).)

### 7.  **Hochbaum Assignment**

142.    Cardwell did not perform well on an assignment for M&A partner Lee Hochbaum in 2017.  *See* ¶¶ 143–145 *infra* and evidence cited therein.

143.    In July and August 2017, Cardwell worked with Hochbaum on a financial advisory agreement.  (Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -368).)

144.    In a written performance review completed in the fall of 2017:

(a)    Hochbaum wrote the following text in the field labeled "Please provide specific examples which support your comments":

Kaloma has been working with me on a financial advisory assignment for [Client R] and [Client Q].  He has generally struggled with the substantive elements of the representation, including his understanding of the financial analyses performed by our clients.  For example, I asked Kaloma to prepare a first draft of our client's disclosure for the proxy statement and the draft that he sent to me included a number of sections lifted from the disclosure from another transaction that I pointed him to as a reference that were not applicable to the transaction at hand (including sections of disclosure that described entire analyses that were not performed by our clients or included in their board decks).  As a result, I ended up rewriting the disclosure essentially from scratch.  Kaloma also tends to make a significant number of careless errors that I would not expect from an associate at any level.  For example, I have frequently noted a specific changes for him and asked him to make corresponding changes throughout the disclosure, only to find that he has made only the change specifically identified and failed to make conforming changes throughout the remainder of the document.  Kaloma has also failed to establish any relationship with the client, despite my having arranged for opportunities for him to do so (such as asking the client to reach out to Kaloma to discuss a particular issue).  As a result of the client['s]s lack of confidence

in Kaloma, the client reaches out to me directly on even the most routine matters.  Finally, Kaloma takes an inordinate amount of time to perform tasks and his responsiveness has been generally poor.  He is rarely in his office when I stop by to speak to him, and when I leave a message often several hours go by before he responds (even during work hours).  He did one time note for me that he would be out of pocket during a particular window, but that is the exception rather than the norm.  His lack of responsiveness has been particularly problematic because the transaction has involved a large number of time-sensitive issues on which the client has expected immediate feedback, and it has often fallen upon me to respond without any support from Kaloma.

    (b)    Hochbaum wrote the following text in the field labeled "Suggestions on how the lawyer can improve his/her skills and performance":

Kaloma needs to make a significant effort to improve his substantive comprehension of the transactions that he is working on.  He also needs to pay more attention to detail and to make sure to proofread work product before it goes to the more senior lawyer or to the client or counterparty.  Finally, Kaloma needs to be more responsive to attempts to contact him or to let the senior lawyers know if there are significant periods when he will be out of pocket and unresponsive.

(Buergel Decl. Ex. 9 (Hochbaum, September 2017) (DPW_SDNY-000144354 at -368).)

145.    The Firm works to ensure that work is performed appropriately, including to "protect clients."  (Buergel Decl. Ex. 4 (Reid Tr. 287:14–288:15; 297:16–19).)

**8.  Amorosi Assignment**

146.    Cardwell did not perform well on an assignment for M&A partner John Amorosi in 2017.  *See* ¶¶ 147–149 *infra* and evidence cited therein.

147.    Cardwell worked with Amorosi around September 2017.  (Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -354)).

148.    In a written performance review completed in the fall of 2017:

    (a)    Amorosi wrote the following text in the field labeled "Please provide specific examples which support your comments":

Kaloma covered a transaction for another associate of the same vintage while she was on vacation.  On the plus side, he did so willingly and brought a good attitude to his work.  On the other side of the ledger, his

substantive work was below expectations.  In fairness to him, he was taking over the project towards the end and there was admittedly a learning curve.  That being said, the issues that remained outstanding on the definitive agreements were relatively circumscribed at that point.  I also spent a good deal of time with Kal[o]ma walking him through the issues and the documents and how the limited number of changes needed to be reflected in the documents to give effect to the two parties' final business deal on the open issues.  Thereafter, the drafts that came back did not accurately capture the business deal in fundamental respects (e.g., the inputs into the purchase price under the two scenarios contemplated and how those inputs were to be reflected in the adjustment mechanism). The drafting also sought to reflect certain changes in the purchase agreement that belonged in the LLC agreement governing post-closing matters among the parties. I explained to him the rationale for the changes after correcting the drafting and he seemed to understand the need for the various changes. In summary, while I appreciated the effort and good attitude that Kaloma brought to the project, the work product was sub-par and reflected a lack of understanding of the business deal and how to reflect it accurately in the documents.

(Buergel Decl. Ex. 9 (Amorosi, October 2017) (DPW_SDNY-000144354 at -354)).

149.    By the fall of 2017, five partners who reviewed Cardwell had answered "behind" to the question "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class": those authored by Hudson (June and September 2016), Amorosi, Goldberg, Hochbaum, and Mills (2017).   (Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -354 (Amorosi), -366 (Goldberg), -368 (Hochbaum), -369 (Hudson September 2016), -371 (Hudson June 2016), and -372 (Mills).)

### 9. Hours

150.    In the January to December 2017 time period, Cardwell reported the following

billable hours:

| Month | Billable Hours |
| --- | --- |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.9 |
| April 2017 | [Vacation][4] |
| May 2017 | 24.2 |
| June 2017 | 0[5] |
| July 2017 | 0 |
| August 2017 | 98.9 |
| September 2017 | 10.4[6] |
| October 2017 | 14.2 |
| November 2017 | 21.2 |
| December 2017 | 0 |

(Buergel Decl. Ex. 11 (DPW_SDNY-000143583)).

### 10. Termination

151.    On January 11, 2018, partners Oliver Smith and Louis Goldberg met with Cardwell

to deliver his 2017 annual review.  (Buergel Decl. Ex. 9 (DPW_SDNY000144354 at -392).)

152.    Smith's summary of the January 11 meeting includes the following text:

(a)    "All reviews consistently noted that the depth and quality of his work and
legal was [sic] analysis was below others of his class year. We also indicated
that his reviewers noted a problem in his timeliness in completing projects
as well as his responsiveness to emails and calls."

(b)    "I read to him specific examples of where partners had indicated that they
sat with Kaloma to show him how the work could have been better.
Kaloma's response was that he thought that meant he was not doing as well
as partners but not that his work was deficient when compared to others of

---

[4]    *See* paragraphs 40–44, *supra*.

[5]    *See* paragraphs 40–44, *supra*.

[6]    *See* paragraphs 40–44, *supra*.

45

his level. We told him that, in fact, his performance is below others of his class.

(c)     "I indicated to Kaloma that I was surprised that he thought his work was done well, given the significant amount of rewriting and corrections necessary."

(d)     "Louis and Kaloma discussed the work that Kaloma did for Louis. Kaloma indicated that Louis had told him that the work had been, in Kaloma's words, 'spot on.' Louis told Kaloma that he never said that and that it was very clear, given that Louis had to rewrite the entire memo, that the work was not well done."

(e)     "Kaloma asked what the plan would be for staffing him going forward.  I told him that it was increasingly challenging to staff him due to his performance on projects but that we were continuing to seek opportunities to staff him.  I asked him what type of projects he thought he could do or would like to be staffed on.  Kaloma did not want to respond other than to say he had made this clear to others in previous meetings and he also commented that he wanted to be staffed 'appropriately.'  I encouraged him to let me know what he wanted to work on and I would talk to the staffing partners."

(Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -391–92)).

