# Buergel Declaration Exhibit 4

Page 1

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5   KALOMA CARDWELL,            )

              Plaintiff,     )

6                                )

            vs.              )19 Civ. 10256

7                                )(GHW)

    DAVIS POLK & WARDWELL,     )

8   THOMAS REID, JOHN BICK,    )

    WILLIAM CHUDD, SOPHIA      )

9   HUDSON, HAROLD             )

    BIRNBAUM, DANIEL BRASS,    )

10  BRIAN WOLFE, and JOHN      )

    BUTLER,                    )

11            Defendants.      )

    _____    )

12

13

14            REMOTE DEPOSITION OF

15                 THOMAS REID

16        located in New York, New York

17            Friday, April 16, 2021

18

19   (Transcript contains Confidential and

20   Highly Confidential portions -

21   confidentiality designations legend at

22   back of transcript)

23

24   Reported By:

25   CATHI IRISH, RPR, CRR, CLVS

Page 2

1
2
3
4
5
6
7          April 16, 2021
8          9:31 a.m.
9
10         Remote deposition of THOMAS REID,
11    with all participants appearing via
12    videoconference, before Cathi Irish, a
13    Registered Professional Reporter,
14    Certified Realtime Reporter, and
15    Notary Public of the State of
16    New York.
17
18
19
20
21
22
23
24
25

Page 3

1
2 A P P E A R A N C E S :
3
4    JEFFRIES LAW
5    Attorneys for Plaintiff
6        1345 Avenue of the Americas
7        New York, New York 10019
8    BY:  DAVID JEFFRIES, ESQ.
9
10   PAUL, WEISS, RIFKIND, WHARTON
11   & GARRISON
12   Attorneys for Defendants
13       1285 Avenue of the Americas
14       New York, New York 10019
15   BY:  BRUCE BIRENBOIM, ESQ.
16       NEENA SEN, ESQ.
17       SUSANNA BUERGEL, ESQ.
18
19 ALSO PRESENT:
20   ZACH CZERENDA, Veritext concierge
21   KALOMA CARDWELL
22   MICHAEL FLYNN
23
24
25

Page 4

1
2 T H O M A S   R E I D,  called as a
3    witness, having been duly sworn by a
4    Notary Public, was examined and
5    testified as follows:
6 EXAMINATION
7 BY MR. JEFFRIES:
8    Q.  Good morning, Mr. Reid.
9    A.  Good morning, Mr. Jeffries.
10   Q.  Mr. Reid, have you been deposed
11 before?
12   A.  No, I actually haven't.  I was
13 prepped for it a long time ago but no.
14   Q.  Okay.  So with respect to today's
15 proceedings, sir, I'm going to ask that
16 you answer all questions in a verbal
17 manner.  Do you understand that?
18   A.  You mean using oral communication
19 or written as well?  Verbal is both.
20 Oral; right?  I'll answer, yes, orally.
21   Q.  Some people have a tendency
22 because it's so ingrained in our everyday
23 interactions to uh-huh, um-hum, nodding
24 and it happens.  It happens no matter how
25 much you do it.

Page 5

                    REID
1
2    A.  I understand and I'll try to make
3 sure I annunciate clearly.
4    Q.  And the reporter will also let us
5 know, I'm sure.
6    A.  Okay.
7    Q.  Additionally, sir, I'm going to
8 ask that you allow me to finish the
9 question before you answer.  Do you
10 understand that, sir?
11   A.  To finish the question, yes.
12   Q.  Okay.  If you don't understand a
13 question that's been put to you, please
14 let me know and I'll rephrase it, okay?
15   A.  Understood.
16   Q.  And if there comes a point in
17 time throughout the proceeding that you
18 need to take a break, please indicate that
19 to us and we'll do so.  My only caveat
20 with respect to that is that if there is a
21 question pending, that you answer the
22 question before going on any type of break
23 or requesting a break so we have
24 continuity between the question and the
25 corresponding answer.

2 (Pages 2 - 5)

Page 10

REID

1            REID
2  partner there on subjects relating to
3  diversity and there were a few e-mails on
4  top of that, very small percentage of the
5  documents by number of pages were several
6  e-mails from the past, and that was it in
7  terms of the documents.
8      Q.  With respect to the documents
9  that were reviewed, were any of the
10 documents within that category items that
11 you had been the author of?
12     A.  No.  Obviously, I'm not the
13 author of the complaint filed in the
14 lawsuit and I was not the author of many
15 of the other pages relating to Davis Polk
16 presentations.  Davis Polk policies I
17 remember being excerpted.  There were one
18 or two e-mails that I was in the chain on
19 and had replied or, yes, so there would be
20 one or two e-mails where I was the author
21 I suppose, yes.
22     Q.  And with respect to those
23 e-mails, have those been provided to
24 counsel prior to the preparatory sessions?
25        MR. BIRENBOIM:  Objection to

Page 11

REID

1            REID
2    form.  You can answer if you know what
3    that means.
4        THE WITNESS:  Sorry, can you
5    repeat the question, Mr. Jeffries?
6  BY MR. JEFFRIES:
7      Q.  Yes.  The e-mails you mentioned
8  had been authored by yourself, had you
9  handed them over to counsel prior to
10 meeting with them?
11     A.  I can't recall if they were
12 specifically handed over to me, but I do
13 remember handing over what I did have to
14 hand that was relevant to this matter, and
15 of course understood and without
16 hesitation granted permission for counsel
17 to do electronic and physical searches of
18 my documents at Davis Polk.
19     Q.  I'm sorry, with respect to the
20 permission for the searching of electronic
21 documents, can you repeat that part?
22     A.  I gave permission to counsel to
23 run electronic search terms through my
24 e-mail files and other document files
25 awhile back, and I would imagine some of

Page 12

REID

1            REID
2  the documents came from that.  They may
3  not have all come from my direct handing
4  over.
5      Q.  And you indicated that in your
6  preparation, you reviewed the complaint
7  that was filed by Mr. Cardwell in the
8  Southern District; correct?
9      A.  Yes.
10     Q.  Have you reviewed each of the
11 complaints that Mr. Cardwell has filed in
12 the Southern District?
13     A.  I think what I reviewed was the
14 latest states but in the course of the
15 last year and a half, I've reviewed the
16 different iterations so -- but what I
17 looked at recently was I think the latest.
18 ████████████ REDACTED ████████████
   ████████████████████████████
   ███ ██████████████████████ but from my
22 perspective, Mr. Jeffries, when the
23 Southern District complaint was filed,
24 that was what I focused on since then, and
25 I haven't heard anything about the EEOC

Page 13

REID

1            REID
2  filing or looked at it in any attention to
3  detail since then.
4      Q.  Mr. Reid, did you have any role
5  in the collection of documents related to
6  the litigation in this matter?
7      A.  No.  No, other than handing over
8  what I had to hand and other than giving
9  permission for my files to be searched, I
10 didn't actually do any of the searching.
11 Is that what you mean, Mr. Jeffries?
12     Q.  That and did you give specific
13 direction, by virtue of your position
14 within the firm at the time as to who
15 should be conducting searches or anything
16 like that?
17     A.  No, not at all.  That was
18 something to be handled by counsel and I
19 was there to make whatever information I
20 had relevant to this matter available to
21 them.  I did not give any direction as to
22 what they should be looking for or in any
23 way control what they were to search.  Is
24 that responsive to your question,
25 Mr. Jeffries?

4 (Pages 10 - 13)

Page 30

REID

1
2   Q.  Yes, as an associate and partner,
3   that's my question.
4   A.  29 years.
5       MR. BIRENBOIM:  Mr. Jeffries, are
6   you there?  Can you hear me?
7       MR. JEFFRIES:  Yes.
8       MR. BIRENBOIM:  With great
9   apologies and your indulgence, I know
10  we just started, but I have to deal
11  with a personal call.  It won't take
12  more than five minutes, but I need to
13  break for that if that's okay with
14  you.
15      MR. JEFFRIES:  Absolutely.  Let's
16  go off and check in in five.
17      MR. BIRENBOIM:  Somewhere between
18  five and 10 minutes.
19      (Recess taken from 10:06 a.m. to
20  10:17 a.m.)
21      (Record read.)
22  BY MR. JEFFRIES:
23  Q.  Mr. Reid, during your employment
24  with Davis Polk, you served as the head of
25  Davis Polk's corporate department and the

Page 31

REID

1
2   firm's managing partner; correct?
3   A.  Yes.
4   Q.  So I'd like to talk to you
5   briefly about both of those positions.
6   **REDACTED**

18  Q.  With respect to the role you held
19  as the firm's managing partner, can you
20  briefly describe the duties and
21  responsibilities that came along with that
22  position?
23  A.  It was also an elected position
24  and it was the chairman of a three-partner
25  committee that had oversight for all of

Page 32

REID

1
2   the practices of the firm, corporate,
3   litigation, tax, again domestically and in
4   the overseas offices.
5   Q.  And how long did you hold that
6   position for?
7   A.  Until -- so 2011 until I left the
8   firm just over eight years later in 2019
9   to go to Comcast.
10  Q.  I want to speak to you briefly
11  about the policies, practices and
12  procedures that were in place at Davis
13  Polk during the relevant period, all
14  right, Mr. Reid?
15  A.  Sorry, what is the relevant
16  period?
17  Q.  The relevant period being
18  September of 2014 through August of 2018.
19  A.  Okay.
20  Q.  Did Davis Polk have a strong and
21  clear antidiscrimination policy between
22  2014 and in 2018?
23  A.  I believe it did.
24  Q.  Can you describe what that policy
25  was?

Page 33

REID

1
2   A.  Don't discriminate.  I can't tell
3   you the exact words but it had been there
4   for a very long time, I'm sure it's still
5   there today, and it was no discrimination
6   of any kind is going to be tolerated in a
7   nutshell.
8   Q.  Can you describe what
9   discrimination entailed?
10  A.  Treating people differently on
11  the basis of attributes of gender, race,
12  sexual orientation and not treating people
13  according to purely performance on the
14  job.
15  Q.  Do you know when that policy was
16  created within Davis Polk?
17  A.  I don't.  It was -- it's been
18  there a long time but I don't know exactly
19  when it was created.
20  Q.  Was it in place when you arrived
21  at the firm?
22  A.  I can't recall.  I can't recall.
23  Q.  Do you recall whether or not you,
24  in any of the positions you held within
25  the firm, had any input into the creation

9 (Pages 30 - 33)

Page 74

REID

1          REID
2 others.  I don't have any specific
3 recollection of any specific group or
4 office.
5      Q.  So let's use the group, the M&A
6 group?
7      A.  Um-hum.
8      Q.  Do you have any reason to believe
9 that staffing assignments would have been
10 -- staffing decisions would have been made
11 on the basis of staffing partners walking
12 around and talking to associates about
13 their availability?
14     A.  I don't know how these staffing
15 partners referred to in this e-mail did
16 their job of staffing.  I don't know.
17     Q.  Do you have any reason to dispute
18 the fact that staffing availability would
19 have been recorded and provided to the
20 staffing partners through any type of
21 documentation?
22     A.  I've got no specific basis for
23 knowing that.
24     Q.  And so what do you generally know
25 about how associates -- what generally can

Page 75

1          REID
2 you tell me about the framework through
3 which Davis Polk, arguably one of the
4 largest firms in the world, utilizes to
5 track the availability of associates to
6 take on new work within the practice
7 group, such as the M&A group?
8      A.  This e-mail, as I said, there
9 would be different approaches depending
10 upon which group.  It's a very large firm,
11 you're absolutely right, but within that
12 large firm there were some very small
13 offices and some very small practice
14 groups and they would undoubtedly have
15 done things differently.  They would not
16 have needed what this e-mail refers to by
17 way of weekly updates and one chart.
18     Q.  Let's orient this to one of the
19 larger groups, okay, not one of the small
20 groups.  Let's orient our discussion --
21     A.  Okay.
22     Q.  -- to one of the larger groups.
23 Is it your testimony that one of the
24 larger groups -- and you would agree M&A
25 would be one of the larger groups;

Page 76

1          REID
2 correct?
3      A.  Yes.
4      Q.  So is it your testimony that
5 you're not aware of any method through
6 which the associates' availability for
7 work was tracked, is that your testimony?
8      A.  It's not my --
9          MR. BIRENBOIM:  Hold on,
10     objection to form, mischaracterizes
11     the witness's prior testimony.  You
12     may answer.
13         THE WITNESS:  My testimony is
14     that I don't have specific awareness,
15     other than in a larger group it's not
16     surprising that there would be more
17     structure, meaning more people
18     involved, not just partners but the
19     non-lawyer staff in associate
20     development and paperwork.  It's not
21     surprising.  I'm sure there was a lot
22     more structure in the larger groups
23     versus the smaller groups and offices.
24 BY MR. JEFFRIES:
25     Q.  During Mr. Cardwell's employment,

Page 77

1          REID
2 sir, did you occasionally get updates
3 about how busy certain associates were?
4      A.  No.  I mean associates as a
5 whole, yes, but specific individuals, no.
6      Q.  So is it your testimony here
7 today that during your -- during the
8 relevant period, you did not receive any
9 updates about how busy specific associates
10 were or -- let me restate that.
11         Is it your testimony today that
12 during the relevant period, you did not
13 receive any updates as to the availability
14 of any specific associates, is that your
15 testimony?
16     A.  I did not receive any updates on
17 availability of specific associates,
18 that's correct.
19     Q.  During the relevant period, did
20 you ever receive any updates about the
21 availability of Mr. Cardwell specifically
22 to take on work?
23     A.  I went into it myself at one
24 point in time on my own instigation.
25     Q.  What made you do that, sir?

20 (Pages 74 - 77)



Page 78

1            REID
2   A.   REDACTED

14                     before this meeting, I
15  had dinner with him and a colleague of his
16  and had looked at how he was doing at that
17  time as well, so those were probably the
18  two occasions in which I again
19  proactively, myself, inquired as to how he
20  was doing and in the context of that
21  dinner, how the other associate was doing
22  as well.
23      Q.  Turning to -- what's the
24  earliest -- what would you say is the
25  earliest, based off of the answers you
        just gave, what would you say was the

Page 79

1            REID
2   earliest time you looked into how
3   Mr. Cardwell was doing?
4       A.  To be in preparation for that
5   dinner I mentioned so I think that was the
6   beginning of -- that was the beginning of
7   2016.
8           MR. JEFFRIES:  Can we take this
9       down, Zach?  Can we go to tab 4,
10      please?
11          (Exhibit 3, document Bates
12      labeled DPW_SDNY?000143599, marked for
13      identification.)
14  BY MR. JEFFRIES:
15      Q.  You're going to need to move in
16  on this.
17      A.  Yes.
18      Q.  This is a chart that was -- this
19  is a PDF version of an Excel file that was
20  produced by defendants and this document's
21  Bates number is DPW_SDNY?000143599.
22      A.  Um-hum.
23      Q.  Do you see at the top of the
24  document, if we go to the top?
25      A.  Is this the top?

