# Buergel Declaration Exhibit 5

Page 1

```
 1
 2          UNITED STATES DISTRICT COURT
 3          SOUTHERN DISTRICT OF NEW YORK
 4
 5   KALOMA CARDWELL,            )
                   Plaintiff,   )
 6                              )
              vs.               )19 Civ. 10256
 7                              )(GHW)
     DAVIS POLK & WARDWELL,      )
 8   THOMAS REID, JOHN BICK,     )
     WILLIAM CHUDD, SOPHIA       )
 9   HUDSON, HAROLD              )
     BIRNBAUM, DANIEL BRASS,     )
10   BRIAN WOLFE, and JOHN       )
     BUTLER,                     )
11             Defendants.       )
     _____    )
12
13
14            REMOTE DEPOSITION OF
15                 JOHN BICK
16         located in Quogue, New York
17           Tuesday, April 13, 2021
18
19    (Transcript contains Confidential and
20    Highly Confidential portions -
21    confidentiality designations legend at
22    back of transcript)
23
24    Reported By:
25    CATHI IRISH, RPR, CRR, CLVS
```

Page 2

1
2
3
4
5
6
7
8                April 13, 2021
9                9:30 a.m.
10
11        Remote deposition of JOHN BICK,
12    with all participants appearing via
13    videoconference, before Cathi Irish, a
14    Registered Professional Reporter,
15    Certified Realtime Reporter, and
16    Notary Public of the State of
17    New York.
18
19
20
21
22
23
24
25

Page 3

1
2 A P P E A R A N C E S:
3
4    JEFFRIES LAW
5    Attorneys for Plaintiff
6        1345 Avenue of the Americas
7        New York, New York 10019
8    BY:  DAVID JEFFRIES, ESQ.
9
10    PAUL, WEISS, RIFKIND, WHARTON
11    & GARRISON
12    Attorneys for Defendants
13        1285 Avenue of the Americas
14        New York, New York 10019
15    BY:  BRUCE BIRENBOIM, ESQ.
16        JONATHAN KIM, ESQ.
17        MARISSA DORAN, ESQ.
18
19
20  ALSO PRESENT:
21    ZACH CZERENDA, Veritext concierge
22    KALOMA CARDWELL
23    MICHAEL FLYNN
24
25

Page 4

1
2 J O H N   B I C K,   called as a witness,
3     having been duly sworn by a Notary
4     Public, was examined and testified as
5     follows:
6 EXAMINATION
7 BY MR. JEFFRIES:
8    Q.  Mr. Bick, I'm going to ask you a
9 few questions and firstly, have you been
10 deposed before, sir?
11    A.  Yes.
12    Q.  Okay.  In an abundance of caution
13 I'm going to run through a few preliminary
14 things to keep in mind for this
15 proceeding.  Firstly, I'm going to need
16 all of your answers to be verbal.  Do you
17 understand, sir?
18    A.  Yes.
19    Q.  I'm going to ask that to the best
20 of your ability you wait until I finish
21 the question so that nobody is talking
22 over anybody and so the reporter is able
23 to get everybody's answers down in their
24 entirety.
25        Do you understand that, sir?

Page 5

1            BICK
2    A.  Yes.
3    Q.  I'm going to ask that if at any
4 point in time you need a break in the
5 proceeding or you need to speak to your
6 attorney, that you answer the question
7 that's pending, if there is one, prior to
8 making such a request so that we get a
9 complete answer, question and then break
10 if that's indeed what's necessary, all
11 right, sir?
12    A.  Yes.
13    Q.  Also, if throughout the course of
14 the deposition you don't understand a
15 question that I've put to you, ask me to
16 rephrase it and I will do so.
17        Do you understand that as well?
18    A.  Yes.
19    Q.  All right.  With that said, I
20 believe you indicated that you've been
21 deposed before and what was the nature of
22 the previous proceedings in which you were
23 deposed, Mr. Bick?
24    A.  M&A transactions that I work on.
25    Q.  So were those depositions a part

2 (Pages 2 - 5)

Page 10

```
1                BICK
2  responses; correct?
3      A.  Yes.
4      Q.  Did you review those prior to
5  today?
6      A.  Yes.
7      Q.  With respect to the court
8  documents that you mentioned, did you
9  review Mr. Cardwell's federal complaint
10 prior to today?
11     A.  I am not aware.
12     Q.  Are you aware of whether or not
13 there's one federal complaint by
14 Mr. Cardwell or more than one?
15     A.  I am not aware.
16     Q.  How many versions of
17 Mr. Cardwell's federal complaint did you
18 review prior to today?
19     A.  I don't recollect.
20     Q.  Are you aware of the fact that
21 there was a New York State Division of
22 Human Rights complaint made in this matter
23 by Mr. Cardwell?
24     A.  Yes.
25     Q.  Did you review that prior to
```

Page 11

```
1                BICK
2  today's testimony?
3      A.  I have no recollection of
4  reviewing that complaint.
5                REDACTED
```



```
12     Q.  Did you yourself participate in
13 the gathering of any documents related to
14 this litigation prior to today?
15     A.  Counsel came to see me and asked
16 for any documents that I had so that was
17 the extent of my participation.
18     Q.  The documents -- with respect to
19 that inquiry, did you, in fact, provide
20 documents to counsel?
21     A.  I had no hard copy to deliver to
22 counsel.  All of my documents were e-mails
23 and digital that they could look at
24 through the systems.
25     Q.  And did you provide those
```

Page 12

```
1                BICK
2  documents to counsel prior to today?
3      A.  Again, I didn't provide them
4  anything.  They looked on the computer for
5  e-mails and such.  I did not provide them
6  any hard copy.
7      Q.  Are you aware of whether or not
8  the items that you allowed counsel to
9  review that you just mentioned were in any
10 way supplied to counsel?
11     A.  I don't understand the question.
12     Q.  Did counsel take possession of
13 the items that you indicated were reviewed
14 in a digital format?
15     A.  I do not know because I was not
16 part of the e-mail reviews digitally.
17     Q.  So you yourself did not
18 affirmatively provide counsel with any
19 digital copies or ensure the forwarding of
20 any of the digital information to counsel
21 that you mentioned was reviewed; is that
22 correct?
23     A.  Not to my recollection.
24     Q.  And what type of documents are we
25 talking about?  You mentioned e-mails?
```

Page 13

```
1                BICK
2  What else?  Would these have been other
3  documents that you yourself generated?
4      A.  The only other thing I can think
5  of is the review forms.  I did one interim
6  review of Kaloma which I put into the
7  system, and that would be the only other
8  thing aside from e-mails that I can think
9  of.
10     Q.  Have you generated or authored
11 any memoranda to memorialize any of the
12 complaints or details related to this
13 litigation prior to today?
14         MR. BIRENBOIM:  Objection to
15 form.
16         THE WITNESS:  Not to --
17         MR. BIRENBOIM:  You can answer.
18         THE WITNESS:  Not to my
19 recollection.
20 BY MR. JEFFRIES:
21     Q.  Have you made any contemporaneous
22 notes with respect to Mr. Cardwell prior
23 to your testimony here today?
24     A.  No.
25     Q.  And as you sit here today, do you
```

4 (Pages 10 - 13)

Page 26

BICK

1
2 these other e-mail addresses that you've
3 mentioned; is that correct?
4     A.  I did not.
5     Q.  In 2014 through 2018, was your
6 work e-mail address a part of any internal
7 Listservs?
8     A.  I believe so, yes.
9     Q.  Do you recall which ones?
10    A.  I do not.
11    Q.  Was your work e-mail address a
12 part of the Career Advisors Listserv?
13    A.  I do not know.
14    Q.  Well, do you recall or do you get
15 e-mails sent from the Career Advisors
16 Listserv?
17    A.  I believe so, yes.
18    Q.  Would that have been the case
19 during 2014 through 2018 as well?
20    A.  I believe, yes.
21    Q.  Is there any reason that you do
22 not believe you would have received
23 e-mails from the Career Advisors Listserv
24 in 2014 through 2018?
25    A.  No.

Page 28

BICK - CONFIDENTIAL

1
2     A.  I do not know.
3     Q.  Do you have any reason to dispute
4 that is the e-mail address?
5     A.  I do not.
6     Q.  You previously served as the head
7 of Davis Polk's corporate department,
8 global head of the mergers and
9 acquisitions practice, and a member of the
10 firm's three-person management committee;
11 is that correct?
12    A.  Yes.
13    Q.  I want to go through each of
14 these positions.
15 REDACTED

Page 27

BICK

1
2     Q.  And the Career Advisors Listserv
3 uses the e-mail address
4 cap.advisors.ny@davispolk.com; is that
5 correct?
6     A.  I do not know.
7     Q.  Do you have any reason to dispute
8 that the e-mail address I just read to you
9 is the Career Advisors Listserv e-mail
10 address?
11    A.  No.
12    Q.  Was your work e-mail address also
13 a part of the NYMA Partners Listserv?
14    A.  I do not know.
15    Q.  Are you familiar with whether or
16 not there is an NYMA Partners Listserv?
17    A.  I do not know the specific names
18 of the Listservers.  If you're referring
19 to a Listserv for M&A partners in
20 New York, there is one and I'm part of
21 that.
22    Q.  Are you familiar with whether or
23 not the e-mail address for the Listserv
24 that you mentioned that you're a part of
25 is nyma.partners@davispolk.com?

Page 29

BICK - CONFIDENTIAL

1
2     Q.  Was your departure from that
3 position related to any formal
4 investigation that occurred at Davis Polk?
5     A.  No.
6     Q.  Was your departure from that
7 position related to any informal
8 investigations that occurred at Davis
9 Polk?
10    A.  No.
11    Q.  Did any individual or group of
12 individuals ask you to stop -- ask you to
13 step down from that position?
14    A.  No.
15    Q.  Can you explain why you're no
16 longer the head of Davis Polk's corporate
17 department?
18    A.  I had served three terms.  Tom
19 Reid, who was the managing partner and on
20 the management committee with me, took a
21 job at our client and was stepping down
22 from the management committee.  The three
23 of us who were on the management committee
24 at the time, Tom, Jim Rouhandeh and
25 myself, we decided the best course of

8 (Pages 26 - 29)

Page 30

1      BICK - CONFIDENTIAL
2  action with Tom leaving as managing
3  partner was to disband the existing
4  management committee, hold an election for
5  a new management committee, which would be
6  one year prior to our three-year term
7  ending for that cycle, and so our terms
8  ended.
9          I personally chose not to run
10 again because I was planning to retire in
11 2021, and if I ran for election and was
12 reelected, I would have had a three-year
13 term that would have taken me past my date
14 of retirement, so I told the firm that I
15 was not going to run for reelection.
16     Q.  You were also the M&A practice
17 group head.  That's another position that
18 you held within DPW; correct?
19     A.  For a brief period of time, yes.
20     Q.  What was the period of time that
21 you held that position?
22     A.  I believe it was from 2016
23 through 2017.
24     Q.  And just stepping back for a
25 moment, the head of corporate department

Page 31

1      BICK - CONFIDENTIAL
2  position, that was from 2011 through --
3  did you say 2018; is that correct?
4     A.  REDACTED



Page 32

1      BICK - CONFIDENTIAL
2  REDACTED
9     Q.  Was your departure from the
10 position of M&A practice group head
11 related in any way to any formal
12 investigation that occurred at Davis Polk?
13     A.  No.
14     Q.  Was your departure from the
15 position related in any way to any
16 informal investigation that occurred at
17 Davis Polk?
18     A.  No.
19     Q.  Did any individual or group of
20 individuals ask you to step down from that
21 position?
22     A.  No.
23     Q.  Did any individual or group of
24 individuals recommend that you step down
25 from that position?

