# Buergel Declaration Exhibit 6

Page 1

1
2          UNITED STATES DISTRICT COURT
3          SOUTHERN DISTRICT OF NEW YORK
4
5    KALOMA CARDWELL,            )
                  Plaintiff,    )
6                               )
            vs.                 )19 Civ. 10256
7                               )(GHW)
     DAVIS POLK & WARDWELL,     )
8    THOMAS REID, JOHN BICK,    )
     WILLIAM CHUDD, SOPHIA      )
9    HUDSON, HAROLD             )
     BIRNBAUM, DANIEL BRASS,    )
10   BRIAN WOLFE, and JOHN      )
     BUTLER,                    )
11                Defendants.   )
     _____   )
12
13
14            REMOTE DEPOSITION OF
15               HAROLD BIRNBAUM
16         located in New York, New York
17             Monday, April 12, 2021
18
19    (Transcript contains Confidential, Highly
20    Confidential and Attorneys' eyes only
21    portions - confidentiality designations
22    legend at back of transcript)
23
24    Reported By:
25    CATHI IRISH, RPR, CRR, CLVS

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8                    April 12, 2021
 9                    9:35 a.m.
10
11          Remote deposition of HAROLD
12    BIRNBAUM, with all participants
13    appearing via videoconference, before
14    Cathi Irish, a Registered Professional
15    Reporter, Certified Realtime Reporter,
16    and Notary Public of the State of
17    New York.
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    A P P E A R A N C E S:
 3
 4    JEFFRIES LAW
 5    Attorneys for Plaintiff
 6          1345 Avenue of the Americas
 7          New York, New York 10019
 8    BY:  DAVID JEFFRIES, ESQ.
 9
10    PAUL, WEISS, RIFKIND, WHARTON
11    & GARRISON
12    Attorneys for Defendants
13          1285 Avenue of the Americas
14          New York, New York 10019
15    BY:  BRUCE BIRENBOIM, ESQ.
16          SONDRA SAPORTA, ESQ.
17
18    ALSO PRESENT:
19      ZACH CZERENDA, Veritext concierge
20      KALOMA CARDWELL
21      MICHAEL FLYNN
22
23
24
25
```

Page 4

```
 1
 2    H A R O L D   B I R N B A U M,  called
 3       as a witness, having been duly sworn
 4       by a Notary Public, was examined and
 5       testified as follows:
 6    EXAMINATION
 7    BY MR. JEFFRIES:
 8       Q.  Good morning, Mr. Birnbaum.
 9       A.  Good morning, Mr. Jefferies.
10       Q.  I'm going to be asking you a few
11    questions and throughout the course of the
12    deposition I'm going to ask the following,
13    that you answer all questions verbally.
14    Do you understand that, sir?
15       A.  Yes.
16       Q.  That if there's an opportunity or
17    time during which you require a moment to
18    speak to your attorney that you ask to do
19    so.  However, I will indicate now that if
20    there's a question pending, I would ask
21    that any conversation with your attorney
22    take place after the question has been
23    answered.
24           Do you understand that, sir?
25       A.  I understand.
```

Page 5

```
 1                  BIRNBAUM
 2       Q.  I'm also going to indicate to you
 3    that if you don't understand a question
 4    that I ask that you ask me to rephrase it
 5    or indicate that there's a lack of
 6    understanding because if you answer the
 7    question, I'm going to be assuming that
 8    you understood it in its totality.
 9           Do you understand that, sir?
10       A.  Yes, I do.
11       Q.  Mr. Birnbaum, have you ever been
12    deposed before?
13       A.  No.
14       Q.  Have you ever been a plaintiff or
15    defendant in any other lawsuit aside from
16    this one?
17       A.  No, I have not.
18       Q.  Have you ever been arrested or
19    convicted of a crime?
20       A.  No.
21       Q.  Are you taking any medication or
22    under the influence of any substance that
23    affects your memory or your ability to
24    testify truthfully and accurately today?
25       A.  No, I'm not.
```

2 (Pages 2 - 5)

Page 54

BIRNBAUM - CONFIDENTIAL

1     BIRNBAUM - CONFIDENTIAL
2    of billable hours for a full-time
3    associate in a year?  Yes, there can
4    be lots of reasons for that, including
5    performance issues, sort of the most
6    likely one that comes to mind when you
7    put the hypothetical to me.
8    BY MR. JEFFRIES:
9        Q.  But the answer is yes, it would
10   catch your attention; correct?
11       MR. BIRENBOIM:  Objection,
12       mischaracterizes the witness's
13       testimony.
14   BY MR. JEFFRIES:
15       Q.  You can answer, Mr. Birnbaum.
16       A.  My answer is as I said.
17       Q.  Did Davis Polk utilize a weekly
18   capacity form or system to track
19   associates' matters and availability
20   during 2014 to 2018?
21       A.  So I can answer as to the M&A
22   group and the answer was yes, in that time
23   frame, I believe we did.
24       Q.  Please describe Davis Polk's
25   weekly capacity forms -- and first, we can

Page 55

1     BIRNBAUM - CONFIDENTIAL
2    take this down?  We can take Exhibit 1
3    down, thank you.
4        Mr. Birnbaum, please describe
5    Davis Polk's weekly capacity forms and
6    walk me through how the firm used the
7    forms to track associates' availability to
8    take on new work.
9        A.  Okay, now through this period I
10   was an associate for about half and
11   staffing partner for about half.  Are we
12   focused on a particular part of this
13   period?
14       Q.  Yes, I'm focused on the part when
15   you were a staffing partner.
16       A.  Okay.  So the use of these
17   reports was as follows.  As a staffing
18   partner, I would receive -- my fellow
19   co-staffing partner and I would receive, I
20   believe it was a weekly report that
21   indicated for each associate who was our
22   responsibility to staff, it would indicate
23   I believe the recent hours over a recent
24   historical period for each associate and
25   an indication of how much capacity that

Page 56

1     BIRNBAUM - CONFIDENTIAL
2    associate expected to have going forward
3    to take on new work.  And we would
4    receive, I believe it was a weekly e-mail
5    and we would refer to that for purposes of
6    making staffing decisions over the coming
7    week until we got the next report.
8        MR. JEFFRIES:  I'm going to ask
9        that tab 2 be moved in as Exhibit 2 at
10       this point in time.
11       (Exhibit 2, document Bates
12       labeled DPW_SDNY-000046578, marked for
13       identification.)
14       VERITEXT CONCIERGE:  Exhibit 2
15       has been introduced.  I'm pulling up
16       the screen share now.
17   BY MR. JEFFRIES:
18       Q.  At the bottom of the page, do you
19   see the e-mail from Mr. Cardwell to
20   Ms. Carolina Fenner on February 2, 2017 at
21   11:04 a.m.?
22       A.  I'm going to need a minute to
23   just blow this up a little bit and review
24   it so hold on one second.
25       Q.  So again I'm orienting you to --

Page 57

1     BIRNBAUM - CONFIDENTIAL
2        A.  Yes sorry.  I just need a minute.
3        Q.  Okay.  It's just one line.
4        A.  I just want to make sure I have
5    the context, that's all.
6        Q.  I'm going to point you to a part
7    in this document.
8        A.  I'm sorry, can I let you know
9    when I'm ready to proceed?
10       Q.  I'm not asking you to read the
11   entire document, Mr. Birnbaum, so I'm
12   going to ask that you orient your focus,
13   your attention to the parts I'm speaking
14   to you about.
15       The first is at this point in
16   time I'm asking that you look at the
17   message from Mr. Cardwell to Ms. Fenner --
18       A.  I'm sorry, I need to read the
19   whole e-mail to understand the context.
20   That is important to me in how I answer,
21   so if you could bear with me, that would
22   be great.
23       Q.  I'm just going to remind you for
24   purposes of your answer, I'm teeing up the
25   area that should be informing your

Page 58

BIRNBAUM - CONFIDENTIAL

1    BIRNBAUM - CONFIDENTIAL
2    answers, not the rest of the document but
3    the part that I'm teeing you to.
4        MR. BIRENBOIM:  The witness is
5        entitled to read as much of the
6        document as he wishes to put the
7        document in context.
8    BY MR. JEFFRIES:
9        Q.  I'm going to again ask for your
10   specific attention to where I've pointed
11   your attention.
12       A.  Okay, I'll let you know when I'm
13   ready.
14           Okay, I'm ready.
15       Q.  So you see where Mr. Cardwell
16   stated, just to confirm when a staffing
17   request is made, you determine which
18   associates could be, and ultimately are,
19   asked to work on matters, correct, you saw
20   that; right?
21       A.  Where is that?
22       Q.  You spent five minutes reading
23   the document.
24       A.  I'm sorry, could you just point
25   me to where it is so I have it in front of

Page 59

1    BIRNBAUM - CONFIDENTIAL
2    me when I answer the question?
3        Q.  Yes, it's at the bottom of the
4    page, it is --
5        A.  Here (indicating)?
6        Q.  Yes, the message from
7    Mr. Cardwell to --
8        A.  Yes, I see that.
9        Q.  And carrying forward, do you see
10   where Ms. Fenner responded in her e-mail
11   sent on February 2, 2017 at 11:24 a.m. by
12   telling Mr. Cardwell, your class is no
13   longer in my staffing territory.  I only
14   staff on first and second year but I saw
15   on Christine's chart that you have 100
16   percent capacity and I knew that lawyer
17   was very busy so I asked her if there was
18   any project that she could use your help
19   with.  She said she would love to have
20   your help with that specific one but that
21   she would keep you in mind for deal work
22   as well.
23           Do you see that?
24       A.  I do.
25       Q.  Do you see where Mr. Cardwell

Page 60

1    BIRNBAUM - CONFIDENTIAL
2    stated to Ms. Fenner in this e-mail sent
3    on February 2, 2017 at 11:32 a.m., this is
4    the first time than anyone has told me
5    that that you're no longer responsible for
6    my staffing me.  That raises two
7    questions.  One, who is the primary
8    persons responsible for staffing me; and
9    two, who receives my weekly capacity
10   upload form?
11           Do you see that?
12       A.  I do.
13       Q.  Do you see where Ms. Fenner's
14   e-mail sent to Mr. Cardwell on February 2,
15   2017 at 11:50 a.m., do you see that?
16       A.  Yes.
17       Q.  And do you see that Ms. Fenner in
18   the e-mail states the staffing partners
19   are currently -- the staffing partners
20   currently Brian Wolfe and Harold Birnbaum
21   handle staffing for third years and more
22   senior.  Automatic e-mail comes from the
23   system as me every Tuesday.  Christine
24   puts all updates together in one chart
25   which gets sent to the staffing partners

Page 61

1    BIRNBAUM - CONFIDENTIAL
2    and me.
3        Do you see that?
4        A.  I do.
5    REDACTED
11       Q.  Do you know when Mr. Cardwell
12   became a third year associate?
13       A.  I do not.
14       Q.  Would you dispute it if I said it
15   was in September of 2016?
16       A.  If he started at the firm in the
17   fall of 2014, he would have been at the
18   firm for two full years by the fall of
19   2016 and at that point in time often would
20   have been referred to as a third year
21   associate, two full years under his belt
22   arising a third year.  Terminology varies,
23   sometimes it's not until later in that
24   third year but that's the earliest he
25   would have been considered a third year

16 (Pages 58 - 61)

Page 86

