# Buergel Declaration Exhibit 7

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - - - - x
 5    KALOMA CARDWELL,
 6                         Plaintiff,
 7
 8          -against-    Case No.: 1:19-cv-10256-GHW
 9
10    DAVIS POLK & WARDWELL LLP, THOMAS REID,
11    JOHN BICK, WILLIAM CHUDD, SOPHIA HUDSON,
12    HAROLD BIRNBAUM, DANIEL BRASS, BRIAN WOLFE,
13    and JOHN BUTLER,
14                         Defendant(s).
15    - - - - - - - - - - - - - - - - - - - - x
16                     Date: April 14, 2021
17                     Time: 9:43 a.m.
18
19        DEPOSITION of SOPHIA HUDSON, held Remotely,
20    pursuant to Notice, taken before Judeen M.
21    Denniston, a reporter and Notary Public within
22    and for the State of New York.
23
          Transcript contains Confidential/Highly
24         Confidential and Attorneys portions -
             confidentiality designations legend
25                 at back of transcript
```

Page 2

1
2  Appearances:
3  On behalf of Plaintiff:
4      JEFFRIES LAW
5         1345 Avenue of the Americas
6         New York, New York 10019
7      BY: DAVID JEFFRIES, ESQ.
8
9  On behalf of Defendants:
10     PAUL WEISS RIFKIND WHARTON & GARRISON LLP
11        1285 Avenue of the Americas
12        New York, New York 10019
13     BY: SUSANNA M. BUERGEL, ESQ.
14     and MARISSA DORAN, ESQ.
15     and SONDRA SAPORTA, ESQ.
16     and BRUCE BIRENBOIM, ESQ.
17
18 On behalf of Defendants:
19     GIBSON DUNN & CRUTCHER, LLP
20        1050 Connecticut Ave NW
21        Washington DC 20036
22     BY: GRETA WILLIAMS, ESQ.
23     and
           GRACE HART, ESQ.
24
25

Page 3

1
2  ALSO PRESENT:
3  ZACH CZERENDA - CONCIERGE TECH
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23            * * * * *
24
25

Page 4

1
2              S T I P U L A T I O N S
3
4      IT IS HEREBY STIPULATED AND AGREED by
5  and between the attorneys for the respective
6  parties herein, that filing, sealing and
7  certification be and the same are hereby
8  waived.
9
10     IT IS FURTHER STIPULATED AND AGREED that
11 all objections, except as to the form of the
12 question shall be reserved to the time of
13 the trial.
14
15     IT IS FURTHER STIPULATED AND AGREED that
16 the within deposition may be signed and
17 sworn to before any officer authorized to
18 administer an oath, with the same force and
19 effect as if signed and sworn to before the
20 Court.
21
22
23
24            * * * * *
25

Page 5

1              CONFIDENTIAL
2  S O P H I A  H U D S O N, the witness herein,
3     having first been duly sworn by a Notary
4     Public of the State of New York, was
5     examined and testified as follows:
6         COURT REPORTER:  State your name
7     for the record, please.
8         THE WITNESS:  Sophia Hudson.
9         COURT REPORTER:  State your
10    address for the record, please.
11        THE WITNESS:  1185 Park Avenue,
12    Apartment 4D, New York, New York,
13    10128.
14        COURT REPORTER:  Thank you,
15    first two questions are on the
16    record.
17 EXAMINATION BY
18 MR. JEFFRIES:
19    Q. Ms. Hudson, good morning.
20    A. Good morning.
21    Q. Okay, Ms. Hudson, have you been
22 deposed before?
23    A. No, and I'm just going to turn up
24 the volume. I'm having a little hard time
25 hearing you, Ms. Jeffries.

| Page 130 | Page 132 |
|---|---|
| 1  S. Hudson<br>2  A. The Capital Markets partners did<br>3  have meetings. I cannot recall whether they<br>4  were monthly meetings.<br>5  Q. Are you aware of whether or not any<br>6  of the other practice groups had regularly<br>7  scheduled monthly meetings? Are you aware of<br>8  whether any of the other practice groups had<br>9  regularly scheduled monthly meetings?<br>10  A. Yeah.<br>11  Q. Did you attend any of those meetings<br>12  within the Capital Markets group?<br>13  A. I attended the Capital Markets<br>14  partners' meetings typically.<br>15  Q. Were issues related to<br>16  discrimination ever discussed at those<br>17  meetings?<br>18  A. I don't recall.<br>19  Q. Were issues related to harassment<br>20  ever discussed at those meetings?<br>21  A. I don't recall.<br>22  Q. Were issues related to retaliation<br>23  ever discussed at those meetings?<br>24  A. I don't recall.<br>25       MS. WILLIAMS: Mr. Jeffries, | 1  S. Hudson<br>2       MS. WILLIAMS: Objection to<br>3       form. Calls for speculation.<br>4  A. I don't know.<br>5  Q. Ms. Hudson, what's the earliest that<br>6  you heard anything about Mr. Cardwell making<br>7  comments about race or bias?<br>8       MS. WILLIAMS: Objection.<br>9       Lacks foundation, asked and<br>10       answered. You may answer.<br>11  A. I don't recall anyone making<br>12  statements to me about Mr. Cardwell and any<br>13  assertions as you described.<br>14  Q. So that's not my question. My<br>15  question is, what's the earliest that you<br>16  heard anything about Mr. Cardwell making<br>17  comments about race or bias?<br>18       MS. WILLIAMS: Objection<br>19       asked and answered. I believe<br>20       she testified earlier that she<br>21       has no recollection of hearing<br>22       about any such comments.<br>23  A. Correct I don't have any<br>24  recollection. There's also no earliest<br>25  recollection. |

| Page 131 | Page 133 |
|---|---|
| 1       CONFIDENTIAL<br>2       I'd like to take a break. I<br>3       don't know if you want to finish<br>4       this line of questioning, but<br>5       I'd like to take a break soon.<br>6       MR. JEFFRIES: If you can<br>7       give, okay. Five to 10 minutes?<br>8       MS. WILLIAMS: Sounds good.<br>9       MR. JEFFRIES: What would<br>10       accommodate you best?<br>11       MS. WILLIAMS: Five minutes<br>12       or so is fine. Why don't we say<br>13       2:50? That's seven minutes.<br>14       MR. JEFFRIES: Okay,<br>15       actually let's just do 10<br>16       minutes.<br>17       MS. WILLIAMS: Okay, thanks.<br>18       (Whereupon, a short recess<br>19       was taken.)<br>20       (Back on the record.)<br>21  BY MR. JEFFRIES (continuing):<br>22  Q. Ms. Hudson, during Mr. Cardwell's<br>23  employment, did anyone say anything about Mr.<br>24  Cardwell questioning, whether his assignments<br>25  were connected to race or bias? | 1  S. Hudson<br>2  Q. Well, you testified to knowing about<br>3  the filing of the complaint in 2019, is that<br>4  correct?<br>5       MS. WILLIAMS: Object to<br>6       form.<br>7  Q. Knowing about the filing of Mr.<br>8  Cardwell's federal complaint in 2019. You<br>9  testified about that, correct?<br>10  A. Yes.<br>11  REDACTED<br>20  Q. So to be clear, you do not know you<br>21  have not heard anything about Mr. Cardwell's<br>22  comments related to race or bias in 2018 at<br>23  all, is that correct?<br>24       MS. WILLIAMS: Objection.<br>25       Asked and answered. Lacks |

Page 134

S. Hudson

1
2  foundation may answer.
