UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KALOMA CARDWELL,<br><br>                           *Plaintiff*,<br><br>v.<br><br>DAVIS POLK & WARDWELL LLP, THOMAS REID, JOHN BICK, WILLIAM CHUDD, SOPHIA HUDSON, HAROLD BIRNBAUM, DANIEL BRASS, BRIAN WOLFE, and JOHN BUTLER,<br><br>                          *Defendants*. | 19 Civ. 10256 (GHW) |

**DECLARATION OF LEONARD KREYNIN**

Leonard Kreynin affirms and states as follows:

      1.     I am a partner of Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), practicing in the Mergers and Acquisitions ("M&A") Group. I became a partner of the Firm in 1999. I offer this declaration, on the basis of personal knowledge, to provide my views on Mr. Cardwell's performance as an associate working for me and to explain the role I played as the partner responsible for summarizing reviews of Mr. Cardwell's performance as an associate during the 2016 review cycle at the Firm.

**I.    EXPERIENCE WORKING WITH MR. CARDWELL**

      2.     In his time at the Firm, Mr. Cardwell worked on three of my deal teams, including "Project Giant," on which Mr. Cardwell billed time between August and November 2016.

3. I had occasion to work directly with Mr. Cardwell on the Project Giant matter and to become familiar with his work. Mr. Cardwell's overall performance was poor, and his work product was not what I expect from a junior associate at Davis Polk.

4. For example, Mr. Cardwell worked in the fall 2016 timeframe on an exclusivity agreement for Project Giant. In the course of his work, Mr. Cardwell made unacceptable and fundamental errors.

5. On one occasion during our work together on Project Giant, Mr. Cardwell worked on a draft contract, and edited the document so that it listed the wrong party as a party to the contract. This, in the context of our work, is a significant error; errors such as this have the potential to undermine important corporate structuring issues because they impact which party will be legally bound by a contract and thus responsible for various contractual obligations and representations. Ensuring that the proper parties are bound by the governing agreements is a fundamental, and critically important, issue.

6. Mr. Cardwell also edited a draft document in a manner that would have adversely expanded the scope of agreement to disadvantage our client. This drafting error was significant, and in my view reflected either deep carelessness or Mr. Cardwell's fundamental misunderstanding of our role and our tasks.

7. Based on my experiences with Mr. Cardwell in this period, I came to believe that I could not trust Mr. Cardwell to execute tasks without extremely close supervision.

## II.   2016 ANNUAL REVIEW

8. In the fall of 2016, partners in the M&A Group held our customary series of meetings to decide upon the consensus message to be delivered to midlevel and senior associates. I was assigned, in the ordinary course of my duties in the M&A Group, to deliver Mr. Cardwell's consolidated 2016 annual performance review.

9. I recall attending the meeting at which Mr. Cardwell's performance was discussed and describing my recent experience working with Mr. Cardwell on Project Giant. I conveyed, in sum or substance, that having worked recently and closely with Mr. Cardwell, I considered him to be a poor performer and that his work was unreliable and required close supervision. I recall that the overall view of the group, after an exchange with respect to Mr. Cardwell's performance, was that Mr. Cardwell needed to make significant improvements in his performance. I also distinctly remember discussion, at this meeting, of whether Mr. Cardwell should be scheduled for a performance-based midyear review, and that the decision was that he should. There was no reference or discussion whatsoever at this meeting to any alleged complaints by Mr. Cardwell, about race or otherwise. I can say with certainty that I was aware of no such alleged complaints at the time.

10. I delivered Mr. Cardwell's consolidated 2016 annual performance review in December 2016.

11. On November 14, 2016, more than a month prior to Mr. Cardwell's review, the staffing coordinator who assisted the M&A Group, Carolina Fenner, who attended the review meeting described above, offered to draft bullet points I could use to deliver the consensus message to Mr. Cardwell.

12. The next day, Ms. Fenner sent me draft talking points for Mr. Cardwell's upcoming review, which reflect the consensus described above. In connection with preparing this declaration, I reviewed the draft talking points Ms. Fenner sent to me on November 15, 2016.[1]

---

[1] *See* Buergel Decl. Ex. 44 (DPW_SDNY–000137555). This is a true and correct copy of an email I received from Ms. Fenner on the above-referenced date in the ordinary course of my work at the Firm.

13. I followed these talking points closely in delivering the review message to Mr. Cardwell in December 2016, as the summary I later prepared reflects; I printed them out and had them in front of me during Mr. Cardwell's review meeting. I include both below, for comparison.

14. These are Ms. Fenner's draft talking points:

> **Positives:** You are enthusiastic, hardworking and have a positive attitude. You are open to constructive criticism and want to develop. One reviewer noted significant improvement in the timeliness of your work as compared with last year and that you've been more focused on the task.
>
> **Areas for improvement:**
>
> > Slow down. Pay attention to detail. Make sure that all the details that need to be in the document are there.
> >
> > Ask questions to be sure you understand what you're doing and why.
> >
> > Seek to understand the key aspects of the overall transaction.
> >
> > Work to convey more confidence so that people know that you have a good handle on the matters that have been delegated to you.
>
> **Action item:** We will plan to meet with you again in June 2017 to discuss whether there have been any improvement[s] in these areas.

*Id.*

15. Below is the summary I prepared of the review meeting, which is an accurate summary of points I conveyed to Mr. Cardwell at the meeting:

> I met with Kaloma in the second half of Dec. 2016, before Christmas. I have expressed gratitude for his enthusiastic and positive attitude and hard work and noted that he was open to constructive criticism and improvement. I remarked that at least [one] person noted significant improvement in the timel[i]ness of his work com[pa]red to t[he] last year and greater focus on h[is] work.
>
> I then said that there are significant areas for improvement that we identified and l[is]ted them. They were (1) the need to slow do[w]n, pay attention to detail and ma[k]ing sure that all of the de[ta]ils that need to be refl[ec]ted in t[he] document are there, (2) asking questions to be sure

4

what you are doing and why, (3) seeking to under[sta]nd key aspects of the overall transaction, and (4) conveying more confidence so that peopl[]e working with you know that you have a good handle on t[he] matters delegated.

Kaloma pushed back and asked for specific examples, at which time I pointed out issues that we had with exclusivity agre[e]ments for [*REDACTED* (the "Project Giant")] deal, such as mismatch between parties and signature pages and changes that he made which were adverse to our client. He accepted that but asked for other specific examples which I said that I didn[']t have at hand. The conversation remained friendly despite the pushback by him and concluded with me saying that we plan to meet again in June 2017 to discuss whet[he]r there have been improvements in these areas.[2]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
December 2, 2021

_____
Leonard Kreynin

---

[2] *See* Buergel Decl. Ex. 9 (DPW_SDNY-000144354 at -383–84). This is a true and correct copy of the review summary I submitted for Mr. Cardwell in the ordinary course of my work at the Firm.