# JEFFRIES DECLARATION EXHIBIT 4

Page 1

```
 1
 2           UNITED STATES DISTRICT COURT
 3           SOUTHERN DISTRICT OF NEW YORK
 4
 5    KALOMA CARDWELL,            )
                   Plaintiff,     )
 6                                )
             vs.                  )19 Civ. 10256
 7                                )(GHW)
      DAVIS POLK & WARDWELL,      )
 8    THOMAS REID, JOHN BICK,     )
      WILLIAM CHUDD, SOPHIA       )
 9    HUDSON, HAROLD              )
      BIRNBAUM, DANIEL BRASS,     )
10    BRIAN WOLFE, and JOHN       )
      BUTLER,                     )
11               Defendants.      )
      _____    )
12
13
14
15           REMOTE DEPOSITION OF
16                JOHN BICK
17        located in Quogue, New York
18           Tuesday, April 13, 2021
19
20
21
22    Reported By:
23    CATHI IRISH, RPR, CRR, CLVS
24
25
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8             April 13, 2021
 9             9:30 a.m.
10
11        Remote deposition of JOHN BICK,
12    with all participants appearing via
13    videoconference, before Cathi Irish, a
14    Registered Professional Reporter,
15    Certified Realtime Reporter, and
16    Notary Public of the State of
17    New York.
18
19
20
21
22
23
24
25
```

```
                        BICK
 1
 2   today's testimony?
 3        A.    I have no recollection of
 4   reviewing that complaint.
 5        Q.    Are you aware of Mr. Cardwell's
 6   complaints with the EEOC, Equal Employment
 7   Opportunity Commission?
 8        A.    Yes.
 9        Q.    Did you review those complaints
10   prior to your testimony today?
11        A.    Yes.
12        Q.    Did you yourself participate in
13   the gathering of any documents related to
14   this litigation prior to today?
15        A.    Counsel came to see me and asked
16   for any documents that I had so that was
17   the extent of my participation.
18        Q.    The documents -- with respect to
19   that inquiry, did you, in fact, provide
20   documents to counsel?
21        A.    I had no hard copy to deliver to
22   counsel.  All of my documents were e-mails
23   and digital that they could look at
24   through the systems.
25        Q.    And did you provide those
```

```
                        BICK
 1
 2   documents to counsel prior to today?
 3        A.    Again, I didn't provide them
 4   anything.  They looked on the computer for
 5   e-mails and such.  I did not provide them
 6   any hard copy.
 7        Q.    Are you aware of whether or not
 8   the items that you allowed counsel to
 9   review that you just mentioned were in any
10   way supplied to counsel?
11        A.    I don't understand the question.
12        Q.    Did counsel take possession of
13   the items that you indicated were reviewed
14   in a digital format?
15        A.    I do not know because I was not
16   part of the e-mail reviews digitally.
17        Q.    So you yourself did not
18   affirmatively provide counsel with any
19   digital copies or ensure the forwarding of
20   any of the digital information to counsel
21   that you mentioned was reviewed; is that
22   correct?
23        A.    Not to my recollection.
24        Q.    And what type of documents are we
25   talking about?  You mentioned e-mails?
```

```
                              BICK
1
2        Q.    And the Career Advisors Listserv
3   uses the e-mail address
4   cap.advisors.ny@davispolk.com; is that
5   correct?
6        A.    I do not know.
7        Q.    Do you have any reason to dispute
8   that the e-mail address I just read to you
9   is the Career Advisors Listserv e-mail
10  address?
11       A.    No.
12       Q.    Was your work e-mail address also
13  a part of the NYMA Partners Listserv?
14       A.    I do not know.
15       Q.    Are you familiar with whether or
16  not there is an NYMA Partners Listserv?
17       A.    I do not know the specific names
18  of the Listservers.  If you're referring
19  to a Listserv for M&A partners in
20  New York, there is one and I'm part of
21  that.
22       Q.    Are you familiar with whether or
23  not the e-mail address for the Listserv
24  that you mentioned that you're a part of
25  is nyma.partners@davispolk.com?
```

```
                              BICK
1
2        A.    I do not know.
3        Q.    Do you have any reason to dispute
4   that is the e-mail address?
5        A.    I do not.
6        Q.    You previously served as the head
7   of Davis Polk's corporate department,
8   global head of the mergers and
9   acquisitions practice, and a member of the
10  firm's three-person management committee;
11  is that correct?
12       A.    Yes.
13       Q.    I want to go through each of
14  these positions.
15             With respect to your position as
16  the head of the corporate department, when
17  did you first start serving in that role?
18       A.    2011.
19       Q.    How did it come to pass that you
20  were selected to be in that position?
21       A.    I was elected by the firm and I
22  chose to run.
23       Q.    When did you stop serving in that
24  role?
25       A.    2019.
```

```
                          BICK
1
2     position, that was from 2011 through --
3     did you say 2018; is that correct?
4          A.   2019 when I stepped off of the
5     management committee.  That position, if
6     you will, is part of the management
7     committee.  I get elected to that position
8     by the firm and serve on the management
9     committee as such.
10         Q.   When did you first -- withdrawn.
11              Can you describe how you attained
12    the position of M&A practice group head?
13         A.   Sure.  David Kaplan was the head
14    of the M&A group and he announced
15    unexpectedly that he was leaving the firm
16    to join a client.  This was early 2016 and
17    so we needed to have a replacement to head
18    up the M&A group.  Tom Reid and I
19    discussed this.  We didn't have an
20    immediate choice to replace him among the
21    M&A partners, so it was decided that I
22    would take up that position on an interim
23    basis until we decided collectively who
24    the longer-term replacement for David
25    should be.
```

```
                          BICK
1
2          Q.   So you mentioned -- when did you
3     stop serving in that role?  You mentioned
4     2017.  Do you remember when in 2017 it
5     was?
6          A.   It was roughly a year later so I
7     believe I stepped down and we put in my
8     replacement in about May of 2017.
9          Q.   Was your departure from the
10    position of M&A practice group head
11    related in any way to any formal
12    investigation that occurred at Davis Polk?
13         A.   No.
14         Q.   Was your departure from the
15    position related in any way to any
16    informal investigation that occurred at
17    Davis Polk?
18         A.   No.
19         Q.   Did any individual or group of
20    individuals ask you to step down from that
21    position?
22         A.   No.
23         Q.   Did any individual or group of
24    individuals recommend that you step down
25    from that position?
```

Page 49

BICK

1
2     your understanding of the policy that was
3     in place between 2014 and 2018?
4         A.    You cannot discriminate based on
5     gender, race, ethnic background, religion,
6     other protected statuses.
7         Q.    Do you know when that policy was
8     created?
9         A.    A long time ago.  I don't
10    remember the precise date it was first put
11    in place.
12        Q.    Do you know how it was created?
13        A.    I do not.
14        Q.    Did you play any role in the
15    creation of the policy?
16        A.    Not to my knowledge, no.
17        Q.    From the date of 2018 onwards,
18    are you aware of whether or not that
19    policy has been revised?
20        A.    I do not remember.
21        Q.    Is it possible that it's been
22    revised?
23            MR. BIRENBOIM:  Calls for
24        speculation.
25            THE WITNESS:  I do not know.

Page 50

BICK

1
2     BY MR. JEFFRIES:
3         Q.    If the policy were indeed
4     revised, would you have had input in any
5     revisions of the antidiscrimination
6     policy?
7         A.    If it were a material change, I
8     believe it would have been run by the
9     management committee during my tenure.
10        Q.    How did you become aware -- as a
11    partner, how did you become aware of the
12    antidiscrimination policy at Davis Polk?
13        A.    Well, just as a lawyer, we have
14    regular training sessions and all lawyers
15    and personnel are made aware of the
16    various policies we have in a place.  In
17    addition, each year we circulate all
18    policies of the firm, all material
19    policies and the lawyers are asked to
20    confirm that they've read, reviewed and
21    will comply with those policies.
22        Q.    So that circulation, along with
23    the reading, review and attestation that
24    they are going to comply with the
25    policies, that is relative to associates

Page 53

```
                        BICK
 1
 2   that said you cannot retaliate.
 3       Q.   So it's your testimony that Davis
 4   Polk had a strong, and did you say clear
 5   anti-retaliation policy from 2014 through
 6   2018?
 7       A.   I believe so, yes.
 8       Q.   And according to the policy, what
 9   does it mean to -- what does retaliation
10   mean according to the policy?
11       A.   Well, to give an example, again
12   going back to sexual harassment, if the
13   lawyer or any employee brings a claim that
14   they have been sexually harassed by
15   someone at the firm, and if we talk to the
16   person who is accused, we are certain, I
17   believe, to tell that person that they
18   cannot retaliate in any way, shape or form
19   with the person making the accusation.
20       Q.   And how did partners, associates
21   and counsel become aware of Davis Polk's
22   anti-retaliation policy?
23       A.   It would be part of the regular
24   training I talked about, people would
25   mention that, and it's part of the
```

Page 54

```
                        BICK
 1
 2   policies that are circulated to lawyers.
 3       Q.   Did Davis Polk have any
 4   retaliation policies that prohibited any
 5   form of retaliation against any individual
 6   who raises any questions concerning legal
 7   compliance or professional ethics in good
 8   faith?
 9       A.   On that specific, I don't know
10   what the policy says on legal compliance,
11   but as a practical matter, I believe the
12   answer would be the same.  For example, if
13   someone brought a complaint that there was
14   inappropriate trading of on inside
15   information and we were investigating
16   that, certainly there would be no
17   retaliation against the accuser.
18       Q.   Did Davis Polk have a strong and
19   clear anti-harassment policy from 2014 to
20   2018?
21       A.   Yes.
22       Q.   How did associates, partners,
23   counsel become aware of Davis Polk's
24   anti-harassment policy?
25       A.   On the same basis I described for
```

```
                    BICK
1
2    the other policies.
3        Q.   How would you describe the
4    antiharassment policy?
5        A.   You may not harass, sexually or
6    otherwise, people you are working with.
7        Q.   During Mr. Cardwell's employment,
8    did the firm's policies permit
9    Mr. Cardwell to report any perceived or
10   actual issues related to discrimination,
11   harassment or retaliation to you?
12       A.   He could come and talk to me,
13   yes.
14       Q.   And what, if any,
15   responsibilities are you aware of the
16   firm's anti-harassment, antidiscrimination
17   and anti-retaliation policies create
18   within a partner who receives a report
19   related to any of those issues?
20           MR. BIRENBOIM:  Objection to
21       form.  You may answer if you
22       understand.
23           THE WITNESS:  If an associate
24       comes to me as a partner or as
25       alternatively someone on the
```

```
                    BICK
1
2    management committee and they report
3    sexual harassment to me, I am
4    obligated as sort of a supervisor to
5    report that to the firm so that could
6    be the general counsel's office as
7    well as Sharon Crane as executive
8    director of HR.
9    BY MR. JEFFRIES:
10       Q.   So it's safe to say that your
11   role as a partner creates certain
12   reporting obligations with respect to any
13   claim of harassment, discrimination or
14   retaliation that you would have heard; is
15   that right?
16       A.   If it's a material claim and
17   someone comes in and talks about that,
18   yes, I would report it to the firm and I
19   would tell the person who is raising the
20   complaint with me that I had an obligation
21   to report that to the firm.
22       Q.   You used material a couple times
23   throughout the course of your testimony to
24   delineate the nature of allegations that
25   would be subject to the policies we're
```

