# JEFFRIES DECLARATION EXHIBIT 7

Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3            SOUTHERN DISTRICT OF NEW YORK
 4
 5   KALOMA CARDWELL,            )
                 Plaintiff,      )
 6                               )
             vs.                 )19 Civ. 10256
 7                               )(GHW)
     DAVIS POLK & WARDWELL,      )
 8   THOMAS REID, JOHN BICK,     )
     WILLIAM CHUDD, SOPHIA       )
 9   HUDSON, HAROLD              )
     BIRNBAUM, DANIEL BRASS,     )
10   BRIAN WOLFE, and JOHN       )
     BUTLER,                     )
11              Defendants.      )
     _____    )
12
13
14
15          REMOTE DEPOSITION OF
16               THOMAS REID
17       located in New York, New York
18          Friday, April 16, 2021
19
20
21
22   Reported By:
23   CATHI IRISH, RPR, CRR, CLVS
24
25
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8            April 16, 2021
 9             9:31 a.m.
10
11        Remote deposition of THOMAS REID,
12   with all participants appearing via
13   videoconference, before Cathi Irish, a
14   Registered Professional Reporter,
15   Certified Realtime Reporter, and
16   Notary Public of the State of
17   New York.
18
19
20
21
22
23
24
25
```

Page 11

```
              REID
1
2     form.  You can answer if you know what
3     that means.
4          THE WITNESS:  Sorry, can you
5     repeat the question, Mr. Jeffries?
6  BY MR. JEFFRIES:
7     Q.   Yes.  The e-mails you mentioned
8  had been authored by yourself, had you
9  handed them over to counsel prior to
10 meeting with them?
11    A.   I can't recall if they were
12 specifically handed over to me, but I do
13 remember handing over what I did have to
14 hand that was relevant to this matter, and
15 of course understood and without
16 hesitation granted permission for counsel
17 to do electronic and physical searches of
18 my documents at Davis Polk.
19    Q.   I'm sorry, with respect to the
20 permission for the searching of electronic
21 documents, can you repeat that part?
22    A.   I gave permission to counsel to
23 run electronic search terms through my
24 e-mail files and other document files
25 awhile back, and I would imagine some of
```

Page 12

```
              REID
1
2  the documents came from that.  They may
3  not have all come from my direct handing
4  over.
5     Q.   And you indicated that in your
6  preparation, you reviewed the complaint
7  that was filed by Mr. Cardwell in the
8  Southern District; correct?
9     A.   Yes.
10    Q.   Have you reviewed each of the
11 complaints that Mr. Cardwell has filed in
12 the Southern District?
13    A.   I think what I reviewed was the
14 latest states but in the course of the
15 last year and a half, I've reviewed the
16 different iterations so -- but what I
17 looked at recently was I think the latest.
18    Q.   Have you read Mr. Cardwell's EEOC
19 filing and NYS DHR filing?
20    A.   I remember reading that back when
21 it was filed in 2017 but from my
22 perspective, Mr. Jeffries, when the
23 Southern District complaint was filed,
24 that was what I focused on since then, and
25 I haven't heard anything about the EEOC
```

```
 1              REID
 2  firm's managing partner; correct?
 3      A.   Yes.
 4      Q.   So I'd like to talk to you
 5  briefly about both of those positions.
 6  Can you explain what your responsibilities
 7  and duties were as the head of Davis
 8  Polk's corporate department?
 9      A.   It was a position I was elected
10  to in 2008 and it was a position of
11  oversight for the various corporate
12  departments, both domestically and
13  overseas.
14      Q.   And how long did you serve in
15  that capacity for?
16      A.   Three years, 2008 to 2011 when I
17  became the firm's managing partner.
18      Q.   With respect to the role you held
19  as the firm's managing partner, can you
20  briefly describe the duties and
21  responsibilities that came along with that
22  position?
23      A.   It was also an elected position
24  and it was the chairman of a three-partner
25  committee that had oversight for all of
```

```
 1              REID
 2  the practices of the firm, corporate,
 3  litigation, tax, again domestically and in
 4  the overseas offices.
 5      Q.   And how long did you hold that
 6  position for?
 7      A.   Until -- so 2011 until I left the
 8  firm just over eight years later in 2019
 9  to go to Comcast.
10      Q.   I want to speak to you briefly
11  about the policies, practices and
12  procedures that were in place at Davis
13  Polk during the relevant period, all
14  right, Mr. Reid?
15      A.   Sorry, what is the relevant
16  period?
17      Q.   The relevant period being
18  September of 2014 through August of 2018.
19      A.   Okay.
20      Q.   Did Davis Polk have a strong and
21  clear antidiscrimination policy between
22  2014 and in 2018?
23      A.   I believe it did.
24      Q.   Can you describe what that policy
25  was?
```

                                                  Page 41

                              REID
1
2    were to be directed or recommended that
3    they be directed, but there would have
4    been no prohibition on any associate going
5    to any partner or the associate
6    development non-lawyer professional staff.
7        Q.    During Mr. Cardwell's employment,
8    did the firm's policies permit any lawyer
9    or employee to report any perceived or
10   actual issues related to discrimination,
11   harassment or retaliation to Sharon Crane?
12       A.    Same answer.
13       Q.    So I will take that as a yes?
14       A.    Did it permit, yes.  Again I
15   don't know whether or not the policy said
16   in the first instance we recommend you go
17   to this person or that group or that body,
18   but it would not have said do not go to
19   Sharon Crane.
20       Q.    And who is Sharon Crane?
21       A.    Sharon Crane is -- was in my time
22   as managing partner the co-executive
23   director, which is the most senior member
24   of the non-lawyer administrative staff.
25       Q.    In her capacity in that role,

                                                  Page 42

                              REID
1
2    would she report to you at that time?
3        A.    Yes.
4        Q.    Were Davis Polk's
5    antidiscrimination, anti-harassment and
6    anti-retaliation policies revised any time
7    between 2014 and 2018, sir?
8        A.    I don't know specific revisions.
9    They were as I mentioned reviewed
10   annually.  To the extent there were
11   changes in applicable law that needed to
12   be reflected, they would have been
13   updated.
14       Q.    To the extent that revisions
15   would have been necessary, how would you
16   learn about the revised version of the
17   policies?
18       A.    In the annual certification
19   process.
20       Q.    As you sit here today, do you
21   have a recollection of any specific
22   revisions to the policies that we've
23   discussed during the years of 2014 through
24   2018?
25       A.    Specific revisions, no.

Page 43

REID

1
2     Q.   Do you have a recollection of any
3   revisions being made to the policies that
4   we've discussed during the years of 2014
5   through 2018?
6     A.   I am sure there were some
7   revisions.  I don't recall any of them
8   specifically.
9     Q.   During Mr. Cardwell's employment,
10  how often did you receive training about
11  Davis Polk's antidiscrimination,
12  anti-harassment and anti-retaliation
13  policies?
14    A.   I don't recall going through any
15  training, as you put it, but I organized
16  and would attend various I guess you could
17  call them training or awareness sessions
18  on matters related to this, related to
19  discrimination and harassment.
20    Q.   Were those routinely scheduled,
21  to your recollection?
22    A.   They were pretty routine but it
23  wasn't like they happened the same week of
24  every year or the same week of every
25  month, but they were frequent, let's say.

Page 44

REID

1
2     Q.   Were they conducted by in-house
3   members or outside consultants?
4     A.   Both.
5     Q.   Which outside consultants do you
6   recall conducting such sessions?
7     A.   There were several -- several
8   outside experts in the area that we
9   brought in to talk about the -- talk about
10  issues like discrimination, like
11  unconscious bias.  VallotKarp was one I
12  recall.  There was a woman from the
13  Harvard Kennedy School that we brought in
14  once, maybe twice, but I don't recall any
15  more specifics than that.
16    Q.   Do you recall whether there were
17  specific -- in keeping with the type of
18  sessions that we're discussing, were any
19  of those geared specifically to partners
20  during your time at Davis Polk?
21    A.   There were some of those sessions
22  that were held only with partners.  There
23  were some sessions that were held with
24  partners and associates.  It would vary.
25    Q.   Would you have attended those?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 77

REID

1
2  sir, did you occasionally get updates
3  about how busy certain associates were?
4      A.    No.  I mean associates as a
5  whole, yes, but specific individuals, no.
6      Q.    So is it your testimony here
7  today that during your -- during the
8  relevant period, you did not receive any
9  updates about how busy specific associates
10 were or -- let me restate that.
11          Is it your testimony today that
12 during the relevant period, you did not
13 receive any updates as to the availability
14 of any specific associates, is that your
15 testimony?
16     A.    I did not receive any updates on
17 availability of specific associates,
18 that's correct.
19     Q.    During the relevant period, did
20 you ever receive any updates about the
21 availability of Mr. Cardwell specifically
22 to take on work?
23     A.    I went into it myself at one
24 point in time on my own instigation.
25     Q.    What made you do that, sir?

Page 78

REID

1
2      A.    I knew Kaloma from his time at
3  the firm as a summer associate.  I'd had
4  one or two interactions with him during
5  his summer, and I had a meeting that I was
6  having with him to talk about a particular
7  question he had regarding a client of the
8  firm in the context of the firm's pro bono
9  program.  And I hadn't spoken to
10 Mr. Cardwell for about a year and so I
11 looked into what he had been doing, how
12 busy he was.
13          The year before this meeting, I
14 had dinner with him and a colleague of his
15 and had looked at how he was doing at that
16 time as well, so those were probably the
17 two occasions in which I again
18 proactively, myself, inquired as to how he
19 was doing and in the context of that
20 dinner, how the other associate was doing
21 as well.
22     Q.    Turning to -- what's the
23 earliest -- what would you say is the
24 earliest, based off of the answers you
25 just gave, what would you say was the

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 131

