**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**KALOMA CARDWELL,**

                                        Plaintiff,

**v.**

**DAVIS POLK & WARDWELL LLP, Thomas Reid,**          **1:19-cv-10256-GHW**
**John Bick, William Chudd, Sophia Hudson, Harold**
**Birnbaum, Daniel Brass, Brian Wolfe, and John H.**
**Butler,**

                                        Defendants.


### PLAINTIFF'S RULE 56.1 COUNTER-STATEMENT OF FACTS


Dated: January 24, 2022                    David Jeffries, Esq.
                                           1345 Avenue of the Americas, 33rd Floor
                                           New York, New York 10105
                                           Tel: 212-601-2770
                                           djeffries@jeffrieslaw.nyc


                                           *Attorney for Plaintiff*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and 56.1 of the Local Rules for the United States District Court for the Southern District of New York, plaintiff Kaloma Cardwell respectfully submits the following statement of facts in opposition to defendants, Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), John Bick, Harold Birnbaum, Daniel Brass, John Butler, William Chudd, Sophia Hudson, Thomas Reid, and Brian Wolfe (the "Individual Defendants") (with the Firm, "defendants") Motion for Summary Judgment (ECF 220-231) on all claims brought by Cardwell,  in the amended complaint filed October 2021 ("TAC") (ECF 200).

## TABLE OF CONTENTS

I.      PARTIES AND KEY INDIVIDUALS……………………………………...……………1

II.     DAVIS POLK'S TRACK RECORD WITH BLACK ATTORNEYS …………………..11

III.    POLICIES REGARDING HOURS, PERFORMANCE REVIEWS & STAFFING…….13

IV.     CARDWELL'S EMPLOYMENT HISTORY……………………………...……………15

V.      RETALIATION CLAIMS…………..……………………………………...…………..76

VI.     DISCRIMINATION CLAIMS……………………………………………………………173

VII.    ADDITIONAL FACTS RELATED TO MITIGATION………………..………………186

VIII.   ADDITIONAL FACTS RELATED TO DAMAGES…….……………………………187

## PLAINTIFF'S RULE 56.1 COUNTER-STATEMENT OF FACTS

### I.      PARTIES AND KEY INDIVIDUALS

#### A.      Cardwell

278.    Cardwell is an African-American/Black male. ECF 200, TAC ¶ 4; (ECF 209, Defs. Answer ¶ 4.)

279.    Cardwell attended U.C. Berkeley School of Law ("Berkeley Law") in the 2012 to 2014 time period, and Berkeley Law was ranked within the top ten law schools in the United States

in 2012, 2013, and 2014. (ECF 209, Defs. Answer ¶ 20.)

280.    The Firm participated in Berkeley Law's on-campus interview program in August 2012, and certain Firm personnel interviewed Cardwell. In or about August 2012, Neil Potischman, a partner in the Firm's Northern California office, interviewed Cardwell. The Firm received Cardwell's transcript and résumé. Potischman served as a hiring partner at the time. (ECF 209, Defs. Answer ¶¶ 29-30.)

281.    Potischman's written notes of the interview with Cardwell includes the following:

    a)    "I have never had a finer interview in 12-13 years of doing this."

    b)    "[Cardwell] is a profoundly poised, polished, mature fellow."

    c)    "I think [Cardwell] will succeed."

(ECF 209, Defs. Answer ¶ 31.)

282.    During a second round of interviews in New York City, Davis Polk partner Maurice Blanco and three others interviewed Cardwell. In a summary report of Cardwell's interviews at the Firm, Blanco's written notes of his interview with Cardwell includes the following statements:

    a)    "Kaloma was one of the best applicants I have ever interviewed."

    a)    "He was dynamic, smart, and extremely engaging."

    b)    "He was extraordinary. I think he would be a terrific addition to the firm."

(ECF 209, Defs. Answer ¶ 34.)

283.    On or about August 28, 2012, Cardwell accepted the Firm's offer to join its 2013 summer associate class with the understanding that he would split his summer between Davis Polk and another global law firm interested in hiring Cardwell. (ECF 209, Defs. Answer ¶ 36.)

284.    On or about October 7, 2013, Cardwell accepted Davis Polk's offer to join the Firm as a U.S. associate in its New York Office in the fall of 2014. (ECF 209, Defs. Answer ¶ 51.)

    **B.**    **Davis Polk**

285.    Davis Polk and its associated entities operate in ten cities in seven countries in the Americas, Europe, and Asia. (ECF 209, Defs. Answer ¶ 6.)

286.    In 2019, Davis Polk and its associated entities employed over 165 partners, 103 counsel, and 778 associates; that in the summer of 2019, Davis Polk and its associated entities employed over 100 summer associates. (ECF 209, Defs. Answer ¶ 6.)

287.    The Firm's profits, on average per partner, were at least $3 million dollars per year in 2015, 2016, 2017, and 2018. (ECF 209, Defs. Answer ¶ 718.)

288.    The Firm's alumni network consists of over 3,000 lawyers. (ECF 209, Defs. Answer ¶ 10.)

289.    A slide deck presented to first year associates by Kathleen Ferrell and Renee DeSantis, dated October 6, 2014, includes the following: "The firm is managed by not only the Mgt Committee, but other committees listed on the Intranet under Firm Committees." (ECF 223-13 at 21, Buergel Decl. Ex. 13.)

290.    After Cardwell filed his EEOC/NYSDHR Charge in August 2017, Davis Polk (with Paul Weiss as counsel) filed a Position Statement with the New York State Division of Human Rights on December 5, 2017 ("NYSDHR Brief"). (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000287 - DPW_SDNY-000000574).)

291.    In October 2017, the New York State Division of Human Rights ("NYSDHR") sent Davis Polk a letter dated October 10, 2017 enclosing a copy of a "Verified Complaint" filed by Cardwell. (ECF 209, Defs. Answer ¶ 3.)

292.    In October 2017, Davis Polk received a letter from the NYSDHR that stated:

    a)      "                                                                                                                        ." (Jeffries Decl. Ex. 9 (DPW_SDNY-000000141).)

b) 

." (Jeffries Decl. Ex. 9 (DPW SDNY-000000139).)

c) " ." (Jeffries Decl. Ex. 9 (DPW SDNY-000000139).)

d) " ." (Jeffries Decl. Ex. 9 (DPW SDNY-000000144).)

e) " " (Jeffries Decl. Ex. 9 (DPW SDNY-000000144).)

293.    After Cardwell was terminated, the Firm changed the name of the Associate Development Department to " ," but           ." (Jeffries Decl. Ex. 6 (DeSantis Tr. 87:25-88:6).)

**C.    Individual Defendants**

294.    Reid was elected partner in 1995 and served as member of the Firm's three-person Management Committee from 2011–2019. (ECF 223-75 at 28, Buergel Decl. Ex. 75 (RFA No. 38-39).) Reid served as head of Davis Polk's corporate department from 2008 to 2011. (Jeffries Decl. Ex. 7 (Reid Tr. 31:14-17).)

295.   "[T]he head of Davis Polk's corporate department was "a position of oversight for the various corporate departments, both domestically and overseas." (Jeffries Decl. Ex. 7 (Reid Tr. 31:4-13).)

296.   Bick was elected partner in 1991 and served as head of the Firm's Corporate department and a member of the Firm's three-person Management Committee from 2011–2019. (Jeffries Decl. Ex. 4 (Bick Tr. 28:15-25); ECF 209, Defs. Answer ¶ 8.)

297.   Bick served as Davis Polk's M&A Practice Group Coordinator from approximately June 1, 2015 to May 2017. (ECF 223-75 at 29, Buergel Decl. Ex. 75 (RFA No. 42).)

298.   As head of the corporate group during Cardwell's employment, Bick's responsibilities included providing oversight to the Firm's corporate departments, including the Firm's M&A practice group. (Jeffries Decl. Ex. 7 (Reid Tr. 31:4-13).)

299.   Birnbaum has been a partner in Davis Polk's Corporate Department, practicing in the M&A Group, from July 2016 through the present. (ECF 223-75 at 30, Buergel Decl. Ex. 75 (RFA No. 48).)

300.   Brass has been a partner in Davis Polk's Corporate Department, practicing in the M&A Group, from July 2017 through the present. (ECF 223-75 at 30, Buergel Decl. Ex. 75 (RFA No. 49).)

301.   Butler was a partner in Davis Polk's Corporate Department, practicing in the M&A Group, from approximately 2002 through December 31, 2018. (ECF 223-75 at 29, Buergel Decl. Ex. 75 (RFA No. 43).)

302.   Chudd was a partner in Davis Polk's Corporate Department, practicing in the M&A group, during the dates of Mr. Cardwell's employment at Davis Polk in the 2014 to 2018 time

frame. (ECF 223-75 at 29, Buergel Decl. Ex. 75 (RFA No. 44).) Since 2017, Chudd has served on Davis Polk's alumni committee. (ECF 209, Defs. Answer ¶ 10.)

303.    Hudson was a partner in Davis Polk's Corporate Department, practicing in the Capital Markets Group, from July 2014 through approximately September 2018. (ECF 223-75 at 30, Buergel Decl. Ex. 75 (RFA No. 46).)

304.    Wolfe has been a partner in Davis Polk's Corporate Department, practicing in the M&A Group, from July 2015 through present. (ECF 223-75 at 30, Buergel Decl. Ex. 75 (RFA No. 47).)

**D.    Non-Defendant Davis Polk Partners and Employees in Supervisory Positions**

305.    Jim Rouhandeh was a partner at Davis Polk between 2014-2018, and has been a partner at Davis Polk from 1996 through the present. (ECF 223-75 at 33, Buergel Decl. Ex. 75 (RFA No. 58).)

306.    Lee Hochbaum was a partner in Davis Polk's Corporate Department, practicing in the M&A Group, from July 2016 through the present. (ECF 223-75 at 27, Buergel Decl. Ex. 75 (RFA No. 37).)

307.    Carey Dunne was a partner when Cardwell arrived at the Firm, and served as partner until approximately March 31, 2016, and then served as Counsel from roughly April 1, 2016 until roughly December 31, 2016. (ECF 223-75 at 31, Buergel Decl. Ex. 75 (RFA No. 50).)

308.    On June 26, 2015, a Davis Polk associate emailed Dunne "a draft memo to the Vance Center," which referenced a "'for-profit prison' topic." Dunne was the supervising partner for this memorandum. (ECF 223-75 at 31, Buergel Decl. Ex. 75 (RFA No. 51).)

309.    Oliver Smith was a partner in Davis Polk's Corporate Department, practicing in the M&A Group between 2014-2018, and has been a partner at Davis Polk from 2012 through the present. (ECF 223-75 at 31, Buergel Decl. Ex. 75 (RFA No. 52).)

6

310.    Phillip Mills was a partner in Davis Polk's Corporate Department, practicing in the M&A Group between 2014-2018, and has been a partner at Davis Polk from 1993 through the present. (ECF 223-75 at 32, Buergel Decl. Ex. 75 (RFA No. 54).)

311.    Louis Goldberg was a partner in Davis Polk's Corporate Department, practicing in the M&A Group between 2014-2018, and has been a partner at Davis Polk from 1997 through the present (ECF 223-75 at 32, Buergel Decl. Ex. 75 (RFA No. 55).)

312.    John Amorosi was a partner in Davis Polk's Corporate Department, practicing in the M&A Group between 2014-2018, and has been a partner at Davis Polk from 2003 through the present. (ECF 223-75 at 33, Buergel Decl. Ex. 75 (RFA No. 56).)

313.    Leonard (Len) Kreynin was a partner in Davis Polk's Corporate Department, practicing in the M&A Group, between 2014-2018, and has been a partner at Davis Polk from 1999 through the present. (ECF 223-75 at 33, Buergel Decl. Ex. 75 (RFA No. 57).)

314.    Jim Rouhandeh was a partner at Davis Polk between 2014-2018, and has been a partner at Davis Polk from 1996 through present. (ECF 223-75 at 33, Buergel Decl. Ex. 75 (RFA No. 58).)

315.    Neil Barr was a partner at Davis Polk between 2014-2018, and has been a partner at Davis Polk from 2008 through present. (ECF 223-75 at 33, Buergel Decl. Ex. 75 (RFA No. 59).)

316.    Maurice Blanco was a partner in Davis Polk's Corporate Department between 2014-2018, and has been a partner at Davis Polk from 2008 through present. (ECF 223-75 at 34, Buergel Decl. Ex. 75 (RFA No. 60).)

317.    Monica Holland was a partner in Davis Polk's Corporate Department, practicing in the Credit/Finance Group between 2014-2018, and has been a partner at Davis Polk from 2013 through the present. (ECF 223-75 at 34, Buergel Decl. Ex. 75 (RFA No. 61).)

7

318.     James McClammy is Black and was in the April 2016 to January 2018 time period the only then current Black partner. (ECF 209, Defs. Answer ¶ 360.)

319.     During Cardwell's employment, Michael Flynn was a partner at Davis Polk. (Jeffries Decl. Ex. 5, (Hudson Tr. 9:13-24).)

320.     During Cardwell's employment, Kathleen Ferrell was a partner. (Jeffries Decl. Ex. 10 (DPW SDNY-000000749); Jeffries Decl. Ex. 10 (DPW SDNY-000000749).

321.      Kathleen Ferrell served as the chair of the Firm's Personnel Committee in 2014, 2015, 2016, and certain periods in 2017. (Jeffries Decl. Ex. 10 (DPW_SDNY-000000724 - DPW SDNY-000000817); Ex. 11 (DPW_SDNY-000000577 - DPW SDNY-000000717); Ex. 12 (Lawyers' Handbook as of 10.6.17).)

322.     Kathleen Ferrell and Renee DeSantis presented slide decks to the Firm's first-year associates in 2014, 2015, 2016, and 2017 and certain slides in their presentation related to the Firm's "formal feedback" policies and practices for such years. (ECF 223-13 at 16, Buergel Decl. Ex. 13 (DPW SDNY-000164486); Jeffries Decl. Ex. 13 (DPW_SDNY-000143604); Ex. 14 (DPW_SDNY-000143671); Ex. 15 (DPW_SDNY-000143672).)

323.     During Cardwell's employment, Sharon Crane served as the Executive Director of Personnel, working with the Firm's management committee and overseeing the Firm's human resources, legal recruiting, diversity, equity and inclusion, and professional development departments. (ECF 209, Defs. Answer ¶ 61.)

324.     Crane "███████████████████████████████████ ███████████████████████████████████████████" and that she reported to him in his capacity as the Firm's managing partner. (Jeffries Decl. Ex. 7 (Reid Tr. 41:20-42:3).)

325.     Reid made the following remarks about Crane's role and responsibilities:



a) " ." (Jeffries Decl. Ex. 7 (Reid Tr. 155:5-12).)

b) " ." (Jeffries Decl. Ex. 7 (Reid Tr. 146:10-15).)

c) " (Jeffries Decl. Ex. 7 (Reid Tr. 146:16-25).)

d) " ." (Jeffries Decl. Ex. 7 (Reid Tr. 154:12-18).)

326.    During Cardwell's employment, Renee DeSantis was the Firm's Director of Professional Development (also referred to as Associate Development Department). ECF 209, Defs. Answer ¶ 62. As of September 2021, DeSantis had worked at Davis Polk for 35 years on personnel issues. (Jeffries Decl. Ex. 6 (DeSantis Tr. 23:8-12; 26:17-24).)

327.    DeSantis has served as Director of Associate Development since approximately 2002 or " " and she managed professional development managers who oversee the staffing and handle staffing requests for associates across practice groups." (Jeffries Decl. Ex. 6 (DeSantis Tr. 20:2-25).)

328.    Rocio Clausen, Carolina Fenner, and Alicia Fabe were Professional Development Managers in the Associate Development Department, Clausen until August 2017. ECF 209, Defs. Answer ¶ 62.

329.    Nicole Katz worked in the Associate Development Department as a Professional Development Coordinator beginning in December 2014. ECF 209, Defs. Answer ¶ 62.

330.    DeSantis, Fabe, Clausen, and Fenner all worked in the Firm's Associate Development Department in 2014, 2015, 2016, and 2017, with Clausen working until August 2017.  ECF 209, Defs. Answer ¶ 62; Jeffries Decl. Ex. 6, (DeSantis Tr. 82:9-91:21).)

331.    During Cardwell's employment, Clausen and Fenner also served as staffing coordinators and played a role in staffing Cardwell in the 2014 to 2016 time period. Fenner was staffing coordinator for M&A and therefore played a role in Cardwell's staffing after he assigned to M&A in April 2016. ECF 209, Defs. Answer ¶ 204.

332.    Fenner's primary responsibility was staffing first and second years, but she may have been asked to assist from time to time to staffing third years as well. (Jeffries Decl. Ex. 6 (DeSantis Tr. 99:18-22).)

333.    During Cardwell's employment, Fabe was the Firm's "training and diversity" manager who worked with DeSantis, the Firm's Diversity Committee, and partners to create and facilitate trainings for the Firm, including trainings for the Firm's Lawyering 101 and 301 programs. (Jeffries Decl. Ex. 6 (DeSantis Tr. 89:6-8; 164:14-23).)

334.    During Cardwell's employment, Charles Duggan served as the Firm's General Counsel and Gina Caruso served as the Firm's Deputy General Counsel.  (Jeffries Decl. Ex. 58 (DPW_SDNY_000165064 at 3).)

335.    During Cardwell' s employment, the Firm's partners were obligated to comply with the Firm's nondiscrimination, non-harassment and professional conduct policies. (Jeffries Decl. Ex. 6, (DeSantis Tr. 80:22-81:3); Buergel Decl. Ex. 75 (RFA No. 28).)

336.    During Cardwell's employment, the Firm's employees were obligated to comply with the Firm's nondiscrimination, non-harassment and professional conduct policies. (Jeffries Decl. Ex. 6, (DeSantis Tr. 81:9-15); Buergel Decl. Ex. 75 (RFA No. 28).)

337.     During Cardwell's employment, members of the Firm's General Counsel's Office were obligated to comply with the Firm's nondiscrimination, non-harassment, and professional conduct policies. (Jeffries Decl. Ex. 6, (DeSantis Tr. 81:16-21); Buergel Decl. Ex. 75, (RFA No. 28).)

## II.      DAVIS POLK'S TRACK RECORD WITH BLACK ATTORNEYS

338.     For each year that Cardwell was employed at Davis Polk, the Firm employed over 100 partners and 600 associates as attorneys, but never had more than one partner who identified as African-American or Black (hereinafter, "Black"). (ECF 209, Defs. Answer ¶ 6.)

339.     When Davis Polk recruited Cardwell, and during Cardwell's employment, *The American Lawyer's* Diversity Scorecard indicated that Davis Polk had among the smallest representation of Black attorneys (i.e., exclusively measuring Black attorneys, as opposed to measuring or ranking "minorities" or "lawyers of color") in its partnership as compared to dozens of law firms ranked in the Diversity Scorecard. (ECF 223-93, Buergel Decl. Ex. 82.)

340.     For the fiscal year of 2011, Davis Polk had about 642 total U.S. attorneys, over 100 of whom were partners.  The Firm did not have any partners who self-identified as African-American or Black, and only had 26 non-partner attorneys who self-identified as African-American or Black. (ECF 223-93 at 3, Buergel Decl. Ex. 82.)

341.     For the fiscal year of 2012, Davis Polk had about 633 total U.S. attorneys, over 100 of whom who were partners, but had only one partner who self-identified as African-American and only 24 non-partner attorneys who self-identified as African-American or Black. (ECF 223-93 at 5, Buergel Decl. Ex. 82.)

342.     As of August 31, 2013, Davis Polk had 155 partners, but only one of their 155 partners self-identified as African-American or Black. (ECF 209, Defs. Answer ¶ 38.)

343.   Between 2014 and 2018, 100% of Davis Polk's M&A partners were male and none of them self-identified as African-American or Black. (ECF 209, Defs. Answer ¶ 673.)

344.   As of October 21, 2014, Davis Polk had just ▮ associates who self-identified or were Black and did not have any partners who were Black. (Jeffries Decl. Ex. 16 (DPW_SDNY-000141917).)

345.   As of October 21, 2014, Davis Polk had just ▮ Black associates who were first, second, or third-year associates and; ▮ Black associates who were fourth-year associates; ▮ Black associates who were fifth-year associates; ▮ Black sixth-year associate, and ▮ Black seventh-year associate. (Jeffries Decl. Ex. 16 (DPW_SDNY-000141917).)

346.   In March 2017, Davis Polk's Director of Associate Development (DeSantis) emailed several Firm partners and the Diversity Committee: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (Jeffries Decl. Ex. 17 (DPW_SDNY-000141062).)

347.   As of March 19, 2018, Davis Polk did not have any Black M&A associates who were more senior than Cardwell at the time (i.e., there were no Black M&A 5th, 6th, 7th, 8th, or 9th year associates, or any Black M&A partners). (Jeffries Decl. Ex. 1 (Cardwell Tr. 606:17-608:9).).

348.   During Hudson's tenure at Davis Polk, she never worked with a Black Davis Polk Capital Markets partner or a Black senior associate in the Capital Markets group. (Jeffries Decl. Ex. 5 (Hudson Tr. 184:9-185:8).)

    a)   "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:18).)

    b)   "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:19).)

    c)   "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:25).)

d)    "███████████████████████████████████████████████

███████████████████████████████████

█████████████." (Jeffries Decl. Ex. 5 (Hudson Tr. 185:18-186:2).)

349.    An article entitled "Big Law is Losing the Race," published in *The American Lawyer*'s June 2014 publication, lists Davis Polk as one of eleven out of the "Am Law 100 firms" with "no African-American equity partners" and includes the following text:

a)    "Davis Polk managing partner Thomas Reid says that his firm recruits aggressively for top black law graduates, only to see them leave the firm a few years later for government or in-house positions. In such a small partnership, he says, senior black lawyers are hard to replace; the departure of the sole black partner in 2012, Kimberley Harris, 'knocked us back a key role model,' he says." (ECF 209, Defs. Answer ¶ 55.)

## III.    POLICIES REGARDING HOURS, PERFORMANCE REVIEWS & STAFFING

### A. Billable Client Hours and Billable Pro Bono Hours

350.    During Cardwell's employment, the Firm's Lawyer's Handbook was a resource containing Firm policies and procedures that applied to associates. (ECF 209, Defs. Answer ¶ 65.)

351.    Pro bono work that was billed through the Firm counted towards associates' total billable/legal hours. (Jeffries Decl. Ex. 10 (DPW_SDNY-000000724 - DPW SDNY-000000817); Jeffries Decl. Ex. 11 (DPW_SDNY-000000577 - DPW SDNY-000000717).)

352.    Firm policies regarding Davis Polk and its Pro Bono Commitment, as applied to associates during Cardwell's employment, are set forth in in the Lawyers' Handbooks. Versions of these policies were produced as of Cardwell's first (DPW_SDNY-000000724) and last (DPW_SDNY-000000577) days at the Firm. (Jeffries Decl. Ex. 10 (DPW_SDNY-000000724 - DPW SDNY-000000817); Ex. 11 (DPW_SDNY-000000577 - DPW SDNY-000000717).)

353.    During Cardwell's employment, the Firm's Pro Bono policy stated:

a)    "████████████████████████████████████████████

███"

13

b) 

c)

(Jeffries Decl. Ex. 10 (DPW_SDNY-000000724 - DPW SDNY-000000817); Jeffries Decl. Ex. 11 (DPW_SDNY-000000577 - DPW SDNY-000000717).)

**B.  Formal Feedback via Performance Review Forms**

354.   Regarding the Firm's review policies and practices during Cardwell's employment:

   a)   The Firm conducts performance reviews of its attorneys. (ECF 209, Defs. Answer ¶ 168.)

   b)   The Firm solicits written performance reviews from individual reviewers. (ECF 209, Defs. Answer ¶ 168.)

   c)   Review templates for individual performance reviews contain the question, "do you feel this lawyer is performing materially behind, with or ahead of the lawyer's class[?]" (ECF 209, Defs. Answer ¶ 168.) This question is the only question on the Firm's review template that specifically asks reviewers to indicate whether they feel the lawyer being reviewed is performing materially behind, with, or ahead of the lawyer's class. (ECF 209, Defs. Answer ¶ 570.)

   d)   Upon receiving the individual performance reviews Firm develops a "consensus message" or "consensus feedback" to be delivered to the attorney being reviewed. (ECF 209, Defs. Answer ¶ 168.)

   e)   One Firm partner is asked to deliver the Firm's consensus message to the associate during a subsequent meeting. (ECF 209, Defs. Answer ¶ 168.)

   f)   A record of that subsequent meeting is generally made on a form entitled "Lawyer Reviews – Summary Reviews" ("Summary Review" form) and/or the attachments thereto. (ECF 209, Defs. Answer ¶ 168.)

   g)   The Summary Review form contains sections relating to principal matters worked on by the reviewee and strengths and weaknesses of the reviewee's performance. (ECF 209, Defs. Answer ¶ 168.)

355.   Partners use varying methods for evaluating associates:

   a)  Birnbaum testified:

14



b) Bick testified:



” (Jeffries Decl. Ex. 4, Bick Tr. 184:9-185:8).)

## IV.   CARDWELL'S EMPLOYMENT HISTORY

### A.   Overview

356.   On July 3, 2013, Cardwell informed Reid: "███████████████████ ████████████████████████████████.” (Jeffries Decl. Ex. 18 (DPW_ SDNY-000098092).)

357.   On July 3, 2013, while Cardwell was working as a summer associate at Davis Polk, Reid emailed Cardwell: "████████████████████████████████████████” (Jeffries Decl. Ex. 18 (DPW_ SDNY-000098092).)

358.   Cardwell joined the Firm as a full-time associate on September 15, 2014. (ECF 209, Defs. Answer ¶ 1.)

### B.   Salary Increases and Year-End Bonus

359.   In 2014, Cardwell received a pro-rated salary of $160,000 and a bonus of $15,000. (ECF 224 at 2, Duggan Decl.)

15

360.    In 2015, Cardwell received a salary of $160,000 and a bonus of $15,000. (ECF 224 at 2, Duggan Decl.)

361.    In 2016, Cardwell received a pro-rated salary of $170,000 through 6/30/16 and $190,000 from 7/1/6 and a bonus of $25,000. (ECF 224 at 2, Duggan Decl.)

362.    In 2017, Cardwell received a pro-rated salary of $210,000 until August 10, 2018. (ECF 224 at 2, Duggan Decl.)

363.    In 2017, Cardwell did receive the $50,000 year-end bonus that was paid to associates in his class who received a full bonus from the Firm.  (ECF 224 at 2, Duggan Decl.)

364.    In 2018, Cardwell did not receive the pro-rated salary of $235,000 that was paid through 6/30/18 or the pro-rated salary of $250,00 that was paid from 7/1/18 through the rest of the year or the $80,000 in bonuses paid to associates in his class who received a full bonus from the Firm. (ECF 224 at 2, Duggan Decl.)

365.    In 2019, Cardwell did not receive the salary of $280,000 or the $80,000 in bonuses that associates in his class were paid. (ECF 224 at 2, Duggan Decl.)

366.    In 2021, Cardwell did not receive the pro-rated salary of $325,000 that was paid through 6/30/18 or the pro-rated salary of $350,00 paid from 7/1/21 through the rest of the year or the $64,000 in bonuses that associates in his class were paid. (ECF 224 at 2, Duggan Decl.)

367.    In 2021, Cardwell did not receive the year-end bonus of $115,000 or the $23,000 special bonus that associates in his class were paid. (Jeffries Decl. Ex. 19).

368.    Except as noted herein, for each month that Cardwell was employed in 2014, 2015, 2016, and 2017, he received the full salary and year-end bonus payment that associates in his class were eligible to receive under the Firm's compensation system. (ECF 224 at 2, Duggan Decl.)

369.     Except as noted herein, for each month that Cardwell was employed in 2014, 2015, 2016, and 2017 Cardwell received the full year-end bonus payments that associates in his class were eligible to receive under the Firm's compensation system. (ECF 224 at 2, Duggan Decl.)

370.     At the end of 2014, 2015, 2016, and 2017, Cardwell's salary increased, and he received the full salary increase that associates in his class were eligible to receive under the Firm's compensation system. (ECF 224 at 2, Duggan Decl.)

371.     On November 29, 2016, DeSantis sent an email on behalf of the Management Committee that included the following: "██████████████████████████████ ██████████████████████." (Jeffries Decl. Ex. 99 (DPW_SDNY-000164210).)

372.     On November 29, 2016, DeSantis sent an email on behalf of the Management Committee stating: "██████████████████████████████ ██████████████████." (Jeffries Decl. Ex. 99 (DPW_SDNY-000164210).)

373.     On June 1, 2016, Davis Polk's Director of Professional Development (DeSantis) sent an email with the subject line "████████████████████████" accompanied by an attachment. The email stated: "████████████████████████████████ ██████████████████████████████████████." (Jeffries Decl. Ex. 100 (DPW_SDNY-000143351 - DPW_SDNY-000143352).).

374.     During Cardwell's employment, Davis Polk's compensation schedule was generally determined by law school graduation year, with exceptions made for certain associates. (ECF 224 at 2, Duggan Decl.)

## C.     Disciplinary or Remedial Actions

375.     Davis Polk produced Cardwell's personnel file as it was maintained in the ordinary course of business by Davis Polk's Human Resources Department. (ECF 223-75 at 55, Buergel Decl. Ex. 75 (RFA No. 110).)

376.   Cardwell's personnel file did not contain records of disciplinary action. (ECF 223-75 at 46, Buergel Decl. Ex. 75 (RFA No. 89).)

377.   During Crane's deposition, she testified:



(Jeffries Decl. Ex. 2 (Crane Tr. 256:18-257:3).)

378.   Crane testified:



(Jeffries Decl. Ex. 2 (Crane Tr. 252:253-6).)

379.   Hudson responded: "███████" to the following questions:

   a)   "██████████████████████?" (Jeffries Decl. Ex. 5 (Hudson Tr. 186:23-25).)

   b)   "███████████████████████████" (Jeffries Decl. Ex. 5 (Hudson Tr. 187:2-4).)

   c)   "██████████████████████ (Jeffries Decl. Ex. 5 (Hudson Tr. 187:5-9).)

   d)   "███████████████████████████████████" (Jeffries Decl. Ex. 5 (Hudson Tr. 187:9-13).)

380.   Bick testified:



(Jeffries Decl. Ex. 4 (Bick Tr. 273:23-274:11).)

**D.    Cardwell's First Rotation (Credit, September 2014 to April 2015)**

**1.    Hours**

381.    The notes section in a slide deck dated October 6, 2014 and presented by Kathleen Ferrell and Renee DeSantis to associates states the following:



(ECF 223-13 at 19, Buergel Decl. Ex. 13 (DPW SDNY-000164486).)

382.    In 2014, Davis Polk's informal billable hours goal was approximately 150 total billable hours per month (i.e., 1800 hours/12 months).  (ECF 223-13 at 19, Buergel Decl. Ex. 13 (DPW SDNY-000164486).)

