# Exhibit 40

(Plaintiff's Rule 56.1 Counter-Statement, ECF No. 272 and ECF No. 274)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KALOMA CARDWELL,** | |
| Plaintiff, | |
| **v.** | |
| **DAVIS POLK & WARDWELL LLP, Thomas Reid, John Bick, William Chudd, Sophia Hudson, Harold Birnbaum, Daniel Brass, Brian Wolfe, and John H. Butler,** | 1:19-cv-10256-GHW |
| Defendants. | |

## PLAINTIFF'S RULE 56.1 COUNTER-STATEMENT OF FACTS

Dated: February 7, 2022

David Jeffries, Esq.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-601-2770
djeffries@jeffrieslaw.nyc

*Attorney for Plaintiff*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and 56.1 of the Local Rules for the United States District Court for the Southern District of New York, plaintiff Kaloma Cardwell respectfully submits the following statement of facts in opposition to defendants, Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm"), John Bick, Harold Birnbaum, Daniel Brass, John Butler, William Chudd, Sophia Hudson, Thomas Reid, and Brian Wolfe (the "Individual Defendants") (with the Firm, "defendants") Motion for Summary Judgment (ECF 220-231) on all claims brought by Cardwell,  in the amended complaint filed October 2021 ("TAC") (ECF 200).

## TABLE OF CONTENTS

I.      PARTIES AND KEY INDIVIDUALS……………………………...………….…1

II.     POLICIES REGARDING HOURS, PERFORMANCE REVIEWS & STAFFING……...4

III.    CARDWELL'S QUALIFICATIONS TO REMAIN AN ASSOCIATE …...……...………5

IV.     RETALIATION CLAIMS…………..……………………………………...………..38

V.      DISCRIMINATION CLAIMS…………………………………………………...……95

VI.     ADDITIONAL FACTS RELATED TO MITIGATION………………..……………102

VII.    ADDITIONAL FACTS RELATED TO DAMAGES…….…………………………103

## PLAINTIFF'S RULE 56.1 COUNTER-STATEMENT OF FACTS

**I.      PARTIES AND KEY INDIVIDUALS**

**A.      Cardwell**

278.    Cardwell is an African-American/Black male. (TAC ¶ 4; Defs. Answer ¶ 4.)

**B.      Davis Polk**

279.    After Cardwell filed his EEOC/NYSDHR Charge in August 2017, Davis Polk (with Paul Weiss as counsel) filed a Position Statement with the New York State Division of Human Rights on December 5, 2017 ("NYSDHR Brief"). (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000287 - DPW_ SDNY-000000574).)

1

| **C.** | **Individual Defendants** |

280.    Reid served as member of the Firm's three-person Management Committee from 2011–2019. (Buergel Decl. Ex. 75 (RFA Nos. 38-39).) Reid served as head of Davis Polk's corporate department from 2008 to 2011. (Jeffries Decl. Ex. 7 (Reid Tr. 31:14-17).)

281.    "[T]he head of Davis Polk's corporate department was "a position of oversight for the various corporate departments." (Jeffries Decl. Ex. 7 (Reid Tr. 31:4-13).)

282.    Bick served as head of the Firm's Corporate department and a member of the Firm's three-person Management Committee from 2011–2019. (Jeffries Decl. Ex. 4 (Bick Tr. 28:15-25); ECF 209, Defs. Answer ¶ 8.)

283.    Bick served as M&A Practice Group Coordinator from approximately June 1, 2015 to May 2017. (Buergel Decl. Ex. 75 (RFA No. 42).)

284.    Chudd served on the Alumni Committee since 2017. (Defs. Answer ¶ 10.)

| **D.** | **Non-Defendant Davis Polk Partners and Employees in Supervisory Positions** |

285.    The following Davis Polk attorneys were partners during Cardwell's employment:

a)    Jim Rouhandeh: 1996 to present. (Buergel Decl. Ex. 75 (RFA No. 58).)

b)    Lee Hochbaum: July 2016 to present. (Buergel Decl. Ex. 75 (RFA No. 37).)

c)    Oliver Smith: from 2012 to present. (Buergel Decl. Ex. 75 (RFA No. 52).)

d)    Phillip Mills: from 1993 to present. (Buergel Decl. Ex. 75 (RFA No. 54).)

e)    Louis Goldberg: from 1997 to present (Buergel Decl. Ex. 75 (RFA No. 55).)

f)    John Amorosi: from 2003 to present. (Buergel Decl. Ex. 75 (RFA No. 56).)

g)    Leonard Kreynin: from 1999 to present. (Buergel Decl. Ex. 75 (RFA No. 57).)

h)    Neil Barr: from 2008 to present. (Buergel Decl. Ex. 75 (RFA No. 59).)

i)    Maurice Blanco: from 2008 to present. (Buergel Decl. Ex. 75 (RFA No. 60).)

j)    Monica Holland: from 2013 to present. (Buergel Decl. Ex. 75 (RFA No. 61).)

k)    James McClammy (who is Black and from April 2016 to January 2018 was the only Black partner at the Firm). (ECF 209, Defs. Answer ¶ 360.)

l)    Michael Flynn. (Jeffries Decl. Ex. 5, (Hudson Tr. 9:13-24).)

m)    Kathleen Ferrell. (Jeffries Decl. Ex. 10 (DPW SDNY-000000749).

2

286.    During Cardwell's employment, Sharon Crane served as the Executive Director of Personnel, working with the Firm's management committee and overseeing the Firm's human resources, legal recruiting, diversity, equity and inclusion, and professional development departments. (ECF 209, Defs. Answer ¶ 61.)

287.    Crane was "the most senior member of the non-lawyer administrative staff" and reported to Reid as the Firm's managing partner. (Jeffries Decl. Ex. 7 (Reid Tr. 41:20-42:3).)

288.    During Cardwell's employment, Renee DeSantis was the Firm's Director of Professional Development (also referred to as Associate Development Department). ECF 209, Defs. Answer ¶ 62. (Jeffries Decl. Ex. 6 (DeSantis Tr. 23:8-12; 26:17-24).)

289.    DeSantis served as Director of Associate Development since approximately 2002 and she managed professional development managers who oversee staffing and handle staffing requests for associates across practice groups. (Jeffries Decl. Ex. 6 (DeSantis Tr. 20:2-25).)

290.    Rocio Clausen, Carolina Fenner, and Alicia Fabe were Professional Development Managers in the Associate Development Department.  ECF 209, Defs. Answer ¶ 62.

291.    Nicole Katz worked in the Associate Development Department as a Professional Development Coordinator beginning in December 2014. ECF 209, Defs. Answer ¶ 62.

292.    DeSantis, Fabe, Clausen, and Fenner all worked in the Firm's Associate Development Department in 2014, 2015, 2016, and 2017, with Clausen working until August 2017.  (ECF 209, Defs. Answer ¶ 62; Jeffries Decl. Ex. 6, (DeSantis Tr. 82:9-91:21).)

293.    Clausen and Fenner served as staffing coordinators and played a role in staffing Cardwell from 2014 to 2016. (ECF 209, Defs. Answer ¶ 204.)

294.    During Cardwell's employment, Fabe was the Firm's "training and diversity" manager who worked with DeSantis, the Firm's Diversity Committee, and partners to create and

3

facilitate trainings for the Firm, including trainings for the Firm's Lawyering 101 and 301 programs. (Jeffries Decl. Ex. 6 (DeSantis Tr. 89:6-8; 164:14-23).)

295.    During Cardwell's employment, Charles Duggan served as the Firm's General Counsel and Gina Caruso served as the Firm's Deputy General Counsel.  (Jeffries Decl. Ex. 58 (DPW_SDNY_000165064 at 3).)

296.    Davis Polk partners were obligated to comply with the Firm's nondiscrimination, non-harassment and professional conduct policies. (Jeffries Decl. Ex. 6, (DeSantis Tr. 80:22-81:3); Buergel Decl. Ex. 75 (RFA No. 28).)

## II.    POLICIES REGARDING HOURS, PERFORMANCE REVIEWS & STAFFING

### A.  Billable Client Hours and Pro Bono Hours

297.    Pro bono work that was billed through the Firm counted towards associates' total billable/legal hours. (Jeffries Decl. Ex. 10 (DPW_SDNY-000000724 - DPW SDNY-000000817); Jeffries Decl. Ex. 11 (DPW_SDNY-000000577 - DPW SDNY-000000717).)

298.    Policies regarding Davis Polk's Pro Bono Commitment are set forth in in the Lawyers' Handbooks.  Versions of these policies were produced as of Cardwell's first and last days at the Firm. (Jeffries Decl. Ex. 10 (DPW_SDNY-000000724 - DPW SDNY-000000817); Ex. 11 (DPW_SDNY-000000577 - DPW SDNY-000000717).)

### B.  Formal Feedback via Performance Review Forms

299.    Regarding the Firm's review policies and practices:

a)    The Firm conducts performance reviews of its attorneys. (ECF 209, Defs. Answer ¶ 168.)

b)    The Firm solicits written performance reviews from individual reviewers. (ECF 209, Defs. Answer ¶ 168.)

c)    Review templates for individual performance reviews contain the question, "do you feel this lawyer is performing materially behind, with or ahead of the lawyer's class[?]" (ECF 209, Defs. Answer ¶ 168.)

4

d) This is the only question on the template that specifically asks reviewers to indicate if they feel the lawyer being reviewed is performing materially behind, with, or ahead of their class. (ECF 209, Defs. Answer ¶ 570.)

e) Upon receiving the individual performance reviews Firm develops a "consensus message" or "consensus feedback" to be delivered to the attorney being reviewed. (ECF 209, Defs. Answer ¶ 168.)

f) One Firm partner is asked to deliver the Firm's consensus message to the associate during a subsequent meeting. (ECF 209, Defs. Answer ¶ 168.)

g) A record of that subsequent meeting is generally made on a form entitled "Lawyer Reviews – Summary Reviews" ("Summary Review" form) and/or the attachments thereto. (ECF 209, Defs. Answer ¶ 168.)

h) The Summary Review form contains sections relating to matters worked on by the reviewee and strengths and weaknesses of the reviewee's performance. (ECF 209, Defs. Answer ¶ 168.)

300. Firm partners use varying methods for completing associates' review forms, which include making subjective assessments about the associate's work, experiences, and assignments. (Jeffries Decl. Ex. 4, Bick Tr. 184:9-185:8); Jeffries Decl. Ex. 3, Birnbaum Tr. 285:15-18)

301. There are no "written guidelines" describing how partners should develop an associate's consensus message during their annual reviews meeting. (Jeffries Decl. Ex. 4, Bick Tr. 184:9-185:8).)

## III.   CARDWELL'S QUALIFICATIONS TO REMAIN AN ASSOCIATE

### A.   Salary Increases and Year-End Bonuses

302. Between 2014 and August 10, 2018, Cardwell's annual compensation exceeded $160,000, was at least $260,000 in 2017, and he received the full pro-rated salaries and bonuses paid to associates in his class during such period. (Jeffries Decl. Ex. 8 (NYSDHR Brief, DPW SDNY-000000290; ECF 223-75 at 42, Buergel Decl. Ex. 75 (RFA No. 77-80).)

303. In 2018, Cardwell did not receive the pro-rated salary of $255,00 from August 11, 2018 through year's end or the $65,000 year-end bonus paid to associates in his class. (ECF 223-75 at 44, Buergel Decl. Ex. 75 (RFA No. 82).)

304. Between 2019 and 2021, Cardwell did not receive the salaries and bonuses paid to associates in his class for such years (i.e., at least $360,000 in 2019, $432,000 in 2020, $325,000 in 2021). (ECF 223-75 at 44, Buergel Decl. Ex. 75 (RFA Nos. 81-87).)

305. In addition to the amounts not received in ¶ 304 *supra*, in 2021, Cardwell also did not receive a second year-end bonus of $115,000 or the $23,000 special bonus that associates in his class were paid after December 3, 2021. (Jeffries Decl. Ex. 19.)

306. From 2014-2017, Cardwell's salary increased, and he received the full increase that associates in his class were eligible to receive. Buergel Decl. Ex. 75 (RFA No. 77).)

307. As of November 29, 2016, the Firm deemed Cardwell an "associate[] in good standing [who would] receive a bonus." (Jeffries Decl. Ex. 99 (DPW_SDNY-000164210).)

308. Not every associate receives a year-end bonus. (Jeffries Decl. Ex. 100 (DPW_SDNY-000143351 - DPW_SDNY-000143352).).

309. Bonuses for counsel and certain attorneys with special arrangements were determined on an individual basis. (Jeffries Decl. Ex. 99 (DPW_SDNY-000164210).)

### B. Disciplinary or Remedial Actions

310. Cardwell's personnel file did not contain records of disciplinary action. (ECF 223-75 at 46, Buergel Decl. Ex. 75 (RFA No. 89).)

311. Cardwell was never suspended from work. (Jeffries Decl. Ex. 2 (Crane Tr. 256:18-257:3); Jeffries Decl. Ex. 5 (Hudson Tr. 187:2-4); Jeffries Decl. Ex. 4 (Bick Tr. 273:23-274:11).)

312. Bick did not believe there was a "termination event" until M&A partners Goldberg and Smith met with Cardwell in January 2018. (Jeffries Decl. Ex. 4 (Bick Tr. 273:23-274:11).)

## C.    Cardwell's First Rotation (Credit, September 2014 to April 2015)

### 1.    Hours

313.    Davis Polk's billable hours goal for junior associates was roughly 150 hours per month (1800 hours/12 months).  (Buergel Decl. Ex. 13 (DPW SDNY-000164486).)

314.    Various factors influence an associate's hours, including attendance at orientation, trainings, start-up time, as well as the overall activity levels at the Firm. (ECF 223-13 at 19, Buergel Decl. Ex. 13 (DPW SDNY-000164486); Jeffries Decl. Ex. 6 (DeSantis Tr. 135:13-14).)

315.    During Cardwell's employment, associates' billable client hours were credited towards their "total billable hours" (or "[t]otal [l]egal" hours). (ECF 223-23 at 18, Buergel Decl. Ex. 23 (DPW_SDNY-000140623; (Jeffries Decl. Ex. 10 (DPW SDNY-000000782).)

316.    Time spent attending trainings and department meetings were tracked using the "Professional Development" category within the Firm's timekeeping systems, which Cardwell used to record such time. ECF 223-11 at 3, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

317.    The Firm's records reflect the following hours for Cardwell during this period:

| Month | Billable Client Hours | Pro Bono | Professional Development |
|---|---|---|---|
| September 2014 | 29.5 | 0 | 17.5 |
| October 2014 | 202.6 | 0 | 6.8 |
| November 2014 | 73.8 | 13.6 | 35.7 |
| December 2014 | 138.5 | 13.8 | 8.2 |
| January 2015 | 71.2 | 13.7 | 10.3 |
| February 2015 | 148.7 | .2 | 7.1 |
| March 2015 | 119.6 | 4.3 | |
| April 2015 | 160.1 | .6 | 2.5 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

318.    Between September 2014 and April 2015, the Firm's systems reflected that Cardwell had at least the following "total billable hours":

| Month | Total Billable/Legal Hours |
|-------|---------------------------|
| September | 29.5 |
| October | 202.6 |
| November | 87.4 |
| December | 152.3 |
| January | 84.9 |
| February | 148.9 |
| March | 123.9 |
| April | 160.1 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

## 2. Performance Reviews and 2015 Interim Review

319.  Performance review forms were sent to partners during annual review cycles based on the number of billable hours an associate recorded during that annual review period. See ¶¶ 320, 336, 416, 451.

320.  For the 2014 review cycle, the Firm automatically generated and distributed performance review forms to partners who worked with an associate who billed 50 hours (or more) on one of their matters during that review period. (ECF 223-13, Buergel Decl. Ex. 13, 16).

321.  Cardwell's May 2015 midyear review form with Kyrwood indicates five different "Principal matters" were "considered in the evaluation" and Cardwell had billed more than 50 hours on each matter (ECF 223-9 at 37, Buergel Decl. Ex. 23 (DPW_SDNY-000144389).)

322.  According to the May 2015 midyear review form that Kyrwood completed, Cardwell billed the following hours on five different "principal matters":

| | | | | |
|---|---|---|---|---|
| Principal matter #1: | 151.7 hours | | Principal matter #4: | 73.4 hours |
| Principal matter #2: | 140.9 hours | | Principal matter #4: | 60.0 hours |
| Principal matter #3: | 89.4 hours | | | |

(ECF 223-9 at 37, Buergel Decl. Ex. 23 (DPW_SDNY-000144389).)

323.    A total of six associates completed and submitted written performance evaluations in connection with Cardwell's May 2015 review. (ECF 223-9, Buergel Decl. Ex. 9.)

324.    The reviews show that every associate answered "with" when asked: "Do you feel the [Cardwell] is performing materially behind, with or ahead of [his] class":

| Date of Review | Reviewing Attorney | Group Title | Behind, With, or Ahead?[1] | Citation |
|---|---|---|---|---|
| March 13, 2015 | Yitz Segal | Credit Associate | With | ECF 223-9 at 23, Buergel Decl. Ex. 9 (DPW_SDNY-000144375). |
| March 16, 2015 | Andres Arnaldo | Credit Associate | With | ECF 223-9 at 6, Buergel Decl. Ex. 9 (DPW_SDNY-000144358). |
| March 23, 2015 | Stevan R.B. Nicholas | Credit Associate | With | ECF 223-9 at 21, Buergel Decl. Ex. 9 (DPW_SDNY-000144373). |
| April 6, 2015 | Yuli Wang | Credit Associate | With | ECF 223-9 at 27, Buergel Decl. Ex. 9 (DPW_SDNY-000144379). |
| April 10, 2015 | Sanders Witkow | Credit Associate | With | ECF 223-9 at 28, Buergel Decl. Ex. 9 (DPW_SDNY-000144380). |
| April 13, 2015 | Andres Arnaldo | Credit Associate | With | ECF 223-9 at 5, Buergel Decl. Ex. 9 (DPW_SDNY-000144357). |

325.    The performance reviews reflected in the above chart noted that:

a)      "Kaloma was very good at assisting with the closing and post-closing of the transaction. He's organized and shows attention to detail, and was able to run with tasks on his own." (ECF 223-9 at 5 (Arnaldo, April 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144357).)

b)      "Kaloma did a great job on the transaction I worked with him on. Very good attention to detail and delivered work product on time and in very good shape." (ECF 223-9 at 28 (Witkow, April 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144380).)

c)      "Kaloma worked with me on a small deal that requires him to take the charge in getting the deal through. He did an excellent job in liaising with borrower, borrower's other counsel and lender's counsel and pushing the deal through the finish line with minimal supervision." (ECF 223-9 at 27 (Wang, April 2015), Buergel Decl. Ex. 9 at DPW_SDNY-000144379)

d)      "He's able to understand issues and deal with the mechanics of a complex closing. He's very easygoing and easy to work with. Sometimes he lacks a bit of initiative and takes longer than expected to complete certain tasks, but

---

[1] The full question reads: "Do you feel lawyer is performing materially behind, with, or ahead of lawyer's class?"

overall the quality of his work is quite good." (ECF 223-9 at 6 (Arnaldo, March 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144358).)

e) "Worked on a commitment paper exercise and he did a good first turn. There were a few places where hard thinking would have led him to infer a few additional changes that he didn't make, though that's very typical for someone at his level." (ECF 223-9 at 21 (Nicholas, March 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144373).)

326. In May 2015, Kyrwood completed an interim summary review form summarizing Cardwell's performance and reviews as follows:

a) "Generally positive—organized, high quality work, good attention to detail, hard worker. Some notice that he is a little slow in turnaround time and thought would benefit from asking more questions. Also he should take more initiative."

(ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

327. Kyrwood's "summary review" form describing their review meeting did not memorialize any criticisms or issues related to Cardwell's timekeeping practices or hours. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 (DPW_SDNY-000144389).)

328. Cardwell described his face-to-face interim review with Kyrwood as follows:

a) "The message that was communicated to me was communicated within I would say two or three minutes." (Jeffries Decl. Ex. 1 (Cardwell Tr. 470:22-24).)

b) "[Kyrwood's] tone and substance was there's not much to discuss, you are doing great, people like working with you[.] It was not in tone or substance a conversation around anything related to what I was not doing well." (Jeffries Decl. Ex. 1 (Cardwell Tr. 474:7-11).)

c) "[Kyrwood] did not say anything that could be reasonably construed as or interpreted as negative criticism[,] anything that could be reasonably interpreted as a performance deficiency. … [or] anything that could reasonably be construed as … a performance issue [to fix]." (Jeffries Decl. Ex. 1 (Cardwell Tr. 472:22-473:7).)

### 3. Pretext

329. In the Firm's NYSDHR Brief, Davis Polk represented:

10

a) "***Senior lawyers in the Credit group who worked with Cardwell noted performance issues that were troubling***. For example, and among other issues, senior Credit attorneys noted that Cardwell was 'on the slow side in producing drafts,' and took 'longer than expected to complete certain tasks.' *Exs. 4, 5*. Cardwell came 'to incorrect conclusions that often require[d] his work to be redone,' and his work product 'need[ed] improvement.' *Id*. He neglected to 'ask questions when he does not understand,' and 'even when offered assistance,' declined it. And although Cardwell was 'easygoing' and 'proactive in offering help,' he neglected the 'simpler matters'-the domain of the junior associate on a team tasked with completing a client assignment, as explained in detailed memoranda distributed to new associates at the start of each rotation. Cardwell was not sufficiently "prompt to respond and act.' *Exs. 4, 5*.

The ***Firm delivered this feedback to Cardwell at the end of his Credit rotation***, as part of its routine professional development and training initiatives. A partner from the Credit group, Jason Kyrwood, met with Cardwell to discuss his performance and the areas that needed improvement. Cardwell, according to a contemporaneous note, accepted the feedback and agreed. Ex.7."

(Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000287) (footnotes omitted).) (emphases added.)

330.    The following quoted language from the Firm's NYSDHR Brief does not appear in Kyrwood's "summary review": (i) "on the slow side in producing drafts," (ii) "longer than expected to complete certain tasks," (iii) "ask questions when he does not understand," (iv) "even when offered assistance," (v) "simpler matters," and (vi) "prompt to respond and act." (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 at DPW_SDNY-000144389.)

331.    In the Firm's NYSDHR Brief, Davis Polk also represented:

a) "[A]t the conclusion of Cardwell's required ***two rotations through two separate groups*** …, attorneys on ***multiple deal teams in both groups*** had observed similar dynamics: Cardwell tended to neglect the details on core, basic tasks, despite the Firm's clear expectations for junior associates. The fundamental problems with both the quality and timeliness of Cardwell's work made it difficult for senior lawyers to rely upon him or his work product."

11

332.    Kyrwood's summary review does not mention that anyone at Davis Polk encountered staffing difficulties related to the quality or timeliness of Cardwell's work. (ECF 223-9 at 37 (Kyrwood, May 2015), Buergel Decl. Ex. 9 at DPW_SDNY-000144389.)

**D.    Cardwell's Second Rotation (M&A, April to October 2015)**

**1.    Hours**

333.    The Firm's records indicate the following hours for Cardwell during this period:

| Month | Billable Client Hours | Pro Bono | Professional Development |
|---|---|---|---|
| April 2015 | 160.1 | .6 | 2.5 |
| May 2015 | 190.0 | 11.4 | 3.7 |
| June 2015 | 192.7 | 27.8 | 4.5 |
| July 2015 | 266.5 | 5.2 | 1.0 |
| August 2015 | 169.2 | 4.9 | 4.3 |
| September 2015 | 181.0 | 0 | 2.0 |
| October 2015 | 47.7 | 0 | 3.5 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

334.    The Firm's records indicate that Cardwell had at least the following "total billable hours" (i.e., total legal hours):

| Month | Total Billable/Legal Hours |
|---|---|
| April 2015 | 160.7 |
| May 2015 | 201.4 |
| June 2015 | 220.5 |
| July 2015 | 271.7 |
| August 2015 | 174.1 |
| September 2015 | 181 |
| October 2015 | 47.7 |

(ECF 223-11 at 3-4, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

335.    Cardwell had 1775 billable client hours, 68 pro bono hours, and 1864 total legal hours in 2015. (ECF 223-23 at 18, Buergel Decl. Ex. 23 (DPW_SDNY-000140623).)

**2.    Performance Reviews and 2015 Annual Review with Chudd**

336.    For the 2015 review cycle, the Firm automatically generated and distributed performance review forms to partners who worked with an associate who billed 75 hours (or more) on one of their matters during that review period. (Jeffries Decl. Ex. 13 at p.10.)

