UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

KALOMA CARDWELL,                                     :
                                                     :
                                    Plaintiff,       :
                                                     :
                        -v-                          :
                                                     :
DAVIS POLK & WARDWELL LLP, THOMAS                     :
REID, JOHN BICK, WILLIAM CHUDD,                       :
SOPHIA HUDSON, HAROLD BIRNBAUM,                       :
DANIEL BRASS, BRIAN WOLFE, and JOHN                   :
BUTLER,                                              :
                                                     :
                                    Defendants.      :

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/16/2023

1:19-cv-10256-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

Kaloma Cardwell is a Black man who worked at Davis Polk & Wardwell LLP—one of the world's most prestigious law firms—for four years. He asserts that Defendants here, Davis Polk and various individuals employed at the firm, discriminated against him based on race. That discrimination, he says, came in forms big and small: everything from not being included on team-wide emails, to being given work outside of his focus area, to being removed from projects.

Worse yet, Cardwell says, when he began to complain about this discrimination, Davis Polk retaliated against him, issuing negative performance evaluations and reducing his hours. And he was directly warned that if he didn't stop his complaints, he would be "out of the game" and "off the field"—a statement he viewed as a direct threat.

Cardwell's concerns came to a head in August 2017, when he filed a discrimination and retaliation complaint with the Equal Employment Opportunity Commission (the "EEOC"). In the following months, several individuals provided negative reviews of Cardwell's work, which were used as the basis for Cardwell's termination in early 2018.

Cardwell tells a simple, distressing, story about his time at Davis Polk: He was subject to

discrimination, he complained, and then he was retaliated against and fired.  But Davis Polk and the other Defendants here categorically deny any discriminatory or retaliatory animus, and point to Cardwell's allegedly poor performance as the reason both for his reduction in hours and his ultimate termination.

Cardwell's suit in this Court raises a host of discrimination and retaliation claims under federal, state, and city law; Defendants have moved for summary judgment on all of them.  In response to the motion, in this opinion the Court rules as follows:  First, Cardwell has abandoned his aiding-and-abetting claims, which will therefore be dismissed.  Second, because Cardwell has failed to adduce any admissible evidence that a reasonable jury could use to support a finding of discrimination, Defendants' motion for summary judgment will be granted with respect to his discrimination-based claims.  But third, because a reasonable jury could find that some Defendants retaliated against Cardwell for his complaints, the summary-judgment motion will be denied for Cardwell's claims based on retaliation—though several Defendants, as set forth in detail later in this opinion, will be dismissed from the case because they lacked the requisite knowledge to take retaliatory action.  Finally, Defendants' motion for summary judgment will be granted as to Cardwell's claims for frontpay and backpay but not as to his other claimed damages.  In sum, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

### A.   Facts[1]

Cardwell first joined Defendant Davis Polk & Wardwell LLP (the "Firm" or "Davis Polk")

---

[1] The facts are largely drawn from the parties' Local Civil Rule 56.1 statements and other submissions in connection with these motions.  Some facts are also drawn from Cardwell's third amended complaint, which—because it is sworn, *see* Dkt. No. 200 at 216—"can be considered as evidence for summary judgment purposes."  *Brandon v. Kinter*, 938 F.3d 21, 26 n.5 (2d Cir. 2019).  Facts in Cardwell's complaint, however, "can suffice to defeat summary judgment only insofar as they were made on personal knowledge."  *Curtis v. Cenlar FSB*, 654 F. App'x 17, 20 (2d Cir. June 20, 2016) (summary order) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).  The facts are either undisputed or viewed "in the light most favorable to the party opposing summary judgment"—Cardwell—while "drawing all reasonable inferences in [his] favor."  *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 35 (2d Cir. 2022) (quoting *Guan v. City of New York*,

as a summer associate in 2013.  Dkt. No. 253 ("Pl.'s 56.1 Response") ¶ 1.  Cardwell joined the Firm

as a full-time associate in the Firm's Corporate Department on September 15, 2014 and worked

there until August 10, 2018.  *Id.*  Cardwell was the only Black male associate hired to join Davis

Polk's 2014 class of over 120 associates.  *See* Dkt. No. 209 ("Defs.' Answer") ¶ 317.  After joining

the Firm, Cardwell rotated through three of the Firm's practice groups:  (1) Finance, (2) Mergers &

Acquisitions ("M&A"), and (3) Capital Markets.  Pl.'s 56.1 Response ¶ 46.  Each rotation lasted

approximately six months.  *Id.*  Corporate associates typically only complete two rotations at Davis

Polk and are expected to be permanently assigned to a practice group after their second rotation.  *Id.*

¶ 45.  Cardwell requested, and was granted, the opportunity to complete a third rotation.  *Id.*  After

completing his third rotation, Cardwell was assigned to the M&A practice group.  *Id.* ¶ 48.

Davis Polk conducts performance reviews for its associates.  Defs.' Answer ¶ 168.  As part

of the review process, the Firm solicits written performance reviews from individual reviewers.  The

Firm utilizes a review template, which includes the question:  "[D]o you feel this lawyer is

performing materially behind, with or ahead of the lawyer's class[?]"  *Id.*; *see* Dkt. No. 223 ("Buergel

Decl.") Ex. 9.  The review template also asks the reviewing attorney to describe the associate's

performance.  *See* Buergel Decl. Ex. 9.  Once the reviewing attorneys complete their evaluations, the

Firm develops a "consensus message" or "consensus feedback" to be delivered to the attorney being

reviewed.  Defs.' Answer ¶ 168.  The Firm selects one partner to deliver the consensus message to

the attorney at a meeting.  *Id.*  The partner typically makes a record or summary of the meeting on a

form.  *Id.*  The summary form contains sections relating to matters worked on by the reviewee and

strengths and weaknesses of the reviewee's performance.  *Id.*  The Firm does not have written

guidelines for how partners should develop the associate's consensus message.  Dkt. No. 255

("Jeffries Decl.") Ex. 4 at 279:21–280:14.

---

37 F.4th 797, 804 (2d Cir. 2022)).

###### i.    **Cardwell's First Rotation**

Cardwell completed his first rotation in the Firm's Credit Group from September 2014 to April 2015.  Pl.'s 56.1 Response ¶ 46.  Davis Polk has an "informal goal" that junior associates "bill"—that is, spend and record time on Firm matters—1,800 hours per year (which equates to 150 hours per month).  Buergel Decl. Ex. 13 at 19.  During his first rotation, Cardwell recorded the following number of billable hours per month: 29.5 (September 2014), 202.6 (October 2014), 73.8 (November 2014), 138 (December 2014), 71.2 (January 2015), 148.7 (February 2015), 119.6 (March 2015), and 160.1 (April 2015).  Pl.'s 56.1 Response ¶ 57.  This averages to 117.9 hours per month, somewhat below the Firm's informal goal of 150 hours each month.[2]

In May 2015, after the end of his first rotation, Cardwell had a performance review with partner Jason Kyrwood.  *Id.* ¶ 47.  Five different attorneys completed a total of six written performance reviews in connection with Cardwell's May 2015 review.  Buergel Decl. Ex. 9 at 5, 6, 21, 23, 27, 28.  All six reviews stated that Cardwell was performing "with" his class.  *Id.*  The written performance reviews included the following comments:

- "Kaloma is a hard worker and tries to please.  He is proactive in offering help.  He makes himself available.  But Kal[om]a is on the slow side in producing drafts, and his work product needs improvement.  Part of the reason for this is learning to ask questions when he does not understand instead of taking lots of time to try to figure out everything himself (even when offered assistance) and come to incorrect conclusions that often require his work to be redone."  *Id.* at 23.

- "He's able to understand issues and deal with the mechanics of a complex closing.  He's very easygoing and easy to work with.  Sometimes he lacks a bit of initiative and takes longer than expected to complete certain tasks, but overall the quality of his work is quite good."  *Id.* at 6.

- "Try to take more initiative with the simpler matters and be more prompt to respond and act."  *Id.*

- "Worked on a commitment paper exercise and he did a good first turn.  There were

---

[2] Removing September to allow for the possibility that Cardwell did not start his first rotation until late that month, Cardwell's average for the other months was 130.6 billable hours.

a few places where hard thinking would have led him to infer a few additional changes that he didn't make, though that's very typical for someone at his level." *Id.* at 21.

- "Kaloma worked with me on a small deal that requires him to take the charge in getting the deal through. He did an excellent job in liaising with borrower, borrower's other counsel and lender's counsel and pushing the deal through the finish line with minimal supervision." *Id.* at 27.

- "Kaloma did a great job on the transaction I worked with him on. Very good attention to detail and delivered work product on time and in very good shape." *Id.* at 28.

- "I think the most important thing for Kaloma is to have more self-confidence. He definitely understands everything surrounding deals and assignments, but I think he waits for instructions when I think his first instinct is right on. One other thing is that he takes a lot of notes. This may just be a personal pet peeve, but I think he's sometimes so focused on making sure that he takes detailed notes that he doesn't focus on the big picture and might miss higher level connections that could help him better understand how a specific assignment fits into the broader context of a deal." *Id.*

- "Kaloma was very good at assisting with the closing and post-closing of the transaction. He's organized and shows attention to detail, and was able to run with tasks on his own." *Id.* at 5.

In his summary of the review, Kyrwood described Cardwell's evaluation as: "Generally positive - organized, high quality work, good attention to detail, hard worker. Some notice that he is a little slow in turnaround time and thought would benefit from asking more questions. Also he should take more initiative[.]" *Id.* at 37. In his deposition, Cardwell stated that his face-to-face review with Kyrwood was a "two to three-minute conversation" and that Kyrwood "did not say anything that could be reasonably construed as or interpreted as negative criticism," "as a performance deficiency," or as "a performance issue." Jeffries Decl. Ex. 1 at 472:18–473:19.

## ii. Cardwell's Second Rotation

Cardwell's completed his second rotation in M&A from April 2015 to October 2015. Pl.'s 56.1 Response ¶ 46. In that time-period, Cardwell averaged 172.5 hours of billable hours per month—thus exceeding both his average during his first rotation and the firm's informal goal of 150

hours each month.  *See id.* ¶ 69 (recording the following billable hours per month during Cardwell's second rotation:  160.1 (April 2015), 190 (May 2015), 192.7 (June 2015), 266.5 (July 2015), 169.2 (August 2015), 181.0 (September 2015), and 47.7 (October 2015)).

Cardwell raised his first concerns about the Firm's environment for people of color near the start of his second rotation, detailing a racial microaggression that he experienced.  On May 8, 2015, he emailed the Firm's Executive Director of Personnel regarding what he called an "inter-office dynamic," and recommended that the issue be addressed through the Firm's training for third-year associates.  Jeffries Decl. Ex. 69.  Cardwell asked for the training to "remind[ ] our attorneys of the importance of saying hello and introducing themselves to attorneys they do not know," and stated that the Firm should want "to prevent the situation where a summer associate or junior associate (of color) sits at a table at a practice group meeting (or some other meeting), and no one at that table makes eye contact or says hello for 10, 15 minutes or longer."  *Id.*

In response, the Executive Director of Personnel stated that this "is a symptom of lawyers being more socially awkward than most" and that "[u]nfortunately that happens to everyone but it can be most uncomfortable for those who are junior or new or feel different."  *Id.*  She went on to state that "[h]opefully if this happened to you, you showed them how to live in polite society (!) and introduced yourself."  *Id.*  The Executive Director of Personnel forwarded Cardwell's email to the Firm's Director of Professional Development and to a Manager in the Associate Development Department.  *Id.*  The Director of Professional Development responded:  "I know that sometimes the issue is that the 'old' [Davis Polk] person is terrified of introducing themselves to someone they have met before or have been working with for months.  The new person should also introduce him or herself."  *Id.*

During his second rotation, Cardwell worked on a matter with Daniel Brass and Zain Rehman, who were associates at the time.  Pl.'s 56.1 Response ¶¶ 59–60.  On September 9, 2015,

Rehman sent Brass an email, which stated:  "I am getting a bit frustrated on the junior staffing on this deal - as I am doing a lot of heavy lifting on small things which Kaloma should be taking care of.  I will have a conversation with him tomorrow, but I would appreciate if you could please keep him copied on all instructions to me regarding the deal - I think this will help him stay in loop and know what is coming down the pipeline."  Dkt. No. 225 ("Brass Decl.") Ex. 13; Pl.'s 56.1 Response ¶ 62.  On September 30, 2015, at 8:54 p.m., Brass emailed Cardwell asking Cardwell to send him a set of documents "with the dates changed to this Friday."  Pl.'s 56.1 Response ¶ 63; *see* Brass Decl. Ex. 1.  At 9:05 p.m., Cardwell replied, "No problem.  I'll send revised drafts shortly."  Pl.'s 56.1 Response ¶ 63.  At 9:47 p.m., Brass responded, "Any estimate on timing?  I need to get the email out very soon."  *Id.*  At 9:51 p.m., Cardwell replied, "15-20 minutes," to which Brass responded, "I will do it myself."  *Id.*

In his declaration, Brass states that he viewed Cardwell's performance on the matter as "unreliable and substandard."  Brass Decl. ¶ 2.  Brass asserts that Cardwell "was at times not available when I needed assistance, or delivered work so slowly that I either had to handle it myself or learned not to entrust Mr. Cardwell with time-sensitive work."  *Id.*  Further, Brass asserts that he "often had to redo the work" Cardwell sent to him, and that he "made errors in the work he delivered to me that made it difficult to trust the work product I received from him."  *Id.* ¶¶ 2–3.

On September 30, 2015, the Firm's Black Affinity Group (the "BAG") met with the Firm's Diversity Committee to discuss diversity and inclusion issues at the Firm.  *See* Dkt. No. 274 ("Pl.'s 56.1 Counterstatement") ¶ 529; Defs.' Answer ¶ 72.  Leaders of Davis Polk's Associate Development Department, including Renee DeSantis, the Firm's Director of Professional Development, attended the meeting.  Defs.' Answer ¶ 73.  At that meeting, Cardwell made a comment about how Black associates being staffed and otherwise treated differently than white associates represented "disparate treatment" that "would continue to have a negative impact on

[black] associates' careers, their development, [and] opportunities at the firm." Dkt. No. 260 Ex. 117 at 347:22–349:22.  In response, DeSantis asked Cardwell a question about his personal experience at the Firm, and Cardwell relayed an example of not being invited to all meetings relating to a transaction on which he was staffed.  Jeffries Decl. Ex. 6 ("DeSantis Tr.") at 173:17–175:13; *see also* Jeffries Decl. Ex. 1 at 307:18–19 (Cardwell stated in the meeting that he had "experienced exclusion based on [his] race at Davis Polk").  In a later deposition, DeSantis testified that she was surprised by that example, because Cardwell should have understood that as a "relatively junior associate," he would not have been invited to all such meetings.  DeSantis Tr. at 175:10–175:19. Cardwell would later send an email stating that no one followed up with him after the meeting about his experiences or suggested remedies or training.  Jeffries Decl. Ex. 80.

In December 2015, following the end of his M&A rotation, partner William Chudd gave Cardwell a performance review.  Pl.'s 56.1 Response ¶ 47.  Caroline Fenner, a Professional Development Manager in the Associate Development Department, asked Chudd to give Cardwell his review, and stated that she would "draft the messages that all rising 2nd years should get."  Jeffries Decl. Ex. 85; *see also* Defs.' Answer ¶ 62.  Four individuals wrote performance reviews for Cardwell, including Rehman and Chudd.  Buergel Decl. Ex. 9 at 4, 10–11, 22, 26.  Brass did not submit a written performance review in connection with Cardwell's December 2015 review.  *See id.* at 35.  On October 28, 2015, after being asked to submit a review, Brass responded that he "really only had a very little direct contact with him on [a matter] - I think [Rehman]'s review is much more realistic.  I don't think I would be able to say much worthwhile?"  Jeffries Decl. Ex. 28.

Three of the reviewers stated that Cardwell was performing "with" his class, while Chudd stated that he had "no basis" to answer whether Cardwell was performing materially behind, with, or ahead of his class.  Buergel Decl. Ex. 9 at 4, 10–11, 22, 26.  Cardwell's reviews included the following comments:

- "I did not have much direct interaction with Kaloma on the . . . transaction. That said, we were very stretched on the transaction, and the impression I got from the team was that they did not have confidence that Kaloma could interact directly with the client (as much as, for instance, some of the other first years could).  Also, my understanding was that he was not yet able to take the lead on the diligence report, while another first year could take the lead (and that his due diligence summaries needed quite a bit of work).  For this reason, my impression is that Kaloma may be 'behind' in his class, although because my impression is based off of third party accounts, I do not feel totally confident with this determination." *Id.* at 10.

- "Kaloma acted as the junior associate on [an entity's] acquisition of [another entity's businesses].  In that role he coordinated the drafting of a due diligence report and provided other support.  I appreciate that Kaloma wants to learn and be involved in the deal [and] he very quickly volunteers to join calls and take on work.  He needs to make sure to focus, however, on still doing the tasks that are appropriate for his class.  For example, although he quickly volunteers to help with items it can take a very long time for him to complete a draft.  (A process that is made wors[e] by constant assurances that work will be ready shortly, even though it is still many hours from being delivered.)  This not only makes it difficult with assignments that you ask him to complete, but also can make a person hesitant to ask him to take on additional tasks because the timing for delivery is unclear.  My impression is that this problem is caused potentially by (1) him taking on too many deals and not being able to dedicate enough time to the projects he is already staffed on, (2) pushing to be involved in tasks where he is not really needed, taking away from time he could be spending on his assignments, or (3) not effectively communicating timing (i.e., its ok to say something will take a few hours)." *Id.* at 26.

- "Kaloma seems like an engaged and eager, young associate.  I did not have enough interaction with him or directly with his work product, so I am not in a position to evaluate his capacity to take it to the next level." *Id.* at 4.

- "Kaloma is hardworking and always willing to help.  He did a good job with the schedules and other diligence matters on the deal." *Id.* at 22.

- "My suggestion would be increased responsiveness to email communications and performing the tasks assigned – especially when a deal is approaching signing.  When a task is assigned without a deadline, please confirm [with] the assigning attorney as to when they would like to see the first draft to avoid any confusion." *Id.*

In addition, Chudd rated Cardwell's "[d]rafting skills (including logical organization, clarity, brevity,

consistency, intelligent use of precedents and ability to do original drafting)" and "[a]bility to inspire

9

client confidence" as "below expectations," but otherwise stated that he had no basis to review

Cardwell's skills and work habits.  *See id.* at 10–11.

In his summary of Cardwell's December 2015 review, Chudd described the "substance of

the evaluation" as:

> Kaloma received praise for being engaged and eager, he is hard working and always
> willing to help.  Reviewers also noted that he could be more responsive on email
> communication, and improve his communication with senior lawyers regarding task
> deadlines and timing of deliverables.  He also seemed to overlook more basic tasks in
> favor of more substantive work, often at the detriment of being able to deliver on
> the more basic tasks.

