**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KALOMA CARDWELL,** | |
| Plaintiff, | |
| **v.** | |
| **DAVIS POLK & WARDWELL LLP, Thomas Reid, John Bick, and Daniel Brass,** | **1:19-cv-10256-GHW** |
| Defendants. | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* RE: SPOLIATION OF EVIDENCE</u>

Dated: September 15, 2023

David Jeffries, Esq.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Tel: 212-601-2770
djeffries@jeffrieslaw.nyc

*Attorney for Plaintiff*

# TABLE OF CONTENTS

**Page**

OVERVIEW ................................................................................................................... 1

LEGAL STANDARD .................................................................................................... 3

MOTION *IN LIMINE* #1

   I.   SANCTIONS FOR SPOLIATION OF EVIDENCE BY
       DAVIS POLK, THOMAS REID, AND JOHN BICK ................................................ 6

      A.  Introduction.................................................................................................... 6

      B.  Legal Standard .............................................................................................. 7

      C.  Argument ...................................................................................................... 7

           1.  Relevant Records Related to Hudson and Cardwell's
               Third Rotation Existed........................................................................ 7

           2.  Davis Polk, Reid, and Bick Understood their
               Duty to Preserve and Knew When It Arose.......................................11

               i.  General Knowledge of Duty to Preserve.......................11

              ii.  Davis Polk, Reid, and Bick Had Knowledge
                     of At Least Eight Triggering Events that
                     Created a Duty to Preserve Hudson's
                     Records.......................................................................13

           3.  Davis Polk, Reid, and Bick Failed to Take
                Reasonable Steps to Preserve Hudson's Records,
                and Cardwell Was Prejudiced..........................................................16

           4.  Davis Polk, Reid, and Bick Intended to Deprive
               Cardwell of Evidence, and Did So to Gain
               Advantages In Litigation..................................................................19

      D.  Conclusion...................................................................................................29

MOTION *IN LIMINE* #2

   I.   SANCTIONS FOR SPOLIATION OF EVIDENCE BY
       DAVIS POLK, THOMAS REID, AND JOHN BICK...........................................30

      A.  Introduction.................................................................................................30

      B.  Legal Standard.............................................................................................30

      C.  Argument.....................................................................................................30

           1.  The Evidence Indicates an Individual Review for
               Cardwell from Kreynin Existed, But Was Not Produced
                with the Intent to Deprive Cardwell of Such Evidence.....................31

           2.  Conclusion.........................................................................................37

CONCLUSION…….....…....…………………….…….…....…………………………….......40

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*,
    *473 F.3d 450 (2d Cir. 2007)*…………………………………….………………………………….3

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
    757 F.2d 523 (2d Cir. 1985)…………………………...………..…………………..……7

*Castro v. Smith*,
    2023 WL 5371311, at *5 (S.D.N.Y. August 22, 2023)………………………...……..…..4, 5

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
    2021 WL 4190628, at *18 (S.D.N.Y. Aug. 18, 2021)…………………………………….5, 29

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011) …………………...………………….……...…..19

*Charlestown Cap. Advisors v. Acero Junction, Inc.*,
    337 F.R.D. 47 (S.D.N.Y. 2020)……...……………………………………...…..4, 5, 16, 29

*Conklin v. Cnty. of Suffolk*,
    No. 09 Civ. 3014, 2012 WL 1560390, at *17 (E.D.N.Y. May 3, 2012)...……..……………40

*Cruz v. G-Star Inc.*,
    2019 WL 4805765, at *11 (S.D.N.Y. Sept. 30, 2019)…………………………………….11

*Europe v. Equinox Holdings, Inc.*,
    92 F.Supp.3d 167, 178 (S.D.N.Y. 2022)……………...……………………………….6, 30

*Farella v. City of New York*,
    No. 05-CV-5711, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007)………………………..4

*Fashion Exch. LLC v. Hybrid Promotions, LLC*,
    2021 WL 1172265, at *6 (S.D.N.Y. Mar. 29, 2021)……………………..………………...5

*Fujitsu Ltd. v. Federal Exp. Corp.*,
    247 F.3d 423 (2d Cir. 2001)…………………………………………………………...11

*Hollis v. CEVA Logistics U.S., Inc.*,
    603 F.Supp.3d 611 (N.D. Ill. 2022)…..………………………...………………...……..29

*Karsch v. Blink Health Ltd.*,
    2019 WL 2708125, at *21 (S.D.N.Y. June 20, 2019)………...…….…………………...5

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
  No. 15-CV-9363, 2018 WL 1512055, at *9 (S.D.N.Y. Mar. 12, 2018)...………...…………...5

*Martinez v. Davis Polk LLP*,
  208 F.Supp.3d 480 (E.D.N.Y. 2016) …………………………………...………………...20-22

*Moody v. CSX Transp., Inc.*,
  271 F. Supp. 3d 410 (W.D.N.Y. 2017)…………………………….......…………..5, 23, 29

*Mugavero v. Arms Acres*,
  2009 WL 1904548, *4 (S.D.N.Y. July 1, 2009)…..…………..….............……...…………...7

*Orbit One Commc'ns, Inc. v. Numerex Corp.*,
  271 F.R.D. 429 (S.D.N.Y. 2010)……………………………...............……...………...11

*Ottoson v. SMBC Leasing & Fin., Inc.*,
  268 F. Supp. 3d 570 (S.D.N.Y. 2017)…………………….………….……...………...5, 29

*Prelvukaj v. Naselli*,
  2023 WL 3570659, at *7 (S.D.N.Y. May 18, 2023).…………………..………...………...6

*R.F.M.A.S., Inc. v. So*,
  271 F.R.D. 13 (S.D.N.Y. 2010)..………………………………………...….……...………...11

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000)...……………………...……………………...………...………....23

*Rosen v. Thornburgh*,
  928 F.2d 528 (2d Cir. 1991)……………………….………………...….……...….………3

*Shanghai Weiyi Int'l Trade Co., Ltd. v. Focus 2000 Corp.*,
  2017 WL 2840279, at *10 (S.D.N.Y. June 27, 2017)………........……………………29

*Skyline Steel, LLC v. PilePro, LLC*,
  101 F. Supp. 3d 394 (S.D.N.Y 2015)………...……………………………….……...11

*Sekisui Am. Corp. v. Hart*,
  945 F. Supp. 2d 494 (S.D.N.Y. 2013)…………….……….……….……......……..11

*Tainsky v. Clarins USA, Inc.*,
  363 F. Supp. 2d 578 (S.D.N.Y. 2005)……………………...……..……..………..40

*Zann Kwan v. Andalex Grp., LLC*,
  737 F.3d 834 (2d Cir. 2013)……………….……...……..……..……..………..40

**<u>Rules and Statutes</u>**

Fed. R. Civ. P. 37(e) .................................................................................................4, 5, 11

Fed. R. Civ. P. 37(e)(1) ....................................................................................................5

Fed. R. Civ. P. 37(e)(2) ...................................................................................5, 6, 17, 30

Fed. R. Evid. 403…………..............................................................................................30

Fed. R. Evid. 801(d)(2)…………...................................................................................7

Plaintiff Kaloma Cardwell ("Cardwell" or "Plaintiff"), by his undersigned counsel, respectfully moves this Court through this memorandum of law, and accompanying declarations and exhibits in support of his motion, pursuant to the Court's Order (Dkt. No. 320), Fed. R. Civ. P. 37, and the Court's inherent power to manage its own affairs, against Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm") and named defendants Thomas Reid, John Bick, and Daniel Brass (the "Individual Defendants," and, together with Davis Polk, "Defendants").

## **OVERVIEW**

During Cardwell's employment, and at Firm leaders' repeated encouragement for its associates to provide feedback to the Firm, Cardwell communicated concerns about him and other minority attorneys experiencing bias and racial exclusion at Davis Polk. In response to and in anticipation of Cardwell's protected activity, certain defendants (i) threatened Cardwell, (ii) denied Cardwell the right to discuss his protected activity with his practice group coordinator and a member of the Firm's Management Committee—a response that deprived Cardwell of information and violated the Firm's own complaint procedure policies[1]—and then (iii) knowingly manufactured a false and misleading "factual background" about Cardwell's performance, employment, and the very structure of Firm's business practices.[2]

---

[1] "My general recollection was that [Cardwell] was stating that because he was a Black associate he was being discriminated against and not getting work." **Dkt. No. 256-4 at 24** (Bick Tr. 189:9-190:12); "Reid also testified that he told Cardwell, in response to Cardwell's request that he speak with Bick about his concern that his limited hours were due to his race and not his performance, that such a conversation between Cardwell and Bick would be 'pointless…'" **Dkt. No. 305 at 25**; *see also* **Defs.' Answer ¶ 65** (admitting that the Firm's March 21, 2017 version of the Lawyer's Handbook contained the text "Lawyers who believe they have been subjected to such prohibited conduct or who believe that they have witnessed such prohibited conduct…should discuss their concerns immediately with…the practice group coordinator…or any member of the Firm's Management Committee"); **Dkt. No. 223-75 at 29-30** ("Davis Polk admits that Mr. Bick served as Davis Polk's M&A Practice Group Coordinator from approximately June 1, 2015 to May 2017.").

[2] "However, the language quoted in the NYSDHR brief came from various reviews that were not delivered to Cardwell. Instead, as per Davis Polk's process, they were given to a partner (in this case, Kyrwood) who created a 'summary review' to be shared with Cardwell." Dkt. No. 305 at 67.

They did so while anticipating litigation, with knowledge that both Cardwell's protected activity and their false and misleading statements about the "factual background" and their business could influence the New York State Division of Human Rights's ("NYSDHR") investigation[3] and pursuit of the "State's interest,"[4] would likely indirectly influence the U.S. Equal Employment Opportunity Commission's ("EEOC") determination,[5] and possibly be ruled upon to the detriment of Cardwell's rights by an agency,[6] judge, jury, and even this Court.[7]

At a time in which "people at the firm 'recognized' that 'if [Cardwell] went public with his complaints, there would be news coverage and [people] could have [their] reputation harmed through these complaints" (Dkt. No. 305 at 66; Dkt. No. 259 Ex. 105 at 212:3–16), defendants worked to dissuade Cardwell from engaging in protected activity, take Cardwell "off the field" and "out the game," and prevent Cardwell from establishing a *prima facie* case for employment retaliation and pretext.

