**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

KALOMA CARDWELL,

                 *Plaintiff*,

        v.

DAVIS POLK & WARDWELL LLP,
THOMAS REID, JOHN BICK, and DANIEL
BRASS,

                 *Defendants*.

Case No. 19-cv-10256-GHW

**PROPOSED JOINT PRETRIAL
ORDER**

The Honorable GREGORY H. WOODS, U.S. District Judge:

      Having conferred pursuant to Fed. R. Civ. P. 16 and Rule 5.A of Hon. Gregory H.
Woods' Individual Rules and Practices, the following matters have been agreed to by the Parties
or are proposed for the Court's consideration.

**I.      Full Caption of the Action**

      The full caption of the action is *Kaloma Cardwell* v. *Davis Polk & Wardwell LLP,
Thomas Reid, John Bick, and Daniel Brass*, Civil Case No. 1:19-cv-10256-GHW.

**II.     Trial Counsel**

<u>Attorney for Plaintiff</u>
DAVID JEFFRIES ATTORNEY AT LAW
David Jeffries
1345 6th Avenue
Ste 33rd Floor
New York, NY 10019
Telephone: (212) 601-2770
Facsimile: (212) 729-7490
djeffries@jeffrieslaw.com

<u>Attorneys for Defendants</u>
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Bruce Birenboim
Susanna M. Buergel
Jeh C. Johnson

1285 Avenue of the Americas
New York, NY 10019
Tel:  (212) 373-3000
Fax:  (212) 757-3990
bbirenboim@paulweiss.com
jjohnson@paulweiss.com
sbuergel@paulweiss.com

Martha L. Goodman
2001 K Street, NW
Washington, DC 20006-1047
Telephone:  (202) 223-7341
Facsimile:  (202) 330-5921
mgoodman@paulweiss.com

### III.    Subject Matter Jurisdiction

Plaintiff contends that this Court has subject matter jurisdiction over his claims that arise under federal law pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding an alleged deprivation of his rights under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981(a).  Plaintiff contends that this Court has supplemental subject matter jurisdiction over Plaintiff's related claims arising under the New York State Human Rights Law § 296(1)(e) and the New York City Administrative Code § 8-107(7), pursuant to 28 U.S.C. § 1367(a).

Defendants do not contest that this Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1367.

### IV.    Claims and Defenses

Plaintiff's Summary of Claims

During Cardwell's early years of employment at Davis Polk, Cardwell communicated concerns and complaints about him and other minority attorneys at Davis Polk experiencing bias and exclusion because of their race. Although his concerns and complaints harmed no one, Cardwell immediately experienced retaliatory blowback.  The responses to and anticipation of Cardwell's protected activity increased until certain defendants threatened Cardwell and then unflinchingly carried out the threat. Defendants fired Cardwell because of his protected activity and did so by knowingly manufacturing a false and misleading "factual background" about Cardwell's performance, employment, and core aspects of the Firm's business.

Defendants' retaliatory animus and actions towards Cardwell, including conscious attempts to smear his reputation, continued beyond his employment at Davis Polk. It was not until Defendants were required during discovery to produce the performance reviews of other associates, which made it undeniable that other associates received criticisms and warnings that Cardwell did not, did Defendants temper their public, four-year narrative about Cardwell barely

making the transition from being *a law student*. See ECF 25 ("Davis Polk hired Plaintiff in the hopes that he would succeed and make the transition from law student to skilled attorney. These hopes were disappointed.")

Cardwell asserts that he will put on a sufficient amount of evidence to show that, during Cardwell's employment and since, Defendants acted with reckless indifference and conscious disregard of Cardwell's rights—which includes the right to engage in protected activity without others attempting to intimidate him, take him out the game, or publicly humiliate him.

Compensatory and punitive damages are warranted and necessary to remedy life-altering harms to Plaintiff and deter Defendants and others from engaging in similar acts.

Plaintiff initially brought claims of retaliation against Sophia Hudson, William Chudd, John Butler, Brian Wolfe, and Harold Birnbaum in violation of Title VII, § 1981, the NYSHRL, and the NYCHRL, which were dismissed in connection with defendants' summary judgment motion. (ECF. No. 305.) Plaintiff also initially brought claims of discrimination against Davis Polk, Reid, Bick, Birnbaum, Wolfe, and Brass in violation of Title VII, § 1981, the NYSHRL, and the NYCHRL, which were dismissed in connection with defendants' summary judgment motion. (ECF. No. 305.) Plaintiff's aiding and abetting claims have been dismissed in their entirety, and do not remain to be tried.

<u>Defendants' Summary of Their Defenses</u>

Cardwell was terminated from his employment at Defendant Davis Polk for legitimate, non-retaliatory reasons related to his performance on the job.

Over the course of his four-year tenure at the Firm, lawyers in three different practice groups within the Firm observed—and documented—similar and increasingly troubling problems with Cardwell's performance. Over time, it became apparent to Defendants that Cardwell was unable consistently to do the types of client-critical tasks he would need to be able to do in order to continue at the Firm. Cardwell ultimately was unable to successfully make the transition from junior to midlevel associate or to demonstrate that he had the skills necessary to succeed at the Firm.

In early 2018, Cardwell was told during his annual review that his poor performance had made it increasingly challenging to staff him at a level consistent with that of his peers and that it was time for him to begin—supported by his full Firm salary and with the assistance of job placement services paid for by the Firm—to seek alternative employment. During this time, Cardwell was not required to perform any work at the Firm so that he could concentrate on finding a new job. At Cardwell's request, the Firm extended this period to six months. Yet during this six-month period, Plaintiff never availed himself of the services that the Firm offered. Since February 2018, Plaintiff has never looked for alternative employment.

Further, there is no evidence that will corroborate Cardwell's made-for-litigation assertions that the documented evidence of his unsatisfactory performance is a sham or that the Firm sought to punish Cardwell for any complaints he allegedly made about racial bias or

exclusion, or that any Defendant engaged in any scheme to terminate him based on the alleged pretext that he was a poor performer.

As Plaintiff notes, this is an action to recover damages for retaliation under federal, state, and city law.  This trial is only about whether Defendants retaliated against Plaintiff because of his alleged protected activities.  Defendants did not.

Accordingly, Defendants assert that Plaintiff cannot prevail on his claims for retaliation brought pursuant to Title VII, Section 1981, the New York State Human Rights Law, or the New York City Administrative Code because: (a) Plaintiff cannot prove that each of the protected activities he asserts in fact constitute protected activities under the relevant law; and (b) Plaintiff cannot prove the requisite connection (i) between each alleged protected activity and any adverse employment action, or (ii) between each alleged protected activity and conduct on the part of a defendant that was reasonably likely to deter a person from engaging in protected activity.  Plaintiff will not be able to prove that retaliation was a "but-for" cause of any adverse employment action, or that the conduct was motivated even in part by retaliation.

Further, the evidence will show that any adverse employment actions were taken for legitimate, non-retaliatory reasons.  Plaintiff will not be able to put forth sufficient evidence for a jury to find that the legitimate reasons for such actions were pretext for retaliation.

Plaintiff's discrimination-based claims against Defendants have been dismissed in their entirety, and do not remain to be tried.

Plaintiff's aiding and abetting claims have been dismissed in their entirety, and do not remain to be tried.

Plaintiff's claims against William Chudd, Sophia Hudson, Harold Birnbaum, Brian Wolfe, and John Butler have been dismissed in their entirety, and no claims remain to be tried against them.

Plaintiff will not be able to put forward sufficient evidence to support an award of compensatory damages.  Plaintiff's claims for frontpay and backpay damages have been dismissed in their entirety, and do not remain to be tried.

Plaintiff will not be able to put forth sufficient evidence for a jury to award  punitive damages, including because no Defendant violated the law maliciously, vindictively, or with willful or wanton disregard of Plaintiff's rights.

## V.        Trial Length

The case is to be tried before a jury.

Plaintiff's Position

Plaintiff objects to and does not consent to Defendants' proposal. Plaintiff acknowledges that the Court has "for the sake of caution, . . . set aside at least three weeks for a trial of the case." (ECF 313). Plaintiff estimates that that the total length of trial will take at least three weeks, and that his case-in-chief will last at least two weeks. Plaintiff objects to and does not consent to Defendants' request for a "trial clock" of 35 hours per side. Defendants' "trial clock" proposal is inconsistent with the nature of this case, Plaintiff's allegations, and seeks to weaponize their other positions regarding witnesses, exhibits, and the evidence they are currently seeking to exclude through a motion *in limine*. Plaintiff has a right to meet his "burden" and Defendants' requests regarding the length of trial, coupled with their other requests, are simply an attempt to undermine Plaintiff's ability to meet his "burden."

<u>Defendants' Position on Length of Trial</u>

Defendants estimate that this case can be tried in approximately 2 weeks, inclusive of jury selection, opening statements, and closing arguments. Defendants request that the Court establish a "trial clock" of 35 hours per side. Defendants submit that a trial clock of 35 hours per side (i.e., approximately six trial days assuming six to six and a half hours of trial per day) is an appropriate amount of time to try this case, which: is not complex, does not involve a complicated evidentiary record, involves four claims for relief which substantially overlap and require the same kinds of evidence, and does not require the cumulative, repetitive testimony of the multitude of witnesses listed on Plaintiff's trial witness list. *See Wantanabe Realty Corp.* v. *City of New York*, 2004 WL 2112566, at *2 (S.D.N.Y. Sept. 23, 2004) ("Trial courts have discretion to impose reasonable time limits on the presentation of evidence at trial. This is essential if they are to manage their dockets, as many cases compete for trials and for the attention of judges, and no party has an unlimited call on their time.").

## VI.    Magistrate

Not all parties consent to trial by a magistrate judge.

## VII.    Stipulations of Fact

1. Kaloma Cardwell is an African-American/Black ("Black") male.

2. Davis Polk & Wardwell LLP ("Davis Polk" or the "Firm") is a global law firm registered as a limited partnership under the laws of the State of New York, with its principal place of business at 450 Lexington Avenue, New York, New York 10017.

3. Mr. Cardwell attended U.C. Berkeley School of Law ("Berkeley Law") in the 2012 to 2014 time period.

4. Mr. Cardwell joined Davis Polk as a summer associate in 2013.

5. Mr. Cardwell was an employee of Davis Polk from September 15, 2014 through August 10, 2018.

6. Mr. Cardwell worked as a lawyer in the Firm's Corporate Department, and had the title of associate at Davis Polk.

7. Mr. Cardwell received the same year-end bonus payment given in each of 2014, 2015, 2016, and 2017 to other associates in his class year of equal tenure.

8. Thomas Reid became a partner at Davis Polk in 1995 and served as a partner during (as well as outside of) the 2014–2018 timeframe.

9. Mr. Reid was Managing Partner of the Firm during (as well as outside of) the 2014–2018 timeframe.

10. John Bick became a partner at Davis Polk in 1991 and was a partner at Davis Polk during (as well as outside of) the 2014–2018 timeframe.

11. Mr. Bick was head of the Firm's Corporate Department during (as well as outside of) the 2014–2018 timeframe.

12. Daniel Brass has been a partner in the M&A practice group of Davis Polk's Corporate Department from July 2017 through the present.

13. Mr. Brass served as a M&A staffing partner from approximately July 2017 through August 10, 2018.

14. Mr. Bick and Mr. Reid were members of the Firm's three-person Management Committee during (as well as outside of) the 2014–2018 timeframe.

15. The Firm conducts performance reviews of its associates.

16. The Firm solicits written performance reviews of its associates from individuals who worked with the associate being reviewed.

17. A record of that subsequent meeting is generally made on a form titled "Lawyer Reviews – Summary Reviews" ("Summary Review" form) and/or the attachments thereto.

18. The Summary Review form contains sections relating to principal matters worked on by the reviewee and strengths and weaknesses of the reviewee's performance.

19. Firm partners in Davis Polk's M&A group had a practice of meeting annually in or around September or October to discuss the performance reviews of more senior M&A associates, but not the reviews of the most junior associates or rotators.

20. Cardwell participated in face-to-face review meetings in May 2015, December 2015, June 2016, December 2016, and January 2018.

21. Associates in the Firm's Corporate Department typically complete two rotations lasting approximately six months, after which the associates typically are assigned formally to one group.

22. Mr. Cardwell completed a first rotation in the Credit practice group from September 2014 to April 2015.

23. Mr. Cardwell completed a second rotation in the M&A practice group from April 2015 to October 2015.

24. Mr. Cardwell completed a third rotation in the Capital Markets practice group from October 2015 to April 2016.

25. After the third rotation, Mr. Cardwell was assigned to the M&A practice group in April 2016.

## VIII.   Statements of Law

Agreed-Upon Statements of Law

1. The elements of Plaintiff's Title VII, Section 1981, and New York State Human Rights Law ("NYSHRL") retaliation claims are generally the same: (1) that the plaintiff engaged in protected activity; (2) that the defendant was aware of that activity; (3) that plaintiff "was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse; and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr* v. *N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023); *see Kelly* v. *Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (noting that Title VII and NYSHRL retaliation claims are analyzed under the same standards); *Santos* v. *Costco Wholesale, Inc.*, 271 F. Supp. 2d 565, 574 (S.D.N.Y. 2003) ("[T]he elements required to make out a claim of retaliatory discharge under 42 U.S.C. § 1981 are the same as those required to make out such a claim under Title VII….") (citing *Taitt* v. *Chem. Bank,* 849 F.2d 775, 777 (2d Cir. 1988).

2. There are two differences between Plaintiff's Title VII, Section 1981, and NYSHRL retaliation claims, on the one hand, and, on the other hand, Plaintiff's New York City Human Rights Law ("NYCHRL") claims.

   a. First, for the federal and state law claims, "[P]laintiff need only show that the allegedly retaliatory actions, taken either singularly or in the aggregate, were 'materially adverse,' which is defined as action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Carr* v. *N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023) (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006)).