153.     On February 8, 2018, Smith and Goldberg met with Cardwell and told him that he should begin looking for alternative employment.   (Buergel Decl. Exs. 9 (DPW_SDNY-000144354 at -393); 75 (R&O to RFA 64).)

154.     As to the basis for the decision to tell Cardwell to seek alternative employment:

(a)     According to Bick, Cardwell's termination was "based on performance reviews and performing poorly."  (Buergel Decl. Ex. 5 (Bick Tr. 287:25–288:2).)

(b)     By this point (February 2018), Cardwell "wasn't operating as a fourth year associate.  The work that he was capable of doing would be the work of a first or second year associate and [the Firm] didn't think that was tenable to staff him on those matters, both from a client point of view and also it would be very hard where he might be working with another lawyer who was technically junior to him, but was working at a more senior level than he was."  (Buergel Decl. Ex. 5 (Bick Tr. 317:4–16)).

    (c)    According to Bick, the basis for Cardwell's termination was that "staffing him was becoming untenable" as a result of Cardwell "performing poorly." (Buergel Decl. Ex. 5 (Bick Tr. 286:12–15; 287:19–288:2; 316:23–317:16).)

    (d)    According to Birnbaum, "[p]rior to [Cardwell's] termination," Cardwell "was a very poor performer," and "the general consensus [was] that he really couldn't do the job up to his level, his class year." (Buergel Decl. Ex. 6 (Birnbaum Tr. 267:4–12).)

    (e)    According to Brass, the basis for Cardwell's termination was "Cardwell's unreliable and unsatisfactory performance and, in particular, the fact that Cardwell's performance issues had made it difficult or impossible to find work that he could perform consistent with Firm standards." (Brass Decl. ¶¶ 34–35.)

    (f)    The decision to terminate Cardwell was based on the uniform view of the partners who had been involved in looking at his work closely in the recent time period that his level of performance was not satisfactory and the consensus view that, given his continuing performance issues, it would be difficult to staff him going forward for assignments consistent with his seniority level, a problem which would continue to worsen over time. (Buergel Decl. Ex. 4 (Reid Dep Tr. 314:16–315:4), Ex. 5 (Bick Tr. 286:4–15), Brass Decl. ¶¶ 34–35; *cf.* Kreynin Decl. ¶ 9.)

155.    The Firm informed Cardwell that he could take up to three months, at full salary, to find another job, and that the Firm's resources and job placement services were available to him. (Buergel Decl. Exs. 9 (DPW_SDNY-000144354 at -393–94); 75 (R&O to RFA 64, 65); 3 (DeSantis Tr. 257:15–24)).

156.    Offering three months to look for a job is consistent with Firm practice. Duggan Decl. ¶ 7.

157.    In May 2018, Cardwell's lawyer requested that this period be extended three months, for a total of six months, and the Firm agreed to this request. (Buergel Decl. Ex. 75 (R&O to RFA 64); Ex. 1 (Cardwell Tr. 162:6–164:9).)

158.    Cardwell's lawyer represented that he would use the additional time to actively pursue other employment. (Buergel Decl. Ex. 71 (Email to L. Hansen et al. re: Cardwell | DPW [IWOV-OGDMS.FID590327] (Aug. 17, 2018)).)

159.    Cardwell's last day of employment at the Firm was August 10, 2018.  (Buergel Decl. Ex. 75  (R&O to RFA 64).)

160.    The Firm and its partners were not aware, in January or February 2018, that Cardwell had submitted a rebuttal to the position statement the Firm submitted to the NYSDHR, and, indeed, did not receive a copy of any rebuttal until after commencement of this lawsuit in November 2019, when it submitted a FOIL request.  (Duggan Decl. ¶ 8 (referencing Nov. 19, 2019 letter to NYSDHR Records Access Officer (Buergel Decl. Ex. 72), noting that Davis Polk had received "no communication from the NYSDHR regarding the matter since December 2017, nor have we received copies of (i) any briefs or replies filed by Mr. Cardwell, if any were ever filed . . . .").)

## 11. Causal Connection

161.    No testimony by any witness reasonably supports the allegation that the stated reason for Cardwell's termination—his unsatisfactory performance—was false.

162.    No document or non-testimonial evidence reasonably supports the allegation that the stated reason for Cardwell's termination—his unsatisfactory performance—was false.

163.    No document or non-testimonial evidence reasonably supports the allegation that the "real reason" for Cardwell's termination was retaliation.

164.    No testimony by any witness reasonably supports the allegation that the "real reason" for Cardwell's termination was retaliation.

165.    No document or non-testimonial evidence reasonably supports the allegation that the "real reason" for the alleged failure to staff Cardwell was retaliation.

166.    No testimony by any witness reasonably supports the allegation that the "real reason" for the alleged failure to staff Cardwell was retaliation.

167.   No document or non-testimonial evidence reasonably supports the allegation of retaliatory animus against Cardwell on the part of:

      (a)   Bick;

      (b)   Birnbaum;

      (c)   Brass;

      (d)   Butler;

      (e)   Chudd;

      (f)   Hudson;

      (g)   Reid;

      (h)   Wolfe;

      (i)   Davis Polk.

168.   No testimony by any witness reasonably supports the allegation of retaliatory animus against Cardwell on the part of:

      (a)   Bick;

      (b)   Birnbaum;

      (c)   Brass;

      (d)   Butler;

      (e)   Chudd;

      (f)   Hudson;

      (g)   Reid;

      (h)   Wolfe;

      (i)   Davis Polk.

169.   No document or non-testimonial evidence reasonably supports the allegation of racial animus/discrimination against Cardwell on the basis of race by:

      (a)   Bick;

(b)      Birnbaum;

(c)      Brass;

(d)      Reid;

(e)      Wolfe;

(f)      Davis Polk.

170.    No testimony by any witness reasonably supports the allegation of racial animus/discrimination against Cardwell on the basis of race by:

(a)      Bick;

(b)      Birnbaum;

(c)      Brass;

(d)      Reid;

(e)      Wolfe;

(f)      Davis Polk.

## IV.    OTHER ISSUES

### A.    Defendants

171.    Cardwell thought well of the individual defendants before he decided to sue them. *See* ¶¶ 172–176 *infra* and evidence cited therein.

172.    In the July 2016 to March 2017 time period, Cardwell identified defendants Tom Reid and Harold Birnbaum as partners with whom he would like to work in his weekly capacity forms.  (Buergel Decl. Ex. 12 (DPW_SDNY-000143599).)

173.    Cardwell received feedback on his performance in real time.

174.    Cardwell created notes in the January 2016 timeframe that included the following text: "Sheila and I gave examples of attorneys who were particularly good at giving feedback.  I

mentioned Sophia Hudson, Laura Turano, and Len Kreynin."   (Buergel Decl. Ex. 20 (KCARDWELL019038 at -42).)

175.   On September 1, 2017, when asked by a contact "[w]ho is worth my time on D[iversity] & I[nclusion] issues" at Davis Polk, Cardwell responded, "I think you should consider the following:  [] Partners:  William Aaronson, John Amorosi, Oliver Smith, Lee Hochbaum, and William Chudd[.]  Associates:  Laura Turano, Caitlin Cunningham."  (Buergel Decl. Ex. 63 (KCARDWELL015618).)   Cardwell's response post-dated his 2017 work with Amorosi and Hochbaum and his 2015 review with Chudd.