Page 80

1            REID
2       Q.  Yes.
3       A.  Yes.
4       Q.  Do you have any understanding of
5   what types of categories would be included
6   on any of the -- do you have any
7   understanding of what types of categories
8   would be included in any of the documents
9   that Davis Polk would have used to track
10  the availability of associates to take on
11  work during 2014 through 2018?
12          MR. BIRENBOIM:  Objection to
13      form, no foundation.  If you
14      understand the question, you may
15      answer.
16          THE WITNESS:  I don't understand
17      the question.
18  BY MR. JEFFRIES:
19      Q.  You previously indicated that you
20  were not aware of the usage of weekly
21  capacity forms.  Do you recall stating
22  that, sir?
23      A.  I think what I said is I hadn't
24  had any specific recollection of specific
25  forms, but it wouldn't surprise me that

Page 81

1            REID
2   the larger groups had more structure,
3   i.e., more people and more paperwork
4   focused on staffing associates.  I think
5   that's what I said and I'm saying again.
6       Q.  Let's talk about some of that
7   paperwork that would have been used to
8   track associates.  What type of
9   information would be tracked?
10      A.  Again, I don't -- sorry, Bruce,
11  go ahead.
12          MR. BIRENBOIM:  Objection to
13      form.  You may answer if you can.
14          THE WITNESS:  I don't have any
15      specific recollection of any
16      particular form when I talk about
17      paperwork.  So it would be speculation
18      if I was to say what a form would look
19      like and again, I would imagine it
20      would vary group by group, office by
21      office.
22  BY MR. JEFFRIES:
23      Q.  In connection with what you're
24  able to imagine with respect to this
25  issue, can you imagine there being certain

21 (Pages 78 - 81)

Page 126

REID

1
2     form, mischaracterizes the record.
3     You may answer if you know.
4         THE WITNESS: I think you're
5     leaping -- you're making several leaps
6     there. But when I looked at the
7     performance reviews and saw the low
8     hours, my conclusion was that the
9     performance reviews for two years in a
10    row were the reason that he wasn't
11    getting work.
12 BY MR. JEFFRIES:
13    Q. And what was that based on?
14    A. Reading the reviews for the
15 second time, once in January 2016 and once
16 in March 2017.
17    Q. What about the reviews would lead
18 you to believe that it was performance
19 that led to him not being staffed by
20 Mr. Birnbaum and Mr. Wolfe?
21    A. They raised very serious alarm
22 bells, even at a very early stage in his
23 career.
24    Q. So in your experience, the
25 feedback in those reviews led you to

Page 127

REID

1
2  believe that him receiving almost zero
3  hours was justified?
4         MR. BIRENBOIM: Objection to
5     form. If you understand that
6     question, you can answer it.
7         THE WITNESS: I don't understand
8     the word "justified." What I can say
9     is I believe that the cause was very
10    weak performance over a period of his
11    first two years at the firm and that
12    had led to the low hours that I saw as
13    well.
14        MR. JEFFRIES: Let's take that
15    break. 45 minutes, Bruce?
16        MR. BIRENBOIM: Are you talking
17    about lunch? I had thought -- it's up
18    to the group.
19        MR. JEFFRIES: Let's go off for a
20    second.
21        (Recess taken from 12:17 p.m. to
22    12:30 p.m.)
23 BY MR. JEFFRIES:
24    Q. Mr. Reid, before the break, I
25 believe you'd indicated there were

Page 128

REID

1
2  occasions during which you personally
3  reviewed Mr. Cardwell's performance
4  reviews during 2014 through 2018; correct?
5     A. Correct.
6     Q. And I wanted -- and I believe you
7  mentioned that there was one such review
8  that took place in 2017; is that correct?
9     A. Correct. That was the second.
10    Q. The second. And with respect to
11 your viewing of those items in 2017, who
12 provided those items to you in order for
13 you to review them?
14    A. I don't recall which individual
15 specifically provided the reviews. The
16 reviews I believe are kept for the
17 associate development team, so it may be
18 them that collected them and sent them to
19 my office, but I don't recall them being
20 handed to me by anybody.
21    Q. All right. And do you recall --
22 what would the process have been that led
23 to them being provided to you, how would
24 that occur?
25    A. It could have -- the process

Page 129

REID

1
2  started when I asked for the reviews. I
3  can't recall who I asked. It could have
4  been John Bick, it could have been Sharon
5  Crane, it might have been Renee DeSantis
6  directly in the associate development
7  team. Unlikely to be anybody else but I
8  can't recall which individual it was.
9     Q. And can you remind me again what
10 triggered you looking into Mr. Cardwell's
11 hours in 2017?
12    A. In 2017, in early March, I
13 believe it was, the partner who looked
14 after our pro bono program said there was
15 a matter, a question that Mr. Cardwell was
16 raising about a potential conflict of
17 interest of some kind between work in the
18 pro bono program and a past former client
19 of the firm. And I believe the partner
20 involved who was looking after the pro
21 bono program did not feel equipped to talk
22 to that conflict issue. It was not
23 something that she normally did in her
24 role and referred it to the management
25 committee.

33 (Pages 126 - 129)

Page 130

REID

1
2    Q.   And was the partner in the pro
3  bono role Sharon Katz?
4    A.   Yes, yes.
5    Q.   Do you recall whether there was a
6  former partner by the name of Cary Dunn
7  that had any role in the interactions with
8  Mr. Cardwell supporting that view that was
9  raised to you by Ms. Katz?
10    A.   Yes, the matter Mr. Cardwell was
11  raising, he had initially raised with
12  Mr. Dunn, Cary Dunn, but shortly after
13  having it raised, I believe, Mr. Dunn
14  retired from the partnership to work in
15  the Manhattan DA's office.
16    Q.   We'll come back to that, thank
17  you.
18        So on the matter of the
19  performance reviews during the period of
20  2017 when you reviewed them that second
21  time, let's go back to that for a moment.
22        Now, you indicated that you
23  looked at -- well, tell me in your own
24  words, firstly, did you evaluate those
25  reviews in connection with anyone else?

Page 131

REID

1
2    MR. BIRENBOIM:  Objection to
3    form.
4        THE WITNESS:  What do you mean in
5    connection with anyone else?
6  BY MR. JEFFRIES:
7    Q.   Well, did you evaluate those
8  reviews in connection with conversations
9  or in the presence of anyone else that had
10  knowledge about your concern about
11  Mr. Cardwell's hours?
12        MR. BIRENBOIM:  Objection to form
13    and I think misstates the testimony.
14    You can answer.
15        THE WITNESS:  So there were two
16    parts to this.  There was the meeting
17    I had with Ms. Katz and Mr. Cardwell
18    about his conflict question.  In
19    preparation for that meeting, I very
20    quickly just checked what he was
21    working on and I saw that he wasn't
22    working, period.
23        We had our meeting on the
24    conflict issue, dealt with that.  And
25    at the end of that meeting, I raised

Page 132

REID

1
2    with him the question of his low hours
3    and said I would follow up on that and
4    get back to him, that we should talk
5    about it.
6  BY MR. JEFFRIES:
7    Q.   Okay.
8    A.   When you say in connection with
9  anybody else, Ms. Katz would have heard me
10  say that in the meeting but I haven't
11  spoken about his reviews at that time.
12    Q.   But at the time of that meeting,
13  you had reviewed the performance reviews
14  ahead of time?
15    A.   No, I'd seen his hours were very
16  low at that meeting.  REDACTED

Page 133

REID

1
2    REDACTED
                                    I don't
5  know exactly how long but in that period
6  of time, I actually got the reviews and
7  read them.
8    Q.   Mr. Reid, during the relevant
9  period, did Davis Polk have annual firm
10  meetings?
11    A.   This is again the '14 to '18
12  period you're referring to, his employment
13  period?
14    Q.   Yes.
15    A.   The Cardwell employment period.
16  And by firm meetings, you mean partnership
17  meetings?
18    Q.   Yes, an annual firm meeting for
19  the partners.
20    A.   There's one every year, usually
21  at the end of January, beginning of
22  February area.
23    Q.   I want to speak to you about the
24  meeting that would have occurred in
25  February of 2018; okay?

34 (Pages 130 - 133)

Page 150

```
1              REID
2  in the group or inviting others from
3  outside the group to attend.  That was I
4  guess a description of what they were.
5         MR. JEFFRIES:  Can we take down
6  this exhibit, Zach, and move in tab
7  14, please?
8         (Exhibit 9, document entitled
9  Exhibit 1, Cardwell EEOC Charge
10  Against Davis Polk (August 3, 2017,
11  marked for identification.)
12 BY MR. JEFFRIES:
13  Q.  I'm going to ask that --
14 Mr. Reid, I believe earlier we indicated
15 the EEOC charge that Mr. Cardwell had made
16 against Davis Polk in 2017.
17  A.  I remember the EEOC charge, yes.
18  Q.  And I believe we discussed the
19 fact that you had, at least at the time it
20 was received in 2017, reviewed that
21 charge; correct?
22  A.  Yes.
23  Q.  And so this -- would you agree
24 that this is the EEOC charge that was
25 filed in 2017 by Mr. Cardwell?
```

Page 151

```
1              REID
2  A.  From memory it looks like it.
3  Q.  I'm just going to take you to
4  paragraph 8, please.  Do you see where the
5  complaints states, "On another occasion,
6  during a September 2015 DPW Black attorney
7  group meeting, I raised the general issue
8  of Black DPW attorneys being excluded in
9  the workplace.  Partners Monica Holland
10 and Maurice Blanco and Renee DeSantis, the
11 director of associate development,
12 attended the meeting.  After I made my
13 comment, Ms. DeSantis directly asked
14 whether I had personally experienced
15 race-related exclusion at the firm.
16 Although I answered affirmatively, and
17 described how such exclusion is harmful to
18 Black associates' professional development
19 and careers, neither Ms. DeSantis nor any
20 of the partners in attendance followed up
21 with me about my (or others') experience."
22         Mr. Reid, does that accurately
23 indicate the language in paragraph 8?
24  A.  You read it word for word.
25 ████████████████REDACTED████████████████,
```

Page 152

```
1              REID
2 ███████████REDACTED███████████
███████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████████
██████████████████████████
██  ███████████████████████████████
9  Q.  Did anyone at the firm ever give
10 you updates regarding BAG meetings?
11  A.  Not regularly, no.  I attended
12 what I would characterize as the most
13 important BAG meeting of the year, which
14 was every Friday evening before Labor Day
15 I attended the BAG dinner for law students
16 that had received an offer from us to join
17 the summer class the next year.
18         And it was a dinner of the BAG
19 group and the Black law students and the
20 goal was to get to know them, and in some
21 cases persuade them to accept our offer
22 and not a competitor.  So that was every
23 year.  I don't recall having regular
24 interactions beyond that.
25  Q.  And so what about on a
```

Page 153

```
1              REID
2  non-regular basis?
3  A.  Well, with the group as a whole,
4  I don't recall any regular interactions.
5  There were several members in the group
6  that I would talk to from time to time
7  socially, but I don't recall any
8  discussion about that BAG group and how it
9  was working.
10  Q.  Well, who within the group would
11 you -- well, withdrawn.
12         Did Sharon Crane ever give you
13 updates about BAG meetings?
14  A.  I don't recall any.
15  Q.  Is it possible that she would
16 give you updates about BAG meetings?
17         MR. BIRENBOIM:  Objection to
18  form, calls for speculation.  You can
19  answer if you have anything to say.
20         THE WITNESS:  That would be my
21  answer, I don't know.  It would be
22  speculation.
23 BY MR. JEFFRIES:
24  Q.  Well, to the extent that
25 something occurred during a BAG meeting
```

39 (Pages 150 - 153)

REID

2 that was then brought to Sharon Crane's
3 attention, would that be something you
4 would expect for her to speak to you about
5 in the weekly meeting, in your meetings
6 with her?
7     MR. BIRENBOIM:  Objection to
8     form.  If you have any answer to that,
9     you may answer.
10     THE WITNESS:  Again, the same as
11     before, a very general explanation, I
12     said Sharon had a very broad
13     portfolio.  She is a superb
14     professional and I trusted her
15     judgment on what to bring to my
16     attention and what not to bring to my
17     attention.  And I don't recall her
18     ever disappointing me in that regard.
19 BY MR. JEFFRIES:
20     Q.  Based off of your prior
21 testimony, you would agree that it would
22 be unusual for Sharon Crane to discuss
23 with you something that happened at a BAG
24 meeting that had come to her attention; is
25 that correct?

REID

2     MR. BIRENBOIM:  Objection to
3     form.  You may answer, Tom.
4     THE WITNESS:  That's not what I'm
5     saying.  Sharon is a superb
6     professional, highly compensated,
7     great judgment and she exercised that
8     judgment, to my knowledge, quite
9     nicely in terms of what issues she
10     felt were worthy of my attention,
11     whether that be the BAG group or any
12     other issue in her broad portfolio.
13 BY MR. JEFFRIES:
14     Q.  Did anyone at the firm ever give
15 you updates directly about Mr. Cardwell?
16     MR. BIRENBOIM:  Objection to
17     form.  You may answer if you can.
18     THE WITNESS:  No, I think I got
19     the review folder.  I don't recall how
20     I got it but beyond that, no.
21 BY MR. JEFFRIES:
22     Q.  So beyond that, beyond the
23 instances that required -- that resulted
24 in you getting the review folders, you
25 don't recall anyone else having direct

REID

2 conversations with you about Mr. Cardwell
3 during the relevant period?
4     A.  The relevant period again
5 includes right up to his departure in
6 2018; right?
7     Q.  Yes.
8     A.  So after I got involved when I
9 noticed how low his hours were, the next
10 step was to get his review folder and talk
11 to him.  Then there were conversations
12 about Mr. Cardwell's performance as we --
13 following that second March 2017 meeting.
14     Q.  Okay.  So then as a time marker,
15 it would be your testimony that prior to
16 March 2017, you don't -- prior to March
17 2017, you didn't engage in any
18 conversations wherein Mr. Cardwell was
19 directly -- where anything with respect to
20 Mr. Cardwell was directly brought to your
21 attention; is that correct?
22     A.  Correct.  **REDACTED**

REID

2 **REDACTED**

7     Q.  And you're saying that you don't
8 recall but are you saying that -- well, do
9 you remember hearing anything about
10 Mr. Cardwell making comments about how he
11 experienced exclusion at Davis Polk due to
12 his race prior to that dinner?
13     A.  Prior to the dinner, no.
14     MR. BIRENBOIM:  Which dinner?
15     MR. JEFFRIES:  The dinner in
16     January.
17     THE WITNESS:  The dinner in
18     January?
19 BY MR. JEFFRIES:
20     Q.  Yes.
21     A.  No, not prior to that dinner.
22     Q.  We talked about this dinner
23 tangentially.  Let's talk about the dinner
24 a bit more now.  Who do you remember --
25 well, how did that dinner come about?