Page 33

1      BICK - CONFIDENTIAL
2     A.  No.
3     Q.  Did any individual or group of
4  individuals require that you step down
5  from that position?
6     A.  No.
7     Q.  And so for the sake of
8  completion, why did you step down from the
9  role as the M&A practice group head?
10     MR. BIRENBOIM:  Objection, asked
11 and answered.  You can answer it again
12 if you have something to add.
13     THE WITNESS:  I don't.
14 BY MR. JEFFRIES:
15     Q.  So you're standing by your
16 testimony which was that it was an interim
17 position?
18     A.  I took the position expecting to
19 step down after a brief period of time.
20     Q.  While you were in the position or
21 going into the position, was there a
22 forecasted date by which you would be
23 stepping down?
24     A.  No.
25     Q.  You've also been a part of the

Page 34

BICK

1
2    three-person management committee within
3    Davis Polk; correct?
4        A.  Yes, we discussed that.
5        Q.  When did you first start serving
6    as a member of the firm's three-person
7    management committee?
8        A.  As I said previously, 2011.
9        Q.  How did it come to pass that
10   you -- well, how did it come to pass that
11   you were a member of the three-person
12   management committee, was that previously
13   a part of your position as the head of the
14   corporate group?
15       MR. BIRENBOIM:  Objection to
16   form.  You may answer.
17       THE WITNESS:  Could you rephrase
18   the question?  I don't understand the
19   question.
20   BY MR. JEFFRIES:
21       Q.  Is there any similarity between
22   the roles of head of the corporate group
23   and the position of the three-person
24   management committee, are those the same
25   roles or separate?

Page 35

BICK

1
2        A.  They are one and the same.  I am
3    on the management committee and my title
4    on the management committee is global head
5    of corporate.  That was a specific spot at
6    the time and that's what I was elected to.
7        Q.  Did Davis Polk investigate any
8    complaints of discrimination, harassment
9    or retaliation between the years of 2014
10   and 2018?
11       A.  Apart from Kaloma Cardwell, I
12   have no other recollection of any other
13   such complaint.
14       Q.  Based on your position as --
15   based on the positions that you've
16   mentioned holding relative to firm
17   management, are you aware of whether or
18   not the firm initiated an investigation
19   based on the complaints made by
20   Mr. Kaloma Cardwell in relation to his
21   employment between the years of 2014 and
22   2018 at Davis Polk?
23       MR. BIRENBOIM:  Objection to
24   form.  You can answer the question.
25       THE WITNESS:  How do you define

Page 36

BICK

1
2    investigation?  I'm not sure I would
3    view it as an investigation.  I don't
4    understand.
5    BY MR. JEFFRIES:
6        Q.  Let's step back a little bit
7    then.
8        Based on your experience and
9    knowledge of firm policies and procedures,
10   what type of investigation, if any, does
11   Davis Polk undertake with respect to a
12   claim of discrimination?  How is such a
13   claim handled?
14       A.  If we become aware of a
15   complaint, we work with lawyers in the
16   general counsel office, sometimes with
17   outside counsel, and we review the matter.
18       Q.  Who is responsible for
19   undertaking that review?
20       A.  If it's a complaint regarding
21   discrimination or harassment, it would be
22   the management committee working with the
23   general counsel office and outside counsel
24   sometimes.
25       Q.  And what role would the

Page 37

BICK

1
2    management committee itself play within
3    that process?
4        A.  We're making decisions for the
5    firm.
6        Q.  What steps in an investigation
7    such as the type that we described, what
8    would the steps be that the management
9    committee weighs in on, what kind of
10   decisions would be made, what would the
11   steps be?
12       A.  It's a little vague.  I couldn't
13   site categorically each and every step we
14   take.  As I said, we consult with general
15   counsel, we follow their lead in how they
16   would ask questions or do an
17   investigation, if necessary, and if they
18   need input from us or any particular
19   decisions, we do so.
20       Q.  So I think that we're both in
21   agreement as to the fact that an
22   investigation would require some type of
23   affirmative steps to be taken; correct?
24   It entails the undertaking of some
25   affirmative steps; correct?

10 (Pages 34 - 37)

Page 78

BICK - CONFIDENTIAL
2    THE WITNESS: Can you move it up
3  or down so I can see above it, if
4  that's what you're referring to?
5    MR. JEFFRIES: I'm going to need
6  you to move it down a little bit.
7    VERITEXT CONCIERGE: I'm sorry,
8  what am I doing? Mr. Bick has full
9  control here.
10    THE WITNESS: Okay, sorry. I'll
11  move it down.
12  BY MR. JEFFRIES:
13    Q. And again orienting you to
14  February 2, 2017 at 11:50 a.m.
15    A. That her response is that Harold and
16  Brian are the staffing partners for third
17  years and more senior, that reference,
18  yes.
19    Q. Right. So it states, "The
20  staffing partners (currently Brian Wolfe
21  and Harold Birnbaum) handle staffing for
22  third years and more senior. The
23  automatic e-mail comes from the system as
24  me every Tuesday. Christine puts all
25  updates together in one chart, which gets

Page 79

BICK - CONFIDENTIAL
2  sent to the staffing partners and me."
3    You see that language; correct?
4    A. Yes.
5    Q. Mr. Birnbaum became a staffing
6  partner in the firm's M&A group in the
7  summer of 2016; correct?
8    A. I don't know the precise date.
9    Q. Does that sound like the time
10  frame during which he became a staffing
11  partner?
12    A. Well, I would agree he's the
13  staffing partner at this time.
14    Q. And do you know when Mr. Cardwell
15  became a third-year associate?
16    A. It would have been sometime in
17  the fall of 2016, two years after he
18  started at the firm.
19    Q. Was he a member of the M&A group
20  at the time he became a third-year
21  associate?
22    A. Yes.
23    Q. Carolina Fenner claimed in her
24  e-mail to Mr. Cardwell that from the time
25  that Mr. Cardwell had become a third-year

Page 80

BICK - CONFIDENTIAL
2  associate, Harold Birnbaum and Brian Wolfe
3  were the two primarily responsible for
4  staffing Cardwell. Do you agree with
5  that?
6    A. Yes, the M&A group had two
7  staffing partners, Brian and Harold, and
8  so they would have been staffing generally
9  third-year associates and above.
10    Q. Who else, if anyone, was also
11  primarily responsible for staffing
12  third-years and those more senior?
13    A. Just those two.
14    Q. Going back to that time, what
15  would your position have been within the
16  M&A group?
17    A. At this point, I was still head
18  of the M&A group.
19    REDACTED

Page 81

BICK - CONFIDENTIAL
2  REDACTED
3    Q. In your role as the head of the
4  M&A group, did you have input or were you
5  entitled to have input in the staffing of
6  associates on different assignments?
7    A. Any partner can have input to the
8  staffing partners. There's dialogues all
9  the time. When new deals come in you talk
10  to the staffing partners and you give them
11  input as to your needs and who is
12  available.
13    MR. JEFFRIES: I'm now going to
14  turn to tab 3. I'd like to have tab 3
15  moved into evidence.
16    MR. BIRENBOIM: Mr. Bick, are you
17  okay, do you need a break?
18    THE WITNESS: I'm still okay,
19  Bruce.
20    MR. BIRENBOIM: Anyone else need
21  a break on our team?
22    MR. JEFFRIES: Here's what we'll
23  do. We'll take a break in a few
24  minutes. I'm just going to make it
25  through this next range of questions

21 (Pages 78 - 81)

Page 106

```
 1          BICK - CONFIDENTIAL
 2  Mr. Cardwell's performance reviews?
 3          MR. BIRENBOIM:  Objection to
 4  form.
 5          THE WITNESS:  Harold's knowledge
 6  would be derivative in the sense that
 7  he would have been in the M&A partner
 8  meetings where all associates are
 9  reviewed, and he in theory was at
10  those meetings when Kaloma was
11  reviewed and heard the performance
12  review.
13  BY MR. JEFFRIES:
14      Q.   What about with respect to
15  Ms. Fenner, would the same rationale apply
16  to Ms. Fenner with respect to her ability
17  or her derivative knowledge of
18  Mr. Cardwell's performance reviews?
19      A.   Generally representatives of
20  associate development, Renee, Carolina,
21  others would participate at review
22  sessions for associates.  I don't know
23  whether Carolina was present on the day
24  that Kaloma received his review and heard
25  the review internally with the partners.
```

Page 107

```
 1          BICK - CONFIDENTIAL
 2      Q.   And based on the nature of the
 3  e-mails that we've read from
 4  Ms. Carolina Fenner with respect to the
 5  staffing of Mr. Cardwell, you would agree
 6  that Ms. Fenner was concerned as to the
 7  lack of staffing that Mr. Cardwell was
 8  receiving during the period of October
 9  2016 through March 2017; correct?
10          MR. BIRENBOIM:  Objection,
11  foundation.
12          THE WITNESS:  I don't know if she
13  was concerned or not.  I think she's
14  asked -- she knows that he has
15  capacity and is asking that he get
16  work but I don't know the state of her
17  mind.
18  BY MR. JEFFRIES:
19      Q.   Well, she clearly thinks that he
20  should be staffed; correct?
21      A.   Yes, it would be great if we
22  could give him something, yes.
23      Q.   During the period of October 2016
24  through March 2017, you worked with the
25  firm's M&A partners; correct?
```

Page 108

```
 1          BICK - CONFIDENTIAL
 2      A.   Who worked with the firm's M&A
 3  partners?
 4      Q.   Yourself, as the head of the M&A
 5  group, you would have been working with
 6  the M&A partners in a variety of
 7  capacities; correct?
 8      A.   I'm sorry, David, what was the
 9  time period you're talking about?
10      Q.   October 2016 through March 2017.
11      A.   Yes, I was head of the M&A group
12  and I would be working with partners in
13  that capacity.
14          MR. JEFFRIES:  You can take this
15  exhibit down, Zach.
16  BY MR. JEFFRIES:
17      Q.   And in your capacity as the head
18  of the M&A group, you would have had as we
19  discussed, input with respect to staffing
20  during that period of time; correct?
21      A.   I was not responsible for
22  day-to-day staffing so generally I
23  wouldn't have been involved in these type
24  of staffing decisions.  So you say I could
25  have input, yes, I could walk into
```

Page 109

```
 1          BICK - CONFIDENTIAL
 2  Harold's office and ask, but my
 3  interaction with staffing partners was
 4  generally staffing on my matters.
 5      Q.   But I think you would agree that
 6  as a matter of practice based off of your
 7  position as the head of the group, you had
 8  input in -- you had the ability to have
 9  input into the staffing assignments --
10      A.   You say as a matter of practice.
11  If I wanted to go in and talk to partners
12  about particular staffing, I could.
13      Q.   And during the period of October
14  2016 through March 2017, you worked with
15  the firm's M&A partners to staff
16  Mr. Cardwell differently than the firm's
17  white M&A associates, didn't you?
18      A.   I did not.
19      Q.   Did Mr. Cardwell's race in any
20  way contribute to you and the firm's M&A
21  partners staffing Mr. Cardwell differently
22  than the firm's white M&A associates?
23      A.   No, sir, it did not.
24          REDACTED
```

28 (Pages 106 - 109)

Page 110

1    BICK - CONFIDENTIAL/HIGHLY CONFIDENTIAL
2               REDACTED

9  BY MR. JEFFRIES:
10    Q.  And when you say until maybe
11  March time frame, what, if anything, did
12  you learn about the status of his billable
13  hours during March?
14    A.  That he had not had significant
15  billable hours consistent with the
16  document we reviewed previously.
17    Q.  How did that come to your
18  knowledge?
19    A.  Someone brought it to my
20  attention.  I can't remember precisely
21  who.
22    Q.  Well, who would have been in a
23  position to bring that particular detail
24  to your attention at that time?
25    A.  Different people.