```
1        BIRNBAUM - CONFIDENTIAL
2    been introduced.  I'm pulling it up
3    now.
4  BY MR. JEFFRIES:
5    Q.   And so do you see the e-mail from
6  Ms. Fenner to yourself and Brian Wolfe
7  sent on December 27, 2016?
8    A.  Yeah, I do.  Let me just read
9  this whole document here.
10       Okay, yes, I see it.
11    Q.  Do you see the subject line says
12  December 27, capacity update?
13    A.  I do.
14    Q.   This e-mail lists capacity
15  updates for M&A associates across five
16  different classes of associates; correct?
17    A.  Yeah, I don't remember this
18  e-mail but this looks like Carolina's sort
19  of staffing capacity report when the
20  regular format wasn't available for
21  whatever reason so yes, this looks like
22  her capacity report for this date.
23    Q.  Isn't it true that Cardwell is
24  the only associate on the list in this
25  e-mail who had 100 percent of his time
```

Page 87

```
1        BIRNBAUM - CONFIDENTIAL
2  free and available to take on new work?
3       MR. BIRENBOIM:  Objection, the
4    document speaks for itself.  You can
5    answer.
6       THE WITNESS:  Yes, he's the only
7    associate on this list with 100
8    percent next to his name.
9  BY MR. JEFFRIES:
10    Q.  Isn't it also true with the
11  exception of one other associate,
12  Mr. Cardwell is the only Black associate
13  listed in this e-mail?
14    A.  Let me just look and see if I can
15  remember here.  Let me just for my own
16  purposes, so -- I'm sort of -- I think I
17  know what each of these people identified
18  themselves as but [REDACTED] and [REDACTED] were
19  white.  [REDACTED] was Indian or I think
20  Pakistani.  [REDACTED] was white.  [REDACTED] was
21  of Asian descent, [REDACTED] was white.  [REDACTED] I
22  think was Persian.  [REDACTED] was white.
23  Mr. Cardwell was Black, [REDACTED] and [REDACTED]
24  were white.  [REDACTED] was Black.  [REDACTED] was
25  white.  [REDACTED] white.  [REDACTED] was I think
```

Page 88

```
1        BIRNBAUM - CONFIDENTIAL
2  Indian.  And [REDACTED] was white.
3           REDACTED
4
5
6    Q.  Do you see the part in
7  Ms. Fenner's e-mail where she told you and
8  Brian Wolfe, would be great if we could
9  give Cardwell something?
10    A.  I see that, yes.
11    Q.  So Mr. Birnbaum, at the time you
12  received Ms. Fenner's December 27th
13  e-mail, had you noticed that she had sent
14  you three e-mails over the prior two
15  months where she explicitly told you it
16  would be great if we could give Cardwell
17  something?
18    A.  I don't.  I don't remember but I
19  will say there were periods when I was
20  aware that he had quite a bit of capacity.
21  I was doing everything I could to staff
22  him but his performance issues made it
23  very, very difficult to do that.
24       MR. JEFFRIES:  I'm going to ask
25    that the question be marked to be
```

Page 89