3  A. I don't remember hearing no. Do the
4  answers. I don't remember. I don't remember
5  hearing about anything like that.
6  Q. And same question for 2017.
7        MS. WILLIAMS: Objection.
8        Asked and answered lacks
9        foundation. You may answer.
10  A. You see, when you say same question.
11  I don't remember hearing about any, any such,
12  comments in 2017 either.
13  Q. What's the earliest that you heard
14  anything about Mr. Cardwell making comments
15  related to how he believed his race was
16  impacting his assignments or hours or
17  evaluations.
18        MS. WILLIAMS: Objection.
19        Asked and answered again. Lacks
20        foundation, you may answer.
21  A. I don't remember hearing anything
22  about that.
23  Q. So let's turn back to tab 11.
24        CONCIERGE TECH: Tab 11,
25        Exhibit 10 should be your marked

Page 135

1        CONFIDENTIAL
2        exhibit folders.
3        (Whereupon, the witness was
4        shown a document marked as
5        Exhibit 10 for identification as
6        of this date.)
7  Q. Do you see where it says Columbia
8  needs to be someone's project as soon as
9  possible? I E get work and hours and direct
10  feedback.
11  A. I see that this email that we talked
12  about before, that I'd never seen before does
13  say that.
14  Q. During Mr. Cardwell's employment,
15  did you hear anyone described Mr. Cardwell as
16  a project?
17  A. I, Oh, sorry. Go ahead. Yeah. I
18  don't remember hearing Mr. Cardwell described
19  as a project.
20  Q. Did during Mr. Cardwell's
21  employment. Did you hear anyone described Mr.
22  Cardwell needing to be, or going to be a
23  project?
24  A. I don't remember hearing Mr. Carl
25  Cardwell describing that way.

Page 136

1        S. Hudson
2  Q. During Mr. Cardwell's employment,
3  did you hear anyone describe any matter that
4  Mr. Cardwell worked on as a project?
5  A. Sorry, could the court reporter just
6  please repeat back that question?
7        MS. WILLIAMS: Object to the
8        form.
9  Q. I'm actually going to restate what I
10  believe that there may be a word in there
11  that's different. My question was during Mr.
12  Cardwell's employment, did you hear anyone
13  describe any matter that Mr. Cardwell worked
14  on as a project?
15  A. So I don't remember.
16  Q. During Mr. Cardwell's employment,
17  did the word project have any particular
18  meaning or purpose among some partners?
19        MS. WILLIAMS: Object to the
20        form?
21  A. I don't know.
22  Q. During Mr. Cardwell's employment,
23  did the word project have any particular
24  meaning or purpose among, one moment, one
25  moment. During Mr. Caldwell's employment? Was

Page 137

1        S. Hudson
2  the word project a type of code word for
3  anything?
4        MS. WILLIAMS: Object to the
5        form?
6  A. I don't know.
7  Q. At the firm. Did Mr. Cardwell ever
8  become the firm's project?
9        MS. WILLIAMS: Object to the
10        form?
11  A. I don't know.
12  Q. Did anyone at the firm make Cardwell
13  someone, make Mr. Cardwell someone's project?
14        MS. WILLIAMS: Object to the
15        form.
16  A. I don't know.
17  Q. At this time in Mr. Cardwell's
18  employment in September, October of 2016, did
19  you believe that Mr. Cardwell was a poor
20  performer?
21        MS. WILLIAMS: Object to the
22        form.
23  A. I don't know.
24  Q. Is that to say you don't know around
25  this period, whether you thought Mr. Cardwell

35 (Pages 134 - 137)

Page 150

1       S. Hudson
2       I'm sorry. I didn't hear that
3       question, can you read it back?
4    Q. March 21st, 2017, you became aware
5  that Mr. Cardwell asked the firm if you could
6  review his personnel file and performance
7  reviews, correct?
8       MS. WILLIAMS: Object to the
9       form, lacks foundation. You may
10      answer.
11   A. No.
12   Q. During Mr. Cardwell's employment,
13 did you hear anything about Mr. Cardwell
14 asking the firm if he could review his
15 personnel file and performance reviews?
16      MS. WILLIAMS: Same
17      objection, you may answer.
18   A. I don't recall hearing anything
19 about that.
20   Q. During Mr. Cardwell's employment,
21 did you ever hear anything about Mr.
22 Cardwell, Thomas Reed and Lynn Cranen having
23 a meeting?