Page 57

BICK

1
2 discussing.  How do you determine whether
3 an allegation is material or defined?
4     A.   An allegation about what, please?
5     Q.   How do you determine whether an
6 allegation is material or immaterial?
7     A.   What type of allegation?
8     Q.   An allegation with respect to
9 discrimination.
10         MR. BIRENBOIM:  Objection to
11     form.  You may answer.
12         THE WITNESS:  If someone came to
13     me and alleged that they were being
14     discriminated against, I would myself
15     generally report that to the firm.
16 BY MR. JEFFRIES:
17     Q.   So would you make an internal
18 calculation about whether or not the claim
19 is material or not prior to reporting it
20 or would you simply report the claim --
21 the allegation rather?
22     A.   I'm assuming the allegation is
23 clear.  So sometimes a person comes in and
24 makes a complaint, it's not clear what
25 exactly they're complaining about, so

Page 58

BICK

1
2 that's where the judgment comes in.  But
3 if it's a clear allegation of
4 discrimination in any shape or form, then
5 yes, I would report it.
6     Q.   So for the sake of clarity, the
7 determination in your mind about whether
8 or not to report an allegation that you
9 hear is based on the clarity of it, not a
10 judgment as to whether it's a minor or
11 more significant type of allegation; is
12 that correct?
13     A.   Again, the way I think about it,
14 if there's a clear allegation of
15 discrimination, that's important and would
16 be brought to the firm.
17     Q.   So under that analysis, there are
18 some allegations that you would not bring
19 to the firm; is that correct?
20     A.   Well, as I said previously, it
21 would be where it was unclear what exactly
22 was being claimed or alleged.
23     Q.   How does the policy in place at
24 Davis Polk instruct partners to think
25 about that type of scenario?  How does the

Page 81

```
 1              BICK
 2   associates.
 3      Q.   In your role as the head of the
 4   M&A group, did you have input or were you
 5   entitled to have input in the staffing of
 6   associates on different assignments?
 7      A.   Any partner can have input to the
 8   staffing partners.  There's dialogues all
 9   the time.  When new deals come in you talk
10   to the staffing partners and you give them
11   input as to your needs and who is
12   available.
13      MR. JEFFRIES:  I'm now going to
14      turn to tab 3.  I'd like to have tab 3
15      moved into evidence.
16      MR. BIRENBOIM:  Mr. Bick, are you
17      okay, do you need a break?
18      THE WITNESS:  I'm still okay,
19      Bruce.
20      MR. BIRENBOIM:  Anyone else need
21      a break on our team?
22      MR. JEFFRIES:  Here's what we'll
23      do.  We'll take a break in a few
24      minutes.  I'm just going to make it
25      through this next range of questions
```

Page 82

```
 1              BICK
 2   but certainly based off of the
 3   comments made by Mr. Birenboim and
 4   yourself, Mr. Bick, we'll take a break
 5   in short order.
 6      (Exhibit 3, document Bates
 7      labeled DPW_SDNY-0001435999, marked
 8      for identification.)
 9   BY MR. JEFFRIES:
10      Q.   I want you to take a look at the
11   item that's in front of you right now.
12   This is a PDF version of an Excel file
13   that was produced by Davis Polk and this
14   document's Bates number is
15   DPW_SDNY-0001435999.  So you might have to
16   zoom in a little bit to see it, if that's
17   the case.
18      A.   Yes, I could enlarge it a little
19   bit.
20      VERITEXT CONCIERGE:  If you move
21      the mouse, the controls will come up.
22      You have control of my computer right
23      now.  I've requested that you have
24      access.  Do you see it?
25      THE WITNESS:  I've got the plus.
```

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400
Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

Page 109

BICK

1
2   Harold's office and ask, but my
3   interaction with staffing partners was
4   generally staffing on my matters.
5       Q.   But I think you would agree that
6   as a matter of practice based off of your
7   position as the head of the group, you had
8   input in -- you had the ability to have
9   input into the staffing assignments --
10      A.   You say as a matter of practice.
11  If I wanted to go in and talk to partners
12  about particular staffing, I could.
13      Q.   And during the period of October
14  2016 through March 2017, you worked with
15  the firm's M&A partners to staff
16  Mr. Cardwell differently than the firm's
17  white M&A associates, didn't you?
18      A.   I did not.
19      Q.   Did Mr. Cardwell's race in any
20  way contribute to you and the firm's M&A
21  partners staffing Mr. Cardwell differently
22  than the firm's white M&A associates?
23      A.   No, sir, it did not.
24      Q.   From October 2016 through March
25  2017, you knew that Mr. Cardwell was not

Page 110

BICK

1
2   being staffed on billable matters, didn't
3   you?
4           MR. BIRENBOIM:  Objection to
5       form.
6           THE WITNESS:  I didn't know his
7       staffing or his particular hours until
8       maybe March time frame.
9   BY MR. JEFFRIES:
10      Q.   And when you say until maybe
11  March time frame, what, if anything, did
12  you learn about the status of his billable
13  hours during March?
14      A.   That he had not had significant
15  billable hours consistent with the
16  document we reviewed previously.
17      Q.   How did that come to your
18  knowledge?
19      A.   Someone brought it to my
20  attention.  I can't remember precisely
21  who.
22      Q.   Well, who would have been in a
23  position to bring that particular detail
24  to your attention at that time?
25      A.   Different people.

```
                          BICK
1
2        Q.    How did you react to finding out
3    he billed 14 hours in December?
4             MR. BIRENBOIM:  Objection, form,
5        foundation.
6             THE WITNESS:  My reaction was we
7        needed to try to get him work.
8    BY MR. JEFFRIES:
9        Q.    How did you react to the fact
10   that there were a series of months after
11   December and up to the period of March
12   2017 where Mr. Cardwell billed single
13   digits in hours?
14       A.    Well, I think it gets into the
15   issue of his performance and so I
16   understood what had happened and how it --
17   why it was happening, but I knew it had to
18   be addressed and find him work.
19       Q.    With respect to your statement
20   about understanding what happened and why
21   it happened, what is it that you
22   understood happened that led to his
23   considerably low hours being billed
24   between December and March?
25       A.    He had received a series of poor
```

```
                          BICK
1
2    performance reviews, really since he began
3    at the firm.  And after the review period
4    ended in 2016, significant issues had been
5    identified and communicated to him and
6    that made it hard to staff him on many
7    transactions based on that performance.
8        Q.    So it's your understanding and
9    your testimony that since Mr. Cardwell
10   began at the firm, he had been receiving a
11   series of performance reviews indicating
12   that he was a poor performer?
13       A.    That he had performance issues
14   that he needed to work on.
15       Q.    What was your understanding of
16   those performance issues that would have
17   contributed to him -- that would have led
18   to him not being staffed while he was an
19   associate in your practice group?
20       A.    My recollection of the key points
21   that were communicated to him in different
22   performance reviews, including one that I
23   discussed with him, would be first that I
24   would think of as sort of time management
25   and process issues which would be
```

Page 115

```
 1                    BICK
 2  responsiveness to calls and e-mails from
 3  members of the team and clients, to
 4  understanding sort of the work needed to
 5  be done, making sure he asked all the
 6  questions so that he could deliver a
 7  better subset of work product when he
 8  delivered it and not requiring additional
 9  work by either the associates or the
10  partner in charge, just attention to
11  details and carelessness where sometimes
12  work would not be completed with the right
13  conforming changes or other items
14  addressed, and again, general lack of
15  understanding from time to time on work.
16          So this had been communicated to
17  him and was discussed in the fall and the
18  deal was that he was not keeping up with
19  the people in his immediate class of 2014
20  from a performance point of view and that
21  made it a bit more challenging for us to
22  staff him on the transactions that were
23  coming up relative to other associates who
24  had availability and time.
25      Q.   And were any of those assessments
```

Page 116

```
 1                    BICK
 2  based on -- so your position is that those
 3  issues, those so-called issues are why he
 4  wasn't staffed from December through
 5  March?
 6      A.   Yes, it was related to his
 7  performance over the last two years.
 8      Q.   And how do you know that?
 9      A.   Because I read his review files.
10      Q.   How do you know that that is what
11  drove Mr. Wolfe's and Mr. Birnbaum's
12  thinking with respect to them refraining
13  from staffing him between October --
14  between the period of October 2016 through
15  March of 2017?
16          MR. BIRENBOIM:  Objection to
17      form, mischaracterizes the record, the
18      use of refrain.  You can answer.
19          THE WITNESS:  Two things.  One,
20      when I started to focus on his
21      inability to get work, I did talk to
22      Harold and Brian and we talked
23      about -- I talked about with each of
24      them the difficulties they were having
25      getting him staffed, but I think we
```

Page 117

BICK

1
2   agreed it was hard with his
3   performance issues to put him on
4   certain types of transactions.  And
5   then two, I had been a staffing
6   partner myself in my younger days when
7   I was first a partner and I had seen
8   similar types of problems where a poor
9   performing associate would be
10   difficult to staff on transactions, so
11   I could understand the problems they
12   were dealing with.
13      MR. JEFFRIES:  So at this time I
14   would like to move in tab 7.
15      (Exhibit 7, document Bates
16   labeled DPW_SDNY-000086138, marked for
17   identification.)
18 BY MR. JEFFRIES:
19    Q.  So at the very bottom of the
20 page, do you see the e-mail --
21    A.  I'm just trying to get the
22 control.  I'm going to increase the size
23 because I can't read it.  Okay.
24    Q.  I'm going to be drawing your
25 attention to the e-mail from you to

Page 118

BICK

1
2 Mr. Cardwell on August 31, 2017 from --
3 I'm confusing -- from Mr. Birnbaum to
4 Mr. Cardwell, August 31, 2017 at 5:04.
5    A.  Um-hum.
6    Q.  So do you see that the subject of
7 the e-mail is pitch?
8    A.  Yes.
9    Q.  Okay.  And do you see that in
10 that e-mail, Mr. Birnbaum states, "Kaloma,
11 we're pitching for a new client, couple of
12 public company deals, and would like to
13 include you on the team for the pitch.
14 Nothing to do right now, just wanted to
15 give you a heads up.  Who knows if we'll
16 get it, but here's hoping.  Sounds like it
17 wouldn't start until mid September, FYI."
18    Do you see that?
19    A.  I see that, yes.
20    Q.  Do you know whether or not --
21 were you aware of that pitch?
22    A.  I do not recollect this pitch,
23 no.
24    Q.  In your position as the head of
25 the M&A group, would that be something

BICK

1
2    Q.   Do you recall if you had
3    conversations with Harold Birnbaum about
4    Mr. Cardwell in February?
5       A.   Harold might have been included
6    but I don't remember.
7       Q.   Do you recall whether you had
8    conversations with Brian Wolfe about
9    Mr. Cardwell in February 2018?
10      A.   He might have been included, too,
11   but I don't remember.
12      Q.   Do you recall whether you had any
13   conversations with Daniel Brass about
14   Mr. Cardwell in February of 2018?
15      A.   I do not think so.
16      Q.   What about Len Kreynin?
17      A.   He could have been included but I
18   don't remember.
19      Q.   What is it about the period --
20   what is it about the period of February
21   2018 that sparks your recollection that
22   there were conversations about
23   Mr. Cardwell during that specific period
24   of time?
25      A.   Well, in terms of the chronology

BICK

1
2    here, roughly two weeks prior to this
3    e-mail chain, I know that Louis Goldberg
4    and Oliver Smith sat down and talked to
5    Kaloma about his performance and was
6    effectively giving him his review for the
7    2017 time period.
8         I also remember that one of the
9    questions that Kaloma asked of Oliver and
10   Louis after receiving his review was what
11   are the firm's plans regarding my working
12   at the firm and staffing me on
13   transactions going forward.  Louis and
14   Oliver I understand told him that we
15   hadn't decided yet what we were going to
16   do.
17        And so from that review until a
18   date in February, we were considering what
19   we would do, whether to continue trying to
20   get him work and staff him on transactions
21   or effectively tell him to go look for
22   another job.  The conclusion was that he
23   should look for another job, that he
24   wouldn't be staffed on matters going
25   forward, so looking for another job would