```
 1              REID
 2         MR. BIRENBOIM:  Objection to
 3    form.
 4         THE WITNESS:  What do you mean in
 5    connection with anyone else?
 6  BY MR. JEFFRIES:
 7    Q.   Well, did you evaluate those
 8  reviews in connection with conversations
 9  or in the presence of anyone else that had
10  knowledge about your concern about
11  Mr. Cardwell's hours?
12         MR. BIRENBOIM:  Objection to form
13    and I think misstates the testimony.
14    You can answer.
15         THE WITNESS:  So there were two
16    parts to this.  There was the meeting
17    I had with Ms. Katz and Mr. Cardwell
18    about his conflict question.  In
19    preparation for that meeting, I very
20    quickly just checked what he was
21    working on and I saw that he wasn't
22    working, period.
23         We had our meeting on the
24    conflict issue, dealt with that.  And
25    at the end of that meeting, I raised
```

Page 132

```
 1              REID
 2    with him the question of his low hours
 3    and said I would follow up on that and
 4    get back to him, that we should talk
 5    about it.
 6  BY MR. JEFFRIES:
 7    Q.   Okay.
 8    A.   When you say in connection with
 9  anybody else, Ms. Katz would have heard me
10  say that in the meeting but I haven't
11  spoken about his reviews at that time.
12    Q.   But at the time of that meeting,
13  you had reviewed the performance reviews
14  ahead of time?
15    A.   No, I'd seen his hours were very
16  low at that meeting.  There were two
17  meetings in March of '17.  The first one
18  was set up to discuss his question about a
19  potential conflict in the pro bono
20  program.  And I had seen his hours were
21  very low going into that meeting.
22         And we got to the end of that
23  meeting, and he had raised nothing about
24  his work being so low.  I did and said I
25  wanted to get back to him on it.  I wanted
```

Page 133

                           REID
1
2   to look into it and get back.  And that
3   was the second March meeting.  I don't
4   know, two or three weeks later, I don't
5   know exactly how long but in that period
6   of time, I actually got the reviews and
7   read them.
8       Q.   Mr. Reid, during the relevant
9   period, did Davis Polk have annual firm
10  meetings?
11      A.   This is again the '14 to '18
12  period you're referring to, his employment
13  period?
14      Q.   Yes.
15      A.   The Cardwell employment period.
16  And by firm meetings, you mean partnership
17  meetings?
18      Q.   Yes, an annual firm meeting for
19  the partners.
20      A.   There's one every year, usually
21  at the end of January, beginning of
22  February area.
23      Q.   I want to speak to you about the
24  meeting that would have occurred in
25  February of 2018; okay?

Page 134

                           REID
1
2       A.   2018?
3       Q.   Yes.  Did the firm have an annual
4   firm meeting on -- or during the week of
5   February the 5th, 2018?
6       A.   That would be about the right
7   time.  I don't recall the exact date but
8   that would be about the time we had every
9   annual meeting.
10      Q.   Did you attend that annual
11  meeting?
12      A.   I attended the annual meeting
13  plenary session, if you will, with all
14  partners together in one room Thursday
15  afternoon and Friday afternoon and I sit
16  throughout that.
17      Q.   Aside from that meeting you just
18  mentioned, were there other practice group
19  meetings, separate meetings during the
20  annual meeting?
21      A.   Yes, for a couple of days before
22  the Thursday lunchtime, the practice
23  groups get together and talk about the
24  year behind them, the year ahead, their
25  strategic plans for client development and

REID

1
2    what to do again and what -- how to
3    improve their practice performance.
4        Q.   I'm not sure if I asked this but
5    did you attend the firm meeting in
6    February 2018, did you yourself attend it?
7        A.   I attended -- I held -- I'd start
8    what I called the plenary session in my
9    answer, which is where all of the partners
10   from all its practices and offices sit
11   down just after lunch on a Thursday and
12   leave just after lunch on a Friday, 24
13   hours roughly.
14       Q.   Did you attend any annual
15   practice group meetings during that annual
16   meeting period?
17       A.   I don't recall.  I didn't attend
18   many during my time.  I wanted to leave
19   the practice groups to get on and have
20   their own discussions.  I had enough to do
21   with the overall meeting for those 24
22   hours.
23       Q.   During the meetings that occurred
24   during the week of February 5, 2018, did
25   any Davis Polk partners discuss

REID

1
2    Mr. Cardwell?
3        A.   I did not and I didn't hear
4    anybody discussing him, but that's the
5    extent to which I can answer your
6    question.
7        Q.   So would it be safe to say that
8    you don't know if there were any
9    discussions held about Mr. Cardwell during
10   that meeting?
11          MR. BIRENBOIM:   Objection to
12       form.  You can answer that question.
13          THE WITNESS:   I know what I know
14       and that's what I discussed and what I
15       heard discussed and I know that
16       Mr. Cardwell was no part of those
17       discussions.  That's the extent to
18       which I can answer that question.
19   BY MR. JEFFRIES:
20       Q.   And so to be clear, did you hear
21   about anyone else having talked about
22   Mr. Cardwell during that meeting?
23       A.   I did not.
24       Q.   Mr. Reid, were issues related to
25   discrimination ever discussed at these

Page 137

                    REID
1
2  annual meetings?
3      A.   Yes, most, if not all of the
4  annual meetings that I chaired as managing
5  partner, so that's before and after his
6  employment period, we would usually have
7  some time set aside in that 24-hour period
8  to talk about growing a more diverse firm,
9  unconscious bias, sometimes bringing in --
10 usually bringing in an outside consultant.
11     Q.   And were issues related to
12 harassment ever discussed at these annual
13 meetings?
14     A.   Yes, as part of the -- as part of
15 those general trainings and raising
16 awareness as to what unconscious bias is
17 and how harassment can be -- how behavior
18 can be perceived as harassment, I'm sure
19 we did touch on that.  But I don't recall
20 specifically any presenter or any specific
21 context.
22     Q.   Would that be your same answer as
23 to whether harassment was ever discussed
24 at these annual meetings?
25     A.   Yes, that would be the same

Page 138

                    REID
1
2  answer.
3      Q.   Were those types of issues
4  discussed in the annual meeting in 2018?
5      A.   I don't recall specifically but I
6  do recall wanting to make that theme
7  generally be part of every annual meeting,
8  to constantly bring it to the front of
9  partners' minds.  It's the most important
10 meeting of the firm's year and it was the
11 right place for that theme to be dealt
12 with and dealt with with the use of
13 outside experts.
14     Q.   And with respect to outside
15 experts, do you recall which outside
16 experts, if any, were brought in for that
17 annual meeting in February?
18     A.   I referred to one earlier, a firm
19 named VallotKarp.  We also brought in the
20 woman I referred to at the Kennedy School.
21 Her name was Iris, spelled I-R-I-S,
22 Bohnet, B-O-H-N-E-T.  She's an author of
23 several leading works on unconscious bias.
24 And there was a gentleman named Chris
25 DeSantis, who once spoke to us about

Page 139

REID

1
2  generational diversity.  There may and I'm
3  sure there were others.  I just don't
4  recall who they were at this point.
5      Q.    And those would have been
6  sessions for all in attendance at the
7  annual meeting to attend?
8      A.    Yes, all partners.
9      Q.    Right, all partners, yes.
10          MR. BIRENBOIM:  You're talking
11      about 2018; right?
12          MR. JEFFRIES:  Yes.
13          MR. BIRENBOIM:  Okay.
14  BY MR. JEFFRIES:
15      Q.    And were there non-partners that
16  were present at that meeting?
17      A.    There would have been the senior
18  non-lawyer administrative staff, so Sharon
19  Crane and her co-executive director Robin
20  Griffiths would certainly have been there.
21  There would have been other people, less
22  senior, their direct reports, most of them
23  would have been there.  And then there
24  would be the necessary support staff to do
25  the audio/visual work and, you know, the

Page 140

REID

1
2  logistics coming in and out so that would
3  be quite a few people.
4      Q.    During Mr. Cardwell's employment,
5  did the firm's partners or practice groups
6  have any monthly meetings?
7      A.    The firm's partners or practice
8  groups.  They would have had meetings.  On
9  what cadence, weekly, monthly, more
10  frequent, less frequent, I wouldn't know.
11  We had a weekly firm meeting is what I
12  know, that again I was responsible for
13  that, not every week, most weeks.
14      Q.    Did you attend those?
15      A.    Most.
16      Q.    Were issues related to
17  discrimination ever discussed at these
18  weekly meetings?
19      A.    Occasionally we would do -- we
20  might do something to echo the discussions
21  that were held at annual partners'
22  meetings, but I don't recall anything
23  specific.  And we would have referred to,
24  you know, the meetings to talk about
25  recruiting, the meetings to talk about the

Page 145

```
             REID
1
2   Mr. Cardwell sent on May 8, 2015 at
3   7:34 a.m.?
4       A.   Yes.
5       Q.   That e-mail was sent to Sharon
6   Crane and Vanessa Jackson?
7       A.   Yes.
8       Q.   On the second page at the top, do
9   you see where the e-mail states, "I'm not
10  sure if 301 is still underway, but I
11  wanted to flag in inter-office dynamic
12  that I hope is explicitly addressed in
13  301.  I think it would be helpful if
14  training reminded our attorneys of the
15  importance of saying hello and introducing
16  themselves to attorneys that they do not
17  know.  With the summer associate program
18  around the corner and the firm attempting
19  to improve a number of diversity outcomes,
20  I think this point is especially relevant.
21  To give one example, I think we want to
22  prevent the situation where a summer
23  associate or junior associate (of color)
24  sits at a table at a practice group
25  meeting or some other meeting and no one
```

Page 146