383.    A slide deck presented by Kathleen Ferrell and Renee DeSantis, dated October 6, 2014, notes that Cardwell and all associates in his class were expected to attend a mandatory

professional development training called "Lawyering 101," which started the week of November 3, 2014. (ECF 223-13 at 9, Buergel Decl. Ex. 13 (DPW SDNY-000164486).)

384.     During Cardwell's employment, pro bono hours and work were a critical component of the overall work and Davis Polk lawyers were encouraged to commit time and resources to pro bono matters in which they were interested. Jeffries Decl. Ex. 10 (DPW SDNY-000000811).); ECF 209, Defs. Answer ¶ 48; ECF 223-13 at 11, Buergel Decl. Ex. 13 (DPW SDNY-000164486).)

385.     The firm considered pro bono work to be a form of training for associates and a set of commitments that ensured Davis Polk maintained its position in the pro bono community. (Jeffries Decl. Ex. 10 (DPW SDNY-000000811).); ECF 209, Defs. Answer ¶ 48; ECF 223-13 at 11, Buergel Decl. Ex. 13 (DPW SDNY-000164486).)

386.     During Cardwell's employment, associates' billable client hours were credited towards their "total billable hours" (or "Total Legal" hours). (ECF 223-23 at 18, Buergel Decl. Ex. 23 (DPW_SDNY-000140623; (Jeffries Decl. Ex. 10 (DPW SDNY-000000782).)

387.     During Cardwell's employment, the Firm's trainings and department meetings were tracked through (and Cardwell routinely billed such trainings to) the Firm's "Professional Development" category within the timekeeping systems that tracked associates' hours. ECF 223-11 at 3, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

388.     "███████████████████████████████████████
███████████████████." (Jeffries Decl. Ex. 6 (DeSantis Tr. 135:13-14).)

389.     In the September 2014 to April 2015 time period, the Firm's records, as Davis Polk kept them in the ordinary course, reflect the following hours for Cardwell:

| Month | Billable Client Hours | Pro Bono | Professional Development |
|---|---|---|---|
| September 2014 | 29.5 | 0 | 17.5 |
| October 2014 | 202.6 | 0 | 6.8 |
| November 2014 | 73.8 | 13.6 | 35.7 |
| December 2014 | 138.5 | 13.8 | 8.2 |
| January 2015 | 71.2 | 13.7 | 10.3 |
| February 2015 | 148.7 | .2 | 7.1 |
| March 2015 | 119.6 | 4.3 | |
| April 2015 | 160.1 | .6 | 2.5 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

390.    In the September 2014 to April 2015 period, the Firm's records, as Davis Polk kept

them in the ordinary course, reflected Cardwell had at least the following "total billable hours":

| Month | Total Billable/Legal Hours |
|---|---|
| September | 29.5 |
| October | 202.6 |
| November | 87.4 |
| December | 152.3 |
| January | 84.9 |
| February | 148.9 |
| March | 123.9 |
| April | 160.1 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

391.    The Firm's method of calculating associates' billable hours did not include the

number of hours that associates spent helping the Firm achieve its recruiting goals. (ECF 223-23

at 18, Buergel Decl. Ex. 23(b) (DPW_SDNY-000140623).)

## 2.    Performance Reviews and 2015 Interim Review

392.    During Cardwell's employment, the Firm's policy for generating and distributing

performance review forms to partners during annual review cycles was based on the number of

billable hours recorded for each matter during the considered annual review period.

21

393.    For the 2014 annual review cycle, the Firm's information technology systems automatically generated and distributed performance review forms to partners who worked with an associate who billed about 50 hours (or more) on one of their matters during that review period.

394.    A slide deck, dated October 6, 2014, presented by Kathleen Ferrell and Renee DeSantis to the Firm's first-year associates outlines the following steps with respect to the Firm's



" process:

a)    "████████████████████████████████████
              "

b)    "████████████████████████████████████

c)    "████████████████████████ " (ECF 223-13, Buergel Decl. Ex. 13, 16).

395.    Cardwell's May 2015 midyear review form with Kyrwood indicates five different "Principal matters" were "considered in the evaluation" and Cardwell had billed more than 50 hours on each matter (ECF 223-9 at 37, Buergel Decl. Ex. 23 (DPW_SDNY-000144389).)

396.    According to the May 2015 midyear review form with Kyrwood, Cardwell billed the following hours on five different "principal" matters:

| | |
|---|---|
| Principal matter #1: | 151.7 hours |
| Principal matter #2: | 140.9 hours |
| Principal matter #3: | 89.4 hours |
| Principal matter #4: | 73.4 hours |
| Principal matter #4: | 60.0 hours |

(ECF 223-9 at 37, Buergel Decl. Ex. 23 (DPW_SDNY-000144389).)

397.    A total of six associates completed and submitted written performance evaluations in connection with Cardwell's May 2015 review. (ECF 223-9, Buergel Decl. Ex. 9.)

398.    Every associate who submitted a performance review for Cardwell during this review period, and in connection with his first rotation, indicated that Cardwell was performing "with" associates in his class. *See* Buergel Decl. 9 (*see* source citations in ¶ 401).

399.    Cardwell's performance reviews from this period show that every associate answered "with" in response to the question: "Do you feel the [Cardwell] is performing materially behind, with or ahead of lawyer's class":

| Date of Review | Reviewing Attorney | Group Title | Behind, With, or Ahead?[1] | Citation |
|---|---|---|---|---|
| March 13, 2015 | Yitz Segal | Credit Associate | With | ECF 223-9 at 23, Buergel Decl. Ex. 9 (DPW_SDNY-000144375). |
| March 16, 2015 | Andres Arnaldo | Credit Associate | With | ECF 223-9 at 6, Buergel Decl. Ex. 9 (DPW_SDNY-000144358). |
| March 23, 2015 | Stevan R.B. Nicholas | Credit Associate | With | ECF 223-9 at 21, Buergel Decl. Ex. 9 (DPW_SDNY-000144373). |
| April 6, 2015 | Yuli Wang | Credit Associate | With | ECF 223-9 at 27, Buergel Decl. Ex. 9 (DPW_SDNY-000144379). |
| April 10, 2015 | Sanders Witkow | Credit Associate | With | ECF 223-9 at 28, Buergel Decl. Ex. 9 (DPW_SDNY-000144380). |
| April 13, 2015 | Andres Arnaldo | Credit Associate | With | ECF 223-9 at 5, Buergel Decl. Ex. 9 (DPW_SDNY-000144357). |

---

[1] The full question reads: "Do you feel lawyer is performing materially behind, with, or ahead of lawyer's class?"

400. The performance reviews reflected in the chart in ¶ 401 *supra* and submitted in connection with Cardwell's May 2015 review included the following statements:

a) "Kaloma was very good at assisting with the closing and post-closing of the transaction. He's organized and shows attention to detail, and was able to run with tasks on his own." (ECF 223-9 at 5 (Arnaldo, April 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144357).)

b) "Kaloma did a great job on the transaction I worked with him on. Very good attention to detail and delivered work product on time and in very good shape." (ECF 223-9 at 28 (Witkow, April 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144380).)

c) "Kaloma worked with me on a small deal that requires him to take the charge in getting the deal through. He did an excellent job in liaising with borrower, borrower's other counsel and lender's counsel and pushing the deal through the finish line with minimal supervision." (ECF 223-9 at 27 (Wang, April 2015), Buergel Decl. Ex. 9 at DPW_SDNY-000144379)

d) "He's able to understand issues and deal with the mechanics of a complex closing. He's very easygoing and easy to work with. Sometimes he lacks a bit of initiative and takes longer than expected to complete certain tasks, but overall the quality of his work is quite good." (ECF 223-9 at 6 (Arnaldo, March 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144358).)

e) "Worked on a commitment paper exercise and he did a good first turn. There were a few places where hard thinking would have led him to infer a few additional changes that he didn't make, though that's very typical for someone at his level." (ECF 223-9 at 21 (Nicholas, March 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144373).)

f) "Kaloma is a hard worker and tries to please. He is proactive in offering help. He makes himself available." (ECF 223-9 at 23 (Segal, March 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144375).)

401. In May 2015, Jason Kyrwood, a Davis Polk Corporate Partner, completed an interim summary review form summarizing Cardwell's performance and reviews as follows:

a) "Generally positive—organized, high quality work, good attention to detail, hard worker. Some notice that he is a little slow in turnaround time and thought would benefit from asking more questions. Also he should take more initiative."

(ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

402.    In the "summary review" form describing Cardwell's May 2015 review with Kyrwood, Kyrwood did not memorialize any criticisms, concerns, issues related to Cardwell's timekeeping practices or billable hours. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

403.    Cardwell described his face-to-face interim review with Kyrwood as follows:

a)      "." (Jeffries Decl. Ex. 1 (Cardwell Tr. 470:22-24).)

b)      "" (Jeffries Decl. Ex. 1 (Cardwell Tr. 474:7-11).)

c)      "."
(Jeffries Decl. Ex. 1 (Cardwell Tr. 472:22-473:7).)

### 3.    Pretext

404.    In the Firm's NYSDHR Brief, Davis Polk represented:

a)      "***Senior lawyers in the Credit group who worked with Cardwell noted performance issues that were troubling***.  For example, and among other issues, senior Credit attorneys noted that Cardwell was 'on the slow side in producing drafts,' and took 'longer than expected to complete certain tasks.' *Exs. 4, 5.* Cardwell came 'to incorrect conclusions that often require[d] his work to be redone,' and his work product 'need[ed] improvement.' *Id.* He neglected to 'ask questions when he does not understand,' and 'even when offered assistance,' declined it. And although Cardwell was 'easygoing' and 'proactive in offering help,' he neglected the 'simpler matters'-the domain of the junior associate on a team tasked with completing a client assignment, as explained in detailed memoranda distributed to new associates at the start

of each rotation. Cardwell was not sufficiently "prompt to respond and act.' *Exs. 4, 5.*

> The ***Firm delivered this feedback to Cardwell at the end of his Credit rotation***, as part of its routine professional development and training initiatives. A partner from the Credit group, Jason Kyrwood, met with Cardwell to discuss his performance and the areas that needed improvement. Cardwell, according to a contemporaneous note, accepted the feedback and agreed. Ex.7."

(Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000287) (footnotes omitted).) (emphases added.)

405.    In the "summary review" form attributed to Kyrwood for Cardwell's May 2015 interim review, the Firm's quoted language "on the slow side in producing drafts" does not appear. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

406.    The quoted language "longer than expected to complete certain tasks" does not appear. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

407.    The quoted language "ask questions when he does not understand" does not appear. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

408.    The quoted language "even when offered assistance" does not appear. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

409.    The quoted language "simpler matters" does not appear. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

410.    The quoted language "prompt to respond and act" does not appear. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 at DPW_SDNY-000144389.)

411.    In the Firm's NYSDHR Brief, Davis Polk represented:

> a)    "Nonetheless, at the conclusion of Cardwell's required ***two rotations through two separate groups*** within Davis Polk's Corporate Department, attorneys on ***multiple deal teams in both groups*** had observed similar

dynamics: Cardwell tended to neglect the details on core, basic tasks, despite the Firm's clear expectations for junior associates. The fundamental problems with both the quality and timeliness of Cardwell's work made it difficult for senior lawyers to rely upon him or his work product."

412.   In the "summary review" form attributed to Kyrwood for Cardwell's May 2015 interim review, the summary review does not mention that anyone at Davis Polk encountered staffing difficulties related to the quality or timeliness of Cardwell's work. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 at DPW_SDNY-000144389.)

**E.   Cardwell's Second Rotation (M&A, April to October 2015)**

**1.   Hours**

413.   In the April 2015 to September 2015 time period, the Firm's records, as Davis Polk kept them in the ordinary course, indicated the following hours for Cardwell:

| Month | Billable Client Hours | Pro Bono | Professional Development |
|---|---|---|---|
| April 2015 | 160.1 | .6 | 2.5 |
| May 2015 | 190.0 | 11.4 | 3.7 |
| June 2015 | 192.7 | 27.8 | 4.5 |
| July 2015 | 266.5 | 5.2 | 1.0 |
| August 2015 | 169.2 | 4.9 | 4.3 |
| September 2015 | 181.0 | 0 | 2.0 |
| October 2015 | 47.7 | 0 | 3.5 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

414.   In the April 2015 to September 2015 time period, the Firm's records as Davis Polk kept them in the ordinary course indicated Cardwell had at least the following "total billable hours" (i.e., Total Legal Hours):

| Month | Total Billable/Legal Hours |
|---|---|
| April 2015 | 160.7 |
| May 2015 | 201.4 |
| June 2015 | 220.5 |
| July 2015 | 271.7 |
| August 2015 | 174.1 |

| Month | Total Billable/Legal Hours |
|---|---|
| September 2015 | 181 |
| October 2015 | 47.7 |

(ECF 223-11 at 3-4, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

415.   An email from Fabe to DeSantis, dated June 10, 2016, and the attachment to that email, indicated that Cardwell had 1775 billable client hours, 68 pro bono hours, and 1864 total legal hours in 2015. (ECF 223-23 at 18, Buergel Decl. Ex. 23 (DPW_SDNY-000140623).)

### 2.   Performance Reviews and 2015 Annual Review with Chudd

416.   For the 2015 annual review cycle, the Firm's information technology systems automatically generated and distributed performance review forms to partners who worked with an associate who billed about 75 hours (or more) on one of their matters during that review period.

417.   A slide deck, dated Fall 2015, presented by Kathleen Ferrell and Renee DeSantis to the Firm's first-year associates describes the Firm's "███████████" process as including:

a)   ███████████████████████████████████████████████████"

b)   '███████████████████████████████████████████████

c)   '██████████████████████████" (Jeffries Decl. Ex. 13 at p.10).

418.   On August 19, 2015, Nicole Katz, on behalf of Associate Development, sent an email to associates (with Kathleen Ferrell, Defendant Bick, and Rouhandeh "cc'd") that stated:

a)   '█████████████████████████████████." (Jeffries Decl. Ex. 20 (DPW_SDNY-000054680).)

b)   '██████████████████████████████████████████████████ " (Jeffries Decl. Ex. 20 (DPW_SDNY-000054680).)

c)  ███████████████████████████████████████████████████████

(Jeffries Decl. Ex. 20 (DPW_SDNY-000054680).)

d)  ███████████████████████████████████████████████████████

(Jeffries Decl. Ex. 20 (DPW_SDNY-000054680).)

419.  On September 8, 2015, an automatically generated email from the Professional

Development Department (███████████████) was sent to M&A partner Len Kreynin stating:

a)  "████████████." (Jeffries Decl. Ex. 21 (DPW_SDNY-000165047).)

b)  "██████████████████████████████████████████." (Jeffries Decl. Ex. 21 (DPW_SDNY-000165047).)

420.  Cardwell's performance reviews from the period considered in his 2015 annual review with Chudd involved reviews for the September 2014 to September 2015 review period. (ECF 223-9 at 35, Buergel Decl. Ex. 23 (DPW_SDNY-000144387).)

421.  Cardwell's December 2015 annual review form with Chudd lists fourteen different "Principal" matters Cardwell had worked on and that were "considered in the evaluation." (ECF 223-9 at 35, Buergel Decl. Ex. 23 (DPW_SDNY-000144387).)

422.  According to the 2015 annual review form, Cardwell billed the following number of hours on fourteen different "principal" matters:

| Principal matter 1: | 188.7 hours |
|---------------------|-------------|
| Principal matter 2: | 172.5 hours |
| Principal matter 3: | 166.1 hours |
| Principal matter 4: | 164.0 hours |

29

| | |
|---|---|
| Principal matter 5: | 148.7 hours |
| Principal matter 6: | 122.6 hours |
| Principal matter 7: | 120.9 hours |
| Principal matter 8: | 99.1 hours |
| Principal matter 9: | 97.1 hours |
| Principal matter 10: | 89.4 hours |
| Principal matter 11: | 89.3 hours |
| Principal matter 12: | 73.4 hours |
| Principal matter 13: | 67.7 hours |
| Principal matter 14: | 66.1 hours |

(ECF 223-9 at 35, Buergel Decl. Ex. 23 (DPW_SDNY-000144387).)

423.    103.    In the "Annual Review" form describing Cardwell's December 2015 review

with Chudd, the names of two partners and two associates are listed as those whom "[c]omments

[were] received from." (ECF 223-9 at 35, Buergel Decl. Ex. 23 (DPW_SDNY-000144387).)

424.    During the April 2015 to September 2016 period, Daniel Brass, ██████, and

Cardwell worked on a transaction together. (Jeffries Decl. Ex. 28 (DPW_SDNY-000086908).)

425.    On October 28, 2015, Carolina Fenner emailed Brass with 

█████" in the subject line and the following text in the body: "

███████████" (Jeffries Del. Ex. 28 (DPW-SDNY-000086908).)

426.    Daniel Brass did not complete or submit a performance evaluation for Cardwell in

2015. (Jeffries Decl. Ex. 28 (DPW_SDNY-000086908).)

427.    On October 28, 2015, Brass responded to Fenner's request to "███████████

███████" for Cardwell as follows: "█████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████" (Jeffries Decl. Ex. 28 (DPW_SDNY-000086908).)

428.    On October 28, 2015, Carolina Fenner acknowledged Brass's decision to not

submit a performance evaluation for Cardwell via a reply email that read: "████████████

███████" (Jeffries Decl. Ex. 28 (DPW_SDNY-000086908).)

429.    ███████ indicated on his performance evaluation for Cardwell that he had an

"extensive" level of contact with Cardwell. (ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-

000144374).)

430.    ████████'s performance evaluation stated that "Kaloma is hardworking and

always willing to help. He did a good job with the schedules and other diligence matters on the

deal." (ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144374).)

431.    When asked: "Do you feel [Cardwell] is performing materially behind, with or

ahead of lawyer's class[?]," ████████ answered "with" on the evaluation that he submitted.

(ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144374).)

432.    Senior M&A associate ████████ was the only other associate who submitted

an evaluation for Cardwell in connection with his 2015 annual review and she also answered

"with" to the question: "Do you feel [Cardwell] is performing materially behind, with or ahead of

lawyer's class[?]" (ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144378).)

433.    After ████████ answered "with" to that question, she completed the portion of

the form that solicited "suggestions on how [Cardwell] [could] improve his/her skills and

performance" and included the following professional development goals:

a)  "Kaloma acted as the junior associate on [an] acquisition." (ECF 223-9 at 26, Buergel Decl. Ex. 9 (DPW_SDNY-000144378).)

b)  "In that role he coordinated the drafting of a due diligence report and provided other support. I appreciate that Kaloma wants to learn and be involved in the deal[.] [H]e very quickly volunteers to join calls and take on work." (ECF 223-9 at 26, Buergel Decl. Ex. 9 (DPW_SDNY-000144378).

c)  "My impression is that" Cardwell is "taking on too many deals and not being able to dedicate enough time to projects he is already staffed on, (2) pushing to be involved in tasks where he is not really needed, taking away from time he could be spending on his assignments, or (3) not effectively communicating timing (i.e., its ok to say something will take a few hours)" (ECF 223-9 at 26, Buergel Decl. Ex. 9 (DPW_SDNY-000144378).)

434.  On July 27, 2015, during the review period in which Cardwell received a performance evaluation from ▇▇▇▇, Cardwell asked a Black associate:

a)  

(Jeffries Decl. Ex. 30 (DPW_ SDNY-000099978).)

435.  For the period that covered the 2015 annual review period, Cardwell explained that "as a black associate at the firm [he] was asked to do more than the white associates at the firm, especially similarly-situated white M&A associates, with respect to the firm's diversity and inclusion and recruiting efforts." (Jeffries Decl. Ex. 1 (Cardwell Tr. 465:14-21).)

436.  On September 24, 2015, the Firm's Director of Legal Recruiting (Cristobal V. Modesto) emailed the Director of Associate Development (DeSantis) and gave "▇▇▇▇ ▇▇▇▇" to a handful of attorneys including Cardwell for "▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇":

a)  "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



b)   "

(Jeffries Decl. Ex. 31 (DPW_SDNY-000140930).) (emphasis added.)

437.   In connection with the email Modesto sent on September 24, 2015 (Jeffries Decl. Ex. 31 (DPW_SDNY-000140930)), Cardwell's 2015 Annual Review Summary form, which covered the period September 2014 through September 2015, noted Cardwell received a commendation for his pro bono work or recruiting efforts.  ECF 223-9 at 35, Buergel Decl. Ex. 9.)

438.   Cardwell's 2015 review summary form stated: "[Cardwell] went above and beyond in regarding to recruiting and the summer program."  ECF 223-9 at 35, Buergel Decl. Ex. 9.)

439.   In connection with Cardwell's 2015 annual review with Chudd, M&A partner John Amorosi created and submitted a performance review for Cardwell. (ECF 223-9 at 4, Buergel Decl. Ex. 9 (DPW_SDNY-000144356).)

440.   Amorosi's performance review dated September 23, 2015 indicated that Amorosi answered "with" to the question: "Do you feel this lawyer is performing materially behind, with or ahead of lawyer's class"? (ECF 223-9 at 4, Buergel Decl. Ex. 9 (DPW_SDNY-000144356).)

441.   In connection with Cardwell's 2015 annual review, Chudd created and submitted a review for Cardwell. (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

442.   Chudd's performance evaluation form dated September 22, 2015 stated:

a)   "I did not have much direct interaction with Kaloma on the [CLIENT] transaction. (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

b)   "My impression is based off of third party accounts." (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

33

443.    As reflected in the chart below and the evidence cited therein, all of the performance reviews that became a part of Cardwell's 2015 annual review show that not a single associate or partner answered "behind" in response to the question "Do you feel the [Cardwell] is performing materially behind, with or ahead of lawyer's class[?]"  ECF 223-9 at 26, Buergel Decl. Ex. 9 (DPW_SDNY-000144378); ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362); ECF 223-9 at 4, Buergel Decl. Ex. 9 (DPW_SDNY-000144356); ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144374).

444.    With the exception of Chudd who answered "no basis," every reviewer to submit a review form for Cardwell for the period leading to his December 2015 review answered "with" when asked: "Do you feel [Cardwell] is performing materially behind, with or ahead of [his] class":

| Date of Review | Reviewing Attorney | Group Title | Do you feel lawyer is performing materially behind, with, or ahead of lawyer's class? | Citation |
|---|---|---|---|---|
| Sept. 18, 2015 | Laura Turano | M&A Associate | With | ECF 223-9 at 26, Buergel Decl. Ex. 9 (DPW_SDNY-000144378). |
| Sept. 23, 2015 | William Chudd | M&A Partner | No basis | ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362). |
| Sept. 23, 2015 | John Amorosi | M&A Partner | With | ECF 223-9 at 4, Buergel Decl. Ex. 9 (DPW_SDNY-000144356). |
| Nov. 2, 2015 | Zain Rehman | M&A Associate | With | ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144374). |

445.    As of 2015, the Associate Development Department described Chudd's "no basis" individual review for Cardwell as "███████," not "negative" or "behind." (Jeffries Decl. Ex. 49 (DPW_SDNY-000167391).)

446.    On September 22, 2015, Fenner informed Chudd that she would draft the consensus message that Cardwell was to receive for his 2015 annual review, explaining: "███████████ ████████████████████████████████████████████████████████████." (Jeffries Decl. Ex. 85 (DPW_SDNY-000091957).)

447.    At the time of Fenner's September 22, 2015 email to Chudd, Cardwell was a "rising 2nd year."  (ECF 209, Defs. Answer ¶ 71.)

448.    The message that Fenner wrote for Cardwell's 2015 annual review is in the left column of this chart and the message attributed to Chudd (and appearing in Cardwell's summary review form bearing the date December 22, 2015) is in the right column.  They state as follows:

| Fenner's Review Message for Cardwell's 2015 Annual Review | Chudd's Review Message |
|---|---|
| **Positives:**<br><br>"Seems engaged and eager, is hardworking and always willing to help."<br><br>**Areas for improvement:**<br>- "Increase responsiveness to email communications<br>- Improve communication with senior lawyers: (i) when a task is assigned without a deadline, he should ask the assigning attorney when they would like to see the draft first; (ii) should communicate timing effectively to avoid confusion;<br>- Focus on doing the tasks that have been assigned to him in a timely fashion and well (rather than pushing to do tasks that normally would be performed by more senior associates, which can understandably take a long time for him to do)." | **Substance of evaluation (including … strengths and weaknesses in the reviewee's performance in the last 12 months, improvements, if any, from prior year's review:**<br><br>"Kaloma received praise for being engaged and eager, hardworking and always willing to help.<br><br>Reviewers also noted that he could be more responsive on email communication, and improve his communication with senior lawyers regarding task deadlines and deliverables.<br><br>He also seemed to overlook more basic task in favor of more substantive work, often at the detriment of being able to deliver on the more basic tasks."<br><br>"Kaloma needs to focus on delivering excellent work product on time and communicating his deadlines and timing. Once he does this, senior lawyers will feel more comfortable delegating more work to him." |
| (Jeffries Decl. Ex. 49 (DPW_SDNY-000167391).) | (ECF 223-9 at 35, Buergel Decl. Ex. 9 (DPW_SDNY-000144387).) |

### 3.  Pretext

449.   Chudd did not use the consensus message that Fenner drafted for Cardwell, despite

Fenner instructing him to do so.  Fenner informed Chudd that she was "███████████████

███████████████████████." (Jeffries Decl. Ex. 85 (DPW_SDNY-000091957).)

450.   As to the substance of his annual review meeting with Chudd, Cardwell testified:

a)    "████████████████████████████████

███████████████████████████████████████



." (Jeffries Decl. Ex. 1 (Cardwell Tr. 482:9-17).).

b) "                                                                                            "
(Jeffries Decl. Ex. 1 (Cardwell Tr. 489:11-16).).

c) "                                                                                            ." (Jeffries Decl. Ex. 1 (Cardwell Tr. 489:17-490:6).).

d) "                                                                                            ." (Jeffries Decl. Ex. 1 (Cardwell Tr. 491:18-492:6).).

451.   However, Davis Polk shifted its assessments and interpretation about Cardwell's 2015 annual review after he filed an EEOC Charge in August 2017, claiming that Chudd's summary review was the first negative review that Cardwell received. As Cardwell explained:

a)



"
(Jeffries Decl. Ex. 1 (Cardwell Tr. 492:18-494:16).).

452.   In the Firm's NYSDHR Brief, Davis Polk represented:

a)   "During his M&A rotation, Cardwell worked on at least nine separate matters, and attorneys on multiple teams noted *increasingly serious performance issues, echoing the themes that had emerged during Cardwell's first rotation in the Credit group*." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000294).)

453.   In the Firm's NYSDHR Brief, Davis Polk also represented that:

a)   "*Over the first year* or two of his time at Davis Polk, as his deficiencies became manifest, it became *difficult to assign work that Cardwell could perform reliably*." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000289) (emphases added).

454.   Around the same time that Chudd submitted his evaluation for Cardwell and decided not to rate him as "behind" his class (and stated that he did not have much "direct interaction" with Chudd), Chudd rated other associates that he worked with as "behind" in evaluations and summary reviews submitted during that exact same review cycle. For example, on September 23, 2015 and September 25, 2015, Chudd rated M&A Associate (Associate 7) as "behind" in his individual and annual reviews for that associate:

| Associates Chudd Rated as "Behind" in Individual Reviews and Summary Reviews (for Annual Reviews) in 2015 | | | | | |
|---|---|---|---|---|---|
| Date of Review | Name | Group Title | Do you feel lawyer is performing materially behind, with, or ahead of lawyer's class? | Review Type | Citation |
| Sept. 23, 2015 | Associate 7 | M&A Associate | Behind | Individual | (Jeffries Decl. Ex. (DPW_SDNY-000165956).) |
| Sept. 25, 2015 | Associate 7 | M&A Associate | Behind | Annual Review | (Jeffries Decl. Ex. (DPW_SDNY-000165954).) |

**F.   Third Rotation (Capital Markets, October 2015 to March 2016)**

**1.   Hours**

455.    In the October 2015 to April 2016 time period, the Firm's records (as Davis Polk kept them in the ordinary course) indicated the following hours for Cardwell:

| Month | Billable Client Hours | Professional Development |
|---|---|---|
| October 2015 | 47.7 | 3.5 |
| November 2015 | 134.1 | 8.9 |
| December 2015 | 94.4 | 0 |
| January 2016 | 56.7 | 0 |
| February 2016 | 44.1 | 12.2 |
| March 2016 | 4.3 | 0 |
| April 2016 | 43.6 | 0 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

456.    An associate's hours should be evaluated based on several data points before conclusions are drawn as to what those hours might mean or indicate.  Specifically, Hudson stated:



(Jeffries Decl. Ex. 114, Hudson Tr. 103:6-104:22).)

### a. September 30, 2015 Complaint

457.    Capital Markets staffing partners were responsible for staffing third years and more senior and from time to time would also directly staff second years.  (Jeffries Decl. Ex. 114, Hudson Tr. 87:13-20).)  Byron Rooney was a staffing partner in the Firm's Capital Markets group and a member of the Firm's Diversity Committee.

458.    As explained *infra*, Cardwell's hours were impacted by a complaint that he made on September 30, 2015 during a meeting attended by members of the Diversity Committee and Associate Development Department.

459.    As explained *infra*, Capital Markets staffing partners Byron Rooney and Hudson had knowledge of and participated in discussions about Cardwell's September 30, 2015 complaint.

### b. Impact of a Third Rotation on Experience

460.    Most associates participate in two rotations and then permanently assign to one of the groups they rotated through. (Jeffries Decl. Ex. 1 (Cardwell Tr. 453:6-12).)

461.    In September 2015, internal emails confirm that staffing decisions take into account the types of rotations that an associate has done, and the specific tasks they have experience doing:

    a)  An associate emailed Clausen: ██████

    █████████████." (Jeffries Decl. Ex. 33 (DPW_SDNY-000141795).)

    b)  Clausen responded: ███████

    ██████████." (Jeffries Decl. Ex. 33 (DPW_SDNY-000141794).)

    c)  The senior associate responded: "██████

    ██████." (Jeffries Decl. Ex. 33 (DPW_SDNY-000141794).)

d) Clausen responded: █████████████████████
████████████████████████████████████████
██████████████ " (Jeffries Decl. Ex. 33 (DPW_SDNY-000141793).)

462.   On November 5, 2015:

a) An associate emailed Clausen: "█████████████████
████████████████████████████████████████
████████████████████ " (Jeffries Decl. Ex. 34 (DPW_SDNY-000141815).)

b) Clausen responded: "██████████████████████████
████████████ " (Jeffries Decl. Ex. 34 (DPW_SDNY-000141815).)

c) The associate responded: ████████████████
████████████████████████████████████████
████████████████████████████████████████ "
(Jeffries Decl. Ex. 34 (DPW_SDNY-000141815).)

d) Clausen assigned the matter to an associate who had both Capital Markets experience and prior experience working with Richard Truesdell. (Jeffries Decl. Ex. 34 (DPW_SDNY-000141815).)

463.   On June 6, 2016, Alicia Fabe emailed DeSantis an email attaching a draft presentation to DeSantis with the following cover note:

a) "█████████████████████████████████████████
███████████████████ " (Jeffries Decl. Ex. 35 (DPW_SDNY-000140582- DPW_SDNY-000140607).)