337.    The Firm "underst[ood] that senior associates may be knowledgeable about [a junior associate's] work on a matter," and that reviewing attorneys could solicit feedback from such senior associates.   (Jeffries Decl. Ex. 20 (DPW_SDNY-000054680).)

338.    During the annual review process, M&A partners were asked to complete reviews for associates who billed 75 hours or more in the last 12 months to a matter on which they were one of the most active partners or counsel. (Jeffries Decl. Ex. 21 (DPW_SDNY-000165047).)

339.    Reviews from September 2014 to September 2015 were considered in Cardwell's 2015 annual review. (ECF 223-9 at 35, Buergel Decl. Ex. 23 (DPW_SDNY-000144387).)

340.    Cardwell's 2015 annual review form lists fourteen principal matters that were "considered in the evaluation." (Buergel Decl. Ex. 23 (DPW_SDNY-000144387).)

341.    According to the form, Cardwell billed the following hours on these matters:

| Principal matter 1: | 188.7 hours | | Principal matter 8: | 99.1 hours |
|---|---|---|---|---|
| Principal matter 2: | 172.5 hours | | Principal matter 9: | 97.1 hours |
| Principal matter 3: | 166.1 hours | | Principal matter 10: | 89.4 hours |
| Principal matter 4: | 164.0 hours | | Principal matter 11: | 89.3 hours |
| Principal matter 5: | 148.7 hours | | Principal matter 12: | 73.4 hours |
| Principal matter 6: | 122.6 hours | | Principal matter 13: | 67.7 hours |
| Principal matter 7: | 120.9 hours | | Principal matter 14: | 66.1 hours |

(ECF 223-9 at 35, Buergel Decl. Ex. 23 (DPW_SDNY-000144387).)

342.    Brass declined to complete or submit a performance evaluation for Cardwell in 2015. On October 28, 2015, Brass reported that he "really only had a very little direct contact with him on Digicel - I think Zain's review is much more realistic. I don't think I would be able to say much worthwhile?" (Jeffries Decl. Ex. 28 (DPW_SDNY-000086908).)

343.    Zain Rehman indicated on his evaluation form that he had an "extensive" level of contact with Cardwell. (ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144374).)

344.    Rehman's evaluation stated that "Kaloma is hardworking and always willing to help. He did a good job with the schedules and other diligence matters on the deal." (ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144374).)

345.    When asked: "Do you feel [Cardwell] is performing materially behind, with or ahead of lawyer's class[?]," Rehman answered: "with." (ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144374).

346.    Senior M&A associate Laura Turano was the only other associate who submitted an evaluation for Cardwell that cycle and she also answered that Cardwell was performing materially "with" his class.  (ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144378).

347.    On July 27, 2015, Cardwell asked a Black associate:

   a)    "How will the Firm protect or reward black associates who might be called to participate in recruiting efforts that (non-black and some black) attorneys are not? How does the Firm prevent other/senior associates from thinking such black associates are avoiding or not prioritizing 'the work'?"

(Jeffries Decl. Ex. 30 (DPW_ SDNY-000099978).)

348.    On September 24, 2015, the Firm gave "special recognition" to a few attorneys including Cardwell for "contribut[ing] notably to the achievement of [its] recruiting goals." (Jeffries Decl. Ex. 31 (DPW_SDNY-000140930).) (emphasis added.)

14

349.    Cardwell's 2015 Annual Review Summary form, which covered the period September 2014 through September 2015, noted that he received a commendation for his pro bono work or recruiting efforts. (ECF 223-9 at 35, Buergel Decl. Ex. 9.)

350.    The review summary form stated that "[Cardwell] went above and beyond in regarding to recruiting and the summer program." (ECF 223-9 at 35, Buergel Decl. Ex. 9.)

351.    M&A partner John Amorosi also submitted a review for Cardwell in connection with this annual review. (ECF 223-9 at 4, Buergel Decl. Ex. 9 (DPW_SDNY-000144356).)

352.    Amorosi's review indicated that Cardwell was materially performing "with" lawyers in his class. (ECF 223-9 at 4, Buergel Decl. Ex. 9 (DPW_SDNY-000144356).)

353.    Chudd also submitted a review for Cardwell. (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

354.    Chudd's evaluation form, dated September 22, 2015, indicated that he "did not have much direct interaction with Kaloma" and that his impressions of Cardwell were "based off of third party accounts." (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

355.    Not a single associate or partner concluded that Cardwell was performing materially "behind" lawyers in his class:

| Date of Review | Reviewing Attorney | Group Title | Behind, With, or Ahead? | Citation |
|---|---|---|---|---|
| Sept. 18, 2015 | Laura Turano | M&A Associate | With | ECF 223-9 at 26, Buergel Decl. Ex. 9 (DPW_SDNY-000144378). |
| Sept. 23, 2015 | William Chudd | M&A Partner | No basis | ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362). |
| Sept. 23, 2015 | John Amorosi | M&A Partner | With | ECF 223-9 at 4, Buergel Decl. Ex. 9 (DPW_SDNY-000144356). |
| Nov. 2, 2015 | Zain Rehman | M&A Associate | With | ECF 223-9 at 22, Buergel Decl. Ex. 9 (DPW_SDNY-000144374). |

356.     The Associate Development Department described Chudd's "no basis" review as "unspecified," not "negative" or "behind." (Jeffries Decl. Ex. 49 (DPW_SDNY-000167391).)

357.     On September 22, 2015, Fenner informed Chudd that she would draft the consensus message that Cardwell and "all [other] rising 2nd years should get" for their 2015 annual review. (Jeffries Decl. Ex. 85 (DPW_SDNY-000091957).)

358.     As of September 2015, Cardwell was a "rising 2nd year." (Defs. Answer ¶ 71.)

### 3.     Pretext

359.     Chudd's summary review form included comments that neither appear in the consensus message that Fenner drafted nor were discussed with Cardwell. (Jeffries Decl. Ex. 85 (DPW_SDNY-000091957); Jeffries Decl. Ex. 49 (DPW_SDNY-000167391); Buergel Decl. Ex. 9 (DPW_SDNY-000144387); Jeffries Decl. Ex. 1 (Cardwell Tr. 492:18-494:16.)

360.     Davis Polk's NYSDHR Brief characterized this as a negative annual review. (Jeffries Decl. Ex. 1 (Cardwell Tr. 492:18-494:16).).

361.     December 2017 marked the first time that anyone at the Firm claimed that Chudd's summary review was the first negative review that Cardwell received. (Jeffries Decl. Ex. 1 (Cardwell Tr. 492:18-494:16).).

362.     In the Firm's NYSDHR Brief, Davis Polk represented:

a)     "During his M&A rotation, Cardwell worked on at least nine separate matters, and attorneys on multiple teams noted ***increasingly serious performance issues, echoing the themes that had emerged during Cardwell's first rotation in the Credit group***." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000294).)

b)     "***Over the first year*** or two of his time at Davis Polk, as his deficiencies became manifest, it became ***difficult to assign work that Cardwell could perform reliably***." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW SDNY-000000289) (emphases added).

16

363.     For the 2015 annual review cycle, Chudd rated other associates as "behind" in the performance evaluations and summary reviews that he submitted, including for Associate #7. (Jeffries Decl. Ex. (DPW_SDNY-000165956); Jeffries Decl. Ex. (DPW_SDNY-000165954).)

### E.     Third Rotation (Capital Markets, October 2015 to March 2016)

#### 1.     Hours

364.     The Firm's records indicated the following hours for Cardwell during this period:

| Month | Billable Client Hours | Professional Development |
|---|---|---|
| October 2015 | 47.7 | 3.5 |
| November 2015 | 134.1 | 8.9 |
| December 2015 | 94.4 | 0 |
| January 2016 | 56.7 | 0 |
| February 2016 | 44.1 | 12.2 |
| March 2016 | 4.3 | 0 |
| April 2016 | 43.6 | 0 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

365.     Staffing partners use multiple datapoints to understand an associate's hours, and specifically, why an associate's hours may be low at any particular time (including the associate's reviews, the staffing needs of their group, the availability of other associates, and any personal circumstances that may apply).  (Jeffries Decl. Ex. 114, Hudson Tr. 103:6-104:22).)

366.     Capital Markets staffing partners staffed third-year and more senior associates and from occasionally staffed second years.  (Jeffries Decl. Ex. 114, Hudson Tr. 87:13-20).)   Byron Rooney was a staffing partner in Capital Markets and a member of the Diversity Committee. See ¶ 567 *infra*.

367.     Cardwell made a complaint on September 30, 2015 during a meeting attended by members of the Diversity Committee and Associate Development Department.  See ¶ 486 *infra*.

17

368.     Cardwell worked with Hudson on two matters.  According to the summary review form for his 2016 annual review, Cardwell billed 143.5 hours on one matter and 53.8 hours on the other. (ECF 223-9 at 31, Buergel Decl. Ex. DPW_SDNY-000144383.)

369.     On the matter where Cardwell billed 143.5 hours, Hudson asked that 4.1 hours be written off for post-closing tasks (after the deal closed) and did so in response to the senior associate telling Hudson: "Kaloma seemed to have spent a lot of time of the closing sets"; "don't know if you want to keep all that time." (Jeffries Decl. Ex. 60 (DPW_SDNY-000096513).)

370.     On the other matter with Hudson (to which Cardwell billed 53.8 hours), Hudson did not write off any of Cardwell's time. ((Jeffries Decl. Ex. 60 (DPW_SDNY-000096513).)

371.     None of the Firm's summary review forms reflect that Cardwell had billing issues, that he underbilled, or that he worked so slowly that clients were overbilled and time had to be written off. (Buergel Decl. Ex. 9 (DPW_SDNY-000144389); Buergel Decl. Ex. 9 (DPW_SDNY-000144385); Buergel Decl. Ex. 9 (DPW_SDNY-000144383); Buergel Decl. Ex. 9 (DPW_SDNY-000144391-DPW_SDNY-000144392).)

### a. Non-Performance Reasons for Staffing

372.     Most associates participate in two rotations and then permanently assign to one of the groups they rotated through. (Jeffries Decl. Ex. 1 (Cardwell Tr. 453:6-12).)

373.     Staffing decisions take into account the rotations an associate has done, the tasks they have performed, and if the associate has worked with the supervising partner. (Jeffries Decl. Ex. 33 (DPW_SDNY-000141793 to -796); Jeffries Decl. Ex. 34 (DPW_SDNY-000141815).)

374.     On June 6, 2016, Alicia Fabe from the Associate Development Department prepared a presentation on Black associates in Corporate and Tax, which indicated that Cardwell "[d]id [an] extra six month rotation in Capital Markets at his request" but that there was "difficulty staffing him in Capital Markets." (Jeffries Decl. Ex. 35 (DPW_SDNY-000140597).)

375.    The presentation was prepared in advance of a meeting the following week with John Bick, to specifically discuss the performance of Black associates in these groups. (Jeffries Decl. Ex. 35 (DPW_SDNY-000140597).)

376.    The deck was revised to state that Cardwell "[d]id [an] extra six month rotation in Capital Markets at his request" but that there was "difficulty staffing him in Capital Markets based on performance issues." (Buergel Decl. Ex. 23(b) (DPW_SDNY-000140609 at -623–624).) (emphasis added))

377.    The words "based on performance issues" were added around June 10, 2016, after Hudson spoke to Fabe. (Jeffries Decl. Ex. 35 (DPW_SDNY-000164803); TAC ¶ 126.)

378.    Capital Markets is "partially about helping companies raise financing in the capital markets" and as a result, "there will be times when the market activity is slower, and there is less work for the group to do." (Jeffries Decl. Ex. 5 (Hudson Tr. 34:5-17).)

379.    In March 2016, Rooney and Cardwell had a check-in meeting where Rooney apologized for not being able to get Cardwell more work and placed the blame for Cardwell not being staffed on how challenging the market was during his rotation. (ECF 200, TAC ¶ 171.)

### b.  Cardwell's Experiences on Hudson's Deal

380.    Hudson asserted in a review form dated June 2016 that in November 2015, replacement staffing occurred on one of her deals due to Cardwell's performance. (Jeffries Decl. Ex. 5 (Hudson Tr. 216:15-218:4; Buergel Decl. Ex. 9 (DPW_SDNY-000144371).)

381.    It stated: "diligence and other preparatory tasks were completed so slowly that a second junior … needed to be staffed" and "the deal was postponed shortly thereafter." (Jeffries Decl. Ex. 5 (Hudson Tr. 216:15-218:4; Buergel Decl. Ex. 9 (DPW_SDNY-000144371).)

382.     The junior associate was REDACTED and the senior associate was REDACTED . (Jeffries Decl. Ex. 5 (Hudson Tr. 216:15-218:4); Buergel Decl. Ex. 9 (DPW_SDNY-000144371); Jeffries Decl. Ex. 38 (DPW_SDNY-000028150).

383.     Hudson claimed that her review was "based on" her "involvement, working on the transaction" with Cardwell and REDACTED.  (Jeffries Decl. Ex. 5 (Hudson Tr. 218:11-222:15).)

384.     REDACTED was staffed on the deal on November 5, 2015, as evidenced by emails between Cardwell, Clausen, and REDACTED discussed why REDACTED was added to Hudson's deal team:

a.  REDACTED emailed Clausen: "FYI, I am only on one capital markets deal [CLIENT C], and it has not been very active for the past two weeks. As a rotator, I would really hope to get exposure to different types of capital markets transactions over the course of my 6-month rotation. Do you think there might be some other deal work in the group that might need my help?" (Jeffries Decl. Ex. 36 (DPW_SDNY-000141816).)

b.  Clausen responded: "Right now, things are not as busy as they were a few weeks ago but I'm sure things will pick." (Jeffries Decl. Ex. 36 (DPW_SDNY-000141816).)

c.  Cardwell emailed Clausen: "Per … below, we just found out that the first filing for this deal will be next Tuesday and not in December as all parties previously thought." (Jeffries Decl. Ex. 37 (DPW_SDNY-000045506).)

d.  Clausen emailed REDACTED : "I don't have debt offering assignment at the moment but we could use your help on the [CLIENT S]. It's with Sophia Hudson, REDACTED and Kaloma Cardwell. They just found out that the first filing for this deal will be next Tuesday and not in December as all parties previously thought." (Jeffries Decl. Ex. 36 (DPW_SDNY-000141816).)

385.     On November 7, 2015, Hudson and REDACTED discussed why REDACTED was added to the team:

a.  Hudson asked REDACTED "Are both Kaloma and REDACTED helping you?" (Jeffries Decl. Ex. 38 (DPW_SDNY-000028150).)

b.  REDACTED replied: "Rocio reached out about taking on another first-year as I understand they're pretty slow right now. REDACTED helping with backup but it's a discrete task that we began yesterday so we're almost done." (Jeffries Decl. Ex. 38 (DPW_SDNY-000028150).)

c.  Hudson replied: "Ok, thanks. Feel free to check with the partner before adding such staffing."  (Jeffries Decl. Ex. 38 (DPW_SDNY-000028150).)

20

    d. She added: "Not a big deal." (Jeffries Decl. Ex. 38 (DPW_SDNY-000028150).)

386. On November 10, 2015, a lawyer from another law firm informed Hudson, REDACTED Cardwell, and REDACTED that deal would be put on hold due to market conditions and that the client REDACTED " (Jeffries Decl. Ex. 39 (DPW_SDNY-000015658).)

387. On November 10, 2015, REDACTED sent Hudson, Cardwell, and REDACTED a confirmatory email conveying that the deal would be put on hold. (Jeffries Decl. Ex. 40 (DPW_SDNY-000015660).)

388. Hudson asserted "diligence and other preparatory tasks were completed so slowly that a second junior associate needed to be staffed," including because Cardwell once worked overnight on November 8, 2015. (Jeffries Decl. Ex. 5 (Hudson Tr. 253:8-254:9).)

389. On December 17, 2015, Hudson declined a senior associate's offer to secure replacement staffing on a deal so that Hudson and Cardwell would have coverage while that associate took vacation. (Jeffries Decl. Ex. 41 (DPW_SDNY-000096468).)

390. On January 19, 2016, Hudson declined a different associate's offer to secure replacement staffing on a deal so that Hudson and Cardwell would have coverage while that associate took vacation. (Jeffries Decl. Ex. 42 (DPW_SDNY-000096512).)

### 2. Contemporaneous Emails – Cardwell's Performance

391. A senior associate working on a deal with Cardwell and Hudson explained to Hudson why Cardwell did not complete a task sooner (i.e., the associate did not want to email the client on Thanksgiving). (Jeffries Decl. Ex. 44 (DPW_SDNY-000093366).)

392. On December 28, 2015, Laura Turano, an M&A associate, emailed Fenner praising Cardwell's performance, noting that he deserved a "gold star next to his name." (Jeffries Decl. Ex. 45 (KCARDWELL021629).)

393.     Turano thanked Cardwell and explained that she "sent the email … to Carolina so that [his work] doesn't go unnoticed." (Jeffries Decl. Ex. 46 (KCARDWELL022886).)

394.     On January 9, 2016, a different senior associate thanked Cardwell for his work on an assignment, noting that he "did an excellent job, and [his] work looks very thorough." (Jeffries Decl. Ex. 47 (KCARDWELL021315).)

395.     On January 9, 2016, the senior associate approved work product that Cardwell prepared for circulation to the broader team, noting that it "looks great" and that he had "no comments." (Jeffries Decl. Ex. 48 (KCARDWELL021313).)

### 3.     Pretext

396.     On or around September 24, 2017, Hudson described another associate who worked overnight on an assignment over the weekend as "extremely willing to work hard" but that "[s]ometimes [she worries] because he works so hard – working through the night on the weekend so that he can spend time with his family." (Jeffries Decl. Ex. 138, DPW-SDNY-00165864.)

397.     Hudson testified that Cardwell sending an email "on a Sunday at 4:03 AM" was illustrative of her concerns and was an example of Cardwell "working slowly, and taking too long to complete tasks" such that it "caused [her] to need to bring on another junior associate." (Jeffries Decl. Ex. 5 (Hudson Tr. 250:13-255:10).)

398.     In the Firm's NYSDHR Brief, Davis Polk represented that the "Firm made exceptions to policy for Cardwell's benefit by permitting him to try a third practice area to see if he could gain traction in his first year or so." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000292).)

399.     Cardwell explained that he sought permission to complete a third rotation after completed a practice group assignment survey before starting at the firm in September 2014, which

identified the firm's Credit and Capital Markets groups as groups that could supplement his M&A practice. (Jeffries Decl. Ex. 1 (Cardwell Tr. 453:13-24).)

400.    Cardwell discussed his preference with Vanessa Jackson, John Amorosi, and Maurice Blanco, who all confirmed that a third rotation in Capital Markets would be a good idea given Cardwell's long-term M&A interest. (Jeffries Decl. Ex. 1 (Cardwell Tr. 454:20-455:7).)

### F.    Assigned Member of M&A Group (April 2016 – March 2017)

#### 1.    Hours

401.    The Firm's records indicated the following hours for Cardwell during this period:

| Month | Billable Client Hours |
|---|---|
| April 2016 | 43.6 |
| May 2016 | 101.1 |
| June 2016 | 96.9 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | 229.6 |
| October 2016 | 112.4 |
| November 2016 | 68.9 |
| December 2016 | 14.1 |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.9 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000143583).)

402.    During Cardwell's employment, the Firm provided M&A rotators and associates with a "[m]emorandum for: M&A associates" that indicated:

   a.    "Assignments in the M&A Group are distributed by the assignment coordinators."

   b.    "Any partner or associate who needs help on a matter must call the assignment coordinators first."

   c.    "The coordinators will determine appropriate staffing in consultation with the lawyer who needs help."

   d.    "You should expect to be staffed on multiple matters at once."

(Jeffries Decl. Ex.8, DPW_SDNY-000000335).

403.     From April 2016 to the first half of September 2016, Cardwell was staffed by the Firm's non-partner staffing coordinators, namely Fenner. (ECF 209, Defs. Answer ¶ 270.)

404.     On April 6, 2016, Fenner informed Cardwell that she was "trying [her] best to send work [his] way but things have been really slow in terms of new staffing requests" and that she had "only gotten requests for very junior work (research, presentation slides, closing checklist, etc.)," which she sent to "1st years." (Jeffries Decl. Ex. 50 (DPW_SDNY-000162107).)

405.     In May 2016, after Fenner staffed Cardwell on a matter, Cardwell informed Fenner that the status of the deal changed, and the assignment no longer involved billable work: "[W]e lost the bid on Felipe's deal (and … there isn't any work going forward). My capacity is 100%. Please staff away!" (Jeffries Decl. Ex. 43 (DPW_SDNY-000162109).)

406.     On or around August 4, 2016, Fenner told Cardwell there had been no decision to limit Cardwell's staffing to certain types of deals or matters. (ECF 209, Defs. Answer ¶ 240.)

407.     After associates are assigned permanently and become third-year associates, their staffing is coordinated by junior staffing partners. (ECF 209, Defs. Answer ¶ 270.)

408.     In September 2016, Cardwell became a third-year associate. (ECF 209, Defs. Answer ¶ 288.)

409.     Around September 2016, Birnbaum and Wolfe began serving as junior staffing partners for Cardwell and other M&A associates in their third-year. (Birnbaum Tr. 61:5-10; ECF 209, Defs. Answer ¶¶ 11, 270.)

410.     Associates could signal their capacity to take on new work by completing weekly forms that were sent to the Firm's staffing coordinators. (ECF 209, Defs. Answer ¶ 203.)

411.     These weekly capacity forms and the Firm's computer systems contain data relating to associates' capacity and billable hours. (ECF 209, Defs. Answer ¶ 293.)

412.     Birnbaum and Wolfe had access to and received M&A associates' weekly capacity forms, including Cardwell's, to the extent the forms were submitted for that week. (ECF 209, Defs. Answer ¶ 365; Jeffries Decl. Ex. 3 (Birnbaum Tr. 55:16-56:7; *id.* 71:12-18).)

413.     Cardwell at times reported to have capacity of over 50% to take on new work. (ECF 209, Defs. Answer ¶ 240.)

414.     Between January and March 2017, Cardwell submitted capacity forms that indicated he had 100% availability. (ECF 209, Defs. Answer ¶ 344.)

415.     Davis Polk, Birnbaum, and Wolfe did staff Cardwell on any new matters in September 2016, October 2016, November 2016, December 2016, January 2017, February 2017, or March 2017. (ECF 209, Defs. Answer ¶¶ 363-67.).

### 2.     Performance Reviews and 2016 Annual Review with Kreynin

416.     For the 2016 review cycle, the Firm automatically generated and distributed review forms to partners who worked with an associate who billed about 75 hours (or more) on one of their matters during that review period. (Jeffries Decl. Ex. 14 (DPW_SDNY-000143671).)

417.     As with other years, partners "underst[ood] that senior associates may be knowledgeable about [a junior associate's] work on a matter," and that reviewing attorneys could solicit feedback from such senior associates.   (Jeffries Decl. Ex. 22 (DPW_SDNY-000143965).)

418.     During the annual review process, M&A partners were asked to complete reviews for associates who billed 75 hours or more in the last 12 months to a matter on which they were one of the most active partners or counsel. (Jeffries Decl. Ex. 23 (DPW_SDNY-000165045).)

419.     Reviews from September 2015 to September 2016 were considered in Cardwell's 2016 annual review. (ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144383).)

420.     Cardwell's 2016 annual review form lists seven principal matters that were "considered in the evaluation." (Buergel Decl. Ex. 23 (DPW_SDNY-000144383).)

421.    According to the form, Cardwell billed the following hours on these matters:

| | | | |
|---|---|---|---|
| Principal matter 1: | 143.5 hours | Principal matter 5: | 55.6 hours |
| Principal matter 2: | 126.5 hours | Principal matter 6: | 55.3 hours |
| Principal matter 3: | 99.5 hours | Principal matter 7: | 53.8 hours |
| Principal matter 4: | 56.5 hours | | |

(ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144383).)

422.    The form reflected that comments were provided by five partners and four associates for this review. (ECF 223-9 at 33, Buergel Decl. Ex. 23 (DPW_SDNY-000144383)

423.    Bick claimed that reviews are weighted, such that "where there's let's say seven real good reviews, one person has a bad review, I think usually that would be understood to be sort of an outlier and probably discounted." (Jeffries Decl. Ex. 4 (Bick Tr. 280:15-281:14).)