*Id.* at 35–36.  Chudd indicated that Cardwell received a commendation for his recruiting efforts,

stating that Cardwell "went above and beyond in regard[s] to recruiting and the summer program."

*Id.*  For the section on "[c]omments from the reviewee regarding his or her evaluation of his or her

performance," Chudd wrote:

> Kaloma asked for more direct real-time performance evaluations.  I told him that the
> best way to do this was to seek input from the more senior lawyers on his team after
> a signing/closing when it is still fresh in his mind.  To get constructive feedback, I
> suggested that he should ask for areas where he could improve.  He was also
> concerned about his billable hours compared to others, as well as his standing in his
> class.

*Id.*  Next, under "developmental priorities for the next year," Chudd wrote:  "Kaloma needs to focus

on delivering excellent work product on time and communicate his deadlines and timing.  Once he

does this, senior lawyers will feel more comfortable delegating more work to him."  *Id.*

Cardwell asserts that he never requested "real-time performance evaluations," but rather

requested "real-time feedback."  Pl.'s 56.1 Response ¶ 68; Dkt. No. 200 (Plaintiff's third amended

complaint, or "TAC") ¶ 117.  Cardwell argues that "[r]eal-time feedback is categorically different

than real-time performance evaluations," and that he does not think that "any associate in their first

or second year . . . would . . . request . . . performance evaluations when there are far simpler and

easier ways, more helpful ways . . . to receive feedback."  Jeffries Decl. Ex. 1 at 503:8–505:9.

### iii.    Cardwell's Third Rotation

Cardwell completed his third rotation in the Capital Markets group from October 2015 to April 2016.  Pl.'s 56.1 Response ¶ 46.  His hours during this rotation were significantly lower than in his previous rotations, as Cardwell averaged only 60.7 hours per month.  *See id.* ¶ 72 (recording the following billable hours per month:  47.7 (October 2015), 134.1 (November 2015), 94.4 (December 2015), 56.7 (January 2016), 44.1 (February 2016), 4.3 (March 2016), and 43.6 (April 2016)).

During this rotation, Cardwell worked with Partner Sophia Hudson on two matters.  Pl.'s 56.1 Response ¶ 80(b).  While working on one of them, on November 8, 2015, Cardwell emailed Hudson work product at 4:03 a.m.  *Id.* ¶ 73.  Hudson forwarded Cardwell's email to a more senior associate working on the matter, and wrote:  "Why do you think he was up until 4:03 working on this?  I think he could have just included my comments rather than copying them over (if that's what took him so long)."  *Id.*  In her deposition, Hudson stated:

> I can remember one instance where I had given him comments on an offering document and the next morning I woke up to see that he had sent an email at it 4:00-something in the morning, and he had copied all of my comments over, in his own handwriting.  And I was surprised, flabbergasted actually, because that was certainly not a typical practice; a typical practice which is reuse the partner's comments.  And it was frankly, time consuming for him to copy them over and a completely unnecessary waste of client's money to do that.

*Id.* ¶ 74.  The next day, Hudson requested "a folder with [Cardwell's] reviews since starting at [Davis Polk]" to "have a read on the situation."  *Id.* ¶ 75.  In her deposition, Hudson testified that by saying she wanted a read on the situation, she was referring to Cardwell's performance and that she "wanted to get the background of people who had worked with him in the first full year at the firm." Jeffries Decl. Ex. 5 ("Hudson Tr.") at 243:16–244:14.

As that early November 2015 matter was ongoing, a junior associate emailed a professional development manager with a request to get additional exposure to "different types of capital markets transactions."  Jeffries Decl. Ex. 36.  After Cardwell informed that professional development

manager that a filing on his and Hudson's deal was coming up sooner than anticipated, Jeffries Decl.

Ex. 37, the manager emailed the junior associate to staff her on the deal.  Jeffries Decl. Ex. 36.

Hudson, however, later wrote that "diligence and other preparatory tasks" on that deal "were

completed so slowly that a second junior associate needed to be staffed."  Hudson Tr. at 216:6–

218:5.  She further testified that "[t]here is no reason why a second-year associate [like Cardwell],

who was performing at or above his class, couldn't have gotten all of [the] work [on the deal] done,

even on the accelerated timeline."  *Id.* at 229:11–14.

Impressions of Cardwell's work over the next several months varied.  For example, on

December 28, 2015, an associate working with Cardwell sent an email to Fenner which stated:

> I just wanted to let you know that Kaloma has been a huge help over the last few
> days.  An issue arose on . . . a deal he helped on before he rotated out of M&A . . .
> and he has gone above and beyond to help me promptly find relevant
> information/analyze the contracts to help the client.  I wanted to email you now so I
> didn't forget to mention this.  There should be a gold star next to his name,
> especially given that it was a holiday weekend and he's currently in cap markets.

Jeffries Decl. Ex. 45.  But on February 17, 2016, Hudson asked for 4.1 hours to be written off for

post-closing tasks after she received an email from an associate which stated:  "Kaloma seemed to

have spent a lot of time of the closing sets although I tried to manage that process - don't know if

you want to keep all that time."  Jeffries Decl. Ex. 60.

During this time, Cardwell was frustrated because he believed that he was being excluded.

On November 6, 2015, Cardwell was not initially copied on a congratulatory email concerning a deal

on which he had completed substantial work (he learned about the email after it was subsequently

forwarded to him).  Pl.'s 56.1 Counterstatement ¶ 573; *see* Jeffries Decl. Ex. 77.  He expressed

frustration about the issue via email to a partner at Davis Polk, and also emailed the associate who

sent the original congratulatory email to ask that he be "copied on emails related to that

matter/team."  Pl.'s 56.1 Counterstatement ¶¶ 573, 576; *see* Jeffries Decl. Exs. 77, 80.

On January 21, 2016, Cardwell and another Black associate had dinner with partner Tom

Reid.  Pl.'s 56.1 Response ¶ 177; Buergel Decl. Ex. 20.  During that dinner, Cardwell and the other

associate conveyed to Reid that they felt they had been treated differently, as compared to white

associates, while working on Firm matters.  Jeffries Decl. Ex. 1 at 358:22–359:5.[3]  When Reid

explained that the experiences that Cardwell and the other associate had were likely due to

supervising lawyers not having adequate social skills, Cardwell replied by stating that this explanation

"could not be true" because the same white associates who said little to him would become

"extremely gregarious" when interacting with white associates, partners, and clients.  *Id.* at 359:6–

360:10.  In notes taken by Cardwell immediately following the dinner, he wrote a journal entry dated

January 21, 2016:

> I just got in from having dinner (at Benjamin's Steakhouse . . .) with Tom Reid and
> [another associate].  The conversation was incredibly helpful, and I think everyone
> left the dinner with an increased amount of respect of the other participants[.]  The
> takeaways are as follows:  Tom cares about and wants improved diversity outcomes.
> . . .  He was noticeably (and intentionally displaying discomfort) uncomfortable &
> unhappy to hear [the other associate] and I tell him about experiences in which we
> were treated by other attorneys as if we don't matter, aren't worth getting to know or
> investing in, and so on.  [The other associate] and I talked about associates who are
> unwilling to make eye contact, use our names or give us timely feedback that would
> help us grow as attorneys. . . .
>
> We talked about implicit biases. . . .  Tom seemed particularly interested when I
> described that implicit bias harms the person acting on such biases in that people's
> cognitive processes are being taken up by racialized subconscious thoughts. . . .
>
> It [is] clear that Tom thinks much of the social isolation is due to lawyers (and [Davis
> Polk] lawyers) lacking social skills[.]  I mentioned that I used to think that about
> some attorneys but then noticed that they turned into Leonardo DiCaprio when
> dealing with partners. . . .  Tom didn't completely agree but I think he got my point.
> Throughout the convo [the other associate] and I raised a number of suggestions
> that the firm should consider.  Tom requested that the suggestions be things he can
> enact immediately, that they be simple, & easy for people to repeat. . . .  His response
> about simple solutions [was] a bit disappointing b/c not all solutions are simple. . . .
>
> I stressed that many Black associates leave b/c of [the] Firm's cultures and many

---

[3] While a lawyer participating in Cardwell's deposition labeled this testimony as concerning a "September 2016" dinner with Reid, the details provided in the transcript, as well as Cardwell's contemporaneous notes about the dinner, make clear that this testimony concerns the January 21, 2016 dinner between Cardwell, the other associate, and Reid.  *See* Buergel Decl. Ex. 20 (Cardwell's notes).

> policies come too late[.] . . .  We discussed (at length) how attorneys give feedback and that it's often too late, not helpful or racialized.  I offered alternatives . . . Tom agreed in principle with us but he didn't commit himself to a remedy. . . .

> Tom briefly discussed how [the other associate] and I are doing at the [F]irm[.]  For me:  Do a better job of setting [people's] expectations for how long it will take me to do something[.] . . .

> All in [a]ll it was a wonderful blessing[.]

Buergel Decl. Ex. 20.

In June 2016, Cardwell was given an in-person review by the head of the Corporate Department, John Bick.  *See* Pl.'s 56.1 Response ¶ 81.  At Davis Polk, reviews which take place outside of the Firm's annual performance review process are "referred to at times as mid-year reviews, interim reviews, or off-cycle reviews," and "occur for a variety of reasons, including . . . a view that the associate has performance deficiencies that should be addressed again before waiting for the annual review process."  Buergel Decl. Ex. 75 RFA No. 23.  The parties dispute the impetus of Cardwell's June 2016 review.  Cardwell alleges that the Firm gave him a mid-year review not because of his performance but to lay the foundation for Cardwell's ultimate termination.  *See* Pl.'s 56.1 Response ¶ 81 (response).  By contrast, Bick wrote in his review that it was conducted in response to Cardwell's request for feedback on his work.  *Id.* ¶ 81(a).

On June 6, 2016, the Associate Development Department prepared a draft presentation in preparation of a meeting with Bick to discuss the performance of Black associates in the Firm's Corporate and Tax Departments.  Jeffries Decl. Ex. 35.  The presentation contained two slides relating to Cardwell.  *Id.* at 16–17.  The slides included Chudd's summary of Cardwell's December 2015 review along with the following comments:

- "2015 Hours:  Billable:  1775; Pro Bono:  68; Total Legal:  1864."

- "2016 Hours – First Quarter: Billable:  106; Pro Bono:  0; Total Legal:  107."

- "Did extra six month rotation in Capital Markets at his request; difficulty staffing

him in Capital Markets[.]"

- "Kaloma has been concerned about his billable hours compared to others as well as his standing in his class - his hours have been consistently low since October 2015, with the exception of November 2015."

- "Kaloma asked for more direct real-time performance evaluations – Bill told him the best way to do this was to seek input from the more senior lawyers on his team after a signing/closing when it is still fresh in his mind.  He should ask for areas where he could improve."

- "2016 goals:  Improve communication with senior lawyers re:  task deadlines & timing of deliverables"

- "With to behind class."

*Id.*  The presentation was finalized on June 10, 2016.  *See* Buergel Decl. Ex. 23 at 2.  In the final presentation, the phrase "difficulty staffing him in Capital Markets" was changed to "difficulty staffing him in Capital Markets based on performance issues."  *Id.* at 19.  The revised presentation also included an action item to "[p]rovide candid feedback" to Cardwell.  *Id.*

Bick met with the Associate Development Department on June 13, 2016.  Pl.'s 56.1 Response ¶ 187.  The same day, DeSantis emailed Fenner and Alicia Fabe—also a Professional Development Manager, Defs.' Answer ¶ 62—and asked:  "Can we talk tomorrow about how we can get John Bick what he asked for with the least amount of negative blow back for [Cardwell]?  Worried about the 'mid year review' label."  Defs.' Answer ¶ 129.  Fabe replied:  "Yes—agree it is sensitive."  *Id.* ¶ 134.  Fenner replied:  "Yes agree, especially since he wasn't given any indication in his last annual review [meeting] that we would be checking in mid-year."  *Id.*  Later that day, DeSantis emailed an Associate Development Coordinator stating:  "[Please] hold off on distributing any reviews on Kaloma.  Alicia [Fabe] and Carolina [Fenner] and I want to discuss.  [Thanks]."  *Id.* ¶ 135 (alterations in original).

On June 14, 2016, a day after the meeting with Bick, Alicia Fabe sent herself an email containing an attached a document entitled "Draft Diversity Committee Agenda – Tuesday, June

14th." Pl.'s 56.1 Response ¶ 188; Buergel Decl. Ex. 25.  Under a section regarding the meeting with John Bick "re:  black corporate associates," the document states:  "Meeting w/ [Bick] – discussed 9 corporate black and 2 black tax associates; follow up/action items, i.e., discussion w/ CAP advisors re: low/high hours; interim review for [Cardwell]."  Pl.'s 56.1 Response ¶ 188; Buergel Decl. Ex. 25.

On June 17, 2016, an Associate Development Coordinator asked:  "Can you please confirm for me whether the reviewer list in my previous email below works for reviewing Kaloma?  Since this is a sensitive review, I'm not sure if senior associates should be included as reviewers . . . ." Defs.' Answer ¶ 135.  On June 20, 2016, the Associate Development Department sent emails to attorneys that Cardwell had worked with requesting feedback on his performance.  Defs.' Answer ¶ 137.  The emails stated that that Cardwell had "asked for more real-time feedback."  *See id.*; Pl.'s 56.1 Response ¶ 189.  On June 22, 2016, Fenner sent an email to her colleagues which stated in part: "I asked John Bick if he would be willing to give Kaloma his 'real-time feedback' and he agreed." Pl.'s 56.1 Response ¶ 190.

Six reviews were created in response to the Development Department's request.  Buergel Decl. Ex. 9 at 3, 7, 13, 15, 19, 25.  Four of the reviewers rated Cardwell as "with" his class and one reviewer did not provide a rating.  *Id.* at 3, 7, 13, 15, 25.  Those reviews included the following comments:

- "Kaloma did an excellent job on a difficult diligence assignment summarizing the terms of a credit card affiliation agreement.  His work was thoughtful and comprehensive.  I look forward to working with him again."  *Id.* at 3.

- "He was generally eager to help but was unavailable at times when tasks needed to be completed in real time.  I would suggest keeping better track of deal timing and the status of documentation."  *Id.* at 7.

- "My contact with Kaloma was very limited - only a couple of days on a relatively simple assignment.  Given the limited working sample, it's difficult to make any definitive assessment of his work product, however, I can say that he was pleasant to work with, responsive to emails and seemed eager to learn."  *Id.* at 13.

- "Kaloma did a proxy form check and seems to have done a good job of it, including communicating with the client and coordinating internally with the [Davis Polk] benefits lawyers.  He was prompt and professional throughout."  *Id.* at 15.

- "Kaloma worked on preparing a chart outlining statements made in a legal complaint, statements made by the same party in the press and the arb spread at the same time.  I appreciated his enthusiasm for the assignment and diligent research of relevant press articles.  I also thought that he worked well calculating and incorporating the arb spread into the analysis. . . . .  I thought that Kaloma's work (and the timeliness of turning in the work) was a notable improvement from my experience working with him a year ago."  *Id.* at 25.

The final review was provided by Sophia Hudson.  In her review, Hudson rated Cardwell as

"behind" his class.  *Id.* at 19.  Hudson's review included the following comments:

Kaloma worked on two of my deals during his rotation through capital markets, a follow on offering for [Client U] and a tender offer for [Client T] notes.  On both deals, Kaloma reported directly to an associate rather than me (a third year for [Client U] and a fifth year for [Client T]).  Both associates reported that Kaloma worked very slowly and provided work product that was disappointing.  On the [Client U] deal, diligence and other preparatory tasks were completed so slowly that a second junior associate needed to be staffed.  The deal was postponed shortly thereafter.  On the [Client T] deal, Kaloma had difficulty meeting deadlines and turned in work product that had to be substantially redone by the senior associate given client deadlines.  When the senior associate went on vacation, I worked directly with Kaloma to see if I could help.  I found that he did not understand key aspects of the transaction at a relatively late stage.  He also lacked attention to detail.  When I later billed the client, I learned that he spent dozens of hours compiling the closing set rather than enlisting a legal assistant to do so, as would be standard practice.  However, throughout the entire process, Kaloma was eager to work on the transactions and displayed a very good attitude.  He was attentive over holiday weekends and wanted to do a good job.

I would suggest that Kaloma ensures that he fully understands what is being asked of him when an assignment is given to him.  If he later realizes that he doesn't understand something, he should ask for clarification in a timely manner rather than jeopardize the timing of providing work product to a client by trying to work through it himself and turning in work to a senior associate that needs significant reworking.  Kaloma has such wonderful personal / communications skills, and he should use them with his senior associates to get all of the information and context that he needs in order to hit it out of the ballpark.  He then needs to execute with great attention to detail while working sufficiently quickly to meet the time demands of a transaction/client I would note that I gave Kaloma real-time feedback on these points during the [Client T] tender offer and found that he was extremely willing to hear the feedback and took it with grace.  I did not have another chance to work with him before he went back to M&A, but I have attended recruiting events with

him subsequently and continued to find him engaging and interested in learning more about the firm and different practices.

*Id.*

On June 30, 2016, Bick emailed Cardwell requesting his availability to discuss "another research assignment." Defs.' Answer ¶ 144. Bick also planned, upon meeting with Cardwell, to deliver "realtime feedback" that Cardwell has asked for because, based on information that Bick had received from Hudson and others in their reviews, he had "great concern" about Cardwell's performance. Jeffries Decl. Ex. 4 at 292:17–293:13. When Bick and Cardwell met, Bick spent the first few minutes of the meeting describing the research assignment, and then stated, "I know you asked for feedback, so I figured I'd take a few minutes to go through your reviews." TAC ¶ 145. According to Cardwell, Bick told him that "[i]t's been noted on a few occasions that you have a pattern of missing deadlines." *Id.* ¶ 150. Cardwell responded: "That feedback is extremely surprising. I'm sitting here wracking my brain and I'm struggling to think of any deadlines that I've missed, and I can't think of any. I haven't missed any deadlines. Can you provide examples of 'deadlines' that I missed?" *Id.* Bick responded, "[w]ell don't think of it as deadlines," and then discussed "general timing critiques" which Cardwell believed were too vague to corroborate or dispute. *Id.* ¶ 151. Cardwell told Bick that the feedback was inconsistent with prior feedback he had received, and that he had not received such feedback previously. *Id.* ¶ 153. Cardwell then asked Bick to provide specific examples, but Bick did not do so. *Id.* Finally, Cardwell asked Bick to go back to the reviewers to learn more about their comments. *Id.* ¶ 155. Cardwell states that Bick agreed to do so, but that Bick never followed up with Cardwell. *Id.*[4] In notes taken after the review, Bick wrote that Kaloma took his feedback well. Buergel Decl. Ex. 9 at 33.