Thus, the essence of this employment retaliation case—and indeed the parties' respective motion *in limine* filings—is that Defendants did not (and do not) have a fact- or document-supported explanation for the manner in which they responded to Cardwell's protected activity, stopped staffing Cardwell for months at a time, and fired Cardwell.  Defendants did not (and do

---

[3] "The NYSDHR, not the EEOC, investigated plaintiff's claims…and Davis Polk…submitted briefing and evidence." Defendants' February 2020 motion to dismiss, Dkt. No. 34 at 14.

[4] "The Division represents neither the Complainant nor the Respondent. The Division pursues the State's interest in the proper resolution of the matter in accordance with the Human Rights Law. Complainant and Respondent can retain private counsel to represent them during the investigation…." Dkt. No. 256-8 at 4 (NYSDHR to Davis Polk)

[5] "[A]lthough in most cases only one investigation is conducted pursuant to work-sharing agreements with these federal agencies." Dkt. No. 256-8 at 5 (NYSDHR to Davis Polk on or around October 10, 2017).

[6] "The Firm respectfully requests that the [NYSDHR] make a determination in this matter that there is no probable cause to believe the Firm has engaged in an act of unlawful discrimination or retaliation, and requests the Complaint be dismissed pursuant to Section 297.2 of the Human Rights Law (N.Y. Exec. Law, art. 15; 9 N.Y.C.R.R. § 465.5(d)(1))."  Davis Polk's NYSDHR Brief, Dkt. No. 271-1 at 27.

[7] "Defendants respond that…this Court lacks jurisdiction to hear Plaintiff's state and city claims, because those claims are barred by Plaintiff's election of remedies in choosing to pursue his claims before the NYSDHR." Dkt. No. 25 at 4 (Defendants in the parties' first joint letter to the Court in December 2019).

2

not) have a credible explanation for why they, "at the least, overstated" to the NYSDHR what reviews Cardwell received and how their own performance review system worked, and then failed to preserve "records" that they **have since admitted** related to Cardwell's performance. The parties' respective motions *in limine* are consistent with these realities.

For the reasons stated herein, Cardwell respectfully seeks the following requests and orders. Cardwell does so with the hope that his protected activity leads to accountability and justice—outcomes that at the time of this filing depend on a jury being allowed to consider Cardwell's retaliation and punitive damages claims in the context of all the relevant facts, performance evaluations, contemporaneous email records, work product, actions, party admissions, statements, and inferences that a sophisticated, competent, and experienced group of defendant-lawyers have worked so hard to knowingly ignore, hide, misrepresent, destroy, and/or "overstate" to the foreseeable and actual detriment of Cardwell's rights.[8]

## LEGAL STANDARD

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 148 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007)). For spoliation "sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed*." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 493 (S.D.N.Y.

---

[8] "[E]mployment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent… A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (internal citations omitted).

2022) (quoting *Farella v. City of New York*, No. 05-CV-5711 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007)).

Under Rule 37(e), if electronically stored information ("ESI") that should have been preserved in anticipation of litigation is lost due to a failure to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action….

Fed. R. Civ. P. 37(e). "The imposition of sanctions depends on whether the loss of ESI caused prejudice to another party or if the destroying party acted with the intent to deprive.  If prejudice is found, sanctions must be limited to 'measures no greater than necessary to cure the prejudice.'" *Castro v. Smith*, 2023 WL 5371311, at *5 (S.D.N.Y. August 22, 2023) (citing Fed. R. Civ. P. 37(e)(1)). "Such measures may include forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment." *Id*. "If intent to deprive is found, 'a court may consider whether to impose … measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.'" *Castro, 2023 WL 5371311, at *5* (citing *Charlestown Cap. Advisors v. Acero Junction, Inc.*, 337 F.R.D. 47, 59 (S.D.N.Y. 2020)) (internal citations omitted).

4

"Before determining whether sanctions are appropriate under either Rule 37(e)(1) or Rule 37(e)(2), the Court must first determine whether the threshold requirements have been satisfied: (1) that relevant ESI existed; (2) that the ESI should have been preserved in anticipation of litigation; (3) that the allegedly spoliating party did not take reasonable steps to preserve the ESI; and (4) that the ESI cannot be entirely restored or replaced." *Castro*, 2023 WL 5371311, at \*7. *See Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-CV-9363, 2018 WL 1512055, at \*9 (S.D.N.Y. Mar. 12, 2018); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017). "A party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence." *Id.*

A party seeking sanctions under subsection (e)(2) bears the burden to show by clear and convincing evidence that the alleged spoliator acted with the intent to deprive the movant of the information for use in the litigation. *Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at \*21 (S.D.N.Y. June 20, 2019); *Lokai Holdings LLC*, 2018 WL 1512055, at \*8. "Courts in this Circuit have held that where a party has significantly failed in its obligation to preserve and collect documents, it is appropriate to infer intent to deprive." *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2021 WL 1172265, at \*6 (S.D.N.Y. Mar. 29, 2021); *see also Ottoson*, 268 F. Supp. 3d at 582-84. Intent to deprive can also be inferred when the "data loss [cannot] be 'credibly explained' other than by bad faith." *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 2021 WL 4190628, at \*18 (S.D.N.Y. Aug. 18, 2021) (citing *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017)). If a finding of intent is made, no separate showing of prejudice is required. *Castro*, 2023 WL 5371311, at \*10; *see also Charlestown Cap. Advisors, LLC*, 337 F.R.D. at 60; Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("Subdivision (e)(2) does not include a requirement that the court find prejudice ... the finding of

5

intent required by the subdivision can support ... an inference that the opposing party was prejudiced by the loss of information.").

Undoubtedly, various remedies for spoliation have been deemed warranted, including because "even where the spoliator acted with mere negligence, as between the innocent and negligent parties, courts recognize that the negligent party has no right to benefit from its negligence." *See Europe v. Equinox Holdings, Inc.*, 92 F.Supp.3d 167, 178 (S.D.N.Y. 2022).

## I.   PLAINTIFF'S MOTION *IN LIMINE* #1 FOR SANCTIONS FOR SPOLIATION OF EVIDENCE BY DAVIS POLK, THOMAS REID, AND JOHN BICK

### A.  Introduction

Davis Polk, Thomas Reid, and John Bick (i) significantly failed in their obligation to preserve and collect documents related to Sophia Hudson (formerly a Davis Polk partner) and other evidence relevant to Cardwell's claims and their defenses and (ii) their failure to preserve Hudson's (and other's) records cannot be credibly explained other than by bad faith.  Thus, Cardwell requests sanctions under Fed. R. Civ. P. 37(e)(2). Specifically, Cardwell requests (i) an adverse inference instruction to the jury that it must presume records and information not preserved regarding Hudson (and his third rotation) were unfavorable to Davis Polk, Reid, and Bick;[9] or, in the alternative, (ii) Defendants be precluded from arguing (and a jury be precluded from inferring) through exhibits, testimony, or, questioning that Hudson's (and others') performance assessments or reviews of Cardwell during his third rotation in the Capital Markets practice group contributed to (a) Bick creating a June 2016 mid-year review cycle for Cardwell and (b) how the Firm assessed, staffed, or fired Cardwell.

---

[9] "[T]o correct this evidentiary imbalance which Defendants created, it is appropriate that an instruction be given at trial to permit an adverse inference…" *Prelvukaj v. Naselli*, 2023 WL 3570659, at *7 (S.D.N.Y. May 18, 2023).

If Defendants' position is that they did not send Hudson (as well as associates and other Capital Markets partners) a preservation notice because Hudson's (and others') records were not relevant to Cardwell's claims or their defenses when the duty to preserve arose—that is, as explained below, on or around March 29, 2017; May 24, 2017; June 7, 2017; July 20, 2017; August 3, 2017; October 10, 2017;  December 5, 2017; or August 17, 2018—then it would be an unjust imbalance and unduly prejudicial against Cardwell for Defendants to directly or indirectly argue at trial that Hudson (or her records related to Cardwell's performance or rotation in capital markets) is relevant to how members of the Firm assessed, staffed, or fired Cardwell. Thus, at a minimum, a fair trial in this case requires Defendants not being allowed to benefit from their failure to preserve evidence related to Hudson and his Capital Markets rotation.

### B.  Legal Standard

The relevant legal standard is described *supra* at 3-6.

### C.  Argument

> 1.  Relevant Records Related to Hudson and Cardwell's
>     Third Rotation Existed

Hudson was and has always been a material custodian and witness during Cardwell's employment and she possessed information and documents, both electronic and hard copy, that were relevant to Cardwell's claims and Defendants' defenses. Cardwell "rotated through Hudson's practice group, Capital Markets, from October 2015 until April 2016." Dkt. No. 209 ("Defs.' Answer") ¶ 91.[10] Cardwell "worked with Hudson and others during part of that time." *Id*. "Cardwell billed more than 100+ hours to matters on which Hudson also worked" and

---

[10] As referenced herein, the statements of fact in Defendants' Answer, Defendants' NYSDHR Brief, and their (or their partners') declarations submitted in connection with Defendants' motion for summary judgment are all party admissions (among other party admissions) and admissible evidence. *See* Fed. R. Evid. 801(d)(2); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528–29 (2d Cir. 1985); *Mugavero v. Arms Acres*, 2009 WL 1904548, *4 (S.D.N.Y. July 1, 2009).