   For the city law claim, Plaintiff must prove the employer engaged in conduct which was reasonably likely to deter a person from engaging in protected activity. N.Y.C. Admin. Code § 8-107(7); *Reichman* v. *City of New York*, 117 N.Y.S. 3d 280, 286 (2d Dep't 2020).

    b. Second, for the federal and state law claims, Plaintiff must prove that the but-for cause of the alleged adverse employment action was the Plaintiff's protected activity. *Zann Kwan*, 737 F.3d at 845. "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id*. at 846.

    For the city law claim, Plaintiff must prove that the "protected activity was a motivating factor [for] defendant's retaliatory action—not, as under Title VII, that it was a but-for cause." *Philip* v. *Gtech Corp.*, 2016 WL 3959729, at *11 (S.D.N.Y. July 20, 2016).

3. Compensatory and punitive damages for Plaintiff's Title VII retaliation claim are statutorily capped at $300,000 combined. 42 U.S.C. § 1981a(b)(3)(D); *Mugavero* v. *Arms Acres, Inc.*, 680 F. Supp. 2d 544, 586 (S.D.N.Y. 2010).

<u>Plaintiff's Additional Statements of Law</u>

1. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan*, 737 F.3d at 846.

2. Regarding Plaintiff's Title VII claim, anticipatory retaliation or "preemptive retaliation" has been held to be prohibited conduct under Title VII.

    a. First, in interpreting Title VII's antiretaliation provision more broadly than its anti-discrimination provision, the Supreme Court has held that the antiretaliation provision's primary purpose is "maintaining unfettered access to Title VII's remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

    b. The Supreme Court has interpreted Title VII's antiretaliation provision broadly, holding that an employer is prohibited from retaliating against an employee for engaging in protected activity if that retaliation "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Carr v. New York City Transit Authority*, 76 F.4th at 180-81 (2d Cir. 2023) (quoting same and noting "[a]ll that is relevant is whether the actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination.").

    c. Where an employer retaliates against an employee in anticipation of that employee engaging in protected activity, that employer may well dissuade that employee from engaging in the activity, and therefore that employer may also violate Title VII. *See Belyea v. City of Glen Cove*, 2022 WL 3586559, at *14

(E.D.N.Y. Aug. 22, 2022) ("In view of the fact that Plaintiff was ultimately terminated and thus suffered an adverse employment action based on her termination,…the threat of termination is also an adverse employment action.") ; *Lester v. O'Rourke*, 2018 WL 3141796 at *4 (N.D. Ill. June 27, 2018) (quoting *Robinson*, 519 U.S. at 346 and holding that "[b]ecause the anti-retaliation provision exists primarily to maintain 'unfettered access to statutory remedial mechanisms,' some kinds of threatened retaliation…must be actionable under Title VII."); *Beckel v. Wal-Mart Associates, Inc.*, 301 F.3d 621, 624 (7th Cir. 2002) ("[I]f there were admissible evidence that Wal–Mart had threatened the plaintiff with firing her if she sued, … [s]uch a threat would be a form of anticipatory retaliation, actionable as retaliation under Title VII."); *Sauers v. Salt Lake Cty.,* 1 F.3d 1122, 1128 (10th Cir. 1993) ("Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination exists no less retaliatory than action taken after the fact; consequently, we hold that this form of preemptive retaliation falls within the scope of [Title VII].").

2. Compensatory and punitive damages under Plaintiff's Section 1981, NYSHRL, and NYCHRL retaliation claims are not capped. 42 U.S.C. 1981a(b)(4) ("Nothing in this section shall be construed to limit the scope of, or the relief available under, section 1981 of this title"); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 798 (8th Cir. 2004) ("[I]n making the decision to limit damages in Title VII cases, Congress made the implicit judgment not to limit damages in § 1981 cases."); NYS Executive Law § 297(4)(c); N.Y. Admin. Code. § 8-502(a); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F.Supp.3d 68, 101 (E.D.N.Y. 2020) ("The NYCHRL . . . imposes no limit on the amount of punitive damages a court may award.")

Defendants' Additional Statements of Law

1. For all of Plaintiff's remaining claims, temporal proximity between a protected activity and an adverse employment action, standing alone, is not sufficient to prove retaliatory intent.  *Slattery* v. *Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *Figueroa* v. *Garland*, No. 1:21-cv-7849-GHW, 2022 WL 17539114, at *16 (S.D.N.Y. Dec. 6, 2022) (Woods, J.) (quoting *Slattery*, 248 F.3d at 95).

2. For all of his remaining claims, Plaintiff must prove that any individual defendant had personal knowledge of the alleged protected activity.  *Stern* v. *State Univ. of N.Y.*, No. 16-cv-5588, 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018).

3. The Title VII cap of $300,000 is routinely used as a benchmark for appropriate punitive damages under Section 1981, the NYSHRL, and the NYCHRL.  *See Thomas* v. *iStar Fin., Inc.*, 508 F. Supp. 2d 252, 263 (S.D.N.Y. 2007) (NYCHRL); *Kauffman* v. *Maxim Healthcare Servs., Inc.*, 509 F. Supp. 2d 210, 220–21 (E.D.N.Y. 2007).

4. Plaintiff must prove his entitlement to punitive damages under the "clear and convincing standard" burden of proof, not preponderance of the evidence.  *RVC Floor Decor, Ltd.* v. *Floor & Decor Outlets of Am., Inc.*, 2023 WL 3092918, at *6 (E.D.N.Y. Apr. 26, 2023)

(citing *Randi A.J.* v. *Long Island Surgi-Ctr.*, 46 A.D.3d 74, 86 (2d Dep't 2007) and *Munoz v. Puretz*, 301 A.D.2d 382, 384 (1st Dep't 2003)); *see also Chadha* v. *Chadha*, 2020 WL 1031385, at *12 (E.D.N.Y. Mar. 2, 2020), *R&R adopted*, 2020 WL 5228812 (E.D.N.Y. Sept. 2, 2020); *Pure Power Boot Camp, Inc.* v. *Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 526 (S.D.N.Y. 2011); *Flynn* v. *Cable News Network, Inc.*, 2021 WL 6290046, at *9 (S.D.N.Y. Oct. 22, 2021).

5. In order to make out a claim for "anticipatory retaliation," a plaintiff must prove that the defendant took an adverse action "in anticipation of" a plaintiff's protected activity. *See Ochei* v. *The Mary Manning Walsh Nursing Home Co.*, 2011 WL 744738, at *6 (S.D.N.Y. Mar. 1, 2011) (the anti-retaliation provision of Title VII may apply when the employer terminates the "employee . . . about to file a complaint"). Plaintiff does not plead that any adverse action was taken in anticipation of a protected activity. Further, to the extent Plaintiff appears to claim Reid's statements to Plaintiff in the March 29, 2017 meeting were an adverse action in anticipation of a protected activity, the Court has held that those statements were not an adverse action. (ECF No. 305 at 62–63.) *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 705 (S.D.N.Y. 2016) ("Partial summary judgment thus functions as 'a pretrial adjudication that certain issues shall be deemed established for the trial of the case….'"); Fed. R. Civ. P. 56.

## IX. Trial Witnesses

<u>Parties' Agreed-Upon Trial Witness Processes and Procedures</u>

The parties' identification of witnesses herein shall be without prejudice to their ability to call currently unidentified rebuttal witnesses, with all parties reserving rights to object that the witness is not a proper rebuttal witness. Notwithstanding the foregoing, each party has represented to the other that any witness whom such party currently anticipates may be called, including any rebuttal witnesses, has been identified to the opposing party. The parties agree that, to the extent any potential party currently anticipates the need to call any additional witnesses, including for rebuttal, such party shall immediately notify the opposing party.

The parties agree to provide the other side advance notice of witnesses to be called, in the order that it intends to call them.

The parties disagree as to how much advance notice must be provided. Plaintiff proposes twenty-four hours advance notice. Defendants propose seventy-two hours' advance notice, in particular because the vast majority of witnesses on Plaintiff's list are affiliated with Defendants.

If the order of the witnesses to be called on a given day changes, the parties will provide notice of the change to the opposing party as immediately as possible after the order has changed. If a party decides not to call a designated witness, such party will provide notice of that change to the opposing party as immediately as possible after the party has determined not to call a witness.

Unless the Court orders otherwise, and excluding any rebuttal case, all witnesses will only testify once. If a party calls an adverse witness live in its case, then that party will conduct

an adverse direct of the witness.  The opposing party will then conduct its direct exam of the witness, which may extend beyond the scope of the adverse direct.  The calling party may then re-cross examine the adverse witness, and the opposing party may then re-direct the witness. The parties may continue to re-cross or re-direct the witness in accordance with the scope of matters covered by the immediately preceding re-cross or re-direct.

<u>Plaintiff's Trial Witnesses</u>

Plaintiff **will call** the following witnesses:

| Name | Method | Subject of Testimony |
|------|--------|----------------------|
| Kaloma Cardwell | In person | Mr. Cardwell's employment background, performance and experiences with Defendants, the Firm's partners, associates, and employees; discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made by current or former employees of Defendants; complaints Mr. Cardwell made concerning discrimination and retaliation during his employment; the harms and damages he suffered as a result of Defendants' retaliatory actions; the punitive damages that are warranted and necessary; Defendants' corporate and management structure; Defendants' financial condition and business; Defendants' business, personnel and employment decisions, policies and practices. |
| Martin Dellacona | In person | Mr. Dellacona worked in the Firm's Information Systems department and worked with the Firm's Associate Development to send or respond to communications related to the Firm's Lawyering Review System and associates' workload capacity forms.<br><br>Mr. Dellacona will be questioned about his emails, communications, and work that involved sending instructions to partners and others regarding the Firm's "Lawyer Review System," and other communications related to instructions or guidance that were sent to the Firm's partners and associates regarding the writing or documenting of individual reviews or summary reviews.<br><br>He will also be questioned about his communications in the context of Defendants' business, personnel and employment decisions, |

| | | |
|---|---|---|
| | | policies and practices as they existed during Cardwell's employment. |
| Renee DeSantis | In person | Ms. DeSantis will be questioned her role as the Director of the Associate Development Department; her emails and communications to Mr. Cardwell and the Firm's partners, counsel, associates, and employees, including her communications about the Firm's performance review process; the trainings or reminders she facilitated regarding how partners should document, communicate, and summarize performance reviews; the concerns and complaints Mr. Cardwell made during the September 2015 Diversity Committee meeting and September 2016 meeting with a Manager in her Department; and her role in assessing Plaintiff's performance and the Firm's decision to fire Cardwell in January 2018.<br><br>She will also be questioned about other issues and communications related to Mr. Cardwell's employment, staffing, performance and experiences; discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made by current or former employees of Defendants; complaints Mr. Cardwell made concerning discrimination and retaliation during his employment; Defendants' knowledge and responses to Mr. Cardwell's complaints concerning discrimination and retaliation; the damages he suffered as a result of Defendants' retaliatory actions; Defendants' business, personnel and employment decisions, policies and practices. |
| Alicia Fabe | In person | Ms. Fabe was a manager in the Firm's Associate Development Department; member of the Firm's Diversity Committee; and the author or custodian of various emails and documents that were sent to or related to Mr. Cardwell; Defendants; the Diversity Committee meetings and the agendas that she authored or revised in advance of those meetings; and the Diversity Committee's "Management Committee Reports" that were used to provide updates to the Management Committee, to name just a few. |

| | | |
|---|---|---|
| | | She was present for or had knowledge of Mr. Cardwell's September 2015 and September 2016 complaints.<br><br>Ms. Fabe will be questioned about Plaintiff and Defendants regarding the Firm's review process; the trainings she facilitated for associates and partners; her role in requesting or facilitating feedback from associates to Firm leaders and partners; as well as other issues related to Mr. Cardwell's employment, staffing, performance and experiences.<br><br>Ms. Fabe will also be questioned about her knowledge of Cardwell's complaints or concerns, Defendants' knowledge of and reaction to those concerns and complaints, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Carolina Fenner | In person | Ms. Fenner was a member of the Firm's Associate Development Department and authored several communications related to Mr. Cardwell's staffing; performance and performance reviews; including the "consensus message" Mr. Cardwell was supposed to receive in 2015 and 2016; as well as documents that indicate she recommended Mr. Cardwell should not be scheduled for a mid-year review in the Fall of 2017.<br><br>Ms. Fenner will be questioned about her emails and communications to and related to Mr. Cardwell, including her role in staffing Mr. Cardwell from 2015 through 2018.<br><br>Ms. Fenner will also be questioned about her knowledge of Cardwell's complaints or concerns, Defendants' knowledge of and reaction to those concerns and complaints, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Kathleen Ferrell | In person | Ms. Ferrell was the Firm's head of Personnel Committee; was listed as a contact person in the Firm's complaint procedure policies; a person who completed an individual review for Mr. Cardwell in 2017, and the author/presenter of |

| | | |
|---|---|---|
| | | emails, presentations, and memos related to the Firm's review process.<br><br>She sent (or had sent on her behalf) annual reminders, instructions, and memos about the Firm's review process to partners (including Defendants), counsel, and associates (including Mr. Cardwell).<br><br>Ms. Ferrell will be questioned about her performance evaluation of Mr. Cardwell; the emails she sent Plaintiff and Defendants regarding the Firm's review process; her presentations to Mr. Cardwell and other associates on "How to Get Feedback;" as well as other issues related to Mr. Cardwell's employment, staffing, performance and experiences.<br><br>Ms. Ferrell will also be questioned about her knowledge of Mr. Cardwell's complaints or concerns, Defendants' knowledge of and reaction to those concerns and complaints, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Byron Rooney | In person | Mr. Rooney was a staffing partner in the Capital Markets group; made staffing decisions related to Mr. Cardwell's staffing during his Capital Markets rotation; and had communications with Mr. Cardwell regarding how Mr. Cardwell was staffed during his Capital Markets rotation.<br><br>Mr. Rooney was also a member of the Firm's Diversity Committee and participated in several communications in connection with the September 2015 BAG/Diversity Committee meeting where Mr. Cardwell made a complaint.<br><br>Mr. Rooney will be questioned about his staffing decisions and communications with Mr. Cardwell, his knowledge of Cardwell's complaints or concerns, Defendants' knowledge of and reaction to those concerns and complaints, as well as Davis Polk's operations and business |

| | | |
|---|---|---|
| | | model, including staffing, assigning, and/or the partnership. |
| Monica Holland | In person | Ms. Holland was a corporate partner who worked on matters with Cardwell. She was the Chair of the Firm's Diversity Committee; was present during Cardwell's September 2015 complaint to the Diversity Committee; and participated in the Diversity Committee's "Management Committee Reports," which routinely provided updates to the Firm's Management Committee about the Firm's Affinity Groups, including an update about meetings several Defendants testified they did not have knowledge of or do not recall having knowledge of.