176.   When Cardwell filed his EEOC/NYSDHR Charge in or about August 2017, he did not name any of the Individual Defendants as respondents (in other words, he named only the Firm).  (Buergel Decl. Ex. 63 (KCARDWELL011422).)

## B.   January 2016 Dinner

177.   In January 2016, Reid invited Cardwell and then-associate Sheila Adams, who is also Black/African-American and is now a partner, to dinner.  (Buergel Decl. Ex. 1 (Cardwell Tr. 357:23–358:18).)   Reid reviewed Cardwell's performance reviews in advance of this dinner. (Buergel Decl. Ex. 4 (Reid Tr. 181:12–17).)

178.   Reid had met Cardwell while Cardwell was a summer associate (Buergel Decl. Ex. 4 (Reid Tr. 78:2–3)), and learned at that time of Cardwell's "college football career and NFL aspirations" (Buergel Decl. Ex. 4 (Reid Tr. 164:3–4).)  Reid invited Cardwell and Adams to the January 2016 dinner following a lecture at the New York City Bar Association in the fall of 2015 at which Reid "said [he] thought it was important for leaders to be connected with young lawyers, be accessible and [he] wanted to live up to that."  (Buergel Decl. Ex. 4 (Reid Tr. 182:6–9).)

179.   Reid testified that at the January 2016 dinner, he gave Cardwell a "short synthesis about" his performance file, noting that "the timeliness issue and setting expectations" are "fixable

issues," but that they "really do need to be fixed early in a corporate lawyer, any lawyer's career."

(Buergel Decl. Ex. 4 (Reid Tr. 186:20–187:2).)

180.    Reid agreed, at or around the time of the January 2016 dinner, to have the Firm pay

for Cardwell to attend a February 2016 conference in Orlando for Black legal professionals.

(Buergel Decl. Ex. 4 (Reid Tr. 160:22–162:5).)  Cardwell attended the conference.  (Buergel Decl.

Ex. 1 (Cardwell Tr.  456:2–16).)

181.    In addition to discussing the conference, Reid testified that the following "other

topics" "were discussed during the conference":

> (a)    "I remember Mr. Cardwell and his colleague saying that [t]he challenge[] that they discussed with other Black associates at other law firms on Wall Street was the problem of being noticed is what I recall."

> (b)    "[W]e talked about, you know, what we were doing at the firm generally. They wanted to know what the presentations were that I brought to the firm's annual meeting."

> (c)    "And then the other thing that we talked about is Mr. Cardwell reminded me of what told he [sic] me the very first time he introduced himself to me when he was a summer associate, he reminded me of his college football career and NFL aspirations.  And in that context he told me I can take and learn from tough feedback."

> (d)    "And one of their issues was we don't think we get the right level of feedback.  And I said again, that's a general issue with associate feedback, particularly in the younger years.  And again I said we have training for that for partners to give better feedback.  And then I think I surprised him when I said by the way, before coming out here I looked at your review folders and I can give you what I see in those folders is my feedback, synthesizing that right now."

(Buergel Decl. Ex. 4 (Reid Tr. 162:18–164:23).)

182.    Reid gave the following testimony in response to the following question:

> "Q. Do you recall whether during the course of that dinner Mr. Cardwell raised issues specific to Davis Polk about diversity and inclusion?

> A. No, except insofar as he was talking about his experience and his only law firm experience was Davis Polk.  But he never made any specific

complaint or allegation, if that's what you're asking.  And, in fact, as I mentioned in my previous answer, he and his colleague did say that this was an issue they discussed generally with their fellow Black lawyers at other Wall Street law firms.

Q. And when you say an issue, which issue are we talking about?

A. The issue of being noticed."

(Buergel Decl. Ex. 4 (Reid Tr. 165:8–24).)

183.     Within hours of the January 2016 dinner, Cardwell wrote a journal entry that included the following statements:

(a)     "I just got in from having dinner (at Benjamin's Steakhouse-2nd Floor, Corner of Room) with Tom Reid and Sheila Adams."

(b)     "The conversation was incredibly helpful, and I think everyone left the dinner with an increased amount of respect at the other participants."

(c)     "Tom [Reid] cares about and wants improved diversity outcomes."

(d)     "All in all it was a wonderful blessing."

(Buergel Decl. Ex. 20 (KCARDWELL019038 at -39, -43).)

184.     As to the January 2016 dinner:

(a)     Cardwell emerged from the January 2016 dinner with Tom Reid with positive views of Reid, as Cardwell's contemporaneous notes reflect.

(b)     At the dinner, Cardwell discussed issues of diversity and inclusion generally (as his notes reflect), and experiences that he described as "consistent with what we experience outside the Firm in midtown (and similar places) and what we experienced in other educational & academic environments," but did not make a specific complaint at the dinner to Reid of "intentional discrimination" on the basis of race at Davis Polk.

## C.     June 2016: Purported "Sham" Review with Bick

185.     Cardwell's June 2016 review with John Bick was not a "sham."

186.     On June 10, 2016, the Associate Development Department created a presentation titled "Corporate Associate Development Update – BAGs" "for [their] meeting with John [Bick]."

(Buergel Decl. Decl. Ex. 23(a) (DPW_SDNY-000140608); Ex. 23(b) (DPW_SDNY-000140609).) Two slides relating to Cardwell included the following comments:

(a) "2016 Hours – First Quarter: Billable: 105; Pro Bono: 0; Total Legal: 107."

(b) "Did extra six month rotation in Capital Markets at his request; difficulty staffing him in Capital Markets based on performance issues."

(c) "Kaloma has been concerned about his billable hours compared to others as well as his standing in his class - his hours have been consistently low since October 2015, with the exception of November 2015."

(d) "Kaloma asked for more direct real-time performance evaluations – Bill told him the best way to do this was to seek input from the more senior lawyers on his team after a signing/closing when it is still fresh in his mind. He should ask for areas where he could improve."

(e) "With to behind class."

(f) "Action Items: Provide candid feedback."

(Buergel Decl. Ex. 23(b) (DPW_SDNY-000140609 at -623–624).)

187. Bick met with members of the Associate Development Department in or about Monday, June 13, 2016. (Buergel Decl. Ex. 24 (DPW_SDNY-000140824).)

188. On June 14, 2016:

(a) Alicia Fabe sent an email to herself attaching a document titled "Draft Diversity Committee Agenda" that included the following text: "Meeting w/ JB – discussed 9 corporate black and 2 black tax associates; follow up/action items, i.e., discussion w/ CAP advisors re: low/high hours; interim review for KC." (Buergel Decl. Exs. 25(a) (DPW_SDNY-000164543); 25(b) (DPW_SDNY-000164544 at -44).)

189. On June 20, 2016:

(a) Carolina Fenner sent an email to Amorosi seeking feedback on Cardwell's performance that included the following text: "Kaloma asked for more real-time feedback." (Buergel Decl. Ex. 26 (DPW_SDNY-000141867).)

(b) Rocio Clausen sent an email to Joseph Hall seeking feedback on Cardwell's performance that included the following text: "Kaloma asked for more real-time feedback." (Buergel Decl. Ex. 27 (DPW_SDNY-000141868).)

(c)     Clausen sent an email to defendant Sophia Hudson seeking feedback on Cardwell's performance that included the following text: "Kaloma asked for more real-time feedback." Clausen asked for "feedback regarding his rotation" in Capital Markets and requested that Hudson "provide feedback on the work he did for [Client U] and the [Client T] Tender," and sent her a link to the Lawyer Review System. (Buergel Decl. Ex. 28 (DPW_SDNY-000141390).)