40 (Pages 154 - 157)

Page 158

```
 1              REID
 2     A.  If you recall the article about
 3  the diversity panel that you put on the
 4  screen before we just took that break.
 5     Q.  Yes.
 6     A.  So that was a City Bar event and
 7  it was not very well attended because it
 8  was an absolutely miserable evening, such
 9  that I could see in the audience
10  Mr. Cardwell and a colleague of his.  At
11  the end of the panel, I went up to them
12  and thanked them for coming out on such a
13  miserable night and being there.  And I
14  said thank you for showing your support or
15  something like that.
16          And they said look, it's, you
17  know, something along the lines of, of
18  course, it's very important to us and we
19  should talk further and I said great, tell
20  you what, let's have dinner or something
21  like that.  And I think the dinner took
22  place about a month or two later.
23          MR. JEFFRIES:  I'd like to have
24     tab 14 moved into evidence, please.
25          VERITEXT CONCIERGE:  We're
```

Page 159

```
 1              REID
 2  currently looking at tab 14.
 3          MR. JEFFRIES:  Let's move to
 4     paragraph 9.
 5  BY MR. JEFFRIES:
 6     Q.  Now paragraph 9 reads as follows,
 7  correct, "A few months later in January
 8  2016, I approached Tom Reid, DPW managing
 9  partner, with an inquiry about whether the
10  firm would be willing to sponsor me to
11  attend a Black lawyer professional
12  development conference.  Unexpectedly,
13  Mr. Reid advised that I should not sign up
14  for the conference, despite my explanation
15  that such opportunities would foster
16  relationships between Black attorneys at
17  DPW and senior executives at Fortune 100
18  companies that could be leveraged for DPW
19  business in the future.  Mr. Reid
20  ultimately agreed to sponsor our
21  participation, but only after I and
22  another associate spent a considerable
23  amount of time explaining to him how this
24  would benefit us as Black associates.  In
25  that conversation, and prior to Mr. Reid
```

Page 160

```
 1              REID
 2  agreeing to sponsor our participation, we
 3  also explicitly raised the institutional
 4  bias that we, as Black associates, had
 5  experienced at DPW."
 6          So is the dinner that we are
 7  discussing at this point the meeting
 8  referenced in the paragraph that I just
 9  read?
10          MR. BIRENBOIM:  Objection to
11     form.  I don't see reference to a
12     meeting, but you can answer.
13          THE WITNESS:  The dinner was in
14     January 2016 I'm pretty sure, so
15     that's the best answer to your
16     question.
17  BY MR. JEFFRIES:
18     Q.  With respect to what I've just
19  read to you, the contents of January 2016,
20  do you remember discussing a conference at
21  the dinner?
22     A.  [REDACTED]
```

Page 161



```
 1              REID
 2     [REDACTED]
```

41 (Pages 158 - 161)



Page 162

1        REID
2        REDACTED

6    Q.  How long was that dinner?  How
7  long did you spend together?
8    A.  I didn't have a stopwatch on,
9  Mr. Jeffries, but it would have been about
10  a couple of hours.
11    Q.  So would it be fair to say that
12  aside from that conference, there were
13  other discussion points?
14    A.  Yes, yes.
15    Q.  I think you referenced it as a
16  very good dinner?
17    A.  It was a good discussion, yes.
18        REDACTED

Page 164

1        REID
2        REDACTED

24    Q.  Did you make any notes or memos
25  subsequent to this meeting with

Page 163

1        REID
2  REDACTED

Page 165

1        REID
2  Mr. Cardwell and the other associate?
3    A.  No.
4    Q.  So the recitation that you're
5  giving at this point in time is based off
6  of your recollection solely?
7    A.  Yes.
8        REDACTED

25    Q.  And I think you earlier mentioned

42 (Pages 162 - 165)

Page 166

REID

2 that that issue of being noticed in that
3 discussion, you drew some similarity
4 between that and the e-mail that we looked
5 at to Sharon Crane; is that right?
6    A.  The e-mail about introducing
7 yourself.
8    Q.  So it would be safe to say you
9 recognized that there's an element of
10 racial exclusion that that conversation is
11 founded upon; correct?
12       MR. BIRENBOIM:  Objection to
13    form, mischaracterizes the testimony.
14    You may answer.
15       THE WITNESS:  What I said was in
16    my testimony is that that issue of
17    being noticed is a, I think, issue of
18    social awkwardness among the kind of
19    people who become lawyers.
20 BY MR. JEFFRIES:
21    Q.  The issue of being noticed that
22 was being discussed was being discussed
23 within the context of race; correct?
24       MR. BIRENBOIM:  Objection to
25    form, mischaracterizes the testimony.

Page 167

REID

2    You may answer.
3       THE WITNESS:  They were raising
4    it in that context and I was saying
5    the context was much broader than
6    that.
7 BY MR. JEFFRIES:
8    Q.  I understand that there were two
9 different sides to it but it was a
10 conversation, irrespective of the parties'
11 sides within the conversation, about a
12 racial dynamic, would you agree?
13       MR. BIRENBOIM:  Objection to
14    form.
15       THE WITNESS:  The whole
16    discussion was about diversity in the
17    profession and race issues in society
18    at large.  I wanted to have our
19    associates know that I was accessible
20    on those issues and ready to talk.
21    And that's why I engaged with them.
22 BY MR. JEFFRIES:
23    Q.  And regarding his comments about
24 race, do you recall him talking about only
25 other law firms or were those

Page 168

REID

2 conversations about race within the
3 context of experiences at Davis Polk?
4       MR. BIRENBOIM:  Objection to
5    form.  You can answer if you have a
6    recollection, Mr. Reid, about any
7    distinction.
8       THE WITNESS:  I believe they were
9    put in the context of the profession
10    if not society at large.  That was the
11    nature of the discussion.  It only got
12    specific to them when I talked about
13    their performance reviews.
14 BY MR. JEFFRIES:
15    Q.  Aside from the part of the
16 conversation about performance reviews,
17 it's your testimony that the conversations
18 that were being had about diversity and
19 racial exclusion were not tied by them to
20 their experiences at Davis Polk during the
21 conversation?
22       MR. BIRENBOIM:  Asked and
23    answered, you may answer again.
24       THE WITNESS:  Yes, they were
25    talking about their experience.  They

Page 169

REID

2    had only worked at one law firm, Davis
3    Polk, and they said this is something
4    they hear from their Black colleagues
5    at other law firms.  It was a
6    conversation about society.  The legal
7    profession is part of society.  Davis
8    Polk is part of the legal profession.
9    So that's the context that needs to be
10    framed around this.
11 BY MR. JEFFRIES:
12    Q.  But what I'm hearing, and I just
13 want to make sure I'm hearing you say in
14 the correct way -- well, we're talking
15 about -- I want to make sure that we're on
16 the same page with respect to whether or
17 not any of the conversations that were
18 being had, specific comments by
19 Mr. Cardwell, were tied to his experiences
20 at Davis Polk as opposed to what I'm
21 hearing a bit from you about experiences
22 being echoed by associates, Black
23 associates at other law firms.
24    A.  I go back to my previous answer.
25 I think that's a slightly different

43 (Pages 166 - 169)

REID
1
2 formulation of your previous question and
3 I just would like to restate word for word
4 my previous answer.
5    Q.   To be clear, your previous
6 answer, the way I take it is that the
7 comments that Mr. Cardwell and Ms. Adams
8 made were general comments that had
9 relevance with respect to the general
10 experiences that Black associates were
11 having in the law profession; is that
12 correct?
13       MR. BIRENBOIM:  Objection -- Tom,
14    give me a second.  Objection to form,
15    mischaracterizes the witness's
16    testimony.  The testimony was what the
17    testimony was.
18 BY MR. JEFFRIES:
19    Q.   Please answer, Mr. Reid.
20    A.   I refer to my previous answer is
21 what I said.
22    Q.   So I'm processing your previous
23 answer and asking this question, sir.
24       Were any of the -- were the
25 comments made with respect to

REID
1
2 Mr. Cardwell -- were the comments made
3 from a position of Mr. Cardwell being
4 employed at Davis Polk and experiences
5 that he was personally experiencing at
6 Davis Polk?
7       MR. BIRENBOIM:  Objection to
8    form.  This is probably the fifth or
9    sixth time you've asked the same
10    question.  Asked and answered.  If you
11    have anything to add, Mr. Reid, you
12    may.
13       THE WITNESS:  No, I have nothing
14    to add.
15 BY MR. JEFFRIES:
16    Q.   And Sheila Adams was the other
17 associate present; correct?
18    A.   Correct.
19       MR. ADAMS:  Let's go to tab 15,
20    please.
21       (Exhibit 10, document Bates
22    labeled DPW_SDNY-000099794, marked for
23    identification.)
24 BY MR. JEFFRIES:
25    Q.   Just take a moment to review,

REID
1
2 sir.
3    A.   (Witness perusing document.)
4    Q.   Do you see that we are currently
5 viewing an e-mail exchange?
6    A.   Yes.
7    Q.   Would you agree that it's an
8 e-mail from Mr. Cardwell -- this includes
9 an e-mail from Mr. Cardwell and Ms. Adams?
10    A.   Yes.
11       MR. BIRENBOIM:  I think that
12    mischaracterizes the top e-mail.  I
13    don't know which e-mail we're looking
14    at.
15       MR. JEFFRIES:  I want us to focus
16    on the top e-mail.
17       MR. BIRENBOIM:  Just for the
18    record, I want to note the top e-mail
19    appears to be an e-mail from Ms. Adams
20    to Ms. Adams, not to Mr. Cardwell.
21 BY MR. JEFFRIES:
22    Q.   Now I just want you to note the
23 date of that e-mail, that top e-mail.
24    A.   January 20th, yeah.
25    Q.   Yes, January 20th.  And the date

REID
1
2 of the dinner was on or around January 20,
3 2016; correct?
4    A.   I think that's right.
5    Q.   And were any of these topics,
6 topics that are listed in this e-mail,
7 discussed at the dinner between yourself,
8 Mr. Cardwell and Ms. Adams?
9    A.   I don't -- I recall generally the
10 first bullet point, competitive
11 challenges.  I discuss -- I do recall
12 specifically the second bullet point as I
13 see it here, what makes a good partner.  I
14 don't recall the late bloomer thing
15 discussion.  I absolutely do not recall
16 the next bullet, the racialized reviews
17 and I do recall discussing the last point.
18 That's when I talked about the
19 presentations we have at annual meetings.
20    Q.   So just turning to these last few
21 right here, this one here, some associates
22 have received arguably gendered and/or
23 racialized reviews; who, if anyone, is
24 serving as the gut-check in the review
25 process to pick up on these comments and

Page 178

REID

1
2 the dinner or shortly.  It may have been
3 that the idea was I would get back to them
4 after the dinner.  If that was the idea,
5 that's the only work stream as you call it
6 that was agreed.
7        MR. JEFFRIES:  Okay, let's go off
8    for a moment.
9        (Lunch recess taken at 1:35 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 179

REID

1
2    A F T E R N O O N   S E S S I O N
3       (Time noted:  2:17 p.m.)
4 T H O M A S   R E I D,  resumed and
5    testified as follows:
6 CONTINUED EXAMINATION
7 BY MR. JEFFRIES:
8    Q.  Let's go back on, please.
9        So Mr. Reid, prior to the break,
10 we were discussing a meeting, a dinner
11 rather, from January of 2016.  And, in
12 fact --
13        MR. JEFFRIES:  Zach, can you move
14    in tab 16 at this time, please?
15        (Exhibit 11, document Bates
16    labeled DPW_SDNY-000143444, marked for
17    identification.)
18 BY MR. JEFFRIES:
19    Q.  Okay.  Please take a moment to
20 review this document, Mr. Reid.
21        Now you'll note that this
22 document is the same as the last one that
23 we were looking at before the break.
24    A.  Almost.
25    Q.  Well, what I do want to point out

Page 180

REID

1
2 is that in this document, it is indicated
3 that the sender is Sheila Adams and the
4 recipient is Kaloma Cardwell.  And so to
5 the extent that -- in recognition of your
6 careful analysis with respect to this
7 exhibit, would you agree that there are
8 similarities between the topics in this
9 e-mail and the last one that we looked at?
10    A.  Yes.
11    Q.  And would you further agree that
12 this e-mail contains topics or a list of
13 topics that are organized in a fashion
14 that would allow them to be discussed
15 topically at a later date?
16        MR. BIRENBOIM:  Objection to
17    form, no foundation.  You may answer.
18        THE WITNESS:  I actually don't
19    know what you're asking, sorry,
20    Mr. Jeffries.  This looks like the
21    same words but I can't tell you word
22    for word.  It purports at the
23    beginning to be agenda thoughts, so I
24    don't know whether they are still --
25    the two lawyers here are still going

Page 181

REID

1
2 and framing the agenda.  What caught
3 my eye was the format's different.
4 The last one had a gap between the
5 third and the fourth bullet.
6 BY MR. JEFFRIES:
7    Q.  Let's take this down.  Mr. Reid,
8 with respect to the dinner in January of
9 2016 involving Mr. Cardwell, yourself and
10 Ms. Adams, did you speak to anyone about
11 that dinner?
12        REDACTED
13
14
15
16
17
18    Q.  Do you recall speaking to Sharon
19 Crane about anything related to your
20 dinner with Mr. Cardwell?
21    A.  I may have said I was having it
22 or had it but I don't recall discussing
23 the content except perhaps the conference,
24 request to go to the conference --
25    Q.  Did you speak with -- at this

46 (Pages 178 - 181)

Page 182

REID

2 time, would it have been typical for you
3 to meet with associates for dinner?
4     A.  Yes.  Again, I recall the article
5 about the New York City Bar panel I
6 attended.  REDACTED

And I met with a
10 number of different associates in
11 different groups over the years I was
12 managing partner.
13     Q.  Now, with respect to what you
14 said to Ms. Crane about the dinner, what
15 did you tell her?
16     A.  I don't recall if I did tell her
17 much of anything other than it was
18 happening or had happened already and also
19 mentioning the conference permission that
20 I had given either at this dinner or after
21 the dinner, and again I don't recall when
22 it was I changed my mind to give them
23 permission to go to the conference.
24     Q.  Would you have brought up the
25 conversation about performance reviews?