Page 111

1    BICK - CONFIDENTIAL/HIGHLY CONFIDENTIAL
2    Q.  Would that have been something
3  that was brought to your attention by the
4  staffing coordinators?
5       MR. BIRENBOIM:  Objection, calls
6    for speculation.  You can answer.
7       THE WITNESS:  Any number of
8    people could have brought it to my
9    attention.
10 BY MR. JEFFRIES:
11    Q.  So just to be clear, I'm speaking
12  about the period -- a period of October
13  2016 through March 2017 during which
14  Mr. Cardwell was a member of the M&A
15  group; correct?
16    A.  Yes.
17    Q.  And accordingly, or
18  correspondingly rather, a period during
19  which as a member of the M&A group,
20  Mr. Cardwell was not staffed on matters by
21  the staffing coordinators of the M&A
22  group; correct?
23       MR. BIRENBOIM:  Objection to
24    form.
25       THE WITNESS:  I don't know about

Page 112

1    BICK - CONFIDENTIAL/HIGHLY CONFIDENTIAL
2    the staffing but I do know that he had
3    low billable hours.
4  BY MR. JEFFRIES:
5    Q.  In keeping with what you're
6  stating, you would agree that between
7  October 2016 and March 2017, Mr. Cardwell
8  had low billable hours, right?
9    A.  Yes, during I believe December
10  and January, February, March, it would
11  have been low billable hours, yes.
12    Q.  In fact, alarmingly low billable
13  hours; correct?
14    A.  That's your characterization, not
15  mine.
16    Q.  Well, 14.1 billable hours in
17  December, you don't consider that low?
18    A.  I do consider it low.
19    Q.  Low on what spectrum, is it an
20  average amount of -- is there nothing
21  about him billing 14 hours in December
22  that would be alarming to you as the head
23  of the M&A group?
24    A.  I guess I object to the fact that
25  it would be alarming.

Page 113

1       BICK - HIGHLY CONFIDENTIAL
2    Q.  How did you react to finding out
3  he billed 14 hours in December?
4       MR. BIRENBOIM:  Objection, form,
5    foundation.
6       THE WITNESS:  My reaction was we
7    needed to try to get him work.
8  BY MR. JEFFRIES:
9    Q.  How did you react to the fact
10  that there were a series of months after
11  December and up to the period of March
12  2017 where Mr. Cardwell billed single
13  digits in hours?
14    A.  Well, I think it gets into the
15  issue of his performance and so I
16  understood what had happened and how it --
17  why it was happening, but I knew it had to
18  be addressed and find him work.
19    Q.  With respect to your statement
20  about understanding what happened and why
21  it happened, what is it that you
22  understood happened that led to his
23  considerably low hours being billed
24  between December and March?
25             REDACTED

29 (Pages 110 - 113)



Page 114

1          BICK
2          REDACTED

8    Q.  So it's your understanding and
9  your testimony that since Mr. Cardwell
10  began at the firm, he had been receiving a
11  series of performance reviews indicating
12  that he was a poor performer?
13    A.  That he had performance issues
14  that he needed to work on.
15    Q.  What was your understanding of
16  those performance issues that would have
17  contributed to him -- that would have led
18  to him not being staffed while he was an
19  associate in your practice group?
20    A.  My recollection of the key points
21  that were communicated to him in different
22  performance reviews, including one that I
23  discussed with him, would be first that I
24  would think of as sort of time management
25  and process issues which would be

Page 115

1          BICK
2  responsiveness to calls and e-mails from
3  members of the team and clients, to
4  understanding sort of the work needed to
5  be done, making sure he asked all the
6  questions so that he could deliver a
7  better subset of work product when he
8  delivered it and not requiring additional
9  work by either the associates or the
10  partner in charge, just attention to
11  details and carelessness where sometimes
12  work would not be completed with the right
13  conforming changes or other items
14  addressed, and again, general lack of
15  understanding from time to time on work.
16      So this had been communicated to
17  him and was discussed in the fall and the
18  deal was that he was not keeping up with
19  the people in his immediate class of 2014
20  from a performance point of view and that
21  made it a bit more challenging for us to
22  staff him on the transactions that were
23  coming up relative to other associates who
24  had availability and time.
25    Q.  And were any of those assessments

Page 116

1      BICK - CONFIDENTIAL
2  based on -- so your position is that those
3  issues, those so-called issues are why he
4  wasn't staffed from December through
5  March?
6    A.  Yes, it was related to his
7  performance over the last two years.
8    Q.  And how do you know that?
9    A.  Because I read his review files.
10    Q.  How do you know that that is what
11  drove Mr. Wolfe's and Mr. Birnbaum's
12  thinking with respect to them refraining
13  from staffing him between October --
14  between the period of October 2016 through
15  March of 2017?
16      MR. BIRENBOIM:  Objection to
17    form, mischaracterizes the record, the
18    use of refrain.  You can answer.
19          REDACTED

Page 117

1      BICK - CONFIDENTIAL
2          REDACTED

13      MR. JEFFRIES:  So at this time I
14  would like to move in tab 7.
15      (Exhibit 7, document Bates
16  labeled DPW_SDNY-000086138, marked for
17  identification.)
18  BY MR. JEFFRIES:
19    Q.  So at the very bottom of the
20  page, do you see the e-mail --
21    A.  I'm just trying to get the
22  control.  I'm going to increase the size
23  because I can't read it.  Okay.
24    Q.  I'm going to be drawing your
25  attention to the e-mail from you to

30 (Pages 114 - 117)

BICK - CONFIDENTIAL
1
2 I have no recollection that Kaloma's
3 complaint was discussed at the firm
4 meeting during the week of February
5 5th.
6 BY MR. JEFFRIES:
7    Q.  Well, what about conversations
8 about Mr. Cardwell generally?  Did you
9 engage in any conversations about
10 Mr. Cardwell generally during the annual
11 meeting of 2018?
12    A.  Outside the firm meeting, we had
13 some discussions regarding Kaloma in the
14 month of February.  I don't recollect
15 whether it was during the week of the
16 annual meeting but it would have been just
17 a separate conversation, not associated
18 with the firm meeting.
19    Q.  So with respect to those
20 conversations, who were they had with?
21    A.  To my recollection, it would be
22 Tom Reid, the managing partner, Louis
23 Goldberg, Oliver Smith, both M&A partners,
24 and perhaps a few others I don't
25 recollect.

BICK - CONFIDENTIAL
1
2    Q.  Do you recall if you had
3 conversations with Harold Birnbaum about
4 Mr. Cardwell in February?
5    A.  Harold might have been included
6 but I don't remember.
7    Q.  Do you recall whether you had
8 conversations with Brian Wolfe about
9 Mr. Cardwell in February 2018?
10    A.  He might have been included, too,
11 but I don't remember.
12    Q.  Do you recall whether you had any
13 conversations with Daniel Brass about
14 Mr. Cardwell in February of 2018?
15    A.  I do not think so.
16    Q.  What about Len Kreynin?
17    A.  He could have been included but I
18 don't remember.
19    Q.  What is it about the period --
20 what is it about the period of February
21 2018 that sparks your recollection that
22 there were conversations about
23 Mr. Cardwell during that specific period
24 of time?
25    A.  Well, in terms of the chronology

BICK - CONFIDENTIAL
1
2 here, roughly two weeks prior to this
3 e-mail chain, I know that Louis Goldberg
4 and Oliver Smith sat down and talked to
5 Kaloma about his performance and was
6 effectively giving him his review for the
7 2017 time period.
8 REDACTED
17    And so from that review until a
18 date in February, we were considering what
19 we would do, whether to continue trying to
20 get him work and staff him on transactions
21 or effectively tell him to go look for
22 another job.  The conclusion was that he
23 should look for another job, that he
24 wouldn't be staffed on matters going
25 forward, so looking for another job would

BICK - CONFIDENTIAL
1
2 be his -- what he should be doing.
3    He would get fully paid while he
4 was at the firm and that message was
5 delivered I think the week after this
6 annual meeting based on conversations we
7 had, and I believe it was Oliver and Louis
8 who went back and gave him that message.
9    Q.  And how do you recall that in the
10 sequence of events?
11    MR. BIRENBOIM:  Objection to
12 form.
13    THE WITNESS:  Based on the
14 documents I reviewed regarding his
15 review and my recollection.
16    MR. JEFFRIES:  Just off the
17 record for one moment.
18    (Discussion off the record.)
19    MR. JEFFRIES:  At this point, I'm
20 going to introduce tab 3 into
21 evidence.
22    VERITEXT CONCIERGE:  Would you
23 like me to pull tab 3 back up?  We
24 introduced tab 3 at 11:13 a.m.
25    MR. JEFFRIES:  Give me one

39 (Pages 150 - 153)

Page 182

1        BICK - CONFIDENTIAL
2  you've given into this line of questioning
3  based off of your prior response.
4        MR. JEFFRIES:  The witness
5    indicated that there were items, that
6    there were incidents that he learned
7    about within the -- within his --
8    within the process of him being aware
9    of the EEOC complaint and I'm asking
10    what other incident he learned
11    about --
12        MR. BIRENBOIM:  Wait a minute,
13    Mr. Bick.
14        THE WITNESS:  Sorry.
15        MR. BIRENBOIM:  I know exactly
16    what you're asking him and you're not
17    entitled to inquire what he learned
18    about from counsel in connection with
19    his meetings with counsel.  So I
20    direct the witness not to answer to
21    the extent that question calls for the
22    disclosure of those discussions.
23  BY MR. JEFFRIES:
24    Q.  Without asking and without giving
25  information about any advice given to you

Page 183

1        BICK - CONFIDENTIAL
2  by counsel, Mr. Bick, aside from this
3  particular incident that's chronicled in
4  the e-mail, were there other incidents
5  that you learned about relative to
6  Mr. Cardwell at the time that you were
7  discussing the EEOC complaint that
8  Mr. Cardwell made?
9    A.  I believe there were other
10  incidents but I learned about those where
11  counsel was present.
12        MR. BIRENBOIM:  Mr. Bick, to be
13    clear, if you learned something by --
14        MR. JEFFRIES:  Mr. Birenboim,
15    wait a minute.  Mr. Birenboim.
16        MR. BIRENBOIM:  I'm trying to
17    help.
18        MR. JEFFRIES:  We're not going to
19    do that.  This is neither an objection
20    nor anything appropriate for the
21    record.
22        MR. BIRENBOIM:  I was trying to
23    help you get the information.
24        MR. JEFFRIES:  I don't believe
25    that to be the case.  I'll do it

Page 184

1        BICK - CONFIDENTIAL
2    myself, thank you very much.
3  BY MR. JEFFRIES:
4    Q.  Mr. Bick, what is the -- what is
5  BAG?
6    A.  It's the Black Affinity Group.
7    Q.  And what are affinity groups?
8    A.  Affinity groups are different
9  groups of lawyers that get organized for
10  various functions such as for Black
11  associates, for Asian associates, for
12  women, parents, mothers, so they can form
13  different groups to meet and discuss
14  common issues relevant to the group and
15  other interests or as well as social
16  functions.
17    Q.  So the BAG group is a Black
18  Affinity Group within Davis Polk; correct?
19    A.  Yes.
20    Q.  Would BAG have existed during
21  2014 through 2018?
22    A.  I believe so but I'm not a
23  hundred percent sure when it started but I
24  believe it existed.
25        REDACTED

Page 185

1        BICK - CONFIDENTIAL
        REDACTED
9    Q.  To be clear, did you ever hear
10  about Mr. Cardwell and other BAG members
11  meeting with the firm's diversity
12  committee and associate development
13  department at any time --
14        MR. BIRENBOIM:  Objection, asked
15    and answered.
16    Q.  -- during the time he was
17  employed at the firm?
18        MR. BIRENBOIM:  Objection, asked
19    and answered.  You may answer again.
20        THE WITNESS:  I learned about it
21    after the complaint was filed.
22  BY MR. JEFFRIES:
23    Q.  Did you learn about -- what did
24  you learn about the meeting?
25        MR. BIRENBOIM:  Objection.