```
1        BIRNBAUM - CONFIDENTIAL
2    stricken after the portion of the
3    answer in which the witness answered
4    affirmatively as to having received
5    the messages from Ms. Fenner.
6  BY MR. JEFFRIES:
7    Q.  At the time, okay, at the time
8  you got this message, you understood that
9  the word something meant staffing
10  assignment; right?  She's asking about
11  giving --
12    A.  That's how I interpret it now.
13  Again, I don't remember any of this but
14  looking at the e-mail now, that's how I
15  interpret it, yes.
16    Q.  And at this time you understood
17  that Carolina Fenner was a staffing
18  coordinator for the firm's most junior M&A
19  associates; right?
20    A.  Yes.
21    Q.  At the time you understood that
22  Ms. Fenner, a manager in the associate
23  development department, was familiar with
24  all of Mr. Cardwell's performance reviews;
25  right?
```

23 (Pages 86 - 89)

Page 90

BIRNBAUM - CONFIDENTIAL

1
2    A.  So I don't know if she was a
3  manager.  I don't know if that was her
4  title, I don't recall, and I don't know
5  that she was familiar with all the
6  performance reviews.  She may have been
7  but I don't know.
8    Q.  Isn't it true that at the time
9  Carolina Fenner was both concerned and
10  confused as to why neither you nor Wolfe
11  would staff Mr. Cardwell during the period
12  of October 2016 through March 2017?
13    A.  There are a number of problems
14  with that question.  First of all, I don't
15  think that's what Carolina thought.
16  Second of all, we didn't refuse to staff
17  him on anything.  We were trying as best
18  we could to staff him on deals that he
19  could handle.  The problem was he was a
20  very poor performer and it was difficult
21  due to his performance issue to staff him
22  on deals.  We were doing our best.
23    Q.  During the period of October 2016
24  through March of 2017, you staffed
25  Mr. Cardwell differently than the firm's

Page 91

BIRNBAUM - CONFIDENTIAL

1
2  white M&A associates, didn't you?
3    A.  No, and I don't know what you're
4  talking about.
5    Q.  Did Mr. Cardwell's race in any
6  way contribute to you staffing
7  Mr. Cardwell differently than the firm's
8  white M&A associates?
9    A.  Not at all.
10    Q.  Are you sure?
11    A.  Yes.
12    Q.  From October 2016 through March
13  2017, John Bick knew that Mr. Cardwell was
14  not being staffed on billable matters,
15  didn't he?
16    A.  I don't know.
17    MR. BIRENBOIM:  No foundation.
18  BY MR. JEFFRIES:
19    Q.  During the period of October 2016
20  through March 2017, what was John Bick's
21  nexus to the M&A department?
22    A.  He would have -- he would have
23  been -- he was a partner in the group.
24  Beyond that, I think he may have been
25  co-head of the group at the time but I'm

Page 92

BIRNBAUM - CONFIDENTIAL

1
2  not sure.
3    Q.  When you say co-head of the
4  group, do you mean co-head of the M&A
5  group; correct?
6    A.  I do.
7    Q.  The same group Mr. Cardwell was
8  in at that time; correct?
9    A.  Yes.
10    Q.  And so as co-head of the group,
11  did he have any say so in staffing?
12    A.  Not really.  I mean staffing was
13  the responsibility of the staffing
14  partners.  As co-head was he, you know,
15  did he have input, you know, from time to
16  time, maybe.  He may have but in general,
17  that was not his day-to-day responsibility
18  as I recall.
19    Q.  I'm not asking about day-to-day
20  responsibilities, just whether or not as
21  the co-head of the group, he had input in
22  staffing.
23    A.  He may have.  I don't recall.
24  Again I don't recall the specific staffing
25  instances.  I had quite a lot of these

Page 93

BIRNBAUM - CONFIDENTIAL

1
2  conversations at the time.
3    Q.  Did he care whether associates
4  were billing, did he care whether
5  associates within the M&A group were
6  billing or not?
7    MR. BIRENBOIM:  Objection, no
8  foundation.
9    MR. JEFFRIES:  You can answer,
10  Mr. Birnbaum.
11    MR. BIRENBOIM:  If you have a
12  basis to answer what he thought, you
13  can answer.
14    THE WITNESS:  I don't know what
15  was in his head.  I think we all cared
16  and wanted to see associates billing,
17  both for their own development and
18  for -- and to generate revenue and so
19  on but I don't know anything specific
20  to how Mr. Bick thought about it.
21  BY MR. JEFFRIES:
22    Q.  During the period of October
23  2016 -- wait, so your testimony is that as
24  a partner and as a staffing partner, you
25  can't give an opinion as to whether or not

24 (Pages 90 - 93)



Page 94

1        BIRNBAUM - CONFIDENTIAL
2  the co-head of the M&A group would want
3  his associates billing or not?
4        MR. BIRENBOIM:  Objection, no
5     foundation for knowing what's in his
6     head.  You can answer.
7        THE WITNESS:  It's all the same.
8     I don't know what was in John's head.
9     I don't know what was in -- we didn't
10    discuss it so I can't tell you that.
11    I assume as an M&A partner he would
12    want them working both for their own
13    career development and for revenue
14    generating purposes.  That would be my
15    expectation.  I just don't know what
16    was in Mr. Bick's head.
17  BY MR. JEFFRIES:
18            REDACTED

Page 95

1        BIRNBAUM - CONFIDENTIAL
2   REDACTED
                          the period of October 2016
5  through March 2017, did Mr. Bick say
6  anything to you that led you to not staff
7  Mr. Cardwell?
8     A.  No, not that I recall.
9     Q.  During the period of October 2016
10 through March 2017, did any other Davis
11 Polk partner directly tell you not to
12 staff Mr. Cardwell?
13    A.  No, not that I recall.
14    Q.  So is it possible, you indicated
15 you can't recall, is it possible that such
16 thing occurred?
17    A.  No.  I can't really imagine.
18    Q.  So you've indicated you can't
19 recall and you can't imagine.  I'm asking
20 you for a yes or no answer with respect to
21 whether or not between October 2016 and
22 March 2017 you as the staffing coordinator
23 were told by any other Davis Polk partners
24 directly not to staff Mr. Cardwell, is
25 your answer yes or no?

Page 96

1        BIRNBAUM - CONFIDENTIAL
2     A.  No.
3            REDACTED
18    Q.  So you made a decision not to
19 staff an associate for an extended period
20 of time based off of opinions given by
21 other partners but you don't remember any
22 of their names?
23        MR. BIRENBOIM:  Objection,
24    completely mischaracterizes the
25    testimony.  You may answer.

Page 97

1        BIRNBAUM - CONFIDENTIAL
2  BY MR. JEFFRIES:
3     Q.  What are their names?
4     A.  Look, that's not what I said and
5  let me explain.  Look, the staffing
6  process involves partners coming to
7  staffing partners with a deal and the
8  staffing partners proposing an associate
9  and there's often a bit of a negotiation
10 around that because the partner whose deal
11 it is wants the best associate they can
12 get and they may or may not be available,
13 it's a bit of a back and forth.  I could
14 never unilaterally impose an associate on
15 a partner, it just didn't work like that
16 so this was routine.  This happened just
17 like I said multiple times a day so no, I
18 don't remember the specifics or the
19 partners or the deals but I can tell you
20 it was very hard to staff Mr. Cardwell
21 because of his performance issues.
22    Q.  So you're saying it happened a
23 lot from a lot of different partners but
24 as you sit here today, you can't give me
25 the names of a single partner or a single

25 (Pages 94 - 97)

Page 98

BIRNBAUM - CONFIDENTIAL
1
2  deal in which that happened?
3      A.  No, it just -- it was so frequent
4  and routine at the time that I can't
5  remember those details.
6      Q.  And roughly speaking, how many
7  M&A partners were in the New York office
8  between 2014 and 2018?
9      A.  I don't know -- I don't know --
10  again, I don't know the numbers at any
11  point in time.  I think between 15 and 20
12  but I couldn't tell you specifically at
13  specific points in time in that period.
14     Q.  So less than 30?  It?
15     A.  Yes.
16     Q.  Did you have conversations with
17  Brian Wolfe about staffing Mr. Cardwell
18  during the period of October 2016 through
19  March 2017?
20     A.  I don't -- I just don't remember
21  any specifically.  As my fellow staffing
22  partner, I think it's likely that we did
23  but I just don't remember.
24     Q.  So do you have a recollection of
25  what Mr. Wolfe's assessment was that came

Page 99

BIRNBAUM - CONFIDENTIAL
1
2  from any of the conversations you had with
3  him with respect to staffing Mr. Cardwell
4  during the period of October 2016 through
5  March 2017 when you were both staffing
6  partners?
7      A.  I don't remember -- no, I don't
8  remember specifically what Mr. Wolfe's
9  assessment was.  I think he shared the
10  view held throughout the group that
11  Mr. Cardwell was a very poor performer but
12  I don't remember specific discussions
13  about that.
14     Q.  So in this instance, you're fine
15  injecting your belief as to what another
16  person thought about Mr. Cardwell but in
17  other questions throughout your testimony,
18  you've expressed reluctance as to
19  expressing your belief as to what an
20  individual was thinking.  Can you
21  reconcile that?
22         MR. BIRENBOIM:  Objection,
23     argumentative.  You can answer if you