24      MS. WILLIAMS: Object to the
25      form, lacks foundation. You may

Page 151

1       S. Hudson
2       answer.
3    A. No, I don't remember hearing
4  anything about that.
5    Q. Did you participate in any
6  discussions about Mr. Cardwell having a
7  meeting with Thomas Reed and Lynn Crane?
8       MS. WILLIAMS: Objection to
9       form, lacks foundation. Asked
10      and answered.
11   A. I don't remember participating in
12 any such meetings.
13   Q. I'm sorry, what was that?
14   A. I don't remember participating in
15 any such meetings.
16   Q. Ever?
17   A. Well, the meetings that you
18 described in your question, I don't remember
19 participating in any of the meetings that you
20 described in your question.
21   Q. Well, I'm not asking you about
22 participation in the meeting. I'm asking you
23 if you participated in any discussions
24 related to [crosstalk] --
25   A. Yeah, no. I don't remember

Page 152

1       CONFIDENTIAL
2  participating in any discussions about that
3  meeting ever.
4    Q. Ever. Through Mr. Cardwell's
5  employment, did you ever hear anything about
6  Mr. Cardwell contacting Louis Goldberg about
7  how his experience at Davis Polk had made him
8  physically ill?
9       MS. WILLIAMS: Objection,
10      lacks foundation.
11   A. I don't remember hearing anything
12 about that.
13   Q. And in 2017... Well, who is Louis
14 Goldberg?
15   A. Louis Goldberg is an M&A partner at
16 Davis Polk.
17   Q. Would he have been an M&A partner at
18 Davis Polk in 2017?
19   A. Yes.
20   Q. During Mr. Cardwell's employment,
21 did you ever hear anything about Mr.
22 Cardwell, Louis Goldberg and Sharon Crane
23 having a meeting?
24   A. I don't recall hearing anything
25 about that meeting or about a meeting. Can

Page 153

1       S. Hudson
2  you describe?
3    Q. Ms. Hudson, when did you first
4  REDACTED



Page 154

1    CONFIDENTIAL
2    REDACTED
[lines 3-20 redacted]
21    I think I read that complaint before I
22 had any... Obviously I didn't have counsel
23 when I read that complaint, so that's when I
24 learned about it.
25    Q. Based on what you read, why did Mr.

Page 155

1         S. Hudson
2 Cardwell file a complaint?
3         MS. WILLIAMS: Object to the
4         form, calls for speculation.
5    Q. You can answer.
6    A. I have not. I told you I've read the
7 complaint, obviously read the revised
8 complaints, but haven't memorized them and I
9 can't read back to you the chronology of
10 events.
11    Q. Well based on what you read, what do
12 you remember him to have alleged?
13         MS. WILLIAMS: Objection.
14    A. So I think the complaint says or
15 alleges, the complaint alleges, that he was
16 discriminated against by Davis Polk and
17 retaliated against by Davis Polk.
18    Q. Did you talk to any M&A partners
19 about Mr. Cardwell's EOC or NYSD HR
20 complaints?
21         MS. WILLIAMS: Objection.
22    A. No.
23    Q. Did you speak with John Bick about
24 Mr. Cardwell's EOC complaint or in NYSD HR
25 complaint?

Page 156

1         S. Hudson
2         MS. WILLIAMS: Objection.
3    A. No.
4    Q. Did you speak with Tom Reed about
5 the EOC or NYSD HR complaint?
6         MS. WILLIAMS: Objection.
7    A. No.
8    Q. Did you speak with John Butler about
9 the NYSD HR or EOC complaint?
10    A. No.
11         MS. WILLIAMS: Objection.
12    A. No, sorry.
13    Q. Did you speak with William Chudd
14 about the NYSD HR or EOC complaint?
15         MS. WILLIAMS: Objection.
16    A. No.
17    Q. Did you speak with Howard Bimbaum
18 about the EOC or NYSD HR complaint?
19         MS. WILLIAMS: Objection.
20    A. No.
21    Q. Did you speak with Brian Wolfe about
22 the NYSD HR or EOC complaint?
23         MS. WILLIAMS: Objection.
24    A. No.
25    Q. Did you talk to any M&A partners

Page 157

1         S. Hudson
2 about Mr. Cardwell's EOC or NYSD HR
3 complaints?
4         MS. WILLIAMS: Objection.
5    A. No.
6    Q. Based on what you know, did Davis
7 Polk file a response to Mr. Cardwell's EOC
8 complaint?
9         MS. WILLIAMS: Objection.
10         Again, I'm going to instruct if
11         you know about that
12         independently from the
13         complaint, you may answer it to
14         the extent you know about that
15         through conversations with
16         counsel, I'm going to instruct
17         you not to answer.
18    Q. And I'm going to again indicate the
19 fact that it's entirely proper for an answer
20 to be given with respect to a factual
21 occurrence. I'm not asking about a privileged
22 communication, but rather about a factual
23 occurrence and Ms. Hudson, to the extent that
24 you have information relative to that
25 question, I'm going to ask you to proceed.

Page 158

1      S. Hudson
2           MS. WILLIAMS:  And Mr.
3      Jeffries, the facts that I
4      choose to relay to her or not
5      and how I choose to relay them,
6      that I do or any of her other
7      lawyers choose to relay, I'm
8      going to assert privilege over
9      those and instruct her not to
10     answer. Ms. Hudson, if you know
11     about the response by Davis Polk
12     that Mr. Jeffries asked you
13     about independently from
14     conversations with counsel, you
15     may answer.
16  A.  I know that Davis Polk, their
17 response.
18  Q.  Were you involved in any way in the
19 drafting or creation of any of the
20 information that appeared in Davis Polk's
21 NYSD HR answer and position statement?
22          MS. WILLIAMS:  Objection. To
23     the extent that that would
24     reveal any conversations with
25     counsel. You may answer.

Page 159

1      S. Hudson
2  A.  No.
3  Q.  No? Is that your answer?
4  A.  My answer is no.
5  Q.  And is that because it is your
6 understanding that that question calls for a
7 privileged response or is it answered just
8 no, you were not involved?