1                    BICK
2    Mr. Cardwell?
3              MR. BIRENBOIM:  Same caution to
4        the witness that I gave with respect
5        to Ms. Crane.
6              THE WITNESS:  Yes, I remember a
7        conversation in 2016 with Renee
8        regarding Kaloma.
9    BY MR. JEFFRIES:
10        Q.   And how many conversations have
11   you had with Ms. Crane about Mr. Cardwell
12   overall in regards to this -- withdrawn.
13             How many conversations have you
14   had with Ms. Crane about Mr. Cardwell
15   overall?
16             MR. BIRENBOIM:  Are we talking
17        about Ms. DeSantis or Ms. Crane?
18             MR. JEFFRIES:  I'm going back to
19        Ms. Crane right now.
20             MR. BIRENBOIM:  Okay.
21             THE WITNESS:  Any specific time
22        period or just everything?
23   BY MR. JEFFRIES:
24        Q.   During Mr. Cardwell's employment.
25        A.   Well, you know, call it sort of

1                    BICK
2    pre-privileged conversations, I don't
3    recollect any such conversations with
4    Sharon Crane regarding Kaloma.  After we
5    have privileged conversations, I cannot
6    tell you the number of times I met in a
7    group with Sharon.
8        Q.   In addition to meeting in a group
9    to discuss Kaloma with Sharon Crane, have
10   there been any e-mails between yourself
11   and Ms. Crane about Mr. Kaloma Cardwell
12   before or after counsel became involved?
13        A.   Not to my recollection, no.
14        Q.   What about with respect to Renee
15   DeSantis, any e-mails between yourself and
16   Renee DeSantis about Mr. Cardwell before
17   or after counsel had become involved?
18        A.   I believe there were some e-mails
19   in 2016 but I couldn't give you a complete
20   list or breakdown.
21        Q.   Now, during Mr. Cardwell's
22   employment, did you ever hear anything
23   about Mr. Cardwell and other Black members
24   meeting with the firm's diversity
25   committee and associate development

Page 159

BICK

1
2 department?
3     A.   I have no recollection of that,
4 no.
5     Q.   During Mr. Cardwell's employment,
6 did you ever speak to Sophia Hudson about
7 Mr. Cardwell?
8     A.   I did.
9     Q.   And when was that?
10     A.   In 2016.
11     Q.   And what was the nature of that
12 conversation?
13     A.   Kaloma had worked with Sophia
14 during his capital markets rotation and I
15 talked to her about his performance on
16 those transactions.
17     Q.   What was said about his
18 performance?
19     A.   He had not performed well.  My
20 recollection was that he had worked on
21 three of Sophia's transactions in capital
22 markets during his six-month rotation in
23 capital markets, and she was very
24 concerned about his performance consistent
25 with what I described earlier.

Page 160

BICK

1
2     Q.   At the time that you had these
3 conversations with Sophia Hudson about
4 Mr. Cardwell, was he in the capital
5 markets group or was he in M&A?
6     A.   The conversation I had with
7 Sophia was in June of 2016.  I don't
8 remember exactly what day and at that
9 time, Kaloma was in the M&A practice
10 group.
11     Q.   How did that conversation come
12 about, who initiated it?
13     A.   I did.
14     Q.   What was the reason that you
15 initiated that conversation with
16 Ms. Hudson about Mr. Cardwell during that
17 time period?
18     A.   I had an earlier meeting with
19 Renee, I believe Carolina and Alicia Fabe
20 where we reviewed a presentation that they
21 had prepared for me regarding Black
22 American, African American associates in
23 the corporate group and we had gone
24 through how each was doing in terms of a
25 career development.  And there was a slide

BICK

1

2  prepared for me regarding Kaloma and there

3  were several issues there, a flag, one of

4  which was recent performance in capital

5  markets.  I asked questions about that.

6  One of those three people described the

7  difficult time that Kaloma had in capital

8  markets during his rotation, in particular

9  work that he had done on three of Sophia's

10  transactions.  I was very concerned about

11  his performance in capital markets and

12  what I was hearing in terms of the

13  substance, and so I thought it best for me

14  to call Sophia directly and hear exactly

15  her thoughts on the subject.

16     Q.   And her thoughts related to I

17  think you said three different

18  transactions or three different

19  assignments he worked on with her?

20     A.   That's my recollection.

21     Q.   And by virtue of the

22  conversations on each of those particular

23  assignments, he had -- how would you

24  describe it, would you describe it as

25  underperformed or in some other fashion?

BICK

1

2     A.   Yes, or performed poorly.  Again

3  in terms of process issues, he had not

4  paid attention to details, had been

5  careless sometimes, he had not turned in

6  good work product at deadlines.  It was

7  apparent to the lawyers that worked with

8  him he had substantive issues

9  understanding the work product so maybe he

10  had not asked enough questions.  And as a

11  result, it led to taking a little bit too

12  long to do the work and not meeting the

13  deadlines.  And so these were general

14  issues that she had identified on the

15  three deals.  And she also had worked

16  directly with him so this is both

17  information she got from associates that

18  worked with Kaloma as well as her own

19  personal experience.

20     Q.   So based off of her working

21  directly with Kaloma, she had observed the

22  issues that you previously indicated;

23  correct?

24     A.   Yes.

25     Q.   And that was also information

Page 169

```
              BICK
 1
 2      A.   9 September 2016, yes.
 3      Q.   And this -- in this e-mail, it
 4   reads, "If you talk to John today about
 5   the other stuff please mention Kaloma.  As
 6   discussed, he needs to be someone's
 7   project as soon as possible, i.e., get
 8   work and hours and direct feedback.  Given
 9   his conversation with Rocio, I don't think
10   it makes sense to wait to implement
11   sometime in January after review season."
12           So who is John in that particular
13   e-mail?  That would be you; correct?
14      A.   I believe she's referring to me,
15   yes.
16      Q.   And the words given his
17   conversation with Rocio, that's a
18   reference to a prior conversation between
19   Rocio Clausen and Mr. Cardwell; correct?
20           MR. BIRENBOIM:  Objection to
21        form.
22           THE WITNESS:  I see what the
23        e-mail says.  That seems to be what
24        she's referring to.
25   ///
```

Page 170

```
              BICK
 1
 2   BY MR. JEFFRIES:
 3      Q.   Are you aware of any conversation
 4   between Rocio Clausen and Kaloma Cardwell
 5   in September of 2016?
 6      A.   Fully based on this e-mail, I
 7   have no other recollection.
 8      Q.   Is it your testimony you were
 9   never informed of Mr. Cardwell having a
10   meeting with Rocio Clausen in September of
11   2016 aside from this e-mail you're seeing
12   here today?
13      A.   I have no recollection of that
14   meeting or what was discussed.
15      Q.   Well, my question to you, sir, is
16   aside from this e-mail that we're looking
17   at today, did you have any knowledge of a
18   meeting between Rocio Clausen and
19   Mr. Cardwell prior to your testimony
20   today?
21           MR. BIRENBOIM:  Objection, asked
22        and answered.  You can answer.
23           THE WITNESS:  If I have no
24        recollection, I have no knowledge.
25   ///
```

Page 171

```
              BICK
 1                 BICK
 2   BY MR. JEFFRIES:
 3        Q.   Sorry, what was that?
 4        A.   If I was no recollection of the
 5   meeting or what was discussed, I have no
 6   knowledge.  To me it's the same thing.
 7        Q.   And so did there come a point in
 8   time when you were ever informed in any
 9   capacity about the meeting or about a
10   meeting between Rocio Clausen and Kaloma
11   Cardwell in September of 2016?
12        A.   I have no recollection of being
13   briefed about that meeting or the
14   conversation.
15        Q.   What about ever, were you ever
16   informed about any meeting between Rocio
17   Clausen and Kaloma Cardwell?
18        A.   Only as a result of this e-mail.
19             MR. JEFFRIES:  At this point in
20        time, let's go off for a moment.
21             (Lunch recess taken at 1:26 p.m.)
22
23
24
25
```

Page 172

```
 1                 BICK
 2    A F T E R N O O N   S E S S I O N
 3        (Time noted:  2:14 p.m.)
 4   J O H N   B I C K,  resumed and testified
 5      as follows:
 6        MR. JEFFRIES:  At this point in
 7      time, I would like to move tab 13 into
 8      evidence.
 9        (Exhibit 11, document Bates
10      labeled DPW_SDNY-000141924, marked for
11      identification.)
12   CONTINUED EXAMINATION
13   BY MR. JEFFRIES:
14        Q.   Mr. Bick, do you see the item
15   moved into evidence?
16        A.   8 May 2015, yes.
17        Q.   That item is an e-mail, correct,
18   a series of e-mails?
19        A.   Yes, I was going to read it.  I
20   haven't seen this.
21        Q.   Take a moment to look through it.
22   I'm going to be speaking to you about the
23   e-mail from May 8, 2015 at 7:34 a.m.
24        A.   I'll let you know when I'm
25   finished.
```

Page 179

BICK

1
2       that of the head of corporate, would it be
3       expected for a complaint of racial
4       discrimination or racial exclusion to be
5       brought to the attention of firm
6       management?
7           A.   Sure, if an employee or lawyer
8       went to Sharon and raised a formal
9       complaint of racial discrimination, I'm
10      sure she would bring that to management's
11      attention.
12          Q.   You mentioned this e-mail was
13      brought to your attention after the EEOC
14      complaint was filed; is that correct?
15              MR. BIRENBOIM:  Objection to the
16          form.
17              THE WITNESS:  I've not seen this
18          e-mail before but the subject matter
19          of Kaloma visiting with or talking to
20          Sharon about, let's call it
21          introduction issue, I did hear about
22          in connection with the complaint.
23      BY MR. JEFFRIES:
24          Q.   And just to be clear, that would
25      have been you hearing about this incident

Page 180

BICK

1
2       referenced in the e-mail in connection
3       with a complaint of racial discrimination
4       that Mr. Cardwell made against the firm;
5       is that correct?
6               MR. BIRENBOIM:  Objection to the
7           form.
8               THE WITNESS:  It occurred -- I
9           learned about it after the complaint
10          was filed.
11      BY MR. JEFFRIES:
12          Q.   Right.  And what was the
13      nature -- what was the nexus between you
14      learning about this complaint and the
15      complaint being filed?
16              MR. BIRENBOIM:  I caution the
17          witness not to disclose any
18          conversations with counsel about any
19          litigation.
20              THE WITNESS:  Again, after the
21          EEOC complaint was filed, this was
22          just one factual item I heard about
23          that there was this conversation.  I
24          certainly don't characterize it as a
25          complaint, it was a suggestion by

Page 183

                            BICK
1
2     by counsel, Mr. Bick, aside from this
3     particular incident that's chronicled in
4     the e-mail, were there other incidents
5     that you learned about relative to
6     Mr. Cardwell at the time that you were
7     discussing the EEOC complaint that
8     Mr. Cardwell made?
9          A.   I believe there were other
10    incidents but I learned about those where
11    counsel was present.
12            MR. BIRENBOIM:  Mr. Bick, to be
13       clear, if you learned something by --
14            MR. JEFFRIES:  Mr. Birenboim,
15       wait a minute.  Mr. Birenboim.
16            MR. BIRENBOIM:  I'm trying to
17       help.
18            MR. JEFFRIES:  We're not going to
19       do that.  This is neither an objection
20       nor anything appropriate for the
21       record.
22            MR. BIRENBOIM:  I was trying to
23       help you get the information.
24            MR. JEFFRIES:  I don't believe
25       that to be the case.  I'll do it

Page 184

                            BICK
1
2     myself, thank you very much.
3     BY MR. JEFFRIES:
4          Q.   Mr. Bick, what is the -- what is
5     BAG?
6          A.   It's the Black Affinity Group.
7          Q.   And what are affinity groups?
8          A.   Affinity groups are different
9     groups of lawyers that get organized for
10    various functions such as for Black
11    associates, for Asian associates, for
12    women, parents, mothers, so they can form
13    different groups to meet and discuss
14    common issues relevant to the group and
15    other interests or as well as social
16    functions.
17         Q.   So the BAG group is a Black
18    Affinity Group within Davis Polk; correct?
19         A.   Yes.
20         Q.   Would BAG have existed during
21    2014 through 2018?
22         A.   I believe so but I'm not a
23    hundred percent sure when it started but I
24    believe it existed.
25         Q.   During Mr. Cardwell's employment,

Page 185

BICK

1
2    did you ever hear anything about
3    Mr. Cardwell and other BAG members meeting
4    with the firm's diversity committee and
5    associate development department sometime
6    in 2015?
7         A.   I do not.  I have no recollection
8    of that.
9         Q.   To be clear, did you ever hear
10   about Mr. Cardwell and other BAG members
11   meeting with the firm's diversity
12   committee and associate development
13   department at any time --
14             MR. BIRENBOIM:  Objection, asked
15        and answered.
16        Q.   -- during the time he was
17   employed at the firm?
18             MR. BIRENBOIM:  Objection, asked
19        and answered.  You may answer again.
20             THE WITNESS:  I learned about it
21        after the complaint was filed.
22   BY MR. JEFFRIES:
23        Q.   Did you learn about -- what did
24   you learn about the meeting?
25             MR. BIRENBOIM:  Objection.