```
             REID
1
2   at that table makes eye contact or says
3   hello for 10, 15 minutes or longer."
4       Do you see that, sir?
5       A.   Yes.
6       Q.   Did Sharon Crane or anyone else
7   discuss the substance of Mr. Cardwell's
8   May 8, 2015 e-mail with you?
9       A.   No.
10      Q.   Did you meet with Sharon Crane
11  regarding the substance of -- well, did
12  you meet with Sharon Crane regularly at
13  that time in 2015?
14      A.   Yes, on a variety of matters.
15  Her responsibilities were quite broad.
16      Q.   And when you say on -- well, how
17  regularly would you meet with her?
18      A.   I couldn't tell you precisely but
19  maybe it's a better answer if I tell you
20  that she was -- remind you that I said she
21  was the co-executive director of the firm
22  and that has -- she and Robin Griffiths.
23  She had a portfolio of responsibilities
24  that included legal and nonlegal
25  personnel, finance, information
```

REID
1   technology, audio/visual, catering,
2
3   facilities, foreign offices, leasing of
4   space, a vast portfolio.  And depending
5   upon the issue of the day, we would meet
6   to talk about what she needed guidance or
7   input on.  She and Robin were quite
8   self-sufficient but there were times when
9   the management committee needed to be
10  involved.
11      Q.   So by virtue of her position and
12  the portfolio that you reference, would
13  you say that you would meet with Sharon
14  Crane with the frequency of every week?
15      A.   I couldn't give you a precise
16  answer but it wouldn't surprise me if it
17  was every week.  For example, she would
18  attend those firm weekly lunches but there
19  would be lots of people at those.
20      Q.   Within your working with Sharon
21  Crane, have you had an opportunity to ever
22  discuss issues of -- issues related to
23  diversity and inclusion?
24      A.   Yes.
25      Q.   And so would you say that Sharon

REID
1
2   Crane understood that you cared about
3   diversity and inclusion issues?
4       A.   Yes.
5       Q.   Would you say that she knew that
6   you cared about the careers and trajectory
7   of diverse associates?
8       A.   Yes.
9       Q.   And against that backdrop of
10  understanding with respect to your
11  concerns about diversity and the careers
12  and trajectory of diverse associates, is
13  it your testimony that Sharon Crane never
14  mentioned anything to you about an e-mail
15  that she received from Mr. Cardwell in
16  2015?
17      A.   Yes.
18          MR. BIRENBOIM:  Objection to
19      form, asked and answered.  You may
20      answer again.
21          THE WITNESS:  Yes, I don't recall
22      ever discussing this e-mail.
23  BY MR. JEFFRIES:
24      Q.   You said you don't recall but is
25  it possible that you could have spoken to

Page 151

REID

1

2     A.    From memory it looks like it.

3     Q.    I'm just going to take you to

4  paragraph 8, please.  Do you see where the

5  complaints states, "On another occasion,

6  during a September 2015 DPW Black attorney

7  group meeting, I raised the general issue

8  of Black DPW attorneys being excluded in

9  the workplace.  Partners Monica Holland

10  and Maurice Blanco and Renee DeSantis, the

11  director of associate development,

12  attended the meeting.  After I made my

13  comment, Ms. DeSantis directly asked

14  whether I had personally experienced

15  race-related exclusion at the firm.

16  Although I answered affirmatively, and

17  described how such exclusion is harmful to

18  Black associates' professional development

19  and careers, neither Ms. DeSantis nor any

20  of the partners in attendance followed up

21  with me about my (or others') experience."

22         Mr. Reid, does that accurately

23  indicate the language in paragraph 8?

24     A.    You read it word for word.

25     Q.    During Mr. Cardwell's employment,

Page 152

REID

1

2  did you ever hear anything about

3  Mr. Cardwell and other BAG members meeting

4  with the firm's diversity committee and

5  associate development department sometime

6  in 2015?

7     A.    I don't recall.  I don't recall

8  that, no.

9     Q.    Did anyone at the firm ever give

10  you updates regarding BAG meetings?

11     A.    Not regularly, no.  I attended

12  what I would characterize as the most

13  important BAG meeting of the year, which

14  was every Friday evening before Labor Day

15  I attended the BAG dinner for law students

16  that had received an offer from us to join

17  the summer class the next year.

18         And it was a dinner of the BAG

19  group and the Black law students and the

20  goal was to get to know them, and in some

21  cases persuade them to accept our offer

22  and not a competitor.  So that was every

23  year.  I don't recall having regular

24  interactions beyond that.

25     Q.    And so what about on a

Page 153

```
                         REID
1
2    non-regular basis?
3        A.    Well, with the group as a whole,
4    I don't recall any regular interactions.
5    There were several members in the group
6    that I would talk to from time to time
7    socially, but I don't recall any
8    discussion about that BAG group and how it
9    was working.
10       Q.    Well, who within the group would
11   you -- well, withdrawn.
12           Did Sharon Crane ever give you
13   updates about BAG meetings?
14       A.    I don't recall any.
15       Q.    Is it possible that she would
16   give you updates about BAG meetings?
17           MR. BIRENBOIM:  Objection to
18       form, calls for speculation.  You can
19       answer if you have anything to say.
20           THE WITNESS:  That would be my
21       answer, I don't know.  It would be
22       speculation.
23   BY MR. JEFFRIES:
24       Q.    Well, to the extent that
25   something occurred during a BAG meeting
```

Page 154

```
                         REID
1
2    that was then brought to Sharon Crane's
3    attention, would that be something you
4    would expect for her to speak to you about
5    in the weekly meeting, in your meetings
6    with her?
7            MR. BIRENBOIM:  Objection to
8        form.  If you have any answer to that,
9        you may answer.
10           THE WITNESS:  Again, the same as
11       before, a very general explanation, I
12       said Sharon had a very broad
13       portfolio.  She is a superb
14       professional and I trusted her
15       judgment on what to bring to my
16       attention and what not to bring to my
17       attention.  And I don't recall her
18       ever disappointing me in that regard.
19   BY MR. JEFFRIES:
20       Q.    Based off of your prior
21   testimony, you would agree that it would
22   be unusual for Sharon Crane to discuss
23   with you something that happened at a BAG
24   meeting that had come to her attention; is
25   that correct?
```

```
 1               REID
 2        MR. BIRENBOIM:  Objection to
 3    form.  You may answer, Tom.
 4        THE WITNESS:  That's not what I'm
 5    saying.  Sharon is a superb
 6    professional, highly compensated,
 7    great judgment and she exercised that
 8    judgment, to my knowledge, quite
 9    nicely in terms of what issues she
10    felt were worthy of my attention,
11    whether that be the BAG group or any
12    other issue in her broad portfolio.
13 BY MR. JEFFRIES:
14    Q.   Did anyone at the firm ever give
15 you updates directly about Mr. Cardwell?
16        MR. BIRENBOIM:  Objection to
17    form.  You may answer if you can.
18        THE WITNESS:  No, I think I got
19    the review folder.  I don't recall how
20    I got it but beyond that, no.
21 BY MR. JEFFRIES:
22    Q.   So beyond that, beyond the
23 instances that required -- that resulted
24 in you getting the review folders, you
25 don't recall anyone else having direct
```

```
 1               REID
 2 conversations with you about Mr. Cardwell
 3 during the relevant period?
 4    A.   The relevant period again
 5 includes right up to his departure in
 6 2018; right?
 7    Q.   Yes.
 8    A.   So after I got involved when I
 9 noticed how low his hours were, the next
10 step was to get his review folder and talk
11 to him.  Then there were conversations
12 about Mr. Cardwell's performance as we --
13 following that second March 2017 meeting.
14    Q.   Okay.  So then as a time marker,
15 it would be your testimony that prior to
16 March 2017, you don't -- prior to March
17 2017, you didn't engage in any
18 conversations wherein Mr. Cardwell was
19 directly -- where anything with respect to
20 Mr. Cardwell was directly brought to your
21 attention; is that correct?
22    A.   Correct.  There was -- again I
23 mentioned to you that in January 2016, I
24 had -- I looked at his folder, his reviews
25 then together with another colleague of
```

Page 157

                    REID
1
2   his before I attended a dinner event, just
3   the three of us, but I don't recall
4   discussing him in his performance or work
5   other than reviewing those folders at that
6   time.
7        Q.   And you're saying that you don't
8   recall but are you saying that -- well, do
9   you remember hearing anything about
10  Mr. Cardwell making comments about how he
11  experienced exclusion at Davis Polk due to
12  his race prior to that dinner?
13       A.   Prior to the dinner, no.
14            MR. BIRENBOIM:   Which dinner?
15            MR. JEFFRIES:   The dinner in
16       January.
17            THE WITNESS:   The dinner in
18       January?
19  BY MR. JEFFRIES:
20       Q.   Yes.
21       A.   No, not prior to that dinner.
22       Q.   We talked about this dinner
23  tangentially.  Let's talk about the dinner
24  a bit more now.  Who do you remember --
25  well, how did that dinner come about?

Page 158

                    REID
1
2        A.   If you recall the article about
3   the diversity panel that you put on the
4   screen before we just took that break.
5        Q.   Yes.
6        A.   So that was a City Bar event and
7   it was not very well attended because it
8   was an absolutely miserable evening, such
9   that I could see in the audience
10  Mr. Cardwell and a colleague of his.  At
11  the end of the panel, I went up to them
12  and thanked them for coming out on such a
13  miserable night and being there.  And I
14  said thank you for showing your support or
15  something like that.
16            And they said look, it's, you
17  know, something along the lines of, of
18  course, it's very important to us and we
19  should talk further and I said great, tell
20  you what, let's have dinner or something
21  like that.  And I think the dinner took
22  place about a month or two later.
23            MR. JEFFRIES:   I'd like to have
24       tab 14 moved into evidence, please.
25            VERITEXT CONCIERGE:   We're

Page 159

```
1                  REID
2      currently looking at tab 14.
3            MR. JEFFRIES:  Let's move to
4      paragraph 9.
5  BY MR. JEFFRIES:
6      Q.    Now paragraph 9 reads as follows,
7  correct, "A few months later in January
8  2016, I approached Tom Reid, DPW managing
9  partner, with an inquiry about whether the
10 firm would be willing to sponsor me to
11 attend a Black lawyer professional
12 development conference.  Unexpectedly,
13 Mr. Reid advised that I should not sign up
14 for the conference, despite my explanation
15 that such opportunities would foster
16 relationships between Black attorneys at
17 DPW and senior executives at Fortune 100
18 companies that could be leveraged for DPW
19 business in the future.  Mr. Reid
20 ultimately agreed to sponsor our
21 participation, but only after I and
22 another associate spent a considerable
23 amount of time explaining to him how this
24 would benefit us as Black associates.  In
25 that conversation, and prior to Mr. Reid
```

Page 160