464.   On a slide in the presentation, and specifically on the slides relating to Cardwell, under the header "████████████ " is the following description:

a) "█████████████████████████████████████████
███████████████████ " (Jeffries Decl. Ex. 97 (DPW_SDNY-000164803).)

465.   The slides related to Cardwell indicate: "████████████████████
████████████████████████████████████████ ." This version of the deck did not

state: "." (Jeffries Decl. Ex. 35 (DPW_SDNY-000164803).)

466.    The words " " were added to the deck on or around June 10, 2016, after Hudson spoke to Fabe. (Jeffries Decl. Ex. 35 (DPW_SDNY-000164803; ECF 200, TAC ¶ 126).)

### c.   Sophia Hudson and Market Conditions

467.    When asked "," Hudson responded:

a)   Capital Markets is " " (Jeffries Decl. Ex. 5 (Hudson Tr. 34:5-17).)

468.    Hudson asserted in a performance review form dated June 2016 and during her deposition that, around November 2015, replacement staffing occurred on a deal involving Cardwell because of reasons related to Cardwell's performance. (Jeffries Decl. Ex. 5 (Hudson Tr. 216:15-218:4; ECF 223-9 at 19, Buergel Decl. Ex. 9 (DPW_SDNY-000144371).)

469.    Hudson asserted in performance review that "diligence and other preparatory tasks were completed so slowly that a second junior associate needed to be staffed" and that "the deal was postponed shortly thereafter." (Jeffries Decl. Ex. 5 (Hudson Tr. 216:15-218:4; ECF 223-9 at 19, Buergel Decl. Ex. 9 (DPW_SDNY-000144371).)

470.    Hudson testified that the junior associate who replaced Cardwell was possibly and that the senior associate on the deal was    . (Jeffries Decl. Ex. 5 (Hudson Tr. 218:11-19).)

471.    On November 5, 2015, the following events transpired:

a. ██████████ sent an email to Clausen that included the following text:

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████ ?"

(Jeffries Decl. Ex. 36 (DPW_SDNY-000141816).)

b. Clausen's response including the following: ████████████
████████████████████████████████████ " (Jeffries

Decl. Ex. 36 (DPW SDNY-000141816).)

c. Cardwell sent Clausen an email with the following: ████████
█████████████████████████████████ ." (Jeffries Decl. Ex. 3.

(DPW SDNY-000045506).)

d. Clausen emailed ████████████ : "
████████████████████████████████████
████████████████ " (Jeffries Decl. Ex. 36 (DPW_SDNY-000141816).)

472. Hudson's "████████████████████████████████████

████████████████████ " "██████" her "████████████████████

████████████████ ." (Jeffries Decl. Ex. 5 (Hudson Tr. 218:11-222:15).)

473. On November 7, 2015, two days after Clausen staffed ████ on that transaction:

a. Hudson emailed ████████ asking: '██████████████████
████ " (Jeffries Decl. Ex. 38 (DPW SDNY-000028150).)

b. ████████ replied to Hudson and included the following response: "
████████████████████████████████████████
████████████████████████ " (Jeffries Decl. Ex. 3

(DPW SDNY-000028150).)

Hudson relied to ████████ :
████████████████████ ." (Jeffries Decl. Ex. 38 (DPW SDNY-
000028150).)

d. Hudson also sent ████████ an email that included the following text: "██
████████ ." (Jeffries Decl. Ex. 38 (DPW SDNY-000028150).)

43

474.    The "second junior associate [who] needed to be staffed" referenced in Hudson's

reviews of Cardwell was ███████. (Jeffries Decl. Ex. 5 (Hudson Tr. 216:15-218:4); ECF 223-

9 at 19, Buergel Decl. Ex. 9 (DPW_SDNY-000144371).)

475.    On November 10, 2015, at 8:43 am (EST), a lawyer from another law firm sent an

email to Hudson, ██████, Cardwell, and ███████ that included the following:

    a.    "████████████████████████████████████████

          ████████████████████████████████████████

          ██████████████████████████"

(Jeffries Decl. Ex. 39 (DPW_SDNY-000015658).)

476.    On November 10, 2015, at 9:46 am (EST), ██████ sent an email to Hudson and

various parties (with Cardwell and ███ "cc'd") that included the following comments:

    a.    "████████████████████████████████████████

          ████████████████████████████████████████

          ████"

(Jeffries Decl. Ex. 40 (DPW_SDNY-000015660).)

477.    Hudson asserted "diligence and other preparatory tasks were completed so slowly

that a second junior associate needed to be staffed" because, by way of one "representative

example," Cardwell once worked overnight on September 8, 2015. (Jeffries Decl. Ex. 5 (Hudson

Tr. 253:8-254:9).)

478.    The junior associate referenced in her review was staffed on September 5, 2015—

days before Cardwell was "up until 4:03 am working"—and the senior associate who staffed the

junior told Hudson that he made the staffing decision partly because "████████████████

████████████████████████████████████████████." (Jeffries Decl. Ex. 38

(DPW_SDNY-000028150).)

44

479.   On December 17, 2015, a senior associate on a deal involving Hudson and Cardwell exchanged emails where Hudson declined the senior associate's offer to get replacement staffing and such exchange included the following comments:

    a.   Senior Associate:



    a.   Hudson: "

(Jeffries Decl. Ex. 41 (DPW_SDNY-000096468).)

480.   On January 19, 2016, an associate emailed Hudson:

    a.   "

    b.   "

(Jeffries Decl. Ex. 42 (DPW_SDNY-000096512).)

481.   On January 19, 2016, Hudson replied: "                                          ." (Jeffries Decl. Ex. 42 (DPW_SDNY-000096512).)

482.   In March 2016, Capital Markets partner Byron Rooney and Cardwell had a check-in meeting regarding Cardwell's staffing and experiences in Capital Markets. (ECF 209, Defs. Answer ¶ 547; Third Amended Complaint, ECF 200 at 171.)

483.   Rooney apologized to Cardwell for not being able to get more work to Cardwell during his rotation and placed the blame for Cardwell not being staffed on more matters on how challenging the market was during his rotation. (Third Amended Complaint, ECF 200 at 171.)

484. In May 2016, after Fenner staffed Cardwell on a matter, Cardwell emailed Fenner:

" ███████████████████████████████████████████████

███████████████████████████████ " (Jeffries Decl. Ex. 43 (DPW_SDNY-

000162109).)

### 2.     Other Contemporaneous Emails and Records

485. During his third rotation, Cardwell worked with Hudson on two matters. According to the summary review form for his 2016 annual review, Cardwell billed 143.5 hours and 53.8 hours on matters with her. (ECF 223-9 at 31, Buergel Decl. Ex. DPW_SDNY-000144383.)

486. On the matter where Cardwell billed 143.5 hours, Hudson asked that 4.1 hours be written off and did so after the senior associate on the deal emailed Hudson stating: "█████

██████████████████████████ " and ███████████████████████

█████ ." (Jeffries Decl. Ex. 60 (DPW_SDNY-000096513).)

487. On the matter where Cardwell billed 53.8 hours, there is no document that indicates Hudson asked for any time to be written off. ((Jeffries Decl. Ex. 60 (DPW_SDNY-000096513).)

488. None of the Firm's summary review forms for Cardwell's interim or annual reviews reflect that Cardwell had billing issues, that he underbilled on matters, or that he worked so slowly that clients were overbilled and time had to be written off. (ECF 223-9 at 37-38, Buergel Decl. Ex. 9 (DPW_SDNY-000144389); ECF 223-9 at 34-35, Buergel Decl. Ex. 9 (DPW_SDNY-000144385); ECF 223-9 at 31-32, Buergel Decl. Ex. 9 (DPW_SDNY-000144383); ECF 223-9 at 40, Buergel Decl. Ex. 9 (DPW_SDNY-000144392).)

489. On November 27, 2015, the senior associate working on a deal with Cardwell and Hudson sent Hudson an email that explained why the client was not contacted on Thanksgiving:

a.  " █████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████ ." (Jeffries Decl. Ex. 44 (DPW_SDNY-000093366).)

490.    On December 28, 2015, ███████ , an M&A associate, sent an email to Fenner that included the following comments:



a.    ████████████████████████████████████████████

████████████████████ ." (Jeffries Decl. Ex. 45 (KCARDWELL021629).)

491.    On December 28, 2015, ██████████ , a senior M&A associate, forwarded that email to Cardwell, stating: ████████████████████████████████

████████████████ " (Jeffries Decl. Ex. 46 (KCARDWELL022886).)

492.    On January 9, 2016, a senior associate emailed Cardwell:

a)    ████████████████████████████████████████████
████████████████████████ ." (Jeffries Decl. Ex. 47 (KCARDWELL021315).)

b)    ████████████████████████████████████████████

██████████ ." (Jeffries Decl. Ex. 47 (KCARDWELL021315).)

c)    "Thanks very much, Kaloma. And, again, excellent work." (Jeffries Decl. Ex. 47 (KCARDWELL021316).)

493.    On January 9, 2016, the senior associate sent Cardwell another email:

a)    ████████████████████████████████████████████



████████████████████████████ ." (Jeffries Decl. Ex. 48 (KCARDWELL021313).)

### 3.     Pretext

494.    On or around September 24, 2017, Hudson described another associate who worked

through the night on an assignment over the weekend, as follows:

a)  " (Jeffries Decl. Ex. 138, DPW-SDNY-00165864.)

495.    Ms. Hudson provided the following testimony on redirect, led by her counsel:





(Jeffries Decl. Ex. 5 (Hudson Tr. 250:13-255:10).)

496. In the Firm's NYSDHR Brief, Davis Polk represented:

    a) "The Firm made exceptions to policy for Cardwell's benefit by permitting him to try a third practice area to see if he could gain traction in his first year or so." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000292) (emphasis added.)

497. Cardwell sought permission to complete a third rotation for the following reasons:



    a) "                            ." (Jeffries Decl. Ex. 1 (Cardwell Tr. 453:13-24).)

    b) "                                (Jeffries Decl. Ex. 1 (Cardwell Tr. 454:20-455:7).)

### G.    Assigned Member of M&A Group (April 2016 – March 2017)

#### 1.    Hours

498.    In the April 2016 to March 2017 time period, the Firm's records as Davis Polk kept them in the ordinary course indicated the following hours for Cardwell:

| Month | Billable Client Hours |
|-------|----------------------|
| April 2016 | 43.6 |
| May 2016 | 101.1 |
| June 2016 | 96.9 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | 229.6 |
| October 2016 | 112.4 |
| November 2016 | 68.9 |
| December 2016 | 14.1 |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.9 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

499.    Cardwell became permanently assigned to the M&A group in April 2016. (ECF 209, Defs. Answer ¶ 204.)

500.    During Cardwell's employment, the Firm provided M&A rotators and associates with a "███████████████████████" that indicated:



a.    "████████████████████████████████████
████████."

b.    "████████████████████████████████████
██████████"

c.    "████████████████████████████████████
████."

d.    "████████████████████████████████████████████"

(Jeffries Decl. Ex.8, DPW_SDNY-000000335).

501.   In response to a complaint that Cardwell filed with the EEOC and NYSDHR around August 2017, Davis Polk submitted its Position Statement on December 5, 2017 to the NYSDHR and included the "                                        " referenced *supra* as an attachment. (Jeffries Decl. Ex. 8 (DPW SDNY-000000336).)

502.   From April 2016 to the first half of September 2016, Cardwell was staffed by the Firm's non-partner staffing coordinators, namely Fenner. (ECF 209, Defs. Answer ¶ 270.)

503.   On April 6, 2016, Fenner sent Cardwell an email that included the following text:

    a.   "                                                                    " (Jeffries Decl. Ex. 50 (DPW_SDNY-000162107).)

504.   On or around August 4, 2016, Fenner told Cardwell there had been no decision to limit Cardwell's staffing to certain types of deals or matters. (ECF 209, Defs. Answer ¶ 240.)

505.   After associates are assigned permanently to groups and become third year associates, their staffing is coordinated by junior staffing partners. (ECF 209, Defs. Answer ¶ 270.)

506.   In September 2016 Cardwell became a third-year associate. (ECF 209, Defs. Answer ¶ 288.)

507.   In or about August and September of 2016, Birnbaum and Wolfe served as junior staffing partners for associates in the M&A group who were third-year associates and senior. (Birnbaum Tr. 61:5-10); ECF 209, Defs. Answer ¶¶ 11, 270.)

508.   Associates could signal their capacity to take on new work on forms that were sent to the Firm's staffing coordinators. (ECF 209, Defs. Answer ¶ 203.)

509.   Such weekly capacity forms and the Firm's computer systems contain data relating to associates' capacity and billable hours. (ECF 209, Defs. Answer ¶ 293.)

510.   Birnbaum and Wolfe had access to M&A associates' weekly capacity forms to the extent the forms had been timely submitted for that week. (ECF 209, Defs. Answer ¶ 365.)

511.   Birnbaum's testimony about the capacity forms that he and Wolfe received and how they used the forms to track associates' availability to take on new work and make staffing decisions includes the following comments:

a)   ""

(Birnbaum Tr. 55:16-56:7).)

512.   Cardwell at times reported to have capacity of over 50% to take on new work. (ECF 209, Defs. Answer ¶ 240.)

513.   Cardwell submitted capacity forms from January to March 2017 in which he indicated that he had 100% availability. (ECF 209, Defs. Answer ¶ 344.)

514.   When asked about Cardwell's weekly capacity forms, Birnbaum stated that he didn't ' ▮ ' but that he had ' ▮ ' he and Brian Wolfe did not receive them because " ▮ ." (Jeffries Decl. Ex. 3 (Birnbaum Tr. 71:12-18).)

515.   Davis Polk, Birnbaum, and Wolfe did staff Cardwell on any new matters in September 2016, October 2017, November 2016, December 2016, January 2016, February 2016, or March 2016. (ECF 209, Defs. Answer ¶¶ 363-67.).

2.   **Performance Reviews and 2016 Annual Review with Kreynin**

516.    For the 2016 review cycle, the Firm's information technology systems automatically generated and distributed performance review forms to partners who worked with an associate who billed about 75 hours (or more) on one of their matters during that review period.

517.    A slide deck dated Fall 2016 was presented by Kathleen Ferrell and Renee DeSantis to the Firm's first-year associates, and included the following under a " ████████████ " header:



(Jeffries Decl. Ex. 14 (DPW_SDNY-000143671).)

518.    On August 18, 2016, Nicole Katz sent an email to associates (with Kathleen Ferrell, Defendant Bick, and James Rouhandeh "cc'd").  The email indicated:

    a) " ████████████████████████ ." (Jeffries Decl. Ex. 22 (DPW_SDNY-000143965).)

    a) " ████████████████████████████ ." (Jeffries Decl. Ex. 22 (DPW_SDNY-000143965).)

    b) " ████████████████████████ " (Jeffries Decl. Ex. 22 (DPW_SDNY-000143965) (emphasis added.)

    c) " ████████████████████████ " (Jeffries Decl. Ex. 22 (DPW_SDNY-000143965).)

519.    On September 7, 2016, an automatically generated email from the Professional Development Department ( ████████████ ") was sent to M&A partner Phillip Mills stating:

a) "███████████████████████████████" (Jeffries Decl. Ex. 23 (DPW_SDNY-000165045).)

b) "███████████████████████████████████████████████████." (Jeffries Decl. Ex. 23 (DPW_SDNY-000165045).)

520.     Cardwell's performance reviews from the period considered in his 2016 annual review with Kreynin involved reviews for the September 2015 to September 2016 review period. (ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144383).)

521.     Cardwell's December 2016 annual review form with Kreynin lists seven different "Principal" matters that Cardwell had worked on and that were "considered in the evaluation." (ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144383).)

522.     According to the 2016 annual review form, Cardwell billed the following number of hours across seven different "principal" matters:

| Principal matter 1: | 143.5 hours |
|---|---|
| Principal matter 2: | 126.5 hours |
| Principal matter 3: | 99.5 hours |
| Principal matter 4: | 56.5 hours |
| Principal matter 5: | 55.6 hours |
| Principal matter 6: | 55.3 hours |
| Principal matter 7: | 53.8 hours |

(ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144383).)

523.   In the "Annual Review" form describing Cardwell's December 2016 annual review with Kreynin, five partners and four associates are listed under the "[c]omments received from" heading. (ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144383)

524.   Bick explained that "where there's let's say seven real good reviews, one person has a bad review, I think usually that would be understood to be sort of an outlier and probably discounted." (Jeffries Decl. Ex. 4 (Bick Tr. 280:15-281:14).)

525.   Cardwell's performance reviews indicate that Hudson (a Capital Markets partner who did not work in Cardwell's assigned practice group), is the only reviewer of those who submitted review forms for Cardwell in 2016 to answer "behind" in response to the question: "Do you feel the [Cardwell] is performing materially behind, with or ahead of lawyer's class":

| Date of Review | Reviewing Attorney | Group Title | Do you feel lawyer is performing materially behind, with, or ahead of lawyer's class? | Citation |
|---|---|---|---|---|
| June 22, 2016 | Christopher Bezeg | M&A Associate | With | ECF 223-9 at 7, Buergel Decl. Ex. 9 (DPW_SDNY-000144359). |
| June 20, 2016 | Brian Friedman | M&A Associate | [blank] | ECF 223-9 at 13, Buergel Decl. Ex. 9 (DPW_SDNY-000144365). |
| June 20, 2016 | Joseph Hall | Cap. Markets Partner | With | ECF 223-9 at 15, Buergel Decl. Ex. 9 (DPW_SDNY-000144367). |
| June 20, 2016 | Sophia Hudson | Cap. Markets Partner | Behind | ECF 223-9 at 19, Buergel Decl. Ex. 9 (DPW_SDNY-000144371). |
| June 21, 2016 | Laura Turano | M&A Associate | With | ECF 223-9 at 25, Buergel Decl. Ex. 9 (DPW_SDNY-000144377). |
| June 22, 2016 | John Amorosi | M&A Partner | With | ECF 223-9 at 3, Buergel Decl. Ex. 9 (DPW_SDNY-000144355). |
| September 27, 2016 | Sophia Hudson | Cap. Markets Partner | Behind | ECF 223-9 at 17, Buergel Decl. Ex. 9 (DPW_SDNY-000144369). |
| September 27, 2016 | John Butler | M&A Partner | [blank] | ECF 223-9 at 8, Buergel Decl. Ex. 9 (DPW_SDNY-000144360). |
| October 4, 2016 | Francesca Campbell | M&A Associate | With | ECF 223-9 at 9, Buergel Decl. Ex. 9 (DPW_SDNY-000144361). |
| October 4, 2016 | Laura Turano | M&A Associate | With | ECF 223-9 at 24, Buergel Decl. Ex. 9 (DPW_SDNY-000144376). |

526.   Bick provided the following responses when asked about the process the Firm used

to evaluate Cardwell for Cardwell's 2016 annual review with Kreynin:



Q:

?"



A.

Q: "              ?"

A: "

(Jeffries Decl. Ex. 4, Bick Tr. 282:20-283:12).)

527.    The reviews associates reflected in the chart in ¶ 523 *supra* and submitted in connection with the evaluations Cardwell received in 2016 included the following statements:

a) Cardwell "was pleasant to work with, responsive to emails and seemed eager to learn."

(ECF 223-9 at 13 (Friedman, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144365).)

a) "Kaloma did a proxy form check and seems to have done a good job of it, including communicating with the client and coordinating internally with the DPW benefits lawyers. He was prompt and professional throughout."

(ECF 223-9 at 15 (Hall, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144367).)

b) "Kaloma was eager to work on the transactions and displayed a very good attitude. He was attentive over holiday weekends and wanted to do a good job."

(ECF 223-9 at 19 (Hudson, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144371).)

c) "Kaloma worked on preparing a chart outlining statements made in a legal complaint, statements made by the same party in the press and the arb

spread at the same time. I appreciated his enthusiasm for the assignment and diligent research of relevant press articles. I also thought that he worked well calculating and incorporating the arb spread into the analysis."

(ECF 223-9 at 25 (Turano, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144377).)

d) "I thought that Kaloma's work (and the timeliness of turning in the work) was a notable improvement from my experience working with him a year ago."

(ECF 223-9 at 25 (Turano, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144377).)

e) "Kaloma did an excellent job on a difficult diligence assignment summarizing the terms of a credit card affiliation agreement. His work was thoughtful and comprehensive. I look forward to working with him again."

(ECF 223-9 at 3 (Amorosi, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144355).)

f) "I do want to commend Kaloma for his positive attitude. He did not give up or gel frustrated, even when I gave him direct feedback. In fact, when I corrected his grammar in an email and proved a point with a grammar handbook, he not only bought himself the book, he also gamely bought me an updated version. We have subsequently collaborated on recruiting, and I believe he does want to do well at the firm."

(ECF 223-9 at 17 (Hudson, September 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144369).)

g) "He did a good job of coordinating the diligence requests of the specialist groups (benefits) and passing them on to the client."

(ECF 223-9 at 8 (Butler, September 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144360).)

h) "Kaloma has an excellent attitude and is a pleasure to work with. He is enthusiastic and performs at his best when he is given the full context of a deal. He steps up and works very hard."

(ECF 223-9 at 9 (Campbell, October 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144361).)

i) "Kaloma reviewed the D&O insurance policies and policy summaries for [CLIENT Z] and suggested changes based on precedents. He showed a good command of the material and was able to provide a number of helpful

recommendations (even though this isn't the type of work our firm typically does)."

(ECF 223-9 at 24 (Turano, October 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144376).)

j) "I think there has been a notable improvement in Kaloma's work this year compared to last year. Last year, I had issues with the timeliness of his work. This year, he's been more focused on the task and has produced high quality work product. He also has discussed openly his efforts to improve his work product/work habits."

(ECF 223-9 at 24 (Turano, October 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144376).)

528.    The Firm's practice groups differ drastically such that Hudson's knowledge and assessments were limited to the Capital Markets group:

a) "                                                                          ." (Jeffries Decl. Ex. 114, Hudson Tr. 29:13-30:9).)

b) "                                                                          ." (Jeffries Decl. Ex. 114, Hudson Tr. 96:14-97:3).)

c) "                                                            ." (Jeffries Decl. Ex. 114, Hudson Tr. 105:9-11).)

529.    Hudson assessments did not speak to Cardwell as an M&A associate, and she stated: "                                                          " when asked "how did Mr. Cardwell perform as an associate[?]"  (Jeffries Decl. Ex. 114, Hudson Tr. 173:8-12).)

530.    Hudson stated the following when asked about Cardwell's work on her matters and when Cardwell might be terminated as a result of his performance on those matters:





(Jeffries Decl. Ex. 5, Hudson Tr. 197:8-198:24).)

### 3. Pretext

531.   In the Firm's NYSDHR Brief, Davis Polk represented:

    a) "By the fall of 2016, reviews of Cardwell's performance reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role."

    b) "By this point, and consistent with Davis Polk's practices, Cardwell's poor performance over three rotations and at the beginning of his post-rotation assignment to the M&A group was such that it would have warranted giving Cardwell a message that it was time for him to look for another job."

(Jeffries Decl. Ex. 8 (DPW SDNY-000000296).)

532.   In the Firm's NYSDHR Brief, Davis Polk represented:

    a) "Cardwell has suffered from persistent, demonstrated performance problems throughout his tenure at Davis Polk that have been separately memorialized by senior attorneys *in three parts of the Firm*. Although these problems repeatedly have been communicated to Cardwell, his performance has not improved over time." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000292) (citations omitted.) (emphasis added.)

533.   In the Firm's NYSDHR Brief, Davis Polk represented:

    a) "Cardwell's assignments and hours were driven by his record of poor performance *across three separate groups* within the Davis Polk Corporate

Department."

(Jeffries Decl. Ex. 8 (NYSDHR Brief, DPW_SDNY-000000287).) (emphasis added.)

534.   Crane testified as follows regarding mid-year reviews and associate check ins:



(Jeffries Decl. Ex. 2 (Crane Tr. 47:9-48:16).)

535.   The following is a contemporaneous Firm summary of assessments related to associates scheduled to receive check-ins at the end of 2016, including a summary of Cardwell's 2016 year-end review and the summaries of other corporate associates' 2016-year end reviews:

| Name Department | 2016 Year-End Review | Citation |
|---|---|---|
| **CONTEMPORANEOUSLY CREATED FIRM SUMMARY OF CARDWELL'S 2016 YEAR-END REVIEW AND THE SUMMARIES OF OTHER CORPORATE ASSOCIATES' 2016-YEAR END REVIEWS** | | |
| Cardwell<br><br>M&A | ██████████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144474).) |
| REDACTED<br><br>M&A | ██████████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144473).) |
| REDACTED<br><br>Capital Markets | ██████████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144471).) |
| REDACTED<br><br>Capital Markets | ██████████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144471).) |
| REDACTED<br><br>Capital Markets | ██████████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144471).) |
| REDACTED<br><br>Capital Markets | ██████████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144471).) |

| CONTEMPORANEOUSLY CREATED FIRM SUMMARY OF CARDWELL'S 2016 YEAR-END REVIEW AND THE SUMMARIES OF OTHER CORPORATE ASSOCIATES' 2016-YEAR END REVIEWS | | |
|---|---|---|
| **Name Department** | **2016 Year-End Review** | **Citation** |
| REDACTED<br><br>Capital Markets | ████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144472).) |
| REDACTED<br><br>Capital Markets | ████████ | |
| REDACTED<br><br>SEG | ████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144473).) |
| REDACTED<br><br>SEG | ████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144473).) |
| REDACTED<br><br>Credit | ████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144474).) |
| REDACTED<br><br>Credit | ████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144474).) |
| REDACTED<br><br>IMG | ████████ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144474).) |



| Name Department | 2016 Year-End Review | Citation |
|---|---|---|
| **CONTEMPORANEOUSLY CREATED FIRM SUMMARY OF CARDWELL'S 2016 YEAR-END REVIEW AND THE SUMMARIES OF OTHER CORPORATE ASSOCIATES' 2016-YEAR END REVIEWS** | | |
| REDACTED<br><br>FIG | ███ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144475).) |
| REDACTED<br><br>RE | ███ | (Jeffries Decl. Ex. 59 (DPW_SDNY-000144475).) |

536.    Hudson's September 27, 2016 performance review for Cardwell includes the following: "Kaloma completed a rotation in Capital Markets as his third rotation and was aware that he would be behind others in his class as a result of doing so."

537.    When asked why he wanted to complete a third rotation, Cardwell testified:



b) "█████████████████ " (Jeffries Decl. Ex. 1 (Cardwell Tr. 453:13-24).)

c) "█████████████████ " (Jeffries Decl. Ex. 1 (Cardwell Tr. 454:20-455:7).)

**H.    March 2017 to August 2018**

**1.    Hours**

538.    In the April 2017 to December 2017 time period, the Firm's records as Davis Polk kept them in the ordinary course indicated the following hours for Cardwell:

| Month | Billable Client Hours |
|-------|----------------------|
| April 2017 | (Firm-Approved Vacation) |
| May 2017 | 24.2 |
| June 2017 | 0 |
| July 2017 | 0 |
| August 2017 | 98.9 |
| September 2017 | 10.4 |
| October 2017 | 14.2 |
| November 2017 | 21.2 |
| December 2017 | 0 |

539.    Davis Polk, Birnbaum, and Brass did not staff Cardwell on any matters after Davis Polk filed its Position Statement. (ECF 209, Defs. Answer ¶ 479.)

### 2.    Cardwell Was Capable of Being Staffed and Was Staffed

540.    In 2017, Cardwell worked on matters with M&A partners Lee Hochbaum and Louis Goldberg, including a memorandum that Cardwell co-authored. (ECF 200, TAC ¶ 626 n.98.)

541.    On August 31, 2017, Birnbaum emailed Cardwell (with Brass cc'd):

a)    "."

(Jeffries Decl. Ex. 133 (DPW_SDNY-000086138).)

542.    On September 1, 2017, Birnbaum emailed Kreynin informing him that Cardwell had received his August 31, 2017 email to Cardwell. (Jeffries Decl. Ex. 133 (DPW_SDNY-000086138).)

543.    Regarding the Firm's "⬛" for "⬛" for "⬛," on September 1, 2017, Kreynin sent an email the potential client that included the

comments " ████████████████████████████████████████████

████████████████████████████████████████ ."

544.   Kreynin sent the proposal on September 5, 2017, explaining that ██████████

████████████████████████████████████████████

████████████████████████████████████ ." " ██████

████████████████████████████████████████████

████████████████████████████████ ." (Jeffries Decl. Ex. 135

(DPW_SDNY-000086138).)

545.   Under the header, " ██████████ ," the proposal described the following tasks that

would be performed by members of the proposed team (including Cardwell):



(Jeffries Decl. Ex. 135 (DPW_SDNY-000086138).)

546.   The proposal anticipated that " ██████████████████████████████

██████████████████████████████ ." (Jeffries Decl. Ex. 135 (DPW_SDNY-

000086138).)

547.    The proposal that Kreynin sent the potential client included Cardwell's picture and a Firm-created professional biography. (Jeffries Decl. Ex. 135 ( DPW_SDNY-000086138).)

548.    When Davis Polk puts in a " ███████████████ " it " ██████████████████

███████████████████████ ." (Jeffries Decl. Ex. 116 (Reid Tr. 299:4-7).)

549.    A " ██████████████████████████ " would be a " ████████████

███████████████ " and that it's " ██████████ . (Jeffries Decl. Ex. 116 (Reid Tr.

299:10-14).)

550.    On September 6, 2017, Reid received an email confirming that Cardwell was being used in a pitch to secure a new Firm client, and that Cardwell would be a part of the M&A team working on the public company transactions. (Jeffries Decl. Ex. 134 (DPW_ SDNY-000098097).)

551.    Reid confirmed that he did not have any concerns, nor was he aware of any concerns about Cardwell potentially working on multiple transactions in 2017 and 2018, if the Firm won the business. (Jeffries Decl. Ex. 116 (Reid Tr. 303:15-304:18).)

552.    Between April 2017 and November 2017, Cardwell worked on a deal with Lee Hochbaum involving the finalization of fairness opinions for two of the Firm's clients. (Jeffries Decl. Ex. 117 (Cardwell Tr. 509:22-510:3).)

553.    Reid testified that a " ██████████ " is an important document. (Jeffries Decl. Ex. 116 (Reid Tr. 292:22-25).)

554.    On October 21, 2017, Kreynin and Goldberg (then the co-head of M&A) shared the following emails:



    a) Kreynin: ███████████████████████████
       ██████████████████ "

    b) Goldberg: " ███████████████████████████
       ██████████ "

    c) Kreynin: " ██████████ "

    d)  Kreynin: "███████████████?"

    e)  Goldberg: "███."

(Jeffries Decl. Ex. 137 (DPW_SDNY-000140126).)

### 3.   Performance Reviews and 2017 Annual Review with Oliver Smith

555.   For the 2017 review cycle, the Firm's information technology systems automatically generated and distributed performance review forms to partners who worked with an associate who billed 75 hours (or more) on one of their matters during that review period.