424.    Cardwell's reviews indicate that Hudson was the only reviewer to answer that Cardwell was materially "behind" other associates in his class":

26

| Date of Review | Reviewing Attorney | Group Title | Behind, With, or Ahead?[2] | Citation |
|---|---|---|---|---|
| June 22, 2016 | Christopher Bezeg | M&A Associate | With | ECF 223-9 at 7, Buergel Decl. Ex. 9 (DPW_SDNY-000144359). |
| June 20, 2016 | Brian Friedman | M&A Associate | [blank] | ECF 223-9 at 13, Buergel Decl. Ex. 9 (DPW_SDNY-000144365). |
| June 20, 2016 | Joseph Hall | Cap. Markets Partner | With | ECF 223-9 at 15, Buergel Decl. Ex. 9 (DPW_SDNY-000144367). |
| June 20, 2016 | Sophia Hudson | Cap. Markets Partner | Behind | ECF 223-9 at 19, Buergel Decl. Ex. 9 (DPW_SDNY-000144371). |
| June 21, 2016 | Laura Turano | M&A Associate | With | ECF 223-9 at 25, Buergel Decl. Ex. 9 (DPW_SDNY-000144377). |
| June 22, 2016 | John Amorosi | M&A Partner | With | ECF 223-9 at 3, Buergel Decl. Ex. 9 (DPW_SDNY-000144355). |
| September 27, 2016 | Sophia Hudson | Cap. Markets Partner | Behind | ECF 223-9 at 17, Buergel Decl. Ex. 9 (DPW_SDNY-000144369). |
| September 27, 2016 | John Butler | M&A Partner | [blank] | ECF 223-9 at 8, Buergel Decl. Ex. 9 (DPW_SDNY-000144360). |
| October 4, 2016 | Francesca Campbell | M&A Associate | With | ECF 223-9 at 9, Buergel Decl. Ex. 9 (DPW_SDNY-000144361). |
| October 4, 2016 | Laura Turano | M&A Associate | With | ECF 223-9 at 24, Buergel Decl. Ex. 9 (DPW_SDNY-000144376). |

425.    Bick claimed the consensus reached during their group discussion was Cardwell should be given a midyear review in 2017. (Jeffries Decl. Ex. 4, Bick Tr. 282:20-283:12).)

426.    The reviews associates reflected above and submitted in connection with the evaluations that Cardwell received in 2016 included the following statements:

---

[2] The full question reads: "Do you feel lawyer is performing materially behind, with, or ahead of lawyer's class?"

a) Cardwell "was pleasant to work with, responsive to emails and seemed eager to learn." (ECF 223-9 at 13 (Friedman, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144365).)

a) "Kaloma did a proxy form check and seems to have done a good job of it, including communicating with the client and coordinating internally with the DPW benefits lawyers. He was prompt and professional throughout." (ECF 223-9 at 15 (Hall, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144367).)

b) "Kaloma worked on preparing a chart outlining statements made in a legal complaint, statements made by the same party in the press and the arb spread at the same time. I appreciated his enthusiasm for the assignment and diligent research of relevant press articles. I also thought that he worked well calculating and incorporating the arb spread into the analysis." (ECF 223-9 at 25 (Turano, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144377).)

c) "I thought that Kaloma's work (and the timeliness of turning in the work) was a notable improvement from my experience working with him a year ago." (ECF 223-9 at 25 (Turano, June 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144377).)

d) "Kaloma has an excellent attitude and is a pleasure to work with. He is enthusiastic and performs at his best when he is given the full context of a deal. He steps up and works very hard." (ECF 223-9 at 9 (Campbell, October 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144361).)

e) "Kaloma reviewed the D&O insurance policies and policy summaries for [CLIENT Z] and suggested changes based on precedents. He showed a good command of the material and was able to provide a number of helpful recommendations (even though this isn't the type of work our firm typically does)." (ECF 223-9 at 24 (Turano, October 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144376).)

f) "I think there has been a notable improvement in Kaloma's work this year compared to last year. Last year, I had issues with the timeliness of his work. This year, he's been more focused on the task and has produced high quality work product. He also has discussed openly his efforts to improve his work product/work habits." (ECF 223-9 at 24 (Turano, October 2016), Buergel Decl. Ex. 9 (DPW_SDNY-000144376).)

427.    Hudson explained that M&A and Capital Markets "differ drastically" such that her knowledge of staffing considerations and performance assessments were limited to Capital Markets. (Jeffries Decl. Ex. 114, (Hudson Tr. 29:13-30:9; 96:14-97:3;105:9-11).)

428. Hudson explained that none of her assessments spoke to Cardwell's capabilities or performance as an M&A associate. (Jeffries Decl. Ex. 114, Hudson Tr. 173:8-12).) Hudson stated that she "had no reason to think [Cardwell] might be terminated, based on [her] time working with him." (Jeffries Decl. Ex. 5, Hudson Tr. 197:8-198:24).)

### 3. Pretext

429. In the Firm's NYSDHR Brief, Davis Polk represented that:

a) "By the fall of 2016, reviews of Cardwell's performance reflected an increasing concern that his work was not at the level expected of a Firm associate, much less an associate making the transition, as Cardwell was that fall, from the junior to the midlevel role."

b) "By this point, and consistent with Davis Polk's practices, Cardwell's poor performance over three rotations and at the beginning of his post-rotation assignment to the M&A group was such that it would have warranted giving Cardwell a message that it was time for him to look for another job."

c) "Cardwell has suffered from persistent, demonstrated performance problems throughout his tenure at Davis Polk that have been separately memorialized by senior attorneys *in three parts of the Firm*. Although these problems repeatedly have been communicated to Cardwell, his performance has not improved over time." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000292) (citations omitted.) (emphasis added.)

d) "Cardwell's assignments and hours were driven by his record of poor performance *across three separate groups* within the Davis Polk Corporate Department."

(Jeffries Decl. Ex. 8 (NYSDHR Brief, DPW_SDNY-000000287 to -292).) (emphases added.)

430. Mid-year reviews can be given to an associate following a partner's request. (Jeffries Decl. Ex. 2 (Crane Tr. 47:9-48:16).)

431. Crane testified that mid-year reviews "could be related" to an associate performing poorly or performing well. (Jeffries Decl. Ex. 2 (Crane Tr. 47:9-48:16).)

432. Unlike Cardwell's 2016 year-end review, the Firm noted in assessments of other Corporate associates who were scheduled to receive check-ins at the end of 2016 that the associates

were "behind ▨ class" (Jeffries Decl. Ex. 59 (DPW_SDNY-000144471); "told ▨ would get six month review and that ▨ needed to demonstrate higher level of commitment if ▨ wanted to stay" (Jeffries Decl. Ex. 59 (DPW_SDNY-000144473); "told to start looking for new job in July and given a three month target" (Jeffries Decl. Ex. 59 (DPW_SDNY-000144472); "told ▨ needed to improve in the next several months or time at the firm will be limited" (Jeffries Decl. Ex. 59 (DPW_SDNY-000144473); "told improvement needed or ▨ would need to leave the firm" (Jeffries Decl. Ex. 59 (DPW_SDNY-000144473), "told ▨ that we would help ▨ to find ▨ a new position but would not increase comp." (Jeffries Decl. Ex. 59 (DPW_SDNY-000144475); had or was "poor performance, 'stalled,' unwilling to contribute to the team" (Jeffries Decl. Ex. 59 (DPW_SDNY-000144475); "told … long-term prospects … are not good and that ▨ is not functioning as a mid-level" (Jeffries Decl. Ex. 59 (DPW_SDNY-000144475).

433.    Hudson's September 27, 2016 review for Cardwell claims that he "completed a rotation in Capital Markets as his third rotation and was aware that he would be behind others in his class as a result of doing so." (Buergel Decl. Ex. 9 (DPW_SDNY-000144369).)

**G.    March 2017 to August 2018**

**1.    Hours**

434.    The Firm's records indicated the following hours for Cardwell during this period:

| Month | Billable Client Hours |
| --- | --- |
| April 2017 | (Firm-Approved Vacation) |
| May 2017 | 24.2 |
| June 2017 | 0 |
| July 2017 | 0 |
| August 2017 | 98.9 |
| September 2017 | 10.4 |
| October 2017 | 14.2 |
| November 2017 | 21.2 |
| December 2017 | 0 |

435.     Davis Polk, Birnbaum, and Brass did not staff Cardwell on any matters after Davis Polk filed its Position Statement. (ECF 209, Defs. Answer ¶ 479.)

### 2.     Staffing

436.     In 2017, Cardwell worked on matters with partners Lee Hochbaum and Louis Goldberg, including a memorandum that Cardwell co-authored. (ECF 200, TAC ¶ 626 n.98.)

437.     On August 31, 2017, Birnbaum emailed Cardwell (with Brass cc'd):

a)     "Kaloma, we're pitching for a new client, couple of public company deals, and would like to include you on the team for the pitch. Nothing to do right now, just wanted to give you a heads-up. Who knows if we'll get it, but here's hoping. Sounds like it wouldn't start until mid-September, FYI."

(Jeffries Decl. Ex. 133 (DPW_SDNY-000086138).)

438.     On September 1, 2017, Birnbaum and Kreynin discussed staffing Cardwell on these public company deals. (Jeffries Decl. Ex. 133 (DPW_SDNY-000086138).)

439.     On September 1, 2017, Kreynin informed the potential client that Davis Polk was "working on a detailed proposal which includes the full team that we would field for the transaction(s)" and that he "should be able to give you a comprehensive proposal on Tuesday." (Jeffries Decl. Ex. 135 (DPW_SDNY-000167345).)

440.     Kreynin sent the proposal on September 5, 2017, explaining that he included "the professional biographies of the members of the Davis Polk team that would work collaboratively on the transaction should you choose to engage us."  "Our presentation reflects both the professional accomplishments of the team and the diversity of Davis Polk's lawyers."  (Jeffries Decl. Ex. 135 (DPW_SDNY-000167348).)

441.     The proposal described the tasks that would be performed by Cardwell and other members of the proposed team, including "[a]ssist[ing] in analyzing structure of proposed sale and, as applicable," "[p]repar[ing] markup of seller's purchase and sale agreement (PSA) and

ancillary documents," "finalization of the PSA and ancillary documents," and "[c]oordinate the closing of the transaction." (Jeffries Decl. Ex. 135 (DPW_SDNY-000167349).)

442.    The proposal anticipated that "[w]ork will commence on September 15, 2017" and the "[c]losing will occur no later than March 1, 2018." (Jeffries Decl. Ex. 135 (DPW_SDNY-000167349).)

443.    The proposal included Cardwell's picture and a Firm-created professional biography. (Jeffries Decl. Ex. 135 (DPW_SDNY-000167365, DPW_SDNY-000167384).)

444.    When Davis Polk puts in a "pitch for new business" it "would be fair to state the firm tries to put its best foot forward." (Jeffries Decl. Ex. 116 (Reid Tr. 299:4-7).)

445.    A "pitch involving a couple of public company deals" would be a "significant pitch within the eyes of the Firm" and it is considered "meaningful business." (Jeffries Decl. Ex. 116 (Reid Tr. 299:10-14).)

446.    On September 6, 2017, Reid was informed that Cardwell was being used in a pitch to secure a new Firm client, and that Cardwell would be a part of the M&A team working on the public company transactions. (Jeffries Decl. Ex. 134 (DPW_ SDNY-000098097).)

447.    Reid confirmed that he did not have any concerns, nor was he aware of any concerns about Cardwell potentially working on multiple transactions in 2017 and 2018, if the Firm won the business. (Jeffries Decl. Ex. 116 (Reid Tr. 303:15-304:18).)

448.    Between April 2017 and November 2017, Cardwell worked on a deal with Lee Hochbaum involving the finalization of fairness opinions for two of the Firm's clients. (Jeffries Decl. Ex. 117 (Cardwell Tr. 509:22-510:3).)

449.    Reid testified that a "fairness opinion" is an important document. (Jeffries Decl. Ex. 116 (Reid Tr. 292:22-25).)

450. On October 21, 2017, Kreynin and Goldberg shared the following exchange:

    a) Kreynin: "Are we still trying to stuff Kaloma on projects as lead associate? If so, I will take him on this."

    b) Goldberg: "Yes trying to staff him. Not necessarily as senior. Whatever makes sense. Thanks much."

    c) Kreynin: "I will take him."

    d) Kreynin: "Any special instructions?"

    e) Goldberg: "Nope."

(Jeffries Decl. Ex. 137 (DPW_SDNY-000140126).)

### 3. Performance Reviews and 2017 Annual Review with Smith

451. For the 2017 review cycle, the Firm's automatically generated and distributed review forms to partners who worked with an associate who billed 75 hours (or more) on one of their matters during that review period. (Jeffries Decl. Ex. 15 (DPW_SDNY-000143672).)

452. As in other years, partners "underst[ood] that senior associates may be knowledgeable about [a junior associate's] work on a matter," and that reviewing attorneys could solicit feedback from such senior associates. (Jeffries Decl. Ex. 24 (DPW_ SDNY-000143977).)

453. During the annual review process, M&A partners were asked to complete reviews for associates who billed 75 hours or more in the last 12 months to a matter on which they were one of the most active partners or counsel. (Jeffries Decl. Ex. 25 (DPW_SDNY-000165040).)

454. Reviews from September 2016 to September 2017 were considered in Cardwell's 2017 annual review. (ECF 223-9 at 39, Buergel Decl. Ex. 23 (DPW_SDNY-000144391).)

455. Cardwell's 2017 annual review form lists three different principal matters that were "considered in the evaluation." (Buergel Decl. Ex. 23 (DPW_SDNY-000144391).)

456. According to the form, Cardwell billed the following hours on these matters:

| Principal matter 1: | 362.3 hours |
| Principal matter 2: | 78.9 hours |
| Principal matter 3: | 57.9 hours |

(ECF 223-9 at 39, Buergel Decl. Ex. 23 (DPW_SDNY-000144391).)

457.    Unlike Cardwell's 2015 and 2016 annual review forms, the 2017 annual review form does not list the names of any partners or associates under "[c]omments received from." (*Compare* Buergel Decl. Ex. 23 (DPW_SDNY-000144383) (2016 annual review form) *with* Buergel Decl. Ex. 23 (DPW_SDNY-000144391) (2017 annual review form).)

458.    Cardwell's 2017 annual review did not incorporate evaluations from any attorneys from two of three of the principal matters listed on Cardwell's official summary review for this annual review cycle. (ECF 223-9 at 39, Buergel Decl. Ex. 23 (DPW_SDNY-000144391).)

459.    On January 11, 2018, partners Oliver Smith and Louis Goldberg met with Cardwell to deliver his 2017 annual review. (TAC ¶¶ 480, 483.)

460.    This meeting was the very first time that anyone at Davis Polk expressed to Cardwell that the Firm concluded that (i) Cardwell appeared to be or was "behind" associates of the same class year or (ii) the quality of his work was supposedly poor. ECF 200, TAC ¶ 516.

461.    During the meeting, Cardwell expressed his belief that these negative reviews were inconsistent with feedback he had been given from partners while he was doing the work for those matters. (ECF 209, Defs. Answer ¶ 502.)

462.    Cardwell's 2017 annual review was partly based on comments provided by the reviewing partners during review discussions. (ECF 209, Defs. Answer ¶ 484.)

463.     On February 5, 2018, a member of the Associate Development Department emailed

Fenner: "The summary for Kaloma is intentionally blank." (DPW_SDNY-000105472); ECF 209,

Defs' Answer ¶ 531.)

464.     Crane testified that the summary review was blank "because [she] ha[d] the full

version of this form" in her possession, and that she had possession of it "based on instructions

from general counsel." (Jeffries Decl. Ex. 119, Crane Tr. 318:17-319:23).)

465.     When "reviews are done in the ordinary course," "there's no need to talk to

counsel." (Jeffries Decl. Ex. 115, Bick Tr. 234:4-235:5).)

466.     Lee Hochbaum, an M&A partner, received an email on September 7, 2017 from

Gina Caruso, counsel who worked on behalf of Davis Polk in response to the EEOC Charge.

Hochbaum submitted a review for Cardwell on September 19, 2017. (ECF 209, Defs. Answer ¶

489; Jeffries Decl. Ex. 52 (Davis Polk's Privilege Log No. 300).)

467.     In his review, Hochbaum rated Cardwell as materially "behind" associates in his

class, becoming the first M&A partner to do so. (ECF 209, Defs. Answer ¶ 488.)

468.     Phillip Mills, an M&A partner, exchanged over a dozen emails on September 11,

2017 with counsel who worked on behalf of Davis Polk in response to the EEOC Charge.  Mills

submitted a review for Cardwell on October 2, 2017. (ECF 209, Defs. Answer ¶ 490; (Jeffries

Decl. Ex. 52 (Davis Polk's Privilege Log Nos. 302-08; 310-18).

469.     In his review, Mills rated Cardwell as materially "behind" associates in his class,

becoming the second M&A partner at Davis Polk to do so. (ECF 209, Defs. Answer ¶ 488.)

470.     Louis Goldberg, an M&A partner exchanged emails, including with counsel,

following the EEOC Charge who worked on behalf of Davis Polk in response to the EEOC Charge.

Goldberg submitted a review for Cardwell on October 6, 2017. (ECF 209, Defs. Answer ¶ 492; Jeffries Decl. Ex. 52 (Davis Polk's Privilege Log Nos. 222-23).

471.    In his review, Goldberg rated Cardwell as materially "behind" associates in his class, becoming the third M&A partner at Davis Polk to do so. (ECF 209, Defs. Answer ¶ 488.)

### 4.    Termination of Employment

472.    On February 8, 2018, Oliver and Goldberg informed Cardwell that there had been a Firm decision, in light of performance issues, that the Firm could not staff Cardwell consistent with his class year and the Firm's obligations to its clients; and thus, the Firm believed it was time for Cardwell to begin to look for alternative employment. (ECF 209, Defs. Answer ¶ 588.)

473.    Specifically, Goldberg told Cardwell that staffing him as an M&A associate was "not a situation that's workable."  (ECF 200, TAC ¶ 592.)

474.    When asked about the circumstances of Cardwell receiving a "time to go" message, Bick explained: "[W]e were making that decision collectively and it was discussed in the fall of 2017, and then ultimately the message was agreed that in February … we came back to him and said he needed to look for a new job. So that's when he was told he had to leave the firm." (Jeffries Decl. Ex. 4, Bick Tr. 284:23-287:5).)

475.    The discussions "that led to the decision to terminate Mr. Cardwell" occurred in "the January/February time frame of 2018."  (Jeffries Decl. Ex. 4, Bick Tr. 284:23-287:5).)

476.    Bick identified these groups or specific individuals as involved in the decision to terminate Cardwell's employment: the "Management Committee" (i.e., Bick, Reid, and Rouhandeh); "Staffing Partners" (i.e., Harold Birnbaum; Brian Wolfe); Louis Goldberg; Oliver Smith; and "everyone [else] who had input."  (Jeffries Decl. Ex. 4, Bick Tr. 284:23-287:5).)

### 5.    Pretext

477.    Between May 2015 and May 2017, Cardwell had ten face-to-face meetings with partners familiar with his performance, reviews, and professional development and no one ever told Cardwell that Hudson or the Firm believed or noted in a performance review that Cardwell was "behind" lawyers in his class or that the quality of his work was poor and/or contributing to issues related to his staffing. (ECF 200, TAC ¶ 548-50.)

478.    When asked "[c]ould Mr. Cardwell do work as an M&A associate for Davis Polk if supervised," Reid responded: "With supervision, any associate can do M&A work."  (Jeffries Decl. Ex. 116 (Reid Tr. 308:20-309:5).)

479.    A negative performance review normally does not trigger termination.   (Jeffries Decl. Ex 6, DeSantis Tr. 279:16-23).)

480.    "[I]f an associate's performance improves or if they are showing signs of improvement, they can stay indefinitely."  (Jeffries Decl. Ex 6, DeSantis Tr. 279:16-23).)

481.    DeSantis also answered "yes" to the following questions:

   a) "Are you aware of associates remaining employed at the firm despite receiving behind ratings in performance reviews in a prior review period?" (Jeffries Decl. Ex 6, DeSantis Tr. 280:11-15).)

   b) "Are you aware of associates remaining employed at the firm despite receiving multiple negative performance reviews in a prior review period?" (Jeffries Decl. Ex 6, DeSantis Tr. 280:16-21).)

   c) "Are there times when the associate development department is involved or has input in discussions about whether or not to terminate an associate when a termination is based on performance?"  (Jeffries Decl. Ex 6, DeSantis Tr. 276:18-277:7).)

482.    The Director of the Associate Development Department was not involved in the decision to terminate Cardwell's employment, nor did she know why the Firm fired him. (Jeffries Decl. Ex 6, DeSantis Tr. 274:9-11; 278:5-8; 275:13-21.)

37

483.    Hudson testified that she does not know why Cardwell was fired and if other employees were fired for the same reason. (Jeffries Decl. Ex. 5 (Hudson Tr. 200:23-201:6-8).)

484.    The Executive Director – Personnel was not involved in the decision to fire Cardwell.  (Jeffries Decl. Ex. 2 (Crane Tr. 257:19-20; 258:12-24; 259:3-10; 259:19-25).)

## IV.    RETALIATION CLAIMS

### A.  Overview

485.    On March 6, 2015, when discussing the article "*When Talking About Bias Backfires*" during a firm-wide event, Davis Polk partners and associates, including Cardwell, discussed the fact that "new research suggested that if people are not careful, making people aware of bias can backfire, leading them to discriminate more rather than less."  (ECF 209, Defs. Answer ¶¶ 57-58.)

486.    On September 30, 2015, Cardwell told the Diversity Committee that he was perceiving and experiencing racial exclusion at Davis Polk and that it was harming his and other Black associates' professional development and careers. (Cardwell Decl. ¶ 7; TAC ¶¶ 71-75.)

487.    Cardwell's comments and perceptions around exclusion were discussed among the partners and administrators on the Diversity Committee and later in trainings and discussions about Cardwell, retention, and implicit bias. ((Jeffries Decl. Ex. 6 (DeSantis Tr. 181:19-182:12; 184:4-13); Jeffries Decl. Ex. 91 (DPW_SDNY-000000474); Jeffries Decl. Ex. 92 (DPW_SDNY-000144244); Jeffries Decl. Ex. 91 (DPW_SDNY-000000480).)

488.    Cardwell testified that no one at Davis Polk concluded that he was behind prior to his complaints about discrimination at the Firm. He explained: "No one at the firm concluded in their performance review that I was behind any associates in my class prior to making the complaint that I made on September 30th, 2015. It is also a fact that no M&A partner ever concluded in the performance review that I was behind associates in my class prior to me filing

38

the EEOC and New York State Division of Human Rights complaints in August of 2017." (Jeffries Decl. Ex. 1 (Cardwell Tr. 262:13-263:3).)

**B.   The Firm's Complaint Procedure Policies And Practices**

489.    During Cardwell's employment, the Firm encouraged lawyers to report perceived or experienced discriminatory behavior or harassment. (ECF 209, Defs. Answer ¶ 65.)

490.    The Firm's Complaint Procedure, as applied to associates, is set forth in the Firm's Lawyers' Handbook. (ECF 223-75 at 22, Buergel Decl. Ex. 75 (RFA No. 24); Jeffries Decl. Ex. 10 (DPW SDNY-000000758); Ex. 11 (DPW SDNY-000000654).)

491.    Reid, Bick, Hudson, Birnbaum, and DeSantis testified that partners, associates and other employees could make or report complaints related to perceived or actual discrimination, harassment, or retaliation to Crane. (Jeffries Decl. Ex. 4 (Bick Tr. 56:23-57:8; (Jeffries Decl. Ex. 7 (Reid Tr. 41:7-19); (Jeffries Decl. Ex. 5 (Hudson Tr. 52:6-17).)

492.    "[I]f someone wanted to make a … complaint regarding any discriminatory behavior or harassment, … they would elevate it immediately to … Sharon Crane in her role as executive director of personnel, Jill Sterner, the director of human resources, their practice group coordinator or head of their office, the head of the administration committee, Joe Hadley, the firm's general counsel or deputy general counsel or any member of the firm's management committee." (Jeffries Decl. Ex. 6 (DeSantis Tr. 62:10-23).)