---

[4] Bick's testimony about the content of the conversation during this meeting differs significantly from Cardwell's recollection. *See* Jeffries Decl. Ex. 4 at 260:7–261:7. But because of the case's summary-judgment posture, to the extent that the parties disagree about what was said, the Court adopts Cardwell's version for the purposes of this motion. *See M.A.*, 53 F.4th at 35.

####      iv.    Cardwell's Assignment to M&A

After completing his third rotation, Cardwell was assigned to work in the Firm's M&A practice area in April 2016.  Pl.'s 56.1 Response ¶ 48.  From that time through September 2016, Cardwell averaged 126.2 billable hours per month.  *Id.* ¶ 123 (recording the following billable hours per month:  101.1 (May 2016), 96.9 (June 2016), 146.4 (July 2016), 160.5 (August 2016)).

On July 22, 2016, Brass emailed a staffing coordinator asking for staffing on a deal, and specifically requested "a good second year or great first year with some capacity to help."  Pl.'s 56.1 Response ¶ 83.  The staffing coordinator responded:  "Hi Dan.  The only 2nd year I can offer today/foreseeable future is Kaloma Cardwell.  He has 50 percent.  Would that work?  There's no strong 1st year available. . .  Sorry!"  *Id.*  Brass replied:  "How is he rating at the moment?  Last time I used him it really wasn't great."  *Id.*  The staffing coordinator wrote back:  "I think that with the proper amount of supervision he can do a good job, but needs to be supervised.  Laura [Turano] has worked with him lately."  *Id.*  Brass then emailed Turano and asked, "How good is Kaloma these days?"  *Id.* ¶ 84.  Turano replied, "I think he's doing great.  Big difference from last year."  *Id.*  Brass then asked, "Able to mark-up documents by himself reliably?"  *Id.*  Turano replied, "He hasn't done markups for me."  *Id.*  In his declaration, Brass asserts that he followed up regarding Cardwell's performance because, based on his experience working with Cardwell previously, he believed that Cardwell "had not displayed the professional skillset necessary for this particular deal and assignment, which was fast-moving, complex, and required the ability to execute detail-oriented work with precision and without laborious, line-by-line and step-by-step handholding or supervision."  Brass Decl. ¶ 8.

After speaking with Turano, Brass reached back out to the staffing coordinator and wrote:  "Ok – what other first-years (regardless of ability) have time?"  Pl.'s 56.1 Response ¶ 85.  The staffing coordinator replied, "[o]n paper none but I am emailing some people to confirm.  Staffing

has been painfully thin!"  *Id.*  After several attempts to find other associates failed, Brass emailed, "Let's go with Kaloma then.  Thanks very much for hunting!"  *Id.*

That afternoon, Cardwell reached out to Brass to let him know that he was assigned to the deal and to schedule time to get started.  *Id.* ¶ 87.  Bick responded approximately three hours later, telling Cardwell, "I think you stand down for now!"  *Id.*  In the interim, Brass had learned that another (midlevel) associate had availability and staffed that associate on the deal.  *See* Brass Decl. ¶ 16.

On September 8, 2016, after a professional development manager asked Cardwell if he would work on an assignment for the Credit group—even though Cardwell had been assigned to the M&A practice group—Cardwell responded that this request was part of a pattern of Black associates being staffed differently than others at the Firm (though also stated he was willing to work on the assignment so long as he could be assured that he would have an opportunity to work on M&A matters).  Jeffries Decl. Ex. 1 at 374:24–378:22.  The development manager interpreted Cardwell's comments as turning down the assignment, and was surprised by that response.  DeSantis Tr. at 207:22–209:10.

Also in September 2016, Cardwell was staffed on two matters—one for "Client N" with M&A partner Marc Williams and one called "Project Giant" with M&A partner Len Kreynin.  Pl.'s 56.1 Response ¶ 106.  On September 29, 2016, Fenner emailed Cardwell to ask about his capacity to work on Project Giant.  *Id.* ¶ 107.  After Cardwell responded that he had none because of the amount of work needed for the Client N project, an associate on the Project Giant team responded to Cardwell by informing him that another associate would replace him on Project Giant.  *Id.*  Cardwell said he understood and thanked the associate.  *Id.*

In October 2016, some of the M&A partners met to discuss the consensus feedback to give to certain associates, including Cardwell.  *Id.* ¶ 115.  Bick testified that the group consensus was that

Cardwell should be given a midyear review in 2017.  Pl.'s 56.1 Counterstatement ¶ 425; Pl.'s 56.1

Response ¶ 116.  For his annual review, the Firm relied on the reviews Cardwell had received prior

to his June 2016 review, as well as four additional reviews gathered in advance of the annual review,

including a second review by Sophia Hudson.  *See* Pl.'s 56.1 Counterstatement ¶ 424.  Hudson rated

Cardwell as "behind" his class.  Buergel Decl. Ex. 9 at 17.  Hudson's review stated:

> Kaloma completed a rotation in Capital Markets as his third rotation and was aware
> that he would be behind others in his class as a result of doing so.  He was staffed
> like a 1st year associate on several deals with me – in particular two [Client T] tender
> offers and a [Client U] follow on.  In particular on the [Client T] tender offer project,
> he struggled.  The very good senior associate . . . was very careful to thoroughly
> explain assignments to him and give him firm deadlines so that [the senior associate]
> would have time to review his work before sending the documents to me and then to
> the client.  Kaloma had difficulties meeting the deadlines, would then admit that he
> didn't understand the assignment and send work product that was incomplete.  [The
> senior associate] continued to work closely with him, including on more simple
> aspects of the project such as press releases and closing certificates.  The same thing
> played out several times.  At the end of the project (which was actually two nearly
> identical tender offers in a row), I worked directly with him while [the senior
> associate] was on vacation.  During those two weeks, it became clear to me that
> Kaloma did not understand key aspects of the transaction.  I do not know whether
> he should have asked more questions earlier or been more careful to seek to
> understand what he was doing rather than just processing paperwork.  In any event,
> as I have told him, it is really essential to seek to understand what you are doing and
> why.  I do want to commend Kaloma for his positive attitude.  He did not give up or
> get frustrated, even when I gave him direct feedback.  In fact, when I corrected his
> grammar in an email and proved a point with a grammar handbook, he not only
> bought himself the book, he also gamely bought me an updated version.  We have
> subsequently collaborated on recruiting and I believe he does want to do well at the
> firm.

*Id.*

Two of the other reviewers rated Cardwell as "with" his class, while the final reviewer did

not provide a rating.  *Id.* at 8, 9, 24.  Cardwell's reviews included the following comments:

- "My experience with Kaloma was pretty abbreviated and I am not sure it will be
  representative of his work more broadly, but here it is:  Kaloma was enthusiastic but
  very inexperienced.  He was asked to diligence the corporate structure of a venture
  stage company.  In conversations I did not get the sense that he fully understood
  what he was talking about.  I walked him through the handful of things I wanted him
  to focus on, one of which was the equity capital structure and how the preferred

stock worked.  His diligence report said the preferred was convertible into common stock.  I asked him on what basis, and he said he would have to follow up on that.  That did not inspire confidence.  However, he did a good job of coordinating the diligence requests of the specialist groups (benefits) and passing them on to the client.  The deal died shortly after that, so we didn't get much of a chance to work together."  *Id.* at 8.

- "Kaloma has an excellent attitude and is a pleasure to work with.  He is enthusiastic and performs at his best when he is given the full context of a deal.  He steps up and works very hard.  . . . .  I think Kaloma would benefit from slowing down and spending all of the time and energy necessary to tick and tie every detail.  I think that sometimes in an effort to be super responsive, Kaloma may lose sight of certain details (albeit minute).  Relatedly and I am sure this comes with time[ ], Kaloma would benefit from focusing on his confidence.  There have been a few instances when we were on the phone with a client when I would ask him a question, and he equivocated in his answer, which made me feel like maybe he did not know the answer.  In every instance, [h]is initial answer (although with equivocation) was correct.  So he had a good handle on the matters that I had delegated to him, but sometimes he did not convey that because I think he lacks confidence at times.  I believe that with time and the right training / mentorship, Kaloma can absolutely gain that confidence."  *Id.* at 9.

- "He showed a good command of the material and was able to provide a number of helpful recommendations (even though this isn't the type of work our firm typically does).  . . . .  I think there has been a notable improvement in Kaloma's work this year compared to last year.  Last year, I had issues with the timeliness of his work.  This year, he's been more focused on the task and has produced high quality work product.  He also has discussed openly his efforts to improve his work product/work habits."  *Id.* at 24.

On November 14, 2016, Fenner emailed partner Len Kreynin:

> When you meet with Kaloma to deliver his review, would you please mention that we'll plan to meet with him again in June 2017 (midyear review) to see if there has been progress in the areas discussed?  Also, please let me know if you'd like me to do a first draft of the message to be delivered to him (positives, areas for improvement, etc.).  I know it's a tricky one.

Pl.'s 56.1 Response ¶ 118.  On November 15, 2016, Fenner emailed Kreynin the talking points for

Cardwell's upcoming review:

> Positives:  You are enthusiastic, hardworking and have a positive attitude.  You are open to constructive criticism and want to develop.  One reviewer noted significant improvement in the timeliness of your work as compared with last year and that you've been more focused on the task.

Areas for improvement: Slow down. Pay attention to detail. Make sure that all the details that need to be in the document are there. Ask questions to be sure you understand what you're doing and why. Seek to understand the key aspects of the overall transaction. Work to convey more confidence so that people know that you have a good handle on the matters that have been delegated to you.

Action item: We will plan to meet with you again in June 2017 to discuss whether there have been any improvement in these areas.

*Id.* ¶ 119.

Kreynin gave Cardwell his annual review on December 19, 2016. Pl.'s 56.1 Response ¶ 120.

In his summary of the review, Kreynin described the "substance of the evaluation" as:

I met with Kaloma in the second half of Dec. 2016, before Christmas. I have expressed gratitude for his enthusiastic and positive attitude and hard work and noted that he was open to constructive criticism and improvement. I remarked that at least [one] person noted significant improvement in the timel[i]ness of his work com[pa]red to t[he] last year and greater focus on h[is] work. I then said that there are significant areas for improvement that we identified and l[is]ted them. They were (1) the need to slow do[w]n, pay attention to detail and ma[k]ing sure that all of the de[ta]ils that need to be refl[ec]ted in t[he] document are there, (2) asking questions to be sure what you are doing and why, (3) seeking to under[sta]nd key aspects of the overall transaction, and (4) conveying more confidence so that peopl[]e working with you know that you have a good handle on t[he] matters delegated. Kaloma pushed back and asked for specific examples, at which time I pointed out issues that[] [w]e had with exclusivity agre[e]ments for [a specific] deal, such as mismatch between parties and signature pages and changes that he made which were adverse to our client. He accepted that but asked for other specific examples which I said that I didn[']t have at hand. The conversation remained friendly despite the pushback by him and concluded with me saying that we plan to meet again in June 2017 to discuss whet[he]r there have been improvements in these areas.

Buergel Decl. Ex. 9 at 31–32.

Meanwhile, in September 2016, Cardwell had become a third-year associate. Defs.' Answer ¶ 288. After associates permanently assign to a group and become third-year associates, their staffing is coordinated by junior staffing partners along with the Firm's staffing coordinators. *Id.* ¶ 270; *see* Pl.'s 56.1 Counterstatement ¶ 719. When Cardwell became a third-year associate, Birnbaum and Wolfe were the junior staffing partners for third-year M&A associates. Defs.' Answer ¶ 270; Pl.'s 56.1 Counterstatement ¶ 720.

To signal their capacity to take on new work, associates at the Firm could fill out weekly forms that were sent to the Firm's staffing coordinators.  Defs.' Answer ¶ 203.  At times, Cardwell reported that he had over 50% capacity to take on new work.  *Id.* ¶ 240.  From January to March 2017, Cardwell reported that he had 100% capacity.  *Id.* ¶ 344.  While Birnbaum and Wolfe had access to associate's weekly capacity forms, Cardwell was not staffed on any new matters between December 2016 and March 2017.  *Id.* ¶¶ 363–366.  Birnbaum testified that Cardwell was difficult to staff during this time period due to his poor performance.  *See* Pl.'s 56.1 Response ¶¶ 109–111.  Cardwell alleges that he was not staffed on these matters because of racial animus.  TAC ¶ 368.  In any event, there is no doubt that Cardwell's billable hours steadily and significantly declined from September 2016 through March 2017 such that Cardwell, by the end of that period, was recording almost no billable time.  *See* Pl.'s 56.1 Response ¶¶ 123, 150 (recording the following monthly billable hours:  229.6 (September 2016), 112.4 (October 2016), 68.9 (November 2016), 14.1 (December 2016), 2.2 (January 2017), 1.9 (February 2017), 1.9 (March 2017)).

On March 9, 2017, Cardwell had a meeting with Reid.  Defs.' Answer ¶ 377.  Reid told Cardwell that the Firm was aware of his billable hours and told Cardwell that the issue needed to be addressed.  *Id.*  Specifically, Reid told Cardwell that his "work hours are low, that they are low for reasons that are not your fault, and that we're going to get it fixed."  Pl.'s 56.1 Counterstatement ¶ 740; *see* Dkt. No. 260 Ex. 117 at 392:5–9, 397:5–7.

Reid had a follow-up meeting with Cardwell on March 29, 2017 that also included Kreynin.  Pl.'s 56.1 Response ¶ 127.  Cardwell wrote a note to himself shortly after the meeting, in which he recorded that Reid stated that Davis Polk had "dropped the ball" in supervising Cardwell but that Cardwell had also failed to finish assignments on time.  Buergel Decl. Ex. 48(b); *see also* Jeffries Decl. Ex. 7 at 221:14–222:25 (Reid stating that he told Cardwell that Davis Polk should have delivered tough feedback to him "hot on the heels of his annual review at the end of the previous year" rather

than allowing "several months of inactivity").  Cardwell, in the note to himself, stated that he said in the meeting that it was problematic that issues were now being raised that had not been said to him previously despite his requests for feedback.  Buergel Decl. Ex. 48(b).  By contrast, Reid testified that, in the March 29 meeting, he told Cardwell that he was repeating issues that had previously been brought to Cardwell's attention.  Pl.'s 56.1 Response ¶ 127.  Kreynin identified, as an example of an error Cardwell had made, Cardwell's swapping of entity names in a contract that Cardwell had worked on for Kreynin.  *Id.*; Buergel Decl. Ex. 48(b).  Cardwell also testified that:

> [a]t one point Mr. Reid became visibly agitated, he became extremely serious, and at that point he told me that if I do not let things go, if I do not stop making these inquiries, that I would be . . . out of the game.  I asked Mr. Reid what does that mean?  He said out of the game, off the field, you know what it means.

Dkt. No. 260 Ex. 117 at 416:12–20.  Cardwell viewed this as a retaliatory threat.  TAC ¶ 427.[5]  Reid also testified that he told Cardwell, in response to Cardwell's request that he speak with Bick about his concern that his limited hours were due to his race and not his performance, that such a conversation between Cardwell and Bick would be "pointless" and that instead, the key thing to focus on was moving forward with improving Cardwell's performance.  Buergel Decl. Ex. 4 at 223:18–225:2.  Reid further testified that he orally relayed Cardwell's concerns about race to others at the firm.  *Id.* at 227:13–228:3.

Cardwell used approved vacation time for all of April, and returned to the office on May 2, 2017.  Pl.'s 56.1 Response ¶¶ 40, 129.  On May 22, 2017, Cardwell emailed Goldberg to say that, in thinking about his employment experience at Davis Polk, he had become ill.  Defs.' Answer ¶ 450.  In response, Goldberg scheduled a meeting with Cardwell and the Firm's Executive Director of

---

[5] In his testimony, Reid admitted to making the comment about Cardwell being off the field, but construed it differently. *See* Jeffries Decl. Ex. 7 at 241:15–242:23 (noting that he saw his statement about Cardwell finding himself "off the field" if he did not "get in the game" as a motivational tactic); *see also* Pl.'s 56.1 Response ¶ 127.  For purposes of this motion, the Court construes the conversation in the light most favorable to supporting Cardwell's claims.  *See M.A.*, 53 F.4th at 35.

Personnel for the next day.  *Id.* ¶ 451.  At that meeting, Cardwell indicated that he did not feel that his performance was poor and had been asking questions about his staffing on projects.  *Id.* ¶ 453.

On August 3, 2017, Cardwell filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (the "EEOC") and the New York Department of Human Rights (the "NYSDHR").  Buergel Decl. Ex. 62.  In it, Cardwell outlined the discrimination and retaliation he believed he had experienced at Davis Polk.  *Id.*  Bick, Reid, and Brass all became aware of the charge sometime in August 2017.  Pl.'s 56.1 Response ¶ 17.  In response, Davis Polk filed a position statement with the NYSDHR (the "NYSDHR Brief").  Dkt. No. 52 Ex. 4.

Within the three month period following his EEOC complaint, Cardwell would receive several negative written performance reviews.  For example, during the period after Cardwell returned from vacation, he worked on two assignments for M&A Partner Louis Goldberg.  Pl.'s 56.1 Response ¶¶ 132, 134.  In the fall of 2017, after both assignments were completed, Goldberg completed a written performance review in which he took issue with Cardwell's effort level on the first assignment and performance on both, and categorized Cardwell as "behind" his class members overall.  *Id.* ¶ 135.

Additionally, Cardwell was staffed on a deal with M&A Partner Phillip Mills around June 14, 2017.  *Id.* ¶ 138.  After Cardwell completed a draft "bid letter" on Friday, June 16, 2017, Mills attempted to reach Cardwell mid-day Tuesday to go over the letter.  *Id.* ¶¶ 139–140.  After Cardwell failed to respond to either that email or a subsequent one sent later that day, Mills emailed Goldberg—10 hours after his original email to Cardwell—to explain why Cardwell's failure to respond was "simply not acceptable."  *Id.* ¶ 140.  In a fall 2017 review, Mills detailed his disappointment with this experience and wrote that Cardwell had failed to apologize for it.  *Id.* ¶ 141.

In July and August 2017, Cardwell also worked with M&A Partner Lee Hochbaum on a

financial advisory agreement.  *Id.* ¶ 143.  In a September 2017 review, Hochbaum wrote that Cardwell had "struggled with the substantive elements of the representation," "failed to establish any relationship with the client," and had exhibited "generally poor" responsiveness to Hochbaum's requests.  *Id.* ¶ 144.

Finally, in September 2017, Cardwell worked with M&A partner John Amorosi on an additional assignment.  *Id.* ¶ 147.  While Amorosi wrote in a fall 2017 performance review that Cardwell had "brought a good attitude to his work," he also noted that Cardwell's "substantive work was below expectations."  *Id.* ¶ 148.