"Cardwell billed more hours on such matters than he did on matters on which other Capital Markets partners worked." *Id*. at ¶ 540. "The Summary Review form that Bick completed in connection with [Cardwell's] June 30, 2016 review referred to feedback received from Hudson." *Id*. at ¶ 552. "Hudson's June 2016 and September 2016 reviews were the first and second Firm reviews submitted for [Cardwell] during his employment as an associate at the Firm that answered 'behind' directly in response to the question 'do you feel this lawyer is performing materially behind, with or ahead of lawyer's class.'" *Id*. at ¶ 568. "The time period covered by the [March 2017] review summary Kreynin provided included, among others, Cardwell's time in Capital Markets, and included, among others, Hudson's reviews. *Id*. at ¶ 561. In Davis Polk's NYSDHR Brief, the Firm asserted that "Cardwell's performance over three rotations and at the beginning of his post-rotation assignment to the M&A group…warranted giving Cardwell a message that it was time for him to look for another job." *Id*. at ¶ 91. Davis Polk's "NYSDHR brief included references to the performance reviews and feedback from Hudson." *Id*. at ¶ 478.

Electronic and hard copy documents related to Cardwell's **performance** were relevant to Defendants' preservation obligations, and Defendants had a duty to ensure the preservation of more than just Hudson's (and other partners' and associates') performance reviews. Defendants' admissions, assertions, and defenses make this clear:[11]

- "[A]fter experiencing problems with plaintiff's **performance**, Hudson requested to be sent plaintiff's performance reviews." Defs.' Answer ¶ 85 (emphasis added).

- "[O]ver the time that [Hudson and Cardwell] worked together [Hudson] would have given [Cardwell], there were **many emails**, phone calls, in-person meetings, **markups of work product**, which would have been real time feedback." Dkt. No. 223-7 at 8 (Hudson Tr. 160:24-161:5) (emphasis added).

---

[11] See also Defs.' Answer ¶ 91 ("The Firm sometimes informs associates (sometimes after … an **interim review**) that, due to the associate's **performance**, the Firm has determined that the associate should seek other employment."); ¶ 188 ("[I]t is not uncommon for the Firm to reference an associate's past **performance** issues during a 'time to go' meeting.")  (emphasis added).

- 
." Ex. B
(Hudson Tr. 162:3-164:12) (emphasis added).

- "The Individual Defendants admit that formal annual **performance reviews** are not the only mechanism by which associates receive feedback with respect to their work and **performance**; for example, changes to drafts and comments from clients are forms of feedback provided to associates." Dkt. No. 223-75 at 11 (RFA No. 2) (emphasis added).

- "Kaloma…worked with [Hudson] during his [CM] rotation and [Bick] talked to her about his **performance**…." Dkt. 256-4 at 17 (Bick Tr. 159:5-160:13).

- "I had taken a look at his hours before the meeting and they were extremely low and I wanted to look into why…[a]nd that's why we had that meeting on March 29th"…"I looked into [Cardwell's] **performance reviews from the previous annual cycle, fall of 2016**," and "there had already been work that I had done looking at his review folders to make sure the comments that were so adverse were specific enough as to make me comfortable that they were not driven by conscious or unconscious bias." *See* Dkt. Nos . 256-7 at 33 (Reid Tr. 215:16-216:18) and 223-4 at 25 (Reid Tr. 230:7-15).

- Cardwell was "told that there had been a Firm decision, **in light of plaintiff's performance** issues, that the Firm could not staff plaintiff on projects consistent with his class year (seniority)…; **and that in light of this**, the Firm believed that it was time for plaintiff to begin to look for alternative employment." Defs.' Answer ¶ 588 (emphasis added).

- "[T]he message…delivered to plaintiff regarding…staffing him and his future at the firm reflected input from the Management Committee…and reviews of partners who…evaluated plaintiff's **performance**." *Id*. ¶ 620

Notwithstanding Defendants' post-litigation admissions about the relevancy of Hudson and Hudson's records, Defendants knew during Cardwell's employment that Hudson's (and other's) records from Cardwell's Capital Markets rotation existed and were relevant. On October 18, 2017, Davis Polk's counsel sent the NYSDHR a letter concerning Davis Polk's efforts to identify, gather, and provide the NYSDHR with facts and evidence. Davis Polk's counsel stated:

9



Ex. C (emphasis added). After nearly five months of non-stop work following the receipt

of a draft of Cardwell's **seven-page EEOC** Complaint on July 20, 2017 (Ex. D)—which

contributed to what Davis Polk claims in its privilege log are nearly 500 "privileged"

communications and documents between July 20, 2017 and December 5, 2017 (*see* Dkt. No.

256-51)—on December 5, 2017, Davis Polk submitted to the NYSDHR their official response to

Cardwell's dual-filed EEOC/NYSDHR complaint. Dkt. Nos. 271-271-4.  Davis Polk's

response—full of 2014-2017 emails, presentations, and communications from Firm staff,

associates, partners, consultants, and clients—appeared in their **288-page** NYSDHR Brief. *Id*.

The Firm's NYSDHR Brief referenced various records from Cardwell's third rotation:

> **Markups** require junior associates to understand the reason for the
> proposed changes, and to implement those changes thoughtfully,
> carefully and consistently. But Cardwell failed to do so….
>
> Cardwell's **performance over three rotations** and at the
> beginning of his post-rotation assignment to the M&A group was
> such that it would have warranted giving Cardwell a message that
> it was time for him to look for another job…
>
> Cardwell cannot establish that his **performance** was 'satisfactory.'
> The indisputable **record** makes clear that it was not. **This alone is
> fatal to his claims**.

Dkt. No. 271-1 at 10, 12, 22) (emphasis added).  Relevant records related to Hudson, and

Cardwell's Capital Markets rotation, including but not limited to emails and markups from

Hudson, existed. Defendants failed to preserve much of this evidence concerning Hudson's records. And, Defendants having produced some of Hudson's emails does not mitigate this fact or the prejudice. *See Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 509–10 (S.D.N.Y. 2013))

> ### 2. Davis Polk, Reid, and Bick Understood their Duty to Preserve and Knew When It Arose

> #### i.   *General Knowledge of Duty to Preserve*

"The obligation to preserve evidence arises when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "For the purposes of Rule 37(e), 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'" *Cruz v. G-Star Inc.*, 2019 WL 4805765, at *11 (S.D.N.Y. Sept. 30, 2019) (quoting *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010)). "The preservation obligation requires a litigant to do more than refrain from intentionally destroying relevant evidence; the litigant must also 'take affirmative steps to prevent inadvertent spoliation.'" *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015) (quoting *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010)). These steps include "identify[ing] all sources of potentially relevant evidence and implement[ing] a 'litigation hold' suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence." *Id*.

Davis Polk, Reid, and Bick—all sophisticated parties—knew what the "duty to preserve" requires and when the duty to preserve records arises. Consistent with the basic structure of Davis Polk's business, Defendants' polices, handbooks, departure materials, and training materials that Davis Polk and Bick used to **train associates** all provide guidance on what the duty to preserve entails and when it arises.

The ████████████" presentation that Bick used to train the Firm's first-year associates in 2014 (and that the Firm likely used from 2015-2017)[12] contains the following quoted information:



Ex. E (emphasis added). Other sources also informed Defendants of their obligations.

Davis Polk's lawyer handbook states under a "Records Retention" header:

> There are legal requirements, ethical rules and business reasons to preserve records. For example, the law requires that any record that is relevant to an actual or reasonably foreseeable litigation, proceeding **or**

---

[12] In 2015, 2016, and 2017, the Firm also conducted a similarly titled "████████████" training, as part of the Firm's annual Lawyering 101 trainings. The agendas for the Lawyering 101 trainings were virtually the same agenda/training sessions in 2014, 2015, 2016, and 2017. *See* Ex. J.

[13] Regarding this list and Hudson's "records," among other individuals' documents not preserved (as noted herein), not a single category on this list was preserved in its entirety for any of Cardwell's "triggering events."

[14] This is especially true and noteworthy in employment discrimination and retaliation cases.

**investigation must be preserved**. In addition, specific laws may require that certain types of documents be preserved. Failure to preserve records when legally required to do so can result in civil or criminal penalties….Whether something is a record that needs to be preserved will be determined by content, not by physical form….

**The records retention policy applies to all records**, in whatever form, including, for example, hard copies and electronic files (e.g., document files, email.) **wherever stored** (i.e., whether on a computer, BlackBerry or **any other device, at the office or at home**….

Dkt. Nos. 256-9 at 46; 256-10 at 84 (emphasis added).

Also, Davis Polk's "Associate/Counsel" departure check list stated:



Ex. F at 1, 4 (noting automatic deletion policies) (emphasis added).

> ii.    *Davis Polk, Reid, and Bick Had Knowledge of At Least Eight Triggering Events that Created a Duty to Preserve Hudson's Records*



Ex. E at 4 (from Davis Polk's and Bick's " ▮▮▮▮▮▮▮▮▮ " training materials). Davis Polk, Reid, and Bick had

knowledge of at least eight events that triggered a duty to preserve Hudson's and others' records. These eight events occurred on or around March 29, 2017; May 24, 2017; June 7, 2017; July 20, 2017; August 3, 2017, October 10, 2017, December 5, 2017; and August 17, 2018. On March 29, 2017, Defendants knew they had a duty to preserve and not destroy any and all documents that were relevant to Cardwell's March 29, 2017 allegations about discrimination and his hours ("First Triggering Event"). Reid testified: "I realized this was a very different kind of conversation, and this was not a pointless complaint and needed to be reported by me to the other members of the management committee and to our internal counsel." Dkt. No. 297-34 (Reid Tr. 227:20-25). Bick testified: "My general recollection was that [Cardwell] was stating that because he was a Black associate he was being discriminated against and not getting work." Dkt. No. 256-4 at 24 (Bick Tr. 189:9-190:12)

On May 24, 2017, Davis Polk received notice that Cardwell had obtained legal counsel ("Second Triggering Event"). Defs.' Answer at ¶ 463. On June 7, 2017, Davis Polk circulated preservation notices to various partners and staff, including Reid and Bick ("Third Triggering Event"). Dkt. No. 256-51 at 7 (*see* "Category 5" regarding preservation notices). On July 20, 2017, Davis Polk received another preservation notice ("Fourth Triggering Event"), this time from Cardwell's counsel. The notice stated:



Ex. D (emphasis added). The draft EEOC complaint was virtually identical to the

complaint that Cardwell filed with the EEOC on or around August 3, 2017 ("Fifth Triggering

Event"). *Compare* Ex. D (July 20, 2017 draft EEOC complaint) with Dkt. No. 223-62 at 2-8

(filed EEOC complaint). Davis Polk, Bick, Reid, and Brass all became aware of the charge

sometime in August 2017. Dkt. No. 305 at 26; Defs.' Answer at ¶ 476.  Further, the July 2017

draft complaint was also virtually identical to the complaint Cardwell filed with the NYSDHR,

of which Davis Polk received a copy in a letter from the NYSDHR on or around October 10,

2017 ("Sixth Triggering Event"). Defs.' Answer at ¶ 3; *compare* Ex. D (draft EEOC complaint)

with Dkt. No. 256-8 at 10-14 (filed NYSDHR complaint).