Ms. Holland will be questioned about her role on the Firm's Diversity Committee; the Diversity Committee's "Management Committee Reports" and other communications to the Diversity Committee and Management Committee; and her knowledge of Cardwell's complaints or concerns, Defendants' knowledge of and reaction to those concerns and complaints, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Jill Sterner | In person | Ms. Sterner had communications with Mr. Cardwell in 2017 regarding his health, including when she informed Mr. Cardwell that he would have to take medical leave and get clearance from a medical professional before returning to work.

She also received direct communications from Cardwell where Mr. Cardwell told her that his health issues were the result of the Firm, Reid, and Bick's actions.

Ms. Sterner will be questioned about her communications with Mr. Cardwell and Defendants on issues related to Mr. Cardwell's health, medical leave, and complaints, as well as issues related to Mr. Cardwell's employment, staffing, performance and experiences; discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made by current or former employees |

| | | |
|---|---|---|
| | | of Defendants; complaints Mr. Cardwell made concerning discrimination and retaliation during his employment; Defendants' knowledge and responses to Mr. Cardwell's complaints concerning discrimination and retaliation; Defendants' business, personnel and employment decisions, policies and practices; as well her observations or knowledge of the health issues Mr. Cardwell experienced while working for Defendants, as well as the damages suffered by Mr. Cardwell as a result of Defendants' retaliatory actions. |
| Nicole Katz | In person | Ms. Katz was a member of the Firm's Associate Development Department and authored several communications related to Mr. Cardwell's performance and performance reviews, including an email where she stated, "The summary for Kaloma is blank intentionally."

Ms. Katz will be questioned about her emails and communications related to Mr. Cardwell, including the basis for stating Mr. Cardwell's summary was intentionally blank.

Ms. Katz will be questioned about Mr. Cardwell's employment, staffing, performance and experiences, as well as Defendants' business, personnel and employment decisions, policies and practices. |
| Jason Kyrwood | In person | Mr. Kyrwood will be questioned about aspects of Davis Polk's operations and business model, including staffing and performance reviews; his communications with Plaintiff during Plaintiff's employment at Davis Polk; Plaintiff's job performance; his 2015 annual review meeting with Mr. Cardwell; and the basis for Mr. Kyrwood's view, as noted in his 2015 Summary Review of Mr. Cardwell's first rotation that Mr. Cardwell's work/performance was "Generally positive - organized, high quality work, good attention to detail, hard worker." |
| Gar Bason Jr. | In person | Mr. Bason will be questioned regarding his experience working with Plaintiff, Plaintiff's job performance, the instructions and communications he received regarding the Firm's Lawyer Review System, his understanding of |

| | | |
|---|---|---|
| | | those communications at the time, and the basis for Mr. Bason's decision to not complete a performance review for Plaintiff in the Fall of 2016, including whether he did so because he was adhering to the Firm's Lawyer Review System and thus chose not to complete a review on the basis that he did not have enough interaction with Mr. Cardwell to do so.<br><br>Mr. Bason may also be questioned about his knowledge of Cardwell's complaints or concerns, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership.<br><br>Mr. Bason will be questioned about his choice to not complete a review for Mr. Cardwell in the Fall of 2016, including whether he chose not to on the basis that he did not have enough interaction with Mr. Cardwell. |
| Arthur Golden | In person | Mr. Golden will be questioned regarding his experience working with Plaintiff, Plaintiff's job performance, the instructions and communications he received regarding the Firm's Lawyer Review System, his understanding of those communications at the time, and the basis for Mr. Golden's decision to not complete a performance review for Plaintiff in the Fall of 2016, including whether he did so because he was adhering to the Firm's Lawyer Review System and thus chose not to complete a review on the basis that he did not have enough interaction with Mr. Cardwell to do so.<br><br>Mr. Golden will be questioned about his knowledge of Cardwell's complaints or concerns, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership.<br><br>Mr. Golden will be questioned about his choice to not complete a review for Mr. Cardwell in the Fall of 2016, including whether he chose not to on the basis that he did not have enough interaction with Mr. Cardwell. |

| Michael Davis | In person | Mr. Davis will be questioned regarding his experience working with Plaintiff, Plaintiff's job performance, the instructions and communications he received regarding the Firm's Lawyer Review System, his understanding of those communications at the time, and the basis for Mr. Davis's decision to not complete a performance review for Plaintiff in the Fall of 2016, including whether he did so because he was adhering to the Firm's Lawyer Review System and thus chose not to complete a review on the basis that he did not have enough interaction with Mr. Cardwell to do so.<br><br>Mr. Davis will be questioned about his knowledge of Cardwell's complaints or concerns, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership.<br><br>Mr. Davis will be questioned about his choice to not complete a review for Mr. Cardwell in the Fall of 2016, including whether he chose not to on the basis that he did not have enough interaction with Mr. Cardwell. |
| Lee Hochbaum | In person | Mr. Hochbaum will be questioned regarding his experience working with Plaintiff; Plaintiff's job performance, the instructions and communications he received regarding the Firm's Lawyer Review System; his understanding of those communications at the time; the basis for Mr. Hochbaum's decision to not complete a performance review for Plaintiff in the Fall of 2016; including whether he did so because he was adhering to the Firm's Lawyer Review System and thus chose not to complete a review on the basis that he did not have enough interaction with Mr. Cardwell to do so; and the process and substance that resulted in the negative performance reviews he completed for Mr. Cardwell in the Fall of 2017.<br><br>Mr. Hochbaum will be questioned about his knowledge of Cardwell's complaints or concerns, as well as Davis Polk's operations and business |

| | | |
|---|---|---|
| | | model, including staffing, assigning, and/or the partnership.<br><br>Mr. Hochbaum will be questioned about his choice to not complete a review for Mr. Cardwell in the Fall of 2016, including whether he chose not to on the basis that he did not have enough interaction with Mr. Cardwell. |
| Louis Goldberg | | Mr. Goldberg will be questioned regarding his experience working with Plaintiff; Plaintiff's job performance, the May 2017 complaint that Mr. Cardwell communicated to Mr. Goldberg in an email, the process and the substance that resulted in the negative performance reviews he completed for Mr. Cardwell in the Fall of 2017, the annual review meeting he conducted with Mr. Cardwell in January 208, and and the basis and his role for telling Mr. Cardwell he had to seek new employment in February 2018.<br><br>Mr. Goldberg will also testify about his knowledge of Cardwell's complaints or concerns, Defendants' responses to those concerns and complaints, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Len Kreynin | In person | Mr. Kreynin will be questioned regarding the declaration he submitted in connection with Defendants' motion for summary judgment; his experience working with Plaintiff; Plaintiff's job performance; the instructions and communications he received regarding the Firm's Lawyer Review System; his understanding of those communications at the time; and the basis for Mr. Kreynin's decision to not complete a performance review for Plaintiff in the Fall of 2016 (if this is his position), including whether he did so because he was adhering to the Firm's Lawyer Review System and thus chose not to complete a review on the basis that he did not have enough interaction with Mr. Cardwell to do so.<br><br>Mr. Kreynin will be questioned about his knowledge of Cardwell's complaints or concerns, Defendants' knowledge and responses to Mr. |

| | | |
|---|---|---|
| | | Cardwell's complaints, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership.<br><br>If Mr. Kreynin denies having created a review for Mr. Cardwell, Mr. Kreynin will also be questioned about his purported choice to not complete a review for Mr. Cardwell in the Fall of 2016, including whether he chose not to on the basis that he did not have enough interaction with Mr. Cardwell. |
| John Butler | In person | Mr. Butler will be questioned regarding the performance review he completed for Mr. Cardwell in the Fall of 2016 (and the assertions contained therein, including  the basis for his decision to not answer "behind" to the question, "do you feel this lawyer is performing material behind, with, or ahead of lawyer's class"); the communications he received or participated in as Mr. Cardwell's assigned Career Advisor/Mentor; the declaration he submitted in connection with Defendants' motion for summary judgment.<br><br>Mr. Butler will also be questioned about Plaintiff's job performance; the instructions and communications he received regarding the Firm's Lawyer Review System; his understanding of those communications at the time; his knowledge of Mr. Cardwell's complaints or concerns, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Francesca Campbell | In person | Ms. Campbell worked with Mr. Cardwell in 2016 and 2017 and completed performance reviews for Mr. Cardwell in 2016.<br><br>Ms. Campbell will be questioned regarding aspects of Davis Polk's operations and business model, including staffing and performance reviews, her communications with Plaintiff during Plaintiff's employment at Davis Polk, her experience working with Plaintiff, Plaintiff's job performance, the basis for Ms. Campbell's view, as noted in the October 2016 performance evaluation she completed for Mr. Cardwell, that Mr. Cardwell was performing "with" his class. |

| Laura Turano | In person | Ms. Turano worked with Mr. Cardwell in 2015 and 2016 and completed performance reviews for Mr. Cardwell in 2015 and 2016.<br><br>Ms. Turano will be questioned regarding aspects of Davis Polk's operations and business model, including staffing and performance reviews; her communications with Plaintiff during Plaintiff's employment at Davis Polk; her experience working with Plaintiff; Plaintiff's job performance; the basis for Ms. Turano's view, as noted in her Fall 2015 and Fall 2016 performance evaluation she completed for Mr. Cardwell, that Mr. Cardwell was performing "with" his class. |
| --- | --- | --- |
| John Amorosi | In person | Mr. Amorosi will be questioned regarding his experience working with Plaintiff; Plaintiff's job performance, the instructions and communications he received regarding the Firm's Lawyer Review System; his understanding of those communications at the time; as well as the basis for Mr. Amorosi's decision to rate Mr. Cardwell as "with" his class in a performance review in the Spring of 2016 and the process and substance that resulted in the negative performance reviews he completed for Mr. Cardwell in the Fall of 2017.<br><br>Mr. Amorosi will also be questioned about his knowledge of Cardwell's complaints or concerns, the Firm's responses to Mr. Cardwell's complaints and concerns, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Oliver Smith | In person | Mr. Smith will be questioned regarding Plaintiff's job performance, the annual review meeting he conducted with Mr. Cardwell in January 2018; the instructions and communications he received regarding the Firm's Lawyer Review System; his understanding of those communications at the time; the basis for the "blank" summary review that he submitted for Mr. Cardwell, and the basis and his role for telling Mr. Cardwell he had to seek new employment in February 2018. |

| | | |
|---|---|---|
| | | Mr. Smith will also be questioned about his knowledge of Mr. Cardwell's complaints or concerns, Defendants' responses to those concerns and complaints, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| James Rouhandeh | In person | Mr. Rouhandeh was a member of the Management Committee and participated in several communications and interactions related to the Diversity Committee's formal and informal "Management Committee Reports" (regarding the Firm's Black Attorney Group); Mr. Cardwell's complaints and concerns, including the March 2017 complaint that Bick testified he reported to the Management Committee; and the Firm's decision to fire Mr. Cardwell, which several Defendants and discovery responses indicated involved the participation of the Management Committee.<br><br>Mr. Rouhandeh will be questioned about his knowledge of Cardwell's complaints or concerns; Defendants' knowledge and responses to his complaints and concerns, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership.<br><br>Mr. Rouhandeh will also be questioned about discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made or alleged by current or former employees of Defendants. |
| Neil Barr | | Mr. Barr was a member of the Management Committee and the author of an email that was sent to Davis Polk's employees and stated, "Mr. Cardwell's termination had nothing to do with his race. He was terminated for legitimate, non-discriminatory reasons, following negative performance reviews given in the ordinary course." Mr. Barr will testify about the basis for the assertions in his emails concerning Mr. Cardwell, his performance, and the reasons the Firm fired Mr. Cardwell.<br><br>Mr. Barr will be questioned about his knowledge |

| | | |
|---|---|---|
| | | of Cardwell's complaints or concerns; Defendants' knowledge and responses to his complaints and concerns, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Sharon Crane | In person | Ms. Crane was the Firm's then-Executive Director of Personnel, member of the Firm's Diversity Committee, and worked with the Firm's Management Committee.<br><br>Ms. Crane will be questioned about aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership; her communications with and about Plaintiff during Plaintiff's employment at Davis Polk; various emails and communications she participated in regarding Plaintiff's staffing, performance review, and complaints; her knowledge of Mr. Cardwell's concerns and complaints and the Firm's knowledge and reactions to his concerns and complaints, and the events leading up to the termination of Plaintiff's employment.<br><br>Ms. Crane will also be questioned about discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made or alleged by current or former employees of Defendants. |
| Rocio Clausen | In person | Ms. Clausen will be questioned regarding her experience as the Professional Development Manager at Davis Polk during the relevant time period, aspects of Davis Polk's operations and business model, including staffing, assigning, and/or performance reviews, her communications with Plaintiff during Plaintiff's employment at Davis Polk, her knowledge of Plaintiff's request for feedback, and her efforts in 2015 and 2016 to staff Plaintiff, and her communications regarding Mr. Cardwell's September 2015 complaint.<br><br>Ms. Clausen will also be questioned about her knowledge of Mr. Cardwell's complaints or concerns; Defendants' knowledge and responses to his complaints and concerns, as well as Davis |