190.    On June 22, 2016, Fenner sent an email to colleagues including the following text:

(a)     "I asked John Bick if he would be willing to give Kaloma his 'real-time feedback' and he agreed." (Buergel Decl. Ex. 29 (DPW_SDNY-000140831).)

191.    On June 23, 2016, Fenner sent an email to a colleague including the following text:

(a)     "I also asked if he *[Bick]* would be willing to give Kaloma his review. He said yes (phew!). Right now we have 4 reviews. I'm going to see if we get one more, but, in any event, will send John the folder before I go on vacation on Friday afternoon." (Buergel Decl. Ex. 30 (DPW_SDNY-000165358).)

192.    Junior associates in the Corporate Department customarily receive interim reviews after each rotation. (Duggan Decl. ¶ 6.)

193.    Bick's June 30, 2016 summary of Cardwell's review of the same date included the phrase, "Kaloma had asked for mid-year feedback on his work, and this review is in response to that request." (Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -385).)

194.    Bick testified that, based on "the review coming out of capital markets and the three matters [Cardwell] worked on in capital markets[, Cardwell] could be summarized as a poor performer." (Buergel Decl. Ex. 5 (Bick Tr. 247:8–12).)

195.    Bick testified that he "was concerned if [he] didn't give [Cardwell] that feedback, the next time [a reviewer] would actually sit down and talk to him could be in November or December of 2016, and these were serious issues and [Bick] wanted him to be aware of them and be focused on them," because Bick "felt it was important not to lose time." (Buergel Decl. Ex. 5 (Bick Tr. 293:3–11).)

196.     Bick testified, with respect to the June 2016 meeting, that in his view "issues like responsiveness and paying attention to details," were "addressable by [Cardwell], they were within his control," and that Bick was "trying to caution him and have him focus because if those things don't get fixed, that's sort of the core of our service to clients, if you're not responsive and you're not careful, you're just not going to succeed in a firm like [Davis Polk]."  (Buergel Decl. Ex. 5 (Bick Tr. 260:17–261:7).)

### D.     August 2016 Clausen Request

197.     In 2016, Cardwell was asked by Rocio to take an assignment in the Credit group. With respect to this request:

> (a)     Cardwell had formerly rotated through Credit, and understood that associates would sometimes be called upon to assist with work outside the associate's department or practice group.

> (b)     It is not the case that the request made to Cardwell was made only to "person[s] of color or someone who isn't a White man" (meaning White women); of the five associates Clausen was told to start staffing on credit matters, two were White men and two were White women, as set forth below.

> (c)     Cardwell does not bring claims in this action of differential treatment on the basis of gender.

198.     Notes in a presentation given to corporate associates starting in the Fall 2014 (Cardwell's class) stated that Davis Polk is a "professional *service* firm and work needs to get done even if it's not in [the associate's] department or practice group."  (Buergel Decl. Ex. 13 (DPW_SDNY-000164486 at slide 8) (emphasis in original); 14 (DPW_SDNY-000164478) (June 4, 2015 parent email noting this presentation was used for 2014 first year associates).)

199.     Cardwell understood "that the legal profession is a service industry" and that "that sometimes involved doing work that is not in your department or practice group."  (Buergel Decl. Ex. 1 (Cardwell Tr.  122:24–123:7).)

200.    On August 15, 2016, Rocio Clausen emailed three Credit partners the hours of Credit associates as well as the hours of "2014 and 2015 associates who previously rotated through credit." (Buergel Decl. Ex. 36 (DPW_SDNY-000144553 at -554).)  Cardwell was included in the list of previous rotators.  *Id*. at -555.  Clausen was told, with respect to five such associates, "please do start staffing these folks on credit matters . . .  as appropriate."  *Id*. at -553.

201.    Of the five associates whom Clausen was told to "start staffing on credit matters . . . as appropriate," two were White men and two were White women.  (Duggan Decl. ¶ 5.)

202.    On September 8, 2016, Clausen emailed Cardwell and asked if he would "be able to assist the Credit group" because the "credit juniors are over capacity and . . . a few juniors [are] going on vacation which has made it more difficult."  Clausen additionally noted she had "been reaching out to other groups for support if possible."  (Buergel Decl. Exs. 37 (DPW_SDNY-000046514; 1 (Cardwell Tr. 375:12–15).)

203.    Cardwell met with Clausen on or about September 8, 2016.  (Buergel Decl. Ex. 1 (Cardwell Tr. 375:15–17).)

(a)    Cardwell alleges that in his September 2016 meeting with Clausen, Clausen "told Mr. Cardwell the names of five or six associates (i) who she claimed she had asked to help with Firm's finance group and, similar to Mr. Cardwell, whose assigned practice groups were not finance."  TAC ¶ 259.

(b)    At Cardwell's deposition, Cardwell testified that he "d[id] not recall any of the names" of the associates Clausen allegedly listed.  (Buergel Decl. Ex. 1 (Cardwell Tr.  329:3–20).)

(c)    Clausen reported to DeSantis that in this conversation, Cardwell turned down the assignment.  (Buergel Decl. Ex. 3 (DeSantis Tr. 204:24– 206:19).)

(d)    Cardwell was not staffed on the Credit matter.

(e)    Clausen was primarily assigned to staff the Credit and Capital Markets groups.  (Buergel Decl. Ex. 1 (Cardwell Tr.  377:21–23), Ex. 3 (DeSantis Tr. 204:8–10).)

(f)    As of September 2016, Cardwell was an "assigned member of the M&A group."  (Buergel Decl. Ex. 1 (Cardwell Tr.  377:9–13).)

### E.    December 2016 For-Profit Prison Issue

204.    Cardwell alleges that he contacted Firm partner Carey Dunne on December 5, 2016 to raise a complaint regarding the Firm's representation of a client operating for-profit prisons, that this constituted protected activity, and that he was retaliated against as a result (because his hours dropped between late 2016 and March 2017).

205.    With respect to the Cardwell's December 5, 2016 email, as set forth further below:

(a)    The email did not constitute protected activity;

(b)    Cardwell could not have been retaliated against as a result of the email by any defendant at any point prior to March 3, 2017, because they were not made aware of it prior to that time;

(c)    Any drop in Cardwell's hours prior to March 3, 2017 was not attributable to the December 5, 2016 email.

(d)    There is no evidence that Cardwell was retaliated against in any way as a result of the December 5, 2016 email.

206.    On October 24, 2020, the Court ruled that Cardwell's allegations relating to the Firm's representation of a for-profit prison company do not constitute protected activity. Memorandum Opinion and Order, ECF 78 at 61; *accord* ECF 198 at 55–59, 61.

207.    In the June 2015 time period, Cardwell worked on a team preparing a memo for the Vance Center (the "Vance Memo").  (Buergel Decl. Ex. 45 (DPW_SDNY-000084704 *et seq.*).)

208.    On June 26, 2015, Cardwell was copied (by virtue of his membership in the "vance" group email list) on emails in which:

(a)    an associate ("Associate G") sent Carey Dunne, the supervising partner, a "draft memo" for the Vance Center.  *Id.* at -706.

(b)     Associate G wrote, "We should also make a disclosure to the Vance Center that we have a current client who operates for-profit prisons." *Id*.

(c)     Dunne replied (to email (b)), "Agreed thanks." *Id*.