Page 183

REID

2     MR. BIRENBOIM:  Objection to
3 form, calls for speculation.  You can
4 testify to what you recall.
5     THE WITNESS:  I don't recall
6 talking with Sharon Crane about the
7 summary of their prior reviews that I
8 gave them at the dinner.
9 BY MR. JEFFRIES:
10     Q.  Well, you do recall talking with
11 them -- and when I say them, I mean
12 Mr. Cardwell and Ms. Adams -- about their
13 reviews at the dinner; correct?
14     A.  Yes.
15     Q.  What feedback did you give
16 Mr. Cardwell about his performance at the
17 dinner?
18     A.  I picked out for him a couple of
19 points that leapt out at me when I
20 reviewed his folder before going to the
21 dinner and they had to do with timeliness
22 and also had to do with setting
23 expectations for what he could and
24 couldn't do within a particular time
25 period.

Page 184

REID

2     Q.  And so just for the record,
3 Mr. Reid, I'll note that it does appear
4 that there have been times when you have
5 been distracted to some degree by your
6 phone and I would ask that if that is
7 indeed the case, that to the extent
8 possible you avoid checking your phone or
9 looking at the phone --
10     A.  Mr. Jeffries, who are you
11 referring this question to?
12     Q.  I'm just referring the question
13 to you, Mr. Reid.
14     A.  No, my phone has been turned off.
15 The only device that has been active for
16 the entire time is the computer or the
17 laptop that I'm doing this videoconference
18 on now.  You can check my phone records.
19 The devices have not been active from the
20 minute this started.
21     Q.  It's not an issue, Mr. Reid.  I
22 think --
23     A.  It's not an issue because it's
24 not a fact.
25     Q.  Well, then let's continue.

Page 185

REID

2     Mr. Reid, did you speak to Renee
3 DeSantis about the dinner that
4 Mr. Cardwell and Ms. Adams had attended?
5     A.  I don't recall any discussion
6 with her about the dinner at all.
7     Q.  Did you speak with Mr. Bick about
8 the dinner with Mr. Cardwell and
9 Ms. Adams?
10     A.  I don't recall but with John,
11 like with Sharon reflecting their
12 seniority, I may have mentioned I was
13 having dinner or had dinner.
14     Q.  Did you speak with Mr. Chudd
15 about anything related to your dinner with
16 Mr. Cardwell and Ms. Adams?
17     A.  No.
18     Q.  Did you speak with Ms. Hudson
19 about anything related to your dinner with
20 Mr. Cardwell and Ms. Adams?
21     A.  No, I don't believe so.  No
22 recollection.
23     Q.  Mr. Reid, is there anything about
24 Mr. Cardwell's performance that you told
25 him about during the dinner that you

47 (Pages 182 - 185)

Page 186

```
 1              REID
 2 didn't mention today?
 3     A.  I don't think so.  As I said, I
 4 didn't want to read him his whole review
 5 folder.  The reviews were being given in
 6 front of another associate and I asked are
 7 you both happy for me to give you a little
 8 synthesis, a short synthesis about the
 9 folder I had seen.  But I think it was
10 punctuality or timeliness and setting
11 expectations up front with the people he
12 was working for.
13     Q.  Picking up on that particular --
14 withdrawn.
15         You didn't say anything to
16 Mr. Cardwell about him being a poor
17 performer; correct?
18         MR. BIRENBOIM:  Objection to
19     form.  You can answer.
20              REDACTED
```

REDACTED

Page 187

```
 1              REID
 2 REDACTED
 3 BY MR. JEFFRIES:
 4     Q.  Did you say anything about him
 5 being behind?
 6     A.  I don't think so.
 7     Q.  Did you say anything about him
 8 receiving negative reviews?
 9     A.  I said what I saw in your review
10 folder were these points.  It was --
11 remember, this was his first ever set of
12 reviews.  He'd been at the firm barely a
13 year and that was the context in which I
14 said these are issues for a young lawyer,
15 they need to be fixed but are fixable with
16 the right application.
17     Q.  And based on what you said
18 earlier, this was during a conversation
19 when he told you that he could receive
20 tough feedback; is that correct?
21     A.  Yes, he said -- yes.  In fact,
22 the review summaries came as part of an
23 expression of hope that they could get
24 more feedback.  It was not just
25 Mr. Cardwell but Ms. Adams as well said
```

Page 188

```
 1              REID
 2 they would appreciate more feedback.  And
 3 in that context, Mr. Cardwell said that he
 4 was used to getting -- I think he said
 5 something like I've played for a lot of
 6 tough coaches in my career and I can take
 7 and learn from tough feedback.
 8         MR. JEFFRIES:  Can we move in tab
 9     10, Zach?  Thank you.
10         (Exhibit 12, document Bates
11     labeled DPW_SDNY-000099560, marked for
12     identification.)
13 BY MR. JEFFRIES:
14     Q.  Mr. Reid, do you see the e-mail
15 from Rocio Clausen and Carolina Fenner to
16 Mr. Cardwell on September 8, 2016?
17     A.  Yes.
18     Q.  Do you see where the e-mail
19 states, "I hope you are well.  Would you
20 be able to assist the credit group (mainly
21 JW Perry and Frank Manley) with some KYC,
22 organizational materials, resolutions,
23 certificates, et cetera for a REDACTED
24 deal closing later this month"?
25         Do you see that?
```

Page 189

```
 1              REID
 2     A.  Yes.
 3         MR. JEFFRIES:  I'd like to take
 4     this down and have tab 11 put in,
 5     please.
 6         (Exhibit 13, document Bates
 7     labeled DPW_SDNY-000140832, marked for
 8     identification.)
 9 BY MR. JEFFRIES:
10     Q.  Mr. Reid, please take a moment to
11 look at this.
12     A.  Um-hum.
13     Q.  Do you see that this is an e-mail
14 from Rocio Clausen?
15     A.  No, it's Sharon Crane.
16     Q.  Correct.  Thank you.  Do you see
17 this is an e-mail from Sharon Crane to
18 Renee DeSantis on September 9, 2016 at
19 11:49 a.m.?
20     A.  Yes.
21     Q.  Do you see where the e-mail
22 states, "If you talk to John today about
23 the other stuff, please mention Kaloma.
24 As discussed he needs to be someone's
25 project as soon as possible, i.e., get
```

48 (Pages 186 - 189)

Page 190

REID

1          REID
2  work and hours and direct feedback.  Given
3  his conversation with Rocio, I don't think
4  it makes sense to wait to implement
5  sometime in January after review season."
6          Do you see that language, sir?
7      A.  Yes, I do.
8      Q.  In this e-mail, does John refer
9  to John Bick?
10         MR. BIRENBOIM:  Objection to
11     form.  You've not established he's
12     ever seen this e-mail.
13         THE WITNESS:  I've never seen the
14     e-mail and therefore do not know which
15     John it is.
16  BY MR. JEFFRIES:
17     Q.  During Mr. Cardwell's employment,
18  did you hear anything about Mr. Cardwell
19  being asked to work on a credit assignment
20  while he was in M&A?
21     A.  No.
22     Q.  During Mr. Cardwell's employment,
23  did you ever hear anything about
24  Mr. Cardwell meeting with a staffing
25  coordinator?

Page 191

1          REID
2      A.  No.
3          REDACTED

12         MR. BIRENBOIM:  Objection to
13     form.  You can answer to the extent
14     you have any knowledge.
15         THE WITNESS:  No knowledge.
16  BY MR. JEFFRIES:
17     Q.  Do you have any reason to believe
18  that during Mr. Cardwell's employment,
19  Mr. Cardwell questioned whether a credit
20  assignment was connected to race or bias,
21  was connected to his race or bias?
22         MR. BIRENBOIM:  Objection to
23     form.  You can answer.
24         THE WITNESS:  No.
25  ///

Page 192

1          REID
2  BY MR. JEFFRIES:
3      Q.  Do you have any reason to believe
4  -- during Mr. Cardwell's employment, do
5  you have any reason to believe that anyone
6  said anything about Mr. Cardwell
7  questioning whether his assignments were
8  connected to race or bias?
9          MR. BIRENBOIM:  Objection to
10     form, no foundation.  You can answer
11     if you know.
12         THE WITNESS:  No.
13  BY MR. JEFFRIES:
14     Q.  So it's your testimony that
15  during Mr. Cardwell's employment, you
16  never heard any comments about
17  Mr. Cardwell complaining about his
18  staffing?
19     A.  That's correct.
20     Q.  Not even from Mr. Cardwell
21  himself?
22     A.  Oh, until the late March meeting,
23  that was the first time.  March 2017.
24     Q.  So that March 2017 meeting was
25  the first time that you had ever heard any

Page 193

1          REID
2  complaint -- that you ever heard that
3  Mr. Cardwell had any complaints about his
4  staffing while at the firm?
5      A.  Correct, including at the first
6  meeting where I said I noticed his hours
7  were very low.  He said nothing about it
8  then.
9      Q.  Well, you did tell him that you
10  would get the hours fixed; correct?
11     A.  At the first meeting in March
12  with Sharon Katz, I said I was going to
13  look into it as to why the hours were so
14  low and get back to him.
15     Q.  And you also told him that his
16  low hours weren't his fault; correct?
17         MR. BIRENBOIM:  Objection to
18     form, mischaracterizes the testimony.
19         THE WITNESS:  No, I said I
20     noticed his hours were low and I was
21     going to look into it and get back to
22     him.  And I don't recall what he said
23     in response.  I don't think he said
24     much in response and that was the end
25     of that meeting, which was the one

49 (Pages 190 - 193)

Page 194

REID

1           REID
2     about the pro bono program conflict.
3  BY MR. JEFFRIES:
4     Q.   Did you tell him his hours were
5  because of his performance?
6     A.   That was at the second March
7  meeting.
8     Q.   Did you tell him that his hours
9  were because of his performance reviews?
10       MR. BIRENBOIM:  Objection to
11    form.  What meeting are we talking
12    about or are you asking for any time?
13       MR. JEFFRIES:  The first meeting.
14       THE WITNESS:  The first meeting,
15    no.  The first March 2017 meeting, no.
16    The second March 2017 meeting, yes.
17  BY MR. JEFFRIES:
18    Q.   Do you have any reason to believe
19  that sometime in 2016, someone talked to
20  Mr. Bick about Mr. Cardwell's comments
21  about being staffed on a credit
22  assignment?
23       MR. BIRENBOIM:  Objection to
24    form, calls for speculation.  You can
25    answer.

Page 195

REID

1           REID
2       THE WITNESS:  I don't recall any
3    awareness of that.
4  BY MR. JEFFRIES:
5     Q.   Do you have any reason to believe
6  that sometime in 2016, someone talked to
7  you about -- well, do you have reason to
8  believe that in 2016, someone talked to
9  Mr. Chudd about Mr. Cardwell's comments
10  about being staffed on a credit
11  assignment?
12       MR. BIRENBOIM:  Same objection.
13    You can answer if you have any
14    knowledge.
15       THE WITNESS:  Same answer.  No
16    knowledge.
17  BY MR. JEFFRIES:
18    Q.   Do you have any reason to believe
19  that sometime in 2016, someone talked to
20  Brian Wolfe about Mr. Cardwell's comments
21  about being staffed on a credit
22  assignment?
23       MR. BIRENBOIM:  Same objection.
24       THE WITNESS:  Same answer.
25  ///

Page 196

REID

1           REID
2  BY MR. JEFFRIES:
3     Q.   And that answer is?
4     A.   I have no knowledge.
5     Q.   Do you have any reason to believe
6  that sometime in 2016, someone talked to
7  Mr. Wolfe about Mr. Cardwell's comments
8  about being staffed on a credit
9  assignment?
10       MR. BIRENBOIM:  Objection to
11    form.
12       THE WITNESS:  No knowledge.
13  BY MR. JEFFRIES:
14    Q.   Around September and October of
15  2016, did you participate in any other
16  discussions that were about Mr. Cardwell
17  and about how he was being staffed at the
18  firm?
19    A.   I don't recall any.
20    Q.   So Mr. Reid, what's the earliest
21  that you heard anything about Mr. Cardwell
22  making comments related to how he believed
23  his race was impacting his assignments or
24  hours or evaluations?
25       MR. BIRENBOIM:  Objection to

Page 197

REID

1           REID
2    form, assumes facts not in evidence.
3    You can say what you recall, if
4    anything.
5       THE WITNESS:  What I recall is
6    the conversation at the second March
7    2017 meeting was the first time that
8    he made a specific claim about his
9    career being affected by race.
10  BY MR. JEFFRIES:
11    Q.   So let's get back to the exhibit
12  that's on the screen at this time.
13    A.   Yes.
14    Q.   Mr. Reid, do you see where it
15  says, "Kaloma needs to be someone's
16  project as soon as possible, i.e., get
17  work and hours and direct feedback," do
18  you see that?
19    A.   Yes.
20    Q.   During Mr. Cardwell's employment,
21  did you hear anyone describe Mr. Cardwell
22  as a project?
23    A.   No.  No.
24    Q.   During Mr. Cardwell's employment
25  -- well, have you ever heard anyone

50 (Pages 194 - 197)



Page 214

REID

1
2    A.  I think there had been one or two
3   requests in the past that has been
4   answered the same way but I couldn't tell
5   you when or which associate.  Sometimes it
6   was an academic discussion.  Sometimes it
7   was a discussion purely theoretically of I
8   had to do reviews and should the reviewed
9   person get to see what was written down,
10  discussed, as I said in a totally academic
11  context.
12     Q.  What was your understanding of
13  why Mr. Cardwell was not allowed to see at
14  all his reviews?
15     MR. BIRENBOIM:  Objection to
16  form.  I think he answered that
17  question.  You can answer it again.
18     THE WITNESS:  To comply with --
19  exactly, same answer as before, to
20  comply with the policy.
21 BY MR. JEFFRIES:
22     Q.  We've spoken about a meeting in
23  March of 2017 between yourself and
24  Mr. Cardwell throughout the day; correct?
25     MR. BIRENBOIM:  Objection.

Page 215

REID

1
2    THE WITNESS:  There were a few
3   meetings.
4  BY MR. JEFFRIES:
5    Q.  I want to turn to the second
6   meeting at this point in time.
7    A.  Um-hum.
8   REDACTED

16    Q.  Why did that meeting take place?
17    A.  That's the connection to the
18  first March meeting where we discussed the
19  for-profit prison group and the fact that
20  they were a former client.  And we then
21  went on to talk about a broad-ranging
22  discussion, for-profit prisons generally,
23  actually, and the Ava DuVernay movie that
24  was released around that time, 13th.
25     And at the very end of the

Page 216

REID

1
2   meeting as we were literally breaking up,
3   REDACTED

8   And that's why we had that meeting on
9   March 29th.
10     Q.  So the meeting on March 29th was
11  the follow-up as you indicated?
12     A.  Yes.
13   REDACTED

Page 217

REID

1
2   REDACTED

23     Q.  During that meeting, you
24  indicated that Mr. Cardwell's lack of work
25  in the previous few months was related to

55 (Pages 214 - 217)

Page 218

REID

2 his performance?
3 [REDACTED]

8    Q.   And it's your testimony --
9    A.   Based on the quality of his work
10 as reflected in the performance reviews,
11 for not one but two years now.
12    Q.   And you had reviewed those
13 performance reviews prior to the meeting;
14 correct?
15    A.   Yes.
16    Q.   And it was your assessment that
17 the performance reviews that you reviewed
18 justified him not receiving any work for
19 the series of months leading up to that
20 meeting?
21    A.   It was a cause and effect
22 explanation.  I wouldn't use a term like
23 justification.  It was a cause and effect
24 explanation.
25    Q.   Were there any other causes?