47 (Pages 182 - 185)

BICK - CONFIDENTIAL

1 BICK - CONFIDENTIAL
2 conversations. I don't know the precise
3 meetings or the actual conversations, but
4 management committee knew about the
5 meeting with Kaloma and general counsel
6 was involved at some juncture here.
7 Q. And how did they know about that
8 meeting with Kaloma?
9 MR. BIRENBOIM: Objection to
10 form.
11 THE WITNESS: Tom had a follow-on
12 meeting, everyone was informed and
13 again, Kaloma took his month off and I
14 was really focusing on coming up with
15 a work plan for when he returned.
16 BY MR. JEFFRIES:
17 Q. When you say everyone involved,
18 who are you talking about?
19 A. People from the general counsel's
20 office, the management committee, Jim, Tom
21 and myself. Sharon was I think involved
22 and knew what was going on.
23 Q. Were there any M&A partners that
24 were involved in the discussions that lead
25 up to this meeting?

1 BICK - CONFIDENTIAL
2 A. Not with respect to the meeting
3 with Tom but as I was focusing on a work
4 plan, just to get him work down the road,
5 I was going to be talking to some of the
6 M&A partners in connection with that
7 effort.
8 Q. And which M&A partners did you
9 intend to speak to?
10 A. Certainly the two staffing
11 partners. I told Brian and Harold, and
12 during the course of the discussions I
13 reached out to a few partners. I don't
14 know that I have a complete list about
15 their willingness to work with Kaloma on
16 some of their matters.
17 Q. Since Mr. Cardwell had expressed
18 concerns about staffing, did you tell the
19 staffing partners about the meeting with
20 Tom?
21 A. I have no actual recollection of
22 specifically talking about that with them.
23 My recollection again is talking about a
24 work plan and how to get Kaloma work.
25 That was the discussion I was having with

1 BICK - CONFIDENTIAL
2 them.
3 Q. Was it possible you communicated
4 information to the staffing partners about
5 the meeting with Tom?
6 MR. BIRENBOIM: Objection, calls
7 for speculation. You may answer.
8 THE WITNESS: I just don't know.
9 BY MR. JEFFRIES:
10 REDACTED
16 Q. So is it your testimony that in
17 2016, you had no information or no
18 knowledge about a meeting between Sheila
19 Adams, Kaloma Cardwell and Tom Reid?
20 A. I have no recollection of
21 discussing that dinner in prior periods.
22 Q. Did you come to learn that during
23 that dinner with Tom Reid and Sheila
24 Adams, Mr. Cardwell discussed topics
25 related to diversity and inclusion at

1 BICK - CONFIDENTIAL
2 Davis Polk?
3 MR. BIRENBOIM: Objection to the
4 extent it calls for the disclosure of
5 conversations with counsel. Otherwise
6 you can answer.
7 THE WITNESS: I have no
8 recollection of the substance of the
9 discussions at that dinner.
10 BY MR. JEFFRIES:
11 Q. Did the discussions about that
12 dinner come up in relation to
13 conversations about the EEOC complaint
14 that Mr. Cardwell filed against Davis
15 Polk?
16 MR. BIRENBOIM: Same caution, any
17 discussions or information learned
18 from counsel, I would direct the
19 witness not to answer. If you learned
20 it from reading Mr. Cardwell's
21 complaints, you certainly can testify
22 about that.
23 THE WITNESS: I have no
24 substantive recollection.
25 MR. JEFFRIES: I ask that tab 10

Page 198

1      BICK - HIGHLY CONFIDENTIAL
2    be moved into evidence.
3         (Exhibit 12, document Bates
4    labeled DPW_SDNY-000099560, marked for
5    identification.)
6  BY MR. JEFFRIES:
7    Q.  Do you see the item that's been
8  placed into evidence?
9    A.  Yes.
10   Q.  Can you make it any larger?  Why
11 don't we make it larger.
12      Do you see that that's an e-mail
13 from Rocio Clausen and Carolina Fenner to
14 Mr. Cardwell on September 8, 2016?
15   A.  Yes, I'm just reading it.
16      (Witness perusing document.)
17      Yes, I've read it now.
18   Q.  Do you see where the e-mail
19 states, "I hope you are well.  Would you
20 be able to assist the credit group (mainly
21 JW Perry and Frank Manley) with some KYC,
22 organization, materials, resolution,
23 certificates, et cetera, for a REDACTED
24 deal closing later this month?"
25      Do you see that?

Page 199

1      BICK - HIGHLY CONFIDENTIAL
2    A.  I do.
3    Q.  On or around September or October
4  in 2016, were you aware that Rocio Clausen
5  and Carolina Fenner had reached out to
6  Mr. Cardwell and attempted to staff him on
7  a credit assignment?
8    A.  I was not aware of this staffing
9  request.
10           REDACTED

17   Q.  You never observed any
18 discussions or you were never informed of
19 any discussions related to Ms. Clausen's
20 attempt to staff Mr. Cardwell on a credit
21 assignment in 2016?
22   A.  No, something like this would not
23 have been brought to my attention.
24   Q.  At this point in time in
25 September of 2016, Ms. Clausen was a

Page 200

1      BICK - HIGHLY CONFIDENTIAL
2  manager in the associate development
3  department; correct?
4    A.  Yes.
5    Q.  And what would your role have
6  been at that point in time, in September
7  of 2016?
8    A.  I was on the management committee
9  and at that point I was head of the M&A
10 group.
11   Q.  At that point in time,
12 Mr. Cardwell would have been an associate
13 in the management -- in the M&A
14 department; correct?
15   A.  Yes.
16   Q.  And did you ever learn of an
17 attempt to staff Mr. Cardwell while he was
18 one of your associates in the M&A
19 department in a -- with respect to an
20 assignment in the credit department?
21   A.  Look, this happens with some
22 frequency where one group needs help and
23 they don't have sufficient resources, so
24 certainly within corporate that group will
25 reach out and ask for help from other

Page 201

1      BICK - HIGHLY CONFIDENTIAL
2  practice groups and we do this all the
3  time.  So I read this, this is a fairly
4  standard request and the reason Kaloma is
5  being asked is because he did a rotation
6  in credit so he has some training and
7  experience that would be useful to the
8  team working on this REDACTED transaction.
9  So from my vantage point reading this for
10 the first time, I think this is fairly
11 standard and not unusual.
12   Q.  At any time were you aware that
13 Mr. Cardwell and Rocio Clausen had a
14 meeting about the staffing assignment?
15   A.  I have no recollection of that
16 meeting, no.
17   Q.  Do you have any reason to believe
18 that Mr. Cardwell questioned whether the
19 assignment or his hours were connected to
20 his race?
21   A.  I did not hear any such
22 discussion or allegation.
23      MR. JEFFRIES:  At this point in
24 time I'm going to ask that tab 11 be
25 moved into evidence.

51 (Pages 198 - 201)

Page 202

1          BICK - CONFIDENTIAL
2          VERITEXT CONCIERGE:  I believe
3    tab 11 was moved into evidence at
4    1:22 p.m.  Would you like me to pull
5    it up?
6          MR. JEFFRIES:  Yes.
7    BY MR. JEFFRIES:
8      Q.   With respect to this exhibit --
9    we've already discussed the fact that in
10   this particular exhibit, the person
11   related to as John is yourself; correct?
12     A.   I believe so, yes.
13     Q.   And you see where it says that
14   Kaloma needs to be someone's project as
15   soon as possible?
16     A.   Yes.
17     Q.   I.e., get work and hours and
18   direct feedback?
19     A.   Yes.
20     Q.   During Mr. Cardwell's employment,
21   have you ever heard people describe
22   Mr. Cardwell as needing to be someone's
23   project?
24     A.   No.
25     Q.   To your knowledge, was

Page 203

1          BICK - CONFIDENTIAL
2    Mr. Cardwell made someone's project?
3          MR. BIRENBOIM:  Objection to
4    form.
5          THE WITNESS:  Not to my
6    recollection, no.
7    BY MR. JEFFRIES:
8      Q.   Within the context of this
9    e-mail, what does it mean or what is being
10   communicated with respect to Kaloma
11   Cardwell being made someone's project?
12         MR. BIRENBOIM:  Objection to
13   form, no foundation.  It's not the
14   witness's e-mail.
15         THE WITNESS:  I would be
16   speculating.  You would have to ask
17   Sharon.
18   BY MR. JEFFRIES:
19              REDACTED

Page 204

1          BICK - CONFIDENTIAL
2              REDACTED

11     Q.   You mentioned that that belief
12   was in part formed by conversations with
13   others.  Which others, which people are
14   you speaking about that contribute to that
15   assessment?
16     A.   I spoke to Sophia as we discussed
17   earlier and I reviewed review files from a
18   whole bunch of lawyers regarding his
19   performance over the years.
20     Q.   Anyone else?
21     A.   In September, not to my
22   recollection, no.
23     Q.   So the review files you mentioned
24   from other associates, do you know which
25   associates those review files were from?

Page 205

1          BICK - CONFIDENTIAL
2          MR. BIRENBOIM:  Objection to
3    form, mischaracterizes the testimony.
4          THE WITNESS:  Again I reviewed
5    lawyer feedback that was in his review
6    file, so that covered all lawyers, it
7    could be associates, it could be
8    counsel, it could be partners.
9    BY MR. JEFFRIES:
10     Q.   And you believe that those
11   individuals describe Mr. Cardwell as a
12   poor performer at that time?
13     A.   They identified performance
14   issues that needed to be addressed by
15   Kaloma going forward.
16     Q.   Well, my question is whether or
17   not they described him as a poor
18   performer.
19     A.   I don't recollect the use of the
20   precise phrase that you're using, poor
21   performer.  But again, the issues that we
22   discussed of having issues with the
23   substantive work, maybe not understanding
24   the work assignment which led to working a
25   little bit longer than was contemplated on

52 (Pages 202 - 205)



Page 222

BICK - CONFIDENTIAL

1         BICK - CONFIDENTIAL
2 when you became aware that Mr. Cardwell
3 asked the firm if he could view his
4 personnel file and performance reviews?
5    A.  I do remember that he asked to
6 review the personnel files.
7    Q.  And how did you become aware of
8 Mr. Cardwell's request?
9    A.  I believe the request was made to
10 Sharon Crane and I learned about it
11 through her or derivatively through her.
12    Q.  And did the firm indeed allow
13 Mr. Cardwell to see any of the documents
14 that were a part of his personnel file or
15 performance reviews?
16    A.  I don't remember.
17    Q.  Aside from being informed, aside
18 from the possibility or aside from being
19 informed by Ms. Crane about the request
20 being made by Mr. Cardwell, were you
21 updated on what, if any, action was taken
22 in regards to Mr. Cardwell's request?
23    A.  I have no recollection of the
24 request or the outcome other than he made
25 that request.