24     can.
25         THE WITNESS:  Yeah, I think it's

Page 100

BIRNBAUM - CONFIDENTIAL
1
2  pretty easy to reconcile.  I was
3  talking with Mr. Wolfe about staffing
4  decisions a lot so I had a pretty good
5  sense of his views of all the
6  associates.  It's very -- it's very
7  different than I think the last
8  example we were talking about so I
9  think it's easily reconciled.
10 BY MR. JEFFRIES:
11     Q.  I'm going to turn to -- so just
12  before I move from this, is it your
13  opinion based on your assessment of
14  Mr. Cardwell, your position as a staffing
15  coordinator at the time and his
16  performance to the extent it was discussed
17  with you during 2014 and 2018, that
18  Mr. Cardwell was a risk to clients at the
19  point when you were making considerations
20  about staffing him?
21     A.  Sorry, so I don't -- just to be
22  clear, I became staffing partner when I
23  made partner in 2016.  I don't have any
24  recollection of Mr. Cardwell at all really
25  before that so I can't speak to any

Page 101

BIRNBAUM - CONFIDENTIAL
1
2  earlier periods.  Is your question about
3  from and after 2016 when I became the
4  staffing partner?
5      Q.  Yes, just like the other
6  questions I asked you, I'm asking you
7  about from October 2016 through March
8  2017, is your testimony today that
9  Mr. Cardwell was a risk to clients?
10         MR. BIRENBOIM:  Objection to
11     form.
12         MR. JEFFRIES:  You can answer.
13         MR. BIRENBOIM:  Answer if you
14     can.
15         REDACTED

26 (Pages 98 - 101)

1    BIRNBAUM - CONFIDENTIAL
2         ██████ REDACTED ██████
3    ██ ██████████████████
4  BY MR. JEFFRIES:
5    Q.  Your testimony if I'm clear is
6  also that you don't remember the names of
7  any people aside from Mr. Wolfe who was
8  your fellow staffing coordinator that had
9  given you this type of feedback about
10  Mr. Cardwell.  Isn't that what you also
11  testified?  You don't remember the names
12  of these people?
13       MR. BIRENBOIM:  Objection to
14  form.
15       MR. JEFFRIES:  Correct?
16       MR. BIRENBOIM:  Objection to
17  form.  You can answer.
18       THE WITNESS:  As I explained, I
19       had so many staffing conversations
20       about Mr. Cardwell and other
21       associates with my fellow partners
22       through this period, I don't remember
23       the specifics at this point.  What I
24       remember is a very strong and clear
25       general impression that he was a very

1    BIRNBAUM - CONFIDENTIAL
2       poor performer and had very serious
3       performance issues.
4  BY MR. JEFFRIES:
5    Q.  Which led to him not being
6  staffed for six months; correct?
7       MR. BIRENBOIM:  Objection to
8  form.
9       THE WITNESS:  I don't know what
10       period you're talking about or if he
11       was --
12  BY MR. JEFFRIES:
13    Q.  We're talking about the period,
14  Mr. Birnbaum, the same period we've been
15  talking about for the past 15 minutes,
16  October 2016 through March 2017.  Sounds
17  like you're saying that his performance
18  was so bad that you couldn't staff him for
19  six months; is that correct?
20       ██████ REDACTED ██████
21  ██ █████████████████████████████
22  ██ ██████████████  I think he had matters
23  ██ ████████████████████████████████
24  throughout that period of time so we were
25  sometimes able to succeed but it was very,

1    BIRNBAUM - CONFIDENTIAL
2  very difficult.
3       MR. JEFFRIES:  Okay.  I'd like to
4  introduce Exhibit 7, tab 7 at this
5  point in time.
6       (Exhibit 7, document Bates
7       labeled DPW_SDNY-000086138, marked for
8       identification.)
9  BY MR. JEFFRIES:
10    Q.  So at the very bottom of the
11  page, do you see the e-mail from you to
12  Mr. Cardwell sent on August 31, 2017 at
13  5:04 p.m.?
14    A.  Give me a minute here.
15       (Witness perusing document.)
16       Okay, the e-mail at the bottom of
17  this chain?
18    Q.  Yes.
19    A.  I see an e-mail there.
20    Q.  And you see that the subject of
21  the e-mail is pitch; right?
22    A.  I see -- I see the subject of the
23  next e-mail up is pitch.  I can't tell if
24  it was the same subject.
25    Q.  Do you see that your e-mail

1    BIRNBAUM - CONFIDENTIAL
2  stated, "Kaloma, we're pitching for a new
3  client, couple of public company deals,
4  and would like to include you on the team
5  for the pitch.  Nothing to do right now,
6  just wanted to give you a heads up.  Who
7  knows if we'll get it, but here's hoping.
8  Sounds like it wouldn't start until mid
9  September, FYI."
10       Is that what -- you'd agree
11  that's what the e-mail reads?
12    A.  Yes, that's what the words say.
13    Q.  Your words, your words, right,
14  your e-mail, your words?
15    A.  Yes, it looks like it was an
16  e-mail from me.
17    Q.  Before you sent this e-mail, did
18  anyone else besides yourself, Daniel Brass
19  and Leonard Kreynin -- Len Kreynin, know
20  that Mr. Cardwell would be on the team for
21  the pitch?
22    A.  I don't think so.
23    Q.  Well, did Louis Goldberg know?
24    A.  I don't recall that.
25    Q.  Do you know if John Bick knew?

27 (Pages 102 - 105)

Page 106

BIRNBAUM - CONFIDENTIAL

1
2    A.   I don't recall that.
3    Q.   Do you know if Thomas Reid knew?
4    A.   I don't recall that.
5    Q.   Do you know if William Aaronson
6  knew?
7    A.   No, I don't recall that.
8    Q.   Was this pitch important to the
9  firm's M&A group?
10   A.   I really don't remember any of
11 the details about it for the reasons that
12 we've discussed.
13   Q.   Which reasons are those?
14   A.   You know, this was a long time
15 ago and I handle a lot of these staffing
16 requests.  There could have been five
17 pitches that week, I just don't remember
18 the details.
19   Q.   Did the M&A group see this pitch
20 as an opportunity to build a long-term
21 relationship with a potential client?
22   A.   I just -- I don't remember the
23 pitch.  I mean I don't remember who it was
24 to, I just don't remember any of the
25 details.  At some level every pitch is

Page 107

BIRNBAUM - CONFIDENTIAL

1
2  important and an opportunity but I don't
3  remember any details about this so I
4  couldn't tell you.
5    Q.   You would agree that the firm
6  puts its best foot forward in an attempt
7  to secure a potential client; right?
8    A.   Pitches are important.
9    Q.   And so in keeping with my
10 question, would you agree that the firm
11 puts its best foot forward in this
12 attempting to secure business from a
13 potential client like in a pitch?
14   A.   Pitches were certainly looking to
15 impress clients and we're look certainly
16 looking to do that however we can.
17 Staffing pitches like staffing anything
18 else is subject to availability, subject
19 to competing demands on people's times,
20 you know, do we always put the best
21 partner forward, we put a great team
22 forward for sure but that's how pitches
23 work.
24   Q.   Do you see that within a minute
25 of -- as you look through the e-mail

Page 108

BIRNBAUM - CONFIDENTIAL

1
2  chain, you can see there's a response from
3  Mr. Cardwell; correct?
4    A.   On the Friday, September 1,
5  10:12 a.m. response?
6    Q.   Yes.
7    A.   I do see that.
8    Q.   So do you see that within a
9  minute of Mr. Cardwell having replied to
10 your e-mail, you forward Mr. Cardwell's
11 e-mail to the M&A partner Lynn Kreynin and
12 said, "See below, have no heard back from
13 Kaloma."
14        Does that mean that you have now
15 heard back from Kaloma?
16   A.   I don't remember what I meant but
17 looking at it now, that's what I think I
18 probably meant, yes, and this was -- this
19 was pretty standard practice.  I mean when
20 we have an assignment to fill, we talk to
21 the partner about who could do it,
22 identify an associate, reach out to the
23 associate and once the associate confirmed
24 availability, we confirm to the partner
25 that they are on board so that's what I

Page 109

BIRNBAUM - CONFIDENTIAL

1
2  was doing here.
3                  REDACTED

19   A.   I didn't, I didn't know it then,
20 no.
21   Q.   In this instance, with respect to
22 the pitch that we're talking about right
23 now, did the company ask Davis Polk to put
24 together a proposal?
25   A.   Sorry, I just don't remember any

28 (Pages 106 - 109)

1        BIRNBAUM - CONFIDENTIAL
2    not answered.
3        MR. BIRENBOIM:  If his answer is
4    he doesn't recall the policy, that's
5    his answer.
6        MR. JEFFRIES:  This is not an
7    answer about policy, this is his
8    understanding of retaliation within
9    the workplace setting at Davis Polk in
10   which he is a partner.
11       MR. BIRENBOIM:  No, you connected
12   it to the Davis Polk policy.  Go back
13   and read your question.
14   BY MR. JEFFRIES:
15       Q.  What's your understanding of
16   retaliation, Mr. Birnbaum?
17       A.  Just in general terms, it's
18   taking -- it's taking some action against
19   someone to punish them for something they
20   did.
21       Q.  What about discrimination?
22       A.  It's treating someone differently
23   for some perceived way in which they are
24   different.
25       Q.  What about harassment?

1        BIRNBAUM - CONFIDENTIAL
2        A.  It's acting in a way that's
3    offensive or makes someone uncomfortable
4    in some way.
5        MR. JEFFRIES:  Counsel.
6        MR. BIRENBOIM:  Yes, sir.