9  A.  I didn't know about the EOC
10 complaint or response until I read the
11 federal complaint that was filed.
12  Q.  The firm told NYSD HR that Mr.
13 Cardwell received meaningful real time
14 feedback over the course of years, is that
15 true?
16          MS. WILLIAMS:  Object to the
17     form of question.
18          Are you reading from a
19     document, Mr. Jeffries?
20          MR. JEFFRIES:  I'm asking
21     the question on the basis of the
22     NYSD HR complaint that was filed
23     on the information that was
24     contained within the federal
25     complaints that Ms. Hudson

Page 160

1      S. Hudson
2      indicated that she's read. And
3      so I'll restate the question.
4           Did Mr. Cardwell receive
5      meaningful real time feedback
6      over the course of years?
7           MS. WILLIAMS:  Object to the
8      form of the question, calls for
9      speculation. You may answer.
10  A.  I don't know.
11  Q.  Did he receive meaningful real time
12 feedback while he worked in the Capital
13 Markets department?
14          MS. WILLIAMS:  Same
15     objections.
16  A.  He received meaningful real time
17 feedback from me.
18  Q.  What about anyone else?
19  A.  I don't know.
20  Q.  And what real time meaningful
21 feedback did you give Mr. Cardwell, Ms.
22 Hudson?
23  A.  I cannot recall the specific
24 conversations, emails, markups, but over the
25 time that we worked together I would have

Page 161

1           CONFIDENTIAL
2 given him, there were many emails, phone
3 calls, in-person meetings, markups of work
4 product, which would have been real time
5 feedback.
6           MR. JEFFRIES:  One moment.
7      Oh Madam reporter, can you take
8      the exhibit down?
9           COURT REPORTER:  I'm not in
10     control, sorry.
11          MR. JEFFRIES:  Oh.
12          COURT REPORTER:  Sorry,
13     that's Zack.
14          CONCEIRGE TECH:  I'm sorry.
15          COURT REPORTER:  No problem.
16  Q.  Within those documents and
17 communications, what was the substance of the
18 feedback that you gave Mr. Cardwell, Ms.
19 Hudson?
20          MS. WILLIAMS:  Object to the
21     form.
22  A.  Which documents and communications
23 are you referring to?
24  Q.  The ones that you mentioned would
25 have contained the feedback that you gave to

41 (Pages 158 - 161)

Page 174

1          S. Hudson
2   sensitive. And from what I recall, it was a
3   very time sensitive, compact timeframe under
4   which we had to do an established series of
5   tasks.
6          So when I say we, I was the partner
7   supervising it. A lot of the tasks were
8   junior level type tasks. Putting together
9   diligence request lists, reviewing diligence
10  documents, circling numbers in offering
11  documents for cover letters, circling other
12  types of information in the offering
13  documents for backup and then reviewing the
14  backup that the company provided for to back
15  up those statements.
16         So all what I considered to be very
17  simple tasks that can be performed by a
18  junior associate and my again, very time
19  sensitive, but needed to be done, not
20  complicated, not difficult, just needed to be
21  done. It needed to be done in a timely
22  fashion. And the concern that I had about
23  Kaloma's performance was that he operated
24  very slowly on this and jeopardized the
25  ability for us to meet our client's

Page 175

1          CONFIDENTIAL/HIGHLY CONFIDENTIAL
2   expectations to get through this very set and
3   well-defined series of simple tasks on a
4   tight timeframe.
5       Q.  How many performance reviews did you
6   complete for Mr. Cardwell?
7       A.  Two.
8       Q.  Did anyone else have input on Mr.
9   Cardwell's performance evaluations?
10      A.  So on the performance evaluations,
11  on the two performance evaluations that I
12  drafted for Mr. Cardwell, I drew my personal
13  experience working with him as well as the
14  feedback that I got from the other team
15  members on the deals, namely REDACT and REDACTED
16      Q.  Anyone else aside from REDACTE and
17  REDACTED have input on the performance reviews
18  that you generated from Mr. Cardwell?
19          MS. WILLIAMS:  Objection,
20          misstates testimony.
21      A.  So my performance reviews were based
22  on my experience working with Mr. Cardwell,
23  together with the input that I got from
24  REDACTED and REDACTE It is possible that I
25  might've gotten feedback directly from the

Page 176

1          CONFIDENTIAL/ HIGHLY CONFIDENTIAL
2   client. It wouldn't have been on REDACTED, it
3   would have been on REDACTE but I don't recall.
4           REDACTED



            Informing my assessment of Mr.
25  Cardwell's performance on the two deals that

Page 177

1          CONFIDENTIAL/HIGHLY CONFIDENTIAL
2   I worked with him, I took into account the
3   feedback that I had gotten from the
4   associates, REDACTED and REDACTED during
5   the time that we worked on those deals.
6       Q.  Now I'm asking you about them one at
7   a time.
8       A.  Sure.
9       Q.  And so I'm asking about the decision
10  with respect to what went into the
11  performance review. I'm asking you who had
12  input on the performance reviews? REDACTED did
13  not decide what was in the review, but you
14  get input into how the document was
15  generated, correct?
16          MS. WILLIAMS:  Objection,
17          misstates testimony, last
18          foundation. You may answer.
19      A.  REDACTED had no input into what
20  I put into what I wrote in the sense of we
21  didn't talk about the words, we didn't talk
22  about the conclusions, but I used the
23  information that I had gathered from REDACTED
24  while we worked on that deal to, well I used
25  the information that I had from REDACTED r from

Page 178

1  CONFIDENTIAL/HIGHLY CONFIDENTIAL
2  that deal when I wrote the performance
3  review.
4      Q. Is it the same methodology by which
5  Eric would have had input?
6          MS. WILLIAMS: Object to the
7          form, lacks foundation. You may
8          answer.