Page 186

BICK

1
2    Mr. Bick, to the extent the question
3    calls for the disclosure of
4    information you learned from counsel,
5    that is privileged and you should not
6    disclose it.  To the extent you heard
7    it by reading it in a complaint, you
8    can disclose that because that's not a
9    communication from counsel.
10             MR. JEFFRIES:  Actually, to the
11        extent the question is calls for
12        facts, I'm going to require an answer.
13        I'm not asking about advice,
14        Mr. Birenboim.  I'm entitled to ask
15        him about the facts.
16             MR. BIRENBOIM:  That is a
17        preposterous position.  If counsel
18        briefs you on the facts, it is
19        privileged and I direct you not to
20        answer.
21             MR. JEFFRIES:  The facts --
22             MR. BIRENBOIM:  Take that to the
23        judge, David.
24             MR. JEFFRIES:  We will be taking
25        that to the judge if your position is

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

BICK

1
2    asked and answered.  Mr. Bick, if you
3    have information about that outside of
4    what you learned from counsel, you may
5    testify about it.
6        THE WITNESS:  Not to my
7    knowledge.
8    BY MR. JEFFRIES:
9        Q.   Mr. Bick, do you remember hearing
10   anything about Mr. Cardwell making
11   comments about him experiencing exclusion
12   at Davis Polk due to his race?
13       A.   I remember comments that he made
14   to others.
15       Q.   What's the earliest you remember
16   hearing that?
17       A.   Sometime in 2017.
18       Q.   And what comments did you -- what
19   types of comments did you hear about him
20   making?
21       A.   My general recollection was that
22   he was stating that because he was a Black
23   associate he was being discriminated
24   against and not getting work.
25       Q.   Who did you hear that from?

BICK

1
2        A.   My recollection is that it
3    followed a conversation Kaloma had with
4    Tom Reid.
5        Q.   And who did you hear about that
6    conversation from?
7        A.   From Tom.
8        Q.   What did you hear about that?
9        A.   I don't know the precise date but
10   it was on or about March of 2017 or
11   shortly thereafter but I don't have a
12   precise date.
13       Q.   You hadn't heard anything about
14   that from Tom prior to 2017?
15       A.   To the best of my recollection,
16   no.
17       Q.   You hadn't heard anything about
18   that from anyone else prior to 2017?
19       A.   To the best of my recollection,
20   no.
21       Q.   Were there any other comments you
22   heard about prior to 2017?
23       A.   Comments about what?
24       Q.   About Mr. Cardwell and his
25   complaints of with respect to not getting

Page 195

BICK

1
2   A.   Not with respect to the meeting
3   with Tom but as I was focusing on a work
4   plan, just to get him work down the road,
5   I was going to be talking to some of the
6   M&A partners in connection with that
7   effort.
8   Q.   And which M&A partners did you
9   intend to speak to?
10   A.   Certainly the two staffing
11   partners.  I told Brian and Harold, and
12   during the course of the discussions I
13   reached out to a few partners.  I don't
14   know that I have a complete list about
15   their willingness to work with Kaloma on
16   some of their matters.
17   Q.   Since Mr. Cardwell had expressed
18   concerns about staffing, did you tell the
19   staffing partners about the meeting with
20   Tom?
21   A.   I have no actual recollection of
22   specifically talking about that with them.
23   My recollection again is talking about a
24   work plan and how to get Kaloma work.
25   That was the discussion I was having with

Page 196

BICK

1
2   them.
3   Q.   Was it possible you communicated
4   information to the staffing partners about
5   the meeting with Tom?
6   MR. BIRENBOIM:  Objection, calls
7   for speculation.  You may answer.
8   THE WITNESS:  I just don't know.
9   BY MR. JEFFRIES:
10   Q.   Do you remember hearing anything
11   about a meeting between Mr. Cardwell,
12   Sheila Adams and Tom Reid over dinner?
13   A.   I learned of that fact in
14   connection with discussions after the
15   March meeting, I believe.
16   Q.   So is it your testimony that in
17   2016, you had no information or no
18   knowledge about a meeting between Sheila
19   Adams, Kaloma Cardwell and Tom Reid?
20   A.   I have no recollection of
21   discussing that dinner in prior periods.
22   Q.   Did you come to learn that during
23   that dinner with Tom Reid and Sheila
24   Adams, Mr. Cardwell discussed topics
25   related to diversity and inclusion at

Page 199

```
                            BICK
1
2        A.   I do.
3        Q.   On or around September or October
4   in 2016, were you aware that Rocio Clausen
5   and Carolina Fenner had reached out to
6   Mr. Cardwell and attempted to staff him on
7   a credit assignment?
8        A.   I was not aware of this staffing
9   request.
10       Q.   Did there come a point in time
11  where you were ever made aware that Rocio
12  Clausen and Carolina Fenner had reached
13  out to Mr. Cardwell and attempted to staff
14  him on a credit assignment?
15       A.   No, this is the first time I'm
16  seeing it.
17       Q.   You never observed any
18  discussions or you were never informed of
19  any discussions related to Ms. Clausen's
20  attempt to staff Mr. Cardwell on a credit
21  assignment in 2016?
22       A.   No, something like this would not
23  have been brought to my attention.
24       Q.   At this point in time in
25  September of 2016, Ms. Clausen was a
```

Page 200

```
                            BICK
1
2   manager in the associate development
3   department; correct?
4        A.   Yes.
5        Q.   And what would your role have
6   been at that point in time, in September
7   of 2016?
8        A.   I was on the management committee
9   and at that point I was head of the M&A
10  group.
11       Q.   At that point in time,
12  Mr. Cardwell would have been an associate
13  in the management -- in the M&A
14  department; correct?
15       A.   Yes.
16       Q.   And did you ever learn of an
17  attempt to staff Mr. Cardwell while he was
18  one of your associates in the M&A
19  department in a -- with respect to an
20  assignment in the credit department?
21       A.   Look, this happens with some
22  frequency where one group needs help and
23  they don't have sufficient resources, so
24  certainly within corporate that group will
25  reach out and ask for help from other
```

Page 203

BICK

1              BICK
2  Mr. Cardwell made someone's project?
3          MR. BIRENBOIM:  Objection to
4      form.
5          THE WITNESS:  Not to my
6      recollection, no.
7  BY MR. JEFFRIES:
8      Q.   Within the context of this
9  e-mail, what does it mean or what is being
10  communicated with respect to Kaloma
11  Cardwell being made someone's project?
12          MR. BIRENBOIM:  Objection to
13      form, no foundation.  It's not the
14      witness's e-mail.
15          THE WITNESS:  I would be
16      speculating.  You would have to ask
17      Sharon.
18  BY MR. JEFFRIES:
19      Q.   Well, at the time of this e-mail
20  in September or October of 2016, did you
21  believe that Mr. Cardwell was a poor
22  performer?
23      A.   I think he had performance issues
24  as we discussed, so there were significant
25  issues that he had to work on.

Page 204

BICK

1              BICK
2      Q.   So again, asking specific as to
3  you, did you believe that Mr. Cardwell was
4  a poor performer at the time of this
5  e-mail in September of 2016?
6      A.   Based on feedback I received from
7  others, looking at his reviews, talking to
8  others, yes, I think he had performance
9  issues which I had communicated to him
10  that he needed to focus on and improve.
11      Q.   You mentioned that that belief
12  was in part formed by conversations with
13  others.  Which others, which people are
14  you speaking about that contribute to that
15  assessment?
16      A.   I spoke to Sophia as we discussed
17  earlier and I reviewed review files from a
18  whole bunch of lawyers regarding his
19  performance over the years.
20      Q.   Anyone else?
21      A.   In September, not to my
22  recollection, no.
23      Q.   So the review files you mentioned
24  from other associates, do you know which
25  associates those review files were from?

BICK

1
2  denied the ability to see his performance
3  reviews and personnel files?
4      MR. BIRENBOIM:  Asked and
5      answered.  You can answer.
6      THE WITNESS:  I was going to say
7      as I've previously answered, our
8      policy was not to allow lawyers to see
9      or have their personnel files, so that
10     was the reason why he didn't get his.
11  BY MR. JEFFRIES:
12     Q.   Was Mr. Cardwell's request the
13  first time that an associate requested to
14  see his or her performance reviews, to
15  your knowledge?
16     A.   I don't know prior requests.
17     MR. JEFFRIES:  Zach, can we take
18     down Exhibit 10?
19  BY MR. JEFFRIES:
20     Q.   During Mr. Cardwell's employment,
21  did you ever hear anything about
22  Mr. Cardwell contacting Louis Goldberg
23  about how his experiences at Davis Polk
24  had made him physically ill?
25     A.   The only thing I recollect was

BICK

1
2  the event in June where he stated he
3  needed a leave of absence.  My
4  recollection was because he felt stress.
5  I don't remember the physically ill part
6  but I do remember him requesting a leave
7  of absence based on what stress he had.
8      Q.   And is it your recollection that
9  Mr. Cardwell asked for the leave of
10  absence?
11     A.   That is my understanding, yes.
12     Q.   And why do you have that belief?
13     MR. BIRENBOIM:  Objection to
14     form.
15     THE WITNESS:  In connection with
16     preparation.  I read e-mails at the
17     time.
18  BY MR. JEFFRIES:
19     Q.   With respect to the e-mails that
20  you read in connection with that
21  development, who were those e-mails from?
22     A.   I don't remember the person.  It
23  was someone in HR because he had been sort
24  of nonresponsive to Phillip Mills in
25  connection with an M&A transaction that he

BICK

1
2   requested the leave of absence; correct?
3       A.   I thought he did.  That's my
4   recollection.
5       Q.   Well --
6       A.   Because he responded that he
7   wasn't able to respond to Phillip because
8   of these stress issues.
9       Q.   What would your response be if I
10  told you that Mr. Cardwell was -- if I
11  told you that the leave of absence was
12  something that was put to Mr. Cardwell by
13  firm management as opposed to a leave of
14  absence that he himself had requested?
15          MR. BIRENBOIM:  Objection to
16      form.
17          THE WITNESS:  I was on the
18      management committee.  I have no
19      recollection of that.  Maybe someone
20      discussed it with him but not to my
21      knowledge.
22  BY MR. JEFFRIES:
23      Q.   With respect to the meeting --
24  actually withdrawn.
25          Have you yourself seen any