```
1                  REID
2  agreeing to sponsor our participation, we
3  also explicitly raised the institutional
4  bias that we, as Black associates, had
5  experienced at DPW."
6            So is the dinner that we are
7  discussing at this point the meeting
8  referenced in the paragraph that I just
9  read?
10           MR. BIRENBOIM:  Objection to
11     form.  I don't see reference to a
12     meeting, but you can answer.
13           THE WITNESS:  The dinner was in
14     January 2016 I'm pretty sure, so
15     that's the best answer to your
16     question.
17 BY MR. JEFFRIES:
18     Q.    With respect to what I've just
19 read to you, the contents of January 2016,
20 do you remember discussing a conference at
21 the dinner?
22     A.    Yes, I do.  It was in the course
23 of a two-hour or so dinner.  If it was a
24 five-minute discussion, I would be
25 surprised.  It was very short.
```

Page 161

```
1              REID
2    Q.   And what do you remember
3 discussing at that dinner?
4    A.   About the conference?  I think
5 before the dinner, Mr. Cardwell had made a
6 request that he go to this conference
7 which I had not heard of before, and I had
8 originally said no but let's talk about it
9 at dinner.  And as I said, we had a very
10 short discussion at dinner and I can't
11 remember if it was there and then or on
12 reflection overnight or shortly after the
13 dinner that I decided look, I'd rather
14 that we don't have associates picking
15 which conferences to go to for a couple of
16 different reasons but on this occasion,
17 given again their interest and their
18 engagement and the terrific discussion we
19 had at that dinner, the three of us, I
20 decided to make an exception to the
21 general rule.
22         The general rule was there so
23 that anything like that was given on a
24 fair access basis.  And the other thing
25 was is I wanted to be sure about what kind
```

Page 162

```
1              REID
2 of conference it was people were going to.
3 I wanted to make sure it was worthwhile
4 and I could use the firm resources.  And I
5 just didn't know anything about this one.
6    Q.   How long was that dinner?  How
7 long did you spend together?
8    A.   I didn't have a stopwatch on,
9 Mr. Jeffries, but it would have been about
10 a couple of hours.
11    Q.   So would it be fair to say that
12 aside from that conference, there were
13 other discussion points?
14    A.   Yes, yes.
15    Q.   I think you referenced it as a
16 very good dinner?
17    A.   It was a good discussion, yes.
18    Q.   So please, tell me other topics
19 that were discussed during that dinner.
20    A.   I recall similar to the point in
21 the e-mail, I remember Mr. Cardwell and
22 his colleague saying that he challenged
23 that they discussed with other Black
24 associates at other law firms on Wall
25 Street was the problem of being noticed is
```

Page 163

```
              REID
1
2    what I recall.
3           And I think I said look, that
4    does come up in our -- in the
5    presentations that I made sure the firm
6    has on an at least an annual basis on
7    things like unconscious bias and diversity
8    and hopefully it will improve through
9    time.  I also said that this is a -- I
10   think it's similar to the answer you
11   showed me in that e-mail exchange that
12   Sharon or Renee DeSantis or somebody made,
13   that lawyers are not the most -- they can
14   be socially awkward or something.  And I
15   said it does happen I think to all young
16   lawyers, but I understand the point that
17   we're raising in the race context.
18          The other thing -- we talked
19   about, you know, what we were doing at the
20   firm generally.  They wanted to know what
21   the presentations were that I brought to
22   the firm's annual meeting.  And then the
23   other thing that we talked about is
24   Mr. Cardwell reminded me of what told he
25   me the very first time he introduced
```

Page 164

```
              REID
1
2    himself to me when he was a summer
3    associate, he reminded me of his college
4    football career and NFL aspirations.  And
5    in that context he told me I can take and
6    learn from tough feedback.
7           And one of their issues was we
8    don't think we get the right level of
9    feedback.  And I said again, that's a
10   general issue with associate feedback,
11   particularly in the younger years.  And
12   again I said we have training for that for
13   partners to give better feedback.  And
14   then I think I surprised him when I said
15   by the way, before coming out here I
16   looked at your review folders and I can
17   give you what I see in those folders is my
18   feedback, synthesizing that right now.
19      Q.   Were there any other
20   conversations?
21      A.   Not that I recall.  I think what
22   I've given you is sort of a good flavor
23   for the couple of hours we spent together.
24      Q.   Did you make any notes or memos
25   subsequent to this meeting with
```

Page 165

REID

1

2  Mr. Cardwell and the other associate?

3      A.   No.

4      Q.   So the recitation that you're

5  giving at this point in time is based off

6  of your recollection solely?

7      A.   Yes.

8      Q.   Do you recall whether during the

9  course of that dinner Mr. Cardwell raised

10  issues specific to Davis Polk about

11  diversity and inclusion?

12      A.   No, except insofar as he was

13  talking about his experience and his only

14  law firm experience was Davis Polk.  But

15  he never made any specific complaint or

16  allegation, if that's what you're asking.

17  And, in fact, as I mentioned in my

18  previous answer, he and his colleague did

19  say that this was an issue they discussed

20  generally with their fellow Black lawyers

21  at other Wall Street law firms.

22      Q.   And when you say an issue, which

23  issue are we talking about?

24      A.   The issue of being noticed.

25      Q.   And I think you earlier mentioned

Page 166

REID

1

2  that that issue of being noticed in that

3  discussion, you drew some similarity

4  between that and the e-mail that we looked

5  at to Sharon Crane; is that right?

6      A.   The e-mail about introducing

7  yourself.

8      Q.   So it would be safe to say you

9  recognized that there's an element of

10  racial exclusion that that conversation is

11  founded upon; correct?

12          MR. BIRENBOIM:  Objection to

13      form, mischaracterizes the testimony.

14      You may answer.

15          THE WITNESS:  What I said was in

16      my testimony is that that issue of

17      being noticed is a, I think, issue of

18      social awkwardness among the kind of

19      people who become lawyers.

20  BY MR. JEFFRIES:

21      Q.   The issue of being noticed that

22  was being discussed was being discussed

23  within the context of race; correct?

24          MR. BIRENBOIM:  Objection to

25      form, mischaracterizes the testimony.

Page 171

```
              REID
1  Mr. Cardwell -- were the comments made
2  from a position of Mr. Cardwell being
3  employed at Davis Polk and experiences
4  that he was personally experiencing at
5  Davis Polk?
6         MR. BIRENBOIM:  Objection to
7      form.  This is probably the fifth or
8      sixth time you've asked the same
9      question.  Asked and answered.  If you
10     have anything to add, Mr. Reid, you
11     may.
12        THE WITNESS:  No, I have nothing
13     to add.
14  BY MR. JEFFRIES:
15     Q.   And Sheila Adams was the other
16  associate present; correct?
17     A.   Correct.
18        MR. ADAMS:  Let's go to tab 15,
19     please.
20        (Exhibit 10, document Bates
21     labeled DPW_SDNY-000099794, marked for
22     identification.)
23  BY MR. JEFFRIES:
24     Q.   Just take a moment to review,
```


Page 172

```
              REID
1  sir.
2      A.   (Witness perusing document.)
3      Q.   Do you see that we are currently
4  viewing an e-mail exchange?
5      A.   Yes.
6      Q.   Would you agree that it's an
7  e-mail from Mr. Cardwell -- this includes
8  an e-mail from Mr. Cardwell and Ms. Adams?
9      A.   Yes.
10        MR. BIRENBOIM:  I think that
11     mischaracterizes the top e-mail.  I
12     don't know which e-mail we're looking
13     at.
14        MR. JEFFRIES:  I want us to focus
15     on the top e-mail.
16        MR. BIRENBOIM:  Just for the
17     record, I want to note the top e-mail
18     appears to be an e-mail from Ms. Adams
19     to Ms. Adams, not to Mr. Cardwell.
20  BY MR. JEFFRIES:
21     Q.   Now I just want you to note the
22  date of that e-mail, that top e-mail.
23     A.   January 20th, yeah.
24     Q.   Yes, January 20th.  And the date
```

Page 173

REID

1
2  of the dinner was on or around January 20,
3  2016; correct?
4      A.   I think that's right.
5      Q.   And were any of these topics,
6  topics that are listed in this e-mail,
7  discussed at the dinner between yourself,
8  Mr. Cardwell and Ms. Adams?
9      A.   I don't -- I recall generally the
10 first bullet point, competitive
11 challenges.  I discuss -- I do recall
12 specifically the second bullet point as I
13 see it here, what makes a good partner.  I
14 don't recall the late bloomer thing
15 discussion.  I absolutely do not recall
16 the next bullet, the racialized reviews
17 and I do recall discussing the last point.
18 That's when I talked about the
19 presentations we have at annual meetings.
20     Q.   So just turning to these last few
21 right here, this one here, some associates
22 have received arguably gendered and/or
23 racialized reviews; who, if anyone, is
24 serving as the gut-check in the review
25 process to pick up on these comments and

Page 174

REID

1
2  sensitize the partnership to this
3  possibility to address/fix, if needed?
4  This is similar to what we discussed
5  before.
6          Do you recall that being a topic
7  that was discussed, sir?
8          MR. BIRENBOIM:  Objection, asked
9      and answered.  He said he did not
10     recall that.  Mischaracterizes the
11     testimony.
12         THE WITNESS:  That's right.
13 BY MR. JEFFRIES:
14     Q.   You do not recall that being --
15     A.   That's the bullet point I said I
16 did not recall.  The racialized review,
17 gendered and/or racialized review
18 reference.
19     Q.   And the other point that you
20 don't recall being discussed was the one
21 underneath it; is that correct?
22     A.   No, that one I do recall.  And as
23 I mentioned in one of my previous answers,
24 I talked to them about the unconscious or
25 implicit bias presentations that we would

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 181