556.   A slide deck, dated Fall 2017, presented by Kathleen Ferrell and Renee DeSantis to the Firm's first-year associates includes the following under the header "████████":



    f)  "████████████████████████████████"

    g)  "████████████████████████████"

    h)  "██████████████████"

(Jeffries Decl. Ex. 15 (DPW_SDNY-000143672).)

557.   On August 17, 2017, Nicole Katz emailed email associates (with Kathleen Ferrell, Defendant Bick, and James Rouhandeh "cc'd"). The email indicated:

    a)  "█████████████████████████████." (Jeffries Decl. Ex. 24 (DPW_SDNY-000143977).)

    b)  "████████████████████████████████████████████." (Jeffries Decl. Ex. 24 (DPW_SDNY-000143977).)

    c)  "████████████████████████████████████████████." (Jeffries Decl. Ex. 24 (DPW_SDNY-000143977) (emphasis added.)

    d)  "███████████████████████████████

███████████████████████████████████████████ ."

(Jeffries Decl. Ex. 24 (DPW_SDNY-000143977).)

558.    On September 5, 2017, an automatically generated email from the Professional

Development Department (████████████████") was sent to Brass informing him that:

    a)  "████████████████████████████ ."  (Jeffries  Decl.  Ex.  25
        (DPW_SDNY-000165040).)

    b)  "███████████████████████████████████████
        ████████████████████████████ ." (Jeffries Decl.
        Ex. 25 (DPW_SDNY-000165040).)

559.    Cardwell's performance reviews from the period considered during his 2017 annual

review with Oliver Smith involved reviews for the September 2016 to September 2017 review

period. (ECF 223-9 at 39, Buergel Decl. Ex. 23 (DPW_SDNY-000144391).)

560.    Cardwell's December 2017 annual review form lists three different "Principal"

matters Cardwell had worked on, and that were "considered in the evaluation." (ECF 223-9 at 39,

Buergel Decl. Ex. 23 (DPW_SDNY-000144391).)

561.    According to the 2017 annual review form, Cardwell billed the following number

of hours on three "principal" matters:

| Principal matter 1: | 362.3 hours |
|---|---|
| Principal matter 2: | 78.9 hours |
| Principal matter 3: | 57.9 hours |

(ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144383).)

562.    Within the "Annual Review" form describing Cardwell's December 2017 annual

review, the form does not list the names of any partners or associates under the "[c]omments

received from" heading (ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144391)

563.    For Cardwell's 2017 annual review, Davis Polk did not collect performance assessments from any partners or associates for "Principal matter 1" or "Principal matter 3" through its official performance evaluation system. (ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144391)

564.    Cardwell's 2017 annual review did not include evaluations from anyone who worked on two out of three of the principal matters listed on Cardwell's official summary review for his 2017 annual review. (ECF 223-9 at 39, Buergel Decl. Ex. 23 (DPW_SDNY-000144391).)

565.    On January 11, 2018, partners Oliver Smith and Louis Goldberg met with Cardwell to deliver his 2017 annual review. (TAC ¶¶ 480, 483.)

566.    This meeting was the very first time anyone at Davis Polk ever expressed to Cardwell that the Firm concluded that (i) Cardwell appeared to be or was "behind" associates of the same class year or (ii) the quality of his work was supposedly poor. ECF 200, TAC ¶ 516.

567.    During the meeting, Cardwell expressed his belief that these negative performance reviews were inconsistent with feedback he had been given from partners while he was doing the work. (ECF 209, Defs. Answer ¶ 502.)

568.    Cardwell's 2017 annual review was partly based on comments from the reviewing partners during review discussions. (ECF 209, Defs. Answer ¶ 484.)

569.    On February 5, 2018, a member of the Firm's Associate Development Department emailed Fenner: "███████████████████████████████████." (DPW_SDNY-000105472); ECF 209, Defs' Answer ¶ 531.)

570.    When asked "███████████████████████████████████████████████, ," Crane responded:

A:    ████████████████████████████████████████████████."

70



(Jeffries Decl. Ex. 119, Crane Tr. 318:17-319:23).)

571.    Bick testified as follows concerning the Firm's policies:



(Jeffries Decl. Ex. 115, Bick Tr. 234:4-235:5).)

572.    Lee Hochbaum, an M&A partner, received an email on September 7, 2017 from Gina Caruso, counsel who worked on behalf of Davis Polk in response to the EEOC Charge. Hochbaum submitted a performance review for Cardwell on September 19, 2017. (ECF 209, Defs. Answer ¶ 489; Jeffries Decl. Ex. 52 (Davis Polk's Privilege Log Nos. 300).)

573.    In his performance review, Hochbaum answered "behind" in response the question is Cardwell "materially behind, with, or ahead" of associates in his class, becoming the first M&A partner at Davis Polk to do so since Cardwell first worked in the Firm's M&A group in 2015. (ECF 209, Defs. Answer ¶ 488.)

574.    Phillip Mills, an M&A partner, exchanged over a dozen emails on September 11, 2017 with counsel who worked on behalf of Davis Polk in response to the EEOC Charge.  Mills submitted a performance review for Cardwell on October 2, 2017. (ECF 209, Defs. Answer ¶ 490; (Jeffries Decl. Ex. 52 (Davis Polk's Privilege Log Nos. 302-08; 310-18).

575.    In his performance review for Cardwell, Mills answered "behind" in response the question is Cardwell "materially behind, with, or ahead" of associates in his class, becoming the second M&A partner at Davis Polk to do so. (ECF 209, Defs. Answer ¶ 488.)

576.    Louis Goldberg, an M&A partner exchanged emails, including with counsel, following the EEOC Charge who worked on behalf of Davis Polk in response to Cardwell's EEOC Charge.  Goldberg submitted a performance review for Cardwell on October 6, 2017. (ECF 209, Defs. Answer ¶ 492; Jeffries Decl. Ex. 52 (Davis Polk's Privilege Log Nos. 222, 223).

577.    In his performance review for Cardwell, Goldberg answered "behind" in response the question is Cardwell "materially behind, with, or ahead" of associates in his class, becoming the third M&A partner at Davis Polk to do so. (ECF 209, Defs. Answer ¶ 488.)

4.    Termination

578.    On February 8, 2018, Oliver and Goldberg informed Cardwell that there had been a Firm decision, in light of performance issues, that the Firm could not staff Cardwell on projects consistent with his class year (seniority) and the Firm's obligations to its clients; and that in light of this, the Firm believed that it was time for Cardwell to begin to look for alternative employment. (ECF 209, Defs. Answer ¶ 588.)

579.    Specifically, Goldberg told Cardwell that staffing him as an M&A associate was "not a situation that's workable." (ECF 200, TAC ¶ 592.)

580.    When asked about the circumstances of Cardwell receiving a "time to go" message, Bick explained: "███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ ." (Jeffries Decl. Ex. 4, Bick Tr. 284:23-287:5).)

581.    The discussions "████████████████████████████████████████████

██████████████████████████████ ." (Jeffries Decl. Ex. 4, Bick Tr. 284:23-287:5).)

582.    When asked who was involved in the decision, Bick responded:



A. "█████████████████████████████."

(Jeffries Decl. Ex. 4, Bick Tr. 284:23-287:5).)

### 5.   Pretext

583.   Between May 2015 and May 2017, Cardwell had ten face-to-face meetings with Davis Polk partners who had knowledge of Cardwell's performance, performance reviews, and professional development and not one partner in any of these meetings ever told Cardwell that Hudson or the Firm believed or noted in a performance review that Cardwell was "behind" lawyers in his class or that the quality of his work was poor and/or contributing to issues related to his staffing. (ECF 209, Defs. Answer ¶ 548.)

584.   When asked "[████████████████████████████████████ █████████████," Reid responded: "███████████████████████████████." (Jeffries Decl. Ex. 116 (Reid Tr. 308:20-309:5).)

585.   With respect to the relationship between an associate receiving a negative performance review and that associate being asked to leave the Firm, DeSantis explained that:

    a)   "████████████████████████████ ██████████████." (Jeffries Decl. Ex 6, DeSantis Tr. 279:16-23).)

    b)   "█████████████████████████████████████ ███████████████████████████." (Jeffries Decl. Ex 6, DeSantis Tr. 279:16-23).)

586.   DeSantis also answered "yes" to the following questions:

    a)   "████████████████████████████████ ████████████████████████" (Jeffries Decl. Ex 6, DeSantis Tr. 280:11-15).)

    b)   "████████████████████████████████ ████████████████████████" (Jeffries Decl. Ex 6, DeSantis Tr. 280:16-21).)



c) ' ██████████████████████████████████████ ' (Jeffries Decl. Ex 6, DeSantis Tr. 276:18-277:7).)

587.   When asked: ' ██████████████████████████████ ' DeSantis responded: ' ██████████████████████████ ' (Jeffries Decl. Ex 6, DeSantis Tr. 274:4-8).)

588.   When asked if she knows why Cardwell was terminated, DeSantis responded: ' ██████ ' (Jeffries Decl. Ex 6, DeSantis Tr. 274:9-11).)

589.   When asked if she has ' ████████████████████████████████ ,' DeSantis answered that does not know why Cardwell was terminated. (Jeffries Decl. Ex 6, DeSantis Tr. 278:5-8).)

590.   When asked ' ████████████████████████████████ ' and ' ████████████████████ ,' DeSantis answered: ' ████████████████████████████████ ' (Jeffries Decl. Ex 6, DeSantis Tr. 275:13-21).)

591.   Hudson testified as follows with respect to Cardwell's termination:

Q: ████████████████████████████████ ' (Jeffries Decl. Ex. 5 (Hudson Tr. 198:17-24).)

A: ' ████████████████████████████████ ' (Jeffries Decl. Ex. 5 (Hudson Tr. 198:17-24).)

Q: ████████████████████████████ ?" ." (Jeffries Decl. Ex. 5 (Hudson Tr. 200:23-201:6-8).)

A: ████████████████████████████████ ." (Jeffries Decl. Ex. 5 (Hudson Tr. 200:23-201:6-8).)

592.     When whether she participated in the Firm's decision to terminate Cardwell's employment or if she knew who participated in such discussions, she answered:



"█████████████████████████████" (Jeffries Decl. Ex. 2 (Crane Tr. 257:19-20).)

"████████████████████████████████" (Jeffries Decl. Ex. 2 (Crane Tr. 258:12-24).)

"████████████████████" (Jeffries Decl. Ex. 2 (Crane Tr. 259:3-7).)

"████████████████████" (Jeffries Decl. Ex. 2 (Crane Tr. 259:8-10).)

"██████████████████████████████" (Jeffries Decl. Ex. 2 (Crane Tr. 259:19-25).)

## V.     RETALIATION CLAIMS

### A. Overview

593.     On March 6, 2015, the "DPWomen" affinity group hosted or sponsored an event entitled "Women at Work." An article entitled *"When Talking About Bias Backfires"* was distributed in advance. Reid attended the event.  (ECF 209, Defs. Answer ¶¶ 57-58.)

594.     On March 6, 2015, when discussing the article *"When Talking About Bias Backfires,"* certain Davis Polk partners and associates, including Cardwell, discussed the fact that "new research suggests that if people are not careful, making people aware of bias can backfire, leading them to discriminate more rather than less."  (ECF 209, Defs. Answer ¶¶ 57-58.)

595.     On September 30, 2015, Cardwell told Davis Polk's Diversity Committee—a group of partners and administrators who were connected to every major Firm leader, practice group, and committee involved with retention and associate development—that he was perceiving and experiencing racial exclusion at Davis Polk and that it was harming his and other Black associates' professional development and careers. (Cardwell Decl. ¶ 7; TAC ¶¶ 71-75.)

596.    Cardwell's comments and perceptions around exclusion were discussed among the partners and administrators on the Diversity Committee and later in various trainings and discussions about Cardwell, retention, and implicit bias. ((Jeffries Decl. Ex. 6 (DeSantis Tr. 181:19-182:12; 184:4-13); Jeffries Decl. Ex. 91 (DPW_SDNY-000000474); Jeffries Decl. Ex. 92 (DPW_SDNY-000144244); Jeffries Decl. Ex. 91 (DPW_SDNY-000000480)).)

597.    When asked if he believed "█████████████████," Birnbaum stated:



a)    "██████████████████████████
        ███████████████████████████
        ███████████████████████████
        ██████."

(Jeffries Decl. Ex. 3 (Birnbaum Tr. 248:16-249:6).)

598.    When asked "███████████████████████
████████████████████████████████████████
█████," Birnbaum answered:

a)    "███████████████████████████
        ███████████████████████████
        ███████████████████████████
        █████."

(Jeffries Decl. Ex. 3 (Birnbaum Tr. 255:15-256:5).)

599.    Cardwell testified that no one at Davis Polk concluded that he was behind prior to his complaints about discrimination at the Firm. He explained: ███████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

█████████████████████████████████████████████████████████." (Jeffries

Decl. Ex. 1 (Cardwell Tr. 262:13-263:3).)

## B. The Firm's Complaint Procedure Policies And Practices

600.    During Cardwell's employment, the Firm encouraged lawyers to report perceived

or experienced discriminatory behavior or harassment. (ECF 209, Defs. Answer ¶ 65.)

601.    A slide deck dated October 26, 2015, which was presented to Davis Polk associates

during "Lawyering 101" by Chriss Schell, Amy Starr, and Gina Caruso, indicates the following

with respect to "██████████████████":



(Jeffries Decl. Ex. 58 (DPW_SDNY_000165064 at 3).)

602.    The Firm's Complaint Procedure, as applied to associates, is set forth in the Firm's

Lawyers' Handbook. (ECF 223-75 at 22, Buergel Decl. Ex. 75 (RFA No. 24); Jeffries Decl. Ex.

10 (DPW SDNY-000000758); Ex. 11 (DPW SDNY-000000654).)

603.    During Cardwell's employment, the Firm's Complaint Procedure "████████████

████████████████████████████████████████████████████

██████████████████████." Jeffries Decl. Ex. 10 (DPW SDNY-000000749); Ex. 11

(DPW SDNY-000000644).)

604.    Reid, Bick, Hudson, Birnbaum, and DeSantis, all testified that partners, associates

and other employees could make or report complaints related to perceived or actual discrimination,

harassment, or retaliation to Crane. (Jeffries Decl. Ex. 4 (Bick Tr. 56:23-57:8; (Jeffries Decl. Ex.

7 (Reid Tr. 41:7-19); (Jeffries Decl. Ex. 5 (Hudson Tr. 52:6-17).)

    605.   DeSantis testified that her:

    a)



." (Jeffries Decl. Ex. 6 (DeSantis Tr. 62:10-23).)

    606.   During Cardwell's employment, the anti-discrimination, anti-retaliation,

professional conduct, and ethics policies described in the Firm's Lawyers' Handbook stated:





(Jeffries Decl. Ex. 10 (DPW SDNY-000000758); Ex. 11 (DPW SDNY-000000654).)

607.   The Firm's Complaint Procedures, as described in the Firm's Lawyers' Handbook, expressly stated that



(Jeffries Decl. Ex. 10 (DPW SDNY-000000758); Ex. 11 (DPW SDNY-000000654).)

608.   The Firm's Lawyer Handbook also expressly encouraged employees who believe they have been subjected to the type of conduct described in ¶ 608 *supra* to discuss their concerns

with Sharon Crane or Jill Sterner. (Jeffries Decl. Ex. 10 (DPW SDNY-000000758); Ex. 11 (DPW SDNY-000000654).)

609.    "Firm employees are expected to comply with [the] policies set forth in handbooks applicable to them."  (Buergel Decl. Ex. 75 (RFA Nos. 28-31).)

## C.  Davis Polk Committees, Groups And Channels Of Real-Time Cross Department Communication

610.    During Cardwell's employment, Davis Polk encouraged its Management Committee, Diversity Committee, Women's Initiative's Committee, Affinity Groups, Associate Development Department, and all of its associates to provide feedback to the Firm with respect to issues related to diversity and inclusion. (ECF 209, Defs. Answer ¶ 56.)

611.    "BAG" is the Black Affinity Group at Davis Polk.  It includes, but is not limited to, Firm attorneys who self-identify as African-American or Black. (ECF 209, Defs. Answer ¶ 56.)

612.    During Cardwell's employment, he was a member of BAG and served on the BAG steering committee. (ECF 209, Defs. Answer ¶ 315.)

613.    During Cardwell's employment, BAG, among other Firm affinity groups and committees within the Firm, met regularly to discuss their experiences at Davis Polk. (ECF 209, Defs. Answer ¶ 315.)

614.    The Firm's Diversity Committee as "███████████████████████ ████████." (Jeffries Decl. Ex.8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000305).)

615.    Firm partners Monica Holland, Maurice Blanco, Byron Rooney, Sartaj Gill, Kyoko Takahashi Lin served on the Firm's Diversity Committee from October 27, 2014 through at least May 14, 2018, with Holland serving as the Chair of the Diversity Committee during that period. (Jeffries Decl. Ex. 57 (DPW_SDNY-000045274).)

616.     The administrators who served on the Firm's Diversity Committee included Sharon Crane, Renee DeSantis, and Alicia Fabe. (Jeffries Decl. Ex. 6 (DeSantis Tr. 37:13-40:22; 192:5); Jeffries Decl. Ex. 53 (DPW_SDNY-000144206); Jeffries Decl. Ex. 56 (DPW_SDNY-000143348).)

617.     The Diversity Committee routinely met as a group throughout the year. (Jeffries Decl. Ex. 6 (DeSantis Tr. 37:13-40:22).)

618.     The Diversity Committee listserv "███████████████████████" that she received e-mails from during Cardwell's employment. (Jeffries Decl. Ex. 6 (DeSantis Tr. 25:5-11).)

619.     During Cardwell's employment, the Firm's Diversity Committee met with the Firm's Management Committee on a biannual basis to focus on addressing vestigial cultural barriers that existed within Davis Polk. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144208).)

620.     DeSantis and Crane met frequently. (ECF 209, Defs. Answer ¶ 80.)

621.     A slide from a PowerPoint Presentation delivered to Firm associates in November 2016 states that partners Monica Holland, Maurice Blanco, Sartaj Gill, Kyoko Takahashi Lin, Jim McClammy, and Byron Rooney, as well as Crane, DeSantis, and Fabe, all served on the Firm's Diversity Committee at the time. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144206).

622.     A slide from a PowerPoint Presentation delivered to the Firm associates in November 2016 states that partners Kyoko Takahashi Lin and William Chudd, as well as Crane, DeSantis, and Fabe, all served on the Firm's Women's Initiative Committee at the time. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144207).)

623.  A slide from that PowerPoint Presentation explains that ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ ."

(Jeffries Decl. Ex. 53 (DPW_SDNY-000144206).

624.  A slide from that PowerPoint Presentation states the Women's Initiative Committee

"█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ ."

(Jeffries Decl. Ex. 53 (DPW_SDNY-000144207).)

625.  During Cardwell's employment, Firm partners William Chudd and Kyoko Takahashi Lin served on the Firm's Women's Committee. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144207).)

626.  A slide from a PowerPoint Presentation delivered to Firm associates on October 30, 2017 states that partners Monica Holland, John Amorosi, Maurice Blanco, Sartaj Gill, Kyoko Takahashi Lin, Jim McClammy, and Byron Rooney, as well as Crane, DeSantis, and Fabe, served on the Firm's Diversity Committee at the time. (Jeffries Decl. Ex. 63 (DPW_SDNY-000164693).

627.  A slide from that PowerPoint Presentation confirms that partners Kyoko Takahashi Lin and William Chudd, as well as Crane, DeSantis, and Fabe, served on the Firm's Women's Initiative Committee at the time. (Jeffries Decl. Ex. 63  (DPW_SDNY-000164693).)

628.  A slide from that PowerPoint reflected the same mission statement as the November 2016 deck: '████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ ." (Jeffries Decl. Ex. 63 (DPW_SDNY-000164693).

629.   A slide from that PowerPoint Presentation also states that the Women's Initiative Committee "███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████." (Jeffries Decl. Ex. 63 (DPW_SDNY-000164693).)

630.   A document that Fabe described as "███████████████" with the header

███████████████████████████████████████████████

███████████" noted that the Women's Initiative Committee, Diversity Committee, and Management Committee work "███████████████████████████," with the Women's Initiative Committee and Diversity Committee each meeting twice a year with the Management Committee.  (Jeffries Decl. Ex. 64 (DPW_SDNY-000164691).)

631.   With respect to training and development, the document reflected that this was discussed at the ███████████████████," and that the Management Committee "██

███████████████████████████████████████████████

███████████████████." (Jeffries Decl. Ex. 64 (DPW_SDNY-000164691).)

632.   During Cardwell's employment, the Firm's Lawyer's Handbook stated:

a) "███████████████████████████████████████████

███████████████████████████████████████████

███████████████████." 

(Jeffries Decl. Ex. 10 (DPW SDNY-000000803); Ex. 11 (DPW SDNY-000000701).)

**D.  SEPTEMBER 2015 COMPLAINT**

**1.  Protected Activity And Knowledge**

*A. Knowledge - Davis Polk, Monica Holland, Maurice Blanco, Crane, DeSantis, Fabe, And Diversity Committee*

84

633.   On October 21, 2014, Crane emailed Greg Andres (with Fabe cc'd):



(Jeffries Decl. Ex. 65 (DPW_SDNY-000164751).)

634.   On October 27, 2014, Holland sent an email to partners Monica Holland, Maurice Blanco, Byron Rooney, Greg Andres, Sartaj Gill, Kyoko Takahashi Lin (cc'ing Crane, DeSantis, Fabe, Cristobal Fulton, and Erica Tucker):



(Jeffries Decl. Ex. 56 (DPW_SDNY-000143348).)

635.   Holland's October 27, 2014 email to the "newly constituted" Diversity Committee also included the following comments under the words "█████":



(Jeffries Decl. Ex. 56 (DPW_SDNY-000143348).)

636.   On May 8, 2015, Cardwell emailed Crane and a more senior Black associate regarding what he called an "inter-office dynamic." (ECF 209, Defs. Answer ¶ 60.)

637.   Cardwell's May 8, 2015 email to Crane included the following comments:

a)  "



." (Jeffries Decl. Ex. 69 (DPW_SDNY-000141925).)

638.   Within an hour of receiving Cardwell's email, Crane replied:



(Jeffries Decl. Ex. 69 (DPW_SDNY-000141924).)

639.   Crane forwarded this to DeSantis and Fabe. DeSantis replied (cc'ing Fabe):



(Jeffries Decl. Ex. 69 (DPW_SDNY-000141924).)

640.     DeSantis and Crane met weekly. (Jeffries Decl. Ex. 6 (DeSantis Tr. 162:18-21).)

641.     When asked ███████████████████████████████████

███████ ." DeSantis stated that ██████████████████████████████

███████████████████████████████ ."  (Jeffries Decl. Ex. 6, DeSantis Tr.

162:9-16).)

642.     DeSantis testified that she "████████████████████████

████████████ ."  The two "████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████ ."

(Jeffries Decl. Ex. 6 (DeSantis Tr. 163:25-164:23).)

643.     On July 27, 2015, Crane sent an email with the subject line "████████████

██████████ " to several Black associates who were members of the "████████████████ ":

a)  Because "█████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████ ."

(Jeffries Decl. Ex. 30 (DPW_ SDNY-000099978).)

644.    On July 27, 2015, Cardwell sent a member of the BAG Steering Committee the following questions and suggested topics:



███████████████████████████████████████████████████████?"

(Jeffries Decl. Ex. 30 (DPW_ SDNY-000099978).)

645.    On August 4, 2015, Cardwell received an email from a White first-year associate who had forwarded Cardwell an email chain involving substantive work streams on a transaction that Cardwell and the other first-year associate were both staffed on at the time. Cardwell sent the other first-year associate in email and asked: "Can you send a reply all email saying[:] "Looping in Kaloma Cardwell (cc'd above)"?"  (Jeffries Decl. Ex. 103 (KCARDWELL021539).)

646.    On April 5, 2016, Cardwell received another email from a White first-year associate who had forwarded Cardwell an email chain involving substantive work streams on a transaction that Cardwell and the other first-year associate were both staffed on at the time. Cardwell was left off this email chain and workstream as well by senior associates/partners on the deal team. (Jeffries Decl. Ex. 104 (KCARDWELL021546).)

647.    On September 9, 2015, ███████ emailed Brass in connection with a matter that the three of them were staffed on, stating: ██████████████████████████

███████████████████████████████████████████

████████████████." (Jeffries Decl. Ex. 29 (DPW_SDNY-000086743).)

648.    On September 29, 2015, BAG's associate chair emailed the Diversity Committee:

a)  '███████████████████████████████████████
████████████████████████████████████████
█████████████████"  (ECF 209, Defs. Answer ¶ 72; Jeffries Decl. Ex. 72 (DPW_SDNY-000165441).)

b)  '████████████████████████████████████████
████████████████████?"

c)  '████████████████████████████████████████
█████████████████"



d) "███████████████████████████████████
███████?""

e) "███████████████████████████████████
██████████""

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

(Jeffries Decl. Ex. 72 (DPW_SDNY-000165441).)

649.    The email sent by the associate chair of BAG included a list of "███████████
████████████████." (Jeffries Decl. Ex. 72 (DPW_SDNY-000165441).)

650.    On or around September 29, 2015, partners Byron Rooney, Monica Holland, James McClammy, and the individuals on the Firm's Diversity Committee listserv (cc'd on the email), exchanged emails. (Jeffries Decl. Ex. 73 (DPW_SDNY-000168085 - DPW_SDNY-000168086).)

651.    On or around September 29, 2015, Holland comments to the Diversity Committee and provides the following responses to some of the questions posed in ¶ 647 *supra*:

a) "███████████████████████████████████
████████████████████████████████████
████████████████████████." (Jeffries Decl. Ex. 73
(DPW_SDNY-000168086).)

b) "███████████████████████████████████
████████." (Jeffries Decl. Ex. 73 (DPW_SDNY-000168086).)

652.    On September 29, 2015, McClammy responded:

a) "████████████████████████████." (Jeffries Decl. Ex. 73
(DPW_SDNY-000168085).)

653.    On or around September 29, 2015, Rooney replied:

a) "█████████████████████████████████
████████████████████████████████████
██████████" (Jeffries Decl. Ex. 73 (DPW_SDNY-000168086).)

654.　On September 30, 2015, members of the Diversity Committee, as well as the Firm's Director of Professional Development (DeSantis), met with members of BAG, including Cardwell, to discuss issues related to diversity and inclusion. (ECF 209, Defs. Answer ¶ 72.)

655.　"██████████████████████████████████
████████████████." (Jeffries Decl. Ex. 6 (DeSantis Tr. 185:4-9).)

656.　Chair of the Firm's Diversity Committee and Credit partner Monica Holland, and Capital Markets partner Maurice Blanco—as well as Cardwell, DeSantis, Fabe and other members of the Firm's Diversity Committee—attended the September 30, 2015 BAG meeting. (ECF 209, Defs. Answer ¶ 73; (Jeffries Decl. Ex. 6 (DeSantis Tr. 172:19-20).)

657.　When deposed, DeSantis testified that she "███████████████████████
███████" during the meeting. (Jeffries Decl. Ex. 6 (DeSantis Tr. 172:19-20).)

658.　DeSantis asked Cardwell a direct question about his specific experiences at Davis Polk. (Jeffries Decl. Ex. 6 (DeSantis Tr. 173:23-24).)

659.　DeSantis asked "████████████████████████████████
████████████████████████████████████████
(Jeffries Decl. Ex. 6 (DeSantis Tr. 175:10-14).)

660.　In addition to providing an example of the exclusion that he experienced, Cardwell stated that he was not simply just talking about being excluded. He made clear that the type of exclusion he referred to was and is harmful to his and other Black associates' professional development and careers because the disparate treatment relates to fewer and different staffing-related opportunities. (ECF 200, TAC ¶ 74; *see also* Cardwell Decl. ¶¶ 12, 13, 33.)

661.    During the BAG meeting, Cardwell told Renee DeSantis and Alicia Fabe and others in attendance that he experienced exclusion at Davis Polk based on his race. (Jeffries Decl. Ex. 1 (Cardwell Tr. 307:14-185:8; ECF 200, TAC ¶¶ 71-72.)

662.    Between May 2015 and the September 30, 2015 BAG meeting, Cardwell worked in the M&A group and on a transaction involving Chudd and another first-year associate. (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

663.    Cardwell's September 30, 2015 complaint—made in the presence of DeSantis and Fabe, Monica Holland, Maurice Blanco, and other members of the Diversity Committee—related to a transaction involving Chudd and this first year associate. (Cardwell Tr. 347:19-350:13).)

664.    Cardwell testified as follows with respect to that complaint:



(Jeffries Decl. Ex. 117, Cardwell Tr. 347:19-350:13).)

665.    On handwritten notes created by DeSantis on or around September 30, 2015, the words ▮▮▮ " " ▮▮▮ ," and " ▮▮▮ " appear next to Cardwell's name. (Jeffries Decl. Ex. 73 (DPW_SDNY-000168082).)

666.    DeSantis and Crane met around October 5, 2015. (ECF 209, Defs. Answer ¶ 80.)

667.   DeSantis's notes from their meeting contain these comments (except for the bracketed language):

a)   ""

(ECF 209, Defs. Answer ¶ 81; Jeffries Decl. Ex. 74 (DPW_SDNY-000144527).)

668.   DeSantis's notes indicate: "                                              "
Jeffries Decl. Ex. 74 (DPW_SDNY-000144527).)

669.   Cardwell's first name is handwritten next to the quoted text in ¶ 667 *supra*. (ECF 209, Defs. Answer ¶ 81.)

670.   Cardwell's name on these notes relates "                              ," as he shared with BAG meeting attendees. (Jeffries Decl. Ex. 6 (DeSantis Tr. 181:12-14).)

671.   Crane "

" (Jeffries Decl. Ex. 2 (Crane Tr. 110:25-111:13).)

672.   With respect to attendance at the September 30, 2015 BAG meeting, Crane stated:
"                                   ." (Jeffries Decl. Ex. 2 (Crane Tr. 106:11-13).)

673.   DeSantis updated Crane on the BAG meeting, including the specific comments and experiences that Cardwell shared.  (Jeffries Decl. Ex. 6 (DeSantis Tr. 181:19-23).)

674.   DeSantis's discussion with Crane related to the notes that she took on or around October 5, 2015. (Jeffries Decl. Ex. 6 (DeSantis Tr. 181:24-125:8).)

675.   DeSantis had the following reactions to Cardwell's comments at the meeting:



" (Jeffries Decl. Ex. 6 (DeSantis Tr. 175:14).)

(Jeffries Decl. Ex. 6 (DeSantis Tr. 176:20-177:3).)

." (Jeffries Decl. Ex. 6 (DeSantis Tr. 177:16-21).)

(Jeffries Decl. Ex. 6 (DeSantis Tr. 178:3-18).)

676.   Referencing her October 5, 2015 "notes," DeSantis told Crane:



(Jeffries Decl. Ex. 6 (DeSantis Tr. 181:24-182:12).)