493.    During Cardwell's employment, the anti-discrimination, anti-retaliation, professional conduct, and ethics policies described in the Firm's Lawyers' Handbook stated:

   a)   "The Firm strongly recommends the prompt reporting of all perceived incidents of discriminatory behavior or harassment on the basis of sex, race, … or any other basis prohibited by federal, state or local law, regardless of the offender's identity or position.

Lawyers who believe they have been subjected to such prohibited conduct or who believe that they have witnessed such prohibited conduct or any

other behavior inappropriate to the workplace should discuss their concerns immediately with …any member of the Firm's Management Committee."

b) "The Firm encourages the prompt reporting of complaints of inappropriate or offensive conduct so that rapid and constructive action can be taken before the conduct becomes severe or pervasive. Early reporting and intervention is often the most effective method of resolving actual or perceived incidents of prohibited conduct."

c) "Complaints of inappropriate conduct will be investigated promptly."

(Jeffries Decl. Ex. 10 (DPW SDNY-000000760); Ex. 11 (DPW SDNY-000000655).)

494.    "Firm employees are expected to comply with [the] policies set forth in handbooks applicable to them."  (Buergel Decl. Ex. 75 (RFA Nos. 28-31).)

## C.  Davis Polk Committees, Groups And Cross Department Communications

495.    During Cardwell's employment, Davis Polk encouraged its Management Committee, Diversity Committee, Women's Initiative's Committee, Affinity Groups, Associate Development Department, and all of its associates to provide feedback to the Firm with respect to issues related to diversity and inclusion. (ECF 209, Defs. Answer ¶ 56.)

496.    BAG, as well as other Firm affinity groups and committees within the Firm, met regularly to discuss their experiences at Davis Polk. (ECF 209, Defs. Answer ¶ 315.)

497.    The Firm's Diversity Committee as "a dedicated task force of partners and administrators." (Jeffries Decl. Ex.8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000305).)

498.    Partners Monica Holland, Maurice Blanco, Byron Rooney, Sartaj Gill, Kyoko Takahashi Lin served on the Diversity Committee from October 27, 2014 through at least May 14, 2018, with Holland serving as the Chair during that period.  (Jeffries Decl. Ex. 57 (DPW_SDNY-000045274); Jeffries Decl. Ex. 53 (DPW_SDNY-000144206.)

499.    The administrators who served on the Diversity Committee included Crane, DeSantis, and Fabe. (Jeffries Decl. Ex. 6 (DeSantis Tr. 37:13-40:22; 192:5); Jeffries Decl. Ex. 53 (DPW_SDNY-000144206); Jeffries Decl. Ex. 56 (DPW_SDNY-000143348).)

500.    The Diversity Committee routinely met throughout the year. (Jeffries Decl. Ex. 6 (DeSantis Tr. 37:13-40:22).)

501.    DeSantis received emails from the Diversity Committee listserv during Cardwell's employment. (Jeffries Decl. Ex. 6 (DeSantis Tr. 25:5-11).)

502.    During Cardwell's employment, the Diversity Committee met with the Firm's Management Committee on a biannual basis to focus on addressing vestigial cultural barriers that existed within Davis Polk. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144208).)

503.    DeSantis and Crane met frequently. (ECF 209, Defs. Answer ¶ 80.)

504.    As of November 2016, partners Lin and Chudd, as well as Crane, DeSantis, and Fabe, served on the Women's Initiative Committee. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144207).)

505.    "The Diversity Committee works together with the Management and Women's initiative Committee to advance firm-wide initiatives relating to the recruitment, development, retention and promotion of our lawyers." (Jeffries Decl. Ex. 53 (DPW_SDNY-000144206).

506.    The Women's Initiative Committee "[m]eets regularly to assess policies and practices as they relate to recruitment, retention, mentoring and career development of our women lawyers at all levels and to coordinate the firm's overall women's initiatives." (Jeffries Decl. Ex. 53 (DPW_SDNY-000144207).)

507.    Chudd and Lin served on the Women's Committee. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144207).)

41

508.    As of October 30, 2017, Holland, Amorosi, Blanco, Gill, Takahashi Lin, McClammy, and Rooney, as well as Crane, DeSantis, and Fabe, served on the Firm's Diversity Committee. (Jeffries Decl. Ex. 63 (DPW_SDNY-000164693).

509.    As of that date, Lin and Chudd, as well as Crane, DeSantis, and Fabe, served on the Women's Initiative Committee. (Jeffries Decl. Ex. 63 (DPW_SDNY-000164693).)

510.    The Women's Initiative Committee, Diversity Committee, and Management Committee work "closely together to advance diversity initiatives," with the Women's Initiative Committee and Diversity Committee each meeting twice a year with the Management Committee. (Jeffries Decl. Ex. 64 (DPW_SDNY-000164691).)

511.    Training and development were discussed at the "[l]ast two annual partner meetings" in February 2016 and 2017. (Jeffries Decl. Ex. 64 (DPW_SDNY-000164691).)

512.    The Management Committee "meets with the practice group coordinators throughout the year to monitor the activity level and quality of work assigned to women and diverse associates." (Jeffries Decl. Ex. 64 (DPW_SDNY-000164691).)

513.    The Lawyer's Handbook stated that the Diversity Committee "is one of the places," "where members may discuss issues relating to the Firm's policy against discrimination … and ways to heighten the sensitivity of all DPW personnel." (Jeffries Decl. Ex. 10 (DPW SDNY-000000803); Ex. 11 (DPW SDNY-000000701).)

514.    As of October 2014, the Firm's Diversity Committee discussed (i) "concrete idea[s] [it] can implement in 2015" to help the Firm's "diversity and inclusion efforts," (ii) "an issue or concern [it] should look to tackle in 2015," and (iii) "[r]eports to Management Committee." (Jeffries Decl. Ex. 56 (DPW_SDNY-000143348).)

### D.  September 2015 Complaint

### 1.  Protected Activity And Knowledge

*A.  Knowledge*

515.    On May 8, 2015, Cardwell emailed Crane and a more senior Black associate regarding what he called an "inter-office dynamic," and recommended that the issue be addressed through the Firm's training for third-year associates. (ECF 209, Defs. Answer ¶ 60; (Jeffries Decl. Ex. 69 (DPW_SDNY-000141925).)

516.    Crane responded that the Firm's training for third-years ("Lawyering 301") is "about management and managing teams." (Jeffries Decl. Ex. 69 (DPW_SDNY-000141924).)

517.    Crane forwarded this to DeSantis and Fabe. DeSantis replied (cc'ing Fabe):

  a)  DeSantis: "[Thanks]- I know sometimes the issue is that the "old" dpw person is terrified of introducing themselves to someone they have met before or have been working with for months. The new person should also introduce him or herself."

  b)  Crane: "I know. Hence my last paragraph."

(Jeffries Decl. Ex. 69 (DPW_SDNY-000141924).)

518.    Crane reacted to Cardwell's email by "express[ing] general frustration that everyone wasn't more extraverted." (Jeffries Decl. Ex. 6, DeSantis Tr. 162:9-16).)

519.    DeSantis testified that she believes she "also discussed [Cardwell's complaint] with Alicia Fabe," as they "worked together on planning our training programs, like lawyering 301 and we would talk about how we could encourage cross-practice group, cross-office networking throughout the programs, so [DeSantis] probably mentioned this to her and in that context." (Jeffries Decl. Ex. 6 (DeSantis Tr. 163:25-164:23).)

520.    On July 27, 2015, Crane emailed Black associates on the "BAG Steering Committee," requesting that they recommend "specific initiatives" that they would like Reid and the Firm to consider implementing. (Jeffries Decl. Ex. 30 (DPW_ SDNY-000099978).)

521.    In response to Crane's request, Cardwell sent a member of the BAG Steering Committee the following questions and suggested topics:

a)    "How are (non-black and black) attorneys being trained or incentivized to develop black junior associates who are staffed on their deals/teams?"

b)    "How are (non-black and black) attorneys being trained or incentivized to provide constructive and consistent feedback to black attorneys?"

c)    "What's the Firm's plan for ensuring black associates are exposed to a variety of partners and associates throughout the Firm and within practice groups? How are (non-black and black) mid-level associates being trained and encouraged to participate in these "exposure" efforts?"

d)    "How will the Firm protect or reward black associates who might be called to participate in recruiting efforts that (non-black and some black) attorneys are not? How does the Firm prevent other/senior associates from thinking such black associates are avoiding or not prioritizing "the work''?"

e)    "How does the Firm train (non-black and black) associates to deal with (scientifically verified) implicit bias patterns in general and (scientifically verified) anti-black implicit bias patterns more specifically? How does the Firm determine the frequency in which attorneys should receive such trainings? How does the Firm determine which attorneys should receive such trainings?"

f)    "What's the Firm's plan for developing (non-black and black) attorneys' understanding of how to create an inclusive environment on deals, assignments, at practice group meetings, etc.? What's the Firm's plan for developing these understandings among attorneys who do not attend the voluntary lunch discussions that focus on these issues and dynamics?"

(Jeffries Decl. Ex. 30 (DPW_ SDNY-000099978).)

522.    On August 4, 2015, Cardwell received an email from a White first-year associate who had forwarded Cardwell an email chain involving substantive work streams on a transaction

44

that Cardwell and the other first-year associate were both staffed on at the time. Cardwell sent the other first-year associate in email and asked: "Can you send a reply all email saying[:] "Looping in Kaloma Cardwell (cc'd above)"?" (Jeffries Decl. Ex. 103 (KCARDWELL021539).)

523. On April 5, 2016, Cardwell received another email from a White first-year associate who had forwarded Cardwell an email chain involving substantive work streams on a transaction that Cardwell and the other first-year associate were both staffed on at the time. Cardwell was left off this email chain and workstream as well by senior associates/partners on the deal team. (Jeffries Decl. Ex. 5 (Hudson Tr. 184:9-185:8).)

524. On September 9, 2015, Rehman emailed Brass in connection with a matter that the three of them were staffed on, stating: "I would appreciate if you could please keep him copied on all instructions to me regarding the deal-I think this will help him stay in loop and know what is coming down the pipeline." (Jeffries Decl. Ex. 29 (DPW_SDNY-000086743).)

525. On September 29, 2015, BAG's associate chair emailed the Diversity Committee and circulated a list of topics for discussion on September 30, 2015, including "the Diversity Committee's action items for the … next year," "the diversity consultant that the firm is considering bringing in to talk to the partners," and "further engage non-diverse lawyers in the discussion about diversity at the firm." (Jeffries Decl. Ex. 72 (DPW_SDNY-000165441).)

526. On or around September 29, 2015, partners Rooney, Holland, McClammy, and the individuals on the Diversity Committee listserv (cc'd on the email), exchanged emails. (Jeffries Decl. Ex. 73 (DPW_SDNY-000168085 - DPW_SDNY-000168086).)

527. On or around September 29, 2015, Holland comments to the Diversity Committee and provides the following responses to some of the questions posed by the Steering Committee:

a) "From my perspective, our next action items relate to review season: evaluating performance reviews of diverse associates, assessing issues,

45

spotting stars and monitoring career progress. My question is whether we share something like this with associates." (Jeffries Decl. Ex. 73 (DPW_SDNY-000168086).)

b) "I am inclined to say it will be a recognized consultant who is a leader in the industry and that after the partners, we will move on to associates as well." (Jeffries Decl. Ex. 73 (DPW_SDNY-000168086).)

528. Rooney responded that "[t]he planned partner session is a good example of involving 'other'" non-diverse lawyers. (Jeffries Decl. Ex. 73 (DPW_SDNY-000168086).)

529. On September 30, 2015, members of the Diversity Committee, as well as the Director of Professional Development (DeSantis), met with members of BAG, including Cardwell, to discuss issues related to diversity and inclusion. (ECF 209, Defs. Answer ¶ 72.)

530. Holland, Blanco, Cardwell, DeSantis, Fabe and other members of the Diversity Committee attended. (Defs. Answer ¶ 73; (Jeffries Decl. Ex. 6 (DeSantis Tr. 172:19-20).)

531. DeSantis testified that during the meeting, she asked Cardwell a "direct question" about "his personal experience" at Davis Polk, and he "relayed an example of not being invited to all meetings related to a transaction, which surprised [her]." (Jeffries Decl. Ex. 6 (DeSantis Tr. 172:19-20; 173:23-24; 175:10-14).)

532. Cardwell stated that he was describing exclusion that was harmful to his and other Black associates' development and careers because the disparate treatment leads to fewer and different staffing opportunities. (Cardwell Decl. ¶¶ 12, 13, 33; Jeffries Decl. Ex. 117, Cardwell Tr. 347:19-350:13.)

533. During the BAG meeting, Cardwell told DeSantis, Fabe and others in attendance that he experienced exclusion at Davis Polk based on his race. (Jeffries Decl. Ex. 1 (Cardwell Tr. 307:14-185:8; ECF 200, TAC ¶¶ 71-72.)

46

534.     Between May 2015 and the September 30, 2015 BAG meeting, Cardwell worked in the M&A group and on a transaction involving Chudd and another first-year associate. (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

535.     This complaint, which was made in the presence of DeSantis and Fabe, Holland, Blanco, and other members of the Diversity Committee, related to a transaction involving Chudd and this first year associate. (Cardwell Tr. 347:19-350:13).)

536.     On handwritten notes created by DeSantis on or around September 30, 2015, the words "calls," "meetings," and "micro inequities" appear next to Cardwell's name. (Jeffries Decl. Ex. 73 (DPW_SDNY-000168082).)

537.     DeSantis and Crane met around October 5, 2015. (ECF 209, Defs. Answer ¶ 80.)

538.     Cardwell's name is handwritten next to the following notes, which DeSantis created in connection with their meeting:

    a)  "BAG Meeting – more training for partners and mid-levels and [senior associates] needed; feeling excluded from [meetings]/calls; desire to be involved with selecting a consultant and action items for partners; … skepticism about effectiveness of [the Firm's Career Advisor Program], [especially] in connection with improving opportunities to get in front of clients ([especially] difficult in litigation); issues [regarding] staffing more senior lawyers in litigation—to schedule meeting with Jim Rouhandeh, Jim McClammy and maybe Monica [Holland]; discussion re: benefits of having one person focused 100% on diversity."

(ECF 209, Defs. Answer ¶ 81; Jeffries Decl. Ex. 74 (DPW_SDNY-000144527).)

539.     DeSantis's notes indicate: "selecting a consultant and action items for partners." (Jeffries Decl. Ex. 74 (DPW_SDNY-000144527).)

540.     Cardwell's name within these notes relates Cardwell's feelings of being excluded, as he shared at the BAG meeting. (Jeffries Decl. Ex. 6 (DeSantis Tr. 181:12-14; 184:4-13).)

541.     Crane "would expect that Renee DeSantis would raise … a complaint … to [her] or to a partner or to general counsel's office." (Jeffries Decl. Ex. 2 (Crane Tr. 110:25-111:13).)

542.    DeSantis updated Crane on the BAG meeting, including the specific comments and experiences that Cardwell shared.  (Jeffries Decl. Ex. 6 (DeSantis Tr. 181:19-23).)

543.    DeSantis's discussion with Crane related to the notes that she took on or around October 5, 2015. (Jeffries Decl. Ex. 6 (DeSantis Tr. 181:24-125:8).)

544.    DeSantis had the following reactions to Cardwell's comments at the meeting:

  a)    "What surprised me was not that he was excluded from all meetings or -- but that he would expect to be invited to all meetings about any particular corporate transaction as a junior, relatively junior associate." (Jeffries Decl. Ex. 6 (DeSantis Tr. 175:14).)

  b)    "I assume he was referring to a transaction to which he had been assigned, but what surprised me was that he seemed to be unaware that there were potentially different work streams that were going on simultaneously that he was not necessarily involved in." (Jeffries Decl. Ex. 6 (DeSantis Tr. 176:20-177:3).)

  c)    "When he mentioned that he felt that he was aware of meetings that had taken place without him being present, I expressed my surprise that he would find that surprising. I don't remember the exact words I used but I said something like well, you know, of course not everyone on a given transaction attends every meeting related to that transaction. The clients wouldn't want to pay for that." (Jeffries Decl. Ex. 6 (DeSantis Tr. 178:3-18).)

545.    Referencing her October 5, 2015 "notes," DeSantis told Crane:

  a)    "I felt we needed to provide more training for partners and mid-levels and seniors about work streams and client sensitivities around billing because some associates were feeling excluded from meetings and calls. And then I went on to say they also expressed a desire to be involved in selecting a consultant."

(Jeffries Decl. Ex. 6 (DeSantis Tr. 181:24-182:12).)

546.    DeSantis also created notes from the September 30, 2015 BAG meeting on or around September 30, 2015. (Jeffries Decl. Ex. 73 (DPW_SDNY-000168082).)

547.    DeSantis's notes of the BAG meeting include Cardwell's name handwritten in close proximity to the following comments:

a) "Calls"
b) "Meetings"
c) "Microinequities"
d) "Formal mechanism needed to teach inclusion & feedback"
e) "lots to say - ??"
f) "associates should have input"
g) "training needed for partners & senior / mid-level associates"
h) "meetings occurring [without] diverse associates?"

(Jeffries Decl. Ex. 73 (DPW_SDNY-000168082 - DPW_SDNY-000168083).)

548.    DeSantis thought Cardwell's "comment was noteworthy" because "[i]t struck [DeSantis] that we need to improve our training to address this perception." (Jeffries Decl. Ex. 6 (DeSantis Tr. 179:6-12).)

549.    When asked "wasn't [his] comment about exclusion the type of comment that was relevant and that you would have had with other people at the time," DeSantis responded:

a) "I did not – again, I thought the issue was more of a training issue for our junior associates to explain how work is assigned and streams, and for our more senior and mid-level and perhaps partners to explain how they should be also clear about what's happening across the course of the transaction so people don't feel excluded. I did not – I thought it was more of a training issue."

(Jeffries Decl. Ex. 6 (DeSantis Tr. 192:21-193:20).)

550.    DeSantis testified that she also discussed the September 2015 complaint with Fabe in the context of "training for junior associates," including (i) "explaining to them in greater detail client sensitivities around being efficient," (ii) "the importance of not over-staffing," and (iii) "the realities of a large corporation transaction where there are often multiple work streams where people are working in parallel," and "there [being] too much work to do in too little time." (Jeffries Decl. Ex. 6 (DeSantis Tr. 188:14-191:24).)

551.    On September 23, 2015, Chudd submitted a review for Cardwell and answered "no basis" in response to over a dozen performance-based categories and questions that appeared on the evaluation form. (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

49

552.     Chudd's review described the type of transaction that DeSantis associated with Cardwell's complaint. (Jeffries Decl. Ex. 6 (DeSantis Tr. 188:14-191:24).)

553.     Chudd's review stated: "[W]e were very stretched on the transaction, and the impression that I got from the team was that they did not have confidence that Kaloma could interact directly with the client (as much as, for instance, some of the other first years could)." (ECF 223-9 at 10, Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

554.     On January 10, 2017, Cardwell filed a "rebuttal" to Davis Polk's NYSDHR Brief noting that "Chudd's evaluation highlights, at best, the implicit bias to which the Firm was already subjecting [Cardwell]," because "an M&A partner was evaluating him not on his actual performance, but on biased perceptions." (ECF 200, TAC ¶ 483.)

555.     Cardwell testified: "This discrimination refers to the exclusion that I was experiencing on an M&A deal involving William Chudd, REDACTED It refers to me being staffed differently than REDACTED It refers to me being mentored differently than REDACTED It refers to the senior associate on the deal creating opportunities for REDACTED as I mentioned. All of these things I believe were impacted by or influenced by my race." (Jeffries Decl. Ex. 1, Cardwell Tr. 347:22-348:9).)

### B.   Knowledge

556.     The Diversity Committee discussed Cardwell's concerns in the context of "future professional development discussions." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW SDNY-000000306); Jeffries Decl. Ex. 6 (DeSantis Tr. 192:21-193:20).)

557.     Chudd and Fenner discussed Cardwell in September 2015. *See supra* ¶ 357.

558.     On August 20, 2015, and September 9, 2015, Fenner sent M&A partners Oliver Smith and Brian Wolfe a list of the M&A rotators in Cardwell's class who would be permanently

assigning to the M&A group in September 2015, and which associates would be doing a third rotation, including Cardwell. (Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

559.    Fenner's emails noted that Cardwell would be doing a third rotation in the Capital Markets. (Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

560.    DeSantis met with Bick "a couple times a year during rotations." (Jeffries Decl. Ex. 6 (DeSantis Tr. 223:3-10).)

561.    On September 3, 2015, Fabe emailed Reid:

    a)    "Thank you for meeting with Renee and me to discuss Lawyering 101. Based on your comments and feedback, we have made some changes to the 101 agenda. The full agenda is attached for you review, but specifically, we revised the first day's schedule so that it is a more cohesive/thematic day focusing on the firm's culture, values/ethics and history through the following programs:"

(Jeffries Decl. Ex. 75 (DPW_SDNY-000165054).)

562.    On September 4, 2015, Reid emailed Fabe (cc'ing the "Management Committee" listserv, Crane, and DeSantis) regarding Lawyering 101:

    a)    "This is very much what I wanted to see. But, we need to weave through all this the theme that what we are doing here we are doing not just because it is right to do, it is because it is vitally competitive to do and if we fail to be competitive, even slightly, our ability to do good is finished. So, to that end, please let me have the detailed content for the various sessions as you get it."

(Jeffries Decl. Ex. 75 (DPW_SDNY-000165054).)

563.    On October 15, 2015, Fabe sent Reid (cc'ing the "Management Committee" listserv, Crane, and DeSantis) "PowerPoints for the Tips for Success and Attorney Conduct and Ethics programs," which were scheduled for the first day of Lawyering 101. (Jeffries Decl. Ex. 75, DPW-SDNY-0000165053.)

564.    On October 22, 2015, Fabe sent Reid an update (cc'ing the "Management Committee" listserv, Crane, and DeSantis) that Fabe and the Associate Development Department

were working with invited speakers to revise the Firm's presentations for Lawyering 101. (Jeffries Decl. Ex. 75 (DPW_SDNY-000165053).)

565. Lawyering 101 is a training for first-year associates where the Firm provides an overview of the Firm, as well as professional skills programs and substantive training in a few key practice areas. (Jeffries Decl. Ex. 13 (DPW_SDNY-000143604 at p. 6 in the PowerPoint).)

566. In 2015, Lawyering 101 was conducted between October 26, 2015 and October 29, 2015. (Jeffries Decl. Ex. 13 DPW_SDNY-000143604 at p. 6 in the PowerPoint).)

567. Diversity Committee member Rooney and Hudson were Capital Markets staffing partners during Cardwell's Capital Markets rotation. (Jeffries Decl. Ex. 62 (DPW_SDNY-000144472); Defs. Answer ¶ 547; TAC ¶ 626 at 171; Jeffries Decl. Ex. 5 (Hudson Tr. 25:18-20.)

568. Hudson testified that as a staffing partner she would "touch base with the other [staffing partner] to see if they had any thoughts to objections to who I was going to staff on a matter." (Jeffries Decl. Ex. 114, Hudson Tr. 28:10-20).)

569. Cardwell began working on a transaction with Hudson on or around October 26, 2015. (ECF 209, Defs. Answer ¶ 85.)

570. The Diversity Committee was briefed on the September 2015 BAG meeting. Rooney and other Committee members received those updates. (ECF 209, Defs. Answer ¶¶ 72-73; Jeffries Decl. Ex. 6 (DeSantis Tr. 172:19-20); Jeffries Decl. Ex. 73 (DPW_SDNY-000168082 - DPW_SDNY-000168083).)

571. On October 27, 2015, Chudd and Hudson served as co-"faculty" during a session of the Firm's Lawyering 101 program. (Jeffries Decl. Ex. 130, DPW_SDNY-000143608).)

572.    On October 28, 2015, Crane emailed Fabe (cc'ing Monica Holland and DeSantis), requesting performance reviews from Cardwell and other Black attorneys. (Jeffries Decl. Ex. 76 (DPW_SDNY-000141939).)

573.    On November 6, 2015, after a white first-year associate, forwarded Cardwell an email: "We have officially completed the closing of the [Client L] transaction. Congratulations, and thanks again to all of you for all of your hard work"—Cardwell sent an email to Vanessa Jackson that included the following comments:

a)    "This is the type of stuff I be talking about. Pretty sure I billed hundreds of hours on this deal."

b)    "Context: I billed hundreds of hours on the deal. Was on the deal from the beginning. I've been repeatedly left off of email communications to the 'team.'"

c)    "And I explicitly spoke to this issue at the BAG meeting. I offered suggestions. Am I supposed to follow-up with folks I've already described the issue to and who haven't had anything to say about it to me since? Not happening."