As shown by the above-chronicled projects, Cardwell continued to obtain some work both before and after his EEOC complaint.  Even in late August 2017, in fact, Birnbaum emailed Cardwell to give him a "heads-up" that the Firm was pitching their services to a new client.  Dkt. No. 260 Ex. 133.  When Kreynin sent Davis Polk's proposal to the potential client on September 5, 2017, Cardwell was listed as a "member[ ] of the Davis Polk team that would work collaboratively on the transaction should you choose to engage us."  Dkt. No. 260 Ex. 135 at 5.  And Reid testified that it would "be fair to state that the [F]irm tries to put its best foot forward" when it pitches new clients.  Dkt. No. 260 Ex. 116 at 299:4–7.

That said, after Cardwell recorded no billable hours during April 2017 while on vacation, he averaged only 21.1 of recorded billable hours each month for the rest of the year.  *See* Pl.'s 56.1 Response ¶ 150 (recording the following billable hours:  24.2 (May 2017), 0.0 (June 2017), 0.0 (July 2017), 98.9 (August 2017), 10.4 (September 2017), 14.2 (October 2017), 21.2 (November 2017), 0.0 (December 2017)).  And by the end of 2017, five partners had written a total of six reviews that identified Cardwell as performing behind his class—Hudson (who authored two such reviews in June and September 2016) as well as Amorosi, Goldberg, Hochbaum, and Mills (all of whom wrote their reviews in fall 2017).  *Id.* ¶ 149.

### v.   Cardwell's Termination

On January 11, 2018, Goldberg and another partner (Oliver Smith) met with Cardwell to deliver Cardwell's 2017 annual review.  Pl.'s 56.1 Response ¶ 151.  Prior to the review, as detailed above, Hochbaum, Mills, Goldberg, and Amorosi had submitted performance reviews in the fall of 2017 in which they all listed Cardwell as performing "behind" his class.  Defs.' Answer ¶ 488.  In a summary of the January 11, 2018 meeting, Smith wrote that he and Goldberg informed Cardwell that his work had been substandard.  Pl.'s 56.1 Response ¶ 152.  Smith also wrote in his meeting summary that when Cardwell stated that he was unaware that his work had been subpar, Smith and Goldberg responded by noting their surprise, given the significant amount of rewriting that had to be done on Cardwell's assignments during 2017.  *Id.*  Smith also wrote that, when the parties discussed Cardwell's future staffing, Smith told Cardwell that it was challenging to staff him on projects because of his performance, and that Cardwell declined to signal out the kinds of projects he would like to be staffed on other than to say that he wanted to be staffed "appropriately."  *Id.*

On February 8, 2018, Smith and Goldberg met with Cardwell and told him that he should begin looking for alternative employment—a directive colloquially referred to as a "time to go" message.  *Id.* ¶ 153; *see* Dkt. No. 270 ("Pl.'s Opp'n") at 11.  Bick, Birnbaum, and Brass all testified separately that this decision was made because of Cardwell's poor work performance.  *Id.* ¶ 154.  The Firm granted Cardwell three months, at full salary, to find another job, and granted him an additional three months upon Cardwell's request.  *Id.* ¶¶ 155, 157.  Cardwell's final day of employment at Davis Polk was August 10, 2018.  *Id.* ¶ 159.

### B.  Procedural History

Cardwell filed this lawsuit in November 2019.  Dkt. No. 1.  Since that time, Cardwell has amended his complaint three times.  The first amended complaint was the subject of a motion to dismiss, which the Court granted in part on October 24, 2020.  Dkt. No. 78.  The second amended

complaint was the subject of another motion to dismiss, which was granted in part on September 23, 2021. Dkt. No. 198. Plaintiff was granted leave to replead his dismissed claims.

Cardwell filed his third amended complaint (the "TAC") on October 4, 2021, which is the active complaint for purposes of this motion. Dkt. No. 200. Cardwell asserts twelve claims in the TAC. Counts one and two allege that Davis Polk discriminated and retaliated against Cardwell in violation of Title VII of the Civil Rights Act of 1964. TAC ¶¶ 741–748. Count three alleges that Defendants Davis Polk, Bick, Birnbaum, Brass, Reid, and Wolfe discriminated against Cardwell in violation of 42 U.S.C. § 1981(a). *Id.* ¶¶ 749–752. Count four alleges that all Defendants retaliated against Cardwell in violation of 42 U.S.C. § 1981(a). *Id.* ¶¶ 753–757. Count five alleges that Defendants Davis Polk, Bick, Birnbaum, Brass, Reid, and Wolfe discriminated against Cardwell in violation of the New York State Human Rights Law (the "NYSHRL") § 296(1)(a). *Id.* ¶¶ 758–761. Count six alleges that Reid and Bick aided and abetted Defendants' violations of section 296(1)(a) in violation of NYSHRL § 296(6). *Id.* ¶¶ 762–765. Count seven alleges that all Defendants retaliated against Cardwell in violation of NYSHRL § 296(1)(e). *Id.* ¶¶ 766–769. Count eight alleges that Reid and Bick aided and abetted Defendants' violations of section 296(1)(e) in violation of section 296(6). *Id.* ¶¶ 770–773. Count nine alleges that Davis Polk, Bick, Bick, Birnbaum, Brass, Reid, and Wolfe discriminated against Cardwell in violation of New York City Human Rights Law (the "NYCHRL") § 8-107(1)(a). *Id.* ¶¶ 774–777. Count ten alleges that Reid, and Bick aided and abetted violations of section 8-107(1)(a) in violation of NYCHRL § 8-107(6). *Id.* ¶¶ 778–781. Count eleven alleges that all Defendants retaliated against Cardwell in violation of NYCHRL § 8-107(7). *Id.* ¶¶ 782–784. Count twelve alleges that Reid and Bick aided and abetted violations of section 8-107(7) in violation of section 8-107(6). *Id.* ¶¶ 785–788.

On December 3, 2021, Defendants filed a motion for summary judgment with respect to all of Cardwell's claims. Dkt. No. 220. Defendants filed a brief in support of the motion, Dkt. No.

221 ("Defs.' Mem."), a Local Rule 56.1 statement of undisputed facts, Dkt. No. 222 ("Defs.' 56.1 Statement"), and a number of declarations and exhibits referenced in the brief and statement of undisputed facts, Dkt. Nos. 223–229.

On January 21, 2022, Plaintiff filed a response to Defendants' Local Rule 56.1 statement, Dkt. No. 253 ("Pl.'s 56.1 Response"), and a number of declarations and exhibits, Dkt. Nos. 254–56. On January 24, 2022, three days after Plaintiff's deadline to respond to the motion for summary judgment had expired, Plaintiff filed additional submissions, including a Local Rule 56.1 counterstatement of facts. *See* Dkt. Nos. 257, 259–60, 262. Cardwell also failed to submit a memorandum of law in opposition to Defendants' motion for summary judgment by the January 21, 2022 deadline. Consequently, Defendants requested leave to file a motion to disregard Plaintiff's untimely filings or for sanctions in connection with Plaintiff's filings. Dkt. No. 265. The Court held a conference regarding Defendants' proposed motion to strike and for sanctions on January 27, 2022. *See* Dkt. No. 268. At the conference, Plaintiff conceded that his 56.1 counterstatement of facts did not comply with Local Rule 56.1. *See* Dkt. No. 269. As a result, the Court struck Plaintiff's Rule 56.1 counterstatement. *Id.*

On February 7, 2022, Plaintiff filed a memorandum of law in opposition to Defendants' motion for summary judgment, Dkt. No. 270 ("Pl.'s Opp'n"), a Local Rule 56.1 counterstatement of facts, Dkt. No. 272 ("Pl.'s 56.1 Counterstatement"), and an additional declaration and exhibits, Dkt. No. 271. Defendants again sought to strike Plaintiff's Rule 56.1 counterstatement on the grounds that it failed to comply with Local Rule 56.1. *See* Dkt. No. 275. At a conference held on February 14, 2022, the Court relieved Defendants' obligation under the Court's individual rules to reply to Plaintiff's counterstatement of facts. *See* Dkt. No. 280. The facts included in Plaintiff's counterstatement are not deemed admitted for purposes of Defendants' motion for summary

judgment.  *Id.*  On March 11, 2022, Defendants filed a reply brief, Dkt. No. 288 ("Reply"), and a declaration and additional exhibits, Dkt. No. 289.

## II.   LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted),

and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

In employment discrimination cases, where direct evidence of intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination. *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994)), *aff'd*, 470 F. App'x 20 (2d Cir. 2012). "However, even in such cases, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment and show more than some metaphysical doubt as to material facts." *Id.* at 275–76 (internal quotation marks omitted) (first quoting *Schwapp v. Town of Avon*, 118 F. 3d 106, 110 (2d Cir. 1997); and then quoting *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)); *Brown v. Johnson & Johnson Consumer Products, Inc.*, 92-cv-7886, 1994 WL 361444, at *3 n.3 (S.D.N.Y. July 11, 1994) ("To assert that [defendant's] witnesses may be lying, without any evidence to contradict the witnesses' testimony cannot defeat a motion for summary judgment." (citation omitted)).

## III.    DISCUSSION

As an initial matter, Cardwell has abandoned his aiding-and-abetting claims.  *See* TAC

¶¶ 762–765 (count six), 770–773 (count eight), 778–781 (count ten), 785–788 (count twelve).  In his

opposition to Defendants' motion, Cardwell states that he "does not oppose that portion of

Defendants' motion relating to his claims for aiding and abetting."  Pl.'s Opp'n at 3 n.1.  "A party

abandons a claim in the context of a summary judgment motion when she does not respond to

arguments concerning that claim."  *Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020), *aff'd

sub nom. Bryant v. Iheanacho*, 859 F. App'x 604 (2d Cir. 2021); *see also Dynamic Concepts, Inc. v. Tri-State

Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) (summary order) ("Where a partial

response to a motion [for summary judgment] is made—i.e., referencing some claims or defenses

but not others . . . in the case of a counseled party, a court may, when appropriate, infer from a

party's partial opposition that relevant claims or defenses that are not defended have been

abandoned." (alterations in original) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir.

2014)).  Accordingly, the Court grants Defendants' motion for summary judgment as to Cardwell's

aiding-and-abetting claims.

The Court next considers Cardwell's remaining claims for discrimination and retaliation.

### A.  Cardwell's Discrimination Claims (Count One, Count Three, Count Five, and Count Nine)

#### 1.  Legal Standard

##### a.  Title VII, Section 1981, and the NYSHRL

Employment discrimination claims under Title VII, Section 1981, and the NYSHRL "are

governed at the summary judgment stage by the burden-shifting analysis" established by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  *Tolbert v. Smith*, 790

F.3d 427, 434 (2d Cir. 2015); *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) ("We analyze

[Plaintiff's] Title VII, § 1981, and NYHR discrimination claims under the familiar burden-shifting

framework set forth in *McDonnell Douglas . . . .*").   Under the *McDonnell Douglas* framework, Cardwell "bears the initial burden of establishing a prima facie case of discrimination." *Holcomb*, 521 F.3d at 138.   To establish a *prima facie* case, Cardwell "must show:  (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150 (quoting *Holcomb*, 521 F.3d at 138).   "A plaintiff's burden of establishing a *prima facie* case is *de minimis.*" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).

"Establishment of a *prima facie* case 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Adeniji v. Admin. for Children Servs.*, 43 F. Supp. 2d 407, 419 (S.D.N.Y. 1999) (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335 (2d Cir. 1997)), *aff'd*, 201 F.3d 430 (2d Cir. 1999).   If the plaintiff meets that initial burden, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014).   If the employer offers such a reason, the presumption of discrimination raised by the *prima facie* case is rebutted, and the burden returns to the plaintiff to point to evidence from which a reasonable jury could conclude that the employer's stated reasons are merely a pretext for unlawful discrimination. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).

### b.  NYCHRL

Unlike Title VII, the NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155, 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d Cir. 2013)).   That lower standard reflects the fact that the NYCHRL acts as a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve

only as a floor below which the [NYCHRL] cannot fall." *Mihalik*, 715 F.3d at 109 (internal

quotation marks omitted). "To defeat summary judgment on a discrimination . . . claim," under the

NYCHRL, "the plaintiff 'need only show that her employer treated her less well, at least in part for a

discriminatory reason.'" *Bacchus v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 214, 246 (E.D.N.Y.

2015) (quoting *Mihalik*, 715 F.3d at 110). "The employer may then 'present evidence of its

legitimate, non-discriminatory motives to show the conduct was not caused by discrimination,' but is

only entitled to summary judgment where 'the record establishes as a matter of law that

discrimination played no role in its actions.'" *Id.* (quoting *Mihalik*, 715 F.3d at 110)).

Nonetheless, the NYCHRL "is not a 'general civility code.'" *Mihalik*, 715 F.3d at 110

(quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S. 2d 27, 40–41 (1st Dep't 2009)). "The plaintiff

still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not

enough that a plaintiff has an overbearing or obnoxious boss.  [H]e must show that [ ]he has been

treated less well at least in part '*because of* h[is] [protected characteristic].'" *Id.* (quoting *Williams*, 872

N.Y.S. 2d at 39, 40 n.27).

### 2.  Application

#### a.  Title VII, Section 1981, and the NYSHRL (Counts One, Three, and Five)

The Court assumes without deciding that Cardwell has made out a *prima facie* case under

*McDonnell Douglas*,[6] thus shifting the burden to Defendants to put forth a legitimate, non-

discriminatory reason for its alleged adverse employment actions.  At this stage of the *McDonnell*

*Douglas* framework, the Court asks whether Defendants have "introduced evidence that '*taken as true,*

---

[6] "Second Circuit case law makes clear that the court may simply assume that the plaintiff has established a prima facie case and skip to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action." *Sattar v. Johnson*, 129 F. Supp. 3d 123, 138 (S.D.N.Y. 2015), *aff'd sub nom. Sattar v. United States Dep't of Homeland Sec.*, 669 F. App'x 1 (2d Cir. 2016); *see also Ramos v. Piller, Inc.*, No. 07-cv-4047, 2009 WL 3401261, at *4 (S.D.N.Y. Oct. 21, 2009) ("[A]n increasing number of courts in this Circuit presume that plaintiffs have sufficiently presented a prima facie case in discrimination suits.") (collecting cases).

would *permit* the conclusion that there was a nondiscriminatory reason.'" *Holcomb*, 521 F.3d at 141

(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). "This burden is one of production,

not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530

U.S. 133, 142 (2000) (quoting *St. Mary's*, 509 U.S. at 509).

Defendants have met their burden under the second stage of *McDonnell Douglas* by proffering

sufficient evidence that the alleged adverse employment actions were due to Cardwell's poor

performance. "Poor performance is a legitimate, non-discriminatory reason for terminating an

employee." *Ramsaran v. Booz & Co. (N.A.) Inc.*, No. 14-cv-708-GHW, 2015 WL 5008744, at *7

(S.D.N.Y. Aug. 24, 2015) (collecting cases). Defendants have offered ample evidence of Cardwell's

poor performance. For example:

- In 2016, local counsel for one of the Firm's clients emailed a partner, stating that "[a]lthough I sent Mr. Cardwell two messages about [an issue] on January 24 and March 5 respectively, I did not receive any responses. This has come as some surprise, as I have not previously experienced such a lapse in communication despite working with the Davis Polk NY team over the past five years." Pl.'s 56.1 Response ¶ 126.

- In May of 2017, a partner assigned Cardwell to draft an article. Almost a month later, Cardwell sent back a three-page draft, which included the footnote "TBD whether relevant and recent case law exists and/or can be cited." A redline comparing Cardwell's draft to the final product shows that the partner had to rewrite a substantial amount of the article. In a written performance review, the partner stated that "Kaloma was very slow in producing work product (seemed like he thought this was not a real assignment, until he saw it got a lot of outside attention). His version largely repeated substance he had seen in emails from others, and did not analyze the issues in a manner designed for a practical client memo. He also did not analyze the cases (and footnoted asking whether he should do so)." *Id.* ¶¶ 132, 135.

- On June 20, 2017, a partner reached out to meet with Cardwell to review work product that Cardwell was preparing for the partner. Cardwell did not respond, even after the partner followed up five hours later. By the end of the day, Cardwell still had not responded. As a result, the partner had to reach out for a replacement to staff the deal. The partner described working with Cardwell as "very disappointing" and stated that Cardwell's "inability to handle a routine assignment is troubling and his failure to apologize does not inspire me to work further with him." *Id.* ¶¶ 140–141.

Defendants have also proffered evidence of Cardwell's negative written performance reviews, as well

as other discussions of Cardwell's poor performance.  *See* Reply at 9–11.

Turning to the third stage of the *McDonnell Douglas* framework, Plaintiff fails to provide sufficient evidence for a reasonable jury to infer that his race played a role in Defendants' alleged adverse employment actions.  The Court will address Cardwell's arguments regarding the Individual Defendants and Davis Polk in turn.

*Individual Defendants:*  First, Cardwell asserts that "Reid, Bick, Chudd, Birnbaum, Wolfe, Brass, and Butler all contributed to the Firm's (i) consensus view in connection with Cardwell's 2017 annual review that he was 'behind' associates in his class and (ii) decision to give him a 'time to go' message in February 2018."  Pl.'s Opp'n at 42.  But Cardwell does not identify any evidence that Defendants intentionally discriminated against him by taking these actions.[7]  "[A]n employee's general disagreement with a supervisor's evaluation of the employee's job performance, by itself, does not create an inference of discrimination or constitute proof of pretext."  *Yeger v. Inst. of Culinary Educ., Inc.*, No. 14-cv-8202, 2017 WL 377936, at *11 (S.D.N.Y. Jan. 25, 2017); *see also Iverson v. Verizon Commc'ns*, No. 08-cv-8873, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) ("Merely disagreeing with a supervisor's assessment of work performance . . . 'is insufficient to raise a triable issue of fact regarding pretext.'" (quoting *Milano v. Astruel*, No. 05-cv-6527, 2008 WL 4410131, at *41 (S.D.N.Y. Sept. 26, 2008)).  "While we must ensure that employers do not act in a discriminatory fashion, we do 'not sit as a super-personnel department that reexamines an entity's business decisions.'"  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (per curiam) (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997)).  Accordingly, Cardwell's disagreement

---

[7] In attempting to connect the "time to go" message to discriminatory motivation, Cardwell alleges that Bick "testified that the Firm perceived Cardwell to be a 'threat' after [Cardwell] filed the EEOC Charge in August 2017."  Pl.'s Opp'n at 42.  But Bick's explanation of *why* Cardwell was viewed as a threat at that time—that, if Cardwell went public with complaints like the ones he made to the EEOC, "there would be news coverage and [people] could have [their] reputation harmed," Dkt. No. 259 Ex. 105 at 212:9–16—raises a potential inference not of discrimination, but of retaliation.  *See infra* Part III(B)(2)(c)(ii).  And Cardwell has not adduced any other evidence connecting the "time to go" message to discriminatory animus.

with Defendants' evaluation of his performance and decision to terminate him is insufficient to establish pretext. *See Pearson v. Lynch*, No. 10-cv-5119, 2012 WL 983546, at *10 (S.D.N.Y. Mar. 22, 2012) ("Although Plaintiff vehemently disagrees with Defendants' assessment of his performance and the decision to select him as one of the two weakest administrative assistants of the group, this does not show pretext.").