The NYSDHR told Defendants that the NYSDHR is a "[s]tate agency mandated to

receive, **investigate**, and resolve complaints of discrimination" under New York law to "fairly

and thoroughly **investigate the allegations in light of all evidence gathered**." *Id*. at 4 (emphasis

added). The NYSDHR also told Defendants (i) "[t]he Human Rights Law prohibits retaliation

against any person because he or she has opposed discriminatory practices [or] filed a

discrimination complaint" and (ii) "[a]ll facts and evidence provided by [Davis Polk] to the

[NYSDHR] in the course of its proceedings will be considered by the Commission."  *Id*. at 2, 7.

On December 5, 2017, Defendants submitted their 288-page NYSDHR Brief ("Seventh

Triggering Event"). On August 17, 2018, counsel for Defendants received another preservation

notice from Cardwell's counsel. In response, Defendants' counsel asserted, "We understand our

preservation obligations."[15] All eight of these triggering events took place before Hudson

---

[15] *See* Dkt. No. 223-71 (showing an email included in Defendants' MSJ and counsel for Defendants asserting, "**We understand our preservation obligations**" in response to Defendants being reminded to "**retain all documents, including documents in electronic and draft form, contained in these devices or stored on voicemail, servers, or iPads or other similar tablet devices, relating to this matter, in addition to its other preservation obligations**") (emphasis added).

departed from the Firm in September 2018. Defs.' Answer ¶ 9. Davis Polk, Reid, and Bick had

opportunity after opportunity to preserve Hudson's (and other's) records.

> 3. <u>Davis Polk, Reid, and Bick Failed to Take Reasonable Steps to Preserve Hudson's Records, and Cardwell Was Prejudiced</u>

Hudson did not receive a preservation notice during Cardwell's employment. Ex. B,

Hudson Tr. 210:23-211:6 ███████████████████████████████████████

██████████████████████████████████████████████████ Hudson left the

firm in September 2018, shortly after Cardwell's last day of employment in August 2018. Defs.'

Answer ¶¶ 1, 9. Thus, the Court can conclude Davis Polk, Reid, and Bick failed to take

reasonable steps to preserve Hudson's records. *See Charlestown Cap. Advisors*, 337 F.R.D. at 61

("Where a party fails to timely institute 'a formal litigation hold and . . . otherwise informally

preserve ESI,' the Court can conclude that it did not undertake reasonable steps to preserve

ESI.")

To be sure, evidence related to Hudson (and other's) was destroyed, including from the

Firm's automatic deletion processes. Some of Davis Polk's departure procedures notes that files

are deleted after an attorney leaves the Firm unless they are subject to a preservation notice:

> Please let the [Firm] know promptly if you have decided to leave the Firm. You must meet with [the Firm] before you leave for an exit interview and in order to review a checklist of departure procedures. The checklist addresses, among other things, … the forwarding of any electronic or paper documents you may have that are subject to a preservation notice….**[F]iles will be deleted after you leave the Firm unless they are subject to a preservation notice**. Dkt. No. 256-10 at 126-27; *see also* Ex. F at 1, 4 (describing other deletion processes)

Defendants' decision to not preserve relevant records prejudiced Cardwell,[16] not the least

of which is because this case has "████████," Defendants and many of their witnesses

---

[16] *See*, among other things noted herein, footnote 22 *infra* at 22.

16

have already claimed and will continue to claim that they do not "recall" information that is damaging to Defendants' defenses, and the Court has made rulings characterizing certain allegations and theories as "speculative" or without sufficient documentary evidence. *See generally* Dkt. No. 305. Defendants' decision to not preserve Hudson's records through what should have been a routine preservation notice was not an accident. Their decision ensured that many of her records, including evidence related to Cardwell's claims and the records they themselves claim reflect an associates' "performance," did in fact "███████." *See* Ex. E (Bick presentation stating, ███████████████████████

On these facts alone, sanctions under Fed. R. Civ. P. 37(e)(2) are warranted, including an order that establishes an adverse inference instruction that orders a jury to infer or presume that Defendants failed to preserve all of Hudson's records, documents, and communications because such information would have been favorable to Cardwell's claims.

These facts, however, are not the only relevant facts. Despite explicit and selective references to the following individuals (or their documents or performance reviews) in its NYSDHR Brief, Davis Polk's privilege log suggests that Defendants also did not send preservation notices to:

- Partners Cardwell had worked with during his first and second years at the Firm, including his third rotation (for example *compare* Dkt. No. 256-51 (Davis Polk privilege log) with Ex. G (showing although eight Capital Markets partners and associates were considered as potential reviewers for Cardwell's June 2016 mid-year review, **none** of them received preservation notices);
- partners who completed performance reviews for Cardwell (*compare* Dkt. No. 256-51 with Dkt. No. 223-9 (Capital Markets partner's review));
- partners (e.g., Byron Rooney, a Capital Markets staffing partner) who made staffing decisions for Cardwell and participated in check-ins with Cardwell about his staffing during his third rotation (*compare* Dkt. No. 256-51 *with* Ex. K (Cardwell's staffing report being requested on behalf of Rooney and other staffing coordinators/partners) *and* Ex. L (Rooney stating, ████████████████████████████████████████");

17

- *virtually every associate* who had ever worked with Cardwell (with the exception of Brass who later become a partner), completed an individual performance review for him, or was present during his complaints (*see* Dkt. No. 256-51 (showing associates did not receive preservation notices));[17] and

- various members of the Firm's diversity committee (and associates) who were present during his September 2015 complaint and subsequently discussed Cardwell in Diversity Committee meetings. (*compare* Dkt. No. 256-51 *with* Dkt. No. 256-72 at 3 (showing members not listed on Davis Polk's privilege log)).

Defendants cannot plausibly or credibly argue (i) that none of the above individuals possessed relevant information related to Cardwell's performance or claims, or defendants' defenses, (ii) that such relevant information was never deleted or destroyed through automatic deletion protocols or when individuals left the Firm, (iii) that somehow Defendants still managed to otherwise produce all relevant documents and information in discovery, or (iv) that none of the destroyed records and information would have been helpful to Cardwell's case. Notably, the Court has already identified relevant records and emails that are helpful to Cardwell's case that are also records Defendants apparently did not preserve or produce in discovery. *See* Dkt. No. 305 at 12 (the Court noting "[i]mpressions of Cardwell's work over the next several months varied" and the Court citing a complimentary email that has Plaintiff's bates number and that Plaintiff has been unable to locate in the documents Defendants' produced in discovery, while also citing **an email from Hudson** to suggest a different impression); *see also* Dkt. Nos. 256-47-48 (showing other emails where (i) associates complimented Cardwell's work product and performance and (ii) Plaintiff has been unable to locate them in the documents Defendants produced in discovery).

---

[17] The undue prejudice resulting from Defendants decision to not send preservation notices to associates cannot be overstated. For example, Defendants' MSJ relied on emails from associates (or references to such emails or associates) whose documents Defendants never preserved. At trial, they will continue to rely on selectively preserved emails. *See, e.g.*, Dkt. Nos. 223-16, 18, 19, 34, 39, and 47; as well as various summary judgment declarations and attachments thereto (e.g., Brass's declaration at Dkt. Nos. 225-3 and 225-5).

Defendants' decision to selectively preserve some records and not send preservation notices to relevant partners and associates, including Hudson, resulted in the destruction of relevant evidence. This information cannot be restored through additional discovery and could not have been restored when Cardwell filed his federal complaint. Cardwell has been prejudiced.

>    4. <u>Davis Polk, Reid, and Bick Intended to Deprive Cardwell
>       of Evidence, and Did So to Gain Advantages In Litigation</u>

The more "sophisticated" a party is, the better it should understand its obligation to preserve documents when the prospect of litigation looms. *See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 289 (S.D.N.Y. 2011). Davis Polk, Reid, and Bick failed to preserve all relevant records and evidence with an intent to deprive Cardwell of the information. They are sophisticated parties, and they knew that ███████████████████ ████ *See* Ex. H at 24 (stating ██████████████████████████████ ██████████ presentation used to train associates and that describes preservation steps).

Defendants' knowledge about its preservation obligations did not merely come from their general knowledge as a competent and experienced law firm or group of lawyers, or even the specific preservation notices that they received in the context of Cardwell's complaints. During Cardwell's employment, Davis Polk, Reid, and Bick's knowledge about the relationship between its preservation obligations and the outcome of investigations and litigation also came from their collective experience defending the Firm against another federal discrimination and retaliation lawsuit that was ongoing at the same time Cardwell made certain protected complaints. (*See* Reid's testimony, stating, "I only actually recall one other discrimination legal proceeding in my entire time as managing partner" when asked, "Was Mr. Cardwell's EEOC complaint the first you received as a managing partner?" Dkt. No. 297-34 (Reid Tr. 279:16-280:8).)