| | | Polk's operations and business model, including staffing, assigning, and/or the partnership. |
|---|---|---|
| Sheila Adams | In person | Ms. Adams will be questioned about her communications with Mr. Cardwell during his employment, including the concerns and complaints that Mr. Cardwell contemporaneously communicated to Ms. Adams prior to their meeting with Mr. Reid in January 2016, immediately after his face-to-face review with Mr. Bick in June 2016, and immediately after his meeting with Mr. Reid and Mr. Kreynin in March 2017.<br><br>Ms. Adams will also be questioned about her communications with Defendants and other Firm leaders and employees regarding Mr. Cardwell, the September 2015 BAG/Diversity Committee meeting, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Larry Jacobs | In person | Mr. Jacobs will be questioned about the emails that he sent Mr. Cardwell during his employment, the presentations that he created or present to Mr. Cardwell, his and Defendants' knowledge and responses to Mr. Cardwell's complaints concerning discrimination and retaliation; as well as Davis Polk's operations and business model, including preserving or preventing the destruction of documents through litigation holds.<br><br>Mr. Jacobs will also be questioned about discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made or alleged by current or former employees of Defendants. |
| Michael Flynn | In person | Mr. Flynn's primary role during Mr. Cardwell's employment was that of a partner in Davis Polk litigation group. Mr. Flynn became involved in this case in connection with Mr. Cardwell's EEOC complaint, and was brought in by Mr. Reid to coordinate the Firm's internal communications and discussions related to Defendants' responses and employment actions in light of Mr. Cardwell's protected activity. |

| | | |
|---|---|---|
| | | Mr. Flynn verified Defendants' interrogatories, which addresses many non-privileged facts, issues, and employment decisions.<br><br>Despite his alleged duties as working with counsel, Mr. Flynn is a fact witness and will be questioned about the basis of the facts that he verified in Defendants' interrogatory responses; his role in investigating, collecting documents, and coordinating responses to Mr. Cardwell's protected activity; his role and other's role related to how the Firm identified the basis for the "Factual Background" section in Firm's NYSDHR Brief; and his communications with the Firm's M&A partners in 2017 shortly before M&A partners completed performance evaluations for Mr. Cardwell that rated him as "behind," as well as other communications and issues related to Mr. Cardwell's employment, the Firm's policies, and the Firm's responses to his protected activity that are not protected by attorney-client privilege or that are otherwise waived because Defendants' have demonstrated their intent to improperly use attorney-client privilege as a sword instead of a shield. |
| Charles Duggan | In person | Mr. Duggan is a partner at Davis Polk who submitted a declaration in connection with Defendants' motion for summary judgment "based on personal knowledge or inquiries of others at Davis Polk who compiled information from records maintained by the Firm."<br><br>Mr. Duggan  served as the Firm's General Counsel and was listed in various presentations and handbooks as a person associates should or could speak with if they had issues related to the Firm's complaint procedure policies or other ethical and legal considerations and questions.<br><br>Mr. Duggan's declaration touches upon many non-privileged facts, issues, and employment decisions.<br><br>Despite his alleged duties as counsel, Mr. Duggan is a fact witness and will be questioned about his and Defendants' knowledge and responses to Mr. |

| | | |
|---|---|---|
| | | Cardwell's complaints concerning discrimination and retaliation, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership.<br><br>If Defendants' attempt to impermissibly use the "attorney-client" privilege to, distance themselves from material employment actions while asserting that such decisions cannot be inquired about because they involved the participation of internal or external counsel, Mr. Duggan will be called to testify on those issues.<br><br>Mr. Duggan will also be questioned about discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made or alleged by current or former employees of Defendants. |
| Gina Caruso | In person | Ms. Caruso worked as counsel for Davis Polk, served as Deputy General Counsel in the Firm's general counsel office, and was listed in the Firm's complaint procedure policies.<br><br>Ms. Caruso is also the author of a presentation that the Firm used to train first-year associates during Lawyering 101 related to the Firm's anti-retaliation policies and related ethical considerations. Ms. Caruso conducted this training before Mr. Cardwell in 2014, and Reid and others reviewed the presentation for such training in 2015.<br><br>Ms. Caruso will be questioned about her and Defendants' knowledge and responses to Mr. Cardwell's complaints concerning discrimination and retaliation, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership.<br><br>Ms. Caruso will also be questioned about discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made or alleged by current or former employees of Defendants. |

| Harold Birnbaum | In person | Mr. Birnbaum will be questioned regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his role as staffing coordinator for the M&A group, and his efforts to staff Plaintiff on M&A matters, including Birnbaum's communications to Mr. Cardwell in August 2017 where Birnbaum informed Mr. Cardwell that he or the Firm had identified Mr. Cardwell as an associate who would be part of the Firm's effort to secure a new client and potential business on a "couple of public company deals." <br><br> Mr. Birnbaum will also be questioned about his knowledge and communications related to Mr. Cardwell's complaints and concerns, Defendants' knowledge and responses to his complaints and concerns, as well as Defendants' business, personnel and employment decisions, policies and practices. |
| --- | --- | --- |
| Brian Wolfe | In person | Mr. Wolfe will be questioned regarding his declaration submitted in connection with Defendants' motion for summary judgment, aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his role as staffing coordinator for the M&A group, and his efforts to staff Plaintiff on M&A matters. <br><br> Mr. Wolfe will also be questioned about his knowledge and communications related to Mr. Cardwell's complaints and concerns, Defendants' knowledge and responses to his complaints and concerns, as well as Defendants' business, personnel and employment decisions, policies and practices. |
| Thomas Reid | In person | Mr. Reid will be questioned about, among other topics, aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his communications with Plaintiff during Plaintiff's employment at Davis Polk, his communications with Defendants and other partners, counsel, and employees regarding  the January 2016 dinner he shared with Plaintiff and Sheila Adams, the |

| | | |
|---|---|---|
| | | March 2017 meeting with Plaintiff and Len Kreynin, Plaintiff's protected activities, Plaintiff's staffing, Plaintiff's performance, and the events leading up to the termination of Plaintiff's employment.<br><br>Mr. Reid will also be questioned about about discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made or alleged by current or former employees of Defendants. |
| John Bick | In person | Mr. Bick will be questioned about, among other topics, aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his communications with Plaintiff during Plaintiff's employment at Davis Polk, his communications with Defendants and other partners, counsel, and employees regarding  the Plaintiff's concerns and complaints (and the Defendants' responses and reactions), staffing, performance, his role as a Career Advisor/Mentor, and the communications and events leading up to the termination of Plaintiff's employment.<br><br>Mr. Bick will also be questioned about discrimination and retaliation committed at Davis Polk; complaints and/or allegations of discrimination, retaliation, or other misconduct made or alleged by current or former employees of Defendants. |
| Daniel Brass | In person | Mr. Brass will be questioned about his experience working with Plaintiff, Plaintiff's job performance, the instructions and communications he received regarding the Firm's Lawyer Review System, his understanding of those communications at the time, and the basis for Mr. Brass's decision to not complete a performance review for Plaintiff in 2015 or 2016, including whether he did so because he was adhering to the Firm's Lawyer Review System and thus chose not to complete a review on the basis that he did not have enough interaction with Mr. Cardwell to do so. |

| | | |
|---|---|---|
| | | Mr. Brass will also be questioned about his knowledge of Cardwell's complaints or concerns, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Carolyn Cardwell | In person | Ms. Cardwell will testify to her observations of the emotional distress Mr. Cardwell experienced while working for Defendants and following Defendants' termination of employment, as well as the damages suffered by Mr. Cardwell as a result of Defendants' retaliatory actions. |
| Stephanie Llanes | In person | Ms. Llanes will testify to her observations of the emotional distress Mr. Cardwell experienced while working for Defendants and following Defendants' termination of employment, as well as the damages suffered by Mr. Cardwell as a result of Defendants' retaliatory actions. |

Plaintiff **may call** the following witnesses, depending on whether, among other issues, there is a successful challenge to the admissibility of certain records and statements concerning Plaintiff's employment:

| Name | Method | Subject of Testimony |
|---|---|---|
| William Chudd | In person | Mr. Chudd may be questioned about the declaration he submitted in connection with Defendants' motion for summary judgment; his experience working with Plaintiff; Plaintiff's job performance; the instructions and communications he received regarding the Firm's Lawyer Review System; his understanding of those communications at the time; and the basis for Mr. Chudd's decision to not answer "behind" to the question, "do you feel lawyer is performing materially behind, with, or ahead of their class" in his 2015 individual review for Mr. Cardwell.<br><br>Mr. Chudd may also be questioned about his knowledge of Cardwell's complaints or concerns, Defendants' knowledge and responses to Mr. Cardwell's complaints, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Maurice Blanco | In person | Mr. Blanco served in the Firm's Capital Markets Group and may be questioned about his communications with Mr. Cardwell during his |

| | | |
|---|---|---|
| | | employment, including his communications regarding Mr. Cardwell's request to complete a third rotation in the Firm's Capital Markets group.<br><br>Mr. Blanco may also be questioned about his communications with Defendants and other Firm leaders and employees regarding Mr. Cardwell, the September 2015 BAG/Diversity Committee meeting, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| Vanessa Jackson | In person | Ms. Jackson may be questioned about her communications with Mr. Cardwell during his employment, including the concerns and complaints that Mr. Cardwell contemporaneously communicated to Ms. Jackson prior to their meeting with Mr. Reid in January 2016, immediately after his face-to-face review with Mr. Bick in June 2016, and immediately after his meeting with Mr. Reid and Mr. Kreynin in March 2017.<br><br>Ms. Jackson may also be questioned about her communications with Defendants and other Firm leaders and employees regarding Mr. Cardwell, the September 2015 BAG/Diversity Committee meeting, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership. |
| James McClammy | | Mr. McClammy may be questioned about his communications with or about Mr. Cardwell, including his communications related to his involvement with the Firm's Black Attorney Group and Diversity Committee.<br><br>Mr. McClammy may also be questioned about Defendants and other Firm leaders and employees regarding Mr. Cardwell, the September 2015 BAG/Diversity Committee meeting, as well as Davis Polk's operations and business model, including staffing, assigning, and/or the partnership |
| Susanna Buergel | In person | Mr. Bick testified that "that Paul Weiss and litigators in the general counsel's office from Davis Polk would have been drafting sort of the work on [the NYSDHR Brief].<br><br>Ms. Buergel may be called as a witness if Defendants' attempt to use any reliance on counsel defenses, good faith defenses, or otherwise attempt |

| | | to impermissibly use the "attorney-client" privilege by distancing themselves from material employment actions while asserting that such decisions can not be inquired about because they involved the participation of internal or external counsel. |
|---|---|---|
| Bruce Birenboim | In person | Mr. Bick testified that "that Paul Weiss and litigators in the general counsel's office from Davis Polk would have been drafting sort of the work on [the NYSDHR Brief].<br><br>Mr. Birenboim may be called as a witness if Defendants' attempt to use any reliance on counsel defenses, good faith defenses, or otherwise attempt to impermissibly use the "attorney-client" privilege by distancing themselves from material employment actions while asserting that such decisions cannot be inquired about because they involved the participation of internal or external counsel. |
| Sophia Hudson*<br><br>*This is not a concession that Hudson should be allowed to testify, or that any evidence related to Hudson should be allowed at trial.<br><br>Hudson's participation in the subject of Plaintiff's motion in limine and her participation and relevancy will be determined by the ruling on such motion. | In person | Pending the Court's ruling on Plaintiff's motion *in limine*, Ms. Hudson may be questioned about her experience working with Plaintiff, Plaintiff's job performance, and her communications with Defendants during the relevant period.<br><br>Ms. Hudson may also be questioned about her knowledge of Cardwell's complaints or concerns; Defendants' knowledge and responses to his complaints and concerns, as well as Davis Polk's operations and business model, including staffing, performance reviews, assigning, and/or the partnership. |

Plaintiff reserves the right: (1) to supplement or amend their list of trial witnesses; (2) amend the estimated amount of time for witnesses' testimony; (3) to call witnesses on rebuttal who are not identified in this joint pre-trial order based on the witnesses, testimony, and exhibits offered by Plaintiff and Defendants; (4) not to call any person on this list; (5) to call any persons identified by Defendants as a potential witness (without waiver of any objection to certain witnesses for any purpose); (6) to call custodians of records as may be necessary; and (7) to

introduce testimony by way of deposition transcript in the event that a witness becomes unavailable.

This action includes thirteen separate claims against four defendants. Thus, as an initial matter, Plaintiff's witness list is partly a function of the concerns and complaints that were made over a three-year period, the feedback, staffing, and assessment systems that Defendants created and relied on during Plaintiff's employment, including various but interconnected departments and committees, and the evidence that indicates Defendants' "four-year tenure" explanations and defenses are pretext. Defendants assert that various witnesses and topics are cumulative, but they conveniently ignore the structure of Davis Polk's business. Davis Polk had a Management Committee, Diversity Committee, Associate Development Department, and Human Resources Department, among other committees and departments. Some of the committee members and issues overlap, but these individuals and committees did not do "cumulative" and repetitive work.