209.     On June 28, 2015, Associate G sent the Vance Memo to the client in an email including the following text:

> "However, please be aware that we considered addressing the state of for-profit prisons in the United States, but Davis Polk has a current client who operates such facilities, which informed our decision not to pursue that topic."

(Buergel Decl. Ex. 15 (DPW_SDNY-000081538).)

210.     On December 5, 2016, more than 17 months after Davis Polk sent the Vance Memo to the Vance Center:

(a)     Cardwell emailed then-Firm partner Carey Dunne to ask whether they could "discuss what can be done to distance ourselves from" what he believed was a then-Firm client (Geo Group) operating private prisons. (Buergel Decl. Ex. 45 (DPW_SDNY-000084704).)

(b)     Dunne responded that he did not know "what relationship, if any, the Firm still has with" Geo Group. *Id.* at -705.

(c)     Dunne wrote to Cardwell, "If you like, I can flag for the management committee," but he noted that "I'm leaving the firm in two weeks so I don't think I'm any longer in a position to weigh in . . . ." *Id.*

(d)     Cardwell responded, "Carey, Thanks for getting back to me. I understand the timing restrictions. I'll flag it for the Management Committee, as the conversation may go beyond the next two weeks. Regards, Kaloma." *Id.*

211.     Cardwell's December 5, 2016 email did not represent a good-faith attempt to invoke a Firm policy relating to the raising of questions with respect to legal compliance and professional ethics.

212.     As of December 5, 2016:

(a)     The Firm no longer in fact represented Geo Group and had not for several months.  Duggan Decl. ¶ 9.

(b) Cardwell had been aware for more than 17 months that the Firm had completed the Vance Memo in the form it did after explaining to the Vance Center that it represented "a client who operates" "for-profit prisons." (*Compare* Buergel Decl. Ex. 15 (DPW_SDNY-000081538) *with* Buergel Decl. Ex. 45 (DPW_SDNY-000084704).)

213.   Cardwell did not "flag" the issue of the Firm's representation of Geo Group "for the Management Committee" at any point prior to March 3, 2017.  (*See, e.g.*, Buergel Decl. Ex. 45 (DPW_SDNY-000084704) (Mar. 3, 2017 email from Cardwell forwarding his December 6, 2016 email to Dunne, writing, "As you'll read, Carey's comments suggest that he did not have a conversation with the management committee[.]").)

214.   There is no evidence that any Davis Polk partner but Dunne received or had knowledge of Cardwell's December 5, 2016 email until Cardwell forwarded it in March 2017.

215.   No Firm partner but Dunne could have retaliated against Cardwell on the basis of the December 5, 2016 email.

216.   In Cardwell's 2017 EEOC/NYSDHR Charge, he alleged that "[a]fter raising my concerns to Mr. Dunne [on December 5, 2016], my assignments and corresponding hours dropped precipitously," noting that "from January through March 2017, I billed a <u>total</u> of only 5.9 hours." (Buergel Decl. Ex. 62 (KCARDWELL011422).)

217.   No Firm partner but Dunne could have retaliated against Cardwell on the basis of the December 5, 2016 email by causing a drop in billable hours "from January through March 2017," and Cardwell does not allege that Dunne—who departed the Firm for unrelated reasons shortly thereafter—did so.

## V.   ALLEGED DAMAGES

### A.   Claims

218.   In his amended initial disclosures, Cardwell claims the following categories of damages and no others:

(a)     "backpay damages" of "approximately $2,030,000" for "amounts related to salary and bonuses";

(b)     "frontpay damages" of "at least $20 million over a ten-year period" because, he alleges, "Defendants' conduct caused Plaintiff to lose the opportunity to become a partner at Davis Polk" and, he alleges, "profits per equity partner was $4,514,000";

(c)     "compensatory damages" of "approximately $2.8 million" because he allegedly "has suffered significantly and will suffer for the rest of his life"; and

(d)     "punitive damages" "ranging from $14 million to $28 million" as a result of defendants' "unlawful conduct" including "intentionally designing and/or implementing a 'black box' performance evaluation system";

(e)     "attorney's fees" of "at least $10,000"; and

(f)     "further legal and equitable relief as this Court deems necessary, just, and proper."

(Buergel Decl. Ex. 74 (Plaintiff's Third Amended Initial Disclosures, at 11–13) (internal quotation marks omitted).)

### B.    Claims for Compensatory Damages

#### 1.    Claim

219.    On August 21, 2020, Cardwell served amended initial disclosures containing the following statement:

> "**Compensatory Damages:** As a result of Defendants' conduct, and as exacerbated by false, created-for-litigation statements to the press concerning Plaintiff's alleged performance and abilities as an attorney, Plaintiff has suffered significantly and will suffer for the rest of his life."

(Buergel Decl. Ex. 74 (Plaintiff's Third Amended Initial Disclosures, at 12).)

#### 2.    Alleged False Statements

220.    Cardwell claims damages on the basis of "false, created-for-litigation statements concerning [his] alleged performance and abilities," but the only relevant public "statements" made by Davis Polk were (i) an email sent within the Firm the day *after* Cardwell's public filing

of this lawsuit, and (ii) statements made in court filings.  Neither of these can form the basis of a

damages claim.  To the extent Cardwell claims damages on the basis of statements in the Firm's

2017 EEOC/NYSDHR position statement, it was Cardwell, not the Firm, who chose to make those

statements public for the first time, and defendants are not liable for Cardwell's choice.

221.    Cardwell filed this lawsuit on November 4, 2019.  ECF 1.  Cardwell concedes this

was a "public act."  (Buergel Decl. Ex. 1 (Cardwell Tr. 246:25–247:2).)

222.    When asked at his deposition, "[c]an you point to any public statement by Davis

Polk in a court filing or otherwise prior to the moment you brought the complaint in this lawsuit,"

Cardwell testified, "[t]hat I have personal knowledge of, no."  (Buergel Decl. Ex. 1 (Cardwell Tr.

276:8–13).)

223.    On November 5, 2019, the day after Cardwell filed this lawsuit (November 4, 2019,

*see* ECF 1), the Firm's managing partner sent the following email to Firm employees:

> Subject: Recent Lawsuit
>
> Dear Colleagues:
>
> As you may have seen, a lawsuit against Davis Polk and several
> individuals was filed last night by a former associate, Kaloma Cardwell,
> which alleges racial discrimination and retaliation.
>
> Mr. Cardwell's termination had nothing to do with his race. He was
> terminated for legitimate, non-discriminatory reasons, following negative
> performance reviews given in the ordinary course. We will defend
> ourselves vigorously and will show, based on the record, that the claims
> are not supported by the facts or the law.
>
> Diversity and inclusiveness in the workplace are core values and
> commitments of Davis Polk. We have worked hard to develop Firm-wide
> training and development programs for lawyers across the seniority
> spectrum, and we have devoted substantial resources to the recruitment,
> training, and development of diverse talent. For many years, we have had
> a dedicated group of partners and administrators working on these issues.
>
> I believe, as the Firm does, that having a diverse and inclusive work
> environment that promotes equality is not only the right thing but also

leads to a more qualified workforce and delivers better and more innovative lawyering that is more responsive to clients' needs.

I know you understand that given the pendency of this litigation, we are unable to provide additional information at this time. We will, however, keep you updated on developments, as necessary. If you receive any inquiries related to the lawsuit, please refer them to Tenley Chepiga or our office of general counsel.