Page 219

REID

2    A.   Not that I could discern.
3    Q.   Were there any other causes that
4 anyone would be able to attribute to the
5 lack of work that Mr. Cardwell was
6 receiving leading up to that meeting?
7    MR. BIRENBOIM:  Objection to
8    form.  If you understand the question,
9    you can answer.
10    THE WITNESS:  I can tell you I
11    was unable to discern any cause for
12    his lack of work other than two years
13    of poor performance.
14 BY MR. JEFFRIES:
15    Q.   What was Mr. Cardwell's reaction
16 to your comments?
17    A.   Well, it was surprising.  When he
18 was a summer associate, at the January
19 2016 dinner with him and Ms. Adams, on
20 both those occasions he had been quite
21 emphatic with me that he had learned from
22 tough feedback in the past and tough
23 coaches and that he could take it, that he
24 could learn from it.
25    But he continued to say that we

Page 220

REID

2 were exaggerating this typographical
3 error, as he saw it.  I said I was
4 disappointed that he was not living up to
5 what he said he could do before, which is
6 take tough feedback.  And I said I was
7 also disappointed that I had had to come
8 to him.  I had had to raise the issue with
9 him at the previous meeting in March, and
10 I didn't understand why he wasn't being --
11 he'd shown his willingness to introduce
12 himself to me, to come to dinner with me.
13 I didn't understand why he was being more
14 proactive about managing his career.
15    And I reminded him at the January
16 dinner, that I'd said this job is tough
17 and you've got to really lean in and get
18 through some tough times and adversity and
19 you're not doing it.
20    Q.   So what did Mr. Cardwell say to
21 you during the meeting?
22    A.   Well, as I mentioned, he
23 basically wanted to dismiss the one
24 particular performance episode as a typo.
25 It wasn't that, it was more than that.

Page 221

REID

2 When I said to him that -- when I reminded
3 him of the I can take tough feedback
4 affirmations that he had made to me twice
5 before and that I didn't think he was
6 living up to that, and that this meeting
7 was about tough feedback and about
8 managing his career, he then started to
9 assert that the reason he wasn't getting
10 work was because he had been, a word he
11 then started to use, repeat several times,
12 he had been racialized.
13    Q.   Did he ask you any questions?
14    A.   He -- after he said I believe
15 I've been racialized, I had previously
16 said to him that a mistake we Davis Polk
17 partners had made was in not giving him
18 this tough feedback hot on the heels of
19 his annual review at the end of the
20 previous year.
21    And instead, what had happened
22 was several months of inactivity had gone
23 by.  I said we should have been on it
24 then, we should have been having a
25 conversation like this then, and we should

56 (Pages 218 - 221)

1          REID
2 have been structuring a program of mixed
3 assignments with different -- mixed
4 partners who were good teachers.  And I
5 said look, this is tough feedback but it's
6 not like you've been inactive for any more
7 than three or four months.
8          You're hopefully going to have a
9 long career and we'll recover these three
10 or four months, if you're the same
11 Mr. Cardwell that I remember with the
12 impressive ambition from your summer
13 associate days and from as recently as
14 January 2016.
15    Q.   Did you say a mistake was made or
16 did you tell him that the mistake was that
17 you didn't give him tough feedback?
18    A.   I said the mistake was made that
19 we hadn't sat down with him and had the
20 conversation that said ███ REDACTED ███
██████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████
██████████████████ We had not sat down, put it

1          REID
2 in those stark terms and then begun a
3 period of trying to turn it around.
4    Q.   What review are you referring to?
5    A.   The annual reviews drawn the year
6 before which were built on top of concerns
7 raised in his first set of reviews at the
8 end of 2015.
9    Q.   Okay.  So just to be clear, I'm
10 hearing reviews; correct?
11    A.   Um-hum.
12    Q.   All right.  So the annual review
13 from the year before and so we're talking
14 about reviews from which years?
15    A.   Late 2015 and '16.
16    Q.   So the reviews from 2015?
17    A.   And '16.
18    Q.   And 2016.  Did Mr. Cardwell ask
19 if he could be allowed to meet with
20 Mr. Bick to discuss the issues that he
21 puts out?
22    A.   He asked for that in the context
23 of I believe my hours have to do with my
24 race, not my performance and I'd like to
25 talk to John Bick about that.

1          REID
2    Q.   And what was your response?
3    A.   That I said that I believed
4 having read the reviews and asked some
5 questions of partners who'd worked with
6 him in the time since our last meeting at
7 the beginning of March, that I was quite
8 convinced that his lack of activity was a
9 direct cause of his poor performance,
10 which was now given two years had passed,
11 several people had worked with him, was
12 quite widely known.  The poor performance
13 was quite widely known.
14    Q.   If that was his concern, did you
15 tell him the firm would allow him to have
16 the conversation he requested to have with
17 Mr. Bick?
18    A.   No, I said I thought it was
19 pointless and what we needed to do was to
20 fill the gap created by three or four
21 months of inactivity by getting him that
22 mixed diet of work with partners that I
23 knew were good teachers and that would
24 give him the best shot of rehabilitation
25 because it was going to involve going over

1          REID
2 some pretty junior basic skills.
3    Q.   So just to be clear, and based
4 off of the answers you've just given, your
5 testimony is that an associate made a
6 discrimination complaint and you told him
7 his complaint was pointless?
8         MR. BIRENBOIM:  Objection to
9    form, completely mischaracterizes the
10    testimony and I think intentionally.
11    Mr. Reid, you may answer.  You know
12    that wasn't what he said,
13    Mr. Jeffries.
14         MR. JEFFRIES:  Again,
15    Mr. Birenboim --
16         MR. BIRENBOIM:  No, I'm not going
17    to tolerate that kind of misbehavior
18    from a member of the Bar.  You should
19    not intentionally misstate testimony.
20    You can answer, Mr. Reid.
21         MR. JEFFRIES:  This in no way
22    approximates anything that would be
23    considered distorting the testimony.
24    It's my examination of this witness
25    with respect to a specific issue and

57 (Pages 222 - 225)

Page 226

```
           REID
1
2    if it doesn't comport with what you
3    believe should be the tactics taken,
4    then you have your remedies and there
5    will be an examination of the record.
6    But I'm going to ask for the second
7    time now that you make succinct
8    objections.
9        Madam Reporter, can you read the
10   question back?
11       (Record read.)
12       THE WITNESS:  Incorrect.
13       MR. BIRENBOIM:  Objection,
14   completely mischaracterizes the
15   testimony.  You may answer.
16       THE WITNESS:  It's an
17   incorrect -- the question distorts my
18   previous answer.
19   BY MR. JEFFRIES:
20   Q.  Mr. Reid, did Mr. Cardwell tell
21   you that he believed the staffing was due
22   to his race?
23   A.  Yes.
24   Q.  And so that's a racial complaint;
25   correct?
```

Page 227

```
           REID
1
2    A.  Yes.
3        MR. BIRENBOIM:  Objection to
4    form.  You may answer.
5    BY MR. JEFFRIES:
6    Q.  When I asked you whether or
7    not -- and when we spoke about the fact
8    that Mr. Cardwell wanted to speak to
9    Mr. Bick because he believed that his
10   staffing was related to his race, the
11   answer to that question previous was that
12   you believed it was pointless; correct?
13   A.  I believed the conversation with
14   Mr. Bick was pointless.  I did not tell
15   him the complaint was pointless and unlike
16   the general discussion we had about race
17   in society in January 2016, unlike the
18   conversation we had about race and
19   incarceration issues just a few weeks
20   previously, I realized this was a very
21   different kind of conversation, and this
22   was not a pointless complaint and needed
23   to be reported by me to the other members
24   of the management committee and to our
25   internal counsel, I believe.
```

Page 228

```
           REID
1
2    Q.  And is that what you did?
3    A.  I believe I did.
4    Q.  What's the basis of your belief
5    you reported this to either the management
6    committee or internal counsel?
7    A.  I recall discussions about the
8    meeting shortly in the days that followed.
9    Q.  Well, was there any kind of memo
10   that you made in regards to the meeting
11   that we're discussing with Mr. Cardwell?
12   A.  No, there were two things I did.
13   I wanted folks to know that that specific
14   complaint, to my knowledge, the first from
15   him had been made, and I also wanted to
16   get on without any interference with the
17   other thing that I had spoken to
18   Mr. Cardwell about, which was getting him
19   work, getting him busy and getting him
20   rehabilitated in terms of his performance.
21   Q.  So did you send any e-mails to
22   the management committee about the --
23   A.  I don't recall.
24   Q.  Did you send any e-mails to
25   Sharon Crane about the meeting that you
```

Page 229

```
           REID
1
2    just had with Mr. Cardwell?
3    A.  I don't recall e-mails but I may
4    well have communicated to her the
5    substance of his complaint.
6    Q.  Did you write down in any way the
7    details about the complaint that
8    Mr. Cardwell had made to you?
9    A.  I don't recall.  It wasn't a
10   complex complaint.
11   Q.  Right.  I agree.  And so my
12   question to you, especially in light of
13   how it wasn't a complicated complaint, I'm
14   struggling to understand why it wasn't
15   reduced to writing of some sort.
16   A.  Because --
17       MR. BIRENBOIM:  Objection,
18   argumentative.  Just testify to the
19   facts, Mr. Reid.
20       THE WITNESS:  It can be reported
21   orally and that's what I did.
22   BY MR. JEFFRIES:
23   Q.  So your testimony is you reported
24   this complaint orally and that's it; is
25   that correct?
```

58 (Pages 226 - 229)

Page 230

REID

1
2    A.  I believe that's right.  I don't
3  recall writing any e-mails about it.  I
4  may have done but I believe it was
5  straightforward enough it could just be
6  reported out orally.
7    Q.  And did this complaint trigger an
8  investigation?
9    A.  We'd already done -- there had
10  already been work that I had done looking
11  at his review folders to make sure the
12  comments that were so adverse were
13  specific enough as to make me comfortable
14  that they were not driven by conscious or
15  unconscious bias.  I believe I asked
16  internal counsel or Sharon Crane --
17    MR. BIRENBOIM:  I'm going to
18  caution the witness not to disclose
19  conversations with counsel.  You can
20  testify generally if you spoke to
21  counsel and the subject matter.
22    THE WITNESS:  So I did speak to
23  them and I think it would have been
24  with a view to making sure that we
25  were not missing anything here and

Page 231

REID

1
2  that the facts from the review
3  folders, which were quite clear, were
4  the facts and the only facts.
5  BY MR. JEFFRIES:
6    Q.  So that we're on the same page,
7  you understand the difference between an
8  investigation into performance and an
9  investigation into a racial complaint,
10  correct, Mr. Reid?
11    MR. BIRENBOIM:  Objection to
12  form.
13    MR. JEFFRIES:  I'm sorry, I
14  didn't hear your answer.
15    MR. BIRENBOIM:  You may answer if
16  you understand it different.
17    THE WITNESS:  They are two
18  different topics so they are two
19  different investigations.
20  BY MR. JEFFRIES:
21    Q.  Right.  And so in your previous
22  answer, you discussed a focus that you had
23  on his performance going into that
24  meeting; correct?
25    A.  What I said in my previous answer

Page 232

REID

1
2  was that I looked at his review folders
3  going into the meeting and had seen that
4  the comments that were adverse regarding
5  his performance were quite specific.
6    Q.  So now I'm asking you about the
7  comment that Mr. Cardwell made with
8  respect to his belief that there was
9  racial -- there was a racial reason
10  related to his lack of work.  And I'm
11  asking you whether the firm conducted an
12  investigation into that complaint.
13    MR. BIRENBOIM:  You can answer
14  that yes or no, Mr. Reid.  Just don't
15  disclose conversations --
16    THE WITNESS:  I was actually
17  trying to keep a thread on your
18  question.  Can you repeat it, please?
19  BY MR. JEFFRIES:
20    Q.  Sure.
21    Did the firm conduct an
22  investigation into Mr. Cardwell's
23  discrimination complaint?
24    A.  It was looked into, I believe.
25    Q.  What's your basis for that

Page 233

REID

1
2  belief?
3    A.  There were a number of people who
4  had -- who were -- who this was reported
5  to.  And in their follow-up, which I left
6  them to do, I would imagine they would
7  make sure themselves that there had been
8  no racial bias at work in his performance
9  reviews.  Again, what I would have been
10  worried by is reviews that said
11  Mr. Cardwell doesn't seem to get it,
12  Mr. Cardwell doesn't really fit in the M&A
13  practice, qualitative, vague reviews like
14  that.  That is not what I saw.  What I saw
15  were very specific, with examples,
16  problems.
17    Q.  To be clear, Mr. Reid, you
18  conflated your assessment of
19  Mr. Cardwell's performance reviews into an
20  analysis of Mr. Cardwell's racial
21  complaint.  And so --
22    A.  No, no, that's not what I said.
23    Q.  Okay.  We'll fix this now.
24    My question to you to be quite
25  clear is whether or not an investigation

59 (Pages 230 - 233)

Page 234

REID

1
2 was conducted or not.
3      MR. BIRENBOIM:  Objection, asked
4   and answered.  If you have anything to
5   add you can add.
6      THE WITNESS:  Nothing to add.
7 BY MR. JEFFRIES:
8   Q.  Well, I need your answer.  Is
9 your answer yes or no as to whether or not
10 a complaint, the complaint was
11 investigated?
12      MR. BIRENBOIM:  Asked and
13   answered again, Mr. Reid.
14      THE WITNESS:  Nothing to add
15   beyond the answer.  If you want to
16   have it read out again so you can
17   remind yourself of what it was, that's
18   fine.
19 BY MR. JEFFRIES:
20   Q.  That's not the way it goes,
21 Mr. Reid.  Respectfully, I would ask that
22 you -- irrespective of how you feel about
23 the amount of time we're spending on this
24 issue, I ask for your answer in regards to
25 whether or not you have knowledge of an

Page 235

REID

1
2 investigation taking place because of
3 Mr. Cardwell's complaint to you, yes or
4 no.
5   A.  I believe the answer is that it
6 was considered in the context of the
7 reaction to what he accused the firm of at
8 the meeting I had with him.  I did not
9 play a specific role in that, other than
10 to satisfy myself personally that the
11 reviews were substantiated with specific
12 examples of extremely poor performance.
13   Q.  So does that in some way relate
14 to the fact -- or does that in some way
15 relate to whether or not Mr. Cardwell's
16 complaint was deemed to have merit by the
17 firm?
18      MR. BIRENBOIM:  Objection to
19   form, mischaracterizes the testimony.
20      MR. JEFFRIES:  My question --
21      MR. BIRENBOIM:  And Mr. Reid, you
22   should not disclose any conversations
23   with counsel.
24      THE WITNESS:  All I'm disclosing
25   is what I did personally which was in

Page 236

REID

1
2   the review of the folders, my
3   assessment of the review folders, I
4   was alert to making sure that the
5   criticisms were concrete, specific,
6   substantiated by examples.
7 BY MR. JEFFRIES:
8   Q.  You were the managing partner at
9 this time and you had reviewed
10 Mr. Cardwell's files.  In your assessment
11 at that time, did you believe that
12 Mr. Cardwell had made a racial
13 discrimination complaint that had merit
14 enough to be reported to the firm?
15      MR. BIRENBOIM:  Objection to
16   form.  You may answer, Mr. Reid, if
17   you can.
18      THE WITNESS:  I mean your
19   question talks about my review of his
20   folders and then you talk about his
21   racial complaints.
22 BY MR. JEFFRIES:
23   Q.  That's what your answers have
24 been doing, Mr. Reid.
25   A.  No, they are entirely

Page 237

REID

1
2 unconnected.
3   Q.  Well, they have been connected
4 for the past five minutes.
5   A.  You talked of his complaint.
6 What I was looking for was to make sure
7 the reviews had been done carefully with
8 specific examples of poor performance.
9 They had.  REDACTED

20   Q.  And you went and evaluated his
21 performance reviews; correct?
22   A.  Yes.
23   Q.  What was that treatment about --
24   A.  When you say treatment, what do
25 you mean?