Page 223

BICK - CONFIDENTIAL

1         BICK - CONFIDENTIAL
2    Q.  Do you know if it was against
3 firm policy to allow Mr. Cardwell to see
4 any documents that were a part of his
5 personnel file or performance reviews?
6    A.  I do know that our policy for
7 lawyers was not to give them their
8 personnel file if they requested it.
9    Q.  You said that the policy was not
10 to give the associate their performance
11 file or their personnel file or
12 performance reviews; is that correct?
13    A.  That was our policy not to give
14 those files out to lawyers.
15    Q.  What about viewing those items,
16 what's your understanding of the firm's
17 policy that was in place during the time
18 of Mr. Cardwell's employment with respect
19 to allowing an associate to view their
20 personnel file or performance reviews?
21    A.  What I answered previously that
22 our policy we would not give or allow them
23 to review their personnel policy --
24 personnel file.
25    Q.  And what is that position that

Page 224

BICK - CONFIDENTIAL

1         BICK - CONFIDENTIAL
2 you've expressed based on?
3    MR. BIRENBOIM:  Objection.
4    THE WITNESS:  Look, it was a
5 policy that predated my time so I
6 wasn't part of the original
7 discussion.
8 BY MR. JEFFRIES:
9    Q.  Do you have any indication as to
10 whether or not that policy had changed in
11 any way from the time that it was put into
12 existence?  You indicated that it predated
13 you.  Do you have any indication as to
14 whether or not there were any changes
15 within that policy that would have
16 extended to the time that you were -- or
17 that would have extended to the time
18 encompassing Mr. Cardwell's request to see
19 his file?
20    A.  I'm not familiar with or don't
21 recollect any changes.  There may have
22 been changes that are required by law but
23 I'm not familiar with that either.
24    Q.  So what was your understanding
25 with respect to why Mr. Cardwell was

Page 225

BICK - CONFIDENTIAL

1         BICK - CONFIDENTIAL
2 denied the ability to see his performance
3 reviews and personnel files?
4    MR. BIRENBOIM:  Asked and
5 answered.  You can answer.
6    THE WITNESS:  I was going to say
7 as I've previously answered, our
8 policy was not to allow lawyers to see
9 or have their personnel files, so that
10 was the reason why he didn't get his.
11 BY MR. JEFFRIES:
12    Q.  Was Mr. Cardwell's request the
13 first time that an associate requested to
14 see his or her performance reviews, to
15 your knowledge?
16    A.  I don't know prior requests.
17    MR. JEFFRIES:  Zach, can we take
18 down Exhibit 10?
19 BY MR. JEFFRIES:
20        REDACTED



Page 226

```
1         BICK - CONFIDENTIAL
2              REDACTED
8     Q.   And is it your recollection that
9  Mr. Cardwell asked for the leave of
10 absence?
11    A.   That is my understanding, yes.
12    Q.   And why do you have that belief?
13        MR. BIRENBOIM:  Objection to
14    form.
15        THE WITNESS:  In connection with
16    preparation.  I read e-mails at the
17    time.
18 BY MR. JEFFRIES:
19    Q.   With respect to the e-mails that
20 you read in connection with that
21 development, who were those e-mails from?
22    A.   I don't remember the person.  It
23 was someone in HR because he had been sort
24 of nonresponsive to Phillip Mills in
25 connection with an M&A transaction that he
```

Page 227

```
1  was working with and given the lack of
2  response which extended over 24 hours, we
3  became concerned about where he was and
4  what was happening.  So multiple people
5  reached out to him, including HR, and my
6  recollection is he responded to HR and
7  flowing out of that was that he had to
8  take some time off.
9     Q.   Is it your understanding that the
10 person that reached Mr. Cardwell was the
11 one that received the request from
12 Mr. Cardwell to take a leave?
13    A.   I don't know specifically but I
14 do believe that the person at HR who was
15 reaching out, he responded to her, but I
16 don't know the whole series of
17 conversations between her and Kaloma
18 Cardwell.
19    Q.   Do you remember anything else
20 about this event?
21    A.   No, I think I've described what I
22 remember but if you have any specific
23 questions, I'm happy to answer.
24    Q.   How did the M&A group respond
```

Page 228

```
1         BICK - CONFIDENTIAL
2  to -- how did the M&A group respond to
3  Mr. Cardwell's request for a leave of
4  absence?
5     A.   I don't think there was any M&A
6  group response.
7     Q.   Is it normal for an associate to
8  request a leave of absence?
9         MR. BIRENBOIM:  Objection to
10    form.
11        THE WITNESS:  Yes, I think
12    associates and lawyers generally
13    request a leave of absence from time
14    to time based on personal
15    circumstances.
16 BY MR. JEFFRIES:
17    Q.   What's the firm's position on
18 mandating nonvoluntary leave for
19 employees?
20        MR. BIRENBOIM:  Objection to
21    form.
22        THE WITNESS:  Mandating
23    non-mandatory leaves?  Implying what?
24 BY MR. JEFFRIES:
25    Q.   You indicated Mr. Cardwell
```

Page 229

```
1         BICK - CONFIDENTIAL
2  requested the leave of absence; correct?
3     A.   I thought he did.  That's my
4  recollection.
5     Q.   Well --
6     A.   Because he responded that he
7  wasn't able to respond to Phillip because
8  of these stress issues.
9     Q.   What would your response be if I
10 told you that Mr. Cardwell was -- if I
11 told you that the leave of absence was
12 something that was put to Mr. Cardwell by
13 firm management as opposed to a leave of
14 absence that he himself had requested?
15        MR. BIRENBOIM:  Objection to
16    form.
17        THE WITNESS:  I was on the
18    management committee.  I have no
19    recollection of that.  Maybe someone
20    discussed it with him but not to my
21    knowledge.
22 BY MR. JEFFRIES:
23    Q.   With respect to the meeting --
24 actually withdrawn.
25        Have you yourself seen any
```

58 (Pages 226 - 229)

Page 230

1          BICK - CONFIDENTIAL
2   documents indicating Mr. Cardwell's
3   request for a leave of absence?
4       A.   I remember seeing one e-mail
5   where he was reporting in and saying that
6   he was unable to respond because something
7   to the effect that he was having a
8   difficult time.
9                    REDACTED

14      Q.   And to the best of your
15  understanding, why did Mr. Cardwell file a
16  complaint with EEOC?
17      MR. BIRENBOIM:  Objection to
18  form, no foundation.  This witness
19  doesn't know what Mr. Cardwell is
20  thinking but you can answer.
21      MR. JEFFRIES:  The witness
22  testified as having reviewed the
23  complaints.  I'm asking him to answer
24  based off that.
25      THE WITNESS:  He was alleging

Page 231

1          BICK - CONFIDENTIAL
2   racial discrimination and his
3   treatment while at the firm.
4   BY MR. JEFFRIES:
5       Q.   And what else do you remember
6   about Mr. Cardwell's complaints, if
7   anything else?
8       A.   No, no more details than that.
9       Q.   Did you have any conversations
10  about Mr. Cardwell's administrative
11  complaints when Mr. Cardwell was working
12  at the firm?
13      A.   Can you rephrase that?  I didn't
14  hear the whole question.
15      Q.   Did you have any conversations
16  about Mr. Cardwell's administrative
17  complaints when he was working at the
18  firm?
19      A.   When you refer to administrative
20  complaints, what is that?
21      Q.   Complaints to EEOC and NYS DHR.
22      MR. BIRENBOIM:  You can answer
23  that yes or no with respect to
24  counsel.
25      THE WITNESS:  Can you just repeat

Page 232

1          BICK - CONFIDENTIAL
2    now the whole question?
3   BY MR. JEFFRIES:
4       Q.   Sure.
5           Did you have any conversations
6   about Mr. Cardwell's administrative
7   complaints when he was working at the
8   firm?
9       A.   Only in the context of talking to
10  management committee with counsel present.
11      Q.   So it's your testimony that each
12  of the conversations that you had about
13  Mr. Cardwell's administrative complaints
14  were in the presence of counsel and with
15  the rest of the management committee; is
16  that your testimony?
17      A.   Yes, that was the general
18  practice.
19      Q.   And does that include e-mail
20  communications?
21      A.   I believe so, yes.
22      Q.   Did you have any conversations
23  about -- did you have any general
24  conversations with any other members of
25  the firm partnership with respect to

Page 233

1          BICK - CONFIDENTIAL
2   Mr. Cardwell's complaints, the EEOC
3   complaint and the NYS DHR complaint?
4       A.   Not to my knowledge, no.
5       Q.   A moment ago you mentioned
6   that -- you mentioned the term general
7   practice in connection with your
8   conversations with the management
9   committee and with respect to the general
10  practice in relation to Mr. Cardwell's
11  administrative complaint.  Aside from
12  those types of conversations, did you have
13  any conversations with anyone else inside
14  of the firm with respect to Mr. Cardwell's
15  complaints?
16      A.   No, I think I answered this
17  question before but the answer is no, to
18  my knowledge.
19      Q.   And were you obligated to act on
20  those complaints in any way in your role
21  as a partner?
22      MR. BIRENBOIM:  Objection to
23  form.  If you understand that, you can
24  answer it.
25      THE WITNESS:  How do you define

59 (Pages 230 - 233)

Page 242

BICK - CONFIDENTIAL
1       BICK - CONFIDENTIAL
2  in his first rotation, if he got five
3  reviews, who would make the decision as to
4  characterize which reviews would be
5  weighed more than others in the summary
6  review process?
7       A.  Again, the process that you're
8  describing is not how I see a review
9  process.  Just again at a high level in an
10  annual review, there will be a reviewing
11  partner assigned to give the associate the
12  review.  That reviewing partner will look
13  at the written reviews submitted by
14  lawyers who have worked for in this case
15  Kaloma.
16       And that review then is discussed
17  at a practice group meeting, in this case
18  let's say M&A, and other M&A partners are
19  encouraged to participate and attend that
20  meeting.  Not everyone does, they have
21  work clients or client conflicts but most
22  do attend those meetings.  So the
23  particular associate with the reviewing
24  partner leading the discussion is
25  discussed.

Page 243

1       BICK - CONFIDENTIAL
2       Others can raise questions of
3  input.  People who have given written
4  reviews can add in or answer questions or
5  give more background.  And from that, the
6  group discusses what the message should be
7  to the lawyer in question, and the
8  reviewing partner is responsible for
9  taking that consensus review from the
10  group, summarizing it and giving it to the
11  lawyer in question in their annual review.
12       Q.  We'll come back to that.  Do you
13  see this document is dated December 5,
14  2017?
15       A.  Actually where is that?
16       Q.  Would you just turn to the second
17  page?
18       A.  Yes, I see a date, December 5,
19  2017.
20       Q.  Now, if you turn to the next
21  page, page 3, you're looking at the bottom
22  of the page, do you see the paragraph that
23  starts with Cardwell's performance?
24       MR. BIRENBOIM:  Can we go down a
25  bit?