7        MR. JEFFRIES:  I need to make a
8    call to the court.  I would like to
9    propose a 30-minute break at this
10   time.  Is that acceptable?
11       MR. BIRENBOIM:  A call to the
12   court in this case?
13       MR. JEFFRIES:  No, no.
14       MR. BIRENBOIM:  Yes, we can break
15   for lunch.
16       MR. JEFFRIES:  Let's do a
17   30-minute lunch break.
18       MR. BIRENBOIM:  2 o'clock?
19       MR. JEFFRIES:  Let's do 2:05.
20       MR. BIRENBOIM:  Okay.
21       (Lunch recess taken at 1:37 p.m.)
22
23
24
25

1                BIRNBAUM
2        A F T E R N O O N   S E S S I O N
3        (Time noted:  1:50 p.m.)
4    H A R O L D   B I R N B A U M,  resumed
5        and testified as follows:
6    CONTINUED EXAMINATION
7    BY MR. JEFFRIES:
8        Q.  Mr. Birnbaum, I'm just going to
9    remind you you're still under oath from
10   earlier today.  Do you recall?
11       A.  Yes.
12       MR. JEFFRIES:  I'm going to ask
13   that tab 10 be moved into evidence.
14       VERITEXT CONCIERGE:  Tab 10 has
15   been introduced and I'm pulling it up
16   now.
17   BY MR. JEFFRIES:
18       Q.  Mr. Birnbaum, do you see the
19   e-mail -- do you see what's on your screen
20   right now?
21       A.  I do.  Let me zoom in here.
22       Q.  And it's an e-mail; correct?
23       A.  Yes, looks like an e-mail.
24       Q.  Do you see --
25       A.  Sorry, just give me one second to

1      BIRNBAUM - HIGHLY CONFIDENTIAL
2    read this if you would.  (Witness perusing
3    document.)
4        Okay.
5        Q.  Do you see that's an e-mail from
6    Rocio Clausen to Mr. Cardwell and that
7    Carolina Fenner is also copied on that
8    e-mail; correct?
9        A.  I see that from the e-mail, yes.
10       Q.  The date is September 8, 2016;
11   right?
12       A.  Yes.
13       Q.  Do you see where the e-mail
14   states I hope you are well, would you be
15   able to assist the credit group (mainly JW
16   Perry and Frank Manley) with some KYC,
17   organizational materials, resolutions,
18   certificates, et cetera for a tailwind
19   deal closing later this month?
20       Do you see that?
21       A.  Yes.
22       Q.  On or around September or October
23   of 2016, were you aware that Clausen or
24   Fenner had reached out to Mr. Cardwell and
25   attempted to staff him on a credit

44 (Pages 170 - 173)

1      BIRNBAUM - HIGHLY CONFIDENTIAL
2  assignment?
3      A.  I don't know.  I may have been, I
4  don't recall.
5      Q.  If you were aware, how would you
6  have gained that knowledge?
7      A.  I don't know.  I mean maybe
8  Carolina would have mentioned it to me or
9  asked me.  I don't know.
10     Q.  In keeping with your
11  responsibilities as a staffing
12  coordinator, right, back at that time, how
13  would something like that occur?  If there
14  was outreach from her to staff an
15  associate on something, how would you
16  become aware of it, was there some
17  mechanism involved?  Was there a policy,
18  was there an expectation by you, how would
19  that develop that you had any knowledge or
20  would you just not be told?
21     A.  No, I think she would probably
22  reach out.  I think she probably would
23  have reached out to I guess it would have
24  been Brian Wolfe and me at the time, but
25  I'm not sure and I just don't recall.

1      BIRNBAUM
2      Q.  On or around September or October
3  of 2016, were you aware that Mr. Cardwell
4  and Rocio Clausen had a meeting on or
5  around September 8, 2016?
6      A.  No, I was not aware of that.
7      Q.  So it is your testimony you're
8  not aware of any meeting between Rocio
9  Clausen and Mr. Cardwell on September 8,
10  2016, in October of 2016, that meeting
11  occurred without you having any knowledge
12  of it?
13     A.  I'm sorry, when?  September or
14  October?
15     Q.  So are you aware -- or going back
16  to October of 2016, were you aware that
17  Rocio Clausen and Mr. Cardwell had a
18  meeting on September 8, 2016?
19     A.  No, I don't think I was aware of
20  that.
21     Q.  Ms. Clausen was a manager in the
22  associate development department at that
23  time; correct?
24     A.  As I recall she was in, maybe it
25  was the associate development group or

1      BIRNBAUM
2  professional development.  I don't know if
3  she was a manager or not but she had a
4  similar role to Carolina but in a
5  different group, not the M&A group.
6      Q.  Did you have any conversations
7  with Ms. Clausen about her meeting with
8  Kaloma Cardwell at any time?
9      A.  At any time?
10     Q.  Yes.
11     A.  No, not that I recall.
12     Q.  Did you have any have any
13  conversation with Rocio Clausen about her
14  meeting with Mr. Cardwell in September at
15  all?
16     A.  I don't think so.
17     Q.  Is it possible that such -- that
18  information or the fact that a meeting
19  like that occurred was brought to your
20  attention?
21         MR. BIRENBOIM:  Objection, calls
22  for speculation.  You can answer.
23         THE WITNESS:  I don't think it
24  happened.  I didn't routinely have
25  meetings with her.  I think I would

1      BIRNBAUM
2  have remembered it and I don't
3  remember it.
4  BY MR. JEFFRIES:
5      Q.  So I'm not asking about whether
6  you had the meeting.  To be clear I'm
7  asking whether you were informed by Rocio
8  Clausen about a meeting that she had with
9  Mr. Cardwell.
10     A.  I don't recall.
11     Q.  Were you informed by anyone else
12  within the associate development
13  department about a meeting between Rocio
14  Clausen and Kaloma Cardwell?
15     A.  I don't think so.
16     Q.  Were you informed by anyone about
17  a meeting between Rocio Clausen and Kaloma
18  Cardwell in September of 2016 or at any
19  other period of time when you would have
20  been responsible for his staffing?
21     A.  I don't recall.
22         REDACTED

45 (Pages 174 - 177)

BIRNBAUM - CONFIDENTIAL
REDACTED

5    Q.   During September of 2016, would
6  Rocio Clausen have been someone who
7  reported to you?
8    A.   No.
9    Q.   What was her position at that
10  time?
11    A.   I told you what I know of her
12  position.
13    Q.   What was that?
14    A.   She was in either associate
15  development or professional development.
16  It's possible we called it associate
17  development at that time and I don't know
18  what her title was in that group.  And she
19  primarily worked with other groups, not
20  M&A.
21    Q.   So you were not aware of her
22  specific title and your testimony is she
23  didn't report to you.  She wouldn't even
24  report to you when staffing an M&A
25  associate at that time?

BIRNBAUM - CONFIDENTIAL
2    A.   No.
3    Q.   So it's your testimony that
4  Ms. Clausen would be able to staff an M&A
5  associate without consulting with you or
6  informing you of the decision; is that
7  your testimony?
8    A.   No, I didn't say that.
9    Q.   Well, what would be the case if
10  Rocio Clausen was to staff an M&A
11  associate that is subject to your staffing
12  directives, what would the policy be or
13  what would the routine be in terms of
14  informing you of the decision or of the
15  actions she was taking?
16    MR. BIRENBOIM:  Objection to
17  form.  You can answer.
18    THE WITNESS:  I just don't
19  remember the details of this
20  particular staffing arrangement.  But
21  I can tell you that in general, this
22  kind of thing happened from time to
23  time, right, yes, Mr. Cardwell was in
24  M&A.  But sometimes when other groups
25  are really busy, we're asked to help

BIRNBAUM - CONFIDENTIAL
2  out and pitch in and we try to do so
3  when we can.  And in those
4  circumstances the way that it
5  generally works is -- I think her CO
6  was working with the credit group at
7  the time if I remember correctly.  I
8  think she probably would have reached
9  out to Carolina in the first instance.
10  It was sort of our counterpart in M&A,
11  I believe, and I think we probably
12  would have spoken with Carolina.  So
13  it's consistent that I would have had
14  direct interactions with her CO, but
15  there would have been some form of
16  checking and permission so on.  That's
17  generally how it worked but I don't
18  remember how it worked in this
19  specific instance.
20  BY MR. JEFFRIES:
21    Q.   Okay.  And so I'm just trying to
22  understand what the normal procedure would
23  be.  I'm trying to understand what the
24  level of input that you would have in a
25  decision like that, in a scenario such as

BIRNBAUM - CONFIDENTIAL
2  that where there's a cross-departmental
3  designation.
4    A.   I just described it.  That's the
5  input I would have had.
6    Q.   Being made aware at some point by
7  Carolina Fenner, who you indicated would
8  have been communicated with by Rocio
9  Clausen; is that correct?
10    A.   Generally, my co-staffing partner
11  and I would have input and we would be
12  able to weigh in on whether or that made
13  sense o not.  Again, I don't remember this
14  specific instance but in general that's
15  how it would work.
16    Q.   Do you recall Mr. Cardwell being
17  described as someone who refused a
18  cross-department assignment?
19    A.   No.
20    Q.   In your conversations with
21  Ms. Clausen -- or do you have any
22  recollection of any conversation with
23  Rocio Clausen in which it was indicated
24  that Mr. Cardwell had questioned being
25  staffed on a credit assignment -- had

46 (Pages 178 - 181)

Page 186