9      A. Yes.
10     Q. And is that the same manner in which
11 the client would have had input?
12     A. No. If the client had said anything
13 to me, it would've just been to talk to me
14 about whether the firm was performing
15 adequately and I would have taken whatever
16 the client said into account when assessing
17 Kaloma, but I don't think clients are focused
18 on firm performance reviews.
19     Q. So for your June 2016 review?
20     A. Yeah.
21     Q. Did anyone other than Connor or Eric
22 have input prior to you writing it?
23     A. No.
24         MS. WILLIAMS: Object to the
25         form.

Page 179

1      S. Hudson
2      A. No.
3      Q. And turning to the second review
4  that you did for Mr. Cardwell.
5      A. Sure.
6      Q. Do you recall when you did a second
7  review for Mr. Cardwell?
8      A. September of 2016.
9      Q. Did that review also include work
10 that had been done with a team including Mr.
11 Cardwell, Eric and Connor or with other
12 people?
13         MS. WILLIAMS: Objection to
14         the form.
15     A. Yes, that review covered the same
16 review period so it was the same two matters
17 with the same two members.
18     Q. And in regards to the September of
19 2016 review, anyone else have input on that
20 review besides you?
21         MS. WILLIAMS: Object to the
22         form.
23     A. No.
24     Q. So did Eric or Connor have input on
25 that review?

Page 180

1      S. Hudson
2      A. There was no incremental input from
3  Eric or Connor. It was the same process as I
4  described.
5      Q. What was the time of those
6  performance evaluations relative to Mr.
7  Cardwell's complaints?
8          MS. WILLIAMS: Object to the
9          form, lacks foundation. You may
10         answer.
11     A. I can't answer. I don't know about,
12 I know the timing of the performance reviews
13 were in June and September. I have no idea
14 about the timing of any complaints.
15     Q. During Mr. Cardwell's employment,
16 did you ever wonder if any of Mr. Cardwell's
17 performance reviews were impacted by his
18 complaints?
19         MS. WILLIAMS: Object to the
20         form, lacks foundation. She's
21         already said she wasn't aware of
22         any.
23     A. I wasn't aware of the complaints and
24 so I didn't wonder about anything related to
25 any complaints.

Page 181

1      S. Hudson
2      Q. Was Mr. Cardwell ever placed on a
3  performance improvement plan?
4      A. I don't know.
5      Q. Did you ever recommend that Mr.
6  Cardwell be placed on any type of improvement
7  plan?
8      A. I don't think so. Not really. I'm
9  not familiar with that term. Vaguely, I'm
10 starting to vaguely remember. It's been years
11 since I've heard that term, but.
12     Q. Well are you familiar with the
13 concept of a performance improvement plan?
14     A. No, I'm just vaguely starting to
15 remember that I may have heard that term at
16 some point, but I'm not exactly sure what it
17 refers to.
18     Q. Did you recommend any type of
19 remedial steps to be taken with respect to
20 Mr. Cardwell to improve his performance?
21         MS. WILLIAMS: Object to the
22         form.
23     A. Yes, my performance reviews included
24 recommended steps to take, recommended
25 actions to do.

Page 198

1  CONFIDENTIAL
2  can we take another break
3  please?
4      MR. JEFFRIES:  Sure.
5      (Whereupon, a short recess
6      was taken.)
7      (Back on the record.)
8  BY MR. JEFFRIES (continuing):
9   Q. Ms. Hudson, is Mr. Cardwell still
10 employed at Davis Polk?
11  A. No. At the beginning of today we
12 established that his employment lasted
13 through August 10th, 2018.
14  Q. Was he terminated?
15      MS. WILLIAMS:  Objection.
16  A. I believe so.
17  Q. What is the earliest moment that you
18 thought Mr. Cardwell may be terminated?
19      MS. WILLIAMS:  Object to the
20      form; lacks foundation. You may
21      answer.
22  A. I don't know. I had no reason to
23 think he might be terminated, based on my
24 time working with him.
25  Q. When did you first hear that someone

Page 199

1      S. Hudson
2  from the firm was interested in Mr. Cardwell
3  working somewhere other than Davis Polk?
4      MS. WILLIAMS:  Object to the
5      form; lacks foundation. You may
6      answer.
7   A. I wasn't told that someone was
8  interested in him working somewhere other
9  than Davis Polk.
10  Q. Why was Mr. Cardwell terminated?
11      MS. WILLIAMS:  Objection.
12      REDACTED
14  Q. Who made the decision to terminate
15 Mr. Cardwell?
16      MS. WILLIAMS:  Objection.
17  A. I wasn't involved in the decision. I
18 don't know who, specifically, decided to
19 terminate Mr. Cardwell.
20  Q. Generally, who made the decision to
21 terminate Mr. Cardwell?
22      MS. WILLIAMS:  Objection to
23      the form; asked and answered.
24  A. I wasn't involved in the decision
25 and I don't know who made the decision.

Page 200

1      S. Hudson
2   Q. Did you have input in the decision
3  to terminate Mr. Cardwell?
4      MS. WILLIAMS:  Objection to
5      the form; asked and answered
6      several times now.
7   A. No.
8   Q. Do you typically have input in
9  decisions to terminate associates due to
10 performance?
11      MS. WILLIAMS:  Objection to
12      the form.
13  A. During my time at Davis Polk I
14 would've only had input regarding employment
15 decisions for associates in the Capital
16 Markets group.
17  Q. How was the termination decision
18 communicated to Mr. Cardwell?
19  A. I don't know.
20      MS. WILLIAMS:  Objection to
21      the form.
22  A. Sorry.
23  Q. How many other employees been
24 terminated for the same reason that Mr.
25 Cardwell was terminated for?

Page 201

1      S. Hudson
2      MS. WILLIAMS:  Object to the
3      form; calls for speculation,
4      lacks foundation. You may
5      answer.
6   A. I don't know why Mr. Cardwell was
7  terminated and whether other employees were
8  terminated for the same reason.