BICK

1
2   documents indicating Mr. Cardwell's
3   request for a leave of absence?
4       A.   I remember seeing one e-mail
5   where he was reporting in and saying that
6   he was unable to respond because something
7   to the effect that he was having a
8   difficult time.
9       Q.   When did you first become aware
10  that Mr. Cardwell had filed a complaint
11  with the EEOC and with NYS DHR?
12      A.   I believe it was around the
13  August 2017 time frame.
14      Q.   And to the best of your
15  understanding, why did Mr. Cardwell file a
16  complaint with EEOC?
17          MR. BIRENBOIM:  Objection to
18      form, no foundation.  This witness
19      doesn't know what Mr. Cardwell is
20      thinking but you can answer.
21          MR. JEFFRIES:  The witness
22      testified as having reviewed the
23      complaints.  I'm asking him to answer
24      based off that.
25          THE WITNESS:  He was alleging

Page 291

                    BICK
1
2    happening?
3        A.   People have gotten negative
4    reviews in the sense that they have to
5    work on specific areas and remain
6    employed, so yes.
7        Q.   Are you aware of associates
8    remaining employed at the firm despite
9    receiving behind ratings in performance
10   reviews in a prior review period?
11           MR. BIRENBOIM:  Objection to
12       form.
13           THE WITNESS:  Again, I don't have
14       any details.
15   BY MR. JEFFRIES:
16       Q.   Are there any
17   nonperformance-based reviews -- excuse me,
18   are there any nonperformance-based reasons
19   that can contribute to an associate being
20   rated behind other associates in their
21   class?
22       A.   Not to my knowledge.  It's all
23   based on performance relative to other
24   members in their class.
25       Q.   Who made the decision to give

Page 292

                    BICK
1
2    Mr. Cardwell a midyear review in June of
3    2016?
4        A.   He didn't get a midyear review.
5        Q.   So your testimony is that
6    Mr. Cardwell did not receive a midyear
7    review in 2016?
8        A.   I view it as an interim review.
9    In the fall of 2015 he was not told he was
10   going to be given a midyear review, which
11   is I think is a term of art, that says in
12   connection with your annual review, here
13   are the performance issues we want you to
14   work on and we're going to touch base six
15   months later in a midyear review around
16   May or June.
17           The interim review I gave to
18   Kaloma was based on the information I got
19   in my meeting with associate development
20   in June and it caused me great concern.  I
21   did talk to Sophia, I asked for review
22   forms to be filled by people who had
23   worked with him recently.  And then based
24   on all of that, I thought it was important
25   to sit down and give him that input.  I

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

```
                    BICK
1
2   just make sure I'm not missing anything.
3   Okay.  I want to read it.
4       Q.   Well, in this it describes the
5   message that Mr. Cardwell is to receive
6   for the 2016 annual review.  And what is
7   that message?  Actually it says, who are
8   the trickier messages on your list and it
9   says Kaloma is one.  And that's an e-mail
10  from you; correct?
11      A.   Yes.
12      Q.   And then it further states --
13  what does that mean that Kaloma is one of
14  the trickier reviews?
15      A.   The trickier messages is my sort
16  of a shorthand for messages that we give
17  to certain associates who have performance
18  issues, and are we going to tell them that
19  they should start looking for a new job,
20  are not working out.  Or do we say here
21  are the issues you need to work on and
22  come back for a midyear review a formal
23  midyear review in June of the following
24  year or is it some variation.
25           So as we go through that
```

```
                    BICK
1
2   high-level review with all of the
3   associates, we will identify one, two or
4   three to get these more difficult messages
5   and so at the end of the review process,
6   we cycle back and discuss these people who
7   have the more difficult messages, you
8   know.  I use shorthand and say trickier
9   but it's the more difficult messages at
10  the end of the review process.
11      Q.   And what did you mean when you
12  used the term trickier messages here in
13  this?
14      A.   Again, what I just said, it's a
15  more difficult message touching on whether
16  they should be looking for a new job,
17  whether we're going to give them a midyear
18  review because sometimes we'll say look,
19  we need to see really significant
20  improvement or else you're going to have
21  to look for a new job.  Or we just say
22  look, we're going to do a midyear review,
23  we need to see improvement on these issues
24  and then we'll discuss it at that time.
25  So there's all these different variations
```

```
               BICK
 1
 2    requested the leave of absence; correct?
 3        A.   I thought he did.  That's my
 4    recollection.
 5        Q.   Well --
 6        A.   Because he responded that he
 7    wasn't able to respond to Phillip because
 8    of these stress issues.
 9        Q.   What would your response be if I
10    told you that Mr. Cardwell was -- if I
11    told you that the leave of absence was
12    something that was put to Mr. Cardwell by
13    firm management as opposed to a leave of
14    absence that he himself had requested?
15             MR. BIRENBOIM:  Objection to
16        form.
17             THE WITNESS:  I was on the
18        management committee.  I have no
19        recollection of that.  Maybe someone
20        discussed it with him but not to my
21        knowledge.
22    BY MR. JEFFRIES:
23        Q.   With respect to the meeting --
24    actually withdrawn.
25             Have you yourself seen any
```

```
               BICK
 1
 2    documents indicating Mr. Cardwell's
 3    request for a leave of absence?
 4        A.   I remember seeing one e-mail
 5    where he was reporting in and saying that
 6    he was unable to respond because something
 7    to the effect that he was having a
 8    difficult time.
 9        Q.   When did you first become aware
10    that Mr. Cardwell had filed a complaint
11    with the EEOC and with NYS DHR?
12        A.   I believe it was around the
13    August 2017 time frame.
14        Q.   And to the best of your
15    understanding, why did Mr. Cardwell file a
16    complaint with EEOC?
17             MR. BIRENBOIM:  Objection to
18        form, no foundation.  This witness
19        doesn't know what Mr. Cardwell is
20        thinking but you can answer.
21             MR. JEFFRIES:  The witness
22        testified as having reviewed the
23        complaints.  I'm asking him to answer
24        based off that.
25             THE WITNESS:  He was alleging
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 241

BICK

1
2  respect to the conclusions related to the
3  weighing of certain reviews over others?
4       A.   I don't understand the question.
5  It's not specific.
6       Q.   What input, if any, would you
7  have had with respect to the arguments
8  related to weighing certain performance
9  reviews over others within the NYS DHR
10  submission?
11            MR. BIRENBOIM:  Objection, this
12       is coming very close to asking for
13       Mr. Bick's conversations with counsel
14       so I'm going to direct him not to
15       disclose conversations with counsel.
16       If you can answer otherwise, you can
17       try.
18            THE WITNESS:  All of this could
19       have been discussions with counsel so
20       as directed by counsel, I can't
21       answer.
22  BY MR. JEFFRIES:
23       Q.   So in the scenario in which
24  Mr. Cardwell got five reviews, for example
25  -- so actually in Mr. Cardwell's tenure,

Page 242

BICK

1
2  in his first rotation, if he got five
3  reviews, who would make the decision as to
4  characterize which reviews would be
5  weighed more than others in the summary
6  review process?
7       A.   Again, the process that you're
8  describing is not how I see a review
9  process.  Just again at a high level in an
10  annual review, there will be a reviewing
11  partner assigned to give the associate the
12  review.  That reviewing partner will look
13  at the written reviews submitted by
14  lawyers who have worked for in this case
15  Kaloma.
16            And that review then is discussed
17  at a practice group meeting, in this case
18  let's say M&A, and other M&A partners are
19  encouraged to participate and attend that
20  meeting.  Not everyone does, they have
21  work clients or client conflicts but most
22  do attend those meetings.  So the
23  particular associate with the reviewing
24  partner leading the discussion is
25  discussed.

BICK

1                 BICK

2   describe Mr. Cardwell as a poor performer?

3      A.   To my knowledge, no one used that

4   phrase, poor performer, in the context of

5   the review.

6      Q.   And what about with respect to

7   2016?

8      A.   In 2016, again the review coming

9   out of capital markets and the three

10  matters he worked on in capital markets

11  could be summarized as a poor performer

12  but that word wasn't used.  Again the same

13  words you see in this paragraph,

14  responsiveness to the team, to the

15  clients, care and attention to details,

16  asking questions at the beginning so he

17  fully understood what the assignment was,

18  because it would appear that he didn't

19  fully understand the assignment and that

20  led to one missing deadlines, and that the

21  work product wasn't always very good so it

22  would take time and effort for the

23  supervising senior lawyers to redo the

24  work, these things were flagged, not

25  always fall together but lawyers were

1                 BICK

2   seeing this from time to time.

3      Q.   And is it your testimony that

4   these things were flagged in reviews that

5   you would have -- is it your testimony

6   these things were flagged with respect to

7   reviews in 2016?

8      A.   Yes, based on -- certainly in

9   2016.  I know Sophia sat him down and

10  discussed all of these things in detail so

11  that's very important realtime feedback.

12  And then I sat down and spoke to him in

13  June of 2016 and talked about the need to

14  focus on things that I thought were

15  correctable, if he worked at it, which is

16  responsiveness, that's within his control,

17  paying attention to details and care,

18  that's just rereading documents and making

19  sure that he made all the changes that

20  were necessary, and then making sure you

21  understood the assignment going in so that

22  if you have any questions, go back and ask

23  because if you wait too long, it leads to

24  him taking too much time and not meeting

25  deadlines.  So again you can sort of

Page 257

```
        BICK
1
2       Q.    What were Mr. Cardwell's job
3   responsibilities as an associate?
4       A.    As a first year, he would do the
5   introductory basic work for corporate
6   transactions.  That could range from
7   helping senior lawyers get a transaction
8   to signing, it can help with closing
9   documents, a lot of due diligence review,
10  both on the buy side and sell side for
11  various transactions, and just learning
12  the basic blocking and tackling of the
13  corporate transactions that you're working
14  on.
15      Q.    Did Mr. Cardwell's job
16  responsibilities ever change as an
17  associate?
18      A.    Not significantly because the
19  performance issues that we've been talking
20  about held him back from taking on
21  increasing senior roles and senior
22  responsibilities over the time period that
23  we've talked about.
24      Q.    You indicated not significantly,
25  but did they change in any respect as he
```

Page 258