```
               REID
 1
 2      and framing the agenda.  What caught
 3      my eye was the format's different.
 4      The last one had a gap between the
 5      third and the fourth bullet.
 6  BY MR. JEFFRIES:
 7      Q.   Let's take this down.  Mr. Reid,
 8  with respect to the dinner in January of
 9  2016 involving Mr. Cardwell, yourself and
10  Ms. Adams, did you speak to anyone about
11  that dinner?
12      A.   I asked to see their reviews
13  before I went to the dinner so that I
14  could be prepared to talk about them.  I
15  don't know who I asked to get those
16  reviews but I don't recall discussing the
17  dinner beyond that.
18      Q.   Do you recall speaking to Sharon
19  Crane about anything related to your
20  dinner with Mr. Cardwell?
21      A.   I may have said I was having it
22  or had it but I don't recall discussing
23  the content except perhaps the conference,
24  request to go to the conference.
25      Q.   Did you speak with -- at this
```

Page 182

```
               REID
 1
 2  time, would it have been typical for you
 3  to meet with associates for dinner?
 4      A.   Yes.  Again, I recall the article
 5  about the New York City Bar panel I
 6  attended.  I said I thought it was
 7  important for leaders to be connected with
 8  young lawyers, be accessible and I wanted
 9  to live up to that.  And I met with a
10  number of different associates in
11  different groups over the years I was
12  managing partner.
13      Q.   Now, with respect to what you
14  said to Ms. Crane about the dinner, what
15  did you tell her?
16      A.   I don't recall if I did tell her
17  much of anything other than it was
18  happening or had happened already and also
19  mentioning the conference permission that
20  I had given either at this dinner or after
21  the dinner, and again I don't recall when
22  it was I changed my mind to give them
23  permission to go to the conference.
24      Q.   Would you have brought up the
25  conversation about performance reviews?
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 185

1                    REID
2        Mr. Reid, did you speak to Renee
3  DeSantis about the dinner that
4  Mr. Cardwell and Ms. Adams had attended?
5        A.   I don't recall any discussion
6  with her about the dinner at all.
7        Q.   Did you speak with Mr. Bick about
8  the dinner with Mr. Cardwell and
9  Ms. Adams?
10        A.   I don't recall but with John,
11  like with Sharon reflecting their
12  seniority, I may have mentioned I was
13  having dinner or had dinner.
14        Q.   Did you speak with Mr. Chudd
15  about anything related to your dinner with
16  Mr. Cardwell and Ms. Adams?
17        A.   No.
18        Q.   Did you speak with Ms. Hudson
19  about anything related to your dinner with
20  Mr. Cardwell and Ms. Adams?
21        A.   No, I don't believe so.  No
22  recollection.
23        Q.   Mr. Reid, is there anything about
24  Mr. Cardwell's performance that you told
25  him about during the dinner that you

Page 186

1                    REID
2  didn't mention today?
3        A.   I don't think so.  As I said, I
4  didn't want to read him his whole review
5  folder.  The reviews were being given in
6  front of another associate and I asked are
7  you both happy for me to give you a little
8  synthesis, a short synthesis about the
9  folder I had seen.  But I think it was
10  punctuality or timeliness and setting
11  expectations up front with the people he
12  was working for.
13        Q.   Picking up on that particular --
14  withdrawn.
15        You didn't say anything to
16  Mr. Cardwell about him being a poor
17  performer; correct?
18        MR. BIRENBOIM:  Objection to
19        form.  You can answer.
20        THE WITNESS:  What I said is
21        these are really -- these are fixable
22        issues, the timeliness issue and
23        setting expectations, but they are
24        issues that really do need to be fixed
25        early in a corporate lawyer, any

```
                                   Page 187
 1                 REID
 2       lawyer's career.
 3   BY MR. JEFFRIES:
 4       Q.    Did you say anything about him
 5   being behind?
 6       A.    I don't think so.
 7       Q.    Did you say anything about him
 8   receiving negative reviews?
 9       A.    I said what I saw in your review
10   folder were these points.  It was --
11   remember, this was his first ever set of
12   reviews.  He'd been at the firm barely a
13   year and that was the context in which I
14   said these are issues for a young lawyer,
15   they need to be fixed but are fixable with
16   the right application.
17       Q.    And based on what you said
18   earlier, this was during a conversation
19   when he told you that he could receive
20   tough feedback; is that correct?
21       A.    Yes, he said -- yes.  In fact,
22   the review summaries came as part of an
23   expression of hope that they could get
24   more feedback.  It was not just
25   Mr. Cardwell but Ms. Adams as well said
```

```
                                   Page 188
 1                 REID
 2   they would appreciate more feedback.  And
 3   in that context, Mr. Cardwell said that he
 4   was used to getting -- I think he said
 5   something like I've played for a lot of
 6   tough coaches in my career and I can take
 7   and learn from tough feedback.
 8            MR. JEFFRIES:  Can we move in tab
 9       10, Zach?  Thank you.
10            (Exhibit 12, document Bates
11       labeled DPW_SDNY-000099560, marked for
12       identification.)
13   BY MR. JEFFRIES:
14       Q.    Mr. Reid, do you see the e-mail
15   from Rocio Clausen and Carolina Fenner to
16   Mr. Cardwell on September 8, 2016?
17       A.    Yes.
18       Q.    Do you see where the e-mail
19   states, "I hope you are well.  Would you
20   be able to assist the credit group (mainly
21   JW Perry and Frank Manley) with some KYC,
22   organizational materials, resolutions,
23   certificates, et cetera for a CLIENT W
24   deal closing later this month"?
25            Do you see that?
```

Page 191

```
                           REID
1
2       A.   No.
3       Q.   During Mr. Cardwell's employment,
4  did you ever hear anything about him
5  meeting with Rocio Clausen?
6       A.   No.
7       Q.   During Mr. Cardwell's employment,
8  did anyone say anything about Mr. Cardwell
9  questioning whether a credit assignment
10 was connected to race?
11      A.   No.
12           MR. BIRENBOIM:  Objection to
13      form.  You can answer to the extent
14      you have any knowledge.
15           THE WITNESS:  No knowledge.
16 BY MR. JEFFRIES:
17      Q.   Do you have any reason to believe
18 that during Mr. Cardwell's employment,
19 Mr. Cardwell questioned whether a credit
20 assignment was connected to race or bias,
21 was connected to his race or bias?
22           MR. BIRENBOIM:  Objection to
23      form.  You can answer.
24           THE WITNESS:  No.
25 ///
```

Page 192

```
                           REID
1
2  BY MR. JEFFRIES:
3       Q.   Do you have any reason to believe
4  -- during Mr. Cardwell's employment, do
5  you have any reason to believe that anyone
6  said anything about Mr. Cardwell
7  questioning whether his assignments were
8  connected to race or bias?
9            MR. BIRENBOIM:  Objection to
10      form, no foundation.  You can answer
11      if you know.
12           THE WITNESS:  No.
13 BY MR. JEFFRIES:
14      Q.   So it's your testimony that
15 during Mr. Cardwell's employment, you
16 never heard any comments about
17 Mr. Cardwell complaining about his
18 staffing?
19      A.   That's correct.
20      Q.   Not even from Mr. Cardwell
21 himself?
22      A.   Oh, until the late March meeting,
23 that was the first time.  March 2017.
24      Q.   So that March 2017 meeting was
25 the first time that you had ever heard any
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 205

REID

1
2     Q.    So that would be the earliest
3  point at which you found out about
4  Mr. Cardwell's concerns related to that
5  issue?
6     A.    Yes.
7     Q.    And the client that we're talking
8  about, the client was -- the former client
9  rather was GEO Group; correct?
10    A.    Yes.
11    Q.    And at what point did GEO Group
12  become a former client?
13    A.    I don't know but when I looked
14  into it, I couldn't honestly tell you
15  exactly when but it was some point in the
16  prior couple of years that the work we had
17  done for them had terminated, so some
18  point in the two years before March 2017,
19  I believe.
20    Q.    Who was the relationship partner
21  for GEO Group?
22    A.    The relationship partner, as I
23  recall looking into it was a retired Davis
24  Polk partner, meaning he had retired by
25  March 2017, was the original source of

Page 206

REID

1
2  Davis Polk doing work for that client.
3     Q.    At this time of Mr. Cardwell's
4  e-mails, Len Kreynin was the relationship
5  partner for GEO Group; correct?
6     A.    No, he had done a corporate
7  matter for them, but I spoke to
8  Mr. Kreynin about that and he had done one
9  matter, had no relationship with them.  It
10  was a relationship of this by then retired
11  litigation partner.
12    Q.    Did you ever tell Mr. Cardwell
13  that Len Kreynin was the relationship
14  partner for GEO Group?
15    A.    No.
16    Q.    So your testimony is you never
17  told Mr. Cardwell specifically that Len
18  Kreynin was the relationship partner for
19  GEO Group at all?
20    A.    You focus very much on this term
21  relationship partner.  I knew Mr. Kreynin
22  was not the relationship partner.  I knew
23  he had done a matter for them in the years
24  before.  So I may have said Len Kreynin
25  knows this client but I highly doubt I'd

Page 207

```
 1                    REID
 2   say he's the relationship partner because
 3   he wasn't.  It was a retired Davis Polk
 4   partner.
 5        Q.   Did you ever tell Mr. Cardwell
 6   that you went and talked to Mr. Kreynin
 7   about his comments regarding GEO Group?
 8        A.   Whose comments?
 9        Q.   About Mr. Cardwell's comments
10   about GEO Group.
11           MR. BIRENBOIM:  Objection to
12        form, foundation.  You can answer if
13        you have any recollection.
14           THE WITNESS:  I may have told --
15        I may have told Mr. Cardwell that I
16        had asked Mr. Kreynin about the client
17        because I couldn't ask, as you call
18        it, the relationship partner.  He
19        retired from the firm.  And I told
20        Mr. Cardwell that in connection with
21        that I found out that work for that
22        client had finished some time ago and
23        they were not a current client and
24        were not going to be a future client.
25   ///
```

Page 208