677.   When asked why Cardwell's name appeared in her notes, DeSantis responded:



(Jeffries Decl. Ex. 6 (DeSantis Tr. 184:4-13).)

678.   DeSantis also testified:





(Jeffries Decl. Ex. 6 (DeSantis Tr. 186:9-16).)

679.  DeSantis testified as follows to the following questions:



(Jeffries Decl. Ex. 6 (DeSantis Tr. 186:25-188:12).)

680.  DeSantis's notes from the October 5, 2015 meeting with Crane contain the following typed and handwritten comments (except for the bracketed language):



(Jeffries Decl. Ex. 74 (DPW_SDNY-000144527); ECF 209, Defs. Answer ¶ 81.)

681.   In addition to creating notes of her October 5, 2015 meeting with Crane, DeSantis also created notes from the September 30, 2015 BAG meeting on or around September 30, 2015. (Jeffries Decl. Ex. 73 (DPW_SDNY-000168082).)

682.   DeSantis's notes of the September 30, 2015 BAG meeting include instances in which Cardwell's name is handwritten in close proximity to the following comments:



(Jeffries Decl. Ex. 73 (DPW_SDNY-000168082 - DPW_SDNY-000168083).)

683.   During the BAG meeting, ███████████████████████████████████
█████████████████████████████████████████████." (Jeffries Decl. Ex. 6 (DeSantis Tr. 179:6-12).)

684.   DeSantis thought Cardwell's ████████████████" because ████████
███████████████████████████████████████████." (Jeffries Decl. Ex. 6 (DeSantis Tr. 179:6-12).)

685.   When asked "████████████████████████████████████████████
████████████████████████████," DeSantis responded:



(Jeffries Decl. Ex. 6 (DeSantis Tr. 192:21-193:20).)

686.    DeSantis testified as follows when asked who she discussed the September 30, 2015 complaint with:



(Jeffries Decl. Ex. 6 (DeSantis Tr. 188:14-191:24).)

687.    On September 23, 2015, Chudd submitted an individual review for Cardwell and answered "no basis" for the following prompts and questions that appeared on the evaluation form:

    a)    "Overall, do you feel this lawyer 1s performing materially behind, with or ahead of the lawyer's class"?

    b)    "Ability to identify and analyze legal issues"

    c)    "Knowledge of relevant substantive law"

    d)    "Understanding of accounting issues and ability to work with quantitative concepts"

    e)    "Understanding of the overall business context {including the relationship between the business problems and legal issues presented)"

    f)    "Presentation skills"

g)   "Negotiation skills"

h)   "Working hard"

i)   "Being thorough, well organized and efficient"

j)   "Taking initiative/ownership of work product or project"

k)   "Deal management skills"

l)   "Ability to handle multiple matters simultaneously"

m)   "Willingness to volunteer and pitch-in wherever necessary (take on new work, review standard forms, help with recruiting etc)"

n)   "Self-confidence/maturity"

o)   "Judgment and common sense"

p)   "Standing with peers, Junior lawyers and staff"

q)   "Client management skills (including responsiveness to client needs)"

r)   "Focus on client development (including being proactive in developing relationships with individuals at the client and in identifying business opportunities and effectiveness in business pitches)"

(ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

688.   Chudd's 2015 individual review of Cardwell states:

a)   "I did not have much interaction with Kaloma on the [REDACTED] transaction. That said, we were very stretched on the transaction, and the impression that I got from the team was that they did not have confidence that Kaloma could interact directly with the client (as much as, for instance, some of the other first years could)."

(ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

689.   On January 10, 2017, while still an employee at Davis Polk, Cardwell filed a

"rebuttal" to Davis Polk's Position Statement that included the following comments:

a)   "Mr. Chudd's evaluation highlights, at best, the implicit bias to which the Firm was already subjecting Mr. Cardwell; even at this early stage of his tenure with the Firm, an M&A partner was evaluating him not on his actual performance, but on biased perceptions."  (ECF 200, TAC ¶ 483.)

690.   Cardwell testified as follows with respect to his staffing on Chudd's transaction and the September 30, 2015 complaint:

a)   "  "

(Jeffries Decl. Ex. 1, Cardwell Tr. 347:22-348:9).)

B.   *Knowledge - Chudd, Hudson, Reid, Bick, And Other Firm Partners Learned About Cardwell's September 2015 Complaint Via The Partners And Administrators On The Firm's Diversity Committee And Associate Development Department*

691.   In the Firm's NYSDHR Brief, Davis Polk represented:

a)   "Attendees at the meeting responded to Cardwell's observation by discussing the fact that it is not uncommon, particularly in the context of client concerns and high billable rates, not to include all members of teams on every call, particularly junior associates." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW SDNY-000000306).)

b)   "But contrary to Cardwell' s assertion that there was no 'follow[] up,' the Committee made note of the concern for future professional development discussions."

(Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW SDNY-000000306).)

692.   In September 2015, Chudd was asked by Fenner to deliver Cardwell's 2015 annual review, which typically took place at the Firm in December.  (Jeffries Decl. Ex. 71 (DPW_SDNY-000091956).)

693.   On September 22, 2015, Fenner emailed Chudd: "                          ." (Jeffries Decl. Ex. 85 (DPW_SDNY-000091957).)

694.   At the time of Fenner's September 22, 2015 email to Chudd, Cardwell was a "rising 2nd year" and became a second-year associate in September 2015. (ECF 209, Defs. Answer ¶ 71.)

695.    Hudson served as a staffing partner for the Firm's Capital Markets group during Cardwell's employment. (Jeffries Decl. Ex. 5 (Hudson Tr. 25:18-20).)

696.    On August 20, 2015, and September 9, 2015, Fenner sent M&A partners Oliver Smith and Brian Wolfe a list of the M&A rotators in Cardwell's class who would be permanently assigning to the M&A group in September 2015, and which associates would be doing a third rotation, including Cardwell. (Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

697.    Fenner's emails noted that Cardwell would be doing a third rotation in the Firm's Capital Markets group. (Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

698.    DeSantis met with Bick "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" (Jeffries Decl. Ex. 6 (DeSantis Tr. 223:3-10).)

699.    On September 3, 2015, Fabe emailed Reid:

    a) "



(Jeffries Decl. Ex. 75 (DPW_SDNY-000165054).)

700.    On September 4, 2015, Reid emailed Fabe (cc'ing the "Management Committee" listserv, Crane, and DeSantis) regarding Lawyering 101:

    a) "



(Jeffries Decl. Ex. 75 (DPW_SDNY-000165054).)

701.    On October 15, 2015, Fabe emailed Reid (cc'ing the "Management Committee" listserv, Crane, and DeSantis) with respect to Lawyering 101:



(Jeffries Decl. Ex. 75, DPW-SDNY-0000165053.)

702.    On October 22, 2015, Fabe emailed Reid (cc'ing the Management Committee" listserv, Crane, and DeSantis):

a)    '"

(Jeffries Decl. Ex. 75 (DPW_SDNY-000165053).)

703.    Lawyering 101 is a training for the Firm's first-year associates where the Firm's partners and staff provide an overview of the Firm, as well as professional skills programs and substantive training in a few key practice areas. (Jeffries Decl. Ex. 13 (DPW_SDNY-000143604 at p. 6 in the PowerPoint).)

704.    In 2015, the Firm's "⬛" was conducted between October 26, 2015 and October 29, 2015.  (Jeffries Decl. Ex. 13 DPW_SDNY-000143604 at p. 6 in the PowerPoint).)

705.    Cardwell started a rotation in the Firm's Capital Markets group in October 2015. (ECF 209, Defs. Answer ¶ 85.)

706.    Diversity Committee member Byron Rooney and Sophia Hudson served as staffing partners for Capital Markets during Cardwell's rotation in Capital Markets. (Jeffries Decl. Ex. 62 (DPW_SDNY-000144472); ECF 209, Defs. Answer ¶ 547; Third Amended Complaint, ECF 200 ¶ 626 at 171.)

707.  Hudson testified that as a staffing partner she would "█████████████

████████████████████████████████████████████████████████████

█████." (Jeffries Decl. Ex. 114, Hudson Tr. 28:10-20).) Cardwell began working on a transaction

with Hudson on or around October 26, 2015. (ECF 209, Defs. Answer ¶ 85.)

708.  Cardwell made a protected complaint at the September 30, 2015 BAG meeting

attended by Maurice Blanco and other members of the Diversity Committee.  The Diversity

Committee was briefed on the September 30, 2015 meeting.  Byron Rooney and other Diversity

Committee members received those updates.  (ECF 209, Defs. Answer ¶¶ 72-73; Jeffries Decl. Ex.

6 (DeSantis Tr. 172:19-20); Jeffries Decl. Ex. 73 (DPW_SDNY-000168082 - DPW_SDNY-

000168083).)

709.  On October 27, 2015, less than one month after the BAG meeting, Chudd and

Hudson served as co-"faculty" during one of the sessions that Davis Polk hosted during its

Lawyering 101 training program.  (Jeffries Decl. Ex. 130, DPW_SDNY-000143608).)

710.  On October 28, 2015, Crane emailed Fabe (cc'ing Monica Holland and DeSantis),

requesting performance reviews from Cardwell and other Black attorneys:

    a)  Crane:  ████████████████████████████████
             ████████████████████████

        Fabe:  "████████████████████████████████████████?"

    b)  Crane: "████████."

(Jeffries Decl. Ex. 76 (DPW_SDNY-000141939).)

711.  On November 6, 2015, after a white first-year associate, forwarded Cardwell an

email: ████████████████████████████████████████████████████

████████████████████████████"—Cardwell sent an email to ████████

█████, a Black associate at the time, where the two shared the following exchange:



Cardwell: "███████████████████████
██████████."

Black Associate: "████████████████

Cardwell: "█████████████████████████
████████████████████

Black Associate: ██████████████████
██████████████████████

Cardwell: ████████████████████████
████████."

(Jeffries Decl. Ex. 77 (DPW_SDNY-000100376).)

712.    On November 6, 2015, Jackson also told Cardwell that she "███████████

███████████████████████████████████

██████████." (Jeffries Decl. Ex. 78 (DPW_SDNY-000105125).)

713.    On November 6, 2015, Theodore W., a different White first-year M&A associate,

forwarded the same congratulatory email referenced in ¶ 710 *supra*, and in response Cardwell

again forwarded the email to ████████ stating: "████████████████

█████████████." (Jeffries Decl. Ex. 79 (DPW_SDNY-000100378).)

714.    On November 6, 2015, Cardwell emailed the more senior associate on the matter:

"████████████████████████████████

██████." (Jeffries Decl. Ex. 80, DPW-SDNY-000100381.)

715.    Following Cardwell's November 6, 2015 email to Andrew K., Jackson and

Cardwell shared the following exchange:

Cardwell: "████████."



(Jeffries Decl. Ex. 80 (DPW_SDNY-000100381).)

716.   On November 9, 2015, Hudson emailed Clausen with Cardwell's name in the subject line. Hudson requested to see Cardwell's reviews via the following exchange:

a) Hudson: "███████████████████████████████████████ ?"

b) Clausen: "████████████████████████████████████████ ?"

c) Hudson: "██████████████████████████████████████ "

(Jeffries Decl. Ex. 81 (DPW_SDNY-0001413522).)

717.   Hudson testified that she "████████████████████████████████████

████████████████████████ ." (Jeffries Decl. Ex. 5, Hudson Tr. 244:8-12).)

718.   With respect to how Hudson answered Clausen's question, she noted:

a) "████████████████████████████████████████████████
████████████████████████████████████████ "

(Jeffries Decl. Ex. 5 (Hudson Tr. 243:16-20).)

719.   As of November 9, 2015, Chudd's review for Cardwell had been completed.

720.   Later on November 9, 2015, Clausen followed up with Hudson about Cardwell:

a) "████████████████████████████████████████████
████████████████████████████ ." (Jeffries Decl. Ex. 82 (DPW_SDNY-000141821).)

b) "███████████████████████████████████████████" (Jeffries Decl. Ex. 82
(DPW_SDNY-000141821).)

### 2. Adverse Employment Action And Causal Connection

721. On November 16, 2015, Fenner emailed Chudd:



b) "████████████████████████████████"

(Jeffries Decl. Ex. 83 (DPW_SDNY-000091958).)

722. For younger associates, first or second year associates like Cardwell (at the time),

their "████████████████████████████████████████████████

████████." (Jeffries Decl. Ex. 4 (Bick Tr. 278:5-14).

723. Chudd provided Cardwell with an in-person annual review on December 18, 2015.

(ECF 209, Defs. Answer ¶ 115; Jeffries Decl. Ex. 84 (DPW_ SDNY-000027533).)

724. As to Cardwell's 2015 annual review meeting with Chudd, Cardwell explained:

a) "I recall the meeting being very short. I recall Mr. Chudd leading with some
compliments or positive feedback. I recall Mr. Chudd roughly speaking to
two potential areas of improvement, one of which relates to I believe
possibly asking more questions, the other relates to him telling me to not
think about the big picture so much." (Jeffries Decl. Ex. 1 (Cardwell Tr.
482:9-17).).

b) "I believe Mr. Chudd had knowledge of my September 30th, 2015
complaint at the time that this summary review was created. I believe that
complaint influenced certain comments that appeared in this evaluation."
(Jeffries Decl. Ex. 1 (Cardwell Tr. 489:11-16).).

c) "I believe the interpretations that appear in the summary review that
William Chudd created were influenced by the complaint that I made on
September 30th, 2015, and that their interpretation would not have appeared
had I not made that September 30th, 2015 complaint, and that that is a form
of retaliation." (Jeffries Decl. Ex. 1 (Cardwell Tr. 489:17-490:6).).

d) The answer is that this performance review was influenced by the September 30th, 2015 complaint that I made and then it was used by Mr. Chudd and the firm in a retaliatory manner because of the complaints that I made, namely those complaints made on September 30th, 2015." (Jeffries Decl. Ex. 1 (Cardwell Tr. 491:18-492:6).).

725.   In the chart below, the message that Fenner wrote for Cardwell's 2015 annual review appears in the left column and the message attributed to Chudd (and that appears in Cardwell's summary review form) appears in the right column as follows:

| Fenner's Review Message for Cardwell's 2015 Annual Review | Chudd's Review Message (As Memorialized in a Summary Review Form for Cardwell's 2015 Annual Review) |
|---|---|
| **Positives:**<br><br>"Seems engaged and eager, is hardworking and always willing to help."<br><br>**Areas for improvement**:<br><br>- "Increase responsiveness to email communications<br>- Improve communication with senior lawyers: (I) when a task is assigned without a deadline, he should ask the assigning attorney when they would like to see the draft first; (ii) should communicate timing effectively to avoid confusion;<br><br>- Focus on doing the tasks that have been assigned to him in a timely fashion and well (rather than pushing to do tasks that normally would be performed by more senior associates, which can understandably take a long time for him to do)."<br><br>(Jeffries Decl. Ex. 49 (DPW_SDNY-000167391).) | **Substance of evaluation (including … strengths and weaknesses in the reviewee's performance in the last 12 months, improvements, if any, from prior year's review**:<br><br>"Kaloma received praise for being engaged and eager, hardworking and always willing to help.<br><br>Reviewers also noted that he could be more responsive on email communication, and improve his communication with senior lawyers regarding task deadlines and deliverables.<br><br>He also seemed to overlook more basic task in favor of more substantive work, often at the detriment of being able to deliver on the more basic tasks."<br><br>"Kaloma needs to focus on delivering excellent work product on time and communicating his deadlines and timing. Once he does this, senior lawyers will feel more comfortable delegating more work to him."<br><br>(ECF 223-9 at 33, Buergel Decl. Ex. 9 (DPW_SDNY-000144388).) |

726. The following message appears in the summary review form attributed to Chudd for Cardwell's December 2015 annual review: "Kaloma asked for more direct real-time performance evaluations." (ECF 223-9 at 33, Buergel Decl. Ex. 9 (DPW_SDNY-000144388).)

727. On at least one occasion during Cardwell's employment, Hudson completed a summary review form for an associate's annual review documenting that the associate would be "████████████████████." The review stated that ████████████████████████████████." (Jeffries Decl. Ex. 86 (DPW_SDNY-000165899).)

728. In June 2016, the Firm and Bick conducted a midyear review for Cardwell and solicited a performance evaluation from Hudson.

729. Bick's Summary Review contained the comment: "Kaloma generally received positive reviews, with the notable exception of Sophia Hudson." (ECF 209, Defs. Answer ¶ 154.)

730. Hudson's June 2016 and September 2016 reviews were the first and second Davis Polk reviews submitted for Cardwell that answered "behind" directly in response to the question "do you feel this lawyer is performing materially behind, with or ahead of lawyer's class." (ECF 209, Defs. Answer ¶ 568.)

731. During his deposition, Cardwell answered "██" to the following questions:

    a) "████████████████████████████████████████" (Jeffries Decl. Ex. 1 (Cardwell Tr. 502:20-24).)

    b) "████████████████████████████?" (Jeffries Decl. Ex. 1 (Cardwell Tr. 503:3-5).)

732. "████████████████████████████████████████████████ ██████." (Jeffries Decl. Ex. 1 (Cardwell Tr. 184:9-185:8).) Specifically, Cardwell explained:

    a) "██████████████████████████████████████████

████████████████████████████████████████████ " (Jeffries Decl. Ex. 1 (Cardwell Tr. 505:4-9).)

733.    Associates can review a midyear review for reasons other than performance

deficiencies. (Jeffries Decl. Ex. 107, DeSantis Tr. 238:21-239 (testifying that ████████████

████████████████████████████████████████████████ ").). Mid-year reviews

"occur[] for a variety of reasons, including but not limited to a view that the associate has

performance deficiencies." (ECF 223-75 at 61, Buergel Decl. Ex. 75 (RFA No. 23).)

734.    DeSantis noted that the mid-year review label carries a negative connotation:

a) "████████████████████████████████████████████
████████████████████████. " (Jeffries Decl. Ex. 113, DeSantis Tr. 234:2-7).)

b) "████████████████████████████████████████████
████████████████ " (Jeffries Decl. Ex. 113, DeSantis Tr.
234:2-7).)

735.    Crane provided the following testimony concerning mid-year reviews:

a) "████████████████████████████████████████████
████████████ " (Jeffries Decl. Ex. 2
(Crane Tr. 42:25-43:6).)

b) "████████████████████████████████████████████
████ ." (Jeffries Decl. Ex. 2 (Crane Tr. 45:4-8).)

c) "████████████████████████████████████████████
████████ " (Jeffries Decl. Ex. 2 (Crane Tr. 274:12-21.)

d) When asked: "████████████████████████████████
████████████████████████████████████████████
████ " (Jeffries Decl. Ex. 2 (Crane Tr. 47:9-48:16)

### 3.  Pretext

736.    The Firm's NYSDHR Brief made the following representations regarding the type

of assessments and feedback Cardwell received prior to his January 2016 dinner with Reid:

a) "[D]espite meaningful, real-time feedback over the course of years, together with repeated interventions and second chances, Cardwell's performance has failed to improve." (Jeffries Decl. Ex. 8 (DPW SDNY-000000289).)

b) "Senior lawyers in the Credit group who worked with Cardwell noted performance issues that were troubling….The Firm delivered this feedback at the end of his Credit rotation, as part of its routine professional and training initiatives….Cardwell, according to a contemporaneous note, accepted the feedback and agreed." (Jeffries Decl. Ex. 8 (DPW SDNY-000000293).)

c) "[T]he fact remained that Cardwell's work was sufficiently unreliable that they were reluctant to provide him with responsibility for time-critical tasks….The Firm delivered this feedback to Cardwell." (Jeffries Decl. Ex. 8 (DPW_SDNY-000000294).)

d) "Cardwell knew what was expected of him" (Jeffries Decl. Ex. 8 (DPW_SDNY-000000294).)

e) "Serious performance problems, echoing those that had emerged in his first two rotations, became apparent during his third rotation in the Capital Markets group. Indeed, the great weight of senior attorneys' experience with Cardwell during his third rotation pointed to very serious difficulties…In one instance, Cardwell's "diligence and other preparatory tasks were completed so slowly that a second junior associate needed to be staffed." Cardwell failed adequately to balance the need for "great attention to detail" and the need to ''meet the time demands of [the] transaction/client." And Cardwell's failure to "ask for clarification in a timely manner" risked "jeopardiz[ing] the timing of providing work product to a client."

Also as before, there were serious problems with the substance of Cardwell's work. A reviewer noted that Cardwell's delegation practices were not in keeping with the Firm's expectations, and described Cardwell as "behind" his class even when it came to performing "routine" tasks. To the question whether she would "work with this person again," this reviewer answered "no." Once again, the Firm delivered this feedback to Cardwell, both in real time and at the end of his third rotation. For example, one partner, Sophia Hudson, provided Cardwell with detailed feedback over the course of their work together and spoke with him about the need to raise the substantive quality of his work." (Jeffries Decl. Ex. 8 (DPW SDNY-000000295).)

f) "They did ask for feedback, and Reid offered it….As it related to Cardwell, Reid emphasized the critical importance for young lawyers of paying close attention to all of the details of their assignments because without exhibiting

the ability to handle the details, senior lawyers would not be comfortable relying on his work in any respect." (Jeffries Decl. Ex. 8 (DPW SDNY-000000296).)

737.    Reid testified as follows regarding Cardwell's performance up until January 2016:



(Jeffries Decl. Ex. 7 (Reid Tr. 185:23-187:24).)

## E.  JANUARY 2016 COMPLAINT

### 1.  Protected Activity

738.    On December 1, 2016, Reid participated on a panel discussion: "Finding Bliss in the Future of Legal Service & Practice" at the New York City Bar. Hudson, Crane, and Cardwell attended the event. (ECF 209, Defs. Answer ¶ 98.)

739.    DeSantis discussed Cardwell's September 30, 2015 comments with Crane on or around October 5, 2015, and on October 28, 2015, Crane requested Cardwell's performance reviews. On November 9, 2015, Hudson requested Cardwell's reviews; and on January 11, 2016, Reid requested Cardwell's reviews. (Jeffries Decl. Ex. 7 (Reid Tr. 181:7-17); Jeffries Decl. Ex. 76 (DPW_SDNY-000141939); Jeffries Decl. Ex. 81 (DPW_SDNY-0001413522).)

740.    Regarding his request to see Cardwell's reviews, Reid testified:

a)   " ." (Jeffries Decl. Ex. 7 (Reid Tr. 181:12-17).)

741.    Reid also testified:



(Jeffries Decl. Ex. 7 (Reid Tr. 151:25-152:8).)

742.    Reid testified as follows concerning discussions of Cardwell prior to March 2017:

(Jeffries Decl. Ex. 7 (Reid Tr. 156:22-157:6).)

111

743.    On January 12, 2016, Crane and the Firm's Management Committee members (i.e.,

Reid, Bick, and Rouhandeh) were a part of a chain of emails related to Cardwell.

744.    Reid provided the following context for his relationship with Cardwell:



(Jeffries Decl. Ex. 7 (Reid Tr. 77:25-78:12).)

745.    One day before, Cardwell and ⬛⬛⬛, a Black associate at the time, had

dinner with Reid on January 21, 2016, ⬛⬛ sent Cardwell an email with ⬛⬛⬛" as the

subject line, and containing the following questions:



(Jeffries Decl. Ex. 88 (DPW_SDNY-000143444).)

746.    Reid remembered discussing some of the "⬛⬛⬛" in the email. (Jeffries

Decl. Ex. 7 (Reid Tr. 172:7-173:19).)

747.    Reid provided the following testimony regarding the dinner:





Q:  "█████████████████████████████████████████████████████"

A: "████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████" (Jeffries Decl. Ex. 7 (Reid Tr. 160:18-162:5).)

Q: "█████████████████████████████████████████████████████"

A. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



."

Q: "███████████████████████?"

A. ███████████████████████████████████████████████████." (Jeffries Decl. Ex. 7 (Reid Tr. 162:18-164:23).)

Q: "████████████████████████████████████████████████████████████"

A. "██████████████████████████████████████████████████████████████████████████████████████████████████."

Q. "████████████████████████████████████████████████████?"

A. "█████████████████████."

(Jeffries Decl. Ex. 7 (Reid Tr. 165:8-165:24).)

748.    Cardwell testified that:

a)



"

(Jeffries Decl. Ex. 1 (Cardwell Tr. 358:22-360:10).)

749.    "Cardwell spoke at length about implicit bias both conceptually and in relation to the race-based discrimination he himself had experienced during his time at the Firm. During the conversation Mr. Cardwell also inquired about how the Firm insulated assessments and conclusions about performance reviews from the effects of bias and whether there were mechanisms in place to ensure that feedback was reviewed between the reviewing attorney and the associate who received it."  (ECF 200, TAC ¶ 105.)

750.    On January 21, 2016, following the dinner, Cardwell memorialized parts of his discussion with Reid in a journal.  These contemporaneous notes include the following comments:

    a)   "[Tom] was noticeably uncomfortable & unhappy (and intentionally displaying discomfort) uncomfortable & unhappy [sic] to hear Sheila and I tell him about experiences in which we were treated by other attorneys as if we don't matter, aren't worth getting to know or investing in, and so on."

    b)   "Sheila and I talked about associates who are unwilling to make eye contact, use our names or give us timely feedback that would help us grow as attorneys."

    c)   "We talked about implicit biases."

    d)   "Tom is waiting to evaluate the consultant before moving forward with a plan."

    e)   "I described that implicit bias harms the person acting on such biases in that people's cognitive processes are being taken up by racialized subconscious thoughts."

    f)   "It clear [sic] that Tom thinks much of the social isolation is due to lawyers (and DPW lawyers) lacking social skills. I mentioned that I used to think that about some attorneys but then I noticed that they turned into Leonardo DiCaprio when dealing with partners."

    g)   "Sheila and I discussed issues with others simply not looking at us as if we will be around or leaders of the firm. Tom didn't completely agree but I think he got the point."

    h)   "Throughout the convo Sheila and I raised a number of suggestions that the firm should consider. Tom requested that the suggestions be things he can enact immediately, that they be simple, & easy for people to repeat. He said

115

he doesn't want complex solutions,, suggesting that he has to repeat things over and over with lots of examples for partners & attorney to get on board."

i) "[Tom] also mentioned that things must be done incrementally and that some white male associates have questioned why some women were able to have dinner with him. He basically was saying he & the Firm has to be careful about creating certain perceptions b/c white guys will throw a tantrum."

j) "We discussed changing 101 in order to stress to attorneys that the firm expects attorneys to get to know other attorneys."

k) "We discussed (at length) how attorneys give feedback and that it's often too late, not helpful or racialized."

l) "Tom said he and we have to be cautious to not create an impression that we're not focusing becoming excellent attorneys at the firm or focusing on things other than the basic/foundation necessary to succeed there/at the firm."

(ECF 223-20 at 2-8, Buergel Decl. Ex. 20.)

751.   At all times during Cardwell's employment, Davis Polk's Complaint Procedure policy included the following provisions:



(Jeffries Decl. Ex. 10 (DPW SDNY-000000760); Ex. 11 (DPW SDNY-000000655).)

752.   When asked whether Reid spoke with Bick about his dinner with Cardwell, Reid

stated: ███████████████████████████████████████████████████████

█████████████████████████." (Jeffries Decl. Ex. 7 (Reid Tr. 185:7-10).)

753.   On January 26, 2016, Cardwell sent then-associate ██████████ an email outlining

follow-up items regarding their meeting with Reid.  The cover email read: "████████████

███████████████████████████████████████████████████████████████

████████████████████" and listed the following items:



(Jeffries Decl. Ex. 89 (DPW_SDNY-000032059).)

2.  *Knowledge Of September 2015 And January 2016 Complaints*
    *(Bick, Reid, Wolfe, Oliver Smith)*

754.    Davis Polk's management committee (Reid, Bick, James Rouhandeh), staffing partners (e.g., Hudson, Wolfe, Oliver Smith), and other Davis Polk partners learned about the substance of Cardwell's race-related comments about exclusion and bias and the Firm's performance evaluation and feedback systems through the Firm's trainings and discussions on implicit bias, as well as the Diversity Committees meetings with BAG and the Firm's other Affinity Groups. (Jeffries Decl. Ex. 6 (DeSantis Tr. 192:21-193:20).)

755.    Davis Polk provided the following interrogatory response:

   a) Interrogatory No. 17: "Identify all partners and managers who are responsible for (or have participated in) assessing whether associate performance reviews or summary reviews are being, have been, or have the potential to be completed in a discriminatory or retaliatory manner (or influenced or affected by discrimination or retaliation)."

   b) Response: "Davis Polk states that members of its Human Resources Department, including without limitation Sharon Crane, are familiar with the Firm's annual performance review and summary review process, and with the Firm's efforts to ensure that the Firm's policies and practices further its goals of diversity and inclusion, as are members of the Firm's Diversity Committee."

(Jeffries Decl. Ex. 32 (Rog No. 17).)

756.    Reid believed that Cardwell raised issues about "███████████████████████ ███████ and Reid noted that "███████████████████████████████████ ██████████" and that the Firm had "████████████████████████████████████."

(Jeffries Decl. Ex. 7 (Reid Tr. 164:7-13).)

757.    According to Reid's remarks during the January 2016 dinner, many Davis Polk partners (i) believed that existing research confirms Black and other minority attorney groups experience bias in the workplace and at Davis Polk, and also (ii) believed that they themselves are fair and would never act with bias against attorneys from those groups. (ECF 200, TAC ¶ 108.)

758.    Reid acknowledged that during their dinner, Cardwell raised issues related to "█████ ████████████████████" and "██████████████████████████████ ████████████████████████████████████████████████████████████████." (Jeffries Decl. Ex. 7 (Reid Tr. 162:20-163:8).)

759.    In response to Cardwell's questions during their January 2016 dinner about written reviews and whether anyone was reviewing them for accuracy and potential bias, Mr. Reid mentioned that he and the Firm were waiting to evaluate a certain diversity and inclusion consultant before "moving forward with a plan."  (ECF 200, TAC ¶ 106.)

760.    Reid told Cardwell during their January 2016 dinner that the problem of being noticed came up "████████████████████████████████████████████████ █████████████████████████████████." (Jeffries Decl. Ex. 7 (Reid Tr. 163:9-185:8).)

761.    Reid testified that during "████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████████████." (Jeffries Decl. Ex. 7 (Reid Tr. 136:24-137:10).)

762.    "████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████" (Jeffries Decl. Ex. 7 (Reid Tr. 44:5-12).)

763.    During Cardwell's employment, the Firm had an annual firm meeting "████ ████████████████████████████████." (Jeffries Decl. Ex. 7 (Reid Tr. 133:18-22).)

764.    In February 2016, the Firm conducted a partner training during its Annual Partner meeting on how microinequities and unconscious bias, and the perception of these, affect daily



interactions and team dynamics, and strategies for reducing them. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144208).)

765.    The February 2016 partner training included a session that was facilitated by VallotKarp, a diversity and inclusion consultant. It included ▮▮▮▮▮▮▮▮▮▮" for partners. (Jeffries Decl. Ex. 91 (DPW_SDNY-000000474); Jeffries Decl. Ex. 8 (DPW_SDNY-000000305).)