(Jeffries Decl. Ex. 77 (DPW_SDNY-000100376).)

574.    Jackson told Cardwell that she "would 100% forward Caitlin's email to [the more senior associate] and ask that he keep [Cardwell] copied on emails related to that matter (even if it's over)." (Jeffries Decl. Ex. 78 (DPW_SDNY-000105125).)

575.    On November 6, 2015, REDACTED a different White first-year M&A associate, forwarded the same congratulatory email, and in response, Cardwell forwarded the email to Jackson stating: "Clearly, the other first-years recognized someone was missing from the email." (Jeffries Decl. Ex. 79 (DPW_SDNY-000100378).)

576.    On November 6, 2015, Cardwell emailed the more senior associate on the matter: "Congrats on closing the deal. Grateful if you can keep me copied on emails related to that matter/team." (Jeffries Decl. Ex. 80, DPW-SDNY-000100381.)

577.    Cardwell had a follow-up exchange with BAG Steering Committee member Jackson where he explained that "after [he] was put on the spot and spoke to this pattern in a personal context, in a meeting with partners and folks from the diversity staff, no one followed up with [him] … about [his] experiences or [his] suggested remedies/trainings." (Jeffries Decl. Ex. 80 (DPW_SDNY-000100381).)

578.    On November 9, 2015, Hudson emailed Clausen with Cardwell's name in the subject line. Hudson requested to see Cardwell's reviews to "have a read on the situation." (Jeffries Decl. Ex. 81 (DPW_SDNY-000141352).)

579.    Hudson "wanted to get the background of people who had worked with [Cardwell] in [his] first full year at the firm." (Jeffries Decl. Ex. 5, Hudson Tr. 244:8-12).)

580.    Chudd's review for Cardwell was completed on September 23, 2015, and part of his review file as of November 9, 2015. (Buergel Decl. Ex. 9 (DPW_SDNY-000144362).)

581.    Later, on November 9, 2015, Clausen followed up with Hudson:

a)   "I spoke with Renee [DeSantis] and Carolina Fenner re: Kaloma. Kaloma hasn't received his formal review yet. Renee suggested that we provide Kaloma with real-time specific feedback." (Jeffries Decl. Ex. 82 (DPW_SDNY-000141821).)

b)   "Could we ask his seniors **REDACTED** to provide him with real-time specific feedback (if they haven't been doing so)?" (Jeffries Decl. Ex. 82 (DPW_SDNY-000141821).)

## 2.   Adverse Employment Action And Causal Connection

582.    On November 16, 2015, Fenner emailed Chudd and asked him to let her know if he had any questions about Cardwell and his "firm history" before she sent Cardwell's review file. (Jeffries Decl. Ex. 83 (DPW_SDNY-000091958).)

583.    For junior associates (e.g., in their first or second year like Cardwell at the time), their "review could be prepared just by the reviewing partner working in tandem with associate development." (Jeffries Decl. Ex. 4 (Bick Tr. 278:5-14).

584.    Chudd provided Cardwell with an in-person annual review on December 18, 2015. (ECF 209, Defs. Answer ¶ 115; Jeffries Decl. Ex. 84 (DPW_ SDNY-000027533).)

585.    The following appears in his summary review form: "Kaloma asked for more direct real-time performance evaluations." (Buergel Decl. Ex. 9 (DPW_SDNY-000144388).)

586.    Cardwell testified that at no point "prior to June 2016 … had [he] asked of the firm for more direct real-time performance evaluations" or for "anything along those lines." (Jeffries Decl. Ex. 1 (Cardwell Tr. 502:20-24; 503:3-5).)

587.    Cardwell testified that "[r]eal-time feedback is categorically different than real-time performance evaluations." (Jeffries Decl. Ex. 1 (Cardwell Tr. 184:9-185:8).)

588.    Cardwell testified that he did not "think … any associate in their first or second year … would … request … performance evaluations when there are far simpler and easier ways, more helpful ways … to receive feedback." (Jeffries Decl. Ex. 1 (Cardwell Tr. 505:4-9).)

589.    With respect to the 2015 annual review meeting with Chudd, Cardwell testified that he believed Chudd had knowledge of his September 2015 complaint, and that certain "interpretation[s] would not have appeared [in Chudd's summary review] had [he] not made that September 30th, 2015 complaint." (Jeffries Decl. Ex. 1 (Cardwell Tr. 491:18-492:6).).

### 3.   Pretext

590. The Firm's NYSDHR Brief made the following representations regarding the type of assessments and feedback Cardwell received prior to his January 2016 dinner with Reid:

> a) "Serious performance problems, echoing those that had emerged in his first two rotations, became apparent during his third rotation in the Capital Markets group. Indeed, the great weight of senior attorneys' experience with Cardwell during his third rotation pointed to very serious difficulties…In one instance, Cardwell's "diligence and other preparatory tasks were completed so slowly that a second junior associate needed to be staffed.'
>
> Also as before, there were serious problems with the substance of Cardwell's work. A reviewer noted that Cardwell's delegation practices were not in keeping with the Firm's expectations, and described Cardwell as "behind" his class even when it came to performing "routine" tasks. To the question whether she would "work with this person again," this reviewer answered "no." Once again, the Firm delivered this feedback to Cardwell, both in real time and at the end of his third rotation." (Jeffries Decl. Ex. 8 (DPW SDNY-000000295).)

591. Reid did not convey these criticisms to Cardwell in January 2016, nor did he tell Cardwell that he was a poor performer or that Cardwell had received negative reviews. (Jeffries Decl. Ex. 7 (Reid Tr. 185:23-187:24).)

| E. | January 2016 Complaint |
|---|---|

| 1. Protected Activity |
|---|

592. On December 1, 2016, Reid participated on a panel: "Finding Bliss in the Future of Legal Service & Practice" at the New York City Bar. Hudson, Crane, and Cardwell attended the event. (ECF 209, Defs. Answer ¶ 98.)

593. DeSantis discussed Cardwell's September 30, 2015 comments with Crane on or around October 5, 2015, and on October 28, 2015, Crane requested Cardwell's reviews. Jeffries Decl. Ex. 76 (DPW_SDNY-000141939)

594. On November 9, 2015, Hudson requested Cardwell's reviews; and on January 11, 2016, Reid requested Cardwell's reviews. (Jeffries Decl. Ex. 81 (DPW_SDNY-000141352; Jeffries Decl. Ex. 7 (Reid Tr. 181:7-17).)

595. Reid testified that he wanted "to see [his] reviews before I went to the dinner so that I could be prepared to talk about them. I don't know who I asked to get those reviews but I don't recall discussing the dinner beyond that." (Jeffries Decl. Ex. 7 (Reid Tr. 181:12-17).)

596. On January 12, 2016, Crane and the Firm's Management Committee members (i.e., Reid, Bick, and Rouhandeh) exchanged emails related to Cardwell. (Jeffries Decl. Ex. 88 (DPW_SDNY-000143444).)

597. One day before, Cardwell and Sheila Adams, a Black associate at the time, had dinner with Reid on January 21, 2016, Adams sent Cardwell an email with "Agenda Items":

    a) "Some associates have received arguably gendered and/or racialized reviews; who, if anyone, is serving as the gut-check in the review process to pick up on these comments and sensitize the partnership to this possibility to address/fix, if needed? (This is similar to what we discussed before.)"

    b) "Relatedly, do the partners receive specific training in implicit bias in any formalized way? Would he be committed to instituting this?"

(Jeffries Decl. Ex. 88 (DPW_SDNY-000143444).)

598. Reid remembered discussing some of these "Agenda Items." (Jeffries Decl. Ex. 7 (Reid Tr. 172:7-173:19).)

599. Reid provided the following testimony regarding the dinner:

    "I remember Mr. Cardwell and his colleague saying … that they discussed with other Black associates at other law firms on Wall Street was the problem of being noticed is what I recall. And I think I said look, that does come up in our -- in the presentations that I made sure the firm has on an at least an annual basis on things like unconscious bias and diversity and hopefully it will improve through time."

    "I said it does happen I think to all young lawyers, but I understand the point that we're raising in the race context. The other thing -- we talked about …

what we were doing at the firm generally. They wanted to know what the presentations were that I brought to the firm's annual meeting."

"And one of their issues was we don't think we get the right level of feedback. And I said again, that's a general issue with associate feedback, particularly in the younger years. And again I said we have training for that for partners to give better feedback."

(Jeffries Decl. Ex. 7 (Reid Tr. 165:8-165:24).)

600.    Cardwell and Reid discussed "[t]he issue of being noticed."  (Jeffries Decl. Ex. 7 (Reid Tr. 165:24).)

601.    Cardwell testified as follows regarding the complaint that he made at the dinner:

a)    "[D]uring the conversation we were talking about being treated differently. Sheila Adams and myself were talking about experiences that with, believe we were treated differently by white associates/partners on those matters. In response, Mr. Reid attempted to explain the experiences we were having by saying associates/partners simply are not always the best managers, that they are not always the best with having particular types of social skills.

And in response … I told Mr. Reid that [his] explanation simply was not true and could not be true, because the same white associates would, while treating me in a way that allowed them to say very little to me…  when discussing [a] matter or explaining parts of the matter, … would then become extremely gregarious, extremely thorough, extremely detailed in their communications with white associates, partners, and clients. So I explained to him that what I was experiencing was not a function of white associates merely lacking social skills or managerial skills, but that it was our race, my race, that was the difference."

(Jeffries Decl. Ex. 1 (Cardwell Tr. 358:22-360:10).)

602.    Cardwell "spoke at length about implicit bias … conceptually and in relation to the race-based discrimination he … experienced … at the Firm" and asked "how the Firm insulated assessments and conclusions about … reviews from the effects of bias."  (TAC ¶ 105.)

603.    On January 21, 2016, following the dinner, Cardwell memorialized his complaint and parts of his discussion with Reid in a journal.  His contemporaneous notes reflect that:

a) "[Tom] was noticeably uncomfortable & unhappy … to hear Sheila and I tell him about experiences [where] we were treated by other attorneys as if we don't matter, aren't worth getting to know or investing in, and so on."

b) "Sheila and I talked about associates who are unwilling to make eye contact, use our names or give us timely feedback that would help us grow as attorneys."

c) "We talked about implicit biases."

d) "Tom is waiting to evaluate the consultant before moving forward with a plan."

e) "Sheila and I discussed issues with others simply not looking at us as if we will be around or leaders of the firm."

f) "Sheila and I raised a number of suggestions that the firm should consider. Tom requested that the suggestions be things he can enact immediately, that they be simple, & easy for people to repeat. He said he doesn't want complex solutions,, suggesting that he has to repeat things over and over with lots of examples for partners & attorney to get on board."

g) Reid said "things must be done incrementally and that some white male associates have questioned why some women were able to have dinner with him. He basically was saying … the Firm has to be careful about creating certain perceptions b/c white guys will throw a tantrum."

h) "We discussed changing 101 in order to stress to attorneys that the firm expects attorneys to get to know other attorneys."

i) "We discussed (at length) how attorneys give feedback and that it's often too late, not helpful or racialized."

(ECF 223-20 at 2-8, Buergel Decl. Ex. 20.)

604.    Reid testified that he may have discussed this January 2016 dinner conversation with Bick and Crane. (Jeffries Decl. Ex. 7 (Reid Tr. 185:7-10).)

605.    On January 26, 2016, Cardwell sent Adams an email outlining the following follow-up items from their meeting with Reid, including "suggestions that we discussed … that we'd like Tom and DPW to consider and implement":

a) "Implicit bias"

b) "Give Specific Examples of What Attorneys Can and Should Do"

c) "Introduce themselves to attorneys they don't know"

d) "If allowed, be intentional about inviting all team members to join conference calls and meetings. Why? Due to subconscious bias, some groups are more likely to be unintentionally not invited."

e) "Make eye contact and say hello. Why? Due to subconscious bias, some groups are much less likely to receive eye contact and/or a friendly gesture."

f) "Create opportunities to give constructive feedback as soon as possible. Giving feedback too late (e.g., in an official review but not face-to-face) can decrease trust and undermine the goals above."

(Jeffries Decl. Ex. 89 (DPW_SDNY-000032059).)

### 2. Knowledge Of September 2015 And January 2016 Complaints

606. Davis Polk's Management Committee (Reid, Bick, James Rouhandeh) and other Davis Polk partners learned about Cardwell's race-related comments about exclusion and bias and the Firm's performance evaluation and feedback systems through the Firm's trainings and discussions on implicit bias, as well as the Diversity Committees meetings with BAG and the Firm's other Affinity Groups. (Jeffries Decl. Ex. 6 (DeSantis Tr. 192:21-193:20).)

607. Davis Polk identified " members of its Human Resources Department, including … Crane," and "members of the Firm's Diversity Committee" in response to an interrogatory that requested the names of "all partners and managers who are responsible for (or have participated in) assessing whether associate performance reviews or summary reviews are being, have been, or have the potential to be completed in a discriminatory or retaliatory manner (or influenced or affected by discrimination or retaliation." (Jeffries Decl. Ex. 32 (Rog No. 17).)

608. According to Reid's remarks during the January 2016 dinner, many Davis Polk partners (i) believed existing research confirms Black and other minority attorney groups experience bias in the workplace and at Davis Polk, and (ii) believed that they are fair and would never act with bias against attorneys from those groups. (ECF 200, TAC ¶ 108.)

609. Reid told Cardwell during their dinner that the problem of being noticed came up "in the presentations that [Reid] made sure the firm ha[d] on an at least an annual basis on things like unconscious bias and diversity." (Jeffries Decl. Ex. 7 (Reid Tr. 163:9-185:8).)

610. Reid testified that during "most, if not all of the annual meetings that [Reid] chaired as managing partner," which occurred "before and after [Cardwell's] employment," the Firm "would usually have some time set aside in that 24-hour period to talk about growing a more diverse firm, unconscious bias, … usually bringing in an outside consultant." (Jeffries Decl. Ex. 7 (Reid Tr. 136:24-137:10).)

611. "[T]here were several – several outside experts in the area that [the Firm] brought in to talk about the -- talk about issues like discrimination, like unconscious bias. VallotKarp was one." (Jeffries Decl. Ex. 7 (Reid Tr. 44:5-12).)

612. During Cardwell's employment, the Firm had an annual firm meeting "at the end of January, beginning of February area." (Jeffries Decl. Ex. 7 (Reid Tr. 133:18-22).)

613. In February 2016, the Firm conducted a partner training during its Annual Partner meeting on how microinequities and unconscious bias, and the perception of these, affect daily interactions and team dynamics, and strategies for reducing them. (Jeffries Decl. Ex. 53 (DPW_SDNY-000144208).)

614. The February 2016 partner training included a session facilitated by VallotKarp, a diversity and inclusion consultant. The session included "action item[s]" for partners. (Jeffries Decl. Ex. 91 (DPW_SDNY-000000474); Jeffries Decl. Ex. 8 (DPW_SDNY-000000305).)

615. On or around September 30, 2015, Holland commented that the Firm would bring in a "recognized consultant who is a leader in the industry," and that members of the Firm's

Diversity Committee helped evaluate and select VallotKarp to conduct a training with the Firm's partners. (Jeffries Decl. Ex. 73, DPW-SDNY-000168086.)

616. On February 5, 2016, VallotKarp delivered a presentation to the Firm's partners entitled: "Inclusion and Team Performance: Moving from Awareness to Action." (Jeffries Decl. Ex. 91 (DPW_SDNY-000000474).)

617. Similar to the presentations used by consultants during Davis Polk's Lawyering 101 program in 2015, the deck from VallotKarp's February 2016 presentation was reviewed and revised with input from DeSantis and/or Fabe. (Jeffries Decl. Ex. 7 (Reid Tr. 44:5-12).)

618. VallotKarp conducted "group interviews with the steering committees of the associate Affinity Groups (BAG, ASAME, HLA, LGBT and DPWomen)" and "interviewed the Diversity Committee, the Women's Initiatives Committee and the Management Committee [16 partners]." (Jeffries Decl. Ex. 91 (DPW SDNY-000000476).)

619. The deck reflected the following goals, recommendations, and best practices:

   a) "Understand that unconscious behaviors can enhance or hinder performance through inclusion or exclusion

      • These dynamics may include 'insider/outsider,' unconscious bias, confirmation bias and 'micro-inequities'"

   b) "Understand how different associates experience and perceive law firms (including Davis Polk)"

   c) "Identify steps that partners can take to promote diversity and inclusion, thereby enhancing associate performance and team performance"

   d) "As partners, you are the guardians of the Firm culture, and must take the lead in promoting inclusion"

   e) "Getting to know associates and building relationships, including 'across difference,' is essential for:

      • Promoting excellence
      • Maximizing individual and team performance

- Creating a true meritocracy
- Fulfilling client expectations
- Enhancing firm image and reputation"

(Jeffries Decl. Ex. 91 (DPW_SDNY-000000474).)

620.    The presentation's slides discussed how associates experienced law firms, and included reports that examined different racial groups (e.g., White men, White Women, Men of Color, Women of Color).  Respondents from those surveys/studies reported the following:

a)  "Others are uncomfortable around me"

b)  "Felt excluded from formal and informal networking opportunities"

c)  "Felt passed over for desirable assignments"

d)  "I didn't receive candid/constructive feedback"

(Jeffries Decl. Ex. 91 (DPW_SDNY-000000479).)

621.    VallotKarp's presentation indicated that certain behaviors related to excluding individuals, discouraging participation, devaluing others' contributions, and "micro-inequities" may or may not be linked to bias. (Jeffries Decl. Ex. 91 (DPW_SDNY-000000480).)

622.    VallotKarp's presentation confirmed that "different people (who feel like outsiders) may experience" certain exclusionary behaviors "more acutely." (Jeffries Decl. Ex. 91 (DPW_SDNY-000000480).)

623.    The presentation reported that "those who feel like outsiders" may "[f]eel isolated," "[s]econd guess themselves," feel "[s]elf conscious," "[r]eluctant to express disagreement," "[h]esitant to offer suggestions or ideas" and "[f]earful that every mistake or misstep will be magnified." (Jeffries Decl. Ex. 91 (DPW_SDNY-000000482).)

624.     The diversity and inclusion consultant also presented a slide to Davis Polk partners during the 2016 annual meeting with the following recommendations and best practices:

a)   "Hold senior associates accountable for being inclusive and contributing to the professional development of all associates equally."

b)   "Be willing to raise questions about how assumptions and/or biases may be influencing decisions."

c)   Consider who you:

- "chat with informally"
- "mentor/offer advice to"
- "give constructive feedback to"

(Jeffries Decl. Ex. 91 (DPW SDNY-000000494).)

625.     VallotKarp recommended that partners "[a]t a minimum, commit to provide candid feedback, in real time or at the end of a matter, to ALL the associates you work closely with," and that they should "[t]ry to treat this action item as a goal like other professional development goals." (Jeffries Decl. Ex. 91 (DPW SDNY-000000495).)

626.     The presentation noted that "confirmation bias" can lead law firm partners to rate a "Caucasian" associate as having better written work product over an "African American" associate—even when the law firm partners were evaluating the same exact memo (with merely a different name listed as the author). (Jeffries Decl. Ex. 91 (DPW SDNY-000000485).)

627.     The presentation reported that "[u]nconscious bias may cause these to happen more to minorities and women." (Jeffries Decl. Ex. 91 (DPW SDNY-000000480).)

628.     The presentation reported that "[t]hese behaviors have been documented in law firms and other workplaces." (Jeffries Decl. Ex. 91 (DPW SDNY-000000481).)

629. On February 25, 2016, the Management Committee presented a Management Committee Report to associates during a firm-wide townhall meeting, which included slides from VallotKarp's presentation. (Jeffries Decl. Ex. 92 (DPW_SDNY-000144242).)

630. The Management Committee's presentation indicated that certain behaviors related to excluding individuals, discouraging participation, devaluing contribution, and micro-inequities may or may not be linked to bias. (Jeffries Decl. Ex. 92 (DPW_SDNY-000144244).)

631. Their presentation also described examples of groups engaging in the same behavior, but nonetheless experiencing and/or receiving different interpretations and perceptions concerning the same conduct. (Jeffries Decl. Ex. 92 (DPW_SDNY-000144246).)

### 3. Adverse Employment Action #1: Scrutiny

632. On March 30, 2016, Fenner informed M&A partners Wolfe and Oliver Smith that Cardwell assigned to the M&A Group. (Jeffries Decl. Ex. 93 (DPW_ SDNY-000105367).)

633. Around March 2016, Fabe categorized the Firm's Black, Hispanic, Asian (4th year and senior only) and LGBT associates. (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

634. Around March 2016, Fabe documented that non-performance "issues" impacted perceptions of Cardwell's performance, including the "issues" that he flagged during the September 30, 2015 BAG meeting. (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

635. The Diversity Committee did not similarly assess the performance or performance evaluations for associates who were not Black, Hispanic, Asian (4th year and senior only), "Two or More Races" or LGBT associates. (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

636. Assessments created from the selective compilation of "diverse associates'" reviews do not evaluate Cardwell relative to the broader set of associates in his "class." (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

637. On March 30, 2016, Fabe provided the following performance and non-performance related assessments for the Firm's Black associates:

| Black Associate | Fabe's Assessments |
|---|---|
| Black Associate A | [Blank] |
| Black Associate B | [Blank] |
| Black Associate C | (Exposure to more matters/be proactive) |
| Black Associate D | (Lots of potential; work on presence in group situations) |
| Black Associate E | (REDACTED so far with [their] class; low hours; could be potential issues) |
| Black Associate F | (CAP advisor -- maybe assign someone more active) |
| Black Associate G | [Blank] |
| Black Associate H | (Average; but showing improvement) |
| Black Associate I | (More opportunities to manage/pay greater attn. To detail) |
| Black Associate J | (Solid; has shown much improvement) |
| Black Associate K | (Bit behind in terms of skill set (very strong [redacted] [practice group] class); but could catch up – there may be confidence issue there) |
| Black Associate L | (Some improvement; reserved/should speak up more; still operating as a junior/needs more exposure/responsibility) |
| CARDWELL | (Going back to M&A) (issues) |
| Black Associate M | (Will check in this summer; significant issues – responsiveness, etc.) |
| Black Associate N | (Needs a lot of hand holding; spotty work) |
| Black Associate O | REDACTED; behind class in skill set; trying to staff [them] on new and different matters) |
| Black Associate P | (Behind class; low hours; trying to get more work) |
| Black Associate Q | (Great communications skills; behind substantively) |

(Jeffries Decl. Ex. 90, (DPW-SDNY-000165512).)

638. Unlike other associates, this list does not describe or specify any performance issues for Cardwell; it simply notes "issues." (Jeffries Decl. Ex. 90 (DPW_SDNY-000165512).)

639. On June 10, 2016, in connection with the scheduled meeting with Bick, Fabe emailed DeSantis a revised presentation about the Firm's Black Corporate associates. The new version "added some information on [J] after our talk with Sophia [Hudson]" and "[a]ction [i]tems." (Jeffries Decl. Ex. 95 (DPW_SDNY-000164841).)

640. Some of the "action items" that Fabe "added" for Cardwell appeared in VallotKarp's February 5, 2016 presentation. (Jeffries Decl. Ex. 95, DPW-SDNY-000164865; Jeffries Decl. Ex. 91 (DPW_SDNY-000000495).)

641. On June 14, 2016, one day after DeSantis and Fabe met with Bick on June 13, 2016 to discuss the Firm's Black associates, Fabe sent herself a "Draft Diversity Committee Agenda – Tuesday, June 14th." (Jeffries Decl. Ex. 101 (DPW_SDNY-000164765 - DPW_SDNY-000164767).)

642. The Draft Diversity Committee Agenda noted that DeSantis "can report on" their "[m]eeting with John Bick re: black corporate associates" and noted "follow up/action items, i.e., .. interim review for [Kaloma Cardwell]." (Jeffries Decl. Ex. 101 (DPW_SDNY-000164765).)