Next, Cardwell attempts to support his discrimination claims by relying on five purported comparators, anonymized as:  Associate #3, Associate #5, Associate #7, Associate #9, and Associate #10. *See* TAC ¶ 644; Pl.'s Opp'n at 31, 36, 42–44 (relying on Associates #3, #5, #7, #9, and #10); Pl.'s 56.1 Counterstatement ¶¶ 828–54.  "A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000).  "To be 'similarly situated,' the individuals with whom [the plaintiff] attempts to compare [him]self must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).  "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (quoting *Graham*, 230 F.3d at 40).  "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).  But "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012) (summary order) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

Cardwell argues that "Birnbaum and Wolfe failed to staff Cardwell on any new matters from September 2016 to March 2017" but staffed "[s]imilarly situated non-Black M&A associates

(including Associate #3, Associate #5, Associate #7, Associate #9, and Associate #10)" during that time period.  Pl.'s Opp'n at 42.  Cardwell has failed to show that he was similarly situated in all material respects to the purported comparators.  Cardwell does not dispute that Associates #3, #5, #7, and #9 were each at least two years senior to Cardwell.  *See* Pl.'s 56.1 Response ¶ 265.  Cardwell has not adduced any evidence from which the Court could draw the inference that corporate associates two years senior to him were subject to the same performance evaluation and discipline standards.  Cardwell's conclusory allegation, unsupported by evidence, that his purported comparators were subject to the same performance evaluation and discipline standards is insufficient.  *See* Pl.'s 56.1 Counterstatement ¶ 828 (relying solely on the TAC).  Further, despite having an extended time to conduct discovery, Cardwell has not adduced any evidence that Birnbaum and Wolfe staffed the purported comparators during that time period.  Cardwell offers no information regarding the staffing for Associate #3 and Associate #10.  *See* Pl.'s Opp'n at 42; Pl.'s 56.1 Counterstatement ¶¶ 828–854.  For Associates #5, #7, and #9, Cardwell relies solely on his allegations in the TAC.  *See, e.g., id.* ¶¶ 837–838 (relying solely on the TAC for the allegation that Birnbaum, Wolfe, and other partners continued to staff Associate #5); *id.* ¶¶ 842–43 (same regarding Associate #7); *id.* ¶ 848 (quoting the TAC for the allegation that "Davis Polk, Mr. Bick, Mr. Wolfe, Mr. Birnbaum, and Mr. Brass did not completely eliminate Associate #9's billable hours within 2-3 months of an M&A partner rating Associate #9 as 'behind.'").

Cardwell's reliance on his Rule 56.1 Counterstatement and TAC to support his allegations about purported comparators is insufficient.  First, as discussed above at Part I(B), the Court has ruled that because Cardwell's 56.1 Counterstatement failed to comply with the local rules in this district, the facts contained within it are not deemed admitted for summary-judgment purposes.  Dkt. No. 280.  Second, "[t]hough we may treat [a] verified complaint 'as an affidavit for summary judgment purposes,' the allegations contained therein can suffice to defeat summary judgment only

insofar as they were made on personal knowledge." *Curtis*, 654 F. App'x at 20 (2d Cir. 2016) (summary order) (first quoting *Colon*, 58 F.3d at 872, and then citing Fed. R. Civ. P. 56(c)(4)).  In the TAC, Cardwell states that his allegations are based "upon actual knowledge as to *his own acts*, and upon information and belief as to all other matters." TAC at 1 (emphasis added); *see Curtis*, 654 F. App'x at 20–21 (rejecting allegations made "[u]pon information and belief" in a verified complaint as "speculative" and "insufficient to defeat defendants' [summary-judgment] motion").  Cardwell has not provided a basis for concluding that his assertions in the TAC regarding the purported comparators are based on personal knowledge.  Thus, Cardwell's allegations are not sufficient to raise a genuine issue of fact regarding whether the purported comparators were treated more favorably.  Accordingly, no reasonable juror could conclude that Cardwell was similarly situated to the purported comparators.[8]

Finally, Cardwell argues that "Bick placed Cardwell on the Firm's 'mid-year' review track in June 2016, on pretextual grounds, where no White M&A associates received a mid-year review in 2016," including "Associate #3, Associate #7, Associate #9, and Associate #10." Pl.'s Opp'n at 42. Again, however, Cardwell has not raised a genuine issue of fact that he is similarly situated to the purported comparators.  Cardwell rotated through three of the Firm's practice groups, whereas corporate associates typically only complete two rotations.  Pl.'s 56.1 Response ¶¶ 45–46.  Cardwell does not dispute that corporate associates customarily receive an interim review after each rotation. *See id.* at 192.  Cardwell has not identified any evidence that any of the purported comparators completed a third rotation but did not receive a mid-year review following completion of the third

---

[8] While Cardwell's failure to point to admissible evidence to establish that purported comparators were similarly situated to him in all material respects is enough to reject this argument, the Court notes that there is also some *admissible* evidence suggesting that at least some of these purported comparators were not, in fact, treated worse that Cardwell. *See* Buergel Decl. Ex. 75 RFA No. 129 (noting that some of the associates Cardwell points to as comparators received "time to go" messages).

rotation.  *See* Pl.'s Opp'n at 42; Pl.'s 56.1 Counterstatement ¶¶ 828–54.[9]  Accordingly, Cardwell has

failed to show that he was similarly situated to the purported comparators in all material respects.

Cardwell also asserts that Bick "repeatedly ignored Cardwell" and "refused his duties as an 'assigned

mentor.'"  Pl.'s Opp'n at 42–43.  Again, however, Cardwell does not identify any evidence that

Bick's actions were motivated by race.  Cardwell has "done little more than cite to [his alleged]

mistreatment and ask the court to conclude that it must have been related to [his] race.  This is not

sufficient."  *Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (alterations in original)

(quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)).

 In sum, Cardwell fails to demonstrate sufficient evidence for a reasonable jury to infer that

his race played a role in the Individual Defendants' alleged adverse employment actions.

 *Davis Polk:*  Cardwell argues that there are four facts which establish an inference of racial

discrimination by Davis Polk.  First, Cardwell repeats his argument regarding the purported

comparators.  *See* Pl.'s Opp'n at 44.  As explained above, Cardwell has not established that he was

similarly situated to the purported comparators.

 Second, Cardwell argues that the Firm tracked and evaluated its Black associates differently

than its non-Black associates.  *See id.*  For this argument, Cardwell relies on the fact that the Firm's

Diversity Committee tracked and assessed the performance of the Firm's "Black BAG members and

evaluated them differently from White BAG members (and the Firm's associates more broadly),"

and asserts that while "affinity groups" were "open to all Davis Polk lawyers . . . and BAG

---

[9] Cardwell asserts that three non-Black associates in his class did not receive a mid-year review despite completing three rotations.  Pl.'s 56.1 Counterstatement ¶¶ 678–682.  Yet, Cardwell does not seek to rely on the three associates as comparators and has not otherwise offered sufficient information about the three associates for the Court to conclude that Cardwell was similarly situated in all material respects to the three associates.  *See id.* (merely stating that each associate was non-Black, in Cardwell's class, and completed three rotations).  Further, Cardwell has not adduced any evidence to support his assertion that the three associates did not receive a mid-year review; he has only proffered evidence that the associates did not receive a mid-year review *from Bick*.  *Compare id.* (citing Defs.' Answer ¶ 160 as support for the proposition that the associates "did not receive a mid-year review in 2016"); *with* Defs.' Answer ¶ 160 (admitting "that Bick did not conduct any mid-year review in 2016 for any M&A associate other than plaintiff.")

[members] including non-Black attorneys, only its Black members were selected, tracked, and evaluated differently from White and non-Black BAG members." *Id.* (emphasis removed); *see* Pl.'s 56.1 Counterstatement ¶¶ 373–375, 633–642.  As an initial matter, however, the evidence shows that the Firm tracked the performance of associates belonging to various minority groups—including Hispanic and Latin American, Asian, mixed-race, and LGBT associates—in the same way that they tracked the progress of Black associates, and that associates in each group were labeled as "high," "mid," or "low."  Jeffries Decl. Ex. 90; Buergel Decl. Ex. 43; Buergel Decl. Ex. 46.  More fundamentally, Cardwell has not identified any evidence that this tracking was implemented to discriminate against Black associates, as opposed to being used as a support system to be sure that Black (or other) associates did not fall behind their peers.  *See* Buergel Decl. Ex. 46 (referencing a list of low-performing "Black, Hispanic, Asian . . . and LGBT associates" and setting discussion of those associates as a topic for an upcoming Diversity Committee meeting); *see also* Buergel Decl. Ex. 20 (Cardwell's recollection of his meeting with Reid, wherein he noted the importance of "tailored strategies" to address the needs of diverse groups at Davis Polk).  That a program tracks the performance of some groups without tracking the performance of others does not show—absent additional evidence—that the tracked groups are being discriminated against.[10]

Third, Cardwell argues that between May 2015 and September 2016, "the Firm's Asian and Black affinity groups sought remedial action for discriminatory and racialized practices within the Firm's staffing and performance evaluation systems."  Pl.'s Opp'n at 45.  As a result, Davis Polk took several steps to address issues related to racial bias in the Firm.  *See id.*  Cardwell's fourth argument is similar.  Cardwell argues that the dearth of Black attorneys at all levels of Davis Polk "supports an inference of discriminatory animus among those in the Firm and those within the

---

[10] Cardwell's argument—that private companies' efforts to support and mentor racial minorities, women, or other underrepresented classes constitute *per se* evidence of discriminatory animus *against* those groups—lacks legal support.  Moreover, it would, if accepted by the Court, have a significant chilling effect on such initiatives.

Firm's corporate departments." *Id.* Cardwell's general allegations regarding the low percentage of Black attorneys at the Firm are by themselves insufficient to raise a genuine issue of fact that any of Davis Polk's alleged adverse employment actions were motivated by Cardwell's race. "[B]road statistical evidence, without evidence of specific instances of discrimination, is not relevant to whether any specific individual acted with discriminatory intent or whether any specific individual was the target of discrimination." *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 n.5 (2d Cir. 2015); *see also Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Statistics alone do not suffice to establish an individual disparate treatment claim for a very good reason: the particular plaintiff must establish *he* was the victim of racial discrimination.").[11]

Accordingly, Cardwell fails to demonstrate sufficient evidence for a reasonable jury to infer that his race played a role in Davis Polk's adverse employment actions.

### b. NYCHRL (Count Nine)

Defendants are entitled to summary judgment on Cardwell's NYCHRL discrimination claim. As described above, the NYCHRL operates as a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall." *Mihalik*, 715 F.3d at 109 (internal quotation marks omitted). Specifically, while Title VII, the NYSHRL, and Section 1981 all require that a defendant's discriminatory conduct be connected to a materially adverse employment action, under the NYCHRL, "the plaintiff 'need only show that her employer treated her less well, at least in part for a discriminatory reason.'" *Bacchus*, 137 F. Supp. 3d at 246 (quoting *Mihalik*, 715 F.3d at 110).

---

[11] Cardwell's data, moreover, can only be described as "statistics" in the most generous sense. The numbers he provides are counts of Black associates and partners at Davis Polk generally and in certain practice areas. *See* Pl.'s 56.1 Counterstatement ¶¶ 809–818. But Cardwell does not run any analysis with the data provided: He does not, for example, control for differences in Black representation among law school graduates, investigate the patterns of Black associate hiring or retention as compared with non-minority lawyers, control for "pull" factors such as the marketability of successful Black Davis Polk associates to in-house or other opportunities, or otherwise place the raw numbers he collects in any meaningful context. As a result, the numerical evidence that he provides is particularly ill-suited to raising, by itself, an inference of discrimination.

But the NYCHRL's lower bar concerning the need to show a materially adverse employment action does not help Cardwell here because, while Cardwell has pointed to multiple adverse employment actions taken by Defendants—see below at Part III(B)(2)(c)—he has failed to present evidence that connects them to discriminatory animus.  Under the NYCHRL, just as under Title VII, Section 1981, and the NYSHRL, a plaintiff must provide evidence that his employer treated him less well "at least in part '*because of* h[is] [protected characteristic].'"  *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S. 2d at 39, 40 n.27).  For the reasons described in the section above, Cardwell has failed to do so; that failure is fatal to his NYCHRL discrimination claim just as it is for his other discrimination causes of action.  Accordingly, Cardwell's NYCHRL discrimination claim will be dismissed also.

### B.  Cardwell's Retaliation Claims (Count Two, Count Four, Count Seven, and Count Eleven)

#### 1.  Legal Standard

Retaliation claims under Title VII, § 1981, and the NYSHRL proceed under the three-step *McDonnell Douglas* burden-shifting framework and are analyzed pursuant to the principles applicable to retaliation claims under Title VII.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) ("Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting analysis."); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) ("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims.").  "First, the plaintiff must establish a prima facie case of retaliation by showing:  (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Baines*, 593 F.3d at 164 (internal citation and quotation marks omitted).  The plaintiff's burden in this regard is "*de minimis*," and "the court's role

in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the plaintiff establishes a *prima facie* case, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory. If the employer succeeds at the second stage, then the presumption of retaliation dissipates and the plaintiff must show that retaliation was a substantial reason for the complained-of action." *Fincher*, 604 F.3d at 720.

The NYCHRL also prohibits retaliation. "Section 8-107(7) of the NYCHRL prohibits employers from 'retaliating or discriminating in any manner against any person because such person has opposed any practice forbidden under this chapter.'" *Mihalik*, 715 F.3d at 112 (quoting former N.Y.C. Admin. Code § 8-107(7)) (alterations omitted). "[T]o make out an unlawful retaliation claim under the NYCHRL, a plaintiff must show that (1) he or she engaged in a protected activity as that term is defined under the NYCHRL, (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S. 3d 238, 246 (2d Dep't 2021). "New York courts have broadly interpreted the NYCHRL's retaliation provisions." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 308 (S.D.N.Y. 2016) (quoting *Mihalik*, 715 F.3d at 112); *see also Mestecky v. N.Y.C. Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (summary order) ("[The] NYCHRL's retaliation provision is broader than Title VII's." (citing *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015)). The NYCHRL is a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the City's Human Rights law cannot fall." *Mihalik*, 715 F.3d at 109 (quotation omitted).

As under Title VII, Section 1981, and the NYSHRL, if the plaintiff can establish his *prima facie* case under the NYCHRL, the Court proceeds by analyzing whether the defendants have articulated a legitimate, non-discriminatory for the allegedly retaliatory action and then, if so, by passing the burden back to the plaintiff to point to evidence showing that the employer's stated reasons are pretextual.  *See Wilkerson v. Metro. Transp. Auth.*, No. 19-cv-9340, 2021 WL 5761649, at *9 (S.D.N.Y. Dec. 3, 2021) ("[F]or both discrimination and retaliation claims under the NYCHRL, courts continue to apply the three-step, burden-shifting framework that the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*." (quoting *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 171 (S.D.N.Y. 2011))).

### 2.  Application

#### a.  *Prima Facie* Case

##### i.  Protected Activity

The parties do not dispute that Cardwell engaged in seven protected activities that occurred: (1) during a meeting between the Firm's Diversity Committee and the Firm's Black Attorney Group in September 2015 (the "September 2015 Complaint"); (2) at a dinner with Reid and a Black senior associate in January 2016 (the "January 2016 Complaint"); (3) during a conversation with a junior staffing coordinator regarding an assignment in the credit group in September 2016 (the "September 2016 Complaint"); (4) during a meeting with Reid and another partner in March 2017 (the "March 2017 Complaint"); (5) through Cardwell emailing a partner that he "became ill" when he "thought more about [his] own story and experiences" at Davis Polk in May 2017 (the "May 2017 Complaint"); (6) through Cardwell filing an EEOC Charge in August 2017 (the "August 2017 Complaint"); and (7) during a face-to-face performance review with two M&A partners in January 2018 (the "January 2018 Complaint").  Defs.' Mem. at 22 fig.2; Pl.'s Opp'n at 6–7.

In addition, Cardwell contends that he engaged in protected activity by raising questions

about the ethics of Davis Polk's representation of an immigrant detention company to two partners in December 2016 and March 2017. Pl.'s Opp'n at 6; Pl.'s 56.1 Counterstatement ¶ 743. The Court previously found that this conduct did not qualify as protected activity even under the NYCHRL's more plaintiff-friendly standard because Cardwell's complaints about Davis Polk's choice of clients could not be reasonably understood as complaints about discrimination at the Firm. Dkt. No. 78 at 60–61. The third amended complaint did not rectify that defect. Cardwell's complaints concerned discrimination by the Firm's client, not discrimination by the Firm itself. Accordingly, Cardwell's December 2016 and March 2017 emails are not protected activity for purposes of his retaliation claim. *See Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) ("[N]ot every act by an employee in opposition to . . . discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978))); *Mihalik*, 715 F.3d at 112 ("[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination.").

### ii. Knowledge

Next, the Court considers whether Defendants had knowledge of Cardwell's alleged protected activity. For Cardwell's retaliation claims against Davis Polk, "[n]othing 'more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.'" *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)). "Courts have found general corporate knowledge to arise when a supervisor, corporate officer, or employee whose job is to investigate and resolve discrimination complaints becomes aware of the protected activity." *Armstrong v. Metro. Transp. Auth.*, No. 07-cv-3561, 2014 WL 4276336, *20 (S.D.N.Y. Aug. 28, 2014) (collecting cases); *see also Kwan v. Andalex Grp.*, LLC, 737 F.3d 834, 844 (2d Cir. 2013) (holding that a complaint made to a corporate officer is "sufficient to

impute . . . general corporate knowledge of the plaintiff's protected activity"). Cardwell has adduced evidence that each of his protected activities was communicated to one or more of the Firm's partners, a human resources employee, members of the Firm's Associate Development Department, or members of the Firm's Diversity Committee. *See* Pl.'s Opp'n at 10–11. Accordingly, Cardwell has established the knowledge prong of the *prima facie* case against Davis Polk.