On July 23, 2014, one of Davis Polk's non-attorney employees filed a lawsuit against Davis Polk in federal court alleging discrimination and retaliation claims in violation of "Title VII," "Section 1981," and the NY State Human Rights Law. *Martinez* v. *Davis Polk LLP*, 208 F.Supp.3d 480 (E.D.N.Y. 2016) (noting that "[i]n August 2013, Martinez filed a charge of race discrimination with the EEOC" and "[t]he EEOC issued a right-to-sue letter on March 19, 2014"). As further described below, material events and disputes in this case are not disconnected from the knowledge Davis Polk and its Management Committee obtained in a motion for summary judgment that Davis Polk filed in August 2015 (and won in September 2016).[18]   Some of these events and disputes include (i) how members of the Firm's management committee triggered an unscheduled mid-year June 2016 performance review cycle for Cardwell that was routinely used to lay the foundation for firing or actually firing associates;[19] (ii) the lie appearing in Hudson's June 2016 review that "diligence and other preparatory tasks" on that deal "were completed so slowly that a second junior associate needed to be staffed"; (iii) how the Firm and Bick caused the June 2016 review cycle through discussions with Hudson but then failed to ensure preservation of evidence related to (a) Hudson, (b) all of the work product or associates' documents related to her reviews, (c) the Capital Markets staffing partners' documents during Cardwell's third rotation on which the 2016 mid-year review was purportedly based; or (iv) how and why Davis Polk overstated which reviews were contemporaneously

---

[18] Davis Polk won summary judgment on September 23, 2016—just a few weeks after Cardwell engaged in protected activity on September 8, 2016. In that September 2016 ruling, the court held: "But, where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *See Martinez*, 208 F.Supp.3d at 490.

[19] *See* Defs.' Answer ¶ 187 ("[The Firm sometimes informs associates (sometimes after … an interim review) that, due to the associate's performance, the Firm has determined that the associate should seek other employment; and that this is sometimes referred to within the Firm as a 'time to go' message or meeting.")

communicated to Cardwell and other Firm partners—first to the NYSDHR and then in affidavits included in Defendants' motion for summary judgment ("MSJ").

Here's a recap of certain key events. Cardwell joined the Firm's Corporate Department on September 15, 2014. Dkt. No. 305 at 3. In September 2015, Cardwell expressed concerns about him and other Black attorneys experiencing racial exclusion to a Davis Polk diversity committee that was comprised of partners, managers, and the Firm's executive director of personnel (who worked with the Firm's management and oversaw the Firm's human resources). Dkt. No. 305 at 7-8. Defs.' Answer ¶¶ 60-61. Some of these individuals were required to work with the Firm's management committee about claims and potential claims, including circumstances that could lead to a claim, in accordance with the Firm's professional liability coverage policies. Dkt. No. 256-9 at 45, Jeffries Decl. Ex. 10.[20]

One month prior to Cardwell's September 2015 complaint, in August 2015, Davis Polk filed what ultimately became a successful motion for summary judgment against a non-attorney Firm employee. *Martinez v. Davis Polk LLP*, No. 1:14-cv-03741, 2016 WL 8861627 (E.D.N.Y. February 26, 2016) Davis Polk's core summary judgment arguments in August 2015 were:

- The employee could not establish a *prima facie* case or pretext because the firm "gave [the employee] four [written] performance reviews that reflected similar … criticisms";
- "Here, in Ms. Martinez's 2010 and 2011 reviews, Mr. Cavanaugh and Ms. Palmer criticized Ms. Martinez's project and time management'";
- "Ms. Martinez cannot satisfy the fourth element of a *prima facie* retaliation claim because she cannot establish a causal connection between her EEOC charge and her subsequent review…";
- "Where there is evidence that the employer was considering the adverse employment action before any protected activity [such as the filing of an EEOC charge], … an

---

[20] "It is the policy of the Firm that all claims or *potential* claims with respect to our professional activities—**including any circumstances that may subsequently rise to a claim against the Firm or any lawyer or employee—be promptly reported to a member of the Management Committee.** Our policies for professional liability coverage require prompt reporting to our carriers of any such claim or circumstance." (emphasis added.)

employer's 'proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality"; and

- "[A]n inference of discrimination does not arise where an employee is criticized in written performance evaluations, then files a complaint, and is later terminated for the reasons set forth in the evaluations." [21]

In November 2015—that is, shortly after Cardwell expressed concerns about associates experiencing racial exclusion at the Firm in September 2015 to a Firm committee full of partners, managers, and executive directors who worked closely with the management committee—a Davis Polk partner requested to be sent all of Cardwell's reviews "since starting at DPW" "to have a read on the situation." Dkt. No. 305 at 51.[22] In January of 2016, Cardwell communicated more concerns and complaints about him and other Black associates experiencing racial exclusion at the Firm. Dkt. No. 305 at 12-13.

Rather than wait for Cardwell to receive his regularly scheduled annual review in December 2016, Bick—a management committee member who was required under the Firm's policies to have knowledge of discrimination and retaliation claims like those in the *Martinez* federal lawsuit—ordered Cardwell to receive an unscheduled "sensitive" review in June 2016. Dkt. No. 305 at 14 ("Cardwell alleges that the Firm gave him a mid-year review not because of his performance but to lay the foundation for Cardwell's ultimate termination"; Dkt. No. 305 at 16 "[s]ince this is a sensitive review, I'm not sure if senior associates should be included as

---

[21] See *Martinez*, 2016 WL 8861627 at *3,8 (internal quotations and citations omitted); *see also* Davis Polk's Rule 56.1 Statement dated August 10, 2015, No. 1:14-cv-03741, Dkt. No. 71 (stating [employee] received "four performance reviews that reflected similar…criticisms")

[22] In the Court's ruling on Defendants' MSJ, the Court recognized these particular email communications but noted, "In her deposition, Hudson testified that by saying she wanted a read on the situation, she was referring to Cardwell's performance and that she 'wanted to get the background of people who had worked with him in the first full year at the firm. Cardwell does not dispute this context." For reasons noted herein, Plaintiff respectfully submits that plaintiff has lost the ability to dispute certain post-litigation deposition testimony because his employer never preserved the documents of Hudson (and others) or documents belonging to the individuals the deponent-employer (i.e., Hudson) allegedly was attempting to contact to get the background on. At the time of Hudson's request, Cardwell had completed a credit rotation and M&A rotation, and virtually none of the credit partners' records and no records belonging to associates were preserved through preservation notices.

reviewers . . . ."). This is the same review cycle where, in response to Cardwell's 2017 dual-filed EEOC/NYSDHR Complaints, Davis Polk told the NYSDHR that Cardwell received these reviews because Cardwell "approached the Associate Development Department and asked for feedback." Dkt. No. 271-1 at 10 n. 9. Emails Defendants produced in discovery leave no doubt that the NYSDHR Brief's statement that Cardwell "approached the Associate Development Department and asked for feedback" has no truth to it or factual support. (See below.)

The fiction Defendants created and submitted to the NYSDHR when explaining Cardwell's June 2016 mid-year review involving Bick and Hudson is circumstantial evidence of their intent and, coupled with Defendants' decision to not send Hudson a preservation notice, is evidence of their desire to gain a litigation advantage. See, e.g., *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."; *Moody*, 271 F. Supp. 3d at 431–32 (finding that circumstantial evidence can also form the basis for a finding of an intent to deprive).

On June 13, 2016, the Director of Davis Polk's Associate Development Department sent her managers in her department an email that included the following statement: "Can we talk tomorrow about how we can get John Bick what he asked for with the least amount of negative blow back for [Cardwell]? Worried about the 'mid year review' label." Defs.' Answer at ¶ 129. A manager replied: "Yes—agree it is sensitive." *Id.* ¶ 134. Another manager replied: "Yes agree, especially since he wasn't given any indication in his last annual review [meeting] that we would be checking in mid-year." *Id.* After Cardwell received these emails in discovery, Defendants asserted in 2021 that Cardwell's review in June 2016 occurred, in part, because "Mr. Bick's analysis of Mr. Cardwell's performance reviews **and feedback on Mr. Cardwell's work**

**(including with respect to Mr. Cardwell's performance in his third rotation**, for which Mr. Cardwell had not yet received a performance review, unlike for his other rotations) caused him to want to relay the concerns about Mr. Cardwell's performance to him before the end-of-the-year review cycle." Dkt. No. 223-75 at 20 (response to RFA No. 20). Bick also testified that he spoke with Hudson in June 2016. Dkt. No. 305 at 53. Virtually none of the key witnesses from Cardwell's third rotation received preservation notices.

Cardwell received the mid-year performance review cycle in June 2016 and the Firm created a summary review of that review cycle that stated, "Kaloma generally received positive reviews, with the notable exception of Sophia Hudson." Dkt. No. 223-9 at 33. Hudson's reviews included purported criticisms and explanations for Cardwell and certain staffing decisions that were different than the explanations associates communicated to Hudson and the Firm's staffing coordinators **in emails**. *Compare* Dkt. No. 305 at 17 (Hudson's review) *with* Dkt. No. 256-35 through Dkt. No. 256-40 (emails from associates who never received preservation notices). Hudson's "June 2016 and September 2016 reviews were the first and second Firm reviews to rate Cardwell as 'behind' in reviews." Defs.' Answer at ¶ 568. Neither Bick's purported concerns about Cardwell's performance, nor "the information that Bick had received from Hudson and others in their reviews" (Dkt. No. 305 at 18) had caused Bick or any of the defendants to send Hudson or many other partners and associates who completed reviews in June 2016 a preservation notice at any point prior to Hudson leaving the firm (or Cardwell filing his November 2019 federal complaint against Defendants).

On September 9, 2016, one day after Cardwell engaged in protected activity with staffing coordinator, Rocio Clausen, Davis Polk's then-Executive Director of Personnel emailed the head of the Associate Development Department and stated: "If you talk to John [Bick] today about the

24

other stuff please mention Kaloma. As discussed, he needs to be someone's project as soon as possible i.e. get work and hours and direct feedback. Given his conversation with Rocio [Clausen] I don't think it makes sense to wait to implement sometime in January after review season." Defs.' Answer at ¶ 275, 277. For four consecutive months, from December 2016 to March 2017, the Firm did not staff Cardwell on any new matter. *Id.* at ¶¶ 363-66.