Second, the witness list is a reflection of the positions Defendants have taken in this case. For example, regarding the proposed joint pretrial order, Defendants have taken the position that all exhibits must have a proper foundation and be admitted by the author of the document, while also complaining that Plaintiff should not be allowed to call the witnesses that will allow him to meet the requisite evidentiary standard and his burden. If Defendants stipulate to certain exhibits or certain facts, some of these witnesses will not be needed. This reality becomes all the more necessary when one factors in the evidence Defendants are currently attempting to exclude through their motion *in limine*, which includes significant and numerous statements of fact and party admissions that they now assert are neither evidence nor unambiguous facts.

Third, Defendants' argument related to Plaintiff's Rule 26 disclosures is an attempt to carve out key witnesses and custodians related to the Firm's performance review system and the instructions they communicated through emails, memos, and other related guidance, among other evidence. This case, at its core, is about the way in which Defendants' staffed, evaluated, and discussed Plaintiff before and after certain individuals obtained an awareness about his concerns and complaints.

Moreover, Defendants' position during discovery was that "the obligation to supplement initial disclosures or other written discovery under Rule 26 arises only where 'the additional or corrective information has not otherwise been made known to the parties during the discovery process or in writing.' Fed. R. Civ. P. 26." Buergel November 2, 2021 Letter to Plaintiff.; *see also* Buergel's Letter to Plaintiff on February 1, 2021 (making the same argument). The Court respectfully educated Plaintiff's counsel and supported a similar view and communicated such view to Plaintiff's counsel at the parties' December 17, 2021 teleconference. *See* ECF 238 at 18. Similarly, not only were Plaintiff's Rule 26 disclosures sufficient during discovery, the information Defendants' now claim they never received was similarly made known to the parties during the discovery process and in writing. This is certainly true of Kathleen Ferrell, among others, whom Defendants identified should be "precluded" from being called as a witness as trial. *See* Plaintiff's RFP No: 129 at ECF 242-2 at 110 (requesting "[d]ocuments and communications, between 2012 and 2018, relating to any memoranda from Kathleen Ferrell or others which described the annual review process").

Fourth, Defendants have been using "internal" and "in-house" counsel interchangeably. Charles Duggan, Gina Caruso, and Michael Flynn did not and do not all have the same functions at Davis Polk. Relatedly, "[i]t is well-recognized that in-house counsel may serve both legal and business functions, and courts will scrutinize the nature of their communications before finding those communications are privileged." *Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 38 (E.D.N.Y. 2013), aff'd, 29 F. Supp.3d 142 (E.D.N.Y. 2014). Duggan and Flynn, both litigation partners, frequently engage in business and non-privileged communications in their role as partner. Similarly, Caruso has also engaged in business roles during Plaintiff's employment, including when she conducted various trainings with Plaintiff and the Firm's associates. Ultimately, Duggan, Caruso, and Flynn, among others, created and participated in communications that were not privileged and Defendants' referring to them as "counsel" in this case does not make every issue or communication related to these individuals "privileged."

Fifth, regarding Birenboim and Buergel, "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Defendants have explicitly invoked counsel when asked questions about assessments of Plaintiff's performance and various Firm responses to Plaintiff's EEOC and NYSDHR complaints, including investigations that were triggered by Plaintiff's complaints. Plaintiff's primary concern relates to Defendants using "privilege" as a sword-and-shield. Defendants selection of "internal" or "external" counsel does not make various long-standing protections from "sword-and-shield" defenses meaningless.

## Defendants' Objections to Plaintiff's Witness List

Defendants object to Plaintiffs' unduly lengthy list, of 38 "will call" and 7 "may call" witnesses, for four reasons summarized briefly below.  Defendants will request that the Court hold a pre-trial conference in advance of December 11, 2023 in order to address Plaintiff's unreasonable, impractical, and cumulative witness list.  Defendants intend to submit a letter to the Court further summarizing Defendants' objections to many of the witnesses on Plaintiff's extensive list.

*First*, Defendants object to Plaintiff calling at least 36 witnesses[1] to testify on the same topics as unnecessarily cumulative and a waste of the jury's, Court's, and parties' time under Rule 403.  Each of these witnesses is disclosed as someone who will testify about the following topics (exclusive of Mr. Cardwell):

---

[1] These witnesses are: Martin Dellacona, Renee DeSantis, Alicia Fabe, Carolina Fenner, Kathleen Ferrell, Byron Rooney, Monica Holland, Jill Sterner, Nicole Katz, Jason Kyrwood, Gar Bason Jr., Arthur Golden, Michael Davis, Lee Hochbaum, Louis Goldberg, Len Kreynin, John Butler, Francesca Campbell, Laura Turano, John Amorosi, Oliver Smith, James Rouhandeh, Neil Barr, Sharon Crane, Rocio Clausen, Sheila Adams, Larry Jacobs, Michael Flynn, Charles Duggan, Gina Caruso, Harold Birnbaum, Brian Wolfe, William Chudd, Maurice Blanco, Vanessa Jackson and Sophia Hudson. Defendants do not object to Plaintiff calling the individual defendants, Thomas Reid, John Bick, and Daniel Brass, on this basis.

- Davis Polk's operations and business model, including staffing, assigning, and/or the partnership (31 will calls, 5 may calls)

- Mr. Cardwell's job performance (13 will calls, 2 may calls)

- Experience working with Mr. Cardwell (11 will calls, 2 may calls)

- Defendants' knowledge and responses to Mr. Cardwell's complaints concerning discrimination and retaliation (10 will calls, 2 may calls)

- Defendant's knowledge of and reaction to Plaintiff's concerns and complaints (5 will calls)

- Instructions and communications related to the Firm's "Lawyer Review System" (10 will calls, 1 may call)

- Discrimination and retaliation committed at Davis Polk (10 will calls)

- Complaints and/or allegations of discrimination, retaliation, or other misconduct made by current or former employees of Defendants (10 will calls)

- Defendants' business, personnel and employment decisions, policies and practices (7 will calls)

- Mr. Cardwell's employment, staffing, performance and experiences (5 will calls)

- Aspects of Davis Polk's operations and business model, including staffing and performance reviews (3 will calls)

Plaintiff should not be permitted to call 36 witnesses, <u>all</u> to testify on these overly broad, and generalized topics, some of which have no or marginal relevance to his remaining claims and where testimony from 36 witnesses on these topics is unnecessarily cumulative and a waste of time.  Likewise, several of these witnesses have little to no relevance to Plaintiff's remaining claims, lack any percipient, first-hand knowledge, did not participate in any events in question, and/or whose sole involvement with anything related to Cardwell was as counsel to Davis Polk.[2] *E.g., United States* v. *Nouri*, 711 F.3d 129, 145 (2d Cir. 2013) (deeming district court "well within its discretion" to preclude testimony on customary commissions by brokerage firms where cumulative of other evidence at trial); *Tranchina* v. *McGrath*, 2022 WL 17491727, at *3 (2d Cir. Dec. 8, 2022) (finding no error in district court's exclusion of testimony that would "in principal part, have simply corroborated . . . earlier testimony"); *United States* v. *Bout*, 651 F. App'x 62, 64 (2d Cir. 2016) (upholding district court's exclusion of witness where it determined that the testimony would be needlessly cumulative of other witnesses' testimony and thus precluded under Fed. R. Evid. 403); *United States* v. *Atias*, 807 F. App'x 80, 82 (2d Cir. 2020) (upholding district court's exclusion of desired additional testimony where it was "no more than cumulative").  Defendants recognize that some of these witnesses have relevant, non-cumulative

---

[2] These witnesses are Monica Holland, Kathleen Ferrell, Byron Rooney, Larry Jacobs, Michael Flynn, Charles Duggan, Gina Caruso, James Rouhandeh, Jill Sterner, Neil Barr, Nicole Katz, and Frances Campbell.

testimony to offer, but Plaintiff should be limited in the number of these witnesses he can call. Defendants are entitled to defend against these claims based solely on admissible evidence for which a proper foundation has been laid; but that defense does not entitle Plaintiff to call cumulative and unnecessary, irrelevant witnesses.

*Second*, Defendants object to Plaintiff calling Charles Duggan, Michael Flynn, and Gina Caruso, as they serve and have only served as in-house counsel to Defendant Davis Polk in connection with this action, the administrative proceedings that preceded this action, and all issues related to Cardwell period. None of them had or has any other role as it relates to Cardwell; they did not work with or interact with Cardwell during his tenure at the Firm. These witnesses' testimony is therefore irrelevant for the reasons stated in Defendants' motions *in limine* nos. 6 and 8. The sole (yet undisclosed) purpose Plaintiff has in attempting to call them to testify would be to invade Defendants' attorney-client privilege, to unduly prejudice Defendants by attempting to make the jury draw improper inferences from their privilege assertions, *United States* v. *St. John*, 267 F. App'x 17, 22 (2d Cir. 2008) (citing *Nabisco, Inc.* v. *PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999)) (no precedent permits an adverse inference "based on the invocation of the attorney-client privilege"), and to testify on topics Defendants have asserted are protected from discovery by the attorney-client privilege and work product doctrine and which the Court has previously ruled Plaintiff was not permitted to discover because Plaintiff had not timely sought to challenge Defendants' privilege assertions. (ECF No. 241, 280.) Nor are Defendants using the attorney-client privilege as a sword and a shield.

*Third*, Defendants object to Plaintiff calling 11 undisclosed witnesses never properly disclosed under Rule 26(a)(1)(A) or Rule 26(e)(1).[3] These witnesses were not listed on any of Plaintiff's Rule 26(a)(1)(A)(i) initial disclosures, last supplemented on August 21, 2020, nearly 9 months before the close of fact discovery; nor were they made known in discovery as people Plaintiff may rely on to support his claims. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The burden of proof as to both exceptions falls on the non-disclosing party." *Quiles* v. *City of New York*, 2014 WL 1918635, at *2 (S.D.N.Y. May 8, 2014). Plaintiff should therefore be precluded from calling these witnesses at trial. *E.g.*, *Robinson* v. *N.Y.C. Transit Auth.*, 2020 WL 3619034, at *5 (S.D.N.Y. July 2, 2020); *Tirado v. Shutt*, 2015 WL 6866265, at *10 (S.D.N.Y. Nov. 9, 2015).

*Fourth*, Defendants object to Plaintiff calling Defendants' trial counsel, Susanna Buergel and Bruce Birenboim. Defendants have "expressly proffer[ed] that they are not relying on" an advice of counsel defense. Feb. 14, 2022 Hr'g Tr. (ECF No. 278) at 50:20-51:6. The Court further noted "there is no indication that defendants are relying on an advice of counsel defense" and that Plaintiff had not "identified any evidence which establishes that defendants are relying on counsel's advice." *Id.* Furthermore, trial counsel Ms. Buergel and Mr. Birenboim have no non-privileged, personal knowledge of any events in question; their testimony is irrelevant, likely to confuse the jury, and a waste of time. It is also an ill-disguised attempt to deprive Defendants of their choice of counsel. *Giuffre* v. *Dershowitz*, 410 F. Supp. 3d 564, 578 (S.D.N.Y. 2019)

---

[3] These witnesses are: Martin Dellacona; Kathleen Ferrell; Arthur Golden; James Rouhandeh; Neil Barr; Larry Jacobs; Michael Flynn; Charles Duggan; Gina Caruso; Susanna Buergel; and Bruce Birenboim.

("The advocate-witness rule prohibits an attorney from representing a party where the attorney will be called as a witness.") (citations omitted); *United States* v. *Bin Laden*, 91 F. Supp. 2d 600, 622 (S.D.N.Y. 2000) ("[L]awyers representing litigants should not be called as witnesses in trials involving those litigants if such testimony can be avoided consonant with the end of obtaining justice.") (citation omitted).  Nor are Defendants using the attorney-client privilege as a sword and a shield.

<u>Defendants' Trial Witnesses</u>

Defendants **will call** the following witnesses:

| Name | Method | Subject of Testimony |
| --- | --- | --- |
| Kaloma Cardwell | In person | Plaintiff will testify regarding his employment with Davis Polk, the alleged protected activities and alleged adverse employment actions, and Plaintiff's alleged damages. |
| Daniel Brass | In person | Mr. Brass will testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his communications with Plaintiff during Plaintiff's employment at Davis Polk, his experience working with Plaintiff, Plaintiff's job performance, the basis for Mr. Brass's view that Plaintiff was a poor performer, Mr. Brass's experience trying to staff Plaintiff while Mr. Brass was a staffing partner, the events leading up to the termination of Plaintiff's employment, and Plaintiff's alleged protected activities of which Mr. Brass has knowledge and the alleged adverse employment actions allegedly taken by Mr. Brass. |
| John Bick | In person | Mr. Bick will testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his communications with Plaintiff during Plaintiff's employment at Davis Polk, the performance review he delivered to Plaintiff in June 2016, Mr. Bick's knowledge of the alleged protected activities and the alleged adverse employment actions, and the events leading up to the termination of Plaintiff's employment, and Plaintiff's alleged protected activities of which Mr. Bick has knowledge and the alleged adverse employment actions allegedly taken by Mr. Bick. |
| Justin McCrary, Ph.D. | In person | Dr. McCrary will testify regarding law firm labor market characteristics, the "up-or-out" model, including at Davis Polk, and his opinions regarding Plaintiff's alleged compensatory damages (but not his opinions about alleged front pay or backpay damages) as set forth in |

| | | paragraphs 51 to 54 of his June 15, 2021 expert report (ECF No. 223-8). |
|---|---|---|
| Thomas Reid | In person | Mr. Reid will testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his communications with Plaintiff during Plaintiff's employment at Davis Polk, the January 2016 dinner he shared with Plaintiff and Sheila Adams, the March 2017 meeting with Plaintiff and Len Kreynin, Plaintiff's alleged protected activities of which Mr. Reid has knowledge and the alleged adverse employment actions allegedly taken by Mr. Reid, and the events leading up to the termination of Plaintiff's employment. |
| Sophia Hudson | In person | Ms. Hudson will testify regarding her experience working with Plaintiff, Plaintiff's job performance, the basis for Ms. Hudson's view that Plaintiff was a poor performer, and Ms. Hudson's June 2016 and September 2016 negative performance reviews of Plaintiff. |