Best regards,

Neil Barr

(Buergel Decl. Ex. 75  (R&O to RFA 73).)

224.    At no point prior to the filing of this lawsuit was the Firm's December 2017 EEOC/NYSDHR position statement, which bears the ledger "Highly Confidential," "FOIA/FOIL Confidential Treatment Requested by Davis Polk," publicly filed.  ECF No. 52-4.  In this litigation, the first party to attach it to a court document was Cardwell, on June 5, 2020.  (ECF No. 52-4.)

### 3.  Health

225.    There is no evidence of any material impact of any alleged acts of defendants on Cardwell's health.

226.    As to mental health, Cardwell testified that he has:

(a)    Not "been diagnosed, to [his] knowledge, with any mental health issue."

(b)    Not "been diagnosed by a professional with anxiety."

(c)    Not "been diagnosed by a professional as having a sleep disorder."

(d)    Not consulted any "mental health professionals" concerning his alleged suffering other than "a conversation" with one doctor in July 2017, who "created the document . . . authorizing [him] to return to work," and "conversations with [his] mom," who "is a clinical social worker."

(e)    Not "been on any prescribed medications" since September 2014.

(Buergel Decl. Ex. 1 (Cardwell Tr.  282:3–6, 288:7–12, 280:4–282:1; 285:4–6).)

227.    As to "physical health," Cardwell testified that

(a)   The symptoms he allegedly "experience[d] in connection with [his] employment" at the Firm were "bouts of fatigue," "headaches," and "a feeling in [his] body that that [he has] never had," in addition to "increased anxiety" and "issues sleeping."

(b)   He has not "been on any prescribed medications" since September 2014.

(Buergel Decl. Ex. 1 (Cardwell Tr.  282:7–283:11; 287:2–21; 285:4–6).)

228.   Cardwell has provided no expert reports, medical records (aside from a one-page "document . . . authorizing [him] to return to work" from one doctor in July 2017), or testimony corroborating his claims with respect to mental, emotional, or physical health.

229.   Cardwell served no expert reports at all in this litigation.

**C.   Claims for Attorneys' Fees**

230.   David Jeffries is Cardwell's only attorney of record in this proceeding.  (Buergel Decl. Ex. 1 (Cardwell Tr. 45:19–46:2).)

231.   Cardwell paid $10,000 to his former attorney of record, Martin Restituyo, for legal services in this matter.  (Buergel Decl. Ex. 1 (Cardwell Tr. 61:9–62:11).)

232.   Cardwell is not paying Jeffries for his services in this matter.  (Buergel Decl. Ex. 1 (Cardwell Tr. 63:25–64:9).)

233.   Jeffries is not being compensated or reimbursed for his services in this matter. (Buergel Decl. Ex. 1 (Cardwell Tr. 66:21–67:6).)

**D.   Claims for Front and Back Pay**

**1.   Back Pay**

*a.   Average Tenure*

234.   For the JD classes of 2009 to 2012, the median tenure for a Davis Polk associate was 4.6 years.  (Buergel Decl. Ex. 8 (McCrary Report 8–9, Ex. 2).)

235. The median tenure for a Davis Polk associate in the class of 2014 was 4.2 years. (Buergel Decl. Ex. 8 (McCrary Report at 8–9, 14, Ex. 2).)

236. Cardwell departed the Firm after three years and eleven months, only approximately three months before the median tenure at Davis Polk for an associate in the class of 2014. (Buergel Decl. Ex. 77 (DPW_SDNY-000168017).)

237. An associate in Cardwell's class year (2014) would have been a seventh-year associate in 2021. (Buergel Decl. Ex. 1 (Cardwell Tr. 266:20–267:20).)

### b. *Compensation*

238. Cardwell was at all times compensated in lockstep with his associate class. (Buergel Decl. Ex. 75 (R&O to RFA Nos. 77–87).)

239. Cardwell received the same year-end bonus payment given in each of 2014, 2015, 2016, and 2017 to other associates in his class year of equal tenure." (Buergel Decl. Ex. 75 (R&O to RFA Nos. 77–87).)

240. Davis Polk's lockstep compensation schedule for associates in the class of 2014 was as follows:

|    | Year | Salary | Bonus | Citation |
|----|------|--------|-------|----------|
| a. | 2014 | $160,000 | $15,000 | Duggan Decl. ¶ 3. |
| b. | 2015 | $160,000 | $15,000 | *Id.* |
| c. | 2016/ *as of 7/1/16* | $170,000/ *$190,000* | $25,000 | *Id.* |
| d. | 2017 | $210,000 | $50,000 | *Id.* |
| e. | 2018 *as of 7/1/18* | $235,000/ *$255,000* | $80,000 | Duggan Decl. ¶ 3; Buergel Decl. Ex. 75 (R&Os to RFA 82). |
| f. | 2019 | $280,000 | $80,000 | Duggan Decl. ¶ 3; Buergel Decl. Ex. 75 (R&Os to RFAs 83–84). |
| g. | 2020 | $305,000 | $127,000 | Duggan Decl. ¶ 3; Buergel Decl. Ex. 75 (R&Os to RFAs 85–86). |

| h. | 2021 *as of 7/1/21* | $325,000/ *$350,000* | $64,000 thru 9/30/2021 | Duggan Decl. ¶ 3; Buergel Decl. Ex. 75 (R&Os to RFA 87). |
|---|---|---|---|---|

## 2. **Failure To Mitigate**

241.     Cardwell failed to mitigate his alleged damages.

242.     Davis Polk offered Cardwell outplacement support after informing him that he should seek alternative employment.  (Buergel Decl. Exs. 70 (DPW_SDNY-000140804); 1 (Cardwell Tr. 240:6–241:21).)

243.     Cardwell:

(a)     did not use any of the outplacement support services provided by Davis Polk.  (Buergel Decl. Ex. 1 (Cardwell Tr. 242:22–25; 238:14–239:4).)

(b)     "did not apply to any jobs during the period in which Davis Polk had told [him] that they were terminating [him]," and "did not apply to any jobs" between February and August 2018.  (Buergel Decl. Ex. 1 (Cardwell Tr. 227:16–21; 228:23–229:3).)

(c)     "[has] not applied for any jobs since [his] last day at the firm."  (Buergel Decl. Ex. 1 (Cardwell Tr. 243:2–9).)

244.     Cardwell has let his bar registration lapse.  (Buergel Decl. Ex. 1 (Cardwell Tr. 247:17–249:4).)

245.     Cardwell let his bar registration lapse as of sometime in 2020, when he was due to reregister but did not do so.  (Buergel Decl. Ex. 76(a) (11/27/2020 printout from website).)

246.     Cardwell's bar registration status remained, as of December 1, 2021, "delinquent," according to the New York State Unified Court System website.  (Buergel Decl. Ex. 76(b) (printout from website).)

247.     In the 2018 to 2020 time period, Cardwell's law school and peer law schools enjoyed an employment rate that is "consistently above 95 percent."  (Buergel Decl. Ex. 8 (McCrary Report at 18 n. 41).)

248.    The job market for former Davis Polk associates is strong, including for associates in class year 2013 to 2015.  (Buergel Decl. Ex. 8 (McCrary Report at 18; *id.*, Ex. 4).)  These associates have found positions at other law firms, as in-house counsel, or in public interest or government, among other positions.  (Buergel Decl. Ex. 8 (McCrary Report at 18).)