60 (Pages 234 - 237)

REID

1
2        MR. BIRENBOIM:  Objection -- you
3    need to give counsel time to object if
4    there's an objection.
5  BY MR. JEFFRIES:
6     Q.  The treatment I'm talking about
7  is the performance reviews, the
8  negative -- withdrawn.
9        You said Mr. Cardwell complained
10 about treatment; correct?
11       MR. BIRENBOIM:  Objection to
12   form.  You may answer, Mr. Reid, if
13   you have anything to add.
14       THE WITNESS:  I have nothing to
15   add to what I said before, which is he
16   complained that he had been racialized
17   after I and Mr. Kreynin had given him
18   examples of why his performance was
19   suffering badly.
20 BY MR. JEFFRIES:
21    Q.  What is the conduct that he was
22 complaining about, Mr. Reid?
23    A.  I think he was linking the
24 racialization to the fact that he had had
25 no work or very little work for the

REID

1
2  previous three or four months.
3     Q.  Thank you.
4        Are you saying he was accusing
5  you about racializing him?
6     A.  Me personally?
7     Q.  Yes, are you saying that he was
8  accusing you of racializing him?
9     A.  He did not accuse me personally
10 at that point in time.
11    Q.  But his comments were about
12 someone else; correct?
13       MR. BIRENBOIM:  Objection to
14   form.  You may answer if you have any
15   more testimony about that.
16       THE WITNESS:  His comments were
17   about him, not me.
18 BY MR. JEFFRIES:
19    Q.  Is it your testimony that he
20 racialized himself?
21    A.  No, no, you're twisting words
22 again, Mr. Jeffries.  What I said there is
23 that he was making comments about the way
24 he had been dealt with, not -- he was not
25 saying it was me who had dealt with him

REID

1
2  that way, so it was not about me
3  personally, it was about him.
4     Q.  Who did he claim had racialized
5  him?
6     A.  I don't recall him putting a
7  specific name of any lawyer or other
8  staff -- or a staff person at Davis Polk.
9  I do recall him saying he wanted to speak
10 to John Bick about why he had not received
11 work.
12       MR. JEFFRIES:  Let's go off for a
13   moment.
14       (Recess taken from 3:35 p.m. to
15   3:53 p.m.)
16 BY MR. JEFFRIES:
17    Q.  So Mr. Reid, prior to the break,
18 we were discussing a March 29, 2017
19 meeting between yourself and Mr. Cardwell
20 and Mr. Kreynin.  During the conversation
21 that we were discussing, did you use any
22 football analogies?
23    A.  Did I use any what, sorry?
24    Q.  Did you use any football
25 analogies?

REID

1
2     A.  Yes, I did.  Yes.
3     Q.  What did you say?  Describe that,
4  please.
5     A.  Sorry, I cut you off.  What did I
6  say and then?
7     Q.  Tell me what you said.
8     A.  You recall in one of our previous
9  Qs and As, I told you about what I said to
10 him having looked into his performance
11 reviews, and he had dismissed those --
12 repeatedly dismissed those as our being,
13 Mr. Kreynin and I exaggerating a typo, a
14 mere typographical error.
15       REDACTED

61 (Pages 238 - 241)

1        REID



24    Q.  And the portion of that comment
25  in regards -- I believe part of your

1          REID
2  management, a topic that we'd spent a
3  little bit of time on at a dinner in
4  January and a very short period of time
5  while he was a summer associate, and which
6  he had couched in those football tough
7  coach, tough feedback statements.
8     Q.  What was the tone in which you
9  made that comment?
10    A.  The tone which I made it?
11    Q.  Yes.
12    A.  I was trying to make him
13  understand that we were going to lean in
14  and help but he had to lean in and help as
15  well, and had to apply himself to the
16  matters that we were going to find him and
17  learning from the partners that we were
18  going to pair him up with.
19    Q.  And you said this to him after
20  you told him his performance was poor;
21  correct?
22    A.  After we went through the -- yes,
23  it came after that.  It came really in
24  response, as I said before, to his
25  dismissal of those performance criticisms

1          REID
2  comment included the phrase you'll be off
3  the field.  Can you speak to what you
4  meant by that?
5     A.  You've got to be involved in the
6  game or you don't get the ball passed to
7  you, to switch to a soccer analogy.
8     Q.  In the analogy you're using, what
9  was the game?
10    A.  What was the game?
11    Q.  You're talking about you have to
12  be in the game?
13    A.  Yes.
14    Q.  What was the game?
15    A.  His career, his career, his
16  career, managing his career.
17    Q.  And what was off the field an
18  analogy for?
19    A.  It was an analogy for if you
20  don't apply yourself, you don't make as
21  much out of your career as you should.
22    Q.  Was it an analogy to the fact
23  that his career at Davis Polk would be
24  over?
25    A.  No, it was about his own career

1          REID
2  as exaggerated.
3     Q.  You said it was soon after he
4  replied by claiming he believed his
5  staffing was as a result of his race?
6     A.  No, before, before that point in
7  time.
8     Q.  So you told him that he'd be off
9  the field if he -- you told him that --
10  the analogy, the football analogy that you
11  referenced was made prior to him claiming
12  that the performance-related issues were
13  related to his race?
14    A.  Yes, because it was a direct link
15  to him not doing what he promised me he
16  would do, which is be open to tough
17  feedback and learn from it.  And he wasn't
18  doing that and I was quite explicit with
19  him that he wasn't doing that, and it was
20  disappointing and his career was going to
21  be, as I told him in January, tough, lots
22  of sacrifice and he needed to lean in and
23  that was the context.
24    Q.  So you told him he'd be off the
25  field before he fully responded; is that

Page 246

REID

1          REID
2 your testimony?
3          MR. BIRENBOIM:  Objection to
4     form, mischaracterizes the testimony.
5     You may answer.
6          THE WITNESS:  I don't know what
7     you mean by fully responded.  I don't
8     understand the question.
9 BY MR. JEFFRIES:
10    Q.  I'm just trying to get the
11 sequence down.  It sounds like you're
12 saying that you told him he'd be off the
13 field before he responded to your comments
14 to him about his performance?
15         MR. BIRENBOIM:  Objection to
16    form, mischaracterizes the entirety of
17    his testimony.  You may answer.
18         THE WITNESS:  I've given you the
19    sequence.  If you want to try and
20    restate the question to get a new
21    question, please do, but I think I've
22    answered the context in which I,
23    again, trying to tap in to what he
24    told me before about his college
25    football experience, to tap into that

Page 247

1          REID
2     and motivate him to engage with us to
3     recover the lost ground of the
4     previous three or four months with new
5     work.
6 BY MR. JEFFRIES:
7     Q.  How did Mr. Cardwell react to you
8 telling him he'd be off the field?
9          MR. BIRENBOIM:  Objection,
10    mischaracterizing the testimony again
11    but you may answer.
12         THE WITNESS:  I don't recall him
13    reacting specifically to that
14    statement.  It was after that that he
15    started to allege that his lack of
16    work was the product of -- it was a
17    consequence of him being as he said
18    racialized.
19 BY MR. JEFFRIES:
20    Q.  In the process of your making
21 your assessment about Mr. Cardwell's
22 performance, who participated in that
23 process with you?
24         MR. BIRENBOIM:  Objection to
25    form.  You can answer if you

Page 248

1          REID
2     understand it.
3          THE WITNESS:  I read his review
4     folders initially by myself and then I
5     had a conversation with Mr. Kreynin
6     and I believe a conversation with
7     another M&A partner who had a
8     disappointing experience with him,
9     which I raised with Mr. Cardwell in
10    the meeting as well.
11 BY MR. JEFFRIES:
12    Q.  Who was the other M&A partner who
13 had a disappointing experience?
14    A.  Marc Williams.
15    Q.  How did Marc find out about the
16 meeting?
17    A.  Which meeting?
18    Q.  The March 29th meeting.  Did you
19 inform Mr. Williams --
20    A.  I called Mr. Williams and I said
21 I understand -- and I don't know how I
22 came to understand whether it was through
23 the review folders or Mr. Kreynin, I don't
24 know, but I called Marc, Mr. Williams, and
25 asked him to walk me through what the

Page 249

1          REID
2     performance problem was in his
3     transaction.
4     Q.  So your assessments -- were you
5 trying to get an assessment of
6 Mr. Cardwell's performance, is that why
7 you called him?
8     A.  I was -- yes, I was building a
9 picture of what progress he'd made in the
10 previous years since our January 2016
11 conversation.
12    Q.  Did you call any other partners?
13    A.  I don't think so.  I don't
14 recall.
15    Q.  So to your recollection, Marc
16 Williams was the only one; is that
17 correct?
18    A.  Mr. Kreynin and Mr. Williams I
19 believe were the only partners I spoke to.
20 I read other reviews by other partners but
21 in terms of phone conversations, they were
22 the only ones.
23    Q.  So you only went to one other
24 partner aside from Mr. Kreynin to get an
25 assessment of Mr. Cardwell's performance;

63 (Pages 246 - 249)

Page 250

1                REID
2  is that correct?
3      A.  I had one other phone
4  conversation, I reviewed the other files.
5      Q.  And from that, from that review
6  of the files, the phone call with
7  Mr. Williams and the conversation with
8  Mr. Kreynin, you knew that when
9  Mr. Cardwell complained about
10 discrimination on March 29th that
11 discrimination could not have been the
12 cause of his staffing, is that your
13 testimony?
14      MR. BIRENBOIM:  Objection,
15   mischaracterizes the testimony.  You
16   may answer.
17      THE WITNESS:  I was comfortable
18   that race was no part of his
19   inactivity, that it was a direct
20   consequence from his poor performance
21   documented in two sets of annual
22   reviews.
23 BY MR. JEFFRIES:
24      Q.  Did your assessment with respect
25 to whether or not race played a role in

Page 251

1                REID
2  Mr. Cardwell's staffing impact the manner
3  in which the firm undertook or did not
4  undertake an investigation of
5  Mr. Cardwell's racial complaint?
6      MR. BIRENBOIM:  Objection to
7   form.  If you understand that
8   question, you can answer.
9      THE WITNESS:  I don't.
10      MR. JEFFRIES:  Madam Reporter,
11   can you read the question back?
12      (Record read.)
13      MR. JEFFRIES:  Can you answer
14   that question upon hearing it a second
15   time, Mr. Reid?
16      MR. BIRENBOIM:  Objection to
17   form.  If you understand it, you can
18   answer it.
19      THE WITNESS:  If what you're
20   asking is did the fact that I looked
21   at the reviews mean nobody else was
22   allowed to think about causes of this
23   inactivity, no, the answer is no.
24 BY MR. JEFFRIES:
25      Q.  You concluded discrimination was

Page 252

1                REID
2  not the cause of the staffing.  Did you
3  reach that conclusion before or during the
4  meeting?
5      A.  Before the meeting, as I
6  mentioned in several previous answers,
7  from my reading of his reviews, I was
8  comfortable that the criticisms made were
9  specific, well documented, well explained,
10 with examples, and I only got more
11 comfortable after speaking with
12 Mr. Kreynin and Mr. Williams.
13      MR. JEFFRIES:  At this time I'm
14   going to ask that tab 17 be moved into
15   evidence.
16      (Exhibit 14, document Bates
17   labeled DPW_SDNY-000052001, marked for
18   identification.)
19 BY MR. JEFFRIES:
20      Q.  Mr. Reid, would you please take a
21 look at the item that's on the screen
22 right now?
23      A.  Um-hum.
24      Q.  And this is an e-mail; correct?
25      A.  Yes.

Page 253

1                REID
2      Q.  And this is an e-mail from
3  Mr. Cardwell to Mr. Goldberg?
4      A.  Yes, yes.
5      Q.  And the date sent was May 22,
6  2017 and the subject is checking in;
7  correct?
8      A.  Yes, yes.
9  ███████████ REDACTED ████████████████
   ████████████████████████████████
   █████████████████████████████████
   ███████████████████████
   ██████████████████████████████████
   ████████████████████████████
17      Q.  When did you find out about this
18 particular contact?
19      MR. BIRENBOIM:  Objection to
20   form, no foundation.
21 BY MR. JEFFRIES:
22      Q.  I'll restate it.
23      Is today the first day you found
24 out about this particular contact between
25 Mr. Cardwell and Mr. Goldberg?