Page 244

1       BICK - CONFIDENTIAL
2       MR. JEFFRIES:  Yes, you can go
3  down a bit.
4  BY MR. JEFFRIES:
5       Q.  And do you see where it says in
6  the second to last sentence in that
7  paragraph, do you see the sentence that
8  begins with "And despite meaningful"?
9       A.  I'm sorry, David, I'm just
10  reviewing these paragraphs here.
11       (Witness perusing document.)
12       Q.  Again that's going to be the
13  middle paragraph, second to last sentence
14  I'm drawing your attention to.
15       A.  Okay, sorry David, where do you
16  want me to look?
17       Q.  So middle paragraph.
18       A.  The one that says Cardwell's
19  performance, that paragraph?
20       Q.  That paragraph, second to last
21  sentence.
22       A.  "And despite meaningful realtime
23  feedback"?
24       Q.  Yes, and that line reads,
25  "Despite meaningful realtime feedback over

Page 245

1       BICK - CONFIDENTIAL
2  the course of years, together with
3  repeated interventions and second chances,
4  Cardwell's performance has failed to
5  improve."
6       Do you see that?
7       A.  I do, yes.
8       Q.  So the firm told the NYS DHR that
9  Cardwell received meaningful realtime
10  feedback over the course of years; is that
11  true?
12       A.  I believe he did, yes.
13       Q.  So what meaningful realtime
14  feedback over the course of years did
15  Mr. Cardwell receive in 2015?
16       MR. BIRENBOIM:  Objection.
17       THE WITNESS:  It varied.  He just
18       received to my knowledge his annual
19       review from an M&A partner, but others
20       had indicated that they had talked to
21       him about his performance on various
22       transactions.
23  BY MR. JEFFRIES:
24       Q.  So in regards to 2015, it's your
25  testimony that the meaningful realtime

62 (Pages 242 - 245)

Page 246

```
 1          BICK - CONFIDENTIAL
 2   feedback that you're talking about
 3   consisted of the summary review; is that
 4   correct?
 5      A.  No, I said there was the summary
 6   review by the M&A partner who gave him his
 7   annual review in 2015 but to my
 8   recollection, some of the reviews said
 9   that they had discussed these issues with
10   Kaloma.
11      Q.  Do you recall any of those
12   reviewers that said that they discussed --
13   that they had taken up further discussion
14   with Mr. Cardwell with respect to any
15   performance issues or anything like that?
16      A.  I don't remember name by name but
17   again, I reviewed all his reviews and that
18   is my recollection, that some of them did
19   discuss issues such as meeting deadlines
20   and responsiveness, attending to details.
21   These things came up from both associates
22   and partners.
23      Q.  So in regards to 2015 reviews
24   that you may have been relying on for that
25   particular answer, did any of them
```

Page 247

```
 1          BICK - CONFIDENTIAL
 2   describe Mr. Cardwell as a poor performer?
 3      A.  To my knowledge, no one used that
 4   phrase, poor performer, in the context of
 5   the review.
 6      Q.  And what about with respect to
 7   2016?
 8              REDACTED
                              . Again the same
13   words you see in this paragraph,
14   responsiveness to the team, to the
15   clients, care and attention to details,
16   asking questions at the beginning so he
17   fully understood what the assignment was,
18   because it would appear that he didn't
19   fully understand the assignment and that
20   led to one missing deadlines, and that the
21   work product wasn't always very good so it
22   would take time and effort for the
23   supervising senior lawyers to redo the
24   work, these things were flagged, not
25   always fall together but lawyers were
```

Page 248

```
 1          BICK - CONFIDENTIAL
 2   seeing this from time to time.
 3      Q.  And is it your testimony that
 4   these things were flagged in reviews that
 5   you would have -- is it your testimony
 6   these things were flagged with respect to
 7   reviews in 2016?
 8      A.  Yes, based on -- certainly in
 9   2016.  I know Sophia sat him down and
10   discussed all of these things in detail so
11   that's very important realtime feedback.
12   And then I sat down and spoke to him in
13   June of 2016 and talked about the need to
14   focus on things that I thought were
15   correctable, if he worked at it, which is
16   responsiveness, that's within his control,
17   paying attention to details and care,
18   that's just rereading documents and making
19   sure that he made all the changes that
20   were necessary, and then making sure you
21   understood the assignment going in so that
22   if you have any questions, go back and ask
23   because if you wait too long, it leads to
24   him taking too much time and not meeting
25   deadlines.  So again you can sort of
```

Page 249

```
 1          BICK - CONFIDENTIAL
 2   manage that process and if you can work on
 3   understanding the assignment and asking
 4   questions, then hopefully that will
 5   ameliorate the poor work product that was
 6   turned in as the deadlines approached.
 7          MR. JEFFRIES:  I'm going to
 8      introduce at this point tab 19.
 9          (Exhibit 15, document entitled
10      M&A - Junior Associate Annual Review -
11      Highlights, marked for
12      identification.)
13   BY MR. JEFFRIES:
14      Q.  Have you seen this document
15   before, Mr. Bick?
16      A.  Yes, this is the 2015 review that
17   Bill Chudd as reviewing partner did.
18      Q.  Do you see the header that
19   says -- well, was this document created by
20   the associate development department?
21          MR. BIRENBOIM:  Objection to
22      form, foundation.  If you know, you
23      can answer.
24   BY MR. JEFFRIES:
25      Q.  This document right here.
```

63 (Pages 246 - 249)

Page 254

BICK - CONFIDENTIAL

1    correct?
2
3        MR. BIRENBOIM:  Objection to
4    form, completely mischaracterizes the
5    document.  You may answer.
6        THE WITNESS:  No, I think it
7    highlights key issues and if I'm
8    reading this, this is not typical of a
9    well-performing associate.  So this is
10   a constructive feedback where he needs
11   to be responsive, he has to improve
12   communication, he has to meet
13   deadlines, he needs to spend more time
14   with work product so he can get that
15   work into them in a timely fashion and
16   understand what he is doing.  So this
17   is not a great review to get.
18   BY MR. JEFFRIES:
19       Q.  In keeping with the things that
20   you've indicated, nowhere on this document
21   does it indicate that Mr. Cardwell is
22   behind his class; right?
23       A.  No, but I have -- I read the
24   underlying reviews myself so I know there
25   was a concern in that regard.

Page 255

BICK - CONFIDENTIAL

1
2        Q.  And on this particular document,
3    again nowhere does it state that
4    Mr. Cardwell received a negative review
5    from anyone at the firm, correct, looking
6    at the face of the document that's been
7    produced in evidence?
8        A.  No, I disagree with that because
9    the areas for improvement suggest he did
10   not get a positive review and it could be
11   viewed as a negative review, which is why
12   these areas of constructive feedback,
13   areas that he should work on sort of
14   reflect that.
15       Q.  Is there any language on this
16   review, aside from your interpretation of
17   other documents which are not subject to
18   this line of questioning, is there
19   anything on this particular document that
20   states -- is it written in any way that
21   Mr. Cardwell should receive a midyear
22   performance review?
23       A.  It doesn't say he should receive
24   a midyear performance review, no.
25       Q.  We can take this down.

Page 256

BICK - CONFIDENTIAL

1
2        As an employee of Davis Polk,
3    what position did Mr. Cardwell hold during
4    the time of his employment?
5        A.  He was an associate in the
6    corporate group.
7        Q.  Was Mr. Cardwell qualified for
8    that position?
9        MR. BIRENBOIM:  Objection to
10   form.
11       THE WITNESS:  How do you mean
12   qualified?  I mean he graduated from
13   law school, he got his JD, he was
14   admitted to the bar, so those are the
15   base qualifications.  He received an
16   offer from Davis Polk to join on a
17   full-term basis.
18   BY MR. JEFFRIES:
19       Q.  So on the basis of the things you
20   just mentioned, he was qualified for the
21   position of being an associate at Davis
22   Polk; correct?
23       A.  Based on the interview we had
24   with him and his time as a summer
25   associate, yes.

Page 257

BICK - CONFIDENTIAL

1
2        Q.  What were Mr. Cardwell's job
3    responsibilities as an associate?
4        A.  As a first year, he would do the
5    introductory basic work for corporate
6    transactions.  That could range from
7    helping senior lawyers get a transaction
8    to signing, it can help with closing
9    documents, a lot of due diligence review,
10   both on the buy side and sell side for
11   various transactions, and just learning
12   the basic blocking and tackling of the
13   corporate transactions that you're working
14   on.
15       Q.  Did Mr. Cardwell's job
16   responsibilities ever change as an
17   associate?
18       A.  Not significantly because the
19   performance issues that we've been talking
20   about held him back from taking on
21   increasing senior roles and senior
22   responsibilities over the time period that
23   we've talked about.
24       Q.  You indicated not significantly,
25   but did they change in any respect as he

65 (Pages 254 - 257)

Page 258

1        BICK - CONFIDENTIAL
2  continued in his time as an associate at
3  Davis Polk?
4      A.  Yes, he was given more advanced
5  assignments to work on that he wouldn't
6  have gotten as a first-year associate, so
7  there was some evolution in terms of the
8  work that he was being exposed to.
9      Q.  How long did Mr. Cardwell remain
10 as an associate at Davis Polk?
11     A.  During the four-year period.
12     Q.  Did Mr. Cardwell's position
13 change at any point during his employment?
14     A.  Change in what way?
15     Q.  Was he ever promoted from the
16 position of associate or demoted in any
17 way?
18     A.  No, the only change I can think
19 of would be that he was told in February
20 of 2018 that he should look for a new job
21 and that he wouldn't be actively staffed
22 on corporate transactions in the M&A
23 group.  So he was still an associate,
24 still getting paid but he's no longer
25 working on transactions and his job is to

Page 259

1        BICK - CONFIDENTIAL
2  look for a job.
3      Q.  How did Mr. Cardwell perform as
4  an associate?
5      A.  Well, again, we flagged the
6  issues.  His critical issues were
7  responsiveness, responding to e-mails,
8  both from team members in Davis Polk and
9  being reachable and not responding to
10 clients and other third parties.  Lack of
11 care or attention to details during the
12 work that he was doing.  Not fully
13 understanding the assignment which led to
14 taking longer than would be expected for
15 the particular assignment and thus not
16 meeting deadlines, and then not
17 understanding the transaction in full, not
18 asking sufficient questions to inform
19 himself that led to sometimes poor work
20 product that needed to be redone by senior
21 people supervising him.  So those were
22 issues that sort of were there from the
23 get-go and continued throughout his tenure
24 with Davis Polk.
25     Q.  Did you conduct performance

Page 260

1        BICK - CONFIDENTIAL
2  evaluations of Mr. Cardwell personally?
3      A.  I gave him -- I sat down with him
4  and did an interim review in June of 2016.
5      Q.  How did you evaluate
6  Mr. Cardwell's performance?
7      A.  Exactly the way we discussed.  I
8  said I reviewed review files from the
9  various lawyers, I've spoken to Sophia and
10 going forward to succeed at Davis Polk,
11 there was some key things he should focus
12 on and work on, again responsiveness to
13 other lawyers here and third parties,
14 paying careful attention to details,
15 meeting deadlines and improve the work
16 product.
17 █████████ REDACTED █████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

Page 261

1        BICK - CONFIDENTIAL
2  ████████ REDACTED ████████
█████████████████████████████
█████████████████████████████
█████████████████████████████
████████ .
8      MR. JEFFRIES:  I'm going off just
9   for one moment.
10     (Discussion off the record.)
11 BY MR. JEFFRIES:
12     Q.  So what was the timing of those
13 performance evaluations or of your
14 performance evaluation with respect to
15 Mr. Cardwell's complaints?
16     MR. BIRENBOIM:  Objection to
17  form, no foundation for complaints.
18     THE WITNESS:  I'm not sure I
19  understand the question.  What was the
20  timing of?
21 BY MR. JEFFRIES:
22     Q.  What was the timing of the
23 evaluation that you gave Mr. Cardwell in
24 relation to the complaints that were made?
25     MR. BIRENBOIM:  Objection.