```
 1          BIRNBAUM - CONFIDENTIAL
 2      from conversations with counsel.
 3      Otherwise you can answer.
 4          THE WITNESS:  Not that I recall.
 5  BY MR. JEFFRIES:
 6      Q.  As you sit here today, you are
 7  aware of the allegation; correct?
 8      A.  No.
 9      Q.  So is this the first time?  Is it
10  your testimony this is the first time that
11  you have heard in any fashion that
12  Mr. Cardwell made a complaint about the
13  firm's relationship with a client known as
14  REDACTED?  Is your testimony that you're
15  learning about that for the first time
16  today?
17      A.  I don't remember hearing that
18  before now.
19      Q.  You say you don't recall hearing
20  that before now.  What had you heard about
21  that -- about any conversation or
22  allegations with respect to Mr. Cardwell
23  making a complaint about the firm's
24  continued relationship with REDACTED
25  prior to today, is this the first time
```

Page 187

```
 1          BIRNBAUM - CONFIDENTIAL
 2  you're hearing about that?
 3      A.  Yes, as far as I can remember.
 4      Q.  Today, right now?
 5      A.  Yes.
 6      Q.  On or around March 21, 2017, were
 7  you aware that Mr. Cardwell had asked the
 8  firm if he could review his personnel file
 9  and performance reviews?
10      A.  No, I was not aware.
11      Q.  Were you aware that he made that
12  request on any date range while he was
13  employed?
14      A.  No, excluding discussions with
15  counsel.
16      Q.  So it's your testimony that
17  prior -- it's your testimony that
18  excluding discussions with counsel, during
19  the period of time when Mr. Cardwell was
20  employed by Davis Polk, you were not aware
21  of any discussions related to his attempt
22  to view his personnel file and performance
23  reviews, is that your testimony?
24      A.  Yes, I was not aware of any
25  attempt he made in that regard.
```

Page 188