9   Q. During Mr. Cardwell's employment,
10 what steps normally preceded the firm
11 terminating an associate for poor
12 performance?
13      MS. WILLIAMS:  Object to
14      form. You may answer.
15  A. I'm trying to think about what I
16 know. Bad performance reviews, for example.
17 That would be a step that preceded being
18 terminated for poor performance, typically.
19  Q. During Mr. Cardwell's employment,
20 were associates allowed to remain employed at
21 the firm despite receiving behind ratings in
22 performance reviews in a prior review period?
23      MS. WILLIAMS:  Object to the
24      form.
25  A. An associate who had received...

Page 238

1      S. Hudson
2   Q. So there are no relevant details
3  being left out this time, correct?
4      A. That's my recollection of how this
5  came about.
6   Q. Did you refresh that recollection
7  prior to your testimony here today?
8          MS. WILLIAMS: Objection to
9      the form and object to the
10     extent it cause for her to
11     reveal any privileged
12     communications.
13  Q. You can answer.
14  A. I think this is called out in one of
15  your communications with the court, so that
16  may have been what has refreshed my
17  recollection, is your calling it out and my
18  thinking about it.
19  Q. Now I'm going to ask that --
20  A. An iterative process.
21         MR. JEFFRIES: I'm going to
22     ask that Tab 18 be moved in.
23         CONCIERGE TECH: Tab 18,
24     Exhibit 16, should be in your
25     marked exhibits folders.

Page 239

1      S. Hudson
2         (Whereupon, the witness was
3      shown a document marked as
4      Exhibit 16 for identification as
5      of this date.)
6   Q. So just... Well, take a moment to
7  look at the exhibit that's been moved in.
8   A. Oh, wow. This goes way down. Okay.
9  This is a very long exhibit.
10         MS. WILLIAMS: This is a 92
11     page document Mr. Jeffries. Is
12     there [crosstalk] --
13         MR. JEFFRIES: Yes. I --
14         MS. WILLIAMS: [crosstalk]
15     to focus on?
16         MR. JEFFRIES: Give me one
17     moment. Let's see.
18         MS. DORAN: If you could
19     just give me a moment to load
20     the document David. David,
21     you're on document 16, what
22     you've called exhibit 16.
23         MR. JEFFRIES: Yes.
24         MS. DORAN: I just want to
25     object to the extent this is an

Page 240

1      S. Hudson
2      improper compilation. This
3      document, the single page with
4      the Bates number DPWSDNY-
5      000141354 [crosstalk] --
6          MR. JEFFRIES: [crosstalk]
7      One moment. I think there's a
8      domestic violence dispute taking
9      place. One moment. Okay. Now,
10     Tab 20 moved in?
11         CONCIERGE TECH: Tab 20,
12     Exhibit 17, should be in your
13     marked exhibit folders.
14         (Whereupon, the witness was
15     shown a document marked as
16     Exhibit 17 for identification as
17     of this date.)
18  Q. Okay. Now, I want you to take a look
19  at this item Ms. Hudson. Do you recognize it?
20         MS. DORAN: And if you could
21     just give us minute. The
22     documents are loading slowly.
23     Sorry, that's fine. Go ahead.
24  Q. All right.
25  A. Yes. I have seen this, yeah.

Page 241

1      CONFIDENTIAL
2   Q. You've seen this. In fact, if we
3  turn to the bottom of this document, November
4  9th, 2015 at 12:48 PM, that's an email from
5  you, correct?
6   A. Yes.
7   Q. You're the author of that document,
8  right?
9   A. Yes.
10  Q. And it states, "May I please be sent
11  a folder with his reviews since starting at
12  DPW. Thanks. Sophia Hudson," right?
13  A. Yes.
14  Q. And the subject line is, "Kaloma,"
15  correct?
16  A. Yes.
17  Q. And that's sent to Rocio Clausen,
18  right?
19  A. Yes.
20  Q. And then the response from Rocio is,
21  "Sure. Will send to you this afternoon. Is
22  everything okay?" Right?
23  A. Yes.
24  Q. Well, why do you think Rocio asked,
25  "Is everything okay," in response to your

Page 242

1      HIGHLY CONFIDENTIAL
2  request?
3          MS. WILLIAMS: Object to
4          form; calls for speculation. You
5          may answer.
6   A. I don't know.
7   Q. Well, you were a partner?
8   A. Yeah, I am a partner.
9   Q. As a partner, you worked at Davis &
10  Polk for a number of years and you made a
11  request to a member of the Associate
12  Development Department that caused her to
13  express a sentiment expressing concern. Would
14  you agree with that?
15         MS. WILLIAMS: Object...
16         Sorry, Ms. Hudson. Object to the
17         form of the question; misstates
18         the document, mischaracterizes
19         the document. You man answer.
20  A. So I think as we've established in
21  some of the earlier emails that you've
22  introduced as exhibits, Rocio knew that
23  Kaloma was working with me on this REDACTED
24  REDACTED deal. In fact, he had been in
25  direct contact with her, letting her know

Page 243

1        S. Hudson
2  that he was working on this deal with me. And
3  I don't know exactly when the deal started
4  but I believe some of the earlier emails
5  indicated that we were working on it in the
6  prior week and over the weekend.
7       So on Monday, after at least several
8  days of working on this transaction with
9  Kaloma, I asked to see his review folder and
10 she was probably asking... I'm going to
11 speculate here, but she knew I was working
12 with him and I asked for his review folder
13 and she probably might've been asking, "Is
14 there a performance issue with him working on
15 your deal?"
16  Q. Well, your response is, to her
17 question, "Is everything okay," your response
18 is, "Yes. I just want to have a read on the
19 situation. Thanks." Right?
20  A. I'm not obligated to tell Rocio
21 every single thing that I'm thinking or what
22 my concerns are. That's not how that
23 operated.
24  Q. Well, what situation were you
25 referring to?