```
        BICK
1
2   continued in his time as an associate at
3   Davis Polk?
4       A.    Yes, he was given more advanced
5   assignments to work on that he wouldn't
6   have gotten as a first-year associate, so
7   there was some evolution in terms of the
8   work that he was being exposed to.
9       Q.    How long did Mr. Cardwell remain
10  as an associate at Davis Polk?
11      A.    During the four-year period.
12      Q.    Did Mr. Cardwell's position
13  change at any point during his employment?
14      A.    Change in what way?
15      Q.    Was he ever promoted from the
16  position of associate or demoted in any
17  way?
18      A.    No, the only change I can think
19  of would be that he was told in February
20  of 2018 that he should look for a new job
21  and that he wouldn't be actively staffed
22  on corporate transactions in the M&A
23  group.  So he was still an associate,
24  still getting paid but he's no longer
25  working on transactions and his job is to
```

Page 259

BICK

1  BICK
2  look for a job.
3      Q.   How did Mr. Cardwell perform as
4  an associate?
5      A.   Well, again, we flagged the
6  issues.  His critical issues were
7  responsiveness, responding to e-mails,
8  both from team members in Davis Polk and
9  being reachable and not responding to
10 clients and other third parties.  Lack of
11 care or attention to details during the
12 work that he was doing.  Not fully
13 understanding the assignment which led to
14 taking longer than would be expected for
15 the particular assignment and thus not
16 meeting deadlines, and then not
17 understanding the transaction in full, not
18 asking sufficient questions to inform
19 himself that led to sometimes poor work
20 product that needed to be redone by senior
21 people supervising him.  So those were
22 issues that sort of were there from the
23 get-go and continued throughout his tenure
24 with Davis Polk.
25      Q.   Did you conduct performance

Page 260

BICK

1  BICK
2  evaluations of Mr. Cardwell personally?
3      A.   I gave him -- I sat down with him
4  and did an interim review in June of 2016.
5      Q.   How did you evaluate
6  Mr. Cardwell's performance?
7      A.   Exactly the way we discussed.  I
8  said I reviewed review files from the
9  various lawyers, I've spoken to Sophia and
10 going forward to succeed at Davis Polk,
11 there was some key things he should focus
12 on and work on, again responsiveness to
13 other lawyers here and third parties,
14 paying careful attention to details,
15 meeting deadlines and improve the work
16 product.
17      And I emphasized with him when he
18 spoke with him, I thought these were
19 addressable by him, they were within his
20 control and I think if he focused on it
21 and worked at it, I was confident he could
22 address issues like responsiveness and
23 paying attention to details.  Those are
24 all things in my mind that are within
25 control.  But I was trying to caution him

Page 261

```
                    BICK
1
2  and have him focus because if those things
3  don't get fixed, that's sort of the core
4  of our service to clients, if you're not
5  responsive and you're not careful, you're
6  just not going to succeed in a firm like
7  ours.
8           MR. JEFFRIES:  I'm going off just
9      for one moment.
10          (Discussion off the record.)
11 BY MR. JEFFRIES:
12     Q.   So what was the timing of those
13 performance evaluations or of your
14 performance evaluation with respect to
15 Mr. Cardwell's complaints?
16          MR. BIRENBOIM:  Objection to
17      form, no foundation for complaints.
18          THE WITNESS:  I'm not sure I
19      understand the question.  What was the
20      timing of?
21 BY MR. JEFFRIES:
22     Q.   What was the timing of the
23 evaluation that you gave Mr. Cardwell in
24 relation to the complaints that were made?
25          MR. BIRENBOIM:  Objection.
```

Page 262

```
                    BICK
1
2  BY MR. JEFFRIES:
3      Q.   What was the time frame?
4      A.   Again, you mean his EEOC
5  complaint and the New York State
6  complaint, is that what you're talking
7  about?
8      Q.   Well, I'm talking about the
9  complaints that you mentioned that you had
10 become aware of throughout the course of
11 the litigation.  You mentioned becoming
12 aware of a complaint made to Sharon Crane,
13 to the BAG group, to Mr. Goldberg, so --
14     A.   These individual complaints, not
15 the legal complaints, is that correct, is
16 my understanding correct?  Those were
17 all --
18          MR. BIRENBOIM:  Wait, objection
19      to the form of the question.  You may
20      answer.
21          THE WITNESS:  My knowledge of
22      those complaints all came after I gave
23      my interim review to Kaloma.
24 BY MR. JEFFRIES:
25     Q.   And again, how did your knowledge
```

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400
Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

Page 267

BICK

1
2  help improve his performance as an
3  associate, are you aware of whether or not
4  Mr. Cardwell was ever placed on anything
5  like that during his employment?
6      A.   Well, are you referring to 2017
7  and the work plan we came up with or are
8  you referring to this time period, call it
9  2014 through end of 2016?
10     Q.   I'm asking you globally, 2014
11 through 2018.  If there's more than one,
12 then please indicate it, but if there's
13 only one that comes to mind, then I'd ask
14 that you indicate that as well.  So with
15 respect to performance improvement plans,
16 performance improvement efforts, what are
17 you aware of with respect to Mr. Cardwell
18 during his employment?
19     A.   Well, in the period from 2014
20 through 2016, he got specific feedback
21 from Bill Chudd, Sophia, myself and Len
22 Kreynin in the 2016 review period to work
23 on these performance issues, so I don't
24 characterize that as a remediation plan,
25 but he was given specific issues to focus

Page 268

BICK

1
2  on where the performance needed
3  improvement.  Then after he had met with
4  Tom Reid in March and took the time off in
5  April, when he came back we had worked out
6  a specific work plan with him going
7  forward which was designed to give him
8  realtime feedback, hands-on training and
9  teaching from partners who were really
10 good teachers, that was their reputation,
11 in order to focus on all of these issues
12 and try to catch him up and make
13 improvements in all these areas.
14     Q.   And so would you say that the one
15 following March 29th of 2017, would you
16 say that was the first work plan?
17     A.   That was the specific work plan
18 we developed for Kaloma to address his
19 performance issues and get him staffed on
20 corporate transactions so he would be in a
21 position to do the work and hopefully
22 improve on these performance issues.
23     Q.   So what did Mr. Cardwell need to
24 do to get off of the work plan?
25     MR. BIRENBOIM:  Objection to

Page 269

                    BICK
1
2       form.
3           THE WITNESS:  He needed to make
4       improvements in these key areas, he
5       needed to do good work, make sure he
6       understood the assignment, meet
7       deadlines, be more careful, pay
8       attention to detail and certainly be
9       responsive to e-mails and contact from
10      not only Davis Polk team but clients
11      and other third parties.
12  BY MR. JEFFRIES:
13      Q.   Was this communicated to him?
14      A.   Yes.
15      Q.   How so?
16      A.   When he came back from his time
17  off in April, I sat down with him and
18  described what we would be working with
19  him on.
20      Q.   Was anyone else a part of that
21  meeting?
22      A.   No, it was just Kaloma and
23  myself.
24      Q.   And so what specifically did you
25  tell him he had to do in that meeting

Page 270

                    BICK
1
2   between the two of you?
3       A.   I said that we would be giving
4   him an assignment with a partner in the
5   M&A group and he would work on that
6   assignment with that M&A partner until it
7   was completed.  That M&A partner would be
8   spending time with him to make sure he
9   understood the transaction.  The partner
10  would be paying attention to the issues
11  that we had identified for improvement
12  such as responsiveness, attention to
13  details, meeting deadlines and doing good
14  work.
15          Once that assignment with the
16  partner was completed, we would find
17  another assignment and move on to the next
18  one and continue to work on those issues,
19  and that my goal was to find partners who
20  were good hands-on teachers where he could
21  learn a lot from them and they were
22  willing to help him directly.
23      Q.   So it's your testimony that you
24  told him it was a plan designed to improve
25  his performance; is that correct?

```
                        BICK
1
2   certainly had opinions about why he wasn't
3   getting work and those opinions were
4   expressed in the meeting with Tom Reid and
5   Len Kreynin; right?
6            MR. BIRENBOIM:  Objection to
7        form.
8            THE WITNESS:  If you could be
9        more clear about what his objections
10       were based on, I could be maybe more
11       responsive.
12  BY MR. JEFFRIES:
13       Q.   As we discussed earlier, his
14  comments were related to not receiving
15  work based off of him being a Black
16  associate and that was communicated, which
17  we discussed earlier, to Tom Reid and Len
18  Kreynin in the March meeting; right?
19       A.   That's when I learned, yes, I
20  believe I was told that Kaloma had said
21  that his lack of work was based on racial
22  discrimination.
23       Q.   Was Mr. Cardwell ever suspended
24  from work at Davis Polk?
25       A.   Not to my knowledge.
```

```
                        BICK
1
2        Q.   Was Mr. Cardwell ever disciplined
3   by Davis Polk?
4        A.   Not to my knowledge, no.
5        Q.   Was Mr. Cardwell ever warned that
6   if he didn't improve his performance that
7   the firm would terminate him?
8        A.   I'm just thinking.  I don't think
9   we learned of a termination event in the
10  performance reviews that we gave him until
11  Louis and Oliver spoke with him.
12       Q.   Did you attend the meetings where
13  partners discussed associates' reviews,
14  review meetings, so to speak?
15       A.   Are you referring to the annual
16  review meetings that we conduct each year?
17       Q.   Yes.
18       A.   Yes.  So for the M&A group, I
19  would attend performance review meetings
20  typically held in -- call it
21  October/November.
22       Q.   Did you attend such a meeting in
23  2016?
24       A.   Yes.
25       Q.   Did you attend such a meeting in
```

```
                           BICK
 1
 2    2017?
 3        A.    Yes.
 4        Q.    Did you attend such a meeting in
 5    2018?
 6        A.    Yes.  It's a series of meetings
 7    so I believe I attended the great majority
 8    of them.  I may have missed one or two but
 9    I don't know each one.
10        Q.    So in keeping with this line of
11    questioning, did you attend the meeting in
12    2015?
13        A.    Yes.
14        Q.    And were any non-partners
15    physically present at any of those
16    meetings?
17        A.    Members of associate development
18    will participate in those meetings.  I
19    couldn't tell you which one was present at
20    which meeting but one of them at least
21    would be attending.
22        Q.    So turning to the meeting in
23    2015, do you recall if Sharon Crane, Renee
24    DeSantis -- do you recall Sharon Crane
25    attended the meeting in 2015?
```

```
                           BICK
 1
 2        A.    Again, I don't remember at each
 3    meeting who attended.
 4        Q.    Would Sharon Crane be the type of
 5    non-partner personnel that would attend
 6    the annual review meetings?
 7        A.    She could but she wasn't
 8    necessarily frequent the way someone from
 9    associate development would always --
10    would always be there at each review
11    meeting.
12        Q.    So in keeping with the fact that
13    someone from associate development would
14    be present at each meeting, do you recall
15    if Renee DeSantis was at the annual review
16    meeting in 2015, 2016, 2017 or 2018?
17        A.    Apart from myself, I don't
18    remember individual attendance by anyone
19    from associate development, other than
20    again generally there's someone there at
21    each meeting, but who it is, I don't know
22    or remember.
23        Q.    Aside from attending, I believe
24    you mentioned -- well, was there any
25    participation that members of the
```

Page 277

```
1                    BICK
2   associate development department would
3   have at these annual review meetings,
4   aside from simply attending?
5       A.   They may ask factual questions
6   directed to them.
7       Q.   Factual questions about what?
8       A.   Certain -- what assignments he
9   might have worked on, if they were young
10  first year, second year or they are
11  working on the staffing, a question might
12  come up whether they were easy to deal
13  with or did they object to staffing,
14  things of that nature.
15      Q.   These would be questions that the
16  associate development department
17  representative would be posing; correct?
18      A.   No, these are questions put to
19  the person from associate development
20  where we needed some more facts regarding
21  the associate.
22      Q.   And with respect to the usage of
23  that information throughout the review
24  meetings or review discussion meetings,
25  would a consensus feedback message be
```

Page 278