```
 1                    REID
 2   BY MR. JEFFRIES:
 3        Q.   And why would you have asked
 4   Mr. Kreynin about Mr. Cardwell's comments?
 5           MR. BIRENBOIM:  Objection to
 6        form.  You may answer if you have a
 7        recollection why you didn't.
 8           THE WITNESS:  I did not talk to
 9        Mr. Kreynin about Mr. Cardwell's
10        comments.  What I talked to
11        Mr. Kreynin about was who is this
12        company, what do we do for them, are
13        we still in touch with them.
14   BY MR. JEFFRIES:
15        Q.   Did you tell anyone other than
16   Ms. Katz about Mr. Cardwell's request?
17           MR. BIRENBOIM:  Objection to
18        form.  You may answer.
19           THE WITNESS:  As I said, Sharon
20        Katz contacted each of the three
21        members of the management committee
22        and shared what the nature of
23        Mr. Cardwell's question was there.  I
24        don't recall it being shared beyond
25        that group.
```

Page 209

```
             REID
1
2    BY MR. JEFFRIES:
3        Q.   Did you ask any other M&A
4    partners about Mr. Cardwell's request?
5        A.   No.
6        Q.   And you didn't normally get this
7    type of request from an associate;
8    correct?
9            MR. BIRENBOIM:  Objection to
10           form, use of the word "request."  Go
11           ahead, you can answer.
12           THE WITNESS:  This was a rare
13           concern raised by an associate about a
14           conflict.  He was asking about an
15           ethical conflict under New York Bar
16           Association rules, which it was not.
17           And that would be a pretty rare thing
18           for an associate to do, yes.
19   BY MR. JEFFRIES:
20       Q.   So is it your testimony that
21   Mr. Cardwell's e-mails about the firm's
22   relationship with a client stayed between
23   yourself, Ms. Katz and who else, if
24   anyone?
25       A.   Mr. Bick and Mr. Rouhandeh, the
```

Page 210

```
             REID
1
2    two other members of the management
3    committee.  I know for sure -- I don't
4    recall the e-mail being shared beyond that
5    group, I just don't recall.
6        Q.   When did you speak to Mr. Bick
7    about Mr. Cardwell's comments regarding
8    the client, the former client?
9        A.   I don't recall speaking to
10   Mr. Bick about Mr. Cardwell's questions.
11   I think what happened next is Sharon Katz
12   and I -- I looked into it to find out more
13   about this company, this client, former
14   client of the firm that I had never heard
15   of, and then went -- got that information
16   from Mr. Kreynin that they were a former
17   client, that they weren't going to become
18   a current client again, that the partner
19   who had brought them into the firm had
20   since retired, and then I think I went
21   with that information to give that
22   explanation to Mr. Cardwell, as well as
23   telling him the fact, for the record,
24   there had been no ethical conflict under
25   our professional conduct rules.  But not
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 211

```
 1              REID
 2  withstanding that, this was a past client,
 3  former client and wasn't going to become a
 4  current client.
 5      Q.   Mr. Reid, on or around March 21,
 6  2017, you became aware that Mr. Cardwell
 7  asked the firm if he could review his
 8  personnel file and performance reviews;
 9  correct?
10      A.   Yes, that was between the two
11  meetings I had with him in March, I think.
12      Q.   And how did you become aware of
13  Mr. Cardwell's request?
14      A.   I don't recall specifically but I
15  believe it was somebody in the Sharon
16  Crane, Renee DeSantis area.
17      Q.   Was that request communicated to
18  you orally -- was information about that
19  request rather communicated to you orally
20  or by e-mail, in some other fashion?
21      A.   I think it was an e-mail and all
22  I heard about it was the fact that he had
23  requested the reviews.
24      Q.   Did the firm allow Mr. Cardwell
25  to see any documents that were part of his
```

Page 212

```
 1              REID
 2  personnel file or performance reviews?
 3      A.   I don't believe so.
 4      Q.   Why not, sir?
 5      A.   Our policy for the longest time
 6  has been not to share the review files
 7  with the reviewed person.
 8      Q.   Who would be responsible for
 9  knowing the policy surrounding that issue?
10      MR. BIRENBOIM:  Objection to
11      form.  The witness just testified to
12      it.  You can answer.
13      THE WITNESS:  I mean it would
14      have been the review files are kept by
15      the associate development folks that
16      are assigned to the practice group
17      concerned, and so they would be
18      responsible for complying with that
19      policy.
20  BY MR. JEFFRIES:
21      Q.   Who made the decision that it was
22  against firm policy to allow Mr. Cardwell
23  to see any documents that were part of his
24  personnel file or performance reviews?
25      A.   Well, I was certainly fine with
```

Page 215

```
 1              REID
 2          THE WITNESS:  There were a few
 3     meetings.
 4  BY MR. JEFFRIES:
 5     Q.   I want to turn to the second
 6  meeting at this point in time.
 7     A.   Um-hum.
 8     Q.   Do you remember that second
 9  meeting was on March 29, 2017?
10     A.   It was at the very end of March.
11  That sounds right.
12     Q.   Aside from yourself and
13  Mr. Cardwell, do you remember if anyone
14  else was involved?
15     A.   Mr. Kreynin.
16     Q.   Why did that meeting take place?
17     A.   That's the connection to the
18  first March meeting where we discussed the
19  for-profit prison group and the fact that
20  they were a former client.  And we then
21  went on to talk about a broad-ranging
22  discussion, for-profit prisons generally,
23  actually, and the Ava DuVernay movie that
24  was released around that time, 13th.
25          And at the very end of the
```

Page 216

```
 1              REID
 2  meeting as we were literally breaking up,
 3  I said to Mr. Cardwell, I said that I had
 4  taken a look at his hours before the
 5  meeting and they were extremely low and I
 6  wanted to look into why and I would be
 7  following up with him and get back to him.
 8  And that's why we had that meeting on
 9  March 29th.
10     Q.   So the meeting on March 29th was
11  the follow-up as you indicated?
12     A.   Yes.
13     Q.   What do you remember about that
14  meeting on March 29?
15     A.   I started by saying this is the
16  follow-up.  And I said that I looked into
17  his performance reviews from the previous
18  annual cycle, fall of 2016, and I said
19  that I'd seen in part some of the same
20  issues that I had spoken to him about at
21  the January 2016 dinner, issues of
22  timeliness and expectation settings I
23  mentioned before, but I said I also had
24  seen some additional issues that were
25  really quite serious and that I'd invited
```

Page 217

```
 1                    R E I D
 2  Mr. Kreynin there to talk to one of those
 3  issues and to share his perspective on
 4  that particular episode.
 5       Q.   And what else do you remember
 6  about the conversation?
 7       A.   Well, I think what happened next
 8  is that Mr. Kreynin talked about this
 9  particular episode where Mr. Cardwell had
10  got the wrong signatory to a particular
11  contract that he was working on for
12  Mr. Kreynin.  Mr. Cardwell dismissed that
13  as merely just a typo and he seemed to be
14  oblivious to the actual legal consequences
15  of a mistake like that in a legally
16  binding contract.
17            And I said it wasn't just a typo
18  and that the performance issues generally
19  were not just typos and that it wouldn't
20  be just typos that would cause his work to
21  dry up so dramatically as it had done so
22  in the previous few months.
23       Q.   During that meeting, you
24  indicated that Mr. Cardwell's lack of work
25  in the previous few months was related to
```

Page 218

```
 1                    R E I D
 2  his performance?
 3       A.   I said the explanation that was
 4  clear to me was that the performance
 5  reviews were bad enough that people had
 6  lost confidence in him and he wasn't
 7  getting work.
 8       Q.   And it's your testimony --
 9       A.   Based on the quality of his work
10  as reflected in the performance reviews,
11  for not one but two years now.
12       Q.   And you had reviewed those
13  performance reviews prior to the meeting;
14  correct?
15       A.   Yes.
16       Q.   And it was your assessment that
17  the performance reviews that you reviewed
18  justified him not receiving any work for
19  the series of months leading up to that
20  meeting?
21       A.   It was a cause and effect
22  explanation.  I wouldn't use a term like
23  justification.  It was a cause and effect
24  explanation.
25       Q.   Were there any other causes?
```

Page 221

```
              REID
1
2   When I said to him that -- when I reminded
3   him of the I can take tough feedback
4   affirmations that he had made to me twice
5   before and that I didn't think he was
6   living up to that, and that this meeting
7   was about tough feedback and about
8   managing his career, he then started to
9   assert that the reason he wasn't getting
10  work was because he had been, a word he
11  then started to use, repeat several times,
12  he had been racialized.
13      Q.   Did he ask you any questions?
14      A.    He -- after he said I believe
15  I've been racialized, I had previously
16  said to him that a mistake we Davis Polk
17  partners had made was in not giving him
18  this tough feedback hot on the heels of
19  his annual review at the end of the
20  previous year.
21           And instead, what had happened
22  was several months of inactivity had gone
23  by.  I said we should have been on it
24  then, we should have been having a
25  conversation like this then, and we should
```

Page 222

```
              REID
1
2   have been structuring a program of mixed
3   assignments with different -- mixed
4   partners who were good teachers.  And I
5   said look, this is tough feedback but it's
6   not like you've been inactive for any more
7   than three or four months.
8            You're hopefully going to have a
9   long career and we'll recover these three
10  or four months, if you're the same
11  Mr. Cardwell that I remember with the
12  impressive ambition from your summer
13  associate days and from as recently as
14  January 2016.
15      Q.   Did you say a mistake was made or
16  did you tell him that the mistake was that
17  you didn't give him tough feedback?
18      A.   I said the mistake was made that
19  we hadn't sat down with him and had the
20  conversation that said this is more than a
21  bad review, this is a review that
22  indicates you need some intensive coaching
23  to see if you can do the job we need you
24  to do here in the corporate department at
25  Davis Polk.  We had not sat down, put it
```

Page 237

REID

1
2  unconnected.
3      Q.   Well, they have been connected
4  for the past five minutes.
5      A.    You talked of his complaint.
6  What I was looking for was to make sure
7  the reviews had been done carefully with
8  specific examples of poor performance.
9  They had.  His complaint about
10  racialization came after I confronted him
11  with specifics, Mr. Kreynin confronted him
12  with his personal experience of his poor
13  performance.
14        The first time Mr. Cardwell made
15  a specific racial complaint about the way
16  he was being treated was after I had
17  brought to his attention his low hours and
18  I had explained the cause of those low
19  hours, poor performance.
20      Q.   And you went and evaluated his
21  performance reviews; correct?
22      A.   Yes.
23      Q.   What was that treatment about --
24      A.   When you say treatment, what do
25  you mean?