766.    On or around September 30, 2015, Holland commented that the Firm would bring in a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," and that members of the Firm's Diversity Committee helped evaluate and select VallotKarp to conduct a training with the Firm's partners. (Jeffries Decl. Ex. 73, DPW-SDNY-000168086.)

767.    On February 5, 2016, VallotKarp presented a slide deck to Firm partners entitled: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (Jeffries Decl. Ex. 91 (DPW_SDNY-000000474).)

768.    Similar to the presentations used by consultants during Davis Polk's Lawyering 101 program in 2015, the deck from VallotKarp's February 2016 presentation was reviewed and revised with input from DeSantis and/or Fabe. (Jeffries Decl. Ex. 7 (Reid Tr. 44:5-12).)

769.    The deck reflected the following goals, recommendations, and best practices:





(Jeffries Decl. Ex. 91 (DPW_SDNY-000000474).)

770.    The presentation's slides discussed how associates experienced law firms, and included reports that examined the extent certain groups (e.g., White men, White Women, Men of Color, Women of Color).  Respondents from those surveys/studies reported the following:

a)  "█████████████████████████"

b)  "██████████████████████████████████████"

c)  "████████████████████"

d)  "██████████████████████"

(Jeffries Decl. Ex. 91 (DPW_SDNY-000000479).)

771.    VallotKarp's presentation stated that certain behaviors related to excluding individuals, discouraging participation, devaluing others' contributions, and "█████████████" may or may not be linked to bias. (Jeffries Decl. Ex. 91 (DPW_SDNY-000000480).)

772.    VallotKarp's presentation confirmed that "████████████████████████████████ ████████████████████" certain exclusionary behaviors "███████████." (Jeffries Decl. Ex. 91 (DPW_SDNY-000000480).)

773.    A consultant presented a slide to Davis Polk partners that reported "████████ ██████████████████████████████" may include the following reactions:

███████████████



(Jeffries Decl. Ex. 91 (DPW_SDNY-000000482).)

774.  The diversity and inclusion consultant also presented a slide to Davis Polk partners during the 2016 annual meeting with the following recommendations and best practices:



(Jeffries Decl. Ex. 91 (DPW SDNY-000000494).)

775.  VallotKarp's presentation had a slide that read:



(Jeffries Decl. Ex. 91 (DPW SDNY-000000495).)

776.  The presentation also had a slide describing that, according to at least one study, it appears that "confirmation bias" can lead law firm partners to rate a "Caucasian" associate as having better written work product over an "African American" associate—even when the law firm partners were evaluating the same exact memo (with merely a different name listed as the author). (Jeffries Decl. Ex. 91 (DPW SDNY-000000485).)

777. The presentation also reported that ████████████████ ██████████████████." (Jeffries Decl. Ex. 91 (DPW SDNY-000000480).)

778. The presentation also reported that ████████████████ ██████████████." (Jeffries Decl. Ex. 91 (DPW SDNY-000000481).)

779. On February 25, 2016, Davis Polk's Management Committee presented a Management Committee Report to the Firm's associates during a firm-wide townhall meeting. Their presentation included several slides from VallotKarp's February 5, 2016 presentation. (Jeffries Decl. Ex. 92 (DPW_SDNY-000144242).)

780. The Management Committee Report presented to the Firm's associates during a firm-wide townhall meeting, specifically included a slide stating that certain behaviors related to excluding individuals, discouraging participation, devaluing contribution, and micro-inequities may or may not be linked to bias. (Jeffries Decl. Ex. 92 (DPW_SDNY-000144244).)

781. Their presentation described examples of groups engaging in the same behavior, but nonetheless experiencing and/or receiving different interpretations and perceptions concerning the same conduct. (Jeffries Decl. Ex. 92 (DPW_SDNY-000144246).)

782. The presentation also included a slide that stated:

a) 

(Jeffries Decl. Ex. 91 (DPW SDNY-000000476).)

3. **September 2015 And January 2016 Complaints: Adverse Employment Actions & Causation**

   a. *Increased Scrutiny Via Additional Assessments And Mid-Year Reviews*

783.    On March 30, 2016, Fenner sent M&A partners Wolfe and Oliver Smith an email that announced that Cardwell and another associate in his class "███████████████████ ██████████████████████████████████████████████████ ███████████████████████." (Jeffries Decl. Ex. 93 (DPW_ SDNY-000105367).)

784.    On June 2, 2016, Fabe emailed Fenner to ask if she had a few minutes to discuss Cardwell and another Black M&A associate ("Associate 2"). (Jeffries Decl. Ex. 94 (DPW_SDNY-000165357).)

785.    Associate 2 is Black and was an assigned M&A associate in 2016, but despite being consistently rated "with" or ahead of their class in 2013, 2014, and 2015, Associate 2's hours were low in 2016 (as noted in his summary reviews). Their summary reviews contained assessments that Davis Polk's diversity consultants had on February 5, 2016 described as possibly being caused by exclusionary and biased interactions. (Jeffries Decl. Ex. 55, DPW-SDNY-0000165928.)

786.    Around March of 2016, Fabe evaluated and categorized perceptions of the Firm's Black, Hispanic, Asian (4th year and senior only) and LGBT associates' performance and potential standing relative to their "class." (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

787.    Around March of 2016, Fabe documented that non-performance issues had impacted perceptions of Cardwell's performance and performance evaluations, including his Third Rotation, exclusion-related issues in the Firm's M&A group during his second rotation, and his complaints about such exclusion. (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

788.    The Diversity Committee did not similarly assess the performance or performance evaluations for associates who were not Black, Hispanic, Asian (4th year and senior only), "Two or More Races" or LGBT associates. (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

789.   Assessments created from the selective compilation of "diverse associates'" reviews does not evaluate Cardwell relative to the broader group of associates in his "class." (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

790.   During the January 2016 dinner, Reid acknowledged that the Firm and practice group leaders do not automatically accept every assessment or criticism of an associate as accurate. He recognized that the Firm (or practice group) weights these assessments before making conclusions about an associate's overall performance or contribution.  (ECF 200, TAC ¶ 107.)

791.   On March 30, 2016, Fabe provided the following performance and non-performance related assessments for the Firm's Black associates:

| Black Associate | Fabe's Assessments |
|---|---|
| Black Associate A | ████ |
| Black Associate B | ████ |
| Black Associate C | ██████████ |
| Black Associate D | █████████████ |
| Black Associate E | █████████████████ |
| Black Associate F | █████████████ |
| Black Associate G | ███ |
| Black Associate H | ██████████ |
| Black Associate I | ███████████████ |
| Black Associate J | ██████████ |
| Black Associate K | ████████████████ |
| Black Associate L | ████████████████ |
| CARDWELL | ████████ |
| Black Associate M | ██████████████████ |
| Black Associate N | ███████████ |

| Black Associate | Fabe's Assessments |
|---|---|
| Black Associate O | ████████████████████████ |
| Black Associate P | ██████████████ |
| Black Associate Q | ██████████████ |

(Jeffries Decl. Ex. 90, (DPW-SDNY-000165512).)

792.    Unlike other associates, this list does not describe or specify any performance issues for Cardwell; it simply notes "███." (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

793.    On June 14, 2016, Fabe sent an email noting that the Diversity Committee intended to discuss with the Management Committee the following:

a)    "████████████████████████████████

(Jeffries Decl. Ex. 101 (DPW_SDNY-000164765 - DPW_SDNY-000164767).)

**b.  June 2016 Mid-Year Review**

794.    On June 10, 2016, Fabe emailed DeSantis:



a)    "████████████████████████████

(Jeffries Decl. Ex. 95 (DPW_SDNY-000164841).)

795.    Some of the "action items for some of the associates" that Fabe "added" for Cardwell and other associates are the same "action items" that appeared in VallotKarp's February 5, 2016 presentation. (Jeffries Decl. Ex. 95, DPW-SDNY-000164865; Jeffries Decl. Ex. 91 (DPW_SDNY-000000495).)

796.    On June 14, 2016, one after before DeSantis and Fabe met with Bick on June 13, 2016 to discuss the Firm's Black associates, Fabe sent an email to herself that included a document

entitled "  (Jeffries Decl. Ex. 101

(DPW_SDNY-000164765 - DPW_SDNY-000164767).)

797.   The Draft Diversity Committee Agenda noted that DeSantis "█████████████

███████████████████████████████████" and further indicated:

a)   "███████████████████████████████

████████████████████████████████

(Jeffries Decl. Ex. 101 (DPW_SDNY-000164765).)

798.   On June 14, 2016, Fabe sent an email to the Diversity Committee listserv that

attached a draft presentation.  They contained with the following comments:





(Jeffries Decl. Ex. 102, DPW_SDNY-000165497 to - 98).)

799.    On June 13, 2016, DeSantis and Fabe met with Bick to discuss the career development of Black associates in the Corporate department, including Cardwell. (ECF 209, Defs. Answer ¶ 127.)

800.    Bick provided the following testimony about Cardwell's 2015 complaint:



Q:
A. "                                  "

(Jeffries Decl. Ex. 4 (Bick Tr. 184:25-185:8).)

801.    On June 13, 2016, DeSantis emailed Fenner and Fabe: "Can we talk tomorrow about how we can get John Bick what he asked for with the least amount of negative blow back for [Cardwell]? Worried about the 'mid year review' label." (ECF 209, Defs. Answer ¶ 129.)

802.    On June 13, 2016, Fabe replied: "Yes—agree it is sensitive."  (ECF 209, Defs. Answer ¶ 134.)

803.    Fenner replied: "Yes agree, especially since he wasn't given any indication in his last annual review [meeting] that we would be checking in mid-year." (ECF 209, Defs. Answer ¶ 134).

804.    On June 13, 2016, DeSantis sent an email to an Associate Development Coordinator stating: "[Please] hold off on distributing any reviews on Kaloma. Alicia [Fabe] and Carolina [Fenner] and I want to discuss. [Thanks]." (ECF 209, Defs. Answer ¶ 135.)

805.    DeSantis testified as follows when asked about Cardwell's performance:



(Jeffries Decl. Ex. 113, DeSantis Tr. 224:7-11).)

806.    On June 17, 2016, Nicole Katz, a coordinator in the Associate Development Department, asked: "Can you please confirm for me whether the reviewer list in my previous email

below works for reviewing Kaloma? Since this is a sensitive review, I'm not sure if senior associates should be included as reviewers…." (ECF 209, Defs. Answer ¶ 135.)

807.   Around June 20, 2016, the Associate Development Department sent emails to senior attorneys with whom Cardwell had worked, including Hudson, requesting feedback on his performance. (ECF 209, Defs. Answer ¶ 137.)

808.   On June 20, 2016, Clausen emailed Hudson:

a)   ""

(ECF 223-28 at 2, Buergel Decl. Ex. 28.)

809.   On June 23, 2016, Bick received Cardwell's reviews. (ECF 209, Defs. Answer ¶ 148.)  Bick maintains that ." (Jeffries Decl. Ex. 4 (Bick Tr. 291:25-292:4).)

810.   On June 29, 2016, DeSantis emailed Bick:

a)   ""

811.   Bick did not conduct a mid-year review in 2016 for any M&A associate other than Cardwell. (ECF 209, Defs. Answer ¶ 160.)

812.   Cardwell testified that:

a)   "

130



." (Jeffries Decl. Ex. 1, Cardwell Tr. 506:8-17).)

b) "

."

(Jeffries Decl. Ex. 117, Cardwell Tr. 507:6-508:10).)

813.    On June 30, 2016, Bick emailed Cardwell: "Let me know when you have a spare moment to discuss another research assignment re: [REDACTED]." (ECF 209, Defs. Answer ¶ 144.)

814.    After Cardwell arrived, Bick spent a few minutes describing the additional research assignment and then pulled out and opened a folder, stating: "I know you asked for feedback, so I figured I'd take a few minutes to go through your reviews." (ECF 200, TAC ¶ 145.)

815.    Cardwell immediately became concerned because he had not requested a performance review or non-real time feedback from anyone at the Firm and because, at this stage in his career, Cardwell had no knowledge that anyone at Davis Polk received this type of unannounced, mid-year face-to-face "review." (ECF 200, TAC ¶ 146.)

816.    During the meeting on June 30, 2016, Bick stated: "It's been noted on a few occasions that you have a pattern of missing deadlines." Cardwell responded: "That feedback is

extremely surprising. I'm sitting here wracking my brain and I'm struggling to think of any deadlines that I've missed, and I can't think of any. I haven't missed any deadlines. Can you provide examples of 'deadlines' that I missed?" (ECF 200, TAC ¶ 150.)

817.    Bick replied: "Well, don't think of it as deadlines" and proceeded to discuss general timing critiques that Cardwell believed at the time were phrased so vaguely that no associate would have been able to assess, verify, or dispute them. (ECF 200, TAC ¶ 151.)

818.    Cardwell informed Bick that his feedback was inconsistent with what had been communicated to Cardwell and that such feedback had never been communicated orally or in writing to Cardwell prior to their conversation. Cardwell asked Bick for additional information, including to be provided with any specific examples, but Bick did not provide any examples or the names of any reviewers who purported held such beliefs. (ECF 200, TAC ¶ 153.)

819.    Cardwell asked if Bick could go back to the reviewers and try to learn what the reviewers could possibly be referring to. Bick indicated that he would but never followed up with Cardwell or subsequently provided Cardwell with any specific examples. (ECF 200, TAC ¶ 155.)

820.    Immediately after the meeting, Cardwell contacted a Black senior Davis Polk associate and informed that associate that Bick just conducted a surprise face-to-face, mid-review and opened the discussion with a blatant lie (i.e., that Bick was giving the review in response to a request by Cardwell). (ECF 200, TAC ¶ 156.)

821.    Hudson's June 2016 and September 2016 reviews were the first and second Davis Polk reviews submitted for Cardwell that answered "behind" directly in response to the question "do you feel this lawyer is performing materially behind, with or ahead of lawyer's class." (ECF 209, Defs. Answer ¶ 568.)

**c. Membership As A Full Member Of The M&A Group Effectively Revoked And Career And Professional Development Opportunities Minimized**

822.    Bick gave Cardwell a research assignment on or around June 30, 2016.  After Cardwell emailed Bick the research memo on July 19, 2016, Bick did not respond to the specific email by return email to Cardwell. (ECF 209, Defs. Answer ¶ 161.)

823.    Cardwell sent Bick a follow-up email on July 26, 2016 about the memo.  Bick did not respond and did not have any further communication about the memorandum. At that time, Bick's office was two doors away from Cardwell's office. (ECF 209, Defs. Answer ¶ 162.)

824.    On June 28, 2016, Clausen emailed Cardwell and asked him to reach out to a senior M&A associate to assist M&A partner Gar Bason on a non-deal assignment. Cardwell agreed and was staffed on the assignment. (ECF 209, Defs. Answer ¶ 208.)

825.    On August 15, 2016, a senior M&A associate sent Cardwell an email and provided the following feedback to Cardwell regarding Cardwell's work on the assignment that Clausen staffed Cardwell on in June 2016:

> a)    "I'm so sorry it took me forever to review this. Very good work on it. Attached please find my comments/thoughts. Some items I thought we could [revert back to the original language as opposed to using your edits] just to minimize changes. Please let me know if it would be helpful to discuss."

(ECF 209, Defs. Answer ¶ 249.)

826.    On August 18, 2016, Cardwell sent an email to M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis and cc'd the senior associate who had instructed Cardwell to email those partners with a draft agreement  that Cardwell and the senior associate reviewed and revised. There is no record of a written or other response to that email. (ECF 209, Defs. Answer ¶ 244.)

827.    On September 7, 2016, Cardwell sent a follow-up email to M&A partners Arthur

Golden, Gar Bason Jr., and Michael Davis (and cc'd the senior associate who instructed Cardwell

to email those partners). There is no record of a written or other response to that email. (ECF 209,

Defs. Answer ¶ 245.)

828.    On September 9, 2016, Cardwell sent a third email to M&A partner Gar Bason Jr

and cc'd Arthur Golden and the senior associate. There is no record of a written or other response

to that email. (ECF 209, Defs. Answer ¶ 247.)

829.    Birnbaum did not contact Cardwell "via individualized" email between June 14,

2016 and August 31, 2017. (ECF 209, Defs. Answer ¶ 299.)

830.    Wolfe did not contact Cardwell "via individualized" email between April 13, 2016

and January 1, 2018. (ECF 209, Defs. Answer ¶ 300.)

831.    Crane, the Firm's Executive Director of Personnel, went about 593 days (from

about May 18, 2016 - January 1, 2018) without sending Cardwell any emails directed to Cardwell's

individual email address. (ECF 209, Defs. Answer ¶ 360.)

832.    Monica Holland, partner and Chair of the Firm's Diversity Committee, went about

584 days (i.e., from about May 27, 2016 - January 1, 2018) without sending Cardwell any emails

directed to Cardwell's individual email address. (ECF 209, Defs. Answer ¶ 360.)

833.    Maurice Blanco, partner and Diversity Committee member, went about 584 days

(i.e., from about May 27, 2016 - January 1, 2018) without sending Cardwell any emails directed

to Cardwell's individual email address. (ECF 209, Defs. Answer ¶ 360.)

834.    Byron Rooney, partner and Diversity Committee member, went about 670 days

(i.e., from about March 2, 2016 - January 1, 2018) without sending Cardwell any emails directed

to Cardwell's individual email address. (ECF 209, Defs. Answer ¶ 360.)

835.    Kyoko Takahashi Lin, partner and Diversity Committee member, went about 458 days (from about September 30, 2016 – January 1, 2018) without sending Cardwell any emails directed to Cardwell's individual email address. (ECF 209, Defs. Answer ¶ 360.)

836.    Sartaj Gill, partner and Diversity Committee member, went approximately 730 days (i.e., he did not email Cardwell at any point in 2016 or 2017 without sending Cardwell any emails directed to Cardwell's individual email address. (ECF 209, Defs. Answer ¶ 360.)

### 4. Pretext

837.    Bick's Summary Review form for the June 2016 midyear review stated that "Kaloma generally received positive reviews, with the notable exception of Sophia Hudson." (ECF 209, Defs. Answer ¶ 154.)

838.    ████████ was in Cardwell's associate class, completed a second rotation like Cardwell in the M&A practice group, did a third rotation like Cardwell in the Firm's capital markets group, and became a member of the M&A group after his third rotation like Cardwell, but did not get receive a mid-year review in 2016. (ECF 209, Defs. Answer ¶ 160; Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

839.    ████████ was in Cardwell's class, completed a second rotation like Cardwell in the M&A practice group, did a third rotation like Cardwell in the Firm's Capital Markets group, but did not get receive a mid-year review in 2016. (ECF 209, Defs. Answer ¶ 160; Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

840.    ████████ was in Cardwell's class, completed a second rotation like Cardwell in the M&A practice group, did a third rotation like Cardwell in the Firm's capital markets group, but did not get receive a mid-year review in 2016. (ECF 209, Defs. Answer ¶ 160; Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

841.　████████████████████ are not Black. (ECF 209, Defs. Answer ¶ 641.)

842.　In the Firm's NYSDHR Brief, Davis Polk represented that Bick and the Firm decided to give Cardwell a mid-year review in June 2016 because:

　　a)　"Cardwell approached the Associate Development department and asked for feedback; the Firm granted his request, solicited reviews, and assigned a partner to meet with him." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000294).)

843.　Bick explained the June 2016 midyear review as follows:





(Jeffries Decl. Ex. 4 (Bick Tr. 291:25-295:25).)

844.     Bick explained the events that preceded the June 2016 review as follows:





."

(Jeffries Decl. Ex. 4 (Bick Tr. 160:2-161:15).)

845.    The following sequence of events occurred: Bick spoke with DeSantis and Fabe on
June 13, 2016, Hudson received an email from Clausen on June 20, 2016, and Hudson completed
her review of Cardwell on June 23, 2016. (ECF 209, Defs. Answer ¶ 127; ECF 223-28 at 2, Buergel
Decl. Ex. 28.); ECF 223-53 at 22, Buergel Decl. Ex. 28 (DPW SDNY-000142003).)

846.    When asked about the mid-year review that Cardwell received, Hudson testified:





A: ███████████████████████
███████ ."

Q: ████████████████████████
████████████████████████ ”

A: ' ██████████████████ ."

Q: ' ██████████████████ ”

A: ' ███████████████████████
███████ ."

Q: ' ████████████████████████
████████████████████

A: ' ████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
██████████████████ ."

Q: ████████████████████████
████████████████

A: ████████████████████████
████████████████████████
███████████████ ”

Q: ' ████████████████████████
███████████████ ”

A: ' ████████████████████████
███████████ ."

Q: ' ████████████████████████
████████████

A: "█████████████████████████████████"

(Jeffries Decl. Ex. 5 (Hudson Tr. 203:20-209:5).)

### F. SEPTEMBER 2016 COMPLAINT

#### 1. Protected Activity And Knowledge

*a. Knowledge -- Davis Polk, Clausen, Crane, DeSantis, Fenner*

847.    On September 7, 2016, Clausen and Fenner exchanged the following emails:



a) Clausen: █████████████████████████

b) Fenner: '███████████████████████

(Jeffries Decl. Ex. 121 (DPW_SDNY-000141404).)

848.    On September 8, 2016, Clausen emailed Cardwell:

a) '███████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████████ "

(Jeffries Decl. Ex. 120 (DPW_SDNY-000099560).)

849.    Cardwell testified regarding his September 8, 2016 conversation with Clausen:



140



(Jeffries Decl. Ex. 1, Cardwell Tr. 375:11-378:22).)

850.   Clausen discussed her September 8, 2016 interactions with Cardwell with DeSantis, Fenner. (ECF 209, Defs. Answer ¶ 275.)

851.   As to her conversation with Clausen, DeSantis testified:



141



(Jeffries Decl. Ex. 6 (DeSantis Tr. 204:16-18; 209:3-10; 209:20-25).).

852.    As to her conversation with Crane, DeSantis testified:



a) ." (Jeffries Decl. Ex. 113, DeSantis Tr. 212:25-213:10.)

b) " (Jeffries Decl. Ex. 113, DeSantis Tr. 215:5-19.)

c) " ." (Jeffries Decl. Ex. 113, DeSantis Tr. 216:8-23.)

853.    When asked, " " DeSantis responded: " (Jeffries Decl. Ex. 113, DeSantis Tr. 210:23-211:3).).

854.   When asked: ███████████████████████████████████

███████████████████████████████████████████████████████████ "

DeSantis responded: "█████████████████████████████████████████

███████████████████████████████████████████ ." (Jeffries Decl. Ex.

113, DeSantis Tr. 211:13-22).).

855.   Other than Crane, DeSantis ████████████████████████████████

██████ " (Jeffries Decl. Ex. 113, DeSantis Tr. 217:14-18).).

856.   When asked to identify all sources for Davis Polk's assertion in its NYSDHR Brief

that Plaintiff "███████████████████████ ," Davis Polk identified Rocio Clausen,

Renee DeSantis, Alicia Fabe, and Carolina Fenner. (Jeffries Decl. Ex. 32 (Davis Polk Rog

Response No. 9).)

> b.   *Knowledge -- Reid, Bick, Birnbaum, Wolfe, And M&A*
>       *Partners Had Knowledge (Via Clausen, Crane, DeSantis,*
>       *And The Associate Development Department)*

857.   On September 9, 2016, Crane emailed DeSantis:

   a) "If you talk to John today about the other stuff please mention Kaloma. As
       discussed, he needs to be someone's project as soon as possible i.e. get work
       and hours and direct feedback. Given his conversation with Rocio [Clausen]
       I don't think it makes sense to wait to implement sometime in January after
       review season."

(ECF 209, Defs. Answer ¶ 275.)

858.   When asked if she mentioned Kaloma to John Bick as Sharon Crane instructed her

to do at the time, DeSantis could not recall.  (Jeffries Decl. Ex. 113, DeSantis Tr. 219:12-15.)

859.   DeSantis met with Sharon Crane weekly. (Jeffries Decl. Ex. 113, DeSantis Tr.

139:3-10.)

860. Reid testified that by virtue of Crane's position, ███████████████████████

████████████████" (Jeffries Decl. Ex. 7 (Reid Tr. 147:11-19).)

861. The Firm conducts performance reviews of its attorneys; solicits written performance reviews from individual reviewers; upon receiving the individual performance reviews; the Firm develops a "consensus message" or "consensus feedback" to be delivered to the attorney being reviewed; and one Firm partner is asked to deliver the Firm's consensus message to the associate during a subsequent meeting. (ECF 209, Defs. Answer ¶ 168.)

862. Fenner asked Kreynin to deliver Cardwell's annual review and the Firm's consensus message during the second half of December 2016. (ECF 209, Defs. Answer ¶ 324.)

863. The consensus message that an associate receives for their annual review follows a



" (Jeffries Decl. Ex. 4 (Bick Tr. 279:4-12).)

864. "Firm partners in Davis Polk's M&A group had a practice of meeting annually in or around September or October to discuss" M&A associates and their performance reviews. (ECF 209, Defs. Answer ¶ 92.)

865. Cardwell was on a list of M&A associates whose reviews were scheduled to be discussed during an October 5, 2016 meeting of the M&A group. (ECF 209, Defs. Answer ¶ 176.)

866. M&A partners are encouraged to participate and attend the M&A annual review meetings and ███████████████████." (Jeffries Decl. Ex. 4 (Bick Tr. 242:7:25).)

867. "Reid, Crane, DeSantis, and Fenner at times" attended the M&A partners' annual review meetings. (ECF 209, Defs. Answer ¶ 172.)

868.    Members of the Associate Development Department would participate in the M&A partners' annual review meetings and "███████████████████████████████ █████████████████████████████████." (Jeffries Decl. Ex. 4 (Bick Tr. 275:17-276:11).

869.    During the annual review meeting, M&A partners would ask members of the associate development department "████████████." (Jeffries Decl. Ex. 4 (Bick Tr. 277:7-14).

870.    When asked about the types of questions M&A partners might ask members of the associate development department, ██████████████████████," for example, whether certain associates "██████████████████████████████████████████." (Jeffries Decl. Ex. 4 (Bick Tr. 276:23-277:14).

871.    Questions were ████████████████████████████████████ ███████████████████████." (Jeffries Decl. Ex. 4 (Bick Tr. 278:15-21).

872.    It "███████████" that the information and facts related by "███████████████████" would be used to help create the consensus feedback message that the associates were to receive. (Jeffries Decl. Ex. 4 (Bick Tr. 277:22-278:14).

873.    Bick explained that during the M&A partners' review meetings, ████████████ ████████████████████████████████████████" (Jeffries Decl. Ex. 4 (Bick Tr. 278:5-14).

874.    The reviews that are delivered to associates "████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████." (Jeffries Decl. Ex. 4 (Birnbaum Tr. 330:13-331:4).).

875.    Birnbaum testified how, on one occasion, even though he wrote in an associate's review that the associate was "████████████████████████████████████████████ ████████████" the Firm nonetheless gave the associate a positive review during his annual review:



(Jeffries Decl. Ex. 3 (Birnbaum Tr. 323:14-325:8); (Jeffries Decl. Ex. 54 (DPW_SDNY-000165909- DPW_SDNY-000165910); (Jeffries Decl. Ex. 55 (DPW_SDNY-000165927 - DPW_SDNY-000165928).)

876.    In that example, even though Birnbaum's name and another M&A partner were the only ones listed on the Summary Review form for an associate's annual review, the Summary Review reflected the contributions of "individuals whose name are not listed." He added:



(Jeffries Decl. Ex. 3 (Birnbaum Tr. 328:12-329:4); (Jeffries Decl. Ex. 54 (DPW_SDNY-000165909 to -910); (Jeffries Decl. Ex. 55 (DPW_SDNY-000165927 to -928).)



(Jeffries Decl. Ex. 3 (Birnbaum Tr. 330:16-331:2); (Jeffries Decl. Ex. 54 (DPW_SDNY-000165909- DPW_SDNY-000165910); (Jeffries Decl. Ex. 55 (DPW_SDNY-000165927 - DPW_SDNY-000165928).)

877.    The feedback memorialized in an associate's summary review form can reflect comments from partners who did not work with the reviewee but who participated in discussions about the reviewee associate during the M&A partners' review meeting.  (Jeffries Decl. Ex. 4 (Birnbaum Tr. 327:9-329:4).).

878.    On September 27, 2016, Fenner emailed Kreynin with the subject line "█████████ ███████": "██████████████████████████████████████████████████████████████ ██████████████████████████████████." (Jeffries Decl. Ex. 122, DPW_SDNY-000134245).)

879.    As Cardwell's reviewing partner, Len Kreynin led a discussion about Cardwell involving the Firm's M&A partners and members of the Firm's Associate Development Department (DeSantis, Fenner, Fabe) during the M&A partners 2016 annual reviews meeting.

880.    In the Firm's NYSDHR Brief, Davis Polk represented that the M&A "partners met" in October 2016 (during their annual review meeting) and discussed what message Cardwell should receive. (Jeffries Decl. Ex. 8 (DPW_SDNY-000000297).)

881.    On October 17, 2016, after Cardwell was discussed at this meeting, Bick emailed Fenner: "███████████████████████████████████████████████████████████████ ████████." (Jeffries Decl. Ex. 96 (DPW_ SDNY-000097840); ECF 209, Defs. Answer ¶ 171.)

882.    On October 21, 2016, Butler described another M&A associate as being "█████ █████████" as Cardwell, in response to Len Kreynin telling Butler: "████████████████ ████████." (Jeffries Decl. Ex. 97 (DPW_ SDNY-000089925).).

883.    On September 27, 2016, and prior to the October 2016 annual review meeting, Butler stated that his "experience with Kaloma was pretty abbreviated." (ECF 223-9 at 8, Buergel Decl. Ex. 9 (DPW_SDNY-000144360).)

### 2. Adverse Employment Action And Causal Connection #1: Billable Hours

884.    In the May 2016 to March 2017 time period, the Firm's records as Davis Polk kept them in the ordinary course indicated the following hours for Cardwell:

| Month | Billable Client Hours |
|---|---|
| May 2016 | 101.1 |
| June 2016 | 96.9 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | 229.6 |
| October 2016 | 112.4 |
| November 2016 | 68.9 |
| December 2016 | 14.1 |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.9 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000On 143583).)

885.    As reflected in ¶ 883 *supra*, Cardwell's hours declined in 20216.  (ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000On 143583).)

886.    Between April 2016 and the first half of September 2016, Cardwell was staffed by the Firm's non-partner staffing coordinators, namely Fenner. (ECF 209, Defs. Answer ¶ 270.)

887.    Bick testified when asked which partners could have input on staffing decisions:



(Jeffries Decl. Ex. 115, Bick Tr. 79:23-81:12).)

888.    From April 2016 to the first half of September 2016, Cardwell was staffed by the Firm's (non-partner) staffing coordinators, namely Fenner. (ECF 209, Defs. Answer ¶ 270.)

889.    Cardwell became permanently assigned to the M&A group in April 2016 and in September 2016 Cardwell became a third-year associate. (ECF 209, Defs. Answer ¶¶ 204, 288.)