643. On June 14, 2016, Fabe emailed the Diversity Committee listserv an agenda "for today's 4 pm meeting" and attached a draft presentation in preparation for their "June 14th meeting with the [Management Committee]," which contained with the following comments:

a) "Potential consultants (for associate training and audit/review of our processes and procedures)"

b) "During the Town Hall, the Management Committee shared with the associates slides from the Vallot Karp APM presentation. The foundation was laid for more training in this area, including at the associate level, but with different consultants."

c) "During Lawyering 301's management skills training, the consultant, Tim Leishman, raised awareness about working with people who are different than you (work style, gender, background)"

d) "[S]uggestions/concerns were not as specific as those expressed during last fall's meeting with BAG"

e) ""ASAME Affinity Group expressed concern … (i) that unconscious bias and stereotypes may affect retention and promotion of ASAME associates, … and (iii) culture and tone -- level of awareness of difference and the experience of being different, i.e., Asian associates being mistaken for others, stereotypes regarding strength of communication/presentation skills for Asian associates"

f) "Meeting with J. Rouhandeh, several litigation partners, S. Crane, R. DeSantis … to address BAG's concern about the lack of staffing oversight at the senior associate level in litigation."

g) "Anna Bridge now monitors senior associate staffing in litigation and will raise staffing issues directly with J. Rouhandeh."

h) "Meeting with John Bick on June 13 to discuss BAG corporate associates"

i) "Include language on unconscious bias in the cover email to the partners announcing the start of the review season"

j) "The Diversity Committee recommends retaining a consultant to review practices and procedures and offer out of the box structural solutions for our identified problems regarding diversity and inclusion"

k) "Retain consultant to conduct program on micro-inequities and unconscious bias for the associates in 2016"

l) "Comments from the Management Committee"

(Jeffries Decl. Ex. 102, DPW_SDNY-000165497 to - 98).)

### 4. Adverse Employment Action #2: June 2016 Mid-Year Review

644. Mid-year reviews "occur[] for a variety of reasons." (Buergel Decl. Ex. 75

(RFA No. 23).)

645. DeSantis noted that the mid-year review label carries a negative connotation:

a) "It's definitely been the case, I think it's very possible that a partner would think that if someone is getting a midyear review, it can indicate that there are performance issues." (Jeffries Decl. Ex. 113, DeSantis Tr. 234:2-7).)

b) "It's possible that some partners may draw that conclusion, that someone is leaving as result of a midyear review." (Jeffries Decl. Ex. 113, DeSantis Tr. 234:2-7).)

646. Crane provided the following testimony concerning mid-year reviews:

a) "A mid-year review is given to an associate if the partners wanted to check in with the associate, you know, after six months." (Jeffries Decl. Ex. 2 (Crane Tr. 42:25-43:6).)

b) "A decision on providing reviews are made by the partners in the practice groups." (Jeffries Decl. Ex. 2 (Crane Tr. 45:4-8).)

c) "It's possible after mid-year reviews, that after that review period someone could be terminated or I guess during the mid-year review you could get the time to go message." (Jeffries Decl. Ex. 2 (Crane Tr. 274:12-21.)

68

647. Bick's Summary Review contained the comment: "Kaloma generally received positive reviews, with the notable exception of Sophia Hudson." (ECF 209, Defs. Answer ¶ 154.)

648. With another associate that Hudson worked with, Hudson completed a summary review form documenting that the associate would be "put on a 6 month check-in but not told." (Jeffries Decl. Ex. 86 (DPW_SDNY-000165899).)

649. On June 13, 2016, DeSantis and Fabe met with Bick to discuss the career development of Black associates in Corporate, including Cardwell. (Defs. Answer ¶ 127.)

650. On June 13, 2016, DeSantis emailed Fenner and Fabe: "Can we talk tomorrow about how we can get John Bick what he asked for with the least amount of negative blow back for [Cardwell]? Worried about the 'mid year review' label." (ECF 209, Defs. Answer ¶ 129.)

651. Fabe replied: "Yes—agree it is sensitive." (ECF 209, Defs. Answer ¶ 134.)

652. Fenner replied: "Yes agree, especially since he wasn't given any indication in his last annual review [meeting] that we would be checking in mid-year." (Defs. Answer ¶ 134.)

653. On June 13, 2016, DeSantis sent an email to an Associate Development Coordinator stating: "[Please] hold off on distributing any reviews on Kaloma. Alicia [Fabe] and Carolina [Fenner] and I want to discuss. [Thanks]." (ECF 209, Defs. Answer ¶ 135.)

654. When asked about Cardwell's performance, DeSantis testified:

> A: "I don't believe I was ever directly present during any conversations about the quality of Kaloma's work."

(Jeffries Decl. Ex. 113, DeSantis Tr. 224:7-11).)

655. On June 17, 2016, Nicole Katz, a coordinator in the Associate Development Department, asked: "Can you please confirm for me whether the reviewer list in my previous email below works for reviewing Kaloma? Since this is a sensitive review, I'm not sure if senior associates should be included as reviewers…." (ECF 209, Defs. Answer ¶ 135.)

656.    Around June 20, 2016, the Associate Development Department sent emails to senior attorneys with whom Cardwell had worked, including Hudson, requesting feedback on his performance. (ECF 209, Defs. Answer ¶ 137.)

657.    On June 23, 2016, Bick received Cardwell's reviews. (Defs. Answer ¶ 148.)

658.    Bick asserted in his deposition that "[Cardwell] didn't get a midyear review." (Jeffries Decl. Ex. 4 (Bick Tr. 291:25-292:4).)

659.    On June 29, 2016, DeSantis emailed Bick:

   a)   "There are a few performance-based mid years which we are in the midst of scheduling; we will send an update on those in a week or two (Kaloma Cardwell - you have file;" [REDACTED], [REDACTED]; AND [REDACTED]- to be scheduled in mid-July)." TAC ¶ 141; ECF 209, Defs. Answer ¶ 141.

660.    Bick did not conduct a mid-year review in 2016 for any M&A associate other than Cardwell. (ECF 209, Defs. Answer ¶ 160.)

661.    Cardwell testified that:

   a)   "Bick asked Renee DeSantis and the firm's Associate Development Department to create a midyear performance review process for me, a midyear performance review process that the firm typically used to alter associate staffing for the worse, that the firm routinely used to terminate associates, that the firm routinely used to justify why associates of certain racial backgrounds were being staffed differently." (Jeffries Decl. Ex. 1, Cardwell Tr. 506:8-17).)

   b)   "Bick's request that I be subjected to a midyear performance review at this time was not based on performance [or] how the firm typically gave or conducted midyear performance reviews for associates who had been rated as behind or perceived to be behind. Mr. Bick did not recommend, did not instruct anyone at the firm to conduct a midyear performance review for any white associate for this period. Mr. Bick did not do so despite the fact that in the prior review period Mr. Bick was aware of the fact that multiple white M&A associates had been rated as behind in their performance reviews, had been rated as behind for at that point consecutive review periods, had been rated as behind by M&A partners."

(Jeffries Decl. Ex. 117, Cardwell Tr. 507:6-508:10).)

662.     On June 30, 2016, Bick emailed Cardwell requesting his availability to "discuss another research assignment." (ECF 209, Defs. Answer ¶ 144.)

663.     During their meeting, Bick spent a few minutes describing the additional research assignment and then pulled out and opened a folder, stating: "I know you asked for feedback, so I figured I'd take a few minutes to go through your reviews." (ECF 200, TAC ¶ 145.)

664.     Cardwell was concerned about the mid-year review because he had not requested a review or non-real time feedback and because Cardwell had no knowledge that anyone at the Firm received this type of unannounced, mid-year face-to-face "review." (ECF 200, TAC ¶ 146.)

665.     During the meeting on June 30, 2016, Bick stated: "It's been noted on a few occasions that you have a pattern of missing deadlines."  Cardwell responded: "That feedback is extremely surprising. I'm sitting here wracking my brain and I'm struggling to think of any deadlines that I've missed, and I can't think of any. I haven't missed any deadlines. Can you provide examples of 'deadlines' that I missed?" (ECF 200, TAC ¶ 150.)

666.     Bick replied: "Well, don't think of it as deadlines" and proceeded to discuss general timing critiques that Cardwell believed at the time were phrased so vaguely that no associate would have been able to assess, verify, or dispute them. (ECF 200, TAC ¶ 151.)

667.     Cardwell informed Bick that his feedback was inconsistent with what had been communicated to Cardwell and that such feedback had never been communicated orally or in writing to Cardwell prior to their conversation. Cardwell asked Bick for additional information, including to be provided with any specific examples, but Bick did not provide any examples or the names of any reviewers who purported held such beliefs. (ECF 200, TAC ¶ 153.)

668.    Cardwell asked if Bick could go back to the reviewers and try to learn what the reviewers could be referring to. Bick indicated that he would but never followed up with Cardwell or subsequently provided specific examples. (ECF 200, TAC ¶ 155.)

669.    Immediately after the meeting, Cardwell contacted a Black senior Davis Polk associate and informed that associate that Bick just conducted a surprise face-to-face, mid-review and opened the discussion with a blatant lie (i.e., that Bick was giving the review in response to a request by Cardwell). (ECF 200, TAC ¶ 156.)

670.    Hudson's June 2016 and September 2016 reviews were the first and second reviews to rate Cardwell as materially "behind" his class. (ECF 209, Defs. Answer ¶ 568.)

### 5.    Adverse Employment Action #3: Career And Professional Development Opportunities

671.    Bick gave Cardwell a research assignment on or around June 30, 2016.  After Cardwell emailed Bick the research memo on July 19, 2016, Bick did not respond to the specific email by return email to Cardwell. (ECF 209, Defs. Answer ¶ 161.)

672.    Cardwell sent Bick a follow-up email on July 26, 2016 about the memo.  Bick did not respond and did not have any further communication about the memorandum. At that time, Bick's office was two doors away from Cardwell's. (ECF 209, Defs. Answer ¶ 162.)

673.    On June 28, 2016, Clausen emailed Cardwell and asked him to reach out to a senior M&A associate to assist M&A partner Gar Bason on a non-deal assignment. Cardwell agreed and was staffed on the assignment. (ECF 209, Defs. Answer ¶ 208.)

674.    On August 15, 2016, a senior M&A associate emailed Cardwell feedback regarding Cardwell's work on an assignment that Clausen staffed him on in June 2016:

      a)    "I'm so sorry it took me forever to review this. Very good work on it. Attached please find my comments/thoughts. Some items I thought we could [revert back to the original language as opposed to using your edits]

just to minimize changes. Please let me know if it would be helpful to discuss."

(ECF 209, Defs. Answer ¶ 249.)

675.    On August 18, 2016, Cardwell sent an email to M&A partners Arthur Golden, Gar Bason Jr., and Michael Davis and cc'd the senior associate who instructed Cardwell to email them a draft agreement that Cardwell revised. There is no record of a written or other response to that email. (ECF 209, Defs. Answer ¶ 244.)

676.    On September 7, 2016, Cardwell sent a follow-up email to M&A partners Golden, Bason, and Davis (and cc'd the senior associate). There is no record of a written or other response to that email. (ECF 209, Defs. Answer ¶ 245.)

677.    On September 9, 2016, Cardwell sent a third email to M&A partner Bason and cc'd Golden and the senior associate. There is no record of a written or other response to that email. (ECF 209, Defs. Answer ¶ 247.)

## 6. Pretext

678.    Bick's Summary Review form for the June 2016 mid-year review stated: "Kaloma generally received positive reviews, with the notable exception of Sophia Hudson." (ECF 209, Defs. Answer ¶ 154.)

679.    REDACTED was in Cardwell's class, and like Cardwell, completed a second rotation in M&A and a third rotation in Capital Markets, and assigned to M&A group after his third rotation, but did not receive a mid-year review in 2016. (ECF 209, Defs. Answer ¶ 160; Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

680.    REDACTED was in Cardwell's class, and like Cardwell, completed a second rotation in M&A and a third rotation in Capital Markets, but did not receive a mid-year review in 2016. (ECF 209, Defs. Answer ¶ 160; Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

73

681.     [REDACTED] was in Cardwell's class, and like Cardwell, completed a second rotation in M&A and a third rotation in Capital Markets, but did not receive a mid-year review in 2016. (ECF 209, Defs. Answer ¶ 160; Jeffries Decl. Ex. 70 (DPW_SDNY-000105342).)

682.     [REDACTED] ,, [REDACTED] . and [REDACTED] . are not Black. (Defs. Answer ¶ 641.)

683.     In the Firm's NYSDHR Brief, Davis Polk represented that Bick and the Firm decided to give Cardwell a mid-year review in June 2016 because:

     a)   "Cardwell approached the Associate Development department and asked for feedback; the Firm granted his request, solicited reviews, and assigned a partner to meet with him." (Jeffries Decl. Ex. 8 (Davis Polk's NYSDHR Brief, DPW_SDNY-000000294).)

684.     Bick testified that the Firm gave Cardwell a midyear review for these reasons:

     "The interim review … was based on the information I got in my meeting with associate development in June and it caused me great concern. I did talk to Sophia, I asked for review forms to be filled by people who had worked with him recently. And then based on all of that, I thought it was important to sit down and give him that input."

     Q: "Did you speak to Ms. Hudson before she completed that review?

     A: Yes, I think she put in a written review in June at some point but I had talked to her. ….

     Q: "So you did speak with Sophia Hudson prior to her completing her written review; is that correct?"

     A: "I did speak to her in the June time frame. … I had a direct conversation with Sophia."

(Jeffries Decl. Ex. 4 (Bick Tr. 291:25-295:25).)

685.     When asked why he initiated a conversation with Hudson, Bick explained:

     "I had an earlier meeting with Renee, I believe Carolina and Alicia Fabe where we reviewed a presentation that they had prepared for me regarding Black American, African American associates in the corporate group and we had gone through how each was doing in terms of a career

development. And there was a slide prepared for me regarding Kaloma and there were several issues there, a flag, one of which was recent performance in capital markets. … I thought it best for me to call Sophia directly and hear exactly her thoughts on the subject."

(Jeffries Decl. Ex. 4 (Bick Tr. 160:2-161:15).)

686.    When asked about the June 2016 mid-year review, Hudson testified:

Q: "Would you dispute whether or not John Bick had a conversation with you, right before you completed the June 2016 review?"

A: "I would dispute that. I have no recollection of that. We may have done that. I'm not going to dispute if he remembers having a conversation where it was clear to him that I had not yet completed my performance review and then he was speaking to me before I had completed it. I'm happy to hear him say that, but I have no recollection of a conversation with John Bick about Kaloma in the June 2016 timeframe."

Q: "Do you remember talking to John Bick about Mr. Cardwell around the time that your review in June of 2016 was completed?"

A: "I just said I have no recollection of a conversation with John Bick about Kaloma Cardwell in the June '16 timeframe, whether before or after I completed my performance review."

Q: "The question is whether you remember speaking to anyone from the Associate Development Department prior to completing the June 2016 review for Mr. Cardwell."

A: "I don't recall. I don't recall if there were any conversations with the Associate Development Department around the time of my June 2016 review of Kaloma."

(Jeffries Decl. Ex. 5 (Hudson Tr. 203:20-209:5).)

| F. | September 2016 Complaint |
| --- | --- |

| 1. Protected Activity And Knowledge |
| --- |

| a. Knowledge |
| --- |

687.    On September 7, 2016, Clausen and Fenner discussed whether Cardwell could assist with a Credit deal and Fenner recommended that Clausen speak with DeSantis because she thought "it's a little sensitive." (Jeffries Decl. Ex. 121 (DPW_SDNY-000141404).)

688.    The assignment led Cardwell to make a legally protected complaint to Clausen on September 8, 2016, which Cardwell summarized as follows::

> a)   "Rocio Clausen had asked me if I would be available to work on an assignment in the Credit group. … During that conversation I explained to her that it was a pattern within our legal profession and at Davis Polk that involved black associates being staffed differently, being staffed in a way that would lead them to have substantially less experience, less training, by the time they are a midlevel associate, specifically around years four, five and six. I explained to her that I did not want to become a part of that pattern, that I wanted my career to not be swept into that pattern, and that I would be willing to work on the credit matter in any manner that the firm -- as long as she and the firm were confident, could assure me that I was not being staffed in a way that would lead to that pattern.
>
> Ms. Clausen responded by sharing her thoughts as to how I was being staffed, why I was being staffed, and in response to that I explained to her that she had just explained to me a process that involved white associates not being asked to work on matters outside of their practice group in this particular instance and as part of a pattern overall.
>
> I explained to her that because of my experiences at the firm it was important to me that I not be staffed differently than associates who would otherwise have the opportunity to be trained, work on things in M&A."

(Jeffries Decl. Ex. 1, Cardwell Tr. 375:11-378:22).)

689.    Clausen discussed her September 8, 2016 interactions with Cardwell with DeSantis and Fenner. (ECF 209, Defs. Answer ¶ 275.)

690.    DeSantis described her conversation with Clausen as follows:

> a)   "Rocio described to me a conversation she had with Kaloma when she asked if he was available."
>
> b)   "[Clausen] was surprised that Kaloma turned down the work and … she told me that Kaloma appealed to her, seemingly -- she felt on the basis of her race as a way to in her -- the way she conveyed it to me, the phrase or word

he used was something like come on Rocio, you get it, you know how it works kind of and she was expressing to me, she said 'I never had anyone say that to me. I didn't know what to say. It was just so weird.'"

c) "It was my understanding that Rocio was interpreting Kaloma's comment to mean something like I'm being asked to do this and I, you know, I should kind of advocate for myself and say no … and you understand what I'm talking about."

d) "Rocio was surprised that Kaloma turned down the work, refused to do the work and made subsequent comments suggesting that she should have some sort of better understanding. And it was my understanding that she felt that he was referring to their shared diverse status."

e) "As Rocio conveyed to me, Kaloma said something like come on, Rocio, you get it, you know how -- and when Rocio was talking to me, she suggested that it was somehow this connection between race or ethnicity."

(Jeffries Decl. Ex. 6 (DeSantis Tr. 204:16-18; 209:3-10; 209:20-25).).

691.    DeSantis discussed Cardwell's September 2016 complaint with Crane, which DeSantis recounted as follows:

a) "I don't remember the exact words I used but it was something to the extent that we need help in credit, Rocio asked Kaloma to help, Kaloma said no and then Kaloma went on to make some comments to Rocio about, you know, kind of seeming to kind of seek this connection." (Jeffries Decl. Ex. 113, DeSantis Tr. 212:25-213:10.)

b) "What I probably said to Sharon was I repeated the phrase, come on Rocio, you get it, you know, and Sharon understood what I was referring to and then perhaps Sharon spoke directly to Rocio Clausen." (Jeffries Decl. Ex. 113, DeSantis Tr. 215:5-19.)

c) "I did tell – he declined -- he refused to take on the finance assignment. The rest of the conversation in terms of conveying the other parts of the conversation that Rocio had with Kaloma, I probably tried to convey that and that's all I know.." (Jeffries Decl. Ex. 113, DeSantis Tr. 216:8-23.)

692.    When asked "[h]ow did Ms. Clausen's comments cause [her] to react," DeSantis responded: "I felt surprised that Kaloma was turning down work." (Jeffries Decl. Ex. 113, DeSantis Tr. 210:23-211:3).).

693. When asked if Cardwell's comments "impacted [her] opinion about Cardwell," DeSantis responded: "I was frustrated because I knew that we needed help in finance." (Jeffries Decl. Ex. 113, DeSantis Tr. 211:13-22).).

694. When asked to identify all sources for Davis Polk's assertion that Cardwell "refuse[d] a cross-departmental assignment," Davis Polk identified Clausen, DeSantis, Fabe, and Fenner. (Jeffries Decl. Ex. 32 (Davis Polk Rog Response No. 9).)

### b. Knowledge

695. On September 9, 2016, Crane emailed DeSantis and stated "[i]f you talk to John today about the other stuff please mention Kaloma" "[g]iven his conversation with Rocio [Clausen]." (ECF 209, Defs. Answer ¶ 275.)

696. Reid testified that by virtue of Crane's position, "it wouldn't surprise" him if they "met every week." (Jeffries Decl. Ex. 7 (Reid Tr. 147:11-19).)

697. The Firm's M&A had a practice of meeting annually in or around September or October to discuss M&A associates and their performance reviews. (Defs. Answer ¶ 92.)

698. M&A partners are encouraged to participate and attend the M&A annual review meetings and "most do attend those meetings." (Jeffries Decl. Ex. 4 (Bick Tr. 242:7:25).)

699. "Reid, Crane, DeSantis, and Fenner at times" attended the M&A partners' annual review meetings. (ECF 209, Defs. Answer ¶ 172.)

700. Members of the Associate Development Department would participate in the M&A partners' annual review meetings and "someone from [the] development would always – would always be there at each review meeting." (Jeffries Decl. Ex. 4 (Bick Tr. 275:17-276:11).)

701.    During the annual review meeting, M&A partners would ask the Associate Development Department "factual questions." (Jeffries Decl. Ex. 4 (Bick Tr. 277:7-14).

702.    When asked about the types of questions M&A partners might ask members of the associate development department, "a question might come up whether," for example, whether certain associates "were easy to deal with or did they object to staffing, things of that nature." (Jeffries Decl. Ex. 4 (Bick Tr. 276:23-277:14).

703.    Questions were "put to the person from associate development where we needed some more facts regarding the associate." (Jeffries Decl. Ex. 4 (Bick Tr. 278:15-21).

704.    It "was the goal" that the information and facts related by "associate development" would be used to help create the consensus feedback message that the associates were to receive. (Jeffries Decl. Ex. 4 (Bick Tr. 277:22-278:14).

705.    Bick explained that during the M&A partners' review meetings, "there would be again a discussion led by the reviewing partner." (Jeffries Decl. Ex. 4 (Bick Tr. 278:5-14).

706.    The reviews that are delivered to associates "reflects the review of the group" and that they "have a discussion as a group of M&A partners and there's a consensus" where "everyone has a voice and ultimate we reach a consensus as to what review is to be delivered." (Jeffries Decl. Ex. 4 (Birnbaum Tr. 330:13-331:4).).

707.    Birnbaum testified that associates' consensus messages and summary review forms are based on the group's discussion and not necessarily based on the individual reviews that are submitted for associates or partners who worked with an associate: (Jeffries Decl. Ex. 3 (Birnbaum Tr. 323:14-325:8, 327:9-329:4; 330:16-331:2); (Jeffries Decl. Ex. 54 (DPW_SDNY-000165909- DPW_SDNY-000165910); (Jeffries Decl. Ex. 55 (DPW_SDNY-000165927 - DPW_SDNY-000165928).)

708.   Fenner asked Kreynin to deliver Cardwell's annual review and the Firm's consensus message during the second half of December 2016. (ECF 209, Defs. Answer ¶ 324.)

709.   On September 27, 2016, Fenner sent Kreynin an email with "Our discussion" as the subject line and listed "partners for whom our system generated reviews for Kaloma (based on hours worked per matter)." (Jeffries Decl. Ex. 122, DPW_SDNY-000134245).)

710.   Regarding the process used to evaluate Cardwell for his 2016 annual review, Bick testified that "Kreynin was the reviewing partner leading the discussion." Kreynin "gathered up the written reviews," "summarized them for the group," and the group discussed what message to give Cardwell without any "formulaic weighting" applied to the reviews received for Cardwell. (Jeffries Decl. Ex. 4, Bick Tr. 282:20-283:12).)

711.   Cardwell was on a list of M&A associates whose reviews were to be discussed during an October 5, 2016 meeting of the M&A group. (ECF 209, Defs. Answer ¶ 176.)

712.   On October 17, 2016, after Cardwell was discussed at this meeting, Bick emailed Fenner: "Who are the trickier messages on your list? Kaloma is one." (Jeffries Decl. Ex. 96 (DPW_ SDNY-000097840); ECF 209, Defs. Answer ¶ 171.)

713.   On October 21, 2016, Butler described another M&A associate as being "not nearly as dangerous" as Cardwell, in response to Len Kreynin telling Butler: "Great. I guess it is Kaloma time for me." (Jeffries Decl. Ex. 97 (DPW_ SDNY-000089925).).)

714.   On September 27, 2016, and prior to the October 2016 annual review meeting, Butler stated that his "experience with Kaloma was pretty abbreviated." (ECF 223-9 at 8, Buergel Decl. Ex. 9 (DPW_SDNY-000144360).)

## 2. Adverse Employment Action And Causal Connection #1: Billable Hours

715. Bick explained that "trickier messages [was] sort of a shorthand for messages that we give to certain associates who have performance issues, and are we going to tell them that they should start looking for a new job, are not working out."

a) "So as we go through that high-level review with all of the associates, we will identify one, two or three to get these more difficult messages and so at the end of the review process, we cycle back and discuss these people who have the more difficult messages, you know. I use shorthand and say trickier but it's the more difficult messages at the end of the review process."