For Cardwell's retaliation claims against William Chudd, Sophia Hudson, Harold Birnbaum, Brian Wolfe, John Butler, Daniel Brass, Thomas Reid, and John Bick (together, the "Individual Defendants"), on the other hand, Cardwell must show that they had personal knowledge of his protected activity. *Stern v. State Univ. of N.Y.*, No. 16-cv-5588, 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018) (holding that although "'general corporate knowledge' may suffice to show knowledge where retaliation is claimed against a corporate defendant," for claims against an individual defendant, the plaintiff must show that the individual defendant was aware of the plaintiffs' protected activity); *see also Littlejohn v. City of New York*, 795 F.3d 297, 302 (2d Cir. 2015) (a plaintiff is required to present evidence that shows that "*the defendant* knew of the protected activity" (emphasis added)); *Gates v. City of New York*, No. 20-cv-3186, 2021 WL 3774189, at *12 (S.D.N.Y. Aug. 25, 2021) ("[F]or either [of the individual defendants] to have retaliated against [the plaintiff] because of his filing of the EEOC charge, they of course needed to have knowledge of that charge."); *Alali v. DeBara*, No. 07-cv-2916, 2010 WL 11712774, at *5 (S.D.N.Y. Sept. 30, 2010) ("[W]hen a retaliatory action is alleged to be based on the filing of a prior discrimination complaint, the plaintiff must establish that each individual defendant against whom he brings the retaliation claim was personally aware of the prior complaint at the time he engaged in the alleged retaliatory conduct at issue."). Knowledge is also a required element for a retaliation claim under the NYCHRL. *Olaechea v. City of New York*, No. 17-cv-4797, 2022 WL 3211424, at *5 (S.D.N.Y. Aug. 9, 2022) ("For an individual defendant to be liable for retaliation under the NYCHRL, he must have

actually participated in the conduct giving rise to the plaintiff's claims.  Such participation requires

retaliatory intent—and therefore necessarily requires an individual's knowledge of the protected

activity at the time of his participation." (internal quotation marks and citations omitted)).  The

Court will address whether Cardwell has adduced evidence that each Individual Defendant had

knowledge of Cardwell's protected activity in turn.

*Chudd:*  Cardwell alleges that Chudd had knowledge of the September 2015 Complaint.

Cardwell does not dispute that Chudd testified that he was not aware of any of Cardwell's protected

activities at any point during Cardwell's employment with Davis Polk.  Pl.'s 56.1 Response ¶ 10.

Instead, Cardwell speculates that Renee DeSantis, Davis Polk's Director of Associate Development,

told Chudd about the September 2015 Complaint.  DeSantis attended the meeting in which

Cardwell made his complaint and her notes of the meeting include the phrases "[m]icroinequities,"

"[f]ormal mechanism needed to teach inclusion & feedback," and "training needed for partners &

senior / mid-level associates."  Pl.'s 56.1 Counterstatement ¶ 547.  In her deposition, DeSantis

testified that she viewed Cardwell's complaint as "more of a training issue for our junior associates

to explain how work is assigned and streams, and for our more senior and mid-level and perhaps

partners to explain how they should be also clear about what's happening across the course of the

transaction so people don't feel excluded."  Pl.'s 56.1 Counterstatement ¶ 549.  Relying on these

comments, Cardwell argues that DeSantis "intended to use [Cardwell's] feedback to address

'microinequities' and 'train' partners (e.g., Chudd) on 'inclusion'" and that "[a] reasonable juror can

conclude that DeSantis engaged in these follow-up efforts, including discussing the complaint with

Chudd and incorporating Cardwell's feedback into the upcoming Lawyering 101 training program

(since DeSantis thought the complaint reflected a "training issue")."  Pl.'s Opp'n at 13.

Cardwell's argument is purely speculative.  DeSantis' notes do not indicate that she intended

to discuss Cardwell's complaint with Chudd.  At most, DeSantis' notes suggest that she intended to

incorporate the content of Cardwell's complaint into future trainings, not that DeSantis intended to discuss the specific fact that Cardwell made the complaint with anyone, let alone Chudd.  Further, DeSantis testified that while she discussed Cardwell's complaint with two individuals who are not defendants in this case, she does not remember discussing his complaint with anyone else.  *See* DeSantis Tr. 190:8–191:24.  Cardwell's unsubstantiated speculation that DeSantis' generic notes and comments regarding potential training for partners must mean that DeSantis told Chudd about Cardwell's complaint does not create a material issue of fact.  *See Fujitsu*, 247 F.3d at 428 (the non-movant "may not rely on conclusory allegations or unsubstantiated speculation"); *see also Alali*, 2010 WL 11712774, at *5 ("[U]nsubstantiated speculation that an individual with awareness of a prior complaint 'must have' informed a defendant of the prior complaint based merely on their relationship with one another is insufficient to establish awareness.").  Accordingly, Cardwell has not raised a genuine issue of fact that Chudd had knowledge of the September 2015 Complaint.

Finally, Cardwell suggests that Chudd had knowledge of Cardwell's protected activities because he "received a preservation notice on June 7, 2017."  Pl.'s Opp'n at 14 n.31.  To support this assertion, Cardwell relies on Defendants' privilege log.  The privilege log shows that Chudd was sent an email along with numerous other partners on June 7, 2017.  Jeffries Decl. Ex. 52 at 7 (log entry #58).  The privilege log assigns the email to the following privilege category:  "Non-public communications and/or work product with counsel requesting, providing, or reflecting legal advice, including documents reflecting such communications, or forwarding such communications and their attachments (including, among others draft letters, draft emails, draft reports, and analyses) concerning document preservation notices."  *Id.* at 2.  Based solely on this information, Cardwell speculates that the email Chudd received was "relat[ed] to Cardwell's complaints and the fact that Davis Polk learned that Cardwell obtained legal counsel."  Pl.'s 56.1 Counterstatement ¶ 786. Assuming without deciding that the privilege log entry is admissible evidence that the Court can

consider at this stage, the log entry does not provide sufficient information from which a reasonable juror could conclude that Chudd had knowledge of Cardwell's protected activity. That Chudd received an email that "concern[ed] document preservation notices" is insufficient, standing alone, to reasonably infer that the email contained information regarding Cardwell's protected activities.

Because Cardwell has not raised a genuine issue of fact that Chudd had knowledge of his protected activities, Defendants' motion for summary judgement as to Cardwell's retaliation claims against Chudd is granted.

*Hudson:* In her deposition, Hudson testified that she did not recall "knowing anything about Mr. Cardwell's comments about race or bias" until she read the complaint filed in this action. Pl.'s 56.1 Response ¶ 12. Cardwell disputes Hudson's testimony and argues that Hudson had knowledge of the September 2015 Complaint. Cardwell bases his argument on emails sent by Hudson on November 9, 2015.

On November 8, 2015 Cardwell emailed work product to Hudson at 4:03 a.m. Pl.'s 56.1 Response ¶ 73. Hudson forwarded Cardwell's email to a more senior associate working on the matter, and stated: "Why do you think he was up until 4:03 working on this? I think he could have just included my comments rather than copying them over (if that's what took him so long)." *Id.* In her deposition, Hudson stated:

> I can remember one instance where I had given him comments on an offering document and the next morning I woke up to see that he had sent an email at it 4:00-something in the morning, and he had copied all of my comments over, in his own handwriting. And I was surprised, flabbergasted actually, because that was certainly not a typical practice; a typical practice which is reuse the partner's comments. And it was frankly, time consuming for him to copy them over and a completely unnecessary waste of client's money to do that.

*Id.* ¶ 74. The next day, Hudson requested "a folder with [Cardwell's] reviews since starting at [Davis Polk]" to "have a read on the situation." *Id.* ¶ 75. In her deposition, Hudson testified that by saying she wanted a read on the situation, she was referring to Cardwell's performance and that she

"wanted to get the background of people who had worked with him in the first full year at the firm."
Hudson Tr. 243:16–244:14.

Cardwell does not dispute this context.  Instead, he points out that Hudson and Chudd
served as co-faculty during a Lawyer 101 training program on October 27, 2015 and that "[f]rom
October to November 2015, Hudson and the Associate Development Department exchanged
dozens of emails about Cardwell (including in Hudson's capacity as a Staffing Partner)."  Pl.'s Opp'n
at 13.  Based on these interactions, Cardwell contends that "[a] reasonable juror can conclude that
the 'situation' Hudson was referring to was the September 2015 complaint about Chudd's team (of
which Chudd and Associate Development had indirect and direct knowledge, respectively)."  *Id.*

Notably, Cardwell does not identify any evidence to support that Chudd or the Associate
Development Department told Hudson about the September 2015 Complaint.  Further, as
discussed above, Cardwell has not raised a genuine issue of fact that Chudd knew of the September
2015 Complaint.  Cardwell's unsupported speculation that Chudd or the Associate Development
Department must have told Hudson about the complaint merely because they were in contact with
each other does not raise a genuine dispute of fact.[12]  *Alali*, 2010 WL 11712774, at *5
("[U]nsubstantiated speculation that an individual with awareness of a prior complaint 'must have'
informed a defendant of the prior complaint based merely on their relationship with one another is
insufficient to establish awareness.").  Cardwell's unsupported speculation that the "situation"
Hudson was referring to was the September 2015 Complaint is also insufficient.  *See Fujitsu*, 247

---

[12] The case cited by Cardwell in opposition is distinguishable.  In *McKenzie v. Atlantic Richfield Co.*, 906 F. Supp. 572 (D. Colo. 1995), the Court relied on various pieces of circumstantial evidence that the defendants had knowledge of the protected activity, not solely that "routinely interacted and met with other company officials who in fact were aware of" the protected activity.  *Id.* at 576.  Still, the Court observed that the issue was a "close call" and that the plaintiff's evidence was "very thin and purely circumstantial," but ultimately held that "reasonable inference can be drawn that [the defendants] were aware of [the protected activity], notwithstanding their deposition testimony to the contrary."  *Id.* at 577.  Here by contrast, Cardwell relies solely on his speculation that Hudson might have learned of Cardwell's protected activities because she interacted with other individuals who had knowledge.  Cardwell has not adduced any other evidence, not even circumstantial evidence, which supports an inference that Hudson would have had knowledge of his complaints.

F.3d at 428 (the non-movant "may not rely on conclusory allegations or unsubstantiated speculation").

Cardwell's allegation that Hudson had knowledge of his January 2016 complaint similarly fails. Cardwell asserts that Hudson learned of Cardwell's September 2015 and January 2016 complaints because she talked with Bick before submitting her June 2016 review for Cardwell. Pl.'s Opp'n at 17. Although Bick testified that he spoke with Hudson in June 2016, Cardwell does not identify any evidence that Bick discussed Cardwell's prior complaints with Hudson during that conversation. Instead, Cardwell's assertion that Hudson must have learned of the complaints during that conversation is based purely on speculation.

Accordingly, Cardwell has not raised a genuine issue of fact that Hudson had knowledge of Cardwell's September 2015 or January 2016 complaints. Cardwell does not proffer any evidence that Hudson had knowledge of any other protected activity. *See* Pl.'s Opp'n at 12–14. Thus, Defendants' motion for summary judgement as to Cardwell's retaliation claims against Hudson is granted.

*Birnbaum & Wolfe:* Cardwell contends that Birnbaum and Wolfe learned of the September 2016 Complaint at the M&A group's annual review meeting held on October 5, 2016. Pl.'s Opp'n at 15; Pl.'s 56.1 Counterstatement ¶¶ 695, 697–711. Cardwell does not adduce direct evidence that Birnbaum and Wolfe attended the meeting, but instead introduces evidence that M&A partners were encouraged to attend the annual meeting and that most of the M&A partners attended the annual meetings. Pl.'s 56.1 Counterstatement ¶ 698. Similarly, although Cardwell does not have direct evidence that someone with knowledge of his protected activities attended the meeting, Cardwell adduces evidence that persons with knowledge would "at times" attend the review meetings, and that at least one person from the Associate Development Department attended each annual review meeting. *Id.* ¶¶ 699–700. Finally, although Cardwell does not have direct evidence that he was

discussed at the meeting, Cardwell's name was on a list of M&A associates whose performance reviews were scheduled to be discussed at the meeting. *Id.* ¶ 711.

Given this evidence, a reasonable juror could conclude that Birnbaum and Wolfe attended the meeting, that at least one person from the Associate Development Department with knowledge of Cardwell's protected activity attended the meeting, and that Cardwell's reviews were discussed at the meeting. However, Cardwell attempts to go even further—Cardwell argues that a reasonable juror could conclude "that when Cardwell was discussed, his September 2016 complaint was mentioned." Pl.'s Opp'n at 15. Cardwell argues that because M&A partners would ask the Associate Development Department factual questions during the meeting, it is reasonable to infer that they also discussed Cardwell's September 2016 complaint. *Id.* However, Cardwell has not adduced any evidence that Cardwell's September 2016 complaint, or any other protected activity, was discussed during the meeting. Further, both Birnbaum and Wolfe testified that they did not remember having knowledge of Cardwell's protected activity prior to reading Cardwell's complaint filed in this action. Pl.'s 56.1 Response ¶¶ 8, 14. Cardwell's unsupported speculation that his protected activity must have been discussed at the meeting merely because his performance was discussed is insufficient to establish a genuine issue of material fact. *See Alali*, 2010 WL 11712774, at *5.

Finally, Cardwell argues that Birnbaum and Wolfe had knowledge of his protected activities because they "received a preservation notice after Cardwell retained counsel on June 7, 2017." Pl.'s Opp'n at 15. For the reasons described above, Cardwell has not adduced sufficient evidence to support a reasonable inference that the preservation notice informed Birnbaum and Wolfe of Cardwell's protected activity. Because Cardwell has not raised a genuine issue of fact that Birnbaum or Wolfe had knowledge of his protected activities, Defendants' motion for summary judgement as to Cardwell's retaliation claims against Birnbaum and Wolfe is granted.

*Butler:*  Cardwell has not raised a genuine issue of fact that Butler had knowledge of any of Cardwell's protected activity.  Cardwell speculates that Butler knew of his protected activities because Butler referred to Cardwell as "dangerous" in an email in October 2016 despite having stated a few weeks previously that his "experience with Kaloma was pretty abbreviated."  Pl.'s Opp'n at 16.  In the email exchange, Butler and another partner were discussing the performance of a different associate.  Butler stated that he gave the other associate "a big talk about how he needs to independently read these things, spot issues, and come up with things to discuss, but he simply does not produce issues lists, etc."  Jeffries Decl. Ex. 97.  In response, the partner stated "Great.  I guess it is Kaloma time for me."  *Id.*  Butler replied that the other associate "is not nearly as dangerous.  I would just pile on."  *Id.*  Given this context, it is clear that Butler was recommending that the partner assign the other associate more work rather than Cardwell because Butler believed Cardwell's performance to be worse.  No reasonable juror could conclude that Butler's comment was a reference to Cardwell's prior complaints.  Cardwell's unsupported speculation that Butler was actually referring to his protected activity, without more, is insufficient to establish a genuine dispute of material fact.

Finally, Cardwell argues that Butler had knowledge of Cardwell's protected activities because he "received a preservation notice related to Cardwell's retention of counsel on June 7, 2017."  Pl.'s Opp'n at 16.  For the reasons described above, Cardwell has not adduced sufficient evidence to support a reasonable inference that the preservation notice informed Butler of Cardwell's protected activity.  Accordingly, Defendants' motion for summary judgment as to Cardwell's retaliation claims against Butler is granted.

*Brass:*  Defendants admit that Brass had knowledge of the August 2017 Complaint.  Defs.' Mem. at 22 n.14.  Cardwell does not allege that Brass had knowledge of any other protected activity. *See* Pl.'s Opp'n at 15–16.

*Reid*:  Defendants admit that Reid had knowledge of the January 2016, March 2017, August 2017, and January 2018 complaints.  Defs.' Mem. at 22 n.14.  Cardwell also alleges that indirect evidence shows that Reid had knowledge of the September 2015 complaint.  Pl.'s Opp'n at 11.  In his deposition, Reid testified that he did not recall hearing about the September 2015 complaint. Jeffries Decl. Ex. 7 at 151:25–152:8.[13]  Cardwell's attempt to controvert that testimony is unavailing. He first points to evidence that members of the Diversity Committee and some partners—but not Reid—exchanged emails about the *upcoming* meeting at which Cardwell would make his September 2015 complaint.  *See* Pl.'s Opp'n at 12 n.27 (citing Pl.'s 56.1 Counterstatement ¶¶ 525–528).  Even if this evidence showed that Reid knew about that upcoming meeting (and it does not), it would not show that he had knowledge of Cardwell's complaint made at the meeting.  Cardwell then attempts to show Reid's knowledge of Cardwell's September 2015 complaint by asserting that (1) DeSantis, a participant in the September 2015 meeting, recognized and took note of Cardwell's complaint, *see* Pl.'s 56.1 Counterstatement ¶¶ 536–39, 547–49, (2) DeSantis shared Cardwell's complaint with Sharon Crane from the Human Resources Department, *see id.* ¶¶ 537–38, and (3) because Crane met with Reid on a weekly basis, *id.* ¶ 696, she must have shared her knowledge of Cardwell's complaint with him.  Pl.'s Opp'n at 12 n.27.  The evidence supports the first two legs of that argument, as DeSantis shared notes about Cardwell's complaint with Crane.  *See* Jeffries Decl. Ex. 74 (noting the issues Cardwell identified with Cardwell's name written next to the notes).  But it does not support the further inference that Crane told Reid about Cardwell's complaint—and Reid expressly disclaimed, in his testimony, that Crane ever did so.  *See* Jeffries Decl. Ex. 7 at 153:12–14 ("Q:  Did

---

[13] Cardwell takes issue with this characterization of Reid's testimony, as he argues that it reflected Reid not recalling or having present knowledge of the September 2015 complaint, rather than affirmative testimony that he had no knowledge of while Cardwell was employed at Davis Polk.  *See* Pl.'s 56.1 Response ¶ 22.  But Reid answered "I don't recall that, no" to the question "did you *ever* hear anything about Mr. Cardwell and other BAG members meeting with the [F]irm's diversity committee and associate development sometime in 2015?"  Jeffries Decl. Ex. 7 at 151:25–152:8.  And the pages that follow in the deposition transcript make clear that Reid's testimony is that he did not know about the September 2015 meeting.  *See id.* at 152–155.

Sharon Crane ever give you updates about BAG meetings?  A:  I don't recall any.").

Finally, Cardwell points to several presentations and emails in which "action items" were provided to partners for Cardwell and other Black associates, and partners were briefed more generally on the importance of inclusion.  *See* Pl.'s 56.1 Counterstatement ¶ 614 (noting a February 2016 presentation on inclusion that included action items for partners); *id* ¶¶ 639–640 (noting a June 2016 presentation about the Firm's Black Corporate associates that contained "action items" for Cardwell).  But the February 2016 presentation does not contain any information about Cardwell's September 2015 complaint; rather, it speaks generally to best practices for inclusion.  *See* Jeffries Decl. Ex. 91.  And the "action items" for Cardwell in the June 2016 presentation also make no mention of his September 2015 complaint.  *See* Jeffries Decl. Ex. 95 at 26 (listing "[p]rovide candid feedback" and "[d]iscuss CAP advisor assignment in October 2016" as Cardwell's action items).  In sum, Cardwell has not introduced any evidence to effectively counter Reid's testimony that he was unaware of Cardwell's September 2015 complaint.