The entries on Davis Polk's privilege log began on March 5, 2017 (Dkt. No. 256-51 at 5) and Cardwell's summary reviews were printed on March 6, 2017 (Defs.' Answer at ¶ 374). On March 20, 2017, Cardwell asked leaders and managers of Davis Polk's Associate Development Department if he could see his "file and all of his reviews to date." *Id.* at ¶ 387. Cardwell made the request multiple times, and his request was denied multiple times without him being allowed to see any aspect of his individual reviews or summary reviews. *Id.* at ¶¶ 394, 397.

Also on March 20, 2017, Davis Polk's then-Executive Director of Personnel responded to Cardwell's request by asking a Director who had knowledge of Cardwell's September 2015 and September 2016 complaints, "What's the current state of play? He is supposed to get a mid year in June?" *Id.* at ¶¶ 60-61, 389. That day, Kreynin, an M&A partner in the Corporate Department who conducted Cardwell's face-to-face annual review in December 2016, received an email that referenced Cardwell's request to see his performance reviews. *Id.* at ¶ 431. In response, Kreynin sent Bick an email, stating, "███████████████ Ex. I. Bick responded, ████████████ ██████████████████████████████████ *Id* (emphasis added).

Reid, Kreynin and Cardwell met on March 29, 2017. Dkt. No. 305 at 24. However, just one day before the meeting, Kreynin created a summary review that purports to reflect performance evaluations that Cardwell received from Hudson and Kreynin for the September

2015-2016 review period. *Id*. at 23.[23]  Immediately after the meeting, the Firm continued to implement a plan for Cardwell. "During the month of April 2017,…the Firm discussed a…plan for Cardwell."  Dkt. No. 271-1 at 16. Critically, by not preserving Hudson's and associates' records, and then designating hundreds of records between March 2017 and December 2017 as "privileged" (*see* Dkt. No. 256-51), including the preservation notices themselves, Davis Polk, Reid, and Bick intentionally created advantages for themselves in this litigation.

As noted above, circumstantial evidence related Defendants' intent to deprive Cardwell of relevant evidence was documented, in part, in the Firm's December 5, 2017 NYSDHR Brief, including when Davis Polk asserted in the NYSDHR Brief that "Cardwell cannot establish that his performance was 'satisfactory.' The indisputable record makes clear that it was not. This alone is fatal to his claims." Dkt. Nos. 271 - 271-4). Here, Defendants were speaking about a "record" that they were intentionally, actively, and systematically not preserving. Davis Polk's NYSDHR Brief reflects the intent of an employer that knew it had possession, control, and the ability to selectively not preserve nearly every relevant document related to (i) partners', associates', and staff members' electronic and hard copy records; and (ii) Cardwell's contemporaneously communicated, documented, and discussed concerns and complaints. With full control of the discovery record intentionally not being preserved, and a months-long commitment to making it harder for Cardwell to establish or prove that his performance could be considered satisfactory by an agency or court, Cardwell was not staffed on any new matters after Davis Polk submitted its NYSDHR response. Defs.' Answer at ¶ 479.

As the Court knows, the Firm's NYSDHR Brief includes a "Factual Background" section that is about fifteen pages. Dkt. 271-1 at 6-22. Bick testified that Davis Polk's litigators

---

[23] As further explained below, Kreynin's summary review for Cardwell was not created in the ordinary course and cannot be credibly reconciled with the Firm's Lawyering Review System.

"draft[ed] sort of the work on [the NYSDHR Brief]." *See* Dkt. No. 242-15 (Bick Tr. 238:16-239:5). Reid and Bick testified that they reviewed and/or fact-checked the NYSDHR Brief prior to it being submitted to the NYSDHR. Dkt. No. 297-34 (Reid Tr. 279:11) (Reid testifying, "But if I'd seen something in that [NYSDHR Brief] that I was not comfortable with, did not think represented facts, I would have said something. But I don't recall…suggesting any changes."); Dkt. No. 242-15 (Bick Tr. 238:11-240:4) (Bick testifying, "I believe I read the document and gave comments. I believe most of my comments would be of a factual nature… I read the complaint and didn't object to what they stated.").

And yet, many of the descriptions and representations in Davis Polk's "Factual Background" section describe events and interactions that Defendants knew never happened and **could not have happened**—descriptions and representations that have no factual or documentary support. The intent of Davis Polk, Reid, and Bick to deprive Cardwell of relevant records through a significant failure of their duty to preserve documents was consistent with their intent to deprive the NYSDHR with a truthful, complete, and fact- and document-supported description of (i) their performance review system and (ii) the individual reviews and feedback that was contemporaneously communicated to Cardwell. For example, Davis Polk's, Reid's, and Bick's representation to the NYSDHR that "*The Firm delivered this feedback to Cardwell at the end of his Credit rotation*" is undeniably an untrue statement of a material fact and reflects a conscious and coordinated effort in 2017 to impact the NYSDHR's investigation. Since their submitted NYSDHR Brief and attempt to gain litigation advantages, Defendants have since admitted that Cardwell received completely different feedback at the end of his Credit rotation. *See* Dkt. No. 305 at 5 ("In his summary of the review, Kyrwood described Cardwell's evaluation as: "Generally positive - organized, high quality work, good attention to detail, hard worker.");

Defs.' Answer at ¶ 198 ("Kyrwood provided an accurate summary of the in-person review meeting conducted with plaintiff in May 2015.)[24]

To be sure, the Court has already identified evidence relevant to the Court's evaluation of whether Defendants' failed to preserve evidence with an "intent to deprive":

- "[T]he language quoted in the NYSDHR brief came from…reviews that were not delivered to Cardwell…That the Firm appears to have, at the least, overstated the extent to which…reviews were contemporaneously communicated to Cardwell could lead a reasonable jury to doubt the Firm's broader statements that Cardwell's performance was, in fact, disappointing from the start." Dkt. No. 305 at 67-68.

- "Cardwell's testimony that Reid told him, if Cardwell did not stop making complaints, that Cardwell would be 'off the field,'…might be seen as probative of the question of Defendants' intent to violate Cardwell's rights." *Id*. at 75.

- "Bick stated in his testimony that after Cardwell filed his EEOC complaint…, people at the firm 'recognized' that 'if [Cardwell] went public with his complaints, there would be news coverage and [people] could have [their] reputation harmed through these complaints.'" *Id*. at 66; Dkt. No. 259 Ex. 105 at 212:3–16.

Davis Polk, Reid, and Bick knew their preservation obligations in March 2017 (date Davis Polk's privilege log begins and March 2017 complaint made), June 2017 (date Davis Polk circulated preservation notices), July 2017 (Davis Polk received preservation notice from Cardwell's counsel), August 2017 (EEOC charge filed), October 2017 (NYSDHR complaint received), and September 2018 (date Defendants' counsel stated they understood their "obligations"). And yet, Hudson (and others) went more than 16-plus months *after March 2017 and during Cardwell's employment* without receiving a preservation notice. This evidence supports an inference that Defendants intentionally disregarded their preservation obligations so that ESI could be lost or deleted, no one could view what actually occurred, and Cardwell could

---

[24] Though Plaintiff has not yet seen Defendants' motion *in limine*, Defendants have suggested that these are the types of statements of facts and party admissions that Defendants now seek to exclude through in their motion *in limine*.

not use the evidence to support a likely lawsuit. *See Hollis v. CEVA Logistics U.S., Inc.*, 603 F.Supp.3d 611, 623 (N.D. Ill. 2022) (reaching same conclusion about the loss of ESI).

### D. Conclusion

On the facts stated herein, an adverse inference jury instruction is warranted for three separate, independently sufficient reasons. First, the evidence supports in inference that Davis Polk, Reid, and Bick intentionally chose not to preserve Hudson's records. *Id*. Second, Davis Polk, Reid, and Bick significantly failed their obligation to preserve and collect documents. *See Ottoson*, 268 F. Supp. 3d at 584 ("An adverse inference instruction is warranted here because Defendants have provided sufficient evidence that additional communications…likely existed, were not produced, and were relevant."). Third, their failure to preserve Hudson's (and many others') records "[cannot] be 'credibly explained' other than by bad faith." *CBF Industria de Gusa S/A*, 2021 WL 4190628, at *18 (citing *Moody*, 271 F. Supp. 3d at 431).

If such relief is not granted, at a minimum, Defendants should receive the same rebalancing as other defendants who have "exhibited both a protracted disregard of their obligation to preserve, search, and produce relevant evidence…." *See Charlestown Capital Advisors, LLC*, 337 F.R.D. at 67. In *Charlestown Capital Advisors,* Defendants were precluded from arguing or presenting certain evidence to "prevent…[plaintiff's] former employers from taking advantage of an evidentiary gap created by the…Defendants themselves." *Id*. at 68; *see also Shanghai Weiyi Int'l Trade Co., Ltd. v. Focus 2000 Corp.*, 2017 WL 2840279, at *10 (S.D.N.Y. June 27, 2017) (preclusion orders are "entirely appropriate" where the sanctioned party has failed "to produce the evidence necessary to resolve the issue as to which preclusion is sought"). Under this alternative remedy, Cardwell respectfully requests that Defendants be precluded from presenting evidence through Hudson or arguing that Hudson's performance

assessments or reviews of Cardwell during his third rotation in the Capital Markets practice group contributed to (a) Bick creating a June 2016 mid-year review cycle for Cardwell and (b) how the Firm assessed, staffed, or fired Cardwell.  *See Europe*, 592 F.Supp.3d at 180 (ordering similar remedy and precluding Defendants from (i) using evidence from the period information and records were not preserved or (ii) arguing plaintiff was worse than co-workers during the same period).