Defendants identify below the witnesses that they **may call**, depending on whether, among other issues, there is a successful challenge to the admissibility of records concerning Plaintiff's job performance:

| Name | Method | Subject of Testimony |
|---|---|---|
| Sheila Adams | In person | Ms. Adams may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, the January 2016 dinner she shared with Plaintiff and Thomas Reid, and her communications with Plaintiff during and after Plaintiff's employment at Davis Polk. |
| John Amorosi | In person | Mr. Amorosi may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his communications with Plaintiff during Plaintiff's employment at Davis Polk, his experience working with Plaintiff, Plaintiff's job performance, the basis for Mr. Amorosi's view that Plaintiff was a poor performer, and Mr. Amorosi's October 2017 negative performance review of Plaintiff. |
| Harold Birnbaum | In person | Mr. Birnbaum may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his role as staffing coordinator for the M&A group, and his efforts to staff Plaintiff on M&A matters, and the |

| | | |
|---|---|---|
| | | difficulty he had staffing Plaintiff as a result of Plaintiff being a poor performer. |
| Maurice Blanco | In person | Mr. Blanco may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his communications with Plaintiff during Plaintiff's employment at Davis Polk, the process surrounding Plaintiff's interview to join the Firm, and the September 2015 meeting between the Diversity Committee and the Black Affinity Group. |
| John Butler | In person | Mr. Butler may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his experience working with Plaintiff, Plaintiff's job performance, and Mr. Butler's September 2016 performance review of Plaintiff, and the basis for Mr. Butler's view that Plaintiff was a poor performer. |
| William Chudd | In person | Mr. Chudd may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his experience working with Plaintiff, Plaintiff's job performance, Mr. Chudd's September 2015 performance review of Plaintiff, and the December 2015 annual review that Mr. Chudd delivered to Plaintiff. |
| Rocio Clausen | In person | Ms. Clausen may testify regarding her experience as the Professional Development Manager at Davis Polk during the relevant time period, aspects of Davis Polk's operations and business model, including staffing, assigning, and/or performance reviews, her communications with Plaintiff during Plaintiff's employment at Davis Polk, her knowledge of Plaintiff's request for feedback, and her efforts in September 2016 to staff Plaintiff on an assignment for the Credit practice group, and the discussion she had with Plaintiff regarding the same. |
| Sharon Crane | In person | Ms. Crane may testify regarding her role as Executive Director of Davis Polk during the relevant time period, aspects of Davis Polk's operations and business model, including staffing, assigning, and/or performance reviews, her communications with Plaintiff during Plaintiff's employment at Davis Polk, the May 2017 meeting she had with Plaintiff and Louis Goldberg, efforts that were taken to staff Plaintiff, and the events leading up to and around the termination of Plaintiff's employment. |

| Renee DeSantis | In person | Ms. DeSantis may testify regarding her role as Director/Chief of Professional Development during the relevant time period, aspects of Davis Polk's operations and business model, including staffing, assigning, and/or performance reviews, her communications with Plaintiff during Plaintiff's employment at Davis Polk, the September 2015 meeting between the Diversity Committee and the Black Affinity Group, the October 2016 meeting of the M&A partners at which Plaintiff's performance was discussed, and Plaintiff's March 2017 request to review his performance reviews. |
| --- | --- | --- |
| Carolina Fenner | In person | Ms. Fenner may testify regarding her role as a staffing coordinator, aspects of Davis Polk's operations and business model, including staffing, assigning, and/or performance reviews, her communications with Plaintiff during Plaintiff's employment at Davis Polk, her role soliciting performance reviews for Plaintiff, the difficulty she had staffing Plaintiff as a result of Plaintiff being a poor performer, and the draft talking points she prepared for Plaintiff's December 2016 review. |
| Louis Goldberg | In person | Mr. Goldberg may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his experience working with Plaintiff, Plaintiff's job performance, Plaintiff's May 2017 email that he "became ill," the May 2017 meeting he had with Plaintiff and Sharon Crane, Mr. Goldberg's October 2017 negative performance review of Plaintiff, the basis for Mr. Goldberg's review that Plaintiff was a poor performer, the January 2018 and February 2018 meetings he had with Plaintiff and Oliver Smith, and the events leading up to and around the termination of Plaintiff's employment. |
| Lee Hochbaum | In person | Mr. Hochbaum may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his experience working with Plaintiff, Plaintiff's job performance, the basis for Mr. Hochbaum's view that Plaintiff was a poor performer, the October 2016 meeting of the M&A partners at which Plaintiff's performance was discussed, and Mr. Hochbaum's September 2017 negative performance review of Plaintiff. |
| Vanessa Jackson | In person | Ms. Jackson may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, |

| | | |
|---|---|---|
| | | her communications with Plaintiff during his employment at Davis Polk, and her experience working with Plaintiff. |
| Len Kreynin | In person | Mr. Kreynin may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his experience working with Plaintiff, Plaintiff's job performance, the basis for Mr. Kreynin's view that Plaintiff was a poor performer, the October 2016 meeting of the M&A partners at which Plaintiff's performance was discussed, the December 2016 annual performance review that Mr. Kreynin delivered to Plaintiff, and the March 2017 meeting he had with Plaintiff and Thomas Reid. |
| Jason Kyrwood | In person | Mr. Kyrwood may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his experience working with Plaintiff, Plaintiff's job performance, and the May 2015 performance review that Mr. Kyrwood delivered to Plaintiff. |
| Phillip Mills | In person | Mr. Mills may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his experience working with Plaintiff, Plaintiff's job performance, Mr. Mills' October 2017 negative performance review of Plaintiff, and the basis for Mr. Mills' view that Plaintiff was a poor performer. |
| Oliver Smith | In person | Mr. Smith may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his experience working with Plaintiff, Plaintiff's job performance, the January 2018 and February 2018 meetings he had with Plaintiff and Louis Goldberg, and the events leading up to and around the termination of Plaintiff's employment. |
| Brian Wolfe | In person | Mr. Wolfe may testify regarding aspects of Davis Polk's operations and business model, including staffing, assigning, performance reviews, and/or the partnership, his role as staffing coordinator for the M&A group, his efforts to staff Plaintiff on M&A matters, and the difficulty he had staffing Plaintiff as a result of Plaintiff being a poor performer. |

Defendants reserve the right: (1) to supplement or amend their list of trial witnesses; (2) to call witnesses on rebuttal who are not identified in this joint pre-trial order based on the witnesses, testimony, and exhibits offered by Plaintiff; (3) not to call any person on this list; (4)

to call any persons identified by Plaintiff as a potential witness (without waiver of any objection to certain witnesses for any purpose); (5) to call custodians of records as may be necessary to establish the authenticity and admissibility of trial exhibits as business records; and (6) to introduce testimony by way of deposition transcript in the event that a witness becomes unavailable.

All of the witnesses on Defendants' "will call" and "may call" lists may be contacted through defense counsel.  Any other witness on Plaintiff's witness list, which Defendants have incorporated by reference, who is presently affiliated with Davis Polk or Paul, Weiss may be contacted through defense counsel.

<u>Plaintiff's Objections to Defendants' Witness List</u>

Plaintiff objects to Sophia Hudson's inclusion in Defendants' witness list, including for reasons detailed in his motion *in limine*. Plaintiff also objects to Defendants' inclusion of Justin McCrary, Ph.D. in its witness list, as Dr. McCrary does not have any relevant non-hearsay or non-unduly prejudicial  testimony to offer in Defendants' case-in-chief and does not have any knowledge about Plaintiff's health to provide testimony regarding plaintiff's compensatory damages. Defendants' are seeking to exclude witnesses who have direct knowledge of Defendants' staffing and performance review systems and replace such persons with an expert who they admit will discuss general, irrelevant, and prejudicial opinions about "law firm labor market[s]."

## X.   Deposition Designations

<u>Plaintiff's Designations</u>

Plaintiff submits the following designations of which he reserves the right to read in his case-in-chief in the event that a witness not appear live at trial upon receiving notice in accordance with this Order. Plaintiff reserves all rights to remove, modify, or supplement their designations prior to the end of his case in chief, and any counter-designations and objections thereto.

Plaintiff reserves all rights to object to any designations from Defendants and to counter any such designations. As further stated below, Plaintiff objects to Defendants' proposal regarding deposition and video designations.

| Deponent | Deposition Designation |
|---|---|
| Renee DeSantis | 28:7-16; 29:21-36:25; 42:10-12; 43:2-11; 46:16-25; 47:2-17; 50:14-25; 51:2-53:17; 60:13-23; 70:22-71:17; 71:21-72:6; 77:21 -78:2; 80:22- 81:20; 136:22-137:25; 138:2-139:15; 145:9-149:17; 150:2-151:6; 155:20-158:21; 162:18-164:23; 171:2-173:25; 179:19-181:23; 190:8-16; 191:3-11; 192:21-193:20; 204:2-206:23; 212:3-12; 257:15-24; 228:13-229:2; 229:7- 234:8; 257:25-258:4; 258:12-19; 276:16-25; 280:2-21; 295:25-298:22. |

| Sharon Crane | 46:9-50:11; 50:22-51:8; 53: 21-55:9; 56:4-58:16; 59:7-63:19; 68:18-80:13; 85:15-93:18; 96:7- 98:18; 100:11-102:11; 103:23-112:25; 117:12-119:23; 134:7- 138:3; 138:14-144:12; 159:9-165:5; 165:23-166:20; 167-18-169:18; 189:8- 193:14; 227:2-233:21; 234:6-235:3; 236:21- 242:3; 252:2-256:12; 257:21-260:16; 263:17- 264:4; 268:4-268 :19; 275:16-281:10; 282:6- 282:24; 283:15-288:8; 297:19; 301:14; 317:5- 319:23; 323:6-324:22; 325:7 -330:22. |
|---|---|
| Sophia Hudson | 41:4-44:25; 45:9-47:4; 49:5-17; 51:22-53:3; 54:17-55:10; 56:2-58:22; 133:2-10; 138:19-143:10; 153:3 -154:24; 155:18-159:11;160:4-161:5; 161:16-163:3; 176:4-24; 196:17-197:24; 198:17-24; 199:10-25; 200:2-7; 201:19-202:16; 203:11-207:23; 208:11-214:19; 215:11-218:19; 219:10-224:4; 226:2-228:14; 240:18-247:22; 249:21-250:12; 251:4-20 |
| Thomas Reid | 12:18-24; 31:4-17; 77:6-78:12; 132:12-133-7; 151:25-152:8; 156:14-157:6; 160:18-165:24; 181:12-17; 182:6-9; 186:21-187:16; 191:3-11; 215:8-218:24; 222:15-25; 237:3-19; 241:15-242:23; 253:9-16; 271:4-8; 283:5-285:10; 310:3-311:12; 313:17-314:14; 315:13-316:18 |
| John Bick | 11:3-11; 28:15-25; 31:4-25; 79:23-81:2; 109:24-110:16; 113:9-114:7; 115:25-117:12; 152:8-25; 184:25-185:8; 195:2-16; 196:10-15; 199:10-16; 200:16-25; 203:19-204:19; 225:20-226:7; 230:9-13; 247:8-12; 260:7-261:7; 268:14-270:14; 273:13-274:24; 284:23-286:15; 286:16-288:22; 293:3-294:25; 317:4-317; 326:10-329:12. |
| Harold Birnbaum | 61:5-10; 93:3-95:3; 96:3-17; 101:5-104:2; 109:3-20; 177:22-178:20; 188:2-19; 191:21-192:2; 194:19-195:11; 195:25-196:15; 267:4-24; 268:18-25; 273:13-17; 274:24-276:14; 308:16-331:2 |

## Defendants' Deposition Designations and Objections and Counter-Designations to Plaintiff's Deposition Designations

At this time, Defendants do not intend to offer any witness testimony via deposition designation because all deponents are expected to be available for live testimony. Defendants reserve all rights to offer deposition designations should a witness become unavailable. Defendants also reserve the right to use Plaintiff's deposition transcript and video "for any purpose," including for impeachment, as permitted by Fed. R. Civ. P. 32(a)(3).