249.    The Twelve Associates have all either secured employment or returned to graduate school.  (Buergel Decl. Ex. 8 (McCrary Report at 18).)

250.    The Bureau of Labor Statistics reports that among professional and business service workers displaced between January 2017 and December 2019, re-employment was 71 percent by January 2020.  (Buergel Decl. Ex. 8 (McCrary Report at 19).)

251.    The majority of these individuals earned at least as much—if not more—in their new job than in their lost job.  (Buergel Decl. Ex. 8 (McCrary Report at 19).)

### 3.  Front Pay

252.    On August 21, 2020, Cardwell served amended initial disclosures containing the following statement:

> "**Frontpay (i.e., lost future earnings) Damages:** . . .  Plaintiff estimates frontpay damages to be at least $20 million over a ten-year period."

(Buergel Decl. Ex. 74 (Plaintiff's Third Amended Initial Disclosures, at 12).)

253.    On or about October 29, 2017, Cardwell expressed that he would be "interested in a position that's less focused on litigation or direct services," naming as an example "a place like DEMOS (which works on policy, transforming institutions, opportunity, advocacy, shifting narratives, etc.)."  (Buergel Decl. Exs. 21 (KCARDWELL025587); 1 (Cardwell Tr. 235:11–236:11).)  He noted, "I'd also be interested in getting a masters in public administration. Ultimately I think my most meaningful work and impact will result from me forging and

negotiating coalitions and commitments across government, private, and grassroots orgs and sectors." (Buergel Decl. Exs. 21 (KCARDWELL025587); 1 (Cardwell Tr. 235:11–236:11).)

254.   Cardwell testified that "[T]he fact of the matter is, generally speaking, it's one to two people [who make partner] in any given year." (Buergel Decl. Ex. 1 (Cardwell Tr. 263:13–264:8).)

255.   No one at Davis Polk told Cardwell, during the period he was at Davis Polk, that he was "on track to be a partner." (Buergel Decl. Ex. 1 (Cardwell Tr. 266:4–19).)

256.   Defendants' expert witness testified to the following, and Cardwell offered no expert or other rebuttal testimony:

> (a)   Only 2.7% to 5.7% of Davis Polk associates in the classes of 2009 to 2012 were promoted to partner.
>
> (b)   Of the 112 associates who started at the Firm in 2009, 3 were promoted to partner.
>
> (c)   Of the 110 associates who started at the Firm in 2010, 6 were promoted to partner.
>
> (d)   Of the 90 associates who started at the Firm in 2011, 5 were promoted to partner.
>
> (e)   Of the 101 associates who started at the Firm in 2012, 4 were promoted to partner.

(Buergel Decl. Ex. 8 (McCrary Report at 14, Ex. 1).)

## E.   Claims for Punitive Damages

257.   No document or non-testimonial evidence reasonably supports the allegation of malice, reckless indifference, or willful or wanton negligence on the part of:

> (a)   Bick;
>
> (b)   Birnbaum;
>
> (c)   Brass;
>
> (d)   Butler;

(e)    Chudd;

(f)    Hudson;

(g)    Reid;

(h)    Wolfe;

(i)    Davis Polk.

258.    No testimony by any witness reasonably supports the allegation of malice, reckless indifference, or willful or wanton negligence on the part of:

(a)    Bick;

(b)    Birnbaum;

(c)    Brass;

(d)    Butler;

(e)    Chudd;

(f)    Hudson;

(g)    Reid;

(h)    Wolfe;

(i)    Davis Polk.

## VI.    ALLEGED COMPARATORS

### A.    The Twelve Associates

259.    In their accompanying memorandum of law in support of their motion for summary judgment, defendants refer to the associates Cardwell identified by name as his purported "comparators" as the "Twelve Associates."

260.    When producing materials for the Twelve Associates, defendants anonymized them as Associates 1–12.

261.    None of the Twelve Associates:

    (a)    was promoted to partner at Davis Polk.  (Buergel Decl. Ex. 77 (DPW_SDNY-000168017); Duggan Decl. ¶ 4.)

    (b)    remains at Davis Polk.  (Buergel Decl. Ex. 77 (DPW_SDNY-000168017); Duggan Decl. ¶ 4; Buergel Decl. Ex. 8 (McCrary Report at 16).)

262.    Only one of the Twelve Associates stayed for at least their eighth year (Associate 9).  (*See* Buergel Decl. Ex. 77 (DPW_SDNY-000168017).)

## B.    Charts

263.    The following associates' "hire dates" and "termination dates" were as follows:

|     | Associate | Hire Date | Termination Date |
| --- | --- | --- | --- |
| (a) | Associate 1 | 10/6/2014 | 4/5/2019 |
| (b) | Associate 2 | 10/7/2013 | 8/18/2017 |
| (c) | Associate 3 | 10/22/2012 | 3/30/2018 |
| (d) | Associate 4 | 9/15/2014 | 7/31/2015 |
| (e) | Associate 5 | 12/7/2015 | 1/14/2019 |
| (f) | Associate 6 | 10/6/2014 | 4/5/2019 |
| (g) | Associate  7 | 3/5/2012 | 3/16/2018 |
| (h) | Associate  8 | 9/15/2014 | 11/21/2018 |
| (i) | Associate  9 | 10/22/2012 | 2/4/2021 |
| (j) | Associate  10 | 10/20/2014 | 6/8/2018 |
| (k) | Associate  11 | 9/15/2014 | 3/22/2019 |
| (l) | Associate  12 | 10/6/2014 | 7/31/2020 |
| (m) | Cardwell | 9/15/2014 | 8/10/2018 |

(Buergel Decl. Ex. 77 (DPW_SDNY-000168017).)

264.    The following associates **were** in the compensation class of 2014:

|     | Associate | Comp. Class | Sources |
| --- | --- | --- | --- |
| (a) | Associate 1 | 2014 | Duggan Decl. ¶ 4 |
| (b) | Associate 4 | 2014 | Duggan Decl. ¶ 4 |
| (c) | Associate 6 | 2014 | Duggan Decl. ¶ 4 |
| (d) | Associate 8 | 2014 | Duggan Decl. ¶ 4 |
| (e) | Associate 10 | 2014 | Duggan Decl. ¶ 4 |
| (f) | Associate 11 | 2014 | Duggan Decl. ¶ 4 |
| (g) | Associate 12 | 2014 | Duggan Decl. ¶ 4 |

265.    The following associates **were not** in the compensation class of 2014:

|     | Associate   | Comp. Class | Sources           |
|-----|-------------|-------------|-------------------|
| (a) | Associate 2 | 2013        | Duggan Decl. ¶ 4  |
| (b) | Associate 3 | 2012        | Duggan Decl. ¶ 4  |
| (c) | Associate 5 | 2012        | Duggan Decl. ¶ 4  |
| (d) | Associate 7 | 2011        | Duggan Decl. ¶ 4  |
| (e) | Associate 9 | 2012        | Duggan Decl. ¶ 4  |

266.    Of the Twelve Associates, one (Associate 2) is Black/African-American, three are Asian or South Asian, one is Latinx and the remainder are White/Caucasian.  (Duggan Decl. ¶ 5.)