64 (Pages 250 - 253)

Page 254

REID

1
2    A.  I don't recall.  I may have heard
3  about it after that there had been some
4  explanation to Louis but -- i.e., as to
5  why he needed to take medical leave, but I
6  don't recall the specifics here and I
7  certainly don't recall this e-mail which
8  I'm not on.
9    Q.  During Mr. Cardwell's employment,
10 did you ever hear anything about
11 Mr. Cardwell, Louis Goldberg and Sharon
12 Crane having a meeting?
13   A.  No, I did not hear about that
14 meeting.  I knew that he was in contact
15 with Louis at this point in time because
16 following the March 29th meeting, Louis
17 was one of the first good teaching
18 partners that we -- that Mr. Cardwell
19 worked with.
20   Q.  Did you have any conversations
21 with Sharon Crane about this meeting
22 between Mr. Cardwell, Mr. Goldberg and
23 Sharon Katz?
24     MR. BIRENBOIM:  Objection to
25 form, no foundation.  You can answer,

Page 255

REID

1
2  Mr. Reid, if you have any knowledge.
3     THE WITNESS:  I think the
4  question was a meeting between
5  Mr. Goldberg, Mr. Kreynin and
6  Sharon Katz and I have no recollection
7  of any such meeting.
8  BY MR. JEFFRIES:
9    Q.  Did you have any conversations
10 with Sharon Crane about the meeting with
11 Mr. Cardwell and about the e-mail from
12 Mr. Cardwell to Mr. Goldberg?
13   A.  I don't believe I did.
14   Q.  And did you get any kind of
15 update about this exchange between
16 Mr. Cardwell and Mr. Goldberg?
17     MR. BIRENBOIM:  Objection to
18 form.  His testimony was he never
19 heard of it but you may answer.
20     THE WITNESS:  That's right.  I
21 mean update is -- can't be an update
22 if I didn't know about it in the first
23 place.
24 BY MR. JEFFRIES:
25   Q.  So it's your testimony that you

Page 256

REID

1
2  didn't hear about this in spite of the
3  complaint that Mr. Cardwell had made on
4  March 29th to you, you didn't hear
5  anything about this e-mail which would
6  have been after that during which
7  Mr. Cardwell --
8    A.  I don't recall hearing about this
9  e-mail or seeing it.
10   Q.  In your experience at Davis Polk,
11 is it common for associates to make
12 discrimination complaints?
13     MR. BIRENBOIM:  Objection to
14 form.  You may answer.
15     THE WITNESS:  Not to my
16 knowledge, no.
17 BY MR. JEFFRIES:
18   Q.  So by virtue of the fact that
19 your testimony is you did not have
20 knowledge of this e-mail on May 22nd,
21 would it stand to reason that the firm was
22 not checking on Mr. Cardwell after the
23 meeting that had taken place between
24 yourself and him on March 29th?
25     MR. BIRENBOIM:  Objection to

Page 257

REID

1
2  form.  You may answer.
3     THE WITNESS:  No, I think that's
4  a clearly erroneous conclusion you've
5  made there.
6  BY MR. JEFFRIES:
7    Q.  So you reported Mr. Cardwell's
8  complaint on the 29th; right?  Or March
9  29th you reported that complaint; correct?
10   A.  I shared what he said shortly, if
11 not right after that meeting, correct.
12   Q.  And after sharing what he said,
13 at that point the firm was on notice that
14 Mr. Cardwell had made a racial
15 discrimination complaint; correct?
16     MR. BIRENBOIM:  Objection to
17 form.  You may answer.
18     THE WITNESS:  He said he'd been
19 racialized.
20 BY MR. JEFFRIES:
21   Q.  Well, the firm would have been on
22 notice that Mr. Cardwell --
23   A.  The firm was on notice that he
24 said he'd been racialized and that was why
25 he had no work.

65 (Pages 254 - 257)

Page 258

REID

2    Q.   And you're saying despite having
3  knowledge or despite being told that an
4  associate had made a complaint of being
5  racialized, a racial complaint, you're
6  saying that no one at the firm told you
7  about this e-mail from Mr. Cardwell on the
8  next day or shortly afterwards?
9    A.   The next day after what, this
10  e-mail?
11   Q.   Yes.
12   A.   I don't recall ever hearing about
13  this e-mail.  I do recall him taking time
14  out for medical leave, that's all.
15   Q.   You don't think it would be odd
16  for a complaint or an e-mail like this
17  from an associate who had made a complaint
18  of being racially discriminated against
19  within less than two months earlier would
20  not have been brought to your attention?
21   A.   I don't think it changed the
22  character of the issue that came up on
23  March 29th.  I could imagine why people
24  who saw this e-mail --
25   Q.   Do you recall Mr. Cardwell

Page 259

REID

2  meeting with Ms. Sharon Crane and
3  Mr. Goldberg on May 23rd, the day after
4  this e-mail?
5    A.   I don't recall that.
6    Q.   Did you ever hear in any fashion
7  about a meeting between Mr. Cardwell,
8  Sharon Crane and Mr. Goldberg in relation
9  to an e-mail that he sent?
10   A.   I don't recall.
11       MR. BIRENBOIM:  Wait, Mr. Reid.
12   Objection to the extent it calls for
13   the disclosure of any privileged
14   communications you had with in-house
15   counsel on any of these issues.
16   Excluding that, you can answer the
17   question.
18       THE WITNESS:  Can you repeat the
19   question again, please?
20  BY MR. JEFFRIES:
21   Q.   I'll restate it.  And to be clear
22  I'm not asking about any advice or any
23  interpretation of any principles conveyed
24  to you by legal counsel.  I'm asking you,
25  sir, if there came a time when you learned

Page 260

REID

2  about a meeting between Sharon Crane,
3  Louis Goldberg and Kaloma Cardwell?
4    A.   I don't recall.
5        MR. BIRENBOIM:  Objection, Tom,
6    let me -- objection to the extent it
7    calls for the disclosure of any
8    communications with counsel, including
9    factual communications.  Otherwise you
10   may answer.
11       THE WITNESS:  Again, I don't
12   recall the e-mail or the meeting.
13       MR. JEFFRIES:  Can I have tab 18
14   brought up?
15       (Exhibit 15, document Bates
16   labeled DPW_SDNY-000097882, marked for
17   identification.)
18  BY MR. JEFFRIES:
19   Q.   Can you just enlarge this a bit?
20   A.   Got it.
21   Q.   Now, this is an e-mail; correct?
22   A.   Yes.
23   Q.   And on this e-mail, it's sent
24  from Sharon Crane; correct?
25   A.   Yes.

Page 261

REID

2    Q.   And it's sent to you as a
3  recipient; correct?
4    A.   And John Bick, correct.
5    Q.   Right, yourself and John Bick.
6  And the date on which it is sent is May
7  23rd of 2017; right?
8    A.   I see that.
9    Q.   And that would be the day after
10  that prior e-mail that we were just
11  discussing between Mr. Cardwell and Louis
12  Goldberg; correct?
13   A.   Right.
14   Q.   Do you see in the subject line
15  where it states, "Louis and I spoke to
16  Kaloma today.  I can fill you in tomorrow
17  at your convenience," do you see that?
18   A.   That line is the only text in the
19  e-mail so it's easy to see.
20   Q.   Do you deny receiving this
21  e-mail?
22   A.   I don't recall it.  I clearly got
23  the e-mail, that's my old e-mail address
24  but I just don't recall that e-mail.
25   Q.   So that I'm clear, Mr. Cardwell

66 (Pages 258 - 261)

Page 270

```
1           REID
2    you before, I was focused on making
3    sure we delivered on the promise of
4    getting him work so that he might have
5    a chance of recovering the lost ground
6    of the previous months.  I was updated
7    that he had taken some medical --
8    before that, I was updated that he had
9    taken vacation.  Then I remember being
10   updated that he had taken medical
11   leave.  I don't specifically remember
12   this e-mail or the one you showed me
13   before.  And that's what I was focused
14   on and I -- those were the updates I
15   got, who he was working for and on
16   what.
17 BY MR. JEFFRIES:
18   Q.  Well, were you told that he made
19 a complaint on May 22nd or only that he
20 took leave?
21       MR. BIRENBOIM:  Objection -- Tom,
22   Mr. Reid.  Objection to the form,
23   misstates the evidence.  You may
24   answer.
25       THE WITNESS:  All I recall was
```

Page 271

```
1           REID
2    the medical leave point.
3 BY MR. JEFFRIES:
4            REDACTED
```

(Lines 5–8 REDACTED)

```
9    Q.  How did you find out about it?
10   A.  We received a copy.  The firm
11 received a copy.
12   Q.  Aside from the firm receiving a
13 copy overall, how did you specifically
14 find out about it?
15       MR. BIRENBOIM:  Objection to the
16   extent it calls for the disclosure of
17   communications with counsel.
18   Otherwise you may answer.
19       THE WITNESS:  I don't recall how
20   I got it.  By that I mean I don't
21   recall how it was to sent to me, who
22   sent it to me.  I do remember seeing
23   it.
24 BY MR. JEFFRIES:
25   Q.  By virtue of seeing it, what was
```

Page 272

```
1           REID
2    your understanding about the complaint
3    made by Mr. Cardwell, what did it allege?
4        MR. BIRENBOIM:  Objection to
5    form.  You may answer.
6        THE WITNESS:  It alleged what I
7    read in the complaint.
8 BY MR. JEFFRIES:
9    Q.  And I'm asking for your
10 recollection about that.
11   A.  It was more by way of detail to
12 follow up on his March 29th allegation of
13 racialization, of being racialized.
14   Q.  And that was after his March 29th
15 complaint; correct?
16       MR. BIRENBOIM:  Objection to
17   form, misstates testimony.  You may
18   answer.
19       THE WITNESS:  August is after the
20   March 29th meeting and what was said
21   there.  If that's what you're asking,
22   the answer is yes.
23 BY MR. JEFFRIES:
24   Q.  How did you react to
25 Mr. Cardwell's EEOC complaint?
```

Page 273

```
1           REID
2    A.  React to it?  I read it and made
3 sure it was being handled by internal and
4 external counsel.
5    Q.  Did you have any particular
6 reaction to the complaint?
7    A.  Not more than what I just said.
8    Q.  Were you obligated to act on the
9 complaint in any way in your role as a
10 partner?
11       MR. BIRENBOIM:  Objection to
12   form.  I don't understand the
13   question.  You can answer it if you
14   understand.
15       THE WITNESS:  I do not understand
16   it.
17 BY MR. JEFFRIES:
18   Q.  My question to you is by virtue
19 of your role as a partner, were you
20 obligated in any way to take steps that
21 were triggered by the complaint that you
22 received from Mr. Cardwell?
23       MR. BIRENBOIM:  Still object to
24   the form on the same ground.  If you
25   understand it, you can answer.
```

69 (Pages 270 - 273)

Page 274

REID

2    THE WITNESS: I'll repeat what I
3  said, I read it and I made sure it was
4  being handled by counsel.
5  BY MR. JEFFRIES:
6    Q.  Did you talk to any of the M&A
7  partners about Mr. Cardwell's EEOC or NYS
8  DHR complaints?
9    MR. BIRENBOIM: I caution you to
10   not disclose discussions with counsel,
11   but if you had conversations with M&A
12   partners not in the presence of
13   counsel, you can answer.
14    THE WITNESS: I don't recall any
15   specific discussions but again, I
16   recall we went over this, John Bick
17   was an M&A partner as well as sitting
18   on the management committee, so I
19   don't recall any specific discussions
20   with John but he was on the management
21   committee, so I'm sure I was in a
22   discussion or more with him.
23  BY MR. JEFFRIES:
24    Q.  Do you recall any specific
25  discussions after the March 29th meeting

Page 275

REID

2  that you had with Mr. Cardwell with John
3  Bick?
4    A.  With Mr. Cardwell, no.  I only
5  recall, and I believe it was an e-mail,
6  confirming that he could take a few weeks
7  vacation after the March 29th meeting.
8    Q.  I'm actually asking you if you
9  recall any specific conversations with
10  Mr. Bick after your March 29th meeting
11  with Mr. Cardwell.
12    A.  As I mentioned, I reported the
13  conversation with Mr. Cardwell on March
14  29th to the management committee and that
15  would have included Mr. Bick.
16    Q.  Did Mr. Bick have any comments to
17  your reporting of the March 29th meeting?
18    A.  I don't recall any.
19    Q.  Do you recall any conversations
20  with anyone related to Mr. Cardwell
21  following the March 29th meeting?
22    MR. BIRENBOIM: Objection to the
23   extent it calls for the disclosure of
24   any discussions with counsel.
25   Otherwise you may respond.

Page 276

REID

2    THE WITNESS: Can you repeat
3   that?  I lost what you were asking at
4   the end.  Can you repeat the question,
5   please?
6  BY MR. JEFFRIES:
7    Q.  Surely.
8    Do you recall any conversations
9  with anyone related to Mr. Cardwell
10  following March 29th?
11    MR. BIRENBOIM: Same objection.
12    THE WITNESS: Yes, and the
13   discussions I recall were to do with
14   his getting work with Mr. Bick, and I
15   think the first assignment he got was
16   from Mr. Goldberg.  And those are the
17   only specific discussions I recall,
18   when that assignment was given.
19  BY MR. JEFFRIES:
20    Q.  So the only specific discussions
21  you recall after March 29th related to
22  Mr. Cardwell would be discussions with
23  Mr. Bick and discussions with
24  Mr. Goldberg?
25    A.  Actually, there was one

Page 277

REID

2  conversation I had, I believe, with Lee
3  Hochbaum, who I believe was also one of
4  the good teaching partners that I
5  mentioned before, that he and Mr. Cardwell
6  did some work for.
7    Q.  Just before we move off of this,
8  what about with respect to Sharon Crane,
9  did you have any conversations with Sharon
10  Crane about Mr. Cardwell after the March
11  29th -- after the March 29th meeting, but
12  before the May 23rd e-mail from her to
13  you?
14    A.  I don't recall any.
15    Q.  Were you involved in any way in
16  the drafting or creation of any of the
17  information that appeared in Davis Polk's
18  NYS DHR answer and position statement in
19  response to Mr. Cardwell's complaints?
20    MR. BIRENBOIM: You can answer
21   that yes or no.
22    THE WITNESS: The answer to
23   the -- when was that filed, the
24   answer?
25    MR. JEFFRIES: Just one moment.