66 (Pages 258 - 261)

Page 262

BICK - CONFIDENTIAL

BY MR. JEFFRIES:

2  BY MR. JEFFRIES:
3  Q.  What was the time frame?
4  A.  Again, you mean his EEOC
5  complaint and the New York State
6  complaint, is that what you're talking
7  about?
8  Q.  Well, I'm talking about the
9  complaints that you mentioned that you had
10  become aware of throughout the course of
11  the litigation.  You mentioned becoming
12  aware of a complaint made to Sharon Crane,
13  to the BAG group, to Mr. Goldberg, so --
14  A.  These individual complaints, not
15  the legal complaints, is that correct, is
16  my understanding correct?  Those were
17  all --
18      MR. BIRENBOIM:  Wait, objection
19   to the form of the question.  You may
20   answer.
21      THE WITNESS:  My knowledge of
22   those complaints all came after I gave
23   my interim review to Kaloma.
24  BY MR. JEFFRIES:
25  Q.  And again, how did your knowledge

Page 263

BICK - CONFIDENTIAL

2  of those complaints come about?
3      MR. BIRENBOIM:  Objection, asked
4   and answered.  You can answer again if
5   you wish.
6      THE WITNESS:  I learned through
7   discussions at the management
8   committee and outside counsel or
9   general counsel's office in that time
10   frame after the EEOC complaint.
11  BY MR. JEFFRIES:
12  Q.  And you mentioned a review that
13  you yourself had performed of
14  Mr. Cardwell.  Do you remember that?
15  A.  Yes.
16  Q.  How did that review come about?
17  A.  I think we talked about this
18  before but I had a meeting with members of
19  associate development in June where we
20  were looking at professional development
21  of Black American associates in the
22  corporate department.  There was a slide
23  dedicated to Kaloma that flagged several
24  issues that caught my attention.  We had
25  more discussion.

Page 264

BICK - CONFIDENTIAL

2      In particular, what I hadn't
3  heard about before in particular was the
4  performance in capital markets and that
5  rotation from October of 2015 through
6  April 1, 2016 that Sophia had talked to
7  him about.  So I was very concerned that these
8  of.  So I was very concerned that these
9  were some significant performance issues
10  and wanted to get more information and
11  talk to her about it.
12  Q.  During Mr. Cardwell's employment,
13  did you ever wonder if any of
14  Mr. Cardwell's performance reviews were
15  impacted by his complaints?
16      MR. BIRENBOIM:  Objection to
17   form, no foundation he knew about
18   complaints before the legal papers
19   were filed.  You may answer.
20      THE WITNESS:  Because I wasn't
21   aware of the complaints that you're
22   talking about, it didn't impact my
23   interim review.
24  BY MR. JEFFRIES:
25  Q.  How did Mr. Cardwell's

Page 265

BICK - CONFIDENTIAL

2  performance compare to the performance of
3  other employees in Mr. Cardwell's class?
4      MR. BIRENBOIM:  What time period?
5  BY MR. JEFFRIES:
6  Q.  Well, relative to each period of
7  time during which, Mr. Bick, you would
8  have been evaluating him.  So in relation
9  to his class, how would you have assessed
10  his performance in relation to his
11  classmates?
12  A.  I think each reviewing lawyer
13  that I looked at would have a slightly
14  different assessment but I, looking at all
15  of the reviews from the beginning that he
16  had received, the submissions from all
17  lawyers, I thought at this time I gave the
18  interim review that he was performing at a
19  level of below his peers in 2014.  And it
20  was he was still young and still
21  developing so he needed to focus on
22  these issues and start to make corrections
23  going forward so he wouldn't have this
24  become worse over time.
25  Q.  Did anyone else have that opinion

67 (Pages 262 - 265)

Page 266

BICK - CONFIDENTIAL

1            BICK - CONFIDENTIAL
2  at that time?
3      A.  Yes, I remember Bill Chudd was
4  concerned that he was -- could be
5  perceived as behind in his class.  Sophia
6  certainly believed that he was behind
7  compared to other comparable associates.
8      Q.  Anyone else aside from Bill Chudd
9  or Sophia Hudson?
10     A.  No one to my recollection
11 specifically used that term.
12     Q.  What about Harold Birnbaum?
13     A.  I don't remember his review in
14 the context of this time period of M&A in
15 2015 and then back in M&A starting April
16 before I gave the interim review.
17     Q.  Was Mr. Cardwell ever placed on a
18 performance improvement plan?
19         MR. BIRENBOIM:  Objection to
20     form.
21         THE WITNESS:  What do you mean a
22     performance review plan?
23 BY MR. JEFFRIES:
24     Q.  A performance improvement plan, a
25 remediation plan of any type, something to

Page 267

1            BICK - CONFIDENTIAL
2  help improve his performance as an
3  associate, are you aware of whether or not
4  Mr. Cardwell was ever placed on anything
5  like that during his employment?
6      A.  Well, are you referring to 2017
7  and the work plan we came up with or are
8  you referring to this time period, call it
9  2014 through end of 2016?
10     Q.  I'm asking you globally, 2014
11 through 2018.  If there's more than one,
12 then please indicate it, but if there's
13 only one that comes to mind, then I'd ask
14 that you indicate that as well.  So with
15 respect to performance improvement plans,
16 performance improvement efforts, what are
17 you aware of with respect to Mr. Cardwell
18 during his employment?
19     A.  Well, in the period from 2014
20 through 2016, he got specific feedback
21 from Bill Chudd, Sophia, myself and Len
22 Kreynin in the 2016 review period to work
23 on these performance issues, so I don't
24 characterize that as a remediation plan,
25 but he was given specific issues to focus

Page 268

1            BICK - CONFIDENTIAL
2  on where the performance needed
3  improvement.  Then after he had met with
4  Tom Reid in March and took the time off in
5  April, when he came back we had worked out
6  a specific work plan with him going
7  forward which was designed to give him
8  realtime feedback, hands-on training and
9  teaching from partners who were really
10 good teachers, that was their reputation,
11 in order to focus on all of these issues
12 and try to catch him up and make
13 improvements in all these areas.
14     Q.  And so would you say that the one
15 following March 29th of 2017, would you
16 say that was the first work plan?
17     A.  That was the specific work plan
18 we developed for Kaloma to address his
19 performance issues and get him staffed on
20 corporate transactions so he would be in a
21 position to do the work and hopefully
22 improve on these performance issues.
23                REDACTED



12 BY MR. JEFFRIES:
13     Q.  Was this communicated to him?
14     A.  Yes.
15     Q.  How so?
16     A.  When he came back from his time
17 off in April, I sat down with him and
18 described what we would be working with
19 him on.
20     Q.  Was anyone else a part of that
21 meeting?
22     A.  No, it was just Kaloma and
23 myself.
24     Q.  And so what specifically did you
25 tell him he had to do in that meeting

68 (Pages 266 - 269)

Page 270

BICK - CONFIDENTIAL

1          BICK - CONFIDENTIAL
2 between the two of you?
3     A.  I said that we would be giving
4 him an assignment with a partner in the
5 M&A group and he would work on that
6 assignment with that M&A partner until it
7 was completed.  That M&A partner would be
8 spending time with him to make sure he
9 understood the transaction.  The partner
10 would be paying attention to the issues
11 that we had identified for improvement
12 such as responsiveness, attention to
13 details, meeting deadlines and doing good
14 work.
15          Once that assignment with the
16 partner was completed, we would find
17 another assignment and move on to the next
18 one and continue to work on those issues,
19 and that my goal was to find partners who
20 were good hands-on teachers where he could
21 learn a lot from them and they were
22 willing to help him directly.
23     Q.  So it's your testimony that you
24 told him it was a plan designed to improve
25 his performance; is that correct?

Page 271

1          BICK - CONFIDENTIAL
2     A.  Just what I said, I think I
3 explained what I told him.
4     Q.  With respect to what you said, is
5 it your understanding the takeaway he
6 would have had was that it was a plan to
7 improve his performance, or did you at any
8 point indicate to him that was the
9 specific thrust of the work plan that you
10 were explaining to him?
11     A.  Yes, I told him that he would be
12 working with partners I thought were very
13 good teachers, with young lawyers and they
14 would be working with him directly so he
15 wouldn't be working with I'll call it a
16 senior lawyer between him and the partner.
17 They would be paying attention and trying
18 to give him -- review his work product,
19 give him realtime feedback that he was
20 very keen to get, and they knew about and
21 would focus on the issues that we had
22 alerted to him that he needed to be
23 working on.  So if they felt he was not
24 being responsive or not paying attention
25 to detail, they would try to give that

Page 272

1          BICK - CONFIDENTIAL
2 feedback to him on a very timely basis so
3 he could continue to improve.
4     Q.  So is it your understanding that
5 Mr. Cardwell's meeting with Tom Reid and
6 Len Kreynin in March was related to his
7 poor performance?
8          MR. BIRENBOIM:  Objection to
9     form, mischaracterizes his testimony.
10          THE WITNESS:  No, I think the
11     meeting in part was driven by his not
12     getting a lot of work in the three- or
13     four-month period we talked about at
14     the end of 2016 and the first few
15     months of 2017.
16 BY MR. JEFFRIES:
17     Q.  And his complaint at the time;
18 correct?
19          MR. BIRENBOIM:  Objection to
20     form, mischaracterizes the record.
21          THE WITNESS:  I'm not aware of
22     the complaint.  In my mind it was
23     driven by the lack of work.
24 BY MR. JEFFRIES:
25     Q.  Well, Mr. Cardwell himself

Page 273

1          BICK - CONFIDENTIAL
2 certainly had opinions about why he wasn't
3 getting work and those opinions were
4 expressed in the meeting with Tom Reid and
5 Len Kreynin; right?
6          MR. BIRENBOIM:  Objection to
7     form.
8          THE WITNESS:  If you could be
9     more clear about what his objections
10     were based on, I could be maybe more
11     responsive.
12 BY MR. JEFFRIES:
13              REDACTED




23     Q.  Was Mr. Cardwell ever suspended
24 from work at Davis Polk?
25     A.  Not to my knowledge.

69 (Pages 270 - 273)

Page 282

BICK - CONFIDENTIAL
1          BICK - CONFIDENTIAL
2   BY MR. JEFFRIES:
3       Q.   Based on what you know about
4   Mr. Cardwell's reviews, what processes did
5   the M&A partners follow in terms of
6   deciding which reviews should be given
7   more weight than others?
8       A.   Again, based on my just answered
9   question he was discussed, it depends on
10  what time period.  If you want to look at
11  2016, Len Kreynin was the reviewing
12  partner leading the discussion.  He had
13  gathered up the written reviews and
14  summarized them for the group and there
15  was a discussion by the group.  Again,
16  there's no formulaic weighting process.
17  Again, it's just a discussion here of the
18  issues Kaloma has and what message do we
19  want to give to him.
20      Q.   Did Len Kreynin decide that
21  Mr. Cardwell should receive a midyear
22  review?
23      A.   No, that's part of the consensus
24  review process, whether the associate,
25  based on the performance of feedback they

Page 283

1          BICK - CONFIDENTIAL
2   are going to get and the particular
3   constructive feedback or goals we want to
4   see them working on, the group on a
5   consensus basis decides whether that
6   should be a midyear review.  In 2016, the
7   consensus was that given these issues
8   regarding responsiveness, attention to
9   details, understanding assignments,
10  meeting deadlines and in some cases poor
11  work product, the consensus was that he
12  should be given a midyear review in 2017.
13      Q.   During Mr. Cardwell's employment,
14  did you see any documents that stated that
15  Mr. Cardwell knew how he was performing?
16      A.   Did I see any documents that he
17  knew?  Other than that he received the
18  reviews with these people, with these
19  goals, so I would have thought that based
20  on the reviews that Bill Chudd gave to
21  him, that Sophia gave to him on capital
22  markets, that I did on the interim basis
23  and that Len gave him, in my mind he
24  should have had a pretty good idea of the
25  issues that he needed to work on to be

Page 284

1          BICK - CONFIDENTIAL
2   successful at Davis Polk.
3       Q.   Is Mr. Cardwell still employed at
4   Davis Polk?
5       A.   He is not.
6       Q.   And when was Mr. Cardwell
7   terminated?
8       A.   I believe it was August of 2018.
9       Q.   What's the earliest moment that
10  you thought Mr. Cardwell might be
11  terminated for poor performance?
12          MR. BIRENBOIM:  Objection to
13      form.  You may answer if you recall.
14          THE WITNESS:  In fall of 2016 and
15      ultimately in obviously
16      January/February time frame of 2017.
17  BY MR. JEFFRIES:
18      Q.   And why did you have that --
19      A.   I'm sorry, the fall of 2017 and
20  January/February 2018.
21      Q.   So not the fall of 2016; correct?
22      A.   No, not before.
23          REDACTED

Page 285

1          BICK - CONFIDENTIAL
REDACTED

19  BY MR. JEFFRIES:
20      Q.   When was that decision -- when
21  were those discussions taking place, the
22  ones that led to the decision to terminate
23  Mr. Cardwell?
24      A.   That would be in the
25  January/February time frame of 2018.