```
 1              BIRNBAUM
 2          REDACTED
 6      Q.  Were you ever made aware that
 7  Mr. Cardwell had a meeting with Thomas
 8  Reid and Len Kreynin on or around March
 9  29, 2017?
10          MR. BIRENBOIM:  Same caution but
11      you can answer.
12          THE WITNESS:  I don't think so.
13  BY MR. JEFFRIES:
14      Q.  While Mr. Cardwell was employed
15  as an associate at Davis Polk, were you
16  ever told that Mr. Cardwell had met with
17  the managing partner about staffing and
18  performance reviews?
19      A.  No.
20      Q.  Prior to your testimony today,
21  and without getting into the details of
22  any conversation with counsel, did you
23  have an awareness of the fact that
24  Mr. Cardwell had met with Thomas Reid and
25  Len Kreynin about performance reviews
```

Page 189

```
 1              BIRNBAUM
 2  prior to him being terminated?
 3      A.  No, no I don't.
 4      Q.  For the period between October
 5  2016 and April 2017, what was your
 6  involvement in Cardwell's employment?
 7      A.  I don't understand the question.
 8      Q.  Well, what role did you play, did
 9  you play -- would you have been the
10  staffing coordinator throughout that time?
11  Between October 2016 and April 2017, would
12  you have been --
13      A.  Yes.
14      Q.  -- responsible for staffing
15  Mr. Cardwell?
16      A.  Yes, I was one of the staffing
17  partners through that period.  That would
18  have been my principal role with respect
19  to Mr. Cardwell.
20      Q.  Did you have any conversations
21  about Mr. Cardwell during that period of
22  time?
23          MR. BIRENBOIM:  Objection to
24      form.  With anyone at any time in that
25      period?
```

48 (Pages 186 - 189)

Page 190

BIRNBAUM - CONFIDENTIAL

1    BIRNBAUM - CONFIDENTIAL
2    BY MR. JEFFRIES:
3      Q.  Did you have any conversations
4    about Mr. Cardwell with any -- did you
5    have any conversations about Mr. Cardwell
6    and about staffing Mr. Cardwell with Brian
7    Wolfe during October 2016 through April
8    2017?
9      A.  I would have had.  I don't
10   remember any specific conversations.  I do
11   remember in general trying through that
12   period to staff Mr. Cardwell on deals and
13   I would have discussed those deals with
14   the partners who came to Mr. Wolfe and me
15   for staffing.  I would have discussed with
16   Mr. Wolfe and I would have been trying as
17   I had been to find suitable deals that
18   Mr. Cardwell could execute, but it was
19   just very difficult because of his
20   performance.  But I would have been having
21   indications like that just in the ordinary
22   course of my staffing partner role.
23     Q.  In what form would those
24   conversations have taken place?  Would you
25   have e-mailed about it, would you have

Page 191

1    BIRNBAUM - CONFIDENTIAL
2    just talked to people?
3      A.  In general, it was a combination,
4    e-mails, phone calls, stopping by people's
5    offices.
6      Q.  Who did you have those
7    conversations or interactions with?
8      A.  I don't remember specifics.
9      Q.  Do you remember anyone
10   individually?
11     A.  No.  No, certainly not with
12   respect to that period and they just --
13   this was just so ordinary course for me as
14   a staffing partner.  No one instance
15   sticks in my memory.
16     Q.  Are you aware that Mr. Cardwell
17   e-mailed Louis Goldberg on or around May
18   22, 2017 and described how his experiences
19   at Davis Polk had made him physically ill?
20     A.  No.
21              REDACTED

Page 192

1    BIRNBAUM
2    REDACTED
3          THE WITNESS:  Can I just ask for
4    a quick?  Zach, our concierge, could
5    you maybe return my controls over my
6    screen just so I can mute people when
7    I cough and spare people that?
8          VERITEXT CONCIERGE:  Yeah, you
9    should be there.  I took control back.
10   BY MR. JEFFRIES:
11     Q.  So you never heard about -- you
12   never heard about any e-mail from
13   Mr. Cardwell to Mr. Goldberg about how his
14   experiences at Davis Polk were making him
15   physically ill at all prior to today?
16     A.  Not that I recall.
17     Q.  You're saying not that you
18   recall.  We're talking about an associate,
19   Black associate having a conversation with
20   a partner about being made physically ill
21   by virtue of his experience at Davis Polk.
22          Is your testimony truly that you
23   don't recall whether or not such
24   information was made known to you prior to
25   today, is that something you would forget

Page 193

1    BIRNBAUM
2    in your capacity as a staffing
3    coordinator?
4      A.  I don't think I was aware of it.
5      Q.  So is it safe to say that the
6    only thing that you remember about
7    Mr. Cardwell is your belief that he was a
8    poor performer?
9      A.  Sorry, I don't understand, the
10   only thing ever under any circumstances?
11     Q.  Well, I've asked you if you
12   recalled -- I had asked you if you heard
13   of a meeting between Mr. Cardwell and
14   Rocio Clausen with respect to his
15   complaint about being staffed on certain
16   assignments due to his race and your
17   answer was you don't recall.
18          Do you remember that?  Just a few
19   minutes ago.
20     A.  Yes.
21     Q.  And I asked you whether or not
22   you had any recollection or any
23   information rather about a conversation
24   between Louis Goldberg and Mr. Cardwell
25   prior to his -- Louis Goldberg,

Page 194

BIRNBAUM
1
2 Mr. Cardwell and Mr. Reid prior to his
3 termination and you said you don't recall.
4      Do you remember saying that?
5      A.  I remember the discussion we've
6 had over the last few minutes, yes.
7      Q.  Yet the one thing that you do
8 remember and have consistently maintained
9 that you remember is the fact that this
10 associate, Mr. Cardwell, who made a
11 complaint of discrimination against Davis
12 Polk while he was employed there, was a
13 poor performer, that you remember?
14      A.  Well, a couple things about that.
15 I wasn't aware he made a complaint while
16 employed.
17      Q.  As you sit here today you're
18 aware of it?
19      REDACTED

Page 195

1      BIRNBAUM
2      REDACTED
12      Q.  Would you say that was out of the
13 ordinary, the difficulty you had in
14 staffing him?
15      A.  At any given time there are
16 always lower performing associates.  He
17 was a very poor performer.  You know,
18 there was the difference of degree.  There
19 were others who it was hard to staff, too,
20 but he was just very, very hard to staff.
21      Q.  What made him a very, very hard
22 to staff poor performer?
23      A.  What were his performance issues?
24      Q.  Yes.
25      REDACTED

Page 196

1      BIRNBAUM
2      REDACTED
9      Q.  And who communicated these issues
10 to you?
11      A.  I don't remember specifically but
12 these were -- these were the issues and
13 those were his -- that was his general
14 reputation at the time I had
15 responsibility for staffing.
16      Q.  So you don't remember any of the
17 people you may have spoken to but you
18 remember five specific issues that plagued
19 Mr. Cardwell in your recitation of these
20 facts as you sit here today.  But do you
21 don't remember who you spoke to to try to
22 get him staffed, you don't remember any of
23 the deals you tried to get him staffed on,
24 you don't remember any of the people you
25 reached out to in this laborious task to

Page 197

1      BIRNBAUM
2 get him staffed but you remember the
3 issues he had; is that correct?
4      A.  Yes, I mean as I said, this was
5 five years ago, I was working to staff him
6 and 50 other associates.  I don't remember
7 the specifics.  I do remember the general
8 performance issues.
9      Q.  Did you have any conversations
10 with Mr. Goldberg about him meeting with
11 Mr. Cardwell and Mr. Reid at any point
12 prior to today?
13      A.  I don't think so.
14      Q.  Is it a possibility?
15      MR. BIRENBOIM:  Objection to
16 form, calls for speculation.
17      THE WITNESS:  No, I don't
18 remember any such conversation.
19 BY MR. JEFFRIES:
20      Q.  Do you have any reason to believe
21 that there were any specific complaints
22 made by Mr. Cardwell about any specific
23 M&A partners during the meeting between
24 yourself and Mr. Goldberg and Mr. Reid?
25 Do you have any information or any reason



50 (Pages 194 - 197)



Page 266

```
1          BIRNBAUM - CONFIDENTIAL
2          MR. BIRENBOIM:  Objection to the
3      form.
4          THE WITNESS:  I don't recall.
5  BY MR. JEFFRIES:
6      Q.  Did you ever hear that someone --
7  that members of the firm are interested in
8  Mr. Cardwell working somewhere other than
9  Davis Polk?
10     A.  I don't remember.
11     Q.  Did you ever have any
12 conversations with any other partners at
13 Davis Polk about their desire that
14 Mr. Cardwell work somewhere other than
15 Davis Polk?
16     A.  What do you mean desire that he
17 work somewhere other than Davis Polk?
18     Q.  Did you hear from any of the
19 partners, did any of the partners prior to
20 his termination express to you their
21 belief that he should not be working at
22 Davis Polk?
23         MR. BIRENBOIM:  Objection to
24     form.  You can answer.
25         THE WITNESS:  I'm not sure I know
```

Page 267

```
1          BIRNBAUM - CONFIDENTIAL
2      how to answer that question.
3  BY MR. JEFFRIES:
4              REDACTED
5
6
7
8
9
10
11
12
13     Q.  Who did you speak to about that?
14     A.  I've answered that question as
15 best I can repeatedly.  I don't remember
16 specific -- I don't remember specific
17 discussions with specific partners.
18     Q.  So you can't tell me anybody that
19 you've had these conversations about him
20 being such a poor performer?
21     A.  As I've said, no, I have a strong
22 general impression from the time but I
23 can't remember specific conversations with
24 specific people.
25     Q.  Who made the decision to
```

Page 268

```
1          BIRNBAUM - CONFIDENTIAL
2  terminate Mr. Cardwell?
3          MR. BIRENBOIM:  Objection to
4      form.
5          THE WITNESS:  What do you mean?
6  BY MR. JEFFRIES:
7      Q.  Who made the decision to end
8  Mr. Cardwell's employment at Davis Polk?
9          MR. BIRENBOIM:  Objection to
10     form.  You can answer.
11         THE WITNESS:  I'm not sure -- I'm
12     not sure.
13 BY MR. JEFFRIES:
14     Q.  Do you know who it was that
15 decided that he should be terminated due
16 to performance?
17     A.  No.
18              REDACTED
19
20
21
22
23
24
25
```

Page 269