Page 244

1        S. Hudson
2  A. His performance.
3          REDACTED
8   Q. Performance related to observations
9  you made from having an opportunity to work
10 on him for the few weeks he'd been in Capital
11 Markets?
12  A. Yes. I wanted to get the background
13 of people who had worked with him in the
14 first full year at the firm.
15  Q. Is that the kind of request you make
16 of every associate that you worked with at
17 Capital Markets?
18         MS. WILLIAMS: Object to the
19         form. You may answer.
20  A. This was an unusual situation
21 because usually, a second-year associate
22 would've already done a rotation in Capital
23 Markets. And so there would've been someone,
24 either me or other people in the group who
25 would've worked with that person. Kaloma had

Page 245

1        S. Hudson
2  not done a rotation in Capital Markets. He
3  was at the beginning of his second year and
4  no one in my group had worked with him. I
5  didn't have any context. So the fact that he
6  was in the department at the time was a
7  little unusual.
8   Q. So was your goal to get background
9  related to Mr. Cardwell's prior experiences
10 at the firm?
11  A. I think that --
12         MS. WILLIAMS: Object to the
13         form.
14  A. So I think that... Start over. I
15 believe that based on this chronology, I had
16 have made early observations and wanted to
17 see if the things I had been observing had
18 also been observed in his earlier performance
19 reviews in his first two rotations.
20  Q. And did you talk to anyone else to
21 get a read of the situation?
22         MS. WILLIAMS: Object to the
23         form.
24  A. So I didn't even talk to anyone
25 here. I just asked for the reviews because I

62 (Pages 242 - 245)

Page 246

1        S. Hudson
2  didn't know who he had worked with, so that
3  was the most efficient way of learning what
4  his performance reviews had been to date. And
5  I don't recall speaking with anyone else
6  about his performance at the time.
7     Q. So did you talk to anyone who worked
8  in the Associate Development Department about
9  Mr. Cardwell at all around the time that you
10 made this request to see his file?
11          MS. WILLIAMS: Object to the
12       form.
13    A. I don't remember.
14    Q. Ms. Hudson, the situation that
15 you're testifying about and reflected in your
16 email referred to the complaint that Mr.
17 Cardwell made on September 30th, 2015, didn't
18 it?
19          MS. WILLIAMS: Object to the
20       form; misstates testimony.
21    A. No.
22    Q. Is it your testimony that at the
23 time that you sent this email to Rocio
24 Clausen, you did not have any knowledge of
25 the comments that Mr. Cardwell had made about

Page 247

1        S. Hudson
2  discrimination? Is that your testimony?
3          MS. WILLIAMS: Object to the
4       form; lacks foundation, asked
5       and answered. You may answer.
6     A. I was not aware of any complaint
7  made on September 30th or any other day.
8     Q. Were you aware of any comments Mr.
9  Cardwell had made about discrimination prior
10 to the email that you sent to Rocio Clausen
11 in which you said you wanted to get a read on
12 the situation?
13          MS. WILLIAMS: Objection;
14       asked and... Excuse me. I didn't
15       mean to interrupt. Go ahead.
16    Q. Comments, not complaints.
17          MS. WILLIAMS: Objection;
18       asked and answered numerous
19       times throughout the day. You
20       may answer.
21    A. I was not aware of any comments
22 either.
23    Q. Were you aware that others at the
24 firm believed Mr. Cardwell made comments
25 about bias in 2015?

Page 248

1        S. Hudson
2          MS. WILLIAMS: Objection;
3       lacks foundation. You may
4       answer.
5     A. I was unaware that others may have
6  been aware of any comments that Mr. Cardwell
7  had made.
8     Q. In 2015?
9     A. Sorry, yeah.
10    Q. Ms. Hudson, is this your honest
11 testimony, in all respects?
12    A. Yes.
13          MR. JEFFRIES: One moment.
14       Zach, can we have a time check?
15          CONCIERGE TECH: Six hours,
16       58 minutes.
17    Q. Ms. Hudson, has a level of honesty
18 that you brought to your testimony today been
19 the same level of honesty that you utilized
20 in exercising and filling out Mr. Cardwell's
21 June 2016 review?
22          MS. WILLIAMS: Object to the
23       form. You may answer.
24    A. Yes.
25          MR. JEFFRIES: I have no

Page 249

1        CONFIDENTIAL
2       further question.
3          MS. WILLIAMS: I do have a
4       few questions. Can we take a
5       quick break?
6          MR. JEFFRIES: Sure.
7          (Whereupon, a short recess
8       was taken.)
9          (Back on the record.)
10 DIRECT EXAMINATION
11 BY MS. WILLIAMS:
12    Q. Okay. I have a few questions. Can we
13 just take... Thank you for your patience
14 tonight Ms. Hudson. I just have a few more
15 questions.
16    A. Okay.
17    Q. Do you recall Mr. Jeffries asking
18 you some questions about the two performance
19 reviews you wrote about Mr. Cardwell in 2016?
20    A. Yes.
21    Q. Ms. Hudson, did John Bick ever tell
22 you what to say about Mr. Cardwell in any of
23 his performance reviews you wrote in 2016?
24    A. No. Absolutely not.
25    Q. Did Mr. Bick ever attempt in any way

Page 250

1    HIGHLY CONFIDENTIAL
2  to influence what you said about Mr. Cardwell
3  in his performance reviews in 2016?
4     A.  No.  Absolutely not.
5     Q.  Did any other Davis Polk partner
6  ever attempt to influence in any way, what
7  you said about Mr. Cardwell in his 2016
8  performance reviews?
9         REDACTED
13    Q.  In the June 2016 performance review
14  that Mr. Jeffries was asking you about a
15  little while ago, you stated that, quote, "On
16  the REDACTED deal, diligence and other
17  preparatory tasks were completed so slowly
18  that a second junior associate needed to be
19  staffed."
20        Do you recall that?
21    A.  I do.
22    Q.  Sitting here today, do you remember
23  instances on the REDACTED deal in which you
24  became concerned that Mr. Cardwell was
25  spending too much time or client money to

Page 251

1         S. Hudson
2  complete a given task?