```
1                    BICK
2   created?
3          MR. BIRENBOIM:  Objection to
4      form.
5          THE WITNESS:  That was the goal.
6      There would be again a discussion led
7      by the reviewing partner which we
8      talked about before.  A particular
9      associate, younger associates, first
10     or second years typically would not
11     have that discussion.  That review
12     could be prepared just by the
13     reviewing partner working in tandem
14     with associate development.
15         But more senior people, certainly
16     third year and above, there would be a
17     discussion about that individual by a
18     lead reviewing partner.  They would
19     let us know who had given reviews and
20     then summarize their synopsis of all
21     those reviews.  Sometimes they would
22     read quotes from the reviews.
23     Sometimes they would ask the reviewing
24     partner, the partner who had given
25     that specific review to add further
```

Page 279

BICK

2    comment or background if he or she
3    desired.
4         And then following that lead
5    discussion by the reviewing partner,
6    there would be a general discussion
7    where everyone could ask questions or
8    give comments.  And coming out of that
9    would be what is the consensus message
10   that we wanted to deliver to that
11   particular associate based on all of
12   those reviews.
13   BY MR. JEFFRIES:
14        Q.   Could people who didn't work with
15   the associate contribute to the final
16   review message?
17        A.   They could, but typically it
18   would be those who had the most experience
19   with the associate, but everyone could ask
20   a question or make a comment.
21        Q.   Did the partners who discussed
22   the reviews use a written set of policies
23   as a guide to inform how they should
24   discuss associates' reviews?
25        A.   I'm not aware of any specific

Page 280

BICK

2    policy as to how they should conduct the
3    discussion or ask questions.
4         Q.   Did they use a written rubric or
5    scorecard of some sort?
6         A.   No, not to my knowledge.
7         Q.   Does Davis Polk have any material
8    written policies that Davis Polk partners
9    were required to follow where they are
10   discussing individual reviews for the
11   purpose of creating a consensus message?
12        A.   No, no written guidelines saying
13   how you have to develop the consensus
14   message to my knowledge, no.
15        Q.   So if the firm didn't use any
16   written policies or rubrics, how did the
17   Davis Polk partners, how would partners
18   know which individual reviews were to be
19   given more weight than others, if there
20   was nothing, no written policy, no rubric?
21        A.   Well --
22        MR. BIRENBOIM:  Objection to
23        form.  You may answer.
24        THE WITNESS:  There's no written
25        rules regarding weighting because in a

```
                          BICK
 1
 2      way it doesn't necessarily come into
 3      play in any formulaic way.  So, for
 4      example, if an associate got eight
 5      reviews, six of them were very good,
 6      two of them were bad, some people had
 7      some bad experiences, we would discuss
 8      that associate and try to come to a
 9      consensus view.  Obviously in the case
10      where there's let's say seven real
11      good reviews, one person has a bad
12      review, I think usually that would be
13      understood to be sort of an outlier
14      and probably discounted.
15           If on the other hand there was
16      eight reviews, four of them good, four
17      of them bad, there would be more
18      concern that there was a pattern of
19      poor performance, so we would come up
20      with what would be the constructive
21      feedback that we would give to the
22      associate about the key issues that we
23      identified what they should be working
24      on.
25  ///
```

```
                          BICK
 1
 2  BY MR. JEFFRIES:
 3      Q.   Based on what you know about
 4  Mr. Cardwell's reviews, what processes did
 5  the M&A partners follow in terms of
 6  deciding which reviews should be given
 7  more weight than others?
 8      A.   Again, based on my just answered
 9  question he was discussed, it depends on
10  what time period.  If you want to look at
11  2016, Len Kreynin was the reviewing
12  partner leading the discussion.  He had
13  gathered up the written reviews and
14  summarized them for the group and there
15  was a discussion by the group.  Again,
16  there's no formulaic weighting process.
17  Again, it's just a discussion here of the
18  issues Kaloma has and what message do we
19  want to give to him.
20      Q.   Did Len Kreynin decide that
21  Mr. Cardwell should receive a midyear
22  review?
23      A.   No, that's part of the consensus
24  review process, whether the associate,
25  based on the performance of feedback they
```

```
 1                    BICK
 2  are going to get and the particular
 3  constructive feedback or goals we want to
 4  see them working on, the group on a
 5  consensus basis decides whether that
 6  should be a midyear review.  In 2016, the
 7  consensus was that given these issues
 8  regarding responsiveness, attention to
 9  details, understanding assignments,
10  meeting deadlines and in some cases poor
11  work product, the consensus was that he
12  should be given a midyear review in 2017.
13      Q.    During Mr. Cardwell's employment,
14  did you see any documents that stated that
15  Mr. Cardwell knew how he was performing?
16      A.    Did I see any documents that he
17  knew?  Other than that he received the
18  reviews with these people, with these
19  goals, so I would have thought that based
20  on the reviews that Bill Chudd gave to
21  him, that Sophia gave to him on capital
22  markets, that I did on the interim basis
23  and that Len gave him, in my mind he
24  should have had a pretty good idea of the
25  issues that he needed to work on to be
```

```
 1                    BICK
 2  successful at Davis Polk.
 3      Q.    Is Mr. Cardwell still employed at
 4  Davis Polk?
 5      A.    He is not.
 6      Q.    And when was Mr. Cardwell
 7  terminated?
 8      A.    I believe it was August of 2018.
 9      Q.    What's the earliest moment that
10  you thought Mr. Cardwell might be
11  terminated for poor performance?
12          MR. BIRENBOIM:  Objection to
13      form.  You may answer if you recall.
14          THE WITNESS:  In fall of 2016 and
15      ultimately in obviously
16      January/February time frame of 2017.
17  BY MR. JEFFRIES:
18      Q.    And why did you have that --
19      A.    I'm sorry, the fall of 2017 and
20  January/February 2018.
21      Q.    So not the fall of 2016; correct?
22      A.    No, not before.
23      Q.    And when did you first hear that
24  someone from the firm was interested in
25  Mr. Cardwell working somewhere other than
```

Page 285

```
              BICK
1
2  Davis Polk?
3       MR. BIRENBOIM:  Objection to
4    form, no foundation.
5       THE WITNESS:  When you say
6    someone, we were making that decision
7    collectively and it was discussed in
8    the fall of 2017, and then ultimately
9    the message was agreed that in
10   February in response to Kaloma
11   understandably wanting to know what
12   the program would be in terms of
13   working on transactions when he got
14   the review in January of 2018,
15   ultimately we came back to him and
16   said he needed to look for a new job.
17   So that's when he was told he had to
18   leave the firm.
19  BY MR. JEFFRIES:
20   Q.   When was that decision -- when
21  were those discussions taking place, the
22  ones that led to the decision to terminate
23  Mr. Cardwell?
24   A.   That would be in the
25  January/February time frame of 2018.
```

Page 286

```
              BICK
1
2    Q.   And ultimately who made the
3  decision to terminate Mr. Cardwell?
4    A.   I think it was a group
5  discussion.  It would be certainly
6  management committee because of the EEOC
7  complaint and focusing on impact of
8  termination on those proceedings, and then
9  also getting consensus from a handful of
10  people, staffing partners, Louis Goldberg,
11  Oliver, who had given him the reviews,
12  everyone who had input, and ultimately,
13  the consensus was that he should go get
14  another job, that staffing him was
15  becoming untenable.
16   Q.   With respect to specific
17  individuals, I heard you mention the
18  management committee, Goldberg and
19  staffing partners.  So would that be
20  Harold Birnbaum; correct?
21   A.   Yes, Harold and I believe Brian
22  Wolfe.
23   Q.   And with respect to management
24  committee, would that conversation or
25  would that input related to terminating
```

Page 287

```
1                    BICK
2    Mr. Cardwell have involved input from
3    Mr. Tom Reid?
4        A.   Yes, it would have been Tom Reid
5    and Jim Rouhandeh.
6        Q.   And what about any other M&A
7    partners, would there have been any other
8    M&A partners who he worked with that gave
9    input as to the decision to terminate
10   Mr. Cardwell?
11       A.   Not to my recollection.
12       Q.   How was the termination decision
13   communicated to Mr. Cardwell?
14       A.   I believe Louis Goldberg, Oliver
15   Smith followed up on the official
16   performance review they gave him in
17   January with a follow-on message in
18   February.
19       Q.   Have any other employees been
20   terminated for the same reason that
21   Mr. Cardwell was terminated?
22           MR. BIRENBOIM:  Ever?
23   BY MR. JEFFRIES:
24       Q.   In your experience, Mr. Bick.
25       A.   You mean based on performance
```

Page 288

```
1                    BICK
2    reviews and performing poorly?
3        Q.   Yes.
4        A.   Yes, we have talked to other
5    lawyers and lawyers do get told by us that
6    based on performance, you need to look for
7    another job.
8        Q.   Between 2014 and 2018, were any
9    other associates terminated for the same
10   reason as Mr. Cardwell, specifically
11   performance as you mentioned?
12       A.   I don't have a specific list.  I
13   couldn't give you names.  I don't
14   recollect.
15       Q.   Who would have that information,
16   who would have that list of other
17   associates that would have been terminated
18   during the years of 2014 and 2018 for the
19   same reason as Mr. Cardwell?
20       A.   You'd have to look at their
21   written reviews where that message would
22   be delivered.
23       Q.   So is that to say there's not an
24   individual that would have knowledge
25   related to those occurrences by virtue of
```

Page 291

```
                              BICK
 1                            BICK
 2  happening?
 3      A.    People have gotten negative
 4  reviews in the sense that they have to
 5  work on specific areas and remain
 6  employed, so yes.
 7      Q.    Are you aware of associates
 8  remaining employed at the firm despite
 9  receiving behind ratings in performance
10  reviews in a prior review period?
11          MR. BIRENBOIM:  Objection to
12      form.
13          THE WITNESS:  Again, I don't have
14      any details.
15  BY MR. JEFFRIES:
16      Q.    Are there any
17  nonperformance-based reviews -- excuse me,
18  are there any nonperformance-based reasons
19  that can contribute to an associate being
20  rated behind other associates in their
21  class?
22      A.    Not to my knowledge.  It's all
23  based on performance relative to other
24  members in their class.
25      Q.    Who made the decision to give
```

Page 292

```
                              BICK
 1                            BICK
 2  Mr. Cardwell a midyear review in June of
 3  2016?
 4      A.    He didn't get a midyear review.
 5      Q.    So your testimony is that
 6  Mr. Cardwell did not receive a midyear
 7  review in 2016?
 8      A.    I view it as an interim review.
 9  In the fall of 2015 he was not told he was
10  going to be given a midyear review, which
11  is I think is a term of art, that says in
12  connection with your annual review, here
13  are the performance issues we want you to
14  work on and we're going to touch base six
15  months later in a midyear review around
16  May or June.
17          The interim review I gave to
18  Kaloma was based on the information I got
19  in my meeting with associate development
20  in June and it caused me great concern.  I
21  did talk to Sophia, I asked for review
22  forms to be filled by people who had
23  worked with him recently.  And then based
24  on all of that, I thought it was important
25  to sit down and give him that input.  I
```

Page 293

BICK

1
2 know that he wanted realtime feedback and
3 I was concerned if I didn't give him that
4 feedback, the next time we would actually
5 sit down and talk to him could be in
6 November or December of 2016, and these
7 were serious issues and I wanted him to be
8 aware of them and be focused on them and
9 not simply ignore what Sophia might have
10 said so I felt it was important not to
11 lose time and give him this interim
12 review, but I think it's wrong to sort of
13 characterize it as a midyear review.
14     Q.   Are you aware of Sophia Hudson
15 giving Mr. Cardwell a review?
16     A.   Yes, not a formal written review
17 in the February time frame.  She sat down
18 and spoke to him and gave him very
19 concrete feedback about her experience
20 working with him and the issues he needed
21 to focus on.
22     Q.   Are you aware of her giving him a
23 review in 2016 at any time?
24     A.   Yes, we just talked about that.
25 At the end of his capital markets

Page 294

BICK

1
2 rotation, she sat down and gave him
3 feedback based on her work experience with
4 him.
5     Q.   Did you speak to Ms. Hudson
6 before she completed that review?
7     A.   Yes, I think she put in a written
8 review in June at some point but I had
9 talked to her.  I don't know the precise
10 time frame, whether it was just before or
11 just after her review, but she put in the
12 review in June in connection with my
13 request for all lawyers who worked with
14 him in 2016 to fill in some forms so I
15 could have some current data to show him.
16     Because the last thing I wanted
17 to do is sit down with him and just talk
18 about Sophia's issues and what he needed
19 to work on, which was a concern enough for
20 me and certainly prompted the whole review
21 process, but also I wanted to get more
22 current data from people who were
23 currently working with him, so if he asked
24 what do other people think in M&A who are
25 working with me, I didn't want to say I

                         BICK
1
2    don't know.  I wanted to make sure I had
3    that information to share with him.
4            And some of the information was
5    good.  Some of the M&A lawyers who worked
6    with him thought he had done a good job,
7    in particular Laura Turano who had had a
8    negative experience with him in 2015, and
9    had worked with him in 2016 and had a
10   positive experience and seen an
11   improvement, so that was reassuring.
12       Q.   So you did speak with Sophia
13   Hudson prior to her completing her written
14   review; is that correct?
15           MR. BIRENBOIM:  Objection to
16       form, mischaracterizes what he just
17       said.  You may answer.
18           THE WITNESS:  I did speak to her
19       in the June time frame.  I don't
20       remember if she had put in her written
21       review before I spoke with her or not.
22       I had gotten the substance of it from
23       associate development and what they
24       had heard and again, I had a direct
25       conversation with Sophia.

                         BICK
1
2    BY MR. JEFFRIES:
3        Q.   Who were Mr. Cardwell's similarly
4    situated comparators?
5            MR. BIRENBOIM:  Objection to
6        form.  If you understand how to answer
7        that, you can answer it.
8            THE WITNESS:  I couldn't give you
9        the list off the top of my head.
10   BY MR. JEFFRIES:
11       Q.   Well, what traits would you use
12   to discern who Mr. Cardwell's
13   comparatively -- what would make them
14   comparators?
15           MR. BIRENBOIM:  Objection to
16       form, foundation.  You can answer.
17           THE WITNESS:  If you're just
18       comparing him within the M&A group, I
19       would look at other members of the
20       class of 2014 in the group as the
21       closest comparator because they
22       develop in roughly at the firm for the
23       same period time.  I wouldn't compare
24       him in the class of 2014 to someone
25       who was the class of 2013, you know,