Page 238

REID

1
2      MR. BIRENBOIM:  Objection -- you
3      need to give counsel time to object if
4      there's an objection.
5  BY MR. JEFFRIES:
6      Q.   The treatment I'm talking about
7  is the performance reviews, the
8  negative -- withdrawn.
9        You said Mr. Cardwell complained
10  about treatment; correct?
11      MR. BIRENBOIM:  Objection to
12      form.  You may answer, Mr. Reid, if
13      you have anything to add.
14      THE WITNESS:  I have nothing to
15      add to what I said before, which is he
16      complained that he had been racialized
17      after I and Mr. Kreynin had given him
18      examples about why his performance was
19      suffering badly.
20  BY MR. JEFFRIES:
21      Q.   What is the conduct that he was
22  complaining about, Mr. Reid?
23      A.   I think he was linking the
24  racialization to the fact that he had had
25  no work or very little work for the

Page 241

```
          REID
1
2     A.   Yes, I did.  Yes.
3     Q.   What did you say?  Describe that,
4  please.
5     A.   Sorry, I cut you off.  What did I
6  say and then?
7     Q.   Tell me what you said.
8     A.   You recall in one of our previous
9  Qs and As, I told you about what I said to
10 him having looked into his performance
11 reviews, and he had dismissed those --
12 repeatedly dismissed those as our being,
13 Mr. Kreynin and I exaggerating a typo, a
14 mere typographical error.
15          I reminded him of what he told me
16 before on two occasions that he had had
17 tough coaches and could take tough
18 feedback from his college football
19 experience.  And I had said I don't think
20 you're living up to that.  I'd also
21 reminded him of our January '16 dinner
22 where I said you've got to make your own
23 career, you've got to really work hard, it
24 requires enormous sacrifice and I don't
25 see you leaning in the way you do.  And I
```

Page 242

```
          REID
1
2  said to -- again, I probably tried to tap
3  into that college football.  I said you've
4  got to get in the game or you'll find
5  yourself off the field, or words to that
6  effect.
7     Q.   What did that mean when you
8  said --
9     A.   Yes, it was connected to what I
10 told him in January, which is that there
11 are things that your law firm will do for
12 you but largely, it's about application
13 and hard work and attending to what needs
14 to be -- to the flaws that you have, we
15 all have, that need to be fixed.  And we
16 needed to see a lot of application to turn
17 this around with the mixed diet of
18 assignments and partners that were good
19 teachers that he could work with, and that
20 he needed to lean in and embrace that and
21 not just dismiss this issue that
22 Mr. Kreynin was talking about as just a
23 typographical error.
24     Q.   And the portion of that comment
25 in regards -- I believe part of your
```

Page 253

```
               REID
 1
 2      Q.   And this is an e-mail from
 3  Mr. Cardwell to Mr. Goldberg?
 4      A.   Yes, yes.
 5      Q.   And the date sent was May 22,
 6  2017 and the subject is checking in;
 7  correct?
 8      A.   Yes, yes.
 9      Q.   During Mr. Cardwell's employment,
10  did you ever hear anything about him
11  contacting Louis Goldberg about how his
12  experience at Davis Polk had made him
13  physically ill?
14      A.   I knew he had taken time off for
15  medical leave.  I didn't know about this
16  particular contact or explanation.
17      Q.   When did you find out about this
18  particular contact?
19          MR. BIRENBOIM:  Objection to
20      form, no foundation.
21  BY MR. JEFFRIES:
22      Q.   I'll restate it.
23          Is today the first day you found
24  out about this particular contact between
25  Mr. Cardwell and Mr. Goldberg?
```

Page 254

```
               REID
 1
 2      A.   I don't recall.  I may have heard
 3  about it after that there had been some
 4  explanation to Louis but -- i.e., as to
 5  why he needed to take medical leave, but I
 6  don't recall the specifics here and I
 7  certainly don't recall this e-mail which
 8  I'm not on.
 9      Q.   During Mr. Cardwell's employment,
10  did you ever hear anything about
11  Mr. Cardwell, Louis Goldberg and Sharon
12  Crane having a meeting?
13      A.   No, I did not hear about that
14  meeting.  I knew that he was in contact
15  with Louis at this point in time because
16  following the March 29th meeting, Louis
17  was one of the first good teaching
18  partners that we -- that Mr. Cardwell
19  worked with.
20      Q.   Did you have any conversations
21  with Sharon Crane about this meeting
22  between Mr. Cardwell, Mr. Goldberg and
23  Sharon Katz?
24          MR. BIRENBOIM:  Objection to
25      form, no foundation.  You can answer,
```

```
                                    Page 271
1                   REID
2       the medical leave point.
3    BY MR. JEFFRIES:
4       Q.    Mr. Reid, when did you first
5    become aware that Mr. Cardwell filed a
6    complaint with the EEOC and NYS DHR?
7       A.    I believe shortly after it was
8    served in the summer of 2017.
9       Q.    How did you find out about it?
10      A.    We received a copy.  The firm
11   received a copy.
12      Q.    Aside from the firm receiving a
13   copy overall, how did you specifically
14   find out about it?
15           MR. BIRENBOIM:  Objection to the
16       extent it calls for the disclosure of
17       communications with counsel.
18       Otherwise you may answer.
19           THE WITNESS:  I don't recall how
20       I got it.  By that I mean I don't
21       recall how it was to sent to me, who
22       sent it to me.  I do remember seeing
23       it.
24   BY MR. JEFFRIES:
25      Q.    By virtue of seeing it, what was
```

```
                                    Page 272
1                   REID
2    your understanding about the complaint
3    made by Mr. Cardwell, what did it allege?
4           MR. BIRENBOIM:  Objection to
5       form.  You may answer.
6           THE WITNESS:  It alleged what I
7       read in the complaint.
8    BY MR. JEFFRIES:
9       Q.    And I'm asking for your
10   recollection about that.
11      A.    It was more by way of detail to
12   follow up on his March 29th allegation of
13   racialization, of being racialized.
14      Q.    And that was after his March 29th
15   complaint; correct?
16           MR. BIRENBOIM:  Objection to
17       form, misstates testimony.  You may
18       answer.
19           THE WITNESS:  August is after the
20       March 29th meeting and what was said
21       there.  If that's what you're asking,
22       the answer is yes.
23   BY MR. JEFFRIES:
24      Q.    How did you react to
25   Mr. Cardwell's EEOC complaint?
```

Page 277

REID

1    conversation I had, I believe, with Lee
2    Hochbaum, who I believe was also one of
3    the good teaching partners that I
4    mentioned before, that he and Mr. Cardwell
5    did some work for.
6        Q.   Just before we move off of this,
7    what about with respect to Sharon Crane,
8    did you have any conversations with Sharon
9    Crane about Mr. Cardwell after the March
10   29th -- after the March 29th meeting, but
11   before the May 23rd e-mail from her to
12   you?
13       A.   I don't recall any.
14       Q.   Were you involved in any way in
15   the drafting or creation of any of the
16   information that appeared in Davis Polk's
17   NYS DHR answer and position statement in
18   response to Mr. Cardwell's complaints?
19           MR. BIRENBOIM:  You can answer
20       that yes or no.
21           THE WITNESS:  The answer to
22       the -- when was that filed, the
23       answer?
24           MR. JEFFRIES:  Just one moment.

Page 278

REID

1        December 5th.
2            THE WITNESS:  December 5th?
3    BY MR. JEFFRIES:
4        Q.   Yes.
5        A.   Of 2017?
6        Q.   Yes.
7            MR. BIRENBOIM:  I'm just
8        cautioning the witness not to disclose
9        any communications with inside or
10       outside counsel in connection with the
11       preparation of that document.
12           THE WITNESS:  Yes, and I'm sure I
13       read it and in particular with regard
14       to anything it said about me for
15       accuracy.
16   BY MR. JEFFRIES:
17       Q.   Okay.  And just to be clear, I'm
18   not asking you to disclose the details.  I
19   think we've been through this before.  I'm
20   asking you, and you can answer this yes or
21   no, whether or not you were involved in
22   any way in the drafting or creation of any
23   of the information that appeared in Davis
24   Polk's NYS DHR answer and position

1                    REID

2       form.  I don't know how he can answer

3       what is in other people's heads but to

4       the extent you know, you can answer.

5           THE WITNESS:  All I can say is

6       that the EEOC complaint was served

7       against the firm, Davis Polk, the

8       answer was filed by the firm, Davis

9       Polk, not by me personally, the answer

10      was prepared with the advice from

11      expert counsel, so that would lead me

12      to believe that I wasn't the only

13      person that thought that bad

14      performance was the root cause.