890.    After associates are assigned permanently to groups and become third year associates, their staffing is coordinated by junior staffing partners. (ECF 209, Defs. Answer ¶ 270.)

891.    In or about August and September of 2016, Birnbaum and Wolfe served as junior staffing partners for associates in the M&A group who were third-year associates and senior. (Jeffries Decl. Ex. 3, Birnbaum Tr. 61:5-10); ECF 209, Defs. Answer ¶ 270.)

892.    Staffing decisions involved multiple individuals. (ECF 209, Defs. Answer ¶ 203.)

893.    Associates could signal their capacity to take on new work on forms that were sent to the Firm's staffing coordinators. (ECF 209, Defs. Answer ¶ 203.)

894.    Such weekly capacity forms and the Firm's computer systems contain data relating to associates' capacity and billable hours. (ECF 209, Defs. Answer ¶ 293.)

895.    Birnbaum and Wolfe had access to M&A associates' weekly capacity forms to the extent the forms had been timely submitted for that week. (ECF 209, Defs. Answer ¶ 365.)

896.    Birnbaum's testimony about the capacity forms that he and Wolfe received and how they and Davis Polk used the forms to track associates' availability to take on new work and make staffing decisions includes the following comments:

a)  ""

(Jeffries Decl. Ex. 118, Birnbaum Tr. 55:16-56:7).)

897.   Cardwell submitted capacity forms from January to March 2017 in which he indicated that he had 100% availability. (ECF 209, Defs. Answer ¶ 344.)

898.   Davis Polk, Birnbaum, and Wolfe, did staff Cardwell on any new matters in September 2016, October 2017, November 2016, December 2016, January 2016, February 2016, or March 2016. (ECF 209, Defs. Answer ¶ 363-367.).

899.   Bick, Birnbaum, and Wolfe discussed how Cardwell should be staffed:

a) "



b)

."

(Jeffries Decl. Ex. 4, Bick Tr. 116:19-117:12).)

### 3.   Adverse Employment Action And Causal Connection #2: Revocation Of Career Advisors

900.   As of January 20, 2017, Bick and Butler were both of Cardwell's assigned advisors for purposes of the Davis Polk's Career Advisor Program. (ECF 209, Defs. Answer ¶ 348.)

901.   The Firm described the Career Advisor program at the time in an email by, in part, stating: "                                                                                      

." (Jeffries Decl. Ex. 131, DPW-SDNY-000086097.)

902.   The Firm's Lawyer's Handbook stated: "                                          

." (Jeffries Decl. Ex. 11, DPW-SDNY-00000710.)

150

903.   From January 20, 2017 to August 10, 2018, Butler did not email or have a conversation with Cardwell. (ECF 209, Defs. Answer ¶ 354.)

904.   From January 20, 2017 to August 10, 2017, Cardwell did not receive any communications from Bick or Butler about either the Career Advisor program, their role as "advisors," or anything related to Cardwell's long-term career.  (ECF 200, TAC ¶ 354.)

### 4.   Adverse Employment Action And Causal Connection #3: Increased Scrutiny via Mid-Year Review

905.   On October 17, 2016, after Cardwell was discussed at the M&A partners' reviews meeting, Bick emailed Fenner: "                                                  ." (Jeffries Decl. Ex. 96 (DPW_ SDNY-000097840)); ECF 209, Defs. Answer ¶ 171.)

906.   When asked "what does it mean that Kaloma is one of the trickier reviews," Bick responded:



a)   "                                                  ."

(Jeffries Decl. Ex. 4, Bick Tr. 327:12-328:10).)

### 5.   Pretext

907.   For the 2016 annual review period, Fenner recommended that Cardwell not receive a mid-year review.  (Jeffries Decl. Ex. 113, DeSantis Tr. 239:9-17).)

151

908.    Fenner, a manager in the Associate Development Department and assignment coordinator, repeatedly checked-in with Birnbaum and other M&A partners and encouraged the Firm's partners to staff Cardwell. (ECF 209, Defs. Answer ¶ 302.)

909.    On November 18, 2016, Fenner told Birnbaum that it "would be great if we could give [Cardwell] something." (ECF 200, TAC ¶ 303; ECF 209, Defs. Answer ¶ 304.)

910.    On December 27, 2016, Fenner told Wolfe and Birnbaum that it "would be great if we could give [Cardwell] something."  (ECF 200, TAC ¶ 304; ECF 209, Defs. Answer ¶ 304.)

911.    On January 25, 2017, Fenner emailed Wolfe and Birnbaum: "Please see below from Kaloma. John Bick/John Butler have just been designated as his advisors. . . . [I]s there by any chance some work we can send his way? He billed 2 hours in the past 30 days and has 100% capacity. Happy to discuss by phone." (ECF 209, Defs. Answer ¶ 357; ECF 200, TAC ¶ 357.)

912.    During a meeting involving Cardwell and Reid on March 9, 2017, Reid told Cardwell that the Firm was aware of Cardwell's recorded billable time, and communicated to Cardwell that his hours needed to be addressed. (ECF 209, Defs. Answer ¶ 377.)

913.    Reid told Cardwell in March 2017 that Cardwell's "work hours are low, that they are low for reasons that are not your fault, and that we're going to get it fixed." (Jeffries Decl. Ex. 117, Cardwell Tr. 392:5-9).)

914.    Reid explicitly told Cardwell that his low work hours and workload were not Cardwell's fault. (Jeffries Decl. Ex. 117, Cardwell Tr. 397:5-7).)

915.    On March 10, 2017, Cardwell emailed then-Davis Polk associate ██████████:

    a)  ███████████████████████████████████████████████████
        ███████████████████████████████████████████████████
        ██."

(Jeffries Decl. Ex. 123, DPW_SDNY-000143339).)

### G. December 2016 and March 2017 Complaints About Geo Group

#### 1. Protected Activity And Knowledge

##### a. Knowledge -- Davis Polk, Reid, Bick, Rouhandeh

916. The Firm's Complaint Procedure ███████████████████████

████████████████████████████████████████████████

███ " Jeffries Decl. Ex. 10 (DPW SDNY-000000749); Ex. 11 (DPW SDNY-000000644).)

917. On November 8, 2016, after Donald Trump was elected president of the United States, various legal communities became concerned that certain immigrant and racial groups would be unlawfully or unfairly targeted. (Cardwell Decl. ¶ 21.)

918. In December and January 2017, a group of Davis Polk lawyers began thinking about ways to provide assistance to immigrant communities, including immigration lawyers. (Cardwell Decl. ¶ 22.)

919. On January 29, 2017, Sharon Katz, Davis Polk's Special Counsel for Pro Bono, emailed the Firm's litigation associates stating:



a) "

(Jeffries Decl. Ex. 124, DPW_SDNY-000099621).)

920. Around this time, Cardwell participated in discussions related to Trump's election and his potential impact on immigrant communities with his Davis Polk colleagues, as well as members of his own family. (Jeffries Decl. Ex. 117, Cardwell Tr. 337:22-24).).

921.    On January 29, 2017, Katz circulated a *New York Times* article that highlighted legal assistance that both Davis Polk lawyers and a lawyer in Cardwell's family had provided to immigrant families and immigration lawyers at JFK airport.  (Cardwell Decl. ¶ 23.)

922.    As part of these discussions, Cardwell sent two emails, one to Dunne and the other to Katz.  Each were connected to the Firm's past and present pro bono efforts, and Dunne a supervising attorney on a pro bono matter that Cardwell previously handled. (ECF 209, Defs. Answer ¶ 333.)

923.    Cardwell emailed Katz and Dunne as follows:

   a) Cardwell's Email to Dunne (December 2016):  "In light of the Presidential election, the conditions that contributed to its outcome and what is happening in our country, I wanted to briefly follow-up on our memo to the Vance Center. As a reminder, our initial memo detailed how blacks were being disproportionately and unfairly harmed by certain for-profit prison industries and companies. I'm hoping we can discuss what can be done to distance ourselves from GEO and ultimately end the firm's relationship with GEO. I'm not sure what that internal process would or could look like, or whether the firm has ever distanced itself from certain clients in the past, but I'd be interested in hearing what you think could or should be done."

   b) Cardwell's Email to Katz (March 2017):  "In light of your and the firm's recent efforts to address Trump's Muslim ban (and his immigration and policing policies more broadly), I wanted to loop you into the email conversations below."

(ECF 200, TAC ¶¶ 332-39; n.67; *see generally* Cardwell Decl. ¶¶ 21-30.)

924.    On March 5, 2017, Katz forwarded Cardwell's emails to Reid, Bick, and James Rouhandeh, and exchanged subsequent emails with Reid the same day.  (Jeffries Decl. Ex. 125, DPW-SDNY-000098147; Jeffries Decl. Ex. 52 (Davis Polk's Privilege Log Entry No. 7).)

925.    On March 9, 2017, Reid, Katz, and Cardwell met and discussed his concerns and questions about the Firm's relationship with Geo Group.  (Cardwell Decl. ¶ 28.)

926.    Reid thought Cardwell's inquiry was a ▮▮▮▮▮▮▮" question. (Jeffries Decl. Ex. 116, Reid Tr. 320:5-9).)

927.    Per Firm policy, Davis Polk and the lawyers in the General Counsel's office were obligated to enforce the policy that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Jeffries Decl. Ex. 10 (DPW SDNY-000000749); Jeffries Decl. Ex. 11 (DPW SDNY-000000644).)

928.    In the December 2016 to March 2017 time period, Cardwell was not staffed on any new matters.  The Firm's records indicated the following hours for him:

| Month | Billable Client Hours |
| --- | --- |
| May 2016 | 101.1 |
| June 2016 | 96.9 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | 229.6 |
| October 2016 | 112.4 |
| November 2016 | 68.9 |
| December 2016 | 14.1 |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.9 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583); ECF 209, Defs. Answer ¶¶ 363-67.).

## H. March 2017 Complaints

### 1. Protected Activity And Knowledge

*a.    Knowledge -- Davis Polk, Reid, Bick, Kreynin, Crane, Wolfe, Birnbaum, Amorosi*

929.    On March 9, 2017, Reid directly told Cardwell that his low work hours and workload was not Cardwell's fault. (Jeffries Decl. Ex. 117, Cardwell Tr. 397:5-7).)

930.    On March 20, 2017, Cardwell requested to review his personnel file and performance reviews. (ECF 209, Defs. Answer ¶ 387.)

931.    On March 20, 2017, DeSantis and Crane exchanged the following emails:



(Jeffries Decl. Ex. 126, DPW-SDNY-00000410858.)

932.    On March 21, 2017, Fenner received a forwarded email noting Cardwell's request. She replied to DeSantis:

" (Jeffries Decl. Ex. 127, DPW-SDNY-000105409.)

933.    On March 21, 2017, Crane, Reid, and Bick shared the following exchange:





Bick: "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛"

Crane: "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

Reid: "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛"

Crane: "⬛⬛⬛."

(Jeffries Decl. Ex. 128, DPW_SDNY-000141975).)

934.   On March 21, 2017, Crane sent Reid another email:



(Jeffries Decl. Ex. 129, DPW_SDNY-000141980).)

935.   On March 21, 2017, Bick emailed Crane (with Reid cc'd): "⬛⬛⬛⬛⬛⬛⬛"

(Jeffries Decl. Ex. 51 (DPW-SDNY-000097959).)

936.    After, Reid, Bick, Kreynin, Crane, and DeSantis discussed Cardwell's request over email, DeSantis told Cardwell that it was Davis Polk's "policy and practice" to not allow associates to access or view their personnel file or performance reviews. (ECF 200, TAC ¶¶ 391-94; ECF 209, Defs. Answer ¶¶ 391-94.)

937.    The Firm's policy with respect to reviews states:



a)

(Jeffries Decl. Ex. 87 (DPW_SDNY-000142677).)

938.    At no time during Cardwell's employment, did Davis Polk, Reid, Crane, or DeSantis did not allow Cardwell to see "a summary of review meetings." (ECF 200, TAC ¶ 398).

939.    Cardwell's personnel file does not contain a "memo ... indicating [Cardwell's] request and the date the summary review was reviewed." (ECF 223-75 at 55, Buergel Decl. Ex. 75 (RFA No. 110).)

940.    Around March 21, 2017, a meeting was scheduled for Reid, Kreynin, and Cardwell. Before the meeting, Crane sent DeSantis an email stating: "█████████████████████████ ██████████████████████████████████████████████████████." ((ECF 209, Defs. Answer ¶ 403; (DPW_SDNY-000140867).)

941.   On March 28, 2017, Kreynin submitted the formal summary review for Cardwell's 2016 annual review, which occurred during a face-to-face meeting in December 2016. (ECF 209, Defs. Answer ¶ 404.)

942.   Although Kreynin asserted in Cardwell's summary review form that he "[told Cardwell] that there [were] significant areas of improvement that we identified," he never told Cardwell that during the review meeting. (ECF 209, Defs. Answer ¶ 408; ECF 200, TAC ¶ 409.)

943.   Kreynin also claimed in the summary review form that their December 2016 meeting concluded with Kreynin "saying that we plan to meet again in June 2017 to discuss whether there have been improvements in these areas," but Kreynin did not tell Cardwell that during the review meeting. (ECF 209, Defs. Answer ¶ 410-11; ECF 200, TAC ¶ 413)

944.   On March 29, 2017, Reid, Kreynin, and Cardwell met. (ECF 209, Defs. Answer ¶ 403.)

945.   Cardwell described the March 29, 2017 meeting as follows:







(Jeffries Decl. Ex. 117, Cardwell Tr. 413:10-420:7).)

946.    Reid offered the following remarks concerning meeting:

a)



" (Jeffries Decl. Ex. 7 (Reid Tr. 221:13-222:7).)

b)

" (Jeffries Decl. Ex. 7, Reid Tr. 221:18-223:3).)

947.    During the meeting, Cardwell asked Reid for an opportunity to meet with Bick to discuss these issues. Reid acknowledged that Cardwell did so " ." In response, Reid explained that he denied Cardwell's request because he



." (Jeffries Decl. Ex. 7, Reid Tr. 223:18-225:2).)

948.   Reid further remarked:

a) ." (Jeffries Decl. Ex. 116, Reid Tr. 227:13-25).)

b) " ." (Jeffries Decl. Ex. 7 (Reid Tr. 242:3-6).)

949.   When asked if he memorialized the details of the complaint that Cardwell made to him on March 29, 2017, Reid responded:

a) ." (Jeffries Decl. Ex. 116, Reid Tr. 229:6-10).)

b) ." (Jeffries Decl. Ex. 116, Reid Tr. 230:2-6).)

950.   When asked about his knowledge of certain complaints, Bick testified:





(Jeffries Decl. Ex. 4, Bick Tr. 189:9-190:12).)

(Jeffries Decl. Ex. 4 (Bick Tr. 192:22-193:5).)



(Jeffries Decl. Ex. 4 (Bick Tr. 184:9-196:8).)

951.    In the Firm's NYSDHR Brief, Davis Polk represented:

    a) "During the month of April 2017, when Cardwell was out of the office at his own request, the Firm discussed a remediation plan for Cardwell. Partners who had worked with Cardwell when he was more junior- for example, John Amorosi- were of the view that Cardwell was not capable of performing at the level needed for more senior-level assignments."

(Jeffries Decl. Ex. 8 (DPW_SDNY-000000301).)

952.    As of July 12, 2017, when Cardwell returned from the Firm's mandated medical leave, Cardwell's name had already appeared on emails identifying associates who were scheduled to receive "███████" messages. (Jeffries Decl. Ex. 112 (DPW_SDNY-000141074).)

### 2. Adverse Employment Action And Causal Connection

953.    Cardwell used firm-approved vacation time for the period March 31, 2017 to May 2, 2017. (ECF 209, Defs. Answer ¶ 338.)

954.    Cardwell returned to work on May 2, 2017. (ECF 209, Defs. Answer ¶ 437.)

955.   Bick met with Cardwell on or around May 2, 2017. (ECF 209, Defs. Answer ¶ 438.)

956.   The Firm typically reviews associates' billable hours for a variety of reasons. (ECF 209, Defs. Answer ¶ 442.)

957.   As a matter of practice and culture, Bick, the Associate Development Department, and other leaders at Davis Polk regularly and consistently monitored M&A associates' hours. ECF 200, TAC ¶ 442.

958.   Staffing decisions involve multiple sources of data, including associates' weekly availability reports (ECF 209, Defs. Answer ¶ 204.)

959.   During their meeting, Bick told Cardwell that no one at the Firm was going to "actively monitor" Cardwell's hours. ECF 200, TAC ¶ 441.

960.   On May 3, 2017, Cardwell was finally staffed on his first new assignment since approximately August 2016. (ECF 200, TAC ¶ 444.)

961.   On or around May 19, 2017, Bick told Cardwell that he needed to complete this first assignment before the Firm would assign him a second one. (ECF 200, TAC ¶ 445; ECF 209, Defs. Answer ¶ 445.)

962.   Cardwell informed Bick that the memo did not require 100% of his capacity and that Goldberg set a deadline for the next draft that was still a few days away.  (ECF 200, TAC ¶ 455.)

963.   All of Cardwell's billable hours in May 2017 were in connection with that legal research memo. (ECF 200, TAC ¶ 449.)

964.   Crane pulled Cardwell's performance reviews on May 26, 2017.  (Jeffries Decl. Ex. 142, DPW-SDNY-000141984.)

## I.   May 2017 Complaints

a)  **Protected Activity and Knowledge**

965.  On May 22, 2017, Cardwell emailed Goldberg: "I thought about that story as I thought more about my own story and experience here at [Davis Polk] (in addition to other similarly situated workers at [Davis Polk]), and I became ill." (ECF 209, Defs. Answer ¶ 450.)

966.  On May 23, 2017, Cardwell met with Crane and Goldberg.  During the meeting, Cardwell explained that Reid, Bick, Birnbaum, and Wolfe were responsible for staffing Cardwell. (ECF 209, Defs. Answer ¶ 456.)

967.  Cardwell specifically asked Crane to investigate his staffing history and experience at the Firm, and to assess whether Cardwell's experience was in anyway normal. Bick, Reid, Birnbaum, and Wolfe. (ECF 200, TAC ¶ 456; ECF 209, Defs. Answer ¶ 456.)

968.  On May 23, 2017, Crane sent an email to Reid and Bick that included the comment: "Louis [Goldberg] and I spoke to Kaloma today I can [sic] fill you in tomorrow at your convenience." (ECF 200, TAC ¶ 459.)

969.  When asked if Reid learned that Cardwell contacted Goldberg and indicated that his experience at Davis Polk made him physically ill, Reid testified: "███████████████████

████████████." (Jeffries Decl. Ex. 7, Reid Tr. 253:14-15.)

970.  On May 24, 2017, Davis Polk received notice that Cardwell engaged legal counsel. (ECF 209, Defs. Answer ¶ 463.)

971.  On June 7, 2017, about 15 M&A partners—including Chudd, Wolfe, Birnbaum, Hochbaum, Mills, Goldberg, and Amorosi—received communications related to "document preservation notices" relating to Cardwell's complaints and the fact that Davis Polk learned that Cardwell obtained legal counsel.  (Jeffries Decl. Ex. 52, Davis Polk Privilege Log Entry No. 58.)

972.    On July 24, 2017, Brass received communications related to "document preservation notices" arising from to Cardwell's complaints and the fact that Davis Polk learned that Cardwell had obtained legal counsel.  (ECF 200, TAC ¶ 465 n.74.)

973.    On June 13, 2017, Birnbaum emailed Mr. Wolfe and Mr. Brass and told them, "FYI, talked to Louis [Goldberg]. As I suspected, basically, for every deal that comes in, we should think about whether it's right for [Cardwell]."  Brass replied: "Understood." (ECF 209, Defs. Answer ¶ 466; ECF 200, TAC ¶ 466.)

### b)    Adverse Employment Action

974.    It was not until Cardwell engaged counsel, did the Firm's M&A partners assign Cardwell to his first M&A deal in over eight months.  (ECF 200, TAC ¶ 469.)

## J.    August 2017 Complaint (EEOC Complaint)

### a)    Protected Activity & Knowledge

975.    On August 3, 2017, Cardwell filed the EEOC Charge.  The Charge noted that the Firm discriminated against him on the basis of race, and retaliated against him because he "actively raised awareness and concerns regarding issues of racial bias and disparate outcomes." (ECF 209, Defs. Answer ¶ 476.)

976.    As of December 5, 2017, at least the following Davis Polk partners and personnel had knowledge of the EEOC Charge:  William Aaronson, John Bick, Daniel Brass, Sharon Crane, Renee DeSantis, Alicia Fabe, Carolina Fenner, Louis Goldberg, Ronan Harty, Lee Hochbaum, Sharon Katz, Leonard Kreynin, Thomas Reid, and James Rouhandeh.  (Jeffries Decl. Ex. 32, Davis Polk's Response to Rog No. 13.)

### b)    Adverse Employment Action #1:  NYSDHR Brief

977.    On December 5, 2017, Davis Polk filed a 288-page Position Statement in response to Cardwell's Verified Complaint with the NYSDHR. (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW SDNY-000000306).)

978.    The NYSDHR Brief included references to the performance reviews and feedback from Hudson, Butler, Chudd, Bick, and Reid. (ECF 209, Defs. Answer ¶ 478.)

979.    Bick and Reid contributed to the Firm's NYSDHR Brief, with Bick having "█████ ███████████████████████████," mostly "█████████." (Jeffries Decl. Ex. 115, Bick Tr. 238:11-13.)   Reid stated that "██████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████." (Jeffries Decl. Ex. 116, Reid Tr. 279:11-15.)

980.    ███████████████████████████." (Jeffries Decl. Ex. 115, Bick Tr. 238:14-239:2-5.)

981.    As explained *supra* at ¶¶ 404-12, 452-54, 496-97, and 531-37, the NYSDHR Brief contained a number of misstatements and misleading statements related to Cardwell's performance and experiences at the Firm.

982.    Davis Polk's NYSDHR Position Statement detailed and confirmed additional discrimination and retaliation against Mr. Cardwell, as their response included a number of intentionally false mischaracterizations. (ECF 209, Defs. Answer ¶ 477.)

### c)    Adverse Employment Action #2: Staffing & Billable Hours Eliminated

983.    Davis Polk, Birnbaum, and Brass did not staff Cardwell on any matters after Davis Polk filed its Position Statement. (ECF 209, Defs. Answer ¶ 479.)

984. Defendants claim that " 

. (ECF 209, Defs. Answer ¶ 479.)

### d) Adverse Employment Action #3: Post-EEOC Performance Reviews

985. Hochbaum, Mills, Goldberg, and Amorosi submitted performance reviews for Cardwell on September 19, 2017, October 2, 2017, October 6, 2017, and October 9, 2017, respectively; and each answered "behind" directly in response to the question, "do you feel this lawyer is performing materially behind, with or ahead of the lawyer's class."" (ECF 209, Defs. Answer ¶ 488.)

### e) Adverse Employment Action #4: Termination

986. On February 8, 2018, Cardwell was told that there had been a Firm decision, in light of purported performance issues, that the Firm could not staff him consistent with his class year (seniority) and the Firm's obligations to its clients; and that the Firm believed that it was time for Cardwell to begin to look for alternative employment. (ECF 209, Defs. Answer ¶ 588.)

987. When asked about the termination of Cardwell's employment, Bick testified:





(Jeffries Decl. Ex. 4 (Bick Tr. 284:23-287:5).)

### K. Defendants' Inability to Recall Key Events Further Establishes Pretext

#### 1. Bick

988.   Bick believes that if he "███ of a past event, discussion, or other phenomenon, then he has ███" of it.   When asked to clarify his position, he explained: "███." (Jeffries Decl. Ex. 4 (Bick Tr. 170:15-171:6).)

989.   Bick could not recall "███" conversations with Sharon Crane (or others at the Firm) related discussions of Cardwell's complaints, or any action taken in response to them. However, he was able to recall having ███" conversations.   Bick stated:



" (Jeffries Decl. Ex. 4 (Bick Tr. 157:24-158:4).)

990.   When asked if he discussed Cardwell with Crane over email, Bick stated:



Q: "

A: "                                                   "

(Jeffries Decl. Ex. 4 (Bick Tr. 158:8-13).)

991.    Bick could not recall his communications with Crane during key periods when his

complaints were being discussed internally, including at the time Cardwell requested to see his

performance reviews. For example, on March 21, 2017, Bick emailed Crane regarding Cardwell's

request to review his evaluations. (Jeffries Decl. Ex. 61 (DPW_ SDNY-000097959).)

**2.      Reid**

992.    On January 21, 2016, Cardwell had a dinner meeting with Reid and then-associate

███████. On the night of their meeting, Cardwell memorialized the following:

    a) "Throughout the convo ███ and I raised a number of suggestions that the
    firm should consider. Tom requested that the suggestions be things he can
    enact immediately, that they be simple, & easy for people to repeat. He said
    he doesn't want complex solutions,, suggesting that he has to repeat things
    over and over with lots of examples for partners & attorney [sic] to get on
    board." (ECF 223-20 at 2-8, Buergel Decl. Ex. 20.)

993.    On January 26, 2016, Cardwell sent ███████ an email with the subject line

███████," which stated:





(Jeffries Decl. Ex. 89 (DPW_SDNY-000032059).)

994.    Reid testified that Cardwell spoke about race "██████████████████
█████████████████████████████████." He testified that they did not
discuss any "████████" related to race and inclusion (e.g., trainings) that Davis Polk should
consider implementing.  (Jeffries Decl. Ex. 116, Reid Tr. 167:23-169:10; 177:17-178:6).)

995.    Reid was unable to recall any conversations with Crane between March 29, 2017
and May 23, 2017.  (Jeffries Decl. Ex. 7 (Reid Tr. 277:7-14).)  However, he sent Crane at least
two emails on March 30, 2017 and at least one on March 31, 2017 (after Cardwell's March 29,
2017 complaint) related to Cardwell's "performance and staffing." (Jeffries Decl. Ex. 52 (Davis
Polk's Privilege Log Nos. 16-18).)

### 3.    Hudson

996.    A parenthetical within an internal Firm document created after 2015 described
Hudson as a staffing coordinator: "████████████████████████████

██████████████████████████████████████████████

███████████." (Jeffries Decl. Ex. 62 (DPW_SDNY-000144472).)

997.   Regarding her position ████████████████████████████████

██████████████████████████████████████████████

When asked ████████████████████████████████████████

████████████████████." (Jeffries Decl. Ex. 5 (Hudson Tr. 33:20-34:4).)

## 4.   Crane

998.   DeSantis gave Crane an update on the BAG meeting, including Cardwell's comments (i.e., the September 2015 complaint). (Jeffries Decl. Ex. 6 (DeSantis Tr. 181:19-23).)

999.   Their discussion referenced the notes DeSantis took on or around October 5, 2015. Those notes mention Cardwell by name. (Jeffries Decl. Ex. 6 (DeSantis Tr. 179:19-181:23).)

1000.   When asked about her follow-up conversation with DeSantis after the September 2015 BAG meeting (and Cardwell's complaint), Crane testified: ██████████████████." (Jeffries Decl. Ex. 119, Crane Tr. 119:2-5.)

## VI.   DISCRIMINATION CLAIMS

### A.   The Firm's Track Record with Diversity and Inclusion

1001.   For each year that Cardwell was employed at Davis Polk, the Firm employed over 100 partners and 600 associates as attorneys, but never had more than one partner who identified as African-American or Black (hereinafter, "Black"). (ECF 209, Defs. Answer ¶ 6.)

1002.   When Davis Polk recruited Cardwell, and during Cardwell's employment, *The American Lawyer's* Diversity Scorecard indicated that Davis Polk had among the smallest representation of Black attorneys (i.e., exclusively measuring Black attorneys, as opposed to

173

measuring or ranking "minorities" or "lawyers of color") in its partnership as compared to dozens of law firms ranked in the Diversity Scorecard. (ECF 223-93, Buergel Decl. Ex. 82.)

    1003.  For the fiscal year of 2011, Davis Polk had about 642 total U.S. attorneys, over 100 of whom were partners.  The Firm did not have any partners who self-identified as African-American or Black, and only had 26 non-partner attorneys who self-identified as African-American or Black. (ECF 223-93 at 3, Buergel Decl. Ex. 82.)

    1004.  For the fiscal year of 2012, Davis Polk had about 633 total U.S. attorneys, over 100 of whom who were partners, but had only one partner who self-identified as African-American and only 24 non-partner attorneys who self-identified as African-American or Black. (ECF 223-93 at 5, Buergel Decl. Ex. 82.)

    1005.  As of August 31, 2013, Davis Polk had 155 partners, but only one of their 155 partners self-identified as African-American or Black. (ECF 209, Defs. Answer ¶ 38.)

    1006.  Between 2014 and 2018, 100% of Davis Polk's M&A partners were male and none of them self-identified as African-American or Black. (ECF 209, Defs. Answer ¶ 673.)

    1007.  As of October 21, 2014, Davis Polk had ▮ associates who self-identified or were Black and did not have any partners who were Black. (Jeffries Decl. Ex. 16 (DPW_SDNY-000141917).)

    1008.  As of October 21, 2014, Davis Polk had just ▮ Black associates who were first, second, or third-year associates and; ▮ Black associates who were fourth-year associates; ▮ Black associates who were fifth-year associates; ▮ Black sixth-year associate, and ▮ Black seventh-year associate. (Jeffries Decl. Ex. 16 (DPW_SDNY-000141917).)

1009.   In March 2017, DeSantis emailed several Firm partners and the Firm's Diversity Committee indicating that ████████████████████████████████████████ ██████." (Jeffries Decl. Ex. 17 (DPW_SDNY-000141062).)

1010.   As of March 19, 2018, Davis Polk did not have any Black M&A associates who were more senior than Cardwell at the time (i.e., there were no Black M&A 5th, 6th, 7th, 8th, or 9th year associates, or any Black M&A partners). (Jeffries Decl. Ex. 1 (Cardwell Tr. 606:17-608:9).).

1011.   Hudson testified that during her employment at Davis Polk, she had never worked with a Black Davis Polk Capital Markets partner or a Black senior associate in the Firm's Capital Markets practice group. (Jeffries Decl. Ex. 5 (Hudson Tr. 184:9-185:8).)

1012.   Hudson "████████████████████████████████████████ ████" (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:18).) But ████████████████ ████████████████." (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:19).)

1013.   Hudson acknowledged that "████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████." (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:25).)

1014.   Hudson also testified: ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████." (Jeffries Decl. Ex. 5 (Hudson Tr. 185:18-186:2).)

1015.   An article entitled "Big Law is Losing the Race," which was published in *The American Lawyer*'s June 2014 publication, lists Davis Polk as one of eleven out of the "Am Law 100 firms" with "no African-American equity partners" and includes the following text:

1016.  "Davis Polk managing partner Thomas Reid says that his firm recruits aggressively for top black law graduates, only to see them leave the firm a few years later for government or in-house positions. In such a small partnership, he says, senior black lawyers are hard to replace; the departure of the sole black partner in 2012, Kimberley Harris, 'knocked us back a key role model,' he says." (ECF 209, Defs. Answer ¶ 55.)