(Jeffries Decl. Ex. 4, Bick Tr. 327:12-328:10).)

716. The Firm's records indicated the following hours for Cardwell during this period:

| Month | Billable Client Hours |
|---|---|
| May 2016 | 101.1 |
| June 2016 | 96.9 |
| July 2016 | 146.4 |
| August 2016 | 160.5 |
| September 2016 | 229.6 |
| October 2016 | 112.4 |
| November 2016 | 68.9 |
| December 2016 | 14.1 |
| January 2017 | 2.2 |
| February 2017 | 1.9 |
| March 2017 | 1.9 |

(ECF 223-11 at 3-5, Buergel Decl. Ex. 11 (DPW_SDNY-000On 143583).)

717. Between April 2016 and the first half of September 2016, Cardwell was staffed by the Firm's non-partner staffing coordinators, namely Fenner. (ECF 209, Defs. Answer ¶ 270.)

718. Bick testified that any partner can have input on staffing decisions: "Any partner can [give] input to the staffing partners. There's dialogues all the time." (Jeffries Decl. Ex. 115, Bick Tr. 79:23-81:12).)

719.    After associates are assigned permanently to groups and become third year associates, their staffing is coordinated by junior staffing partners. (Defs. Answer ¶ 270.)

720.    In or about August and September of 2016, Birnbaum and Wolfe served as junior staffing partners for associates in the M&A group who were third-year associates and senior. (Jeffries Decl. Ex. 3, Birnbaum Tr. 61:5-10); ECF 209, Defs. Answer ¶ 270.)

721.    Staffing decisions involved multiple individuals. (ECF 209, Defs. Answer ¶ 203.)

722.    Associates could signal their capacity to take on new work on forms that were sent to the Firm's staffing coordinators. (ECF 209, Defs. Answer ¶ 203.)

723.    Such weekly capacity forms and the Firm's computer systems contain data relating to associates' capacity and billable hours. (ECF 209, Defs. Answer ¶ 293.)

724.    Birnbaum and Wolfe had access to M&A associates' weekly capacity forms to the extent the forms had been timely submitted for that week. (ECF 209, Defs. Answer ¶ 365.)

725.    Birnbaum testified that he received weekly capacity forms and that he and Wolfe used the forms to track associates' availability to take on new work and make staffing decisions. (Jeffries Decl. Ex. 118, Birnbaum Tr. 55:16-56:7).

726.    Cardwell submitted capacity forms from January to March 2017 in which he indicated that he had 100% availability. (ECF 209, Defs. Answer ¶ 344.)

727.    Davis Polk, Birnbaum, and Wolfe did not staff Cardwell on any new matters in September 2016, October 2016, November 2016, December 2016, January 2017, February 2017, or March 2017. (ECF 209, Defs. Answer ¶¶ 363-67.).

728.    Bick, Birnbaum, and Wolfe discussed how Cardwell should be staffed. (Jeffries Decl. Ex. 4, Bick Tr. 116:19-117:12.).

### 3.    Adverse Employment Action And Causal Connection #2: Career Advisors Program

729. As of January 20, 2017, Bick and Butler were Cardwell's assigned advisors for purposes of the Davis Polk's Career Advisor Program. (ECF 209, Defs. Answer ¶ 348.)

730. The Firm "believe[d] the addition of [these] advisory relationships will further ensure that Davis Polk's associates develop and succeed." (Jeffries Decl. Ex. 131, DPW-SDNY-000086097.)

731. The Lawyer's Handbook stated: "Associates who are interested in more information about potential job opportunities should contact their CAP Advisor." (Jeffries Decl. Ex. 11, DPW-SDNY-00000710.)

732. From January 20, 2017 to August 10, 2018, Butler did not email or have any conversations with Cardwell. (ECF 209, Defs. Answer ¶ 354.)

733. From January 20, 2017 to August 10, 2017, Cardwell did not receive any communications from Bick or Butler about either the Career Advisor program, their role as "advisors," or anything related to Cardwell's career prospects. (ECF 200, TAC ¶ 354.)

### 4. Pretext

734. During the 2016 annual review period, Fenner recommended that Cardwell not receive a mid-year review in 2017. (Jeffries Decl. Ex. 113, DeSantis Tr. 239:9-17).)

735. Fenner, a manager in the Associate Development Department and assignment coordinator, repeatedly checked-in with Birnbaum and other M&A partners and encouraged the Firm's partners to staff Cardwell. (ECF 209, Defs. Answer ¶ 302.)

736. On November 18, 2016, Fenner told Birnbaum that it "would be great if we could give [Cardwell] something." (ECF 200, TAC ¶ 303; ECF 209, Defs. Answer ¶ 304.)

737.    On December 27, 2016, Fenner told Wolfe and Birnbaum that it "would be great if we could give [Cardwell] something."  (ECF 200, TAC ¶ 304; ECF 209, Defs. Answer ¶ 304.)

738.    On January 25, 2017, Fenner emailed Wolfe and Birnbaum: "Please see below from Kaloma. John Bick/John Butler have just been designated as his advisors. . . . [I]s there by any chance some work we can send his way? He billed 2 hours in the past 30 days and has 100% capacity. Happy to discuss by phone." (ECF 209, Defs. Answer ¶ 357; ECF 200, TAC ¶ 357.)

739.    During a meeting involving Cardwell and Reid on March 9, 2017, Reid told Cardwell that the Firm was aware of Cardwell's recorded billable time, and communicated to Cardwell that his hours needed to be addressed. (ECF 209, Defs. Answer ¶ 377.)

740.    Reid told Cardwell in March 2017 that Cardwell's "work hours are low, that they are low for reasons that are not your fault, and that we're going to get it fixed."  (Jeffries Decl. Ex. 117, Cardwell Tr. 392:5-9; 397:5-7)

741.    On March 10, 2017, Cardwell emailed then-Davis Polk associate Vanessa Jackson and told her that Reid said his "lack of work [was] not [Cardwell's] fault and needs to be fixed." (Jeffries Decl. Ex. 123, DPW_SDNY-000143339).)

| G. | December 2016 and March 2017 Complaints About Geo |
|---|---|

| 1. | Protected Activity And Knowledge |
|---|---|

|  | *a.* | *Knowledge* |
|---|---|---|

742.    The Firm's Complaint Procedure "prohibit[ed] any form of retaliation against any individual who raises any question concerning legal compliance or professional ethics in good faith." Jeffries Decl. Ex. 10 (DPW SDNY-000000749); Ex. 11 (DPW SDNY-000000644).)

743.     In December 2016 and March 2017, Cardwell raised good faith compliance and ethics questions about the Firm's representation of Geo Group in emails to partner Carey Dunne and Sharon Katz. (Cardwell Decl. ¶ 21-23; Jeffries Decl. Ex. 117, Cardwell Tr. 337:22-24).)

744.     Dunne was supervising attorney on the matter about Geo. (Defs. Answer ¶ 333.)

745.     On March 5, 2017, Katz forwarded Cardwell's emails to Reid, Bick, and James Rouhandeh, and exchanged subsequent emails with Reid the same day.  (Jeffries Decl. Ex. 125, DPW-SDNY-000098147; Jeffries Decl. Ex. 52 (Davis Polk's Privilege Log Entry No. 7).)

746.     On March 9, 2017, Reid, Katz, and Cardwell met and discussed his concerns and questions about the Firm's relationship with Geo Group.  (Cardwell Decl. ¶ 28.)

747.     Reid thought Cardwell's inquiry was a "good faith" question. (Jeffries Decl. Ex. 116, Reid Tr. 320:5-9).)

748.     Cardwell was not staffed on any new matters between December 2016 and March 2017. (Buergel Decl. Ex. 11 (DPW_SDNY-000143583); Defs. Answer ¶¶ 363-67)

| **H.** | **... March 2017 Complaints** |
| --- | --- |

| **1.   Protected Activity And Knowledge** |
| --- |

| *a.  Knowledge* |
| --- |

749.     Following Cardwell's March 9, meeting with Reid, on March 20, 2017, Cardwell requested to review his personnel file and performance reviews. (ECF 209, Defs. Answer ¶ 387.)

750.     On March 20, 2017, Crane inquired as to when Cardwell would receive a mid-year review.  (Jeffries Decl. Ex. 126, DPW-SDNY-00000410858.)

751.     As of March 20, 2017, Crane, the Associate Development Department, and the Diversity Committee expected Cardwell to be staffed on matters following his 2016 annual reviews.  (Jeffries Decl. Ex. 126, DPW-SDNY-00000410858.)

752.    On March 21, 2017, Fenner expressed concerns that Cardwell requested to see his reviews.  (Jeffries Decl. Ex. 127, DPW-SDNY-000105409.)

753.    On March 21, 2017, Crane, Reid, and Bick shared in exchange through email that included the following comments:

> Crane: "Kaloma just emailed Professional Development to ask for his file and to review all of his evaluations to date. I believe our policy is not to provide the file for associate review. Renee was going to call him and confirm our policy when she gets into the office. However, I know you both either have or plan to talk to him about his work so I wanted to give you a heads up."

> Reid: "Sharon if that's ok with John I suggest we go back to Kaloma and tell him we don't hand out files but his request is noteworthy so we'll talk to him and go over what he'd like to talk about by way of feedback. I'd suggest Len Kreynin (his reviewer at last year end) and I sit down with him. Ok John?"

> Bick: "Fine. Daniel is on board to help. l need to speak with Darren."

(Jeffries Decl. Ex. 128, DPW_SDNY-000141975).)

754.    On March 21, 2017, Crane sent Reid another email that included these comments:

> a)   "Also, as you know, the individual reviews are discussed among partners, and a consensus is reached as to what the message should be. Some individual reviews are given more weight than others. Some are disregarded in part and some of the more recent feedback may be shared verbally during the meeting and only be included in the final review message." (Jeffries Decl. Ex. 129, DPW_SDNY-000141980).)

755.    After Reid, Bick, Kreynin, Crane, and DeSantis discussed Cardwell's request over email, DeSantis told Cardwell that it was Davis Polk's "policy and practice" to not allow associates to access or view their personnel file or performance reviews. (Jeffries Decl. Ex. 51 (DPW-SDNY-000097959; ECF 200, TAC ¶¶ 391-94; ECF 209, Defs. Answer ¶¶ 391-94.)

756.    During Cardwell's employment, the Firm's policy with respect to employees viewing their personnel file and reviews stated:

86

a) "If an employee requests to see their personnel file, Firm policy is that only a summary of review meetings can be seen. The employee may take notes but is not permitted to make photocopies of the contents. If such a request to review the personnel file is made, a memo is inserted in the employee's file indicating the request and the date the summary review was reviewed."

(Jeffries Decl. Ex. 87 (DPW_SDNY-000142677).)

757.    At no time during Cardwell's employment did Davis Polk, Reid, Crane, or DeSantis allow Cardwell to see "a summary of review meetings."  (ECF 200, TAC ¶ 398).

758.    At no time during Cardwell's employment did Cardwell's personnel file contain a "memo … indicating [Cardwell's] request and the date the summary review was reviewed." (ECF 223-75 at 55, Buergel Decl. Ex. 75 (RFA No. 110).)

759.    Around March 21, 2017, a meeting was scheduled for Reid, Kreynin, and Cardwell. Before the meeting, Crane sent DeSantis an email stating: "As you know, this type of [meeting] is not particularly unique. Tom [Reid] will be there because he just spoke to him recently." ((ECF 209, Defs. Answer ¶ 403; (DPW_ SDNY-000140867).)

760.    On March 28, 2017, Kreynin submitted the formal summary review for Cardwell's 2016 annual review, which occurred in December 2016. (Defs. Answer ¶ 404.)

761.    Although Kreynin asserted in Cardwell's summary review form that he "[told Cardwell] that there [were] significant areas of improvement that we identified," he never told Cardwell that during the review meeting. (ECF 209, Defs. Answer ¶ 408; ECF 200, TAC ¶ 409.)

762.    Kreynin also claimed in the summary review form that their December 2016 meeting concluded with Kreynin "saying that we plan to meet again in June 2017 to discuss whether there have been improvements in these areas," but Kreynin did not tell Cardwell that during the review meeting. (ECF 209, Defs. Answer ¶ 410-11; ECF 200, TAC ¶ 413)

763.    Cardwell testified that, on March 29, 2017, Reid told Cardwell the Firm "dropped the ball," had made "mistakes" with respect to Cardwell's staffing, would not allow Cardwell to

discuss his staffing history with Bick, and that Reid threatened Cardwell and told him he would be "out the game" and "off the field" if Cardwell did not let things go and stop making inquiries. Cardwell also testified that he "explicitly discussed bias" during this meeting.  (Jeffries Decl. Ex. 117, Cardwell Tr. 413:10-420:7).)

764.    Reid admitted during his deposition that he told Cardwell, on March 29, 2017, that the Firm had made mistakes with Cardwell. (Jeffries Decl. Ex. 7 (Reid Tr. 221:13-223:3).)

765.    Reid testified that Cardwell requested an opportunity to meet with Bick to discuss his staffing issues "in the context of" Cardwell's "hours hav[ing] to do with [his] race, not [his] performance." (Jeffries Decl. Ex. 7, Reid Tr. 223:18-225:2).)

766.    Reid testified that Cardwell's March 2017 complaint "needed to be reported by [Reid] to the other members of the management committee and to our internal counsel." (Jeffries Decl. Ex. 116, Reid Tr. 227:13-25).)

767.    Reid testified that he used the words "off the field" in his conversation with Cardwell and that Reid did not memorialize the discussion or Cardwell's complaint from their March 29, 2017 meeting. (Jeffries Decl. Ex.  7 (Reid Tr. 242:3-6); Jeffries Decl. Ex. 116, Reid Tr. 229:6-10; 230:2-6).)

768.    Bick testified that "on or about March of 2017" Reid told him that Cardwell "was stating that because he was a Black associate he was being discriminated against and not getting work" and that Reid "had a follow-on meeting" where "everyone was informed." (Jeffries Decl. Ex. 4, Bick Tr. 189:9-190:12; 194:11-12)

769.    Rouhandeh, the Firm's general counsel's office, and Crane also had knowledge of Cardwell's March 2017 complaint. (Jeffries Decl. Ex. 116, Reid Tr. 227:13-25); Jeffries Decl. Ex. 4 (Bick Tr. 194:19-22).)

88

770.     Bick testified that he spoke with staffing partners Birnbaum and Wolfe and a "a few partners" shortly after being informed about Cardwell's March 2017 complaint. (Jeffries Decl. Ex. 4 (Bick Tr. 184:9-196:8).)

771.     In the Firm's NYSDHR Brief, Davis Polk represented that in April 2017 "the Firm discussed a remediation plan for Cardwell" and that M&A partner John Amorosi was part of such discussions." (Jeffries Decl. Ex. 8 (DPW_SDNY-000000301).)

772.     As of July 12, 2017, when Cardwell returned from the Firm's mandated medical leave, Cardwell's name had already appeared on emails identifying associates who were scheduled to receive "time to go" messages. (Jeffries Decl. Ex. 112 (DPW_SDNY-000141074).)

### 2.  Adverse Employment Action And Causal Connection

773.     Cardwell returned to work on May 2, 2017. (ECF 209, Defs. Answer ¶ 437.)

774.     Bick met with Cardwell around May 2, 2017. (ECF 209, Defs. Answer ¶ 438.)

775.     During their meeting, Bick told Cardwell that no one at the Firm was going to "actively monitor" Cardwell's hours. ECF 200, TAC ¶ 441.

776.     On May 3, 2017, Cardwell was finally staffed on his first new assignment since approximately August 2016. (ECF 200, TAC ¶ 444.)

777.     On or around May 19, 2017, Bick told Cardwell that he needed to complete this first assignment before the Firm would assign him a second one. Cardwell informed Bick that the memo did not require 100% of his capacity and that Goldberg set a deadline for the next draft that was still a few days away (ECF 200, TAC ¶ 445; ECF 209, Defs. Answer ¶ 445.)

778.     All of Cardwell's billable hours in May 2017 were in connection with that legal research memo assigned on May 3, 2017. (ECF 200, TAC ¶ 449.)

779.    Crane pulled Cardwell's performance reviews on May 26, 2017.  (Jeffries Decl. Ex. 142, DPW-SDNY-000141984.)

**I.    May 2017 Complaints**

**a)    Protected Activity and Knowledge**

780.    On May 22, 2017, Cardwell emailed Goldberg: "I thought about that story as I thought more about my own story and experience here at [Davis Polk] (in addition to other similarly situated workers at [Davis Polk]), and I became ill." (ECF 209, Defs. Answer ¶ 450.)

781.    On May 23, 2017, Cardwell met with Crane and Goldberg.  During the meeting, Cardwell explained that Reid, Bick, Birnbaum, and Wolfe were responsible for staffing Cardwell. (ECF 209, Defs. Answer ¶ 456.)

782.    Cardwell specifically asked Crane to investigate his staffing history and experience at the Firm, and to assess whether Cardwell's experience was in anyway normal. Bick, Reid, Birnbaum, and Wolfe. (ECF 200, TAC ¶ 456; ECF 209, Defs. Answer ¶ 456.)

783.    On May 23, 2017, Crane sent an email to Reid and Bick that included the comment: "Louis [Goldberg] and I spoke to Kaloma today I can [sic] fill you in tomorrow at your convenience." (ECF 200, TAC ¶ 459.)

784.    When asked if Reid learned that Cardwell contacted Goldberg and indicated that his experience at Davis Polk made him physically ill, Reid testified: "I knew he had taken time off for medical leave."  (Jeffries Decl. Ex. 7, Reid Tr. 253:14-15.)

785.    On May 24, 2017, Davis Polk received notice that Cardwell engaged legal counsel. (ECF 209, Defs. Answer ¶ 463.)

786.    On June 7, 2017, about 15 M&A partners—including Chudd, Wolfe, Birnbaum, Hochbaum, Mills, Goldberg, and Amorosi—received communications related to "document

preservation notices" relating to Cardwell's complaints and the fact that Davis Polk learned that Cardwell obtained legal counsel. (Jeffries Decl. Ex. 52, Davis Polk Privilege Log Entry No. 58.)

787.    On July 24, 2017, Brass received communications related to "document preservation notices" arising from to Cardwell's complaints and the fact that Davis Polk learned that Cardwell had obtained legal counsel. (ECF 200, TAC ¶ 465 n.74.)

788.    On June 13, 2017, Birnbaum emailed Wolfe and Brass and told them, "FYI, talked to Louis [Goldberg]. As I suspected, basically, for every deal that comes in, we should think about whether it's right for [Cardwell]." Brass replied: "Understood." (ECF 209, Defs. Answer ¶ 466; ECF 200, TAC ¶ 466.)

### b)    Adverse Employment Action

789.    It was not until Cardwell engaged counsel, that the Firm's M&A partners assigned him to his first M&A deal in over eight months. (ECF 200, TAC ¶ 469.)

## J.    August 2017 Complaint (EEOC Complaint)

### a)    Protected Activity & Knowledge

790.    As of December 5, 2017, at least the following Davis Polk partners and personnel had knowledge of Cardwell's EEOC/NYSDHR complaint: William Aaronson, Bick, Brass, Crane, DeSantis, Fabe, Fenner, Goldberg, Ronan Harty, Hochbaum, Sharon Katz, Kreynin, Reid, and Rouhandeh. (Jeffries Decl. Ex. 32, Davis Polk's Response to Rog No. 13.)

### b)    Adverse Employment Action #1:  NYSDHR Brief

791.    The NYSDHR Brief included references to the performance reviews and feedback from Hudson, Butler, Chudd, Bick, and Reid. (ECF 209, Defs. Answer ¶ 478.)

792.    Bick and Reid contributed to the Firm's NYSDHR Brief, with Bick having "read the document and g[iving] comments," mostly "of a factual nature." (Jeffries Decl. Ex. 115, Bick

Tr. 238:11-13.)  Reid stated that "if [he]'d seen something in that answer that [he] was not comfortable with, did not think represented facts, [he] would have said something" but he could not "recall making any – suggesting any changes." (Jeffries Decl. Ex. 116, Reid Tr. 279:11-15.)

793.    "[C]ounsel would have driven the core arguments."  (Jeffries Decl. Ex. 115, Bick Tr. 238:14-239:2-5.)

794.    Davis Polk's NYSDHR Brief includes the representation that "[i]n the course of the [March 29, 2017] discussion, Cardwell raised for the first time, the question of whether his assignments or hours were connected to his race." (Jeffries Decl. Ex. 8 (DPW_SDNY-000000301).). (ECF 209, Defs. Answer ¶ 477.)

### c) Adverse Employment Action #2: Staffing & Billable Hours

795.    Davis Polk, Birnbaum, and Brass did not staff Cardwell on any matters after Davis Polk filed its Position Statement. (ECF 209, Defs. Answer ¶ 479.)

796.    Defendants claim that "four successive matters in 2017, made it increasingly difficult to staff him, and, as a result, he was not staffed on any new matters between December 5, 2017 and his time to go meeting in February 2018. (ECF 209, Defs. Answer ¶ 479.)

### d) Adverse Employment Action #3: Post-EEOC Performance Reviews

797.    Hochbaum, Mills, Goldberg submitted performance reviews for Cardwell in September 2017 and rated Cardwell as materially "behind" lawyers in his class.  *See* ¶¶ 470-71.

798.    Amorosi submitted a performance evaluation for Cardwell on October 9, 2017 and rated Cardwell as materially "behind" lawyers in his class." (ECF 209, Defs. Answer ¶ 488.)

### e) Adverse Employment Action #4: Termination

799.    On February 8, 2018, Cardwell was told that there had been a Firm decision, in light of purported performance issues, that the Firm could not staff him consistent with his class

year (seniority) and the Firm's obligations to its clients; and that the Firm believed that it was time for Cardwell to begin to look for alternative employment. (ECF 209, Defs. Answer ¶ 588.)

800.    When asked about the termination of Cardwell's employment, Bick testified:

> A: "[W]e were making that decision collectively and it was discussed in the fall of 2017, and then ultimately the message was agreed that in February in response Kaloma understandably wanting to know what the program would be in terms of working on transactions when he got the review in January of 2018, ultimately we came back to him and said he needed to look for a new job. So that's when he was told he had to leave the firm."

> Q: "When was that decision – when were those discussions taking place, the ones that led to the decision to terminate Mr. Cardwell?"

> A: "That would be in the January/February time frame of 2018."

> Q: "And ultimately who made the decision to terminate Mr. Cardwell?

> A: "I think it was a group discussion. It would be certainly management committee because of the EEOC complaint and focusing on impact of termination on those proceedings, and then also getting consensus from a handful of people, staffing partners, Louis Goldberg, Oliver, who had given him the reviews, everyone who had input, and ultimately, the consensus was that he should go get another job, that staffing him was becoming untenable."

> Q: "With respect to specific individuals, I heard you mention the management committee, Goldberg and staffing partners. So would that be Harold Birnbaum; correct?"

> A. "Yes, Harold and I believe Brian Wolfe."

> Q: "And with respect to management committee, would that conversation or would that input related to terminating Mr. Cardwell have involved input from Mr. Tom Reid?"

> A: Yes, it would have been Tom Reid and Jim Rouhandeh.

(Jeffries Decl. Ex. 4 (Bick Tr. 284:23-287:5).)

| K. | Defendants' Recollection |
|---|---|
| | 1. Bick |

801.    Bick testified that if he "ha[s] no recollection," of a past event, discussion, or other phenomenon, then he has "ha[s] no knowledge" of it.  When asked to clarify his position, he explained: "If I [have] no recollection of the meeting or what was discussed, I have no knowledge. To me it's the same thing."  (Jeffries Decl. Ex. 4 (Bick Tr. 170:15-171:6).)

802.    Bick could not recall "pre-privileged" conversations with Sharon Crane (or others at the Firm) related to discussions of Cardwell's complaints, or any action taken in response to them.  However, he was able to recall having "privileged" conversations that he could not talk about because they were privileged.  (Jeffries Decl. Ex. 4 (Bick Tr. 157:24-158:4).)

803.    Despite Bick emailing Crane regarding Cardwell's request to view his evaluations, Bick could not recall his communications with Crane on these issues, among other communications during key periods when Cardwell's complaints were discussed. (Jeffries Decl. Ex. 4 (Bick Tr. 158:8-13).) (Jeffries Decl. Ex. 61 (DPW_SDNY-000097959).)