*Bick*:  Defendants admit that Bick had knowledge of the March 2017, August 2017, and January 2018 complaints.  Defs.' Mem. at 22 n.14.  Cardwell argues that indirect evidence shows that Bick also had knowledge of the September 2015, January 2016, September 2016, December 2016, and May 2017 complaints.  Pl.'s Opp'n at 11.  In his deposition, Bick denied contemporaneous knowledge of the September 2015, January 2016, and September 2016 complaints.  Jeffries Decl. Ex. 4 at 184:25–185:21 (denying contemporaneous knowledge of the September 2015 complaint), 199:10–16 (same as to September 2016 complaint), 262:21–23 (denying knowledge of either the September 2015 or January 2016 complaints before providing Cardwell with the June 2016 mid-year review).  And he testified that while he was generally aware of the Cardwell's May 2017 complaint— the email in which Cardwell reported to Goldberg that he was physically ill because of Davis Polk's behavior—he had vague recollection of its details.  *Id.* at 225:20–226:17.

Cardwell has not introduced any evidence to overcome Bick's denial of knowledge of the September 2015 complaint. For that complaint, as with Reid, notes about the upcoming BAG meeting at which Cardwell's complaint was made cannot show Bick's knowledge of it. *See* Pl.'s 56.1 Counterstatement ¶¶ 525–528. And simply showing that Bick met with DeSantis before the June 2016 mid-year review, absent any evidence that DeSantis discussed the complaints with Bick, is insufficient to raise a genuine dispute of materials fact as to whether Bick knew about Cardwell's September 2015 or January 2016 complaints. *See id.* ¶¶ 536–39, 547–49, 560; *Alali*, 2010 WL 11712774, at *5. Nor do general presentations on inclusion, or action items for Cardwell that make no mention of the complaints, show Bick's knowledge of those complaints. *See* Pl.'s 56.1 Counterstatement ¶¶ 614, 639–640.

The same is true as to the January 2016 complaint. Cardwell's evidence of Bick's knowledge is that Cardwell's complaint was made at a January 2016 dinner, and that Reid testified that he "may have mentioned [he] was having dinner or had dinner" with Cardwell to Bick. Jeffries Decl. Ex. 7 at 185:7–13. That Reid may have talked to Bick about having dinner with Cardwell—absent any evidence that Reid mentioned Cardwell's complaint—does not by itself support he conclusion that Bick knew of the comment. Thus, the only competent evidence on point is Bick's denial of contemporaneous knowledge of the complaint. *See id.* at 262:21–23.

Further, Cardwell's December 2016 complaint cannot be considered regardless of Bick's knowledge of it. That complaint questioned the ethics of the Firm's representation of a for-profit prison. *See* Pl.'s 56.1 Counterstatement ¶¶ 742–748. This Court has already ruled that this complaint is not protected as a matter of law because it is "not about discrimination at Davis Polk," but rather about "Davis Polk's choice of clients." Dkt. No. 78 at 61. Accordingly, this complaint cannot form the foundation of protected activity for purposes of Cardwell's discrimination claim.

Cardwell has, however, introduced sufficient evidence to support a reasonable juror's finding

that Bick had knowledge of the May 2017 complaint.  Bick testified that he did have some

recollection of part of the substance of this complaint—that Cardwell needed a leave of absence

because of the stress he was feeling.  Jeffries Decl. Ex. 4 at 225:20–226:7 ("Q:  During Mr.

Cardwell's employment, did you ever hear anything about Mr. Cardwell contacting Louis Goldberg

about how his experiences at Davis Polk had made him physically ill?  A:  The only thing I recollect

was the event in June where he stated he needed a leave of absence.  My recollection was because he

felt stress.  I don't remember the physically ill part but I do remember him requesting a leave of

absence based on what stress he had.").  Cardwell also points to the fact that, after Goldberg and

Crane met with Cardwell after Cardwell sent Goldberg the email about becoming ill, Crane emailed

Bick to say that "Louis [Goldberg] and I spoke to [Cardwell] today I can [sic] fill you in tomorrow at

your convenience."  Defs.' Answer ¶ 459.  Given that fact, and Bick's testimony concerning his

knowledge about Cardwell's leave of absence, a reasonable juror could conclude that he had

knowledge of the May 2017 complaint.

### iii.   Adverse Employment Action and Causal Connection

#### 1.   Legal Standard

To establish his *prima facie* case under Title VII, Section 1981, and the NYSHRL, Cardwell

must also show "an adverse employment action" and "a causal connection between the protected

activity and the adverse employment action" to plausibly allege a retaliation claim.  *Littlejohn*, 795

F.3d at 316.  "The Supreme Court has held that in the context of a Title VII retaliation claim, an

adverse employment action is any action that 'could well dissuade a reasonable worker from making

or supporting a charge of discrimination.'"  *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57).

"This definition covers a broader range of conduct than does the adverse-action standard for claims

of discrimination under Title VII:  'The antiretaliation provision, unlike the substantive

discrimination provision, is not limited to discriminatory actions that affect the terms and conditions

of employment.'" *Id.* (quoting *Burlington*, 548 U.S. at 64) (brackets omitted).  But "[a]ctions that are 'trivial harms'—*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68).

Finally, while the NYCHRL does not require that a plaintiff demonstrate an adverse employment action, he or she still must show that after finding out about a protected activity, "his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and . . . there is a causal connection between the protected activity and the alleged retaliatory conduct." *Reichman v. City of New York*, 117 N.Y.S. 3d 280, 286 (2d Dep't 2020).

## 2.  **Application**

Because Cardwell has sufficiently shown that Davis Polk, Brass, Reid, and Bick each had knowledge of at least one protected activity,[14] the final step in his *prima facie* case is to connect this knowledge to an adverse employment action or retaliatory conduct.  *See Littlejohn*, 795 F.3d at 316; *Reichman*, 117 N.Y.S. 3d at 286.  Cardwell specifies a total of eleven purported adverse actions:  (1) reductions in his billable hours and being staffed on inappropriate matters, (2) his termination, (3) Chudd's November 2015 summary review form, (4) Hudson's 2016 "behind" reviews, (5) Bick's June 2016 mid-year review, (6) increased scrutiny and placement on a "low" performers list, (7) Reid's March 2017 comment about taking Cardwell off the field, (8) revocation of Cardwell's Career Advisor mentorship, (9) negative post-EEOC 2017 reviews and Cardwell's annual review meeting in January 2018, (10) Davis Polk's NYSDHR brief, and (11) revocation of Cardwell's membership with the Firm's Alumni Network.  Pl.'s Opp'n at 9–10.

---

[14] In sum, Cardwell has shown (or Defendants have admitted) that:  (1) Davis Polk had knowledge of each protected activity, (2) Brass had knowledge of the August 2017 complaint, (3) Reid had knowledge of the January 2016, March 2017, August 2017, and January 2018 complaints, and (4) Bick had knowledge of the March 2017, May 2017, August 2017, and January 2018 complaints.  *See supra* Part (III)(B)(2)(a)(ii).

Actions (3), (4), (8), (10), and (11) need not be evaluated at length here. First, because Cardwell has failed to show that Chudd had any knowledge of any protected activity or that anyone with such knowledge influenced his summary review, his November 2015 summary review form (alleged adverse action #3) cannot constitute retaliation. The same is true for Hudson's 2016 reviews (alleged action #4); because Cardwell has not shown she had knowledge of his protected activities, or that anyone with knowledge influenced her reviews, these reviews cannot have been retaliatory. *See Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 350 (S.D.N.Y. 2009) ("[A] causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity.") (quoting *Gordon v. Marquis*, No. 3:03-cv-1244, 2007 WL 987553, at *10 (D. Conn. Mar. 31, 2007)). Nor could any reasonable jury find that filing the NYSDHR brief (alleged action #10) constitutes an adverse employment action; Cardwell points to no authority to the contrary and as Davis Polk reasonably responds: "[T]he Firm had a legal obligation to respond [to Cardwell's EEOC and NYSDHR charge] and the right to defend itself." Reply at 19.[15]

Further, the evidence supporting Cardwell's eighth alleged adverse action—the supposed "revocation of Career Advisor mentorship," Pl.'s Opp'n at 9—simply does not support his characterization of that action. Cardwell notes that Bick and Butler were assigned to be his advisors under the program, but that Cardwell did not receive any communications from Bick or Butler about the program while they served in that role. Pl.'s 56.1 Counterstatement ¶¶ 729–733. But the Davis Polk lawyer's handbook states that "[a]ssociates who are interested in more information about potential job opportunities should contact their [Career] Advisor." Jeffries Decl. Ex. 11 at 135. That procedure, for better or worse, clearly put the onus on *associates* to reach out to advisors

---

[15] As evidenced by the Court's decisions regarding the lack of evidentiary support for Cardwell's discrimination claims, moreover, it was not inappropriate for Defendants to defend themselves.

concerning external career opportunities, not the other way around.  And Cardwell does not allege that Bick or Butler ever neglected to respond to his queries, only that they did not affirmatively reach out to him.  Because Cardwell has not demonstrated that this is unusual under what the evidence shows to be Davis Polk's normal procedure, no reasonable jury could find that it constituted a retaliatory action.

Additionally, the revocation of Cardwell's membership with the Firm's Alumni network (alleged action #11) will not be considered because Cardwell failed to raise it in his complaint. Courts in this district have refused to consider new allegations and claims raised for the first time in an opposition to a motion for summary judgment.  *See, e.g., Scott v. City of New York Dep't of Corr.*, 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (limiting consideration to "far narrower" retaliation claims alleged in complaint, rather than unpleaded retaliation claims raised in plaintiff's opposition to motion for summary judgment), *aff'd sub nom.* 445 F. App'x 389 (2d Cir. 2011); *see also Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings."); *Bonnie & Co. Fashions v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.").  Accordingly, this alleged adverse action cannot underlie his retaliation claims.

Finally, alleged action #7 (Reid's comment that if Cardwell did not "let things go" he would be "out of the game," Dkt. No. 260 Ex. 117 at 416:12–20) is properly viewed not as an independent adverse action but rather as a fact that may raise an inference that the other adverse actions listed by Cardwell were taken for retaliatory reasons.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 423 (2011) (viewing a comment that a supervisor was trying to "get rid of" an employee because of his military obligations as raising an inference of discriminatory animus, not as an independent adverse action).

So that comment will be considered below as part of the pretext analysis for other adverse actions taken by Defendants.

Each of the remaining actions constitutes an adverse employment action for purposes of Title VII, Section 1983, and the NYSDHR (and thus necessarily satisfies the NYCHRL's lower bar) because a reasonable jury could find that each, if taken in response to protected conduct, "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57); *see also id.* at 85 (noting that "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities' . . . [or] the assignment of 'a disproportionately heavy workload' can constitute" adverse employment actions, which goes beyond the standard needed for a retaliation claim) (first quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003), then quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)); *United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 407 (S.D.N.Y. 2018) ("Negative evaluations may be considered adverse where the evaluation negatively impacted [the] plaintiff's employment." (internal citation omitted)).

Because—as explained below, *see* Part III(B)(2)(b)—Defendants can provide a legitimate, non-discriminatory explanation for each of the remaining adverse actions, for the sake of efficiency, the Court will assume without deciding that Cardwell could establish the remaining elements of his *prima facie* case as to these actions. *See Sattar*, 129 F. Supp. 3d at 138. Accordingly, the Court will proceed by analyzing Defendants' purported non-discriminatory reasons for its actions, and then move on to examining whether Plaintiff can reasonably demonstrate that these stated reasons are pretextual.

### b. Legitimate, Non-Discriminatory Reasons

Defendants have met their burden to offer legitimate, non-discriminatory reasons for each

of Plaintiff's remaining adverse actions.  For Cardwell's reduction in billing hours, poor reviews, and ultimate termination, Defendants have proffered Cardwell's poor performance as a non-discriminatory rationale.  *See Ramsaran*, 2015 WL 5008744, at \*7; *supra* Part III(A)(2)(a) (outlining the evidence provided by Defendants of Cardwell's poor performance).  As to Cardwell's placement on the so-called "low performance list," Defendants have argued that the list was part of the Firm's attempt to keep "abreast of the performance and experience of associates of various diverse backgrounds."  Reply at 8; *see* Buergel Decl. Ex. 75 at 16–17 (providing a response to Plaintiff's interrogatory to that effect).  And Defendants allege that Bick's mid-June 2016 review was motivated by Cardwell's December 2015 request for additional feedback and by concerns about Cardwell's performance.  Reply at 9 n.12; *see* Pl.'s 56.1 Response ¶¶ 68, 79–81, 191, 194–196.  Each of these represent "legitimate, non-retaliatory reason[s] for the action that the plaintiff alleges was retaliatory."  *Fincher*, 604 F.3d at 720.  So the Court will proceed to analyzing whether Cardwell can "show that retaliation was a substantial reason for the complained-of action"—that is, that the employer's proffered non-retaliatory rationales are pretextual.  *Id.*

### c.  Pretext

#### i.  Legal Standard

At the pretext stage, a plaintiff must provide "facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that 'the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for [retaliation].'"  *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. Mar. 25, 2010) (summary order) (all alterations in original) (quoting *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125 n.11 (2d Cir. 2008)).

Under Title VII, Section 1981, and the NYSHRL, "a plaintiff alleging retaliation . . . must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845

(quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013)); *see Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271 n.3 (2d Cir. 2016) (standards for retaliation claims are the same under Title VII and the NYSHRL); *Littlejohn*, 795 F.3d at 315 (same as to Title VII and Section 1981).  "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Zann Kwan*, 737 F.3d at 846.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."  *Id.*

The causation standard is lower under the NYCHRL:  Summary judgment is inappropriate if a reasonable jury could conclude that "the defendant's stated reasons were not its *sole* basis for taking action," i.e., that "its conduct was based at least '*in part* on discrimination [or retaliation].'"  *Ya-Chen*, 805 F.3d at 76 (quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 41 (1st Dep't 2012) (emphases added)).  In other words, unlike Title VII, Section 1981, and the NYSHRL, the NYCHRL uses a "mixed-motive" standard whereby pretext is demonstrated if the plaintiff can show that retaliation played *any* role in the defendants' alleged adverse actions.

Finally, under any applicable statute, while temporal proximity between a protected complaint and an adverse employment action can help support a plaintiff's pretext argument, proximity standing alone "is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."  *Id.* at 72 (quoting *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam)); *see Maynard v. Montefiore Med. Ctr.*, No. 18-cv-8877, 2021 WL 396700, at *12 & n.16 (S.D.N.Y. Feb. 4, 2021) (rejecting a retaliation claim under the NYCHRL, as under the NYSHRL, "where timing is the only basis for a claim of retaliation," and collecting other cases

doing the same (brackets omitted)).

### ii.  Application

Because the evidence could lead a reasonable jury to conclude that Defendants' stated reasons for their adverse action were a pretext for retaliation, Defendants' motion for summary judgment as to those claims will be denied.  Specifically, a reasonable jury could conclude that Cardwell's ultimate termination—in which Brass, Reid, and Bick participated—was motivated by retaliatory animus.[16]

Cardwell has introduced direct evidence that individuals at Davis Polk viewed his complaints as threatening, which a jury could find supports an inference of retaliation.  First, Cardwell has testified that, after he raised complaints about racial discrimination at the March 29, 2017 meeting (the March 2017 complaint), Reid "became visibly agitated" and "extremely serious" before telling Cardwell that if he "did not let things go" or "stop making these inquiries," that he "would be . . . out of the game" or "off the field."  Dkt. No. 260 Ex. 117 at 416:12–20.  Second, Bick stated in his testimony that after Cardwell filed his EEOC complaint (the August 2017 complaint), people at the firm "recognized" that "if [Cardwell] went public with his complaints, there would be news coverage and [people] could have [their] reputation harmed through these complaints."  Dkt. No. 259 Ex. 105 at 212:3–16.[17]  A reasonable jury could view these facts as evidence that Davis Polk was concerned

---

[16] Reid and Bick were both on the Management Committee that Bick testified helped make the decision to deliver Cardwell the "time to go" message.  Jeffries Decl. Ex. 4 at 284:23–287:5.  While Brass was not on that committee, he indicated in his declaration that he "participated in discussions in early 2018" regarding the difficulty of staffing Cardwell.  Brass Decl. ¶ 34.  And Bick indicated both that the discussions "that led to the decision to terminate Mr. Cardwell" occurred in "the January/February time frame of 2018," and that "everyone who had input" into Cardwell's performance participated in those "group discussion[s]."  Jeffries Decl. Ex. 4 at 284:23–287:5.  From these facts, a jury could reasonably infer that Brass participated in the decision to terminate Cardwell's employment such that he could be held liable for it (if that decision was retaliatory).

[17] To be sure, both Reid and Bick take issue with these constructions of the relevant facts.  *See* Jeffries Decl. Ex. 7 at 241:15–242:23 (Reid casting his statement about being taken off the field as a motivational tactic); Dkt. No. 259 Ex. 105 at 212:22–23 (Bick stating:  "I didn't say [Cardwell was a] threat.").  But the Court must resolve any factual disputes in Cardwell's favor.  *See M.A.*, 53 F.4th at 35.

about Cardwell's complaints of race discrimination, and was therefore motivated (by retaliatory animus) to terminate Cardwell.

There is also other evidence a reasonable juror could view as casting doubt on Davis Polk's reliance on Cardwell's poor performance as an explanation for his firing.  *See Fleming*, 371 F. App'x at 117 (noting that pretext can be shown by establishing that "the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for [retaliation]").  For instance, in its brief to the NYSDHR, the Firm described Cardwell's reviews from his first rotation as follows:

> Senior lawyers in the Credit group who worked with Cardwell noted performance issues that were troubling.  For example, and among other issues, senior Credit attorneys noted that Cardwell was "on the slow side in producing drafts," and took "longer than expected to complete certain tasks."  [Citation omitted.]  Cardwell came "to incorrect conclusions that often require[d] his work to be redone," and his work product "need[ed] improvement." [Citation omitted.]  He neglected to "ask questions when he does not understand," and "even when offered assistance," declined it.  And although Cardwell was "easygoing" and "proactive in offering help," he neglected the "simpler matters"—the domain of the junior associate on a team tasked with completing a client assignment, as explained in detailed memoranda distributed to new associates at the start of each rotation.  Cardwell was not sufficiently "prompt to respond and act."  [Citation omitted.]

> *The Firm delivered this feedback to Cardwell at the end of his Credit rotation*, as part of its routine professional development and training initiatives.  A partner from the Credit group, Jason Kyrwood, met with Cardwell to discuss his performance and the areas that needed improvement.  Cardwell, according to a contemporaneous note, accepted the feedback and agreed.  [Citation omitted.]

NYSDHR Brief at 6 (emphasis added).  However, the language quoted in the NYSDHR brief came from various reviews that were not delivered to Cardwell.  Instead, as per Davis Polk's process, they were given to a partner (in this case, Kyrwood) who created a "summary review" to be shared with Cardwell.  *See* Buergel Decl. Ex. 9.  And that review stated as to Cardwell:

> Generally positive - organized, high quality work, good attention to detail, hard worker.  Some notice that he is a little slow in turnaround time and thought would benefit from asking more questions.  Also he should take more initiative[.]