Finally, on these facts and circumstances, Cardwell separately requests that Hudson (and her reviews) be prohibited from testifying (or being used) at trial, as such testimony and records are substantially outweighed by its unfair prejudice to Cardwell.  *See* Fed. R. Evid. 403.[25]

## I.   PLAINTIFF'S MOTION *IN LIMINE* #2 FOR SANCTIONS FOR SPOLIATION OF EVIDENCE BY DAVIS POLK, THOMAS REID, AND JOHN BICK

### A.  Introduction

Cardwell requests sanctions against Davis Polk, Reid, and Bick under Fed. R. Civ. P. 37(e)(2). Specifically, Cardwell requests an adverse inference instruction that presumes Kreynin created an individual review for Cardwell in 2016, and that it was not preserved and or produced because it was unfavorable to Defendants. Alternatively, if such remedy is not granted, Cardwell requests (as more fully described below) that all the M&A partners' 2016 reviews produced in discovery be admitted as evidence and available for Cardwell's case-in-chief.

### B.  Legal Standard

The relevant legal standard is described *supra* at 3-6.

### C.  Argument

---

[25] Remarkably, as of the date this filing, Defendants have indicated that they intend to have Hudson testify at trial as one of their witnesses, presumably because they concede that she has always possessed information and records that were relevant to the parties' claims and defenses.

**1.  The Evidence Indicates an Individual Review for Cardwell from Kreynin Existed, But Was Not Produced with the Intent to Deprive Cardwell of Such Evidence**

Davis Polk conducts performance reviews for its attorneys. Defs.' Answer at ¶ 168. As part of its review process, the Firm solicits **written performance reviews** from individual reviewers. *Id* (emphasis added). The Firm utilizes a review template for individual reviews that contains the question: "[D]o you feel this lawyer is performing materially behind, with or ahead of the lawyer's class[?]" *Id.*. Upon receiving the **individual performance reviews**, the Firm develops a "consensus message" or "consensus feedback" to be delivered to the attorney being reviewed. *Id* (emphasis added). One Firm partner is asked to deliver the Firm's consensus message to the associate during a subsequent meeting and a record of that subsequent meeting is generally made on a form titled "Lawyer Reviews – Summary Reviews" ("Summary Review" form) and/or the attachments thereto. *Id*. The Summary Review form contains sections relating to principal matters worked on by the reviewee and strengths and weaknesses of the reviewee's performance. *Id*; *see also* Dkt. No. 305 at 3 (noting same). Lastly, during Cardwell's time as an associate at the Firm, Firm partners in Davis Polk's M&A group had a practice of meeting annually in or around September or October to discuss the performance reviews of more senior M&A associates (i.e., third-year and more senior associates). Defs.' Answer ¶ 92.

Kreynin was an M&A partner in Davis Polk's Corporate group and has been a Davis Polk partner since 1999. Dkt. No. 223-75 at 33 (RFA No. 57). Birnbaum became a Corporate/M&A partner in July 2016, and he served as one of two junior staffing partners in the M&A group between approximately July 2016 and August 2018. Defs.' Answer ¶ 11.

Around August 16, 2016, Cardwell was staffed on a transaction involving Kreynin and a senior M&A associate. *Id*. at ¶ 243. On September 27, 2016, Carolina Fenner, a manager and

staffing coordinator in the Firm's Associate Development Department, sent Kreynin an email: "Hi Len. See below that these were the partners for whom our system generated reviews for Kaloma (based on hours worked per matter)." Dkt. No 223-38 at 2. Kreynin's name was listed as one of the partners for whom the Firm's system had generated review forms for Cardwell. *Id.*

Kreynin delivered Cardwell's annual review during the second half of December 2016. Defs.' Answer at ¶ 324. On March 28, 2017, Kreynin created a summary review form that includes a "comments received from" section. The "comments received from" section of the summary review form Kreynin created lists nine names, including Kreynin's. Dkt. No 223-9 at 31. Birnbaum testified that ████████████████████████████████████████ ████████████████████████████████████████████ Ex. A (Birnbaum Tr. 327:9-328:24).

Despite Birnbaum's testimony and Kreynin's 2016 summary review form for Cardwell listing Kreynin's name in box 3 where it says comments received from, at no point during Cardwell's employment or since has Cardwell or this Court received or seen a written individual review that Kreynin completed for Cardwell. *See* Dkt. Nos. 223 at 2 and 223-9 at 2-42 (showing "the performance reviews **<u>saved</u>** in Davis Polk's Lawyer Review System for Kaloma Cardwell" and included in Defendants' MSJ).

Why did Defendants file reviews that were "saved in" but not "submitted to" the Firm's Lawyer Review System? The "comments received from" section on Kreynin's summary review is the same and in the same location on every summary review form that Defendants have produced for Cardwell for the years 2015, 2016, 2017, and 2018. *Id.* Kreynin's summary review form dated March 28, 2017 is the **only** summary review form for Cardwell that lists a name in

32

box 3 "comments received from" without there also being an individual review for every name listed in that section. *Id.* Kreynin's individual review is the only review that breaks the norm.

There is other evidence that suggests a written review from Kreynin for Cardwell existed and should have been produced. Multiple times on an annual basis, at least with respect to 2015 through 2017, Kreynin received emails that explained the Firm's guidelines concerning the Firm's "Lawyer Review System" and how partners should complete written reviews for associates they worked with. For example, in September 2015, the Firm's Associate Development Department emailed the following guidelines and instructions to Kreynin:

> The annual review process starts today with the distribution of review forms. You are being asked to complete reviews for associates who have billed…to a matter on which you were one of the most active partners or counsel….
>
> **The Lawyer Review System offers you the option to (i) refer the review to another partner, counsel or senior associate or (ii) to elect "No Review" in cases where you did not have enough contact with the associate to complete a review**.
>
> In the event that you think a senior associate may be better able to provide meaningful feedback, you should speak with the senior associate to let him or her know that you have referred the review. Alternatively, you may incorporate the insights provided by the senior associate into your evaluation form…**Completed forms will be retained in the system as required by law**.

Dkt. No. 256-20 at 2 (emphasis added). In addition to the option to complete written individual reviews, Kreynin and other M&A partners were repeatedly told that "The Lawyer Review System offers [them] the option to (i) refer the review to [another lawyer] or (ii) elect 'No Review' in cases where you did not have enough contact with the associate to complete a review." These instructions were circulated to the Firm's M&A partners on an annual basis in 2015, 2016, and 2017. *Id.*; see also Dkt. No. 256-22 at 2; Dkt. No. 256-24 at 2.

33

To state the obvious, Davis Polk's "Lawyer Review System" did not give Kreynin (or other M&A partners)[26] the option (i) of "work[ing] directly" with Cardwell, "becom[ing] familiar with his work," concluding that "having worked recently and closely with Mr. Cardwell, I considered him to be a poor performer and that his work was unreliable and required close supervision," **and** (ii) to elect "No Review" (directly or effectively). Yet, consider the following:

According to a declaration Kreynin submitted in connection with Defendants' 2021 MSJ, Kreynin stated, under the heading "Experience Working with Mr. Cardwell":

> In his time at the Firm, Mr. Cardwell worked on three of my deal teams, including 'Project Giant,' on which Mr. Cardwell billed time between August and November 2016. I had occasion to work directly with Mr. Cardwell on the Project Giant matter and to become familiar with his work. Mr. Cardwell's overall performance was poor, and his work product was not what I expect from a junior associate at Davis Polk.
>
> For example, Mr. Cardwell worked in the fall 2016 timeframe on an exclusivity agreement for Project Giant. In the course of his work, Mr. Cardwell made unacceptable and fundamental errors." Dkt. No 228 at 1-2.

Notably, Cardwell was on a list of M&A associates whose performance reviews were scheduled to be discussed at an **October 5, 2016** meeting of the M&A group. Defs.' Answer at ¶ 176. Regarding this meeting, Kreynin's 2021 declaration asserted:

> "In the fall of 2016, partners in the M&A Group held our customary series of meetings to decide upon the consensus message to be delivered to…associates. I was assigned, in the ordinary course of my duties in the M&A Group, to deliver Mr. Cardwell's consolidated 2016 annual performance review. I recall attending the meeting at which Mr. Cardwell's performance was discussed and describing my recent experience working with Mr. Cardwell on Project Giant. I conveyed, in sum or substance, that having worked recently and closely with Mr. Cardwell, I considered him to be a poor performer and that his work was

---

[26] In the fall of 2016, the Firm's M&A partners had a chance to complete individual reviews for Cardwell, elected not to, and now, in the aftermath of anticipated and actual litigation, are uniformly claiming under oath that Cardwell was virtually unstaffable, had a "record" of poor performance, and was "behind" associates in his class.

unreliable and required close supervision." Dkt. No 228 ¶¶ 8-9.

Kreynin's "ordinary course" of "duties," in 2016, required Kreynin to complete a written performance review for Cardwell unless he did not have enough interaction to do so. This Court should conclude Kreynin had enough interaction to create a written review for Cardwell and that Kreynin did just that. In addition to the facts and reasons stated above, the conclusion that Kreynin created a written review, and that Defendants failed to produce it because it was positive or neutral, is consistent with the fact that, at a minimum, Kreynin created three performance reviews for other associates on or around October 4, 2016 and October 9, 2016.[27]

In the October 4, 2016 review for "Associate 8," Kreynin's review states Associate 8 was

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████     Dkt. No 231-10 at 20 (emphasis added). Per Davis Polk's General Counsel's declaration, **"Associate 8" was an associate in Cardwell's class**. *See* Dkt. No 224 at 3.  Did Kreynin only have enough time between September 2016 and October 5, 2016 to discuss these issues in written reviews about other associates in Cardwell's class, but not Cardwell?

In one of the October 9, 2016 reviews, Kreynin's review for "Associate 3" ██████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████     Dkt. No 231-5 at 5. In the other October 9, 2016 review, Kreynin stated, among other

---

[27] Kreynin likely completed more individual reviews in the fall of 2016, but Defendants refused to provide all reviews created by Kreynin during this period, as requested in a timely served RFP that sought such reviews.

comments, "Associate 7" ███████████████████████████████

████████████████████████ Dkt. No 231-9 at 45. Did Kreynin not contemplate in September and

October 2016 that he should ensure the Firm's partners considered these same issues in the

context of Cardwell through Kreynin's written review?

Davis Polk's Lawyer Review System gave Kreynin (and every other M&A partner who

had an opinion about Cardwell's performance between 2015 and 2016) three options in

August/September/October 2016: (i) complete an individual review, (ii) refer the review, or (iii)

elect "No Review" in cases where he did not have enough contact with Cardwell to complete a

review. Davis Polk's Lawyer Review System is simplified further in a context, as Defendants

have repeatedly asserted, where **any** partner could have submitted reviews without the risk of

associates seeing their individual or summary reviews:[28]

> As part of the annual review process, **any partner can submit a
> review form and that performance evaluations were generally
> requested of all partners and counsel**…with whom an associate
> had worked a certain number of hours during the review period.

Defs.' Answer at ¶ 169.

Did Kreynin work "closely with Mr. Cardwell" in August and September of 2016—that

is, around the time the Firm's system generated a review form for Kreynin to complete for

Cardwell—only for Kreynin to choose to not complete an individual review for Cardwell in

advance of a M&A partners' October 2016 review meeting designed to discuss and summarize

*written performance reviews*?[29] Did Kreynin and the Defendants win a summary judgment

---

[28] *See* Defs.' Answer at ¶ 395 (Defendants asserting that the Firm's "Personnel Files" policy that states, "If an
***employee*** requests to see their personnel file, Firm policy is that only a summary of review meetings can be seen" is
a policy that "applies to non-associate employees, not associates.") Note that Defendants are intentionally
withholding and refusing to show Cardwell or the court the full handbook that this "personnel files" policy is part of.
The document showing the "Personnel Files" policy is at Dkt. No. 256-86 at 2.
[29] ████████████████████████████████████████████████████████
████████████████████ " Ex. A (Birnbaum Tr. 308:17-309:18, discussing the 2016 summary
review at Dkt. No. 231-8 at 33).

motion on September 23, 2016—defeating one of their employee's discrimination and retaliation lawsuits against the Firm by pointing the court to that employee's *written reviews*—only for Kreynin to choose to not complete a written individual review "after having worked recently and closely with Mr. Cardwell"? *See* Kreynin's Declaration at Dkt. No 228 at 1-2. There is no reason to think that the answer to either of these questions is "yes," and there is no way that the evidence at issue could or would ever be replaced or produced at this stage in the case.

### 2. Conclusion

Birnbaum's testimony about the Firm's review forms and all the circumstantial evidence noted herein indicate that Kreynin created a 2016 individual review for Cardwell, that it was destroyed or not produced because it was favorable to Cardwell, that Cardwell was prejudiced as a result, and that Defendants intended to deprive Cardwell of this evidence.[30] Accordingly, for the reasons stated herein, Cardwell respectfully requests an adverse inference instruction that a jury must presume Kreynin's 2016 individual review for Cardwell existed, was not preserved, and no longer exists because it was unfavorable to Defendants.

Alternatively, if Cardwell's request for this adverse inference is not granted, then Cardwell respectfully requests that all the produced M&A partner's 2016 reviews be admitted as evidence and available for Cardwell's case in chief, particularly (but not limited to):

- Kreynin's 2016 reviews (e.g., Dkt. Nos. 231-10 at 20, 231-5 at 5, 231-9 at 45);
- Bick and M&A partner Gar Bason's November 22, 2016 Annual Review of "Associate 5" (Dkt. No. 231-7 at 31-32, noting ███████████████████████████████████████████████████████████████████████████████

---

[30] Notably, for Cardwell's 2017 annual review, the summary review form was "intentionally blank," ensuring that Cardwell and others would have an even harder time establishing who completed reviews for Cardwell. Defs.' Answer at ¶ 531; *see also* Dkt. No. 223-9 at 30 (showing a blank summary review form and "no answer" under "comments received from."

37

- M&A partner John Butler's October 9, 2016 individual review of "Associate 7" (Dkt. No. 231-9 at 12, putting ███████████████████████████████████ ███████████████████████████ (emphasis added));

- M&A partner Lee Hochbaum's November 9, 2016 Annual Review of "Associate 8" (Dkt. No. 231-10 at 31, noting "Associate 8" is ███████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████

- Hochbaum's December 7, 2016 Annual Review of "Associate 7" (Dkt. No. 231-9 at 70, noting the ████████████████████████████████████████████ ██████████████████████████████████ (emphasis added));

- M&A partner Michael Davis's September 22, 2016 individual review of "Associate 7" (Dkt. No. 231-9 at 27, noting ███████████████████████████████ ████████████████████████████████ (emphasis added);

- Davis's September 23, 2016 individual review of "Associate 9" (Dkt. No. 231-11 at 25, noting, ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████"[31] (emphasis added));

- M&A partner John Amorosi's September 25, 2016 individual review of "Associate 9" (Dkt. No. 231-11 at 6, stating, ████████████████████████████████ █████████████████████████████████

- Birnbaum's September 12, 2016 of "Associate 2" (Dkt. No. 231-4 at 7, noting ████████████████████████████████████████████ █████████████████████████████████

- Birnbaum's December 7, 2016 Annual Review of "Associate 2" (Dkt. No. 231-4 at 25, noting, ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████[32]

- Birnbaum's December 8, 2016 Annual Review of "Associate 6" (an associate in Cardwell's class) (Dkt. No. 231-8 at 33, noting, ████████████████ ████████████████████████████████████████████ █████████████████████████████████

---

[31] Notably, Defendants have redacted associates' reviews where the review appears to indicate associates routinely needed supervision and training to transition to or become an effective mid-level/senior associate.

[32] Associate 2 was an associate who was one year **more senior** than Cardwell in 2016. *See* Dkt. No 224 at 3.

In the fall of 2016, these associates and Cardwell were subjected to the same "Lawyering Review System" that utilized the collection of written information from partners through individual reviews. *See* Defs.' Answer at ¶ 92 ("Firm partners in Davis Polk's M&A group had a practice of meeting annually in or around September or October to discuss…**performance reviews**"), ¶ 168 ("Firm solicits **written performance reviews** from individual reviewers"); Dkt. Nos. 256-20 at 2, 256-22 at 2; 256-24 at 2 (stating, "you are…asked to complete reviews")

If Defendants want to argue that Kreynin's 2016 individual review for Cardwell never existed, while also arguing that Kreynin, other M&A partners Cardwell worked with in 2016 (e.g., Amorosi[33] Butler,[34] Hochbaum,[35] Bick,[36] Gar Bason Jr. and Michael Davis[37]), and the M&A staffing partners at the time (e.g., Birnbaum) had the view "that [Cardwell's] **performance reviews** were bad enough that people had lost confidence in him and he wasn't getting work" over the last couple of months as a result—as Reid testified—a jury should be allowed to consider, at a minimum, these same partners' and other M&A partners' 2016 individual and summary reviews to determine questions around causation, pretext, and punitive damages. *See* Dkt. 256-7 at 34 (Reid Tr. 217:23-218:24) (Reid testifying that Cardwell's written performance reviews "for not one but two years now" "was a cause and effect explanation" of Cardwell's lack of work for several months and partners' "lost confidence".).

The fact that, in the fall of 2016, the Firm's M&A partners consistently created *individual* reviews; noted associates were "behind" in individual and summary reviews; and memorialized

---

[33] *See* Dkt. Nos. 223-9 at 31 and 33 (showing Amorosi listed under "[c]omments received from").

[34] *Id.* at 33 (showing Butler listed under "[c]omments received from").

[35] Dkt. No 223-38 at 2 (showing Hochbaum received an individual form for Cardwell around September 27, 2016).

[36] Defs.' Answer at ¶ 144 (showing Bick and Cardwell worked on a research assignment in June 2016)

[37] Defs.' Answer at ¶¶ 244-47 (showing Cardwell working with M&A partners Gar Bason Jr. and Michael Davis, among other M&A partners, on August 18, 2016, September 7, 2016, and September 9, 2016).

criticisms, warnings and potential firings in other associates' reviews but not Cardwell's are all relevant non-prejudicial evidence. *See Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."); *Tainsky v. Clarins USA, Inc.*, 363 F. Supp. 2d 578, 585 (S.D.N.Y. 2005) (stating that lack of verbal or written warnings regarding poor performance, among other factors, undercut employer's suggestion that employee was fired due to poor work performance); *Conklin v. Cnty. of Suffolk*, No. 09 Civ. 3014, 2012 WL 1560390, at *17 (E.D.N.Y. May 3, 2012) (holding that employer's lack of documentation of supposed longstanding attendance problems supported inference that attendance issue was a pretext for retaliation).

## CONCLUSION

Ultimately, Cardwell's requests in this omnibus motion *in limine* are consistent with the fundamental reality that "many of the statements in the record about Cardwell's performance at Davis Polk before he filed his EEOC complaint were either positive or neutral." Dkt. No. 305 at 68-69. Cardwell informed the NYSDHR of this reality in January 2018,[38] and Defendants have repeatedly doubled-down on misrepresenting Cardwell's employment record and its own business practices, including a set of performance reviews that were neither "customary" nor "given in the ordinary course." The requested remedies are warranted and necessary.

---

[38] Cardwell's Rebuttal to Davis Polk's NYSDHR Brief, Dkt. No. 52-6 at 5: "Notably, it is standard practice for Davis Polk to uniformly document associates' poor performance (particularly, performance issues that would 'have warranted giving Cardwell a message that it was time for him to look for another job') and issue warnings. Davis Polk's failure to do so–over more than three years–suggests that Mr. Cardwell's so-called 'poor performance' is a lately created excuse."; *see also* Dkt. Nos. 231-7 at 31-32 and 256-58 at 2-6 (showing Davis Polk documenting in 2016 and in the ordinary course when M&A/corporate associates' performance warranted termination or a warning).

DATED:          September 15, 2023                    Respectfully submitted,

                                                     /s/ David Jeffries

                                                     David Jeffries

                                                     *Attorney for Plaintiff*


cc (via ECF):

Jeh C. Johnson
Bruce Birenboim
Susanna M. Buergel


*Attorneys for Defendants*