Accordingly, subject to using a witness's deposition testimony for impeachment purposes during the witness's live testimony, Defendants object to Plaintiff's effort to use or admit deposition designations for any witness who is available to testify live at trial. *E.g.*, *Buchwald v. Renco Grp., Inc*., 2014 WL 4207113, at *2 (S.D.N.Y. Aug. 25, 2014) ("the preference for live testimony" is "dictated by both common sense and Second Circuit case law") (citing *Napier v. Bossard*, 102 F.2d 467, 469 (2d Cir. 1939) ("The deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand.")). That rule is particularly apt here, where Plaintiff did not videotape any deposition. If the Court nevertheless permits Plaintiff to use deposition in lieu of live testimony, Defendants submit herewith objections to Plaintiff's deposition designations and limited counter-designations for completeness. Appendix 3 attached hereto also provides Defendants' objection codes.

| **Renee DeSantis – April 15, 2021** |
|---|

| Range | Objection/Counter Designation |
|---|---|
| 29:21 - 35:8 | 402 |
| 31:20 - 32:18 | O |
| 33:3 - 34:4 | O |
| 43:2 - 43:11 | 106 |
| 43:6 - 43:12 | 104a |
| 43:12 - 43:12 | Counter Designation |
| 47:6 - 47:17 | 104a, 602, 106 |
| 51:12 - 52:8 | MIL |
| 53:10 - 53:17 | 402 |
| 60:8 - 60:12 | Counter Designation |
| 60:13 - 60:23 | MIL, 402, 403 |
| 70:22 - 71:17 | MIL, 402, 403 |
| 71:21 - 72:6 | MIL, 402, 403 |
| 77:21 - 78:2 | MIL, 402, 403 |
| 80:18 - 80:21 | Counter Designation for completeness |
| 80:22 - 81:20 | 106, MIL, 402, 403 |
| 81:21 - 81:21 | Counter Designation for completeness |
| 136:22 - 137:15 | 602 |
| 137:19 - 138:14 | 602, MIL, 402, 403 |
| 139:11 - 139:15 | MIL, 402, 403 |
| 145:9 - 145:19 | MT |
| 146:5 - 146:16 | MT, A |
| 147:7 - 149:17 | 602, A |
| 156:6 - 157:3 | 802 |
| 157:12 - 158:21 | 802 |
| 163:8 - 163:23 | MT |
| 171:3 - 173:4 | MIL, 802, 402, 403 |
| 180:9 - 181:6 | 802 |
| 190:8 - 190:16 | MT, 403 |
| 192:21 - 193:20 | MT, 403, 104a |
| 204:19 - 206:23 | 104a, 602, 802 |
| 206:24 - 207:3 | Counter Designation for completeness |
| 212:3 - 212:12 | 106, 602, 802, 104a |
| 212:13 - 212:13 | Counter Designation for completeness |
| 228:13 - 229:2 | 106 |
| 229:3 - 229:5 | Counter Designation for completeness |
| 230:13 - 230:16 | MT |
| 231:8 - 231:11 | MT |
| 233:18 - 234:8 | 602, 104a |
| 257:13 - 257:14 | Counter Designation for completeness |
| 257:13 - 257:24 | 106 |
| 276:11 - 276:15 | Counter Designation for completeness |

| | |
|---|---|
| 276:16 - 276:25 | 106, CD |
| 277:2 - 277:7 | Counter Designation for completeness |
| 279:25 - 279:25 | Counter Designation for completeness |
| 280:2 - 280:21 | 106, MIL, 402, 403 |
| 296:8 - 296:19 | 104a |
| 296:15 - 296:19 | 602 |
| 297:8 - 297:11 | 104a, AA |
| 298:6 - 298:22 | 104a |

| Sharon Crane – April 8, 2021 | |
|---|---|
| **Range** | **Objection/Counter Designation** |
| 47:18 - 47:25 | MT |
| 49:21 - 50:4 | MT |
| 50:5 - 50:11 | 106 |
| 50:12 - 50:12 | Counter Designation for completeness |
| 50:22 - 51:8 | MIL, 402, 403 |
| 53:21 - 55:9 | MIL, 402, 403 |
| 57:5 - 58:16 | MIL, 402, 403 |
| 59:7 - 63:19 | MIL, 402, 403, Best Evidence |
| 61:6 - 61:21 | V, MT |
| 68:18 - 80:13 | MIL, 402, 403, 104a, 602 |
| 75:16 - 76:15 | A, Not Testimony |
| 77:3 - 77:13 | O |
| 78:8 - 78:15 | O |
| 85:15 - 85:23 | A, 103 |
| 86:19 - 87:3 | 402, 403, A |
| 89:7 - 90:2 | MT |
| 90:9 - 90:22 | 402, 403 |
| 91:15 - 91:17 | 402, 403 |
| 93:5 - 93:18 | MIL, 402, 403 |
| 96:5 - 96:6 | Counter Designation for completeness |
| 96:7 - 96:10 | 106 |
| 96:20 - 97:24 | 802 |
| 101:11 - 102:11 | 403, AA |
| 104:17 - 106:23 | 104a, 602, AA, 403 |
| 107:17 - 112:25 | 402, 403, 602, AA, 104a |
| 118:4 - 119:23 | 104a, 602, 402, 403 |
| 135:11 - 138:3 | 802, 805, 402, 403 |
| 137:9 - 137:14 | MT |
| 139:5 - 139:15 | 805 |
| 139:19 - 140:3 | 602 |
| 142:9 - 142:17 | MT |

| | |
|---|---|
| 143:3 - 143:10 | 403 |
| 143:11 - 143:21 | MT |
| 161:11 - 163:14 | 402, 403 |
| 164:4 - 164:18 | 802 |
| 166:3 - 166:20 | 805 |
| 167:22 - 169:17 | 805 |
| 189:8 - 193:14 | MIL, 402, 403 |
| 189:21 - 190:12 | 402, 403 |
| 228:19 - 233:21 | 104a, 602, 403 |
| 230:14 - 230:21 | V, A |
| 230:22 - 231:25 | MIL, 402, 403, 103, A |
| 233:11 - 233:21 | MT |
| 234:13 - 235:3 | CD, V |
| 236:21 - 238:10 | 602, 106, 103 |
| 238:11 - 238:24 | MT |
| 238:25 - 239:15 | V, CD |
| 240:7 - 241:7 | MIL, 402, 403, 602 |
| 241:8 - 241:15 | MT |
| 255:16 - 255:21 | 402, 403, 104a, 602 |
| 257:21 - 260:16 | 104a, 403, AA |
| 258:12 - 258:24 | 403, A, AA |
| 260:2 - 260:11 | MT, A |
| 263:17 - 264:4 | 104a |
| 268:4 - 268:19 | 104a |
| 276:17 - 276:22 | 602 |
| 277:7 - 277:16 | 602, AA |
| 277:17 - 277:22 | 802 |
| 278:5 - 278:16 | 602, A, AA |
| 278:17 - 278:25 | 602, A, AA |
| 279:2 - 279:9 | 805 |
| 280:14 - 281:10 | 104a |
| 282:6 - 282:13 | 805 |
| 282:14 - 282:24 | 104a |
| 282:22 - 282:24 | 106, 403 |
| 283:15 - 284:8 | CC, 104a |
| 284:9 - 284:16 | 104a |
| 285:4 - 285:11 | 104a, Mischaracterizes the Document, Best Evidence |
| 285:24 - 286:19 | 802 |
| 286:20 - 287:7 | MT, 802, 103, A |
| 287:20 - 288:8 | CD |
| 298:5 - 298:7 | 802 |
| 300:9 - 300:22 | A, AA |
| 300:23 - 301:14 | A, AA, CD |

| 317:5 - 319:23 | 402, 403 |
| 318:7 - 318:11 | V |
| 323:6 - 324:16 | 402, 103, Mischaracterizes the Record, 403 |
| 325:7 - 325:25 | 402, 403 |
| 326:2 - 327:20 | MIL, 402, 403, 104a, 602 |
| 327:21 - 328:21 | CC, A, CD |
| 329:15 - 329:23 | AA |

| Sophia Hudson – April 14, 2021 | |
|---|---|
| **Range** | **Objection/Counter Designation** |
| 41:4 - 44:25 | MIL, 402, 403 |
| 45:9 - 47:4 | 106 |
| 45:9 - 45:17 | 104a |
| 47:5 - 47:9 | Counter Designation for completeness |
| 49:5 - 49:17 | MIL, 402, 403, 104a |
| 51:22 - 53:3 | MIL, 402, 403, 104a, Best Evidence |
| 54:17 - 54:20 | CD |
| 54:17 - 55:10 | MIL, 402, 403 |
| 56:2 - 58:22 | MIL, 402, 403, Best Evidence, 104a |
| 140:10 - 140:15 | 104a, 103 |
| 141:20 - 142:4 | 602; 104a |
| 153:6 - 154:5 | A, Not Testimony |
| 154:7 - 154:17 | A, Not Testimony |
| 157:9 - 158:15 | A, Not Testimony |
| 160:4 - 160:18 | 602 |
| 161:16 - 161:21 | V |
| 163:4 - 163:18 | Counter Designation for completeness |
| 176:4 - 176:24 | 106 |
| 176:25 - 177:5 | Counter Designation for completeness |
| 196:12 - 196:16 | Counter Designation for completeness |
| 196:17 - 197:24 | 106 |
| 197:2 - 197:13 | 802 |
| 197:8 - 197:24 | AA |
| 198:17 - 198:24 | 104a, 103 |
| 199:10 - 199:25 | 104a, 602, AA |
| 200:2 - 200:7 | 104a, 602, AA |
| 201:19 - 202:16 | MIL, 402, 403 |
| 201:19 - 201:24 | 602 |
| 205:9 - 206:9 | 602 |
| 206:10 - 207:14 | 104a, 602, 403 |
| 206:24 - 207:14 | AA |
| 207:15 - 207:23 | AA |

| 208:11 - 208:15 | V |
|---|---|
| 210:3 - 210:15 | A, Not Testimony |
| 210:16 - 210:22 | 402, 403 |
| 210:23 - 211:2 | 402, 403, MIL |
| 211:3 - 211:5 | 602 |
| 211:7 - 214:19 | MIL, 402, 403, A, Not Testimony |
| 217:7 - 218:5 | MIL, 402, 403, Not Testimony |
| 218:11 - 218:19 | 402, 403 |
| 219:10 - 222:4 | 104a, 402, 403, 802 |
| 223:5 - 223:14 | MT, 802 |
| 226:2 - 228:14 | 402, 802, MT |
| 241:24 - 243:23 | 602, MT |
| 246:7 - 246:13 | AA |
| 246:14 - 246:21 | MT, A, 403 |
| 250:22 - 251:3 | Counter Designation for completeness |
| 251:4 - 251:20 | 106 |

| Thomas Reid – April 16, 2021 | |
|---|---|
| **Range** | **Objection/Counter Designation** |
| 12:18 - 13:3 | Counter Designation for completeness |
| 12:18 - 12:24 | 106, MIL |
| 77:6 - 78:21 | Counter Designation for completeness |
| 77:6 - 78:12 | 106 |
| 78:5 - 78:9 | MIL |
| 132:17 - 132:20 | MIL |
| 162:20 - 163:2 | 802 |
| 165:12 - 165:21 | 802 |
| 181:7 - 181:17 | Counter Designation for completeness |
| 181:12 - 181:17 | 106 |
| 181:25 - 182:12 | Counter Designation for completeness |
| 182:6 - 182:9 | 106 |
| 186:15 - 187:16 | Counter Designation for completeness |
| 186:21 - 187:16 | 106 |
| 191:3 - 191:11 | 104a |
| 215:17 - 215:24 | MIL |
| 219:3 - 219:6 | Counter Designation for completeness |
| 219:10 - 219:13 | Counter Designation for completeness |
| 222:15 - 223:3 | Counter Designation for completeness |
| 222:15 - 222:25 | 106 |
| 241:7 - 242:23 | Counter Designation for completeness |
| 241:15 - 242:23 | 106 |
| 253:9 - 253:16 | 104a |

| 271:4 - 271:8 | MIL |
| 282:21 - 285:10 | Counter Designation for completeness |
| 283:5 - 285:10 | 106 |
| 283:5 - 284:15 | 602 |
| 310:11 - 310:16 | V |
| 313:17 - 314:14 | V |
| 316:5 - 316:18 | MT |

| John Bick – April 13, 2021 ||
| Range | Objection/Counter Designation |
| --- | --- |
| 10:20 - 11:11 | Counter Designation for completeness |
| 11:3 - 11:11 | 106, MIL, 402, 403 |
| 30:24 - 31:25 | Counter Designation for completeness |
| 31:4 - 31:25 | 106 |
| 79:23 - 80:9 | 104a |
| 81:3 - 81:12 | Counter Designation for completeness |
| 109:24 - 110:5 | A |
| 116:10 - 116:18 | 602, MT, A |
| 151:19 - 153:8 | Counter Designation for completeness |
| 152:8 - 152:25 | 106 |
| 152:8 - 152:16 | 802 |
| 194:23 - 195:16 | Counter Designation for completeness |
| 195:2 - 195:16 | 106 |
| 196:10 - 196:15 | 104a |
| 200:16 - 201:11 | Counter Designation for completeness |
| 200:16 - 200:25 | 106, 104a |
| 225:20 - 226:7 | 104a |
| 225:25 - 226:3 | 802 |
| 230:9 - 230:13 | MIL |
| 247:6 - 248:2 | Counter Designation for completeness |
| 247:8 - 247:12 | 106 |
| 259:25 - 260:6 | Counter Designation for completeness |
| 260:7 - 261:7 | 106 |
| 268:14 - 270:14 | 106 |
| 270:15 - 270:22 | Counter Designation for completeness |
| 273:13 - 273:22 | MIL, 802 |
| 273:23 - 274:4 | 402 |
| 274:25 - 275:3 | Counter Designation for completeness |
| 284:23 - 285:18 | 104a |
| 286:5 - 286:8 | MIL |
| 286:23 - 287:11 | 602, V |
| 287:19 - 288:22 | MIL, 402, 403 |

| 292:5 - 293:2 | Counter Designation for completeness |
|---|---|
| 293:3 - 294:25 | 106 |
| 294:5 - 295:11 | 104a, 602 |
| 295:2 - 295:11 | Counter Designation for completeness |
| 316:7 - 317:3 | Counter Designation for completeness |
| 317:4 - 317:16 | 106 |
| 328:11 - 329:12 | AA, 403 |

| Harold Birnbaum – April 12, 2021 ||
|---|---|
| **Range** | **Objection/Counter Designation** |
| 93:3 - 94:16 | 104a |
| 96:7 - 96:11 | 802 |
| 103:4 - 103:11 | V |
| 103:13 - 104:2 | Counter Designation for completeness |
| 109:3 - 109:20 | MIL |
| 177:22 - 178:4 | 104a, 802 |
| 191:21 - 192:2 | 802 |
| 194:7 - 194:18 | Counter Designation for completeness |
| 194:19 - 195:11 | 106 |
| 195:21 - 196:15 | Counter Designation for completeness |
| 195:25 - 196:15 | 106 |
| 268:18 - 268:25 | 106 |
| 269:1 - 269:2 | Counter Designation for completeness |
| 273:13 - 273:17 | 402 |
| 308:16 - 331:2 | MIL, 402, 403 |
| 316:17 - 317:2 | CD |
| 329:7 - 329:20 | A |
| 329:22 - 331:2 | A, CD |

<u>Plaintiff's Objections</u>

Plaintiff's objects to Defendants using deposition transcripts and videos that were not designating and provided to Plaintiff by the Court-ordered September 5, 2023 deadline, unless such transcripts and video are used only for impeachment purposes and accordance with all Federal Rules of Civil Procedure. Defendants chose not to provide any designations by the Court ordered September 5, 2023 deadline, or to give Plaintiff any opportunity to review their designations and provide counter-designations and objections.

Plaintiff reserves all rights to object to any designations from Defendants and to counter any such designations. Plaintiff objects to Defendants' request to use Plaintiff's deposition transcript and video "for any purpose." Plaintiff also objects to any use of deposition video if Plaintiff is not provided with a transcript that corresponds exactly to the edited or unedited video and if Plaintiff is not given four calendar days' advance notice to (i) make objections and have such objections resolved, (ii) review the final video clip and the final video clip designation print

out of the clip to be played to the jury and (iii) meet and confer as necessary to ensure that the final clip played conforms with the parties' stipulation and the Court's rulings. Plaintiff further objects to any video deposition clips of designated testimony for Plaintiff that is not in the order of the testimony in the deposition.

## XI.      Trial Exhibits

<u>Plaintiff's Trial Exhibit List and Defendants' Objections</u>

Plaintiff's list of exhibits he may seek to offer into evidence at trial, except exhibits to be used for impeachment only, is attached hereto as **Appendix 1**.  **Appendix 1** also contains Plaintiff's objections to Defendants' Trial Exhibits.

Plaintiff's inclusion of an exhibit on the list in Appendix 1 does not represent a concession by Plaintiff that the exhibit is in fact admissible at trial. Plaintiff reserves the right to (1) amend, modify, and/or supplement this list at any time, including during trial, and including for impeachment and rebuttal purposes; (2) use and/or seek the admission of any exhibit in Defendants' trial exhibit list; (3) rely on any document relied upon by Defendants' expert, and any table, summary, or work product prepared by Defendants' expert; and (4) generate and use demonstratives, including those that summarize or highlight particular documents from this exhibit list.  Plaintiff reserves the right to introduce documents listed through any appropriate witness, including those identified in this exhibit list.

To the extent that Defendants seeks to use items included on this exhibit list, Plaintiff does not waive his right to object to Defendants' attempt to use such documents.  Nothing in this exhibit list shall be construed as an admission that any document is admissible by its mere presence on this list.  Defendants object to the use of any document at trial without a sponsoring witness.

Defendants reserve the rights to amend or modify their objections, including because Plaintiff did not provide Defendants with copies of his trial exhibits before this filing was due. By not objecting to an exhibit, Defendants do not agree to "pre-admit" such exhibit.  Defendants object to the admission of any exhibit into evidence without the laying of a proper foundation from a sponsoring witness with personal knowledge.

<u>Defendants' Trial Exhibit List and Plaintiffs' Objections</u>

Defendants' list of exhibits they may seek to offer into evidence at trial, except exhibits to be used for impeachment only, is attached hereto as **Appendix 2**.  **Appendix 2** also contains Defendants' objections to Plaintiff's Trial Exhibits.

A key to Defendants' objection codes used for objecting to Plaintiff's exhibits is attached hereto as **Appendix 3**.

Defendants' inclusion of an exhibit on the list in Appendix 2 does not represent a concession by Defendants that the exhibit is in fact admissible at trial.  Defendants reserve the right to (1) amend, modify, and/or supplement this list at any time, including during trial, and

including for impeachment and rebuttal purposes; (2) use and/or seek the admission of any exhibit in Plaintiff's trial exhibit list; (3) rely on any document relied upon by Defendants' expert, and any table, summary, or work product prepared by Defendants' expert; and (4) generate and use demonstratives, including those that summarize or highlight particular documents from this exhibit list. Defendants reserve the right to introduce documents listed through any appropriate sponsoring witness, including those identified in this exhibit list.

Defendants' inclusion of documents on this exhibit list and production of listed documents shall not alter confidentiality designations for those documents. To the extent any of the documents listed are offered at trial, Defendants anticipate that the parties and the Court will agree on a process for further addressing confidentiality issues.

To the extent that Plaintiff seeks to use items included on this exhibit list, Defendants do not waive their right to object to Plaintiff's attempt to use such documents. Nothing in this exhibit list shall be construed as an admission that any document is admissible without a sponsoring witness who can lay a proper foundation and otherwise establish a document's admissibility under applicable rules. Defendants object to the use of any document at trial without a sponsoring witness.

Plaintiff reserves the right to amend or modify his objections to Defendants' list, including because Defendants provided Plaintiff with their exhibits on September 20, 2023 and because this joint pretrial order details several mutually agreeable mechanisms for the parties to update their exhibit lists. By not objecting to an exhibit on Defendants' list, Plaintiff does not agree to "pre-admit" such exhibit. Plaintiff objects to the admission of any exhibit into evidence whose admissibility has not been established under applicable rules.

Parties' Agreed-Upon Trial Exhibit Processes and Procedures

The parties' exhibit lists include the exhibit number to be used at trial and a description sufficient to identify the exhibit to the other party, such as by bates production number. The parties agree that any description of an exhibit is for convenience only and shall not be deemed an admission or otherwise used as evidence.

Each party may offer an exhibit listed on the other party's exhibit list, even if not set forth on its own exhibit list. The listing of an exhibit by a party on its own exhibit list is not an admission that such document is relevant or admissible when offered by the opposing party, and does not waive any evidentiary or other objection by that party should the opposing party seek to offer it into evidence; all such objections are preserved.

Once admitted, an exhibit may be used equally by any party, subject to any limitations as to its admission into evidence, motions *in limine*, and/or other evidentiary objections. Nothing herein shall be construed as a stipulation or admission that any admitted exhibit is entitled to any weight in deciding the merits of the case.

To the extent any party makes any additions, deletions or other modifications to its exhibit list, such party will reasonably promptly serve an updated exhibit list to the other side

along with pre-marked, numbered electronic copies of any exhibits that were not previously on the exhibit list, if any.

Before the first day of trial, the parties will submit to the Court updated copies of their exhibit lists. Such lists will contain all of the exhibits that the parties may use at trial, other than exhibits used solely for impeachment. Other than exhibits used solely for rebuttal, exhibits not listed will not be admitted into evidence unless the parties agree or the Court determines that good cause is shown for their admission and for their non-inclusion on an exhibit list.

To the extent a party objects to the admission of an exhibit, the parties will work in good faith to resolve any objections prior to the Pretrial Conference on December 11, 2023, and may submit any outstanding objections at the Pretrial Conference. The parties shall raise any remaining exhibit disputes to the Court at the beginning of each trial day. The parties anticipate that some exhibit objections will be resolved by the Court's resolution of motions *in limine*.

As to authenticity of exhibits, Plaintiff proposes the parties agree that any exhibit that on its face appears to have been authored, created, or received by any individual party or partner of Davis Polk or an employee, officer, director, counsel, or agent of any party shall be *deemed prima facie* authentic, subject to the right of the party against whom such exhibit is offered to adduce evidence to the contrary. Plaintiff does not agree to Defendants' proposal, including because Defendants are simultaneously working to shorten the length of trial and exclude witnesses who authored material emails and documents. Defendants are willing to agree to a more narrow framework—that any exhibit that on its face appears to have been authored or created by any individual party (for the avoidance of doubt, Cardwell, Reid, Bick or Brass) or an officer, director, or a partner of Davis Polk, shall be deemed *prima facie* authentic, subject to the right of the party against whom such exhibit is offered to adduce evidence to the contrary.

Plaintiff objects to any demonstrative exhibits being used in the parties' opening statements.

## XII.    Damages

Plaintiff's Statement

Plaintiff contends compensatory damages, punitive damages, and attorneys' fees and costs are warranted, as well as further legal and equitable relief as this Court deems necessary, just, and proper. Plaintiff submits that if no evidence related to alleged frontpay or backpay damages should be or is allowed to be submitted to or discussed in the presence of the jury, then no evidence, questioning, or testimony related to Cardwell's actual or alleged failure to mitigate damages should be submitted to the jury or discussed in the presence of the jury.

Compensatory Damages. Under Title VII, compensatory damages are statutorily capped. Under Section 1981, NYSHRL, and NYCHRL, compensatory damages are not capped. 42 U.S.C. 1981a(b)(3) ("Nothing in this section shall be construed to limit the scope of, or the relief available under, section 1981 of this title"); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 798

(8th Cir. 2004) ("[I]n making the decision to limit damages in Title VII cases, Congress made the implicit judgment not to limit damages in § 1981 cases.")

There is no exact standard for fixing the compensation to be awarded for these elements of damage, but emotional distress damages can be supported by "other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress . . . or the objective circumstances of the violation itself." *See Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002).

Punitive Damages. Punitive damages are statutorily capped under Title VII, but can be awarded against each defendant without such caps under Section 1981, NYSHRL, and NYCHRL. 42 U.S.C. 1981a(b)(3)-(4); NYS Executive Law § 297(4)(c); N.Y. Admin. Code. § 8-502(a); *Antoine v. Brooklyn Maids 26, Inc*., 489 F.Supp.3d 68, 101 (E.D.N.Y. 2020) ("The NYCHRL . . . imposes no limit on the amount of punitive damages a court may award.")

Under Title VII and Section 1981, punitive damages are available where plaintiff "present[s] evidence that the employer discriminated (or retaliated) against him with 'conscious knowledge it was violating the law,' or that it engaged in 'egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn.'" *Tepperwein v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 573 (2d Cir. 2011) (quoting *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 102 (2d Cir. 2001)). The Supreme Court has specified that the "terms 'malice' and 'reckless indifference' pertain not to the employer's awareness that it is engaging in discrimination, but to its knowledge that it may be acting in violation of federal law." *See Koldstadt v. Am. Dental Ass'n*, 527 U.S. 526, 527 (1999). In other words, the Supreme Court held that plaintiffs are not required to show egregious or outrageous discrimination in order to recover punitive damages under Title VII.

Unlike the Title VII, and "[i]In contrast to the approach in *Kolstad*," the NYCHRL "requires neither a showing of malice or awareness of the violation of a protected right, representing the lowest threshold, and the least stringent form, for the state of mind required to impose punitive damages." *See Chauca v. Abraham*, 30 N.Y.3d 325, 333. "[T]he standard for determining punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Id*. at 334; *see also Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 201 (1990).

"Punitive damages, in contrast to compensatory damages, are awarded to punish a defendant for wanton and reckless or malicious acts and to protect society against similar acts." *Rivera v. City of New York*, 836 N.Y.S.2d 108, 117 (1st Dep't 2007). Moreover, the Second Circuit has recognized that "[a]wards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct. Nor is there any formula to determine the dollar amount needed to effectuate deterrence." *See Payne v. Jones*, 711 F.3d 85, 93 (2nd Cir. 2013). The Second Circuit has also recognized that "[w]hen the compensable injury was small but the reprehensibility of the defendant's conduct was great, the ratio of a reasonable punitive award to the small compensatory award will necessarily be very high." *Id*. at 102.

Nominal Damages. A jury could award Plaintiff nominal damages to establish that Defendants violated the law and Plaintiff's rights, and punitive damages can be awarded based on nominal damages. *See Bryce v. Wilde*, 333 N.Y.S.2d 614, 616 (3d Dep't 1972); *Erebia v. Chrysler Plastic 14 Products Corp.*, 772 F.2d 1250, 1259 (6th Cir.1985) (under 1981, award of nominal damages proper in absence of absent proof of compensable injury).

Defendants' Statement

Defendants seek that the case be dismissed in its entirety with prejudice, and that judgment entered in favor of Defendants.

Defendants object to Plaintiff's "statement of damages" because it does not comply with the Court's Individual Rule of Practice 5.A.xi, which requires the Plaintiff to provide "A statement of the damages claimed and any other relief sought, including the manner and method used to calculate any claimed damages and a breakdown of the elements of such claimed damages."

Defendants submit that no evidence related to alleged frontpay or backpay damages should be submitted to the jury because such damages claims have been dismissed.  Plaintiff's claim for compensatory and punitive damages under Title VII is statutorily capped at $300,000.  The Title VII cap is routinely used as a benchmark for appropriate punitive damages under Section 1981, the NYSHRL, and the NYCHRL.  *See Thomas* v. *iStar Fin., Inc.*, 508 F. Supp. 2d 252, 263 (S.D.N.Y. 2007) (NYCHRL); *Kauffman* v. *Maxim Healthcare Servs., Inc.*, 509 F. Supp. 2d 210, 220–21 (E.D.N.Y. 2007) (Section 1981).

## XIII.   Unanimous Verdict

Not all parties consent to less than a unanimous verdict.

DATED:  September 22, 2023

By  /s/ David Jeffries
  David Jeffries
  David Jeffries Attorney at Law
  1345 6th Avenue
  Ste 33rd Floor
  New York, NY 10019
  Telephone: 212-601-2770
  Facsimile: 212-729-7490
  djeffries@jeffrieslaw.nyc

  *Attorney for Plaintiff*


By  /s/ Jeh C. Johnson
  Bruce Birenboim
  Jeh C. Johnson
  Susanna M. Buergel
  PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
  1285 Avenue of the Americas
  New York, New York 10019
  Telephone:  (212) 373-3000
  Facsimile:  (212) 757-3990
  bbirenboim@paulweiss.com
  jjohnson@paulweiss.com
  sbuergel@paulweiss.com

  Martha L. Goodman
  PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
  2001 K Street, NW
  Washington, DC 20006-1047
  Telephone:  (202) 223-7341
  Facsimile:  (202) 330-5921
  mgoodman@paulweiss.com

  *Attorneys for Defendants*