267.    Between their start dates at the Firm and Cardwell's last day at the Firm (August 10, 2018), the following associates had the following quantities of reviews in which a reviewer

answered "ahead" or "behind" to substantially the following question: "Overall, do you feel this lawyer is performing materially behind, with or ahead of the lawyer's class":

|  | Associate | "Aheads" | "Behinds" | Sources |
|---|---|---|---|---|
| (a) | Associate 1 | 12 | 0 | Buergel Decl. Ex. 78 (DPW_SDNY-000165612-661) |
| (b) | Associate 2 | 5 | 2 | Buergel Decl. Ex. 78 (DPW_SDNY-000165904-934) |
| (c) | Associate 3 | 2 | 6 | Buergel Decl. Ex. 78 (DPW_SDNY-000165744–807) |
| (d) | Associate 4 | 4 | 0 | Buergel Decl. Ex.78 (DPW_SDNY-000165734–43) |
| (e) | Associate 5 | 0 | 9 | Buergel Decl. Ex.78 (DPW_SDNY-000166042–044); (DPW_SDNY-000166046–076) |
| (f) | Associate 6 | 3 | 1 | Buergel Decl. Ex. 78 (DPW_SDNY-165808–836); (DPW_SDNY-000165838–844); DPW_SDNY-000165847–848 |
| (g) | Associate 7 | 6 | 14 | Buergel Decl. Ex. 78 (DPW_SDNY-000165935-010) |
| (h) | Associate 8 | 1 | 1 | Buergel Decl. Ex. 78 (DPW_SDNY-000165663–691) and (DPW_SDNY-000165694–699) |
| (i) | Associate 9 | 16 | 3 | Buergel Decl. Ex. 78 (DPW_SDNY-000165526–611) |
| (j) | Associate 10 | 1 | 3 | Buergel Decl. Ex. 78 (DPW_SDNY-000166011-041) |
| (k) | Associate 11 | 3 | 0 | Buergel Decl. Ex. 78 (DPW_SDNY-000165700-733) |
| (l) | Associate 12 | 3 | 3 | Buergel Decl. Ex. 78 (DPW_SDNY-000165851-903) |
| (m) | Cardwell | 0 | 6 | Buergel Decl. Ex. 78 (DPW_SDNY-000144354 at -354, -366, -368–69, -371–72) |

268.    The following associates were given "time to go" messages on the following dates:

|  | Associate | Date | Sources |
|---|---|---|---|
| (a) | Associate 3 | November 7, 2017 | Buergel Decl. Ex. 78 (DPW_SDNY-000165793) |
| (b) | Associate 5 | June 29, 2018 | Buergel Decl. Ex. 78 (DPW_SDNY-000166066) |

| | | | |
|---|---|---|---|
| (c) | Associate 7 | September 22, 2017 | Buergel Decl. Ex. 78 (DPW_SDNY-000166001) |
| (d) | Associate 8 | October 16, 2018 | Buergel Decl. Ex. 79 (DPW_SDNY-000165692) |
| (e) | Associate 10 | May 2, 2018 | Buergel Decl. Ex. 78 (DPW_SDNY-000166033) |

269.    None of the following associates' annual reviews reflect that they were asked to leave the Firm:

| | Associate | Sources |
|---|---|---|
| (a) | Associate 1 | Buergel Decl. Ex. 78 (DPW_SDNY-000165652); (DPW_SDNY-000165654); (DPW_SDNY-000165656); (DPW_SDNY-000165658); (DPW_SDNY-000165660); (DPW_SDNY-000165662) |
| (b) | Associate 2 | Buergel Decl. Ex. 78 (DPW_SDNY-000165927); (DPW_SDNY-000165929) (DPW_SDNY-000165931); |
| (c) | Associate 4 | Buergel Decl. Ex. 78 (DPW_SDNY-000165742) |
| (d) | Associate 6 | Buergel Decl. Ex. 78 (DPW_SDNY-000165838); (DPW_SDNY-000165840); (DPW_SDNY-000165847) |
| (e) | Associate 9 | Buergel Decl. Ex. 78 (DPW_SDNY-000165600-610) |
| (f) | Associate 11 | Buergel Decl. Ex. 78 (DPW_SDNY-000165728-732) |
| (g) | Associate 12 | Buergel Decl. Ex. 78 (DPW_SDNY-000165895-903) |

## C.    Reviews

270.    Cardwell testified that his comparators "include folks who were rated as behind in any of their performance reviews" (Buergel Decl. Ex. 1 (Cardwell Tr. 322:11–13)), and that "all of the individuals who were part of the comparator class received behind rated performance reviews without or prior to making any legally protected complaints." (*Id*. at 330:15–19.) Cardwell described himself as "similarly-situated" to white M&A associates "who had been rated as behind, or who had been rated as behind by M&A partners." (*Id*. at 561:12–563:2.)

271.    Combined, the Twelve Associates received approximately 345 reviews from approximately 131 unique reviewers between their start dates at the Firm and Cardwell's last day

at the Firm (August 10, 2018) (including individual reviews, annual reviews, and interim reviews). (*See* Buergel Decl. Exs. 78(a)–(l).)

272.    Of the approximately 345 reviews, only three were submitted or delivered by Bick. (*See* Buergel Decl. Exs. 78(a) (DPW_SDNY-000165612 at -616 (Bick review of Associate 1)); 78(c) (DPW_SDNY-000165744 at -745 (Bick review of Associate 3)); 78(e) (DPW_SDNY-000166066 at -072 (Bick annual review of Associate 5 with George Bason, Jr. (submitted by Bason))).)

273.    Of the approximately 131 reviewers, only 17 of them reviewed or delivered a review to Cardwell.  (*See* Buergel Decl. Ex. 9 (DPW_SDNY-000144354 *et seq.* at -354 (Amorosi); -357 (Arnaldos); -385 (Bick interim review); -360 (Butler); -362 (Chudd); -365 (Friedman); -366 (Goldberg); -368 (Hochbaum); -369 (Hudson); -383 (Kreynin annual review); -389 (Kyrwood annual review); -372 (Mills); -373 (Nicholas); -375 (Segal); -382 (Smith annual review); -376 (Turano); -379 (Wang).)

274.    Of these 17 reviewers, Cardwell chose to depose only two in this litigation.  (*See* Buergel Decl. Exs. 5, 7 (Bick Tr.; Hudson Tr.).)  Of the approximately 131 reviewers, only four were deposed.  (*See* Buergel Decl. Exs. 4–7 (Bick Tr.; Hudson Tr.; Birnbaum Tr.; Reid Tr.).)

275.    Cardwell has put forth no evidence establishing who made final determinations with respect to the staffing of any of the Twelve Associates.

276.    Cardwell has put forth no evidence as to who made the decision *not* to terminate those of the Twelve Associates who were not terminated.

277.    As to the Staffing Allegation, Cardwell has put forth no evidence with respect to the quality or appropriateness of the Twelve Associates' billable assignments, or establishing that

their supervisors—like his—felt they could not trust them with further assignments (but nevertheless gave them work).

Dated:        December 3, 2021
              New York, New York

                        Respectfully submitted,


                        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP


                        By: /s/ Bruce Birenboim
                            Bruce Birenboim
                            Jeh C. Johnson
                            Susanna Buergel
                            Marissa C.M. Doran

                        1285 Avenue of the Americas
                        New York, New York 10019-6064
                        Telephone: (212) 373-3000
                        bbirenboim@paulweiss.com
                        jjohnson@paulweiss.com
                        sbuergel@paulweiss.com
                        mdoran@paulweiss.com
                        *Attorneys for Defendants*