70 (Pages 274 - 277)

Page 282

REID

1
2  about the belief that Mr. Cardwell was a
3  poor performer.
4       MR. BIRENBOIM:  Objection to the
5  extent it calls for the disclosure of
6  any communications with counsel or any
7  work product that led to the creation
8  of the answer.  All of that is
9  privileged.
10 BY MR. JEFFRIES:
11      Q.  You mentioned talking to
12 Mr. Bick; correct?
13      A.  As part of my report to the
14 management committee, that's correct.
15      Q.  And you mentioned talking to Lee
16 Hochbaum; correct?
17      A.  Correct.
18      Q.  And you mentioned talking to
19 Louis Goldberg; correct?
20      A.  Correct.
21      Q.  And so who else besides you held
22 the belief that Mr. Cardwell's performance
23 was the cause of his experience?
24      A.  Who --
25      MR. BIRENBOIM:  Objection to

Page 284

REID

1
2       THE WITNESS:  I think you have
3  got the question the wrong way around.
4  You're asking a question about a
5  belief that his inactivity was caused
6  by his poor performance.  REDACTED



Page 283

REID

1
2  form.  I don't know how he can answer
3  what is in other people's heads but to
4  the extent you know, you can answer.
5       THE WITNESS:  All I can say is
6  that the EEOC complaint was served
7  against the firm, Davis Polk, the
8  answer was filed by the firm, Davis
9  Polk, not by me personally, the answer
10 was prepared with the advice from
11 expert counsel, so that would lead me
12 to believe that I wasn't the only
13 person that thought that bad
14 performance was the root cause.
15 BY MR. JEFFRIES:
16      Q.  So I'm just asking you, Mr. Reid,
17 who of any of the people we mentioned,
18 were there any other people who expressed
19 to you a belief that Mr. Cardwell's
20 performance was the result of his
21 non-staffing and low hours and with
22 respect to his experience at the firm when
23 you spoke to them about Mr. Cardwell?
24      MR. BIRENBOIM:  Objection to
25 form.

Page 285

REID

1
2  REDACTED

11      With Mr. Hochbaum, he worked with
12 Mr. Cardwell on an assignment from one of
13 the firm's financial clients.  Again, it
14 was -- what was recounted to me was lack
15 of understanding of basic corporate law
16 concepts, including in that context the
17 liability exposure of the client and what
18 was a publicly filed SEC disclosure.
19      Q.  So let me just make sure that I
20 heard you correctly.  You were told that
21 Mr. Cardwell lacked basic corporate law
22 concepts; is that correct?
23      A.  I was told that he didn't seem to
24 appreciate in both those assignments some
25 concepts that would be pretty basic.

72 (Pages 282 - 285)

Page 286

REID

1
2    Q.   And beyond that, I'm using your
3  words, so I just want to make sure that we
4  have the same understanding of the nature
5  of the criticisms.  Your words when you
6  first stated it were that he lacked
7  basic -- he lacked a basic understanding
8  of corporate law concepts; is that
9  correct?  That was what your -- that was
10  what was conveyed to you?
11    A.   Lacked it and -- lacked it and
12  did not acquire it despite intensive
13  coaching by both those partners.
14    Q.   Lacked --
15    A.   Acquire.
16    Q.   Thank you.  And I think I also
17  heard in your response that there was a
18  concern about liability to clients based
19  off of Mr. Cardwell's deficiencies; is
20  that correct?
21    A.   No, no, what I said was a lack of
22  understanding that the particular matter
23  that he was working on with Mr. Hochbaum
24  involved disclosure to which our client
25  needed to put his name and therefore, it

Page 287

REID

1
2  needed to be very carefully prepared.
3    Q.   So are you claiming in any way
4  Mr. Cardwell posed a threat to clients by
5  virtue of his poor performance?
6        MR. BIRENBOIM:  Objection to
7    form.  You may answer.
8        THE WITNESS:  Mr. Hochbaum was
9    there to make sure that the work
10    product did not go to the client and
11    certainly did not get filed without
12    him correcting it.
13  BY MR. JEFFRIES:
14    Q.   So in your experience, training
15  and your position as a managing partner,
16  and the position you held before that,
17  would that concern have translated into a
18  concern that Mr. Cardwell was a threat to
19  firm clients?
20        MR. BIRENBOIM:  Objection to
21    form.  I think he answered that but
22    you may answer again.
23        THE WITNESS:  I'll give the same
24    answer but with different words, maybe
25    I'll express myself better,

Page 288

REID

1
2    Mr. Jeffries.  But we -- the work that
3  a firm like Davis Polk does is very
4  complex and it is not the case that an
5  associate, particularly an associate
6  that we knew had serious performance
7  issues, would be allowed to deliver
8  work product directly to the client
9  without partner supervision.  The job
10  of a partner is not to let associates
11  work by themselves, it's to judge how
12  much independence an associate can be
13  given based upon their ability, but
14  the partner is always responsible for
15  supervising the end work product.
16  BY MR. JEFFRIES:
17    Q.   You mentioned a deal with Lee
18  Hochbaum in one of your answers.  Who was
19  the client on that deal?
20    A.   The client was REDACTED.
21    Q.   And was it REDACTED and
22  REDACTED?
23    A.   I don't recall.
24    Q.   And I think I also, correct me if
25  I'm wrong, I heard during your last answer

Page 289

REID

1
2  that Mr. Hochbaum gave you the impression
3  that Mr. Cardwell was not allowed to do
4  unsupervised work?
5        MR. BIRENBOIM:  Objection to
6    form.
7        THE WITNESS:  Not what I said at
8    all.
9  BY MR. JEFFRIES:
10    Q.   Well, you certainly made a
11  comment about the ability to -- the
12  ability for an associate to do work with
13  a -- in relation to a degree of
14  supervision.  Is it your testimony that a
15  well performing associate needs less
16  supervision than a poor performing
17  associate?
18    A.   Yes.
19    Q.   And the better performing the
20  associate, the less supervision would be
21  required by the supervising senior
22  attorney; correct?
23    A.   Yes, assuming it's work the
24  associate has done before, yes.
25    Q.   In the context of Kaloma, is it

73 (Pages 286 - 289)

Page 290

```
               REID
1
2   your testimony that by virtue of your
3   interactions with Lee Hochbaum, you had
4   the understanding that Kaloma needed
5   supervision at all times?
6        MR. BIRENBOIM:  Objection to
7   form.  You may answer.
8        THE WITNESS:  I mean from reading
9   his review forms before the March 29th
10  meeting, from the reports I got from
11  Mr. Hochbaum, he clearly needed very
12  close supervision.
13  BY MR. JEFFRIES:
14   Q.   And on the basis of that
15  understanding that you had from the items
16  you reviewed and your conversations with
17  Mr. Hochbaum, would that have allowed for
18  Mr. Cardwell to allow Mr. Cardwell to do
19  unsupervised legal work with REDACTED
20  and REDACTED ?
21       MR. BIRENBOIM:  Objection to
22  form.  Testify to what you know.
23       THE WITNESS:  I don't understand
24  the question.
25       MR. JEFFRIES:  You mentioned
```

Page 291

```
               REID
1
2   that -- withdrawn.
3        Can I have tab 20 brought up?
4        (Exhibit 16, document Bates
5        labeled DPW_SDNY-000037031, marked for
6        identification.)
7   BY MR. JEFFRIES:
8    Q.   This is an e-mail exchange.  I'm
9   going to ask you to take a moment to look
10  through this document, Mr. Reid.  This
11  document involves the REDACTED and
12  REDACTED deal you just mentioned.
13   A.   (Witness perusing document.)
14       Okay.
15   Q.   Okay.  Now you would agree
16  that -- well, if we look down, first of
17  all, this is an e-mail thread relative to
18  the deal that Mr. Cardwell was working on
19  with Mr. Hochbaum; correct?
20   A.   I don't know but that was the
21  time they were working together so I
22  presume so, that it was a REDACTED
23  deal that I mentioned to you before.  I
24  see only REDACTED here so I don't
25  know about that.
```

Page 292

```
               REID
1
2    Q.   By virtue of your inspection of
3   this e-mail thread, would it be fair to
4   state that this is -- this thread includes
5   conversation about the finalization of
6   documents with respect to the deal?
7        MR. BIRENBOIM:  Objection to
8   form, the e-mails say what they say.
9   There's no evidence that Mr. Reid's
10  ever seen these or knows anything
11  about him.
12  BY MR. JEFFRIES:
13   Q.   I'm asking based off of your
14  observation, Mr. Reid.
15   A.   I haven't seen this before but
16  having read it quickly just now, it refers
17  to finalization of the fairness opinion,
18  that's what's referred to here as the FO.
19  And it also earlier in the chain refers to
20  some substantive questions on the content
21  of the opinion.
22   Q.   Would that be an important
23  document?
24   A.   The fairness opinion?
25   Q.   Yes.
```

Page 293

```
               REID
1
2    A.   Yes.
3    Q.   And do you see -- would you agree
4   that at some point Lee Hochbaum, in fact,
5   in August -- in the e-mail from August 8,
6   2017 at 11:10, Lee Hochbaum indicates that
7   he's going to turn off his phone and go to
8   sleep; correct?
9        MR. BIRENBOIM:  Objection to
10  form.  States exactly the opposite.
11  Please call me on my cell.  He didn't
12  say anything about turning off his
13  phone.
14  BY MR. JEFFRIES:
15   Q.   I'm going to read verbatim from
16  Mr. Hochbaum's message.  It says, "What a
17  pain.  I'm going to turn in shortly but
18  please call me on my cell if you need
19  anything.  Thanks, Kaloma."  Is that what
20  the e-mail states?
21   A.   Thanks, Kaloma, it says.  It says
22  that he is available on his cell for
23  anything.
24   Q.   And the next e-mail up is an
25  e-mail from Mr. Cardwell to Lee Hochbaum
```

74 (Pages 290 - 293)

Page 310

```
 1              REID
 2  BY MR. JEFFRIES:
 3      Q.   This program that you've
 4  discussed a few times, who was responsible
 5  for this program, who was involved in this
 6  program of getting Mr. Cardwell work?
 7      A.   John Bick was -- being M&A
 8  partner and at the time the head of M&A,
 9  took it to make sure that he got a good
10  mix of projects.
11      Q.   And when did you find out about
12  this -- when did you find out about this
13  plan?
14          MR. BIRENBOIM:  Objection to
15      form.
16          THE WITNESS:  When?
17  BY MR. JEFFRIES:
18      Q.   When did you find out about this
19  approach that Mr. Bick was taking towards
20  trying to make sure that Mr. Cardwell got
21  a good mix of work?
22          REDACTED
```

Page 311

```
 1              REID
              REDACTED

                                this straight.
14  Mr. Cardwell goes on leave and returns;
15  correct?
16      A.   Yes.
17      Q.   And --
18      A.   I don't recall exactly when he
19  returned.  It was several weeks of leave.
20      Q.   And upon his return, were
21  there -- was there an understanding of
22  what he would walk into and what kind of
23  assignments would be given to him when he
24  returned or was he --
25      A.   A variety --
```

Page 312

```
 1              REID
 2      Q.   -- took place -
 3          MR. BIRENBOIM:  Let Mr. Jeffries
 4      finish the question.
 5          THE WITNESS:  Sorry, I thought he
 6      had.
 7  BY MR. JEFFRIES:
 8      Q.   When Mr. Cardwell returned or
 9  around the time Mr. Cardwell returned, was
10  there a plan in place as to the type of
11  work he would be getting or was that
12  something that had to be developed after
13  he returned?
14          MR. BIRENBOIM:  Objection to
15      form.  If you know you may answer.
16          THE WITNESS:  The only thing I
17      recall was it was going to be a good
18      mix, different kinds of work,
19      different partners.
20  BY MR. JEFFRIES:
21      Q.   Now, Mr. Cardwell actually ended
22  up being terminated; correct?
23      A.   Correct.
24      Q.   And so the plan around staffing
25  him clearly changed.  When did that
```

Page 313

```
 1              REID
 2  change?
 3      A.   I'm not sure why you say it
 4  clearly changed.
 5      Q.   Well, he ended up being
 6  terminated; right?  That's not the same as
 7  finding work for him to -- finding things
 8  for him to work on.
 9          MR. BIRENBOIM:  Objection to
10      form, mischaracterizes the testimony.
11      You may answer.
12          THE WITNESS:  He -- if you're
13      saying that by not being at the firm
14      he wouldn't have had any firm work to
15      do, I guess that's correct.
16  BY MR. JEFFRIES:
17      Q.   The firm went from staffing him
18  on matters and potential deals to telling
19  him he should move on because the staffing
20  situation became unworkable.  How did that
21  change occur?
22          MR. BIRENBOIM:  Objection to
23      form.  If you understand the question,
24      you can answer it.
25          THE WITNESS:  The reports of the
```

79 (Pages 310 - 313)

Page 314

```
1              REID
2    partners for whom he had been staffed
3    fed into, I believe, his annual
4    review.  I believe the process played
5    out at the end of the year, the annual
6    review season beginning in the
7    following year.  And in addition to
8    the reports of Mr. Hochbaum and
9    Mr. Goldberg, I understand -- I didn't
10   talk to them directly -- but I
11   understand there were also severely
12   critical reviews from Mr. Mills and
13   Mr. Amorosi who he worked with as
14   well.
15 BY MR. JEFFRIES:
16   Q.  Mr. Reid, who made the decision
17 to terminate Mr. Cardwell?
18   A.  I think I just said the consensus
19 of the partners who had been involved in
20 looking at his work closely, working with
21 him closely when he came back in I believe
22 late April of 2017 for the next several
23 months.  The consensus was that what they
24 had seen was a level of performance that
25 the fairest thing to do was to say we
```

Page 315

```
1              REID
2    don't see it working out here and take
3    some time to look around and find another
4    opportunity.
5    Q.  Are you saying Lee Hochbaum had a
6  role in terminating Mr. Cardwell?
7         MR. BIRENBOIM:  Objection to
8    form, mischaracterizes the testimony.
9    You may answer.
10        THE WITNESS:  He gave a
11   performance report is what I said.
12 BY MR. JEFFRIES:
13   Q.  I'm asking you who made the
14 decision to terminate Mr. Cardwell.  Can
15 you state their names?
16             REDACTED
```



Page 316

```
1              REID
2             REDACTED
```

```
19 BY MR. JEFFRIES:
20   Q.  Mr. Reid, when did Davis Polk
21 begin anticipating litigation with
22 Mr. Cardwell?
23        MR. BIRENBOIM:  Objection to form
24   and please don't disclose any
25   conversations with counsel.  If you
```

Page 317

```
1              REID
2    have any knowledge of that, you can
3    answer.
4         THE WITNESS:  My specific
5    recollection of it was when we got the
6    EEOC letter, it was confirmed.
7  BY MR. JEFFRIES:
8    Q.  It was confirmed but I'm asking
9  you when there was any thought in your
10 mind at least that Mr. Cardwell -- I'm
11 asking you as the managing partner, when
12 you began anticipating litigation with
13 Mr. Cardwell.
14        MR. BIRENBOIM:  You can answer
15   for yourself, Mr. Reid.
16        THE WITNESS:  Yes, for myself as
17   a human being, forget managing
18   partner, when somebody says to me they
19   are being racialized, that is a very,
20   very rare, as I testified before,
21   very, very rare occurrence, first time
22   I'd ever experienced it and I had to
23   be alert to the possibility that this
24   could end in conflict.  My response
25   was to make sure that we again got
```

80 (Pages 314 - 317)