72 (Pages 282 - 285)

Page 286

BICK - CONFIDENTIAL
1
2    Q.  And ultimately who made the
3  decision to terminate Mr. Cardwell?
4    A.  I think it was a group
5  discussion.  It would be certainly
6  management committee because of the EEOC
7  complaint and focusing on impact of
8  termination on those proceedings, and then
9  also getting consensus from a handful of
10  people, staffing partners, Louis Goldberg,
11  Oliver, who had given him the reviews,
12  REDACTED

16    Q.  With respect to specific
17  individuals, I heard you mention the
18  management committee, Louis Goldberg and
19  staffing partners.  So would that be
20  Harold Birnbaum; correct?
21    A.  Yes, Harold and I believe Brian
22  Wolfe.
23    Q.  And with respect to management
24  committee, would that conversation or
25  would that input related to terminating

Page 287

BICK - CONFIDENTIAL
1
2  Mr. Cardwell have involved input from
3  Mr. Tom Reid?
4    A.  Yes, it would have been Tom Reid
5  and Jim Rouhandeh.
6    Q.  And what about any other M&A
7  partners, would there have been any other
8  M&A partners who he worked with that gave
9  input as to the decision to terminate
10  Mr. Cardwell?
11    A.  Not to my recollection.
12    Q.  How was the termination decision
13  communicated to Mr. Cardwell?
14    A.  I believe Louis Goldberg, Oliver
15  Smith followed up on the official
16  performance review they gave him in
17  January with a follow-on message in
18  February.
19  REDACTED



Page 288

BICK - CONFIDENTIAL
1
2  REDACTED

4    A.  Yes, we have talked to other
5  lawyers and lawyers do get told by us that
6  based on performance, you need to look for
7  another job.
8    Q.  Between 2014 and 2018, were any
9  other associates terminated for the same
10  reason as Mr. Cardwell, specifically
11  performance as you mentioned?
12    A.  I don't have a specific list.  I
13  couldn't give you names.  I don't
14  recollect.
15    Q.  Who would have that information,
16  who would have that list of other
17  associates that would have been terminated
18  during the years of 2014 and 2018 for the
19  same reason as Mr. Cardwell?
20    A.  You'd have to look at their
21  written reviews where that message would
22  be delivered.
23    Q.  So is that to say there's not an
24  individual that would have knowledge
25  related to those occurrences by virtue of

Page 289

BICK - CONFIDENTIAL
1
2  their role within the firm?
3    A.  Could you rephrase the question?
4  You said a lot there.  I didn't follow it
5  all.
6    Q.  Who can you think of that would
7  have knowledge of that list by virtue of
8  their role within the firm?
9    A.  It's in the HR personnel files
10  for reviews.  If the lawyer is given a
11  message that they need to go a job and
12  leave the firm, that usually would be in
13  the review files as the message is given.
14    Q.  So what steps normally precede
15  the firm terminating an associate for poor
16  performance?
17    A.  No specific steps.
18    Q.  How long is an associate
19  permitted to remain employed at the firm
20  following a negative performance review?
21    MR. BIRENBOIM:  Objection to
22  form.
23    THE WITNESS:  It depends on the
24  circumstances.  It can vary but
25  generally the range would be three to

73 (Pages 286 - 289)

Page 290

```
1         BICK - CONFIDENTIAL
2     six months.
3   BY MR. JEFFRIES:
4     Q.   How long is an associate
5   permitted to remain employed at the firm
6   following a performance review where they
7   are rated as behind their peers?
8         MR. BIRENBOIM:  Objection to
9     form, no foundation, mischaracterizes
10    the record.  You may answer.
11        THE WITNESS:  No difference.
12  BY MR. JEFFRIES:
13    Q.   So that would again be three to
14  six months; is that correct?
15    A.   Somewhere in that range, can be
16  longer.
17    Q.   Are you aware of associates
18  remaining employed at the firm despite
19  receiving multiple negative reviews in a
20  prior review period?
21    A.   I'd have to look at the
22  individual cases.  I can't remember
23  specific cases.
24    Q.   Well, is this something that you
25  have a personal awareness of ever
```

Page 291

```
1         BICK - CONFIDENTIAL
2   happening?
3     A.   People have gotten negative
4   reviews in the sense that they have to
5   work on specific areas and remain
6   employed, so yes.
7     Q.   Are you aware of associates
8   remaining employed at the firm despite
9   receiving behind ratings in performance
10  reviews in a prior review period?
11        MR. BIRENBOIM:  Objection to
12    form.
13        THE WITNESS:  Again, I don't have
14    any details.
15  BY MR. JEFFRIES:
16    Q.   Are there any
17  nonperformance-based reviews -- excuse me,
18  are there any nonperformance-based reasons
19  that can contribute to an associate being
20  rated behind other associates in their
21  class?
22    A.   Not to my knowledge.  It's all
23  based on performance relative to other
24  members in their class.
25    Q.   Who made the decision to give
```

Page 292

```
1         BICK - CONFIDENTIAL
2   Mr. Cardwell a midyear review in June of
3   2016?
4     A.   He didn't get a midyear review.
5     Q.   So your testimony is that
6   Mr. Cardwell did not receive a midyear
7   review in 2016?
8     A.   I view it as an interim review.
9   In the fall of 2015 he was not told he was
10  going to be given a midyear review, which
11  is I think is a term of art, that says in
12  connection with your annual review, here
13  are the performance issues we want you to
14  work on and we're going to touch base six
15  months later in a midyear review around
16  May or June.
17        The interim review I gave to
18  Kaloma was based on the information I got
19  in my meeting with associate development
20  in June and it caused me great concern.  I
21  did talk to Sophia, I asked for review
22  forms to be filled by people who had
23  worked with him recently.  And then based
24  on all of that, I thought it was important
25  to sit down and give him that input.  I
```

Page 293

```
1         BICK - CONFIDENTIAL
2   know that he wanted realtime feedback and
3                   REDACTED
```

REDACTED

```
14    Q.   Are you aware of Sophia Hudson
15  giving Mr. Cardwell a review?
16    A.   Yes, not a formal written review
17  in the February time frame.  She sat down
18  and spoke to him and gave him very
19  concrete feedback about her experience
20  working with him and the issues he needed
21  to focus on.
22    Q.   Are you aware of her giving him a
23  review in 2016 at any time?
24    A.   Yes, we just talked about that.
25  At the end of his capital markets
```

74 (Pages 290 - 293)

Page 314

1        BICK - CONFIDENTIAL
2   feedback.  So in some cases maybe the
3   performance is very poor.  In some
4   cases it's a very good associate, they
5   just need to work on a particular area
6   and we want to see progress.  Some
7   people might view it as stigma.
8   Others, I don't think they do.  It's
9   all part of the review process.
10  BY MR. JEFFRIES:
11      Q.  And again, it's your testimony
12  that Mr. Cardwell asked the associate
13  development department for midyear
14  feedback; correct?
15      A.  That is not my testimony.  My
16  testimony is Kaloma asked for regular
17  realtime review on his work.  And so this
18  review, this interim review I'm giving him
19  in June because again it's not part of the
20  annual review process.  I didn't sit down
21  with the entire M&A group and review all
22  of these issues to deliver the group
23  consensus message that we've talked about
24  during the annual review process.  It was
25  just an interim review and it had two

Page 315

1        BICK - CONFIDENTIAL
2   purposes.  One, to go over again what
3   Sophia had talked about because there were
4   some serious performance issues and I
5   wanted to make sure he took them seriously
6   and worked on them as they are summarized
7   here; and two, I wanted to make sure I had
8   realtime review and input from the M&A
9   lawyers that he was working for starting
10  in April, May and early June.  And it was
11  good that I did because John Amorosi had
12  had a good experience, Laura Turano had a
13  good experience and that was very helpful.
14  And I communicated to him and said that's
15  what he needs to do and that's what he
16  needs to accomplish, continue to do that.
17  And again as I said earlier, a lot of
18  these issues regarding responsiveness,
19  carefulness, attention to details,
20  understanding the transaction, meeting
21  deadlines, I believe those all to be
22  within his control.  If he focused on them
23  and if he worked on them, he could improve
24  on each of those issues, so it was better
25  that he start to focus on them and make

Page 316

1        BICK - CONFIDENTIAL
2   improvements so by the time he gets to the
3   fall review, people could see that he's
4   working on each of these issues and see
5   continued improvement that some people saw
6   here.
7       Q.  When the firm decided to
8   terminate Mr. Cardwell, did they factor in
9   the June 2016 review, reviews rather?
10      A.  I don't think so.  I mean in the
11  sense that we knew that he had performance
12  issues from when he started, but I think
13  in the times where we're taking a
14  determination not to continue with him and
15  that message in February to look for a new
16  job, that's more influenced by the work we
17  had done with him starting in May of 2017.
18      Obviously, at a level prior
19  performance is a factor, we're aware of
20  that, but we're looking at is he making
21  any significant improvement in 2017 to be
22  operating as a third or fourth year
23  associate.  And as a practical matter, we
24  didn't see any significant improvement and
25  ultimately that's what led us to the

Page 317

1        BICK - CONFIDENTIAL
2   decision to terminate him because he's now
3   a rising fourth-year associate.
4                  REDACTED

17      MR. JEFFRIES:  Let's turn to tab
18  14 at this point in time.  You can
19  take this down, Zach.
20      (Exhibit 17, document Bates
21  labeled DPW_SDNY-000140827, marked for
22  identification.)
23      MR. JEFFRIES:  Can you enlarge
24  this a bit?
25      MR. BIRENBOIM:  Zach, can you

80 (Pages 314 - 317)



Page 326

```
1                BICK
2   M&A lawyers who were working with him
3   because based on his prior discussions
4   asking for realtime feedback, I'm sure
5   he'd say what do people think about and I
6   would be remiss not to have an answer when
7   he asked that question if I said I didn't
8   get any feedback, I don't know.  That
9   would have been a wrong outcome.
10                REDACTED
```

Page 327

```
1                BICK
2              REDACTED
```

Page 328

```
1                BICK
2              REDACTED
```

Page 329

```
1                BICK
2              REDACTED
                                    that he
12   needs to focus on to improve.
13         (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25
```

83 (Pages 326 - 329)