```
1          BIRNBAUM - CONFIDENTIAL
2  REDACTED
3      Q.  And when were you asked to
4  provide that input?
5      A.  I don't remember.
6      Q.  Who asked you to provide that
7  input?
8      A.  I don't remember.  I think it was
9  group leadership but I don't remember.  I
10 think one of the -- I think one of the
11 co-heads of our group but I don't remember
12 who or when.
13     Q.  Do you remember if it was John
14 Bick?
15     A.  I don't remember.
16     Q.  Who else could it have been?  You
17 said one of the co-heads.  Who else could
18 it have been at that point in time that
19 would have asked you for your input on
20 that issue?
21     A.  I don't remember exactly when
22 this was but as I mentioned before, I
23 think Mr. Goldberg was co-head at one
24 point in time.  It may have been him.  I
25 don't recall.
```

68 (Pages 266 - 269)

Page 270

1    BIRNBAUM - CONFIDENTIAL
2      Q.   Do you know if this was a
3  conversation that you were requested to
4  give input on in 2016?
5      A.   I don't think it was that early,
6  no.  I mean I would have been asked for
7  input on Mr. Cardwell just as part of my
8  staffing duties but I don't think I was
9  asked for input in connection with a
10  potential decision to terminate him that
11  early.
12      Q.   What is the earliest that you
13  recall being asked to give input or weigh
14  in on the decision to terminate
15  Mr. Cardwell?
16      A.   I don't remember.
17      Q.   Do you recall whether that
18  request for input was in connection with a
19  performance review cycle?
20      A.   It may have been, I don't
21  remember.
22      Q.   Was it in 2018?
23      A.   I don't recall.  I think it may
24  have been but I don't recall specifically.
25      Q.   Was it in 2017?

Page 271

1    BIRNBAUM - CONFIDENTIAL
2      A.   I don't think so.  It sounds
3  early, too, but I don't recall.
4      Q.   How was the conversation carried
5  out in which you gave input?
6      A.   I don't remember.
7      Q.   Was the conversation unusual in
8  any way?
9      A.   I don't remember it being so, no.
10      Q.   Do you remember where you were?
11      A.   No.
12      Q.   Do you remember whether it was
13  face to face?
14      A.   I don't remember.
15      Q.   Do you remember whether there
16  were other people involved in the
17  conversation?
18      A.   No, I don't recall.
19      Q.   Do you remember if it was on the
20  phone?
21      A.   I don't recall.
22      Q.   Do you remember if it was through
23  e-mail?
24      A.   I don't recall.
25      Q.   Do you remember how many

Page 272

1    BIRNBAUM - CONFIDENTIAL
2  conversations there were about this?
3      A.   No.
4      Q.   Do you remember how many people
5  were involved in the conversation about
6  the decision to terminate Mr. Cardwell?
7      A.   No.
8      Q.   Do you remember if you had this
9  conversation -- do you remember if Tom
10  Reid was a part of this conversation that
11  you had?
12      A.   I don't remember.
13      Q.   Do you remember if John Bick was
14  a part of the conversation that you had?
15      A.   No, I don't.
16      Q.   Do you remember if Sophia Hudson
17  was a part of the conversation that you
18  had?
19      A.   No, she wasn't part of any
20  conversation like this.
21      Q.   Do you remember if Daniel Brass
22  was a part of the conversation you had?
23      A.   I don't recall.
24      Q.   Do you remember if Brian Wolfe
25  was a part of the conversations you had?

Page 273

1    BIRNBAUM - CONFIDENTIAL
2      A.   I don't think so.
3      Q.   Do you know if Brian Wolfe had
4  any of his own conversations about whether
5  or not Mr. Cardwell should be terminated
6  for performance?
7      A.   I don't know.
8      Q.   Did he communicate to you that he
9  had been asked for input about whether or
10  not Mr. Cardwell should be terminated for
11  poor performance?
12      A.   No, I don't think so.
13                REDACTED




18      Q.   How many terminations have you
19  participated in as of today, since making
20  partner?
21          MR. BIRENBOIM:  Objection to
22  form.
23          THE WITNESS:  I'm not sure I
24  understand the specific context here.
25  What's the question?

69 (Pages 270 - 273)

Page 274

```
     BIRNBAUM - CONFIDENTIAL
1
2   BY MR. JEFFRIES:
3      Q.  How many terminations of
4   associates have you been involved in in
5   any context since making partner?
6      A.  I would -- I think if -- I think
7   I'd say low single digits.  I don't
8   remember specifically.
9      Q.  And yet as you sit here today,
10  you can't remember who you as a partner
11  and since becoming a partner would have
12  had conversations with about terminating
13  Mr. Cardwell, a Black associate who made a
14  claim of discrimination against Davis
15  Polk, you can't remember who you would
16  have had a conversation with about a
17  decision like that?
18      MR. BIRENBOIM:  Objection to
19  form, no foundation in view of those
20  things.  Go ahead.
21      THE WITNESS:  I didn't know those
22  things.
23  BY MR. JEFFRIES:
24            REDACTED
```

Page 275

```
     BIRNBAUM - CONFIDENTIAL
1
2            REDACTED
6      THE WITNESS:  I don't recall
7   knowing I think prior to his filing a
8   complaint in this litigation.
9   BY MR. JEFFRIES:
10      Q.  What steps normally precede the
11  firm terminating an associate for poor
12  performance?
13      A.  In my experience, consistently
14  poor performance on the associate's part
15  and a decision at the group level by group
16  leadership, potentially with management
17  committee approval to terminate the
18  associate in question.  Those are the key
19  elements in my experience.
20      Q.  In your experience are there any
21  remediation plans that are set forth prior
22  to terminating an associate for poor
23  performance?
24      MR. BIRENBOIM:  Objection to
25  form.
```

Page 276

```
     BIRNBAUM - CONFIDENTIAL
1
2      THE WITNESS:  Yeah, there's -- in
3   my experience, there's, you know, we
4   want our associates to succeed and to
5   turn things around and there's often
6   as part of reviews, you know,
7   constructive feedback, things to work
8   on to, you know, try to do better in
9   the future in the hope that the
10  associate can turn it around.  And so
11  there's that to process of an
12  opportunity to improve, so that's part
13  of the review process that generally
14  precedes termination.
15  BY MR. JEFFRIES:
16      Q.  So let's just get back to the
17  point of your testimony with respect to
18  when you first received notice of
19  Mr. Cardwell's complaints of
20  discrimination.  Is it your testimony --
21  did you receive any preservation notices
22  in connection with any complaints that
23  Kaloma Cardwell made about racial
24  discrimination while employed at Davis
25  Polk?
```

Page 277

```
     BIRNBAUM - CONFIDENTIAL
1
2      A.  Yes, I believe I did.
3      Q.  And what did you think they were
4   about?
5      MR. BIRENBOIM:  Objection to
6   form.
7      THE WITNESS:  I didn't know and I
8   don't recall what I thought at the
9   time.
10  BY MR. JEFFRIES:
11      Q.  What did you do when you got
12  them, who did you speak to?
13      A.  Other than counsel?
14      Q.  Yes.
15      A.  No one.
16      Q.  But you did speak to counsel;
17  right?  You received the preservation
18  notices and you spoke to counsel; is that
19  correct?
20      MR. BIRENBOIM:  Answer that yes
21  or no.
22      THE WITNESS:  Yes.
23  BY MR. JEFFRIES:
24      Q.  And so by virtue of the
25  preservation notices and speaking to
```

70 (Pages 274 - 277)

DocuSign Envelope ID: 2140902A-7B3F-4AB7-B596-39900A062F37

Page 338

1                    BIRNBAUM

2             *** ERRATA SHEET ***

3    NAME OF CASE:  Cardwell vs. Davis Polk

4    DATE OF DEPOSITION:  April 12, 2021

5    WITNESS:  Harold Birnbaum

6

7    PAGE LINE        FROM                    TO

8    36-37 | 25-3 | "Is there any        | This is a new question
                     relationship...partnership."  from Jeffries, not an
                                            answer by witness.

9    296  |  15  |   Exhibit 21          |    Exhibit 15

10   296  | 20-21|   Exhibit 21          |    Exhibit 15

11   ____ | ____ | _____ | _____

12   ____ | ____ | _____ | _____

13   ____ | ____ | _____ | _____

14   ____ | ____ | _____ | _____

15   ____ | ____ | _____ | _____

16   ____ | ____ | _____ | _____

17   ____ | ____ | _____ | _____

18

19               _Harold Birnbaum_____

             HAROLD BIRNBAUM

20

21

     Witness and sworn to before me

22   this ____ day of _____, 2021.

23

     _____  _____

24    (Notary Public)    My Commission Expires:

25