3     A.  Yes, I do.
4     Q.  All right.  And what were those
5  instances that you recall, sitting here
6  today?
7         REDACTED
21       MS. WILLIAMS:  Sandra, could
22     you please put up the document
23     and we'll mark it as... I
24     believe it's exhibit 18.
25       MS. SAPORTA:  Yes.  I'll let

Page 252

1         S. Hudson
2  Zach do so.
3        Zach, are you all right to
4     put that up?
5       CONCIERGE TECH:  Yes.
6       MS. SAPORTA:  Thank you.
7       MS. WILLIAMS:  Let me just
8     pull it up on my own.
9       CONCIERGE TECH:  If you'd
10     like, with everybody's
11     permission, I can upload this
12     into the Jeffries Private folder
13     on Exhibit Share and get this
14     properly marked and introduced.
15       MS. WILLIAMS:  That would be
16     great.  Thank you.
17       CONCIERGE TECH:  I need...
18     No opposition you said?
19       MR. JEFFRIES:  No.
20       CONCIERGE TECH:  Okay.  Then
21     with everybody's permission, I'm
22     going to take this down really
23     quick so that I can do that.  In
24     the marked exhibits folder,
25     Exhibit 18.  And I'm pulling it

Page 253

1    HIGHLY CONFIDENTIAL
2     up again for you.
3       (Whereupon, the witness was
4     shown a document marked as
5     Exhibit 18 for identification as
6     of this date.)
7  BY MS. WILLIAMS:
8     Q.  So Ms. Hudson, the document that's
9  been marked as exhibit 18; the first page
10  bears the Bates label DPWSDNY-95576, if you
11  look down at the bottom of the first page,
12  it's an email from Kaloma Cardwell to REDACTED
13           and a bunch of recipients, including you
14  and Eric and Yolanda, from Davis Polk.  And he
15  says, "Attached, please find our comments to
16  the S1."  And then it goes on.  And that email
17  was sent at 4:03 AM, correct?
18     A.  Yes.
19     Q.  And that was on a Sunday at 4:03 AM
20  --
21     A.  Yes.
22     Q.  -- on November 8th, correct?
23     A.  Yes.
24     Q.  And it looks like later that
25  morning, at 11:23, you write, "Why do you

Page 254
S. Hudson

 1        S. Hudson
 2  think he was up until 4:03 AM working on
 3  this? I think he could've just included my
 4  comments rather than copying them over if
 5  that's what took him so long."
 6        And Ms. Hudson, it doesn't say this
 7  in the email, but was that an email that you
 8  wrote to Eric Lee?
 9     A.  Yes.
10     Q.  His email address isn't in the
11  recipient list. And Eric responded at 12:17
12  PM on November 8th, "He and I chatted. I was
13  worried about his losing sleep when deal
14  didn't require it just now. Personal working
15  style. I try to make it a point not to have
16  unnecessary sleep lost." Is that right?
17     A.  Yes.
18     Q.  And is this email representative of
19  the example that you were just describing
20  where you thought that Mr. Cardwell was
21  copying over comments and working slowly, and
22  taking too long to complete tasks that were
23  given to him?
24     A.  Yes. And I think this is an example
25  of where I picked up on it, as did Eric, as

Page 255
 1           CONFIDENTIAL
 2  evidenced by the fact that Eric had already
 3  called him to ask him why he had done that.
 4     Q.  And is this example illustrative of
 5  the... Is it an example of the types of
 6  things you were concerned about and where he
 7  was working too slowly, that caused you to
 8  need to bring on another junior associate to
 9  the Summit deal?
10     A.  Yes.
11        MR. JEFFRIES:  Objection to
12     form.
13     A.  Sorry. Yes.
14     Q.  Okay. And so you became aware of
15  this particular example, with copying over
16  the comments and that you're concerned about
17  him doing it at 4:03 AM, that was on November
18  8th, 2015, correct?
19     A.  Yes.
20     Q.  Okay. I'd like to pull back up
21  please, exhibit 17. If you could zoom in at
22  that, please. And if you look down, this is
23  the document you were just looking at with
24  Mr. Jeffries a few moments ago. And it's a
25  November 9th email from you to Rocio Clausen

Page 256
 1        S. Hudson
 2  when you say, "May I please be sent a folder
 3  of his reviews, starting at DPW?" And the
 4  subject line of that email is, "Kaloma,"
 5  right?
 6     A.  Yes.
 7     Q.  So on November 8th, 2015, you were
 8  concerned that Mr. Cardwell is completing
 9  tasks slowly and up til 4:03 AM and copying
10  over comments when there was no need to do
11  that and that was taking too long to complete
12  the task, correct?
13     A.  Yes.
14        MR. JEFFRIES:  Objection.
15     Q.  And the following day, you then
16  request Mr. Cardwell's performance reviews,
17  correct?
18        MR. JEFFRIES:  Objection.
19     A.  Yes.
20        MS. WILLIAMS:  Okay. I have
21     nothing further.
22        MR. JEFFRIES:  Just have a
23     few moments?
24        MS. WILLIAMS:  Mr. Jeffries,
25     I'll allow you to ask a few

Page 257
 1        S. Hudson
 2     questions. You are out of time.
 3     You did use all of your seven
 4     hours, so I would ask that you
 5     keep this very, very brief and
 6     obviously, limited to the scope
 7     of my redirect just now.
 8        MR. JEFFRIES:  Yes
 9     counselor. I will very much do
10     that. Just one moment.
11  FURTHER EXAMINATION
12  BY MR. JEFFRIES:
13     Q.  Did you review any documents during
14  the break; the break that we took immediately
15  before you were examined by your counsel?
16     A.  No.
17        MR. JEFFRIES:  Well, no
18     further questions.
19        MS. WILLIAMS:  I would just
20     like to note for the record, my
21     understanding is that the
22     deposition transcript will be
23     designated as highly
24     confidential for 30 days, under
25     the terms of the protective