```
                                       Page 291
                  BICK
1
2    happening?
3        A.   People have gotten negative
4    reviews in the sense that they have to
5    work on specific areas and remain
6    employed, so yes.
7        Q.   Are you aware of associates
8    remaining employed at the firm despite
9    receiving behind ratings in performance
10   reviews in a prior review period?
11           MR. BIRENBOIM:  Objection to
12       form.
13           THE WITNESS:  Again, I don't have
14       any details.
15   BY MR. JEFFRIES:
16       Q.   Are there any
17   nonperformance-based reviews -- excuse me,
18   are there any nonperformance-based reasons
19   that can contribute to an associate being
20   rated behind other associates in their
21   class?
22       A.   Not to my knowledge.  It's all
23   based on performance relative to other
24   members in their class.
25       Q.   Who made the decision to give
```

```
                                       Page 292
                  BICK
1
2    Mr. Cardwell a midyear review in June of
3    2016?
4        A.   He didn't get a midyear review.
5        Q.   So your testimony is that
6    Mr. Cardwell did not receive a midyear
7    review in 2016?
8        A.   I view it as an interim review.
9    In the fall of 2015 he was not told he was
10   going to be given a midyear review, which
11   is I think is a term of art, that says in
12   connection with your annual review, here
13   are the performance issues we want you to
14   work on and we're going to touch base six
15   months later in a midyear review around
16   May or June.
17           The interim review I gave to
18   Kaloma was based on the information I got
19   in my meeting with associate development
20   in June and it caused me great concern.  I
21   did talk to Sophia, I asked for review
22   forms to be filled by people who had
23   worked with him recently.  And then based
24   on all of that, I thought it was important
25   to sit down and give him that input.  I
```

BICK

1
2  know that he wanted realtime feedback and
3  I was concerned if I didn't give him that
4  feedback, the next time we would actually
5  sit down and talk to him could be in
6  November or December of 2016, and these
7  were serious issues and I wanted him to be
8  aware of them and be focused on them and
9  not simply ignore what Sophia might have
10 said so I felt it was important not to
11 lose time and give him this interim
12 review, but I think it's wrong to sort of
13 characterize it as a midyear review.
14       Q.    Are you aware of Sophia Hudson
15 giving Mr. Cardwell a review?
16       A.    Yes, not a formal written review
17 in the February time frame.  She sat down
18 and spoke to him and gave him very
19 concrete feedback about her experience
20 working with him and the issues he needed
21 to focus on.
22       Q.    Are you aware of her giving him a
23 review in 2016 at any time?
24       A.    Yes, we just talked about that.
25 At the end of his capital markets

BICK

1
2  rotation, she sat down and gave him
3  feedback based on her work experience with
4  him.
5       Q.    Did you speak to Ms. Hudson
6  before she completed that review?
7       A.    Yes, I think she put in a written
8  review in June at some point but I had
9  talked to her.  I don't know the precise
10 time frame, whether it was just before or
11 just after her review, but she put in the
12 review in June in connection with my
13 request for all lawyers who worked with
14 him in 2016 to fill in some forms so I
15 could have some current data to show him.
16       Because the last thing I wanted
17 to do is sit down with him and just talk
18 about Sophia's issues and what he needed
19 to work on, which was a concern enough for
20 me and certainly prompted the whole review
21 process, but also I wanted to get more
22 current data from people who were
23 currently working with him, so if he asked
24 what do other people think in M&A who are
25 working with me, I didn't want to say I

Page 317

```
1                        BICK
2   decision to terminate him because he's now
3   a rising fourth-year associate.
4             In our opinion, he wasn't
5   operating as a fourth-year associate.  The
6   work that he was capable of doing would be
7   the work of a first or second year
8   associate and we didn't think that was
9   tenable to staff him on those matters,
10  both from a client point of view and also
11  it would be very hard where he might be
12  working with another lawyer who was
13  technically junior to him, but was working
14  at a more senior level than he was.  It
15  just was going to be very difficult for
16  him and for us.
17            MR. JEFFRIES:  Let's turn to tab
18       14 at this point in time.  You can
19       take this down, Zach.
20            (Exhibit 17, document Bates
21       labeled DPW_SDNY-000140827, marked for
22       identification.)
23            MR. JEFFRIES:  Can you enlarge
24       this a bit?
25            MR. BIRENBOIM:  Zach, can you
```

Page 318

```
1                        BICK
2   tell us how much time we have?
3            VERITEXT CONCIERGE:  We are at
4   six hours and 48 minutes.
5            MR. BIRENBOIM:  12 minutes, okay.
6   BY MR. JEFFRIES:
7       Q.   So I want you to look at the
8   items, specifically the e-mail from Renee
9   DeSantis, June 2016 at 7:30 p.m.  Take a
10  look at that item, Mr. Bick.  It's June
11  13, 2016.
12      A.   I'm just going to read from the
13  bottom up e-mails.
14            (Witness perusing document.)
15            Yes, I read it now, um-hum.
16      Q.   And that's an e-mail from
17  Carolina Fenner -- actually excuse me,
18  from Alicia Fabe to Renee DeSantis and
19  Carolina Fenner; correct?
20      A.   Yes.
21      Q.   And it reads, yes, agreed,
22  especially since he wasn't given -- I've
23  inverted this.  We're going to need to
24  start at the bottom of the document.  So
25  if you just scroll down, Mr. Bick, June
```

Page 325

                                BICK
1
2        again, I think it's easily addressed
3        to take away that concern.  And again,
4        I think based on the issues, the
5        performance issues and giving him time
6        to focus and correct these, this was
7        something we had to do, we should do
8        and we did do.
9   BY MR. JEFFRIES:
10       Q.   Well, what did you communicate to
11  them?  Did you communicate to them that
12  you wanted Mr. Cardwell to be put into a
13  midyear review cycle?
14       A.   No, I said I wanted to talk to
15  him particularly about his experience at
16  capital markets because I saw that as a
17  step back based on after his first two
18  rotations.  I was concerned about that
19  particularly after talking to Sophia
20  because she had very credible and concrete
21  examples of what had gone wrong on his
22  work in capital markets.
23            But at the same time I didn't
24  want to just go in and talk about Sophia.
25  Again, I wanted to have feedback from the

Page 326

                                BICK
1
2   M&A lawyers who were working with him
3   because based on his prior discussions
4   asking for realtime feedback, I'm sure
5   he'd say what do people think about and I
6   would be remiss not to have an answer when
7   he asked that question if I said I didn't
8   get any feedback, I don't know.  That
9   would have been a wrong outcome.
10            MR. JEFFRIES:  Turning to tab 20
11       at this time, I would like to have tab
12       20 moved into evidence.
13            (Exhibit 18, document Bates
14       labeled DPW_SDNY-000097947, marked for
15       identification.)
16            MR. BIRENBOIM:  While we're doing
17       that, you have two minutes left,
18       Mr. Jeffries, so I'm just letting you
19       know.
20  BY MR. JEFFRIES:
21       Q.   At the top of tab 20, can you see
22  where that says -- where at the top it
23  says the message that Mr. Cardwell is
24  supposed to receive for his 2016 review?
25       A.   This is 17 October 2016.  Let me

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 327

1                    BICK
2    just make sure I'm not missing anything.
3    Okay.  I want to read it.
4        Q.    Well, in this it describes the
5    message that Mr. Cardwell is to receive
6    for the 2016 annual review.  And what is
7    that message?  Actually it says, who are
8    the trickier messages on your list and it
9    says Kaloma is one.  And that's an e-mail
10   from you; correct?
11       A.    Yes.
12       Q.    And then it further states --
13   what does that mean that Kaloma is one of
14   the trickier reviews?
15       A.    The trickier messages is my sort
16   of a shorthand for messages that we give
17   to certain associates who have performance
18   issues, and are we going to tell them that
19   they should start looking for a new job,
20   are not working out.  Or do we say here
21   are the issues you need to work on and
22   come back for a midyear review a formal
23   midyear review in June of the following
24   year or is it some variation.
25            So as we go through that

Page 328

1                    BICK
2    high-level review with all of the
3    associates, we will identify one, two or
4    three to get these more difficult messages
5    and so at the end of the review process,
6    we cycle back and discuss these people who
7    have the more difficult messages, you
8    know.  I use shorthand and say trickier
9    but it's the more difficult messages at
10   the end of the review process.
11       Q.    And what did you mean when you
12   used the term trickier messages here in
13   this?
14       A.    Again, what I just said, it's a
15   more difficult message touching on whether
16   they should be looking for a new job,
17   whether we're going to give them a midyear
18   review because sometimes we'll say look,
19   we need to see really significant
20   improvement or else you're going to have
21   to look for a new job.  Or we just say
22   look, we're going to do a midyear review,
23   we need to see improvement on these issues
24   and then we'll discuss it at that time.
25   So there's all these different variations

Page 329

```
1              BICK
2  and that's what the group discusses and we
3  determine what type of message we want to
4  give.
5          So Kaloma, based on the
6  performance issues that we've been talking
7  about, was on this list of what do we tell
8  him, do we tell him he's got to look for a
9  new job, do we tell him we're going to
10 give him a midyear review and to again go
11 over the key performance issues that he
12 needs to focus on to improve.
13          (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 330

```
1              BICK
2      MR. BIRENBOIM:  Zach, can we have
3  the time, please?
4      MR. JEFFRIES:  I have no further
5  questions.
6      MR. BIRENBOIM:  Okay, I have no
7  questions.  Thank you, Mr. Bick.
8      (Time noted:  5:46 p.m.)
9
10
11 _____
12 JOHN BICK
13
14 Subscribed and sworn to before me
15 this _____ day of _____, 20____.
16
17 _____
18 Notary Public
19
20
21
22
23
24
25
```