15  BY MR. JEFFRIES:

16      Q.   So I'm just asking you, Mr. Reid,

17  who of any of the people we mentioned,

18  were there any other people who expressed

19  to you a belief that Mr. Cardwell's

20  performance was the result of his

21  non-staffing and low hours and with

22  respect to his experience at the firm when

23  you spoke to them about Mr. Cardwell?

24          MR. BIRENBOIM:  Objection to

25      form.

1                    REID

2           THE WITNESS:  I think you have

3       got the question the wrong way around.

4       You're asking a question about a

5       belief that his inactivity was caused

6       by his poor performance.  I did not

7       discuss that question with either

8       Mr. Goldberg and Mr. Hochbaum.  What I

9       discussed with them were their

10      experiences about working with him

11      during the months that followed his

12      return to work after the March 29th

13      conversation and the problems that

14      they'd experienced working with him

15      and in his performance again.

16  BY MR. JEFFRIES:

17      Q.   That's helpful, thank you.  What

18  did they tell you?

19      A.   What I learned from Mr. Goldberg

20  is that Mr. Cardwell seemed to lack any

21  fundamental grasp of basic corporate law

22  concepts, and that one particularly

23  disappointing episode was when

24  Mr. Goldberg had to substantially rewrite

25  work product he had been given by

Page 285

REID

1
2  Mr. Cardwell, sat down with Mr. Cardwell,
3  gave him direction as to how to take it on
4  to a subsequent draft and do a better job.
5  And when he got the subsequent draft back
6  it wasn't much better, and there were
7  notes in it saying I haven't done the
8  legal research to substantiate what I'm
9  writing here, I'll do that later, to that
10 effect.
11         With Mr. Hochbaum, he worked with
12 Mr. Cardwell on an assignment from one of
13 the firm's financial clients.  Again, it
14 was -- what was recounted to me was lack
15 of understanding of basic corporate law
16 concepts, including in that context the
17 liability exposure of the client and what
18 was a publicly filed SEC disclosure.
19     Q.   So let me just make sure that I
20 heard you correctly.  You were told that
21 Mr. Cardwell lacked basic corporate law
22 concepts; is that correct?
23     A.   I was told that he didn't seem to
24 appreciate in both those assignments some
25 concepts that would be pretty basic.

Page 286

REID

1
2      Q.   And beyond that, I'm using your
3  words, so I just want to make sure that we
4  have the same understanding of the nature
5  of the criticisms.  Your words when you
6  first stated it were that he lacked
7  basic -- he lacked a basic understanding
8  of corporate law concepts; is that
9  correct?  That was what your -- that was
10 what was conveyed to you?
11     A.   Lacked it and -- lacked it and
12 did not acquire it despite intensive
13 coaching by both those partners.
14     Q.   Lacked --
15     A.   Acquire.
16     Q.   Thank you.  And I think I also
17 heard in your response that there was a
18 concern about liability to clients based
19 off of Mr. Cardwell's deficiencies; is
20 that correct?
21     A.   No, no, what I said was a lack of
22 understanding that the particular matter
23 that he was working on with Mr. Hochbaum
24 involved disclosure to which our client
25 needed to put his name and therefore, it

Page 309

1                    REID
2       however you wish, whether it's yes or
3       no or otherwise.
4            THE WITNESS:  With supervision,
5       any associate can do M&A work.
6    BY MR. JEFFRIES:
7       Q.   At what point did the firm and
8    M&A partners decide that staffing
9    Mr. Cardwell was unworkable?
10      A.   I think several months -- after
11   several months experience with projects
12   like the ones we've talked about following
13   his return to work after the March 29th
14   meeting.
15      Q.   So that wasn't at the time he was
16   being staffed on pitches; correct?
17           MR. BIRENBOIM:  Objection to
18      form.  If you have a recollection you
19      can testify.
20           THE WITNESS:  It was after --
21      this is August 31, 2017.  Again, it
22      was -- this was part of the program of
23      getting him more work and I don't
24      think any conclusion had been reached
25      there -- then.

Page 310

1                    REID
2    BY MR. JEFFRIES:
3       Q.   This program that you've
4    discussed a few times, who was responsible
5    for this program, who was involved in this
6    program of getting Mr. Cardwell work?
7       A.   John Bick was -- being M&A
8    partner and at the time the head of M&A,
9    took it to make sure that he got a good
10   mix of projects.
11      Q.   And when did you find out about
12   this -- when did you find out about this
13   plan?
14           MR. BIRENBOIM:  Objection to
15      form.
16           THE WITNESS:  When?
17   BY MR. JEFFRIES:
18      Q.   When did you find out about this
19   approach that Mr. Bick was taking towards
20   trying to make sure that Mr. Cardwell got
21   a good mix of work?
22      A.   This is what I said to
23   Mr. Cardwell in the March 29th meeting,
24   that I wanted to do to try and recover the
25   lost ground of three or four months of

Page 311

```
                          REID
1
2    very close to zero activity and that we
3    put in place, we continued to go forward
4    with once he came back from the leave he
5    asked for in April.
6        Q.    So when he came back from the
7    leave, there was a plan in place to help
8    him get work; is that correct?
9        A.    The plan was we would look for a
10   good assignment, a good mix of
11   assignments, good teaching partners and
12   get him that work.
13       Q.    So let me get this straight.
14   Mr. Cardwell goes on leave and returns;
15   correct?
16       A.    Yes.
17       Q.    And --
18       A.    I don't recall exactly when he
19   returned.  It was several weeks of leave.
20       Q.    And upon his return, were
21   there -- was there an understanding of
22   what he would walk into and what kind of
23   assignments would be given to him when he
24   returned or was he --
25       A.    A variety --
```

Page 312

```
                          REID
1
2        Q.    -- took place -
3            MR. BIRENBOIM:  Let Mr. Jeffries
4        finish the question.
5            THE WITNESS:  Sorry, I thought he
6        had.
7    BY MR. JEFFRIES:
8        Q.    When Mr. Cardwell returned or
9    around the time Mr. Cardwell returned, was
10   there a plan in place as to the type of
11   work he would be getting or was that
12   something that had to be developed after
13   he returned?
14           MR. BIRENBOIM:  Objection to
15       form.  If you know you may answer.
16           THE WITNESS:  The only thing I
17       recall was it was going to be a good
18       mix, different kinds of work,
19       different partners.
20   BY MR. JEFFRIES:
21       Q.    Now, Mr. Cardwell actually ended
22   up being terminated; correct?
23       A.    Correct.
24       Q.    And so the plan around staffing
25   him clearly changed.  When did that
```

                                                    Page 313

                                REID
1
2    change?
3        A.    I'm not sure why you say it
4    clearly changed.
5        Q.    Well, he ended up being
6    terminated; right?  That's not the same as
7    finding work for him to -- finding things
8    for him to work on.
9            MR. BIRENBOIM:  Objection to
10       form, mischaracterizes the testimony.
11       You may answer.
12           THE WITNESS:  He -- if you're
13       saying that by not being at the firm
14       he wouldn't have had any firm work to
15       do, I guess that's correct.
16   BY MR. JEFFRIES:
17       Q.    The firm went from staffing him
18   on matters and potential deals to telling
19   him he should move on because the staffing
20   situation became unworkable.  How did that
21   change occur?
22           MR. BIRENBOIM:  Objection to
23       form.  If you understand the question,
24       you can answer it.
25           THE WITNESS:  The reports of the

                                                    Page 314

                                REID
1
2    partners for whom he had been staffed
3    fed into, I believe, his annual
4    review.  I believe the process played
5    out at the end of the year, the annual
6    review season beginning in the
7    following year.  And in addition to
8    the reports of Mr. Hochbaum and
9    Mr. Goldberg, I understand -- I didn't
10   talk to them directly -- but I
11   understand there were also severely
12   critical reviews from Mr. Mills and
13   Mr. Amorosi who he worked with as
14   well.
15   BY MR. JEFFRIES:
16       Q.    Mr. Reid, who made the decision
17   to terminate Mr. Cardwell?
18       A.    I think I just said the consensus
19   of the partners who had been involved in
20   looking at his work closely, working with
21   him closely when he came back in I believe
22   late April of 2017 for the next several
23   months.  The consensus was that what they
24   had seen was a level of performance that
25   the fairest thing to do was to say we

Page 315

                    REID
1
2    don't see it working out here and take
3    some time to look around and find another
4    opportunity.
5         Q.   Are you saying Lee Hochbaum had a
6    role in terminating Mr. Cardwell?
7              MR. BIRENBOIM:   Objection to
8         form, mischaracterizes the testimony.
9         You may answer.
10             THE WITNESS:   He gave a
11        performance report is what I said.
12   BY MR. JEFFRIES:
13        Q.   I'm asking you who made the
14   decision to terminate Mr. Cardwell.   Can
15   you state their names?
16        A.   Decisions like that are made by
17   consensus at the firm, the Davis Polk
18   firm, consensus of the partners who have
19   worked with the associate concerned.   I
20   wasn't part of any discussion among those
21   partners with a view to that decision.   I
22   was basically told that things were not
23   working out despite the firm's best
24   efforts over the previous -- over the time
25   since March 29th, but again, that's what I

Page 316

                    REID
1
2    recall.   I was not in the discussion that
3    took a look at his performance over that
4    period.
5         Q.   So you were not a part of those
6    discussions in any way; is that correct?
7         A.   It was reported to me -- sorry.
8              MR. BIRENBOIM:   Form.   Go ahead.
9              THE WITNESS:   It was reported to
10        me the consensus of the group was that
11        this was not going to turn around.   So
12        I was involved to that extent and when
13        I heard that and the view was the
14        better thing for Mr. Cardwell was to
15        start afresh somewhere else.   And when
16        you leave Davis Polk, there are many
17        fantastic opportunities.   I recognized
18        and accepted that decision.
19   BY MR. JEFFRIES:
20        Q.   Mr. Reid, when did Davis Polk
21   begin anticipating litigation with
22   Mr. Cardwell?
23             MR. BIRENBOIM:   Objection to form
24        and please don't disclose any
25        conversations with counsel.   If you