## B.  BAG and the Diversity Committee Were Aware of Racial Bias Within the Firm

1017.  Cardwell's September 30, 2015 complaint was made in the presence of the Firm's Diversity Committee.  (ECF 209, Defs. Answer ¶¶ 72-73; Jeffries Decl. Ex. 6 (DeSantis Tr. 172:19-20); Jeffries Decl. Ex. 73 (DPW_SDNY-000168082 - DPW_SDNY-000168083).)

1018.  DeSantis's notes from the meeting memorialized that she believed of Cardwell's comments and feedback concerned: ███████████████ and "███████████." (Jeffries Decl. Ex. 73 (DPW_SDNY-000168082 - DPW_SDNY-000168083).)

1019.  During the meeting, ████████████████████████████ ███████████████████████████████." (Jeffries Decl. Ex. 6 (DeSantis Tr. 176:10-13).)

1020.  DeSantis thought the ██████████████" because ██████████████ ███████████████████████████." (Jeffries Decl. Ex. 6 (DeSantis Tr. 179:6-12).)

1021.  Her notes also indicate that "████████████████████████ ████████." (Jeffries Decl. Ex. 73 (DPW_SDNY-000168082 - DPW_SDNY-000168083).)

1022.  In connection with an October 5, 2015 follow-up meeting with Crane, DeSantis documented that after the "████████████████████████████

████████████.” (Jeffries Decl. Ex. 74 (DPW_SDNY-000144527); ECF 209, Defs. Answer ¶ 81.)

1023. DeSantis also memorialized the following next step: "████████████████ ████████" including in response to associates ██████████████████████" issues specifically raised by "Kaloma," and ████████████████████████████ ████████" (Jeffries Decl. Ex. 74 (DPW_SDNY-000144527); ECF 209, Defs. Answer ¶ 81.)

### C.    External Diversity Consultants Confirmed These Realities

1024. The Firm brought in ████████████" to discuss issues like ██████████ ████████████.” "████████████.” (Jeffries Decl. Ex. 7 (Reid Tr. 44:5-12).)

1025.  In February 2016, VallotKarp delivered a presentation to the Firm that encouraged lawyers to █████████████████████████████████████████████ ████████████████," and that "[████████████████████████████ █████████████████████.'"    (Jeffries Decl. Ex. 91 (DPW-SDNY-000000474).)

1026.  The Firm's partners participated in the February 2016 training related to issues about "████████████ and ways that associates experience not being noticed—and these issues were discussed by Cardwell during the September 30, 2015 BAG and Diversity Committee meeting and during Reid and Cardwell's January 2016 meeting.  (Jeffries Decl. Ex. 73 (DPW_SDNY-000168082 - DPW_SDNY-000168083); ECF 200, TAC ¶¶ 73-74,104.)

1027.  VallotKarp's presentation encouraged lawyers to ████████████████ ████████████████████," including Davis Polk.  (Jeffries Decl. Ex. 91 (DPW_SDNY-000000474).)

1028.   The presentation specifically addressed how associates experience law firms, and examined the extent to which certain groups (e.g., White men, White Women, Men of Color, Women of Color) experienced exclusion and lack of meaningful opportunities to develop as an associate as a result of bias. (Jeffries Decl. Ex. 91 (DPW_SDNY-000000479).)

1029.   The presentation also described that "confirmation bias" can lead law firm partners to rate a "Caucasian" associate as having better written work product over an "African American" associate—even when the law firm partners were evaluating the same exact memo (with merely a different name listed as the author). (Jeffries Decl. Ex. 91 (DPW SDNY-000000485).)

1030.   The presentation included as a recommendation and best practice that Davis Polk partners "[b]e willing to raise questions about how assumptions and/or biases may be influencing decisions" within the Firm.  (Jeffries Decl. Ex. 91 (DPW SDNY-000000494).)

1031.   The presentation also reported that ███████████████████████████████ ████████████████████████" (Jeffries Decl. Ex. 91 (DPW SDNY-000000480).)

1032.   The presentation also reported that ███████████████████████████████ ████████████████████" (Jeffries Decl. Ex. 91 (DPW SDNY-000000481).)

1033.   During an internal townhall meeting following the presentation, the Firm acknowledged that behaviors related to exclusion, discouraging participation, devaluing contribution, and "micro-inequities" may be linked to bias. (Jeffries Decl. Ex. 92 (DPW_SDNY-000144244).)

1034.   VallotKarp's presentation also confirmed that "██████████████████████ ████████████████" certain exclusionary behaviors ██████████." (Jeffries Decl. Ex. 91 (DPW-SDNY-000000480).)

### D.   Other Affinity Groups Complained About Racial Bias Within the Firm

1035.   On June 15, 2016, Davis Polk's Asian/South Asian/Middle Eastern group took their concerns about racial bias at Davis Polk directly to Reid and the Firm's Management Committee in the form of a 12-page PowerPoint presentation that they presented to him. (ECF 200, TAC ¶ 642 n.103; Jeffries Decl. Ex. 132 (KCARDWELL022873).)

1036.   The presentation included text related to how "implicit bias and exclusion from informal support networks and client development are common and affect the ways in which Asians are evaluated and considered for promotion."  (ECF 200, TAC ¶ 642 n.103; Jeffries Decl. Ex. 132 (KCARDWELL022875).)

1037.   The presentation described " █████████████████████████████ " related to mentoring and developing Davis Polk's non-White associates.  (ECF 200, TAC ¶ 642 n.103; Jeffries Decl. Ex. 132 (KCARDWELL022875).)

1038.   One potential initiative included █████████████████████████████ █████████████████████ " (noting that it could be offered as a part of trainings for first-year associates or as standalone seminars. (ECF 200, TAC ¶ 642 n.103; Jeffries Decl. Ex. 132 (KCARDWELL022883).)

1039.   Another idea was for the Firm to hold ████████████████████████ █████████████████████████████████████ █████████ ."  (ECF 200, TAC ¶ 642 n.103;  Jeffries Decl. Ex. 132 (KCARDWELL022883).)

1040.   The Firm also noted that it " ████████████████████████ ███████████████████████████████████ )."

(ECF 200, TAC ¶ 642 n.103.; Jeffries Decl. Ex. 132 (KCARDWELL022883).)

**E.   Other Associates Were Treated More Favorably Than Cardwell**

1041.   During this time, Cardwell was not treated the same as associates who did not make any discrimination complaints about the Firm and its partners.  (ECF 200, TAC ¶¶ 528, 644.)

1042.   Cardwell was not treated the same as White and other non-Black associates in the context of his performance evaluations, reviews, and in response to his protected complaints.  (ECF 200, TAC ¶¶ 528, 644.)

1043.   Davis Polk, Bick, Wolfe, Birnbaum, and Brass routinely staffed and worked with [non-Black] associates who were rated as "behind" or not meeting the M&A partners' performance expectations.  (ECF 200, TAC ¶ 517.)

1044.   Davis Polk, Bick, Wolfe, Birnbaum, and Brass were "flexible" in continuing to assign and work with those associates, or be staffed junior to their class year or put on "routine" and manageable assignments.  (ECF 200, TAC ¶ 517.)

1045.   These and other associates were permitted to remain employed at Davis Polk for years after receiving such performance reviews.  (ECF 200, TAC ¶ 517.)

### a)      Cardwell's Non-Black Comparators

1046.   The following associates are Cardwell's alleged comparators for purposes of his discrimination claims: Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9.  (ECF 200, TAC ¶ 644.)

1047.   Associate 5 is not Black.  (ECF 200, TAC ¶ 650; ECF 209, Defs. Answer ¶ 650.)

1048.   Associate 7 is not Black.  (ECF 200, TAC ¶ 653; ECF 209, Defs. Answer ¶ 653.)

1049.   Associate 9 is not Black.  (ECF 200, TAC ¶ 655; ECF 209, Defs. Answer ¶ 655.)

1050.   Associate 3 is not Black.  (ECF 200, TAC ¶ 658; ECF 209, Defs. Answer ¶ 658.)

1051.   Associate 8 is not Black.  (ECF 200, TAC ¶ 660; ECF 209, Defs. Answer er ¶ 660.)

1052.   Associate 6 is not Black.  (ECF 200, TAC ¶ 663; ECF 209, Defs. Answer ¶ 663.)

**b)      Cardwell Was Similarly Situated to His Comparators**

1053.   Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 "were subject to the same performance evaluation and discipline standards" and "had the same core responsibilities as a Davis Polk associate." (ECF 200, TAC ¶ 648.)

1054.   Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 were all subject to the same performance evaluation system, which includes the Firm:

> a)    "conduct[ing] performance reviews of its attorneys,"
>
> b)    "solicit[ing] written performance reviews from individual reviewers,"
>
> c)    using a "review template[] for individual performance reviews,"
>
> d)    asking if the reviewer believes the "lawyer is performing materially behind, with or ahead of the lawyer's class,"
>
> e)    "receiving the individual performance review,"
>
> f)    "develop[ing] a 'consensus message' or 'consensus feedback' to be delivered to the attorney being reviewed,"
>
> g)    having "one Firm partner … deliver the Firm's consensus message to the attorney being reviewed,"
>
> h)    "deliver[ing] the Firm's consensus message to the associate during a subsequent meeting," and
>
> i)    "record[ing] … that subsequent meeting … on a form titled 'Lawyer Reviews – Summary Reviews.'" (ECF 209, Defs. Answer ¶ 168.)

1055.   Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 worked with and were evaluated by the same M&A partners, including Bick, Chudd, Butler, Hochbaum, Wolfe, Goldberg, Birnbaum, Oliver Smith, and Phillip Mills. (ECF 200, TAC ¶¶ 519, 526, 652, 654, 657, 659, 665.)

1056.   As M&A associates, Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 were all members of the Firm's Corporate Department, which Bick oversaw and supervised as Head of Corporate.  (ECF 209, Defs. Answer ¶ 8.)

1057.   Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 were all discussed by the Firm's M&A partners during the 2016 annual review meetings and a Firm consensus message was developed for each of them in connection with those meetings and discussion.  (ECF 209, Defs. Answer ¶ 168.)

1058.   Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 were all evaluated using the same performance evaluation form during the 2016 annual review meetings, which asked whether the associate was performing materially ahead, with, or behind their class. (Buergel Decl. Ex. 78; ECF 209, Defs. Answer ¶ 168.)

### c)  The Comparators Had Documented Performance Issues

#### 1.  Associate #5

1059.   Associate 5 received the "behind" rating alleged in the TAC.  (ECF 200, TAC ¶ 650; ECF 209, Defs. Answer ¶ 650.)

1060.   "[S]even Davis Polk M&A partners in nine separate performance evaluations rated Associate #5 as 'behind' across two consecutive years. Mr. Chudd is one of the partners who rated Associate #5 as 'behind.'"  (ECF 200, TAC ¶ 650.)

1061.   "Even though M&A partners and associates rated Associate #5 as 'behind' in at least seven separate performance reviews during … May 2016 and October 2016, this associate billed and was allowed to bill almost the same amount of hours as Mr. Cardwell."  (ECF 200, TAC ¶ 305.)

1062.  "Associate #5 was rated as "behind" by two M&A partners in consecutive years (2016 and 2017), was explicitly told during Associate #5's November 2016 Annual Review that Associate #5 'should view the fact that [Associate #5] was being given lower level tasks as an indication of [Associate #5's] failure to demonstrate a skill set and energy level consistent with high level tasks."  (ECF 200, TAC ¶ 520.)

1063.  "Associate #5's performance reviews were not a barrier to Mr. Bick, Mr. Wolfe, Mr. Birnbaum, Mr. Brass, or the Firm's other M&A partners' willingness to staff and work with Associate #5. During Associate #5's 2017 annual review, the Firm's and M&A group's consensus message to Associate #5 was that "the key for this year" was for Associate #5 "to try to take on as much work as possible…."  (ECF 200, TAC ¶ 522.)

1064.  "Between December 2017 and Associate #5's departure from the Firm, Davis Polk's M&A partners staffed Associate #5 and created workable staffing arrangements to deal with Associate #5's performance issues."  (ECF 200, TAC ¶ 524.)

1065.  Associate #5 "worked in the Firm's M&A group for the entire three-year period [i.e., 2016, 2017, and 2018]."  (ECF 223-75 at 61, Buergel Decl. Ex. 75 (RFA No. 128).)

### 2. Associate #7

1066.  Associate 7 received the "behind" rating alleged in the TAC.  (ECF 200, TAC ¶ 653; Defs. Answer ¶ 653.)

1067.  "[E]ight different Davis Polk M&A partners rated Associate #7 as "behind" across four consecutive years (2014, 2015, 2016, and 2017). Mr. Chudd, Mr. Butler, Mr. Birnbaum, and Mr. Bick were among the partners who rated Associate #7 as "behind" in a performance review." (ECF 200, TAC ¶ 653.)

1068.   "Being assessed as "behind" was not a barrier to Mr. Bick and the Firm's M&A partners', including Mr. Wolfe's, Birnbaum's, and Mr. Brass's, willingness and ability to create a workable staffing and employment arrangement for Associate #7 after M&A partners rated Associate #7 as "behind" in performance reviews."  (ECF 200, TAC ¶ 653.)

1069.   "Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #7's billable hours within 2-3 months of an M&A partner rating Associate #7 as 'behind.'"  (ECF 200, TAC ¶ 653.)

### 3. Associate #9

1070.   Associate 9 received the "behind" rating alleged in the TAC.  (ECF 200, TAC ¶ 655; Defs. Answer ¶ 655.)

1071.   "Davis Polk's M&A partners rated Associate #9 as "behind" based on their personal assessment in three consecutive years (2015, 2016, and 2017). Mr. Wolfe and Mr. Goldberg were among the partners who rated Associate #9 as "behind" in a performance review." (ECF 200, TAC ¶ 653.)

1072.   As an example, "[o]ne of the partners who rated Associate #9 as 'behind' noted in Associate #9's review that the associate's ██████████████████████████████ [██████████████████████████████████,' that Associate #9 '████████████████████ █████████████████████████████,' has '██████████████████' that are '███ ████████████████████" and has '███████' that "████████████████████████ ██████████████████████'"  (ECF 200, TAC ¶ 653; see generally Jeffries Decl. Ex. 136, DPW-SDNY-000165534.)

1073.   "The M&A partner who gave this particular review noted '████████████████ █████████████████████████████████████████████████████████████████.'"  (ECF 200, TAC ¶ 653.)

1074.   "Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #9's billable hours within 2-3 months of an M&A partner rating Associate #9 as 'behind.'"  (ECF 200, TAC ¶ 656.)

1075.   Cardwell's "race and complaints" led Reid, Bick and Davis Polk's M&A partners, including Wolfe, Birnbaum, and Brass "to staff, mentor, evaluate, and employ Mr. Cardwell differently and worse than Associate #9."  (ECF 200, TAC ¶ 657.)

### 4.   *"Behind" Ratings and Mid-Year Review Cycles*

1076.   "Unlike Associate #5, Associate #10, Associate #9, and Associate #3, Mr. Cardwell was never rated as "behind" in performance reviews by M&A partners from more than one review cycle, let alone consecutive review cycles. In fact, more M&A partners rated Associate #5, Associate #10, and Associate #3 as "behind" than Mr. Cardwell."  (ECF 200, TAC ¶ 645.)

1077.   Unlike these associates, only Cardwell was placed in a mid-year performance review cycle based solely on Bick's instructions and request.  (ECF 200, TAC ¶ 646.)

### d)   The Comparators Did Not Leave Until After Cardwell Was Terminated

1078.   Associate 5's last day of employment was January 14, 2019. Associate 6 and Associate 9 left the Firm after Cardwell's employment was terminated.  (Buergel Decl. Ex. 77 (DPW_SDNY-000168017).)

1079.   "Some" of Cardwell's comparators received a "time to go" message (including after Cardwell) but "some did not receive such messages" at all. (Buergel Decl. Ex. 75 (RFA No. 129).)

1080.   An associate's written reviews would reflect the Firm's decision that an associate was being terminated for poor performance.  (Jeffries Decl. Ex. 4 (Bick Tr. 288:15-22).)

### F.   Davis Polk Changed Its Review System To Be More "Consistent"

1081.   The Firm's review system was "highly subjective, easy to manipulate" and "widely known within the Firm to be infected with bias."  (ECF 200, TAC ¶ 679.)

1082.   During four consecutive face-to-face performance review meetings, Cardwell questioned the Firm's review system, and sought examples when he received vague and inconsistent feedback.  (ECF 200, TAC ¶ 680.)

1083.   Although the Firm's consensus review messages and consensus feedback statements were subjective.  (ECF 200, TAC ¶ 680.)

1084.   According to Firm policy, Davis Polk refused to allow Cardwell to view his performance reviews or the Consensus Feedback Statements themselves. (ECF 200, TAC ¶ 681.)

1085.   Cardwell was told he could not review his reviews after he had complained about their discriminatory nature and the refusal to allow Mr. Cardwell to view his reviews or discuss the "past" was intended to and had the effect of quashing Mr. Cardwell's complaints about the review process.  (ECF 200, TAC ¶ 681.)

1086.   The review system allowed Davis Polk partners to use subjective-decision making that enabled cherry picking of feedback from some but not all evaluations. (ECF 200, TAC ¶ 682.)

1087.   Performance reviews and the assessments of "each associate's situation is assessed based on the relevant facts and circumstances, which may, and do, differ from associate to associate."  (ECF 209, Defs. Answer ¶¶ 517, 520, 522, 523, 524, 525.)

1088.   Davis Polk's review system changed during the 2017 annual review period.  (ECF 200, TAC ¶ 480.)

1089.   Davis Polk's performance review system needed to be more "consistent" in part because the review system was not consistently applied to associates.  (ECF 200, TAC ¶ 481.)

## VII.   ADDITIONAL FACTS RELATED TO MITIGATION

1090.   During Cardwell's employment, the Firm's Lawyer's Handbook stated:



." Jeffries Decl. Ex. 11, DPW-SDNY-000000710.)

1091.   From January 20, 2017 to August 10, 2018, Butler did not email or have a conversation with Cardwell. (ECF 209, Defs. Answer ¶ 354.)

1092.   From January 20, 2017 to August 10, 2017, Cardwell did not receive any communications from Bick or Butler about either the Career Advisor Program, their role as "advisors," or anything related to Cardwell's long-term career.  (ECF 200, TAC ¶ 354.)

1093.   During Cardwell's employment, the Firm's Lawyer's Handbook stated:



(Jeffries Decl. Exs. 10-12.)

1094.   Davis Polk did not provide exit interview questionnaires to associates who received "          " messages.  (Jeffries Decl. Ex. 119, Crane Tr. 305:19-306:5).)

1095.   Cardwell was identified as an associate who '          ." (Jeffries Decl. Ex. 119 (Crane Tr. 303:16-24).)

1096. The Firm did not provide Cardwell with access to Davis Polk's Alumni Network. (Jeffries Decl. Ex. 111 (DPW_SDNY-000140805); Cardwell Decl. ¶ 19; *see generally id.* ¶¶ 15-20.)

1097. The Firm did not contact Cardwell two weeks following his departure by sending "an email containing [his] login credentials" as stated in the Firms Lawyer's Handbook. (Jeffries Decl. Ex. 111 (DPW_SDNY-000140805); Cardwell Decl. ¶ 19; *see generally id.* ¶¶ 15-20.)

1098. Chudd is the co-head of Davis Polk's alumni committee, a leadership position that coordinates the Firm's Alumni Network. (Cardwell Decl. ¶ 20.)

## VIII. ADDITIONAL FACTS RELATED TO DAMAGES

### A. Compensatory Damages

1099. Cardwell's employment experiences at Davis Polk have had a detrimental impact on his health. When asked '███████████████' Cardwell responded: '███████████████████████████████.' (Jeffries Decl Ex. 118, Cardwell Tr. 282:7-9.)

1100. When asked about the "██████████," "██████████," and "██████" that resulted from the alleged conduct, Cardwell testified:



." (Jeffries Decl Ex. 118, Cardwell Tr. 282:7-283:11.)



" (Jeffries Decl Ex. 118, Cardwell Tr. 287:2-288:6.)

1101.  On May 22, 2017, less than two months after Cardwell's March 29, 2017 meeting with Reid, when Reid threatened to take Cardwell "off the field" and "out of the game," Cardwell made a complaint to Louis Goldberg.  (TAC ¶ 450.)

1102.  This complaint came "after meeting with Mr. Bick, and in direct connection to Mr. Bick's behavior and the environment Mr. Bick had created for Mr. Cardwell."  (TAC ¶ 450.)

1103.  "Mr. Cardwell informed Mr. Goldberg that he was feeling ill and that his sickness was caused by experiences that he was having at the Firm" as a "follow-up to a conversation about discrimination that Mr. Goldberg had previously shared with Mr. Cardwell."  (TAC ¶ 450.)

1104.  Specifically, Cardwell informed Goldberg: "I thought more about my own … experience here at [Davis Polk] (in addition to other similarly situated workers at [Davis Polk]), and I became ill" and "I'm still feeling and navigating the effects" of that reality.  (TAC ¶ 450.)

1105.  Defendants acknowledge that it was Cardwell's belief that his "'current situation at work' was causing 'health complications,'" (ECF 209, Defs. Answer ¶ 473.)

1106.  At the time, Reid ███████████████████████████████ " after making the May 2017 complaint to Goldberg. (Jeffries Decl. Ex. 7, Reid Tr. 253:14-15.)

1107.  In response to Cardwell's complaint, Goldberg and the Firm informed Cardwell should take time off and that "before [he] return[s] to work [the Firm] will need a medical note from [his] doctor." (TAC ¶ 450.)

| **B.** | **Punitive Damages** |
|---|---|

| | **1.** | **The Firm's Antidiscrimination and Antiretaliation Policies** |
|---|---|---|

1108.  Davis Polk "has antidiscrimination policies, invests in diversity and inclusion training, and makes efforts to train attorneys on related diversity and inclusion literature." (ECF 209, Defs. Answer ¶ 200.)

1109.  Davis Polk "is committed to maintaining a workplace free of discrimination, hostility, harassment, and retaliation." (ECF 209, Defs. Answer ¶ 642.)

1110.  The Firm provides diversity and inclusion trainings regularly ███████████ and over the years has invited a number of speakers and consultants to the Firm, including VallotKarp, Werten Bellamy, Vernā Myers, and UCLA Law Professor Jerry Kang who delivered a presentation to members of the Firm entitled "Implicit Bias and the Law" in approximately March 2014. (ECF 209, Defs. Answer ¶ 200; Jeffries Decl. Ex. 8 (DPW-SDNY-000000395.)

1111.  Bick testified as follows concerning the training he and other partners received:



Q: " ███████████████████████████████████
██████████████████████ " (Jeffries Decl. Ex. 4 (Bick Tr. 50:10-21).)

A: ████████████████████████████████████
████████████████████████████████████
████████████████████ ." (Jeffries Decl. Ex. 4 (Bick Tr. 50:10-21).)

Q: 

" (Jeffries Decl. Ex. 4 (Bick Tr. 53:20-22).)

A:

"

(Jeffries Decl. Ex. 4 (Bick Tr. 53:20-22).)

1112.  During Cardwell's employment, all of Davis Polk's partners were required to participate in some trainings regarding the Firm's anti-discrimination, anti-harassment, or anti-retaliation policies. (ECF 209, Defs. Answer ¶ 200.)

1113.  When asked whether he did not know 

Birnbaum answered: "

" (Jeffries Decl. Ex. 3 (Birnbaum Tr. 162:17:-23).)

1114.  In October 2017, Davis Polk received a letter from the NYSDHR that stated:



a)

." (Jeffries Decl. Ex. 9 (DPW_SDNY-000000141).)

b)

)." (Jeffries Decl. Ex. 9 (DPW SDNY-000000139).)

c) "

." (Jeffries Decl. Ex. 9 (DPW SDNY-000000139).)

d) "

." (Jeffries Decl. Ex. 9 (DPW SDNY-000000144).)

1115.  Cardwell testified that an award of punitive damages is appropriate where:



(Jeffries Decl. Ex. 118, Cardwell Tr. 290:21-294:6.)

### 2.    The Firm's Failure to Investigate Cardwell's Complaints

1116.   "[T]he Firm takes seriously complaints of unlawful discrimination, retaliation, or harassment, whether relating to its performance evaluation policies or practices or otherwise." (Buergel Decl. Ex. 75 (RFA No. 108).)

1117.   When asked if any investigation had been undertaken before the EEOC Complaint, for instance, by Sharon Crane in her capacity as Head of Personnel, Bick testified that: "█████

████████████." (Jeffries Decl. Ex. 115, Bick Tr. 45:25-46:5.)

1118.   No partner, member of Davis Polk's General Counsel's Office, member of the Associate Development Department, or other Davis Polk personnel, spoke with Cardwell about his experiences with bias and discrimination at the Firm, or otherwise attempted to understand the basis for his September 2015 and September 2016 complaints.  (ECF 200, TAC ¶ 76.)

### 3.    The Firm Knew That These Events Impacted Cardwell's Health

1119.   Cardwell made a complaint to Louis Goldberg on May 22, 2017.  (TAC ¶ 450.)

1120.   Cardwell's complaint came "just a few days after meeting with Mr. Bick, and in direct connection to Mr. Bick's behavior and the environment Mr. Bick had created for Mr. Cardwell."  (TAC ¶ 450.)

1121.   Specifically, Cardwell informed Goldberg that he was feeling ill and that his sickness was caused by experiences that he was having at the Firm."  (ECF 200, TAC ¶ 450.)

1122.   Specifically, Cardwell informed Goldberg: "I thought more about my own ... experience here at [Davis Polk] (in addition to other similarly situated workers at [Davis Polk]), and I became ill" and "I'm still feeling and navigating the effects" of that reality.  (TAC ¶ 450.)

1123.   It was Cardwell's belief that his "'current situation at work' was causing 'health complications,'" (ECF 209, Defs. Answer ¶ 473.)

1124.   Reid knew that Cardwell took time off for medical leave following the May 2017 complaint. (Jeffries Decl. Ex. 7, Reid Tr. 253:14-15.)

1125.   In response to this complaint, Goldberg informed Cardwell that "before [he] return[s] to work [the Firm] will need a medical note from [his] doctor."  (TAC ¶ 450.)

1126.   Punitive damages are warranted for at least the following reason:





" (Jeffries Decl. Ex. 118, Cardwell Tr. 290:21-294:6.)

### 4.  The Firm Knew Biased Reviews Would Harm Cardwell's Reputation

1127.  Cardwell discussed his experiences with bias, exclusion, and other "micro-inequities" within other Black associates at the Firm.  According to Cardwell, there was a general consensus among them that "███████████████" both in the form of performance reviews and in the context of "████████████████████████████████████████████████████████████████ ." (Jeffries Decl. Ex. 1 (Cardwell Tr. 302:19-307:24).)

1128.  This was part of the conversation that Cardwell and ██████████████████ " that sought to raise awareness "that ██████████████████████████████████████████████████████████ " and "██████████████████████████████████████ " (Jeffries Decl. Ex. 1 (Cardwell Tr. 302:19-307:24).)

### 5.  The Firm Viewed Cardwell Going Public As a "Threat"

1129.  When asked how the Firm could be impacted by the EEOC Charge, Reid testified:

Q:  ████████████████████████████████████████████

A.  ██████████████████████

Q.  ████████████████████████████████████████████

A. 

Q:

A:

(Jeffries Decl. Ex. 105, Bick Tr. 211:17-212:16).)

1130.   Neil Bar, as a member of the Firm's three-person Management Committee, emailed Davis Polk's employees, including the Firm's non-lawyers, and told them that Cardwell was fired "following negative performance reviews given in the ordinary course." (Jeffries Decl. Ex. 118, Cardwell Tr. 271:13-272:4;  ECF 223-75 at 40, Buergel Decl. Ex. 75 (RFA No. 40).)

1131.   The email was sent to "all Davis Polk associates, counsel, partners, and employees who have a Davis Polk email account."  (Buergel Decl. Ex. 75 (RFA No. 74).)

1132.   Cardwell testified that as a consequence of the Firm's statement:



(Jeffries Decl. Ex. 118, Cardwell Tr. 243:18-25.)

1133.   As further context for Barr's statement, Cardwell explained that:



." (Jeffries Decl. Ex. 118, Cardwell Tr. 271:13-272:4.)

1134.   Defendants stated in a public filing that "Davis Polk hired Plaintiff in the hopes that he would succeed and make the transition from law student to skilled attorney. These hopes were disappointed."  (ECF 25 at 2.)

1135.   Cardwell further testified that "[███████████████████████████████████████████████████████████████████████████████████████████████████████████████."  (Jeffries Decl. Ex. 118, Cardwell Tr. 272:7-10.)

1136.   Cardwell's employability and reputation have been impacted by the unsupported statements made by the Firm, including on November 5, 2019.

1137.   Defendants continued to make unsupported statements in connection with this action that have further harmed Cardwell's reputation and standing in the profession.  (Jeffries Decl. Ex. 140, CARDWELL005327; Jeffries Decl. Ex. 141, CARDWELL005322.)

1138.   Based on Defendants' public filings, the press has reported, among other things, that Davis Polk "claims [Cardwell] has a documented history of poor performance and he didn't improve, despite efforts to coach him."  (Jeffries Decl. Ex. 141, CARDWELL005322.)

1139.   Based on Defendants' public filings, the press has reported, among other things, that Davis Polk "hit[] back at ex-associate in race bias suit, citing 'deficient' performance." (Jeffries Decl. Ex. 140, CARDWELL005327.)

### 6.      The Firm Knew Its Public Statements Would Harm Cardwell's Reputation

1140.   In a CLE presentation that Bick delivered in February 2015, and that Renee DeSantis and Alicia Fabe delivered in November 2015, the Firm acknowledged that ████████████████████████████████████████████████████████████████████."  (Jeffries Decl. Ex. 139, DPW-SDNY-000144233.)

1141.   Davis Polk's NYSDHR Brief acknowledged that "[i]n corporate law (or any type of law, for that matter), a poor reputation … inevitably leads to [employment] difficulties." (Jeffries Decl. Ex. 8, DPW-SDNY-000000292.)

1142.   Cardwell explained that as a Black associate at a majority White law firm, it can sometimes be hard " ███████████████████████████████████ ██████████ " and as a result, law firms including Davis Polk are " ██████████████ " with ████████ ██████████ " goes into building, maintaining, and protecting their name and reputation. (Jeffries Decl. Ex. 1 (Cardwell Tr. 302:19-307:24).)

1143.   Black associates like Cardwell have " ████████████ " to ensure that their names and reputations while working inside of majority White law firms and legal institutions are and remain ██████████ " and free from biased assessments.  (Jeffries Decl. Ex. 1 (Cardwell Tr. 302:19-307:24).)

DATED:          January 24, 2022                    Respectfully submitted,

                                                    /s/ David Jeffries

                                                    David Jeffries

                                                    *Attorney for Plaintiff*

cc (via ECF):

Jeh C. Johnson
Bruce Birenboim
Susanna M. Buergel
Marissa C.M. Doran

*Attorneys for Defendants*

197