### 2.    Reid

804.    Despite Cardwell and Adams memorializing and discussing several follow-up items, Reid testified that they did not discuss any "follow-up items" related to race and inclusion (e.g., trainings) that Davis Polk should consider implementing.  (Jeffries Decl. Ex. 116, Reid Tr. 167:23-169:10; 177:17-178:6).)

805.    Reid was unable to recall any conversations with Crane between March 29, 2017 and May 23, 2017.  (Jeffries Decl. Ex. 7 (Reid Tr. 277:7-14).)  However, he sent Crane at least two emails on March 30, 2017 and at least one on March 31, 2017 (after Cardwell's March 29, 2017 complaint) related to Cardwell's "performance and staffing." (Jeffries Decl. Ex. 52 (Davis Polk's Privilege Log Nos. 16-18).)

### 3.    Hudson

806. A parenthetical within an internal Firm document created after 2015 described Hudson as a staffing coordinator: "During the meeting with Sophia and Byron (staffing cords for CM), they discussed issues and strategies." (Jeffries Decl. Ex. 62 (DPW_SDNY-000144472).)

807. Hudson testified that she does not recall when she stopped serving as a staffing partner. (Jeffries Decl. Ex. 5 (Hudson Tr. 33:20-34:4).)

### 4. Crane

808. Crane testified that she did not recall receiving an update from DeSantis regarding the September 2015 BAG meeting (Jeffries Decl. Ex. 119, Crane Tr. 119:2-5.)

## V. DISCRIMINATION CLAIMS

### A. Statistical Evidence Regarding Davis Polk's Black Attorneys

809. For each year that Cardwell was employed at Davis Polk, the Firm employed over 100 partners and 600 associates as attorneys, but never had more than one partner who identified as African-American or Black (hereinafter, "Black"). (ECF 209, Defs. Answer ¶ 6.)

810. When Davis Polk recruited Cardwell, and during Cardwell's employment, *The American Lawyer's* Diversity Scorecard indicated that Davis Polk had among the smallest representation of Black attorneys (i.e., exclusively measuring Black attorneys, as opposed to measuring or ranking "minorities" or "lawyers of color") in its partnership as compared to dozens of law firms ranked in the Diversity Scorecard. (ECF 223-93, Buergel Decl. Ex. 82.)

811. For 2011, Davis Polk had about 642 U.S. attorneys, over 100 of whom were partners, but no partners who self-identified as Black and only had 26 non-partner attorneys who self-identified as Black. (ECF 223-93 at 3, Buergel Decl. Ex. 82.)

812. For 2012, Davis Polk had about 633 U.S. attorneys, over 100 of whom who were partners, but only one partner who self-identified as Black and only 24 non-partner attorneys who self-identified as Black. (ECF 223-93 at 5, Buergel Decl. Ex. 82.)

813.    As of August 31, 2013, Davis Polk had 155 partners, but only one of their 155 partners self-identified as African-American or Black. (ECF 209, Defs. Answer ¶ 38.)

814.    Between 2014 and 2018, 100% of Davis Polk's M&A partners were male and none of them self-identified as African-American or Black. (ECF 209, Defs. Answer ¶ 673.)

815.    As of October 21, 2014, Davis Polk had 31 associates who self-identified or were Black and did not have any Black partners. (Jeffries Decl. Ex. 16 (DPW_SDNY-000141917).)

816.    As of October 21, 2014, Davis Polk had just 22 Black associates who were first, second, or third-year associates and; four Black associates who were fourth-year associates; two Black associates who were fifth-year associates; one Black sixth-year associate, and one Black seventh-year associate. (Jeffries Decl. Ex. 16 (DPW_SDNY-000141917).)

817.    In March 2017, DeSantis emailed several Firm partners and the Firm's Diversity Committee indicating that "[t]here are 55 diverse 4th – 8th year associates in NY, including LGBT lawyers." (Jeffries Decl. Ex. 17 (DPW_SDNY-000141062).)

818.    As of March 19, 2018, Davis Polk did not have any Black M&A associates who were more senior than Cardwell (i.e., there were no Black M&A 5th, 6th, 7th, 8th, or 9th year associates, or any Black M&A partners). (Jeffries Decl. Ex. 1 (Cardwell Tr. 606:17-608:9).)

819.    Hudson testified that during her employment at Davis Polk, she had never worked with a Black Davis Polk Capital Markets partner or a Black senior associate in the Firm's Capital Markets practice group. (Jeffries Decl. Ex. 5 (Hudson Tr. 184:9-185:8).)

820.    Hudson "was employed as a full-time lawyer from the fall 2006 through September 2018." (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:18).) But "[t]here's never been a black partner in Capital Markets." (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:19).)

821.     Hudson acknowledged that "during [her] time at Davis Polk there was not a black capital markets senior associate that [she could] recall, but there may have been when [she] was a junior associate [or] when [she] was a rotator as a first or second year." (Jeffries Decl. Ex. 5 (Hudson Tr. 184:16-184:25).)

822.     Hudson also testified: "Cardwell [noted] that he was the only black male associate in his first year class. It's thin, there've been consistently small numbers of black associates that Davis Polk has been able to hire." (Jeffries Decl. Ex. 5 (Hudson Tr. 185:18-186:2).)

**B.   BAG and the Diversity Committee**

823.     *See* ¶¶ 553 *supra*, in the section describing the September 2015 complaint.

**C.   External Diversity Consultants**

824.     *See* ¶¶ 609-631 *supra*, in the section describing the participation of consultants and Firm-wide trainings and presentations.

**D.   Other Firm Affinity Groups**

825.     On June 15, 2016, Davis Polk's Asian/South Asian/Middle Eastern group took their concerns about racial bias at Davis Polk directly to Reid and the Firm's Management Committee in the form of a 12-page PowerPoint presentation that they presented to him. (ECF 200, TAC ¶ 642 n.103; Jeffries Decl. Ex. 132 (KCARDWELL022873).)

826.     The presentation included text related to how "implicit bias and exclusion from informal support networks and client development are common and affect the ways in which Asians are evaluated and considered for promotion."  (ECF 200, TAC ¶ 642 n.103; Jeffries Decl. Ex. 132 (KCARDWELL022875).)

827.     The presentation described "Potential Management Committee-Led Initiatives" related to "[t]raining on implicit bias and unconscious stereotypes trainings for all personnel" and "[t]rainings for partners, counsel and senior associates on managing a diverse associate pool and

the specific challenges and barriers to internal advancement." (ECF 200, TAC ¶ 642 n.103; Jeffries Decl. Ex. 132 (KCARDWELL022883).)

### E. Comparators

#### a) Certain Similarly Situated Associates

828.    Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 "were subject to the same performance evaluation and discipline standards" and "had the same core responsibilities as a Davis Polk associate." (ECF 200, TAC ¶ 648.)

829.    Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 were all subject to the same performance evaluation system, which includes the Firm "conduct[ing] performance reviews of its attorneys," "solicit[ing] written performance reviews from individual reviewers," using a "review template[] for individual performance reviews," asking if the reviewer believes the "lawyer is performing materially behind, with or ahead of the lawyer's class" "receiving the individual performance review," "develop[ing] a 'consensus message' or 'consensus feedback' to be delivered to the attorney being reviewed" having "one Firm partner … deliver the Firm's consensus message to the attorney being reviewed," "deliver[ing] the Firm's consensus message to the associate during a subsequent meeting," and "record[ing] … that subsequent meeting … on a form titled 'Lawyer Reviews – Summary Reviews.'" (Buergel Decl. Ex. 78; ECF 209, Defs. Answer ¶ 168.)

830.    Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 worked with and were evaluated by the same M&A partners, including Bick, Chudd, Butler, Hochbaum, Wolfe, Goldberg, Birnbaum, Oliver Smith, and Phillip Mills. (ECF 200, TAC ¶¶ 519, 526, 652, 654, 657, 659, 665.)

831.     As M&A associates, Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 were all members of the Firm's Corporate Department, which Bick oversaw and supervised as Head of Corporate.  (ECF 209, Defs. Answer ¶ 8.)

832.     Cardwell, Associate 3, Associate 5, Associate 7, Associate 8, and Associate 9 were all discussed by the Firm's M&A partners during the 2016 annual review meetings and a Firm consensus message was developed for each of them in connection with those meetings and discussion.  (ECF 209, Defs. Answer ¶ 168.)

**b)     Comparators' Performance Record**

*1.*     Associate *#5*

833.     Associate 5 received the "behind" rating alleged in the TAC.  (ECF 200, TAC ¶ 650; ECF 209, Defs. Answer ¶ 650.)

834.     "[S]even Davis Polk M&A partners in nine separate performance evaluations rated Associate #5 as 'behind' across two consecutive years. Mr. Chudd is one of the partners who rated Associate #5 as 'behind.'"  (ECF 200, TAC ¶ 650.)

835.     "Even though M&A partners and associates rated Associate #5 as 'behind' in at least seven separate performance reviews during … May 2016 and October 2016, this associate billed and was allowed to bill almost the same amount of hours as Mr. Cardwell."  (ECF 200, TAC ¶ 305.)

836.     "Associate #5 was rated as "behind" by two M&A partners in consecutive years (2016 and 2017), was explicitly told during Associate #5's November 2016 Annual Review that Associate #5 'should view the fact that [Associate #5] was being given lower level tasks as an indication of [Associate #5's] failure to demonstrate a skill set and energy level consistent with high level tasks."  (ECF 200, TAC ¶ 520.)

837. "Associate #5's performance reviews were not a barrier to Mr. Bick, Mr. Wolfe, Mr. Birnbaum, Mr. Brass, or the Firm's other M&A partners' willingness to staff and work with Associate #5. During Associate #5's 2017 annual review, the Firm's and M&A group's consensus message to Associate #5 was that "the key for this year" was for Associate #5 "to try to take on as much work as possible…." (ECF 200, TAC ¶ 522.)

838. "Between December 2017 and Associate #5's departure from the Firm, Davis Polk's M&A partners staffed Associate #5 and created workable staffing arrangements to deal with Associate #5's performance issues." (ECF 200, TAC ¶ 524.)

839. Associate #5 "worked in the Firm's M&A group for the entire three-year period [i.e., 2016, 2017, and 2018]." (ECF 223-75 at 61, Buergel Decl. Ex. 75 (RFA No. 128).)

### 2. Associate #7

840. Associate 7 received the "behind" rating alleged in the TAC. (ECF 200, TAC ¶ 653; Defs. Answer ¶ 653.)

841. "[E]ight different Davis Polk M&A partners rated Associate #7 as "behind" across four consecutive years (2014, 2015, 2016, and 2017). Mr. Chudd, Mr. Butler, Mr. Birnbaum, and Mr. Bick were among the partners who rated Associate #7 as "behind" in a performance review." (ECF 200, TAC ¶ 653.)

842. "Being assessed as "behind" was not a barrier to Mr. Bick and the Firm's M&A partners', including Mr. Wolfe's, Birnbaum's, and Mr. Brass's, willingness and ability to create a workable staffing and employment arrangement for Associate #7 after M&A partners rated Associate #7 as "behind" in performance reviews." (ECF 200, TAC ¶ 653.)

843. "Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #7's billable hours within 2-3 months of an M&A partner rating Associate #7 as 'behind.'" (ECF 200, TAC ¶ 653.)

### 3. Associate #9

844. Associate 9 received the "behind" rating alleged in the TAC. (ECF 200, TAC ¶ 655; Defs. Answer ¶ 655.)

845. M&A partners rated Associate #9 as "behind" based on their personal assessment in three consecutive years (2015, 2016, and 2017). Wolfe and Goldberg were among the partners who rated Associate #9 as "behind" in a performance review. (ECF 200, TAC ¶ 653.)

846. "One of the partners who rated Associate #9 as 'behind' noted in [their] review that the associate's 'positive qualities are outweighed by [Associate #9's] significant substantive shortcomings,' that Associate #9 'routinely misreads and misunderstands contractual provisions,' has 'analysis of the issues' that are 'often superficial or wrong" and has "drafting" that "needs to be carefully checked for both conceptual and sloppy errors.'" (ECF 200, TAC ¶ 653; see generally Jeffries Decl. Ex. 136, DPW-SDNY-000165534.)

847. The partner also noted that he "would be hesitant to leave [Associate #9] unsupervised on any substantive tasks that are not routine in nature." (ECF 200, TAC ¶ 653.)

848. "Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #9's billable hours within 2-3 months of an M&A partner rating Associate #9 as 'behind.'" (ECF 200, TAC ¶ 656.)

849. Cardwell's "race and complaints" led Reid, Bick and Davis Polk's M&A partners, including Wolfe, Birnbaum, and Brass "to staff, mentor, evaluate, and employ" Cardwell "differently and worse than Associate #9." (ECF 200, TAC ¶ 657.)

> ### 4. *"Behind" Ratings and Mid-Year Review Cycles*

850.   "Unlike Associate #5, Associate #10, Associate #9, and Associate #3, Cardwell was never rated as "behind" in performance reviews by M&A partners from more than one review cycle. In fact, more M&A partners rated Associate #5, Associate #10, and Associate #3 as "behind" than Cardwell."  (ECF 200, TAC ¶ 645.)

851.   Unlike these associates, only Cardwell was placed in a mid-year performance review cycle based solely on Bick's instructions and request.  (ECF 200, TAC ¶ 646.)

> ### d)   Comparators' Departures from the Firm

852.   These and other associates were permitted to remain employed at Davis Polk for years after receiving the foregoing reviews.  (ECF 200, TAC ¶ 517.)

853.   Associate 5's last day of employment was January 14, 2019. Associate 6 and Associate 9 left the Firm after Cardwell's employment was terminated.  (Buergel Decl. Ex. 77 (DPW_SDNY-000168017).)

854.   "Some" comparators received a "time to go" message (including after Cardwell) but others "did not receive such messages" at all. (Buergel Decl. Ex. 75 (RFA No. 129).)

855.   An associate's written reviews would reflect the Firm's decision that an associate was being terminated for poor performance.  (Jeffries Decl. Ex. 4 (Bick Tr. 288:15-22).)

> ## VI.   ADDITIONAL FACTS RELATED TO MITIGATION

856.   During Cardwell's employment, the Firm's Lawyer's Handbook stated: "Davis Polk alumni enjoy rich and vibrant careers throughout the world. The Firm offers a number of resources, including a robust alumni network, to associates who are interested in pursuing external opportunities. Associates who are interested in more information about potential job opportunities should contact their CAP Advisor or members of the Professional Development Department."  Jeffries Decl. Ex. 11, DPW-SDNY-000000710.)

857.    Butler and Bick did not act as advisors to Cardwell in the Firm's Career Advisor Program. See ¶¶ 729-33 *supra*.

858.    The alumni network consists of over 3,000 lawyers. (Defs. Answer ¶ 10.)

859.    During Cardwell's employment, the Firm's Lawyer's Handbook stated:

a)    "As a Davis Polk lawyer, you are currently a member of the Alumni Network. Upon your departure, we will update your profile on the Alumni Network to include your new title and company (if applicable) and Davis Polk tenure information. … Two weeks after your departure from the firm, an email containing your login credentials will be sent to the email address that you provide in your departure questionnaire."

Jeffries Decl. Exs. 10-12.

860.    Davis Polk did not provide departure or exit interview questionnaires to associates who received "time to go" messages. (Jeffries Decl. Ex. 119, Crane Tr. 305:19-306:5).)

861.    Cardwell was identified as an associate who "should not get an exit interview questionnaire." (Jeffries Decl. Ex. 119 (Crane Tr. 303:16-24).)

862.    The Firm did not provide Cardwell with access to the Alumni Network. (Jeffries Decl. Ex. 111 (DPW_SDNY-000140805); Cardwell Decl. ¶ 19; *see generally id.* ¶¶ 15-20.)

863.    The Firm did not contact Cardwell two weeks following his departure by sending "an email containing [his] login credentials" as stated in the Firms Lawyer's Handbook. (Jeffries Decl. Ex. 111 (DPW_SDNY-000140805); Cardwell Decl. ¶ 19; *see generally id.* ¶¶ 15-20.)

864.    Chudd is the co-head of Davis Polk's alumni committee, a leadership position that coordinates the Firm's Alumni Network. (Cardwell Decl. ¶ 20.)

**VII.    ADDITIONAL FACTS RELATED TO DAMAGES**

**A.    Compensatory Damages**

865.    *See* ¶¶ 780, 784 *supra* describing Cardwell's May 2017 email about feeling ill.

866.     Cardwell's employment experiences at Davis Polk (e.g., not being staffed, being threatened by Reid, and ultimately being fired by the Firm) have negatively impacted his health. (Jeffries Decl Ex. 118, (Cardwell Tr. 282:7-283:11; 287:2-288:6; 290:21-294:6.)

867.     Davis Polk acknowledged that it was Cardwell's belief that his "'current situation at work' was causing 'health complications.'"  (ECF 209, Defs. Answer ¶ 473.)

868.     In 2017, Goldberg informed Cardwell should take time off and that "before [he] return[s] to work [the Firm] will need a medical note."  (TAC ¶ 450.)

| B. | Punitive Damages |
|---|---|

| 1. | The Firm's Antidiscrimination and Antiretaliation Policies |
|---|---|

869.     The Firm conducted trainings related to identifying and remedying bias and discrimination. See ¶¶ 609-631 *supra*.

870.     Davis Polk "has antidiscrimination policies, invests in diversity and inclusion training, and makes efforts to train attorneys on related diversity and inclusion literature."  (ECF 209, Defs. Answer ¶ 200; *see also* Jeffries Decl. Ex. 4 (Bick Tr. 50:10-21).)

871.     Davis Polk "is committed to maintaining a workplace free of discrimination, hostility, harassment, and retaliation."  (ECF 209, Defs. Answer ¶ 642.)

872.     Every year, the Firm circulates all material Firm policies, including certain antidiscrimination policies, and lawyers are asked to confirm that they have read, reviewed, and will comply with those policies." (Jeffries Decl. Ex. 4 (Bick Tr. 50:10-21).)

873.     In October 2017, Davis Polk received a letter from the NYSDHR that stated:

   a)     "The New York State Division of Human Rights is a State Agency mandated to receive, investigate and resolve complaints of discrimination under N.Y. Executive Law, Article 15." (Jeffries Decl. Ex. 9 (DPW_SDNY-000000141).)

   b)     "Enclosed is a copy of a verified complaint filed with the Division of Human Rights against you. This complaint, which alleges an unlawful

discriminatory practice in violation of the New York State Human Rights Law, is being served upon you ….” (Jeffries Decl. Ex. 9 (DPW SDNY-000000139).)

c) “The Human Rights Law prohibits retaliation against any person because he or she has opposed discriminatory practices, filed a discrimination complaint, or participated in any proceeding before the Division. Human Rights Law§ 296.7.” (Jeffries Decl. Ex. 9 (DPW SDNY-000000139).)

d) “You are … notified that a charge of employment discrimination under [x] Title VII of the Civil Rights Act of 1964 … has been received by: The New York State Division of Human Rights … and sent to the EEOC for dual filing purposes.” (Jeffries Decl. Ex. 9 (DPW SDNY-000000144).)

## 2. The Firm's Investigations of Cardwell's Complaints

874. “[T]he Firm takes seriously complaints of unlawful discrimination, retaliation, or harassment, whether relating to its performance evaluation policies or practices or otherwise.” (Buergel Decl. Ex. 75 (RFA No. 108).)

875. When asked if any investigation had been undertaken before the EEOC Complaint, for instance, by Sharon Crane in her capacity as Head of Personnel, Bick testified that: “To the best of my recollection, no.” (Jeffries Decl. Ex. 115, Bick Tr. 45:25-46:5.)

876. No partner, member of Davis Polk's General Counsel's Office, member of the Associate Development Department, or other Davis Polk personnel, spoke with Cardwell about his experiences with bias and discrimination at the Firm, or otherwise attempted to understand the basis for his September 2015 and September 2016 complaints. (ECF 200, TAC ¶ 76.)

## 3. Knowledge of Employment Impacts on Cardwell's Health

877. Defendants had knowledge of the detrimental impact that Cardwell's employment was having on Cardwell's health. See ¶¶ 780-84, 866-68 *supra*.

## 4. Reviews and Reputational Harms and Impacts

878.    Cardwell testified that the Firm's Black attorneys knew that "unsubstantiated comments" in reviews and "general chatter" can "significantly impact" their reputation. (Jeffries Decl. Ex. 1 (Cardwell Tr. 302:19-307:24).)

879.    Cardwell and Sheila Adams discussed this with Tom Reid in January 2016 to raise awareness "that [the Firm] had a performance review system that allowed feedback to come in the form of implicit bias" and "allow unsubstantiated comments about associates to be duplicated over and over again." (Jeffries Decl. Ex. 1 (Cardwell Tr. 302:19-307:24).)

### 5.    "Potential Threat"

880.    Bick testified that the Firm did not "perceive [a] potential threat" to its reputation until Cardwell filed the EEOC Charge, because "the management committee … recognized if he went public with his complaints, there would be news coverage and [they] could have [their] reputation harmed through those complaints." (Jeffries Decl. Ex. 105, Bick Tr. 211:17-212:16).)

881.    Neil Bar, as a member of the Firm's three-person Management Committee, emailed Davis Polk's employees, including the Firm's non-lawyers, and told them that Cardwell was fired "following negative performance reviews given in the ordinary course." (Jeffries Decl. Ex. 118, Cardwell Tr. 271:13-272:4; ECF 223-75 at 40, Buergel Decl. Ex. 75 (RFA No. 40)).)

882.    The email was sent to "all Davis Polk associates, counsel, partners, and employees who have a Davis Polk email account." (Buergel Decl. Ex. 75 (RFA No. 74)).)

883.    As a consequence of the Firm's statement, Cardwell has "had to deal with the practical reality of [this] e-mail to all of Davis Polk, which was later published by *Above the Law*, [where] he essentially told the legal profession that I was terminated for reasons so-called related to my performance reviews." (Jeffries Decl. Ex. 118, Cardwell Tr. 243:18-25.)

884.    Defendants stated in a public filing that "Davis Polk hired Plaintiff in the hopes that he would succeed and make the transition from law student to skilled attorney. These hopes were disappointed." (ECF 25 at 2.)

885.    Cardwell's employability and reputation have been impacted by the unsupported statements made by the Firm, including on November 5, 2019. (Jeffries Decl. Ex. 140, CARDWELL005327; Jeffries Decl. Ex. 141, CARDWELL005322.)

886.    Defendants continued to make unsupported statements in connection with this action that have further harmed Cardwell's reputation and standing in the profession.  (Jeffries Decl. Ex. 140, CARDWELL005327; Jeffries Decl. Ex. 141, CARDWELL005322.)

887.    Based on Defendants' public filings, the press has reported, among other things, that Davis Polk "claims [Cardwell] has a documented history of poor performance and he didn't improve, despite efforts to coach him."  (Jeffries Decl. Ex. 141, CARDWELL005322.)

888.    Based on Defendants' public filings, the press has reported, among other things, that Davis Polk "hit[] back at ex-associate in race bias suit, citing 'deficient' performance." (Jeffries Decl. Ex. 140, CARDWELL005327.)

### 6.    Professional Perceptions and Reputational Harms and Impacts

889.    In a CLE presentation that Bick delivered in February 2015, and that Renee DeSantis and Alicia Fabe delivered in November 2015, the Firm acknowledged that "[h]ow [lawyers] are perceived by others is essential to establishing our professional reputation." (Jeffries Decl. Ex. 139, DPW-SDNY-000144233.)

890.    Davis Polk's NYSDHR Brief acknowledged that "[i]n corporate law (or any type of law, for that matter), a poor reputation … inevitably leads to [employment] difficulties." (Jeffries Decl. Ex. 8, DPW-SDNY-000000292.)

891. Cardwell explained that as a Black associate at a majority White firm, it can be hard "for our … reputations to be based on our actual interactions [and] … performance" and that firms including Davis Polk are "deeply familiar" with "how much work" goes into building and protecting one's reputation. (Jeffries Decl. Ex. 1 (Cardwell Tr. 302:19-307:24).)

892. Black associates like Cardwell have "worked hard" to ensure that their reputations while working at majority White law firms and legal institutions are and remain "unsoiled" and free from biased assessments. (Jeffries Decl. Ex. 1 (Cardwell Tr. 302:19-307:24).)


DATED:        February 7, 2022                Respectfully submitted,

                                              /s/ David Jeffries
                                              David Jeffries

                                              *Attorney for Plaintiff*