*Id.* at 37.  That the Firm appears to have, at the least, overstated the extent to which early poor performance reviews were contemporaneously communicated to Cardwell could lead a reasonable

jury to doubt the Firm's broader statements that Cardwell's performance was, in fact, disappointing from the start.  *See* NYSDHR Brief at 5 ("Cardwell has suffered from persistent, demonstrated performance problems throughout his tenure at Davis Polk. . . .  Although these problems repeatedly have been communicated to Cardwell, his performance has not improved over time.").

Other evidence could similarly undercut the Firm's statement that, even as of 2016, Cardwell's performance was so poor "that it would have warranted giving Cardwell a message that it was time for him to look for another job" at that time.  *Id.* at 10.  For instance, in their March 2017 meeting, Reid told Cardwell that the Firm "had dropped the ball" "with respect to issues related to [Cardwell's] staffing," rather than blaming it on Cardwell's poor performance.  Dkt. No. 260 Ex. 117 at 397:19–23.  And while Defendants focus on the negative reviews that Cardwell received, many of the statements in the record about Cardwell's performance at Davis Polk before he filed his EEOC complaint were either positive or neutral.  *See, e.g.*, Buergel Decl. Ex. 9 (Cardwell's mid-2016 reviews, where Cardwell was rated as "with" his class by four of six reviewers (one did not provide a rating), that included statements like:  "Kaloma did an excellent job on a difficult diligence assignment summarizing the terms of a credit card affiliation agreement.  His work was thoughtful and comprehensive.  I look forward to working with him again" and "Kaloma worked on preparing a chart outlining statements made in a legal complaint, statements made by the same party in the press and the arb spread at the same time.  I appreciated his enthusiasm for the assignment and diligent research of relevant press articles.  I also thought that he worked well calculating and incorporating the arb spread into the analysis").

All of this evidence could support a conclusion that Cardwell's performance was not viewed particularly negatively by the Firm until he filed his EEOC complaint.  Indeed, before Cardwell filed that complaint in August 2017, no M&A partners—and no one at all, apart from Hudson—had filed

a review ranking Cardwell as "behind" his class.[18]  But in the three months following the EEOC

complaint, four M&A partners (Hochbaum, Mills, Goldberg, and Amorosi) all rated Cardwell as

"behind" his class, and those reviews formed part of the basis for Cardwell's termination.  Defs.'

Answer ¶¶ 486, 488.

In addition to moving for summary judgment on all of Plaintiff's claims, Defendants also

To be sure, Davis Polk has supplied ample evidence about concerns with Cardwell's

performance that existed throughout his time at the Firm.  *See supra* Part III(A)(2).  But a reasonable

jury could view the evidence undercutting the Firm's stated explanation for Cardwell's termination,

together with the above-described direct evidence of retaliatory motive and the fact that Cardwell

was given a "time to go" message only months after his EEOC filing, as sufficient to show that but

for Defendants' retaliatory motives, Cardwell would not have been fired.  *See Zann Kwan*, 737 F.3d at

845.  Accordingly, Defendant's motion for summary judgment is denied as to Cardwell's retaliation

claims (with respect to those Defendants who had knowledge of his complaints).

### C.  Damages

In addition to moving for summary judgment on all of Plaintiff's claims, Defendants also

contend that because "Cardwell's theory of damages . . . has no basis in fact or law," it

"independently warrants dismissal on summary judgment."  Defs.' Mem. at 52.  Courts have the

power to separate the issues of liability and damages and grant summary judgment as to either.  *Howe*

*v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 472 (S.D.N.Y. 2011); *see also Jewell-Rung Agency, Inc. v.*

*Haddad Org., Ltd.*, 814 F. Supp. 337, 339 (S.D.N.Y. 1993) ("Courts have granted motions for

summary judgment to limit damages while leaving issues of liability for trial."); Fed. R. Civ. P. 56(g)

(allowing a court, if it "does not grant all the relief requested by the [summary-judgment] motion,"

---

[18] Chudd, in September 2015, had written in his review that his "impression is that [Cardwell] *may* be 'behind' in his class, although because my impression is based off of third party accounts, I do not feel totally confident with this determination."  Buergel Decl. Ex. 9 at 9 (emphasis added).  But he wrote "no basis"—not "behind"—as his answer to the question of whether he felt Cardwell was "performing materially behind, with or ahead of [his] class."  *Id.*

to "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case").

Cardwell seeks six categories of damages:  (1) approximately $2,030,000 in backpay damages (2) at least $20,000,000 in frontpay damages, (3) approximately $2,800,000 in compensatory damages, (4) between $14,000,000 and $28,000,000 in punitive damages, (5) at least $10,000 in attorney's fees, and (6) further legal and equitable relief that this Court deems proper.  Pl.'s 56.1 Response ¶ 218.

### a.  Backpay and Frontpay Damages

The Court will grant Defendants' motion as to Cardwell's backpay and frontpay damages because Cardwell has not introduced any evidence that he attempted to mitigate his damages. Cardwell seeks approximately $2,030,000 in backpay damages (i.e., damages for lost income) and approximately $20,000,000 in frontpay damages (i.e., damages for lost future earnings).  Buergel Decl. Ex. 74 at 11–12.  A plaintiff seeking frontpay or backpay damages under Title VII, Section 1981, the NYSHRL, or the NYCHRL has a duty to mitigate damages.  *E.E.O.C. v. Bloomberg, L.P.*, 29 F. Supp. 3d 334, 340 (S.D.N.Y. 2014) ("Under Title VII, the NYSHRL, and the NYCHRL, a victim of discrimination has a duty to mitigate backpay damages."); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 95 (E.D.N.Y. 2020) (finding that "[a] prevailing plaintiff forfeits her right" under Title VII, the NYSHRL, and the NYCHRL, to "front pay if she fails to mitigate damages by not using reasonable diligence in finding other suitable employment" (quoting *Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08-cv-10283, 2009 WL 2611950, at *3 (S.D.N.Y. Aug. 18, 2009))); *Jowers v. DME Interactive Holdings, Inc.*, No. 00-cv-4753, 2006 WL 1408671, at *10 (S.D.N.Y. 2006) (finding, in a Section 1981 case, that "a victim of employment discrimination has the duty to mitigate his damages by "us[ing] reasonable diligence in finding other suitable employment" (alternation in original) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir.1992)).

"Generally, an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate" by "establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." *Broadnax v. City of New Haven*, 415 F. 3d 265, 268 (2d Cir. 2005) (quoting *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997)). But an "exception to this general rule" applies by which "an employer 'is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment.'" *Id.* (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998)).

Here, Defendants have shown that Cardwell made no reasonable efforts to seek any comparable, suitable work. Specifically, it is uncontested that Cardwell did not apply to *any* jobs in the period between when he was given the "time to go" message and his last day at the Firm, and has not applied to any jobs since. Pl.'s 56.1 Response ¶ 243; *see* Buergel Decl. Ex. 1 at 222:16–21, 228:23–229:3, 243:2–9. Cardwell is also no longer a member of the New York bar, further supporting the conclusion that he has not sought legal employment since leaving the Firm. Pl.'s 56.1 Response ¶ 244.

In short, there is no record evidence that Cardwell has made *any* effort to find *any* employment since leaving Davis Polk. That establishes, as a matter of law, that there is no triable issue of fact as to whether Cardwell made a reasonable effort to seek comparable employment. *See, e.g.*, *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, No. 09-cv-1251, 2015 WL 13699239, at *3–4 (S.D.N.Y. Mar. 25, 2015) (granting a motion for summary judgment based on a plaintiff's failure to mitigate damages even where the plaintiff "contact[ed] a recruiting firm, review[ed] newspaper classifieds, and [made] a handful of phone calls to former colleagues").

Cardwell's response is unpersuasive. He points first to *Ackerman v. National Financial Systems*, 81 F. Supp. 2d 434 (E.D.N.Y. 2000), which held that "[w]hile [an] alleged failure to mitigate may be

pressed by the defendants at the trial, at this juncture there cannot be a determination, as a matter of law, to preclude the plaintiff from seeking back-pay." 81 F. Supp. 2d at 439.  But the *Ackerman* court did not explain its reasoning, and its implication—that mitigation cannot be resolved on summary judgment—stands against the weight of authority.  *See, e.g.*, *Mihalik*, 2015 WL 13699239, at *3–4; *Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 314 (S.D.N.Y. 2009) (likewise resolving the question of mitigation on summary judgment).  And in any event, given Cardwell's testimony and the uncontested record that he did not seek any employment at any time after leaving Davis Polk, the question of mitigation in this case is particularly well-suited to resolution at this stage.  *See* Fed. R. Civ. P. 56(g) (allowing a court to enter orders resolving any material fact, including those related to damages, that are not genuinely in dispute).

Cardwell's primary other response is that he was not required to mitigate damages if such mitigation would have been futile.  Pl.'s Opp'n at 51–52.[19]  But he offers no evidence in support of his conclusion that attempting to find employment would have been futile.  And the primary case to which he points on futility, *Thomas v. Medco*, No. 95-cv-8401, 1998 WL 542321 (S.D.N.Y. Aug 26, 1998), is inapposite.  There, the court upheld a jury award of damages because the plaintiff gave admittedly conflicting testimony regarding her attempt to mitigate damages, and the court recognized that the jury may have credited her trial testimony over statements made at her deposition.  *Thomas*, 1998 WL 542321, at *18.  Only after that conclusion did it note that the jury, based on the evidence presented at trial, might have concluded that searching for a job would have been futile.  *Id.*  But here, Cardwell has not pointed to evidence that could lead a reasonable jury to find that his attempting to search for a job would have been futile, particularly given his admitted

---

[19] Cardwell also states that Defendants should be equitably estopped from advancing a mitigation argument.  Pl.'s Opp'n at 52–53.  But he does not adequately explain—as he must in order to evoke an estoppel argument—how his complete failure to mitigate could have reflected reasonable reliance on any misrepresentations of fact made by Defendants.  *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706 (2d Cir. 2001).

total failure to mitigate (as opposed to the conflicting testimony on that issue in *Thomas*). Accordingly, the Court grants Defendants' motion for summary judgment as to Cardwell's claims for frontpay and back pay damages.[20]

### b. Compensatory Damages

The Court will deny Defendants' summary-judgment motion as to Cardwell's claimed compensatory damages. Cardwell seeks approximately $2,800,000 in compensatory damages. Buergel Decl. Ex. 74 at 12. These damages include claimed reputational harm and emotional distress. Pl.'s Opp'n at 54–56.

Defendants first argue that, for his compensatory damages claim, Cardwell inappropriately relies on statements made after he filed the lawsuit, which cannot form the basis for damages. *See Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 311 (S.D.N.Y. 2015) (holding that post-termination litigation conduct generally does not constitute an adverse action as a matter of law). But regardless of the merit of that argument, Cardwell does not limit his reputational or emotional damages to the effects of the aforementioned press release. Rather, he claims compensatory damages "[a]s a result of Defendants' conduct, *and as exacerbated* by false, created-for-litigation statements to the press concerning Plaintiff's alleged performance and abilities as an attorney" (i.e., the press release). Buergel Decl. Ex. 74 at 12 (emphasis added). This claim clearly contemplates pointing to Defendants' conduct broadly, and not just post-litigation actions, as the foundation for Cardwell's claimed compensatory damages. *See also* Jeffries Decl. Ex. 1 at 302:19–307:24 (describing

---

[20] The Court accordingly need not reach Defendants' alternate arguments as to why frontpay and back pay damages should be barred. *See* Defs.' Mem. at 53–54 (arguing that Cardwell's assertion undergirding his frontpay damages claim—that he would have become a partner at Davis Polk—is speculative); *id.* at 56 (arguing that his Cardwell's assumption that he would have remained at Davis Polk for eight years is also speculative). That said, Cardwell's sought damages *are* highly speculative. In particular, Cardwell's claim that he would have become a partner at the firm, notwithstanding his middling reviews and low tally of billable hours, is unsupported by the factual record. Underscoring the unlikelihood of Cardwell's contention, Davis Polk's expert witness has offered unrebutted testimony that only 2.7%–5.7% of Davis Polk associates in the classes for 2009 to 2012 were promoted to partner. Defs.' 56.1 Statement ¶ 256(a). Simply put, Cardwell has presented no evidence that supports his conclusion that he would have made the cut.

Cardwell's reputational concerns even before the press release).

Nor should Cardwell's emotional distress damages be dismissed because they are supported, at this time, solely by his own testimony.  "A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages." *Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002).  But such an award can be supported by "other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress . . . or the objective circumstances of the violation itself." *Id.*  "Evidence that a plaintiff has sought medical treatment for the emotional injury, while helpful . . . is not required . . . ." *Id.*

Cardwell has proffered his own testimony on alleged emotional distress damages, and has supported them with an account of the alleged underlying violations that, he says, caused them.  *See* Pl.'s Opp'n at 54.  There is thus no cause to find, as a matter of law at this stage, that Cardwell could not prove up his claimed emotional distress damages at trial.[21]  The jury will be in the best position to evaluate—if any Defendants are found liable at trial—whether the fact that Cardwell has never sought help from a professional for his purported emotional distress means that his claim for $2,800,000 in emotional distress and reputational damages should be reduced or eliminated.  *See* Defs.' Mem. at 58 (questioning Cardwell's evidence on this topic).  Accordingly, the Court denies Defendants' motion for summary judgment concerning Cardwell's claimed compensatory damages.

### c.  Punitive Damages

The Court will not dismiss Cardwell's punitive damages claim.  Cardwell seeks between $14,000,000 and $28,000,000 in punitive damages.  Buergel Decl. Ex. 74 at 12.  Punitive damages are

---

[21] For the same reason, granting Defendants' alternate request—to limit Cardwell's compensatory damages to those of a "garden variety," *see* Reply at 23 n.35—would also be inappropriate.  Plaintiff's lead case on this issue is not to the contrary:  It involved a court deciding that only garden-variety damages were appropriate in the context of an entry of default judgment, where the court *had* to determine the damages amount.  *Cartagena v. Providence Constr. Corp.*, No. 14-cv-7357, 2017 WL 9286986, at *4 (E.D.N.Y. May 1, 2017), *report & recommendation adopted*, 2018 WL 2088004 (E.D.N.Y. May 3, 2018).  That is an entirely different scenario than here, where a jury will be able to assess the evidence and make a damages determination for themselves.

available where a plaintiff "present[s] evidence that the employer discriminated (or retaliated) against him with 'conscious knowledge it was violating the law,' or that it engaged in 'egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn.'" *Tepperwein*, 663 F.3d at 573 (quoting *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 102 (2d Cir. 2001)); *see also Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010) ("A punitive damages instruction is appropriate when the plaintiffs have produced evidence that 'the defendant's conduct is . . . motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others,' or, in other words, when the plaintiffs have produced evidence of 'a positive element of conscious wrongdoing' or 'malice.'" (quoting *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121-22 (2d Cir. 2006)).

Given the posture of this case, dismissing Cardwell's punitive damages claim now would be imprudent. For one thing, given the Court's determination that Cardwell may seek compensatory damages, dismissing punitive damages would do little to narrow the scope of the liability phase of trial. For another, Cardwell has adduced some evidence relevant to the question of whether Davis Polk or other Defendants' acted with "conscious knowledge [they were] violating the law"; Cardwell could introduce more at trial. *Tepperwein*, 663 F.3d at 573; *see, e.g.*, Dkt. No. 260 Ex. 117 at 416:12–20 (Cardwell's testimony that Reid told him, if Cardwell did not stop making complaints, that Cardwell would be "off the field," which—if viewed as Cardwell views it—might be seen as probative of the question of Defendants' intent to violate Cardwell's rights). As other Courts have similarly determined, until "after submission of the proof at trial," it is impossible to fully assess whether the evidence supports a claim for punitive damages. *Taylor v. Polygram Recs.*, No. 94-cv-7689, 1999 WL 124456, at *24–25 (S.D.N.Y. Mar. 8, 1999). And if the evidence does support at least submitting that issue to the jury, it is the jury that will be in the best position to determine whether such damages are warranted. So Defendants' motion for summary judgment is denied as to Cardwell's

punitive damages claims at this time.

### d.   Attorney's Fees and Further Relief

Finally, the Court will not dismiss Cardwell's request for attorneys' fees or further relief.  *See* Buergel Decl. Ex. 74 at 13 (maintaining his request, in the TAC, for attorneys' fees and injunctive relief).  The Court does not understand there to be any dispute that Cardwell is only "entitled to attorney's fees" if he achieves "success on the merits," making resolution of this issue on summary judgment unnecessary.  Defs.' Mem. at 60.[22]  And while the Court recognizes that Plaintiff is not seeking reinstatement, *see id.*, it declines to categorically limit its own ability to grant Cardwell "further legal and equitable relief as this Court deems necessary, just, and proper" if such relief is warranted.  Buergel Decl. Ex. 74 at 13.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  First, Defendants' motion is granted as to Plaintiff's aiding-and-abetting claims—counts six, eight, ten, and twelve.  Second, Defendants' motion is granted as to Plaintiff's discrimination-based claims—counts one, three, five, and nine.  Third, Defendants' motion is denied as to Plaintiff's retaliation-based claims—counts two, four, seven, and eleven.  However, for the reasons explained above, because William Chudd, Sophia Hudson, Harold Birnbaum, Brian Wolfe, and John H. Butler did not have requisite knowledge to take retaliatory action against Plaintiff, they are not subject to liability on these (or any) claims and will be dismissed from the case.  Finally, Defendants' motion is granted as to Plaintiff's claimed frontpay and backpay damages but denied as

---

[22] By raising the issue, Defendants appear to be attempting to preliminarily argue what constitutes "success on the merits."  *See* Defs.' Mem. at 60 n.71 ("Even in the event of an award of nominal damages, plaintiff would not be entitled to fees here.").  That question is best left to any applicable post-trial motions.  On a separate note, however, the Court does observe that Plaintiff's counsel and Cardwell himself have both sworn that counsel is acting *pro bono* and without any contingent fee arrangement.  *See* Dkt. No. 141 Ex. 1 ¶ 1 (Cardwell's counsel representing that he is acting *pro bono*); Dkt. No. 141 Ex. 2 ¶ 11 (Cardwell representing that his counsel is working *pro bono*, without "any formal or informal contingency fee arrangement").  Again, the Court finds it prudent to wait until after trial to address what effect, if any, these stipulations would have on a request for attorneys' fees.

to Plaintiff's claimed compensatory damages, punitive damages, attorneys' fees, and further relief.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 220 and to remove William Chudd, Sophia Hudson, Harold Birnbaum, Brian Wolfe, and John H. Butler from the caption of this case.

SO ORDERED.

Dated:  February 16, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge